UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HENRY G. PORTERFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO: 2:05-cv-937-F |
| | ) | |
| | ) | |
| FLOWERS BAKING CO. OF | ) | |
| OPELIKA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

I.    INTRODUCTION

In his Complaint, Plaintiff, a former independent bakery distributor of Defendant, asserts

the following claims:  (1) breach of contract; (2) fraudulent misrepresentation; (3) negligence;

(4) wantonness; and (5) conversion.  All of Plaintiff's claims relate to his contentions that he was

wrongfully barred from Defendant's property, that his Distributor Agreement with Defendant

was thereafter wrongfully terminated, and that Defendant provided him certain alleged "out-of-

code" products for distribution to his customers.[1]

Defendant seeks summary judgment on all of Plaintiff's claims, principally on the

following grounds:

1.    Plaintiff's breach-of-contract claims fail because: a) his Distributor Agreement

was terminated in accordance with its terms after he was kicked out of an account for repeated

service issues; b) Plaintiff made no attempt whatsoever to have someone pick up his products for

---

[1] As discussed further below, the alleged "out-of-code" products at issue in the instant case involve limited
restaurant products that Defendant puts in it its freezers for use in emergency situations, such as when a Burger King
account calls at night and says they need additional buns immediately due to unanticipated demand.

1

delivery after being barred from Defendant's premises for apparently threatening a Company management official; c) the product from the freezer was not "out-of-code" and used only for limited, emergency situations; and d) Plaintiff accepted the benefits of distributing products from the freezer for years, financial and otherwise, and he suffered no damages as a result.

2.      Plaintiff's fraudulent misrepresentation claims fail because: a) such claims are not independent from the provisions in the parties' Distributor Agreement; b) Plaintiff cannot establish the requisite elements of fraud; c) such claim concerning alleged "out-of-code" product is barred by the applicable statute of limitations; and d) such claim concerning alleged "out-of-code" product is barred by the doctrine of waiver and/or estoppel and because Plaintiff has suffered no damages.

3.      Plaintiff's claims of negligence, wantonness, and conversion are not actionable for essentially the same reasons his misrepresentation claims fail.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Flowers Baking Co. of Opelika, LLC ("Flowers")

4.      Flowers, headquartered in Opelika, Alabama, bakes and/or distributes various baked goods throughout west Georgia and central and south Alabama. (Bordeaux Decl. ¶ 2, Tab A.)[2]

5.      Flowers distributes such bakery products primarily through a direct-store-delivery ("DSD") system, *i.e.,* directly to retail accounts such as grocery stores, restaurants, and fast food businesses.  (Bordeaux Decl. ¶ 3, Tab A.)  This DSD system is comprised principally of a network of independent distributors (Bordeaux Decl. ¶ 3, Tab A.)  Plaintiff was a distributor for Flowers.  (Pl. Dep. p. 331, lines 3-6, Tab B.)

---

[2]   The declarations, excerpts of deposition testimony, and other record evidence Flowers relies upon are being filed concurrently herewith with Defendant's Evidentiary Submission in Support of its Motion for Summary Judgment. The record evidence cited can be located behind the referenced "Tab."

6.      Flowers' brands include Nature's Own, Cobblestone Mill, and BlueBird. (Bordeaux Decl. ¶ 4, Tab A.)  Flowers, through its distributors, also distributes non-Flowers' brands to fast food and other restaurant accounts such as Burger King, Sonic, Krystal, Outback, and Chick-fil-A.  (Bordeaux Decl. ¶ 4, Tab A.)

7.      Flowers is a subsidiary of Flowers Foods, Inc., which is headquartered in Thomasville, Georgia.  Flowers Foods is the parent company of numerous other baking subsidiaries.  (Bordeaux Decl ¶ 5, Tab A.)  Flowers is organized as a limited liability company and operates as its own profit and loss center.  (Bordeaux Decl. ¶ 5, Tab A.) Day-to-day decisions regarding Flowers' distributors are made by Flowers' management personnel, not by Flowers Foods' management.  (Bordeaux Decl. ¶ 5, Tab A.)

**B.      Flowers' Distributorship Program**

8.      In 1994, Flowers began utilizing independent distributors to distribute bakery products, instead of employee route salespersons.  Under this business model, distributors are sold distribution rights to certain branded products of Flowers in a defined geographical area.  (Bordeaux Decl. ¶ 6, Tab A.)  The business model is premised on the belief that an independent distributor who owns distribution rights, with a vested equity interest, will have more entrepreneurial incentive than an employee to develop the business and generate additional sales.  (Bordeaux Decl. ¶ 6, Tab A.)

9.      Other subsidiaries of Flowers Foods had implemented the distributorship model prior to Flowers in 1994.  (Bordeaux Decl. ¶ 7, Tab A.)  Certain other major bakers also utilize this business model, including George Weston and Sara Lee. (Bordeaux Decl. ¶ 7, Tab A.)

**C.**    <u>**Plaintiff's Employment Relationship with Flowers**</u>

10.    Prior to becoming an independent distributor for Flowers, Plaintiff was a Flowers employee, working as a route salesperson.  (Pl. Dep. p. 90, lines 16-20, Tab B.)

11.    Steve Bordeaux, Flowers' current President, hired Plaintiff.  (Pl. Dep. p. 85, lines 20-23, p. 86, lines 13-17, Tab B.)

**D.**    <u>**Plaintiff's 1994 Distributor Agreement with Flowers**</u>

12.    In 1994, Plaintiff executed his first Distributor Agreement with Flowers, pursuant to which he became an independent distributor.  (Pl. Dep. p. 95, line 9 to p. 97, line 22; Ex. 3 to Pl. Dep., Tab B.)

13.    Plaintiff does not recall any specific statements by Flowers' representatives in the meetings held prior to becoming a distributor in 1994.  (Pl. Dep. p. 93, line 11 to p. 94, line 21, Tab B.)

14.    Plaintiff agrees that maintaining an adequate and fresh supply of products in his stores is good industry practice, as is properly removing all stale products from his accounts and maintaining proper service and delivery to all of the accounts requesting service.  (Pl. Dep. p. 98, line 4 to p. 99, line 2; Ex. 3 to Pl. Dep., Tab B.)

15.    Plaintiff agrees that, under Section 5.1 of the Distributor Agreement, he was obligated to use his best efforts to develop and sell the products to customers in his territory.  (Pl. Dep. p. 99, lines 3-9; Ex. 3 to Pl. Dep., Tab B.)

16.    Plaintiff agrees that, under Section 16.3 of the Distributor Agreement, if he did not properly service an account that Flowers had the right to issue a ten-day breach letter.  (Pl. Dep. p. 99, lines 16-22; Ex. 3 to Pl. Dep., Tab B.)

17.     Plaintiff understood that, under Section 16.3 of the Distributor Agreement, if he did not cure a breach within the ten business day period that Flowers had the right to terminate the Agreement.  (Pl. Dep. p. 99, line 23 to p. 100, line 21; Ex. 3 to Pl. Dep., Tab B.)

18.     Plaintiff understood that, under Section 19.4 of the Distributor Agreement, the Agreement set forth the terms and conditions of his relationship with Flowers and that if a representation was not contained in the Agreement it was not binding.  (Pl. Dep. p. 101, lines 5-18; Ex. 3 to Pl. Dep., Tab B.)

19.     Plaintiff had the option to sell the 1994 distributorship back to Flowers during the first six months (and one day) of the distributorship.  He did not do so because he was satisfied with the distributor relationship with Flowers.  (Pl. Dep. p. 102, line 8 to p. 103, line 9; Ex. 4 to Pl. Dep., Tab B.)

20.     In 1998, following a federal government investigation, Plaintiff was kicked out of his largest account, Gunter Air Force base, due to an accusation that Plaintiff had devised a scheme to steal bakery items with an estimated loss of $30,000 to the U.S. government.  (Pl. Dep. p. 157, line 10 to p. 164, line 3; Exs. 13 and 14 to Pl. Dep., Tab B.)

21.     Plaintiff received a breach of contract letter for being kicked out of the Gunter Air Force base account, which he rectified by having another distributor, Steve Head, handle the account.  (Pl. Dep. p. 157, lines 13-23, p. 164, lines 4-23; Ex. 13 and 15 to Pl. Dep., Tab B.)

22.     On or around June 23, 2000, Plaintiff sold his first distributorship back to Flowers.  He understood that by executing a document entitled "Release Agreement and

Bill of Sale" he was releasing any claims related to the 1994 Distributor Agreement. (Pl. Dep. p. 173, line 15 to p. 174, line 16, p. 176, line 14 to p. 177, line 5; Ex. 18 to Pl. Dep., Tab B.)

E.    **Plaintiff's 2000 Distributor Agreement with Flowers**

23.    On July 3, 2000, the same day Plaintiff sold his 1994 distributorship back to Flowers, Plaintiff and Flowers executed a new Distributor Agreement.  (Pl. Dep. p. 180, line 23 to p. 181, line 18, p. 182, line 13 to p. 183, line 12; Ex. 19 to Pl. Dep., Tab B.)

24.    Plaintiff read the 2000 Distributor Agreement before he signed it and understood it to be basically the same business relationship as the 1994 Distributor Agreement.  (Pl. Dep. p. 184, line 18 to p. 185, line 2, Tab B.)

25.    Plaintiff agrees that Section 19.4 of the 2000 Distributor Agreement states that the Agreement and the accompanying exhibits are the entire agreement between Plaintiff and Flowers.  (Pl. Dep. p. 187, lines 2-6; Ex. 19 to Pl. Dep., Tab B.)

26.    Section 19.4 in its entirety states: "This Agreement, together with Exhibits A, B, C, D, and E, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter.  Unless set forth in this Agreement, no party shall be liable for any representation made to any other. This Agreement may be amended or modified only by a writing signed by all parties." (Ex. 19 to Pl. Dep., Tab B.)

27.    When Plaintiff signed the 2000 Distributor Agreement, he does not recall any specific discussion about the new Agreement and he understood it to be the same

deal as the 1994 Distributor Agreement.  (Pl. Dep. p. 188, lines 2-23, Tab B.)

28.    Plaintiff had the option to sell the 2000 distributorship back to Flowers during the first six months (and one day) of the distributorship.  Plaintiff did not have any issues with Flowers during this time period, nor did he feel like Flowers was breaching the 2000 Agreement during this first six months.  (Pl. Dep. p. 189, line 1 to p. 190, line 7; Ex. 20 to Pl. Dep., Tab B.)

29.    By letter dated March 16, 2001, Flowers' Director of Sales Grady Messer issued Plaintiff a curable breach letter due to service issues at Plaintiff's Applebee's account.  (Messer Decl. ¶ 2; Ex. 1 to Messer Decl., Tab C.)

30.    By letter dated October 23, 2001, Mr. Messer issued Plaintiff a curable breach letter for out-of-code products in one of Plaintiff's Winn-Dixie accounts.  (Messer Decl. ¶ 3; Ex.2 to Messer Decl., Tab C.)

31.    In March 2002, Plaintiff voluntarily sold his 2000 distributorship back to Flowers.  (Pl. Dep. p. 231, line 3 to p. 232, line 10; Ex. 26 to Pl. Dep., Tab B.)

32.    When selling his 2000 distributorship back to Flowers, Plaintiff executed a "Release Agreement and Bill of Sale."  He understood that by selling his 2000 contract back to Flowers that he was releasing any claims related to this Agreement.  (Pl. Dep. p. 232, line 11 to p. 233, line 9; Ex. 26 to Pl. Dep., Tab B.)

**F.    Plaintiff's 2002 Distributor Agreement with Flowers**

33.    After selling back his 2000 distributorship to Flowers, Plaintiff and Flowers executed another Distributor Agreement.  (Pl. Dep. p. 233, lines 13-20; Ex. 27 to Pl. Dep., Tab B.)

34.    Plaintiff testified that the good industry provision in the 2002 Agreement was "basically the same" as the predecessor Distributor Agreements.  He also testified that Section 5.1, Obligations of Distributor, was the same as the predecessor agreements. (Pl. Dep. p. 233, line 21 to p. 234, line 18; Ex. 27 to Pl. Dep., Tab B.)

35.    Plaintiff testified that with the 2002 Distributor Agreement he simply had more accounts than with the predecessor agreement.  (Pl. Dep. p. 235, lines 7-9, Tab B.)

36.    Plaintiff read the 2002 Distributor Agreement before signing it.  He understood the Agreement, along with its exhibits, were the entire agreement between himself and Flowers.  (Pl. Dep. p. 235, line 21 to p. 236, line 7, Tab B.)

37.    Section 20.4 of the 2002 Distributor Agreement states: "This Agreement, together with Exhibits A, B, C, D, and E, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter.  Unless set forth in this Agreement, no party shall be liable for any representation made to any other.  This Agreement may be amended or modified only by a writing signed by all parties."  (Ex. 27 to Pl. Dep., Tab B.)

38.    The 2002 Distributor Agreement also had a six month buyback option. There were no major issues between Plaintiff and Flowers during this six month period. (Pl. Dep. p. 238, line 5 to p. 239, line 2; Ex. 28 to Pl. Dep., Tab B.)

39.    By letter dated March 18, 2002, Mr. Messer issued Plaintiff a curable breach letter for out-of-code products in two of Plaintiff's Winn-Dixie accounts.  (Messer Decl. ¶ 4; Ex. 3 to Messer Decl., Tab C.)

40.     By letter dated May 29, 2002, Mr. Messer issued Plaintiff a breach of contract letter for multiple service issues.  (Messer Decl. ¶ 5; Ex. 4 to Messer Decl., Tab C.)

41.     Major chain accounts such as Winn-Dixie expect full service five days a week, *i.e.* delivery of the freshest product available on those days.  The normal service days are Monday, Tuesday, Thursday, Friday, and Saturday.  On Wednesdays and Sundays, it is acceptable to the major chain accounts to replenish the bread racks by pulling bakery products from a holding area in the back of the store.  (Bordeaux Decl. ¶ 8, Tab A.)

42.     Plaintiff acknowledged in his deposition that the normal service days were Monday, Tuesday, Thursday, Friday, and Saturday.  (Pl. Dep. p. 107, line 2 to p. 110, line 4, Tab B.)

43.     Messer issued Plaintiff several breach of contract letters for not providing regular service to his customers on normal service days; Plaintiff claimed at his deposition that he could take such days off if he so desired.  (Pl. Dep. p. 248, line 14 to p. 250, line 22, p. 258, lines 7-17, p. 260, line 10 to p. 261, line 11, p. 264, line 13 to p. 265, line 1; Exs. 33, 35, and 36 to Pl. Dep., Tab B.)

44.     By letter date April 7, 2004, Messer reminded Plaintiff that Burger King expected that its stores be serviced five days a week.  Nonetheless, Plaintiff testified he did not need to meet Burger King's expectations.  (Messer Decl. ¶ 6; Ex. 5 to Messer Decl., Tab C; Pl. Dep. p. 266, line 9 to p. 268, line 22, Tab B.)

45.    By letter dated June 3, 2004, Messer issued Plaintiff a breach of contract letter for not providing five day service to his Burger King accounts.  (Messer Decl. ¶ 7; Ex. 6 to Messer Decl., Tab C; Pl. Dep. p. 269, lines 15-22; Ex. 39 to Pl. Dep., Tab B.)

46.    By letter dated July 16, 2004, Messer issued Plaintiff a curable breach letter for failing to properly service his accounts.  (Messer Decl. ¶ 8; Ex. 7 to Messer Decl., Tab C.)

47.    By letter dated October 22, 2004, Messer confirmed a discussion with Plaintiff regarding certain accounts expecting five-day service, which Plaintiff acknowledged at the time should be given to such accounts.  (Messer Decl. ¶ 9; Ex. 8 to Messer Decl., Tab C; Pl. Dep. p. 273, line 1 to p. 274, line 8; Ex. 42 to Pl. Dep., Tab B.)

48.    By letter dated December 6, 2004, Messer issued Plaintiff a curable breach letter due to Plaintiff being kicked out of his Krystal accounts.  (Messer Decl. ¶ 10; Ex. 9 to Messer Decl., Tab C.)  This breach was cured after Sales Manager Steve Stephens and Plaintiff spoke with representatives of Krystal.  (Pl. Dep. p. 274, lines 12-23, p. 277, line 12 to p. 278, line 6; Ex. 43 to Pl. Dep., Tab B.)

49.    By letter dated February 3, 2005, Messer issued Plaintiff a breach of contract letter for being kicked out of one of his Burger King accounts.  (Messer Decl. ¶ 11; Ex. 10 to Messer Decl., Tab C.)  Plaintiff rectified this breach by having another distributor service this account.  (Pl. Dep. p. 278, line 10 to p. 281, line 14; Exs. 44 and 45 to Pl. Dep., Tab B.)

50.    On March 3, 2005, Plaintiff went to his Troy State Sodexho Marriott account in the morning without any hamburger buns.  (Pl. Dep. p. 281, lines 19-23, p. 284, lines 4-10, Tab B.)  He promised the Kitchen Manager that he would bring some

buns back "later that day," but he never returned.  (Pl. Dep. p. 284, lines 11-19, Tab B.)  Plaintiff claims his truck broke down on the way back to the account.  (Pl. Dep. p. 284, line 20 to p. 285, line 3, Tab B.)  Plaintiff, however, did not call the account back, nor did he request assistance from Flowers, another distributor, or anyone else to service the account.  (Pl. Dep. p. 286, lines 6-23, p. 289, lines 7-11, p. 295, line 1to p. 296, line 10, Tab B.)  Plaintiff had his cell phone with him at the time.  (Pl. Dep. p. 281, line 19 to p. 283, line 12, Tab B.)

51.    If distributors request assistance in meeting customer needs, for example, in delivering additional product to a customer to meet the customer's needs, Flowers' managers are available to help.  (Messer Decl. ¶ 14, Tab C; Stephens Decl. ¶ 8, Tab D.)  Flowers' managers regularly help Flowers' distributors in this way.  (Messer Decl. ¶ 14, Tab C; Stephens Decl. ¶ 8, Tab D.)

52.    Plaintiff previously had service issues with the Troy State Sodexho account and had been given a second chance then.  (Stephens Decl. ¶ 5, Tab D.)  On the March 2005 occasion, Sodexho management barred Plaintiff from the account.  (Messer Dep. p. 35, line 7 to, p. 36, line 8, Tab E.)  Stephens tried to get Plaintiff back into the account, but was unsuccessful.  (Stephens Decl. ¶¶ 2, 6, 7; Ex. 1 to Stephens Decl., Tab D.)

53.    By letter dated March 7, 2005, Messer issued Plaintiff a curable breach letter due to Plaintiff having been barred from the Sodexho account; Plaintiff was given two options, resume service or making alternative arrangements for service of the account.  (Messer Decl. ¶ 12; Ex.11 to Messer Decl., Tab C; Pl. Dep. p. 298, lines 3-22;

Ex. 47 to Pl. Dep., Tab B.) Messer hand delivered this breach letter to Plaintiff on March 8, 2005, and also sent a copy to him via certified mail. (Messer Decl. ¶ 12, Tab C.)

54.    Before the ten-day cure period had expired with respect to the Sodexho account, Plaintiff was barred from the Company warehouse because Flowers' management believed he had threatened Messer. (Lord Dep. p. 23, lines 11-15, p. 28, line 21 to p. 30, line 23, Tab H; Lord Decl. ¶¶ 2-3; Ex. 1 to Lord Decl., Tab F.) Messer reported that Plaintiff stated words to the effect, "somebody might die over this," and, "I'm not threatening you – I'm just telling you more people are going to get hurt over this than me." (Messer Dep. p. 54, line 20 to p. 56, line 17; Ex. 2 to Messer Dep., Tab E; Lord Decl. ¶ 2, Tab F.) Plaintiff denies threatening Messer; he contends he only called him a racist. (Pl. Dep. p. 303, line 7 to p. 304, line 15, p. 306, line 21 to p. 309, line 15; Ex. 49 to Pl. Dep., Tab B.) Plaintiff was only two to three feet from Messer when the conversation took place. (Messer Dep. p. 37, lines 11-16, Tab E.)

55.    Once he was barred from the Company's warehouse, Plaintiff did not make any arrangements with anyone else, distributor or otherwise, to have his product picked up so that he could continue servicing his customers. (Pl. Dep. p. 312, line 15 to p. 313, line 22, p. 322, line 14 to p. 323, line 2, Tab B.)

56.    Flowers' distributors may hire helpers to assist them running their distributorships; numerous Flowers' distributors have done so, including distributors in the Montgomery area. (Lord Decl. ¶ 5, Tab F.)

57.    At his deposition, following testimony about various health issues, Plaintiff testified he could get somebody to help him run a bread route, as follows:

Q: Is there any way you could run a bread route at this point?

A:  I can get somebody to help run it.

Q:  Who would you get to help run it?

A:  I can find somebody.

(Pl. Dep. p. 371, lines 3-9, Tab B.)

58.    By letter dated March 23, 2005, Lord notified Plaintiff that his Distributor Agreement would be terminated due to his failure to resume service to his Sodexho account and cure his outstanding breach within ten business days.  (Lord Decl. ¶ 4; Ex. 2 to Lord Decl., Tab F; Pl. Dep. p. 330, line 17 to p. 331, line 6; Ex. 53 to Pl. Dep., Tab B.)

59.    Flowers' current President, Steve Bordeaux, made the final decision to terminate Plaintiff's Distributor Agreement.  (Bordeaux Dep. p. 13, lines 7-20, Tab G.)

60.    The Sodexho account was lost to one of Flowers' competitors, Sara Lee. (Messer Dep. p. 36, lines 11-23, Tab E; Lord Dep. p. 78, lines 10-21, Tab H.)

61.    Since the termination of Plaintiff's Distributor Agreement, Flowers, in accordance with Section 16.4 of the Agreement, has operated Plaintiff's distributorship on his behalf, until the issues in his lawsuit have been resolved.  (Lord Decl. ¶ 4, Tab F; Pl. Dep. p. 383, line 7 to p. 384, line 16, Tab B.)

**G.    Flowers' Use of Freezers for Certain Restaurant Products in Emergency Situations**

62.    Flowers maintains freezers in three of its warehouses, Phenix City, Montgomery, and Opelika.  (Bordeaux Dep. p. 22, line 12 to p. 23, line 2, Tab G; Lord Dep. p. 15, lines 3-7, Tab H.)

63.    The freezers in Montgomery and Phenix City were bought from Burger King in the late 1990's after Burger King decided that they would no longer freeze buns in these locations, but would rather have Flowers deliver products five days a week.

(Lord Dep. p. 57, line 4 to p. 58, line 22, Tab H.)  When Burger King had the freezers, Flowers would deliver products once a week and Burger King would, in turn, put the product in its freezers.  (Lord Dep. p. 57, line 4 to p. 58, line 22, Tab H.)

64.    Flowers utilizes its three freezers to store certain limited restaurant products for emergency situations, such as rolls for Krystal chili pups, rolls for Sonic foot-long hot dogs, and Burger King steak buns.  (Bordeaux Dep. p. 30, 1ines 1-11, p. 68, lines 10-23, Tab G; Lord Dep. p. 40, line 19 to p. 41, line 2, p. 63, line 16 to p. 64, line 12, Tab H; Messer Dep. p. 78, lines 5-19, p. 79, lines 14-22, p. 137, line 19 to p. 138, line 6, Tab E; Messer Decl. ¶ 13, Tab C.)

65.    Such restaurant items are stored in the freezer for a maximum of two to three months.  (Bordeaux Dep. p. 23, lines 3-7, Tab G; Messer Dep. p. 78, lines 20-22, Tab E.)

66.    While the restaurant items are in the freezer, Flowers considers the original out-of-code date to be suspended.  (Bordeaux Dep. p. 61, lines 1-14, p. 64, line 21 to p. 65, line 8, Tab G.)

67.    When such restaurant items are taken out of the freezer the old code date ("good through date") is removed, and a new code date is affixed as the product has been maintained in the freezer.  Typically, once the product is taken out of the freezer, the new out-of-code date is one or two days from the date of removal from the freezer.  (Bordeaux Dep. p. 73, lines 11-21, Tab G; Lord Dep. p. 54, lines 12-14, Tab H; Messer Dep. p. 94, line 13 to p. 95, line 15, Tab E.)

68.    Flowers changes the code dates on such restaurant items to avoid customer confusion; Flowers does not want a restaurant customer to think that they are getting a

product that has been sitting at in the warehouse, unrefrigerated, for two to three months. (Lord Dep. p. 40, lines 1-19, p. 41, line 19 to p. 42, line 9, Tab H.)

69.    Flowers sometimes does not notify individual restaurant managers that specific restaurant items have been in the freezer.  (Bordeaux Dep. p. 69, line 19 to p. 71, line 13, p. 98, line 19 to p. 99, line 6, Tab G.)  Certain accounts, such as Burger King and Krystal, have been notified, that in emergency situations, product may be delivered that has been in a freezer.  (Bordeaux Dep. p. 100, lines 7-23, Tab G; Lord Dep. p. 42, lines 12-20, Tab H.)[3]

70.    Flowers does not consider changing the code date or removing the manufacture date on limited restaurant items to be deceptive because by freezing the product, the code has been suspended.  (Bordeaux Dep. p. 84, lines 14-20, p. 99, line 7 to p. 100, line 23, Tab G; Lord Dep. p. 43, line 5 to p. 44, line 17, Tab H.)

71.    Freezing restaurant items does not distort their product quality and such products are edible when they are taken out of the freezer.  (Bordeaux Dep. p. 60, lines 15-23, Tab G; Lord Dep. p. 43, lines 10-20, p. 64, lines 20-22, Tab H.)

72.    Restaurant accounts would rather have products that have been in the freezer in emergency situations then no product at all.  (Lord Dep. p. 42, line 17 to p. 43, line 4, Tab H.)  Restaurants use products that have been frozen on a regular basis, and freeze products themselves, on occasion, for emergency situations.  (Lord Dep. p. 74, line 11 to p. 76, line 2, Tab H.)

---

[3] Whether a particular restaurant customer was told they were receiving product from the freezer is irrelevant to Plaintiff's claim regarding alleged "out-of-code" product.  To the extent anyone would have standing to assert a claim in this regard, it would be the restaurant customer, not Plaintiff.  This is particularly true given that Plaintiff, as noted below, himself changed code dates and delivered the product to his accounts without saying anything.  (See Fact #80.)

73.     Because the limited restaurant products stored in the freezer are used for emergency situations, such products are used by restaurant accounts quickly.  (Lord Dep. p. 52, line 21 to p. 53, line 10, p. 56, lines 9-13, Tab H.)

74.     The percentage of bun products put in Flowers' freezers ranges from approximately one half percent to one and one quarter percent of Flowers' restaurant bun business.  (Bordeaux Dep. p. 104, lines 7-20, Tab G; Bordeaux Decl. ¶ 9, Tab A.)

75.     By 2000, Plaintiff was utilizing some products from the freezer, but it was not an issue for him at the time.  (Pl. Dep. p. 191, lines 2-22, p. 192, line 21 to p. 193, line 22, Tab B.)  Plaintiff testified most of the time such products were used when customers called for products in the evenings.  (Pl. Dep. p. 191, line 23 to p. 192, line 10, Tab B.)

76.     Plaintiff testified that he began having problems with product coming out of the freezer in 2003 or 2004, and perhaps as early as 2001, when he contends he was not getting products that he ordered.  (Pl. Dep. p. 193, line 23 to p. 194, line 22, Tab B.)

77.     Plaintiff testified he sometimes had to use products from the freezer two to three times a month; sometimes two times a week.  (Pl. Dep. p. 195, lines 4-11, Tab B.)

78.     Plaintiff acknowledges that only certain products came out of the freezer, such as foot-longs for Sonic, chili pups for Krystal, bulk buns for Burger King, and similar products for Sonic and Chick-fil-A; he never delivered any products that had been in the freezer to grocery stores, nor did any Flowers' branded products come out of the freezer.  (Pl. Dep. p. 195, line 12 to p. 197, line 4, p. 211, line 12 to p. 212, line 2, Tab B.)

79.     Plaintiff did not advise his accounts that he was occasionally delivering product that had been in the freezer.  (Pl. Dep. p. 200, line 22 to p. 201, line 23, Tab B.)

80.     Sometimes, Plaintiff took dates off the products himself and delivered it to his accounts without saying anything.  (Pl. Dep. p. 202, line 16 to p. 203, line 3, Tab B.)

81.     Plaintiff received full credit for products he delivered that had been in the freezer.  (Pl. Dep. p. 205, lines 19-23, p. 210, lines 13-19, Tab B.)

82.     Plaintiff testified that his only potential financial loss related to delivering product that had been in the freezer would have been if such product was then picked up from the account.  (Pl. Dep. p. 206, line 1 to p. 207, line 5, p. 210, lines 13-19, Tab B; Lord Decl. ¶¶ 6-7, Tab F.)   While Plaintiff acknowledged he would receive full stale credit for any such transaction, he would not receive a profit margin for any such items. (Pl. Dep. p. 206, line 1 to p. 207, line 5, p. 210, lines 13-19, Tab B.)   Plaintiff acknowledged, however, he could not offer any proof regarding whether any stale product had been in the freezer (or not).  (Pl. Dep. p. 207, line 14 to p. 208, line 8, Tab B.)  Nor do any Company documents exist that could establish whether a stale item had been frozen (or not).  (Lord Decl. ¶ 8, Tab F.)

83.     Plaintiff never lost any customer due to the delivery of products that had been in the freezer.  (Pl. Dep. p. 208, lines 9-14, Tab B.)  Plaintiff acknowledged that when he goes into a restaurant and orders a product that has a bun or other bread product, he would not know if that product has been frozen (or not).  (Pl. Dep. p. 212, lines 17-21, Tab B.)

84.     Plaintiff testified that he had the right to refuse product that had come out of the freezer and that he did refuse such product.  (Pl. Dep. p. 214, lines 1-7, 12-14, Tab B.)  He further testified that under such circumstances he never received a breach of contract letter from Flowers.  (Pl. Dep. p. 214, lines 8-11, Tab B.)

H.     **Miscellaneous**

85.     During the pendency of this lawsuit, on August 15, 2006, Plaintiff filed tax returns for the years 1999 through 2003 representing that he was an independent businessman.  (Pl. Dep. p. 356, lines 1-15, p. 357, lines 8-14, p. 360, lines 4-23, p. 361, lines 4-20, p. 362, line 1 to p. 365, line 12; Exs. 59-64 to Pl. Dep., Tab B.)

86.     While he was a distributor for Flowers, there was no set time that Plaintiff was required to show up at work.  (Pl. Dep. p. 115, lines 20-22, Tab B.)

87.     Plaintiff determined the order of visiting his accounts during the course of a day.  (Pl. Dep. p. 115, line 23 to p. 116, line 8, Tab B.)

88.     Plaintiff could make additions or subtractions to his product orders.  (Pl. Dep. p. 117, line 15 to p. 118, line 7, Tab B.)

89.     When Plaintiff took product off the dock in the morning, he owned it.  (Pl. Dep. p. 120, lines 18-23, Tab B.)

90.     During his deposition, Plaintiff admitted that while he was an independent distributor he benefited financially from certain unauthorized accounting transactions. He also admitted that on some occasions he intentionally did not provide certain accounts products they should have received and that he benefited financially from these transactions as well.  (Pl. Dep. p. 153, line 19 to p. 154, line 7, p. 155, lines 1-4, p. 156, line 9 to p. 157, line 9, Tab B.)

91.     If Plaintiff had admitted that he had stolen from his customers while he was still a distributor for Flowers, current Flowers' President Steve Bordeaux would have terminated Plaintiff's Distributor Agreement due to such misconduct constituting a non-curable breach under Section 16.2 of the Agreement.  (Bordeaux Decl. ¶ 10, Tab A.)

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is mandated if there is no genuine issue of material fact to be tried, and the moving party is entitled to judgment as a matter of law. *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1540 (11th Cir. 1990); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

To survive summary judgment, the opposing party must designate specific record evidence sufficient to establish each element of his or her claim, such that a reasonable jury could find in the party's favor. *Earley*, 907 F.2d at 1080. The opposing party may not rest upon its pleading allegations, but must instead set forth specific facts showing there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Kee*, 918 F.2d at 1540. A factual dispute is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the opposing party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

## IV.    ARGUMENT

Preliminarily, a federal court sitting in diversity follows the choice of law rules of the state in which it sits. *FMC Fin. Corp. v. Murphree*, 632 F.2d 413, 418 (5th Cir. 1980). Alabama has long recognized the rights of parties to an agreement to decide which state's law will govern their agreement. *Craig v. Bemis*, 517 F.2d 677, 680 (5th Cir. 1975).

The parties' Distributor Agreement, Section 20.7, provides that the Agreement and construction thereof should be governed by the laws of Alabama. (Pl. Dep. p. 233, lines 13-20; Ex. 27 to Pl. Dep., Tab B.) This provision bears a reasonable relationship to the parties' supplier-distributor relationship given that Flowers is headquartered in Opelika, Alabama, and Plaintiff worked in the Montgomery area. (Bordeaux Decl. ¶¶ 1, 3, Tab A.) Since all of the conduct alleged in the Complaint arose out of conduct occurring in Alabama, Alabama law also

covers Plaintiff's tort claims of misrepresentation, negligence, wantonness, and conversion. *Etheredge v. Genie Indus., Inc.,* 632 So. 2d 1324, 1325 (Ala. 1994).

A.    <u>**Plaintiff's Breach-of-Contract Claims Are Not Actionable**</u>.

Plaintiff alleges that Flowers breached his Distributor Agreement in two ways: (1) it prohibited him from servicing his accounts and terminated his contract; and (2) it supplied Plaintiff with "out-of-code" product.[4]  Plaintiff's claim(s) must fail as a matter of fact and law because Plaintiff was never prohibited from running his route (territory), but only barred from the premises after Flowers' senior management concluded that he had threatened Grady Messer. His contract was ultimately terminated because he did not cure a breach with a customer as required by his contract.  Plaintiff also cannot show that he was provided with "out-of-code" product or that he suffered damages by distributing the same.

Plaintiff's allegations regarding breach-of-contract are limited to his 2002 Distributor Agreement with Flowers because Plaintiff concedes that any issues or claims arising from previous contracts, specifically the 1994 and 2000 contract(s), are barred by his sale of these contracts back to Flowers.  (Pl. Dep. p. 173, line 15 to p. 174, line 16, p. 176, line 14 to p. 177, line 5, p. 233, lines 13-20; Exs.18 and 26 to Pl. Dep., Tab B.)[5]

1.    **Plaintiff's breach-of-contract claim regarding the termination of his Distributor Agreement is barred because the undisputed facts show that he did not perform in accordance with contract.**

Per the terms of his 2002 Distributor Agreement with Flowers, Plaintiff agrees that it is a good industry practice to maintain proper service and delivery to all his accounts requesting service.  (Pl. Dep. p. 98, line 4 to p. 99, line 2, Tab B.)  Plaintiff also agrees that under

---

[4] As noted above, the "out-of-code" products at issue in the instant case involve limited restaurant products that Flowers puts in its freezers for use in emergency situations.

[5] *See also*, Section IV, F below, "Any Claim of Plaintiff Arising Before March 11, 2002, is Barred by the Doctrine of Release."

Section 5.1 of the 2002 Distributor Agreement that he is obligated to use his best efforts to develop and sell the products to customers in his territory. (Pl. Dep. p. 99, line 3-9; Ex. 27 to Pl. Dep., Tab B.) Given the many breach letters issued to Plaintiff[6], he was also well aware that Flowers has the right, per the contract, to issue a ten-day breach letter if he does not properly service an account and that if he did not cure the breach within ten business days, Flowers had the right to terminate the Distributor Agreement. Plaintiff acknowledged this understanding during his deposition. (Pl. Dep. p. 99, line 16 to p. 100, line 21; Ex. 27 to Pl. Dep., Tab B.)

On March 3, 2005, Plaintiff failed to bring hamburger buns to his Sodexho account located at Troy University in Montgomery. (Pl. Dep. p. 281, lines 19-23, p. 284, lines 4-19, Tab B.) Sodexho is a large, multi-location client of Flowers. (Messer Dep. p. 132, lines 8-11, Tab E.) While Plaintiff promised the Kitchen Manager he would return that day with buns, he never did. Inexplicably, he did not even call Sodexho or anyone associated with Flowers when his truck allegedly broke down a short time later, although he had his cell phone. (Pl. Dep. p. 281, line 19 to p. 283, line 12, p. 284, lines 20-23, p. 285, lines 1-3, Tab B.) Plaintiff also failed to contact anyone regarding the need to get the product to Sodexho, including failing to request assistance from Flowers or contact anyone else even though his adult son was riding with him that day and could have possibly assisted. (Pl. Dep. p. 286, lines 6-11, p. 295, line 1 to p. 296, line 10, Tab B.) Both Grady Messer and Steve Stephens could have assisted Plaintiff with his route, and, had done so in the past, when distributors had transportation or other delivery issues. (Stephens Decl. ¶ 8, Tab D; Messer Decl. ¶ 14, Tab C.)

Because Plaintiff had previously had problems with this account, the Sodexho representative contacted Flowers and advised Flowers that Plaintiff would not be allowed back into the account. (Messer Dep. p. 35, line 7 to p. 36, line 8, Tab E.) Stephens attempted to

---

[6] See Facts # 26, 27, 36, 37, 40, 42, 43, 45, 46.

discuss the matter with Sodexho and tried to get Plaintiff back into the account, but was unsuccessful due largely to the fact that Ms. Barnes, the account representative with Sodexho, did not believe Plaintiff had transportation issues as she had experienced problems with him in the past. (Stephens Decl. ¶¶ 4-5, Tab D.)  In fact, this incident is consistent with Plaintiff's declining performance, as within the three months before this occurrence, Plaintiff had been issued two breach letters, the first related to the fact that Plaintiff had been kicked out of his Krystal accounts, and the second in February 2005, when he was kicked out of one of his Burger King accounts. (Messer Decl. ¶¶10-11; Exs. 9 and 10 to Messer Decl., Tab C.)

On March 7, 2005, Messer issued a curable breach letter per the terms of the 2002 Distributor Agreement, offering Plaintiff two options: (1) resume servicing the Sodexho account; or (2) make alternative arrangements for the account. (Messer Decl. ¶ 12;  Ex. 11 to Messer Decl., Tab C; Pl. Dep. p. 298, lines 3-22; Ex. 47 to Pl. Dep., Tab B.)  This curable breach letter was hand-delivered to the Plaintiff and also sent via certified mail.  (Messer Decl.¶ 12, Tab C.)

Plaintiff visited the Troy State Sodexho site with two area city councilmen, but Ms. Barnes was not interested in speaking with Plaintiff.  (Pl. Dep. p. 299, line 13 to p. 300, line 14, Tab B.)  Plaintiff then visited the Flowers site with the councilmen to meet with Messer and when the councilmen learned he had a few more days to cure his account they left the premises while Plaintiff was still speaking with Messer.  (Pl. Dep. p. 300, lines 15-22, Tab B.)  According to Messer, as Plaintiff was leaving, he turned to Messer and said, "Someone might die over this," and, "I'm not threatening you – I'm just telling you more people are going to get hurt over this than me."  (Messer Dep. p. 54, line 20 to p 56, line 17; Ex. 2 to Messer Dep., Tab E; Pl. Dep. p. 303, lines 4-10; Ex. 48 to Pl. Dep., Tab B.)  Messer reported this to Flowers' senior management, President Steve Bordeaux and Vice President of Sales Michael Lord, who concluded Plaintiff,

had, in fact, threatened Messer.  In accordance with prudent safety measures, Plaintiff was barred from Flowers' premises.  (Lord Dep. p. 23, lines 11-15, p. 28, line 21 to p. 30, line 23, Tab H; Lord Decl. ¶ 2; Ex. 1 to Lord Decl., Tab F; Ex. 27 to Pl. Dep., Tab B.)[7]

Plaintiff could have continued to operate and service his territory had he made arrangements to have another distributor or someone else pack and load his product and meet them off premises; however, Plaintiff made no arrangements to do so. (Pl. Dep. p. 312, line 15 to p. 313, line 22, p. 322, line 14 to p. 323, line 2, Tab B.)   Flowers' distributors may engage helpers to assist them in running their distributorships; numerous Flowers' distributors have done so, including distributors in the Montgomery area.  (Lord Decl. ¶ 5, Tab F.)  Despite the fact that Plaintiff did not get anyone to run his route in March 2005, Plaintiff now states that although he is currently collecting Social Security disability, he could get somebody to run his route today, if necessary. (Pl. Dep. p. 371, lines 3-9, Tab B.)[8]

On March 23, 2005, Lord notified Plaintiff, by letter, that his Distributor Agreement would be terminated due to his failure to resume service to his Sodexho account thus failing to cure his breach within ten business days per the terms of the 2002 Distributor Agreement. (Lord. Decl. ¶ 4, Ex. 2 to Lord Decl., Tab F; Pl. Dep., p. 330, line 17 to p. 331, line 6; Exs. 27 and 53 to Pl. Dep., Tab B.)   The Sodexho account was lost to one of Flower's competitors, Sara Lee. (Stephens Decl., ¶ 6, Tab D; Messer Dep., p. 36, lines 11-23, Tab E; Lord Dep., p. 78, lines 10-21, Tab H.)

---

[7] Threatening public health and safety is a non-curable breach per Section 16.2 of the 2002 Distributor Agreement. While Bordeaux and Lord concluded that Plaintiff had, in fact, threatened Messer, they decided only to bar him from Flowers' premises. (Ex. 27 to Pl. Dep., Tab B.)

[8] It is also notable that Plaintiff had previously been kicked out of other accounts and arranged for substitute distributors to handle such accounts, including Gunter Air Force base and Burger King.  (Pl. Dep. p. 157, lines 10, 13 to p. 164, line 3, 4-23, p. 278, line 10 to p. 281, line 14; Exs. 13, 14, 15, 44, and 45 to Pl. Dep., Tab B.)

In order to prevail on a claim for breach of contract, the "plaintiff must establish: (1) the existence of a valid contract binding on the parties; (2) his own performance under the contract; (3) the defendant's nonperformance under the contract, and (4) resulting damages." *State Farm Fire and Casualty Company v. Larry Williams, et al.*, 926 So. 2d 1008, 1013 (Ala. 2005). *See also, Sullivan v. Eastern Health Systems Inc.*, 953 So. 2d 355, 359 (Ala. 2006); *Childersburg Bancorporation, Inc. v. Peoples State Bank of Commerce*, 2006 U.S. Ala. Civ. App. LEXIS 305, *8-9 (June 2, 2006).

Here, Plaintiff cannot provide the second prong for a breach-of-contract claim, that he performed per the terms of the contract, because it is undisputed that he was not able to cure his breach with Sodexho and the account was lost. It is undisputed that Plaintiff did absolutely nothing on March 3, 2005, to contact Flowers, the customer or anyone else to get the delivery to Sodexho, despite his promise to the customer to come back with the product they needed. This poor service is consistent with the fact that Plaintiff had been issued at least nine breach letters since 2001, due to various customer complaints ranging from cursing customers to leaving out of code product in the stores. (See Facts #26, 27, 36, 37, 40, 42, 43, 45, 46.) Flowers, through Stephens, even attempted to help Plaintiff back into the account, but due to previous poor service by Plaintiff, Sodexho was not willing to give him another chance. Plaintiff seemingly attempts to blame his inability to get back into the account on his being barred from the Montgomery warehouse. This excuse is meritless, particularly given the fact that he made no attempt to engage any helper, nor did he make any attempt to have another distributor service Sodexho as he had in other situations when he had been kicked out of other accounts.

Plaintiff's poor business practices simply caught up with him and he has only himself to blame. As such, Plaintiff cannot prevail on his breach-of-contract claim regarding

termination of the Distributor Agreement as it was actually Plaintiff who breached the contract, not Flowers.

> **2.  Plaintiff's breach-of-contract claim regarding alleged "out-of-code" product is barred because the undisputed facts show that the product was not "out-of-code" and because Flowers exercised reasonable diligence to ensure customer needs were met in emergency situations.**

Plaintiff also cannot prevail on his breach-of-contract claim regarding his allegation that he was supplied with "out-of-code" product because he cannot show that the product was "out-of-code" or that he suffered any damages.  Plaintiff was aware, as early as 2000, that Flowers supplied certain customers, with a limited amount of products from a freezer in emergency situations, and Plaintiff utilized product from the freezer for his deliveries. (Bordeaux Dep. p. 30, lines 1-11, p. 68, lines 10-23, Tab G; Pl. Dep. p. 191, line 2 to p. 193, line 22, Tab B.)  Plaintiff stated that most of the calls for specialty buns for restaurants came in the evening and were limited to specific products such as foot-long buns for Sonic or chili pup buns for Krystal.  (Pl. Dep. p. 191, line 23 to p. 192, line 10, p. 195, line 12 to p. 197, line 4, p. 211, line 12 to p. 212, line 2,  Tab B.)  These limited items were frozen for up to three months in freezers purchased from Flowers' customer, Burger King.  (Lord Dep. p. 57, line 4 to p. 58, line 22, Tab H; Bordeaux Dep. p. 23, lines 3-7, Tab G; Messer Dep. p. 78, lines 20-22, Tab E.)  Once the item was removed from the freezer it was given a new code date of one to two days from the date of removal from the freezer as it was to be used quickly, and Flowers did not want to confuse the customer by allowing it to think that the item had simply been sitting, unrefrigerated, at the warehouse. (Bordeaux Dep. p. 73, lines 11-21, Tab G; Lord Dep. p. 40, lines 1-19, p. 41, line 19 to p. 42, line 9, p. 54, lines 12-14, Tab H.)  These limited items were not out of code, but had been suspended in the freezer, as they would be if an individual bought buns at the store and stored them in the freezer and used them later. (Bordeaux Dep. p. 60, line 5 to p. 61, line 14,

p. 64, line 18 to p. 66, line 5, Tab G; Lord Dep. p. 43, line 5 to p. 44, line 17, Tab H.)  Freezing restaurant items does not distort product quality.  (Bordeaux Dep. p. 60, lines 15-23, Tab G; Lord Dep. p. 43, lines 10-20, p. 64, lines 20-22, Tab H.)  To reiterate, it is undisputed that Plaintiff delivered items from the freezer to meet customer needs. (Pl. Dep. p. 191, lines 2-22, p. 192, line 21 to p. 193, line 22, Tab B.)  Restaurant accounts would rather have products that have been in the freezer than no product at all.  (Lord Dep. p. 42, line 17 to p. 43, line 4, Tab H.)  In fact, restaurants use products that have been frozen on a regular basis, and freeze products themselves on occasion for emergency situations.  (Lord Dep. p. 74, line 11 to p. 76, line 2, Tab H.)

Under Section 6.1 of the Distributor Agreement, Obligations of Company, Flowers was obligated to use its "best efforts" to manufacture and deliver to Plaintiff sufficient quantities of products to supply outlets requesting service in Plaintiff's territory.  (Ex. 27 to Pl. Dep., Tab B.)  Alabama's Commercial Code, which has been held applicable to distributor agreements,[9] defines such "best efforts" as exercising "reasonable diligence as well as good faith" in the performance of the contract.  Ala. Code § 7-2-306(2), Official Comment 5. Flowers' use of the freezers to store limited restaurant products for emergency situations constitutes reasonable diligence as a matter of law.   This practice allows the distributor to have product when unexpected needs arise at restaurant accounts.  (*See* Bordeaux Dep. p. 68, lines 10-22, Tab G, explaining when a customer may fall short of a certain specialty bun due to a busload of customers.)  Indeed, if Flowers did not keep such restaurant products available for emergency situations, Flowers would not be exercising reasonable diligence to meet the special needs of certain restaurant customers.

---

[9] *See Intercorp, Inc. v. Pennzoil Co.,* 877 F.2d 1524, 1527 (11th Cir. 1989); *Thermal Sys. of Ala. Inc. v. Sigafoose,* 533 So. 2d 567, 571 (Ala. 1988).

### 3. Plaintiff's breach-of-contract claim regarding alleged "out-of-code" product is barred because his alleged damages are totally speculative.

One of the fundamental rules of damages is that they be direct and reasonably certain, not remote and speculative. *Alabama Power Co. v. Alabama Pub. Serv. Comm'n.*, 103 So. 2d 14 (Ala. 1958). "Evidence which affords nothing more than mere speculation, conjecture, or guess is insufficient to warrant the submission of a case to the jury." *Systrends, Inc. v. Group 8760, LLC*, 2006 WL 2925323 *21 (Ala. 2006). A plaintiff must produce evidence to show the extent of damages as a matter of just and reasonable inference. *Id.* at *22.

Plaintiff testified that his only potential loss on delivery of product out of the freezer would be if he had to pick up the unused product from the customer. (Pl. Dep., p. 207, lines 1-18, Tab B.) While Plaintiff would still receive full credit for the product, i.e. his cost for the product, he cannot even offer any proof that he had any product returned from a customer which came from the freezer. (Pl. Dep. p. 206, line 1 to p. 207, line 5, 14-23, p. 208, line 8, p. 210, lines 13-19, Tab B; Lord Decl. ¶¶ 6-7, Tab F.) Further, Plaintiff never lost any customers due to delivery of product out of the freezer. (Pl. Dep. p. 208, lines 9-14, Tab B.) This testimony demonstrates that Plaintiff cannot establish the fourth prong necessary for a breach-of-contract claim, resulting damages.

### 4. Plaintiff's breach-of-contract claim regarding alleged "out-of-code" product is barred by the doctrine of estoppel.

Plaintiff delivered product out of the freezer from 2000 until 2005, enjoying the benefits of the sale of these products, financial and otherwise. In fact, it is undisputed that in 2002, Plaintiff sold his 2000 contract back to Flowers and bought a new Distributorship Agreement with Flowers with full knowledge that at times, he would deliver product from the freezer to certain restaurant customers. (Pl. Dep. p. 191, lines 2-22, p. 192 line 21 to p. 193, line 22, p. 231, line 3 to p. 232, line 10, p. 233, lines 13-20; Exs. 26 and 27 to Pl. Dep., Tab B.)

Indeed, Plaintiff continued to use products from the freezer despite the fact that he had the right to refuse such product and did, in fact, do so on occasion.  (Pl. Dep. p. 214, lines 1-7, 12-14, Tab B.)

The law has been clear for centuries: a man may not accept the benefits of a transaction and reject its burdens.  As the Court explained in *Goodman v. Winter*, 64 Ala. 410, 434 (Ala. 1879):

> It is a plain principle of justice, of right, and of law, that a man can not accept the benefits, and reject the burdens of a transaction.  Upon this principle, the books abound with cases in which those who were entitled to avoid a sale, or to adopt and ratify it, or to claim under or in opposition to a conveyance, by accepting the proceeds of the sale, or the benefits of the conveyance, preclude themselves from avoiding it.  – 2 Smith's Lead. Cases, 742.

Here, Plaintiff is unequivocal that he has used product from the freezer to supply his customers, and, as such, as benefited from these sales. (Pl. Dep. p. 201, lines 13-19, p. 205, lines 19-23, Tab B.)  Moreover, Plaintiff freely bought a new contract with Flowers with the knowledge that some limited product was kept in the freezer.  In keeping with the doctrine of estoppel, Plaintiff cannot sue over the use of product from a freezer, while at the same time having benefited from having the supply and utilizing it for at least five years. (Pl. Dep. p. 191, lines 2-22, p. 192, lines 21-23, p. 193, lines 1-22, Tab B.)   Plaintiff is therefore estopped from asserting his contract claim on this issue.  *See Southern Energy Homes Inc. v. Ard*, 772 So. 2d 1131, 1134-35 (Ala. 2000) (purchases of manufactured homes who received warranty containing arbitration provisions were found to have accepted the benefits of the warranty and thus, were bound by its arbitration provisions despite lack of signature); *Salisbury v. Semple,* 565 So. 2d 234 (Ala. 1990) (purchaser of ophthalmology practice is estopped from refusing to make payments on the practice simply because it contains a covenant not to compete applicable to the seller); *Cole v. Racetrac Petroleum Inc.,* 466 So. 2d 93, 96 (Ala. 1985) (lessor who accepted lease payments

from a lessee for ten years and then tried to invalidate the contract based on a technicality was estopped from claiming that the lease was invalid). Based on the undisputed fact that Plaintiff benefited from use of product from the freezer and the case law cited above, he is estopped from claiming breach of contract on the same.

        **5.**    **Plaintiff cannot recover mental or emotional anguish damages or other non-contractual losses on a claim of breach-of-contract.**

Plaintiff also cannot recover mental anguish damages from his claim of breach-of-contract. "As a general rule, mental anguish is not a recoverable element of actual damage growing out of a breach of contract." *Jordan v. Continental Airlines, Inc.,* 2004 WL 447348 (Ala. Civ. App. 2004) (holding that wife could not recover damages for mental anguish as a result of defendant's alleged breach of contract in failing to provide a wheelchair that wife contended caused husband's death) (internal quotes omitted).

In *Bowers v. Wal-Mart Stores, Inc.*, 827 So. 2d 63, 69-70 (Ala. 2001), the Alabama Supreme Court cited with approval an Eleventh Circuit Court of Appeals case, *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351 (11th Cir. 2000), that spoke of "exceptional cases in which Alabama law does allow for mental-anguish claims resulting from a breach of contract." Those exceptional cases listed by the Eleventh Circuit were (1) breaches of contracts to construct or repair, or to provide utilities to, a house, where the breach impacted habitability; (2) breaches of contracts of carriage; (3) breaches of contracts to deliver a baby, when the baby was stillborn; and (4) breaches of warranty in the sale of a "lemon" car. *Bowers*, 827 So.3d at 70. The Alabama Supreme Court stated that "except for the identified types of emotionally intertwined cases to which the Eleventh Circuit refers, we have declined to extend emotional-distress damages to contract claims." *Id. See also, W.B. Davis & Son v. Ruple,* 130 So. 772, 774 (Ala. 1930) (noting that plaintiff's request for damages for mental and physical pain

were <u>not</u> natural and proximate consequences of an alleged breach of an employment contract)[10]

These limited scenarios are not remotely similar to the case at bar and as such, Plaintiff is not

due any emotional or mental anguish damages arising from his claim(s) of breach of contract.

**B.     Plaintiff's Misrepresentation Claims Are Not Actionable As A Matter Of Law.**

In Count Two of the Complaint, Plaintiff makes certain allegations of misrepresentation.

Such allegations are all considered under the same analytical framework – fraudulent

misrepresentation.   "[M]odern case law interpretations of misrepresentation liability, as a

practical matter blur the significance of any distinctions between actions for fraud and deceit."

Michael L. Roberts & Gregory S. Cusimano, *Alabama Tort Law*, 20.0, p. 646 (3d ed. 2000); *see*

*also, Wilhoite v. Franklin*, 570 So. 2d 1236 (Ala. Civ. App. 1990) (treating allegations of fraud,

misrepresentation and deceit as a claim of fraudulent misrepresentation).

In order to survive a motion for summary judgment as a matter of law with respect to a

fraudulent misrepresentation claim, a plaintiff is required to provide substantial evidence of each

of the following elements:  (1) that the defendant made a false representation; (2) of a material

existing fact; (3) on which the plaintiff reasonably relied; and (4) which proximately caused

injury or damage to the plaintiff.  *Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1196 (Ala.

2001).

**1.     Plaintiff's fraudulent misrepresentation claims are barred because such claims are not independent from the promises in the parties' Distributor Agreement.**

"[I]t is clear that *to assert a fraud claim that stems from the same general facts as*

*one's breach-of-contract claim, the fraud claim must be made on representations independent*

---

[10] Similarly, the Alabama Supreme Court has held that "[N]o recovery has ever been allowed for mental distress arising from the wrongful discharge of an employee in breach of an employment contract."  *Wyatt v. BellSouth Inc.*, 757 So. 2d 403, 408 (Ala. 2000), quoting *Hobson v. American Cast Iron Pipe Co.*, 690 So. 2d 341, 344 (Ala. 1997), citing *Southern Medical Health Systems, Inc. v. Vaughn, 669 So. 2d 98 (Ala. 1995).*

*from the promises in the contract and must independently satisfy the elements of fraud*." *Hunt Petroleum Corp. v. Alabama*, 901 So. 2d 1, 10-11 (Ala. 2004) (citing *Deupree v. Butner*, 522 So. 2d 242, 245 (Ala. 1988)) (Houston, J., concurring) (emphasis in original). "[I]t is a universally held principle that the 'mere failure to perform a [contractual] promise does not constitute fraud.'" *Hunt Petroleum Corp.,* 901 So. 2d at 11 (citing *John Brown Automation, Inc. v. Nobles*, 537 So. 2d 614, 618 (Fla. Dist. Ct. App. 1989)) (Houston, J., concurring). Except in the insurance context, a party may intentionally and even in bad faith breach a contract without that action becoming a fraud or other tort. *Hunt Petroleum Corp.,* 901 So. 2d at 11 (citing *American Cast Iron Pipe Co. v. Williams*, 591 So. 2d 854, 857 (Ala. 1991) (Houston, J., concurring).

Fraud in the inducement of a contract is to be distinguished from fraud interwoven with the breach of contract. The latter relates solely to the breaching party's performance of the contract and does not give rise to an independent tort. *Hunt Petroleum Corp.,* 901 So. 2d at 11 (discussing Florida and Michigan authorities) (Houston, J., concurring).

Plaintiff attempts to turn a contract action into a fraud action. Plaintiff's fraud claims (Count Two of the Complaint) arise from, and are not independent of, the Distributor Agreement between Plaintiff and Flowers. Specifically, in Paragraph 13 of the Complaint, Plaintiff asserts, "Defendant represented to Plaintiff that he was purchasing an exclusive right to territory to sell and distribute Flowers products within the territory specifically designated in the contract, and that Defendant would not allow any Defendant, any distributor or company, other than Plaintiff, to call on and distribute Flowers products to any customer within the exclusive territory Plaintiff purchased pursuant to the contract." Plaintiff's assertion in this regard relates solely to the exclusivity provisions in the Distributor Agreement and whether Flowers breached the Agreement when it barred Plaintiff from the Montgomery warehouse and/or terminated the

31

Agreement and began running it on Plaintiff's behalf.  More specifically, Plaintiff's distribution rights and territory, and accompanying rights and obligations, are outlined in Sections 2.1-2.5, 3.1, 3.2, 5.1, and 11.1 of the Agreement.  (Ex. 27 to Pl. Dep., Tab B.)  The parties' respective rights and obligations regarding termination of the Agreement are set forth in Sections 16.1 – 16.4 of the Agreement.  (Ex. 27 to Pl. Dep., Tab B.)  Similarly, in Paragraph 14 of the Complaint, also pled in support of Plaintiff's fraud claim, Plaintiff simply cites several sections of the Agreement regarding products, and product codes and freshness.

Plaintiff's testimony at his deposition further confirms that his fraud claim is simply a breach-of-contract claim.  Prior to executing his first Distributor Agreement in 1994, Plaintiff could not identify any statements by Flowers' officials.  (Pl. Dep. p. 93, line 11 to p. 94, line 21, Tab B.)  When Plaintiff executed his second Distributor Agreement in 2000, he likewise could not identify any specific discussion about the new Agreement, and he testified further that he understood it to be the same deal as the 1994 Agreement.  (Pl. Dep. p. 188, lines 2-23, Tab B.)  Similarly, after selling his 2000 distributorship back to Flowers, Plaintiff, in turn, executed another Distributor Agreement.  He testified that with this new Agreement he simply had more accounts than with the predecessor contract.  (Pl. Dep. p. 233, lines 13-20, p. 235, lines 7-9; Ex. 27 to Pl. Dep., Tab B.)

In sum, Plaintiff's fraud claims are barred because it is inextricably interwoven with Plaintiff's breach-of-contract claims.

> **2.      Plaintiff's fraudulent misrepresentation claims also fail because the undisputed evidence shows that Plaintiff cannot meet the requisite elements.**

Assuming, *arguendo,* Plaintiff's fraud claim is not inextricably interwoven with his breach-of-contract claim, and further, assuming, *arguendo,* a misrepresentation of a material fact, "an essential element of any fraud claim is that the plaintiff must have reasonably relied on

the alleged misrepresentation." *Hunt Petroleum Corp.,* 901 So. 2d at 4 (citing *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1160 (Ala. 2003)). It is not enough to show that false material misrepresentations were made; it must also be established that such misrepresentations were made willfully to deceive, or recklessly without knowledge and thereafter acted upon by the opposite party. Ala. Code § 6-5-101 (1975). "Moreover, the burden is on the party alleging fraud to prove by substantial evidence the element of reliance." *Hunt Petroleum Corp.,* 901 So. 2d at 4 (citing *Allstate Ins. Co. v. Eskridge*, 823 So. 2d 1254, 1264 (Ala. 2001)). "'Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" *Hunt Petroleum Corp.,* 901 So. 2d at 4 (citing *West v. Founders Life Assurance Co. of Florida*, 547 So. 2d 870, 871 (Ala. 1989)); Ala. Code § 12-21-12 (1975); and *Thomas v. Principal Fin. Group*, 566 So. 2d 735, 738 (Ala. 1990)). "Evidence that amounts to 'mere speculation, conjecture, or guess' does not rise to the level of substantial evidence." *Hunt Petroleum Corp.,* 901 So. 2d at 4 (citing Charles W. Gamble, *McElroy's Alabama Evidence* § 448.01 (1991). "Reliance requires that the misrepresentation actually induced the injured party to change its course of action." *Hunt Petroleum Corp.,* 901 So. 2d at 4 (citing *Restatement (Second) of Torts* § 537 (1977)). Additionally, in order for promises to constitute fraudulent misrepresentations, a plaintiff must show that at the time the misrepresentations were made that a defendant had no intention to do the act promised. *Auto-Owners Ins. Co.*, 822 So. 2d at 1197 n.10.

Assuming, *arguendo,* a misrepresentation of a material fact outside the contours of the parties' 2002 Distributor Agreement,[11] there is no evidence of record to suggest any Flowers' representative intended to deceive Plaintiff or made any misrepresentation recklessly

---

[11] There is no record evidence of any alleged misrepresentation outside the Distributor Agreement.

without knowledge. Nor is there any evidence of record to suggest Plaintiff reasonably relied upon any purported representation by a Flowers representative.[12] To the contrary, the uncontradicted evidence of record demonstrates there was no such reasonable reliance. Plaintiff testified that he read the 2002 Agreement before signing it and understood the Agreement, along with its exhibits, were the entire agreement between himself and Flowers.[13] The 2002 Agreement also has an explicit merger/integration clause. (Ex. 27 to Pl. Dep., Tab B.)[14] Perhaps most telling that Plaintiff did not reasonably rely on any alleged misrepresentation of Flowers is his testimony that he began using product from the freezer as early as 2000, and then subsequently entered into the 2002 Agreement. (Pl. Dep. p. 191, lines 2-22, p. 192, line 21 to p. 193, line 22, Tab B.) If, as Plaintiff contends, Flowers' use of the freezer was deceptive in 2005, when he filed his Complaint, it, presumably, was just as deceptive from Plaintiff's perspective in 2002, when he knowingly entered into a new Distributor Agreement.

For all these reasons, Plaintiff has no viable claim of fraud on the merits.

### 3. Plaintiff's fraudulent misrepresentation claim concerning alleged "out-of-code" product is barred by the applicable two-year statute of limitations.

In Alabama, claims of fraudulent misrepresentation are subject to a two-year statute of limitations. Ala. Code § 6-2-38(1) (1975). The limitations period begins to run when a plaintiff is "privy to facts which would 'provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.'" [citations omitted] *Auto-Owners Ins. Co.*, 822 So. 2d at 1195.

---

[12] "Although the terminology varies from state to state the underlying principle is the same – for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation." *Hunt Petroleum Corp.,* 901 So. 2d at 5.

[13] Plaintiff similarly testified with respect to both the 1994 and 2000 Distributor Agreements. (Pl. Dep. p. 101, lines 5-18, p. 235. line 21 to p. 236, line 7, Tab B.)

[14] The 1994 and 2000 Distributor Agreements also had explicit merger/integration clauses. (Exs. 3 and 19 to Pl. Dep., Tab B.)

As discussed above, Plaintiff unequivocally testified that by 2000 he was utilizing some products from the freezer. (Pl. Dep. p. 191, lines 2-22, p. 192, line 21 to p. 193, line 22, Tab B.) Plaintiff went on to testify that the use of products became an issue for him in 2003 or 2004, when he contends that he was not getting the products he ordered. (Pl. Dep. p. 193, line 23 to p. 194, line 22, Tab B.) However, Plaintiff's fraud claim rests on alleged deception. As also discussed above, if, as Plaintiff contends, Flowers' use of products from the freezer was deceptive in 2005, when he filed the Complaint, it, presumably was just as deceptive from his perspective in 2000, when he first started using products from the freezer. Certainly, at that point, he was privy to facts which necessitated follow-up inquiry on his part as stated in *Auto-Owners Ins. Co.* Accordingly, Plaintiff's fraud claim concerning alleged "out-of-code" product is time barred.

### 4. Plaintiff's fraudulent misrepresentation claim concerning "out-of-code" product is barred by the doctrine of waiver and/or estoppel.

For the reasons discussed in section IV. A. 4. of this Brief, to the extent Plaintiff could ever establish a claim for fraudulent misrepresentation, he has waived and/or estopped from pursuing any such claim because subsequent to becoming aware of facts underlying what he now contends is fraud: 1) he continued to operate under his Distributor Agreement and accepted the financial benefits from selling product from the freezer for years before filing this lawsuit; and 2) he entered into a new Distributor Agreement in 2002 with Flowers with full knowledge that product from the freezer would be used on an occasional basis. *See also, Jehle-Slauson Constr. Co. v. Hood-Rich*, 435 So. 2d 716, 719 (Ala. 1983) ("When a contract for release has been induced by fraud, the party claiming fraud must restore the consideration he received under the contract within a reasonable time after discovering the fraud or he waives the right to assert fraud."); *Holczstein v. Bessemer Trust & Sav. Bank*, 136 So. 409, 415 (Ala. 1931)

("If it be conceded that the alleged fraud on the part of Ross was proved as alleged, and constituted a good defense in the first instance, the subsequent renewal of the note after knowledge of said fraud was a waiver of the defense.").

> **5.    Plaintiff's fraudulent misrepresentation claim concerning alleged "out-of-code" product is barred because his damages are totally speculative.**

For the reasons discussed in section IV. A. 3. of this Brief, to the extent Plaintiff could ever establish a claim for fraudulent misrepresentation, any claim is barred because his damages are totally speculative.

> **C.    <u>Plaintiff's Negligence Claim Is Not Actionable As A Matter Of Law.</u>**

> **1.    Plaintiff's negligence claim concerning both alleged "out-of-code" products and the termination of his Distributor Agreement are barred because such claims involve mere failure to perform a contract, and do not provide a foundation for a tort action.**

"A mere failure to perform a contract obligation is not a tort, and it furnishes no foundation for an action on the case." *C&C Products, Inc. v. Premier Ind. Corp.*, 275 So. 2d 124, 130 (1972), *appeal after remand sub nom., Premier Ind. Corp. v. Marlow*, 295 So. 2d 396, *cert. den'd,* 419 U.S.1033 (1974).   Where every wrong alleged is within the confines of a contract, and there is no independent legal duty outside the confines of the contract, there is no cause of action in negligence. *See, e.g. Cahaba Seafood, Inc. v. Central Bank*, 567 So. 2d 1304 (Ala. 1990) (holding that outside contract no duty to lend money, and therefore, summary judgment for bank on negligence and wantonness claims); *Armstrong Business Services, Inc. v. AmSouth Bank,* 817 So. 2d 665 (Ala. 2001) (holding that because no independent common law duty regarding loan application policies, negligence and wantonness claims not actionable).

Here, Plaintiff's own pleading demonstrates that the case at bar is solely a breach-of-contract claim and not a tort claim.  Specifically, in support of his negligence claim, Plaintiff

pleads in Paragraph 19 of the Complaint – "Defendant negligently failed to abide **by the terms of its agreement with Defendant** by supplying Defendant [sic] with "out of code" or expired product, and/or by requiring Plaintiff to deliver "out of code" or expired product to his customers and/or by usurping Defendant's [sic] **duties and obligations under the contract** causing him to incur unnecessary expenses and costs." (emphasis supplied.) Moreover, as discussed in section IV. B. 1. of this Brief, Plaintiff's assertions regarding "out-of-code" products and the termination of his Distributor Agreement relates solely to various provisions in the Agreement. Accordingly, Plaintiff has no actionable negligence claim.[15]

> **2.    Plaintiff's negligence claim also fails because Flowers acted in accordance with the parties' Distributor Agreement and Flowers otherwise exercised such care as a reasonably prudent and careful person under similar circumstances.**

"[N]egligence is the failure to do what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something which a reasonably prudent person would not have done under the same or similar circumstances." *Helms v. Allied Mills Co.,* 387 So. 2d 152, 155 (Ala. 1980).

Accordingly, for the reasons set forth in sections IV. A. 1.-2. of this Brief, Plaintiff has no actionable negligence claim.

> **3.    Plaintiff's negligence claim concerning alleged "out-of-code" product is barred by the applicable two-year statute of limitations.**

In Alabama, negligence claims are subject to a two-year statute of limitations. Ala. Code § 6-2-38(1) (1975).

Accordingly, for the reasons set forth in section IV. B. 3. of this Brief, Plaintiff's

---

[15] The fact that no independent legal duty exists, fiduciary or otherwise, is confirmed by Section 15.1 of the Distributor Agreement: "The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement." (Ex. 27 to Pl. Dep., Tab B.)

negligence claim with respect to alleged "out-of-code" product is time barred.

> **4.      Plaintiff's negligence claim concerning alleged "out-of-code" product is barred by the doctrine of waiver and/or estoppel.**

For the reasons discussed in sections IV. A. 4. and IV. B. 4. of this Brief, to the extent Plaintiff could ever establish a negligence claim with respect to alleged "out-of-code" product, he has waived and/or is estopped from pursuing such claim due to his ongoing conduct under the Distributor Agreement, his purchase of a new Distributor Agreement in 2002 after becoming aware of the limited practice of delivery of items from the freezer, and otherwise.

> **5.      Plaintiff's negligence claim concerning alleged "out-of-code" product is barred because his alleged damages are totally speculative.**

For the reasons discussed in section IV. A. 3. of this Brief, to the extent Plaintiff could ever establish a negligence claim with respect to alleged "out-of-code" product, any such claim is barred because his damages are totally speculative.

> **D.      <u>Plaintiff's Wantonness Claims Are Not Actionable As A Matter of Law.</u>**

> **1.      Plaintiff's wantonness claim concerning both alleged "out-of-code" product and the termination of his Distributor Agreement are barred because such claims involve mere failure to perform a contract, and do not provide a foundation for a tort action.**

As discussed in section IV. C. 1. of this Brief, a mere failure to perform a contract obligation is not a tort when the wrong or wrongs alleged is within the confines of a contract, and there is no independent legal duty outside the confines of the contract. *Cahaba Seafood, Inc.*, *supra*; *Armstrong Business Services, Inc., supra*.    Because Plaintiff's wantonness claim regarding termination of his Distributor Agreement and alleged "out-of-code" product, like his claims for misrepresentation and negligence, relates solely to various provisions of the Distributor Agreement, and because Flowers did not owe Plaintiff any duty independent of the Distributor Agreement, Plaintiff has no claim for wantonness.

2.    **Plaintiff's wantonness claim also fails because the undisputed evidence shows that Plaintiff cannot meet the requisite elements**.

The applicable definition of wantonness is defined by statute as: "Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3) (1975). When a party alleges wanton conduct as a cause of action and seeks punitive damages, a plaintiff must prove that a defendant consciously or deliberately engaged in wanton conduct. *Berry v. Fife*, 590 So 2d. 884, 885 (Ala. 1991); Ala. Code § 6-11-20(a) (1975). This must be proved by "clear and convincing evidence." Ala. Code § 6-11-20(a) (1975).[16]

As discussed above, the undisputed evidence of record shows that products from the freezer were used only for restaurant accounts, in emergency situations, to meet customer needs. Freezing products does not distort product quality and there is no safety issue. As also discussed above, Flowers barred Plaintiff from its Montgomery warehouse only because its senior management believed, in good faith, that Plaintiff had threatened Grady Messer. Flowers then terminated Plaintiff's Distributor Agreement only after attempting to get him back into the Sodexho account, an account with whom Plaintiff had previously had issues, against a backdrop of significant other performance issues. Such a record undermines any inference of wantonness on the part of Flowers. Accordingly, Plaintiff has no viable claim of wantonness.

---

[16] "Clear and convincing evidence" is defined by statute as follows:

> Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.

Ala. Code § 6-11-20(b)(4) (1975).

3.    **Plaintiff's wantonness claim with respect to alleged "out-of-code" product is barred by the applicable two-year statute of limitations.**

In Alabama, wantonness claims are subject to a two-year statute of limitations. Ala. Code § 6-2-38(1) (1975).  Accordingly, for the reasons set forth in section IV. B. 3. of this Brief, Plaintiff's wantonness claim with respect to alleged "out-of-code" product is time barred.

4.    **Plaintiff's wantonness claim with respect to alleged "out-of-code" product is barred by the doctrine of waiver and/or estoppel and because his alleged damages are totally speculative.**

For the reasons set forth in sections IV. A. 3.-4., and IV. B. 4. of this Brief, Plaintiff's wantonness claims with respect to alleged "out-of-code" product are barred by the doctrine of waiver and/or estoppel and because his alleged damages are totally speculative.

E.    **Plaintiff's Conversion Claim Is Not Actionable As A Matter of Law.**

1.    **Plaintiff's conversion claim is barred because such claim involves only potential breach of contract, which does not give rise to an independent tort.**

As discussed in section IV. C. 1. of this Brief, a mere failure to perform a contract obligation is not a tort when the wrong or wrongs alleged are within the contours of the contract, absent an independent legal duty.  As set forth above, following the termination of Plaintiff's Distributor Agreement, Flowers has operated Plaintiff's distributorship on his behalf, which Plaintiff acknowledges.  Thus, Plaintiff's conversion claim revolves solely around whether Flowers has complied with Section 16.4 of the Agreement; therefore, Plaintiff has no independent action in tort.

2.    **Plaintiff's conversion claim also fails because the undisputed evidence shows that he cannot meet the requisite legal standard.**

"To establish conversion, a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Birmingham-Jefferson County Transit Auth. v. Arvan*,

669 So. 2d 825, 828 (Ala. 1995).  Because it is undisputed that Flowers continues to operate

Plaintiff's distributorship on his behalf, as a matter of law, Plaintiff has no conversion claim.[17]

**F.    Any Claim Of Plaintiff Arising Before March 11, 2002 Is Barred By The Doctrine Of Release.**

As stated above, each time Plaintiff sold a distributorship back to Flowers, specifically

his 1994 and 2000 distributorships, he understood he was releasing all claims related to the

distributorship(s).  Particularly, in June 2000, when Plaintiff sold Flowers his 1994

distributorship, he executed a document entitled "Release Agreement and Bill of Sale" wherein

he released any claims related to the 1994 Distributor Agreement.  (Pl. Dep. p. 173, line 15 to p.

174, line 16, p. 176, line 14 to p. 177, line 5; Ex. 18 to Pl. Dep., Tab B.)  Similarly, on March 11,

2002, when Plaintiff sold his 2000 distributorship back to Flowers he again executed a document

entitled "Release Agreement and Bill of Sale" which he understood meant he released all claims

relating to the 2000 distributorship.  (Pl. Dep. p. 232, line 11 to p. 233, line 9; Ex. 26 to Pl. Dep.,

Tab B.)  As such, as of the date of the last sale of his distributorship, March 11, 2002, Plaintiff

had waived and released all claims against Flowers arising before that date, including any claims

arising in contract or tort.  Therefore, Plaintiff is limited to asserting any claims that arise after

March 11, 2002, and relate to the 2002 Distributor Agreement as he has released all claims to

any distributorship agreements before that date.

**G.    Plaintiff's Claim For Punitive Damages Is Not Actionable Because The Undisputed Evidence Shows That Flowers Did Not Consciously Or Deliberately Engage In Any Oppression, Fraud, Wantonness, Or Malice.**

Despite Plaintiff's many breach letters and other issues with customers as a Flowers'

Distributor, he is also seeking punitive damages in this lawsuit.  As stated above, Plaintiff cannot

recover non-contractual or punitive damages arising from his breach-of-contract claim.  In order

---

[17] For example, this includes continuing to make insurance payments on Plaintiff's behalf, including insurance payments for personal vehicles.  (Pl. Dep. p. 383, line 7 to p. 384, line 16, Tab B.)

to collect punitive damages arising from any tort claim, Plaintiff will have to meet the standard set forth in Ala. Code § 6-11-20(a) (1975):

> Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Nothing contained in this article is to be construed as creating any claim for punitive damages which is not now present under the law of the State of Alabama.

A review of Plaintiff's many customer issues while a distributor with Flowers and Flowers' repeated efforts to work with Plaintiff despite numerous customer complaints at the very least demonstrates that Flowers did not engage in oppression, fraud, wantonness or malice, but treated Plaintiff with perhaps too much munificence.

As early as 1998, Plaintiff apparently engaged in serious wrongdoing as a distributor when Gunter Air Force barred him from the base after an extensive investigation. Plaintiff admits that it is possible he stole from this account. (Pl. Dep. p. 157, line 10 to p. 164, line 3; Exs. 13 and 14 to Pl. Dep., Tab B.) Plaintiff was able to rectify this breach only by having another distributor handle the account. (Pl. Dep. p. 157, lines 13-23, p. 164, lines 4-23; Exs. 13 and 15 to Pl. Dep., Tab B.)

During the tenure of his 2000 Distributor Agreement, Plaintiff received two breach letters in 2001, related to his customers, Applebee's and Winn-Dixie. (Messer Decl. ¶¶ 2-3; Exs. 1 and 2 to Messer Decl., Tab C.)

After the purchase of his 2002 Distributor Agreement, Plaintiff's work ethic and habits grew increasingly worse. On March 18, 2002, Plaintiff received a breach letter regarding his failure to remove out-of -code product from a Winn-Dixie. (Messer Decl. ¶ 4, Ex. 3 to Messer Decl., Tab C.) On May 29, 2002, Plaintiff received a breach of contract letter for multiple service issues. (Messer Decl., ¶ 5, Ex. 4 to Messer Decl., Tab C.) On June 3, 2004, Plaintiff

received a breach letter for not providing five day service on his Burger King accounts after having been reminded to do so just two months earlier. (Messer Decl.¶¶ 6-7, Exs. 5 and 6 to Messer Decl., Tab C.)  The following month, on July 16, 2004, Plaintiff received another curable breach letter for failing to properly service his accounts. (Messer Decl. ¶ 8, Ex. 7 to Messer Decl., Tab C.)

On December 6, 2004, Plaintiff was kicked out of his Krystal accounts for leaving product sitting outside the back door of the restaurant, and was issued another curable breach letter. (Messer Decl. ¶ 10, Ex. 9 to Messer Decl., Tab C.)  Two months later, on February 3, 2005, Plaintiff was kicked out of one of his Burger King accounts.  (Messer Decl. ¶ 11, Ex. 10 to Messer Decl., Tab C.)

Following this incident, Plaintiff failed to deliver buns to Sodexho at Troy State and did not contact either the customer or Flowers to provide any explanation and was subsequently kicked out of the account as explained above.  (Facts # 47-56.)  Following the termination of his contract, Flowers has continued running Plaintiff's territory and has not sold his distributorship while litigation is ongoing. (Lord Decl. ¶ 4, Tab F.)

A review of the undisputed facts demonstrates that there is an absence of any of the four elements necessary to award punitive damages.  First, there is no evidence of oppression by Flowers which is defined as "(5) Oppression.  Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."  Ala Code. § 6-11-20 (1975).   As the facts demonstrate, Flowers gave Plaintiff repeated chances to cure his breaches despite that fact that he engaged in theft, unprofessional behavior and sloppiness, which in turn could have harmed Defendant's reputation.   After numerous curable breaches, Defendant finally terminated the contract with Plaintiff after he was unable to cure his breach.  Moreover, Defendant continues to

run Plaintiff's route for him until the litigation is over, even though Plaintiff has now testified that he has engaged in unauthorized accounting to his benefit and also, for lack of a better word, "stiffed" his customers, to his own benefit. (Pl. Dep. p. 153, line 19 to p. 154, line 7, p. 155, lines 1-4, p. 156, line 9 to p. 157, line 9, Tab B.)   There is absolutely no evidence that Flowers has engaged in cruel or unjust measures when dealing with Plaintiff.

Similarly, without reiterating the numerous undisputed facts and arguments in Section VI. B. and C., there is no evidence that Flowers engaged in fraud or wantonness with regard to Plaintiff.   Likewise, there is no evidence that Flowers engaged in malice with regard to its actions involving the Plaintiff.   Flowers gave Plaintiff repeated chances to cure his multiple breaches and even contacted Plaintiff's customers to assist him in getting back into accounts. (Stephens Decl. ¶ 2, Tab D.)   As evidenced by the numerous exhibits to this summary judgment submission, Plaintiff was consistently counseled and supported throughout his tenure as an Independent Distributor with Flowers and this is evidenced by the fact, that Plaintiff bought two additional contracts with Flowers after selling his first territory back to Flowers in 2000.   (Exs. 19 and 27 to Pl. Dep., Tab B.)   If Flowers had indeed engaged in oppression, fraud or malice, it stretches the imagination to believe that Plaintiff would continue his business relationship with Defendant after 2000, buying yet another territory in March 2002.   (Ex. 27 to Pl. Dep., Tab B.)

It is, however, undisputed by Plaintiff's own admission, that Plaintiff actively engaged in theft and unauthorized accounting practices while a distributor with Flowers, thus stealing from Flowers and/or his customers which is a clear breach of Section 16.2 of the contract.   (Ex. 27 to Pl. Dep., Tab B.)   It would be impossible to calculate how much Plaintiff has improperly and fraudulently taken from Flowers and/or his customers.[18]   Had Flowers been aware of these

---

[18] Of course, this is not surprising given that Plaintiff knowingly did not file his 1999-2003 tax returns until 2006, without any explanation for the delay.  (Pl. Dep. p. 365, lines 8-19, Tab B.)

actions by Plaintiff, they would have terminated Plaintiff's contract years ago. (Bordeaux Decl. ¶ 10, Tab A.) A review of the facts of this case demonstrates that there is simply no evidence to support any award of punitive damages in this matter.

### H.    Plaintiff's Damages Both in Tort and Contract are Barred by the Doctrine of After-Acquired Evidence.

It is undisputed that Plaintiff testified that he engaged in improper accounting practices and unauthorized transactions as a distributor with Flowers and that he benefited financially from such transactions. (Pl. Dep. p. 153, line 19 to p. 154, line 7, Tab B.) Such unauthorized transactions included "shorting accounts," meaning he did not deliver all product shown on the delivery tickets, but was still paid for it. (Pl. Dep. p. 156, line to p. 157, line 9, Tab B.) Steve Bordeaux, Flowers' President, had he been aware of this admitted activity, would have terminated Plaintiff's Distributor Agreement under the non-curable breach section of the Agreement, Section 16.2. (Bordeaux Decl. ¶10; Ex. 27 to Pl. Dep., Tab B.)

In the Supreme Court case of *McKennon v. Nashville Banner Publishing Company,* 513 U.S. 352 (1995), the Court held that if evidence was discovered during the course of litigation of wrongdoing that was of "such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of discharge," the Court may dismiss any action for reinstatement or front pay. 513 U.S. at 362-363. The Court added the following with regards to backpay:

> Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit. The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered.

513 U.S. at 362. The theory of after-acquired evidence to halt reinstatement, frontpay and backpay is also applicable to cases arising in contract and/or tort. *Quillen v. American*

*Tobacco Company, et al.*, 874 F.Supp. 1285 (M.D. Ala. 1995).  The same analysis should be applied to the case at bar given Plaintiff's admitted theft.

> **I.**     **Defendant Should Be Awarded Its Legal Fees And Expenses Associated With This Litigation.**

Under Section 17.1(c) of the Distributor Agreement, the prevailing party is entitled to its legal fees and expenses in any litigation.  As such, Defendant prays that should the Court decide that Defendant is entitled to summary judgment, in whole or in part, Defendant be awarded its reasonable attorneys fees and expenses associated with the defense of such claims through summary judgment.

**V.     CONCLUSION**

For the foregoing reasons, Flowers respectfully submits that the Court grant it summary judgment on all of Plaintiff's claims and award it its reasonable costs and attorneys' fees.

Respectfully submitted this 2nd day of July, 2007.

/s/ Kevin P. Hishta
Kevin P. Hishta
Georgia Bar No. 357410
Admitted *Pro Hac Vice*
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Bank of America Plaza
600 Peachtree Street, NE
Suite 2100
Atlanta, GA  30308
E-mail: Kevin.Hishta@ogletreedeakins.com
(404) 881-1300
(404) 870-1732 Fax

Sandra B. Reiss (REI018)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118

E-mail: Sandra.Reiss@ogletreedeakins.com
(205) 328-1900
(205) 328-6000 Fax

Counsel for Defendant, Flowers Baking Co. of
Opelika, LLC

## CERTIFICATE OF SERVICE

      I hereby certify that on this the 2nd day of July, 2007, I electronically filed the foregoing
Brief in Support of Defendant's Motion for Summary Judgment with the Clerk of the Court
using the CM/ECF system which will send notification of such filing to:

      Greg L. Davis
      6987 Halcyon Park Drive
      Montgomery, AL  36117

      Dan W. Taliaferro
      6987 Halcyon Park Drive
      Montgomery, AL  36117

          /s/ Kevin P. Hishta
          Kevin P. Hishta