# Tab B –

# DEPOSITION OF HENRY PORTERFIELD

FREEDOM COURT REPORTING

Page 23

1          Q.      Okay.  Basically the same

2     thing you talked about with Marcus?

3          A.      Yes.

4          Q.      Have any other previous

5     discussions concerning the lawsuit or the

6     allegations in the lawsuit with either

7     Marcus or your daughter?

8          A.      Previously.  Down the road,

9     yes, we have.  We have discussed it

10    before.

11         Q.      Okay.

12         A.      I don't know when.  But --

13    but it's been several times we have

14    discussed it.  Just talk about how long

15    it's going to go, what's going on, what

16    you think and different things like that,

17    yeah.

18         Q.      Did you --

19         A.      No details getting into it.

20         Q.      Did you discuss with either

21    one of them why you believe -- you think

22    that your contract was wrongfully

23    terminated?

FREEDOM COURT REPORTING

Page 85

1          Q.      So what happened?

2          A.      They terminated me and I

3    think about two more salespeoples and

4    about -- at Sears Roebuck.

5          Q.      Okay.  So you were

6    terminated from both Sears and Allstate?

7          A.      Yes.

8          Q.      Okay.  Do you remember

9    anybody else that you've been terminated

10   from?

11         A.      Not that I know of.

12         Q.      Who was the supervisor at

13   Sears that terminated your employment?

14         A.      It's been so long.  I don't

15   know.

16         Q.      Do you recall the name of

17   the supervisor that terminated your

18   employment at Allstate?

19         A.      Chuck -- Chuck Grant.

20         Q.      How did you become

21   interested in working for Flowers?

22         A.      Steve Bordeaux hired me.

23         Q.      Did you know Mr. Bordeaux

1    prior to going to work for Flowers?

2         A.      Yes.

3         Q.      How did you know him?

4         A.      When I worked at Winn-Dixie.

5         Q.      How did you come to know him

6    while you were working at Winn-Dixie?

7         A.      I was the pricing manager at

8    the Winn-Dixie, and they had to come

9    through me to get different things done.

10   I was overseeing all the prices in the

11   store and the vendors and everything.

12   That's how I come to know him.

13        Q.      Was Mr. Bordeaux responsible

14   for you coming to work for Flowers?

15        A.      Yes.

16        Q.      Did he hire you?

17        A.      Yes.

18        (Whereupon, Defendant's Exhibit No.

19   2 was marked for identification purposes

20   by Mr. Hista.)

21        Q.      (BY MR. HISTA)  Let's mark

22   this as 2.  Mr. Porterfield, have you had

23   the opportunity to review Defendant's

FREEDOM COURT REPORTING

Page 90

1    Mr. Rankin.  Who is Mr. Rankin?

2         A.      Supervisor.

3         Q.      Was he the supervisor that

4    terminated your employment at Allstate?

5         A.      He's one of them, yes.  Him

6    and -- he was the supervisor.  And Chuck

7    was the head man.  That's why I said

8    Chuck's name.

9         Q.      Why did you put Mr. Rankin

10   in as the reason for leaving?

11        A.      Well, he the one that

12   recommended it.  That's why.

13        Q.      He's the one that

14   recommended you be terminated?

15        A.      Uh-huh.

16        Q.      Do you recall how long you

17   were in a route sales salesman position

18   before you became a distributor?

19        A.      I think about a little over

20   five years.

21        Q.      Okay.

22        A.      I believe.

23        Q.      Who were your supervisors

FREEDOM COURT REPORTING

Page 93

1    thing.  Somewhere around about '94, '93.

2    Somewhere around there.

3           Q.      Do you recall anything

4    specific about what you heard in the

5    warehouse?

6           A.      Nothing but said they were

7    changing over to distributorships.  And

8    you lose your benefits.  And that's

9    basically what I heard.  They were

10   changing over to distributorships.

11          Q.      Were there a series of

12   meetings to explain what the

13   distributorship relationship or program

14   would entail?

15          A.      It was a series of meetings

16   that we had.  I remember one, maybe two.

17          Q.      Okay.

18          A.      I believe.

19          Q.      One or two meetings?

20          A.      Yes, I believe.

21          Q.      And do you recall what was

22   said during those meetings?

23          A.      I can't go -- go with

FREEDOM COURT REPORTING

Page 94

1  specifics, no.

2           Q.     Okay.  You don't remember

3  any specifics at all from those meetings?

4           A.     One thing I know.  They had

5  everybody pumped up like it was so good.

6  I remember that part.

7                  Everything -- they painted a

8  real pretty picture.  And about two years

9  into it you found out it wasn't as good

10  because everything changed.

11          Q.     Okay.

12          A.     All the good stuff you got

13  when you started it started -- started

14  dropping it back.

15          Q.     Do you remember any specific

16  statements by any Flowers representatives

17  during these --

18          A.     I don't remember.

19          Q.     You don't remember any

20  statements whatsoever?

21          A.     I don't remember.

22          Q.     Do you remember receiving a

23  copy of a distributor agreement during any

FREEDOM COURT REPORTING

Page 95

1    of the meetings that you've mentioned?

2         A.    At that last meeting we did.

3         Q.    Did you receive a copy

4    before that?

5         A.    I don't remember.

6         (Whereupon, Defendant's Exhibit No.

7    3 was marked for identification purposes

8    by Mr. Hista.)

9         Q.    (BY MR. HISTA)  Okay.  The

10   court reporter has marked this next

11   exhibit No. 3.

12             If you could, take a few

13   moments and look at that for me, please.

14        A.    (Witness complying.)

15             MR. TALIAFERRO:  It's twenty

16   pages long.  Would you mind --

17             MR. HISTA:  Yeah.

18        Q.    (BY MR. HISTA)  I'm going to

19   ask you -- you don't need to read the

20   document in its entirety.  I'm just going

21   to ask you about a few specific provisions

22   in it.

23             Why don't we just jump ahead?

FREEDOM COURT REPORTING

Page 96

1    And at the bottom of the page, you will

2    see number -- the FBO and then a series of

3    numbers.  Do you see that?

4            A.    Uh-huh.

5            Q.    That's commonly what is

6    referred to as a Bates number which

7    lawyers use to just keep track of a

8    document.

9            A.    Copies.

10           Q.    If you could look -- and

11   it's actually -- the pages of this

12   document are also numbered.

13                 Can you turn to page 20 of

14   this document?

15           A.    (Witness complying.)

16           Q.    Are you with me on page 20

17   at the bottom of the page?  Why don't you

18   go back a couple of pages?

19           A.    (Witness complying.)  I see.

20   I got -- I got you.

21           Q.    All right.  And do you see

22   the word "distributor" on page 20?

23           A.    Yes.

FREEDOM COURT REPORTING

Page 97

1          Q.     And underneath the word

2     "distributor" is a signature.  Do you see

3     that?

4          A.     Yes.

5          Q.     And is that your signature?

6          A.     Yes, it is.

7          Q.     Do you recognize any of the

8     other signatures on there?

9          A.     Yes.

10          Q.     Could you tell which

11     signatures you recognize?

12          A.     Steve Bordeaux and Calvin

13     Rhodes.  And the other two I can't tell

14     what they said.  Charles something.

15          Q.     Okay.  Can you tell me what

16     this document is?

17          A.     This is the signing of the

18     agreement, or the contract.

19          Q.     Okay.  Is this the first

20     distributor agreement that you signed with

21     Flowers Baking Company of Opelika?

22          A.     Yes.

23          Q.     Okay.  I'd like to just ask

FREEDOM COURT REPORTING

Page 98

1    you some questions about several of the

2    provisions -- several of the provisions in

3    this contract.

4              Let's first turn your

5    attention to Section 2.5.

6         A.    Okay.

7         Q.    Would you agree with me that

8    maintaining an adequate and fresh supply

9    of products in your stores and accounts is

10   good industry practice?

11        A.    Yes.

12        Q.    Would you agree with me that

13   properly rotating the products in your

14   accounts is good industry practice?

15        A.    Yes.

16        Q.    Would you agree with me that

17   promptly removing all stale products from

18   your accounts is good industry practice?

19        A.    Yes.

20        Q.    Would you agree with me that

21   maintaining proper service and delivery to

22   all of the accounts in your territory

23   requesting service is good industry

Page 99

1    practice?

2         A.    Yes.

3         Q.    Turning your attention to

4    5.1, would you agree with me that under

5    Section 5.1 you were agreeing and

6    obligated to use your best efforts to

7    develop and sell the products to the

8    customers in your territory?

9         A.    Yes.

10        Q.    And would you agree with me

11   that under Section 5.1 that you agreed and

12   were obligated to cooperate with the

13   company with respect to company marketing

14   programs?

15        A.    Yes.

16        Q.    Turning your attention to

17   16.3, would you agree with me,

18   Mr. Porterfield, that under Section 16.3

19   that if you did not properly service an

20   account that Flowers had the right to

21   issue you a ten-day breach letter?

22        A.    Yes.

23        Q.    And did you understand that

FREEDOM COURT REPORTING

Page 100

1    under Section 16.3 that if you did not

2    cure a breach during a ten-day period that

3    Flowers had the right to terminate the

4    distributor agreement?

5            A.    You said ten days?

6            Q.    Yes.

7                  MR. TALIAFERRO:  I'm going to

8    object to the form.  But ten business

9    days.

10           A.    Ten business days.

11           Q.    The --

12           A.    I agreed to this.  But in my

13   case, that wasn't the answer.

14           Q.    That's all I'm asking is

15   your understanding.  That if there was --

16   if there was a breach and that breach was

17   not cured within ten business days, would

18   you agree with me that Flowers had the

19   right to terminate the distributor

20   agreement?

21           A.    Yes.

22           Q.    And would you agree with me

23   that under Section 16.3 that if there were

FREEDOM COURT REPORTING

Page 101

1    in fact repeated violations of the

2    distributor agreement that Flowers could

3    terminate the contract on that basis?

4          A.    Yes.

5          Q.    Turning your attention to

6    Section 19.4, if you could take a few

7    moments and read that for me, please.

8          A.    (Witness complying.)

9          Q.    Did you understand that

10   under Section 19.4 that the distributor

11   agreement set forth the terms and

12   conditions of your relationship with

13   Flowers Baking Company?

14         A.    Yes.

15         Q.    And did you understand that

16   if a representation was not contained in

17   this agreement that it wasn't binding?

18         A.    I understand.

19         (Whereupon, Defendant's Exhibit No.

20   4 was marked for identification purposes

21   by Mr. Hista.)

22         Q.    (BY MR. HISTA)

23   Mr. Porterfield, the court reporter is

1    handing you what has been marked as

2    Exhibit -- Defendant's Exhibit No. 3

3    (sic.).

4                    If you could just take a few

5    months and look at that for me, please.

6                    MS. REISS:  I think it's

7    four.

8            Q.    (BY MR. HISTA)  No. 4.  I'm

9    sorry.

10           A.    I understand.

11           Q.    Okay.  Mr. Porterfield, on

12   the bottom right-hand side of this

13   document under the word "distributor," is

14   that your signature?

15           A.    Yes.

16           Q.    Did you sign this document?

17           A.    Yes.

18           Q.    Tell me what it is, please.

19           A.    Agreement if I didn't -- six

20   months to one day the effective day that

21   they would buy back the distributorship.

22   I understand that.

23           Q.    So basically you had six

FREEDOM COURT REPORTING

Page 103

1    months and one day.  If you weren't happy

2    with the way things were going, Flowers

3    would buy it back?

4          A.    Yes.

5          Q.    And during that time period,

6    were you satisfied with the way the

7    distributor relationship was going with

8    Flowers?

9          A.    Yes.

10         (Whereupon, Defendant's Exhibit No.

11   5 was marked for identification purposes

12   by Mr. Hista.)

13         Q.    (BY MR. HISTA)  Okay.  No.

14   5.  If you could take a few moments and

15   look at this one for me, please.

16         A.    It's --

17         Q.    Mr. Porterfield, have you

18   had the opportunity to review Exhibit No.

19   5?

20         A.    I -- I -- I know what this

21   is.

22         Q.    Tell me what it is.

23         A.    This is the outline of the

FREEDOM COURT REPORTING

Page 107

1         A.      Yes.

2         Q.      Tell me how that worked.

3         A.      You ordered seven days in

4    advance.  And I might can get some of it

5    right because it's about so long.

6              On -- such as you order a

7    week in advance for your stops.  And then

8    you -- you had a route book.  It tells

9    about how much the sales, the stop was

10   doing.  And you try to guess at it because

11   that's all you were doing.  Trying --

12        Q.      Okay.

13        A.      -- to get it close.

14   Projection close to what they was selling.

15        Q.      And were you making that

16   decision as to --

17        A.      Yes, I was.

18        Q.      -- what product you were

19   going to order?

20        A.      Yes.

21        Q.      Okay.  When you say you

22   ordered seven days in advance, were you

23   ordering product for your normal service

FREEDOM COURT REPORTING

Page 108

1    days?

2          A.     Yes.

3          Q.     Is that how it generally

4    worked?

5          A.     Yes.

6          Q.     And what were the normal

7    service days?

8          A.     Normal service days was

9    Monday, Tuesday, Thursday, Friday,

10   Saturday.

11         Q.     And your normal off days

12   were Wednesday and Sunday?

13         A.     Yes.

14         Q.     Did you have to do pull-ups

15   on Wednesday and Sunday?

16         A.     No.

17         Q.     How did that work?  How was

18   the --

19         A.     The company had pull-up

20   peoples to do it.

21         Q.     When you -- when you ordered

22   product, would you agree with me that it

23   was good industry practice to order fresh

FREEDOM COURT REPORTING

Page 109

1    product for your accounts for each of the

2    normal service days?

3           A.     It -- it would have been

4    good product if you ordered it three days.

5           Q.     Well, let's say you order on

6    Monday.  What day are you ordering for

7    that --

8           A.     On Monday?

9           Q.     Uh-huh.

10          A.     I am ordering for Saturday

11   of the same -- of the same week.

12          Q.     Okay.  And then on Tuesday

13   you're ordering for the following Monday?

14          A.     For the following Monday.

15          Q.     Okay.  And then on Thursday,

16   what are you ordering for?

17          A.     Tuesday.

18          Q.     And then on Friday what are

19   you ordering for?

20          A.     Thursday.

21          Q.     And on then Saturday?

22          A.     Friday.

23          Q.     Okay.  So you're ordering a

1    week in advance for what you anticipate

2    your customers' needs are on the five

3    normal service days, correct?

4         A.    Yes.

5         Q.    And, you know, is it fair to

6    say that it's good industry practice to

7    provide fresh product to your accounts on

8    those five normal service days?

9         A.    It's -- it's fair industry

10   practice if you had bread in code.  You

11   had a four, five-day code on the bread.

12   You could order Monday and supply Tuesday.

13   Because it still was in code.

14              And you wasn't -- you didn't

15   have stale bread on the market.  For

16   instance, what you order on Saturday, it

17   have an extra day.  It don't come out

18   until Thursday.

19        Q.    But that bread isn't as

20   fresh as the product that went into the --

21   if you had ordered for Tuesday, you would

22   have fresher bread, correct?

23        A.    It would be fresher.

FREEDOM COURT REPORTING

Page 115

1    that what Flowers representatives told you

2    was incorrect?

3            A.      I don't know.

4            Q.      Did you service your Burger

5    Kings five days a week?

6            A.      Sometime.

7            Q.      And sometimes you didn't?

8            A.      Yes.

9            Q.      At some point, there were

10   complaints about your service to Burger

11   King, were there not?

12           A.      Yes.

13           Q.      How would you go about

14   servicing your territory when you were a

15   distributor for Flowers?

16                   What time did you come into

17   the warehouse generally?

18           A.      4:30, quarter to five, five.

19   Somewhere around there.

20           Q.      Okay.  It wasn't any set

21   time to come in, was there?

22           A.      No.

23           Q.      And how did you determine

FREEDOM COURT REPORTING

Page 116

1    the order of visiting your accounts during

2    the course of a day?

3          A.      You determined by what time

4    they open up and about what time the --

5    outline the route you had to take to save

6    you gas on your truck.  That's it.

7          Q.      Did you make that decision?

8          A.      Yes, I did.

9          Q.      Flowers didn't tell you the

10   order in which you had to service the

11   accounts?

12         A.      They told me I had to

13   service -- I knew I had to service

14   Winn-Dixie before twelve and certain

15   things like that.

16         Q.      Because that was

17   Winn-Dixie's policy?

18         A.      Yes.

19         Q.      Take me through a typical

20   day of coming into the warehouse.  You've

21   ordered your product.  There's product in

22   the warehouse.  Just tell me what you did.

23         A.      When you first get in, you

FREEDOM COURT REPORTING

1    run a load sheet, check your load.

2         Q.      When you say load, are you

3    referring to products?

4         A.      Product.  Check your

5    product.  Then you separate it by stops.

6    Then you load your truck.

7              You load your truck with the

8    last stop you work to the front and work

9    yourself back.

10             Then you go and start working

11   the route.  The first stop should be on

12   the tail end of the truck to bring it off

13   first.  And then just finish the day the

14   same way.

15        Q.      Could you make additions or

16   subtractions to product orders?

17        A.      Yes.

18        Q.      Was that commonly referred

19   to as adds and cuts?

20        A.      Yes.

21        Q.      How does that work?

22        A.      If you get in and you have

23   an overage, you can put in the overage.

FREEDOM COURT REPORTING

Page 118

1    If you have something that was damaged,

2    you can use damaged.  Something that

3    wasn't there, you can cut.

4         Q.    Is that your decision?

5         A.    Your daily decision.

6         Q.    Your daily decision?

7         A.    Yes.

8         Q.    What's a final load report?

9         A.    Final load report is --

10   final load report is what you had on the

11   truck.

12        Q.    That's the inventory

13   starting the day?

14        A.    Yes.

15        Q.    Tell me, how did you work,

16   you know, transactions with your

17   authorized charge accounts?  How did that

18   work?

19             What type of sales

20   transaction would you conduct with an

21   authorized charge account?

22        A.    What are you talking about?

23        Q.    Okay.  Did you have any

FREEDOM COURT REPORTING

Page 120

1          Q.      A credit ticket is for stale

2    or returns that you're taking out of the

3    store, correct?

4          A.      Yes.

5          Q.      And you're supposed to take

6    the stale or returns out of the store on

7    the date that it's color coded, correct?

8          A.      Yes.

9          Q.      How did you work

10   transactions with the cash accounts?

11         A.      Basically the same.

12         Q.      Did you generate tickets?

13         A.      Yes.

14         Q.      With the cash accounts, you

15   actually received cash, you know, from the

16   accounts paying for the products?

17         A.      Yes.

18         Q.      When you took the product

19   off the dock in the morning, did you

20   understand that that was your product?

21         A.      Yes.

22         Q.      And you owned it?

23         A.      Yes.

FREEDOM COURT REPORTING

Page 153

1        A.      Yes.

2        Q.      What does that statement

3    mean to you?

4        A.      I was just using an account

5    that -- that used credit in and -- just

6    probably used a credit buy back in that

7    account.  That's what it was.

8               Okay.  If you want credit

9    back some bread in the account and you can

10   resale it to someone else.  So we can go

11   to any cash account and credit it back.

12   That's why it generate a negative sales.

13       Q.      Why was the company putting

14   you on notice that they believed that your

15   accounting wasn't proper?

16       A.      Because when you show a

17   negative, it did look like it wasn't

18   proper.  I understand that.

19       Q.      Was your accounting proper?

20       A.      Sometimes.

21       Q.      Was it sometimes improper?

22       A.      Possibility.

23       Q.      And when you say that it was

FREEDOM COURT REPORTING

Page 154

1    possibly improper, were you engaging in

2    unauthorized transactions?

3          A.      Possible.

4          Q.      And were you benefitting

5    financially from such unauthorized

6    transactions?

7          A.      Sometime.

8          Q.      Do you recall ever having

9    any issues with an account called Bama

10   Lanes?

11         A.      No.

12         Q.      Did you have an account

13   named Bama Lanes?

14         A.      Yes.  And Flowers lost that

15   account.  And I see they added some stuff

16   to it.

17               It was where they went out

18   and said that I was shorting the man some

19   bread.  But that was a lie.  They lost it

20   because the club bread wasn't right.

21               And the lady used to make her

22   own orders.  I didn't make their orders.

23   The kitchen manager ordered the bread.

FREEDOM COURT REPORTING

Page 155

1        Q.      What does shorting bread

2    mean?

3        A.      It mean they didn't get

4    everything they should have had.

5        Q.      Everything that was shown on

6    the ticket?

7        A.      That's what he thought.

8        Q.      That's what who thought?

9        A.      Joe didn't work -- Joe, he

10   didn't work back there at all.

11       Q.      Did the customer think that

12   they were being shorted bread?

13       A.      Not the kitchen manager.

14       Q.      Did somebody at the customer

15   believe --

16       A.      Joe.

17       Q.      And who is Joe?

18       A.      He was the -- over the

19   bowling lane part.

20       Q.      Why do you believe, or why

21   did he believe that, if you know, that he

22   was being shorted bread?

23       A.      I couldn't -- I don't know

FREEDOM COURT REPORTING

Page 156

1    why he would believe it.   I can't answer

2    for him.

3          Q.     So it's your testimony that

4    you did not short that account?

5          A.     I did not short that

6    account.

7          Q.     Ever?

8          A.     Ever.

9          Q.     Did you ever short any other

10   accounts?

11         A.     Yes.

12         Q.     What accounts did you short?

13         A.     I don't remember.

14         Q.     Was it intentional?

15         A.     Sometime.

16         Q.     And why would you do that?

17         A.     Why would I do it?

18         Q.     Uh-huh.  Did you benefit

19   from shorting accounts?

20         A.     Sometime.

21         Q.     Benefitted financially?

22         A.     Not really.

23         Q.     When you say not really,

FREEDOM COURT REPORTING

Page 157

1    what do you mean?

2          A.      Because the route at that

3    particular time wasn't running enough

4    money to do nothing.  Just did make enough

5    to pay for your gas.

6          Q.      But if you did short

7    someone, that would end up benefitting you

8    to at least some degree financially?

9          A.      Little bit.

10         (Whereupon, Defendant's Exhibit No.

11   13 was marked for identification purposes

12   by Mr. Hista.)

13         Q.      (BY MR. HISTA)

14   Mr. Porterfield, have you had the

15   opportunity to review Defendant's Exhibit

16   13?

17         A.      Yes.

18         Q.      Have you seen this document

19   before?

20         A.      Yes.

21         Q.      Could you tell me what you

22   recall about the circumstances leading to

23   this breach of contract letter?

FREEDOM COURT REPORTING

Page 158

```
 1         A.      I don't remember.

 2         Q.      You don't remember anything

 3  about it?

 4         A.      Not much.  Huh-uh.

 5         Q.      Was Gunter Air Force Base

 6  one of your accounts?

 7         A.      Yes.  Uh-huh.

 8         Q.      And do you have any

 9  recollection as to why Gunter Air Force

10  Base no longer wanted you to service them?

11         A.      Something about -- I had got

12  a letter about -- talking about products

13  was short in Maxwell Gunter.

14         Q.      Did Gunter Air Force Base

15  believe that they were not properly

16  receiving credit for various products?

17         A.      That's what they stated.

18         Q.      Was it true?

19         A.      I don't know.

20         Q.      Could it have been true?

21         A.      I don't know.

22         Q.      Do you know if an

23  investigation was conducted?
```

FREEDOM COURT REPORTING

1         A.      I know wasn't nothing done

2    about it.

3         Q.      What do you mean nothing was

4    done about it?

5         A.      I never was prosecuted,

6    never was accused, charged or nothing.

7         Q.      What do you understand was

8    the contention that Gunter Air Force Base

9    was making?

10         A.      They was contending that

11   something was going on wrong.  And I

12   disagreed with it.

13         Q.      Okay.  What exactly did they

14   say was going on wrong?

15         A.      Said credit was taken out,

16   what it did or not.

17         Q.      Was the sum and substance of

18   their complaint that you were stealing

19   from them?

20         A.      I don't know.

21         (Whereupon, Defendant's Exhibit No.

22   14 was marked for identification purposes

23   by Mr. Hista.)

FREEDOM COURT REPORTING

Page 160

1          A.      I read this one.  I got it

2     at home.

3          Q.      Okay.  Take a few moments

4     and let's review Defendant's Exhibit No.

5     14, which is a two-page document.

6                  Mr. Porterfield, would you

7     agree with me that this account notified

8     you that you would no longer be able to

9     serve them due to an accusation of theft?

10         A.      Yes.

11         Q.      And turning to page two of

12    this document, approximately the middle of

13    the page, there's the word "synopsis."

14    And, thereafter, it states that, you know,

15    an investigation was initiated by DoDIG,

16    Defense Criminal Investigative Service.

17                 Do you know anything about

18    that investigation?

19         A.      No.

20         Q.      Have you seen page two of

21    this document before today?

22         A.      Yes.

23         Q.      Do you have any knowledge of

FREEDOM COURT REPORTING

Page 161

1    interviews being conducted as part of any

2    investigation?

3             A.      One time.

4             Q.      Okay.  Were you interviewed?

5             A.      They asked questions once.

6             Q.      Okay.  Who was present

7    during that interview?

8             A.      I don't remember who he was.

9             Q.      The document goes on to

10   state it was alleged based on interviews

11   conducted that such theft had been going

12   on for the past three years with an

13   estimated loss of thirty thousand dollars.

14                    Do you agree or disagree with

15   that statement?

16            A.      I disagree.

17            Q.      And what do you disagree

18   with?

19            A.      The theft went on for three

20   years.  I disagree with the whole -- with

21   the statement.

22            Q.      Did you engage in any

23   accounting transaction with this account

FREEDOM COURT REPORTING

Page 162

1    that could be considered theft?

2         A.    Might have carried some

3    stale out and didn't give them credit for

4    it.  That's it.

5         Q.    Would you agree that's

6    theft?

7         A.    Yes.

8         Q.    The document goes on to

9    state that the investigation ultimately

10   determined that subject, Porterfield, did

11   devise a scheme to convert and steal

12   bakery items from the Commissary by

13   removing items from the Commissary after

14   they had been received into inventory, and

15   then reselling them to cash customers.

16              Do you agree with that?

17        A.    No.

18        Q.    You never did that?

19        A.    I don't -- I don't know.

20        Q.    Could you have done it

21   sometimes?

22        A.    Possible.

23        Q.    The document goes on to

FREEDOM COURT REPORTING

Page 163

1    state that you removed back stocked items

2    from the company warehouse.

3                Did you do that?

4         A.    What company you talking

5    about?

6         Q.    The same account.

7         A.    I don't remember.

8         Q.    Could you have done that,

9    and you just don't remember it here today?

10        A.    I don't remember.

11        Q.    The document goes on to

12   state that you overstated the count of

13   items being delivered.

14                Did do you that?

15        A.    Not that I know of.

16        Q.    Could you have, and you just

17   don't remember it today?

18        A.    Don't remember.

19        Q.    You were -- you were kicked

20   out that of account, correct?

21        A.    Yes, I was.

22        Q.    Was that one of your larger

23   accounts at the time?

FREEDOM COURT REPORTING

Page 164

1          A.      Yes, it was.

2          Q.      Was it your largest account?

3          A.      Yes, it was.

4          (Whereupon, Defendant's Exhibit No.

5     15 was marked for identification purposes

6     by Mr. Hista.)

7          A.      Yeah.

8          Q.      Mr. Porterfield, do you

9     recognize Defendant's Exhibit 15?

10         A.      Yes.

11         Q.      Tell me what it is, please.

12         A.      It's where I sold --

13    transferred the -- let me check it out.

14    Steve Head, I was -- the Commissary.

15    Signed it back to the company.

16         Q.      And you did this because you

17    were no longer allowed to service that

18    account, correct?

19         A.      Yes.  I sold it back to

20    Flowers.  I didn't really sell it because

21    it was a bid stop.  Then they sold it

22    after I sold it back -- after I signed

23    back off, Flowers sold it.

FREEDOM COURT REPORTING

Page 173

```
 1          Q.      Is it fair to say that you

 2   made a complaint, and the company

 3   responded to the complaint --

 4          A.      Yes, they did.

 5          Q.      -- that you made?

 6                  And Mr. Bordeaux was the

 7   president of the company at the time?

 8          A.      No, he wasn't.

 9          Q.      He was vice president of

10   sales?

11          A.      I believe, yes.  I think so.

12          Q.      And he's -- he was one of

13   the senior people in the company?

14          A.      Yes.

15                  (Whereupon, Defendant's Exhibit No.

16   18 was marked for identification purposes

17   by Mr. Hista.)

18          Q.      (BY MR. HISTA)

19   Mr. Porterfield, have you had the

20   opportunity to review Exhibit No. 18,

21   which is a composite exhibit of three

22   documents?

23                  Have you had the opportunity
```

FREEDOM COURT REPORTING

Page 174

1    to review this?

2         A.      Yes.

3         Q.      Do you recognize anything

4    about any of these documents?

5         A.      Repurchasing some more

6    territory.

7         Q.      Okay.  And the first

8    document is entitled repurchase statement,

9    is it not?

10        A.      Yes.

11        Q.      And it's dated June 23,

12   2000?

13        A.      Uh-huh.

14        Q.      And is that your signature

15   on the bottom right-hand side?

16        A.      Yes.

17        Q.      And do you recognize the

18   signature to the left?

19        A.      I believe it's Calvin

20   Rhodes.

21        Q.      And who was Mr. Rhodes?

22        A.      The president.

23        Q.      He was the president at the

FREEDOM COURT REPORTING

Page 176

1          A.     Yes.

2          Q.     Okay.  And now turning to

3   page four, is that your signature on

4   page --

5          A.     Yes.

6          Q.     -- four?

7          A.     Uh-huh.

8          Q.     And Mr. Rhodes' signature to

9   the right-hand side?

10         A.     And Don Adkins.

11         Q.     And who is Don Adkins?

12         A.     The go between, coordinator,

13  whatever.

14         Q.     Okay.  So it's your

15  understanding that you were selling the

16  distribution rights that you held under

17  the '94 contract back to the company?

18                Is that what you understood

19  was going on?

20         A.     Yes.

21         Q.     And did you understand

22  that -- turning your attention to

23  paragraph two of the last document,

FREEDOM COURT REPORTING

Page 177

1    paragraph two, when you signed this

2    document, did you understand that you were

3    releasing any claims related to the 1994

4    agreement?

5         A.    Yes.

6         (Whereupon, Defendant's Exhibit No.

7    19 was marked for identification purposes

8    by Mr. Hista.)

9              MR. TALIAFERRO:  If you don't

10   mind, I'm sure you got a lot of questions,

11   you think it would be all right to break

12   now and let's just grab a sandwich?

13             MR. HISTA:  I think now is as

14   good a time as any.  Let's just grab

15   something relatively quick.

16             MR. TALIAFERRO:  Yeah.

17             MR. HISTA:  Could we do it

18   maybe in half an hour --

19             MR. TALIAFERRO:  Yeah.

20             MR. HISTA:  -- forty-five

21   minutes?  I really think I can get done by

22   three if we can do that.

23             MR. TALIAFERRO:  Yeah.

FREEDOM COURT REPORTING

Page 180

1        A.      You can go to the account or

2    you go to what item you're going to

3    change.

4        Q.      Would any carry over

5    inventory show up?

6        A.      Carry over show up?

7        Q.      Carry over?  Do you

8    recognize that term?

9        A.      It might.

10        Q.      It might.  Okay.  So then

11    you --

12        A.      You have to enter your carry

13    over.

14        Q.      And then what did you scroll

15    over to?

16        A.      Scroll over to the price if

17    you're going to change the price on the

18    product.

19        Q.      And is that the sequence

20    that you would go through to enter a price

21    allowance?

22        A.      Yes.

23        Q.      Okay.  Turning your

FREEDOM COURT REPORTING

Page 181

1    attention to Exhibit No. 19, if you could

2    take just a few moments and look at this.

3              I'm going to ask you again

4    about certain provisions of this document,

5    but I'd like you to review it generally.

6              And then I'm going to ask you

7    if your signature appears on this

8    document.

9         A.    (Witness complying.)

10        Q.    Without reading this

11   document at this point word for word,

12   Mr. Porterfield --

13        A.    Okay.

14        Q.    -- can you tell me what this

15   document is?

16        A.    It's another outline of the

17   distributor agreement between the

18   distributor and Flowers.

19        Q.    Okay.  And looking on page

20   one of the document under the term

21   distributor's agreement -- are you with

22   me?

23        A.    Yes.

FREEDOM COURT REPORTING

Page 182

1          Q.      -- it states that the

2    agreement is made this 3rd day of July,

3    2000.  Do you see that?

4          A.      Yes.

5          Q.      Is this the agreement that

6    replaced your 1994 contract?

7          A.      No.

8          Q.      It's not.  Is this the

9    second distributor agreement that you

10   entered into with Flowers Baking Company?

11         A.      I -- I don't know.  I think

12   we had another one over here.

13         Q.      All right.  Let's turn your

14   attention back to Exhibit No. 18.

15         A.      Okay.

16         Q.      And turn to the second page

17   of Exhibit No. 18.

18         A.      (Witness complying.)  Okay.

19         Q.      What is the date on the

20   first line of that document?

21         A.      The same date that is on

22   this one.

23         Q.      Okay.

FREEDOM COURT REPORTING

1          A.       This is when -- okay.  I got

2    you now.

3          Q.       And that --

4          A.       This is when I sold it back

5    to the company.  And this is when I

6    purchased it back.

7          Q.       Is Exhibit No. 19 the new

8    distributor agreement?

9          A.       Distributor agreement.

10          Q.       Which is signed the same day

11    as you signed the other documents?

12          A.       Yes.

13          Q.       And turning to -- if you

14    look on the bottom right again, what's

15    referred to as a Bates number, FBO and

16    then 000414 --

17          A.       414?

18          Q.       Uh-huh.

19          A.       Okay.

20          Q.       Is that your signature

21    beneath the word "distributor"?

22          A.       Yes.

23          Q.       And do you recognize the

FREEDOM COURT REPORTING

Page 184

1    signature immediately below yours?

2          A.      Calvin Rhodes.

3          Q.      And do you recognize any of

4    the other signatures on this document?

5          A.      Steve Bordeaux and Don

6    Adkins.

7          Q.      Okay.  Turn to the next

8    page, which is Exhibit A.

9          A.      (Witness complying.)

10         Q.      Was that your new territory?

11         A.      Yes.

12         Q.      How much did your territory

13   change from the 1994 agreement?

14         A.      Really after losing the

15   Commissary and all that, it wasn't too

16   much changes.  It was almost a lateral

17   change.

18         Q.      Okay.  Did you -- did you

19   read the distributor's agreement that

20   we're looking at before you signed it?

21         A.      Yes.

22         Q.      Did you understand that it

23   was basically the same business

FREEDOM COURT REPORTING

Page 185

1   relationship as under the 1994 contract?

2          A.      Yes.

3          Q.      And turning your attention

4   to 2.5 of this agreement --

5          A.      2.5?

6          Q.      Correct.

7          A.      What page that is?

8          Q.      Page two.  I'm sorry.

9          A.      Back.

10         Q.      Back.

11         A.      Okay.

12         A.      Oh, back.  I understand.

13   2.5, good industry practice.  I see.

14         Q.      Would you agree that what is

15   set forth in 2.5 is good industry

16   practice?

17         A.      Yes.

18         Q.      And that you were obligated

19   under this agreement to comply with good

20   industry practice?

21         A.      Yes.

22         Q.      Turning your attention to

23   the next page -- and turn your attention

FREEDOM COURT REPORTING

Page 187

1          A.      (Witness complying.)

2          Q.      Would you agree with me that

3    Section 19.4 states that the agreement and

4    the accompanying exhibits are the entire

5    agreement between you and Flowers?

6          A.      Yes.

7          Q.      And would you agree that

8    under Section 19.4 unless it is set forth

9    in this agreement that neither you nor

10   Flowers should be liable for any

11   representation made to each other?

12              MR. TALIAFERRO:  Object to

13   the form.  It calls for a legal

14   conclusion.  If you can answer it, go

15   ahead.

16         A.      I didn't understand it that

17   way.

18         Q.      Okay.  How did you

19   understand that?  Why don't you read the

20   second to the last sentence of Section

21   19.4?  Just read it for the Record.

22         A.      Set forth agreement no party

23   should be disabled -- table?  This word is

FREEDOM COURT REPORTING

Page 188

1    kind of cut off.

2         Q.    Okay.  Let me ask you this

3    then.  When you signed this agreement, was

4    there any specific discussion that you

5    recall about why you were entering into

6    this new agreement?

7         A.    No.

8         Q.    Okay.  You don't -- it was

9    basically you were selling back the old

10   contract?

11        A.    Yes.  I wasn't aware of some

12   of this stuff in here.

13        Q.    But, I mean, nothing was

14   changing as far as you were --

15        A.    At first, we was informed

16   nothing was changing.

17        Q.    Okay.  So to the extent that

18   anything was said --

19        A.    I don't know.

20        Q.    -- you understood it to be

21   the same deal?

22        A.    Understood it to be the same

23   deal.

FREEDOM COURT REPORTING

Page 189

1          (Whereupon, Defendant's Exhibit No.

2     20 was marked for identification purposes

3     by Mr. Hista.)

4          A.     This is basically the same

5     as we went over earlier.

6          Q.     Okay.  Could you tell me

7     what it is, please?  And we're referring

8     to Defendant's Exhibit 20.

9          A.     Six months and one day that

10    you can sell your distributorship back to

11    the company.

12         Q.     So is that the same deal as

13    with the first contract?

14         A.     It seems like the same deal

15    with the first one.

16         Q.     So you understood that

17    within that six-month period if you wanted

18    to get out you could?

19         A.     Yes.  Uh-huh.

20         Q.     Okay.  During that first

21    six-month period of time under the new

22    contract, was, you know, all going well

23    with you and Flowers?

FREEDOM COURT REPORTING

Page 190

1              I mean, were there any issues

2      at that point?

3           A.     No.

4           Q.     Did you feel like Flowers

5      was breaching the 2000 agreement during

6      that first six months in any way?

7           A.     No.

8           Q.     When the 1994 agreement was

9      in place, which was sometime in '94 up

10     until July of 2000, would you agree with

11     that?

12          A.     Yes.

13          Q.     Okay.  During that period of

14     time, was there any issue concerning

15     product that was being delivered from any

16     freezer or freezers?

17          A.     Yes.

18          Q.     There was?

19          A.     Yes.

20          Q.     During that period of time?

21          A.     You said from '94 to --

22          Q.     2000.

23          A.     From 2000?

FREEDOM COURT REPORTING

Page 191

1          Q.       From 1994 up until 2000.

2          A.       I -- I don't know exactly

3    when the freezer came.  I don't know

4    exactly when they got it there.

5          Q.       I mean, could it have been

6    after 2000?  Do you have any specific --

7          A.       I know it was during 2000,

8    but I don't know what year it got there.

9          Q.       Okay.  Well, you just told

10   me that for the first six months of the

11   2000 contract that you didn't feel like

12   Flowers was breaching the contract in any

13   way?

14         A.       For the first six months, I

15   probably used nothing out of that freezer.

16   And I didn't use the freezer as much as

17   some of them no way.  So I wasn't really

18   concerned about it at the time.

19         Q.       So at least at that time it

20   wasn't an issue?

21         A.       At that time, it wasn't an

22   issue.

23         Q.       Okay.  When you -- back then

FREEDOM COURT REPORTING

Page 192

1    when product came out of the freezer, what

2    was the -- what was the procedure?  How

3    would you take -- how would you get it?

4         A.    The majority of the time

5    when product came out of that freezer and

6    was delivered, it was delivered by a

7    company person.  Stop called in the

8    evening time, if somebody delivered, one

9    of Flowers folks delivered the bread out

10   of the freezer.

11              And sometime out of the

12   freezer you can order footlong, chili

13   pups, or something on your route that you

14   ordered fresh, they would replace it out

15   of the freezer for your fresh product.

16   And you had no other choice but to haul

17   out of the freezer.

18        Q.    Let me --

19        A.    Because the company failed

20   to send you with your order.

21        Q.    Okay.  You just told me that

22   up until around 2000 this wasn't an issue

23   with you, correct?

FREEDOM COURT REPORTING

Page 193

1          A.      I said it.

2          Q.      Okay.  So at that point

3    in --

4          A.      You said 2000 -- you -- it's

5    my recollection you was talking about

6    later did I have any problem out of the

7    freezer.

8          Q.      All right.  Let's go over it

9    again.

10         A.      Okay.

11         Q.      I asked you during the first

12   six months of the 2000 contract was

13   Flowers breaching the contract in any way,

14   and you told me no.

15         A.      I didn't have no problem

16   with the freezer.

17         Q.      Okay.  So you had no problem

18   with the freezer --

19         A.      No.

20         Q.      -- up until that point in

21   time?

22         A.      No.  No.

23         Q.      When did you first start

FREEDOM COURT REPORTING

Page 194

1    having an issue with the freezer?

2            A.      I wouldn't know the year.

3            Q.      Okay.  Just tell me when --

4    when do you --

5            A.      I'd --

6            Q.      I mean, what in your mind --

7            A.      Back --

8            Q.      -- triggered you having an

9    issue?

10           A.      About 2003 and 2004.  Around

11   in that time.  In 2001.

12           Q.      All right.  Well, what

13   changed?

14           A.      The company had started --

15   you didn't get your products like you

16   should.  And you had to use the freezer.

17           Q.      Okay.  Again, when product

18   came out of the freezer, how did it come

19   out?  Did you ask for it?

20           A.      I told them I needed product

21   on my route, and they said we had it in

22   the freezer.  I didn't ask for it.

23           Q.      What time -- what time of

FREEDOM COURT REPORTING

1    the day would that typically be at?

2         A.    Sometime you get there in

3    the morning time.  And --

4         Q.    How often did that occur?

5         A.    With Flowers?

6         Q.    Uh-huh.

7         A.    Sometime it could happen

8    two, three -- three times a month.

9         Q.    Okay.

10        A.    Or it could go, sometimes

11   happen two times a week.

12        Q.    Okay.  Tell me exactly what

13   type of product you used that came out of

14   the freezer.

15        A.    Sometime footlongs.

16        Q.    And which account did the

17   footlongs go in?

18        A.    Sonic's.

19        Q.    Okay.

20        A.    Chili pups.

21        Q.    And what --

22        A.    Krystal.

23        Q.    What accounts did the chili

FREEDOM COURT REPORTING

Page 196

1    pups go in?

2          A.      Krystal.

3          Q.      All right.   What other

4    product?

5          A.      Bulk buns.   Burger King.

6          Q.      Okay.

7          A.      Sonic's.

8          Q.      Okay.   What type of product

9    for Sonic?

10          A.      Bulk buns, hot dogs, chili

11   pups, Texas toast.

12          Q.      Anything else for Sonic?

13          A.      I think that's all Sonic

14   used.

15          Q.      Any other --

16          A.      And --

17          Q.      -- accounts that you served

18   product that came out of the freezer?

19          A.      Krystal.

20          Q.      We've talked about Krystal.

21          A.      Burger King, Sonic

22   Chick-Fil-A.

23          Q.      What type of product came

FREEDOM COURT REPORTING

Page 197

1    out of the freezer for Chick-Fil-A?

2           A.       Hamburger buns.  And I just

3    right off can't think of everything that

4    they used at the time.  It's been a while.

5           Q.       Okay.  How often did you

6    deliver product from the freezer to

7    Chick-Fil-A?

8           A.       They had some specialty buns

9    that they used.  And when they didn't send

10   those specialty buns, in the morning time

11   when you get to work, all you had was

12   something to come out of the freezer to

13   supply them.

14              Then you sure enough had to

15   hide it in Chick-Fil-A because Chick-Fil-A

16   was strict about their codes and dates.

17          Q.       Was specialty buns something

18   that you delivered to Chick-Fil-A every

19   day?

20          A.       Yes.

21          Q.       Yes?  And were you

22   responsible for ordering --

23          A.       Right.

FREEDOM COURT REPORTING

Page 200

1        Q.      I'm asking you the product

2   itself.  Is there anything to -- any

3   reason for you to believe that that

4   product is not edible?

5        A.      I just know it's not fresh.

6        Q.      Is there any reason to

7   believe that that product is not edible?

8        A.      Yes, it can be edible.

9        Q.      Okay.  Is there any reason

10  to believe that that product is unsafe in

11  any way?

12       A.      Couldn't answer it.

13       Q.      Do you have any reason to

14  believe that?

15       A.      No.

16       Q.      Have you ever -- ever frozen

17  bread at home?

18       A.      No.

19       Q.      Never have?

20       A.      Not that I know of.  We

21  don't freeze bread.

22       Q.      When you delivered bread to

23  your Chick-Fil-A account, did you tell the

FREEDOM COURT REPORTING

Page 201

1    Chick-Fil-A manager that this product has

2    been in the freezer?

3         A.    I had to go by Flowers'

4    rules, no.

5         Q.    When -- when you went to

6    your Krystal account, did you tell the

7    Krystal manager or managers this product

8    has come out of the freezer?

9         A.    Same answer.  Had to go by

10   Flowers' rule, no.

11        Q.    Okay.  But you didn't?

12        A.    No.

13        Q.    You kept your mouth shut?

14        A.    Had to.

15        Q.    Okay.  Why did you have to?

16        A.    If you did, you got in

17   trouble.

18        Q.    Okay.

19        A.    Flowers specifically told us

20   not to tell them their bread was frozen.

21   And they --

22        Q.    Okay.  Who told you --

23        A.    Supervisors.

FREEDOM COURT REPORTING

Page 202

1        Q.      Who told you that?

2        A.      Steve Stephens for one.

3   Grady for two.

4        Q.      When did Mr. Stephens tell

5   you that?

6        A.      On numerous occasions.  We

7   knew that was the rule before we carried

8   it out of the freezer to them.  They

9   discussed it with us.

10       Q.      I'd like to know what

11  specific conversation you had with Steve

12  Stephens about frozen product.

13       A.      Okay.  Anytime -- one of the

14  supervisors had to get the bread out of

15  the freezer for you.

16               They normally would take the

17  dates off theirself.  And when they take

18  the dates off to make sure that you didn't

19  take it to the stop with the date on it.

20  Sometimes you might have took it off

21  yourself.

22       Q.      Did you do that?

23       A.      Yes, I have did it.

FREEDOM COURT REPORTING

Page 203

1        Q.      Okay.  And you delivered it

2   to your account without saying anything?

3        A.      Yes, I have.

4        Q.      Okay.  Did you tell any of

5   the Outback managers that you were

6   delivering product that had been in the

7   freezer?

8        A.      Outback?

9        Q.      Did you have an Outback

10  Steakhouse?

11       A.      No.

12       Q.      You had a Krystal, Burger

13  King, Sonic?

14       A.      Yes.

15       Q.      What was the other account

16  that you mentioned?  Chick-Fil-A?

17       A.      Chick-Fil-A.

18       Q.      Those are all restaurant

19  accounts, correct?

20       A.      Yes.  And Montgomery

21  Biscuits.

22       Q.      What's Montgomery Biscuits?

23       A.      Baseball stadium.

FREEDOM COURT REPORTING

Page 205

1          Q.      Okay.  And would that be

2    product that had not been in the freezer?

3          A.      Yes.

4          Q.      On the times that you

5    delivered product from the freezer, did

6    you exhaust efforts to get product from

7    other sources?

8          A.      That's what you did first

9    anyway is try to get products, yes.

10          Q.      Did you do that every time?

11          A.      Yes.  Most of the time.

12          Q.      Most of the time?

13          A.      Most of the time.

14          Q.      You didn't do it all the

15    time?

16          A.      Sometime they be gone.

17    That's -- the last resort you had was the

18    freezer.

19          Q.      When you delivered product

20    that had been in the freezer to these

21    accounts, did you receive full credit for

22    that transaction?

23          A.      Yes.

FREEDOM COURT REPORTING

Page 206

1         Q.     So when you delivered

2    product to those accounts, you never lost

3    any money in any way?

4         A.     No.

5         Q.     Did you ever lose any

6    customers?

7         A.     Let's back up.

8         Q.     I said:  Did you ever lose

9    any customers?

10         A.     Let's back up to the last

11    one.

12         Q.     Yes.

13         A.     Some cases you did.  Because

14    you take it out of the freezer, and it

15    wouldn't go full dates.

16              If you had -- if you needed a

17    full order on Tuesday for your Burger

18    King -- all right.  Not Burger King.

19    Let's just use footlong for example.

20              You fill up your Tuesday

21    order with footlongs.  They will not last

22    till Friday or Saturday.  You had to pull

23    them out Thursday.  So you lose money

FREEDOM COURT REPORTING

Page 207

1    there.

2         Q.      You got full credit for any

3    stale or --

4         A.      Yes.  But I you still lost

5    commission.

6         Q.      But the product that came

7    out of the freezer generally was used

8    quickly, was it not?

9         A.      That's what I'm talking

10   about.  It was used quickly.  But you had

11   to fill your order.  So you had to go and

12   adjust your order back to make up for your

13   losses.

14        Q.      How often did you take any

15   product that had been in the freezer out

16   of an account?

17        A.      I wouldn't have a number

18   count.

19        Q.      You wouldn't have any proof

20   that that would have been product that was

21   frozen or product that was fresh, would

22   you?

23        A.      You could tell the

FREEDOM COURT REPORTING

1    difference.

2           Q.      I mean, do you have any

3    records to prove that?

4           A.      I don't think nobody have

5    records to prove that.

6           Q.      Then your answer is no, you

7    don't have any records?

8           A.      No.

9           Q.      Ever lose any customers due

10   to the delivery of product that had been

11   in the freezer?

12          A.      Not that I know of.

13          Q.      Is your answer no?

14          A.      No.

15          Q.      Did you ever advise

16   management that you considered the

17   delivery of product that was in -- that

18   had been in the freezer, that it was --

19          A.      I --

20          Q.      -- a breach of the contract?

21          A.      I complained to Grady and

22   Steve Stephens about it before.

23          Q.      Okay.  When did you first

FREEDOM COURT REPORTING

Page 210

1    frozen, we have to hide it from the

2    customers.

3              Q.      And what was their response?

4              A.      Mr. Messer's response was we

5    just had to do the best we can.

6              Q.      Mr. Messer said that we're

7    doing the best you could?

8              A.      Mr. Messer would respond --

9    I don't know exactly what he said.  It was

10   something pertaining to that.  He kind of

11   like brushed it off the shoulder.  That's

12   what we had to do to supply the customer.

13             Q.      But, again, just so the

14   Record is straight, when you put that

15   product into the account and the product

16   being product that had been in the

17   freezer, you received full credit for that

18   product?

19             A.      Yes, I did.

20             Q.      Other than the accounts that

21   we have mentioned, did you deliver product

22   that had been in the freezer to any other

23   account?

FREEDOM COURT REPORTING

1          A.     Anything but a grocery

2    store.  So it could have been some of the

3    other accounts that used product.

4          Q.     Do you remember any

5    specifics?

6          A.     It -- that's about it.

7          Q.     Okay.  And except for the

8    baseball stadium, are all of the accounts

9    that we have discussed restaurant

10   accounts?

11         A.     Restaurant accounts.

12         Q.     And is it fair to say that

13   you never delivered any product to any

14   grocery store that had been in the

15   freezer?

16         A.     No.

17         Q.     You never did that?

18         A.     Not that I know of.

19         Q.     Okay.  And the grocery

20   stores, that's where all the branded or

21   name brand products went?

22         A.     Yes.

23         Q.     Were any of those -- none of

FREEDOM COURT REPORTING

Page 212

1    these products had been in the freezer?

2         A.    Not -- huh-uh.

3         Q.    Okay.  Are you aware of any

4    Flowers consumer advertising regarding

5    products that go into restaurant accounts?

6         A.    No.

7         Q.    Are you aware of any

8    discussions that Flowers officials may

9    have had with the restaurant accounts that

10   you have mentioned to me regarding product

11   that had been in the freezer?

12        A.    No.

13        Q.    Let's go back to -- let's go

14   back to -- let's just wait for a minute

15   and let's go through and mark a few

16   others.

17             When you go into a restaurant

18   and order product that has a bun or other

19   bread product, would you know if that

20   product has been frozen or not?

21        A.    No.

22        Q.    Are you aware of restaurants

23   other than what you've described as far as

FREEDOM COURT REPORTING

Page 213

```
 1    product coming from Flowers' freezer using

 2    products that have been frozen of any

 3    sort?

 4            A.      No.

 5            Q.      You're not aware of that at

 6    all?

 7            A.      Huh-uh.

 8            Q.      You're not aware of, you

 9    know, for instance, any product that, you

10    know, Chick-Fil-A might --

11            A.      I don't know their rules.

12            Q.      -- possibly --

13            A.      I don't know nothing about

14    it.

15            Q.      Okay.  Did you have anything

16    to do with any program that Burger King

17    had in the 1990s regarding frozen buns?

18            A.      Know nothing about it.

19            Q.      Did you ever advise Flowers'

20    management in writing that you considered

21    product coming out of the freezer a breach

22    of contract?

23            A.      No.
```

FREEDOM COURT REPORTING

Page 214

1        Q.      Did you ever refuse product

2   that had been in the freezer?

3        A.      Yes.

4        Q.      You did?

5        A.      Yes.

6        Q.      And what happened?

7        A.      It wasn't quality.

8        Q.      Okay.  Did you ever receive

9   a breach of contract letter under those

10  circumstances?

11       A.      No.

12       Q.      Did you have the right to

13  refuse such product?

14       A.      I did.

15       (Whereupon, Defendant's Exhibit No.

16  21 was marked for identification purposes

17  by Mr. Hista.)

18       Q.      (BY MR. HISTA)

19  Mr. Porterfield, do you recognize what has

20  been marked as Defendant's Exhibit 21?

21       A.      Uh-huh.

22       Q.      Could you tell me what it

23  is, please?

FREEDOM COURT REPORTING

Page 231

1    26 was marked for identification purposes

2    by Mr. Hista.)

3         Q.    (BY MR. HISTA)

4    Mr. Porterfield, have you had the

5    opportunity to review Exhibit No. 26?

6         A.    Yes.

7         Q.    Do you recognize any of

8    these documents?

9         A.    Yes.

10        Q.    Could you tell me what they

11   are, please?

12        A.    Flowers purchased back stops

13   from me.

14        Q.    Was it stops?  Or the entire

15   distributorship?

16        A.    The entire distributorship.

17        Q.    How did that come about?

18        A.    I bought some more territory

19   in another company.

20        Q.    On page one of the document,

21   the bottom right, is that your signature?

22        A.    Yes.

23        Q.    Is that Mr. Rhodes'

FREEDOM COURT REPORTING

Page 232

1    signature to the left-hand side?

2         A.     Yes.

3         Q.     Page two of this document

4    indicates that it's a purchase agreement.

5    Would you agree with me?

6         A.     Yes.

7         Q.     And does this document

8    reflect Flowers buying back your 2000

9    contract?

10        A.     Yes.

11        Q.     And pages three and four are

12   a document entitled release agreement and

13   bill of sale.  Would you agree with that?

14        A.     Yes.

15        Q.     And on the last page of this

16   document, is that your signature under the

17   word "seller"?

18        A.     Yes.

19        Q.     And is that Mr. Rhodes'

20   signature to the right?

21        A.     Yes.

22        Q.     And was this witnessed by

23   Mr. Bordeaux and Mr. Adkins?

FREEDOM COURT REPORTING

Page 233

1          A.      Yes.

2          Q.      Did you voluntarily sell

3   your 2000 contract back to the company?

4          A.      Yes.

5          Q.      Did you understand that by

6   selling that contract back that you were

7   releasing any claims related to the 2000

8   contract?

9          A.      Yes.

10         (Whereupon, Defendant's Exhibit No.

11   27 was marked for identification purposes

12   by Mr. Hista.)

13         Q.      (BY MR. HISTA)  We're going

14   to mark this one No. 27.

15         A.      Okay.

16         Q.      Again, I'd just like for you

17   to generally identify it for me.  Is this

18   the distributor agreement that replaced

19   your 2000 contract?

20         A.      Yes.

21         Q.      And turning to page two of

22   this document, Section 2.5, good industry

23   practice, would you agree with me that

FREEDOM COURT REPORTING

Page 234

1    that's the, you know, the same --

2        A.        Basically about the same.

3        Q.        -- same thing that's in the

4    first two contracts?

5                And you agree that you had to

6    comply with the good industry practice

7    provision of the distributor agreement?

8        A.        Yes.

9        Q.        And then turning to five

10   point -- 5.1, obligations of

11   distributor --

12       A.        Same.

13       Q.        -- same thing?  Same deal?

14   You knew you had to use your best efforts

15   and to cooperate with the company with

16   marketing programs?

17                And then -- is that yes?

18       A.        Yes.

19       Q.        What discussion do you

20   recall about entering into this new

21   agreement with Flowers?  I mean, how did

22   it come about?

23       A.        Let me check one more thing

FREEDOM COURT REPORTING

Page 235

1    if it may come back to me.  I am looking

2    for stops that was purchased.

3         Q.    It's very close to the end.

4    There's an account listing.  It's like the

5    third to last page.

6         A.    I see it now.  Yes.

7         Q.    So basically the 2002

8    contract, you got some more accounts?

9         A.    Yes.

10        Q.    Was that your request?  Or

11   how did that come about?  Do you remember?

12        A.    They asked -- because they

13   had -- had cut a route, I believe.  And

14   they was putting -- asked some of the

15   stops would they take some of the extra

16   territory.  That's how that come about.

17        Q.    Okay.  And then turning your

18   attention to Section 20.4 of this

19   agreement --

20        A.    20.4.

21        Q.    -- did you read this

22   agreement before you signed it?

23        A.    Yes.

FREEDOM COURT REPORTING

Page 236

1          Q.     Did you understand that this

2     agreement, the distributor's agreement

3     that we're looking at, along with the

4     exhibits referenced A, B, C, D and E, were

5     the entire agreement between you and

6     Flowers?

7          A.     Yes.

8          Q.     Okay.   Read the last

9     sentence of the Section 20.4 for me.

10    Actually the last two sentences.   Just

11    read it out loud for me.

12         A.     Unless set forth in this

13    agreement, no party shall be liable for

14    any representation made to any other.

15    This agreement may be amended or modified

16    only by a written (sic.) signed by all

17    parties.

18         Q.     Okay.   What is your

19    understanding of those two sentences?   Do

20    you have any understanding of those two

21    sentences?

22         A.     No.

23         Q.     Do you understand that the

FREEDOM COURT REPORTING

Page 238

1          A.      Yes, I am.

2          (Whereupon, Defendant's Exhibit No.

3     28 was marked for identification purposes

4     by Mr. Hista.)

5          Q.      (BY MR. HISTA)

6     Mr. Porterfield, I've handed you what has

7     been marked as Exhibit No. 28.  If you

8     could look at this document for me,

9     please,

10         A.      It's basically the same as

11    the other.

12         Q.      Okay.  Is this another basic

13    six-month bale out option?

14         A.      And I understand it.

15         Q.      And you understand it?

16         A.      Yes.

17         Q.      Okay.  During that first six

18    months of that 2002 contract, was there

19    anything going on that was an issue

20    between you and Flowers?

21         A.      I understand.

22         Q.      Was there any major issue

23    between you and Flowers during this six-

FREEDOM COURT REPORTING

Page 239

1    month period?

2         A.      Wasn't no major issue.

3         (Whereupon, Defendant's Exhibit No.

4    29 was marked for identification purposes

5    by Mr. Hista.)

6         Q.      (BY MR. HISTA)

7    Mr. Porterfield, have you ever seen

8    Exhibit No. 28 (sic.) before?

9         A.      29?

10        Q.      I'm sorry.  29.  Have you

11   ever seen Exhibit No. 29 before?

12        A.      You know what?  I don't

13   know.

14        Q.      All right.  Turn to page two

15   of this document.

16        A.      I might need to find mine.

17   I signed this.

18        Q.      Is that your signature on

19   the bottom right?

20        A.      Yes, it is.

21        Q.      By signing this document,

22   would that indicate that you had seen it

23   before?

FREEDOM COURT REPORTING

Page 248

1    because it wasn't done wrong on this.

2          Q.     Let's talk about it.

3          A.     Okay.  Ask the question.

4          Q.     Do you recognize this

5    document?

6          A.     Yes, I do.

7          Q.     And we're referring to

8    Defendant's Exhibit No. 33, correct?

9          A.     Yes.

10          Q.     The second paragraph states:

11    In checking your advance orders, it shows

12    that you only have two trays of products

13    coming for Friday sales.

14                 Do you see that?

15          A.     Yes.

16          Q.     Friday is a normal service

17    day?

18          A.     I did it.

19          Q.     Is Friday a normal service

20    day?

21          A.     If you want to.

22          Q.     Is it good industry

23    practice --

FREEDOM COURT REPORTING

Page 249

1        A.    Yes.

2        Q.    --  to service your accounts

3   on Friday?

4        A.    I felt like it was.

5        Q.    Okay.  Why did you order

6   just two trays of products for Friday?

7        A.    Because I didn't work

8   Friday.

9        Q.    So you --

10       A.    All --

11       Q.    Is it fair to say that you

12   overloaded your market on Thursday?

13       A.    No, I didn't overload it.

14       Q.    How --

15       A.    In that case, I can overload

16   it on Tuesday.  You take off Wednesday.

17   So I took off Friday just like I can take

18   off on Tuesday.

19            You just put enough.  They

20   take two days.  Same thing.  No different.

21   You do the same thing on Saturday.

22       Q.    So you're not just servicing

23   the market at all on those days?

FREEDOM COURT REPORTING

Page 250

1      A.    You don't service them on

2  Wednesday.  You don't service on Sunday.

3  So you can do the same thing on Thursday

4  for Friday.  So --

5      Q.    On the Friday that is

6  referred to in this document, did you

7  service your accounts?

8      A.    The accounts was serviced.

9      Q.    But you didn't --

10     A.    The accounts was serviced

11 that Friday just like they was serviced

12 Monday and Wednesday.  No different.  Pull

13 up.  Put on shelf.  Stacked out.  No

14 problem.

15     Q.    But you only -- only

16 provided or ordered two trays of products?

17     A.    I know what I ordered.  But

18 I serviced my stops.

19     Q.    But you only ordered two

20 trays of product a week in advance,

21 correct?

22     A.    I just told you that.

23     Q.    So to cover the -- cover the

FREEDOM COURT REPORTING

Page 258

1    didn't happen?

2          A.     I don't know anything about

3    it.

4          (Whereupon, Defendant's Exhibit No.

5    35 was marked for identification purposes

6    by Mr. Hista.)

7          Q.     (BY MR. HISTA)

8    Mr. Porterfield, do you recognize

9    Defendant's Exhibit 35?

10         A.     Uh-huh.

11         Q.     Tell me, what is this

12   document?

13         A.     I did it.

14         Q.     It's another example of you

15   ordering only product for a certain

16   account on Friday?

17         A.     Uh-huh.

18         Q.     And you don't believe

19   there's anything wrong by doing that?

20         A.     That wasn't -- this product

21   shouldn't have been ordered on Friday.  It

22   might have been ordered on a Thursday.

23              So no.  I didn't -- I didn't

FREEDOM COURT REPORTING

Page 260

1    Krystal account, would it not?

2                    MR. TALIAFERRO:   Object to

3    the form.   Go ahead and answer.

4           A.      Let me see what you say.   It

5    was -- it was -- no.   I know what

6    happened.   Refrain.

7                    Ordered for Krystal and then

8    didn't order for no one else.   That was

9    another Friday that I --

10          Q.      It's another Friday you just

11   took off?

12          A.      Just took off.   Worked

13   Krystal.

14          (Whereupon, Defendant's Exhibit No.

15   36 was marked for identification purposes

16   by Mr. Hista.)

17          Q.      (BY MR. HISTA)

18   Mr. Porterfield, do you recognize

19   Defendant's Exhibit 36?

20          A.      Uh-huh.

21          Q.      Is this another example of

22   you deciding not to work on Friday?

23          A.      Yes.   A bunch of us took off

FREEDOM COURT REPORTING

Page 261

1    that 4th of July.  Same thing.  I remember

2    that too.  Same thing.

3              Q.     How did the accounts get

4    serviced that day?

5              A.     We pulled them up.

6              Q.     You delivered only a small

7    amount of fresh product?

8              A.     If I ain't mistaken, I

9    believe Krystal and them was closed.  And

10   we just straightened the stores up.  We

11   decided to take the holiday off.

12             Q.     Okay.  So you didn't --

13             A.     No.

14             Q.     -- provide normal service on

15   that day?

16             A.     I provided normal service

17   like you would have on a Wednesday or

18   Sunday.  Made sure the customer was taken

19   care of.  I --

20             Q.     And isn't Friday considered

21   a normal service date?

22             A.     It was considered a holiday

23   for me.

FREEDOM COURT REPORTING

Page 264

1    handled that Thursday, that Monday, that

2    Tuesday, that Wednesday or whatever.

3          Q.     When you take your truck

4    out, you're delivering fresh product?

5          A.     So you come back to control

6    again.

7          Q.     I'm just asking you --

8          A.     I told you.

9          Q.     -- when you take your truck

10   out --

11         A.     But I done told you what I

12   did.  I'm through.

13         Q.     I understand that.  But I

14   just want to make it clear on the Record.

15               When you take your truck out

16   and service your account, are you

17   delivering fresh product?

18         A.     That answer is yes.

19         Q.     And when you don't take your

20   truck out and are providing only pull-up

21   service, you are not delivering any fresh

22   product that particular day; is that

23   correct?

FREEDOM COURT REPORTING

Page 265

1          A.      That's correct.

2              (Whereupon, Defendant's Exhibit No.

3    37 was marked for identification purposes

4    by Mr. Hista.)

5          Q.      (BY MR. HISTA)

6    Mr. Porterfield, have you ever seen

7    Defendant's Exhibit 37?

8          A.      Yes.

9          Q.      What do you recall about

10   Defendant's Exhibit 37?

11         A.      Nothing but two hundred and

12   fifty buns put in Krystal Restaurant No.

13   2, Atlanta Highway.  And --

14         Q.      Was that because you didn't

15   want to work that account on Friday?

16         A.      I don't know.

17         Q.      Could it have been?

18         A.      I think I did work them that

19   Friday.  But it wasn't nothing -- I felt

20   like it wasn't nothing wrong with putting

21   two-fifty in there until they said nothing

22   something about it.

23         Q.      Did you curse at the Krystal

FREEDOM COURT REPORTING

Page 266

1    manager?

2          A.      Curse?  No, I didn't.  No.

3          Q.      So your testimony is what's

4    reflected in this document is false?

5          A.      That's what I think.

6          Q.      Do you recall anybody

7    discussing that with you?

8          A.      I don't know.

9          (Whereupon, Defendant's Exhibit No.

10   38 was marked for identification purposes

11   by Mr. Hista.)

12         A.      I'm aware of this one.

13         Q.      Okay.  And you are referring

14   to Defendant's Exhibit 38?

15         A.      Uh-huh.

16         Q.      What do you recognize about

17   this document?

18         A.      Burger King wanted to be

19   serviced five days a week.  And I was -- I

20   served them four days.

21         Q.      If Burgr King wants five-day

22   service, would you agree with me that

23   that's good industry practice?

FREEDOM COURT REPORTING

Page 267

```
 1        A.      No.

 2        Q.      Why not?

 3        A.      Because you can do the same

 4  thing in three days.

 5        Q.      Even though the customer

 6  requests five-day service, you're telling

 7  me it's your position that's not good

 8  industry practice?

 9        A.      No.  You can do the same

10  thing in three days.

11        Q.      So you feel it's appropriate

12  to ignore a customer's request to

13  service --

14        A.      No.

15        Q.      -- five days?  You think you

16  can do that?

17        A.      No.

18        Q.      You can't?

19        A.      No.

20        Q.      I'm not sure I understand

21  your testimony.  Do you believe that

22  three-day service to Burger King is proper

23  service?
```

FREEDOM COURT REPORTING

Page 268

1          A.      I believe -- in this

2    particular case, in this particular Burger

3    King, selling something like ten trays of

4    buns and not getting out of code, I

5    believe you could have worked them in

6    three days my opinion.

7          Q.      Is it your understanding

8    that Burger King wants their units served

9    five days a week?

10         A.      Yes, sir.  Yes.  That's what

11   they say.  Flowers said.

12         Q.      Is that your understanding

13   of what Burger King policy is?

14         A.      I don't know what Burger

15   King policy is.

16         Q.      Do you have any reason to

17   believe that is not Burger King's policy?

18         A.      No, I don't.

19         Q.      And you believe that you can

20   service Burger King's less than five days

21   if you believe you can get the work done?

22         A.      I believe it.

23         Q.      Did you ever get kicked out

FREEDOM COURT REPORTING

Page 269

1    of any Burger Kings?

2         A.     Yes.

3         Q.     Was it for not providing

4    five-day service?

5         A.  `  No.

6         Q.     Do you know if Burger king

7    ever complained about you not servicing

8    your Burger King accounts five days a

9    week?

10        A.     Flowers told me.  Burger

11   King never said anything to me.

12        (Whereupon, Defendant's Exhibit No.

13   39 was marked for identification purposes

14   by Mr. Hista.)

15        Q.     (BY MR. HISTA)  Turning your

16   attention to Exhibit No. 39, is this

17   another example of where you didn't work

18   your Burger King accounts five days a

19   week?

20        A.     Yes, it is.

21        Q.     You made that decision?

22        A.     Yes.

23        (Whereupon, Defendant's Exhibit No.

FREEDOM COURT REPORTING

Page 273

1          Q.     Mr. Porterfield, have you

2    seen Exhibit No. 42 previously?

3          A.     Yes.   Uh-huh.

4          Q.     Did this meeting take place?

5          A.     Yes.

6          Q.     Is what is reflected in this

7    document an accurate summary of the

8    meeting between yourself, Grady Messer and

9    Steve Stephens?

10         A.     Yes.

11         Q.     So you would agree with the

12   statement some companies expect five days

13   per week, and that is what we must give

14   them?

15                You agree with that

16   statement?

17         A.     I accepted what they said.

18         Q.     Okay.  And the document also

19   states:  Henry, you gave Steve and myself

20   your word that you would correct this, and

21   I appreciate the way you handled it.

22                Is that the way you responded

23   to Mr. Messer and Mr. Stephens?

FREEDOM COURT REPORTING

Page 274

1           A.      Probably did.

2           Q.      Any reason to believe

3    that's -- that you didn't respond in that

4    fashion?

5           A.      Yes.

6           Q.      Okay.  You believe that's

7    true?

8           A.      Yes.

9           (Whereupon, Defendant's Exhibit No.

10   43 was marked for identification purposes

11   by Mr. Hista.)

12          Q.      (BY MR. HISTA)

13   Mr. Porterfield, I've handed you what has

14   been marked as Defendant's Exhibit No. 43.

15              Do you recognize this

16   document?

17          A.      Yes, I do.

18          Q.      Okay.  Were you given a copy

19   of this document?

20          A.      Let me read over it again.

21          (Brief pause.)

22          A.      I remember this.  Yes.  I

23   left it outside.

FREEDOM COURT REPORTING

Page 277

1        A.      They said okay.

2        Q.      Are you sure about that?

3        A.      I said it.

4        Q.      Who were the Krystal

5   managers --

6        A.      I don't remember.

7        Q.      -- that you talked to?  Do

8   you remember?

9        A.      I don't remember none of the

10  managers.  It's been so long.  They change

11  them like sometime.

12       Q.      Were you kicked out of your

13  Krystal accounts because of that

14  particular situation?

15       A.      Yes.  And got back in.

16       Q.      And you did get back in?

17       A.      (Nodding head.)

18       Q.      Who got you back in?

19       A.      Me and Steve Stephens.

20       Q.      Pardon me?

21       A.      Me and Steve Stephens went

22  down and talked to them.

23       Q.      So is it fair to say that

FREEDOM COURT REPORTING

Page 278

1    Steve Stephens helped you get back into

2    the Krystal accounts?

3            A.      We got back in the Krystal

4    account.

5            Q.      And he helped you do that?

6            A.      He went along with me.

7            (Whereupon, Defendant's Exhibit No.

8    44 was marked for identification purposes

9    by Mr. Hista.)

10           Q.      (BY MR. HISTA)   Do you

11   recall the name Kim Colquitt?   Do you

12   recall that name at all?

13           A.      No.

14           Q.      No, you do not?

15           A.      Huh-uh.   This one I totally

16   disagree with.   This lady was crazy.

17           Q.      Okay.   Are you referring to

18   Defendant's Exhibit No. 44?

19           A.      Uh-huh.   Mary.   That was her

20   name.

21           Q.      Do you know her last name?

22           A.      No, I don't.   She had had

23   problems with other vendors.   Said that

FREEDOM COURT REPORTING

Page 279

1    woman didn't have good sense.  And I

2    didn't say anything to her.

3           Q.    So you didn't -- this

4    document states that you told her to stack

5    the damn trays right?

6           A.    Now, you think I'm going to

7    tell that lady that?

8           Q.    I don't know.  Did you tell

9    her that?

10          A.    No.  No.

11          Q.    Did she end up saying that

12   she didn't want you working at the store

13   any more?

14          A.    She sure did.

15          Q.    Did you go and talk to her

16   about it?

17          A.    No.

18          Q.    Any reason why you didn't go

19   and talk to her about it?

20          A.    I don't remember if I didn't

21   talk to her.

22          Q.    Do you recall talking to

23   Grady about it?

FREEDOM COURT REPORTING

Page 280

1          A.     Grady and Steve.

2          Q.     Okay.  What do you remember

3    about that conversation or conversations?

4          A.     I disagreed with what she

5    said.

6          Q.     Did they say they would try

7    and help you get back into the account?

8          A.     I didn't want to work it no

9    more.

10         Q.     Okay.

11         (Whereupon, Defendant's Exhibit No.

12   45 was marked for identification purposes

13   by Mr. Hista.)

14         A.     This is what I wrote not to

15   work that Burger King no more.  I remember

16   this.

17         Q.     You're referring to

18   Defendant's Exhibit No. 45?

19         A.     45.  To go along with 44.

20         Q.     This is the store -- this is

21   the document where you indicate that

22   you're no longer going to be working the

23   Burger King where Mary worked?

FREEDOM COURT REPORTING

Page 281

1          A.      Yes.

2          Q.      What happened to that

3    account?

4          A.      Another route worked it.

5          Q.      Who -- who picked up working

6    it?

7          A.      I know him.  Just the name

8    don't ring a bell right now.

9          Q.      Another distributor?

10         A.      Another distributor picked

11   it up.

12         Q.      From the Montgomery

13   warehouse?

14         A.      Yes.

15         Q.      Do you know if that

16   distributor ever had any issues with Mary?

17         A.      I wouldn't know.  That's

18   2005.  I didn't work but a month after.

19         (Whereupon, Defendant's Exhibit No.

20   46 was marked for identification purposes

21   by Mr. Hista.)

22         A.      This is the one Troy State,

23   yeah.  I remember this.

FREEDOM COURT REPORTING

Page 282

1          Q.      Okay.  Let me ask you just a

2     few questions before we review this

3     document.  By March of 2005, did you carry

4     a cell phone with you when you were

5     servicing your territory?

6          A.      Sometimes I had it.

7     Sometimes I didn't.

8          Q.      And why wouldn't you carry

9     it with you?

10         A.      Well, it could have been one

11    of them times when it wasn't working.

12         Q.      Was it your general practice

13    to carry a cell phone?

14         A.      That is my cell phone.  I

15    didn't have to carry it unless I wanted

16    to.

17         Q.      Would you agree that it

18    would be good business practice to carry a

19    cell phone when you're running a bread

20    route?

21         A.      Well, back before cell

22    phones came out, we didn't carry cell

23    phones to run a bread route.

FREEDOM COURT REPORTING

Page 283

```
 1          Q.      Okay.  In March of 2005,

 2    weren't cell phone prevalent?

 3          A.      Yes, they was.

 4          Q.      Did you have a cell phone at

 5    that time?

 6          A.      Yes, I did.

 7          Q.      Did you normally carry it

 8    with you when you ran your route?

 9          A.      Sometime.

10          Q.      Were you --

11          A.      On that particular day, I

12    did have it.

13          Q.      Okay.  Let's review this

14    document.  Do you recognize the name Joni

15    Barnes?

16          A.      Yes.

17          Q.      Is that the lady that you

18    dealt with at Sodexho?

19          A.      No.

20          Q.      Okay.  How do you recognize

21    the name Joni Barnes?

22          A.      I knew she was the manager.

23          Q.      Who was the individual that
```

FREEDOM COURT REPORTING

Page 284

1    you dealt with at Sodexho?

2         A.      The kitchen manager.  I

3    don't remember her name.

4         Q.      This document states that

5    Ms. Barnes -- she, seemingly referring to

6    Ms. Barnes, told -- told me that on

7    Thursday, March 3, 2005, Henry worked her

8    in the morning but did not have any

9    hamburger buns.  Is that true?

10        A.      Yes, it is.

11        Q.      And then the next clause

12   states:  Henry promised her that he would

13   bring some back later that day.

14               Is that true?

15        A.      That was -- that was true.

16   They needed them for lunch.

17        Q.      Okay.  And Henry never

18   carried any buns back.  Is that true?

19        A.      That's true.

20        Q.      Did you call back to the

21   Sodexho account and tell them that you

22   were not going to make it back that day?

23        A.      That particular day when the

FREEDOM COURT REPORTING

Page 285

1    truck broke down and the truck was

2    steaming so, I got out to work on the

3    truck, and I didn't think about Sodexho.

4           Q.    Okay.  So your testimony is

5    you did not call the Sodexho account

6    back --

7           A.    No, I didn't.

8           Q.    -- on Thursday?

9           A.    No, I didn't.

10          Q.    The document goes on to

11   state:  On Friday, Ms. Barnes called Henry

12   and asked what happened.  Henry told

13   Ms. Barnes his truck broke down, and he

14   couldn't get back to her.

15          A.    Ms. Barnes didn't call

16   Henry.  Henry went back there that next

17   morning and talked to Ms. Barnes --

18          Q.    Okay.

19          A.    -- and explained to her what

20   had happened to my truck.  She didn't call

21   me.

22          Q.    So your testimony is you

23   went back to the account?

FREEDOM COURT REPORTING

Page 286

1        A.       Back to the account, uh-huh.

2        Q.       And you told her that you

3   had had truck problems?

4        A.       Truck had broke down, and I

5   couldn't get back to deliver the buns.

6        Q.       When you -- when your truck

7   broke down, did you call anybody at

8   Flowers and ask for assistance at the

9   Sodexho account?

10       A.       It wouldn't have did any

11  good when the truck broke down.  Because

12  it was a situation where you had about a

13  thirty-minute span from get the buns to

14  get back to them, thirty to forty minutes.

15              And when the truck broke

16  down, it wouldn't have did any good.  They

17  couldn't have made it there on time.

18       Q.       They could have tried?

19       A.       They wouldn't have made it.

20       Q.       But you didn't contact

21  anybody at Flowers?

22       A.       I didn't contact anybody.  I

23  was mostly concerned about my truck.

FREEDOM COURT REPORTING

Page 289

1  good to service Sodexho at that particular

2  time.  Because it had passed the time that

3  they really needed the product.

4            So whatever you did

5  wouldn't -- wouldn't have pleased them no

6  way.

7      Q.    So it's fair to say that you

8  made no attempt in any way, shape or form

9  to either contact the Sodexho account or

10  to get anyone to help with that account?

11      A.    No.  No.

12      Q.    Do you recall how much it

13  cost you to have the truck repaired?

14      A.    I don't remember.

15      Q.    Do you know who repaired the

16  truck?

17      A.    F&D.

18      Q.    Do you know -- recall the

19  individual that you dealt with there?

20      A.    Yes.

21      Q.    Who's that?

22      A.    My kinfolk's shop.  That's

23  who fixed it.

FREEDOM COURT REPORTING

Page 295

1    the next day.  I showed him -- I showed

2    Grady where the manifold was cracked on

3    the truck.  Ask him.

4          Q.     So it's your testimony that

5    Marcus was riding with you that day?

6          A.     Yes, he was.

7          Q.     Did you tell Marcus to try

8    and make any arrangements to get the

9    trucks that run -- the buns that were on

10   your truck over to the Sodexho account?

11         A.     Didn't I tell you that I

12   didn't think about it once the truck broke

13   down?

14         Q.     Could Marcus have gotten the

15   buns to the Sodexho account?

16         A.     No.  He could walk them to

17   it?

18         Q.     Well, could he have called

19   to get a ride?

20         A.     No.

21         Q.     Why not?

22         A.     I told you time had lapsed.

23         Q.     Well, you just testified

FREEDOM COURT REPORTING

Page 296

1    that you were on your way back to the

2    Sodexho account?

3          A.     I was on the way back.  And

4    who?  He had no one to call.

5          Q.     Couldn't you call another

6    distributor?

7          A.     I told you at the time when

8    the truck broke down I didn't think about

9    the buns no more.  My attention was on the

10   truck.

11         Q.     As soon as the truck broke

12   down, if you had called someone, could

13   someone have come and picked up the buns

14   and delivered them to the Sodexho account?

15         A.     No.

16         Q.     Why not?

17         A.     By the time they got to me

18   and got to Sodexho it still would have

19   been too late.

20         Q.     Why do you say that?

21         A.     Because it was -- the time

22   frame was something like about a ten-

23   minute difference from me getting there.

FREEDOM COURT REPORTING

Page 298

1    47 was marked for identification purposes

2    by Mr. Hista.)

3         Q.    (BY MR. HISTA)

4    Mr. Porterfield, you've been handed what

5    has been marked as Defendant's Exhibit 47.

6         A.    Yes.

7         Q.    Do you recognize this

8    document?

9         A.    Yes.

10        Q.    Tell me what it is, please.

11        A.    This document is the letter

12   I received certified mail from Flowers

13   Baking Company.  I -- I -- I remember it,

14   yes.

15        Q.    And this was due to the

16   issue with Sodexho, correct?

17        A.    Sodexho, yes.  I remember

18   this.

19        Q.    And at this point, Sodexho

20   was not allowing you to service them; is

21   that correct?

22        A.    Yes.

23        Q.    Did you understand that you

FREEDOM COURT REPORTING

Page 299

1    had ten business days to try and get back

2    into the Sodexho account?

3         A.    I understood that very

4    clearly.  But I went -- I was barred from

5    the warehouse before ten days.

6         Q.    Okay.

7         (Whereupon, Defendant's Exhibit No.

8    48 was marked for identification purposes

9    by Mr. Hista.)

10        A.    I'm aware of this one too.

11        Q.    Okay.  Let's go over this

12   document.  Defendant's Exhibit No. 48.

13             Does this document reference

14   the meeting that you previously testified

15   concerning Councilman Williams and

16   Councilman Knuckles?

17        A.    Uh-huh.

18        Q.    Is that a meeting with

19   Mr. Messer?

20        A.    Yes.

21        Q.    The document indicates that

22   Councilman Williams said that they been

23   down to see the lady at Troy State about

FREEDOM COURT REPORTING

Page 300

1    getting Henry's problem resolved, but she

2    was real rude and wouldn't talk to them.

3              Were you there when that

4    happened?

5         A.    Yes.

6         Q.    What happened?  What

7    occurred?

8         A.    She came in and she wouldn't

9    talk.  She slammed down what she had and

10   rushed off to the back.

11        Q.    Was that the kitchen

12   manager?  Or was it Ms. Barnes?

13        A.    That was Ms. Barnes, the

14   lady with the attitude.

15        Q.    The document goes on to talk

16   about Mr. Knuckles saying, well, Henry,

17   you've got several more days to work on

18   this.

19        A.    I remember.

20        Q.    Do you remember Mr. Knuckles

21   saying that?

22        A.    Yes, I do.

23        Q.    And then the document says:

FREEDOM COURT REPORTING

Page 303

1    said it really wasn't his fault that he

2    lost the account and that the last

3    breaches wasn't his fault either.

4              Is that what you told

5    Mr. Messer?

6         A.    Yes.

7         Q.    The document states after a

8    little more talk he got up and left.  When

9    he was going out the door, he said

10   somebody might die over this.

11             Did you say that?

12        A.    No.

13        Q.    Positive about that?

14        A.    No.

15        Q.    You're not positive?

16        A.    I said I didn't say it.

17        Q.    You didn't say that?

18        A.    No.

19        Q.    You're positive you didn't

20   say that?

21        A.    I didn't say that.

22        Q.    Did you say words to that

23   effect?

FREEDOM COURT REPORTING

Page 304

1         A.      I didn't say that.

2         Q.      Did you say anything to

3   Mr. Messer as you were going out the door?

4         A.      I didn't say that.

5         Q.      Did you say anything to

6   Mr. Messer as you were going out the door?

7         A.      I called him racist.

8         Q.      Okay.  What else did you

9   say?

10         A.      I believe that's about all.

11         Q.      Could you have said

12   something else, and you just don't

13   remember it today?

14         A.      I didn't -- that's what I

15   said to him.  I called him a racist.

16         Q.      Why did you call him racist?

17         A.      Because he is.

18         Q.      And on what basis do you

19   make that contention?

20         A.      The way he treat me.

21         Q.      Pardon me?

22         A.      The way -- I just -- that's

23   my belief.

FREEDOM COURT REPORTING

Page 306

1    allegedly being a racist?

2         A.      I have with Doug Branch.

3    And not only Grady Messer, John Renfroe.

4         Q.      Who is John Renfroe?

5         A.      The other district manager

6    down there.

7         Q.      When did that discussion

8    take place?

9         A.      Just holding conversation

10   with the guys.  We talks.  I don't know

11   when, but we have talked.

12        Q.      Did Mr. Grady ever make any

13   statement to you to the effect that you

14   didn't need to be threatening anyone?

15        A.      When I called him racist.

16        Q.      What was his response?

17        A.      He just said why would I

18   call him racist.  I don't -- I don't

19   remember exactly what -- what he said, but

20   I didn't make a threat towards him.

21        Q.      So the only thing that you

22   you said during that conversation was,

23   Mr. Messer, you're a racist?

FREEDOM COURT REPORTING

Page 307

1          A.      I called him racist.

2          Q.      And that's it?

3          A.      I talked about him.  I said

4    why was he doing me like this and why was

5    you treating me so different.  And then I

6    did call him racist, yeah.

7          Q.      Did you raise your voice?

8          A.      I don't remember.

9          Q.      Could you have?

10         A.      I don't remember.

11         Q.      Were you close to him when

12   you were having this conversation?

13         A.      No.

14         Q.      How far away were you?

15         A.      About two -- about three

16   feet, maybe.

17         Q.      The document goes on to

18   state I am not threatening anyone but more

19   than me is going to get hurt over this,

20   and that's a promise.

21                 Did you say that?

22         A.      Don't remember.  No.

23         Q.      You don't remember?

FREEDOM COURT REPORTING

Page 308

1          A.    No.  I didn't say that.

2          Q.    You're absolutely sure you

3    didn't say that?

4          A.    I didn't say that.

5          Q.    So if Grady Messer testifies

6    that you said that, he's lying?

7          A.    He's lying.

8          Q.    He's lying about this

9    conversation?

10         A.    He's lying.

11             (Whereupon, Defendant's Exhibit No.

12   49 was marked for identification purposes

13   by Mr. Hista.)

14         Q.    (BY MR. HISTA)

15   Mr. Porterfield, you have been handed what

16   has been marked as Exhibit No. 49.

17             Do you recognize this

18   document?

19         A.    Yes, I do.

20         Q.    Tell me what it is, please.

21         A.    This is a document received

22   from Grady Messer, when the other day he

23   sits here and said he didn't see me but

FREEDOM COURT REPORTING

Page 309

1    one time after that fact.

2                    But he met me the same night

3    he said I threatened him and brought me

4    this letter here.  So --

5         Q.    All right.  Who is this

6    letter from?

7         A.    This letter is from -- it's

8    from Michael Lord.

9         Q.    Did you receive a copy of

10   this letter?

11        A.    I received this copy from

12   Grady Messer that evening at Ryder truck.

13        Q.    All right.  So you were

14   barred from the warehouse?

15        A.    Uh-huh.

16        Q.    Okay.  Who did you get to

17   cover picking up your product and handling

18   transactions at the warehouse?

19        A.    That's -- that's why they

20   was at Ryder.  They was renting a truck

21   and told me to get my truck off the

22   premises.

23                    That's why I was -- wasn't

FREEDOM COURT REPORTING

Page 312

1          Q.      It was before March 16th?

2    Or after March 16th?

3          A.      It was before March 16th.

4          Q.      So Marcus was already banned

5    from the property too?

6          A.      Marcus was banned the same

7    day that I was fired.

8          Q.      Okay.

9          A.      We was terminated the same

10   day, March the 16th.

11         Q.      Marcus wasn't an employee of

12   Flowers, was he?

13         A.      He was working through some

14   temp service.

15         Q.      Okay.  Once you were barred

16   from the warehouse, did you make, you

17   know, any arrangements with any other

18   distributor to handle picking up your

19   product?

20         A.      I was told by Grady Messer

21   that I couldn't come out there and

22   couldn't nobody else run my route.  That I

23   wasn't allowed on the premises.  And --

FREEDOM COURT REPORTING

Page 313

1          Q.      He didn't tell you nobody

2    else could pick up your product, did he?

3          A.      Why would they rent a truck

4    the same night?  They was renting a truck

5    the night that he brought me that

6    paperwork to run that route.

7          Q.      That's not my question.  Did

8    Mr. Messer ever tell you that you could

9    not make arrangements with another

10   distributor to have your product picked

11   up?

12         A.      I don't recall.

13         Q.      He didn't say that, did he?

14         A.      I don't recall.  No.

15         Q.      And you didn't make

16   arrangements with any other distributor to

17   have your product picked up, did you?

18         A.      No, I didn't.

19         Q.      Didn't make arrangements

20   with anybody to have your product picked

21   up, did you?

22         A.      No, I didn't.

23         Q.      Are you aware of any

FREEDOM COURT REPORTING

Page 322

1    service your distributorship and make

2    it -- make acceptable allegation (sic.)

3    against you to insure your customers are

4    properly served -- arrangements that your

5    customers are properly served.

6         Q.    Would that statement not

7    indicate that you were still a distributor

8    for Flowers as of March 17, 2005?

9         A.    This letter would.  But by

10   me not going -- allowed to go on the

11   warehouse, I don't know how I could

12   operate it myself.  I didn't have anyone

13   else to go out there and do it.

14        Q.    But you didn't attempt to

15   get anybody else to help you, did you?

16        A.    I didn't have anyone to do

17   it.

18        Q.    But you didn't ask any other

19   distributor for help, did you?

20        A.    I don't remember.  No.

21        Q.    Well, you've previously

22   testified no.

23        A.    No.

FREEDOM COURT REPORTING

Page 323

1        Q.      Correct?

2        A.      No, I didn't.

3              MR. HISTA:  Let's go off the

4   Record for a minute.

5              THE VIDEO SPECIALIST:  One

6   moment.  Off the Record.

7        (Off-the-Record discussion.)

8              THE VIDEO SPECIALIST:  We're

9   back on the Record.

10        Q.      (BY MR HISTA)

11   Mr. Porterfield, we're back on the Record.

12   It's approximately 3:17.  Are you prepared

13   to proceed?

14        A.      Yes, sir.

15        (Whereupon, Defendant's Exhibit No.

16   51 was marked for identification purposes

17   by Mr. Hista.)

18        Q.      (BY MR. HISTA)

19   Mr. Porterfield, I have had the court

20   reporter hand you what has been marked as

21   Defendant's Exhibit 51.

22              If you could take a few

23   moments and review this document for me,

FREEDOM COURT REPORTING

Page 330

```
 1    attention to the fifth paragraph, you use

 2    the terminology "false accusations."

 3              What are you referring to?

 4         A.    Troy State.

 5         Q.    Anything else?

 6         A.    That's all I was concerned

 7    about.

 8         Q.    The last paragraph of this

 9    letter addresses the issue of product that

10    had been in the freezer.

11              Is this the first time that

12    you had written a letter to Flowers about

13    any --

14         A.    This is.

15         Q.    -- product being in the

16    freezer?

17              (Whereupon, Defendant's Exhibit No.

18    53 was marked for identification urposes

19    by Mr. Hista.)

20         A.    This is the letter I

21    received from Michael Lord and Steve

22    Stephens at Tenda Chick.

23         Q.    Is -- you're referring to
```

FREEDOM COURT REPORTING

Page 331

1    Defendant's Exhibit No. 53, correct?

2          A.      Yes.

3          Q.      And is this the letter that

4    terminated your distributor relationship

5    with Flowers?

6          A.      Yes.

7          Q.      And in this letter, you were

8    given the option of selling the

9    distributorship back to the company; is

10   that correct?

11         A.      Yes.

12         Q.      Did you have any discussions

13   with anyone in Flowers' management about

14   that option?

15         A.      Michael Lord and -- and

16   Grady talked to me about it.  But we

17   didn't -- the conversation didn't last

18   over a few minutes.  It didn't last long.

19   I told them I wasn't going to accept it.

20         Q.      Did you -- where did the

21   conversation or conversations take place?

22         A.      Tenda Chick.

23         Q.      What did they offer you to

FREEDOM COURT REPORTING

Page 356

1    Mr. Porterfield, do you recognize

2    Defendant's Exhibit No. 59?

3         A.    My 1999 1040.

4         Q.    Turning to page two of this

5    document, is that your signature?  Is one

6    of those signatures yours?

7         A.    Uh-huh.

8         Q.    And to the right of your

9    signature is the date August 25, '06?

10        A.    Uh-huh.

11        Q.    Do you see that?

12        A.    Uh-huh.

13        Q.    Is that the date you

14   completed your 1999 tax return?

15        A.    Yes.

16        Q.    Had you completed a tax

17   return for the year 1999 before August 25,

18   2006?

19        A.    No.

20        Q.    Is it fair to say that you

21   knew you had an obligation to file an

22   annual tax return?  Did you know that?

23        A.    Yes, I do.

FREEDOM COURT REPORTING

Page 357

1          Q.     Is it fair to say that you

2     knowingly did not file a tax return for

3     the year 1999?

4          A.     Yes.

5          Q.     Why didn't you file a tax

6     return?

7          A.     I just didn't file it.

8          Q.     Is the information on this

9     tax return accurate?

10          A.     Should be.

11          Q.     Any reason to believe it's

12     not?

13          A.     Ain't no reason to believe

14     it's not.

15               THE VIDEO SPECIALIST:  I need

16     to change the tape, please.

17               MR. HISTA:  Okay.

18               THE VIDEO SPECIALIST:  We're

19     going off the Record.  This is end of Tape

20     6.

21          (Off-the-Record discussion.)

22               THE VIDEO SPECIALIST:  We're

23     back on the Record.  This is the beginning

FREEDOM COURT REPORTING

Page 360

1    61 was marked for identification purposes

2    by Mr. Hista.)

3         Q.    (BY MR. HISTA)

4    Mr. Porterfield, do you recognize

5    Defendant's Exhibit No. 61?

6         A.    Yes.

7         Q.    Tell me what it is, please.

8         A.    2000 taxes.

9         Q.    And turning to page two of

10   Defendant's Exhibit 61, does your

11   signature appear at the bottom of that

12   page?

13        A.    Yes.

14        Q.    Is it a first signature on

15   page two?

16        A.    Yes.

17        Q.    To the right of your

18   signature is a date.  Do you see that?

19        A.    Yes.

20        Q.    Would you agree with me that

21   the date is August 25, 2006?

22        A.    Yes.  Same day I did the

23   other one.

FREEDOM COURT REPORTING

Page 361

1        Q.      Is this the first time that

2   you filed a tax return for the year 2000?

3        A.      Yes.

4        Q.      Turning your attention to

5   page three of this document --

6        A.      Yes.

7        Q.      -- would you agree with me

8   that this document reflects your income

9   and expenses from your Flowers

10  distributorship?

11       A.      Yes.

12       Q.      Do you believe that the

13  information that is on page three of this

14  tax return is accurate?

15       A.      I have to talk to my

16  accountant about that.  It looks like it.

17       Q.      Any reason to believe that

18  it's not accurate as we sit here today?

19       A.      I'm looking at this -- yes.

20  It's accurate.

21       (Whereupon, Defendant's Exhibit No.

22  62 was marked for identification purposes

23  by Mr. Hista.)

FREEDOM COURT REPORTING

1          Q.      (BY MR. HISTA)   We've marked

2     the next one as Defendant's Exhibit No.

3     62.

4                   Do you recognize this

5     document?

6          A.      Yes.

7          Q.      Turning to page two, is that

8     your signature -- first signature on that

9     page?

10         A.      Yes.

11         Q.      Do you agree with me that

12    this is the your 2001 Federal tax return?

13         A.      Yes.

14         Q.      And would you agree with me

15    that you didn't file this return until

16    August 25, 2006?

17         A.      Yes.

18         (Whereupon, Defendant's Exhibit No.

19    63 was marked for identification purposes

20    by Mr. Hista.)

21         Q.      (BY MR. HISTA)

22    Mr. Porterfield, you have in front of you

23    what has been marked as Defendant's

FREEDOM COURT REPORTING

Page 363

1    Exhibit No. 63.

2              Do you recognize this

3    document?

4         A.    2002 taxes.

5         Q.    Is it your 2002 Federal tax

6    return?

7         A.    Yes.

8         Q.    For you and your wife?

9         A.    Yes.

10        Q.    And on page two of that

11   document, is that -- the first signature

12   on that page yours?

13        A.    Yes.

14        Q.    And you didn't file your

15   2002 tax return until August 25, 2006,

16   correct?

17        A.    Yes.

18        Q.    Turning to page three of

19   this document, do you believe that page

20   three of this document accurately reflects

21   your income and expenses related to your

22   Flowers distributorship for the year 2002?

23        A.    Yes.

FREEDOM COURT REPORTING

Page 364

1          (Whereupon, Defendant's Exhibit

2     Nos. 64 & 65 were marked for

3     identification purposes by Mr. Hista.)

4          Q.     (BY MR. HISTA)

5     Mr. Porterfield, do you recognize what has

6     been marked as Defendant's Exhibit 64?

7          A.     2003 taxes.

8          Q.     And is this your 2003

9     Federal tax return for yourself and your

10    wife?

11         A.     Yes.

12         Q.     And on page two of that

13    document, is the first signature on that

14    page yours?

15         A.     Yes.

16         Q.     And this tax return is also

17    dated 8/25/2006.  Would you agree with

18    that?

19         A.     Yes.

20         Q.     Turning to page three of

21    this document, would you agree with me

22    that page three reflects the income and

23    expenses from your Flowers distributorship

FREEDOM COURT REPORTING

Page 365

1    for the year 2003?

2           A.    Yes.

3           Q.    Do you believe that it

4    accurately reflects your income and

5    expenses for the distributorship for that

6    year?

7           A.    Yes.

8           Q.    Okay.  We've just reviewed

9    your tax returns for the years 1999 to

10   2003 which you did not file until August

11   25, 2006, correct?

12          A.    Yes.

13          Q.    Is there any particular

14   reason why you didn't file any of those

15   tax returns until 2006?

16          A.    No reason.

17          Q.    You did understand that you

18   were supposed to file tax returns?

19          A.    I know.

20          Q.    What made you decide to

21   finally file tax returns for those years

22   in 2006?

23          A.    I decided to get them all

FREEDOM COURT REPORTING

Page 371

1    shoulder that almost froze.  High blood

2    pressure and different complaints.

3          Q.    Is there any way that you

4    could run a bread route at this point?

5          A.    I can get somebody to help

6    run it.

7          Q.    Who would you get to help

8    run it?

9          A.    I can find somebody.

10         Q.    How much are you receiving

11   from social security disability at this

12   point?

13         A.    1605 -- 1505.  1506, I

14   think.

15         Q.    For what period?

16         A.    What you mean?

17         Q.    1505 per month?

18         A.    Per month.  Month.  1506 per

19   month.

20         Q.    Are you receiving income

21   from any other source?

22         A.    No.

23         Q.    When did you start receiving

FREEDOM COURT REPORTING

Page 379

```
 1          A.      Had overspent.

 2          Q.      Did you file for bankruptcy

 3    more than once?

 4          A.      I think it was twice.  I

 5    don't know.  Maybe one, two, three.

 6          Q.      Do you have any plans to

 7    file for bankruptcy again?

 8          A.      No.

 9          (Whereupon, Defendant's Exhibit No.

10    66 was marked for identification purposes

11    by Mr. Hista.)

12          Q.      (BY MR. HISTA)

13    Mr. Porterfield, do you recognize

14    Defendant's Exhibit 66?

15          A.      Yes.

16          Q.      Turning to page two of that

17    document, does your signature appear on

18    that page in the left-hand column?

19          A.      Yes, uh-huh.

20          Q.      Turn to the eighth page of

21    this document.

22          A.      (Witness complying.)

23          Q.      Are you on a page that at
```

FREEDOM COURT REPORTING

Page 380

1    the top states Schedule B, personal

2    property?

3           A.     Yes.

4           Q.     And on the type of property

5    on the left, is the first number No. 20?

6           A.     Yes.

7           Q.     And a description and

8    location of the property listed there was

9    a class action lawsuit.

10                 What's that all about?

11          A.     I don't know.

12          Q.     You don't know?

13          A.     Huh-uh.

14          Q.     Would that be something your

15   wife's involved with?

16          A.     I don't know.

17          Q.     You have no idea why that's

18   listed --

19          A.     I don't know.

20          Q.     -- on your petition?

21                 Did you list any claims

22   against Flowers in this document?

23          A.     No.

FREEDOM COURT REPORTING

Page 381

1          Q.      Did you have any claims

2    against Flowers at this time?

3          A.      No.

4          (Whereupon, Defendant's Exhibit No.

5    67 was marked for identification purposes

6    by Mr. Hista.)

7          Q.      (BY MR. HISTA)

8    Mr. Porterfield, do you recognize

9    Defendant's Exhibit No. 67?

10          A.      Yes.

11          Q.      Is this another bankruptcy

12    petition that you filed or was filed on

13    your behalf?

14          A.      Where is -- this was the

15    same --

16          Q.      Let's go back to Exhibit No.

17    66.

18          A.      -- same thing.

19          Q.      We'll go back to Exhibit 66.

20          MR. TALIAFERRO:  Can we take

21    just a quick break if you don't mind?

22          MR. HISTA:  Sure.

23          MR. TALIAFERRO:  I got a call

FREEDOM COURT REPORTING

Page 382

1    I got to take.

2         A.      Okay.

3              THE VIDEO SPECIALIST:  Off

4    the Record.

5         (Short break.)

6              THE VIDEO SPECIALIST:  We're

7    back on the Record.

8         Q.     (BY MR. HISTA)  All right.

9    Let's just lay side by side next to each

10   other --

11        A.      These?

12        Q.      -- Defendant's Exhibit 66

13   and 67 and try and figure out if these are

14   two separate bankruptcies.

15        A.      I can tell you about it --

16        Q.      All right.

17        A.      -- right quick like.

18        Q.      Tell me about it.

19        A.      One of them was Chapter 13

20   and one was Chapter 11.  And they --

21              MR. TALIAFERRO:  Seven.

22        A.      Seven.  Something, you had

23   to file one before you filed the other.

FREEDOM COURT REPORTING

Page 383

1    They went together.

2         Q.    Okay.  So at any point

3    during this bankruptcy proceeding if --

4    assuming it was consolidated, did you --

5    did you have any claim against Flowers?

6         A.    No.

7         Q.    Mr. Porterfield, is it your

8    understanding that Flowers Baking Company

9    of Opelika is continuing to operate your

10   distributorship on your behalf?

11        A.    Yes.

12        Q.    And while Flowers is doing

13   that, is Flowers continuing to make

14   insurance payments on your behalf?

15        A.    Yes.

16        Q.    And does that include

17   insurance payments for any vehicles that

18   you own?

19        A.    Yes.

20        Q.    What vehicles is Flowers

21   currently picking up the insurance for?

22        A.    On 2002 Ford Explorer, a '96

23   Dodge Caravan, a '96 Grand Jeep Cherokee

FREEDOM COURT REPORTING

Page 384

1    and a '95 Isuzu truck.

2         Q.    Are all of those personal

3    vehicles?

4         A.    Two of them are.

5         Q.    Okay.  Which two are

6    personal?

7         A.    The -- all but the Isuzu.

8         Q.    Are personal?

9         A.    Yes.

10        Q.    And what do you use the

11   Isuzu for?

12        A.    It's sitting still.

13        Q.    That's -- that's the bread

14   truck?

15        A.    That's the big truck,

16   uh-huh.

17        Q.    Have you driven it recently?

18        A.    No.

19        Q.    Do you have any restrictions

20   driving?

21        A.    Me, myself?

22        Q.    Yes.

23        A.    No.