# Tab B (cont.)–

# EXHIBITS TO HENRY PORTERFIELD DEPOSITION

## DISTRIBUTOR'S AGREEMENT

AGREEMENT made this ___14th__ day of___June_____, 19_94_, by and between _Flowers Baking Co. of Opelika, Inc._ (COMPANY), and _Henry G. Porterfield_ (DISTRIBUTOR).

### W I T N E S S E T H:

COMPANY has developed or acquired a license of franchise for the use of formulae, recipes, trademarks and tradenames through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein, throughout a geographic area which constitutes the Territory designated in Exhibit A (Territory), attached hereto and made a part hereof; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the division of a portion of its market area into distribution territories, and the sale of its products to Independent Distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, _____Henry G. Porterfield_____ is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY'S products in the Territory; and

- 1 -



FBO000662

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a specified geographic area.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which is hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

## I. WARRANTY

1.1    The foregoing preambles shall constitute warranties, representations, agreements and undertakings by the parties.

## II. DEFINITIONS

2.1    <u>Outlets</u>:  Shall mean all retail stores (except thrift stores) selling to the general public and all restaurant and institutional accounts except those exempt from this Agreement as set forth in Article VII, below.

2.2    <u>Products</u>:  Shall mean fresh baked goods, as specifically described in Exhibit B, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that the Distribution Rights granted herein shall survive only so long as COMPANY has the license or franchise rights for such goods and COMPANY produces and/or sells such goods.

2.3    <u>Distribution Rights</u>:  Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products as set forth in Exhibit B to Outlets in the Territory, which right has been purchased by DISTRIBUTOR

FBO000663

from COMPANY as evidenced by a Bill of Sale executed by the parties, the form of which is attached hereto as Exhibit C, and made a part hereof.

2.4    <u>Territory</u>:    Shall mean that geographic area as more specifically described in Exhibit A within which DISTRIBUTOR owns the Distribution Rights.

2.5    <u>Good Industry Practice</u>:    Shall mean the standards that have developed and are universally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products in all Outlets, properly rotating all Products, promptly removing all stale Products, maintaining proper service and delivery to all Outlets requesting service except those proven consistently to be unprofitable, and maintaining all equipment in a sanitary condition and in good safe working order.

## III. RELATIONSHIP

3.1    <u>Extent and Duration</u>:    COMPANY hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, said ownership to continue until:

(a)    transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b)    COMPANY, for legitimate business reasons, ceases to use distributors to distribute its products in the _Montgomery, Alabama_ market area. In such event, COMPANY will repurchase the territory and distribution rights from DISTRIBUTOR at the greater of the first original purchase price or ten (10)

- 3 -

times the average weekly sales volume of name brand Products in the
Territory calculated over the six month period preceding the repurchase,
or

(c)    either party exercise their rights to terminate pursuant to Section 15.1.

3.2    <u>Nature of Rights</u>: The parties agree that the Distribution Rights sold to
DISTRIBUTOR pursuant to the Bill of Sale can be exercised only pursuant to the
terms of this Agreement and that any termination of this Agreement other than in
accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting
on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms
of this Agreement.

## IV.  <u>SALE OF PRODUCTS</u>

4.1    Products will be sold to DISTRIBUTOR at such terms and prices as established
by COMPANY from time to time.  COMPANY will also furnish to DISTRIBUTOR
suggested resale prices.  Bid prices will be jointly established by COMPANY and
DISTRIBUTOR.

## V.  <u>BEST EFFORTS/DISTRIBUTOR</u>

5.1    <u>Obligations of DISTRIBUTOR</u>: DISTRIBUTOR agrees and covenants to use his/her
best efforts to develop and maximize the sale of COMPANY'S Products to Outlets
within his/her Territory and service his/her Territory in accordance with good
industry practice as defined above.

DISTRIBUTOR shall cooperate with COMPANY on its marketing program and
maintain a clean and neat personal appearance consistent with the professional

- 4 -

FBO000665

image customers and the public associate with COMPANY. DISTRIBUTOR may not carry outside merchandise which is competitive with COMPANY'S products. DISTRIBUTOR may carry noncompetitive products, as long as this does not interfere with the distribution of COMPANY'S Products.

5.2    <u>Non-Compliance</u>:  Failure to comply with Section 5.1 above shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

VI. <u>BEST EFFORTS/MANUFACTURING</u>

6.1    <u>Obligations of Company</u>:  COMPANY shall use its best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products to supply Outlets requesting service in his/her Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR in his/her sales efforts.

VII. <u>ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP</u>

7.1    <u>Accounts Exempt From Agreement</u>:  COMPANY reserves the right to solicit and service drop delivery accounts in DISTRIBUTOR'S Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR'S business.

7.2    <u>Thrift Stores</u>:  COMPANY reserves the right to continue to sell Products through its retail thrift store operation, Company-owned and/or independently owned.

7.3    <u>Other Trademarks</u>:  The parties hereto stipulate that the COMPANY produces a variety of products marketed under a variety of trademarks distributed through

FBO000666

multiple channels of distribution. This Agreement applies only to the trademarks set forth on Exhibit B and does not restrict any other distribution of products by the COMPANY marketed under trademarks not listed on Exhibit B.

## VIII. PAYMENT FOR PRODUCTS

8.1    Settlement of Account:  On or before Friday of each week, DISTRIBUTOR will provide to COMPANY a full settlement of all Products sold to DISTRIBUTOR in, and a statement of operating expenses for the preceding week.

8.2    Maintenance of Records: DISTRIBUTOR will maintain current and accurate financial records for the operation of the Distributorship during the term of the Agreement.   DISTRIBUTOR will provide the COMPANY with complete and accurate quarterly and annual financial reports and operating statements in the form as described in Exhibit E attached hereto and as amended from time to time, within thirty (30) days after each quarter and year end.   To insure the adequacy and accuracy of such reports and otherwise insure compliance with the obligations referenced herein, COMPANY, at its expense, shall be entitled to inspect, copy and audit DISTRIBUTOR'S records and books kept in accordance with this Agreement upon request.

8.2.1  COMPANY, for a period of __One__ ( 1 ) year(s) following the date of this agreement, agrees to reimburse the DISTRIBUTOR the expenses of a certified public accountant, to a maximum of __Five Hundred__ dollars ($ 500.00 ) per year, who will assist the DISTRIBUTOR in the maintenance of these records. Upon request, DISTRIBUTOR shall provide COMPANY evidence of payment to the

- 6 -

certified public accountant.

8.3   <u>Cash Sales</u>:  DISTRIBUTOR is responsible for the collection of all cash sales in his/her Territory.

8.4   <u>Non-Cash Sales</u>:  In cases where Products are sold and distributed to Outlets which have been authorized by COMPANY for credit, COMPANY, at the request and for the convenience of DISTRIBUTOR, may establish an account receivable for COMPANY'S Products with the Outlet and will promptly credit DISTRIBUTOR for all such accounts.  DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY.

8.5   <u>Chain Accounts</u>:  COMPANY reserves the right to continue carrying the accounts receivable for all chain and other major accounts and to promptly credit DISTRIBUTOR for all such accounts.  The accounts covered by this section are listed in Exhibit D, attached hereto and made a part hereof.

8.6   <u>Security Interest</u>:  To secure the payment of any indebtedness or liability of DISTRIBUTOR to COMPANY now or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a security interest in his/her Distribution Rights, all other rights under this Agreement and all Products in DISTRIBUTOR'S possession, and grants to COMPANY the rights of a secured party under the Uniform Commercial Code.

8.7   <u>Security Deposit</u>: DISTRIBUTOR shall furnish COMPANY with a security deposit in the amount of One Thousand Dollars ($1,000.00).  This money shall be deposited into an interest bearing account for the benefit of DISTRIBUTOR and

- 7 -

~~shall be returned~~ to DISTRIBUTOR upon termination of this Agreement after

DISTRIBUTOR has satisfied all requirements under this Agreement.

IX. EQUIPMENT AND MAINTENANCE

9.1    DISTRIBUTOR is responsible for obtaining his/her own delivery truck and purchasing adequate insurance thereon, which will include combined single limit coverage of at least $1,000,000.00.    DISTRIBUTOR'S insurance purchased pursuant to this section shall include COMPANY as an additional named insured. DISTRIBUTOR must provide COMPANY with a written certificate of such insurance.

9.2    DISTRIBUTOR is responsible for truck sanitation.  Consistent with good industry practice, the delivery truck should be kept clean at all times and maintained in such condition as to provide safe, prompt, and regular service to all customers.

9.3    DISTRIBUTOR is responsible for maintenance of his/her delivery truck.

9.4    COMPANY will make available a spare delivery truck at a specified location which DISTRIBUTOR may use in case of an emergency.  DISTRIBUTOR will be charged a daily rental fee for any use of such vehicle.

9.5    COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) collection of sales data, (ii) preparation of sales tickets, (iii) accumulation of sales histories, (iv) preparation of daily and weekly settlements, (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR's daily order of the COMPANY's products, and (vi)  direct

- 8 -

FBO000669

communication to company for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information.

Further, the COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) to provide automated route book information, (ii) to provide automated product movement information, (iii) to provide individual customer sales profiles, and (iv) to provide suggested orders for each customer.

9.5.1  COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by the COMPANY.

9.5.2  DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about the COMPANY's proprietary administrative services.

9.5.3  DISTRIBUTOR acknowledges that he/she cannot and shall not acquire any proprietary rights in the COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services.

9.5.4  This provision shall remain in effect for as long as the DISTRIBUTOR's Agreement is in effect.  However, in the event the DISTRIBUTOR's Agreement is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary

FBO000670

administrative services.  The right to use these administrative services shall not be assigned by DISTRIBUTOR without  the express written consent of COMPANY.

9.5.5  Compliance with these provisions is a material part of the performance standards of the DISTRIBUTOR's Agreement and any violation shall be a material breach of the DISTRIBUTOR's Agreement.

9.5.6  The COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of 14 days notice to the DISTRIBUTOR.

## X.  PRODUCT DELIVERY

10.1   COMPANY shall deliver Products to DISTRIBUTOR at  Montgomery, Alabama  . COMPANY reserves the right to change such location provided that any location chosen will be of suitable size with the necessary loading dock heights to allow for use by DISTRIBUTOR. DISTRIBUTOR will be charged a fee for warehouse use.

## XI.  PRODUCT CODE

11.1   Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, out of code product on the market is a material breach of this Agreement. Repeated violations will be grounds for termination of this Agreement.

11.2   To assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase up to 10% of DISTRIBUTOR'S weekly volume returned as stale product, at a price equal to DISTRIBUTOR'S cost of such product.  In the event that the volume of stale product exceeds 10% of DISTRIBUTOR'S weekly volume, COMPANY will repurchase such stale product at 50% of DISTRIBUTOR'S cost of such product.

FBO000671

11.3    DISTRIBUTOR may not sell any product over code or product not in a saleable condition for distribution to the general public but may otherwise sell such product to purchasers who are not competitors of COMPANY.

## XII. ADVERTISING AND PROMOTIONS

12.1    COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled media advertising.   Subject to COMPANY'S prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

12.2    DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and chain accounts in his/her Territory.   Such promotions and feature pricing are optional with respect to local accounts.  When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in his/her purchase price accounting for such promotion or feature pricing.

## XIII.  SERVICE REQUIREMENTS

13.1    DISTRIBUTOR is responsible for providing service of his/her Territory during periods of sickness, vacation, temporary disability and other similar circumstances.

13.2    In the case of an emergency during which DISTRIBUTOR cannot provide a substitute to service his/her Territory, COMPANY reserves the right to service such Territory and charge DISTRIBUTOR a daily fee plus operating expenses.

## XIV.  TRANSFER OF SALE OF RIGHTS

- 11 -

14.1 <u>Conditions</u>:  The Distribution Rights are owned by the DISTRIBUTOR and may be assigned, transferred or sold, in whole or in part, by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject in either case to the prior written approval of the assignees', transferees' or purchasers' qualifications by COMPANY, which approval will not be unreasonably withheld.  However, any sale, whether made by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR, shall be subject to a first right of refusal on the part of COMPANY at the same terms and conditions offered to DISTRIBUTOR, OR ANYONE ACTING ON BEHALF OF DISTRIBUTOR, by a qualified and/or bona fide purchaser, which right shall expire if not exercised with ten (10) days after the later of:  (a) receipt by COMPANY of written notice of intent to sell to a named purchaser on terms and conditions fully set forth in such notice, and (b) and evaluation by COMPANY of the proposed purchaser.

14.2 <u>Settlement of Account</u>:  No transfer or sale of DISTRIBUTOR'S rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts; provided, however, that COMPANY may waive this requirement if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

14.3 <u>Transfer Fee</u>:  In the event of a sale by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR (including a sale by COMPANY for the account of DISTRIBUTOR), of DISTRIBUTOR'S Distribution Rights, DISTRIBUTOR shall pay

- 12 -

a transfer fee to COMPANY in an amount equal to five (5%) of such gross sales price, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

## XV.   INDEPENDENT BUSINESS

15.1   <u>Essential Term</u>:  The status of DISTRIBUTOR pursuant to this Agreement is that of independent contractor and the parties hereby signify their express intention to this effect.  DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR'S business, it being understood that the primary interest of COMPANY is the results achieved by DISTRIBUTOR. DISTRIBUTOR'S business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business. Any contrary final determination by any governmental agency or court of competent jurisdiction shall entitle either party to cancel this Agreement. Neither DISTRIBUTOR nor any of his/her employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided. The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement.   Furthermore, none of the benefits provided by COMPANY to its employees is available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR'S employees, agents, or servants, except as

- 13 -

FBO000674

required by law.  DISTRIBUTOR will be solely and entirely responsible for his/her acts and for the acts of his/her employees, agents, and servants during the performance of this Agreement, and will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees.  As a part of this obligation, DISTRIBUTOR agrees to obtain a combined single limit insurance policy against any such liability as to COMPANY with limits of at least $1,000,000.00, naming COMPANY as an additional named insured therein. DISTRIBUTOR must provide COMPANY with a written certificate of said insurance. Notwithstanding the fact the DISTRIBUTOR is an independent contractor, COMPANY and DISTRIBUTOR agree that, until further written notice from COMPANY to DISTRIBUTOR, COMPANY shall treat DISTRIBUTOR as a "statutory employee" as defined in Section 3121 of the Internal Revenue Code, and shall withhold and/or remit the appropriate amounts on DISTRIBUTOR'S behalf pursuant to the Federal Insurance Contributions Act and/or Section 3306 of the Federal Unemployment Tax Act.  Any such written notice shall be effective as of the date specified therein which shall be no sooner than thirty (30) days from the date of delivery thereof.

## XVI.  TERMINATION

16.1    Performance:  Except as set forth in Sections 3.1 (b) and (c) above and Section 15.1, or this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof.  In the event DISTRIBUTOR fails to perform his/her obligations under this Agreement,

- 14 -

FBO000675

COMPANY may terminate this Agreement as set forth below.

16.2   <u>Non-Curable Breach</u>:   COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR'S failure of performance involves criminal activity, threatens public health or safety, or threatens to do substantial harm to COMPANY'S business.

16.3   <u>Curable Breach</u>:   In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure his/her failure of performance.  If DISTRIBUTOR does not cure such failure performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure.  Furthermore, the parties agree that repeated violations constitute a chronic failure of performance and threaten substantial harm to COMPANY'S business, and in such event COMPANY shall be entitled to terminate this Agreement and DISTRIBUTOR  shall have no further right to cure.

16.4   <u>Actions Following Termination</u>:   If this Agreement is terminated under either Section 16.2 or 16.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR'S Distribution Rights to a qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement.  Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the

- 15 -

amount of any outstanding liens, any other known liabilities of the Distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to DISTRIBUTOR in exchange for the release of his/her Distribution Rights and interests under this Agreement.

## XVII.  CONSENT TO INCORPORATION

17.1   If DISTRIBUTOR desires to conduct business in a corporate or other legal capacity, other than as a sole proprietorship, COMPANY will consent to the assignment of this Agreement to such legal entity provided:

(a)     If a corporation, DISTRIBUTOR at all times retains at least 51% of the outstanding stock and meets the other conditions set forth in this Article; the books and records of the corporation reflect that the issuance and transfer of shares of stock are restricted and that all stock certificates shall bear a legend giving notice of such restriction and referring the reader to the terms of this Agreement; DISTRIBUTOR acts as such corporation's principal officer and continues personally to meet and guarantee the obligations imposed hereunder; and DISTRIBUTOR executes any other consents or documents reasonably required by COMPANY in connection with such approval.

(b)     If any other legal business enterprise is established, DISTRIBUTOR shall have all other individuals involved in the enterprise as an entrepreneur personally execute this Agreement, and DISTRIBUTOR'S interest in the enterprise shall at all times represent at least 51%.

- 16 -

## XVIII.   TRADEMARKS AND TRADENAMES

18.1   Permission for Use:  DISTRIBUTOR shall make no use of COMPANY'S trademarks

or tradenames subject to this Agreement, nor engage in any program or activity

which makes use of or contains any reference to COMPANY, its products,

trademarks or tradenames, other than as specifically provided herein, except with

the prior written consent of COMPANY.

18.2   Return Upon Termination:  Upon termination of this Agreement, DISTRIBUTOR

shall cease use of COMPANY'S trademarks and shall deliver to COMPANY any

advertising, promotional or merchandising material.

## XIX.   MISCELLANEOUS

19.1   Notice:  Any notice required or permitted under this Agreement shall be deemed

properly given when personally received, or seventy-two (72) hours after deposit

in the U.S. mail, return receipt requested, first class postage prepaid, addressed

to the below designated parties at the below-designated addresses or at such

other address as either party may designate by written notice duly given in

accordance with this Section 19.1:

> As to DISTRIBUTOR,    Henry G. Porterfield, _ _ _  _ _     _ _ _ _ ,
>
> Montgomery, Alabama  _____
>
> As to COMPANY,  Flowers Baking Co. of Opelika, Inc.,  P. O. Box 2548,
>
> Opelika, Alabama  36801-2548 _____

19.2   Survival:   This agreement shall be binding upon the heirs, personal

representatives, successors or assigns of the parties to this Agreement.

- 17 -

19.3    Incorporation of Bill of Sale:  This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

19.4    Entire Agreement:  This Agreement, together with Exhibits A, B, C, D, and E, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter.   Unless set forth in this Agreement, no party shall be liable for any representation made to any other.  This Agreement may be amended or modified only by a writing signed by all parties.

19.5    Indemnification:    DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement. DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws, except as otherwise provided by Paragraph 15.1 herein, with respect to DISTRIBUTOR or DISTRIBUTOR'S employees engaged in performance of this Agreement.

- 18 -

19.6    <u>Covenant Not To Compete</u>:    DISTRIBUTOR agrees that if this Agreement is terminated, DISTRIBUTOR will not, for a period of one (1) year thereafter, sell or attempt to sell any product competitive with the Products as defined in Section 2.2 of this Agreement to any of the customers to whom DISTRIBUTOR made one or more sales during his/her last year as COMPANY'S DISTRIBUTOR.    The geographical territory applicable to this paragraph is the Territory as defined in Section 2.4 of this Agreement.  DISTRIBUTOR agrees that his/her promise herein made to refrain from selling or attempting to sell means that he/she will not, directly or indirectly, either as an individual on his/her own account or as a partner, employee, distributor, agent or salesman of or for any person, firm, association or corporation, engage in selling or attempting to sell any of said competitive products to any of the customers hereinabove designated.

19.7    <u>Governing Law</u>: This Agreement and the construction thereof shall be governed by the laws of the State of _____ Alabama _____.

*1-da*

FBO000680

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this

Agreement on the day and year first above written.

WITNESSES                          DISTRIBUTOR

_____            By: _____

ATTEST:


                                   Flowers Baking Co. of Opelika, Inc.
                                   COMPANY

_____            By: _____

                                   Its:  President _____

- 20 -

FBO000681

EXHIBIT A

# TERRITORIAL DESCRIPTION

## AREA:    204

**SECTION I:**

Territory begins at intersection of Madison Avenue and North Decatur Street. Go North on North Decatur Street to Lower Wetumpka Road working Right side of road only. Go North on Lower Wetumpka to Chisholm Street working Right side of road only. Go East on Chisholm Street to Coliseum Boulevard working Right side of road only. Go South on Coliseum Boulevard to Dickinson Drive working both sides of road. Go Northeast on Dickinson Drive to Gunter Park Drive working both sides of road. Go back Southwest on Dickinson Drive to Coliseum Boulevard. Go South on Coliseum Boulevard to Atlanta Highway working both sides of road. Go West on Atlanta Highway to Madison Avenue working both sides of road. Go West on Madison Avenue to North Decatur Street working Right side of Madison Avenue only.

EXHIBIT A

AREA:___204___

# TERRITORY MAP

## SEE ATTACHED

FBO000683

FBO000684

**AREA:** __204__

## AUTHORIZED PRODUCTS

Distributor shall have the authorization to distribute the
following products in the territory specifically designated in
Exhibit A.

1.   _____
2.   _____
3.   _____
4.   _____
5.   _____

FBO000685

**EXHIBIT B**

## **EXCLUSIVE RIGHTS**

Distributor shall have the exclusive right to sell and distribute the following products in the territory specifically designated in Exhibit A.

1.    **Flowers Label White Bread**
2.    **Sunbeam**
3.    **Nature's Own**
4.    **Roman Meal \***
5.    **BeeBo**
6.    **Jubilee**

\*    **Distribution rights granted herein shall survive only so long as Flowers has the license or franchise rights for such products.**

FBO000686

EXHIBIT "C"

<u>BILL OF SALE</u>

    <u>Flowers Baking Co. of Opelika, Inc.</u>, Seller, subject to the consideration set for the below, hereby conveys, sells, transfers and delivers to <u>Henry G. Porterfield</u>, Buyer, the Distribution Rights specifically described in the Distributor's Agreement executed simultaneously with this Bill of Sale. Both the Distributor's Agreement and all appendices (exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

    The terms of this sale are as follows:

    Purchase price shall be $_____4,808_____. A Two Thousand Dollar ($2,000.00) cash down payment shall be due on or before the effective date of the Distributor's Agreement; remainder shall be paid in __520__ weekly installments at an annual interest rate of _____12%_____.

    Buyer shall own all Distribution Rights in the Territory in himself/herself and in his/her executors, administrators and assigns, consistent with the terms and conditions contained in the Distributor's Agreement.

    Seller has lawful title to the Distribution Rights in the Territory free from all encumbrances. Seller warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, Seller and Buyer execute this Bill of Sale at

_____14th_____ day of _June_, 19_94_.

WITNESSES                                    DISTRIBUTOR


_____


_____          By: _____


ATTEST:                                      Flowers Baking Co. of Opelika, Inc.
                                             COMPANY

_____          By _____

                                             Its: _____President_____


- 2 -

## *AUTHORIZED  CHARGE  ACCOUNT  LIST**

### *AREA:*               *204*

| ACCOUNT NAME | ACCOUNT NUMBER |
|---|---|
| AL ELKS MEMORIAL CENTER | 020200 – 0000 |
| CAPITOL HEIGHTS JR HIGH | 072100 – 0000 |
| DILI DOG, INC. | 108200 – 0000 |
| GUNTER 92 – A – 4076 HQCSJB | 012000 – 0010 |
| KRYSTAL #2 | 331000 – 2002 |
| MORNINGVIEW ELEM SCHOOL | 392600 – 0000 |
| OAK TREE FOODS 5536 | 245000 – 5536 |
| RALLY'S #297 ATL HWY | 521850 – 0000 |
| ZIPPY MART #530 | 165000 – 0530 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

\*   All Accounts listed above as a Distributor's Authorized Charge Account List
are authorized accounts by Flowers.  These Accounts are the responsibility of
Flowers to collect.

FBO000689

## *ACCOUNT LISTING*

### *AREA:* _____ 204 _____

| ACCOUNT NAME |
|---|
| AL ELKS MEMORIAL CENTER |
| BAMA LANES INC |
| CAPITOL HEIGHTS JR HIGH ✓ |
| DAVIS CAFE |
| DILI DOG, INC. |
| ELBOW ROOM |
| GUNTER 92−A−4076 HQCSJB ✓ |
| KRYSTAL #2 |
| MEAT CITY GROCERIES |
| MORNINGVIEW ELEM SCHOOL ✓ |
| OAKTREE FOODS 5536 |
| RALLY'S #297 ATL HWY |
| RIPLEY ST PACKAGE STORE & DELI |
| SUNDOWN E SANDICH & OYSTER HS |
| ZIPPY MART #530 |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

EXHIBIT "E"

Quarterly and Annual Financial Reports, consisting of:

1.    Compiled Statement of Revenues and Expenses

2.    Compiled Statement of Cash Flow

These statements may be prepared on a cash basis and issued without disclosure as required by generally accepted accounting principles.  Further, these statements must be compiled by a certified public accountant in accordance with the standards established by the American Institute of Certified Public Accountants.

3.    Statement of Revenues, expenses other than transportation expense, and fair rental value of vehicles used in the business.

Company will supply actual format, if necessary.

FBO000691

## ADDENDUM

The following agreement is entered into as a supplement to the Distributor's Agreement between   Henry G. Porterfield   (DISTRIBUTOR) and   Flowers Baking Co. of Opelika, Inc.   (COMPANY).   Notwithstanding any other provision contained in the Distributor's Agreement, the parties hereby agree as follows:

(1)     At any time within six (6) months and one (1) day of the effective date of the Distributor's Agreement, should DISTRIBUTOR decide he/she no longer desires to be an independent businessperson, then, if DISTRIBUTOR provides 30 calendar days written notice, COMPANY will buy back the Distribution Rights from DISTRIBUTOR.   DISTRIBUTOR'S obligations under the Distributor's Agreement shall continue until the Distribution Rights are repurchased.

(2)     In the event DISTRIBUTOR exercises his/her option, the purchase price of the Distribution Rights will be an amount equal to the amount DISTRIBUTOR paid COMPANY for such Distribution Rights.

(3)     Provided the vehicle is in usable condition, COMPANY also agrees to purchase the truck purchased by DISTRIBUTOR from COMPANY at the lesser of DISTRIBUTOR'S purchase price or an amount determined by an independent appraiser.

(4)     Except as provided in this Addendum, the parties retain any and all rights set forth in the Distributor's Agreement.

WITNESSES

_____

_____

DISTRIBUTOR

By: _____

Flowers Baking Co. of Opelika, Inc.
COMPANY

ATTEST:

_____

By _____

Its: _____President_____

DEFENDANT'S
EXHIBIT

Porterfield 4          FBO000701



**Flowers Baking Co. of Opelika, Inc.**

**DEFENDANT'S EXHIBIT**

13

TO:        Henry Porterfield Rt. 204

FROM:      Steve Bordeaux
           Vice President of Sales

SUBJECT:   Distributor's Agreement by and between <u>Henry Porterfield</u> ("Distributor") and
           Flowers Baking Co. of Opelika, Inc. ("FBC") dated <u>June 14</u>, 19<u>94</u>
           (hereinafter collectively referred to as "Distributor's Agreement")

Section 2.5 of the above referenced Distributor's Agreement states "Good Industry Practice shall mean the standards that have developed and are universally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of products in all outlets, properly rotating all products, promptly removing all stale products, maintaining proper service and delivery to all outlets requesting service except those proven consistently to be unprofitable, and maintaining all equipment in a sanitary condition and in good safe working order".

Section 5.1, Obligations of Distributor, states "Distributor agrees and covenants to use his/her best efforts to develop and maximize the sale of Company's products to outlets within his/her territory and service his/her territory in accordance with good industry practice as defined above". Further, Section 5.2, Noncompliance, states "Failure to comply with Section 5.1 above shall be considered a material breach of this agreement and shall be governed by the provisions of this agreement dealing with termination".

Section 16.3, Curable Breach, states "In any event of failure of performance by Distributor, Company must give Distributor ten (10) business days written notice within which Distributor may cure his/her failure of performance. If Distributor does not cure such failure of performance within this ten (10) day period, Company may thereafter terminate this Agreement and Distributor shall have no further right to cure..."

On or about August 27, 1998, Gordon Harris, Commisary Manager, told Steve Stephens you would no longer be allowed to service the <u>Gunter Air Force Base</u> commissary account. You were then told by Steve Stephens and Grady Messer of this decision. Please be advised that you have ten (10) business days from the date of this letter to make arrangements to begin servicing that account again. Failure to cure this failure of performance within this period will allow Company to terminate your Distributor's Agreement.

Acknowledged receipt of:                                    FBO000097

_____
Distributor

*Steve Bordeaux*
_____
Vice President of Sales

Date  _____

Date  9/1/98

*Received A copy<br>But Henry Porterfield<br>did not sign it*

P. O. Box 2548  •  Opelika, Alabama 36803-2548  •  334-749-8257  •  Fax 334-749-8735

No.0616   P. 2/2

Oct. 8. 1998 3:31PM



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS 42D AIR BASE WING (AU)
MAXWELL AIR FORCE BASE ALABAMA

Colonel Albert A. Allenback
Commander, 42d Air Base Wing
50 LeMay Plaza South
Maxwell AFB  AL  36112-6334

1 5 SEP 1998

Henry G. Porterfield

Montgomery AL ː            )

Dear Mr. Porterfield

    You are hereby notified that, effective immediately, you are ordered not to reenter or be found within the limits of the United States military reservation at Maxwell AFB, Maxwell Family Housing Annex, or Gunter Annex, Alabama for an indefinite period of time.  This action is based on a charge of Theft of DeCA Property at 155 North Turner Boulevard, Gunter Commissary, Gunter Annex, Alabama on 9 Feb 98, 11 Mar 98, 11 Jun 98, and various other times over the past three years.

        Title 18 of the United States Code, Section 1382 states as follows:

        Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or

        Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation after having been removed therefrom or ordered not to reenter by an officer or person in command or charge thereof,

        Shall be fined not more than $500 or imprisoned not more than 6 months, or both.

    You are further informed that should you reenter or be found upon the limits of the United States military reservation at Maxwell AFB, Maxwell Family Housing Annex, or Gunter Annex, in violation of this order, you will be subject to detainment by the military for prompt delivery to appropriate civil authorities.

    Should any compelling reasons exist which you believe would be sufficient to justify a modification or termination of this order, you should submit a written request addressed to the Commander, 42 SFS, 130 West Selfridge Street, Maxwell AFB AL 36112-6610.

**DEFENDANT'S EXHIBIT**

*14*

ALBERT A. ALLENBACK
Colonel, USAF
Commander

FBO000093

Oct. 8. 1998  3:30PM                                                No.0616   P. 1/2

## STAFF SUMMARY SHEET

| | TO | ACTION | SIGNATURE (Surname), GRADE AND DATE | | TO | ACTION | SIGNATURE (Surname), GRADE AND DATE |
|---|---|---|---|---|---|---|---|
| 1 | 42 SPTG/ CCE | Coord | *Hyatt, Lt 21 Aug 98* | 6 | 42 SFS/ SFA | Distr | |
| 2 | 42 SPTG/ CD | Coord | *Wefel, Lt Col, 26 Aug 98* | 7 | | | |
| 3 | 42 ABW/ CCE | Coord | *Riebel Capt 31 Aug 98* | 8 | | | |
| 4 | 42 ABW/ CV | Coord | *David Childress* | 9 | | | |
| 5 | 42 ABW/ CC | Sig | *Signed 14 Sep* | 10 | | | |

| SURNAME OF ACTION OFFICER AND GRADE | SYMBOL | PHONE | TYPIST'S INITIALS | SUSPENSE DATE |
|---|---|---|---|---|
| Giambattista, Capt | 42 ABW/JA | 3-2789 | SS | |

| SUBJECT | DATE |
|---|---|
| Barment Letter for Henry G. Porterfield, | 21 Aug 98 |

SUMMARY
1. CONDUCT INVOLVED:
    NATURE:  Theft of DeCA Property, Building 811, Gunter Commissary, Maxwell AFB-Gunter Annex AL 36115
    SYNOPSIS:  An investigation was initiated by the DoD IG, Defense Criminal Investigative Service, on allegations Subject Porterfield, an independent vendor for Flowers Bakery Company, had devised a scheme to steal bakery items from DeCA (Gunter Annex Commissary). It was alleged, based on interviews conducted (see Tab 2), that such theft has been going on for the past 3 years with an estimated loss of $30,000. The investigation ultimately determined that Subject Porterfield did devise a scheme to convert and steal bakery items from the Commissary (by removing items from the Commissary after they had been received into inventory and re-selling them to cash customers; by removing "back stocked" items from the Commissary warehouse and having them recharged; and by overstating the count of items being delivered). The investigation specifically disclosed Subject Porterfield unlawfully removed bakery items from Maxwell AFB-Gunter Annex Commissary on 9 Feb 98, 11 Mar 98, and 11 Jun 98, with an estimated loss to DeCA in the amount of $262.00.

2. STATUS OF SUBJECT:
    AGE:  46
    RESIDENCE:                 , Montgomery AL
    No military affiliation.

3. BARMENT RECOMMENDATION:
    YEARS:  Indefinite
    RATIONALE:  Ongoing theft of DeCA Property

4. RECOMMENDATION.  42 ABW/CC sign barment letter at Tab 1.



F. THOMAS GIAMBATTISTA, Capt, USAF
Assistant Staff Judge Advocate

2 Tabs
1. Barment Ltr for Porterfield
2. Investigative File

AF FORM 1768, SEP 84 (EF-V4)    (FORM FLO2)    PREVIOUS EDITION WILL BE USED.

FBO000094



**H & G DISTRIBUTORS**
Henry Porterfield
Owner/Distributor

Montgomery, Alabama
———
Telephone 334/288-7592

Steve Bordeaux, VP Sales                                September 10, 1998
Flowers Baking Company
Opelika, Alabama

Subject: Response to letter dated September 1,1998 regarding distributor agreement
between Henry Porterfield and Flowers Baking Company.

According to section 14.1 of the distributors agreement dated June 14, 1994 which states:
"The distributor rights are owned by the **DISTRIBUTOR** and maybe **ASSIGNED,
TRANSFERRED** or sold, in whole or in **PART**, by distributor, or anyone acting on
behalf of DISTRIBUTOR, subject  in either case to the prior  written approval of the
assignees, transfers or purchasers qualifications by company, **which approval will not be
unreasonable withheld.**

In order to cure the alleged breech of contract as outlined per your letter dated September
1, 1998, I have contacted a distributor, Steve Head, who has agreed to except servicing of
this account. This action is in accordance with my rights of distributorship as outlined in
the aforementioned paragraph. The above individual is currently a distributor for Flowers
Baking Company and is in good standing and has the necessary qualifications to service
the account mentioned in your letter.  If this distributor is unsatisfactory to your
requirements then you may choose one of your own liking. In either case you are
requested to respond to this letter within 10 days in writing to the above address.

Henry G. Porterfield

cc: Steve Bordeaux, Vp Sales Flowers Baking Co.
    Grady Messer, Sales Director, Flowers Baking Co.
    N. Tracy Nickson, Attorney at Law
    Steve Head, Franchised Distributor

Page 1 of 2

FBO000089

DEFENDANT'S
EXHIBIT

18

Flowers Baking Co. of Opelika, Inc.
Repurchase Statement
Henry Porterfield
Distributor No. 2069

06/23/00

Flowers Reconciliation:

Flowers Note:

| | | | | |
|---|---|---|---|---|
| Present Value | 05/20/00 | 30,001.00 | | |
| Beginning Balance | 09/13/99 | 27,658.00 | | |
| Less: Ending Balance | 06/30/00 | 24,122.14 | | |
| Principal Paid In | | | 3,535.86 | |
| Appreciated Value | | | 2,343.00 | |
| | | | | |
| Amount Due Distributor From Flowers | | - | | 5,878.86 |

NationsBank:

Original Note:
| | | | |
|---|---|---|---|
| Beginning Balance | | | |
| Credit: 1987 Chev Step Van vin #1GCHP32K1H3322736 | | | |
| Principal Reduction | Payoff | | |
| Amount Due Distributor From NationsBank | | | 0.00 |

Grand Total Due Distributor                                  5,878.86

| | | | |
|---|---|---|---|
| Less: Truck Repairs: | | 0.00 | |
| Disability Insurance prepaid 11.27 x 4wks | | 0.00 | |
| Other: Tag & Title Fees | | 0.00 | |
| 5% Transfer Fee | 30,001.00 | | |
| | | | 0.00 |
| Net Amount Due To/(From) Distributor | | | 5,878.86 |

Approved:  President                                    Distributor

FBO000061

**PURCHASE AGREEMENT**

This Purchase Agreement is made this **3rd** day of **July, 2000** and between **Flowers Baking Co. Of Opelika, Inc.** (hereinafter "Buyer"), and **Henry G. Porterfield** (hereinafter "Seller"), pursuant to the Distributor's Agreement entered into by Seller and Buyer on **June 14, 1994** (hereinafter "Distributorgreement").

**1.**

Subject to the conditions outlined herein, Seller agrees to sell, and Buyer agrees to buy the Distribution Rights specifically described in the Distributor Agreement and accompanying exhibits which are attached hereto as an Appendix, such descriptive provisions being made a part hereof. The purchase price of said Distribution Rights shall be **$30,001.00** . Said amount will be applied by Buyer in its entirety to Seller's outstanding balance on loan account number **2069** with the **SunTrust Bank**.

**2.**

This Purchase Agreement is made conditioned upon Buyer obtaining from Seller a Release Agreement and Bill of Sale conveying said Distribution Rights to Buyer and releasing forever any claim to said Distribution Rights.

**3.**

Sale shall be closed on or before **June 28, 2000.**

**4.**

This Purchase Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their heirs, successors, administrations, executors and assigns.

**5.**

This Purchase Agreement, together with the provisions in the attached Appendix specifically describing the Distribution Rights sold herein, constitutes the sole and entire agreement between the parties hereto. No representation, promise, or inducement not included in this Purchase Agreement shall be binding upon any party hereto.

IN WITNESS WHEREOF, Buyer and Seller have executed this Purchase Agreement at the day and year first above written .

Seller: **Henry G. Porterfield**                                      Buyer

**Prattville, Al.**
Address                                                                        Address

FBO000062

## RELEASE AGREEMENT AND BILL OF SALE

This Release Agreement and Bill of Sale is made this **3rd** day of **July, 2000**    , by and between **Henry G. Porterfield** (hereinafter "Seller") and Flowers Baking Co. Of Opelika, Inc. (hereinafter "Buyer"), pursuant to the Distributor's Agreement entered into by Seller and Buyer on **June 14, 1994** and the Purchase Agreement executed by Seller and Buyer simultaneously herewith.

### 1.

For the consideration set forth herein, Seller hereby conveys to Buyer lawful title to all Distribution Rights heretofore conveyed to Seller under the above-mentioned Distributor's Agreement and releases and forever waives any claim to said Distribution Rights. Seller warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons and agrees that Buyer has properly purchased said Distribution Rights in accordance with the Distributor's Agreement. Furthermore, Seller, on behalf of himself, his legal representatives, heirs, successors and assigns, does hereby release and forever discharge Buyer and SunTrust Bank, their legal representatives, officers, shareholders, agents, employees, successors and assigns, from any and all claims, actions, causes of action, rights, demands or remedies, whether known or unknown, which he ever had, now has, or may or might in the future have, arising out of, or relating to, the Distributor's Agreement.

### 2.

Buyer agrees to pay Seller $ **30,001.00.** Said amount will be applied by Buyer in its entirety to Seller's outstanding balance on loan account number **2069** with the SunTrust Bank. The preceding consideration is the total and sole consideration given by Buyer to Seller for this Release Agreement and Bill of Sale, and it is expressly understood that such consideration is given and accepted for full release of, and waiver of, any claim to all Distribution Rights heretofore conveyed to Seller by Buyer and for full settlement of any and all claims, actions, causes of action, rights, demands or remedies, whether known or unknown, which Seller ever had, now has, or may or might in the future have, arising out of, or relation to, the Distributor's Agreement.

### 3.

Seller warrants that Seller has read this Release Agreement and Bill of Sale and understands all of its terms and that Seller executes it voluntarily with full knowledge of its significance. Seller further warrants that no promise or inducement has been offered or made except as herein set forth and that this Release Agreement and Bill of Sale is executed without reliance on any statement or representation by Buyer or any of its representatives.

FBO000063

IN WITNESS WHEREOF, Buyer and Seller have executed this Release Agreement on the day and year first above written.

Seller: **Henry G. Porterfield**

Buyer: Flowers Baking Co. Of Opelika Inc.

By: _President_

Witness:

FBO000064

## DISTRIBUTOR'S AGREEMENT

AGREEMENT made this **3rd** day of **July, 2000,** by and between  Flowers Baking Co. of Opelika, Inc.

(COMPANY), and **Henry G. Porterfield** (DISTRIBUTOR).

### W I T N E S S E T H:

COMPANY has developed or acquired a license of franchise for the use of formulae, recipes, trademarks and trade names through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein, throughout a geographic area which constitutes the Territory designated in Exhibit A (Territory), attached hereto and made a part hereof; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the division of a portion of its market area into distribution territories, and the sale of its products to Independent Distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, **Henry G. Porterfield** is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY'S products in the Territory; and

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a specified geographic area.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which is hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

### I. WARRANTY

1.1    The foregoing preambles shall constitute warranties, representations, agreements and undertakings by the parties.

### II. DEFINITIONS

2.1    **Outlets**:  Shall mean all retail stores (except thrift stores) selling to the general public and all restaurant and institutional accounts except those exempt from this Agreement as set forth in Article VII, below.

2.2    **Products**:  Shall mean fresh baked goods, as specifically described in Exhibit B, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided, however, that the Distribution Rights granted herein shall survive only so long as COMPANY has the license or franchise rights for such goods and COMPANY produces and/or sells such goods.

DEFENDANT'S EXHIBIT

19

2.3 **Distribution Ri__s**: Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products as set forth in Exhibit B to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, the form of which is attached hereto as Exhibit C, and made a part hereof.

2.4 **Territory**: Shall mean that geographic area as more specifically described in Exhibit A within which DISTRIBUTOR owns the Distribution Rights.

2.5 **Good Industry Practice**: Shall mean the standards that have developed and are universally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products in all Outlets, properly rotating all Products, promptly removing all stale Products, maintaining proper service and delivery to all Outlets requesting service except those proven consistently to be unprofitable, and maintaining all equipment in a sanitary condition and in good safe working order.

### III. RELATIONSHIP

3.1 **Extent and Duration**:     COMPANY hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, said ownership to continue until:

(a)     transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b)     COMPANY, for legitimate business reasons, ceases to use distributors to distribute its products in the **Phenix City, AL** market area. In such event, COMPANY will repurchase the territory and distribution rights from DISTRIBUTOR at the greater of the first original purchase price or ten (10) times the average weekly sales volume of name brand Products in the Territory calculated over the six month period preceding the repurchase, or

(c)     either party exercise their rights to terminate pursuant to Section 15.1.

3.2 **Nature of Rights**: The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of sale can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms of this Agreement.

### IV. SALE OF PRODUCTS

4.1     Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time. COMPANY will also furnish to DISTRIBUTOR suggested resale prices. Bid prices will be jointly established by COMPANY and DISTRIBUTOR.

### V. BEST EFFORTS/DISTRIBUTOR

**5.1**     **Obligations of ᴛRIBUTOR:** DISTRIBUTOR agrees and covenants to use his/her best efforts to develop and maximize the sale of COMPANY'S Products to Outlets within his/her Territory and service his/her Territory in accordance with good industry practice as defined above.

DISTRIBUTOR shall cooperate with COMPANY on its marketing program and maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY. DISTRIBUTOR may not carry outside merchandise which is competitive with COMPANY'S products. DISTRIBUTOR may carry noncompetitive products, as long as this does not interfere with the distribution of COMPANY'S Products.

**5.2**     **Non-Compliance:** Failure to comply with Section 5.1 above shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

## VI. BEST EFFORTS/MANUFACTURING

**6.1**     **Obligations of Company:** COMPANY shall use its best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products to supply Outlets requesting service in his/her Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR in his/her sales efforts.

## VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP

**7.1**     **Accounts Exempt From Agreement:** COMPANY reserves the right to solicit and service drop delivery accounts in DISTRIBUTOR'S Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR'S business.

**7.2**     **Thrift Stores:** COMPANY reserves the right to continue to sell Products through its retail thrift store operation, Company-owned and/or independently owned.

**7.3**     **Other Trademarks:** The parties hereto stipulate that the COMPANY produces a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution. This Agreement applies only to the trademarks set forth on Exhibit B and does not restrict any other distribution of products by the COMPANY marketed under trademarks not listed on Exhibit B.

## VIII. PAYMENT FOR PRODUCTS

**8.1**     **Settlement of Account:** On or before Friday of each week, DISTRIBUTOR will provide to COMPANY a full settlement of all Products sold to DISTRIBUTOR in, and a statement of operating expenses for, the preceding week.

**8.2**     **Maintenance of Records:** DISTRIBUTOR will maintain current and accurate financial records for the operation of the Distributorship during the term of the Agreement. DISTRIBUTOR will provide the COMPANY with complete and accurate quarterly and annual financial reports and operating statements in the form as described in Exhibit E attached hereto and as amended from time to time, within thirty (30) days after each quarter and year end. To insure the adequacy and accuracy of such

FBO000407

reports and other    , insure compliance with the obligations referenced herein, COMPANY, at its expense, shall be entitled to inspect, copy and audit DISTRIBUTOR'S records and books kept in accordance with this Agreement upon request.

**8.2.1**   COMPANY, for a period of _one_ ( 1 ) year(s) following the date of this agreement, agrees to reimburse the DISTRIBUTOR the expenses of a certified public accountant, to a maximum of _five hundred_ dollars ($ 500 ) per year, who will assist the DISTRIBUTOR in the maintenance of these records. Upon request, DISTRIBUTOR shall provide COMPANY evidence of payment to the certified public accountant.

**8.3**   **Cash Sales**: DISTRIBUTOR is responsible for the collection of all cash sales in his/her Territory.

**8.4**   **Non-Cash Sales**:  In cases where Products are sold and distributed to Outlets which have been authorized by COMPANY for credit, COMPANY, at the request and for the convenience of DISTRIBUTOR, may establish an account receivable for COMPANY'S Products with the Outlet and will promptly credit DISTRIBUTOR for all such accounts. DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY.

**8.5**   **Chain Accounts**:  COMPANY reserves the right to continue carrying the accounts receivable for all chain and other major accounts and to promptly credit DISTRIBUTOR for all such accounts. The accounts covered by this section are listed in Exhibit D, attached hereto and made a part hereof.

**8.6**   **Security Interest**:  To secure the payment of any indebtedness or liability of DISTRIBUTOR to COMPANY now or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a security interest in his/her Distribution Rights, all other rights under this Agreement and all Products in DISTRIBUTOR'S possession, and grants to COMPANY the rights of a secured party under the Uniform Commercial Code.

## IX. EQUIPMENT AND MAINTENANCE

**9.1**   DISTRIBUTOR is responsible for obtaining his/her own delivery truck and purchasing adequate insurance thereon, which will include combined single limit coverage of at least $1,000,000.00 DISTRIBUTOR'S insurance purchased pursuant to this section shall include COMPANY as an additional named insured. DISTRIBUTOR must provide COMPANY with a written certificate of such insurance.

**9.2**   DISTRIBUTOR is responsible for truck sanitation.  Consistent with good industry practice, the delivery truck should be kept clean at all times and maintained in such condition as to provide safe, prompt, and regular service to all customers.

**9.3**   DISTRIBUTOR is responsible for maintenance of his/her delivery truck.

**9.4**   COMPANY will assist DISTRIBUTOR in securing a spare delivery truck, when needed, at a specified location which DISTRIBUTOR may use in case of an emergency. DISTRIBUTOR will be responsible for any charges resulting from any use of such vehicle. On any such vehicle, DISTRIBUTOR is responsible for obtaining automobile liability insurance coverage with limits of at least $1,000,000, with

FBO000408

COMPANY name, s additional insured. On any vehicle DISTRIBUTOR rents, borrows or leases from COMPANY, DISTRIBUTOR agrees that his/her automobile liability insurance will be primary, and COMPANY's insurance will be excess, on any such vehicle.

9.5    COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) collection of sales data, (ii) preparation of sales tickets, (iii) accumulation of sales histories, (iv) preparation of daily and weekly settlements, (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR's daily order of the COMPANY's products, and (vi) direct communication to company for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information.

Further, the COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) to provide automated route book information, (ii) to provide automated product movement information, (iii) to provide individual customer sales profiles, and (iv) to provide suggested orders for each customer.

9.5.1    COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by the COMPANY.

9.5.2    DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about the COMPANY's proprietary administrative services.

9.5.3    DISTRIBUTOR acknowledges that he/she cannot and shall not acquire any proprietary rights in the COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services.

9.5.4    This provision shall remain in effect for as long as the DISTRIBUTOR's Agreement is in effect. However, in the event the DISTRIBUTOR's Agreement is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary administrative services. The right to use these administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

9.5.5    Compliance with these provisions is a material part of the performance standards of the DISTRIBUTOR's Agreement and any violation shall be a material breach of the DISTRIBUTOR's Agreement.

9.5.6    The COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of 14 days notice to the DISTRIBUTOR.

## X. **PRODUCT DELIVERY**

10.1    COMPANY shall deliver Products to DISTRIBUTOR at **Montgomery, Al**. COMPANY reserves the right to change such location provided that any location chosen will be of suitable size with the necessary loading dock heights to allow for use by DISTRIBUTOR. DISTRIBUTOR will be charged a fee for warehouse use.

FBO000409

## XI. PRODUCT CODE

11.1   Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, out of code product on the market is a material breach of this Agreement. Repeated violations will be grounds for termination of this Agreement.

11.2   To assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase up to 10% of DISTRIBUTOR'S weekly volume returned as stale product, at a price equal to DISTRIBUTOR'S cost of such product. In the event that the volume of stale product exceeds 10% of DISTRIBUTOR'S weekly volume, COMPANY will repurchase such stale product at 50% of DISTRIBUTOR'S cost of such product.

11.3   DISTRIBUTOR may not sell any product over code or product not in a saleable condition for distribution to the general public but may otherwise sell such product to purchasers who are not competitors of COMPANY.

## XII. ADVERTISING AND PROMOTIONS

12.1   COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled media advertising. Subject to COMPANY'S prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

12.2   DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and chain accounts in his/her Territory. Such promotions and feature pricing are optional with respect to local accounts. When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in his/her purchase price accounting for such promotion or feature pricing.

## XIII. SERVICE REQUIREMENTS

13.1   DISTRIBUTOR is responsible for providing service of his/her Territory during periods of sickness, vacation, temporary disability and other similar circumstances.

13.2   In the case of an emergency during which DISTRIBUTOR cannot provide a substitute to service his/her Territory, COMPANY reserves the right to service such Territory and charge DISTRIBUTOR a daily fee plus operating expenses.

## XIV. TRANSFER OR SALE OF RIGHTS

14.1   **Conditions**: The Distribution Rights are owned by the DISTRIBUTOR and may be assigned, transferred or sold, in whole or in part, by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject in either case to the prior written approval of the assignees', transferees' or purchasers' qualifications by COMPANY, which approval will not be unreasonably withheld. However, any sale, whether made by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR, shall be subject to a first right of refusal on the part of COMPANY at the same terms and conditions offered to

FBO000410

DISTRIBUTOR, ANYONE ACTING ON BEHALF OF DISTRIBUTOR, by a qualified and/or bona fide purchaser, which right shall expire if not exercised with ten (10) days after the later of: (a) receipt by COMPANY of written notice of intent to sell to a named purchaser on terms and conditions fully set forth in such notice, and (b) and evaluation by COMPANY of the proposed purchaser.

14.2    **Settlement of Account**:  No transfer or sale of DISTRIBUTOR'S rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts; provided, however, that COMPANY may waive this requirement if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

14.3    **Transfer Fee**:  In the event of a sale by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR (including a sale by COMPANY for the account of DISTRIBUTOR), of DISTRIBUTOR'S Distribution Rights, DISTRIBUTOR shall pay a transfer fee to COMPANY in an amount equal to five (5%) of such gross sales price, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

## XV.  INDEPENDENT BUSINESS

15.1    **Essential Term**:  The status of DISTRIBUTOR pursuant to this Agreement is that of independent contractor and the parties hereby signify their express intention to this effect.  DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR'S business, it being understood that the primary interest of COMPANY is the results achieved by DISTRIBUTOR. DISTRIBUTOR'S business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business.  Any contrary final determination by any governmental agency or court of competent jurisdiction shall entitle either party to cancel this Agreement.  Neither DISTRIBUTOR nor any of his/her employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided.  The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement.  Furthermore, none of the benefits provided by COMPANY to its employees is available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR'S employees, agents, or servants, except as required by law.  DISTRIBUTOR will be solely and entirely responsible for his/her acts and for the acts of his/her employees, agents, and servants during the performance of this Agreement, and will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees.  As a part of this obligation, DISTRIBUTOR agrees to obtain a combined single limit insurance policy against any such liability as to COMPANY with limits of at least $1,000,000.00, naming COMPANY as an additional named insured therein.  DISTRIBUTOR must provide COMPANY with a written certificate of said insurance.  Notwithstanding the fact the DISTRIBUTOR is an independent contractor, COMPANY and DISTRIBUTOR agree that, until further written notice from COMPANY

to DISTRIBUTC    COMPANY shall treat DISTRIBUTOK as a "statutory employee" as defined in Section 3121 of the Internal Revenue Code, and shall withhold and/or remit the appropriate amounts on DISTRIBUTOR'S behalf pursuant to the Federal Insurance Contributions Act and/or Section 3306 of the Federal Unemployment Tax Act. Any such written notice shall be effective as of the date specified therein which shall be no sooner than thirty (30) days from the date of delivery thereof.

## XVI. TERMINATION

16.1    **Performance**:  Except as set forth in Sections 3.1 (b) and (c) above and Section 15.1, of this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof.  In the event DISTRIBUTOR fails to perform his/her obligations under this Agreement, COMPANY may terminate this Agreement as set forth below.

16.2    **Non-Curable Breach**:  COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR'S failure of performance involves criminal activity, threatens public health or safety, or threatens to do substantial harm to COMPANY'S business.

16.3    **Curable Breach**:  In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure his/her failure of performance.  If DISTRIBUTOR does not cure such failure performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure.  Furthermore, the parties agree that repeated violations constitute a chronic failure of performance and threaten substantial harm to COMPANY'S business, and in such event COMPANY shall be entitled to terminate this Agreement and DISTRIBUTOR shall have no further right to cure.

16.4    **Actions Following Termination**:  If this Agreement is terminated under either Section 16.2 or 16.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR'S Distribution Rights to an qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement.  Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities of the Distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to DISTRIBUTOR in exchange for the release of his/her Distribution Rights and interests under this Agreement.

## XVII. CONSENT TO INCORPORATION

17.1    If DISTRIBUTOR desires to conduct business in a corporate or other legal capacity, other than as a sole proprietorship, COMPANY will consent to the assignment of this Agreement to such legal entity provided:

(a)   If a corpo....n, DISTRIBUTOR at all times retains at least 51% of the outstanding stock and meets the other conditions set forth in this Article; the books and records of the corporation reflect that the issuance and transfer of shares of stock are restricted and that all stock certificates shall bear a legend giving notice of such restriction and referring the reader to the terms of this Agreement; DISTRIBUTOR acts as such corporation's principal officer and continues personally to meet and guarantee the obligations imposed hereunder; and DISTRIBUTOR executes any other consents or documents reasonably required by COMPANY in connection with such approval.

(b)   If any other legal business enterprise is established, DISTRIBUTOR shall have all other individuals involved in the enterprise as an entrepreneur personally execute this Agreement, and DISTRIBUTOR'S interest in the enterprise shall at all times represent at least 51%.

## XVIII.  TRADEMARKS AND TRADE NAMES

18.1   **Permission for Use**:  DISTRIBUTOR shall make no use of COMPANY'S trademarks or trade names subject to this Agreement, nor engage in any program or activity which makes use of or contains any reference to COMPANY, its products, trademarks or trade names, other than as specifically provided herein, except with the prior written consent of COMPANY.

18.2   **Return Upon Termination**:  Upon termination of this Agreement, DISTRIBUTOR shall cease use of COMPANY'S trademarks and shall deliver to COMPANY any advertising, promotional or merchandising material.

## XIX.  MISCELLANEOUS

19.1   **Notice**:  Any notice required or permitted under this Agreement shall be deemed properly given when personally received, or seventy-two (72) hours after deposit in the U.S. mail, return receipt requested, first class postage prepaid, addressed to the below designated parties at the below-designated addresses or at such other address as either party may designate by written notice duly given in accordance with this Section 19.1:

As to DISTRIBUTOR, **Henry G. Porterfield** ,_____ . **Prattville, AL**     ._____

As to COMPANY, Flowers Baking Co. of Opelika, 101 Simmons Street, Post Office Box 2548, Opelika, AL  36801-2548.

19.2   **Survival**:  This agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties to this Agreement.

19.3   **Incorporation of Bill of Sale**:  This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

19.4   **Entire Agreement**:  This Agreement, together with Exhibits A, B, C, D, and E, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this

subject matter. U: s set forth in this Agreement, no party shall be liable for any representation made to any other. This Agreement may be amended or modified only by a writing signed by all parties.

19.5    **Indemnification**:  DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement.  DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws, except as otherwise provided by Paragraph 15.1 herein, with respect to DISTRIBUTOR or DISTRIBUTOR'S employees engaged in performance of this Agreement.

19.6    **Covenant Not To Compete**:  DISTRIBUTOR agrees that if this Agreement is terminated, DISTRIBUTOR will not, for a period of one (1) year thereafter, sell or attempt to sell any product competitive with the Products as defined in Section 2.2 of this Agreement to any of the customers to whom DISTRIBUTOR made one or more sales during his/her last year as COMPANY'S DISTRIBUTOR.  The geographical territory applicable to this paragraph is the Territory as defined in Section 2.4 of this Agreement.  DISTRIBUTOR agrees that his/her promise herein made to refrain from selling or attempting to sell means that he/she will not, directly or indirectly, either as an individual on his/her own account or as a partner, employee, distributor, agent or salesman of or for any person, firm, association or corporation, engage in selling or attempting to sell any of said competitive products to any of the customers hereinabove designated.

19.7    **Governing Law**: This Agreement and the construction thereof shall be governed by the laws of the State of Alabama .

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement on the day and year first above written.

WITNESSES                                          DISTRIBUTOR

_(signature)_                              By: _(signature)_

_(signature)_                              _(signature)_

ATTEST:                                            COMPANY

_____                    By: _(signature) Calvin Rhodes_

                                           Its: _President_

FBO000414

EXHIBIT A

# TERRITORIAL DESCRIPTION

## AREA:    2069

**SECTION I:**

Territory begins at intersection of Vaughn Road and Eastern Blvd.. Working Promande Shopping Center.  Go West on Vaughn Road to Carter Hill Road.  Working both sides of the road.  Go NorthWest on Carter Hill Road to Hall Street.    Working both sides of the road.    Go North on Hall Street to I-85.  Go on I-85 to  Forest Avenue.  Go North on Forest Avenue to Highland Avenue. Go East on  Highland Avenue to Ann Street.  Go South on Ann Street to Zelda Road.  Working both sides of the Road.  Go East on Zelda Road to Carter Hill Road.

**SECTION II**

FBO000415



FBO000416

**EXHIBIT B**

## EXCLUSIVE RIGHTS

Distributor shall have the exclusive right to sell and distribute the following products in the territory specifically designated in Exhibit A.

1.    **Sunbeam**

2.    **Nature's Own**

3.    **Blue Bird**

4.    **Cobblestone Mill**

5.    **Breads International**

6.

7.

\*    Distribution rights granted herein shall survive only so long as Flowers has the license or franchise rights for such products.

FBO000417

AREA: <u>2069</u>

## AUTHORIZED PRODUCTS

**Distributor shall have the authorization to distribute the following products in the territory specifically designated in Exhibit A.**

1. _____
2. _____
3. _____
4. _____

FBO000418

**EXHIBIT "C"**

**BILL OF SALE**

    Flowers Baking Co. of Opelika, Inc. , Seller, subject to the consideration set for the below, hereby conveys, sells, transfers and delivers to **Henry G. Porterfield**, Buyer, the Distribution Rights specifically described in the Distributor's Agreement executed simultaneously with this Bill of Sale. Both the Distributor's Agreement and all appendices (exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

    The terms of this sale are as follows:

    Purchase price shall be $ **35,421.00** .

    Buyer shall own all Distribution Rights in the Territory in himself/herself and in his/her executors, administrators and assigns, consistent with the terms and conditions contained in the Distributor's Agreement.

    Seller has lawful title to the Distribution Rights in the Territory free from all encumbrances. Seller warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

    IN WITNESS WHEREOF, Seller and Buyer execute this Bill of Sale at **3rd** day of **July, 2000.**

WITNESSES

DISTRIBUTOR

By: Henry C. Porterfield

ATTEST:

COMPANY

By: Calvin Rhodes

Its: President

☐ The Debtor is a transmitting utility as defined in ALA CODE 7-9-105(n).

No. of Additional Sheets Presented:

This FINANCING STATEMENT is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code.

1. Return copy or recorded original acknowledgement to:

Craig Horn
c/o Flowers Baking Co. of Opelika, Inc.
P.O. Box 2548
Opelika, Al. 36603-2548

THIS SPACE FOR USE OF FILING OFFICER
Date, Time, Number & Filing Office

Alabama
Sec. Of State
# 2001-05170 FS
Date 02/07/2001
Time 11:28 AM
File $10.00
EXGN $.00
ELCAM $.00
Form

$10.00

Pre-paid Acct. #_____

2. Name and Address of Debtor                (Last Name First if a Person)

Porterfield, Henry G.

Montgomery, Al.

Social Security/Tax ID #_____

2A. Name and Address of Debtor    (IF ANY)    (Last Name First if a Person)

Social Security/Tax ID #_____

☐ Additional debtors on attached UCC-E

FILED WITH:

3. NAME AND ADDRESS OF SECURED PARTY (Last Name First if a Person)

Sun Trust Bank
25 Park Place, N.E.
P.O. Box 4418  Mail Code 113
Atlanta, Ga. 30303  (P.O. Box 30302)

Social Security/Tax ID #_____

☐ Additional secured parties on attached UCC-E

4. NAME AND ADDRESS OF ASSIGNEE OF SECURED PARTY    (IF ANY)    (Last Name First if a Person)

5. The Financing Statement Covers the Following Types (or Items) of Property:

All distribution rights as described in the Distributor's Agreement
between Flowers Baking Co. of Opelika, Inc. and Henry G. Porterfield

Dated:  August 23, 2000

5A. Enter Code(s) From Back of Form That Best Describes The Collateral Covered By This Filing:

___ ___    ___ ___
___ ___    ___ ___
___ ___    ___ ___
___ ___    ___ ___
___ ___    ___ ___
___ ___    ___ ___

Check X if covered: ☐ Products of Collateral are also covered.

6. This statement is filed without the debtor's signature to perfect a security interest in collateral (check X, if so)
☐ already subject to a security interest in another jurisdiction when it was brought into this state.
☐ already subject to a security interest in another jurisdiction when debtor's location changed to this state.
☐ which is proceeds of the original collateral described above in which a security interest is perfected.
☐ acquired after a change of name, identity or corporate structure of debtor
☐ as to which the filing has lapsed.

7. Complete only when filing with the Judge of Probate:
The initial indebtedness secured by this financing statement is $_____

Mortgage tax due (15¢ per $100.00 or fraction thereof) $_____

8. ☐ This financing statement covers timber to be cut, crops, or fixtures and is to be cross indexed in the real estate mortgage records (Describe real estate and if debtor does not have an interest of record, give name of record owner in Box 5)

Signature(s) of Secured Party(ies)
(Required only if filed without debtor's Signature — see Box 6)

Signature(s) of Debtor(s)

Signature(s) of Secured Party(ies) or Assignee

Signature(s) of Debtor(s)

Henry G. Porterfield
Type Name of Individual or Business

Signature(s) of Secured Party(ies) or Assignee

Sun Trust Bank
Type Name of Individual or Business

(1) FILING OFFICER COPY - ALPHABETICAL
(2) FILING OFFICER COPY - NUMERICAL
(3) FILING OFFICER COPY-ACKNOWLEDGEMENT
(4) FILE COPY - SECURED PARTY
(5) FILE COPY DEBTOR(S)

STANDARD FORM — UNIFORM COMMERCIAL CODE — FORM UCC-1
Approved by The Secretary of State of Alabama

FBO000420

| ☐ The Debtor is a transmitting utility as defined in ALA CODE 7-9-105(n). | o. of Additional ets Presented: | THIS FINANCING STATEMENT is presented to a Filing Officer for filing pursuant to the Uniform Commercial Code. |
|---|---|---|

1. Return copy or recorded original to:acknowledgement to:

**Craig Horn**
**c/o Flowers Baking Co. of Opelika, Inc.**
**P.O. Box 2548**
**Opelika, Al. 36603-2548**

Pre-paid Acct. #_____

THIS SPACE FOR USE OF FILING OFFICER
Date, Time, Number & Filing Office.

Alabama
Sec. Of State
B 2001-05170 FS
Date 2/07/2001
Time 1128 AM

FS    $10.00
CERTN $.000
FEENN $.000
FEEN $10.00

$10.00

2. Name and Address of Debtor                    (Last Name First if a Person)

**Porterfield, Henry G.**

**Montgomery, Al.**

Social Security/Tax ID #_____

2A. Name and Address of Debtor        (IF ANY)        (Last Name First if a Person)

Social Security/Tax ID #_____

☐ Additional debtors on attached UCC-E

FILED WITH:

3. NAME AND ADDRESS OF SECURED PARTY (Last Name First if a Person)

**Sun Trust Bank**
**25 Park Place, N.E.**
**P.O. Box 4418   Mail Code 113**
**Atlanta, Ga. 30303  (P.O. Box 30302)**

Social Security/Tax ID #_____

☐ Additional secured parties on attached UCC-E

4. NAME AND ADDRESS OF        (IF ANY)        (Last Name First if a Person)
ASSIGNEE OF SECURED PARTY

5. The Financing Statement Covers the Following Types (or items) of Property:

**All distribution rights as described in the Distributor's Agreement**
**between Flowers Baking Co. of Opelika, Inc. and Henry G. Porterfield**

**mDated:   August 23, 2000**

5A. Enter Code(s) From Back of Form That Best Describes The Collateral Covered By This Filing:

_ _ _ _    _ _ _ _
_ _ _ _    _ _ _ _
_ _ _ _    _ _ _ _
_ _ _ _    _ _ _ _
_ _ _ _    _ _ _ _
_ _ _ _    _ _ _ _

Check X if covered: ☐ Products of Collateral are also covered.

6. This statement is filed without the debtor's signature to perfect a security interest in collateral (check X, if so)
☐ already subject to a security interest in another jurisdiction when it was brought into this state.
☐ already subject to a security interest in another jurisdiction when debtor's location changed to this state.
☐ which is proceeds of the original collateral described above in which a security interest is perfected.
☐ acquired after a change of name, identity or corporate structure of debtor
☐ as to which the filing has lapsed.

7. Complete only when filing with the Judge of Probate:
The initial indebtedness secured by this financing statement is $_____
Mortgage tax due (15¢ per $100.00 or fraction thereof) $_____

8. ☐ This financing statement covers timber to be cut, crops, or fixtures and is to be cross indexed in the real estate mortgage records (Describe real estate and if debtor does not have an interest of record, give name of record owner in Box 5)

Signature(s) of Secured Party(ies)
(Required only if filed without debtor's Signature — see Box 6)

Signature(s) of Debtor(s)                    Signature(s) of Secured Party(ies) or Assignee

Signature(s) of Debtor(s)                    Signature(s) of Secured Party(ies) or Assignee

**Henry G. Porterfield**                    **Sun Trust Bank**
Type Name of Individual or Business          Type Name of Individual or Business

(1) FILING OFFICER COPY - ALPHABETICAL    (3) FILING OFFICER COPY-ACKNOWLEDGEMENT    STANDARD FORM — UNIFORM COMMERCIAL CODE — FORM UCC-1
(2) FILING OFFICER COPY - NUMERICAL    (4) FILE COPY - SECURED PARTY    (5) FILE COPY DEBTOR(S)    Approved by The Secretary of State of Alabama

FBO000421

## _AUTHORIZED  CHARGE  ACCOUNT  LIST*_

AREA: _2069_

| ACCOUNT NAME | ACCOUNT NUMBER |
|---|---|
| APPLEBEE #8976 | 0040001461 |
| BURGER KING #306 | 0040001515 |
| BURGER KING #9326 | 0040001550 |
| E. Z . FOODS #64 | 0040001866 |
| JACKSON HOSPITAL | 0040001908 |
| KRYSTAL #6 | 0040001854 |
| MASONIC HOME | 0040001890 |
| MONTGOMERY ACADEMY | 0040001914 |
| SONIC #4100 | 0040002022 |
| SUNDAY DINNER | 0040002052 |
| WINN DIXIE #463 | 0040002257 |
| WINN DIXIE #464 | 0040002263 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

*   All Accounts listed above as a Distributor's Authorized Charge Account List
    are authorized accounts by Flowers. These Accounts are the responsibility of
    Flowers to collect.

FBO000422

## ACCOUNT LISTING

### AREA: _____ 2069

| ACCOUNT NAME |
| --- |
| APPLEBEE'S #8976 |
| BURGER KING #306 |
| BURGER KING $9326 |
| DAVIS CAFE |
| E. Z. FOODS #64 |
| JACKSON HOSPITAL |
| KRYSTAL #6 |
| MASONIC HOME |
| MONTGOMERY ACADEMY |
| QUICK SERVE #30 |
| SONIC #4100 |
| SUNDAY DINNER |
| T. J. BEST |
| WINN DIXIE #463 |
| WINN DIXIE #464 |

## EXHIBIT "E"

Quarterly and Annual Financial Reports, consisting of:

1.    Compiled Statement of Revenues and Expenses

2.    Compiled Statement of Cash Flow

These statements may be prepared on a cash basis and issued without disclosure as required by generally accepted accounting principles.  Further, these statements must be compiled by a certified public accountant in accordance with the standards established by the American Institute of Certified Public Accountants.

3.    Statement of Revenues, expenses other than transportation expense, and fair rental value of vehicles used in the business.

Company will supply actual format, if necessary.

FBO000424

## ADDENDUM

The following agreement is entered into as a supplement to the Distributor's Agreement between **Henry G. Porterfield** (DISTRIBUTOR) and Flowers Baking Co. of Opelika, Inc. (COMPANY). Notwithstanding any other provision contained in the Distributor's Agreement, the parties hereby agree as follows:

(1) At any time within six (6) months and one (1) day of the effective date of the Distributor's Agreement, should DISTRIBUTOR decide he/she no longer desires to be an independent businessperson, then, if DISTRIBUTOR provides 30 calendar days written notice, COMPANY will buy back the Distribution Rights from DISTRIBUTOR. DISTRIBUTOR'S obligations under the Distributor's Agreement shall continue until the Distribution Rights are repurchased.

(2) In the event DISTRIBUTOR exercises his/her option, the purchase price of the Distribution Rights will be an amount equal to the amount DISTRIBUTOR paid COMPANY for such Distribution Rights.

(3) Provided the vehicle is in usable condition, COMPANY also agrees to purchase the truck purchased by DISTRIBUTOR from COMPANY at the lesser of DISTRIBUTOR'S purchase price or an amount determined by an independent appraiser. In the event DISTRIBUTOR has leased a vehicle for use in connection with Distributor Agreement and has done so under commercially reasonable circumstances, then COMPANY will assume, and relieve DISTRIBUTOR of, any obligation under said lease.

(4) Except as provided in this Addendum, the parties retain any and all rights set forth in the Distributor's Agreement.

WITNESSES

DISTRIBUTOR

By: _Henry G. Porterfield_

ATTEST:

COMPANY

By: _Calvin Rhodes_

Its: _President_

_____

**DEFENDANT'S EXHIBIT**

20

FBO000436

**DEFENDANT'S EXHIBIT**

Flowers Baking Co. of Opelika, Inc.
Repurchase Statement
Henry Porterfield
Distributor No. 2069

26

03/01/02

Flowers Reconciliation:

Flowers Note:

| | | | | |
|---|---|---|---|---|
| Present Value | 02/23/02 | 33,630.00 | | |
| Beginning Balance | 07/07/00 | 35,420.91 | | |
| Less:  Ending Balance | 02/23/02 | 22,597.94 | | |
| Principal Paid In | | | 12,822.97 | |
| Depreciated Value | | | (1,790.91) | |
| Amount Due Distributor From Flowers | | | | 11,032.06 |

NationsBank:

Original Note:
Beginning Balance
Credit: 1995 Isuzu Box Truck 4KLB4B1A7SJ000316

| | | | |
|---|---|---|---|
| Principal Reduction | Estimated Payoff | 0.00 | |
| Amount Due Distributor From NationsBank | | | 0.00 |

| | |
|---|---|
| Grand Total Due Distributor | 11,032.06 |

| | | | |
|---|---|---|---|
| Less:  Downpayment on new territory | | | |
| Disability Insurance prepaid 11.27 x 4wks | | 0.00 | |
| Other: Tag & Title Fees | | 0.00 | |
| 5% Transfer Fee | 33,630.00 | | |
| | | | 0.00 |
| Net Amount Due To/(From) Distributor | | | 11,032.06 |

Approved:  President

Distributor

FBO000388

## PURCHASE AGREEMENT

This Purchase Agreement is made this __11Th.__ day of __March , 2002__ and between __Flowers Baking Co. Of Opelika ,LLC__ (hereinafter "Buyer"), and __Henry Porterfield__ (hereinafter "Seller"), pursuant to the Distributor's Agreement entered into by Seller and Buyer on __July 3rd.2000__ (hereinafter "Distributor Agreement").

### 1.

Subject to the conditions outlined herein, Seller agrees to sell, and Buyer agrees to buy the Distribution Rights specifically described in the Distributor Agreement and accompanying exhibits which are attached hereto as an Appendix, such descriptive provisions being made a part hereof. The purchase price of said Distribution Rights shall be $ __33,630.00__. Said amount will be applied by Buyer in its entirety to Seller's outstanding balance on loan account number __2069__ with the Flowers Finance,LLC.

### 2.

This Purchase Agreement is made conditioned upon Buyer obtaining from Seller a Release Agreement and Bill of Sale conveying said Distribution Rights to Buyer and releasing forever any claim to said Distribution Rights.

### 3.

Sale shall be closed on or before __March 11th. 2002__

### 4.

This Purchase Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their heirs, successors, administrations, executors and assigns.

### 5.

This Purchase Agreement, together with the provisions in the attached Appendix specifically describing the Distribution Rights sold herein, constitutes the sole and entire agreement between the parties hereto. No representation, promise, or inducement not included in this Purchase Agreement shall be binding upon any party hereto.

IN WITNESS WHEREOF, Buyer and Seller have executed this Purchase Agreement at the day and year first above written .

Seller

**Henry Porterfield**

**Montgomery Alabama**

Buyer

**Calvin Rhodes    President**

FBO000389

## RELEASE AGREEMENT AND BILL OF SALE

This Release Agreement and Bill of Sale is made this **11th. day** of **March, 2002** by and between **Henry Porterfield** hereinafter "Seller") Flowers Baking Co. of Opelika, LLC. and (hereinafter "Buyer"), pursuant to the Distributor's Agreement entered into by Seller and Buyer on **July 3rd. 2000,** and the Purchase Agreement executed by Seller and Buyer simultaneously herewith.

### 1.

For the consideration set forth herein, Seller hereby conveys to Buyer lawful title to all Distribution Rights heretofore conveyed to Seller under the above-mentioned Distributor's Agreement and releases and forever waives any claim to said Distribution Rights. Seller warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons and agrees that Buyer has properly purchased said Distribution Rights in accordance with the Distributor's Agreement. Furthermore, Seller, on behalf of himself, his legal representatives, heirs, successors and assigns, does hereby release and forever discharge Buyer and Flowers Finance, LLC. their legal representatives, officers, shareholders, agents, employees, successors and assigns, from any and all claims, actions, causes of action, rights, demands or remedies, whether known or unknown, which he ever had, now has, or may or might in the future have, arising out of, or relating to, the Distributor's Agreement.

### 2.

Buyer agrees to pay Seller $ **33,630.00.** Said amount will be applied by Buyer in its entirety to Seller's outstanding balance on loan account number **2069** with the Flowers Finance, LLC. The preceding consideration is the total and sole consideration given by Buyer to Seller for this Release Agreement and Bill of Sale, and it is expressly understood that such consideration is given and accepted for full release of, and waiver of, any claim to all Distribution Rights heretofore conveyed to Seller by Buyer and for full settlement of any and all claims, actions, causes of action, rights, demands or remedies, whether known or unknown, which Seller ever had, now has, or may or might in the future have, arising out of, or relation to, the Distributor's Agreement.

### 3.

Seller warrants that Seller has read this Release Agreement and Bill of Sale and understands all of its terms and that Seller executes it voluntarily with full knowledge of its significance. Seller further warrants that no promise or inducement has been offered or made except as herein set forth and that this Release Agreement and Bill of Sale is executed without reliance on any statement or representation by Buyer or any of its representatives.

FBO000390

IN WITNESS WHEREOF, Buyer and Seller have executed this Release Agreement on the day and year first above written.

Seller

Buyer

**Calvin Rhodes   President**

Witness:

FBO000391

DEFENDANT'S
EXHIBIT

27

## DISTRIBUTOR'S AGREEMENT

AGREEMENT made this ___11Th.___ day of March, _2002_, by and between **Flowers Baking Co.
Of Opelika LLC.** (COMPANY), and **Henry Porterfield** (DISTRIBUTOR).

### WITNESSETH:

COMPANY has developed or acquired a license of franchise for the use of formulae, recipes, trademarks and trade names through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein, throughout a geographic area which constitutes the Territory designated in Exhibit A (Territory), attached hereto and made a part hereof; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the division of a portion of its market area into distribution territories, and the sale of its products to Independent Distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, **Henry Porterfield** is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY'S products in the Territory; and

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a specified geographic area.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which is hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

## I. WARRANTY

1.1    The foregoing preambles shall constitute warranties, representations, agreements and undertakings by the parties.

## II. DEFINITIONS

2.1    **Outlets**: Shall mean all retail stores (except thrift stores) selling to the general public and all restaurant and institutional accounts except those exempt from this Agreement as set forth in Article VII, below.

2.2    **Products**: Shall mean fresh baked goods, as specifically described in Exhibit B, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided,

however, that the Distribution Rights granted herein shall survive only so long as COMPANY has the license or franchise rights for such goods and COMPANY produces and/or sells such goods.

2.3 **Distribution Rights**:  Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products as set forth in Exhibit B to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, the form of which is attached hereto as Exhibit C, and made a part hereof.

2.4 **Territory**:  Shall mean that geographic area as more specifically described in Exhibit A within which DISTRIBUTOR owns the Distribution Rights.

2.5 **Good Industry Practice**:  Shall mean the standards that have developed and are universally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products in all Outlets, properly rotating all Products, promptly removing all stale Products, maintaining proper service and delivery to all Outlets requesting service except those proven consistently to be unprofitable, and maintaining all equipment in a sanitary condition and in good safe working order.

## III. RELATIONSHIP

3.1 **Extent and Duration**:  COMPANY hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, said ownership to continue until:

(a) transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b) COMPANY, for legitimate business reasons, ceases to use distributors to distribute its products in the **Montgomery, Al.** market area.  In such event, COMPANY will repurchase the territory and distribution rights from DISTRIBUTOR at the greater of the first original purchase price or ten (10) times the average weekly sales volume of name brand Products in the Territory calculated over the six month period preceding the repurchase, or

(c) either party exercise their rights to terminate pursuant to Section 15.1.

3.2 **Nature of Rights**: The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of sale can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms of this Agreement.

## IV. SALE OF PRODUCTS

4.1 Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time.  COMPANY will also furnish to DISTRIBUTOR suggested resale prices.  Bid prices will be jointly established by COMPANY and DISTRIBUTOR.

FBO000032

## V. BEST EFFORTS/DISTRIBUTOR

5.1   **Obligations of DISTRIBUTOR:** DISTRIBUTOR agrees and covenants to use his/her best efforts to develop and maximize the sale of COMPANY'S Products to Outlets within his/her Territory and service his/her Territory in accordance with good industry practice as defined above.

DISTRIBUTOR shall cooperate with COMPANY on its marketing program and maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY. DISTRIBUTOR may not carry outside merchandise which is competitive with COMPANY'S products. DISTRIBUTOR may carry noncompetitive products, as long as this does not interfere with the distribution of COMPANY'S Products.

5.2   **Non-Compliance:** Failure to comply with Section 5.1 above shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

## VI. BEST EFFORTS/MANUFACTURING

6.1   **Obligations of Company:** COMPANY shall use its best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products to supply Outlets requesting service in his/her Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR in his/her sales efforts.

## VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP

7.1   **Accounts Exempt From Agreement:** COMPANY reserves the right to solicit and service drop delivery accounts in DISTRIBUTOR'S Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR'S business.

7.2   **Thrift Stores:** COMPANY reserves the right to continue to sell Products through its retail thrift store operation, Company-owned and/or independently owned.

7.3   **Other Trademarks:** The parties hereto stipulate that the COMPANY produces a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution. This Agreement applies only to the trademarks set forth on Exhibit B and does not restrict any other distribution of products by the COMPANY marketed under trademarks not listed on Exhibit B.

## VIII. PAYMENT FOR PRODUCTS

8.1   **Settlement of Account:** On or before Friday of each week, DISTRIBUTOR will provide to COMPANY a full settlement of all Products sold to DISTRIBUTOR in, and a statement of operating expenses for, the preceding week.

8.2   **Maintenance of Records:** DISTRIBUTOR will maintain current and accurate financial records for the operation of the Distributorship during the term of the Agreement. DISTRIBUTOR will provide the COMPANY with complete and accurate quarterly and annual financial reports and operating

statements in the form as described in Exhibit E attached hereto and as amended from time to time, within thirty (30) days after each quarter and year end. To insure the adequacy and accuracy of such reports and otherwise insure compliance with the obligations referenced herein, COMPANY, at its expense, shall be entitled to inspect, copy and audit DISTRIBUTOR'S records and books kept in accordance with this Agreement upon request.

8.2.1    COMPANY, for a period of __one__ ( 1 ) year(s) following the date of this agreement, agrees to reimburse the DISTRIBUTOR the expenses of a certified public accountant, to a maximum of __five hundred__ dollars ($ 500 ) per year, who will assist the DISTRIBUTOR in the maintenance of these records. Upon request, DISTRIBUTOR shall provide COMPANY evidence of payment to the certified public accountant.

8.3    **Cash Sales**: DISTRIBUTOR is responsible for the collection of all cash sales in his/her Territory.

8.4    **Non-Cash Sales**: In cases where Products are sold and distributed to Outlets which have been authorized by COMPANY for credit, COMPANY, at the request and for the convenience of DISTRIBUTOR, may establish an account receivable for COMPANY'S Products with the Outlet and will promptly credit DISTRIBUTOR for all such accounts. DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY.

8.5    **Chain Accounts**: COMPANY reserves the right to continue carrying the accounts receivable for all chain and other major accounts and to promptly credit DISTRIBUTOR for all such accounts. The accounts covered by this section are listed in Exhibit D, attached hereto and made a part hereof.

8.6    **Security Interest**: To secure the payment of any indebtedness or liability of DISTRIBUTOR to COMPANY now or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a security interest in his/her Distribution Rights, all other rights under this Agreement and all Products in DISTRIBUTOR'S possession, and grants to COMPANY the rights of a secured party under the Uniform Commercial Code.

## IX. EQUIPMENT AND MAINTENANCE

8.1    DISTRIBUTOR is responsible for obtaining his/her own delivery truck and purchasing adequate insurance thereon, which will include combined single limit coverage of at least $1,000,000.00 DISTRIBUTOR'S insurance purchased pursuant to this section shall be endorsed to name COMPANY as an additional named insured and be primary and not contributory to any other coverage available to the COMPANY under similar policies. The DISTRIBUTOR will provide the COMPANY evidence of insurance and the endorsement described in this section. The DISTRIBUTOR shall provide evidence of the primary and non contributory coverage by providing an additional insured endorsement which specifically states that the insurance is primary and not contributory.

8.2    DISTRIBUTOR is responsible for truck sanitation. Consistent with good industry practice, the delivery truck should be kept clean at all times and maintained in such condition as to provide safe, prompt, and regular service to all customers.

83    DISTRIBUTOR is responsible for maintenance of his/her delivery truck.

84    COMPANY will assist DISTRIBUTOR in securing a spare delivery truck, when needed, at a specified location which DISTRIBUTOR may use in case of an emergency. DISTRIBUTOR will be responsible for any charges resulting from any use of such vehicle. On any such vehicle, DISTRIBUTOR is responsible for obtaining automobile liability insurance coverage with limits of at least $1,000,000, with COMPANY named as additional insured. On any vehicle DISTRIBUTOR rents, borrows or leases from COMPANY, DISTRIBUTOR agrees that his/her automobile liability insurance shall be primary and not contributory to any other coverage available to the COMPANY under similar policies.

85    COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) collection of sales data, (ii) preparation of sales tickets, (iii) accumulation of sales histories, (iv) preparation of daily and weekly settlements, (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR's daily order of the COMPANY's products, and (vi) direct communication to company for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information.

Further, the COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) to provide automated route book information, (ii) to provide automated product movement information, (iii) to provide individual customer sales profiles, and (iv) to provide suggested orders for each customer.

85.1    COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by the COMPANY.

85.2    DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about the COMPANY's proprietary administrative services.

85.3    DISTRIBUTOR acknowledges that he/she cannot and shall not acquire any proprietary rights in the COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services.

85.4    This provision shall remain in effect for as long as the DISTRIBUTOR's Agreement is in effect. However, in the event the DISTRIBUTOR's Agreement is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary administrative services. The right to use these administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

85.5    Compliance with these provisions is a material part of the performance standards of the DISTRIBUTOR's Agreement and any violation shall be a material breach of the DISTRIBUTOR's Agreement.

85.6    The COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of 14 days notice to the DISTRIBUTOR.

## X. PRODUCT DELIVERY

**10.1**   COMPANY shall deliver Products to DISTRIBUTOR at <u>Montgomery Al.</u> . COMPANY reserves the right to change such location provided that any location chosen will be of suitable size with the necessary loading dock heights to allow for use by DISTRIBUTOR. DISTRIBUTOR will be charged a fee for warehouse use.

## XI. PRODUCT CODE

**11.1**   Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, out of code product on the market is a material breach of this Agreement. Repeated violations will be grounds for termination of this Agreement.

**11.2**   To assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase up to 10% of DISTRIBUTOR'S weekly volume returned as stale product, at a price equal to DISTRIBUTOR'S cost of such product. In the event that the volume of stale product exceeds 10% of DISTRIBUTOR'S weekly volume, COMPANY will repurchase such stale product at 50% of DISTRIBUTOR'S cost of such product.

**11.3**   DISTRIBUTOR may not sell any product over code or product not in a saleable condition for distribution to the general public but may otherwise sell such product to purchasers who are not competitors of COMPANY.

## XII. ADVERTISING AND PROMOTIONS

**12.1**   COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled media advertising. Subject to COMPANY'S prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

**12.2**   DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and chain accounts in his/her Territory. Such promotions and feature pricing are optional with respect to local accounts. When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in his/her purchase price accounting for such promotion or feature pricing.

## XIII. SERVICE REQUIREMENTS

**13.1**   DISTRIBUTOR is responsible for providing service of his/her Territory during periods of sickness, vacation, temporary disability and other similar circumstances.

**13.2**   In the case of an emergency during which DISTRIBUTOR cannot provide a substitute to service his/her Territory, COMPANY reserves the right to service such Territory and charge DISTRIBUTOR a daily fee plus operating expenses.

## XIV. TRANSFER OR SALE OF RIGHTS

14.1 **Conditions:** The Distribution Rights are owned by the DISTRIBUTOR and may be assigned, transferred or sold, in whole or in part, by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject in either case to the prior written approval of the assignees', transferees' or purchasers' qualifications by COMPANY, which approval will not be unreasonably withheld. However, any sale, whether made by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR, shall be subject to a first right of refusal on the part of COMPANY at the same terms and conditions offered to DISTRIBUTOR, OR ANYONE ACTING ON BEHALF OF DISTRIBUTOR, by a qualified and/or bona fide purchaser, which right shall expire if not exercised with ten (10) days after the later of: (a) receipt by COMPANY of written notice of intent to sell to a named purchaser on terms and conditions fully set forth in such notice, and (b) and evaluation by COMPANY of the proposed purchaser.

14.2 **Settlement of Account:** No transfer or sale of DISTRIBUTOR'S rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts; provided, however, that COMPANY may waive this requirement if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

14.3 **Transfer Fee:** In the event of a sale by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR (including a sale by COMPANY for the account of DISTRIBUTOR), of DISTRIBUTOR'S Distribution Rights, DISTRIBUTOR shall pay a transfer fee to COMPANY in an amount equal to five (5%) of such gross sales price, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

## XV. INDEPENDENT BUSINESS

15.1 **Essential Term:** The status of DISTRIBUTOR pursuant to this Agreement is that of independent contractor and the parties hereby signify their express intention to this effect. DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR'S business, it being understood that the primary interest of COMPANY is the results achieved by DISTRIBUTOR. DISTRIBUTOR'S business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business. Any contrary final determination by any governmental agency or court of competent jurisdiction shall entitle either party to cancel this Agreement. Neither DISTRIBUTOR nor any of his/her employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided. The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement. Furthermore, none of the benefits provided by COMPANY to its employees is available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR'S employees, agents, or servants, except as required by law. DISTRIBUTOR will be solely and entirely responsible for his/her acts and for the acts of his/her employees, agents, and servants during the performance of this Agreement; and

will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees. As a part of this obligation, DISTRIBUTOR agrees to obtain a combined single limit insurance policy against any such liability as to COMPANY with limits of at least $1,000,000.00, naming COMPANY as an additional named insured therein. Such coverage shall be primary and not contributory. DISTRIBUTOR must provide COMPANY with a written certificate of said insurance. Notwithstanding the fact the DISTRIBUTOR is an independent contractor, COMPANY and DISTRIBUTOR agree that, until further written notice from COMPANY to DISTRIBUTOR, COMPANY shall treat DISTRIBUTOR as a "statutory employee" as defined in Section 3121 of the Internal Revenue Code, and shall withhold and/or remit the appropriate amounts on DISTRIBUTOR'S behalf pursuant to the Federal Insurance Contributions Act and/or Section 3306 of the Federal Unemployment Tax Act. Any such written notice shall be effective as of the date specified therein which shall be no sooner than thirty (30) days from the date of delivery thereof.

## XVI. TERMINATION

16.1 **Performance**: Except as set forth in Sections 3.1 (b) and (c) above and Section 15.1, of this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof. In the event DISTRIBUTOR fails to perform his/her obligations under this Agreement, COMPANY may terminate this Agreement as set forth below.

16.2 **Non-Curable Breach**: COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR'S failure of performance involves criminal activity, threatens public health or safety, or threatens to do substantial harm to COMPANY'S business.

16.3 **Curable Breach**: In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure his/her failure of performance. If DISTRIBUTOR does not cure such failure performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure. Furthermore, the parties agree that repeated violations constitute a chronic failure of performance and threaten substantial harm to COMPANY'S business, and in such event COMPANY shall be entitled to terminate this Agreement and DISTRIBUTOR shall have no further right to cure.

16.4 **Actions Following Termination**: If this Agreement is terminated under either Section 16.2 or 16.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR'S Distribution Rights to an qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement. Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities of the Distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to

FBO000038

DISTRIBUTOR in exchange for the release of his/her Distribution Rights and interests under this Agreement.

## XVII. DISPUTE RESOLUTION

**17.1** **Negotiations And Mediation**

(a)     DISTRIBUTOR and COMPANY shall attempt in good faith and employ their best efforts to resolve and terminate any controversy, claim or dispute arising out of or relating to this Agreement promptly by negotiations. Such negotiations shall take place between representatives of COMPANY and DISTRIBUTORS who have the authority to settle and resolve the dispute. Such negotiations shall begin upon written notice from one party to the other describing any dispute or claim which has not been resolved in the ordinary course of business and suggesting a location for a meeting between the parties to conduct such negotiation within 10 business days after delivery of such notice. Representatives of DISTRIBUTOR and COMPANY shall meet at a mutually acceptable time and place within 10 days after delivery of such and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. Any such meeting may be attended by one or more representatives of each party. No such meeting shall be attended by an attorney representing either party unless such party shall have first given the other party at least three days' notice that it will be accompanied by an attorney at the next scheduled meeting, and at such meeting the other party may also be accompanied by an attorney.

(b)     If the dispute has not been resolved within 30 days of the initial notice, or if the party receiving such notice has failed to meet within 15 days, either party may initiate mediation by a request therefor in writing to the other party. Upon receipt of such notice, DISTRIBUTOR or COMPANY shall be obligated to engage in mediation in accordance with the then-current Mediation Procedure published by the Center for Public Resources, and if the parties fail to agree within 15 days of the date of such request for mediation on the selection of a mediator, then the Center for Public Resources shall appoint a mediator in accordance with its Mediation Procedure and the parties shall continue efforts through mediation to resolve the controversy and dispute between them until mediation is terminated by the occurrence of any of the following events:

(i) A written resolution in settlement of the dispute is reached, or

(ii) The mediator informs the parties in writing that further efforts would not be productive or useful, or

(iii) The parties agree in writing that further efforts would not be productive, or

(iv) Sixty (60) days elapse from the commencement of the mediation without resolution.

Neither COMPANY nor DISTRIBUTOR may withdraw from mediation before such a termination of the process.

(c) If the dispute has not been resolved in accordance with the foregoing within 90 days of the commencement of the negotiation procedure, either party may initiate litigation upon 10 days written notice to the other party; provided, however, that if any party has failed to voluntarily participate in the requirements of the foregoing Paragraphs, the other party may initiate litigation before expiration of the 90 day period. DISTRIBUTOR and COMPANY specifically agree that in litigation between them arising out of or relating to the Agreement, the prevailing party shall be reimbursed by the other party for legal fees and other expenses incurred by that party in such litigation.

(d) All negotiations and mediations pursuant to this Paragraph of the Agreement are confidential and shall be treated as compromise and settlement negotiations for purpose of the Federal Rules of Evidence and any similar state rules of evidence.

(e) All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the procedures specified in this Paragraph. All deadlines specified by this Paragraph may be extended by mutual agreement of the parties.

(f) Each party shall be required to continue the performance obligation under this Agreement pending final resolution of any dispute arising out of or related to this Agreement.

(g) The procedures specified by this Paragraph shall be the sole and exclusive procedures for the resolution of disputes between COMPANY and DISTRIBUTOR arising out of or relating to this Agreement.

## XVIII. CONSENT TO INCORPORATION

18.1 If DISTRIBUTOR desires to conduct business in a corporate or other legal capacity, other than as a sole proprietorship, COMPANY will consent to the assignment of this Agreement to such legal entity provided:

(a)

If a corporation, DISTRIBUTOR at all times retains at least 51% of the outstanding stock and meets the other conditions set forth in this Article; the books and records of the corporation reflect that the issuance and transfer of shares of stock are restricted and that all stock certificates shall bear a legend giving notice of such restriction and referring the reader to the terms of this Agreement; DISTRIBUTOR acts as such corporation's principal officer and continues personally to meet and guarantee the obligations imposed hereunder; and DISTRIBUTOR executes any other consents or documents reasonably required by COMPANY in connection with such approval.

(b)

If any other legal business enterprise is established, DISTRIBUTOR shall have all other

FBO000040

individuals involved in the enterprise as an entrepreneur personally execute this Agreement, and DISTRIBUTOR'S interest in the enterprise shall at all times represent at least 51%.

## XIX.  TRADEMARKS AND TRADE NAMES

19.1   **Permission for Use**:  DISTRIBUTOR shall make no use of COMPANY'S trademarks or trade names subject to this Agreement, nor engage in any program or activity which makes use of or contains any reference to COMPANY, its products, trademarks or trade names, other than as specifically provided herein, except with the prior written consent of COMPANY.

19.2   **Return Upon Termination**:  Upon termination of this Agreement, DISTRIBUTOR shall cease use of COMPANY'S trademarks and shall deliver to COMPANY any advertising, promotional or merchandising material.

## XX.  MISCELLANEOUS

20.1   **Notice**:  Any notice required or permitted under this Agreement shall be deemed properly given when personally received, or seventy-two (72) hours after deposit in the U.S. mail, return receipt requested, first class postage prepaid, addressed to the below designated parties at the below-designated addresses or at such other address as either party may designate by written notice duly given in accordance with this Section 19.1:

As to DISTRIBUTOR,  **Henry Porterfield,**                                   **Montgomery Al.**

As to COMPANY,  **Flowers Baking Co. Of Opelika LLC.   101 Simmons St. Opelika Al.**

20.2   **Survival**:  This agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties to this Agreement.

20.3   **Incorporation of Bill of Sale**:  This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

20.4   **Entire Agreement**:  This Agreement, together with Exhibits A, B, C, D, and E, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter.  Unless set forth in this Agreement, no party shall be liable for any representation made to any other.  This Agreement may be amended or modified only by a writing signed by all parties.

20.5   **Indemnification**:  DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement.  DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws, except as

FBO000041

otherwise provided by Paragraph 15.1 herein, with respect to DISTRIBUTOR or DISTRIBUTOR'S employees engaged in performance of this Agreement.

20.6  **Covenant Not To Compete**:  DISTRIBUTOR agrees that if this Agreement is terminated, DISTRIBUTOR will not, for a period of one (1) year thereafter, sell or attempt to sell any product competitive with the Products as defined in Section 2.2 of this Agreement to any of the customers to whom DISTRIBUTOR made one or more sales during his/her last year as COMPANY'S DISTRIBU-TOR. The geographical territory applicable to this paragraph is the Territory as defined in Section 2.4 of this Agreement. DISTRIBUTOR agrees that his/her promise herein made to refrain from selling or attempting to sell means that he/she will not, directly or indirectly, either as an individual on his/her own account or as a partner, employee, distributor, agent or salesman of or for any person, firm, association or corporation, engage in selling or attempting to sell any of said competitive products to any of the customers hereinabove designated.

20.7  **Governing Law**: This Agreement and the construction thereof shall be governed by the laws of the State of **Alabama**.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement on the day and year first above written.

WITNESSES                                            DISTRIBUTOR

By :

ATTEST:

COMPANY

_____                        By:    **Calvin Rhodes**

                                                 Its:    **President**

FBO000042

EXHIBIT A

# TERRITORIAL DESCRIPTION

## AREA:     2069

**SECTION I:**

Territory begins at intersection of Eastern Blvd. And Vaughn Road. Working Promande Shopping Center.(only). Go West on Vaughn Road to Zelda Road. Working both sides of the road. Go Right on Zelda to Ann street.Working both sides of the road. Go Right on Ann Street to Madison Ave. Go left on Madison Ave.to Mt. Meigs Road. Go left on Mt. Meigs road to South Capital Parkway. Working both sides of the road. Go right on South capital Parkway to Madison Ave. Go left on Madison Ave. to North McDonough .Working both sides of th road. Go right on North McDonough to Columbus St. Working both sides of the road. Go left on Columbus St. To North Perry. Go left on North Perry to Madison Ave. Go right on Madison Ave. To Molton Ave.Working left side of road(only) Go left on Molton Ave.to Montgomery St. Go Left on Montgomery St. To Dexter Ave. Working both sides of the road. Go right on Dexter Ave. To North Bainbridge. Go left on North Bainbridge to Madison Ave.(stop)

**SECTION II**

Territory begins at Zelda Road and Carter Hill Road. Go NorthWest on Carter Hill Road to Hall Street. Working both sides of the road. Go North on Hall Street. To I-85. Go right on I-85 to Forrest Ave. Go left on Forrest Ave. to Highland Ave. Working both sides of the road. Take Highland Ave. back to Ann Street. (stop)

**EXHIBIT A**

**AREA:  2069**

# TERRITORY MAP

**SEE ATTACHED**

FBO000044

FBI000045

FBO000046

## EXHIBIT B

## EXCLUSIVE RIGHTS

Distributor shall have the exclusive right to sell and distribute the following products in the territory specifically designated in Exhibit A.

1.  SunBeam
2.  Nature's own
3.  Cobblestone
4.  Blue Bird
5.  Breads International

*   Distribution rights granted herein shall survive only so long as Flowers has the license or franchise rights for such products.

FBO000047

## EXHIBIT "B"

Except as expressly limited by the Distributor's Agreement, DISTRIBUTOR shall have the exclusive

right to sell and distribute the following Products in the Territory specifically described in Exhibit A.

FBO000048

EXHIBIT "C"

**BILL OF SALE**

**Flowers Baking Co. Of Opelika LLC.**    , Seller, subject to the consideration set for the below, hereby conveys, sells, transfers and delivers to **Henry Porterfield**, Buyer, the Distribution Rights specifically described in the Distributor's Agreement executed simultaneously with this Bill of Sale. Both the Distributor's Agreement and all appendices (exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

The terms of this sale are as follows:

Purchase price shall be $ **34,078.00**.

Buyer shall own all Distribution Rights in the Territory in himself/herself and in his/her executors, administrators and assigns, consistent with the terms and conditions contained in the Distributor's Agreement.

Seller has lawful title to the Distribution Rights in the Territory free from all encumbrances. Seller warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, Seller and Buyer execute this Bill of Sale at **11Th.** day of **March 2002**.

WITNESSES                                        DISTRIBUTOR

By

ATTEST:

COMPANY

By:    **Calvin Rhodes**

Its:        **President**

_____

## *ACCOUNT LISTING*

### *AREA:* _____ *2069* _____

| ACCOUNT NAME |
| --- |
| BURGER KING $9326 |
| DAVIS CAFE |
| DECKER'S CAFE 1 |
| DECKER'S CAFE 2 |
| E. Z. FOODS #64 |
| JACKSON HOSPITAL |
| KRYSTAL #6 |
| LION'S PRIDE |
| MADISON MINI MART |
| MASONIC HOME |
| MONTGOMERY ACADEMY |
| QUICK SERVE #30 |
| REGIONS BANK |
| SILVER SPOON |
| SPECTRUM |
| SUNDAY DINNER |
| TROY STATE |
| T. J. BEST |
| WINN DIXIE #463 |
| WINN DIXIE #464 |
| WINN DIXIE #468 |

## AUTHORIZED  CHARGE  ACCOUNT  LIST*

AREA: _____ 2069 _____

| ACCOUNT NAME | ACCOUNT NUMBER |
|---|---|
| BURGER KING #9326 | 105-40001532 |
| E. Z . FOODS #64 | 105-40001866 |
| JACKSON HOSPITAL | 105-40001908 |
| KRYSTAL #6 | 105-40001830 |
| MASONIC HOME | 105-40001890 |
| MONTGOMERY ACADEMY | 105-40001914 |
| Regions Bank | 105-40001920 |
| Spectrum | 105-40002052 |
| Sunday Dinner | 105-40002052 |
| Troy State | 105-40001926 |
| Winn-Dixie #463 | 105-40002257 |
| Winn-Dixie #464 | 105-40002263 |
| Winn-Dixie #468 | 105-40002275 |

* All Accounts listed above as a Distributor's Authorized Charge Account List
  are authorized accounts by Flowers. These Accounts are the responsibility of
  Flowers to collect.

FBO000051

## EXHIBIT "E"

Quarterly and Annual Financial Reports, consisting of:

1.      Compiled Statement of Revenues and Expenses

2.      Compiled Statement of Cash Flow

These statements may be prepared on a cash basis and issued without disclosure as required by generally accepted accounting principles.   Further, these statements must be compiled by a certified public accountant in accordance with the standards established by the American Institute of Certified Public Accountants.

3.      Statement of Revenues, expenses other than transportation expense, and fair rental value of vehicles used in the business.

Company will supply actual format, if necessary.

## ADDENDUM

The following agreement is entered into as a supplement to the Distributor's Agreement between **Henry Porterfield** (DISTRIBUTOR) and **Flowers Baking Co. Of Opelika LLC.** (COMPANY). Notwithstanding any other provision contained in the Distributor's Agreement, the parties hereby agree as follows:

(1)     At any time within six (6) months and one (1) day of the effective date of the Distributor's Agreement, should DISTRIBUTOR decide he/she no longer desires to be an independent businessperson, then, if DISTRIBUTOR provides 30 calendar days written notice, COMPANY will buy back the Distribution Rights from DISTRIBUTOR. DISTRIBUTOR'S obligations under the Distributor's Agreement shall continue until the Distribution Rights are repurchased.

(2)     In the event DISTRIBUTOR exercises his/her option, the purchase price of the Distribution Rights will be an amount equal to the amount DISTRIBUTOR paid COMPANY for such Distribution Rights.

(3)     Provided the vehicle is in usable condition, COMPANY also agrees to purchase the truck purchased by DISTRIBUTOR from COMPANY at the lesser of DISTRIBUTOR'S purchase price or an amount determined by an independent appraiser. In the event DISTRIBUTOR has leased a vehicle for use in connection with Distributor Agreement and has done so under commercially reasonable circumstances, then COMPANY will assume, and relieve DISTRIBUTOR of, any obligation under said lease.

(4)     Except as provided in this Addendum, the parties retain any and all rights set forth in the Distributor's Agreement.

WITNESSES                                          DISTRIBUTOR

_____                  By: _____

_____

ATTEST:                                            _____
                                                    COMPANY

_____                  By: ___ **Calvin Rhodes** ___

                                                    Its: ___ **President** ___



FBO000273



**Flowers Baking Co.**
of Opelika, LLC

Thursday, June 03, 2004

To: Henry Porterfield , Dist. # 2069

From : Grady  Messer

Subject:  Distributor's Agreement by and between Flowers Baking Co.
Of Opelika, LLC and Henry Porterfield.

Flowers Management has spoken with you on several different
occasions about giving your Burger Kings the proper service that they
require.
Burger Kings requires that all their stores receive 5 days per week
service. You only worked Burger King # 5238, 3 days last week and
Burger King # 306, 4 days.
In the future Burger Kings must have 5 days per week service.

I call your attention to the contents  of Paragraphs 5.1, 2.5, 11.1 and
16.3 of your agreement.

You are required to correct the actions cited within  10 days fo receipt
of this letter , and failure to do so could result in Flowers taking those
actions afforded it by Paragraphs 16.1 through 16.4 of this agreement
which govern termination.


Grady  Messer
Director of Sales



DEFENDANT'S
EXHIBIT

39

FBO000167



**Flowers Baking Co.**
of Opelika, LLC

2004

October 22, 2004

*Mr. Henry Porterfield*

*Henry, today Steve Stephens and myself talked to you about your service to accounts, your attitude toward the small accounts and etc. We were all in agreement that all accounts are very important to you and Flowers. We owe every account service as they expect it. Some companies expect 5 days per week, and that is what we must give them.*

*We also talked about our attitude toward them, like telling them that they were not a big enough account for you to work and etc. We were all in agreement that every account is important and we owe them the respect to work them and be nice to their help.*

*Henry, you gave Steve and myself your word that you would correct this and I appreciate the way you handled it.*

*If I can help you in anyway, let me know.*

*Sincerely,*
*Flowers Baking Company of Opelika, LLC*

*Grady Messer*
*Director of Sales*



DEFENDANT'S
EXHIBIT

42

FBO000721



# Flowers Baking Co.
## of Opelika, LLC

*Steve*
*Saw*
*Letter*
*12-9-04*
*Dec. 22*

Monday, December 06, 2004

Mr. Henry Porterfield
Distributor # 2069
Montgomery , AL

Re: Distributor's Agreement ( Agreement ) between Flowers Baking Company of Opelika
LLC ( Flowers ) and Henry Porterfield ( Distributor )

Dear Henry,

This letter is written in regards to your commission of a corable breach of the above
mentioned agreement.

Saturday, December 4, 2004 , David Miller, District Manager for Krystal Company called me
and said when they told you that they didn't have a key to the back door, that you left the
buns setting outside by the back door and left. He said this was not the first time that he and
his managers had had a problem with you and your bad attitude and he didn't want you
working any of his stores as of today, Monday, Dec. 6, 2004. You work # 2 and # 6 now.

Please be advised that you have 10 days from this failure of performance to cure this breach.
If you do not, Flowers will have no other alternative but to terminate your rights under the
agreement listed in Paragraphs 2.5, 5.1,5.2, and 16.1 in accordances with its terms.
I look forward to hearing from you.

Sincerely,
Flowers Baking Co. Of Opelika, LLC



DEFENDANT'S
EXHIBIT

43

February 3, 2005

Mr. Henry Porterfield
Distributor # 2069
Montgomery, Al.


Re: Distributor's Agreement ( Agreement) between Flowers Baking Co. Of Opelika
LLC ( Flowers ) and Henry Porterfield ( Distributor ).


Dear Mr. Porterfield,

This letter is Written in regards to your commission of a curable breach of the above
Mentioned agreement.

Mary, the manager of Burger King, Carter Hill Road, called Steve Stephen this morning
And said you was very rude and cursed in her store this morning. She said she had asked you
several time to pickup the stale buns before you brought in the fresh one, pick up all your empty
tray each day. She said this morning when she said something to you about picking up the empty
trays, you told her to stack the damn trays right and you would pick them up and when leaving
you had kicked a tray and it caused the door to slam. Mary said that because of the way you had
acted in the past and the way you acted this morning, that she didn't want you working her store
Anymore.

Please be advised that you have 10 days from this failure of performance to cure this breach.
If you do not , Flowers will have no other alternative but to terminate your rights under the
Agreement listed in Paragraphs 2.5, 5.1, 5.2, and 16.1 in accordances with its terms.


Sincerely,
Flowers Baking Co. Of Opelika, LLC

*Grady Messer*
Grady Messer
Director of Sales

**DEFENDANT'S EXHIBIT**

44

FBO000819

To: Flowers Baking Co. Of Opelika, LLC
     Director or Sales Manager Name  *Steve Stephens*

Date *2-14-05*

From:  Distributor's Name  *Henry Porterfield*

Effective *2-14-05*_____, I will no longer be working *Burger King #306*
_____ located at *1621 Carterhill Road  Mont. AL*
I will let Flowers handle this Account for me.  I will forfeit all income from the sale of product
from this Account, until further notice.

Signed  *Henry Porterfield*

Witness  *Rick Bell*


DEFENDANT'S
EXHIBIT
45

FBO000820


DEFENDANT'S EXHIBIT
46

ON FRIDAY 3-4-05, I MET WITH Joni BARNES the FOOD DIRECTOR WITH Sodexho TROY ST" MONTGOMERY. MRS. BARNES NOTIFIED ME that she would No longer use Flowers BAKING Co AS THEIR bread SUPPLIER. MRS. BARNES Explained to me that she his had problems WITH HENRY NOT WORKING their ACCOUNT ON the propER scheduled days. She told me that ON THURSDAY 3-3-05 HENRY WORKED her in the MORNING, but did not HAVE ANY hamburger BUNS, HENRY promised her that he would bring Some back later that day. HENRY NEVER CARRIED ANY bun back. ON FRIDAY MRS. BARNES CALLED HENRY AND ASKED WHAT HAPPENED, HENRY told MRS BARNES his truck broke down AND he Couldn't get back to deliver their BUNS. MRS. BARNES SAID She did NOT believe this Story. MRS. BARNES told me that this was NOT the FIRST time She HAD to go to the Store AND buy product that HENRY FAILED to leave. MRS. BARNES ALSO REMINDED me that About A year Ago she ASKED for A different Breadman, but AFTER talking to me About HENRY being A Distributor AND the possibility of him losing his distributorship, she AGREED to give HENRY ANOTHER CHANCE. MRS BARNES SAID THURSDAY was HENRY'S last CHANCE. MRS BARNES SAID She made ARRANGEMENTS to buy her bread from ANOTHER supplier.

Steve STEPHENS

FBO000821

March 7, 2005

<u>BY CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Mr. Henry Porterfield

Montgomery, AL

Re:   Distributor Agreement between Flowers Baking Co. of Opelika, LLC ("Company") and Henry
      Porterfield ("Distributor") dated March 7, 2005 (hereinafter the "Distributor Agreement")

Dear Mr. Porterfield,

This letter is to notify you that you are in breach of the above referenced Distributor Agreement.

We have been notified that due to your actions on your part, you will no longer be allowed to service
the Sodexho Troy St. at Montgomery in your territory.

In accordance with provisions of the Distributor Agreement, be advised that you have ten (10) business
days from the date of this letter to cure your failure of performance by either:
   (a) Obtaining permission to resume servicing Sodexho Troy St. at Montgomery, or
   (b) Making satisfactory alternative arrangements for providing service to Sodexho Troy St. at
       Montgomery.

If you refuse or otherwise fail to cure your failure of performance within this stated period, Company
reserves the right to thereafter terminate your Distributor Agreement.

If you have any questions, please let me know.

Sincerely,

Grady Messer
Director of Sales

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | |
|---|---|
| Postage | $ $0.37 |
| Certified Fee | $2.30 |
| Return Receipt Fee (Endorsement Required) | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $4.42 |

Postmark Here

MAR 8 2005

03/08/2005

Sent To  Henry Porterfield
Street, Apt. No.;
or PO Box No.
City, State, ZIP+4   Montgomery, AL

PS Form 3800, June 2002

DEFENDANT'S
EXHIBIT
**47**

FBO000729

▶ **Grady Messer**
  03/16/2005 02:43 PM
  • • • • • • • • • • • • • • •

To:     Steve Bordeaux/Flowers@Flowers
cc:     Michael Lord/Flowers@Flowers

Subject: Henry Porterfield

Henry called me about 1:00 P.M. today and wanted to know if I would be here awhile, I told him
yes and he said he wanted to come down and talk to me. About 30 minutes later he come into
my office and had Montgomery City Councilman Williams and Councilman Knuckles with him.
For the record City Councilman Williams is the pastor of Henry's church. They came in and Mr.
Williams said that they had been down to see the lady at Troy State about getting Henry's problem
resolved but she was real rude and wouldn't talk to them. She told them that she didn't have time.
Mr. Williams said that when you have someone livehood at stake, at least she could have talked to
them. He went on to say that they were down here on behalf of Henry and try to get his problem
resolved. I told them that I didn't know how much they knew about it but I couldn't discuss it with
them. They said Henry said it was about losing the Troy State account and I had written Henry a
10 day letter. He asked when the 10 days was up. I told him 10 business days would be March
22. Mr. Knuckles said , well Henry you got several more days to work on this. About that time
Henry said he talked to the lady at Troy State this morning and she said he could come back and
work her. But after these 2 Councilmen went down and talked to her that she may have
changed her mind. At that time Mr. Knuckes said if she said Henry could start back working her
then everything should be ok. I told him that you had 10 days to cure a cureable breach. At that
point they got up and left.
Henry stayed behind and talked to me some more. Henry said it really wasn't his fault that he lost
this account and the last breaches wasn't his fault either. After a little more talking he got up and
left. When he was going out the door he said somebody might die over this. I told him he didn't
need to be threating anyone and his comment was, I'm not threating anyone but , more than me
is going to hurt over this and that's a promise.


DEFENDANT'S
EXHIBIT
48

101 Simmon Street
Opelika, Al 36801
t 334.749.8257
f 334.749.0835

(Letterhead of Company)

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

 **Flowers Baking Co.**
of Opelika, LLC

March 16, 2005

Mr. Henry Porterfield

Montgomery, AL

Re:     Distributor Agreement between Flowers Baking Co. of Opelika, LLC ("Company") and
Henry Porterfield ("Distributor")

Dear Mr. Porterfield:

As per our conversation today, be advised that until further notice you are hereby barred from all
Company property, including the warehouse. This action stems from your threat of harm you
made today to Director of Sales Grady Messer.

If you have any questions, please feel free to call me.

Sincerely,

Michael Lord
Vice President of Sales

**DEFENDANT'S
EXHIBIT**

49

FBO000081

101 Simmon Street
Opelika, Al 36801
t  334.749.8257
f  334.749.0835

March 23, 2005

 **Flowers Baking Co.**
of Opelika, llc

<u>**Via Certified Mail**</u>
<u>**Return Receipt Requested**</u>

Mr. Henry Porterfield

Montgomery, AL

Re:     Distributor Agreement between Flowers Baking Co. of Opelika, LLC and Henry Porterfield dated
        March 11, 2002 (the "Distributor Agreement")

Dear Mr. Porterfield:

This letter is to notify you that your Distributor Agreement will be terminated, effective today.  As you
know, you were notified via our discussions and via letter dated March 7, 2005 of your curable breach of
the Distributor Agreement, and giving you ten (10) business days within which to cure you failure of
performance.  As of today you have failed to cure your breach and the ten (10) days have expired.
Accordingly, the Distributor Agreement will be terminated as stated above.

Under Section 16.4 of the Agreement, the Company is authorized to operate the business on your behalf
and sell the distributorship on your behalf to a qualified purchaser.  From such sale proceeds we would
deduct our operating expenses and any other amounts you owe us.  Another option is for you to sell the
distributorship directly back to the Company.  Our records indicate that you would be due approximately
$23,126 should you choose to sell it back to the Company, based on current value of the distribution rights
and amounts you currently owe us.  This amount is subject to change depending on a number of factors,
including any charges we incur in operating the distributorship until it is either resold to another distributor
or repurchased from you.

We may also be interested in purchasing your delivery truck from you, but will need to discuss that with
you further.  In the meantime, we will not use your truck.  If you wish to pick up your truck, please contact
us so we may make proper arrangements for you to do so.

Please contact me by Saturday, April 2, 2005 to let me know which option you wish to pursue.  If we do
not hear from you by the close of business on that date, we will proceed to sell your distributorship to a
third party as noted above.  We look forward to hearing from you.

Very truly yours,

Michael Lord
Vice President of Sales

DEFENDANT'S
EXHIBIT

**53**

FBO000076


DEFENDANT'S EXHIBIT

59

Form **1040**  Department of the Treasury — Internal Revenue Service

**U.S. Individual Income Tax Return 1999** (99)  IRS use only - Do not write or staple in this space.

For the year Jan 1-Dec 31, 1999, or other tax year beginning _____, 1999, ending _____   OMB No. 1545-0074

| **Label** (See instructions.) | Your First Name | MI | Last Name | | Your Social Security Number |
|---|---|---|---|---|---|
| | Henry | | Porterfield | | |
| **Use the IRS label.** Otherwise, please print or type. | If a Joint Return, Spouse's First Name | MI | Last Name | | Spouse's Social Security Number |
| | Betty | | Porterfield | | |
| | Home Address (number and street). If You Have a P.O. Box, See Instructions. | | | Apartment No. | **▲ Important!** |
| | | | | | You must enter your social |
| | City, Town or Post Office. If You Have a Foreign Address, See Instructions. | | State | ZIP Code | security number(s) above. |
| | Montgomery | | AL | | |

**Presidential Election Campaign** (See instructions.)

| | | Yes | No | |
|---|---|---|---|---|
| ► | Do you want $3 to go to this fund? | | X | Note: Checking 'Yes' will not change your tax or reduce your refund. |
| | If a joint return, does your spouse want $3 to go to this fund? | | X | |

**Filing Status**

Check only one box.

1  ☐ Single
2  ☒ Married filing joint return (even if only one had income)
3  ☐ Married filing separate return. Enter spouse's SSN above & full name here ... ►
4  ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ... ►
5  ☐ Qualifying widow(er) with dependent child (year spouse died ► 19___). (See instructions.)

**Exemptions**

6a ☒ **Yourself.** If your parent (or someone else) can claim you as a dependent on his or her tax return, **do not** check box 6a ...

b ☒ **Spouse** ...

| No. of boxes checked on 6a and 6b | 2 |
|---|---|

c Dependents:

| (1) First name | Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instructions) |
|---|---|---|---|---|
| | | | Son | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

If more than six dependents, see instructions.

No. of your children on 6c who:
● lived with you ..... | 1
● did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers entered on lines above ► | 3

d Total number of exemptions claimed

**Income**

Attach Copy B of your Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not staple, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 13,741. |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required | 8a | |
| b | Tax-exempt interest. Do not include on line 8a ... | 8b | |
| 9 | Ordinary dividends. Attach Schedule B if required | 9 | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) | 10 | |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | 7,353. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ... ► ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | Total IRA distributions ... 15a | b Taxable amount (see instrs) | 15b | |
| 16a | Total pensions & annuities . 16a | b Taxable amount (see instrs) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | 105. |
| 20a | Social security benefits ... 20a | b Taxable amount (see instrs) | 20b | |
| 21 | Other income. List type & amount (see instrs) FORM W-2G | 21 | 2,207. |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ► | 22 | 23,406. |

**Adjusted Gross Income**

| 23 | IRA deduction (see instructions) | 23 | | | |
|---|---|---|---|---|---|
| 24 | Student loan interest deduction (see instructions) | 24 | | | |
| 25 | Medical savings account deduction. Attach Form 8853 | 25 | | | |
| 26 | Moving expenses. Attach Form 3903 | 26 | | | |
| 27 | One-half of self-employment tax. Attach Schedule SE | 27 | | | |
| 28 | Self-employed health insurance deduction (see instructions) | 28 | | | |
| 29 | Keogh and self-employed SEP and SIMPLE plans | 29 | | | |
| 30 | Penalty on early withdrawal of savings | 30 | | | |
| 31a | Alimony paid b Recipient's SSN ► | 31a | | | |
| 32 | Add lines 23 through 31a | | | 32 | |
| 33 | Subtract line 32 from line 22. This is your adjusted gross income ► | | | 33 | 23,406. |

Form 1040 (1999)   Henry & Betty Porterfield

Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 34 | Amount from line 33 (adjusted gross income) | 34 | 23,406. |
| | 35a | Check if: ☐ You were 65/older, ☐ Blind; ☐ Spouse was 65/older, ☐ Blind. Add the number of boxes checked above and enter the total here ▶ 35a ☐ | | |
| | b | If you are married filing separately and your spouse itemizes deductions or you were a dual-status alien, see instructions and check here ▶ 35b ☐ | | |

**Standard Deduction for Most People**

Single: $4,300

Head of household: $6,350

Married filing jointly or Qualifying widow(er): $7,200

Married filing separately: $3,600

| | | |
|---|---|---|
| 36 | Enter your **itemized deductions** from Schedule A, line 28, **or standard deduction** shown on the left. But see instructions to find your standard deduction if you checked any box on line 35a or 35b or if someone can claim you as a dependent | 36 | 7,200. |
| 37 | Subtract line 36 from line 34 | 37 | 16,206. |
| 38 | If line 34 is $94,975 or less, multiply $2,750 by the total number of exemptions claimed on line 6d. If line 34 is over $94,975, see the worksheet in the instructions for the amount to enter | 38 | 8,250. |
| 39 | **Taxable income.** Subtract line 38 from line 37. If line 38 is more than line 37, enter -0- | 39 | 7,956. |
| 40 | Tax (see instrs). Check if any tax is from a ☐ Form(s) 8814 b ☐ Form 4972 ▶ | 40 | 1,196. |
| 41 | Credit for child and dependent care expenses. Attach Form 2441 · · · 41 | |
| 42 | Credit for the elderly or the disabled. Attach Schedule R · · · 42 | |
| 43 | Child tax credit (see instructions) · · · · 43 | |
| 44 | Education credits. Attach Form 8863 · · · · 44 | |
| 45 | Adoption credit. Attach Form 8839 · · · · 45 | |
| 46 | Foreign tax credit. Attach Form 1116 if required · · · 46 | |
| 47 | Other. Check if from ☐ a ☐ Form 3800 b ☐ Form 8396 c ☐ Form 8801 d ☐ Form (specify) 47 | |
| 48 | Add lines 41 through 47. These are your **total credits** | 48 | |
| 49 | Subtract line 48 from line 40. If line 48 is more than line 40, enter -0- ▶ | 49 | 1,196. |

| **Other Taxes** | | | | |
|---|---|---|---|---|
| | 50 | Self-employment tax. Attach Schedule SE | 50 | |
| | 51 | Alternative minimum tax. Attach Form 6251 | 51 | |
| | 52 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | 52 | |
| | 53 | Tax on IRAs, other retirement plans, and MSAs. Attach Form 5329 if required | 53 | |
| | 54 | Advance earned income credit payments from Form(s) W-2 | 54 | |
| | 55 | Household employment taxes. Attach Schedule H | 55 | |
| | 56 | Add lines 49-55. This is your **total tax** | 56 | 1,196. |

| **Payments** | | | | |
|---|---|---|---|---|
| | 57 | Federal income tax withheld from Forms W-2 and 1099 · · · · 57 | 602. | |
| | 58 | 1999 estimated tax payments and amount applied from 1998 return · · 58 | | |
| | 59a | Earned income credit. Attach Schedule EIC if you have a qualifying child. | | |
| | b | Nontaxable earned income: amount ▶ and type ▶ 59a | | No |
| | 60 | Additional child tax credit. Attach Form 8812 · · · · 60 | | |
| | 61 | Amount paid with request for extension to file (see instructions) · · 61 | | |
| | 62 | Excess social security and RRTA tax withheld (see instrs) · · 62 | | |
| | 63 | Other payments. Check if from · · · · a ☐ Form 2439 b ☐ Form 4136 63 | | |
| | 64 | Add lines 57, 58, 59a, and 60 through 63. These are your **total payments** ▶ | 64 | 602. |

| **Refund** | | | | |
|---|---|---|---|---|
| Have it directly deposited! See instructions and fill in 66b, 66c, and 66d. | 65 | If line 64 is more than line 56, subtract line 56 from line 64. This is the amount you **Overpaid** | 65 | |
| | 66a | Amount of line 65 you want **Refunded to You** ▶ | 66a | |
| | ▶ b | Routing number · · · · · · ▶ c Type: ☐ Checking ☐ Savings | | |
| | ▶ d | Account number · · · · · · | | |
| | 67 | Amount of line 65 you want **Applied to Your 2000 Estimated Tax** ▶ 67 | | |

| **Amount You Owe** | | | | |
|---|---|---|---|---|
| | 68 | If line 56 is more than line 64, subtract line 64 from line 56. This is the **Amount You Owe.** For details on how to pay, see instructions ▶ | 68 | 594. |
| | 69 | Estimated tax penalty. Also include on line 68 · · · · 69 | | |

**Sign Here**

Joint return? See instructions.

Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your Signature *Henry C Porterfield* | Date 8/25/06 | Your Occupation Saleman | Daytime Telephone Number (optional) |
|---|---|---|---|
| Spouse's Signature. If a Joint Return, Both Must Sign. *Betty J Porterfield* | Date 8/25/06 | Spouse's Occupation Office Asst | |

**Paid Preparer's Use Only**

| Preparer's Signature ▶ *Danny G Nix* | Date 25 Aug 06 | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's Name (or yours if self-employed) and Address | Myles And Associates    EIN 36-4375060 4703 West Hickory Grove Rd. Letohatchee, Al 36047 | | de |

Form 1040 (1999)

**SCHEDULE C**
(Form 1040)

**Profit or Loss from Business**
(Sole Proprietorship)

OMB No. 1545-0074

**1999**
09

Department of the Treasury
Internal Revenue Service    (99)

► Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.
► Attach to Form 1040 or Form 1041.   ► See instructions for Schedule C (Form 1040).

Name of Proprietor: **Henry Porterfield**

Social Security Number (SSN): 4

A  Principal Business or Profession, Including Product or Service (see instructions)
   **Bread Saleman**

B  Enter Code from Instructions  ► 454390

C  Business Name. If No Separate Business Name, Leave Blank.

D  Employer ID Number (EIN), if Any

E  Business Address (include suite or room no.) ►
   City, Town or Post Office, State, & ZIP Code     **Montgomery, AL**

F  Accounting method:  (1) [X] Cash  (2) [ ] Accrual  (3) [ ] Other (specify) ►

G  Did you 'materially participate' in the operation of this business during 1999? If 'No,' see instructions for limit on losses . . .  [X] Yes  [ ] No

H  If you started or acquired this business during 1999, check here . . . . . . . . . . . . . . . . . . . . . ► [ ]

## Part I   Income

| | | | |
|---|---|---|---:|
| 1 | Gross receipts or sales. **Caution:** If this income was reported to you on Form W-2 and the 'Statutory employee' box on that form was checked, see the instructions and check here . . . . . . . [X] | 1 | 26,986. |
| 2 | Returns and allowances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 26,986. |
| 4 | Cost of goods sold (from line 42 on page 2) . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 . . . . . . . . . . . . . . . . . . . . . . . | 5 | 26,986. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund . . . . . . | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 . . . . . . . . . . . . . . . . . . . . . . . . . . ► | 7 | 26,986. |

## Part II   Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | |
|---|---|---:|---|---|---|---:|
| 8 | Advertising . . . . . . . . . | 8 | | 19 | Pension and profit-sharing plans . . . | 19 | |
| 9 | Bad debts from sales or services (see instructions) . . . . | 9 | | 20 | Rent or lease (see instructions): | | |
| 10 | Car and truck expenses (see instrs) | 10 | 16,113. | | a Vehicles, machinery, and equipment . . . . | 20a | |
| 11 | Commissions and fees . . . . . . | 11 | | | b Other business property . . . . . . . . . . | 20b | |
| 12 | Depletion . . . . . . . . . | 12 | | 21 | Repairs and maintenance . . . . . . . | 21 | |
| 13 | Depreciation and Section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 22 | Supplies (not included in Part III) . . . | 22 | |
| | | | | 23 | Taxes and licenses . . . . . . . . . | 23 | |
| | | | | 24 | Travel, meals, and entertainment: | | |
| 14 | Employee benefit programs (other than on line 19) . . . . | 14 | | | a Travel . . . . . . . . . . . . . . | 24a | |
| 15 | Insurance (other than health) . . . | 15 | 2,500. | | b Meals and entertainment . . . . | | |
| 16 | Interest: | | | | c Enter nondeductible amount included on line 24b (see instructions) | | |
| | a Mortgage (paid to banks, etc) . . . . | 16a | | | | | |
| | b Other . . . . . . . . . . . . . | 16b | | | d Subtract line 24c from line 24b . . . . | 24d | |
| 17 | Legal & professional services . . . | 17 | | 25 | Utilities . . . . . . . . . . . . . | 25 | |
| 18 | Office expense . . . . . . . . . | 18 | | 26 | Wages (less employment credits) . . . . | 26 | |
| | | | | 27 | Other expenses (from line 48 on page 2) . . | 27 | 1,020. |
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27 in columns . . . . . . . . . ► | | | | | 28 | 19,633. |

| | | | |
|---|---|---|---:|
| 29 | Tentative profit (loss). Subtract line 28 from line 7 . . . . . . . . . . . . . . . . . . . . | 29 | 7,353. |
| 30 | Expenses for business use of your home. Attach **Form 8829** . . . . . . . . . . . . . . . . | 30 | |
| 31 | **Net profit (loss).** Subtract line 30 from line 29. | | |
| | • If a profit, enter on **Form 1040, line 12,** and also on **Schedule SE, line 2** (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3. | | |
| | • If a loss, you must go on to line 32. | 31 | 7,353. |
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | |
| | • If you checked 32a, enter the loss on **Form 1040, line 12,** and **also on Schedule SE, line 2** (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3. | 32a [X] All investment is at risk. | |
| | • If you checked 32b, you must attach **Form 6198.** | 32b [ ] Some investment is not at risk. | |

BAA  For Paperwork Reduction Act Notice, see Form 1040 instructions.

Schedule C (Form 1040) 1999

Schedule **C** (Form 1040) 1999 Henry Porterfield         Page 2

**Part III**   **Cost of Goods Sold** (see instructions)

| | | | |
|---|---|---|---|
| 33 | Method(s) used to value closing inventory:   **a** ☐ Cost   **b** ☐ Lower of cost or market   **c** ☐ Other (attach explanation) | | |
| 34 | Was there any change in determining quantities, costs, or valuations between opening and closing inventory? If 'Yes,' attach explanation .................................................................... | | ☐ Yes ☐ No |
| 35 | Inventory at beginning of year. If different from last year's closing inventory, attach explanation ........................................ | 35 | |
| 36 | Purchases less cost of items withdrawn for personal use ...................... | 36 | |
| 37 | Cost of labor. Do not include any amounts paid to yourself ..................... | 37 | |
| 38 | Materials and supplies ............................................. | 38 | |
| 39 | Other costs ...................................................... | 39 | |
| 40 | Add lines 35 through 39 ............................................ | 40 | |
| 41 | Inventory at end of year ............................................ | 41 | |
| 42 | **Cost of goods sold.** Subtract line 41 from line 40. Enter the result here and on page 1, line 4 ........ | 42 | |

**Part IV**   **Information on Your Vehicle.** Complete this part **Only** if you are claiming car or truck expenses on line 10 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file.

43   When did you place your vehicle in service for business purposes? (month, day, year)   ► 01/02/99

44   Of the total number of miles you drove your vehicle during 1999, enter the number of miles you used your vehicle for:

    **a** Business _ _ _ _ _ 51,356   **b** Commuting _ _ _ _ _ _ _ _ _ _   **c** Other _ _ _ _ _ _ _ _ 0

45   Do you (or your spouse) have another vehicle available for personal use? .......................... ☒ Yes ☐ No

46   Was your vehicle available for use during off-duty hours? ................................... ☐ Yes ☒ No

47a   Do you have evidence to support your deduction? ....................................... ☒ Yes ☐ No

    **b** If 'Yes,' is the evidence written? ................................................ ☒ Yes ☐ No

**Part V**   **Other Expenses.** List below business expenses not included on lines 8 — 26 or line 30.

| | |
|---|---|
| cellphone | 1,020. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| 48   Total other expenses. Enter here and on page 1, line 27 ...............   48 | 1,020. |

Schedule **C** (Form 1040) 1999

FDIZ0112   10/21/99

Station Name: Machine:  MTG00: 2163078 Date: 07/27/2004 Tin ' 2:28:29 PM

IRPTRN42276538601999000000            *(TY1999)

DOCUMENT TYPE: W-2                                    PAGE 0002 OF 0005
PAYEE ENTITY DATA:
 HENRY G PORTERFIELD

 MONTGOMERY
 STATE: AL ZIP:

ACCOUNT NUMBER: N/A
PAYER ENTITY DATA:
 FLOWERS BAKING CO OF OPELIKA INC          PENSION INDICATOR: UNANSWERED
 101 SIMMONS STREET
 OPELIKA AL 36801

 TYPE OF EMPLOYMENT: ALL OTHERS            STATUTORY EMPLOYEE IND: YES
 WAGES...........$26,986+
 FICA TX WH.........$948+
 T FICA WAG......$15,298+
 MEDCARE WH.........$221+
 MEDCARE WG......$15,298+


**************************       TAXPAYER  COPY   **************************

Station Name: Machine:  MTG001WA2163078 Date: 07/27/2004 Time: 2:28:27 PM

IRPTRN42276538601999000000            *(TY1999)

 DOCUMENT TYPE: W-2                                   PAGE 0001 OF 0005
PAYEE ENTITY DATA:
 HENRY G PORTERFIELD

 MONTGOMERY
 STATE: AL ZIP:

ACCOUNT NUMBER: N/A
PAYER ENTITY DATA:
 RHEEM MANUFACTURING COMPANY - GUN         PENSION INDICATOR: QUALIFIED PLAN

 MONTGOMERY AL : 7

 TYPE OF EMPLOYMENT: ALL OTHERS            STATUTORY EMPLOYEE IND: NO
 WAGES...............$833+
 TX WITHELD..........$71+
 FICA TX WH...........$51+
 T FICA WAG.........$833+
 MEDCARE WH..........$12+
 MEDCARE WG.........$833+

**************************       TAXPAYER  COPY   **************************

DEFENDANT'S EXHIBIT

Station Name: Machine: MTG00. .2163078 Date: 07/27/2004 Ti. . 2:28:32 PM

IRPTRN42276538601999000000                *(TY1999)

DOCUMENT TYPE: W-2G                                          PAGE 0004 OF 0005
PAYEE ENTITY DATA:
 PORTERFIELD HENRY G

 MONTGOMERY
 STATE: AL ZIP:

ACCOUNT NUMBER:
PAYER ENTITY DATA:
 MACON COUNTY GREYHOUND PARK INC.

 SHORTER AL: . .

 TYPE OF GAMBLING: DOG RACING
 GR WINNING.........$1,552+


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*    TAXPAYER  COPY   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Station Name: Machine:  MTG001WA2163078 Date: 07/27/2004 Time: 2:28:30 PM

IRPTRN42276538601999000000                *(TY1999)

 DOCUMENT TYPE: W-2G                                          PAGE 0003 OF 0005
PAYEE ENTITY DATA:
 PORTERFIELD HENRY G

 MONTGOMERY
 STATE: AL ZIP:

ACCOUNT NUMBER:
PAYER ENTITY DATA:
 MACON COUNTY GREYHOUND PARK INC.

 SHORTER AL:

 TYPE OF GAMBLING: DOG RACING
 GR WINNING.........$655+


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*    TAXPAYER  COPY   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Station Name: Machine:  MTG001  2163078 Date: 07/27/2004 Tim. :2:30:08 PM

IRPTRN42082341501999000000            *(TY1999)

DOCUMENT TYPE: 1099-G                                  PAGE 0002 OF 0002
PAYEE ENTITY DATA:
 PORTERFIELD BETTY J

 MONTGOMERY
 STATE: AL ZIP: :      -                  TAX YEAR OF REFUND: UNSET

ACCOUNT NUMBER: N/A
PAYER ENTITY DATA:
 STATE OF ALABAMA
 DEPARTMENT OF INDUSTRIAL RELATIONS

 MONTGOMERY AL                 :
 1099-G OFFSET: NOT REFUND, CREDIT OR OFFSET FOR TRADE OR BUSINESS
 UNEMPL COM.........$105+


*************************    TAXPAYER  COPY   ************************

Station Name: Machine:  MTG001WA2163078 Date: 07/27/2004 Time: 2:30:04 PM

IRPTRN42082341501999000000            *(TY1999)

DOCUMENT TYPE: W-2                                     PAGE 0001 OF 0002
PAYEE ENTITY DATA:
 BETTY PORTERFIELD


 STATE: ** ZIP: 00000-0000

ACCOUNT NUMBER: N/A
PAYER ENTITY DATA:                     PENSION INDICATOR: UNANSWERED
 AMERICAN KLASSIC DESIGNS


                                       STATUTORY EMPLOYEE IND: NO

 TYPE OF EMPLOYMENT: ALL OTHERS
 WAGES............$12,908+
 TX WITHELD.........$531+
 FICA TX WH.........$800+
 T FICA WAG.......$12,908+
 MEDCARE WH.........$187+
 MEDCARE WG......$12,908+

*************************    TAXPAYER  COPY   ************************


DEFENDANT'S
EXHIBIT

61

Form **1040**

Department of the Treasury — Internal Revenue Service

**U.S. Individual Income Tax Return** **2000** (99) IRS use only — Do not write or staple in this space.

For the year Jan 1-Dec 31, 2000, or other tax year beginning , 2000, ending , 20 OMB No. 1545-0074

| | | | |
|---|---|---|---|
| **Label** (See instructions.) | Your First Name: Henry | MI | Last Name: Porterfield | Your Social Security Number |
| **Use the IRS label. Otherwise, please print or type.** | If a Joint Return, Spouse's First Name: Betty | MI | Last Name: Porterfield | Spouse's Social Security Number |

Home Address (number and street). If You Have a P.O. Box, See Instructions. | Apartment No.

City, Town or Post Office. If You Have a Foreign Address, See Instructions. State: AL ZIP Code
Montgomery

▲ **Important!** ▲
You **must** enter your social security number(s) above.

**Presidential Election Campaign** (See instructions.) ▶ Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ......▶ You ☐ Yes ☐ No Spouse ☐ Yes ☐ No

**Filing Status**

Check only one box.

1 ☐ Single
2 ☒ Married filing joint return (even if only one had income)
3 ☐ Married filing separate return. Enter spouse's SSN above & full name here ... ▶
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ... ▶
5 ☐ Qualifying widow(er) with dependent child (year spouse died ▶ ). (See instructions.)

**Exemptions**

6a ☒ **Yourself.** If your parent (or someone else) can claim you as a dependent on his or her tax return, **do not** check box 6a ..................
b ☒ **Spouse** ........................

No. of boxes checked on 6a and 6b ....... **2**

c Dependents:

| (1) First name | Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instructions) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

No. of your children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions) ..
Dependents on 6c not entered above ..

If more than six dependents, see instructions.

d Total number of exemptions claimed ........................
Add numbers entered on lines above ▶ **2**

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 ........................ | 7 | 9,744. |
| 8a | Taxable interest. Attach Schedule B if required ........................ | 8a | |
| b | Tax-exempt interest. **Do not** include on line 8a ........... 8b | | |
| 9 | Ordinary dividends. Attach Schedule B if required ........................ | 9 | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) ... | 10 | |
| 11 | Alimony received ........................ | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ........................ | 12 | 31,300. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here .... ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 ........................ | 14 | |
| 15a | Total IRA distributions .... 15a | b Taxable amount (see instrs) | 15b | |
| 16a | Total pensions & annuities .. 16a | b Taxable amount (see instrs) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E .. | 17 | |
| 18 | Farm income or (loss). Attach Schedule F ........................ | 18 | |
| 19 | Unemployment compensation ........................ | 19 | 150. |
| 20a | Social security benefits .... 20a | b Taxable amount (see instrs) | 20b | |
| 21 | Other income. List type & amount (see instrs) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 41,194. |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | IRA deduction (see instructions) ................ | 23 | |
| 24 | Student loan interest deduction (see instructions) ......... | 24 | |
| 25 | Medical savings account deduction. Attach Form 8853 ..... | 25 | |
| 26 | Moving expenses. Attach Form 3903 ................ | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE ..... | 27 | |
| 28 | Self-employed health insurance deduction (see instructions) .. | 28 | |
| 29 | Self-employed SEP, SIMPLE, and qualified plans ........ | 29 | |
| 30 | Penalty on early withdrawal of savings ............ | 30 | |
| 31a | Alimony paid b Recipient's SSN ... ▶ | 31a | |
| 32 | Add lines 23 through 31a ........................ | 32 | |
| 33 | Subtract line 32 from line 22. This is your **adjusted gross income** .......... ▶ | 33 | 41,194. |

BAA **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.**

FDIA0112 11/07/00

Form 1040 (2000)

Form 1040 (2000)  Henry & Betty Porterfield                                        Page 2

**Tax and Credits**

| | | |
|---|---|---|
| 34 | Amount from line 33 (adjusted gross income) | **34** 41,194. |
| 35a | Check if: ☐ You were 65/older, ☐ Blind; ☐ Spouse was 65/older, ☐ Blind. Add the number of boxes checked above and enter the total here ▶ | 35a |
| b | If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see instructions and check here ▶ | 35b |

**Standard Deduction for Most People**

Single: $4,400

Head of household: $6,450

Married filing jointly or Qualifying widow(er): $7,350

Married filing separately: $3,675

| | | |
|---|---|---|
| 36 | Enter your itemized deductions from Schedule A, line 28, or standard deduction shown on the left. But see instructions to find your standard deduction if you checked any box on line 35a or 35b or if someone can claim you as a dependent | **36** 7,350. |
| 37 | Subtract line 36 from line 34 | **37** 33,844. |
| 38 | If line 34 is $96,700 or less, multiply $2,800 by the total number of exemptions claimed on line 6d. If line 34 is over $96,700, see the worksheet in the instructions for the amount to enter | **38** 5,600. |
| 39 | Taxable income. Subtract line 38 from line 37. If line 38 is more than line 37, enter -0- | **39** 28,244. |
| 40 | Tax (see instrs). Check if any tax is from a ☐ Form(s) 8814 b ☐ Form 4972 | **40** 4,234. |
| 41 | Alternative minimum tax. Attach Form 6251 | 41 |
| 42 | Add lines 40 and 41 ▶ | **42** 4,234. |
| 43 | Foreign tax credit. Attach Form 1116 if required | 43 |
| 44 | Credit for child and dependent care expenses. Attach Form 2441 | 44 |
| 45 | Credit for the elderly or the disabled. Attach Schedule R | 45 |
| 46 | Education credits. Attach Form 8863 | 46 |
| 47 | Child tax credit (see instructions) | 47 |
| 48 | Adoption credit. Attach Form 8839 | 48 |
| 49 | Other. Check if from a ☐ Form 3800 b ☐ Form 8396 c ☐ Form 8801 d ☐ Form (specify) | 49 |
| 50 | Add lines 43 through 49. These are your total credits | 50 |
| 51 | Subtract line 50 from line 42. If line 50 is more than line 42, enter -0- | **51** 4,234. |

**Other Taxes**

| | | |
|---|---|---|
| 52 | Self-employment tax. Attach Schedule SE | 52 |
| 53 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | 53 |
| 54 | Tax on IRAs, other retirement plans, and MSAs. Attach Form 5329 if required | 54 |
| 55 | Advance earned income credit payments from Form(s) W-2 | 55 |
| 56 | Household employment taxes. Attach Schedule H | 56 |
| 57 | Add lines 51-56. This is your total tax ▶ | **57** 4,234. |

**Payments**

If you have a qualifying child, attach Schedule EIC.

| | | |
|---|---|---|
| 58 | Federal income tax withheld from Forms W-2 and 1099 | 58 297. |
| 59 | 2000 estimated tax payments and amount applied from 1999 return | 59 |
| 60a | Earned income credit (EIC) | 60a |
| b | Nontaxable earned income: amount ▶ and type ▶ | No |
| 61 | Excess social security and RRTA tax withheld (see instrs) | 61 |
| 62 | Additional child tax credit. Attach Form 8812 | 62 |
| 63 | Amount paid with request for extension to file (see instructions) | 63 |
| 64 | Other payments. Check if from a ☐ Form 2439 b ☐ Form 4136 | 64 |
| 65 | Add lines 58, 59, 60a, and 61 through 64. These are your total payments ▶ | **65** 297. |

**Refund**

Have it directly deposited! See instructions and fill in 67b, 67c, and 67d.

| | | |
|---|---|---|
| 66 | If line 65 is more than line 57, subtract line 57 from line 65. This is the amount you overpaid | 66 |
| 67a | Amount of line 66 you want refunded to you | 67a |
| b | Routing number ▶ c Type: ☐ Checking ☐ Savings | |
| d | Account number ▶ | |
| 68 | Amount of line 66 you want applied to your 2001 estimated tax ▶ | 68 |

**Amount You Owe**

| | | |
|---|---|---|
| 69 | If line 57 is more than line 65, subtract line 65 from line 57. This is the amount you owe. For details on how to pay, see instructions ▶ | **69** 4,147. |
| 70 | Estimated tax penalty. Also include on line 69 | 70 210. |

**Sign Here**

Joint return? See instructions.

Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your Signature _Henry G Porterfield_ Date 8/25/06  Your Occupation Salesman  Daytime Phone Number FDIA0112 10/30/00

Spouse's Signature. If a Joint Return, Both Must Sign. _Betty J Porterfield_ Date 8/25/06  Spouse's Occupation Office Asst  May the IRS discuss this return with the preparer shown below (see instructions)? ☐ Yes ☐ No

**Paid Preparer's Use Only**

Preparer's Signature _Sam Hill_ 25 Aug 06

Firm's Name (or yours if self-employed), Address, and ZIP Code  Myles And Associates  EIN 36-4375060  4703 West Hickory Grove Rd.  Letobatchee, Al 36047

Preparer's SSN or PTIN

Employed ☐

EIN

Phone No.

Form 1040 (2000)

| Schedule C | **Profit or Loss from Business** | OMB No. 1545-0074 |
|---|---|---|
| (Form 1040) | (Sole Proprietorship) | **2000** |

Department of the Treasury
Internal Revenue Service (99)  ► Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.
► Attach to Form 1040 or Form 1041.  ► See instructions for Schedule C (Form 1040).

09

| Name of Proprietor | Social Security Number (SSN) |
|---|---|
| Henry Porterfield | |

**A** Principal Business or Profession, Including Product or Service (see instructions)
Bread Saleman

**B** Enter Code from Instructions
► 454390

**C** Business Name. If No Separate Business Name, Leave Blank.

**D** Employer ID Number (EIN), if Any

**E** Business Address (including suite or room no.)►
City, Town or Post Office, State, & ZIP Code
Montgomery, AL

**F** Accounting method:  (1) [X] Cash  (2) [ ] Accrual  (3) [ ] Other (specify) ►

**G** Did you 'materially participate' in the operation of this business during 2000? If 'No,' see instructions for limit on losses ... [X] Yes [ ] No

**H** If you started or acquired this business during 2000, check here ........................................................... ►

## Part I  Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. **Caution:** If this income was reported to you on Form W-2 and the 'Statutory employee' box on that form was checked, see the instructions and check here ........ ► [X] | 1 | 54,668. |
| 2 | Returns and allowances .............................................................................. | 2 | |
| 3 | Subtract line 2 from line 1 .......................................................................... | 3 | 54,668. |
| 4 | Cost of goods sold (from line 42 on page 2) ...................................................... | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 ........................................................ | 5 | 54,668. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund .................. | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 .......................................................... ► | 7 | 54,668. |

## Part II  Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Advertising .................. | 8 | | 19 Pension and profit-sharing plans ........ | 19 | |
| 9 | Bad debts from sales or services (see instructions) ..... | 9 | | 20 Rent or lease (see instructions): | | |
| 10 | Car and truck expenses (see instrs) | 10 | 20,293. | a Vehicles, machinery, and equipment .... | 20a | |
| 11 | Commissions and fees ........ | 11 | | b Other business property .............. | 20b | |
| 12 | Depletion.................. | 12 | | 21 Repairs and maintenance .............. | 21 | |
| 13 | Depreciation and Section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 22 Supplies (not included in Part III) ...... | 22 | |
| | | | | 23 Taxes and licenses .................. | 23 | |
| | | | | 24 Travel, meals, and entertainment: | | |
| 14 | Employee benefit programs (other than on line 19) ..... | 14 | | a Travel ............................ | 24a | |
| 15 | Insurance (other than health) ... | 15 | 2,500. | b Meals and entertainment | | |
| 16 | Interest: | | | c Enter nondeductible amount included on line 24b (see instructions) ... | | |
| a | Mortgage (paid to banks, etc) ........ | 16a | | d Subtract line 24c from line 24b ........ | 24d | |
| b | Other .................... | 16b | | 25 Utilities .......................... | 25 | 575. |
| 17 | Legal & professional services ... | 17 | | 26 Wages (less employment credits) ...... | 26 | |
| 18 | Office expense.............. | 18 | | 27 Other expenses (from line 48 on page 2) .. | 27 | |
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27 in columns ............. ► | | | | 28 | 23,368. |

| | | | |
|---|---|---|---|
| 29 | Tentative profit (loss). Subtract line 28 from line 7 ............................................... | 29 | 31,300. |
| 30 | Expenses for business use of your home. Attach **Form 8829** ...................................... | 30 | |
| 31 | **Net profit or (loss).** Subtract line 30 from line 29. | 31 | 31,300. |

• If a profit, enter on **Form 1040, line 12,** and also on **Schedule SE, line 2** (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3.

• If a loss, **you must** go to line 32.

32 If you have a loss, check the box that describes your investment in this activity (see instructions).

• If you checked 32a, enter the loss on **Form 1040, line 12,** and also on **Schedule SE, line 2** (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3.

32a [X] All investment is at risk.

• If you checked 32b, you must attach **Form 6198.**

32b [ ] Some investment is not at risk.

**BAA  For Paperwork Reduction Act Notice, see Form 1040 instructions.** Schedule C (Form 1040) 2000

FDIZ0112  11/21/00

Schedule C (Form 1040) 2000 Henry Porterfield                                           Page 2

| **Part III** | **Cost of Goods Sold** (see instructions) | | |
|---|---|---|---|

**33** Method(s) used to value closing inventory:   **a** ☐ Cost   **b** ☐ Lower of cost or market   **c** ☐ Other (attach explanation)

**34** Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
If 'Yes,' attach explanation .................................................................   ☐ Yes   ☐ No

| | | |
|---|---|---|
| **35** Inventory at beginning of year. If different from last year's closing inventory, attach explanation .......................................................... | **35** | |
| **36** Purchases less cost of items withdrawn for personal use .......................... | **36** | |
| **37** Cost of labor. Do not include any amounts paid to yourself ........................ | **37** | |
| **38** Materials and supplies .......................................................... | **38** | |
| **39** Other costs .................................................................... | **39** | |
| **40** Add lines 35 through 39 ........................................................ | **40** | |
| **41** Inventory at end of year ....................................................... | **41** | |
| **42** **Cost of goods sold.** Subtract line 41 from line 40. Enter the result here and on page 1, line 4 ......... | **42** | |

| **Part IV** | **Information on Your Vehicle.** Complete this part **only** if you are claiming car or truck expenses on line 10 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file. |
|---|---|

**43** When did you place your vehicle in service for business purposes? (month, day, year)   ► 01/05/99

**44** Of the total number of miles you drove your vehicle during 2000, enter the number of miles you used your vehicle for:
  **a** Business _____ 62,441   **b** Commuting _____   **c** Other _____ 0

**45** Do you (or your spouse) have another vehicle available for personal use? ....................................   ☒ Yes   ☐ No

**46** Was your vehicle available for use during off-duty hours? .................................................   ☐ Yes   ☒ No

**47a** Do you have evidence to support your deduction? .......................................................   ☒ Yes   ☐ No

  **b** If 'Yes,' is the evidence written? ................................................................   ☒ Yes   ☐ No

| **Part V** | **Other Expenses.** List below business expenses not included on lines 8 – 26 or line 30. | |
|---|---|---|
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **48** Total other expenses. Enter here and on page 1, line 27 ................................. | **48** | |

Schedule C (Form 1040) 2000

| **Schedule C** (Form 1040) | **Profit or Loss from Business** (Sole Proprietorship) | OMB No. 1545-0074 **2001** |
|---|---|---|

Department of the Treasury
Internal Revenue Service (99)
► **Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.**
► **Attach to Form 1040 or Form 1041.** ► **See instructions for Schedule C (Form 1040).**

09

| Name of Proprietor | Social Security Number (SSN) |
|---|---|
| Henry Porterfield | |

**A** Principal Business or Profession, Including Product or Service (see instructions)
Bread Saleman

**B** Enter Code from Instructions
► 454390

**C** Business Name. If No Separate Business Name, Leave Blank.

**D** Employer ID Number (EIN), if Any

**E** Business Address (including suite or room no.) ►
City, Town or Post Office, State, and ZIP Code
Montgomery, AL

**F** Accounting method: (1) [X] Cash  (2) [ ] Accrual  (3) [ ] Other (specify) ►

**G** Did you 'materially participate' in the operation of this business during 2001? If 'No,' see instructions for limit on losses ... [X] Yes [ ] No

**H** If you started or acquired this business during 2001, check here ................................................ ► [ ]

### Part I   Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. **Caution.** If this income was reported to you on Form W-2 and the 'Statutory employee' box on that form was checked, see the instructions and check here ........ ► [X] | 1 | 52,941. |
| 2 | Returns and allowances ................................................................ | 2 | |
| 3 | Subtract line 2 from line 1 ............................................................. | 3 | 52,941. |
| 4 | Cost of goods sold (from line 42 on page 2) ............................................ | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 ............................................... | 5 | 52,941. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund .............. | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 ............................................. ► | 7 | 52,941. |

### Part II   Expenses. Enter expenses for business use of your home **only** on line 30.

| | | | | | |
|---|---|---|---|---|---|
| 8 | Advertising ............... | 8 | 19 Pension and profit-sharing plans | 19 | |
| 9 | Bad debts from sales or services (see instructions) .... | 9 | 20 Rent or lease (see instructions): | | |
| 10 | Car and truck expenses (see instrs) | 10 | 22,168. | a Vehicles, machinery, and equipment .... | 20a | |
| 11 | Commissions and fees ........ | 11 | | b Other business property ........ | 20b | |
| 12 | Depletion ................ | 12 | | 21 Repairs and maintenance .......... | 21 | |
| 13 | Depreciation and Section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 22 Supplies (not included in Part III) .... | 22 | |
| | | | | 23 Taxes and licenses ............ | 23 | |
| | | | | 24 Travel, meals, and entertainment: | | |
| 14 | Employee benefit programs (other than on line 19) ...... | 14 | | a Travel .................. | 24a | |
| 15 | Insurance (other than health) ... | 15 | 2,500. | b Meals and entertainment ........ | | |
| 16 | Interest: | | | c Enter nondeductible amount included on line 24b (see instrs) .... | | |
| a | Mortgage (paid to banks, etc) ........ | 16a | | d Subtract line 24c from line 24b .. | 24d | |
| b | Other ............... | 16b | | 25 Utilities ................ | 25 | 610. |
| 17 | Legal & professional services .... | 17 | 300. | 26 Wages (less employment credits) .... | 26 | |
| 18 | Office expense ............. | 18 | | 27 Other expenses (from line 48 on page 2) .. | 27 | 953. |

| | | | |
|---|---|---|---|
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27 in columns ........... ► | 28 | 26,531. |
| 29 | Tentative profit (loss). Subtract line 28 from line 7 ...................................... | 29 | 26,410. |
| 30 | Expenses for business use of your home. Attach Form 8829 ................................ | 30 | |
| 31 | **Net profit or (loss).** Subtract line 30 from line 29. | | |
| | • If a profit, enter on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees. Estates and trusts, enter on Form 1041, line 3. | 31 | 26,410. |
| | • If a loss, you must go to line 32. | | |

32 If you have a loss, check the box that describes your investment in this activity (see instructions).

• If you checked 32a, enter the loss on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3.

32a [X] All investment is at risk.

• If you checked 32b, you must attach Form 6198.

32b [ ] Some investment is not at risk.

BAA  For Paperwork Reduction Act Notice, see Form 1040 instructions.

Schedule C (Form 1040) 2001

**DEFENDANT'S EXHIBIT**

62

Form **1040**    Department of the Treasury — Internal Revenue Service
**U.S. Individual Income Tax Return** **2001**    (99)    IRS use only — Do not write or staple in this space.

For the year Jan 1 - Dec 31, 2001, or other tax year beginning , 2001, ending , 20

OMB No. 1545-0074

**Label**
(See instructions.)

Your First Name: Henry    MI    Last Name: Porterfield

Your Social Security Number

**Use the IRS label. Otherwise, please print or type.**

If a Joint Return, Spouse's First Name: Betty    MI    Last Name: Porterfield

Spouse's Social Security Number

Home Address (number and street). If You Have a P.O. Box, See Instructions.    Apartment No.

City, Town or Post Office. If You Have a Foreign Address, See Instructions.    State AL    ZIP Code

Montgomery

▲ **Important!** ▲
You must enter your social security number(s) above.

**Presidential Election Campaign**
(See instructions.)

► Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? .......... ►

You: [ ] Yes [X] No    Spouse: [ ] Yes [X] No

**Filing Status**

Check only one box.

1 [ ] Single
2 [X] Married filing joint return (even if only one had income)
3 [ ] Married filing separate return. Enter spouse's SSN above & full name here ... ►
4 [ ] Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ►
5 [ ] Qualifying widow(er) with dependent child (year spouse died ► ). (See instructions.)

**Exemptions**

6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, **do not** check box 6a ...................................................

b [X] Spouse ....................................................

No. of boxes checked on 6a and 6b: **2**

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If more than six dependents, see instructions.

No. of your children on 6c who:
● lived with you .....
● did not live with you due to divorce or separation (see instrs)

Dependents on 6c not entered above

d Total number of exemptions claimed

Add numbers on lines above ► **2**

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | |
|---|---|---|
| 7 Wages, salaries, tips, etc. Attach Form(s) W-2 ............. | 7 | 3,923. |
| 8a Taxable interest. Attach Schedule B if required ............. | 8a | |
| b Tax-exempt interest. Do not include on line 8a ...... | 8b | |
| 9 Ordinary dividends. Attach Schedule B if required ............. | 9 | |
| 10 Taxable refunds, credits, or offsets of state and local income taxes (see instructions) | 10 | |
| 11 Alimony received ....................................................... | 11 | |
| 12 Business income or (loss). Attach Schedule C or C-EZ .......... | 12 | 26,410. |
| 13 Capital gain or (loss). Attach Schedule D if required. If not required, check here ► [ ] | 13 | |
| 14 Other gains or (losses). Attach Form 4797 .................... | 14 | |
| 15a Total IRA distributions .... 15a | b Taxable amount (see instrs) | 15b | |
| 16a Total pensions & annuities 16a | b Taxable amount (see instrs) | 16b | |
| 17 Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 Farm income or (loss). Attach Schedule F ....................... | 18 | |
| 19 Unemployment compensation ..................................... | 19 | 4,186. |
| 20a Social security benefits .... 20a | b Taxable amount (see instrs) | 20b | |
| 21 Other income ......................................................... | 21 | |
| 22 Add the amounts in the far right column for lines 7 through 21. This is your total income ► | 22 | 34,519. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 IRA deduction (see instructions) ............. | 23 | |
| 24 Student loan interest deduction (see instructions) ........... | 24 | |
| 25 Archer MSA deduction. Attach Form 8853 ................. | 25 | |
| 26 Moving expenses. Attach Form 3903 ..................... | 26 | |
| 27 One-half of self-employment tax. Attach Schedule SE .... | 27 | |
| 28 Self-employed health insurance deduction (see instructions) | 28 | |
| 29 Self-employed SEP, SIMPLE, and qualified plans ......... | 29 | |
| 30 Penalty on early withdrawal of savings ................. | 30 | |
| 31a Alimony paid b Recipient's SSN .... ► | 31a | |
| 32 Add lines 23 through 31a .................................... | 32 | |
| 33 Subtract line 32 from line 22. This is your adjusted gross income ► | 33 | 34,519. |

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.    Form 1040 (2001)

Form 1040 (2001)    Henry & Betty Porterfield                                                      Page 2

| | | |
|---|---|---|
| **Tax and Credits** | 34 Amount from line 33 (adjusted gross income) | 34 | 34,519. |

**Tax and Credits**

**Standard Deduction for —**
- People who checked any box on line 35a or 35b or who can be claimed as a dependent, see instructions.
- All others:
  Single: $4,550
  Head of household, $6,650
  Married filing jointly or Qualifying widow(er), $7,600
  Married filing separately, $3,800

34 Amount from line 33 (adjusted gross income) ... 34 — 34,519.

35a Check if: ☐ You were 65/older, ☐ Blind; ☐ Spouse was 65/older, ☐ Blind.
Add the number of boxes checked above and enter the total here ► 35a

b If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see instructions and check here ► 35b ☐

36 Itemized deductions (from Schedule A) or your standard deduction (see left margin) ... 36 — 7,600.
37 Subtract line 36 from line 34 ... 37 — 26,919.
38 If line 34 is $99,725 or less, multiply $2,900 by the total number of exemptions claimed on line 6d. If line 34 is over $99,725, see the worksheet in the instructions ... 38 — 5,800.
39 Taxable income. Subtract line 38 from line 37. If line 38 is more than line 37, enter -0- ... 39 — 21,119.
40 Tax (see instrs). Check if any tax is from a ☐ Form(s) 8814 b ☐ Form 4972 ... 40 — 3,169.
41 Alternative minimum tax (see instructions). Attach Form 6251 ... 41
42 Add lines 40 and 41 ... ► 42 — 3,169.
43 Foreign tax credit. Attach Form 1116 if required ... 43
44 Credit for child and dependent care expenses. Attach Form 2441 ... 44
45 Credit for the elderly or the disabled. Attach Schedule R ... 45
46 Education credits. Attach Form 8863 ... 46
47 Rate reduction credit. See the worksheet ... 47 — 600.
48 Child tax credit (see instructions) ... 48
49 Adoption credit. Attach Form 8839 ... 49
50 Other credits from a ☐ Form 3800 b ☐ Form 8396 c ☐ Form 8801 d ☐ Form (specify) ... 50
51 Add lines 43 through 50. These are your total credits ... 51 — 600.
52 Subtract line 51 from line 42. If line 51 is more than line 42, enter -0- ... 52 — 2,569.

**Other Taxes**

53 Self-employment tax. Attach Schedule SE ... 53
54 Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 ... 54
55 Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required ... 55
56 Advance earned income credit payments from Form(s) W-2 ... 56
57 Household employment taxes. Attach Schedule H ... 57
58 Add lines 52-57. This is your total tax ... ► 58 — 2,569.

**Payments**

If you have a qualifying child, attach Schedule EIC.

59 Federal income tax withheld from Forms W-2 and 1099 ... 59 — 285.
60 2001 estimated tax payments and amount applied from 2000 return ... 60
61a Earned income credit (EIC) ... 61a    No
b Nontaxable earned income ... 61b
62 Excess social security and RRTA tax withheld (see instrs) ... 62
63 Additional child tax credit. Attach Form 8812 ... 63
64 Amount paid with request for extension to file (see instructions) ... 64
65 Other payments. Check if from a ☐ Form 2439 b ☐ Form 4136 ... 65
66 Add lines 59, 60, 61a, and 62 through 65. These are your total payments ... ► 66 — 285.

FDIA0112 12/10/01

**Refund**

Direct deposit? See instructions and fill in 68b, 68c, and 68d.

67 If line 66 is more than line 58, subtract line 58 from line 66. This is the amount you overpaid ... 67
68a Amount of line 67 you want refunded to you ... 68a
► b Routing number ... c Type: ☐ Checking ☐ Savings
► d Account number ...
69 Amount of line 67 you want applied to your 2002 estimated tax ... ► 69

**Amount You Owe**

70 Amount you owe. Subtract line 66 from line 58. For details on how to pay, see instructions ... ► 70 — 2,373.
71 Estimated tax penalty. Also include on line 70 ... 71 — 89.

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ Yes. Complete the following. ☒ No
Designee's Name ►    Phone No. ►    Personal Identification Number (PIN) ►

**Sign Here**

Joint return? See instructions.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your Signature ► [signature]    Date 8/25/06    Your Occupation Salesman    Daytime Phone Number
Spouse's Signature. If a Joint Return, Both Must Sign. ► [signature]    Date 8/25/06    Spouse's Occupation Office Asst

**Paid Preparer's Use Only**

Preparer's Signature ► [signature]    Date 25 Aug 06    Check if self-employed ☐    Preparer's SSN or PTIN
Firm's Name (or yours if self-employed), Address, and ZIP Code    Myles And Associates    EIN 36-4375060    EIN
4703 West Hickory Grove Rd    Phone No.



DEFENDANT'S
EXHIBIT

63

Form **1040**    Department of the Treasury — Internal Revenue Service
**U.S. Individual Income Tax Return** **2002**    (99)    IRS use only — Do not write or staple in this space.

For the year Jan 1 - Dec 31, 2002, or other tax year beginning                , 2002, ending        , 20            OMB No. 1545-0074

**Label**
(See instructions.)

| | | |
|---|---|---|
| Your first name | MI | Last name |
| Henry | | Porterfield |

Your social security number

| | | |
|---|---|---|
| If a joint return, spouse's first name | MI | Last name |
| Betty | | Porterfield |

Spouse's social security number

**Use the IRS label. Otherwise, please print or type.**

Home address (number and street). If you have a P.O.box, see instructions.                Apartment no.

City, town or post office. If you have a foreign address, see instructions.        State    ZIP code
Montgomery                                                                    AL

▲ **Important!** ▲
You **must** enter your social security number(s) above.

**Presidential Election Campaign**
(See instructions.)

Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? . . . . . . . .    You ☐ Yes ☒ No    Spouse ☐ Yes ☒ No

**Filing Status**

Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above & full name here . . ▶
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5 ☐ Qualifying widow(er) with dependent child (year spouse died ▶        ). (See instructions.)

**Exemptions**

6a ☒ Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, **do not** check box 6a . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
b ☒ Spouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

No. of boxes checked on 6a and 6b      2

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

No. of children on 6c who:
● lived with you
● did not live with you due to divorce or separation (see instrs) . . .
Dependents on 6c not entered above

If more than five dependents, see instructions.

d Total number of exemptions claimed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Add numbers on lines above . . ▶    2

**Income**

**Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.**

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | |
|---|---|---|
| 7 Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . . . . . . . . | 7 | 18,954. |
| 8a Taxable interest. Attach Schedule B if required . . . . . . . . . . . . . . . . . . | 8a | |
| b Tax-exempt interest. **Do not** include on line 8a . . . | 8b | | |
| 9 Ordinary dividends. Attach Schedule B if required . . . . . . . . . . . . . . . . | 9 | |
| 10 Taxable refunds, credits, or offsets of state and local income taxes (see instructions) | 10 | |
| 11 Alimony received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . . | 12 | 27,225. |
| 13 Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here . . . . . . . ▶ ☐ | 13 | |
| 14 Other gains or (losses). Attach Form 4797 . . . . . . . . . . . . . . . . . . . . | 14 | |
| 15a IRA distributions . . . . . . . | 15a | b Taxable amount (see instrs) | 15b | |
| 16a Pensions and annuities . . . | 16a | b Taxable amount (see instrs) | 16b | |
| 17 Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 Farm income or (loss). Attach Schedule F . . . . . . . . . . . . . . . . . . . . . | 18 | |
| 19 Unemployment compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | |
| 20a Social security benefits . . . . | 20a | b Taxable amount (see instrs) | 20b | |
| 21 Other income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | |
| 22 Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 46,179. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 Educator expenses (see instructions) . . . . . . . . . . . | 23 | |
| 24 IRA deduction (see instructions) . . . . . . . . . . . . . . | 24 | |
| 25 Student loan interest deduction (see instructions) . . . . | 25 | |
| 26 Tuition and fees deduction (see instructions) . . . . . . | 26 | |
| 27 Archer MSA deduction. Attach Form 8853 . . . . . . . . | 27 | |
| 28 Moving expenses. Attach Form 3903 . . . . . . . . . . . | 28 | |
| 29 One-half of self-employment tax. Attach Schedule SE . | 29 | |
| 30 Self-employed health insurance deduction (see instructions) | 30 | |
| 31 Self-employed SEP, SIMPLE, and qualified plans . . . . | 31 | |
| 32 Penalty on early withdrawal of savings . . . . . . . . . . | 32 | |
| 33a Alimony paid b Recipient's SSN ▶ | 33a | |
| 34 Add lines 23 through 33a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 34 | |
| 35 Subtract line 34 from line 22. This is your adjusted gross income . . . . . | 35 | 46,179 |

Form 1040 (2002)    Henry & Betty Porterfield    Page 2

| | | | |
|---|---|---|---|
| **Tax and Credits** | 36 Amount from line 35 (adjusted gross income) .................... | 36 | 46,179. |
| | 37a Check if: ☐ You were 65/older, ☐ Blind; ☐ Spouse was 65/older, ☐ Blind. | | |
| **Standard Deduction for –** | Add the number of boxes checked above and enter the total here ........... ► 37a ☐ | | |
| • People who checked any box on line 37a or 37b or who can be claimed as a dependent, see instructions. | b If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see instructions and check here ............ ► 37b ☐ | | |
| | 38 Itemized deductions (from Schedule A) or your **standard deduction** (see left margin) | 38 | 7,850. |
| | 39 Subtract line 38 from line 36 ................................... | 39 | 38,329. |
| | 40 If line 36 is $103,000 or less, multiply $3,000 by the total number of exemptions claimed on line 6d. If line 36 is over $103,000, see the worksheet in the instructions | 40 | 6,000. |
| • All others: Single, $4,700 | 41 **Taxable income.** Subtract line 40 from line 39. If line 40 is more than line 39, enter -0- ........................ | 41 | 32,329. |
| Head of household, $6,900 | 42 Tax (see instrs). Check if any tax is from **a** ☐ Form(s) 8814 **b** ☐ Form 4972 | 42 | 4,249. |
| | 43 **Alternative minimum tax** (see instructions). Attach Form 6251 | 43 | |
| Married filing jointly or Qualifying widow(er), $7,850 | 44 Add lines 42 and 43 ......................................... ► | 44 | 4,249. |
| | 45 Foreign tax credit. Attach Form 1116 if required ......... | 45 | | |
| | 46 Credit for child and dependent care expenses. Attach Form 2441 ......... | 46 | | |
| Married filing separately, $3,925 | 47 Credit for the elderly or the disabled. Attach Schedule R .... | 47 | | |
| | 48 Education credits. Attach Form 8863 ................. | 48 | | |
| | 49 Retirement savings contributions credit. Attach Form 8880 .. | 49 | | |
| | 50 Child tax credit (see instructions) ..................... | 50 | | |
| | 51 Adoption credit. Attach Form 8839 .................... | 51 | | |
| | 52 Credits from: **a** ☐ Form 8396 **b** ☐ Form 8859 ....... | 52 | | |
| | 53 Other credits. Check applicable box(es): **a** ☐ Form 3800 **b** ☐ Form 8801 **c** ☐ Specify | 53 | | |
| | 54 Add lines 45 through 53. These are your **total credits** ...................... | 54 | |
| | 55 Subtract line 54 from line 44. If line 54 is more than line 44, enter -0- .......... ► | 55 | 4,249. |
| **Other Taxes** | 56 Self-employment tax. Attach Schedule SE ................................ | 56 | |
| | 57 Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 ... | 57 | |
| | 58 Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required ... | 58 | |
| | 59 Advance earned income credit payments from Form(s) W-2 .................... | 59 | |
| | 60 Household employment taxes. Attach Schedule H ........................... | 60 | |
| | 61 Add lines 55-60. This is your **total tax** ............................ ► | 61 | 4,249. |
| **Payments** | 62 Federal income tax withheld from Forms W-2 and 1099 .... | 62 | 1,766. | |
| If you have a qualifying child, attach Schedule EIC. | 63 2002 estimated tax payments and amount applied from 2001 return ... | 63 | | |
| | 64 **Earned income credit (EIC)** ........................ | 64 | | |
| | 65 Excess social security and tier 1 RRTA tax withheld (see instructions) ... | 65 | | |
| | 66 Additional child tax credit. Attach Form 8812 ............. | 66 | | |
| | 67 Amount paid with request for extension to file (see instructions) ... | 67 | | |
| | 68 Other pmts from: **a** ☐ Form 2439 **b** ☐ Form 4136 **c** ☐ Form 8885 | 68 | | |
| | 69 Add lines 62 through 68. These are your **total payments** ............... ► | 69 | 1,766. |
| **Refund** | 70 If line 69 is more than line 61, subtract line 61 from line 69. This is the amount you **overpaid** ... | 70 | |
| Direct deposit? See instructions and fill in 71b, 71c, and 71d. | 71a Amount of line 70 you want **refunded to you** .................... ► | 71a | |
| | ► **b** Routing number ........ _____ ► **c** Type: ☐ Checking ☐ Savings | | |
| | ► **d** Account number ................................ | | |
| | 72 Amount of line 70 you want **applied to your 2003 estimated tax** ....... | 72 | | |
| **Amount You Owe** | 73 Amount you owe. Subtract line 69 from line 61. For details on how to pay, see instructions ........ | 73 | 2,513. |
| | 74 Estimated tax penalty (see instructions) .......... | 74 | 30 | |

**Third Party Designee**   Do you want to allow another person to discuss this return with the IRS (see instructions)? ..................... ☐ Yes. Complete the following.   ☒ No

| Designee's name | Phone no. ► | Personal identification number (PIN) ► |
|---|---|---|

**Sign Here**
Joint return?
See instructions.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date 8/25/06 | Your occupation Salesman | Daytime phone number |
|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | Date 8/25/06 | Spouse's occupation Office Asst | |

**Paid Preparer's Use Only**

| Preparer's signature | Date 25 Aug 06 | □ employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | Myles And Associates    EIN 36-4375060 4703 West Hickory Grove Rd. Letohatchee, Al 36047 | EIN | |
| | | Phone no. | |

Form 1040 (2002)

| SCHEDULE C | Profit or Loss from Business | OMB No. 1545-0074 |
|---|---|---|
| (Form 1040) | (Sole Proprietorship) | **2002** |
| Department of the Treasury<br>Internal Revenue Service    (99) | ► Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.<br>► Attach to Form 1040 or 1041.   ► See instructions for Schedule C (Form 1040). | 09 |

| Name of proprietor | Social security number (SSN) |
|---|---|
| Henry Porterfield | |

**A** Principal business or profession, including product or service (see instructions)

Bread Saleman

**B** Enter code from instructions ► 454390

**C** Business name. If no separate business name, leave blank.

**D** Employer ID number (EIN), if any

**E** Business address (including suite or room no.) ►
City, town or post office, state, and ZIP code
Montgomery, AL

**F** Accounting method: (1) [X] Cash (2) [ ] Accrual (3) [ ] Other (specify) ►

**G** Did you 'materially participate' in the operation of this business during 2002? If 'No,' see instructions for limit on losses .... [X] Yes [ ] No

**H** If you started or acquired this business during 2002, check here ..........................................................

## Part I    Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. **Caution.** If this income was reported to you on Form W-2 and the 'Statutory employee' box on that form was checked, see the instructions and check here ......... ► [X] | 1 | 55,566. |
| 2 | Returns and allowances ................................................................................................ | 2 | |
| 3 | Subtract line 2 from line 1 ........................................................................................... | 3 | 55,566. |
| 4 | Cost of goods sold (from line 42 on page 2) .................................................................... | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 ..................................................................... | 5 | 55,566. |
| 6 | Other income, including Federal and state gasoline or fuel tax credit or refund ........................... | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 ........................................................................... ► | 7 | 55,566. |

## Part II    Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Advertising | 8 | | 19 Pension and profit-sharing plans ......... | 19 | |
| 9 | Bad debts from sales or services (see instructions) ..... | 9 | | 20 Rent or lease (see instructions): | | |
| | | | | a Vehicles, machinery, and equipment ..... | 20 a | |
| 10 | Car and truck expenses (see instructions) ........... | 10 | 23,915. | b Other business property .................. | 20 b | |
| 11 | Commissions and fees ........ | 11 | | 21 Repairs and maintenance .................. | 21 | |
| 12 | Depletion ............................ | 12 | | 22 Supplies (not included in Part III) ........ | 22 | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) ............ | 13 | | 23 Taxes and licenses ....................... | 23 | |
| | | | | 24 Travel, meals, and entertainment: | | |
| | | | | a Travel ................................... | 24 a | |
| 14 | Employee benefit programs (other than on line 19) ........ | 14 | | b Meals and entertainment .... | | |
| 15 | Insurance (other than health) ... | 15 | 2,500. | c Enter nondeductible amount included on line 24b (see instrs) ... | | |
| 16 | Interest: | | | d Subtract line 24c from line 24b ......... | 24 d | |
| a | Mortgage (paid to banks, etc) ... | 16 a | | 25 Utilities ................................... | 25 | 620. |
| b | Other ............................ | 16 b | | 26 Wages (less employment credits) ........ | 26 | |
| 17 | Legal & professional services ... | 17 | 300. | 27 Other expenses (from line 48 on page 2) ... | 27 | 1,006. |
| 18 | Office expense ................. | 18 | | | | |

| | | | |
|---|---|---|---|
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27 in columns .......... ► | 28 | 28,341. |
| 29 | Tentative profit (loss). Subtract line 28 from line 7 ............................................................ | 29 | 27,225. |
| 30 | Expenses for business use of your home. Attach Form 8829 .................................................... | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3.<br>• If a loss, you must go to line 32. | 31 | 27,225. |
| 32 | If you have a loss, check the box that describes your investment in this activity (see instructions). | | |
| | • If you checked 32a, enter the loss on **Form 1040, line 12,** and also on **Schedule SE, line 2** (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3. | 32 a [X] | All investment is at risk. |
| | • If you checked 32b, you must attach Form 6198. | 32 b [ ] | Some investment is not at risk. |

**BAA   For Paperwork Reduction Act Notice, see Form 1040 instructions.**                    Schedule C (Form 1040) 2002

Schedule C (Form 1040) 2002 Henry Porterfield                                                      Page 2

**Part III   Cost of Goods Sold** (see instructions)

33  Method(s) used to value closing inventory   a ☐ Cost   b ☐ Lower of cost or market   c ☐ Other (attach explanation)

34  Was there any change in determining quantities, costs, or valuations between opening and closing inventory?
    If 'Yes,' attach explanation ........................................................................... ☐ Yes ☐ No

| | | |
|---|---|---|
| 35  Inventory at beginning of year. If different from last year's closing inventory, attach explanation ................................................... | 35 | |
| 36  Purchases less cost of items withdrawn for personal use ................. | 36 | |
| 37  Cost of labor. Do not include any amounts paid to yourself .............. | 37 | |
| 38  Materials and supplies ................................................ | 38 | |
| 39  Other costs ........................................................ | 39 | |
| 40  Add lines 35 through 39 ............................................ | 40 | |
| 41  Inventory at end of year ............................................ | 41 | |
| 42  Cost of goods sold. Subtract line 41 from line 40. Enter the result here and on page 1, line 4 ........... | 42 | |

**Part IV   Information on Your Vehicle.** Complete this part only if you are claiming car or truck expenses on line 10 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file.

43  When did you place your vehicle in service for business purposes? (month, day, year)   ► 01/05/1999

44  Of the total number of miles you drove your vehicle during 2002, enter the number of miles you used your vehicle for:
    a Business _ _ _ _ _ _ 65,520   b Commuting _ _ _ _ _ _ _ _ _ _ _   c Other _ _ _ _ _ _ _ _ _ 0

45  Do you (or your spouse) have another vehicle available for personal use? ............................ ☒ Yes ☐ No

46  Was your vehicle available for personal use during off-duty hours? ................................. ☐ Yes ☒ No

47a Do you have evidence to support your deduction? ................................................ ☒ Yes ☐ No

  b If 'Yes,' is the evidence written? ............................................................ ☒ Yes ☐ No

**Part V   Other Expenses.** List below business expenses not included on lines 8 – 26 or line 30.

| | |
|---|---|
| Cellphone | 1,006. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| 48  Total other expenses. Enter here and on page 1, line 27 ................ 48 | 1,006. |

Schedule C (Form 1040) 2002

DEFENDANT'S
EXHIBIT

64

Form **1040**  Department of the Treasury — Internal Revenue Service
**U.S. Individual Income Tax Return** **2003**  (99)  IRS Use Only — Do not write or staple in this space.

For the year Jan 1 - Dec 31, 2003, or other tax year beginning , 2003, ending , 20   OMB No. 1545-0074

**Label** (See instructions.)

Your first name: Henry  MI  Last name: Porterfield  Your social security number

If a joint return, spouse's first name: Betty  MI  Last name: Porterfield  Spouse's social security number

**Use the IRS label. Otherwise, please print or type.**

Home address (number and street). If you have a P.O. box, see instructions.  Apartment no.

▲ **Important!** ▲ You must enter your social security number(s) above.

City, town or post office. If you have a foreign address, see instructions.  State: AL  ZIP code: Montgomery

**Presidential Election Campaign** (See instructions.) ▶ Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ...... You: Yes [ ] No [X]  Spouse: Yes [ ] No [X]

**Filing Status**
Check only one box.
1 [ ] Single
2 [X] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above & full name here ▶
4 [ ] Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5 [ ] Qualifying widow(er) with dependent child. (See instructions.)

**Exemptions**
6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a
b [X] Spouse
No. of boxes checked on 6a and 6b: 2

c Dependents:
| (1) First name  Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|

No. of children on 6c who: ● lived with you ● did not live with you due to divorce or separation (see instrs)
Dependents on 6c not entered above
Add numbers on lines above ▶ 2

If more than five dependents, see instructions.

d Total number of exemptions claimed .............. 2

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

7 Wages, salaries, tips, etc. Attach Form(s) W-2 ................ 7  16,876.
8a Taxable interest. Attach Schedule B if required ............. 8a
b Tax-exempt interest. Do not include on line 8a ... 8b
9a Ordinary dividends. Attach Schedule B if required ......... 9a
b Qualfd divs (see instrs) 9b
10 Taxable refunds, credits, or offsets of state and local income taxes (see instructions) ... 10
11 Alimony received .............. 11
12 Business income or (loss). Attach Schedule C or C-EZ ........ 12  40,081.
13a Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here ▶ [ ] 13a
b If box on 13a is checked, enter post-May 5 capital gain distributions 13b
14 Other gains or (losses). Attach Form 4797 .......... 14
15a IRA distributions 15a  b Taxable amount (see instrs) 15b
16a Pensions and annuities 16a  b Taxable amount (see instrs) 16b
17 Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E 17
18 Farm income or (loss). Attach Schedule F .......... 18
19 Unemployment compensation ............ 19
20a Social security benefits 20a  b Taxable amount (see instrs) 20b
21 Other income 21
22 Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ 22  56,957.

**Adjusted Gross Income**

23 Educator expenses (see instructions) ........ 23
24 IRA deduction (see instructions) ........... 24
25 Student loan interest deduction (see instructions) ..... 25
26 Tuition and fees deduction (see instructions) ...... 26
27 Moving expenses. Attach Form 3903 .......... 27
28 One-half of self-employment tax. Attach Schedule SE .. 28
29 Self-employed health insurance deduction (see instrs) .. 29
30 Self-employed SEP, SIMPLE, and qualified plans ... 30
31 Penalty on early withdrawal of savings ........ 31
32a Alimony paid b Recipient's SSN ▶ 32a
33 Add lines 23 through 32a .......... 33
34 Subtract line 33 from line 22. This is your adjusted gross income ▶ 34  56,957.

Form 1040 (2003)   Henry & Betty Porterfield                                                                     Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 35 | Amount from line 34 (adjusted gross income) .................................................. | 35 | 56,957. |
| | 36a | Check if: □ You were born before January 2, 1939, □ Blind. **Total boxes** □ Spouse was born before January 2, 1939, □ Blind. **checked ▶ 36a** | | |
| **Standard Deduction for –** | b | If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see instructions and check here .............. ▶ 36b □ | | |
| • People who checked any box on line 36a or 36b or who can be claimed as a dependent, see instructions. | 37 | Itemized deductions (from Schedule A) or your **standard deduction** (see left margin) | 37 | 9,500. |
| | 38 | Subtract line 37 from line 35 .......................................................... | 38 | 47,457. |
| | 39 | If line 35 is $104,625 or less, multiply $3,050 by the total number of exemptions claimed on line 6d. If line 35 is over $104,625, see the worksheet in the instructions | 39 | 6,100. |
| | 40 | Taxable income. Subtract line 39 from line 38. If line 39 is more than line 38, enter -0- ... | 40 | 41,357. |
| • All others: Single or Married filing separately, $4,750 | 41 | Tax (see instrs). Check if any tax is from a □ Form(s) 8814 b □ Form 4972 | 41 | 5,506. |
| | 42 | Alternative minimum tax (see instructions). Attach Form 6251 ..................... | 42 | |
| Married filing jointly or Qualifying widow(er), $9,500 | 43 | Add lines 41 and 42 ................................................................ ▶ | 43 | 5,506. |
| | 44 | Foreign tax credit. Attach Form 1116 if required .......... | 44 | | |
| | 45 | Credit for child and dependent care expenses. Attach Form 2441 | 45 | | |
| Head of household, $7,000 | 46 | Credit for the elderly or the disabled. Attach Schedule R .... | 46 | | |
| | 47 | Education credits. Attach Form 8863 ................... | 47 | | |
| | 48 | Retirement savings contributions credit. Attach Form 8880 ... | 48 | | |
| | 49 | Child tax credit (see instructions) ...................... | 49 | | |
| | 50 | Adoption credit. Attach Form 8839 ..................... | 50 | | |
| | 51 | Credits from: a □ Form 8396 b □ Form 8859 | 51 | | |
| | 52 | Other credits. Check applicable box(es): a □ Form 3800 b □ Form 8801 c □ Specify | 52 | | |
| | 53 | Add lines 44 through 52. These are your **total credits** ........................... | 53 | |
| | 54 | Subtract line 53 from line 43. If line 53 is more than line 43, enter -0- ............ ▶ | 54 | 5,506. |
| **Other Taxes** | 55 | Self-employment tax. Attach Schedule SE ............................................ | 55 | |
| | 56 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | 56 | |
| | 57 | Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required ... | 57 | |
| | 58 | Advance earned income credit payments from Form(s) W-2 ........................... | 58 | |
| | 59 | Household employment taxes. Attach Schedule H ................................... | 59 | |
| | 60 | Add lines 54-59. This is your **total tax** ......................................... ▶ | 60 | 5,506. |
| **Payments** | 61 | Federal income tax withheld from Forms W-2 and 1099 .... | 61 | 1,629. | |
| If you have a qualifying child, attach Schedule EIC. | 62 | 2003 estimated tax payments and amount applied from 2002 return | 62 | | |
| | 63 | Earned income credit (EIC) ............................ | 63 | | |
| | 64 | Excess social security and tier 1 RRTA tax withheld (see instructions) | 64 | | |
| | 65 | Additional child tax credit. Attach Form 8812 ............. | 65 | | |
| | 66 | Amount paid with request for extension to file (see instructions) | 66 | | |
| | 67 | Other pmts from: a □ Form 2439 b □ Form 4136 c □ Form 8885 | 67 | | |
| | 68 | Add lines 61 through 67. These are your **total payments** .......................... ▶ | 68 | 1,629. |
| **Refund** | 69 | If line 68 is more than line 60, subtract line 60 from line 68. This is the amount you **overpaid** | 69 | |
| Direct deposit? See instructions and fill in 70b, 70c, and 70d. | 70a | Amount of line 69 you want refunded to you ................................. ▶ | 70a | |
| | ▶ b | Routing number .......... ▶ c Type: □ Checking □ Savings | | |
| | ▶ d | Account number | | |
| | 71 | Amount of line 69 you want applied to your 2004 estimated tax ...... ▶ 71 | | |
| **Amount You Owe** | 72 | Amount you owe. Subtract line 68 from line 60. For details on how to pay, see instructions .......... ▶ | 72 | 3,952. |
| | 73 | Estimated tax penalty (see instructions) .............. 73 | 75. | |

| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instructions)? ............ □ **Yes. Complete the following.** ☒ **No** |
|---|---|
| | Designee's name ▶          Phone no. ▶          Personal identification number (PIN) ▶ |

| **Sign Here** Joint return? See instructions. Keep a copy for your records. | Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. |
|---|---|
| | Your signature *(signed)* | Date 8/25/06 | Your occupation Saleman | Daytime phone number |
| | Spouse's signature. If a joint return, both must sign. *(signed)* | Date 8/25/06 | Spouse's occupation Office Asst | |

| **Paid Preparer's Use Only** | Preparer's signature *(signed)* | Date 25 Aug 06 | Check if self-employed □ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, ZIP code ▶ | Myles And Associates   EIN 36-4375060 4703 West Hickory Grove Rd. Letohatchee, Al 36047 | EIN |
| | | | Phone no. |

Form 1040 (2003)

**SCHEDULE C**
(Form 1040)

Department of the Treasury
Internal Revenue Service    (99)

# Profit or Loss From Business
(Sole Proprietorship)

▶ Partnerships, joint ventures, etc., must file Form 1065 or 1065-B.
▶ Attach to Form 1040 or 1041.    ▶ See Instructions for Schedule C (Form 1040).

OMB No. 1545-0074

**2003**

09

| | |
|---|---|
| Name of proprietor<br>Henry Porterfield | Social security number (SSN) |
| A  Principal business or profession, including product or service (see instructions)<br>Bread Saleman | B  Enter code from instructions<br>▶ 454390 |
| C  Business name. If no separate business name, leave blank. | D  Employer ID number (EIN), if any |

E  Business address (including suite or room no.) ▶
City, town or post office, state, and ZIP code    Montgomery, AL

F  Accounting method:    (1) [X] Cash    (2) [ ] Accrual    (3) [ ] Other (specify) ▶

G  Did you 'materially participate' in the operation of this business during 2003? If 'No,' see instructions for limit on losses ... [X] Yes    [ ] No

H  If you started or acquired this business during 2003, check here ............................ ▶ [ ]

## Part I    Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. Caution. If this income was reported to you on Form W-2 and the 'Statutory employee' box on that form was checked, see the instructions and check here .......... ▶ [X] | 1 | 66,774. |
| 2 | Returns and allowances ................................................. | 2 | |
| 3 | Subtract line 2 from line 1 ............................................. | 3 | 66,774. |
| 4 | Cost of goods sold (from line 42 on page 2) ................................... | 4 | |
| 5 | Gross profit. Subtract line 4 from line 3 ..................................... | 5 | 66,774. |
| 6 | Other income, including Federal and state gasoline or fuel tax credit or refund ............... | 6 | |
| 7 | Gross income. Add lines 5 and 6 ........................................ ▶ | 7 | 66,774. |

## Part II    Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Advertising ................ | 8 | | 19 | Pension and profit-sharing plans | 19 | |
| 9 | Car and truck expenses (see instructions) ............. | 9 | 24,279. | 20 | Rent or lease (see instructions): | | |
| 10 | Commissions and fees ........ | 10 | | | a Vehicles, machinery, and equipment ..... | 20a | |
| 11 | Contract labor (see instructions) ............. | 11 | | | b Other business property ............... | 20b | |
| 12 | Depletion ................ | 12 | | 21 | Repairs and maintenance ............... | 21 | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) ............. | 13 | | 22 | Supplies (not included in Part III) ........ | 22 | |
| | | | | 23 | Taxes and licenses ............... | 23 | |
| | | | | 24 | Travel, meals, and entertainment: | | |
| 14 | Employee benefit programs (other than on line 19) ...... | 14 | | | a Travel ........................ | 24a | |
| 15 | Insurance (other than health) ... | 15 | | | b Meals and entertainment .... | | |
| 16 | Interest: | | | | c Enter nondeductible amount included on line 24b (see instrs) | | |
| | a Mortgage (paid to banks, etc) ........ | 16a | | | d Subtract line 24c from line 24b ......... | 24d | |
| | b Other ............. | 16b | | 25 | Utilities ...................... | 25 | 612. |
| 17 | Legal & professional services | 17 | 400. | 26 | Wages (less employment credits) ........ | 26 | |
| 18 | Office expense ............. | 18 | 150. | 27 | Other expenses (from line 48 on page 2) .... | 27 | 1,252. |
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27 in columns ............ ▶ | | | | | 28 | 26,693. |

| | | | |
|---|---|---|---|
| 29 | Tentative profit (loss). Subtract line 28 from line 7 .............................. | 29 | 40,081. |
| 30 | Expenses for business use of your home. Attach Form 8829 ........................ | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29.<br>• If a profit, enter on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3.<br>• If a loss, you must go to line 32. | 31 | 40,081. |

32  If you have a loss, check the box that describes your investment in this activity (see instructions).

• If you checked 32a, enter the loss on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see instructions). Estates and trusts, enter on Form 1041, line 3.

32a [X] All investment is at risk.
32b [ ] Some investment is not at risk.

• If you checked 32b, you must attach Form 6198.

BAA  For Paperwork Reduction Act Notice, see Form 1040 instructions.    Schedule C (Form 1040) 2003

Schedule **C** (Form 1040) 2003  Henry Porterfield                                                              Page **2**

**Part III**  **Cost of Goods Sold** (see instructions)

| | | |
|---|---|---|
| 33 | Method(s) used to value closing inventory: **a** ☐ Cost  **b** ☐ Lower of cost or market  **c** ☐ Other (attach explanation) | |
| 34 | Was there any change in determining quantities, costs, or valuations between opening and closing inventory? If 'Yes,' attach explanation ............................................................................................................ | ☐ Yes  ☐ No |
| 35 | Inventory at beginning of year. If different from last year's closing inventory, attach explanation | **35** |
| 36 | Purchases less cost of items withdrawn for personal use .................................. | **36** |
| 37 | Cost of labor. Do not include any amounts paid to yourself ................................ | **37** |
| 38 | Materials and supplies ................................................................ | **38** |
| 39 | Other costs ........................................................................ | **39** |
| 40 | Add lines 35 through 39 ............................................................ | **40** |
| 41 | Inventory at end of year ............................................................ | **41** |
| 42 | Cost of goods sold. Subtract line 41 from line 40. Enter the result here and on page 1, line 4 ............ | **42** |

**Part IV**  **Information on Your Vehicle.** Complete this part **only** if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business. See the instructions for line 13 to find out if you must file Form 4562.

43  When did you place your vehicle in service for business purposes? (month, day, year)  ▶ 01/05/1999

44  Of the total number of miles you drove your vehicle during 2003, enter the number of miles you used your vehicle for:

a Business  67,443  b Commuting _____  c Other _____ 0

45  Do you (or your spouse) have another vehicle available for personal use? ............................................  ☒ Yes  ☐ No

46  Was your vehicle available for personal use during off-duty hours? ..................................................  ☐ Yes  ☒ No

47a Do you have evidence to support your deduction? ..................................................................  ☒ Yes  ☐ No

b If 'Yes,' is the evidence written? ..............................................................................  ☒ Yes  ☐ No

**Part V**  **Other Expenses.** List below business expenses not included on lines 8-26 or line 30.

| | |
|---|---|
| Cellphone | 1,252. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| 48  Total other expenses. Enter here and on page 1, line 27 ................................ **48** | 1,252. |

Schedule C (Form 1040) 2003