IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

HENRY PORTERFIELD,                      *
                                        *
        Plaintiff,                      *
v.                                      *
                                        *
FLOWERS BAKING COMPANY OF               *      Case No. 2:05-cv-937-MEF
OPELIKA, LLC,                           *
                                        *
        Defendants.                     *


## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, by and through counsel, and for response to Defendant's

Motion For Summary Judgment, and in opposition to the same, submits the following

brief:

I.    STATEMENT OF MATERIAL FACTS:

        1.      Flowers Foods is a leading producer and marketer of packaged bakery

foods in the United States.  Flowers Foods produces breads, buns, rolls, snack cakes, and

pastries, which are distributed to food service and retail customers in the Southeastern,

Southwestern and mid-Atlantic states.  Flowers Foods bakes "product" as defined in the

distributorship agreement, at each of its thirty (30) plus bakeries and then transports the

"product" to subsidiaries to distribute.

        2.      One of those subsidiaries is the defendant in this case,  Flowers Baking

Company of Opelika, LLC.  Flowers Baking Company of Opelika operates three main

warehouses located in Montgomery, Alabama; Opelika, Alabama and in Phenix City, Alabama and it maintains approximately 11 smaller warehouses throughout central Alabama and West Georgia. (Michael Lord Deposition at pages 14 line 3 through pg. 15 line 8)

3.     Steven Bordeaux is, and was at all times relevant hereto, the president of Flowers Baking Company of Opelika.  (Bordeaux deposition at pg. 11 line 14-23)

4.      Michael Lord is, and was at all times relevant hereto, the vice-president of sales at  Flowers Baking Company of Opelika. ( Lord deposition at pgs.10 line 14 through pg.11 line 11).

5.     Grady Messer is and was at all times relevant hereto the Director of Sales for Flowers Baking of Opelika and he worked out of the Montgomery, Alabama warehouse location. (Messer deposition at pg. 17 line 10-12)

6.     Jerry Woodham has been controller for various Flowers companies and currently serves as controller for Flowers Baking Company of Opelika.  (Woodham deposition at pgs.12 line 2- pg.15 line 20)

7.     The plaintiff in the instant case, Henry Porterfield,  began working as an employee of Flowers Baking Company of Opelika in 1988, running a distribution route delivering bread. (Messer deposition at pg. 21 line 9-11)

8.     In either 1994 or 1995, Flowers Baking Company of Opelika changed the way it conducted business and decided to sell each of its distribution routes. (Messer

2

deposition at pg. 20 line 2-17) Each route was geographically described and sold as an "exclusive territory." No one other than the owner of the exclusive territory could sell Flowers' products within that geographic territory. In 1994 or 1995 Henry purchased a exclusive territory and entered into a distributor agreement with Flowers Baking of Opelika. (Bordeaux deposition at pgs. 34 line 13- pg. 41 line 6). That agreement and the subsequent agreements he entered into in 2000 and 2002 contained the terms of the agreement including, but not limited, to the responsibilities and duties of the parties, the conditions constituting breach, the remedies available once a breach occurred, and other terms and conditions. (See Distributorship Agreement attached hereto as Exhibit "1")

9.     Henry Porterfield distributed Flowers' "products" within his geographic territory which included Ann Street and Zelda Road in Montgomery, Alabama. In 2004, both Publix Grocery Stores and Wal-Mart announced that they would be opening stores within Henry Porterfield's exclusive territory. This was great news for Henry and meant that if these stores did in fact open within his territory, his income for delivering product on his route would greatly increase not only would Henry's route increase, he would not have to work private label bread if he did not want to under the contract. Private label brand bread pays a much lower commission and is often unprofitable for distribution. (Henry Porterfield deposition pg. 45 line 17 through pg. 46 line 2)

10.     Henry Porterfield called on approximately twenty one (21) accounts within his exclusive territory. (See Exhibit "1" attached hereto") One of those accounts was

Troy State Sodexho Marriott.

11.    Sodexho Marriott handled the cafeteria at the Troy State Montgomery campus and regularly purchased Flowers products to use in the cafeteria.

12.    On or about March 3, 2005 the contact person at the Troy State Sodexho Marriott account contacted Henry Porterfield and stated that she needed him to deliver to her some additional buns because she was running out of product.  Henry agreed to deliver the product, however, on his way to make the delivery, his truck began to experience mechanical problems and broke down.  Henry was unable to make the delivery. No one else was available to make the delivery. As a result the manager at the Troy State Sodexho Marriott account became angry and called a competitor to purchase the product she needed.  She also advised Henry that she no longer wanted him to service her account and that she was going to purchase all of her products from one of Flowers' competitors.  Henry in turn notified Flowers and explained to them what had happened.(Henry Porterfield deposition pg. 292 line 1 through 316 line 23)

13.    On March 7, 2007, Henry received a letter from Flowers informing him that he was in violation of his distributorship agreement and that he had ten (10) days to "cure" his alleged failure of performance.

14.    Henry was told that he had to get the Sodexho Marriott account to agree to purchase product or his contract would be terminated.  Henry did not want to lose the account and did not feel that the actions which caused him to lose the account justified  a

ten day breach letter. Even so, Henry did everything that he could, and used his best efforts as called for in his Distributor's Agreement, to try to regain the Sodexho Marriott account. (See Exhibit "5" the Affidavit of Henry Porterfield.)

15.     According to paragraph 5.1 of the distributorship agreement, Henry, as a distributor, agrees and covenants to use his best efforts to develop and maximize the sale of Flowers products to outlets within his territory and to service his territory in accordance with good industry practice. (See Exhibit "1" attached hereto.)

16.     Henry felt that the events which caused him to lose the Sodexho Marriott account at Troy State were beyond his control. Moreover, after Henry was told that Sodexho Marriott would be using one of Flower's competitors to deliver their bread, Henry tried to convince the account manager at Sodexho to let him regain the business.

17.     Henry was initially unsuccessful in his attempts to convince the account manager at Sodexho, and enlisted the help of Montgomery County Commissioner, Jiles Williams, and a Montgomery City Councilman, James Knuckles, to try and get the Sodexho Marriott account back. (See Exhibits "4" and "6" attached hereto) This according to Flowers, would "cure" the alleged breach. (Messer deposition pg. 131, line 17 through 132 line 1.)

18.     Henry spoke with the manager of the Sodexho account on three occasions after the alleged breach. Commissioner Williams and Councilman Knukles both agreed to help Henry and traveled with him to Troy State to meet with the Sodexho account

manager. She refused to see them. She had, however, agreed to allow Henry to resume his deliveries. She informed Henry that he could resume his deliveries and she also stated that she would begin receiving deliveries from another company at the same time. (See Porterfield Affidavit; Messer deposition at pgs 55-56) After their failed attempt to speak to the Sodexho Marriott account manager, both Williams and Knuckles traveled with Henry to the Flowers warehouse to tell Grady Messer of their unsuccessful attempt to retrieve the account.

19.     Henry felt that he had in fact used his "best efforts" to service his territory and that he had used his "best efforts" to regain the account. (See Exhibit "5", Affidavit of Henry Porterfield)

20.     On the same day that Henry Porterfield reported to Messer that he, Knuckles and Williams were unsuccessful at the Sodexho Marriott account, Henry asked his son Marcus Porterfield, who was also an employee of Flowers and regarded by management as a good employee, to run his delivery route for him. Henry further asked Marcus to videotape the freezer and the three month old bread that was in the freezer. Marcus videoed the freezer and was fired that same day. (See Exhibit "5", Affidavit of Henry Porterfield)

21.     Grady Messer alleged that Henry threatened him on that same day (March 16, 2005), and Flowers then prohibited him from entering the premises of Flowers warehouse. Henry never threatened Grady Messer, although he did accuse Messer of

6

being "racist."(See Exhibit "5", Affidavit of Henry Porterfield)

22.    Messer did not call the police to report the alleged threat. (Messer deposition pg. 63 line 13-14)

23.    Messer worked with Henry Porterfield from 1991 till 2005 and he had never threatened Messer.  In fact, Messer never seen Henry do anything to anyone. (Messer pg.65 line 3-19)

23.    Flowers thereafter determined that Henry had not cured his breach and terminated his distributorship's agreement.

24.    Flowers  took Henry Porterfield's distributorship and began to run the route and charge Henry for running it.

25.    It is undisputed that the only reason Henry Porterfield's contract was terminated was because the Troy State Sodexho Marriott account decided not to buy their bakery products from Flowers.  Grady Messer testified at page 53 line 18 through page 54 line 1 as follows:

> Q.    Ok, so just so I'm clear, the reason that Mr. Porterfield's contract was terminated was because he lost the account with Troy State Sodexho Marriott?
> A.    That's correct.
> Q.    And that was it.  That was the only reason?
> A.    Right.

26.    Steven Bordeaux, the president of Flowers Baking Company of Opelika, testified at pg. 18 line 9 through line 20 of his deposition as follows:

> Q.    When was the decision made to terminate Mr. Porterfield's contract?

7

A.    I believe it was the 16th or the 17th.  I'm not exactly sure on the correct date. It was ten days from the time he got the letter.

Q.    And was the decision to terminate his contract based upon failure to secure the Sodexho Marriott contract?

A.    Yes, sir.

Q.    And that was it?

A.    Yes, sir.

27.    It is Plaintiff's position that Flowers Baking of Opelika was in breach of the distributor agreement.  That agreement, which was drafted by Flowers, defines the term "Product" as follows:  "Product shall mean fresh baked goods."  (Messer deposition pg. 76 line 8 through page 77 line 20)

28.    The distributor agreement states that Flowers shall deliver "product" to the distributors.

29.    Paragraph 11.1 of the contract also states that "maintaining a fresh market is a fundamental tenet of the baking industry.  Accordingly, out of code products on the market is a material breach of this agreement.  Repeated violations will be grounds for termination of this agreement." (See Exhibit "1" attached hereto) (Messer pg. 99 line 15 through line 23)

30.    Since maintaining a fresh market is a fundamental tenet of the baking industry, certain safeguards are used by Flowers to monitor and maintain a fresh market. Dates are placed on product when it is baked at the bakery.  (Messer deposition at pg. 79 line 3-10; 92 line 7-8)  In addition to manufacture dates, Flowers color codes its product to assist in determining its freshness.  Products baked on Mondays are given orange ties,

8

Tuesday products are given white ties, Thursday products have blue ties, Friday products are given yellow ties and Saturday products are given green ties. (Messer deposition at pgs 88 line 12 through 92 line 4)

31.    Grady Messer testified that the reason why product is color coded is so that one will know how long the product has been on the shelf.  (Messer deposition at pgs 89 line 20 through 90 line 3) Messer went on to state that Flowers does not want its distributors to deliver products to customers that are "out of code." (Messer deposition at pg. 94 line 6-9)

32.    Customers also expect to have fresh product placed on their store shelves that is within code. (Messer deposition pg. 89 line 16-19)

33.    Flowers code system is set up to direct distributors when to remove product from the shelves.  If product is more than five days old, Flowers requires its distributors to remove the product from the shelves and either throw it away or deliver it to Flowers Thrift stores. ( Steve Bordeaux deposition at pg. 41 line 16 through 42 line 21)

34.    The distributor does this by checking color coded ties and removing all product more than five days old. (Bordeaux deposition pg. 43 line 12 through pg. 44 line 23.)

35.    Despite the fact that Flowers requires its distributors to remove product that is more than five days old from the shelves, Flowers regularly delivers to its distributors product that, by their own testimony, is two to three months old and still represents it as

being fresh. ( Messer deposition pg. 84 line 21 through pg. 85 line 19)

36.    It is the Plaintiff's position that this product is not fresh as defined by the contract, by industry standards or even by general lay person definition of the word "fresh" (See Exhibit "5", Affidavit of Porterfield)

37.    Flowers admits that it freezes product for two to three months and then when the product is removed from the freezer at the Montgomery, Opelika and Phoenix City, Alabama warehouse locations, hair spray is used to remove the date of manufacture from the product and a new date is placed on the product before it is given to the distributors to deliver. (Messer deposition at pg. 94 line 23 through page 95 line 14)

38.    Messer testified that "we spray a little hair spray on a cloth and rub the film lightly and it [the date] zips right off." (Messer deposition at pg. 96 line 20-22).

39.    Messer further testified that the new date placed on the bread that comes out of the freezer is two days from the date that it comes out of the freezer. (Messer deposition pg. 94-98)

40.    Flowers position is that the freezer stops the process of the bread from getting old. (Messer deposition pg. 81 line 21through pg. 82 line 14; pg. 94 line 13-22)

41.    Messer testified in his deposition that product that has been in the freezer for two months or less is still fresh. (Messer deposition pg. 78 line 13 through 82 line 80) (Lord deposition pg. 64).  Messer testified further that Flowers always delivers fresh products. (Messer deposition pg. 93 line 11 through 12)

42.     Steve Bordeaux testified in deposition at page 84, line 14 through 20

concerning frozen "product" as follows:

Q.     Do you think that it is fine to distribute product that you represent to be
       fresh when you have frozen it or suspended it as you would say?
A.     Yes, sir, I do.
Q.     And that's Flower's position; right?
A.     And it's my position.  I think it's okay.

43.     Flowers definition of fresh and Henry Porterfield's definition of fresh are

not the same.  In fact, Flowers definition of fresh is different from the definition

contained within the  American Heritage Dictionary.  During the deposition of  Steve

Bordeaux he testified at pg. 62 line 16 through pg. 64 line 14 as follows:

Q.     Well, let me see if you agree or disagree with this definition of fresh found
       in the American Heritage Dictionary.  Not preserved as by canning,
       smoking, or freezing, for example, fresh vegetables.  Do you agree or
       disagree with that definition?
A.     Without actually having a dictionary in front of me, I'm going to disagree.
Q.     All right.  Let me give you another American Heritage Dictionary definition
       of the word fresh.  Recently made, produced, or harvested, for example,
       fresh bread.  Do you agree with that definition?
A.     No, sir. ...
Q.     And what is it about what I said that you disagree with?
A.     Every bit of it.
Q.     Okay.  So you disagree that recently made, produced, or harvested – you
       disagree with that.  That's not a definition of fresh?
A.     That's correct.
Q.     You disagree with not preserved as by canning, smoking, or freezing, for
       example fresh vegetables.  You disagree with that definition?
A.     Yes, I do.

44.     On or about March 23, 2005 Grady Messer and Michael Lord met Henry

Porterfield at a local restaurant to discuss his distributorship status.  On that date they

presented plaintiff with documents and told him that he should sell his exclusive territory to Flowers for twenty three thousand one hundred twenty six dollars and ninety two cents ($23,126.92). Michael Lord also presented Henry with a letter which terminated Henry's distributorship agreement effective March 23, 2005. That letter went on to state that Flowers was authorized to operate the business on his behalf and to sell the business on Henry's behalf to a qualified purchaser. Henry refused to sign the documents.

45.    Section 16.4 of the distributor agreement covers actions following termination and states as follows:

> "If this Agreement is terminated under either section 16.2 or 16.3, Company, within the limits of its ability to do so, will operate the business for the account of Distributor, deducting its expenses in connection with the operation thereof, and sell Distributor's Distribution Rights to an qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement. Such sale shall be for the account of the terminated Distributor, and the proceeds of such sale, after deducting therefrom any monies owed by Distributor to Company, the amount of any outstanding liens, any other known liabilities of the Distributorship and the reasonable cost incurred in effecting the sale, shall be turned over to Distributor in exchange for the release of his/her Distribution Rights and interest under this Agreement. (See Exhibit "1")

46.    Flowers has continued to operate Henry Porterfield's exclusive territory since his contract was terminated in March 2005 and they charge his account for operational expenses.

47.    Henry receives weekly "Distributor Summary Reports" which purport to detail how Henry's route is being operated. (See weekly distributor summary reports marked as Plaintiff's Exhibit "3" hereto)

48.     These weekly distributor reports show that Henry Porterfield's route has almost doubled in product ordered since Flowers has been running his account, largely in part due to the fact that both Wal-Mart and Publix have opened locations within Henry's exclusive territory.

49.     In 2005, the total product charged to Henry's account was $346,986.95 ; it increased to $600,245.39 in 2006 ( See Exhibit "3" bate stamp # FBO000919 and #FBO000972 for a comparison of the two years).

50.     The W2 sent to Henry Porterfield by Flowers baking Company of Opelika, LLC., purports to show that Henry received wages, tips, other compensation of $46,468.57 in 2005 and $74,499.75 in 2006. (See Exhibit "7" and "8" attached hereto) Henry did not receive these amounts from Flowers Baking Company of Opelika, LLC. (Woodham deposition at pages 91-98).

51.     Interestingly, the weekly distributor report dated 3/20/2005 purports to state that as of the week Henry Porterfield's distributor agreement was terminated, his account had a credit of $495.69 due to Henry. ( See bate stamped # FBO 000878 contained in the weekly distributor summary reports marked as Exhibit "3" hereto) (Woodham deposition pg. 95).

52.     In contrast, Flowers has been running the account since March 2005 and as of 4/21/2007, Henry Porterfield's account has a negative balance of $17,649.11.  In other words, as of April 21 2007, even though Henry's account has almost doubled in size and

it has purportedly made him a total of $121,264.28 for 2005 and 2006, the account is still

negative $17,649.11 ( See bate stamped # FBO 000988 contained in the weekly

distributor summary reports marked as Exhibit "3" hereto).

53.    During discovery plaintiff took the deposition of Jerry Woodham, the

controller for Flowers Baking Company of Opelika and questioned Mr. Woodham

extensively concerning those weekly distributor summary reports. ( Woodham depositon

pgs 41 through 139)

54.    Jerry Woodham, the controller of Flowers Baking Company of Opelika

could not explain why balances changed on the weekly summary reports from week to

week.(Woodham deposition pg. 121 line 3 through pg. 122 line 2)

55.    Woodham testified that the beginning balance on a distributor's weekly

report was derived from the previous weekly distributor balance.  Yet he could not

explain why those figures were different from the figures on the previous weeks balances.

(Woodham deposition at pgs 102-122)

56.    When questioned specifically about weekly balances on a Henry

Porterfield's weekly account, Woodham testified as follows at page 115 of his deposition.

Q.    What I'm trying to figure out is, where do these two figures – you've got
        them listed here as credits which brings weekly distributor balance to
        $9,226.47.
A.    Uh-huh (positive response).
Q.    Is that accurate?
A.    The less prior week pay by scan inventory is the ending inventory for the
        week ending 12-31-05.
Q.    And that's credit?

14

A.     Uh-huh (positive response).

Q.     Is that right?

A.     Yes.

Q.     All right.  And the less current weekly pay by scan delivery tickets, is that also a credit?

A.     Yes.

Q.     And when you take your total distributor balance of 11,506.17 and you take your two credits away from it, it leaves a weekly distributor balance of $9,226.47; correct?

A.     Yes.

Q.     And at the end of the week, that is the weekly distributor balance?

Q.     Is that correct?

Q.     I'm referring to your document that says weekly distributor balance for route 2069 at the end of the week, which is 1-1-2006 to 1-7-2006 – is the weekly distributor balance $9,226.47?

A.     Yes.

Q.     Okay.  When you go from 920 [bate stamped number FBO000920] to 921 [bate stamped number FBO000921], it goes back to $11, 506.17 for the beginning balance owed instead of $9,226.47; is that correct?

A.     Yes.

57.     Woodham was unable in deposition to explain the credits listed at the bottom of each weekly distributor report which covered pay by scan inventory and weekly delivery pay by scan ticket items (Woodham deposition at pages 120-122), and during the deposition it was represented that Michael Lord was more knowledgeable about the pay by scan information than Mr. Woodham. (Woodham deposition pg 134 line 7 - pg. 139 line 16) However when Michael Lord was re-deposed and an explanation of the pay by scan information was given, the plaintiff's weekly report still did not balance.

58.     Lord could not give an explanation why they did not balance and  there was nothing contained within the documents that would indicate why the distributor's balance went up from one week's ending balance to the next week's beginning balance.  (Lord

deposition at page 92 line 18- pg.104 line17)

59.    It is important to note that Flowers was and still is running Henry Porterfield's route. (Lord deposition at page104 line 15-17) Flowers was charging Henry for  two trucks on the account, and they were using two people to run the route (Lord deposition at page 132).

60.    Messer testified however that it is not customary to have two people run the route. (Messer deposition at page 116 line 6-8) In fact, Messer went on to state that none of the routes in Montgomery have two people running them. (Messer deposition pg. 116 line 9 through 12).

61.    Some of the accounts on Henry Porterfield's account are "pay by scan" customers.  In other words, product is delivered to the customer, but the customer only pays for product that is scanned through the particular retail store's scanners at checkout. If the product is stolen, if it is used by the deli to make sandwitches, if it is destroyed and thrown away, then it is considered to be shrinkage or an inventory variance (Woodham deposition pg. 57 line 16).

62.    There is nothing contained within Henry Porterfield's contract that allows Flowers to charge distributors for shrinkage.  Distributors are charged shrinkage on pay by scan accounts. (Woodham pg. 59 line 14 through 64 line 23)

II.                    <u>**STANDARD OF REVIEW**</u>

63.    Under Fed. R. Civ. Proc. 56(c), summary judgment is proper "...if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322 (1986). The party asking for summary judgment "...always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id.</u> at 322-323.

64.    Once the moving party has met its burden, Rule 56(e) "...requires the non-moving party to go beyond the pleadings and by her own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 324. To avoid summary judgment, the non-moving party "...must do more than show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 586 (1986). On the other hand, *the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor.* <u>Anderson v. Liberty Lobby</u>, 477 U.S.

242, 255 (1985) (emphasis added). Alabama law echoes this basic premise when deciding on summary judgment: "In reviewing a summary judgment, this Court reviews the evidence in the light most favorable to the nonmovant." Muller, 919 So.2d 1176 (Ala. 2003).

65.    Thus, in the immediate case where Defendant Flowers is seeking summary judgment, this Court must accept Plaintiff Porterfield's evidence, and all justifiable inferences arising from it, as true. After viewing all evidence in a light most favorable to Plaintiff, this Court should deny summary judgment if there is any issue of material fact.

**III.**                    <u>**ARGUMENT**</u>

**A.    <u>The issue of whether Plaintiff breached the Distributor's Agreement with Defendant Flowers is a question to be resolved by the jury.</u>**

Plaintiff's complaint asserts that Defendant Flowers breached the distributor contract by (1) failing to deliver to him "product" as defined by the contract and (2) by wrongfully terminating his contract.  Defendant's in their brief have asserted that plaintiff cannot recover because Plaintiff has allegedly failed to perform under the contract. Essentially, Flowers is arguing it is not liable for breach of contract because Plaintiff has allegedly breached the same contract. However, contrary to Defendant Flower's assertions, summary judgment is due to be denied on the breach of contract claim because the issue of Plaintiff's performance of its contractual obligations is a question for the jury in this case.

Although Defendant Flowers argues in its brief that Plaintiff failed to perform

under the 2002 Distributor's Agreement for a variety of reasons, its own witness and corporate officers admit that Plaintiff's contract was terminated based only on Porterfield's alleged breach of the Sodexho TSUM account and Plaintiff's alleged failure to "cure" that breach.

Both Steve Bordeaux, the President of Flowers, and Grady Messer, the Flowers sales manager of Plaintiff Porterfield's territory at the time of Plaintiff's termination, stated specifically and unequivocally that the only reason Porterfield's Distributor's Agreement was terminated was because Porterfield lost the Sodexho TSUM account:

> Q. "And was the decision made to terminate his account
> based upon the failure to secure the Sodexho Marriott
> account?"
> A. "Yes, sir."
> Q. "And that was it?"
> A. "Yes, sir."

[Bordeaux deposition, p.18].

> Q. "OK, So just so I'm clear, the reason that Mr.
> Porterfield's contract was terminated was because he
> lost the account with Troy State Sodexho Marriott?"
> A. "That's correct."
> Q. "And that was it. That was the only reason?"
> A. "Right."

[Messer deposition, p.53]. As all inferences are to be viewed in a light most favorable to Plaintiff on a motion for summary judgment, and as Plaintiff contends the alleged breach of the Sodexho TSUM account was the sole reason, or more accurately the sole pretextual reason, for Plaintiff's termination, all other reasons (set forth in facts 26, 27, 36, 37, 40,

19

42, 43, 45 and 46 of Defendant's brief) proffered for termination for nonperformance of the Distributor's Agreement, are not to be considered by this Court. This is especially true in light of the fact that the President of Flowers and Plaintiff's sales manager both explicitly admit that those specific reasons were not the reasons for the termination, and that the Sodexho TSUM account was the sole reason.

Plaintiff contends that the contract was terminated for several reasons that are denied by Flowers, namely that Flowers sought to convert his route when its value increased with the opening of additional stores on the route, that Plaintiff was complaining too much about the lack of fresh baked product as opposed to frozen product, and that Flowers desired to obtain greater profits by running the route in-house. But these facts proffered by Plaintiff are disputed by the parties and are clearly questions for a jury.

The issues before this Court on breach of contract are therefore whether there is a material factual dispute concerning Plaintiff's alleged failure to perform his obligations with regard to the Sodexho TSUM account, and whether there is a material factual dispute concerning this alleged breach being a pretext for terminating the contract. Deciding either issue in favor of Plaintiff requires the submission of this breach of contract count to a jury. As demonstrated below, on both issues there are material facts in dispute, and therefore, both are issues to be resolved by a jury.

The question of Plaintiff's performance on the Sodexho TSUM account is a

question of performance and/or substantial performance. Plaintiff is required, under Section Five (V) of the Distributor's Agreement, "...to use his/her best efforts to develop and maximize the sale..." of Flower's products within his specified geographic area, or "territory." [Pl. Exhibit "1"]. Herein, Plaintiff was confronted with circumstances that prohibited him from timely making his March 3, 2007 delivery to Sodexho TSUM. His truck had broken down, and there were no means available–whether of his own accord or of others–of accomplishing the delivery. Once the "breach" involving Sodexho TSUM had occurred, Plaintiff used his best efforts to regain the account. He spoke with the Sodexho TSUM manager on three occasions promising to avoid any further delivery problems. He even enlisted the aid of two prominent elected officials, Montgomery City Councilman Knuckles and Montgomery County Commissioner Williams, to meet with this manager to convince her to allow him to resume deliveries, and on March 16, 2005, they accompanied Henry to Sodexho TSUM to meet with the manager. [Pl. Exhibit "4" and "6", Affidavits of Knuckles and Williams].

This Court will note that Plaintiff did succeed in reestablishing the account, but was prevented by Flowers from accomplishing this "cure' of the breach. The manager at Sodexho TSUM, as noted in Flowers's own internal document, agreed to allow Henry to resume deliveries to Sodexho TSUM.

> Q. "And then the document says: About that time, Henry
> said he talked to the lady at Troy State this morning, and
> she said he could come back and work her?"
> A. "She did."

21

Q. "Is that, who told you that?"
A. "The lady at Sodexho."

[Porterfield deposition, pp. 300-301]. Having received permission to serve the account

again, Flowers immediately prohibited Porterfield from entering the premises of the

Flowers warehouse, thus preventing Plaintiff from personally operating his own delivery

route. The reason for banning Plaintiff from the warehouse premises was that Grady

Messer claimed Plaintiff threatened him. Plaintiff denies making any threat to Messer or

any employee of Flowers, but does admit to stating Messer was "racist." [Porterfield

deposition, p. 303-304]. For purposes of summary judgment, this allegation of a

threatening statement is not to be considered by this Court as Plaintiff testified it is a false

statement; thus it cannot constitute any valid reason for terminating Porterfield or for

barring him from the warehouse.

After being banned from the Flowers warehouse, Plaintiff made arrangements for

his son Marcus Porterfield to go to the warehouse and run his delivery route. Marcus

Porterfield, though previously lauded by Steve Steverson, a vice president for Flowers, as

the "best pull-up man he had," was also prohibited from entering the warehouse or

running Porterfield's delivery route. [See Exhibit "5," para. 15, attached hereto]. Plaintiff

had further chosen Marcus to run his route because Marcus was familiar with the route,

had worked for Flowers as a pull-up man, and had rode with Plaintiff while working the

route on previous occasions. [See Exhibit "5," para. 15]

Taking Porterfield's statements as true, and viewing the testimony in a light most

22

favorable to Plaintiff,  Henry Porterfield substantially performed the terms of the 2002

Distributor's Agreement. This presents the Court herein with a question of material fact

on the issue of performance of the contract, for "substantial performance permits recovery

for a breach of contract by a party that has not performed all of its obligations under the

contract." City of Orange Beach v. Perdido Pass Developers, Inc., 631 So.2d 850, 853

(Ala. 1993).  In the same year the Alabama Supreme Court further held "...[W]hether a

party has substantially performed a promise under the contract is a *question of fact* to be

determined from the circumstances of each case." Bay City Construction Co. v. Hayes,

624 So.2d 1031, 1034 (Ala. 1993) (emphasis added). Moreover, "...'substantial

performance' of a contract does not contemplate exact performance of every detail..." Id.

And the extent of that performance is to be judged by a jury:  "Whether a party has

substantially performed a promise under a contract is a question of fact to be determined

by a jury." Cobbs v. Fred Burgos Construction Co., 477 So.2d 335, 338 (Ala. 1985).

     Herein, Plaintiff contends there is a question of material fact over complete, as

well as substantial, performance. After the March 3, 2005 Sodexho TSUM alleged

breach, Porterfield did, in fact, "cure" the alleged breach by receiving permission to

resume deliveries to Sodexho TSUM. Yet, at a minimum, Plaintiff substantially

performed. He called the manager three times to convince her to resume his delivery

service. He met with her in person. He brought two elected officials to her jobsite to plead

for the resumption of the service, and after being barred from making his own deliveries,

he arranged for his son to assume the deliveries. Yet at every turn, he was opposed by Flowers: first by prohibiting him from entering the warehouse on a false charge of threatening management, and second, by banning his replacement from entering the premises. Flowers, despite Porterfield's "best efforts" to cure the breach, and despite the fact that he did cure the breach, acted to make his performance impossible, and now Flowers seeks to argue an alleged lack of performance it contrived.

Finally, on this issue of Plaintiff's alleged nonperformance of his contract, the Court should consider the testimony of Charles Morrow, a twenty-five (25) year employee of Flowers, whose sworn testimony raises a jury question over whether Flowers acted intentionally to breach Plaintiff's contract and tortiously convert from Porterfield his delivery route. His November, 2005 affidavit certainly raises a question of material fact as to whether Flowers used the Sodexho TSUM affair as a pretext for its tortious acts and termination of Plaintiff's contract:

> "Most of this problem started more than a year ago, around the time we heard that Publix and Wal-Mart were going to be adding new locations to Henry's routes or not long after. *I have heard Grady Messer state he was going to find a way to get Henry terminated and get his route back*...I also know Grady was angry about Henry complaining over Flowers making us deliver out of date product to our accounts. He said to stop complaining or he would regret it...John Renfroe, a sales manager for Flowers, has said much the same to me about complaining over out of code product or product that was not fresh baked."

[See Exhibit "2," Affidavit of Charles Morrow (emphasis added)].

24

**B.** **There exists an issue of material fact as to whether "out of code" baked products, frozen and stored for months and stamped with false date stamps, constitutes "fresh baked goods" as required in the Distributor's Agreement executed by the parties.**

Defendant Flowers would have this Court believe that bread products baked and date stamped on the day they were baked, then transported to a warehouse often in a different city from where the bakery is located, stored in unfrozen for two to three days, then frozen and stored for three months in a warehouse freezer, then thawed and the original manufacture date secretly removed, then re-stamped with a current date months after they were baked, is the same as "fresh baked goods" delivered directly from the oven within hours or a few days of being baked. Although this position advanced by Defendant appears ludicrous on its face, Plaintiff nevertheless will address it by simply stating that there is a question of material fact on the issue of three month old frozen bread being "fresh baked goods" like the bread Flowers usually provides to its distributors for delivery.

Plaintiff states that this frozen bread is not "fresh baked goods" as required by Section Two (II) of the Distributor's Agreement. Conversely, Flowers contends that three month old frozen bread is "fresh baked goods." The contract does not define "fresh baked goods" but it does state that "maintaining a fresh market is a fundamental tenet of the baking industry..." and further states that as a result of this "fundamental tenet," "...out of code product on the market is a material breach of this agreement..." As neither Plaintiff Porterfield, nor Flowers employees and officers Lord, Bordeaux, or Messer, nor any other

25

corporate employee deposed in this case, has been identified or qualified as an expert on

bread freshness, this difference of opinion surely qualifies as a material issue of fact.

The poverty of Flowers Baking Company's position is best illustrated by its own

definition of the term "fresh," as explained by its President Steve Bordeaux during his

deposition:

> Q. "Well, let me see if you agree or disagree with this
> definition of "fresh" found in the American Heritage Dictionary.
> Not preserved as by canning, smoking, or freezing, for example
> fresh vegetables. Do you agree of disagree with that
> definition?"
> A. "Without actually having a dictionary in front of me, I'm
> going to disagree."
> Q. "All right. Let me give you another American Heritage
> definition of the word "fresh." recently made, produced,
> or harvested, for example, fresh bread. Do you agree with
> that definition?"
> A. "No, sir...."
> Q. Well, let's just say that it's not–let's just say that
> that's my definition. Do you disagree with my definition?"
> A. "As I stated awhile ago, I disagree and I disagree with
> your statement of the definition of that."
> Q. "And what is it about what I said that you disagree with?"
> A. "Every bit of it."
> Q. "Okay. So you disagree that recently made, produced, or
> harvested—you disagree with that. That's not a definition
> of fresh?"
> A. "That's correct."
> Q. "You disagree with not preserved as by canning, smoking,
> or freezing, for example, fresh vegetables. You disagree with
> that definition?"
> A. "Yes, I do."

[Bordeaux deposition, pgs. 63-64]. Obviously, there is nothing in the Distributor's

Agreement that supports this definition advanced by the President of Flowers.

The tenuous explanation of Flowers's need for three month old frozen bread to meet market demands of their restaurant customers is belied by their own history. Previous to 2000 or 2001, Flowers did not employ a freezer and did not deliver previously frozen bread to deliverymen, or store it in its warehouse, for a period of at many years. [Porterfield affidavit, para. 4]. Previous to this millennium, for a period of at least twelve (12) years when Flowers was serving restaurants then as it is now, the company managed to meet the demands of those restaurants with fresh baked (non-frozen) bread. Now, to meet those demands, Flowers contends that it must utilize a freezer to preserve bread for months.

Finally, nothing in Alabama's UCC regarding "best efforts" and "reasonable diligence and good faith" has ever been applied to frozen bread–or any product–that has been deliberately mislabeled or misdated. Furthermore, it contradicts Flowers's language in its own Distributor's Agreement regarding maintaining a fresh market, and out of code product being a "material breach" of the agreement. In sum, there is no law in support of Defendant's contention that its delivery and marketing of three month old bread as "fresh baked goods" is not a violation of its own contract. It is a question of fact that must be resolved by a jury.

**C.**     **Plaintiff is not estopped from asserting his breach of contract claim on Defendant's providing "out of code," or frozen, bread to Plaintiff rather than providing him "fresh baked product" as called for in the Distributor's Agreement executed by the parties.**

Defendant, by tacit omission, admits that estoppel does not apply to any of

Plaintiff's breach of contract claims with the exception of Plaintiff's claim that the Distributor's Agreement was breached by Defendant Flowers providing Plaintiff with "out of code" product. Defendant's reliance on estoppel, with regard to this specific breach, is misplaced.

Each and every case cited by Defendant, <u>Southern Energy Homes, Inc. v. Ard</u>, 772 So.2d 1131 (Ala. 2000), <u>Salisbury v. Semple</u>, 565 So.2d 234 (Ala. 1990), and <u>Cole v. Racetrac Petroleum</u>, 466 So.2d 93 (Ala. 1985), offer no guidance on the issue of estoppel as it applies to a breach of contract claim with these particular facts. Upon even a cursory review, all are readily distinguishable to such a compelling extent that they can bear no similarity to the facts herein. Moreover, there are issues of control, coercion, and fraud that distinguish this case form those cited by Defendant on this one point.

The <u>Ard</u> case was an arbitration case involving the same of a manufactured home, and it specifically concerned a violation of the Magnuson-Moss Warranty Act (Count II), fraudulent misrepresentation (Count III), and negligence (Count V). <u>Ard</u> at 1132. The defendant in that case was seeking to avoid a judicial trial by enforcement of an arbitration clause contained within the written warranty on the manufactured home. The defendant had filed a motion to compel arbitration, the trial court had denied that motion, and the defendant appealed.

In ruling that the motion to compel arbitration should have been granted by the trial court, the Alabama Supreme Court ruled that Plaintiffs Ards were bound by the

arbitration provision because they had accepted benefits arising from the warranty. Id. at

1135. The Court did not rule, as Flowers would have this Court rule, that a party is denied

his or her right to seek redress for breach of contract or warranty because he or she gained

some benefit from the contract; rather, the Supreme Court of Alabama ruled that under

these specific facts a party must seek redress by arbitration.

In sum, this ruling *supports* Plaintiff Porterfield's position: the Alabama Supreme

Court's holding in Ard is not that a Plaintiff may be denied its right of redress for breach

of contract, but only that it must assert that right through arbitration. Stated another way,

if Defendant Flowers is correct in asserting that a plaintiff is denied its right to seek

redress for breach of contract if (as alleged herein) a plaintiff derives some benefit from

the contract, then the Alabama Supreme Court would have ruled that Plaintiffs Ards could

not argue breach of contract or warranty at all, whether in arbitration or in a court of law,

because the Ards had received benefits from the warranty. This was not the ruling by the

Alabama Supreme Court.

Herein, as opposed to the Ard case, there is no position, analogous to arbitration,

asserted by either party. Were Plaintiff Porterfield seeking to avoid the enforcement of an

arbitration provision in the contract, Ard would offer guidance. Without such a provision,

it serves only to augment Plaintiff's position.

Neither Salisbury v. Semple, 565 So.2d 234 (Ala. 1990), or Cole v. Racetrac

Petroleum, 466 So.2d 93 (Ala. 1985), both cited by Defendant Flowers, support

Defendant's contention regarding estoppel. The <u>Salisbury</u> case only prevented one party

from not fulfilling all remaining provisions of a contract containing one illegal provision

(a non-compete clause), which is not remotely close or analogous to the facts herein.

Moreover, the <u>Salisbury</u> case specifically restricted itself to contracts where one party

"...had received all that he had bargained for..." and where one party "...received the

benefit he had bargained for..." <u>Salisbury</u> at 236. As shown in Plaintiff's complaint,

affidavits, and deposition excerpts, Plaintiff Porterfield expressly denies that he

"...received the benefit he had bargained for..." In fact, he alleges he has been deprived of

the benefit of his bargain, has been denied profits, income, and work, and has been denied

his right to receive the product as represented to him in the contract.

The <u>Cole</u> case supports Plaintiff Porterfield's position, not Defendant Flowers. In

that case, plaintiff Cole received monthly payments on a lease with defendant Racetrac

for ten years and then sought to invalidate the lease for a problem Cole knew existed from

the initial date of execution of the lease. The Court in <u>Cole</u> paid particular attention to the

fact that the plaintiff therein never impeached or questioned the lease, and then decided to

have it declared void. <u>Cole</u> at 96. Yet herein, Porterfield questioned the frozen bread

within months of the freezer being used, but was induced–by Defendant Flowers–to not

complain or question the use of frozen bread and to conceal this fraud from the customers

on his delivery route. He was further deceived with the representation that bread only two

months frozen and out of code was still "fresh." When he complained more forcefully, in

2003 and 2004 when provided with bread more than two months frozen, he was again told to remain silent and continue accepting the out of code product. Had he refused to accept the frozen bread, he would have had no product to give his customers and would have been in breach of his contract, as interpreted by Flowers.

In the Cole case, to be analogous to this immediate case, Racetrac would have been knowledgeable of the voidable problem with the lease from the outset and would have told Cole to ignore it, would have told Cole that the violation was not in fact a violation, and would have instructed Cole to continue accepting payments. Moreover, to complete the analogy, Cole would have complained to Racetrac that Racetrac was violating the terms of the lease, and Racetrac would have misrepresented some salient lease provision or fact to Cole to convince Cole to remain true to the lease. Finally, it would be required for Cole to know Racetrac would cancel the lease and/or sue Cole for breach of the lease if Cole tried to remedy the voidable condition. None of this is present in the Cole case.

It is of further import to note that while Plaintiff may have refused the frozen bread, as contended by Defendant, to do so would have resulted in a breach of his Distributor's Agreement. [Exhibit 5, Plaintiff affidavit, para. 6]. Refusing the bread would have left Plaintiff without product for certain customers, and Flowers would have treated the resulting failure to deliver goods to those customers as a breach. It is disingenuous to argue, as Defendant has herein, that their deliveryman is free to refuse the

frozen bread knowing the deliveryman will be terminated by exercising this freedom.

The three cases cited by Defendant Flowers do not support its contention that Plaintiff is estopped from asserting a breach of contract with regard to Flowers's use of out of code, three month old bread as opposed to "fresh baked goods" as required by the contract. To hold otherwise is to allow a tortfeasor to commit a fraud or conversion against the aggrieved party, to misrepresent the true facts to the aggrieved party, and to threaten the aggrieved party for acting to remedy the fraud. Alabama law will not support this interpretation of the law.

**D.**     **Plaintiff's claim for conversion contains issues of material fact to be decided by a jury and thus summary judgment is due to be denied on Plaintiff's conversion claim.**

Conversion may be proven in one of two ways. "To have a conversion claim, there must be (1) a wrongful taking, (2) an illegal assumption of ownership, (3) an illegal use or misuse of another's property, or (4) a wrongful detention or interference with another's property." Gillis v. Benefit Trust Life Ins. Co., 601 So.2d 951, 952 (Ala. 1992). Here, Defendant contends there is no issue of material fact on conversion because, at best, Flowers has merely failed to perform a contractual obligation and because it is operating Plaintiff's distributorship for him, thus it has not taken his property. This analysis is wrong.

First, when reviewing the evidence in a light most favorable to Plaintiff and when drawing all justifiable inferences in favor of Plaintiff as required by Alabama law, it is

clear that Flowers did far more than merely fail to abide by its contract with Plaintiff. The affidavit of Charles Morrow, attached herewith and quoted in detail above in Section III A of this brief, raises a strong inference that Flowers, through its sales manager Grady Messer, intentionally acted to deprive Plaintiff of his exclusive territory that he owned. His affidavit, executed in 2005, states that Flowers management began plotting against Porterfield in the year before he was terminated:

> "Most of this problem started more than a year ago, around the time we heard that Publix and Wal-Mart were going to be adding new locations to Henry's routes or not long after. *I have heard Grady Messer state he was going to find a way to get Henry terminated and get his route back*...

[Exhibit 2, Affidavit of Charles Morrow, paragraph 5 (emphasis added)].

This affidavit requires this Court to infer that the stated reason for terminating Plaintiff's Distributor's Agreement, namely the March 3, 2005 breach concerning the Sodexho TSUM account, was but a pretextual reason for termination, with the actual reason being Flowers's desire to regain control over a lucrative account. This account had more than doubled in revenues once the Publix and Wal-Mart stores were opened. Grady Messer stated he would "...find a way..." to regain the route once it became known the route would increase in value with the addition of new grocery stores. This is a far different, and a far more serious offense, than the dispute over the details of the Sodexho TSUM account.

Accepting Plaintiff's version of events as this Court must, the following additional

acts were committed by Flowers: (1) Flowers prohibited Porterfield from curing the Sodexho TSUM breach by not permitting him to run his delivery route; (2) Flowers prohibited Porterfield from using another person–Marcus Porterfield–from running the route for Plaintiff even though he had previously been an excellent employee; (3) Flowers did not allow Plaintiff to resume his route even though he had received permission from the manager of Sodexho TSUM to renew his deliveries to that account; (4) Flowers prevented Plaintiff from "curing" the Sodexho TSUM breach, and (5) Flowers, through Grady Messer, manufactured a false allegation of threatening behavior in order to prevent Plaintiff from operating his delivery route.

Flowers's contention that it is running Plaintiff's route for Plaintiff's benefit, and thus has not deprived him of his property,  is likewise without merit. First, it is without merit because Plaintiff need not prove Flowers has deprived him of his route; rather Plaintiff need only prove there is a material factual difference as to whether Flowers has committed "...a wrongful detention or interference with another's [Plaintiff's] property..." Id. Taking Plaintiff's route from his personal control, prohibiting Plaintiff from running his route, prohibiting Plaintiff from entering onto company property and banning him from the warehouse, all constitute, at a minimum, "interference" with his property.

Furthermore, this Court should note the extent of the misfeasance and questionable accounting practices undertaken and performed by Flowers since usurping Plaintiff's delivery route. Flowers has been unable to account for the money and expenses charged

34

to the account, and to this date cannot explain its weekly accounting summaries on this route. [Deposition of Woodham]. Since Flowers has assumed control of this route, a once profitable route has become unprofitable even though the revenues generated by the route have more than doubled. This unexplainable accounting of Plaintiff's expenses and revenue has cost Plaintiff thousands of dollars he would have otherwise earned. Instead, that income has gone into the coffers of Flowers, just as Messer intended when he heard of the two new grocery stores opening on Plaintiff's route. These acts constitute not only a "wrongful detention or interference" with Plaintiff's property, but they further constitute a "wrongful taking," "an illegal assumption of ownership," and "an illegal use or misuse of [his] property.

Plaintiff need only show an inference supporting these allegations in order to defeat summary judgment on the issue of conversion. The facts and testimony presented by Plaintiff clearly meet this burden, and summary judgment is thus due to be denied on the issue of conversion.

**E.    When viewing the evidence and inferences arising from the evidence in a light most favorable to Plaintiff, there are material factual issues present that require the submission of Plaintiff's wantonness claim to a jury.**

Defendant contends that Plaintiff's wantonness claim is not actionable because it is a "mere failure to perform a contract" and further because the elements of wantonness are not met when viewing the evidence most favorable to Plaintiff and when drawing all justifiable inferences, arising from the evidence, in Plaintiff's favor. Both of these

contentions are false.

The Alabama Supreme Court recently defined the term "wantonness" as follows: "...the 'conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'" <u>S.B. v. Saint James School</u>, 2006 So.2d (1031517) (Ala. 2006), citing <u>Alfa Mut. Ins. Co. v. Roush</u>, 723 So.2d 1250 (Ala. 1998). The Court has further elaborated upon wantonness conduct by opining "Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury. <u>Carter v. Treadway Trucking, Inc.</u>, 611 So.2d 1034 (Ala. 1992). Elaborating further on wantonness, the Court has held that "[t]o be guilty of wanton conduct, one must, with reckless indifference to the consequences, consciously and intentionally do some wrongful act or omit some known duty, and to be actionable, that act or omission must produce the plaintiff's injury." <u>Id</u>. Because "...what constitutes wanton misconduct depends on the facts presented in each particular case..." and thus presents a question of fact, wantonness is a question best decided by a jury. <u>Id</u>.

Herein, there is ample evidence to support wantonness, and certainly evidence and inferences arising from it, sufficient for submission to a jury. Charles Morrow, as noted in detail in Section III, A of this brief, testified that during the year previous to Porterfield's termination, Flowers sales manager Grady Messer stated he was "...going to find a way to

get Henry terminated and get his route back..." after learning of the new stores opening on Plaintiff's route. This testimony raises the inference of an intentional act and "...conscious culpability." Scott v. Villegas, 723 So.2d 642 (Ala. 1998). At a minimum, this evidence, and the inferences naturally arising from it, support an inference of "...a heedless and reckless disregard for the rights of another person, with consciousness that a pertinent act or omission may result in injury to another." Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1211 (Ala. 1999). Additionally, both Messer and Lord have stated that the alleged Sodexho TSUM breach was the sole reason for Plaintiff's termination, yet they refused to allow him to resume his route even though Plaintiff had "cured" the breach. Then Flowers fabricated a threat as an excuse to bar Plaintiff Porterfield from their warehouse, and immediately thereafter Flowers prohibited his son, Marcus Porterfield, from assuming the route when Plaintiff's son had been an exemplary employee who was familiar with Henry's route.

Defendant alleges in its brief that "...Flowers barred Plaintiff from its Montgomery warehouse only because senior management believed, in good faith, that Plaintiff had threatened Grady Messer." This fact is contradicted by Plaintiff; Messer lied about the threat according to Plaintiff. Defendant alleges that Plaintiff's Distributor's Agreement was terminated "...only after attempting to get him back into the Sodexho account..." This fact is contradicted by Plaintiff; in fact, Flowers prevented Plaintiff from resuming the Sodexho TSUM account. Finally, Flowers contends Plaintiff had a "...backdrop of

significant performance issues." However, President Lord and sales manager Messer both testified that previous issues with Plaintiff had absolutely nothing to do with their decision to terminate his Distributor's Agreement. In sum, every single reason Defendant offers as a justification for terminating Plaintiff's contract is directly contradicted by Plaintiff, Morrow, and by the testimony of Flowers's own witnesses. Summary judgment is thus due to be denied on Plaintiff's wantonness claim.

**F.    Plaintiff's breach of contract claim does not preclude him from asserting tort claims of conversion, wantonness, and fraud.**

Defendant asserts that a person who suffers a breach to a contract he has entered into cannot assert a tort claim on the facts that support his breach of contract claim. This analysis of Alabama law is mistaken. Generally, tort claims do not arise form the exact same facts that support a breach of contract claim on a contract entered into between a plaintiff and defendant. However, there is a major exception to this rule.

The case cited by Defendant in support of his argument that Plaintiff cannot assert a tort claim contains the following language contradicting Defendant's argument:

> " 'There is, in Alabama, no tort liability for nonfeasance
> for failing to do what one has promised to do in the absence
> of a duty to act apart from the promise made. On the other hand,
> misfeasance, or negligent affirmative conduct in the performance
> of a promise generally subjects an actor to tort liability as well as
> contract liability for physical harm to persons and tangible things....'"

Armstrong Business Services, Inc. v. AmSouth Bank, 817 So.2d 665, 681 (Ala. 2001). The Armstrong case cites Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala. 1985) for this broad exception to the general rule Defendant relies upon. In the Morgan case, the plaintiff had a contractual relationship with South Central Bell for listings in the telephone book, but South Central Bell breached its contract with the plaintiff by repeatedly failing to list plaintiff's business in the phone book. Consequently, he suffered business, or economic, losses. Allowing his tort claim to be submitted to the jury, the Alabama Supreme Court relied upon Prosser on Torts:

> "'Entering into a bargaining transaction, pursuant to which one party promises to do something, does not not alter the fact that there was a preexisting obligation to act with reasonable care to avoid harm.' Prosser, Selected Topics in the Law of Torts, 655, at 665-667 (1984)."

Morgan at 114.

Herein, there is ample evidence before this Court of "misfeasance" and "affirmative negligent conduct" on the part of Flowers. Indeed, there is evidence of intentional and wanton conduct on the part of Flowers specifically designed to harm Plaintiff. The harmful and damaging conduct of Flowers is detailed in Section III, D of this brief. Furthermore, Flowers went beyond the contract when it began using questionable and fraudulent accounting practices in running Plaintiff's route.

39

First, Flowers converted Plaintiff's delivery route, then, above and beyond the terms of the contract, they began to turn a profitable route into an unprofitable one, even though the revenues for the route doubled after the new stores were added to the route. When deposed, no one in the Flowers corporation could explain their accounting practices. Plaintiff, however, does have an explanation: Flowers is intentionally trying to show a loss on his route to suppress its fair value. When Plaintiff had the route, it had a positive value; after Defendant Flowers assumed it, the route, though doubled in revenues, had a negative value.

Were Defendant's position to be believed, no person could sue for a tort injury if the injury involved a contract. This misinterpretation would preclude a claim of conversion when a finance company or bank wrongfully repossesses an automobile from a customer who financed the car with a finance company or bank. According to Plaintiff, because the customer and financial institution entered into a contract, the customer could not sue for conversion over a wrongful repossession because the customer would be limited only to a breach of contract claim. When a financial employee acts maliciously or wantonly (as Messer did herein to convert Plaintiff's delivery route) to wrongfully repossess a customer's automobile, there could be no claim for conversion. Alabama law does not support such a narrow interpretation of tort law. Therefore, Plaintiff herein is entitled to submit his tort claims to a jury.

**G.    The After-Acquired Evidence Doctrine is inapplicable to this case.**

Defendant contends that Plaintiff cannot claim any damages herein due to alleged improper accounting practices, and bases this position on the federal doctrine of after-acquired evidence discovered during the course of litigation. However, there is a factual dispute over the accounting practices Defendant relies upon, Plaintiff unequivocally denied the only specific instance of improper activity he was accused of, and the cases relied on by defendant for this doctrine are all federal discrimination cases that have never been applied to any diversity case based on state law.

Defendant bases its argument on McKennon v. Nashville Banner Publishing Company, 513 U.S. 352 (1995). However, McKennon is a United States Supreme Court age discrimination case. It is specifically limited to federal discrimination claims, and nowhere in the opinion is it extended to diversity cases applying state law. Similarly, United States Circuit Courts of Appeal have not extended this doctrine beyond federal discrimination claims. See Sparrow v. United Air Lines, 276 F.3d 1111 (D.C. Ct. App. 2000) (race discrimination claim); Pascouau v. Martin Marietta Corp., 185 F.3d 874 (10th Cir. 1999) (sexual harassment claim); Vichore v. AMBAC, Inc., 106 F.3d 457 (2nd Cir. 1996) (race discrimination claim); Kennedy v. Owesso Group, 134 F.3d 371 (6th Cir. 1998) (age discrimination claim); Bergelson v. Laidlaw Transit, 141 F.3d 1173 , (9th Cir. 1998) (age and religious discrimination claim); Bowers v. NCAA, 475 F.3d 524 (3rd Cir. 2007) (disability discrimination claim)..

Defendant attempts to interpret <u>Quillen v. American Tobacco Co.</u>, 874 F. Supp. (M.D. Ala. 1995) as extending this doctrine into claims and causes of action not involving federal discrimination. The <u>Quillen</u> case does not support this interpretation. In <u>Quillen</u>, the trail judge was deciding a Title VII discrimination case.[1] The case does not expressly extend the after-acquired evidence doctrine to any pendant state claims. Moreover, the case rests largely on the Eleventh Circuit case of <u>Turnes v. AmSouth Bank</u>, 36 F.3d 1057 (11th Cir. 1994), a case that likewise concerned a Title VII discrimination claim. Defendant has failed to cite any Alabama or Eleventh Circuit case extending this doctrine to purely state claims such as the ones presented in this diversity case applying Alabama state law.

Yet even if this Court were to presumptuously apply this doctrine to purely state claims in the absence of any federal discrimination claim, the Court would still have to submit this issue to the jury. The <u>Turnes</u> case holds that even if a Plaintiff proves a prima facie discrimination claim, "...it remains for the factfinder to determine whether, absent any illegitimate motive, AmSouth would have discovered Turnes' credit history and if so, whether it would have rejected him on that basis." <u>Turnes</u> at 1062. As in <u>Quillen</u>, when the trial court rejected the argument to limit damages on the

_____

[1] Defendant represents to this Court that the after-acquired doctrine, in the <u>Quillen</u> case, is extended to "cases arising in contract and/or tort." Plaintiff disagrees. The <u>Quillen</u> case was a Title VII discrimination case with pendant state claims, but the decision issued by Judge Albritton was solely and exclusively related to the Defendant American Tobacco Company's motion for summary judgment on the Title VII claims only. The after-acquired evidence analysis does not apply to the state claims.

basis of after-acquired evidence, the Defendant must show "...without dispute..." that it would have terminated Defendant solely on the basis of this after-acquired evidence. Quillen at 1296.

Defendant cannot make this showing because first, the evidence of wrongdoing is not specific and clear, and second, because Defendant has excused many past allegations of wrongdoing on Plaintiff's part in the past. Plaintiff only concedes that his accounting was "sometimes" proper and that it is "possible" he engaged in unauthorized transactions. [Porterfield deposition, p. 153-154]. Moreover, and far more relevant, Defendant's own brief and factual submissions belie their argument that Flowers would have terminated Plaintiff's Distributor's Agreement had they been aware of his "possible" unauthorized transactions or "shorting" of accounts. Defendant's assertions on this issue are belied by the fact that Plaintiff was terminated solely for the loss of the Sodexho TSUM account and not for any past transgressions. Defendant claims he was guilty of theft of $30,000.00 on the Gunter AFB account (paragraph 20 of Defendant's brief); that he was forced out of an account for this theft (paragraph 21 of Defendant's brief); that he shorted the Bama Lanes account (Plaintiff deposition, p. 154); and that he suffered numerous breaches in service (paragraph 44, 48-50 of Defendant's brief). Based on Flowers' refusal to terminate Plaintiff for these many improprieties, a jury question is surely presented as to whether these acts "...were not in fact as important as [Defendant] now contends." Id. When there is a

dispute in the evidence, as exists here as in Quillen, "...this is a question of fact" as it was in the Quillen case. Id.

Because the doctrine of after-acquired evidence is a doctrine not extended to exclusively state law claims in federal diversity cases, as it is a doctrine utilized by federal courts exclusively on discrimination cases, as it is a doctrine not recognized by law in Alabama courts, and/or because there is a dispute in the evidence based on Defendant Flowers' own prior acts, this issue of damages is a question for a jury.

**H.**    **Punitive damages on Plaintiff's claims of conversion, wantonness and fraud are questions for a jury and should not be denied on summary judgment.**

Plaintiff is entitled to punitive damages on its claims of conversion, wantonness, and fraud if there is evidence Flowers "...consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Alfa Mut. Fire Ins. Co. v. Payton, 742 So.2d 1228 (Ala. 1997); citing Section 6-11-20(a), Ala. Code (1975) and Ex Parte Norwood Hodges Motor Co., 680 So.2d 245 (Ala. 1996). As discussed previously in Section III, D and E, there are undeniable inferences of a deliberate and conscious act of conversion and wantonness to be drawn from the testimony of Charles Morrow and the actions of Defendants in preventing Plaintiff from "curing" his alleged breach, in barring him from the company warehouse, and in preventing him from running his delivery route.

Defendant would have this Court believe there is no evidence to support

punitive damages against Flowers, and were Defendant's testimony deemed to be true when in conflict with Plaintiff's, and were all reasonable inferences to be drawn in Defendant's favor, there would be some measure of merit to this argument. However, the converse is observed on summary judgment, and all of Defendant's assertions in Section IV, G are contradicted by facts and inferences presented by Plaintiff.

Defendant contends, in its brief, that Flowers "...gave Plaintiff repeated chances to cure his breaches..." The contrary is true. Defendant fabricated a story about Plaintiff making a threat to Grady Messer; Defendant barred Plaintiff from the warehouse thus preventing him from personally running his route; Defendant prohibited Plaintiff's son from running Plaintiff's route; and Defendant prevented Plaintiff from resuming deliveries to Sodexho TSUM after he had received permission from the Sodexho TSUM manager to begin anew his deliveries.

Defendant further contends in its brief that Flowers "finally" terminated Plaintiff only "[a]fter numerous curable breaches..." Yet Defendant's own witnesses unequivocally state Plaintiff's alleged prior breaches had absolutely nothing to do with his termination. [Bordeaux deposition, p. 18; Messer deposition, p. 53]. They unequivocally insist Plaintiff was terminated only because of the alleged Sodexho TSUM breach–an alleged breach they worked diligently to prevent Plaintiff from "curing."

The Payton Court opined that such evidence in that case "...if believed by the

jury..." could support a finding of "...clear and convincing evidence..." that supported

punitive damages. Generally, the "issue of whether defendant's conduct was

committed willfully, wantonly, or intentionally is a question for the jury on the issue

of punitive damages." <u>Surrency v. Harbison</u>, 498 So.2d 1097 (Ala. 1985). As ample

evidence exists for the imposition of punitive damages, a jury should decide these

damages and summary judgment is due to be denied on the issue of punitive damages.

I.    **Plaintiff's damages for being provided three month old frozen, or out of code, bread, as opposed to fresh baked goods, are sufficient for purposes of summary judgment.**

        Plaintiff's Distributor's Agreement entitles him to receive "fresh baked goods,"

however, Flowers has instead been providing Plaintiff with frozen bread, sometimes

three months old, to deliver to customers he served on his route before that route was

taken from him. Moreover, Defendant has further made Plaintiff a party to a fraud by

having him deliver bread with false date stamps affixed to it. By providing Plaintiff

with a product that is not as advertised, not fresh, and mislabeled, Flowers subjects

Plaintiff to potential lawsuits from those customers he has delivered Flowers' product

to, and thus exposes him to suffering money damages as the agent of Flowers who

delivered a misrepresented product to them.

        Although Plaintiff could have chosen to not deliver the frozen bread supplied

by Flowers, he would not have had product to meet his customer's needs had he

chosen to refuse the frozen goods, and he would have then been in breach of his

agreement with Flowers for a failure of delivery. In effect, Flowers forces its deliverymen to use its frozen products, and thus they are forced to become a party to a fraud. Exposing others to tortious conduct and forcing them to act in concert with a fraud, on pain of losing one's livelihood, is damaging conduct. Therefore, Plaintiff has suffered damages.

Plaintiff need not prove his damages in any exact amount. He need only "...produce evidence tending to show the extent of damages as a matter of just and reasonable inference." Jamison, Money, Farmer & Co. v. Standeffer, 678 So.2d 1061, 1067 (Ala. 1996). As this case is merely being reviewed on summary judgment, Plaintiff contends he need only show that reasonable inferences, arising from the evidence, when viewed in a light most favorable to Plaintiff, show that he has suffered damages. Plaintiff has made that showing and summary judgment on the issue of Plaintiff's damages related to being furnished frozen bread is due to be denied.

**J.**    **Plaintiff concedes that damages for mental anguish and emotional distress are not recoverable under the breach of contract claim filed herewith; Plaintiff seeks the recovery of said damages on its claims for conversion, fraud, and wantonness.**

**K.**    **Plaintiff concedes that all claims arising prior to the execution of the March 11, 2002 Distributor's Agreement are released.**

**L.**    **Plaintiff concedes that its fraud claims are untenable for reasons lack of**

47

**reasonable reliance**.

Respectfully submitted this the 26th day of July, 2007.

/s/ GREG L. DAVIS (DAV077)
Greg L .Davis (DAV077)
Dan W. Taliaferro(TAL006)
Attorneys for the Plaintiff

**OF COUNSEL:**

The Law Offices of:
GREG L. DAVIS
6987 Halcyon Park Drive
Montgomery, Alabama 36117
(334) 832-9080
(334) 409-7001 Fax

Dan W. Taliaferro
Attorney at Law
6987 Halcyon Park Drive
Montgomery, Alabama 36117
(334)409-0545
(334)409-7001 Fax

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all parties of record, as listed below, by placing same in the United States Mail, postage prepaid and properly addressed on this the 26th day of July, 2007.

Kevin P. Hishta
Sandra B. Reiss
OLGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203

/s/ Greg L. Davis
OF COUNSEL

49