COPY [1]

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HENRY PORTERFIELD,

     Plaintiff,

  vs.                 CIVIL ACTION NO.
                     2:05-CV-937-MEF

FLOWERS BAKING COMPANY OF
OPELIKA, LLC,

     Defendant.


\* \* \* \* \* \* \* \* \* \* \* \*


**DEPOSITION OF GRADY MESSER**, taken

pursuant to stipulation and agreement before Tracye

Sadler, Certified Shorthand Reporter and

Commissioner for the State of Alabama at Large, at

the Tiger Town Inn, 205 21st Street, Opelika,

Alabama, on May 7, 2007, commencing at

approximately 1:20 p.m.


\* \* \* \* \* \* \* \* \* \* \* \*


HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

150

```
*  *  *  *  *  *  *  *  *  *  *  *  *
```

WITNESS SIGNATURE PAGE

```
*  *  *  *  *  *  *  *  *  *  *  *  *
```

In Re:  Henry Porterfield vs. Flowers Baking Company

    I, **GRADY MESSER**, hereby certify that I have read the foregoing transcript of my deposition given on May 7, 2007, and it is a true and correct transcript of the testimony given by me at the time and place stated with the corrections, if any, and the reasons therefor noted on a separate sheet of paper and attached hereto.

_____
**GRADY MESSER**

    SWORN TO AND SUBSCRIBED before me this 24ᵗʰ day of _____May_____, 2007.

_____
NOTARY PUBLIC

    MY COMMISSION EXPIRES:

_____
NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Aug 15, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

## _CORRECTION SHEET_

| _PAGE_ | _LINE_ | _CORRECTIONS_ |
|---|---|---|
| 94 | 20 | Should be thawed |


(Witness)

2

1                          APPEARANCES

2


3    ON BEHALF OF THE PLAINTIFF:

4    Mr. Greg L. Davis
     LAW OFFICES OF GREG L. DAVIS
5    Attorneys at Law
     6987 Halcyon Park Drive
6    Montgomery, Alabama  36117


7    ON BEHALF OF THE DEFENDANT:

8
     Ms. Sandra B. Reiss
9    OGLETREE, DEAKINS, NASH, SMOAK & STEWART
     Attorneys at Law
10   One Federal Place, Suite 1000
     1819 Fifth Avenue North
11   Birmingham, Alabama  35203


12
     ALSO PRESENT:
13
     Mr. Henry Porterfield
14   Mr. Michael Lord

15


16                * * * * * * * * * * *

17


18                EXAMINATION INDEX

19
     BY MR. DAVIS . . . . . . . . . . .     5
20   BY MS. REISS . . . . . . . . . . .   137
     BY MR. DAVIS . . . . . . . . . . .   143
21


22
              (Index continued on next page)
23

3

## PLAINTIFF'S EXHIBITS

1     Sketch of Montgomery Warehouse                    135

2     3-16-05 E-mail to Steve Bordeaux/Michael          136
      Lord from Grady Messer

3     3-7-05 Breach Letter to Mr. Porterfield           136
      from Grady Messer

* * * * * * * * * * * *

## STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of **GRADY MESSER** is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Tracye Sadler, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the Statute.

It is further stipulated and agreed by and

4

1    between counsel representing the parties in this

2    case that the filing of said deposition is hereby

3    waived and may be introduced at the trial of this

4    case or used in any other manner by either party

5    hereto provided for by the Statute regardless of

6    the waiving of the filing of the same.

7         It is further stipulated and agreed by and

8    between the parties hereto and the witness that the

9    signature of the witness to this deposition is

10   hereby not waived.

11

12              *  *  *  *  *  *  *  *  *  *  *  *

13

14              THE COURT REPORTER:  Usual

15                  stipulations?

16              MR. DAVIS:  Yes.

17              MS. REISS:  He's going to read it

18                  and sign.

19

20

21

22

23

5

**GRADY MESSER**

1

2      The witness, after having first been duly sworn

3   to speak the truth, the whole truth, and nothing

4   but the truth, testified as follows:

5                        EXAMINATION

6   BY MR. DAVIS:

7    Q.   Please state your name for the record.

8    A.   Grady Messer.

9    Q.   Mr. Messer, what's your current address?

10   A.   6221 Wynfrey Place, Montgomery, Alabama,

11        36117.

12   Q.   And who do you live there with?

13   A.   My wife.

14   Q.   And what's her name?

15   A.   Phyllis.

16   Q.   What is your -- it's my understanding --

17        what's your current position, or do you

18        have a current position?

19   A.   Director of sales.

20   Q.   How long have you been there?

21   A.   About 16 years.

22   Q.   And that's with Flowers?

23   A.   Flowers Baking Company of Opelika.

6

1   Q.   What's your educational background?

2   A.   High school.

3   Q.   When did you get out of high school?

4   A.   '61.

5   Q.   Once you got out of high school, what was

6        the first job that you had?

7   A.   I believe -- that's a long way back.  But I

8        believe it's Anniston Manufacturing

9        Company.

10  Q.   And what did you do for Anniston

11       Manufacturing Company?

12  A.   Worked in -- it was a cotton mill.

13  Q.   Did you grow up in Anniston or --

14  A.   No.

15  Q.   Where did you grow up?

16  A.   Growed up in Delta, Alabama.

17  Q.   Where is Delta?

18  A.   That is probably 35, 40 miles south of

19       Anniston.

20  Q.   Is it close to Roanoke?

21  A.   Kind of.

22  Q.   I'm just trying to think of where it's at.

23  A.   Yeah, kind of.  It's -- you ever heard of

7

```
1        Lineville?

2   Q.   I know where Lineville is.

3   A.   Okay.  It's pretty close to Lineville.

4   Q.   How long did you work at Anniston

5        Manufacturing Company?

6   A.   Probably two or three years.

7   Q.   What did you do after that?

8   A.   Grocery store.

9   Q.   In Anniston?

10  A.   No.  In Talladega.

11  Q.   What did you do there at the grocery store,

12       what kind of work?

13  A.   Well, a little of everything.  My uncle

14       owned the business, so ...

15  Q.   And how long did you work for your uncle?

16  A.   Golly.  Two or three years.  I'm not sure.

17  Q.   How long -- what was the next job you had?

18  A.   Flowers.

19  Q.   And so what year?

20            You went to work there in --

21  A.   Let's back up.  McGough Bakeries.

22  Q.   McGough?

23  A.   McGough, M-C-G-O-U-G-H.
```

8

1   Q.   How long did you work for McGough Bakeries?

2   A.   I went to work in '68, and I think Flowers

3        Baking Company bought McGough out in '73.

4        And, like I say, I think that's ...

5   Q.   What did you do when you first went to work

6        for McGough Bakers?

7   A.   Route salesman.

8   Q.   How long were you a route salesman?

9   A.   Probably four years.

10   Q.   What was the next position you had with

11        McGough?

12   A.   Supervisor.

13   Q.   And then were you supervisor when Flowers

14        bought you out in 1973?

15   A.   Yes.

16   Q.   What position did you assume at Flowers?

17   A.   The same.

18   Q.   And what geographic area was McGough

19        Bakers -- Bakery and what area did they

20        cover?

21   A.   At one time they had a bakery in

22        Birmingham, one in Montgomery, one in

23        Decatur, Alabama.  So basically that part

9

1       of Alabama.  It was independent.

2   Q.  Once Flowers purchased it in '73, did you

3       stay at the same physical location?

4   A.  Yes.

5   Q.  And was that in -- what city were you in at

6       that time?

7   A.  That was in Birmingham.

8   Q.  How long did you stay in Birmingham?

9   A.  I think it was about eight years.

10  Q.  Were you a supervisor the entire time that

11      you were in Birmingham?

12  A.  Yes.

13  Q.  Did they transfer you to another facility?

14  A.  After I left Birmingham, I went to work for

15      Flowers Baking Company of Opelika in

16      Montgomery, Alabama.

17  Q.  What position did you assume when you went

18      to work in Montgomery?

19  A.  Sales manager.

20  Q.  And that was in what year?

21  A.  '80 -- I believe around '80, '81, '82,

22      somewhere in that neighborhood.

23  Q.  Okay.  As sales manager what was your --

10

1       what did you do?  What was your job duties?

2  A.   The duties were to oversee the sales of

3       Flowers baked goods in the Montgomery area.

4  Q.   How many salesmen or route -- I don't know

5       what -- did you have all route people, like

6       independent contractors, or did you have

7       actual in-house people working for you at

8       that time?  What did you have?

9  A.   In 1980?

10  Q.   In 1980, '81, '82.

11  A.   There was company salespeople.

12  Q.   How many company salespeople did you have?

13  A.   I'm not sure right offhand but probably 25

14       or so.

15  Q.   And was that for just the Montgomery area

16       or was that Opelika, Birmingham, and

17       Montgomery?

18  A.   No, no.  My area back then was Montgomery,

19       Selma, Greenville.

20  Q.   How far east did you go?

21  A.   In 1980, probably Tallassee, I believe, is

22       as far as I went.

23  Q.   What about north?

11

1    A.    North I went to Clanton.

2    Q.    All right.  You had about 25 salespeople

3          working underneath you that were actually

4          delivering Flowers products at that time;

5          is that right?

6    A.    Or Sunbeam.

7    Q.    Or Sunbeam?

8    A.    Yes.

9    Q.    And how long did you remain sales manager?

10   A.    I was there about two years.

11   Q.    Then what happened?

12   A.    Then I went to work for Flowers Baking

13         Company of Gadsden.

14   Q.    What position there?

15   A.    Same position, sales manager.

16   Q.    Why did you move from Montgomery to

17         Gadsden?  Was it an increase in pay or was

18         it --

19   A.    Well, yeah, it was and --

20   Q.    Was it a promotion?

21   A.    -- better opportunity.

22              No.  It was a lateral move.

23   Q.    How many salespeople did you oversee in

12

1        Gadsden?

2    A.   Probably around the same.  I'm not sure.

3        It's been a long time.

4    Q.   And how long did you remain in Gadsden?

5    A.   I was there about five years.

6    Q.   What was the next position you held with

7        Flowers?

8    A.   Okay.  I left Gadsden and went to

9        Birmingham, back to Birmingham.  I was --

10       let's see -- I want to say around '87 vice

11       president of sales.

12   Q.   And how long were you vice president of

13       sales?

14   A.   About four years.

15   Q.   And what was your job duties and

16       responsibilities as vice president of

17       sales?

18   A.   Basically to overlook the sales of Flowers

19       products, customer contact, things of that

20       nature.

21   Q.   Did vice president of sales -- was that the

22       next position up above a sales manager?

23   A.   That's correct.

13

1   Q.   How many sales managers did you oversee as
2        vice president of sales?
3   A.   We had two.
4   Q.   And where were they?
5   A.   They were in Birmingham.
6   Q.   Did you oversee any sales managers in the
7        Montgomery market?
8   A.   No.
9   Q.   Or Gadsden market?
10  A.   No.
11  Q.   Was it a different vice president of sales
12       that handled those particular markets?
13  A.   That is correct.
14  Q.   You were there for four years in
15       Birmingham.  What was your next position?
16  A.   Was director of sales in Montgomery,
17       Alabama, for Flowers Baking Company of
18       Opelika.
19  Q.   What does the director of sales do?
20  A.   It oversees the sales of Flowers products,
21       contact -- you know, customer contact.
22  Q.   Is that a step above vice president of
23       sales or basically the same type position?

14

1 A. It's a step right below.

2 Q. Right below?

3 A. Yes.

4 Q. So you went down when you went back to

5   Montgomery?

6 A. That's right.

7 Q. What was the reason that you went down in

8   position?

9 A. I don't know.

10 Q. Was it a cut in pay?

11 A. No.

12 Q. Who made the decision to move you down to

13   director of sales in Montgomery?

14 A. Probably Mr. Lord.  Probably Gene Lord.

15 Q. Was there a problem in Birmingham that

16   caused you to be demoted to director of

17   sales?

18 A. I don't know.

19 Q. As vice president of sales did you know of

20   anything that would have caused you to be

21   demoted?

22 A. I did not.

23 Q. Had your sales been falling below a certain

15

```
 1         level?
 2    A.   When you say a certain level, what do you
 3         mean by that?
 4    Q.   Did y'all have a quota or did y'all have,
 5         you know, a projection that you wanted
 6         sales to be at and did you meet your quota
 7         or your sales goals while you were vice
 8         president of sales in Birmingham?
 9    A.   I'm really not sure.  I'm sure we had
10         goals, you know, that we -- you know, you
11         got profit goals and sales goals.  So, you
12         know, like I say, I'm not sure.
13    Q.   Well, you've been with the company a
14         while.  You didn't have any idea why you
15         got demoted?
16    A.   Not really, no.
17    Q.   Nobody ever told you any reason why?
18    A.   They just had plans for, you know,
19         Birmingham.
20    Q.   Who assumed your position as vice president
21         of sales in Birmingham?
22    A.   I believe Carter Wood.
23    Q.   Was he working in the Birmingham office at
```

16

1      that time?

2  A.   No.

3  Q.   Where was he?

4  A.   I think he was in Opelika at the time.

5  Q.   So they moved you to director of sales in

6       Montgomery in, what, '91 -- '90, '91?

7  A.   I think it's '91.

8  Q.   All right.  As director of sales, were

9       sales managers beneath you the next step

10      down?

11 A.   That's correct.

12 Q.   How many sales managers did you have in

13      '91?

14 A.   Four.

15 Q.   And they covered the same market area --

16      Clanton, Selma, Greenville, Tallassee,

17      Montgomery -- that you talked about

18      earlier?

19 A.   Yeah.  Tuskegee, Alex City.

20 Q.   All within that geographic area?

21 A.   Right.

22 Q.   Who were your sales managers back then?

23 A.   In '91?

17

1    Q.    In '91.

2    A.    Jim Bob Smith was one of them.  Billy

3          Reed.  I believe Woody Jaye.  And I think

4          Chris Tate.  I'm not -- I'm not sure of the

5          dates.  They have been my sales managers

6          before.  I'm not sure ...

7    Q.    How long did you stay director of sales in

8          the Montgomery market?

9    A.    That is my job now.

10   Q.    So from '91 until 2007 you've been director

11         of sales?

12   A.    That's correct.

13   Q.    Who do you report to in the Montgomery

14         market now presently in 2007?

15   A.    Michael Lord.

16   Q.    Michael Lord?

17   A.    Yes.

18   Q.    What's his position with Flowers?

19   A.    Vice president, Opelika.

20   Q.    How many sales managers do you have now in

21         2007?

22   A.    We have four.

23   Q.    Who are the sales managers now?

18

```
 1   A.   Now?

 2   Q.   Now.

 3   A.   We've got Steve Stevens, John Renfroe,

 4        Billy Reed, and Jeff Powell.

 5   Q.   Okay.  How many routes are there in the

 6        Montgomery market?

 7   A.   Now, what do you mean by the Montgomery

 8        market?  The market I just told you or --

 9   Q.   Yeah.  Well, you've got four sales

10        managers.  I assume that they each have --

11   A.   Well, two of the sales managers -- one of

12        the sales managers is in Selma; okay?

13   Q.   Right.  Which one is that?

14   A.   That's Billy Reed.  He has Selma, Clanton,

15        Greenville.

16   Q.   Okay.

17   A.   Then Jeff Powell has got Alex City and

18        Tallassee.

19   Q.   Okay.

20   A.   The other two --

21   Q.   Renfroe and Stevens.

22   A.   -- Renfroe and Stevens, was in the

23        Montgomery market.
```

19

1    Q.   How many routes are there in the Montgomery

2         market with those two sales managers?

3    A.   With those two managers, I believe we've

4         got 17.

5    Q.   How many of those 17 are company-owned

6         routes?

7    A.   Not any.

8    Q.   How many routes do you have in the Selma

9         market?

10   A.   Well, Selma, Greenville, Clanton -- six.

11   Q.   In the Alex City market?

12   A.   Six.

13   Q.   Are any of the Selma or Alex City markets

14        company-owned routes?

15   A.   No.

16   Q.   Since 1991 to present have there been any

17        company-run routes while you've been

18        director of sales?

19   A.   Yes.

20   Q.   When's the last time there was a

21        company-run route?

22             MS. REISS:   Company-run or

23                  company-owned?

20

1           MR. DAVIS:  Company-owned.

2    A.    I believe we sold the routes to

3          distributors in ninety -- in '94, '95, I

4          believe, is when we sold them.  Somewhere

5          in that neighborhood.

6    Q.    So since '94 or '95 all the routes have

7          been run by distributors such as like

8          Mr. Porterfield, an independent contractor?

9               MS. REISS:  I want to object to

10                   the extent you asked for

11                   company-owned.  Now you're

12                   using the term company-run.

13                   There is a difference.

14   Q.    Company-owned since 1994, 1995.

15   A.    Since we went independent distributors.

16   Q.    Since you've had independent distributors.

17         Since that time?

18   A.    We had two private label routes that we

19         was -- you know, was -- during that time --

20         since that time.  But since then they

21         have -- they have been discontinued.

22   Q.    Okay.  Do you know Henry Porterfield?

23   A.    I absolutely do.

21

1    Q.    How long have you known Mr. Porterfield?

2    A.    I think we met in '91.

3    Q.    You were working at the Montgomery location

4          in '91; right?

5    A.    Yes.

6    Q.    How was it that you came about meeting him

7          in '91?

8    A.    He was a salesperson.

9    Q.    Was he a -- did he work for Flowers at that

10         time as an employee?

11   A.    He did.

12   Q.    What was his job then as an employee of

13         Flowers?

14   A.    He was a salesman.

15   Q.    Did he have a route?

16   A.    He had a route.

17   Q.    Was he already working there in 1991 or was

18         he hired in 1991?

19   A.    No.  He was already there when I came.

20   Q.    And in 1991 did you still have about 17

21         routes?

22   A.    In the Montgomery --

23   Q.    In the Montgomery market?

22

1   A.   -- warehouse?

2        Somewhere in that neighborhood.  I'm

3      not sure exactly, but ...

4   Q.   Who was Mr. Porterfield's sales manager in

5      1991?

6   A.   I believe -- and I'm not sure, but I

7      believe it's probably Woody Jaye.

8   Q.   After Woody Jaye, who was the next sales

9      manager for that -- who covered Henry

10     Porterfield?

11        When I say covered it, was his

12     supervisor.

13   A.   Yeah.  It may have been Steve Stevens.  I'm

14     not exactly sure, but I think it was.

15   Q.   Did Steve Stevens remain his sales manager

16     up until the time he left Flowers --

17     Mr. Porterfield left Flowers?

18   A.   Yes.  Steve Stevens is still sales manager.

19   Q.   So from the time that you've been there

20     Woody Jaye or Steve Stevens would have been

21     Mr. Henry Porterfield's sales manager?

22   A.   I think so.

23   Q.   And when did Mr. Porterfield first become

23

1      an independent contractor for Flowers

2      Baking of Opelika?

3             I think you told me earlier that 1994

4      is when y'all started.

5   A.  I think -- I'm not sure --

6                MS. REISS:  We can't help you.

7   A.  I'm not sure of the date.

8   Q.  Okay.  Well, it was after you came to

9      Montgomery that --

10  A.  Oh, yes.  Yes.  It was somewhere in '94,

11     '95.  I'm not sure.  I don't know.

12  Q.  As director of sales in Montgomery what

13     would you do on a daily basis?

14  A.  My daily basis is -- of course, I make sure

15     everything is -- you know, we get all of

16     our products, customer relations, visit

17     stores, collect money on ARs.  I spend time

18     in my other markets, you know, Alex City,

19     Troy, Clanton.

20  Q.  Anything else?

21  A.  Basically, you know, just everyday running

22     the business, you know, other than -- that

23     covers most everything, you know.

24

1   Q.   When you say you gather the products, what

2       do you mean by that?

3   A.   Well, I didn't say gather the product.

4   Q.   Oh, okay.  What do you do?

5   A.   My first -- my first thing in the morning

6       is to basically touch bases with my sales

7       managers to make sure they've got all their

8       products that they ordered.

9   Q.   In the warehouse or --

10   A.   Well, yeah, the different warehouses

11       that -- yeah.

12   Q.   Okay.

13   A.   And, like I say, basically touch base with

14       them, see if they've got any kind of

15       problems or -- and if we got all our

16       products and things like that.

17   Q.   How many products does Flowers distribute

18       currently?

19   A.   A lot of them.  I'm not sure.  Talking

20       about cakes, bread -- soft bread, hard

21       breads.  I'm not sure.

22   Q.   Any products other than products with

23       Flowers' name?

25

1    A.    Oh, yes.

2    Q.    What other products?

3    A.    Sunbeam, Nature's Song, Roman Meal,

4          Cobblestone Mill, Blue Bird Cakes.  We

5          distribute some private labels:

6          Winn-Dixie, Great Value, Ideal, Oven

7          Fresh.  That's some of the --

8    Q.    On private label, what's private label?

9    A.    Private label is a store brand.

10   Q.    So like on Winn-Dixie it would be

11         Winn-Dixie brand?

12   A.    Winn-Dixie bread, yes.

13   Q.    You said that one of your job duties was

14         customer relations.  What is that?

15   A.    That's calling on customers, you know,

16         contacting them on a regular basis.

17   Q.    Like customers that your route salesmen

18         deliver to or --

19   A.    Yes.  Well, that's some of them, yeah.

20   Q.    What other type customers do you call on?

21   A.    Some of them is the -- the supervisors with

22         different groups, the district managers.

23   Q.    I don't follow you.  Like what -- I

26

1     understand like if there's, you know, a

2     Hardee's that you're selling to that's on

3     somebody's route, maybe customer relations

4     with that.

5  A.  Yeah.

6  Q.  What else are you talking about?

7  A.  Take for instance Wal-Mart; okay?

8  Q.  Okay.

9  A.  Wal-Mart has their store directors.  They

10     have their managers, you know, store

11     managers, and then they also have district

12     managers that's over a number of stores,

13     seven, eight, ten stores, you know.  Then

14     they have the merchandising managers, so --

15  Q.  But it's still customers that ultimately

16     all of your route salespeople call on?

17  A.  Well, actually, yeah, I suppose so.

18  Q.  I mean, if it's not people that they

19     actually call on, it's people connected to

20     the company --

21  A.  Oh, yeah.

22  Q.  -- that they call on?

23  A.  Correct.

27

1  Q.  And when you say visit stores, are you

2      talking about stores that actually buy the

3      product from Flowers or -- that your route

4      salesmen are actually calling on like

5      Wal-Mart or Hardee's or Burger King or any

6      of those stores?

7  A.  That's right.

8  Q.  And you said you collect money on ARs.

9  A.  Right.

10 Q.  What's an AR?

11 A.  AR is accounts receivable.

12 Q.  So do you have someone in -- or do y'all

13     have a department called accounts

14     receivable at your Montgomery location?

15 A.  No.

16 Q.  So your job -- that's one of your job

17     duties --

18 A.  Right.

19 Q.  -- is to collect on all accounts

20     receivable?

21 A.  In my area, that's correct.

22 Q.  I thought maybe you were talking about

23     maybe just problem accounts, but you're

28

1   talking about all accounts?

2 A. Right.  If they're an authorized charge.

3 Q. And then you said you spend time in other

4   markets.  And when you said other markets

5   were you talking about the Selma market and

6   the Alex City market, those markets?

7 A. That's right.

8 Q. Anything else that you do on a daily basis?

9 A. That covers the biggest -- like I say,

10   just -- there might something come up, but

11   that basically covers it.

12 Q. All right.  As director of sales how often

13   do you come in contact with the route

14   salespeople?

15 A. Well, some of them that -- some of them is

16   daily.  If I'm in the office and at the

17   warehouse and they come in, I see them.  If

18   I'm out on the market in maybe one of their

19   stores, I see them out there.  So it

20   depends, you know.  I might see -- I might

21   see one every day, you know, if I just

22   happen to be around the warehouse office

23   when he comes in.

29

1   Q.   How often did you see or did you come into

2        contact with Mr. Henry Porterfield?

3   A.   Probably one or two times a week probably

4        minimum.

5   Q.   Any specific reason why you came into

6        contact with him or was it just in and out

7        of the facility there that you would run

8        into your route salesmen at the Montgomery

9        location?

10  A.   Well, a lot of -- a lot of times would be

11       that he would come to the warehouse when he

12       come in in the afternoons.  On occasions I

13       would see him out in his market.  On some

14       other occasions I would be seeing some of

15       his customers for some problems that he

16       might have.

17  Q.   How many different times did customers

18       complain about Mr. Porterfield to you?

19  A.   I don't know.

20            MS. REISS:  Since he started in

21               Montgomery?

22            MR. DAVIS:  Right.

23  A.   I don't really have a number, but quite a

30

1     few.

2    Q.   Like more than five, less than five?

3    A.   More than five.

4    Q.   More than ten, less than ten?

5    A.   Probably more than 20.

6    Q.   How many more than 20?

7    A.   I really don't -- I don't -- I can't

8     recall.

9    Q.   More than 50?

10   A.   I can't recall.  I don't keep up with the

11     times that ...

12   Q.   What kind of complaints do you recall?

13   A.   On one occasion he had left the bread on

14     the outside of the -- I think this was a

15     Krystal.  He left the bread sitting on the

16     outside of the back door, left a ticket

17     sticking in it.  And, of course, they

18     called about that.

19       Another time he was barred from working

20     a stop.  I want to say this might have been

21     a Burger King.  We had several occasions

22     that we had Krystal, Burger King that --

23     that we had occasion ...

31

```
 1          On Gunter Air Force Base we had a
 2          problem that come in contact with him where
 3          he had been barred from the base and
 4          couldn't work it.
 5     Q.   Okay.
 6     A.   Several occasions on where he had, like
 7          I say, got -- him and the manager of some
 8          of the stores had had words.  That's just a
 9          few of them.
10     Q.   And whenever you have a problem like this,
11          is this what y'all call a breach of the
12          contract?  Is this --
13     A.   A curable breach, yes.
14     Q.   A curable breach?
15     A.   Uh-huh (positive response).
16     Q.   On the incident that you recall where bread
17          was left outside of Krystal, was that a
18          curable breach?
19     A.   That was definitely.
20     Q.   And just for the record, what's a curable
21          breach?
22     A.   A curable breach is a breach where he has
23          ten days to satisfy it.
```

32

1    Q.    You also said that he was -- in one

2          instance that you remember he was barred

3          from working a stop.  Do you know what stop

4          that was?

5                    MS. REISS:  I'm going to object to

6                        the form.  He said it was more

7                        than one incident.

8    Q.    Do you recall any stops he was barred from

9          working?

10   A.    One of them was Gunter Air Force Base

11         Commissary.

12   Q.    I've got that one.  You told me that's the

13         third one.  Before that you said you

14         remember an instance he was barred from

15         working a stop.

16   A.    Okay.

17   Q.    Was there one before Gunter or were you

18         talking about the same ...

19   A.    Some of them had called in and didn't want

20         him to work them and we would go out and

21         see them or he would get back in and he

22         would cure his breach.

23   Q.    All right.  Let's talk about the Gunter Air

33

1      Force Base one for a second.  What do you

2      recall about that breach?

3  A.   Okay.  I -- I don't know.  I remember

4      getting a call from them and going out and

5      meeting with the security people several

6      times.  They supposedly had him on tape

7      where he was taking bread out and wouldn't

8      give him credit and they barred him from

9      the base.  They didn't want him back on the

10     base.  They said that he had supposedly

11     stolen $30,000 or up to $30,000.  And they

12     barred him from the base.  He couldn't go

13     back on base -- the Air Force Base anymore.

14  Q.   When was that roughly?

15  A.   I believe it was roughly '98, 1998.

16  Q.   Was he ever allowed to go back on the base?

17  A.   No.

18  Q.   Did anyone else start servicing that

19     account?

20  A.   Yes.  I think -- I believe he -- I believe

21     he got someone to work it for him.  I'm not

22     sure.  Like I say, that's been about nine

23     or ten years ago.

34

1   Q.   Was Mr. Porterfield given a ten-day notice

2        letter back in 1998 regarding the Gunter

3        Air Force Base account?

4   A.   I think so.

5   Q.   Was that breach cured?

6   A.   I think it might have been when he got

7        someone else to work it.

8   Q.   How long a time period was it between the

9        ten-day notice letter and when he actually

10       got someone to work it?

11  A.   I don't remember.

12  Q.   Was it months?

13  A.   Well, we -- we as a company -- we probably

14       had extra people that worked it the next

15       day, but I'm not sure how long it was.

16  Q.   Was it more than ten days before he got

17       someone --

18  A.   Before he got somebody?

19  Q.   -- to work it?

20  A.   I'm not sure.

21  Q.   Your records, though, would indicate how

22       long it was, wouldn't they?

23  A.   I would imagine, yes.

35

1   Q.  Any other instances that you recall sitting

2       here today where Mr. Porterfield was barred

3       from working a stop?

4   A.  Troy State Sodexho Marriott.

5   Q.  When was that?

6   A.  That was in March of 2005, I believe.

7   Q.  Tell me what you recall about

8       Mr. Porterfield being barred from working

9       at Troy State Sodexho Marriott.

10  A.  I understand that he didn't deliver their

11      bread that day.  The lady called in and I

12      believe he told her he had truck problems.

13      Which, you know, had he had truck problems

14      and he had called one of us -- when I say

15      one of us, myself or Steve Stevens, sales

16      manager, certainly we would have helped him

17      out and carried bread down there.

18         But I think it was later on in the day,

19      and I think Mr. Stevens went down and

20      talked to the lady.  And that's when she

21      told him that she didn't want Henry back in

22      to service her anymore.

23  Q.  Was that the same day that she had called

36

1        in?  Did it all happen in a one-day period?

2    A.   I'm really not sure whether -- it was

3         probably either that day or the next day

4         one.  I'm not sure.

5    Q.   Was Mr. Porterfield sent a breach letter, a

6         ten-day breach letter on the Troy State

7         Sodexho Marriott account?

8    A.   Yes.

9    Q.   Was that breach cured?

10   A.   No.

11   Q.   Does Flowers service Troy State Sodexho

12        Marriott now currently, today?

13   A.   Troy State -- Sodexho Marriott is a big

14        company, you know, and they have units all

15        over the world -- all over the United

16        States, you know.  This particular one at

17        Troy State in Montgomery, we lost it to our

18        competitors.

19   Q.   Which was who?

20   A.   I believe it was Colonial at that time.

21   Q.   And when did you lose it to them?

22   A.   When he -- I understand when he didn't

23        carry the bread back.

37

```
1    Q.   Okay.  Let me ask you this just so I
2         understand it:  With an account like Troy
3         State, is that an account that Flowers
4         Baking Company has and then they give it to
5         a distributor or is that an account that a
6         distributor goes out and gets or can it be
7         both?
8    A.   Sodexho or Troy State --
9    Q.   Any account.  I'm just saying, you know --
10        let's just kind of walk through an
11        account.  Like can a route salesman go get
12        a brand new account?
13   A.   Yes.
14   Q.   If there's somebody in his geographic
15        exclusive territory that moves into it, he
16        himself can go out and call on store "X"
17        over here and get that account?
18   A.   If it's in his territory.
19   Q.   If it's in his territory.  Can the sales
20        manager also go out and call on a store to
21        try to get that store for one of his
22        salesmen in that area?
23   A.   In that particular area, yes.
```

38

1   Q.   Can you also call on somebody in that

2        particular area and try to get that store

3        for the route salesman that controls that

4        geographic area?

5   A.   Yes.

6   Q.   Once you get that store or that business,

7        whatever it is that's buying bread from

8        Flowers, is the person that has the most

9        contact with that store the route salesman?

10  A.   It's the person that that area -- that's in

11       that territory.

12  Q.   Right, that's in that territory.

13  A.   Yes.

14  Q.   As far as actual ordering product, does

15       that person order product only through the

16       route salesman responsible for that

17       geographic area or is it set up where it's

18       ordered through the company somehow?

19            And maybe I'm not asking a good

20       question.  Let's try it this way.  Let's

21       just take company "X" out here.

22  A.   Okay.

23  Q.   And company "X" needs -- they're going to

1    have a big function tomorrow and they need

2    a thousand buns.  Do they pick up the phone

3    and call you down at Flowers, or how do

4    they order that for that special event, you

5    know, when it's coming up?  Or do they call

6    somebody like Henry Porterfield that

7    services them and say get me some more

8    buns?  Or how does all that work?

9    A.    Well, it works, I guess, both ways.  They

10    could tell the person that runs the route

11    in that territory or they could pick the

12    phone up and call.

13    Q.    And talk to whom once they picked up the

14    phone and called?

15    A.    Well, we -- we got a thrift store at our

16    warehouse location, and they possibly may

17    talk to the girl there at the store or one

18    of the managers may be in the office.

19    Q.    How does the route salesman know what to

20    deliver every week?  Like does he get a

21    report telling him you need to take this

22    many buns to this place or this many to

23    that place or how does he know what to

40

1          deliver where?

2     A.   Well, we have an average sell-off that we

3          go by, you know, four-week average.  And we

4          try to order by the average of what they

5          usually sell, of course, taking in

6          consideration holidays, you know, events

7          and things like that.

8     Q.   Is that something that the route salesman

9          figures up and computes and decides what to

10         carry each week, or do y'all give him some

11         kind of printed report saying carry, you

12         know, three cases of this to this place and

13         two cases of that to another place?  How

14         does the route salesperson know what to

15         take?

16    A.   Okay.  It's in his hand-held computer and

17         it gives him an average.  And he can either

18         go with what the computer dictates to him

19         or he can change that.

20    Q.   Okay.  A hand-held computer is one of those

21         little --

22    A.   Yeah.

23    Q.   -- what, four-by-eight, four-by-ten little

1        hand-held computers?

2    A.    That's correct.

3    Q.    What kind of information is contained

4        within the hand-held computer?

5    A.    It's got each customer's name, address, the

6        products they normally sell, their average

7        sell-off.  It prints out his ticket every

8        day.

9    Q.    Is there a particular program that that

10        computer runs, some type of software that

11        it runs to keep up with all of that?

12    A.    I'm sure it is, but I'm not -- I don't get

13        into that part of it.

14    Q.    Okay.  So the computer, is it linked to

15        your home office computer --

16    A.    Yes.

17    Q.    -- or is it independent all by itself and

18        not connected in any way?

19    A.    Oh, it's linked to Opelika, yes.

20    Q.    Is it like wireless or something?

21    A.    Well, yes, it's wireless.

22    Q.    You don't have to go plug it in anywhere

23        for it to be --

42

```
 1   A.   Well, at night they plug it in or put it in

 2        its little holder, yes.

 3   Q.   But like when he's -- when a route

 4        salesperson is out in the field delivering

 5        product and he has it with him, if he

 6        changes something, then automatically it

 7        gets sent back to Opelika to the main

 8        computer?

 9   A.   Once he carries it in and puts it in his

10        holder and plugs it in at night.

11   Q.   And then it syncs at night?

12   A.   Then it communicates.  Of course, there

13        again, it -- you know, it gives him an

14        order, each stop.  When he gets in in the

15        afternoons, he checks up with his -- it

16        prints out his settlement sheets and, you

17        know, his tickets and everything.

18   Q.   Like when he delivers product, does he type

19        into that little hand-held that he

20        delivered a certain amount of product?

21   A.   Yeah.  It tells how much he delivers,

22        right.

23   Q.   But, I mean, does he have to physically put
```

1         that into the little hand-held, I've

2         delivered four cases of buns to Hardee's?

3  A.   I think so. I'm not that -- I never --

4         I don't know how to work one, okay, but I

5         think it does.

6                MS. REISS: Don't guess if you

7                   don't know.

8  Q.   But if I came in to run the route and I had

9         never run the route before and you gave me

10        the hand-held computer and you showed me

11        how to operate it, I could look at it and I

12        would know that I had to go to the first

13        stop and the first stop I had to deliver,

14        you know, ever how many cases of product to

15        that stop. And I could look at it and the

16        second stop it would tell me how many cases

17        I had to deliver there. Would that be

18        fair?

19  A.   Well, if you come in, we would have --

20        somebody that knew about the computer would

21        go teach you; okay?

22  Q.   Right. Right.

23  A.   But, yeah, it would have each stop on it,

44

1    yeah.

2    Q.    And I could look at the information

3          provided there and I would know not only

4          the stop but how much product needed to go

5          to each stop?

6    A.    It would have on there what you ordered as

7          far as the week before, yes.

8    Q.    And is it typical that places typically

9          order about the same each week?

10   A.    Possible.  It could -- you know, it could

11         vary.

12   Q.    Could fluctuate a little bit, but --

13   A.    It could vary.

14   Q.    So I would know that the last week if 20

15         cases of buns were delivered, then this

16         week I probably ought to have 20 cases of

17         buns for them again?

18   A.    Probably so.

19   Q.    Does it tell me -- like earlier you

20         mentioned that certain stops want product

21         every day.  Does it tell -- if I looked at

22         it, would it tell me that, you know, every

23         day -- Monday, Tuesday, Wednesday,

45

| | | |
|---|---|---|
| 1 | | Thursday, Friday -- I have to go to |
| 2 | | Wal-Mart to deliver product? |
| 3 | A. | If it was programmed in for you to work it |
| 4 | | every day, yes. |
| 5 | Q. | And it would tell me how much product I had |
| 6 | | to deliver each day? |
| 7 | A. | There again, you're ordering the products a |
| 8 | | week ahead and whatever you ordered for -- |
| 9 | | it would be on there what you ordered for |
| 10 | | it the week before. |
| 11 | Q. | Let me ask you this:  Are there stops that |
| 12 | | want their product delivered at a certain |
| 13 | | time? |
| 14 | A. | Oh, yeah. |
| 15 | Q. | By looking at the computer would I know, |
| 16 | | then, that a certain stop I had to deliver |
| 17 | | between, you know, noon and three o'clock? |
| 18 | | Would that information be included on |
| 19 | | there? |
| 20 | A. | The stops -- and I'm not sure whether the |
| 21 | | time is on in the computers or not.  But |
| 22 | | the stops are numbered, you know, one, two, |
| 23 | | three, four, five.  And once you work this |

1    stop, then your next stop you normally work

2    comes up on the computer next.

3  Q.  So it tells you -- it directs you which

4    stop to go to next?

5  A.  I think so.

6  Q.  But let's say as an independent contractor

7    I didn't want to start working till like

8    one o'clock in the afternoon.  Everybody

9    else started to work at eight o'clock in

10   the morning or six o'clock in the morning.

11   Would that throw me off if certain people

12   only wanted their product delivered at a

13   certain time?

14  A.  Your job -- or your independent

15   distributor, if he can satisfy that

16   customer by working at one o'clock in the

17   afternoon, that's fine with us, you know.

18  Q.  But if the customer wants it delivered at

19   one o'clock, then I need to have it there

20   at one o'clock?

21  A.  I would imagine.

22  Q.  You told me about the Gunter Air Force Base

23   stop, about him being barred there.  You

```
 1          told me about the Troy State Sodexho.  Is

 2          there any other stops that you recall

 3          Mr. Porterfield ever being barred from?

 4     A.   There's other stops that he had problems

 5          with.  I'm not -- you know, I can't recall

 6          the ones that he was barred from.  Like I

 7          say, it's been several years ago, but

 8          there's other stops that he had problems

 9          with.

10     Q.   Was he given ten-day notice letters of a

11          breach on those occasions?

12     A.   Yes, on a lot of occasions he was.

13     Q.   Is that your normal and customary practice

14          to give ten-day notice letters if there's a

15          problem with anything on the route?

16     A.   Yes.

17     Q.   And who is it that decides that it's a

18          breach of the contract?

19     A.   Well, we have a -- like I say, the contract

20          spells it out really, you know.

21     Q.   So all you have to do is look at the

22          contract to determine if it's a breach?

23     A.   Well, if you have a customer to call in
```

48

1    complaining about something, then, you

2    know, certainly it's -- you go talk to them

3    or they tell you on the telephone and that

4    a lot of times determines whether it's a

5    breach or not.

6    Q.    You told me earlier that there were several

7          occasions where he, being Mr. Porterfield,

8          and a manager of a store had words.  Do you

9          recall any specifics of that happening?

10   A.    I think one of them was Burger King, Carter

11         Hill Road.

12   Q.    Tell me what you remember about that one.

13   A.    I think it had to do -- like I say, it had

14         to do with trays and not stacking the

15         trays, him not picking -- not going to pick

16         them up if they didn't stack them.  That

17         was one of the occasions.

18   Q.    Any other occasion where Mr. Porterfield

19         and a manager of a store had words that you

20         recall?

21   A.    Another one, I think, was -- and, like I

22         say, I'm not sure whether it was a Krystal

23         or a Burger King where he left bread on the

1    outside of the store.

2    Q.   That's the one you told me about earlier;

3         right?

4    A.   That's correct.

5    Q.   Anything else?  Any other occasion where

6         Mr. Porterfield and a manager of a store

7         had words?

8    A.   Right offhand I can't -- like I say, it's

9         been -- been a lot of years between them,

10        you know.

11   Q.   Okay.

12                  MS. REISS:  Greg, when you get to

13                     a good stopping point, let me

14                     know so we can take a little

15                     break.

16                  MR. DAVIS:  Sure.  We can go ahead

17                     now if you want to.

18                  (A brief recess was taken.)

19   Q.   (Mr. Davis continuing:)  Let me ask you

20        this:  Who was it at Flowers that made the

21        decision to terminate Mr. Porterfield?

22   A.   When you say terminate, you mean terminate

23        his contract?

50

1    Q.    Yes.

2    A.    I guess Mr. Lord's.

3    Q.    All right.  Did you participate in that?

4    A.    Yes.  I wrote the breach letter.

5    Q.    For what reason was Mr. Porterfield's

6          contract terminated?

7    A.    For him losing the -- not being able to

8          work Troy State Sodexho Marriott.

9    Q.    Anything else?

10   A.    That's the reason his contract was

11         terminated.

12   Q.    Did Sodexho Marriott ever allow

13         Mr. Porterfield back onto their facility?

14   A.    Not to my knowledge.

15   Q.    If they had, would you have known about it?

16   A.    I'm sure I would, yeah.

17   Q.    But y'all don't handle that account

18         presently; is that right?

19   A.    We handle Sodexho Marriotts, yes.

20   Q.    But do you handle Sodexho Marriott for Troy

21         State University?

22   A.    The Troy State in Montgomery, I don't think

23         we handle it.

51

1    Q.    When Mr. Porterfield called on the Troy

2          State Sodexho Marriott account, was that

3          just Montgomery Troy State?

4    A.    The one that he called on?

5    Q.    Yes.

6    A.    Yes.

7    Q.    Because Troy State has various locations.

8    A.    Yes.  They've got locations in Troy,

9          Alabama, you know.

10   Q.    And Dothan and --

11   A.    Yeah.

12   Q.    -- different parts around the state.

13   A.    Right.

14   Q.    The only account that he called on was the

15         Troy State Montgomery?

16   A.    That's correct.

17   Q.    The Sodexho Marriott account -- Sodexho

18         Marriott has locations that they service

19         all over?

20   A.    All over, yes.

21   Q.    When you said we still service Sodexho

22         Marriott, what were you referring to?

23   A.    We service all over other than that one.

52

1          We still service Troy State in Troy,

2          Alabama, you know, Sodexho.

3    Q.    In a different geographic route?

4    A.    Yeah.

5    Q.    Any Sodexho Marriott accounts within the

6          route that Mr. Porterfield had that are

7          there now that you would call on?

8    A.    I'm really not sure.  It's possible, but

9          I'm not sure.

10   Q.    Was it -- and explain to me just so the

11         record is clear --

12   A.    Okay.

13   Q.    -- Sodexho Marriott is what?

14   A.    That is a company that comes in and maybe

15         handles the lunchrooms or the kitchens of

16         different locations, hospitals, schools,

17         things like that.

18   Q.    And they are contracted with whatever

19         school, hospital, military installation,

20         whatever it might be to run a particular

21         operation, for instance, the cafeteria of

22         that installation or university or whatever

23         it is?

53

1    A.    As far as I know, yes.

2    Q.    And Troy State or whatever the institution

3          is can recontract with somebody else to run

4          that part of their facility at any time?

5    A.    I don't know.

6    Q.    If Troy State terminates its contract with

7          Sodexho and picks up another contract with

8          another servicing company, that has nothing

9          to do with Flowers?

10   A.    If we -- you know, if we have serviced that

11         company that comes in and takes it from

12         them, we would work it, you know.

13   Q.    You would work it?

14   A.    Yes.

15   Q.    But if not --

16   A.    If not, we would not unless we, you know,

17         sold them on it.

18   Q.    Okay.  So just so I'm clear, the reason

19         that Mr. Porterfield's contract was

20         terminated was because he lost the account

21         with Troy State Sodexho Marriott?

22   A.    That's correct.

23   Q.    And that was it.  That was the only

54

1     reason?

2   A.   Right.

3   Q.   And who did you meet with at Flowers

4     concerning that decision?

5   A.   Who did I meet with?

6     Probably talked on the telephone to

7     Michael and -- yeah.

8   Q.   What did you and Michael talk about

9     regarding Mr. Porterfield losing the

10    account with Troy State Sodexho Marriott?

11  A.   Okay.  We gave him the breach letter,

12    ten-day breach --

13  Q.   That's what you sent him?

14  A.   That's correct.

15  Q.   And then during that ten-day period -- did

16    you talk to Michael during that ten-day

17    period?

18  A.   I'm sure I did, yeah.

19  Q.   What did y'all talk about?

20  A.   I don't remember at this time.  But during

21    the ten-day period I talked with Henry.

22    During that time Henry called me one day

23    and wanted to know if I could talk with

1       him.  I said sure.  And he said we'll be

2       there in about 30 minutes.

3           In about 30 minutes Henry and a

4       Mr. Williams and a Mr. Knuckles -- I

5       believe was his name -- came walking in my

6       office.  And I was expecting Henry only.

7       He didn't say he was bringing someone else

8       with him; okay?  And I think both of them

9       were city councilmen at that time.  I think

10      one of them may have been Henry's pastor.

11          Anyway, we sat down and they was asking

12      me -- they said they had been down to Troy

13      State to talk to the lady about getting

14      Henry back in the store -- or the unit, and

15      the lady would not even talk with them.

16      And I explained to them that, you know, I

17      wasn't going to discuss Henry's business

18      with them.  That was personal between

19      Henry, you know.  And they said, well, they

20      was just trying to help Henry.

21          And the lady down there wouldn't even

22      talk to him about it.  And one of the guys

23      asked me -- I think it was Mr. Knuckles

56

1     asked me did -- how long did he have to get

2     back in the stop. And I told him it was a

3     ten-day breach. And he looked around to

4     Henry and said, well, you got -- you got

5     several days to work on that stop.

6         And after a brief conversation between

7     us they get up and leave. And Henry lagged

8     back and -- I don't know. He and I made a

9     few conversations, and he made the remarks

10    that somebody might get killed over this --

11    no, no, no, I'm sorry -- somebody might die

12    over this. I said, Henry, are you

13    threatening me? He said, I'm not

14    threatening you. I'm just telling you

15    there's more people going to get hurt over

16    this than me. And then he turned around

17    and left.

18  Q.  All right. Any other conversations that

19    you had with -- well, let me back up. I

20    was talking about to begin with

21    conversations you had with Michael, and we

22    kind of got sidetracked here.

23  A.  Okay.

57

1    Q.    In that ten-day period how many

2          conversations do you think you had with

3          Michael?

4    A.    I don't really remember how many we had.

5    Q.    Okay.

6    A.    Michael and myself generally talk every day

7          about something, not necessarily a

8          distributor or whatever but about

9          something.

10   Q.    Did y'all talk during that ten-day period

11         about Mr. Porterfield?

12   A.    I'm not sure.

13   Q.    And I may be wrong, but I thought you told

14         me earlier that it was Michael that made

15         the decision to terminate Henry; is that

16         right?

17   A.    I think so.

18   Q.    Tell me how that came about.

19   A.    Well, when he was given the ten-day letter,

20         you know, he couldn't get back in the

21         stop.  And then once he came and talked to

22         me that day and made the threatening

23         remarks, then certainly I e-mailed Michael

1    and was telling him about the meeting we

2    had.  The conversation was talked about and

3    everything.  And that's when the -- I think

4    the letter went out to bar him from the

5    premises for threatening -- when he

6    threatened me that morning -- that

7    afternoon.

8  Q.   And who was it that sent that letter?

9  A.   I believe it was Michael.

10  Q.   Did you have any other conversations --

11       let's back up.

12            From the time you sent the ten-day

13       breach letter you told me about one

14       conversation you had with Henry when he

15       came into the office with two other

16       gentlemen.  During that time period did you

17       have other conversations with Henry?

18  A.   I believe -- I'm not sure.  I think we met

19       with Henry.  I think Mike and myself did.

20       I'm not sure.

21  Q.   And when was that?

22  A.   It was sometime during -- I believe it was

23       during that ten-day period.

1   Q.   And what was the reason that y'all met with

2        him during that ten-day period?

3   A.   I don't remember.  I just remember us

4        meeting.

5   Q.   Was it -- obviously it was before you sent

6        him the letter to bar him from the

7        premises?

8   A.   I think so.  I believe.  I'm not sure.

9   Q.   Did y'all meet with him to discuss the Troy

10       State Sodexho Marriott account?

11  A.   I feel sure that was on the agenda, yes.

12       That's probably what it was about.

13  Q.   What do you recall Henry saying during that

14       conversation?

15  A.   I don't know.  He had his brother with

16       him.  I don't remember.

17  Q.   Is that Robert?

18  A.   I don't remember what his name was.

19  Q.   But he had one of his brothers with him?

20  A.   One of his brothers was with him.

21  Q.   And did his brother say anything?

22  A.   His brother said a few things.  And at that

23       time, you know, Michael told him we wasn't

60

1      going to discuss Henry's business with him,

2      you know.

3   Q.   What do you recall his brother saying?

4   A.   I don't remember what he said.

5   Q.   How many brothers does Henry have that you

6      know about?

7   A.   That's the only one.  And I don't even know

8      whether that's his brother or not.  He said

9      it was.  I guess it was.

10  Q.   You never met him before that day?

11  A.   It's possible, but I didn't -- I didn't

12     remember him if I had.

13  Q.   But you and Michael and Henry and his

14     brother were meeting, and you think it was

15     between the time of the ten-day breach

16     letter and the date you sent him the letter

17     saying don't come back on the premises?

18  A.   I can't recall really.

19  Q.   Well, it wasn't after the letter went out

20     where you told him not to come back on the

21     premises, was it?

22  A.   No.  It was probably before that letter.

23     I'm not sure.

61

1   Q.   And y'all had to be discussing the Troy

2        State Sodexho Marriott account; correct?

3   A.   I would imagine, yes.

4   Q.   So if you were discussing that, there

5        wouldn't have been a reason to discuss it

6        before the ten-day notice letter went out

7        because that's when you found out about the

8        breach; is that right?

9   A.   Yes.

10  Q.   So wouldn't it seem logical that it was

11       between the date that you sent out the

12       ten-day notice letter and the date you

13       barred him from coming on the premises?

14  A.   I would imagine.

15  Q.   That's two times during that time period.

16       Any other times that you talked to Henry

17       during that time period?

18  A.   I don't think so.

19  Q.   Did Henry make any threatening comments to

20       you when him and his brother came into your

21       office?

22  A.   Well, him and his brother didn't come into

23       my office.

62

```
 1    Q.   I'm sorry.  When they met with you and

 2         Michael, wherever that was.

 3    A.   That was at a restaurant.

 4    Q.   What restaurant was that?

 5    A.   I believe it was Tenda Chick.

 6    Q.   What was the reason that y'all met at

 7         Tenda Chick?

 8    A.   We just met at a restaurant.  No particular

 9         reason it was that particular one.

10    Q.   That wasn't part of Henry's route?

11    A.   No.

12    Q.   All right.  When y'all met at the

13         restaurant, at the Tenda Chick, you,

14         Michael, Henry and his brother, was there

15         anyone else present?

16    A.   No.

17    Q.   During that meeting did Henry make any

18         threatening remarks to you?

19    A.   I don't think so, no.

20    Q.   Had Henry ever made any threatening remarks

21         to you prior to that time?

22    A.   To me, no.

23    Q.   And the remarks that you felt threatening,
```

1          tell me what those were again.

2   A.   When he started to leave, he made a comment

3          that someone might die over this.  And I

4          asked him was he threatening me.  He said,

5          no, I'm not threatening you, but more

6          people is going to get hurt than me.

7   Q.   Anything else he said?

8   A.   I believe that's all.

9   Q.   Anything else you said?

10   A.   No.

11   Q.   But you thought that was a threat?

12   A.   Yes.

13   Q.   Did you contact the police?

14   A.   Not at that time.

15   Q.   Did you ever contact the police?

16   A.   We did.

17   Q.   When was that?

18   A.   When he received -- when we sent the letter

19          to him barring him from the warehouse.

20   Q.   And what did you tell the police when you

21          contacted them?

22   A.   We asked them -- we told them the

23          situation, that we was barring someone from

64

1      the warehouse and that we may be calling --

2      if he came in, that they might be calling

3      them.  And they -- they told us, you know,

4      that they couldn't do anything until it

5      happened, so ...

6  Q.    You didn't fill out any reports with the

7      police?

8  A.    No.  They would not.

9  Q.    Did you ever fill out a report with the

10      police that you felt like you had been

11      threatened?

12  A.    No.

13  Q.    Any type of harassment lawsuit?  Have you

14      ever filed anything civilly against

15      Mr. Porterfield?

16  A.    No.

17  Q.    You didn't file anything with any police or

18      any sheriff's department or any law

19      enforcement authority whatsoever regarding

20      this threat that Mr. Porterfield allegedly

21      made to you?

22  A.    No.

23  Q.    Did you think that Mr. Porterfield was

65

1        threatening you?

2   A.   I didn't know.

3   Q.   How many years have you worked with

4        Mr. Porterfield?

5   A.   Since '91.

6   Q.   He's never threatened you before then?

7   A.   No.

8   Q.   Did you think Mr. Porterfield was going to

9        do something to you?

10   A.   I didn't know.

11   Q.   Had he ever indicated that he might do

12       anything to you?

13   A.   No.

14   Q.   Ever give you any indication to believe

15       that he might carry out the alleged threat?

16   A.   No.

17   Q.   Have you ever seen him do anything to

18       anybody else?

19   A.   No.

20   Q.   Never seen him beat up anybody or hit

21       anybody?

22   A.   No.

23   Q.   Never seen him kill anybody?

66

1    A.    No.

2    Q.    Anything at all that you can tell me

3          sitting here today that would in your

4          opinion support your belief that

5          Mr. Porterfield might kill you?

6    A.    Just the remarks that he made.

7    Q.    Nothing else?

8    A.    No.

9    Q.    Did you think that Mr. Porterfield might

10         kill you at that time?

11   A.    I didn't know.

12   Q.    But you didn't call the police to let them

13         know?

14   A.    No.

15   Q.    All right.  You sent out this letter

16         barring Mr. Porterfield from the premises;

17         correct?

18   A.    Yeah.  I believe Mr. Lord sent that out.

19   Q.    Once that was sent out, did you have any

20         other conversations with Henry Porterfield?

21   A.    I don't think I did, no.

22   Q.    So since that time you haven't had any

23         other conversations with Henry Porterfield?

67

1    A.    No.

2    Q.    And the date that you barred him from the

3          premises was March what?  It was March of

4          2005; right?

5    A.    March of 2005.

6    Q.    Have you ever barred anyone else since 1991

7          from coming on the premises?

8    A.    Not to my knowledge, no.

9    Q.    Since 1991 have you ever terminated for

10         cause any contracts with any route

11         salesmen?

12   A.    No.

13   Q.    So Mr. Porterfield is the only one since

14         you've been there in 1991?

15   A.    That ...

16   Q.    Was terminated for cause.

17   A.    For cause, yes, as far as I know.

18   Q.    Was anybody terminated for any reason that

19         was a route salesman?

20   A.    As far as terminated, no, I don't think so.

21   Q.    People might have quit during that time

22         period --

23   A.    Yeah.

68

1   Q.   -- or turned their accounts back over to

2        Flowers; is that right?

3   A.   That's right.

4   Q.   Did Mr. Porterfield's son work there at

5        that time also?

6   A.   Mr. Porterfield's son worked for a

7        temporary service which was a pull-up

8        service that we -- you know, we have to

9        pull up our routes on Wednesdays and

10       Sundays.

11  Q.   Explain for me what a pull-up route is.

12  A.   Okay.  A pull-up route is -- the

13       distributor is off on Wednesdays and

14       Sundays, and we run what we call pull-up

15       routes that goes around to the key

16       accounts, straightens the bread up, pulls

17       the bread up in their absence.  And they

18       normally work around eight, nine hours a

19       day.  And that's what he was doing.

20  Q.   And they only work two days a week?

21  A.   Yes.

22  Q.   That's Wednesdays and Sundays?

23  A.   Wednesdays and Sundays.  Some of them

69

1    occasionally works Saturday afternoons.

2    But, yes, it's temporary.

3  Q.  On a pull-up account, is the person that's

4    servicing or that's performing the

5    pull-up -- is he doing pull-up for just one

6    particular route or are there pull-up

7    people for every route?

8  A.  Well, we got pull-up routes -- we have five

9    in Montgomery, okay, and most of them have

10    around six stores each.  And one pull-up

11    person could have, you know, one stop in

12    six routes or whatever, but it's the

13    geographical area.  It's whatever stores

14    that's in that area they would pull up.

15  Q.  If you had six different routes owned by

16    six different distributors that were

17    actually servicing them, could a --

18        MS. REISS:  That's five, but ...

19  Q.  Five.  I'll do one more for six.

20        Can you have -- can a pull-up person go

21    work, you know, a Wal-Mart in this one, a

22    Publix over here?

23  A.  Oh, yeah.

70

1   Q.   And he can switch all over the place;

2        right?

3   A.   Yeah.

4   Q.   Or the pull-up guy may work just one?

5   A.   He could.  But he works the same ones every

6        week.

7   Q.   Every week?

8   A.   Yeah.  He's got a list of them.  But it

9        could be one here, there, you know, in

10       different territories.

11   Q.   And it's not so much as -- it's key

12       accounts, I guess?

13   A.   That's true.

14   Q.   It's not your mom-and-pop grocery stores

15       out in the country somewhere --

16   A.   No.

17   Q.   -- that may be a small account.  It's your

18       big ones like Winn-Dixie --

19   A.   It's like Winn-Dixie, Wal-Marts, Publix,

20       Bruno's.

21   Q.   Now, how many pull-up account people do you

22       have working?

23   A.   We have five pull-up routes.

71

1    Q.    You've got five pull-up routes?

2    A.    Yeah.

3    Q.    And those five pull-up routes cover 17

4          routes?

5    A.    Well, yes.

6    Q.    Is that right, in Montgomery?

7    A.    Yes.

8    Q.    They service 17 routes?

9    A.    Yeah.

10   Q.    All right.  Now, Mr. Porterfield's son was

11         working one of those accounts; right?

12   A.    That's right.

13   Q.    Was he terminated?

14   A.    Yes.

15   Q.    When was he terminated?

16   A.    About the same time.

17   Q.    It was the same day, wasn't it?

18   A.    Probably was.

19   Q.    What was the reason that he was terminated?

20   A.    He was videotaping on company property.

21   Q.    What was he videotaping?

22   A.    The warehouse, the freezer that we got,

23         different things.

72

1    Q.    Who terminated him?

2    A.    Who?

3          I believe -- well, we called the

4    temporary service and told them that we

5    didn't want his service anymore.  I'm not

6    sure who called, but it could have been

7    Steve Stevens or -- I'm not sure who it was

8    that called them and told them we didn't

9    need him anymore because of that fact.

10   Q.    Do you know what he was videoing?

11   A.    The warehouse area.  We don't allow videos

12   on company property.  That's a company

13   rule.

14   Q.    Did you ever ask him what he was videoing?

15   A.    I didn't, no.

16   Q.    Did anybody else ever ask him?

17   A.    I can't speak for anybody else.

18   Q.    Did anybody tell you that they asked him

19   what he was videoing?

20   A.    I assume -- yeah.  He was videoing the

21   warehouse area, yeah.

22   Q.    But did they tell you what he was videoing

23   in the warehouse area?

73

```
 1   A.   I don't remember, no.

 2   Q.   Nobody has ever told you what they thought

 3        he was videoing?

 4   A.   Well, like I told you, there was -- he was

 5        videoing the warehouse.  He was in the

 6        parking lot area videoing that and the

 7        freezer, yeah.

 8   Q.   Where is your warehouse located in

 9        Montgomery?

10   A.   4323 Norman Bridge Road.

11   Q.   I'm going to give you a piece of paper and,

12        if you would, just kind of give me a

13        general layout of what your warehouse and

14        grounds look like there at the Montgomery

15        location.  And I know it's not to scale.

16   A.   We got a bargain store up there.

17   Q.   And you've designated --

18                MS. REISS:  Why don't you spell

19                     out the word bargain store

20                     instead of putting "BS."

21                THE WITNESS:  Okay.

22   Q.   Thrift store --

23   A.   Thrift store.
```