74

1   Q.   -- in the front.

2   A.   Okay.

3   Q.   And that faces the highway?

4   A.   That faces Norman Bridge Road.

5        And then back here you have our sales

6        room and, of course, the bathroom and our

7        offices, sales manager's office, my office.

8        Of course, there's a hall that goes up

9        through here.

10       Back here is our warehouse area.  You

11       know, there's the doors where the trucks

12       back in on both sides.

13  Q.   Why don't you label those warehouse doors.

14  A.   Okay.

15  Q.   Draw little arrows down to them.

16  A.   Okay.  On the end here you've got -- we

17       call them the relay doors where the big

18       tractor-trailers back in.  We have two of

19       them.  Of course, we've got a fence around

20       the warehouse.  Back in the back it used to

21       be a -- used to be a garage, but it's not

22       any -- well, it's still a garage, but it's

23       closed.  The garage is closed now.  We have

75

1           a freezer right here.  And that's basically

2           it.

3      Q.   Is that the only place that you've got a

4           freezer on the premises?

5      A.   Yes.

6      Q.   How big is the freezer?

7      A.   Probably -- let's see -- six feet by 15

8           maybe.  It's a small one, walk-in.

9      Q.   What's the purpose of having a freezer?

10     A.   To have a -- to keep restaurant products --

11          some products that -- Chili Pups, some of

12          the products that we don't have a lot of

13          turnover and we keep them in case some of

14          the customers run out at night.  Or in a

15          lot of cases like Henry would call and say,

16          hey, you got any Chili Pups in the freezer

17          or whatever.  And then we would have them

18          for him or other distributors.

19     Q.   Pursuant to the contract, Chili Pups, any

20          of those things would be product; is that

21          right?

22     A.   Pardon?

23     Q.   Chili Pups is product as defined by your

76

1          contract; is that right?

2    A.    I don't know that Chili Pups is defined in

3          the contract.  I don't understand --

4    Q.    Any type of -- let me ask it this way,

5          then:  What is product of Flowers Baking

6          Company?

7    A.    What do you mean, now, what is products?

8    Q.    Product.  Your contract, I think, defines

9          it.

10   A.    We got --

11                  MS. REISS:  Why don't you let him

12                      look at the contract, then.

13   A.    We got --

14                  MS. REISS:  Why don't you look at

15                      the contract; okay?

16                  THE WITNESS:  Okay.

17                  MS. REISS:  He's asking you about

18                      the contract.

19   Q.    I've got a clean copy of this somewhere,

20         but let me just show you this.

21             If you look under the definitions of a

22         contract, it defines product at the bottom

23         of the page.

77

1    A.    Products --

2    Q.    Is that right?

3    A.    I see it -- yeah, it says products.

4          What does the contract define products

5          as?  If you would, just read it for the

6          record.

7    A.    Shall mean fresh baked goods, as

8          specifically described in Exhibit B,

9          attached hereto and made a part hereof,

10         which are currently produced or distributed

11         by Flowers -- or distributed by the

12         company, provided --

13              I don't know what that is.

14                   MS. REISS:  That's just a thing

15                   off the document.

16   A.    -- however, that the distributor's rights

17         granted herein shall survive only as long

18         as the company has the license or franchise

19         rights for such goods and company produces

20         and sells such goods.

21   Q.    So anything that Flowers produces or

22         distributes is product; is that right?

23   A.    I would say it's products, but it's not the

78

1         products put in the freezer.

2    Q.   But that defines product as anything that

3         y'all -- as fresh baked goods; correct?

4    A.   That's what that says, yes.

5    Q.   Are frozen goods fresh baked goods?

6    A.   The products that we keep in our freezer

7         are fresh.  It's a limited number of

8         products such as foot-long hot dogs, Chili

9         Pups, things of that nature that

10        restaurants use.  And when we get them, we

11        put them in there fresh.  So, yes, they're

12        fresh.

13   Q.   How long do they remain fresh in a freezer?

14   A.   Well, we don't -- we only keep them so long

15        in the freezer, probably a couple of

16        months.  But we only use them on

17        emergencies, when we have call-ins during

18        the night or one of the distributors asks

19        for them.

20   Q.   So you don't keep anything longer than two

21        months in the freezer?

22   A.   Probably not, no.

23   Q.   Is there a log or any type of recordkeeping

79

1          as to the dates that items are placed into

2          the freezers?

3    A.    The dates are on the products, yes.

4    Q.    So the dates are on the product?

5    A.    That's correct.

6    Q.    And the date that's on the product is the

7          date that it was manufactured?

8    A.    That's correct.

9    Q.    And who places the dates on the product?

10   A.    The producing plant that produces it.

11   Q.    And so when it -- let's take an example,

12         Chili Pups.

13   A.    Okay.

14   Q.    When the Chili Pups get produced at the

15         plant, the date is put on the Chili Pups.

16         They're shipped to your warehouse in

17         Montgomery, received at your warehouse.

18         And then some of those items are sent out

19         to the stores that need them and some are

20         placed into the freezer for emergencies; is

21         that right?

22   A.    That's right.

23   Q.    And they're not kept any longer than two

80

1    months?

2  A.    Right.

3  Q.    Now, have there ever been occasions where

4        products have been kept longer than two

5        months in the freezer?

6  A.    Not to my knowledge.

7  Q.    Do you have any type of recordkeeping on

8        dates product comes out of the freezer?

9        Like if I went down there today -- or let's

10       say I went down there in March of 2005.  If

11       I walked into the freezer and looked at the

12       dates on all of the product in the freezer,

13       could I find any of them that were more

14       than two months old?

15 A.    You should not, no.

16 Q.    Whose responsibility is it for determining

17       when products are disposed of out of the

18       freezer?

19 A.    Most of the sales managers handles the

20       freezer.

21 Q.    Do you ever handle the freezer?

22 A.    What do you mean by handle?

23 Q.    Do you ever make sure that product is

```
 1          properly disposed of out of the freezer
 2          after two months?
 3     A.   I don't check it that often, no.
 4     Q.   Do the sales managers check it?
 5     A.   Yes.
 6     Q.   How often do they check it?
 7     A.   I'm not sure.  I don't know right offhand
 8          how often.
 9     Q.   But do they check it at least once every
10          two months?
11     A.   I'm sure they -- yeah.
12     Q.   So if product was in the freezer more than
13          two months old, then the sales manager
14          responsible for checking the freezer hadn't
15          properly checked it?
16     A.   If it was in there longer than that, he
17          would not have properly checked it.  Is
18          that the question?
19     Q.   That's the question.
20     A.   That's correct.
21     Q.   So sitting here today is it your testimony
22          that product that's been frozen for two
23          months or less is still fresh product?
```

82

1   A.   Yes.

2   Q.   And who has told you at Flowers that that's

3        fresh product?  Has someone -- has Michael

4        or someone at Flowers told you it's all

5        right to have product in the freezer for

6        two months or less?

7   A.   Well, it's just like going in the store and

8        buying two pounds of hamburger meat and you

9        carry it home and you don't use it that

10       night.  You put it in the freezer.  And

11       that hamburger meat is just as fresh as it

12       was when you bought it.  And that's

13       basically how bread is.  It stops the --

14       you know, from getting old.

15  Q.   My question to you, though, is, has Michael

16       or anyone else at Flowers told you that

17       it's fine to have product in the freezer

18       for two months or less and that as long as

19       it's in there for two months or less it's

20       still considered fresh product by Flowers?

21  A.   I can't say that they have told me that.  I

22       know it is myself, you know.  So I can't

23       say they said -- somebody has told me that.

83

1    Q.    And who do you report directly to?

2    A.    Michael Lord.

3    Q.    All right.  And has Michael Lord been with

4          you on the premises in Montgomery to the

5          freezer when product has been removed from

6          the freezer or placed into the freezer?

7    A.    Michael -- I'm not sure.  I don't remember

8          him if he has.

9    Q.    But he knows you have a freezer on the

10         premises?

11   A.    Yes.

12   Q.    He knows you keep product in the freezer?

13   A.    Yes.

14   Q.    At other Flowers locations you also keep

15         product in freezers there, too, or is this

16         the only store that does?

17   A.    Well, that's the only one I have in my area

18         where we do.

19   Q.    How many warehouse locations do you have in

20         your area?

21   A.    Seven, I think.

22   Q.    And when you say in your area, you're

23         talking about the area that you told me

84

1   about earlier, north to Clanton, south to

2   Greenville, west to Selma, and east to

3   Tallassee?

4 A. That's correct.

5 Q. And out of all those seven locations that

6   you have warehouse locations, the

7   Montgomery location is the only location

8   that has a freezer?

9 A. Yes.

10 Q. What about when you worked in the

11   Birmingham market?  Did any of those

12   locations have freezers?

13 A. I don't think so.

14 Q. What about when you worked in the Anniston

15   market?  Did any of those have -- or if it

16   wasn't Anniston, it was somewhere.  Where

17   was it?

18 A. Gadsden.

19 Q. Gadsden.  Did any of those have freezers?

20 A. I don't remember.

21 Q. In your opinion is it a breach of the

22   distributor agreement to deliver to your

23   distributors product which has been frozen

85

```
1           for any length of time?

2    A.     We do not deliver products to the

3           distributor that --

4    Q.     All right.  That was a bad question.  Is it

5           in your opinion a breach of the distributor

6           agreement to provide to distributors for

7           pickup product which has been frozen?

8                    MS. REISS:  I'm going to object to

9                       the extent it calls for a

10                      legal conclusion.  You can go

11                      ahead and answer.

12   Q.     Okay.  Ask the question one more time.

13                   MR. DAVIS:  Will you read it back

14                      for me, Tracye.

15                   (Requested portion of record read

16                      by the court reporter.)

17                   MS. REISS:  Same objection.  Go

18                      ahead and answer.

19   A.     Okay.  No.

20   Q.     If product is placed into the freezer, just

21          so I'm clear on this, the product has a

22          code on it, a date code; is that right?

23   A.     That's right.
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

86

1   Q.   And if you had that same product in your
2         warehouse and Mr. Porterfield came and
3         picked up that product from the warehouse
4         and delivered that product to any of his
5         customers on his route and that product had
6         a date on it of today's date -- what's
7         today -- May the 7th, 2007, at what point
8         in time would that product be out of code?
9   A.   Okay.  When he picks -- or we get stuff out
10        of the freezer --
11   Q.   I'm not talking about out of the freezer.
12   A.   Okay.
13   Q.   I'm just talking about -- I'm talking
14        about -- let's say the truck comes into the
15        warehouse from Flowers and it's been --
16        it's not manufactured at your location;
17        correct?
18   A.   Okay.  No.  That's right.
19   Q.   It's been manufactured at what location?
20        Let's just say loaf bread.
21   A.   Opelika or Tuscaloosa.
22   Q.   Opelika.  Loaf bread comes into your
23        facility here.

87

1    A.    Okay.

2    Q.    It's got a code on it; correct?

3    A.    That's right.

4    Q.    That code has a date within it; correct?

5    A.    Correct.

6    Q.    Let's say that that bread was made

7          yesterday.  I don't know if they make them

8          on Sunday or not, but --

9    A.    Oh, yeah.

10   Q.    It was made yesterday on the 6th of May

11         2007.  You get it here today on the 7th.

12   A.    Okay.

13   Q.    It comes in the truck.  It's taken off at

14         the back back here at your relay doors into

15         your facility and housed here in your

16         warehouse.

17   A.    Okay.

18   Q.    Mr. Porterfield or any of your distributors

19         come in.  They've got jobs to go to to

20         deliver this product.  If they come in and

21         pick up that product and take it out to --

22         let's say to -- Winn-Dixie is not a good

23         example because they use their own product

88

1            a lot of times.  Say it's a name-brand

2            Flowers product that's being delivered to

3            Winn-Dixie.

4    A.    Okay.

5    Q.    At what point in time does that product

6            sitting on the shelf in Winn-Dixie become

7            out of code?

8    A.    Okay.  If it's a loaf of Sunbeam bread that

9            we get on Monday, it's due out on Friday.

10   Q.    Explain what you mean.  You mean it's due

11           to come back out of the store on Friday?

12   A.    That's correct.  It has a color code on

13           it.  And what we get on Monday has an

14           orange tie.  We pick it up on Friday and

15           bring it back to the thrift store.

16   Q.    So to be out of code, product has to be on

17           the shelf for five days before it's

18           determined to be out of code?

19   A.    For different items it's different codes,

20           but yes.

21   Q.    But for Sunbeam bread it's five days?

22   A.    Yes.

23   Q.    What about for Chili Pups?

89

1   A.   Chili Pups has got a color code on them.

2   Q.   And what's the color code on Chili Pups?

3   A.   Basically the same.

4   Q.   What about foot-long hot dog buns?

5   A.   Everything that we produce at -- with

6        exception of cakes -- has -- and bulk buns

7        has a color tie on them.

8   Q.   And the color tie for every occasion is

9        five days?

10  A.   Some of them are six days.  Some of them

11       are more.

12  Q.   So if a product is five days or six days in

13       some cases, then it's out of code if it's

14       longer -- if it's past that day?

15  A.   That's correct.

16  Q.   Okay.  And do customers expect from your

17       experience to have product placed on their

18       shelf that is within code, fresh product?

19  A.   Yes.

20  Q.   And what is the reason why you actually

21       color code product?  Is it so you'll know

22       how long it's been there?

23  A.   Right.

90

1   Q.   You want to know how long that loaf of

2        bread has been sitting on that shelf?

3   A.   That's right.

4   Q.   Because if a customer calls you and tells

5        you this bread is not fresh and you know

6        that it was just put there the day before,

7        then you know that that bread is only two,

8        three days old maximum from the date it was

9        produced; is that right?

10   A.   Well, it's got a colored -- the bread that

11        we put in the grocery stores has a color

12        code on it and also has a date on it with

13        the manufacturing number and all that.

14   Q.   So you can walk into the store -- if a

15        customer calls you up and says come down

16        here, I want to talk to you, and they take

17        you out on the floor and they say, you

18        know, I don't think this bread is fresh and

19        I'm not happy with this bread, I don't

20        think it's fresh, I've had people complain,

21        you can walk over to the counter and pick

22        up a loaf of bread and look at it and tell

23        the date that it was manufactured, can't

91

1           you?

2    A.     If this -- if the date is on the bread,

3           yes.

4    Q.     And it's got a code on -- a color code if

5           it's not so you'll know how long it's been

6           there?

7    A.     Right.

8    Q.     The color code is a code for each

9           particular day of the week?

10   A.     That's right.

11   Q.     And is it always the same color code every

12          week?

13   A.     Every week.

14   Q.     So what color is Monday?

15   A.     What color do we get on Monday?

16   Q.     Yes.

17   A.     We get orange ties on Sunbeam bread on

18          Monday.

19   Q.     And what color do you get on Tuesday?

20   A.     On Tuesday we get white ties.

21   Q.     What do you get on Wednesday?

22   A.     We don't work on Wednesday.  Thursday we

23          get blue ties, I believe.

92

1    Q.    What do you get on Friday?

2    A.    Friday, I believe, is -- Friday is yellow.

3    Q.    What about Saturday?

4    A.    Saturday is green.

5    Q.    All right.  Do all products have a code on

6          them, a color code?

7    A.    All products -- all products except bulk

8          buns and cakes.  They have a date on them.

9    Q.    Do all products have a date on them?

10   A.    Yes.  Unless, you know, the date machine

11         misses or something.

12   Q.    But they're supposed to have a date on

13         them?

14   A.    Absolutely.

15   Q.    So you could tell -- number one, you can

16         pick up a loaf of bread on the counter and

17         look at it when you've got the customer

18         complaining and go, well, this was an

19         orange twist tab, so I know that this

20         particular was delivered on Monday.  And I

21         can look at the date and tell what date it

22         was made at the factory; right?

23   A.    Uh-huh (positive response).

93

1    Q.    Or the plant or whatever you want to call

2          it.

3    A.    Right.

4    Q.    The manufacturing plant.

5                So you know two ways if the product is

6          fresh or not; right?

7    A.    Right.

8    Q.    And do customers expect to have fresh

9          product from your experience?

10   A.    Yes.

11   Q.    Do you always deliver fresh product?

12   A.    Yes.

13   Q.    Is it a breach to deliver product that is

14         not fresh?  Is it a breach for -- back up.

15         Strike that.

16              Is it a breach of the agreement for you

17         to deliver or to allow distributors to pick

18         up product that is out of code?

19              MS. REISS:  I'm going to object to

20                  the extent it calls for a

21                  legal conclusion.  You can go

22                  ahead and answer.

23   A.    But the question was is it a breach for

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

94

1        them to pick it up out of code?

2    Q.  Is it a breach on behalf of Flowers for

3        them to allow them to pick it up?

4    A.  And carry it to another customer?

5            Yes.

6    Q.  You don't want your distributors to deliver

7        product to customers that's out of code, do

8        you?

9    A.  No.

10   Q.  You want product that is fresh being

11       delivered to everyone; right?

12   A.  That's right.

13   Q.  Well, tell me how is a product fresh and in

14       code when it's been sitting in a freezer

15       for two months.

16   A.  That freezer stops the process of it

17       getting old.  And when we take it out --

18       and, like I say, it's only minimum items

19       that we keep in there.  And when we take it

20       out of the freezer and throw it out, we put

21       a two-day date on it.  And in most cases

22       it's used the day we carry it.

23   Q.  Do you change the original date on it?

95

1    A.    We take the original date off.

2    Q.    So the original date that was placed on the

3          bread on the date it was manufactured is

4          removed and a new date is put on it?

5    A.    The date -- yes.

6    Q.    And the new date that's put on it is the

7          date that it came out of the freezer?

8    A.    That's right.

9    Q.    And --

10   A.    No, no.  I'm sorry.  It's two days from the

11         day it comes out of the freezer.

12   Q.    So if it came out of the freezer today on

13         the 7th of May, then a date would be put on

14         it for the 9th of May?

15   A.    That's right.

16   Q.    Now, what does that date of the 9th of May

17         indicate?

18   A.    It indicates if it's still in that

19         restaurant when we get there on the 9th

20         that we pick it up.

21   Q.    So basically you're removing the original

22         production date of the bread and you're

23         putting a remove by date onto the bread?

96

1   A.   Right.

2   Q.   Is that right?

3   A.   That's right.

4   Q.   Is that a practice that's customary --

5       strike that.

6          Is this location in Montgomery the only

7       location that you know of that does that?

8   A.   No.

9   Q.   What other locations do it?

10   A.   I think we have one in -- here in Opelika

11       and one in Columbus maybe.

12   Q.   That have freezers?

13   A.   Yes.

14   Q.   As far as the decision to remove the

15       production date, how did you learn to do

16       that?

17   A.   Well, really wasn't no learning to it, you

18       know.  We just swipe it off and --

19   Q.   With alcohol or --

20   A.   We spray a little hairspray on a cloth and

21       rub the film lightly and it zips right

22       off.

23   Q.   But who was it that instructed you to do it

97

1        that way?

2    A.   I can't remember that anybody instructed

3         us.  It's just something we've always done

4         since we had them.

5    Q.   But your bosses knew that you did that,

6         your superiors?

7    A.   Yes.

8    Q.   And they do it at other locations?

9    A.   I suppose.

10                  MS. REISS:  Don't guess.  Don't

11                  guess.

12   A.   I don't know, then.

13   Q.   Do you know what the health department

14        requires?

15   A.   No.

16   Q.   Do you know what any government agency

17        requires regarding when the date is removed

18        from a product when it -- the date it was

19        manufactured, food product?

20   A.   No.

21                  MR. DAVIS:  Why don't we take a

22                  five-minute break.

23                  (A brief recess was taken.)

98

```
 1    Q.    (Mr. Davis continuing:)  Would you agree
 2          with me, Mr. Messer, that by changing the
 3          dates on the -- that the bread was
 4          manufactured that you're actually
 5          controlling the -- or you're representing a
 6          new date that the bread was manufactured?
 7    A.    When we put it in the freezer, we suspend
 8          the date.  When we take it off, we give it
 9          two days.  So we still consider it fresh
10          bread when we bring it out.
11    Q.    Do you tell your customers -- if I went out
12          and talked to Winn-Dixie tomorrow and I
13          went out and talked to any of the customers
14          that are on a Flowers route and asked them
15          if they were aware that they were delivered
16          frozen bread, would they be aware of that?
17                    MS. REISS:  I'm going to object to
18                        the form.  Facts not in
19                        evidence.  He never said they
20                        delivered to grocery stores.
21    Q.    Anyplace on your route --
22    A.    Yeah.
23    Q.    If I went and surveyed anyplace on your
```

99

1         route that you deliver frozen bread to,

2         would they be aware that they've gotten

3         frozen bread?

4    A.   The only time we carry it -- get it out of

5         the freezer and carry it or deliver it,

6         it's a restaurant, selected items.  If you

7         asked them, I don't know.  We don't just

8         say, hey, we're bringing you frozen bread.

9    Q.   You don't disclose it to them, do you?

10   A.   We don't tell them, no.  If they ask us, we

11        tell them.

12   Q.   Have you ever had anybody complain about

13        you delivering frozen bread to them?

14   A.   I can't think of anyone.

15   Q.   If you look at paragraph 11.1 of the

16        distributor's contract, what does that

17        paragraph 11.1 say?

18   A.   It says maintaining a fresh market is a

19        fundamental tenet of the baking industry.

20        Accordingly, out-of-code products on the

21        market is a material breach of this

22        agreement.  Repeated violation will be

23        grounds for termination of this agreement.

100

1   Q.   Would you agree with me that by changing

2       the date on bread that you've made it out

3       of code?

4   A.   No.

5   Q.   Would you agree with me that changing the

6       date on the bread misrepresents the date

7       that the bread was manufactured?

8   A.   The bread, when we take it out of the

9       freezer, if we put two days on it, it's

10      still fresh.  So, there again, the customer

11      that we carry the bread to -- restaurant

12      customers is the only one that gets it --

13      the manufacturing date doesn't mean

14      anything to them really.  They look at the

15      date that it's due up.

16   Q.   Really it's not just the people that you

17      take it to, your customers, that get the

18      bread.  It's the whole general population

19      that has a possibility of getting that

20      bread, isn't it?

21             MS. REISS:  Object to the form.

22   Q.   I mean, you know that when you deliver

23      product to Krystal or Burger King that

101

```
 1          they're ultimately going to be turning

 2          around and taking your product and selling

 3          it to the general public, don't you?

 4     A.   I know that if Henry's Krystal calls in

 5          tonight wanting Chili Pups and Henry calls

 6          and wants Chili Pups out of the freezer,

 7          it's either -- if that's all we've got to

 8          carry them, which is still fresh products

 9          and they will sell them that night, then I

10          don't see anything wrong with that, no.

11     Q.   My question is, though, that you know that

12          those products will be distributed to the

13          general population by people that shop and

14          purchase Krystals, don't you?

15     A.   The Chili Pups, yes.

16     Q.   Let me ask you this on follow-up with

17          something I asked you earlier.  On the

18          loads -- I know you told me that the

19          computer -- hand-held computer has all of

20          the loads on it; right?

21          Does Henry place what his loads are

22          into the computer or does Flowers do that

23          for him?
```

102

1   A.   The distributor does it.

2   Q.   So the distributor figures out what he's

3       got to deliver to each route?

4   A.   To each customer.

5   Q.   To each customer?

6   A.   Yeah.

7   Q.   Okay.  And then once he figures it out,

8       does he notify the sales manager, or who

9       does he notify?  How do you as the --

10      running the operation know how much product

11      to have on hand?

12  A.   Each distributor handles each stop

13      himself.  He orders for himself.  At the

14      end of the day, then that order goes into

15      the central computer and makes the order

16      out for him.

17  Q.   And then it's -- it makes the order out and

18      sends it back through the computer?

19  A.   Well, yeah, it sends -- in other words,

20      that's what he orders -- we order a week

21      ahead, and that's what he's going to get

22      next week.  And then he has -- his

23      computer -- he's got a load sheet that he

103

```
 1        prints out.  It's packed out at night.  He

 2        prints that out to see if he's got it or if

 3        it was, you know, everything he ordered.

 4    Q.  Once he -- let me ask you this:  On the

 5        computer, if he stops at, you know, a

 6        mom-and-pop grocery store out in the

 7        country and he's got a small delivery that

 8        he makes there every week, at the end of

 9        that delivery does he have to sit there and

10        go, all right, today I delivered 20 loaves

11        of bread, next week I need to deliver 20

12        loaves of bread, or does it do it for him

13        automatically?

14    A.  Quite honestly I'm not that up to date on

15        the hand-helds because that's not -- but I

16        think it suggests a two to four-week

17        average.  And if he sells -- if he's been

18        selling 20 loaves of bread, then it's going

19        to suggest that for the following week,

20        yes.

21    Q.  And once the product is delivered, it's

22        delivered -- it's delivered to your

23        warehouse here in Montgomery --
```

104

1   A.   Uh-huh (positive response.)

2   Q.   -- for your distributors to pick up?

3   A.   That's right.

4   Q.   If I were a distributor and wanted to have

5        a distributor contract with Flowers, I

6        couldn't tell you, tell you what, have a

7        truck stop by my house and deliver it to my

8        house, I want to pick up everything from my

9        house?  I couldn't do that, could I?

10  A.   No.

11  Q.   I would have to pick it up from the

12       warehouse, wouldn't I?

13  A.   From the warehouse.

14  Q.   As far as the money that you receive from

15       any of the customers on the route, do they

16       pay Henry when they're out there on the

17       route for the product?

18  A.   Unless it's an authorized charge.

19  Q.   And what's the difference?

20  A.   All right.  An authorized charge is a

21       charge that the company approves and agrees

22       to collect the money for.  In other words,

23       when we sell the bread to the distributor,

105

```
 1          he may buy $5,000 worth of bread this week
 2          and he pays us either in authorized charges
 3          or cash.
 4     Q.   Would like a Winn-Dixie be an authorized
 5          charge?
 6     A.   That's correct.
 7     Q.   So when he delivers product to Winn-Dixie,
 8          he doesn't have to go back in the back and
 9          pick up a check from Winn-Dixie to bring to
10          you, does he?
11     A.   No.
12     Q.   It goes straight to Flowers, doesn't it?
13     A.   Yes.
14     Q.   Typically how much of a route is authorized
15          charges?
16     A.   Guessing, most routes probably 89 percent.
17          Unless it's a country route.  Country
18          routes run more.
19     Q.   As far as the delivery vans that they use,
20          do they rent those from Flowers or do they
21          purchase them from Flowers?
22     A.   They can either rent -- most of the guys
23          that's been it in any time -- length of
```

106

1  time own their own.  They can either rent

2  them or buy them -- or -- not -- excuse

3  me -- lease them or buy them.

4 Q. And that's deducted from their paychecks,

5  the lease payments?

6 A. The lease payments that they're charged

7  weekly for, yes, on their statement.

8 Q. Do y'all have trucks that you actually

9  lease to distributors?

10 A. We don't have any trucks.  The lease comes

11  through a leasing company.

12 Q. What leasing company is it?

13 A. I'm really not sure.  I don't get involved

14  in the leases, so I'm not sure.

15 Q. Let me ask you this:  You know, when

16  distributors come down to the warehouse and

17  they pick up product from the warehouse, do

18  you control what type of products they can

19  deliver?

20 A. Not really.

21 Q. So if I'm a distributor and I'm working for

22  you and I come and pick up product at the

23  warehouse here, can I go down to Pringles

1          Potato Chips Company and also pick up

2          Pringles and go deliver Pringles on my

3          route while I'm out there delivering?

4    A.    Okay.  Ask me that first question again.

5    Q.    Do you control what products distributors

6          can distribute?

7    A.    As long -- and I think the --

8    Q.    The contract says it, doesn't it?

9    A.    It says in the contract as long as it

10         doesn't interfere with a product that we --

11         of the same -- you know, like bread product

12         or whatever.

13   Q.    In fact, the only thing they can deliver

14         under the contract is Flowers products or

15         products which Flowers distributes, isn't

16         it?

17   A.    That's mostly all -- yeah, that's all

18         they're delivering, but that's -- the

19         contract --

20   Q.    They can't deliver anything other than

21         Flowers products, can they, something that

22         Flowers --

23              MS. REISS:  If you want to show

108

```
 1                    him the contract.  I'm going

 2                    to object to the form.

 3              MR. DAVIS:  I'm just asking what

 4                    he knows.

 5    A.   Well, in my case Flowers products are

 6         Sunbeam -- the products that we bake is the

 7         only thing that -- to my knowledge that

 8         they deliver, yes.

 9    Q.   And they can't deliver anything else other

10         than that, can they?

11    A.   I don't think we've had anybody to try

12         or -- to try to deliver anything else.

13    Q.   Y'all provide the route salesmen with a

14         computer; is that right?

15    A.   That's right.

16    Q.   Do you provide them with other items

17         besides a computer?

18              MS. REISS:  I'm going to object.

19                    You mean the hand-held

20                    computer?

21              MR. DAVIS:  Hand-held computer.

22              MS. REISS:  Okay.

23    A.   Yeah.
```

109

```
 1   Q.   Do you provide them with other items other
 2        than a hand-held computer?
 3   A.   We have labels that they can use, yes.
 4   Q.   Do you provide them with racks?
 5   A.   Racks, dollies, yes.
 6   Q.   Anything else?
 7   A.   Dollies and hand-held computers, displays,
 8        special displays.
 9   Q.   If there's a dispute with a customer, does
10        the customer contact Flowers about a
11        dispute typically?
12   A.   In most cases.
13   Q.   If there's a dispute regarding a
14        distributor, who handles those disputes?
15   A.   With a -- distributor with a customer?
16   Q.   Yes.
17   A.   In most cases the sales manager goes and
18        meets with a customer.
19   Q.   Can you also go meet with a customer?
20   A.   Can I?
21   Q.   Yes.
22   A.   Yes.
23   Q.   Have you ever in the past?
```

110

1    A.    Have I ever in -- yes.

2    Q.    And you have the right to terminate a

3          distributor, don't you?

4    A.    No.

5    Q.    Who has the right to terminate him?

6    A.    That would be the vice president of sales

7          or president.

8    Q.    Flowers has the right to terminate a

9          distributor?

10               MS. REISS:  I'm going to object to

11                    the form.  You can answer.

12   A.    I would assume, yeah.

13   Q.    As far as the actual delivery of product,

14         you told me earlier this afternoon about a

15         dispute regarding -- I believe you said

16         Krystal or somebody -- yeah, it was

17         Krystal -- that there was a problem that

18         bread was left on the outside of the

19         Krystal.

20   A.    Uh-huh (positive response.)

21   Q.    You remember telling me about that?

22   A.    Sure do.

23   Q.    And that that was a curable breach of the

111

1          contract?

2    A.    That's right.

3    Q.    And how was that breach cured?

4    A.    I believe the sales manager went and talked

5          to the manager.  And he had had problems

6          before, but he said he would give Henry one

7          more chance.  And so he let him come back

8          in and start working it.

9    Q.    And the breach in that situation was

10         delivering product outside the store, on

11         the back steps of the store; is that

12         right?

13   A.    Well, he left the bread on the back of the

14         store and just left a ticket sticking in

15         there with it.

16   Q.    And you don't want him to leave bread on

17         the outside of the store?

18   A.    It's not that I want him to.  The

19         customer --

20   Q.    The customer --

21   A.    -- is not going to -- they're not going to

22         have that.

23   Q.    But it was cured?

112

1    A.    Yes.

2    Q.    And as long as Henry delivered product

3          inside the Krystal there was no problem?

4    A.    Well, I wouldn't say it wouldn't be a

5          problem.  As long as he was taking care of

6          the customer's needs and he didn't have a

7          problem with the customer, you know, and

8          the customer wasn't complaining about

9          something, he wouldn't have a problem, no.

10   Q.    But it wouldn't be a problem if the

11         customer was not complaining about other

12         things if he delivered the product inside

13         the door versus outside?

14   A.    Well, if the customer was happy with that,

15         yes.  But I don't know -- like I say, the

16         customer -- he may have had problems, but

17         it might be -- that particular time he left

18         the bread on the outside of the store.

19   Q.    But once the customer, Krystal in this

20         instance, brought it to your attention, you

21         notified Henry of it; right?

22   A.    Yes.

23   Q.    And to your knowledge did Henry deliver

113

```
 1        product to Krystal after that?

 2   A.   Yes.

 3   Q.   And did he deliver it inside the store?

 4   A.   Oh, yeah.

 5   Q.   He didn't deliver it outside anymore?

 6   A.   Not to my knowledge.

 7   Q.   What about uniforms that are worn by

 8        distributors?  Do they have to wear any

 9        kind of uniform?

10   A.   They don't have to.  Some of them -- some

11        of them do and some of them don't.

12   Q.   What kind of uniform do some of them wear

13        that wear it?

14   A.   Some wears a shirt with a Sunbeam patch or

15        Nature's Own patch or some of them are

16        golf-type shirts.  Some of them are

17        button-up shirts.

18   Q.   But they have Flowers or Flowers product

19        type logos on them or Sunbeam product?

20   A.   Sunbeam and on most cases now -- some of

21        them still have old uniforms that they had

22        when they were distributors -- I mean, the

23        company employees.  Most of them have
```

114

1          Sunbeam, Nature's Own, Cobblestone Mill,

2          Blue Bird.  That's the logo on the shirts

3          now.

4     Q.   That's products that y'all distribute?

5     A.   Yes, that's correct.

6     Q.   All right.  Tell me about -- Henry is

7          barred from coming on the premises;

8          correct?  Remember that?

9     A.   Yeah.

10    Q.   That was in May of '05; right?

11               MS. REISS:  Object.  March of '05.

12    Q.   I'm sorry.  March of '05.

13    A.   I think so.

14    Q.   What happened to Henry's route --

15         distributor route once he was barred from

16         coming on the premises?

17    A.   We continued to run it for him.

18    Q.   Okay.  And who was it that ran it for

19         Henry?

20    A.   It was either a company extra person or a

21         supervisor.

22    Q.   Sitting here today do you know who it was?

23    A.   It's been so long.  There's been -- Tammy

1              Luster, which is operations manager, has

2              run it some.  Her extra person, John

3              Beasley, has run it some.  But there have

4              been several that's run it over the last,

5              what, two years.

6        Q.    Has there been more than one person at a

7              time running this one route?

8        A.    There have been.

9        Q.    And why was there more than one person at a

10             time placed on running a route?

11       A.    When he had a new account open up on the

12             route.

13       Q.    And what account was that?

14       A.    Wal-Mart and Publix.

15       Q.    So when those two accounts opened up on the

16             route, you got two people to run the route?

17       A.    We did.

18       Q.    How was the route divided?

19       A.    It wasn't divided.

20       Q.    Did the people deliver to the same places

21             or did they each have certain places that

22             they had to deliver to, two separate people

23             that were running the route at that time?

116

1    A.    Well, in most cases they -- there was two

2          on the truck.  There for a while when the

3          Food -- I mean, when the Wal-Mart first

4          opened we had two trucks that we put on

5          there.

6    Q.    Is that customary to have two people

7          running a route?

8    A.    No.

9    Q.    How many of your 17 routes in the

10         Montgomery area have two people on the

11         truck?

12   A.    Not any of them.

13   Q.    How many have ever had two people on the

14         truck?

15   A.    When a new account opens, it's very

16         possible that for the first few weeks we

17         put two people on there till it gets -- you

18         know, we know what's happening.

19   Q.    How long were two people on this particular

20         route?

21   A.    Quite a while.

22   Q.    What's quite a while?

23   A.    Quite a while.  Maybe -- I don't know -- a

117

1      year.

2  Q.  Any reason why two people were on there for

3      a year?

4  A.  To -- the route was a big route.  To get it

5      down to where they can handle it.

6  Q.  One person couldn't learn it in a short

7      period of time?

8  A.  Well, one person is on there today.

9  Q.  Okay.  Who is that one person that's on it

10     today?

11 A.  John Beasley has been running it.

12 Q.  All right.  How long has John Beasley been

13     running it?

14 A.  Several months now.  I'm not sure how long.

15 Q.  When you had two people running it, was

16     either one of the two people qualified to

17     learn it to where they could run it within

18     a few weeks which is the normal practice

19     that you just told me about?

20 A.  Well, when we had two people on it, one of

21     them was the management -- manager with an

22     extra person.

23 Q.  So you had a manager.  Which manager?  Was

118

1         that --

2    A.   Probably Tammy Luster --

3    Q.   All right.  Tammy Luster.  Who else?

4    A.   And John Beasley was on there for a while.

5    Q.   All right.  Anybody else that's ever run it

6         besides those two?

7    A.   For a day or two at a time or whatever,

8         yeah, we probably had -- let's see.  Steve

9         Stevens has probably run it.

10   Q.   With Tammy Luster?

11   A.   Probably.

12   Q.   All right.  Anybody else?

13   A.   I can't think of anybody right offhand.

14   Q.   Tammy Luster couldn't run it by herself?

15   A.   It would have been tough for her to run it

16        by herself and done her regular duties too.

17   Q.   What were her regular duties?

18   A.   As operations manager.  She is right under

19        the sales manager and she rides routes and

20        helps them, distribution, customer contact,

21        things like that.

22   Q.   As operations manager is she in a position

23        lateral with you, above you, below you?

119

| | | |
|---|---|---|
| 1 | A. | Below. |
| 2 | Q. | Does she report to you? |
| 3 | A. | She reports to the sales manager. |
| 4 | Q. | Who is that? |
| 5 | A. | That's Steve Stevens. |
| 6 | Q. | All right.  So Steve Stevens is sales |
| 7 | | manager and Tammy reports to him? |
| 8 | A. | That's correct. |
| 9 | Q. | All right.  How long has Tammy been with |
| 10 | | the company? |
| 11 | A. | Probably ten years or so. |
| 12 | Q. | Is Tammy a full-time employee? |
| 13 | A. | Yes. |
| 14 | Q. | Do you know what the job duties of |
| 15 | | operations manager are? |
| 16 | A. | It's to just be the -- work with sales, |
| 17 | | with distributors, the customers, help them |
| 18 | | in any way that they need help. |
| 19 | Q. | Do you know if -- does Tammy get a -- is |
| 20 | | she a salaried employee? |
| 21 | A. | She is. |
| 22 | Q. | Is Steve a salaried employee? |
| 23 | A. | Yes. |

120

1   Q.   John Beasley, what is his position right

2       now?

3   A.   He is an extra person.

4   Q.   Extra person?

5   A.   Extra, yes.

6   Q.   Is he a salaried employee?

7   A.   He works by the hour when he runs a bread

8       route.  If he's on that route for a number

9       of weeks, then he gets commission on the

10      route.

11  Q.   How long has he -- or does he receive a

12      commission now for the route?

13  A.   Yes.

14  Q.   When did he start receiving commission for

15      the route?

16  A.   When he started running it full-time by his

17      self.

18  Q.   About two months ago?

19  A.   Two or three months ago, that's right.

20  Q.   Like February, March?

21  A.   It could have been.  I'm not sure.

22  Q.   Before that he worked by the hour?

23  A.   When he -- when he's not running a regular

121

1    route, then he works by the hour.

2    Q.    When he ran Henry Porterfield's route, was

3          he working by the hour?

4    A.    He's running Porterfield's route now and he

5          works on commission.

6    Q.    He works on commission.  But I thought you

7          told me that since Henry has left that

8          Tammy and John ran it at one time together.

9    A.    They have run it one time together, and

10         that's been back a year or so ago when the

11         Wal-Mart first opened up.

12   Q.    When they ran it together back when the

13         Wal-Mart first opened up, was John working

14         by the hour then?

15   A.    No -- well, yes.  Yes, he was working by

16         the hour then.

17   Q.    Do you know what John makes an hour?

18   A.    Golly.  I'm thinking it's ...

19              MS. REISS:  Then or now?

20              MR. DAVIS:  Then.

21   Q.    Then or now?

22         Then?

23         I don't turn his payroll in, but I

122

1      think it's like $15 an hour for the first

2      40 hours.

3   Q.  And does he work overtime?

4   A.  Sometimes.  Overtime he gets time and a

5      half.

6   Q.  Did John ever have to work overtime when he

7      was working by the hour on this particular

8      account?

9   A.  Probably not when there was two people on

10     there, no.

11  Q.  Did Tammy ever work the account all by

12     herself?

13  A.  There may have been special occasions that

14     she did, but not on a regular basis.

15  Q.  Did Steve Stevens ever work the account by

16     himself?

17  A.  He may have on special occasions, but not

18     on a regular basis.

19  Q.  And when you say special occasions, you're

20     talking about one day here, one day there?

21  A.  Yes.

22  Q.  Other than that you had somebody -- two

23     people working it?

123

```
1    A.   That's correct.

2    Q.   Who decided to put Steve Stevens running

3         the account?  Was that your job -- I mean,

4         your call?

5    A.   You mean John Beasley?

6    Q.   No.  I'm talking about Steve Stevens to

7         begin with.  You told me he ran it for a

8         while.

9    A.   Well, he's the sales manager over that

10        area, and whenever he run it, I'm sure that

11        somebody else was out or whatever.  So that

12        was his call.

13   Q.   Okay.  What about Tammy?  Who decided to

14        put Tammy, the normal operations manager

15        for Flowers, running this account?

16   A.   Who decided to?

17   Q.   Yeah.

18   A.   That being her -- in her branch, it just --

19        you know, that's just what happens.  She

20        takes care of the stops in that branch.

21        That's part of her job.

22   Q.   Since she was a salary employee, did she

23        receive extra money for running this route?
```

124

```
 1    A.   No.
 2    Q.   Did y'all hire somebody else while she was
 3         running the route to be operations manager?
 4    A.   No.
 5    Q.   What about when Steve Stevens was running
 6         the route?  Did he receive extra money for
 7         running the route other than what he got on
 8         his normal salary?
 9    A.   No.
10    Q.   Did y'all have to hire somebody else to be
11         sales manager whenever he was out running
12         the route?
13    A.   No.
14    Q.   Do you know how much Tammy Luster makes as
15         operations manager?
16    A.   Not right offhand.
17    Q.   Do you know how much Steve Stevens makes as
18         sales manager?
19    A.   Not right offhand.
20    Q.   You said John Beasley started running this
21         account about two to three months ago on a
22         full-time basis?
23    A.   Uh-huh (positive response).
```

125

1   Q.  He's doing it by himself now; right?

2   A.  That's right.

3   Q.  And you said he's getting commission now

4       for running that route?

5   A.  That's right.

6   Q.  Do you have a distributor contract with him

7       for running that route?

8   A.  No.

9   Q.  What kind of commission does he get for

10      running that route?

11  A.  I believe it's ten percent.

12  Q.  Ten percent of what?

13  A.  Ten percent of the dollar, the weekly

14      dollar sales.

15  Q.  And who came up with that figure?

16  A.  I guess Flowers Baking Company of Opelika.

17  Q.  Since March of 2005, have any of the

18      accounts that were present in March 2005

19      come off the books?

20  A.  What do you mean come off the books, now?

21  Q.  The route has a geographic area that the

22      distributor calls on; correct?

23  A.  Yes.

126

1    Q.    Within that route in March 2005 there were

2          a certain number of stops, businesses,

3          restaurants, grocery stores, whatever, that

4          were called on within that route.  Since

5          March 2005 have any of the businesses,

6          grocery stores, restaurants, whatever they

7          were that you were calling on in March of

8          2005 -- have any of those changed to one of

9          your competitors or for whatever reason

10         they're not allowing you to call on them

11         now?

12   A.    I can't remember one that ...

13   Q.    So every person, company, entity that was

14         present in March of 2005 is still within

15         that same distributor geographic area?

16   A.    To my knowledge, unless they closed up or

17         whatever.  And I don't remember any that

18         has.

19   Q.    And since March of 2005 you told me earlier

20         Wal-Mart came into that area.

21   A.    That's right.

22   Q.    And Publix came into that area?

23   A.    That's right.

127

1    Q.    And you picked up both Wal-Mart and Publix?

2    A.    That's correct.

3    Q.    Any other accounts that have come into that

4          geographic area since March 2005?

5    A.    I don't think so.

6    Q.    Any other restaurants that have come into

7          that geographic area?

8    A.    We had a Chick-Fil-A.  I think that's the

9          only one.

10   Q.    Does John Beasley report to Steve Stevens

11         presently?

12   A.    Yes.

13   Q.    Do you know how many hours it takes John

14         Beasley to run the account presently?

15   A.    Just guessing -- of course, different days

16         it takes different hours, but just

17         guessing, probably eight to ten hours a

18         day.

19   Q.    So you think that the route can be run in

20         eight to ten hours a day for five days a

21         week or are you talking about more?

22   A.    It's five days a week that they run the

23         route.

128

1   Q.   So 40 to 50 hours a week you should be able

2        to run a route; is that correct?

3   A.   In most cases, yes.

4   Q.   Are there any routes that you have in the

5        Montgomery office that take more than 40

6        hours to run?

7   A.   I'm sure we do have some.  And when you --

8        when you ask about that, it depends on --

9        when you say run a route, you know, a lot

10       of the guys, they don't get in a hurry.

11       You know, they may stand out there and talk

12       to customers for 20, 30 minutes.  So it

13       takes different times.  Different days

14       takes different hours.  But most every

15       route we've got can be run in 40 or 50

16       hours a week.

17  Q.   Have you ever had employees complain about

18       it taking more than 50 hours a week to run

19       a route?

20  A.   Well, I don't have employees.  They're

21       independent distributors.

22  Q.   Have you ever had any independent

23       distributors complain to you that it takes

129

1   more than 50 hours a week to run a route

2   ever?

3 A. Ever?

4    I -- golly.  I don't remember any

5   that's complained about it.

6 Q. Have any of them ever mentioned to you that

7   it took more than 50 hours to run their

8   route?

9 A. I'm sure it's been mentioned.

10 Q. Do you recall who mentioned it to you?

11 A. No.

12 Q. Do distributors get vacation time?

13 A. They can purchase a vacation.

14 Q. They have to pay for it?

15 A. The first week it's $50.  They can purchase

16   a second week.  I believe it's 150.  But

17   yes.

18 Q. It's not a benefit that's given to them

19   automatically.  They have to pay for that?

20 A. Yes.  They're independent distributors.

21   They're business people, their own ...

22 Q. Do they get any sick leave?

23 A. No.

130

1    Q.   Do you withhold federal taxes on them?

2    A.   I don't control that part, so I'm not sure.

3    Q.   Who would be the person most knowledgeable

4         about the accounting of this particular

5         account?

6              When I say this particular one, with

7         Henry Porterfield.

8    A.   Who would be the accounting?

9              Jerry Woodham is our controller.  Now,

10        what do you mean by accounting?  What

11        part --

12   Q.   Charges that have been charged to --

13   A.   That route?

14   Q.   -- that route.

15   A.   Probably be Jerry Woodham, which is our

16        controller.

17   Q.   Have you ever had any distributors that

18        have lost an account before and not been

19        able to regain it within ten days?

20   A.   I cannot think of any right offhand.

21   Q.   Have any happened recently?

22   A.   That lost an account --

23   Q.   Yes.

131

```
1    A.    -- and ...

2              I can't think of one recently, no.

3    Q.    If one had been lost recently, you would

4          know about it, though; right?

5    A.    In most cases.

6    Q.    So you're telling me that since 19 -- just

7          so I'm right -- since 1991, since you came

8          to the Montgomery market as director of

9          sales, that you've never had any

10         distributor out there lose one of the

11         customers on a route and never regained

12         that customer again?

13   A.    We haven't had one to lose one and breach

14         his contract and not -- and not get it --

15         you know, he had a noncurable breach and

16         get it completed in ten days.

17   Q.    If Sodexho had told you that Henry could

18         come back on the premises, would that have

19         cured the breach?

20   A.    Yes.

21   Q.    If Sodexho had told you that Henry could

22         come back on the premises, would you have

23         terminated Henry?
```

132

1    A.    Not if he got back in the account, no.

2    Q.    Have you ever had someone lose an account

3          and you not send them a curable breach

4          letter?

5    A.    A key account, probably not.  Little

6          mom-and-pops that probably didn't know

7          about it, it's possible.

8    Q.    What is a key account?

9    A.    A key account being a Winn-Dixie or a big

10          account, Sodexho, more than one store,

11          Wal-Mart, Bruno's.

12    Q.    Is there a dollar figure that you have to

13          rise to to reach key account status?

14    A.    Well, not necessarily.  You know, most key

15          accounts are a group of stores or whatever,

16          you know, but no.

17    Q.    So a key account typically is a very large

18          account, though, within one geographic

19          area?

20    A.    A key account is a -- something that we

21          refer to as being a group of stores or, you

22          know, a big volume store.

23    Q.    If -- I'm trying to think of one.  If there

133

1        was a Burger King and the Burger King was

2        in Columbus, Georgia, and it's called on by

3        Flowers in Columbus, Georgia, and there's a

4        Burger King in Montgomery and it's called

5        on by one of your distributors here in

6        Montgomery, is that Burger King in that one

7        geographic area a key account?

8  A.   I would think so, yes.

9  Q.   Because it's got more than one location

10       that Flowers calls on?

11  A.   That's one of the reasons, yes.

12  Q.   Is there another reason besides that?

13  A.   Well, it's -- yeah, it's a national chain,

14       you know.

15  Q.   So if it's a national chain and it's got

16       more than -- or it's got more than one

17       store, then it becomes a key account?

18  A.   Not necessarily.

19  Q.   What else?

20  A.   What else?

21         That's -- like I told you before, it's

22       just a term that we use -- or I use in the

23       bread business as being a key account.

134

1          Maybe everybody don't use it.

2    Q.    Okay.  As far as the actual contract that

3          Henry entered into, did you have any input

4          into his last contract?

5    A.    No.

6    Q.    It wasn't signed by you?

7    A.    No.

8    Q.    It was signed by somebody at home office;

9          right?

10   A.    That's correct.

11                    MR. DAVIS:  Why don't you give me

12                 about five minutes.

13              (A brief recess was taken.)

14              (Plaintiff's Exhibit 1 was marked

15              for identification.)

16   Q.    (Mr. Davis continuing:)  I know I talked

17         about this drawing earlier.  I'm going to

18         just mark it as Plaintiff's Exhibit 1, the

19         drawing that you did of the Montgomery

20         warehouse location.  Let me ask you another

21         question about it.

22         Back here where the freezer was, do

23         y'all still operate that freezer?

135

1   A.   Yes.

2   Q.   Still put bread in it now?

3   A.   Yes.

4   Q.   Do you still remove dates from bread that

5       you put into that freezer as of today?

6   A.   Yeah.

7   Q.   When you take it out, do you put new dates

8       on it still today?

9   A.   Uh-huh (positive response).

10           (Plaintiff's Exhibit 2 was marked

11            for identification.)

12   Q.   Let me show you what I've marked as

13       Plaintiff's Exhibit Number 2.  I think you

14       mentioned an e-mail earlier.  Just look

15       over Plaintiff's Exhibit Number 2 and see

16       if that is the same e-mail that you were

17       talking about earlier.

18   A.   That's correct.

19   Q.   That e-mail is from you to Steve Bordeaux

20       and Michael Lord; is that correct?

21   A.   That is right, yes.

22   Q.   And the date of that e-mail looks like

23       3-16-2005?

136

1    A.    That is right.

2              (Plaintiff's Exhibit 3 was marked

3              for identification.)

4    Q.    Let me show you what I've marked as

5          Plaintiff's Exhibit Number 3.  Do you

6          recognize that document?

7    A.    Yes.

8    Q.    And what is that document?

9    A.    That's a ten-day curable breach.

10   Q.    And which breach did that letter refer to?

11   A.    Troy State.

12   Q.    That's the Troy State Sodexho account that

13         you referred to earlier?

14   A.    That's correct.

15   Q.    That's the account that Mr. Porterfield was

16         terminated over; is that correct?

17              MS. REISS:  Object to the form.

18   A.    That's the one that his contract was

19         terminated.

20   Q.    What's the date of that particular letter?

21   A.    March 7th, 2005.

22   Q.    Is there any difference in the contract

23         that Mr. Porterfield was operating under

137

1      versus a contract that distributors are

2      operating under now?

3  A.   I'm not sure.  I don't know.

4              MR. DAVIS:  That's all I've got.

5              MS. REISS:  I just have a few.

6                   EXAMINATION

7  BY MS. REISS:

8  Q.   Are you aware if Mr. Porterfield ever asked

9      for product out of the freezer?

10 A.   Yes.

11 Q.   Did Mr. Porterfield ever complain to you

12      about having to take product out of the

13      freezer?

14 A.   No.  He was glad to get it.

15 Q.   Do you know if Mr. Porterfield ever

16      complained to anyone else about having to

17      get product out of the freezer?

18 A.   Not to my knowledge, no.

19 Q.   On what occasions do you have to provide

20      product out of a freezer to a customer?

21 A.   Very seldom.  It depends.  There's weeks

22      that go by that you don't.  Then you may

23      have two or three in one week.  But less

138

1    than one percent of our business comes out
2    of there, you know, very seldom.
3  Q.  Are any products that are kept in the
4    freezer delivered to grocery stores?
5  A.  No.  All products are restaurant products.
6    None goes to grocery stores.
7  Q.  Has Mr. Porterfield ever come to you or
8    anyone else that you know of and said that
9    a customer complained that he delivered
10    them products out of a freezer?
11  A.  Not to my knowledge.
12  Q.  Has he ever had a breach issue because he
13    delivered a product that came out of the
14    freezer?
15  A.  Not to my knowledge, no.
16  Q.  Is failure to pull product off the shelf a
17    breach issue?  Is it a possible breach
18    issue?
19  A.  Like out of codes in grocery stores?
20  Q.  Yes.
21  A.  Yes.
22  Q.  Has Mr. Porterfield ever had an issue where
23    he's failed to pull old product off the

139

1          shelf?

2    A.    Yes.

3    Q.    More than once?

4    A.    More than once.  I can remember one in

5          Winn-Dixie, Carter Hill Road.  I think we

6          sent him a breach letter on it.

7    Q.    So he allowed product to go beyond the code

8          on his route; is that correct?

9    A.    In some cases, yes.

10   Q.    Did Mr. Porter -- did you ever receive any

11         complaints from Mr. Porterfield's

12         colleagues/codistributors about

13         Mr. Porterfield?

14   A.    I wouldn't say they were complaints, but

15         I -- they have voiced their opinion about

16         him.

17   Q.    Is it a positive opinion or a negative

18         opinion?

19   A.    Negative.

20   Q.    Can you give me an example?

21   A.    Some examples where they would be missing

22         products and think that he may have got it,

23         you know, just something to uproar the

140

1    warehouse, keep something going all the

2    time.  Since Mr. Porterfield has left, the

3    warehouse has been in more harmony.  The

4    distributors have -- seems like they have

5    come together more so.

6    Q.   Have you ever put any out-of-code product

7         in the freezer?

8    A.   No.

9    Q.   Have you ever offered -- have you ever been

10        in a situation where you've offered

11        Mr. Porterfield to buy back his route?

12   A.   Yes.

13   Q.   Okay.  When did that occur?

14   A.   I think it occurred twice.  And I'm wanting

15        to say, going back to the question earlier,

16        I believe that was one of the meetings we

17        had with him at Tenda Chick, Mike and

18        myself.  That might have been to buy back

19        his route.  I'm not sure.  It's been so

20        long.  But we have offered, I'm thinking,

21        twice -- at least twice to buy back his

22        route.

23   Q.   And you think one of those occasions was at

141

1        the Tenda Chick?

2    A.   I think it could have been.

3    Q.   Would that have been after his breach was

4        not cured?

5    A.   I'm not sure.

6    Q.   When Mr. Stevens is running

7        Mr. Porterfield's route, who is doing

8        Mr. Stevens' job?

9    A.   Most of the time myself or another sales

10       manager.

11    Q.   When Tammy is running his route, who is

12       doing Tammy's job?

13    A.   In most cases Mr. Stevens or another

14       operations manager.  We have to -- when one

15       of them guys are tied up, we have to chip

16       in and do their job.

17    Q.   Since you've been at the Montgomery

18       location since '90, '91, which -- if you

19       know -- well, based on your experience,

20       which route distributor has received the

21       most complaints from customers?

22    A.   Probably Mr. Porterfield.  No.  I'm sure

23       it's Mr. Porterfield.

1   Q.   When Mr. Porterfield was banned from the

2         Air Force Base, do you think his contract

3         should have been terminated at that time?

4   A.   Yes.

5   Q.   Do you know why it wasn't?

6   A.   I do not.

7   Q.   You don't have the power to terminate his

8         contract?

9   A.   I do not, no.

10   Q.   Did any of the customers ever complain to

11        you they suspected Mr. Porterfield was

12        stealing from them other than the Air

13        Force?

14   A.   We've had a couple.  Krystal supervisor,

15        Chris Baker, was one of them.

16              MS. REISS:  That's all I have.

17              MR. DAVIS:  A couple of questions.

18                 EXAMINATION

19  BY MR. DAVIS:

20   Q.   You said that less than one percent of your

21        product actually goes into the freezer?

22   A.   Oh, a lot less than one percent.

23   Q.   What is the total amount of product that

143

1       comes through the Montgomery location?

2    A.   Per day or per week or per --

3    Q.   Per year.

4    A.   Per year?

5         I'm not sure.  I mean --

6    Q.   What about per day?

7    A.   -- I have to look.  I can look it up, but I

8        don't know right offhand.

9    Q.   You don't know how much comes in average

10        per week?

11   A.   I know --

12            MS. REISS:  You mean cost or

13                amount of buns or what are you

14                talking about?

15            MR. DAVIS:  I'm talking about

16                amount of product, a dollar

17                figure for amount of product.

18   A.   I know how much my division runs per week.

19   Q.   How much is that?

20   A.   We run about $230,000 a week.

21   Q.   And is that pretty much constant throughout

22        the year?

23   A.   No.  It's up and down.  It depends on the

144

1  holidays, different things.

2  Q.  How much does it fluctuate up and down?

3  A.  It could go, holidays, 270, 280.

4  Q.  What about down times?  What does it go to

5  a week?

6  A.  That's 220, 230.  That's normal, you know.

7  Q.  So if I go to the grocery store, I'll never

8  get any frozen bread.  I only have to go to

9  restaurants to get frozen bread?

10  A.  You will never get frozen bread out of the

11  grocery stores.

12  MS. REISS:  Object to the form.

13  Q.  You told us that you did some of the extra

14  jobs for Steve Stevens.  Did you get paid

15  any extra?

16  A.  No, sir.

17  Q.  What about for -- did he get paid any extra

18  for doing Tammy Luster's job?

19  A.  No.

20  Q.  Do you know of anybody that got paid any

21  extra for doing any of the jobs when

22  they're out running a route other than

23  somebody that's actually running that route

145

1       full-time?

2    A.   You mean the -- the management?

3    Q.   The management.

4    A.   No, they don't get paid any extra.

5    Q.   You still have about 17 routes today?

6    A.   In Montgomery?

7    Q.   In Montgomery.

8    A.   Somewhere in that -- yeah.  About that

9         many, yes.

10   Q.   More or less?

11   A.   I think we have -- let's see.  I think

12        we've got 11 there in Montgomery now.

13   Q.   What happened to the other?

14   A.   I'm sorry.  No, no, no, not 11.

15            16.

16   Q.   What happened to the other route, one route

17        that you -- when you had 17 at one time?

18        Did it get consolidated?

19   A.   Did I say 17 or about 17?

20   Q.   I thought you said 17, but was it 16?

21   A.   It was -- yeah.

22   Q.   Has there been any fluctuation in that

23        number over the last five years?

1  A.  We may have put one route on, but not that
2      much fluctuation, no.
3  Q.  Do you know which route you put on in the
4      last five years?
5  A.  The last one that was put on was 60 --
6      yeah, 6065.
7  Q.  And which route is that?
8  A.  That's the one that works part of Wetumpka.
9  Q.  Do you know sitting here today typically
10     how long a distributor, if you had to
11     estimate, lasts at Flowers?
12 A.  How long they last?
13 Q.  Typically.
14          MS. REISS:  You mean in
15               Montgomery?
16 Q.  In Montgomery.
17 A.  Well, we got --
18 Q.  I mean, you've been there 25 years, 26
19     years.
20 A.  Okay.  We got one that started to work in
21     '79 or '80 still there.
22 Q.  And do you have some that come and go
23     pretty fast, too, that last less than a

147

1          year?

2     A.   Less than a year?

3              All that I've got now has been there

4          longer than a year.  But we've had them --

5          not necessarily in Montgomery, but, yes --

6          the bread business is not made for

7          everybody.  So, yeah, they come and go.

8     Q.   Back in 1998 did you recommend to your

9          superiors at that time that Henry

10         Porterfield be terminated?

11    A.   I can't remember, but I'm sure I did.

12    Q.   Well, you say you can't remember.  Sitting

13         here today under oath do you have any

14         memory of ever doing that?

15    A.   Of recommending him to be terminated?

16             I think he should have been, yes.

17    Q.   But my question is, sitting here today

18         under oath can you tell me that I did

19         recommend Henry Porterfield be terminated?

20    A.   Yes, I did.

21    Q.   All right.  Who did you talk to in 1998?

22    A.   Steve -- Steve Bordeaux.  I think I may

23         have talked to Calvin Rhodes too.

1           MR. DAVIS:  That's all I've got.

2           (Deposition concluded at

3           approximately 4:40 p.m.)

4           *  *  *  *  *  *  *  *  *

5          FURTHER DEPONENT SAITH NOT

6           *  *  *  *  *  *  *  *  *

7          REPORTER'S CERTIFICATE

8  STATE OF ALABAMA:

9  MONTGOMERY COUNTY:

10      I, Tracye Sadler, Certified Shorthand

11  Reporter and Commissioner for the State of Alabama

12  at Large, do hereby certify that I reported the

13  deposition of:

14             **GRADY MESSER**

15  who was duly sworn by me to speak the truth, the

16  whole truth and nothing but the truth, in the

17  matter of:

18         HENRY PORTERFIELD,

19         Plaintiff,

20         vs.

21         FLOWERS BAKING COMPANY OF

22         OPELIKA, LLC,

23         Defendant.

149

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3              NORTHERN DIVISION

 4              Case Number 2:05-CV-937-MEF

 5   on May 7, 2007.

 6              The foregoing 148 computer-printed pages

 7   contain a true and correct transcript of the

 8   examination of said witness by counsel for the

 9   parties set out herein.  The reading and signing of

10   same is hereby not waived.

11              I further certify that I am neither of

12   kin nor of counsel to the parties to said cause nor

13   in any manner interested in the results thereof.

14              This 15th day of May 2007.

15

16

17
             Tracye Sadler, Certified
18           Shorthand Reporter and
             Commissioner for the State
19           of Alabama at Large

20

21

22

23
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

150

* * * * * * * * * * * * *

WITNESS SIGNATURE PAGE

* * * * * * * * * * * * *


In Re:  Henry Porterfield vs. Flowers Baking Company


    I, **GRADY MESSER**, hereby certify that I have read the foregoing transcript of my deposition given on May 7, 2007, and it is a true and correct transcript of the testimony given by me at the time and place stated with the corrections, if any, and the reasons therefor noted on a separate sheet of paper and attached hereto.



_____
**GRADY MESSER**

    SWORN TO AND SUBSCRIBED before me this _____ day of _____, 2007.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____