haislip, ragan, green, starkie & watson, p.c.
566 south perry street • montgomery, alabama 36104

HRGS&W

1

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HENRY PORTERFIELD,

     Plaintiff,

  vs.               CIVIL ACTION NO.
                     2:05-CV-937-MEF

FLOWERS BAKING COMPANY OF
OPELIKA, LLC,

     Defendant.

       *  *  *  *  *  *  *  *  *  *  *  *


      **DEPOSITION OF STEVE BORDEAUX**, taken

pursuant to stipulation and agreement before Tracye

Sadler, Certified Shorthand Reporter and

Commissioner for the State of Alabama at Large, at

the Tiger Town Inn, 205 21st Street, Opelika,

Alabama, on May 8, 2007, commencing at

approximately 11:10 a.m.

       *  *  *  *  *  *  *  *  *  *  *  *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.

11

1   Q.   How long were you a supervisor in

2        Montgomery?

3   A.   I believe it was in '85 or '86 they

4        promoted me to sales manager.

5   Q.   Of Montgomery?

6   A.   Yes, sir.

7   Q.   And how long were you sales manager in

8        Montgomery?

9   A.   Until May of '91.

10  Q.   And what happened in May of '91?

11  A.   I was promoted to VP of sales for Opelika

12       bakery -- Flowers Baking Company of

13       Opelika.

14  Q.   And how long did you stay VP of sales in

15       Opelika?

16  A.   Just till approximately two and a half

17       years ago.  I got promoted to plant

18       president.

19  Q.   2004 or --

20  A.   No, sir.  It was 2005, January of 2005.

21  Q.   To president of Flowers Baking Company of

22       Opelika?

23  A.   That is correct.

12

1   Q.   And what's your job duties and
2        responsibilities as president for Flowers
3        Baking Company of Opelika?
4   A.   Responsibility is to reach our sales profit
5        goal, lead, guide, and direct management
6        teams over each department to reach their
7        goals and exceed in the bread-making
8        industry.
9   Q.   You were working in Montgomery when Henry
10       Porterfield was hired; correct?
11  A.   I believe that is correct.
12  Q.   Did you hire Mr. Porterfield?
13  A.   I was thinking about that the other day,
14       and I can't remember if I hired Henry or
15       someone else did.  I'm pretty sure that I
16       perhaps interviewed with him, but I'm
17       not -- not sure if I was the one that
18       actually gave the final okay to hire
19       Mr. Porterfield.
20  Q.   Were you sales manager when Mr. Porterfield
21       was hired or were you supervisor?
22  A.   I'm not exactly sure.  I can't remember
23       if -- exactly what year Mr. Porterfield

13

1    started as a route salesperson at the

2    time.  It was quite a few years ago though.

3  Q.  Mr. Porterfield was -- his contract with

4    Flowers Baking Company was terminated in

5    March of 2005, I believe?

6  A.  Yes, sir, I believe so.

7  Q.  Tell me what your involvement was regarding

8    the termination of Mr. Porterfield's

9    contract.

10  A.  My involvement was to give the final say-so

11    whether to go forward or not go forward on

12    the issue of the curable breach.

13  Q.  When you say go forward or not go forward,

14    explain to me what you mean by that.

15  A.  Whether to terminate the contract for the

16    curable breach that was not cured or not

17    to.

18  Q.  And who besides yourself participated in

19    that decision-making process?

20  A.  Michael Lord and myself.

21  Q.  Tell me what you recall about the first

22    time that you heard about the breach that

23    Mr. Porterfield had with his contract.

1    A.    On -- for this particular incident was with

2          the Sodexho Marriott account, which is part

3          of Troy State, that he did not service the

4          account and that she didn't want him

5          servicing anymore, you know, just for his

6          lack of performance.

7    Q.    Who told you about this breach with Sodexho

8          Marriott?

9    A.    Michael Lord and Grady Messer.

10   Q.    Was that by phone or did y'all have a

11         meeting, or how did that --

12   A.    He sent us an e-mail, Grady Messer did, at

13         approximately the same time addressed to

14         myself and to Michael Lord.

15   Q.    And then once you got the e-mail, did you

16         meet with Grady Messer or was everything

17         done over the phone after that?

18   A.    Some of both.  We met with him and also

19         discussed the issue over the phone.

20   Q.    Who besides yourself met with Grady Messer

21         in person?

22   A.    I believe it was just us three.

23   Q.    You, Michael Lord, and Grady Messer?

15

1    A.    Grady Messer.

2    Q.    And where did y'all meet?

3    A.    In Montgomery.  We didn't meet at the

4          warehouse.  I can't remember the exact

5          location.  We did at times meet at the

6          Steak-n-Shake, Hardee's.  I can't remember

7          the exact place that we met.

8    Q.    Tell me what you remember about that

9          meeting with you, Grady Messer, and Michael

10         Lord.

11   A.    We discussed what happened, that this lady

12         was upset that she didn't get service.  And

13         she also brought up the fact that she had

14         had a problem before not getting proper

15         service.  That was mentioned.  And I

16         believe Grady told me that Steve Stevens

17         went to see her at one time before on this

18         other incident that he didn't get -- she

19         didn't get proper service about, you know,

20         the service issues that she's been having,

21         and she didn't want any more service

22         problem issues.  And if not, she was going

23         to change.  And Steve Stevens corrected

16

1    everything with her and let Henry continue
2    to work her at that time.
3  Q.  And was this Grady that was telling you
4    this?
5  A.  Yes, sir.
6  Q.  Did you meet with Grady in person more than
7    once or just once?
8  A.  I'm pretty sure we met more than once,
9    probably also at our bakery.
10 Q.  In Opelika?
11 A.  Yes, sir.
12 Q.  What do you recall about a meeting with
13    Grady Messer at the bakery in Opelika?
14 A.  More or less the same that I just
15    mentioned, that -- the curable breach and
16    it was not cured or was going -- looked
17    like it was not going to be cured within
18    the ten-day span.
19 Q.  Okay.  So you think you met with Grady at
20    least two times before the termination of
21    the contract?
22 A.  Yes, sir.
23 Q.  And --

17

1   A.   And probably talked a couple -- you know,

2        several times over the phone.

3   Q.   Tell me about the phone conversations that

4        you recall.

5   A.   More of the same.  Just rehashed the same

6        thing that we had talked about before.

7   Q.   How long were the phone conversations?

8   A.   I don't recall.  I mean, I'm sure we

9        discussed other issues at the time when we

10       were on the phone.

11  Q.   Was it a call specifically to discuss Henry

12       Porterfield or was it a general --

13  A.   I don't remember, sir.

14  Q.   When was the decision made to terminate the

15       contract?

16  A.   I believe it was the very next day.

17  Q.   Very next day after what?

18  A.   After he got the curable breach --

19  Q.   Letter?

20  A.   -- letter, yes, sir, which was the very

21       next day that he got the curable breach

22       letter.  I believe the breach actually

23       happened on March the 6th and then we gave

18

1   him a ten-day curable breach letter the
2   7th.
3   Q.  And you decided to terminate him then?
4   A.  No, sir.  I can't terminate anybody, but I
5       can give them a letter to cure a breach.
6   Q.  So a letter was given to cure the breach on
7       the 7th?
8   A.  Yes, sir, I believe so.
9   Q.  When was the decision made to terminate
10      Mr. Porterfield's contract?
11  A.  I believe it was the 16th or the 17th.  I'm
12      not exactly sure on the correct date.  It
13      was ten days from the time he got the
14      letter.
15  Q.  And was the decision to terminate his
16      contract based upon failure to secure the
17      Sodexho Marriott contract?
18  A.  Yes, sir.
19  Q.  And that was it?
20  A.  Yes, sir.
21  Q.  Have you ever had other distributors that
22      worked underneath you at any level -- I
23      mean -- any level -- any of the positions

19

1      that you were holding with Flowers -- And I

2      think you just told me about all of them.

3      But have you ever had any route salesmen

4      that had a breach that was not cured and

5      continued to work for Flowers after that?

6  A.  There are some distributors that we gave

7      breach letters to and they did not cure the

8      breach letters and they went ahead and

9      decided to go ahead and sell their route

10     back to Flowers Baking Company of Opelika

11     prior to the ten-day span, you know, for

12     the contract.

13  Q.  Other than that have there been any

14     distributors that have had breach letters

15     sent to them and they didn't cure the

16     breach?

17  A.  Yes, sir.  We've had some people that we've

18     sent registered mail to -- of course, the

19     registered mail would come back to us where

20     they had abandoned their route and just

21     moved away completely and we never heard

22     from them again.  They might have had some

23     problems with the Internal Revenue.  We had

20

1    that happen one time.  We have one that we

2    don't know what happened to him.  He

3    just -- we went over to his house and

4    nobody was there.  His truck was sitting

5    there with a blown engine.

6  Q.  Have you ever had a route salesman that

7      didn't cure a breach that continued to work

8      for Flowers?

9  A.  Not to my knowledge.

10  Q.  Have you ever had distributors or route

11      salesmen that have lost accounts similar to

12      Sodexho Marriott that didn't get a breach

13      letter at all?

14  A.  Not to my knowledge.

15  Q.  Is it standard operating procedure every

16      time that an account is lost that that

17      distributor will get a ten-day breach

18      letter?

19  A.  I don't know if it's always.  I'm sure

20      there's probably some circumstances in

21      there that maybe someone did not get one,

22      but I can't -- I don't know of any to my

23      knowledge.

21

1  Q.  Can you think of a situation where someone

2      wouldn't get a ten-day notice letter once

3      they lost an account?

4  A.  No, sir, I cannot.

5  Q.  Did you have any conversations with Henry

6      Porterfield after the ten-day breach letter

7      was sent out to him?

8  A.  No, sir.

9  Q.  Have you had any conversations with

10     Mr. Porterfield since that time?

11 A.  No, sir.

12 Q.  When's the last time that you spoke to

13     Mr. Porterfield?

14 A.  I don't know.  I can't remember the last

15     time that I actually spoke with him.

16 Q.  Was it around the time that his contract

17     was terminated?  Was it months before?  Was

18     it years before?

19 A.  No, sir.  I don't know.  I mean, I don't

20     know.

21 Q.  You don't have any --

22 A.  The last time I actually spoke with him,

23     no, sir, I do not know.

22

1  Q.  You don't have any memory of speaking with
2      him in the last five years?
3  A.  I'm sure that I have spoken with him in the
4      last five years, but I don't know the exact
5      date or exactly what it was about or
6      anything.
7  Q.  You don't have any memory of it today?
8  A.  I don't have any memory of it at all, sir,
9      not just today other than, you know, me
10     seeing Mr. Porterfield out there a few
11     minutes ago and said hey.
12 Q.  There's been testimony yesterday and today
13     concerning bread that was placed into the
14     freezer at the Montgomery warehouse
15     location, the Opelika warehouse location,
16     and the Phenix City warehouse location.
17     Are you aware that bread is placed into the
18     freezer at those locations?
19 A.  Yes, sir.  I'm aware that the main use of
20     that freezer is for bun usage.  There
21     perhaps might have been some bread in -- as
22     I refer to as loaf breads.  There may have
23     been some in there, but I'm not exactly

23

1    sure what was in there.  But I know the

2    biggest part of it was mainly buns.

3  Q.  How long is that bread stored in the

4    freezer?

5  A.  We try not to keep it longer than any three

6    months -- two months to three months.  It

7    is subject to get freezer-burned.

8  Q.  What happens to the bread once it's removed

9    from the freezer?

10  A.  If it's been in there longer than three

11    months, then we remove it and throw it in

12    the trash dumpster because it had freezer

13    burn on it.

14  Q.  If it's being sold to a restaurant, what

15    happens to the bread?

16    When I say bread, buns, bread

17    products.

18  A.  What do you mean by what happened to it?  I

19    mean, what --

20  Q.  Are you aware that the dates are removed

21    from the product?

22  A.  Yes, sir.

23  Q.  Are you aware that new dates are placed

24

1      onto the product?

2  A.   Yes, sir.  Most of the time dates are put

3       on them, but there is times where dates

4       were not put on it.

5  Q.   Were you the person that authorized the

6       dates to be removed from the product?

7  A.   As far as being authorized, I can't say

8       that I was actually authorized to do it,

9       but it's just something that we've been

10      doing.  And I was aware of it, so you could

11      say that I authorized it, yes, sir.

12 Q.   At least while you've been the president of

13      the company at Flowers Baking Company of

14      Opelika you've authorized it?

15 A.   Yes, sir.

16 Q.   Before you were the president -- when you

17      were the vice president, who was the

18      president at that time?

19 A.   That was Calvin Rhodes.

20 Q.   And did Mr. Rhodes know that bread was

21      being taken out of the freezer and new

22      dates placed on it?

23 A.   Yes, sir, I'm -- I believe he was aware of

25

1      that, yes, sir.

2            When you refer to bread, you are

3      meaning buns in particular?

4   Q.  Buns, yes.  Yes.

5            How do you think -- or how do you know

6      that Mr. Rhodes was aware of it?

7   A.  Mr. Rhodes was there when we purchased the

8      freezers from Burger King.

9   Q.  Was he aware that the dates were removed

10     from the product?

11  A.  Yes, sir.

12  Q.  Was he aware that the new dates were placed

13     onto the product?

14  A.  Yes, sir.

15  Q.  Have you discussed the fact that you use

16     bread from the freezer with Brad Alexander,

17     the regional vice president?

18  A.  Can you ask that question again for me,

19     please?

20  Q.  Sure.  Have you discussed the fact that

21     bread is taken from a freezer at your

22     Montgomery, your Opelika, and your Phenix

23     City locations and sold to restaurants --

26

| | | |
|---|---|---|
| 1 | | and when I say bread, I'm meaning buns. |
| 2 | A. | Yes, sir. |
| 3 | Q. | Have you discussed that with Brad Alexander |
| 4 | | who is the regional vice president of |
| 5 | | Flowers Foods? |
| 6 | A. | Yes, sir, he's aware of it. |
| 7 | Q. | How do you know Mr. Brad Alexander is aware |
| 8 | | of it? |
| 9 | A. | Because I told him. |
| 10 | Q. | Has he been there when it's been done, I |
| 11 | | mean, when you've actually been removing |
| 12 | | dates? |
| 13 | A. | No, sir, he hasn't been there. |
| 14 | Q. | Why did you tell Brad Alexander that you |
| 15 | | were doing that? |
| 16 | A. | Because we had this pending lawsuit and he |
| 17 | | needed to be aware of it. |
| 18 | Q. | When did you tell him? |
| 19 | A. | I don't recall the exact date.  No, sir, I |
| 20 | | do not. |
| 21 | Q. | It's been after the lawsuit has been filed? |
| 22 | A. | I'm sure he knew about it before, but I |
| 23 | | can't recall me telling Brad Alexander we |

27

1       have a freezer in those locations and we

2       are putting product in there and selling

3       it.

4   Q.  Are you aware of freezers in any other

5       locations other than those three that I've

6       discussed?

7   A.  No, sir, I'm not aware what other

8       facilities have.

9   Q.  What did Mr. Brad Alexander tell you when

10      you told him that you were placing bread

11      into the freezer?

12  A.  Off the top of my head I don't actually

13      recall.  I mean, you know, said just make

14      sure that we do it -- we're doing it

15      properly, let it thaw properly.

16  Q.  He didn't tell you to stop doing it though?

17  A.  No, sir.

18  Q.  Did you tell Mr. Alexander that you were

19      removing the old dates and placing new

20      dates on the product?

21  A.  Yes, sir.

22  Q.  He didn't tell you to stop that either, did

23      he?

28

1   A.   No, sir.

2   Q.   What about Mr. Lord, Gene Lord?  Is he

3         aware that you have product that's being

4         placed into a freezer and then sold to

5         customers in the restaurant business?

6   A.   I'm not really sure what he knows.

7   Q.   Have you ever discussed it with him?

8   A.   No, sir.

9   Q.   Ever received any memos from him?

10   A.   No, sir.

11   Q.   Ever received any e-mails from him?

12   A.   Excuse me.  I have received e-mails from

13         him, yes, sir.

14   Q.   Dealing with the fact that bread is -- or

15         product is being placed into the freezer

16         and then removed at a later date and sold?

17   A.   No, sir, I haven't had any discussion with

18         him or any e-mail correspondence to that

19         regard with Mr. Lord.

20   Q.   Who besides Mr. Brad Alexander have you

21         discussed the fact that bread is being --

22         buns are being placed into the freezer and

23         then removed at a later date and sold?

29

1 A. No one other than legal counsel.

2 Q. No one other than legal counsel?

3 A. And Mr. Messer, which he knows about it

4    because he was there.

5 Q. Anything that you recall Brad Alexander

6    telling you after you discussed it with

7    him?

8        MS. REISS:  Object to the form.

9         Asked and answered.  You can

10        go ahead and answer.

11 A. Would you repeat the question.

12 Q. Anything at all that you recall Brad

13    Alexander telling you about the fact

14    that -- you know, after you told him the

15    fact that you were placing bread into the

16    freezer, removing the dates, and placing

17    new dates on them?

18        MS. REISS:  Same objection.

19 A. No, sir, I can't remember anything specific

20    other than what I've already stated.

21 Q. And you think that was after this lawsuit

22    was filed or you think it could have been

23    before?

30

1    A.    I'm pretty sure it was before.  I mean, he

2          was aware that we had the freezers and that

3          we purchased them from Burger King and, you

4          know, knew what we were doing with them.

5          There's emergency situations and that's all

6          the freezers were for was emergency

7          situations.  It's not something every day,

8          but that's -- that practice is being done.

9          And that's all they are for is for

10         emergency situations for fast food

11         restaurants mainly.

12   Q.    Let me ask you this:  Regarding your route

13         salesmen such as Henry Porterfield, does

14         Flowers have the right to direct the manner

15         in which Mr. Porterfield does business?

16               MR. HISTA:  You want to clarify

17                    the time frame, whether you're

18                    talking about when he was an

19                    employee route salesman or

20                    when he was a distributor.  He

21                    was both.

22               MR. DAVIS:  When he was a

23                    distributor.

31

1    A.    Would you repeat the question, please.

2              MR. DAVIS:  Read it back, please.

3              (Requested portion of the record

4              read by the court reporter.)

5              MR. HISTA:  Also object to the

6              extent it calls for a legal

7              conclusion.

8    Q.    You can answer.

9    A.    As far as us having the rights to actually

10         tell Henry what to do, we don't tell him

11         what to do.  The consumers -- or his

12         customers on his route tell him what to

13         do.  All we can do is advise him what he

14         should do and what has been done in the

15         past and is proven good selling practices

16         and give advice to him.

17   Q.    Let's take Henry for example.  If Henry

18         delivers product outside a restaurant

19         instead of inside the restaurant, do you

20         have the right to tell him, Henry, you

21         can't deliver product outside this

22         restaurant, you need to make sure it's

23         delivered inside this restaurant?

32

1   A.   Again, like I stated before, I cannot tell

2        Henry that he needs to deliver product

3        inside the restaurant.  That particular

4        customer needs to tell him that he needs to

5        deliver it inside the restaurant.

6   Q.   And if he --

7   A.   And that's a known given practice that we

8        do is deliver it inside the restaurant, not

9        leave it outside the restaurant.

10  Q.   And if the customer tells him to deliver it

11       inside the restaurant and he doesn't

12       deliver it inside the restaurant, then do

13       you have the right to terminate him?

14              MS. REISS:  Object to the form.

15              They can't terminate him.

16  Q.   Terminate his contract.

17  A.   We can't terminate him for leaving product

18       outside of a restaurant.

19  Q.   If the company that he's left the product

20       outside of says we're not going to do

21       business with you anymore because he left

22       the product outside, would that be a breach

23       of the contract?

33

1   A.   Say that again, sir.

2   Q.   If the restaurant comes to you and says,

3        Mr. Bordeaux, Henry left product outside my

4        restaurant, I don't want to do business

5        with Henry anymore, do you then have the

6        right to terminate his contract with

7        Flowers?

8   A.   No, sir.  I would give him a breach letter

9        to get with that particular manager or

10       owner to correct his actions in that

11       particular account.

12  Q.   And if -- go ahead.

13  A.   And you've referred to terminating --

14       excuse me.  I --

15  Q.   Go right ahead.

16  A.   I can't terminate him for anything

17       because -- all I can do is terminate his

18       contract.  I cannot terminate him.  I

19       cannot fire Henry Porterfield.

20  Q.   You can terminate his contract?

21  A.   That's correct.

22  Q.   And in the business world if he's unable to

23       get back in and get that business back,

34

1              then you have the right if you've sent him

2              a ten-day breach letter to terminate his

3              contract with Flowers; is that right?

4      A.      That's correct.  I mean, if he can't cure

5              the breach, we have the right to terminate

6              the contract.

7      Q.      So on a distributorship agreement there are

8              restaurants, businesses, grocery stores

9              that are within a geographic area that that

10             distributor has a right to distribute

11             product to; correct?

12     A.      That is correct.

13     Q.      And when Henry became a distributor for

14             Flowers, he came in and he was given the

15             option to purchase a particular area; isn't

16             that correct?

17     A.      Purchase the rights to a particular area,

18             yes, sir.

19     Q.      The rights.  And he purchased rights to a

20             particular area; correct?

21     A.      Uh-huh (positive response).  Yes, sir.

22     Q.      And those rights are that distributor's

23             exclusive rights; is that correct?

35

1   A.   Yes, sir.

2   Q.   No one else can come in and sell Flowers

3        product within that geographic area that he

4        purchased, can they?

5   A.   Another distributor cannot, but we have the

6        right -- as a company we could come in

7        there and build a satellite warehouse or a

8        satellite thrift store to sell product

9        within that particular territory, yes, sir,

10       we do.

11  Q.   But if I purchased a geographic territory

12       and I paid for that geographic territory,

13       John Doe, if he has purchased a geographic

14       territory right next to mine with Flowers,

15       also, he can't come to the warehouse and

16       pick up bread and go deliver to a store or

17       a restaurant or business right smack dab in

18       the middle of my geographic territory, can

19       he?

20  A.   Only under certain situations.  If that

21       particular distributor was thrown out of

22       that account or there was a problem with

23       the account and they didn't want that

36

1    particular distributor to service them,

2    that distributor could get another person

3    to come into his territory and service that

4    account.  Or if he abandoned that account

5    and we didn't know about it and they called

6    in and we sent somebody, whether it be the

7    one next to him or the one two territories

8    over, to go service the account.  We can --

9    it can be done under certain situations

10   when he has abandoned it or -- and didn't

11   tell anybody and they called in for service

12   or he got another distributor to come in

13   and service it.

14   Q.   If an account has never been abandoned, if

15        it's -- let's just say that there is -- a

16        brand new store comes in -- a brand new

17        restaurant comes into an account and it's

18        within a geographic territory owned by

19        Henry Porterfield.  If John Doe has the

20        account right next to it, can he go over to

21        that geographic area and call on that new

22        customer and get that business in that

23        geographic territory owned by Henry

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

37

1           Porterfield?

2    A.    Yes, sir, he can.

3    Q.    And what would happen?  He would receive --

4    A.    Only if he gave him permission to do so.

5    Q.    If he did not have permission to do so at

6          all, if John Doe had no permission to go

7          into that geographic area and solicit

8          business, does he have the right to go in

9          and solicit business within a geographic

10         area that's not his?

11              MR. HISTA:  Objection to the

12                  extent it calls for a legal

13                  conclusion, but otherwise the

14                  witness can answer.

15   A.    No.  He -- he doesn't have the rights to go

16         in there.

17   Q.    Only Mr. Porterfield would have the rights

18         to go and call on clients within his

19         geographic area?

20   A.    That is correct.

21   Q.    And, likewise, John Doe -- no one can go

22         into John Doe's area and call on his

23         accounts unless he gives them permission to

38

1        do so.  Otherwise those are his accounts

2        within that area, any new account that

3        comes into that area?

4    A.   Yes, sir.  There's been other distributors

5        that have called on certain accounts that

6        might be in John Doe's territory just

7        because that person knew the owner of that

8        store and by doing so we've picked up that

9        account and all of its sister stores or

10       restaurants and this particular guy had two

11       of them in his territory.  So there are

12       certain circumstances regarding that.  It

13       could happen.  But if he called on that

14       one, John Doe over here would be servicing

15       his restaurant that this distributor or

16       Flowers management person called on at the

17       time to possibly pick up those accounts.

18   Q.   And if John Doe had someone come into his

19       territory and start servicing another

20       business -- and using your example -- I'm

21       sorry.  I have to draw with a pen in my

22       hand -- talk with a pen in my hand.

23            If we've got two geographic areas and

39

1    we've got John Doe over here and we've got

2    Jim Doe over here.  If John has two or

3    three accounts that he's calling on within

4    his geographic territory and a third one

5    moves into Jim Doe's territory, can John

6    Doe call on that account in Jim Doe's

7    territory?

8  A.    Yes, sir, if he wants to call on it.

9  Q.    Will John Doe be compensated if he gets

10    business from that account within Jim Doe's

11    territory?

12  A.    No, sir.  We'll tell him thank you for

13    helping your fellow distributor out, Jim,

14    for helping him --

15  Q.    Jim would get paid for that account;

16    correct?

17  A.    Yes, sir.

18         -- for helping Jim get some business

19    and make some more discount.

20  Q.    Otherwise there would be a breach of the

21    exclusivity provisions in the distributor

22    agreement?

23         MS. REISS:  I object to the extent

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

40

1        it calls for a legal

2        conclusion.  You can answer.

3   A.   Yes, sir, most cases it would be.  On your

4        little map there, not all territories butt

5        up to each other exactly just for reference

6        purposes.

7   Q.   And since we were discussing it, I'll just

8        go ahead and mark it as Plaintiff's 1 to

9        this deposition.

10              (Plaintiff's Exhibit 1 was marked

11              for identification.)

12  A.   Mr. Davis, can I comment on that?

13  Q.   Yes.

14  A.   We have had that happen where a distributor

15       refused to work it because it was a private

16       label account or a fast food account and

17       their discount was not up to where they

18       thought they could be profitable for their

19       route to service that account.

20  Q.   Has Flowers ever been sued by one

21       distributor over a scenario similar to what

22       we've just been discussing?

23  A.   I don't have any knowledge of that.

41

1   Q.   Did Raymond Price work under you in

2       Montgomery?

3   A.   Not directly under me as a distributor, no,

4       sir.  I think I might have been -- I was

5       sales manager there.  Some district

6       managers or supervisors there under him, I

7       believe.

8   Q.   Are you aware that Raymond Price filed a

9       lawsuit against Flowers?

10   A.   Yes, sir, I'm aware of that.

11   Q.   Do you know what the reason that he filed

12       the lawsuit was?

13   A.   Right at this time, unless I go back and

14       research it, no, sir, I can't -- don't

15       recall.

16   Q.   Tell me about distributors -- I'm sorry --

17       about route salesmen.  If you've got a

18       route salesman and he's calling on a

19       particular geographic area, he also has to

20       pick up bread within that geographic area

21       that is out of code; is that correct?

22               MS. REISS:  Wait a minute.  You're

23                talking about route salesmen

42

1           now?

2                   MR. DAVIS:  I'm sorry.  I'm

3               sorry.  Distributors.

4           MS. REISS:  Okay.

5    Q.   If you've got a distributor, he's got to

6         pick up bread within his area that's out of

7         code?

8    A.   Yes, sir, he's supposed to.

9    Q.   What happens when the distributor picks up

10        bread that's out of code?  What's done with

11        it?

12   A.   It's supposed to be throwed away, but we

13        didn't always have people to throw it

14        away.  We didn't give them credit for it

15        because it has happened quite often -- or

16        at times.  Excuse me.

17   Q.   What about the thrift store?  How does the

18        thrift store work within a -- like at the

19        Montgomery warehouse, where does the bread

20        come from for the thrift stores?

21   A.   It comes from the distributor routes.

22   Q.   Is that bread that's been picked up on

23        those routes?

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

43

1    A.    Yes, sir.

2    Q.    It's been -- walk me through -- give me an

3          example of what happens from, I guess, the

4          time the bread gets there to the time it

5          gets to the thrift store.

6    A.    Well, the distributor comes in at the end

7          of the day and finishes working all of his

8          accounts and sorts the product out.  And

9          the thrift store operator checks him in

10         based on a sheet of paper that lists all of

11         the products to see if it's all there.

12   Q.    Does the distributor -- I guess to begin

13         with he picks up bread from the warehouse

14         and takes it out to customers out in the

15         field; is that correct?

16   A.    That's correct.

17   Q.    Like Winn-Dixie, you know, Publix,

18         different supermarkets.  At the end of five

19         days has that product been picked up if

20         it's still on the shelf at Publix or

21         Winn-Dixie or whatever by that distributor?

22   A.    The product is picked up by the

23         distributors, yes, sir, and it comes back

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

44

1    to the outlet stores.

2  Q.    Comes back to the outlet stores.  Does

3        Flowers control the distributor as to how,

4        when, where he's to pick up the bread?

5              MS. REISS:  I'm going to object to

6                  the extent it calls for a

7                  legal conclusion.  You can

8                  answer.

9  A.    We don't control him, no, sir.

10 Q.    Do you tell the distributor that he's got

11       to pick up bread that's, you know, four or

12       five days old based on the code?

13 A.    Picking up what the color tie says for it

14       to be picked up on, yes, sir.

15 Q.    Can the distributor pick up bread that is

16       not out of code and bring it back in?

17 A.    He can pick it up if it's in code, out of

18       code, molded, falling apart in the bag, and

19       bring it back.

20 Q.    Bring it back.  Get credit for it when he

21       brings it back?

22 A.    I didn't say that, but we would make a

23       judgment call at that time.

45

1    Q.    When does he get credit for it?

2    A.    Usually that afternoon when he closes out

3          his hand-held computer.

4    Q.    And what products does he get credit for?

5          Does he get credit for molded bread?

6    A.    Gets credit for all the products that's on

7          that sheet.

8    Q.    And do you tell him that he has to pick up

9          molded bread, also, off the shelf?

10   A.    I don't tell him, but usually he won't have

11         to wait very long.  His customers are going

12         to tell him to get it off of there.

13   Q.    You have a procedure, though, set up

14         whereby bread is color-coded.  It's got

15         different twist ties on it; correct?

16   A.    Correct.

17   Q.    He can walk into a business and look at it

18         and go -- by looking at the twist ties and

19         tell which bread to pick back up; correct?

20   A.    Correct.

21   Q.    That's a procedure that Flowers has set up;

22         correct?

23   A.    Right.

46

1   Q.   Once it's picked up, if it's still usable

2         bread, it's brought back into the thrift

3         store; correct?

4   A.   That's correct.

5   Q.   And when it gets to the thrift store, you

6         instruct him on what to do with the bread,

7         is that correct, as far as bringing it to

8         the thrift store?

9   A.   Oh, yes, sir.  He's already brought it to

10        the store, yes, sir.

11   Q.   Brings it to the thrift store.  What he's

12        to do with it once it gets there?

13   A.   Right.

14   Q.   That he's supposed to sort it, fill out the

15        proper paperwork; is that correct?

16   A.   Usually the computer fills out the

17        paperwork for you on what he's actually

18        leaving in the store.

19   Q.   And the stales -- I think is what you refer

20        to them in the industry as, the stales.

21        That's the -- the product that's stale has

22        to be separated?

23   A.   Excuse me for interrupting.

47

1   Q.   Sure.

2   A.   Stales or returns, yes.  Those words are

3        used quite often, yes, sir.

4   Q.   The stales or returns have to be separated

5        when he returns them back.  He can't bring

6        them in in bulk and put them all in one --

7        they have to be separated out; correct?

8   A.   That's correct.

9   Q.   And how much is he allowed to bring back to

10       the thrift stores?

11  A.   There's no certain or definite number that

12       we concrete stand by.  Each route was set

13       up based on anything under eight percent or

14       seven percent, depending on the volume of

15       the route, as a goal that we shoot for as

16       far as a dollar budget allowed for that

17       particular route.  So all routes were

18       different.  Some might have been $500 worth

19       of stale that we thought was adequate for

20       that route to cover all of his space in the

21       stores and gain new customers and have

22       repeat sales.  Normally a bread rack

23       wouldn't sell if it's very low on product.

48

```
1          So you have to have some product on the
2          shelf, you know, to maintain your shelf
3          space.
4    Q.    Well, is it five percent, seven percent,
5          eight percent, or does it vary according to
6          the routes?
7    A.    It varies for the routes.  Some routes may
8          have a seven-percent goal.  Some routes may
9          have a ten-percent goal.
10   Q.    And when you say a goal, are you talking
11         about a goal of less than that percentage
12         being stale or being returns?
13   A.    Less as far as percentage based on the
14         amount of dollar sales for that week.
15         Normally the set goal does not change given
16         for that route.  It might be $500 for an
17         example and that equates to eight percent
18         for that route.  Another route, route B,
19         might be $800 stale goal, but that's
20         required because -- due to the customers
21         may insist that -- to give you an example,
22         Mr. Davis, you're not going to leave my
23         bread rack this low.  I want my bread rack
```

49

1       kept full.  Some of those accounts we're

2       aware of that.  Some accounts we give extra

3       stale dollar budgets to to account for some

4       of those customers that are that demanding

5       and want more product on their shelves out.

6   Q.   And Flowers sets the stale budget allowance

7       or the stale budget goals?

8   A.   For our records we do, but for the

9       distributor -- it's ten percent is what we

10      allow.  Anything over ten percent is taboo.

11  Q.   Anything over ten percent would be excess?

12  A.   Excess of their ten-percent goal, yes, sir.

13  Q.   Of their ten-percent goal.

14  A.   And that's explained to them prior to

15      purchasing that distributor route.

16  Q.   And what happens if a distributor brings in

17      12 percent of stale product back to the

18      thrift store?  Do they get credit for all

19      12 percent?

20  A.   Yes, sir.  It's not -- this is not a

21      cut-and-dried situation on the stale for a

22      given route.  Some routes go over their

23      budget every week.  We know why they go

50

1    over it because that store is that

2    demanding and they need the product.  If

3    they continue to go over their stale goal,

4    we would counsel with them and ask them

5    what's the problem, can we help you, do I

6    need to go see store manager A for you to

7    ask him to, you know, let us cut back the

8    product that's on the shelf and in turn

9    would help us have less stale.

10                (Plaintiff's Exhibit 2 was marked

11                for identification.)

12   Q.   Let me show you what I've marked as

13        Plaintiff's Exhibit Number 2.

14   A.   Okay.

15   Q.   What's the date on that memo?

16   A.   January 24th of 2005.

17   Q.   And that's from Michael Lord?

18   A.   Yes, sir.

19   Q.   And you got a copy of this memo it shows;

20        is that correct?

21   A.   Yes, sir.

22   Q.   And it's addressed to the distributors?

23   A.   Yes, sir.

51

1   Q.   Distributors being persons like Mr. Henry

2        Porterfield was at that time?

3   A.   Yes, sir.

4   Q.   And does that basically set forth Flowers'

5        policy regarding the thrift stores?

6   A.   It sets forth something that's not being

7        done that was explained to them prior to

8        them being a distributor and they all

9        agreed to do by signing the contract.

10  Q.   It says -- just read the first paragraph

11       there for me.  If you would, read it out

12       loud.

13  A.   You should be delivering your --

14            MS. REISS:  No.  It has come to my

15                  attention --

16  Q.   No.  It's come to my attention.

17  A.   It's come to my attention that we have a

18       few routes that are not following procedure

19       when it comes to delivering stales to the

20       thrift store.  Effective immediately the

21       following procedure must take place.

22  Q.   All right.  So Flowers has set forth

23       procedures that distributors must follow

1      regarding thrift stores; correct?

2  A.  That's correct.  If they want to receive

3      credit for their product, yes, sir,

4      that's -- and this was explained to them

5      prior to them being a distributor also.

6  Q.  And the very first one there says you

7      should be delivering your stales to the

8      thrift store on a daily basis.  Going to

9      the thrift store twice per week will not be

10     acceptable.  Is that correct?  Did I read

11     that correct?

12 A.  That's what it states, yes, sir.

13 Q.  So Flowers controls the distributors by

14     telling them how many days a week they must

15     go to the thrift store to deliver product?

16          MS. REISS:  I'm going to object to

17               the extent it calls for a

18               legal conclusion.  You can

19               answer.

20 A.  You made the comment of us controlling

21     them.  No, sir, it does not control them.

22     This is standard procedures that we put

23     forth prior to them becoming distributors

53

1          and it was all explained to them that that

2          was part of the agreement that they had to

3          do.  And all we were doing is reinforcing

4          the procedures that had already been

5          explained to them.

6     Q.   Well, the procedures are that they have to

7          go to the thrift store on a daily basis;

8          correct?

9     A.   If they have any stale, yes, sir.

10    Q.   And the procedure as set forth in this

11         paragraph numbered number one, going to the

12         thrift store twice per week will not be

13         acceptable; is that correct?

14    A.   That's what it states.

15    Q.   And not be acceptable from Flowers?

16         Flowers won't accept it if you go to the

17         stores only twice a week?

18    A.   That's what it states, but we usually

19         accepted it.  Because it happened where

20         somebody -- you know, several didn't go

21         twice -- you know, every day.  And we had

22         to get with all of those distributors that

23         violated that particular item right there.

54

```
 1   Q.   But you want them to come to the store on a
 2        daily basis with their stale product if
 3        they have any?
 4   A.   Yes, sir.
 5   Q.   The second paragraph:  You should be
 6        running two copies of your stale report.
 7        You need to leave one copy with the store
 8        and keep one for yourself.  From the copy
 9        that you keep for yourself, be sure that
10        you send a signed copy into the bakery each
11        day.  The office will be checking to be
12        sure that a signed stale sheet is sent in
13        each day.  Does that set forth the
14        procedure that the distributors are to
15        follow with regard to stale reports?
16   A.   Yes, sir.  It says what they're supposed to
17        do.  It hadn't -- it's nothing that hadn't
18        been explained to them before.  It's just
19        refreshing their memory on what they're
20        required to do.
21   Q.   Number four, all stales must be separated.
22        What does that mean?
23   A.   You don't want your four-inch buns mixed in
```

1    with your five-inch buns and your

2    four-and-a-half-inch size bun or two or

3    three cakes mixed in there between them.

4    You know, in a particular stack some of

5    those four-inch and five-inch buns were

6    stacked way over here and below it was some

7    loaf bread, below it were cakes, and then

8    over on another stack you had the same

9    thing.  They should be separated by item

10    and grouped together by those items.

11    Q.    And Flowers requires that they be

12          separated; correct?

13    A.    Yes, sir.

14    Q.    Number five, out of code has been out of

15          hand.  Excess out of code will not be

16          tolerated.  What does that number five

17          mean?

18              Out of code has been out of hand.  Does

19          that mean that there has been too much

20          out-of-code product?

21    A.    Most of the time when somebody says that

22          that's what they mean, yes, sir.

23    Q.    What does it mean when it says excess out

1      of code will not be tolerated?

2  A.  It means it will not be tolerated.  There

3      again, it happened and we would counsel

4      with them about having an excessive amount

5      of out of code.  And we would counsel with

6      them.

7  Q.  The last paragraph, if you would, read that

8      for the record for me there.

9  A.  If the above procedures are not followed,

10     we will have no choice but to charge your

11     stale back to you.  If you have any

12     questions, please contact your sales

13     manager or director of sales.

14  Q.  So if the distributors do not follow the

15     procedures that Flowers sets forth in

16     detail in this memo which I've marked as

17     Plaintiff's Exhibit 2, then Flowers charges

18     stales back to that distributor, don't

19     they?

20  A.  No, sir.

21  Q.  Doesn't the memo say we have no choice but

22     to charge your stales back to you?

23  A.  Yes, sir.  The only time that we did that

57

1    was when we had had habitual offenders that

2    we have already talked to about this

3    problem and it continued and continued and

4    continued and continued.  And when -- you

5    know, when your bucket fills up with water,

6    you've got to do something with it.  And

7    we'll have enough and we'll usually go

8    ahead and charge that particular product

9    back to a distributor because it was a

10   chronic failure of them to follow

11   procedure.

12   Q.  You would agree with me that Flowers

13       determines what the distributors have to do

14       with regard to the thrift store.  You've

15       set forth what they've got to do; is that

16       correct?

17   A.  That is correct.  And it also states that

18       in the contract.

19   Q.  It also sets forth how it's to be done by

20       the distributors --

21   A.  Yes, sir.

22   Q.  -- and when it's to be done by the

23       distributors?

58

1   A.   Yes, sir.

2                    MR. DAVIS:  Why don't we take a

3                 five-minute break.

4             (A lunch recess was taken.)

5   Q.   (Mr. Davis continuing:)  If you would, look

6        at paragraph 11.1.  And if you would read

7        paragraph 11.1 into the record for me.

8   A.   Maintaining a fresh market is a fundamental

9        tenet of the baking company.

10       Accordingly --

11                   MS. REISS:  Industry.

12  A.   I'm sorry.  Of the baking industry.

13       Accordingly, out-of-code product on the

14       market is a material breach of this

15       agreement.  Repeated violations will be

16       grounds for termination of the agreement.

17  Q.   Maintaining a fresh market is a fundamental

18       tenet of the baking industry.  What does

19       that comment mean to you?

20  A.   That they will maintain a fresh market in

21       the industry, I mean, as far as the

22       accounts that's serviced.

23  Q.   Is that fresh product?

59

1   A.   That means that fresh product that is of

2        saleable nature.

3   Q.   Okay.  If we look back at paragraph 2.2, it

4        describes products.  If you would, read for

5        me what 2.2 states.

6   A.   Shall maintain fresh baked goods, as

7        specifically described in Exhibit B,

8        attached hereto and made a part hereof

9        which is -- are currently produced and/or

10       distributed by company, provided, however,

11       that the distribution rights granted herein

12       shall survive only so long as company has

13       the license or franchise rights for such

14       goods and company produces and/or sells

15       such goods.

16  Q.   Does Flowers advertise through any media

17       that they sell fresh baked products?

18  A.   I'm not sure.  I'm trying to think over

19       some of our commercials what they might

20       say, but I don't recall ever any

21       advertising stating that it says fresh.

22  Q.   Does the FDA allow Flowers or bakers to use

23       the word fresh in their advertising, if you

1    know?

2              MS. REISS:  I'm going to object to

3                    the extent it calls for a

4                    legal conclusion.

5    A.   I'm sure -- you know, I don't know exactly

6         what they expect as far as that -- in that

7         regards.  I do not know.

8    Q.   What's your definition of fresh?

9    A.   Fresh is anything that is of good quality

10        and it's still in good shape as far as it

11        being -- any product for that matter, you

12        know, as far as it being edible or -- you

13        know, it's still good for you.  It wouldn't

14        be harmful, you know, for eating.

15   Q.   Okay.  Do you think that freezing bread

16        still makes it be fresh as Flowers would

17        describe fresh or define fresh?

18   A.   I think freezing bread does not distort the

19        actual product, whether it be Flowers'

20        product or anybody else's product.  I don't

21        think it distorts the product as far as the

22        quality and the edible goodness of that

23        particular product.

61

1    Q.    Would you agree with me that freezing is a

2          form or a method of preserving a product?

3    A.    It extends the product.

4    Q.    It allows you to take fresh product and

5          preserve its freshness for a while.  Would

6          you agree with that statement?

7    A.    It extends the actual shelf life of that

8          product because it is suspended.  I mean,

9          it's in --

10   Q.    It's suspended.  It's preserved?

11   A.    I don't know if it's preserved.  If it's

12         preserved, it's something that's going to

13         really distort the -- it changes the

14         product itself when you preserve something.

15   Q.    Well --

16   A.    And I'm speaking of that in regards to

17         grandmother making, you know, fig preserves

18         or what have you.

19   Q.    Well, let's take another example.  And I'll

20         use my grandmother.  I remember she had

21         blueberry trees.  And if you went out and

22         picked a bucket of blueberries and brought

23         them in and set them in the sink two or

62

```
1    three days they would all be mush.  If you
2    took the same blueberries and washed them
3    and put them in a bag and put them in her
4    deep freeze, it would preserve them or
5    prolong them.  Would you agree with that?
6  A.  I agree with what your grandmother does,
7      yes.  That's a good --
8  Q.  I mean, it preserves it; right?
9  A.  Right.
10 Q.  It keeps it from spoiling?
11 A.  That's true.
12 Q.  Do you think that the American Heritage
13     Dictionary is an authority on the
14     definition of words?
15 A.  I can't really say yea or nay.
16 Q.  Well, let me see if you agree or disagree
17     with this definition of fresh found in the
18     American Heritage Dictionary.  Not
19     preserved as by canning, smoking, or
20     freezing, for example, fresh vegetables.
21     Do you agree or disagree with that
22     definition?
23 A.  Without actually having a dictionary in
```

63

1       front of me, I'm going to disagree.

2   Q.   All right.  Let me give you another

3        American Heritage Dictionary definition of

4        the word fresh.  Recently made, produced,

5        or harvested, for example, fresh bread.  Do

6        you agree with that definition?

7   A.   No, sir.

8                  MS. REISS:  Just for clarification

9                      of the record, which American

10                     Heritage Dictionary are you

11                     getting these definitions

12                     from?  Which edition?

13                 MR. DAVIS:  I don't know which

14                     edition.

15  Q.   What is it about those definitions that I

16       quoted to you that you disagree with?

17  A.   Well, I don't know if those are exactly how

18       it's written in the dictionary.  All I got

19       to go on is what you're sitting here

20       telling me.

21  Q.   Well, let's say that it's not -- let's just

22       say that that's my definition.  Do you

23       disagree with my definition?

64

1    A.    As I stated awhile ago, I disagree and I

2          disagree with your statement of the

3          definition of that.

4    Q.    And what is it about what I said that you

5          disagree with?

6    A.    Every bit of it.

7    Q.    Okay.  So you disagree that recently made,

8          produced, or harvested -- you disagree with

9          that.  That's not a definition of fresh?

10   A.    That's correct.

11   Q.    You disagree with not preserved as by

12         canning, smoking, or freezing, for example,

13         fresh vegetables.  You disagree with that

14         definition?

15   A.    Yes, I do.

16   Q.    And do you have a basis or a reason why you

17         disagree with it?

18   A.    There's several terms for freshness.  If

19         you -- you can use your terminology of

20         freshness.  You can use my terminology of

21         freshness.  But as far as freezing product,

22         it does not preserve it.  All it does is

23         put it in a suspended state.  It's not

1    preserving it to mean it's going to last

2    there forever and ever and ever.  It's a

3    temporary state, the freezing part is, and

4    that's what I'm calling as far as fresh.

5    It's still fresh products in a suspended

6    state for a small length of time.  And we

7    don't keep anything in our freezers more

8    than two to three months.

9    Q.   So you as president of Flowers Baking of

10        Opelika would define fresh to include

11        freezing as long as it's only frozen for a

12        two to three-month period?

13   A.   No, sir, I disagree with that.  That's your

14        assessment.

15   Q.   All right.  Well, tell me what your

16        assessment of -- as president of Flowers

17        Baking Company your definition of the word

18        fresh.

19   A.   My definition of fresh is fresh baked

20        quality of products that's no -- not longer

21        than 14 to 16 days old if it has not been

22        frozen.  If the product has been -- half of

23        that length of that time, the 14th or 16th

66

1    day, if it's frozen, the product is

2    suspended and it is still in good shape

3    three months from the time that you froze

4    that product. It is still considered fresh

5    product.

6  Q.   So your definition and Flowers' definition

7       is that if it is frozen, it is suspended

8       and for a two to three-month period it's

9       still considered fresh?

10 A.   Yes, sir, it's still considered fresh.

11 Q.   Do you know what the Food and Drug

12      Administration defines fresh as?

13 A.   No, sir, I do not.

14 Q.   Do you know if Flowers Baking Company is

15      subject to the Food and Drug

16      Administration?

17 A.   Yes, we are subject to the Food and Drug

18      Administration. But with regards to

19      freshness, I do not know that specifically.

20 Q.   Is changing the code on product a breach of

21      the distributor agreement?

22              MS. REISS:  Object to the extent

23                  it calls for a legal

67

1                    conclusion.  You can answer.

2    A.    No, sir.

3    Q.    So you can change the date on products and

4          not be in breach of the distributor

5          agreement?

6                    MR. HISTA:  Objection.  Vague.

7    Q.    Is that --

8    A.    Excuse me.  Go ahead.  Ask me again,

9          please, sir.

10   Q.    So you can change the date or the product

11         code on a product and not be in violation

12         of the distributor agreement?

13   A.    Yes.

14                   MS. REISS:  Same objection.

15   Q.    Yes, you can?

16   A.    In certain senses, yes, sir.

17   Q.    When can you?

18                   MS. REISS:  You're talking about

19                     the buns that come out of the

20                     freezer?

21                   MR. DAVIS:  I'm just asking him

22                     when he can change the date

23                     and not be in violation of the

68

1          distributor agreement.

2                  MS. REISS:  Well, I think you need

3                      to clarify, then, when -- if

4                      and when that is ever done.

5    A.   When it is done, it is product that's came

6         out of our freezers and the date was

7         changed, yes, sir.

8    Q.   And that's not a violation of the

9         distributor agreement?

10   A.   No, sir.  Mainly because we don't come and

11        ask for those buns.  We don't sit there and

12        say, well, Mr. Davis, I have some steak

13        buns or freezer buns and if you run short

14        and you need them.  They came and asked us

15        for -- they meaning other distributors as

16        well as Mr. Porterfield -- for product out

17        of the freezers because they underordered,

18        didn't order properly.  A busload of

19        baseball players came through where they

20        had a tournament in a certain area and they

21        sold more than was anticipated.  That's

22        when the freezer product was used.

23   Q.   And it's not a violation -- my sole

69

1    question, though, it's not a violation of

2    the distributor agreement for Flowers to

3    change the date on product?

4  A.  No, sir.  No, sir.

5  Q.  Well, would it be --

6  A.  Not in that regard that I just mentioned

7    it's not.

8  Q.  Would it be a violation for a distributor

9    to change the date on product?

10  A.  It depends on the circumstances, what it

11    was, what context it was being used or why

12    he was doing it.

13  Q.  But you never tell the customers in the

14    field, the restaurants, that you've changed

15    the date, do you?

16           MS. REISS:  Object to the form.

17               Facts not in evidence.  You

18               can go ahead and answer.

19  A.  Yes, sir.  We have told them in the past

20    sometimes at the local units, sometimes no,

21    just, you know, to cut down on the

22    intermediate local level harassment that

23    would possibly come as far as them maybe

1          being upset because we had, you know,

2          changed the --

3      Q.  Frozen product?

4      A.  Frozen product.

5      Q.  And you changed the date on it?

6      A.  Yes, sir.

7      Q.  And you could see where that would cause

8          certain customers to be irate about that,

9          can't you?

10     A.  Because they wouldn't understand.  But if

11         they got upset, we would explain to them

12         what the procedure was for that particular

13         incident.  It was an emergency situation

14         and only done on emergency situations.  It

15         was done to take care of the customer's

16         needs, whether it be on Mr. Porterfield's

17         route or any other route.  It was only done

18         on extreme emergency cases, and if they

19         asked, we would tell them.  If they asked

20         the distributor and he don't know, all they

21         had to do was pick up the phone and call us

22         and ask us or we would have a manager over

23         there to explain it to them what actually

71

1    happened.  We took these particular buns

2    out of the freezer.  We did that as a

3    precautionary measure because you, the

4    customer, had a certain item on sale and

5    you used -- you gave us the estimated usage

6    increase for your particular unit.  You

7    used more buns than what the estimated unit

8    possible requirement would be.

9  Q.   But you didn't disclose it to the customer?

10            MS. REISS:  Object to the form.

11                  Asked and answered.

12  A.   Sometimes we did.  Sometimes we didn't,

13       sir.

14  Q.   Would you pay the same for frozen bread as

15       you would for bread that had never been

16       frozen?

17  A.   Yes, sir, if it's in good quality

18       product -- in good -- if it's in good

19       quality of product, yes, sir, I would.

20  Q.   And you think that consumers should pay the

21       same for frozen bread that's in good

22       quality as opposed to bread that's never

23       been frozen?

72

```
 1            MS. REISS:  I'm going to object to
 2            the use of frozen bread.  We
 3            have clarified more than once
 4            it's buns to specific
 5            restaurants on specific
 6            occasions.  I don't want there
 7            to be -- it to be misconstrued
 8            that it's going to a grocery
 9            store or anything like that on
10            the record.
11   Q.   Are buns bread?  Are they made from dough,
12        or are they not bread?
13   A.   It's really all bread, but we refer to buns
14        as buns and bread as bread.  I mean, but --
15   Q.   But buns are still bread?
16   A.   But all of it combined is bread.  You know,
17        if you want to clarify -- classify that as
18        breads.
19   Q.   And do you know that when buns are
20        delivered to restaurants, that restaurants
21        are going to turn around and sell them to
22        consumers that come in there and buy hot
23        dogs and buy Chili Pups and whatever they
```

1      may buy at those restaurants. You know

2      that ultimately the consumer is going to

3      receive that bun; correct?

4  A.   If we took some out of the freezer and a

5      distributor took them to that unit after he

6      had called us telling them that he wanted

7      them and they used them in that particular

8      restaurant for an emergency situation, yes,

9      sir.

10  Q.   Is one reason -- well, strike that.

11        By changing the date on bread are you

12      representing that the bread is good to that

13      new date?

14  A.   By changing the date to a different date?

15  Q.   Yes.

16  A.   Yes, sir. Still good through the date that

17      we would put on it, yes, sir.

18  Q.   And you put basically two days on it; is

19      that right?

20  A.   Yes, sir, two days after we take something

21      out of the freezer.

22  Q.   And why don't you leave the original dates

23      on it?

74

A.   Mainly as a precautionary measure in case
we ever have a recall situation.  It gives
the time and the date that it was baked and
what producing plant it came from is the
main reason -- main and only reason just
about it.

Q.   Well, if customers get buns -- if a
restaurant gets a bun and it's got a date
that's three months old, would that
cause -- potentially cause a problem with
that customer?

A.   I guess if they got buns that was three
days old -- I mean --

Q.   Three months old.

A.   -- three months old, yes, sir, there would
probably be a problem.  I don't -- it would
probably be molded to -- probably wouldn't
be nothing left in the bag.

Q.   Well, if they got a product and the product
said that it was manufactured three months
earlier but it wasn't molded, do you think
that could cause some concern to that
customer?

75

1    A.    Well, I don't see how a product that's

2          three months old is not going to be molded.

3    Q.    Unless it's been frozen?

4    A.    Unless it's been suspended.

5    Q.    Frozen?

6    A.    Frozen would be suspended, yes, sir.

7    Q.    How else can you suspend something other

8          than freezing it?

9    A.    I don't know if you can.

10   Q.    Whose clients are the restaurants that buy

11         bread from Flowers?

12                    MS. REISS:  Object to the form.  I

13                         don't even -- I don't

14                         understand that question.

15   A.    I don't understand your question, whose

16         clients.  I mean ...

17   Q.    Whose -- one second.

18                    MS. REISS:  It is after lunch.

19   Q.    Let me ask you this:  As far as Mr. Henry

20         Porterfield did, what particular part of

21         the distributor's agreement did

22         Mr. Porterfield violate?

23                    MS. REISS:  Let him look at it.

76

1          MR. HISTA:  What time frame are

2              you referring to in that

3              question?

4          MR. DAVIS:  That caused him to be

5              terminated -- caused his

6              contract to be terminated,

7              same thing.

8          MS. REISS:  No.

9   A.   Number 16.3, curable breach, where he

10       didn't cure his breach.

11  Q.   What does 16.3 say?

12         MS. REISS:  You want him to read

13              the whole thing?

14         MR. DAVIS:  Yes.

15  A.   In the event of failure of performance by

16       distributor, customer must give distributor

17       ten business days --

18         MS. REISS:  Company.

19  A.   -- company must give distributor ten

20       business days written notice within which

21       distributor may cure his or her failure of

22       performance.  If distributor does not cure

23       such failure of performance within this

77

1      ten-day period, company may thereafter

2      terminate this agreement and distributor

3      shall have no right -- further right to

4      cure.  Furthermore, the parties agree that

5      repeated violations constitute a chronic

6      failure of performance and threaten

7      substantial harm to company's business and

8      in such event the company shall be entitled

9      to termination -- terminate this agreement

10     and distributor shall have no further

11     rights to cure.

12 Q.  Now, what failure of performance was it

13     that Mr. Porterfield breached?

14 A.  He did not provide adequate product service

15     to Sodexho Marriott account.

16 Q.  Where in the contract does it require

17     Mr. Porterfield to provide adequate product

18     service to Sodexho Marriott?

19 A.  Well, to all of his accounts on his route

20     and not specifically Sodexho Marriott.  But

21     that was the one that you had made

22     reference to as far as what the curable

23     breach was.

78

1   Q.  Where in the contract does it provide that

2       Mr. Porterfield shall provide adequate

3       product service to his accounts?

4   A.  It would be in 5.1, obligation of

5       distributor.

6   Q.  What does it say in 5.1?

7   A.  Distributor agrees and covenants to use his

8       or her best effort to develop and maximize

9       the sale of company's product to outlets

10      within his or her territory and service his

11      or her territory in accordance with good

12      industry practice as defined above.

13  Q.  So Mr. Porterfield would have to use his

14      best efforts to service the account; is

15      that correct?

16  A.  That is true.

17  Q.  And if he doesn't use his best efforts to

18      service the account, then according to

19      Flowers he would be in breach of it; is

20      that right?

21          MR. HISTA:  That's

22          mischaracterizing his

23          testimony.  He's saying in

1                    accordance with good industry

2                    practice.

3    Q.   Who determines good industry practice?

4    A.   Who does?

5    Q.   Yes.

6    A.   We do.

7    Q.   Flowers does?

8    A.   As far as, you know, whatever the normal

9         good business industry practice would be,

10        whether it be Flowers Baking Company

11        servicing good accounts or Frito-Lay

12        servicing their accounts.  Whatever the

13        industry practice is.

14   Q.   And is there someplace you can go look to

15        see what industry practice is?

16   A.   Not necessarily.  If you're making your

17        customer happy and taking care of all of

18        his customer's needs, whether it be on

19        bread, meat, potato chips or whatever, and

20        providing him with quality service and

21        quality product and he's happy.  But that

22        wasn't the case.

23   Q.   Who makes the determination if the

1    distributor is using his best efforts?

2  A.  Everybody that he's affiliated with with

3      Flowers.

4  Q.  So Flowers --

5  A.  And the district manager.  Could be the

6      sales manager.

7  Q.  All right.  Sales manager does.  Who else?

8  A.  That's probably the two that he would come

9      in contact with more often than anyone else

10     on a day-to-day basis.

11 Q.  Okay.  Who else at Flowers?

12 A.  I would just leave it at that as far as any

13     direct, you know, association with that

14     individual.

15 Q.  Did you determine if Mr. Porterfield was

16     using his best efforts?

17 A.  I guess I did since I was the one that had

18     the final say-so as far as terminating the

19     contract, mainly because of all the past

20     performances from Mr. Porterfield.

21 Q.  Well, you've already told us that you

22     didn't consider those in deciding to

23     terminate this contract, that the reason

81

1    you terminated this contract was because of

2    the Sodexho Marriott; is that correct?

3  A.   Right.  But --

4          MS. REISS:  Object to the form.

5                You're mischaracterizing his

6                testimony.

7  A.   It is not -- the slate is not wiped clean,

8    Mr. Davis.  Everything is -- the past is

9    still part of his distributorship, how he

10   performed, how he did his job, how he

11   handled his customers, how he grew his

12   business, and it wasn't done.

13  Q.   You didn't terminate him on any of those

14   other curable breaches, did you?

15  A.   No, sir, we didn't.  But we had --

16  Q.   Did you have the right to?

17  A.   We had the right to do it.

18  Q.   Did you have the right to --

19  A.   Yes, we did.

20  Q.   -- terminate him even if he cured the

21   breach?

22  A.   On any -- not just one or two, Mr. Davis.

23  Q.   I'm just asking, did you have --

82

1    A.    But the chronic --

2    Q.    Did you have the right --

3              MS. REISS:  Let him finish

4                   answering the question.

5              MR. DAVIS:  That's fine.

6    A.    After a chronic abuse on his part, we could

7          have terminated the contract, yes, sir.

8    Q.    You didn't terminate it, did you?

9    A.    No, sir.

10   Q.    You didn't terminate it any of the times up

11         until -- the only time you terminated it

12         was on March the 17th, 2005?

13             MS. REISS:  Object.  That's

14                  incorrect information or facts

15                  not in evidence.

16   Q.    In March of 2005 you terminated it;

17         correct?

18   A.    Yes, sir.

19   Q.    Did you ever terminate it prior to March

20         2005?

21   A.    No, sir.  In context to -- we terminated

22         prior contracts, yes, sir.

23   Q.    You've terminated prior contracts, but you

1        didn't terminate Mr. Porterfield's

2        relationship with Flowers, did you?

3  A.    No, sir.

4  Q.    Did you decide that Mr. Porterfield was not

5        servicing his territory in accordance with

6        good industry practices?

7  A.    Yes, sir, with the information that was

8        gathered by Michael Lord and Grady Messer.

9  Q.    Does good industry practice include

10       providing fresh product?

11  A.   Yes, sir, fresh product that is in saleable

12       condition, in edible condition.

13         Mr. Davis, there's no difference in

14       taking buns out of our freezer that the

15       distributors wanted to take to their

16       accounts than you having a party at your

17       house.  Your wife bought 12 packs of buns,

18       whether it be Flowers, Sara Lee, Pepperidge

19       Farm buns or whatever.  She didn't use them

20       all.  She stuck four packs of them in the

21       freezer.  Three weeks later when you had a

22       group of friends over at your house she got

23       them out of the freezer and used them and

84

1       ate them.  And I am sure that you have done

2       that.  Your wife has done that.  I have

3       done that.  Probably everybody that we know

4       of has done that.

5    Q.  I understand that.

6    A.  There's nothing wrong with that product.

7    Q.  There's nothing wrong with freezing

8       product.  I agree with that.  The

9       difference is that there is something wrong

10      with freezing product that you represent to

11      be fresh.

12                  MR. HISTA:  Objection.

13                  Argumentative.

14   Q.  Do you think that it's fine to distribute

15      product that you represent to be fresh when

16      you have frozen it or suspended it as you

17      would say?

18   A.  Yes, sir, I do.

19   Q.  And that's Flowers' position; right?

20   A.  And it's my position.  I think it's okay.

21      You asked me did I think --

22                  MS. REISS:  I'm going to object to

23                  the extent that he is not a

1              30(b)(6) witness.  He is

2              testifying as Steve Bordeaux;

3              okay?

4         MR. DAVIS:  He's also

5              testifying --

6    Q.   Are you testifying today as the president

7         of Flowers Baking Company of Opelika?

8    A.   Yes, ma'am -- yes, sir.

9    Q.   Is there anybody at Flowers Baking Company

10        of Opelika that -- in any corporate

11        capacity that has more authority than you

12        do at Flowers Baking Company of Opelika?

13   A.   No, sir.

14        MR. DAVIS:  Why don't we take

15             about a five-minute break.

16        (A brief recess was taken.)

17   Q.   (Mr. Davis continuing:)  Under the

18        distributors's agreement there are two

19        kinds of breaches; correct?

20   A.   Yes, sir.

21   Q.   A noncurable breach and a curable breach;

22        correct?

23   A.   Yes, sir.

86

```
 1   Q.   Mr. Porterfield wasn't terminated for a
 2        noncurable breach, was he?
 3                  MS. REISS:  Object to the form.
 4                  Go ahead and answer.
 5   A.   No, sir.  It was a curable breach that
 6        he ...
 7   Q.   And curable breach is listed under 16.3 and
 8        curable breach is the one that gives you
 9        ten days to correct the problem; correct?
10   A.   I'd have to review it to see, sir.
11             16.3 is curable.  16.2 is noncurable.
12   Q.   And 16.3 is the one that gives you the
13        ten-day time period; correct?
14   A.   Yes, sir.
15   Q.   Actually 16.3 has two parts to it, doesn't
16        it?
17             Why don't you read --
18   A.   Let me read it right quick.
19             Okay.
20   Q.   The way I read it -- and you tell me if I'm
21        wrong -- is that under 16.3, which covers
22        curable breaches, you can determine that a
23        distributor has a curable breach and give
```

1   him ten days to cure it.  That's one way

2   under curable breach.  The second way under

3   16.3, in some situations the company can

4   determine that there is no cure at all and

5   terminate the person; is that right?

6 A. I'm sorry.  Would you repeat that.

7 Q. Sure.  Let me show you.  Let me --

8 A. Okay.

9 Q. If you don't mind, I'll come around there

10   and we'll look at it together.

11    Under curable breach, you've got the

12   ten-day part of curable breach where you

13   give them ten days.  Furthermore, the

14   parties agree that repeated violations

15   constitute a chronic failure of performance

16   and threatens substantial harm to the

17   company's business, and in such event

18   company shall be entitled to terminate this

19   agreement and distributor shall have no

20   further right to cure.  You read that?

21 A. Yes, sir, I read that.

22 Q. And in situations where the company

23   determines that there's a chronic failure

88

1  or it threatens substantial harm to the

2  company's business, you don't even have to

3  send a ten-day letter to the distributor.

4  You can just terminate and he have -- the

5  distributor shall have no further right to

6  cure.  Is that the way you read that?

7  A.    Yes, sir.

8  Q.    In Mr. Porterfield's situation under 16.2,

9  he didn't receive a noncurable breach

10  letter, did he?

11  A.    No, sir.

12  Q.    Under 16.3, Mr. Porterfield received a

13  curable breach letter which gave him ten

14  days to correct it.  He didn't receive a

15  letter that gave him no right to cure under

16  16.3, did he?

17  A.    Excuse me.  No, sir.  It also says right

18  here after failure of performance within

19  ten-day period the company may thereafter

20  terminate.  We didn't have to do anything

21  if we didn't want to.  We were subject to

22  do whatever we wanted to after that ten

23  days.

89

1    Q.    It was up to the company to do it?

2    A.    Yes, sir.

3    Q.    Whether or not a distributor is in breach

4          of the contract is determined solely by

5          Flowers, isn't it?

6    A.    More or less, yes, sir.

7    Q.    Flowers is the ultimate decision-maker in

8          deciding whether or not the distributor is

9          in breach; right?

10   A.    Yes, sir.  But to my knowledge, Mr. Davis,

11         we have never ran anybody off in regards to

12         terminating their contract that didn't

13         justifiably warrant doing so.

14   Q.    And that was based on Flowers' opinion that

15         it justifiably warranted doing so?

16   A.    Based on past history, past write-ups, past

17         ten-day letters, et cetera, et cetera, et

18         cetera.

19   Q.    But my point is Flowers decides that;

20         correct?

21   A.    Yes, sir.

22   Q.    Who drafts the contract that the

23         distributor signs?

90

1   A.   In the years past when I was VP I did some

2         of them.  At the present time Michael Lord

3         does some of them along with the director

4         of sales.

5   Q.   Does the distributor get to negotiate on

6         the contract regarding what terms should be

7         in here or what shouldn't be or is the

8         distributor given this copy to sign?

9   A.   He's given that copy to sign as far as the

10        contract.

11   Q.   Let me ask you a question about what I want

12        to mark as Plaintiff's Exhibit Number ...

13               (Brief interruption.)

14               (Plaintiff's Exhibits 3, 4, and 5

15               were marked for identification.)

16   Q.   Let me show you what I've marked as

17        Plaintiff's Exhibit Number 3 to begin

18        with.  Are you familiar with this document?

19   A.   Not this particular one.  I do know it's a

20        distributor's statement.

21   Q.   Who at Flowers is the -- do you have a

22        comptroller or an accountant or someone in

23        a position that actually determines all of

1         these figures that are placed on like

2         Plaintiff's Exhibit 3?

3   A.   The numbers speak for themselves as far as

4         where they go and everything.  But, yes,

5         sir, we have a controller at our facility.

6   Q.   Who is the most knowledgeable person at

7         your facility regarding how these figures

8         are computed and determined?

9   A.   I wouldn't know exactly who was the best.

10         Jerry Woodham, our controller, is very

11         good, and then, of course, Michael Lord is

12         also very good as far as determining these

13         numbers or where the numbers arrive from.

14   Q.   Do you actually participate in determining

15         how all these numbers are arrived at?

16   A.   No, sir.

17   Q.   So if I asked you a specific question about

18         how they came up with a relay adjustment,

19         would you be able to tell me or would you

20         have to defer me to someone else to answer

21         that question?

22   A.   Somebody else would have to answer that

23         because I could not explain it to you.

92

1   Q.   I went ahead and marked Plaintiff's Exhibit
2        3, 4, and 5.  I think they're all the same
3        type documents, but I think they're just
4        for separate years.  If you would, just
5        confirm that for me.
6   A.   It's three different ones, yes, sir.
7   Q.   And you think your comptroller would be the
8        best person to answer questions about how
9        those figures were derived?
10  A.   I don't know if he would be the best.
11       Either him or either Michael Lord could
12       explain it to you.
13                  MR. DAVIS:  That's all the
14             questions I've got.
15                  MS. REISS:  I've got a few.
16                  EXAMINATION
17  BY MS. REISS:
18  Q.   Mr. Bordeaux, we were talking about the
19       thrift store earlier.  Does Mr. Porterfield
20       have to turn in his product to the thrift
21       store?
22  A.   No, ma'am, he doesn't have to.  But we had
23       told everyone that we would buy their

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

93

1      products back, you know, if it's brought to

2      us daily.  But they don't have to sell it

3      back to us.

4  Q.  So it's his option whether or not to sell

5      his product back on his truck -- that ends

6      up back on his truck to the thrift store?

7  A.  He could go and sell it to some hog feeder

8      if he wanted to, but we wouldn't give him

9      credit.

10  Q.  Or he could just throw it off the back of

11      his truck into a trash can if he wanted to?

12  A.  Ride by the Alabama River and throw it off

13      in the river if he wanted to.

14  Q.  But if he sells it back to the thrift

15      store, he needs to follow a few certain

16      procedures; is that correct?

17  A.  That is correct, which we covered earlier

18      with Mr. Davis.

19  Q.  Has Mr. Porterfield ever mentioned product

20      that has come out of the freezer to you in

21      any manner, under any circumstance?

22  A.  No, ma'am.  Not that I recall, no, ma'am.

23  Q.  Do you know if he has ever mentioned it to

94

1      anyone else?

2   A.  I -- I don't know.  I wouldn't know that.

3   Q.  Have you heard about that he's mentioned it

4       to anyone else?

5   A.  No, ma'am.

6   Q.  Did you ever know he had an issue with

7       product coming out of the freezer before he

8       filed this lawsuit?

9   A.  No, ma'am.

10  Q.  Did he ever have a -- do you know if he

11      ever had a customer who said I can't take

12      your product anymore, Mr. Porterfield,

13      because it came out of the freezer?  Do you

14      know of any such circumstance?

15  A.  No, ma'am, not that I know of.

16  Q.  Have you ever knowingly had bread in a

17      restaurant that you knew was frozen?

18  A.  Yes, ma'am.

19  Q.  What was that -- what restaurant was that?

20  A.  Outback Steakhouse, Wendy's, Chili's.

21  Q.  When you were at Outback Steakhouse --

22  A.  Arby's.

23  Q.  -- did you eat the bread they served you

95

1      that had been frozen?

2  A.   Yes, ma'am.

3  Q.   Did you complain to management that they

4       had given you frozen bread?

5  A.   No, ma'am.

6  Q.   When the waiter served the bread, did he

7       say, hey, customer, this bread has been

8       frozen?

9  A.   No one has ever said that to me, no, ma'am.

10 Q.   Did you feel that you had been tricked

11      because you knew the bread had been

12      frozen?

13 A.   No, ma'am.

14 Q.   Did you get sick afterwards because you ate

15      bread that had been frozen?

16 A.   No, ma'am.

17 Q.   Did you feel the need to call the FDA on

18      Outback Steak?

19 A.   No, ma'am.

20 Q.   Looking at previous -- looking at the

21      distributor agreement.  Looking at the

22      paragraph regarding good industry practice

23      in Mr. Porterfield's contract, does that

96

1        also include maintaining proper service and

2        delivery to all outlets requesting service?

3  A.   Yes, ma'am.

4  Q.   And did Mr. Porterfield comply with that

5        part of the contract?

6  A.   No, ma'am.

7  Q.   Did he comply with that part of the

8        contract with regard to Sodexho?

9  A.   No, ma'am.

10  Q.   Did Sodexho complain about

11       Mr. Porterfield's service because they had

12       received any sort of frozen product?

13  A.   No, ma'am.

14  Q.   What was Sodexho's complaint about

15       Mr. Porterfield?

16  A.   They weren't serviced at all.

17  Q.   What percentage of the product is frozen to

18       your knowledge that is delivered to

19       restaurants?

20  A.   Half to one percent, maybe one and a

21       quarter at times.

22  Q.   You said earlier that you bought -- the

23       freezer was purchased from Burger King;

97

1       correct?

2   A.    Yes, ma'am.

3   Q.    And they had a program where they were

4       using frozen buns for a time?

5   A.    Yes, ma'am.

6   Q.    Do you know if Burger King told their

7       customers these buns are frozen every time

8       someone bought a Whopper?

9   A.    No, ma'am, they did not.

10   Q.    Do you have knowledge if the FDA came down

11       on Burger King for having frozen their

12       buns?

13   A.    No, ma'am.

14           MS. REISS:   That's it.

15           EXAMINATION

16 BY MR. DAVIS:

17   Q.    Do you know if Burger King even knew that

18       the buns were frozen?

19   A.    That Burger King knew that they were

20       frozen?

21         Yes, sir.

22   Q.    Did you tell Burger King we're delivering

23       you frozen buns?

1   A.   Yes, sir.

2   Q.   You did?

3   A.   Yes, sir.

4   Q.   Which Burger King did you tell that to?

5   A.   Are you asking me that in regards to what

6        she said earlier as far as Burger King?

7   Q.   Yes.

8   A.   Yes, sir.  And the particular area that we

9        had was in Columbus, Georgia, and they were

10       frozen and that was their program.

11  Q.   They knew they were frozen?

12  A.   Yes, sir.

13  Q.   You told me earlier that sometimes you told

14       customers that they were getting frozen

15       buns and sometimes you didn't.

16            MS. REISS:  Object to the form.

17            That's not his testimony.

18  A.   That's not my testimony.

19  Q.   Do you always tell customers -- when I say

20       customers, I'm talking about your Burger

21       Kings, your Sonics, your Krystals -- that

22       they're getting buns that are frozen or

23       have been frozen?

99

1    A.    No, we didn't tell them every time.  And

2          I'm sure Mr. Porterfield or any other

3          distributor did not tell them either when

4          they were in dire need of buns and got

5          frozen buns out of the freezer.  I didn't

6          tell them.  They didn't tell them.

7    Q.    So is it possible that the customer that

8          received the buns didn't even know they

9          were getting frozen buns?

10   A.    That is correct.  But those frozen buns

11         were good, saleable, in edible condition

12         buns.

13   Q.    So they were being deceived about the fact

14         that they were getting buns that were

15         frozen versus fresh product?

16   A.    No, sir, I'm not saying that.  You can say

17         that.  I'm not saying that, no, sir.  I

18         don't feel like that they were deceived.

19   Q.    You feel like that it was fine to deliver

20         them product that had been suspended,

21         frozen?

22   A.    Yes, sir.  It's a saleable, edible, good

23         tasting, good product.  I could serve you

some buns, Mr. Davis -- or anybody for that
matter -- and make you a sandwich and you
would not know the difference between
frozen and fresh.  And I don't see where
that is being deceptive or pulling the wool
over somebody's eye or anything.

The reason we did not say anything to
local management, whether it be at -- a
store manager or restaurant level person --
is that -- just the hassle and stuff that
you would have to go through there
explaining that to them, and the buns are
fine.

But as far as any corporation or
anything, Burger King or Krystal or whoever
it is, knows on certain situations,
emergency situations, taking care of our
customers' needs, the distributor's
customers' needs, that they got some frozen
buns on emergency situations.  And that's
not being brassy or anything.  I'm telling
you just like it was.  I mean, it's
emergency situation only.  Probably a half

101

1      to one percent of our weekly business is

2      ever frozen.

3   Q.   How much is your weekly business in

4      Opelika?

5              MS. REISS:  Object to the form.

6                 Vague.  What do you mean by

7                 that?

8   A.   I don't know.  As far as dollar value, I

9      can't --

10              MR. DAVIS:  He just testified it's

11                 one percent of his weekly --

12              MS. REISS:  You said how much of

13                 his business is.  I don't know

14                 if you mean --

15              MR. DAVIS:  Weekly sales.

16              MS. REISS:  Okay.

17   A.   I don't think we're supposed to disclose

18      dollar amounts of --

19   Q.   Well, yesterday Mr. Grady Messer said that,

20      I think, Montgomery did --

21              MS. REISS:  It's okay.  It'll be

22                 protected.

23   Q.   It's protected in here.

102

1        He told us what Montgomery's was.

2    What's Opelika's?

3  A.  All right.  As far as estimated, it

4    averages -- because it changes every week.

5    Every week is not the same -- 650,000 to

6    725,000, ballpark range there.  It

7    fluctuates as far as total dollar sales.

8  Q.  A week?

9  A.  A week, yes, sir.

10  Q.  What about in the Phenix City market?

11  A.  Without looking at some computer run

12    report, I couldn't tell you exactly how

13    it's separated.

14  Q.  What about an estimate?

15        MS. REISS:  I don't want you to

16          guess if you don't know.

17  Q.  You don't have to -- I'm not going to hold

18    you to it.  I'm asking for an estimate of

19    what Phenix City is.  Is it in line with

20    Montgomery or is it larger or smaller than

21    Montgomery?

22  A.  It's a little larger due to population.

23    $350,000 worth of sales.  And that's gross

103

1       sales.

2   Q.  So that's about a million-two a week for

3       the three locations, 650, 350 and -- I said

4       200 for Montgomery.  That might be --

5   A.  No, sir.  I might have answered you

6       incorrectly.  When you said Columbus --

7   Q.  Phenix City.

8   A.  -- I was -- that's in one geographical area

9       for us.  Opelika, Columbus, LaGrange is all

10      part of one area.

11  Q.  So 650 covers Opelika, Phenix City --

12  A.  Opelika, Phenix City, yes, sir, and

13      LaGrange, Georgia.

14          350 to 400,000 for all of that general

15      area.

16  Q.  Well, what's the 650 to 725 a week?

17  A.  That was the grand total of all of them.

18  Q.  Of all of them?

19  A.  Yes, sir.

20  Q.  So about a half a percent to as high as one

21      and a quarter percent of that gross weekly

22      sales actually gets frozen?

23  A.  I wouldn't say actually gets frozen, no,

104

| 1 | | sir. |
| 2 | Q. | Well, I thought you told me that -- |
| 3 | A. | It all depends on -- |
| 4 | Q. | -- as low as a half-percent and sometimes |
| 5 | | as high in certain situations as one and a |
| 6 | | quarter percent would actually get frozen. |
| 7 | A. | No.  I didn't say it gets frozen.  I said |
| 8 | | that that was probably -- based on a |
| 9 | | different week -- I mean, you could go some |
| 10 | | weeks and not have any.  You could go some |
| 11 | | weeks and it might be 1.2 percent.  We |
| 12 | | don't really track it.  That was just an |
| 13 | | estimated guess on my part based on the |
| 14 | | number of buns that we will use based on a |
| 15 | | particular account getting "X" number of |
| 16 | | trays per week.  It's just, you know, a |
| 17 | | nonscientific way for me to kind of look at |
| 18 | | what we were doing as far as freezing a |
| 19 | | product.  There's nothing scientific about |
| 20 | | it. |
| 21 | Q. | One other thing I wanted to ask you.  You |
| 22 | | said on the Sodexho Marriott account that |
| 23 | | Mr. Porterfield didn't service it at all. |

1         You're talking about on that particular

2         day -- I think it was March 6th --

3    A.   That was in question, yes, sir.

4    Q.   That was in question.  Because he had a --

5         reportedly had a broke-down truck that

6         day?

7    A.   That's what I heard, yes, sir.  I

8         didn't ...

9                   MR. DAVIS:  That's all I've got.

10                  MS. REISS:  That's all we have.

11

12                  (Deposition concluded at

13                  approximately 2:35 p.m.)

14

15                  * * * * * * * * *

16              FURTHER DEPONENT SAITH NOT

17                  * * * * * * * * *

18              REPORTER'S CERTIFICATE

19   STATE OF ALABAMA:

20   MONTGOMERY COUNTY:

21        I, Tracye Sadler, Certified Shorthand

22   Reporter and Commissioner for the State of Alabama

23   at Large, do hereby certify that I reported the

106

1    deposition of:

2                        **STEVE BORDEAUX**

3    who was duly sworn by me to speak the truth, the

4    whole truth and nothing but the truth, in the

5    matter of:

6                    HENRY PORTERFIELD,

7                    Plaintiff,

8                    vs.

9                    FLOWERS BAKING COMPANY OF

10                   OPELIKA, LLC,

11                   Defendant.

12                   IN THE UNITED STATES DISTRICT COURT

13                   FOR THE MIDDLE DISTRICT OF ALABAMA

14                   NORTHERN DIVISION

15                   Case Number 2:05-CV-937-MEF

16   on May 8, 2007.

17               The foregoing 105 computer-printed pages

18   contain a true and correct transcript of the

19   examination of said witness by counsel for the

20   parties set out herein.  The reading and signing of

21   same is hereby not waived.

22               I further certify that I am neither of

23   kin nor of counsel to the parties to said cause nor

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

107

1    in any manner interested in the results thereof.

2                    This 17th day of May 2007.

3

4

5    _____
     Tracye Sadler, Certified
6    Shorthand Reporter and
     Commissioner for the State
7    of Alabama at Large

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

108

```
 1              * * * * * * * * * * * * *

 2              WITNESS SIGNATURE PAGE

 3              * * * * * * * * * * * * *

 4

 5    In Re:  Henry Porterfield vs. Flowers Baking Company

 6

 7        I, STEVE BORDEAUX, hereby certify that I

 8    have read the foregoing transcript of my deposition

 9    given on May 8, 2007, and it is a true and correct

10    transcript of the testimony given by me at the time

11    and place stated with the corrections, if any, and

12    the reasons therefor noted on a separate sheet of

13    paper and attached hereto.

14

15

16              _____
                STEVE BORDEAUX

17        SWORN TO AND SUBSCRIBED before me this _____

18    day of _____, 2007.

19              _____
                NOTARY PUBLIC
20
                MY COMMISSION EXPIRES:
21

22              _____

23
```