**COPY**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

HENRY PORTERFIELD,

     Plaintiff,

  vs.                CIVIL ACTION NO.
                         2:05-CV-937-MEF

FLOWERS BAKING COMPANY OF
OPELIKA, LLC,

     Defendant.

* * * * * * * * * * * *

**DEPOSITION OF JERRY WOODHAM**, taken

pursuant to stipulation and agreement before Tracye

Sadler, Certified Shorthand Reporter and

Commissioner for the State of Alabama at Large, at

the Tiger Town Inn, 205 21st Street, Opelika,

Alabama, on July 16, 2007, commencing at

approximately 1:00 p.m.

* * * * * * * * * * * *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.

haislip, ragan, green, starkie & watson, p.c.
566 south perry street • montgomery, alabama 36104

12

1    A.    Yes.

2    Q.    How long did you stay assistant controller

3          in Villa Rica?

4    A.    A year.

5    Q.    So in October of '03 what happened?

6    A.    I left Flowers of Villa Rica and went to

7          Flowers Baking of Bailey Street -- well,

8          it's actually Bailey Street Bakery and

9          Flowers Baking of Tucker.

10   Q.    Is Bailey Street in Tucker, Georgia --

11   A.    No.

12   Q.    -- or is that a separate --

13   A.    It's a separate company in Atlanta.

14   Q.    It's separate from Flowers Baking of

15         Tucker?

16   A.    Yes.

17   Q.    So what position did you assume at those

18         two locations?

19   A.    Controller.

20   Q.    So you were controller over two locations?

21   A.    Yes.

22   Q.    Now, is Flowers Baking of Bailey Street --

23         is that actually a place where they

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

13

1          manufacture the buns, or is that a

2          distributorship type place?

3     A.   They only manufacture at Bailey Street.

4     Q.   And Flowers Baking of Tucker --

5     A.   Same thing.

6     Q.   They only manufacture?

7     A.   Yes.

8     Q.   And then out of those two locations,

9          Flowers ships buns and rolls and bread and

10         whatever to other places that distribute

11         the bread?

12    A.   Yes.

13    Q.   Is that correct?

14    A.   Uh-huh (positive response).

15    Q.   So out of Flowers Baking of Bailey, you

16         wouldn't have route distributors like Henry

17         Porterfield pulling up to this location to

18         pick up bread.  It would be

19         tractor-trailers pulling up to pick it up

20         to take it to a warehouse?

21    A.   Yes.

22    Q.   Same with Flowers Baking of Tucker?

23    A.   Yes.

14

```
1    Q.   How long did you stay as comptroller or
2         controller for these two locations?
3    A.   Approximately two years.
4    Q.   So sometime around October '05?
5    A.   No.  It was first of '06 when I left.
6    Q.   And what happened the first of '06?
7    A.   Terminated my employment at Flowers Baking
8         of Tucker and Bailey Street Bakery and came
9         back to Flowers Baking of Opelika.
10   Q.   And why did you come back to Flowers Baking
11        of Opelika?
12   A.   They had an opening and I wanted to get
13        back to this area.
14   Q.   Did you ask to be moved to Flowers Baking
15        of Opelika?
16   A.   Well, no.  I was told that there was an
17        opening at the company.  And I was asked if
18        I was interested and I said yes.
19   Q.   Were you terminated from Flowers Baking of
20        Bailey Street?
21   A.   Well, my employment was terminated, just
22        like they were at all of them when I left.
23   Q.   I guess what I'm asking is, did they tell
```

15

1     you to leave or did you just say --

2  A.  No.  They didn't tell me to leave, no.

3  Q.  Did they say --

4  A.  Whenever you leave one bakery and go to

5     another one, your employment is terminated

6     there and you start over at the other one,

7     at the new bakery.

8  Q.  All right.  But you made the decision to

9     terminate your employment at both of those

10     locations?

11  A.  Yes.  Yes.

12  Q.  Someone else didn't make that decision for

13     you?

14  A.  Right.

15  Q.  All right.  Came back to Flowers Baking of

16     Opelika in the first part of '06?

17  A.  Yes.

18  Q.  And you came back as controller; is that

19     right?

20  A.  Yes.

21  Q.  I may say different things.  Is it

22     controller or comptroller, or what actually

23     is the position?

16

1    A.    Controller.

2    Q.    All right.  As a controller for Flowers

3          Baking of Opelika, what are your job duties

4          and responsibilities?

5    A.    Well, basically anything on the financial

6          side, making -- balancing accounts, making

7          sure our accounts have the right balances

8          in them.  I'm responsible for fixed assets,

9          anything financial.  I mean, I could

10         list ...

11   Q.    Is the controller -- are you the head guy

12         in the controller department of Flowers

13         Baking of Opelika?

14   A.    Yes.

15   Q.    How many people in that department report

16         to you?

17   A.    Five.

18   Q.    And what are their positions?

19   A.    It's office manager, receptionist, computer

20         operator, A/R clerk, and A/P clerk.

21   Q.    Who's the office manager?

22   A.    Judy Manley.

23   Q.    And what does Judy Manley do as office

17

1          manager?

2    A.    She basically runs the office.  She pretty

3          much deals with the other four ladies.  She

4          assists me in the accounting function.

5    Q.    Is she an accountant or have an accounting

6          background?

7    A.    She doesn't have an accounting degree.

8    Q.    But she's been doing it, on-the-job type

9          work?

10   A.    Yes.

11   Q.    Who is the accounts receivable clerk?

12   A.    Wanda Payne.

13   Q.    And the accounts payable clerk?

14   A.    Teresa Jernigan.

15   Q.    And I guess their positions are just what

16         they are, one does accounts receivable, one

17         does accounts payable?

18   A.    Yes.

19   Q.    And is that accounts receivable for Flowers

20         Baking of Opelika only?

21   A.    Yes.

22   Q.    All of the work that you do is for Flowers

23         Baking of Opelika?

1   A.   Yes.

2   Q.   And who do you report to at Flowers Baking

3        of Opelika?

4   A.   The plant president of Flowers Opelika.

5   Q.   Have you ever testified in any kind of

6        legal proceeding before?

7   A.   No.

8   Q.   Have you ever been sued by anybody?

9   A.   No.

10  Q.   Ever sued anyone?

11  A.   No.

12  Q.   You've been put up as, I guess, the person

13       most knowledgeable about all of the

14       accounts dealing with Henry Porterfield,

15       number one, and, I guess, the person most

16       knowledgeable about how you compute what

17       the value of a route is.  Are you the

18       person most knowledgeable about those two

19       areas at Flowers Baking of Opelika?

20  A.   I couldn't say if I'm the most

21       knowledgeable.  I deal with it.

22  Q.   That's what you do on a daily basis?

23  A.   Yes.

19

1    Q.    You or your staff --

2    A.    Yes.

3    Q.    -- that all reports to you?

4    A.    Yes.

5    Q.    In 2005 you weren't working at Flowers of

6          Opelika, were you?

7    A.    No.

8    Q.    Who was the comptroller who was working in

9          March of 2005 in Opelika?

10   A.    I believe it was Craig Horn.

11   Q.    Does Craig Horn still work for Flowers

12         Baking?

13   A.    He works for Flowers Baking Company of New

14         Orleans.

15   Q.    And what does he do there?

16   A.    Controller.

17   Q.    So in 2005 you had nothing to do with how

18         the computations were made involving Henry

19         Porterfield's route and the amount of money

20         that was offered to him?

21   A.    No, sir.

22   Q.    As a comptroller how do you go about

23         computing the value of a route?

20

1   A.   It's ten times the weekly average and the

2        branded sales.

3   Q.   All right.  And tell me what branded sales

4        are.

5   A.   It's -- take away your private -- well,

6        just examples would be Sunbeam bread,

7        Nature's Own bread.  It's not private

8        label.  It's not fast food or bid business.

9   Q.   Anything else?

10  A.   That's it.

11  Q.   Private label.  Private label would be

12       Wal-Mart, their private label bread;

13       correct?

14  A.   Yes.

15  Q.   Who else has private label?

16  A.   Well, usually any grocery store has their

17       own private label brand.

18  Q.   Like Winn-Dixie?

19  A.   Yeah.

20  Q.   Publix?

21  A.   Yeah.  I mean, I don't get into the product

22       that much, but I'm pretty sure they do.

23  Q.   When you say no fast food, what do you

21

1    consider fast food?

2    A.    Burger King, Hardee's, Wendy's.

3    Q.    And no bid business.  What do you consider

4          bid business?

5    A.    Any business we have to bid on like

6          schools.

7    Q.    Once you take out private label, once you

8          take out fast food, once you take out bid

9          business, you come up with a -- I guess

10         a -- is it a weekly average?

11   A.    Uh-huh (positive response).

12   Q.    And whatever that weekly average is

13         multiplied by ten?

14   A.    Right.

15   Q.    And who is it that determines or came up

16         with the valuation for a route?

17   A.    What do you mean?  This method?

18   Q.    Yes.

19   A.    I don't know.  I mean, that's what they

20         were doing when I started and I don't know.

21   Q.    Is that part of the contract between the

22         distributor and Flowers?

23   A.    I don't know.  I don't deal with the

22

1    contracts.

2    Q.    Is that just what you were taught how to do

3          it?

4    A.    Yes.

5    Q.    Did you have to go somewhere and look at it

6          to see how it was done?  Did you have to

7          look at any books or any kind of documents

8          to see that's typically how it was done?

9    A.    Well, I might have looked at one that was

10         done before.

11   Q.    And would Mr. Horn, I guess, have trained

12         you on how it was done --

13   A.    Yes.

14   Q.    -- whenever you were at Flowers of Opelika

15         initially?

16   A.    Yes.

17   Q.    And is that the way they do it at all

18         Flowers that you've worked at?

19   A.    The method for determining a route?

20   Q.    Yes.

21   A.    Yes.

22   Q.    Prior to coming here today what documents

23         have you looked at?

23

1   A.   What documents have I looked at?

2          I mean, I looked at -- you talking

3          about any specific documents or --

4   Q.   In preparation for this deposition.

5   A.   I've seen a repurchase statement that was

6          done.

7   Q.   Okay.  Anything else?

8   A.   No.

9   Q.   Was that a repurchase statement on the

10        route that Henry Porterfield owns?

11   A.   Yes.

12   Q.   And when was that repurchase statement

13        prepared?

14   A.   I don't know.

15   Q.   Did it have the actual figures in it?

16   A.   It had some figures, yes.

17   Q.   Do you remember what figures were in that

18        repurchase statement?

19   A.   I mean, not exact numbers, not off the top

20        of my head.

21   Q.   Do you remember roundabout what they were?

22   A.   Yeah, I could say close.

23   Q.   Well, close what was it?

24

1          You don't have to -- it's not a guess.

2      I mean, it's not --

3  A.   I believe the route value was -- I want to

4      say 23, 24,000.

5  Q.   I'm going to show you what has already

6      previously been marked as Plaintiff's

7      Exhibit Number 3 to Michael Lord's

8      deposition, which this consists of a

9      letter, a three-page purchase agreement and

10      general release, and a territory

11      reconciliation.  Have you ever seen that

12      document before?

13               MR. HISHTA:  For record purposes,

14                    you're talking about the first

15                    page?

16  Q.   The first page of that document.

17  A.   No.

18  Q.   Have you ever seen the purchase agreement

19      and general release?

20  A.   No.

21  Q.   Have you ever seen the last page of that

22      document?

23  A.   Yes.  Now, I don't know if it was the exact

1    same numbers, but, yes, I've seen one.

2  Q.  This is a territory reconciliation on Henry

3    Porterfield's territory; is that correct?

4  A.  Uh-huh (positive response).

5  Q.  And it says Henry Porterfield, 2069, here

6    at the top.  It's got his distribution

7    number on it also; correct?

8  A.  Uh-huh (positive response).

9  Q.  Looking at this document, it shows the

10    original purchase price.  It looks like

11    $45,110.  I apologize.  I'm trying to read

12    it sideways.  And then you've got

13    distributor's adjusted purchase price.  It

14    looks like 30,000.  And the way that's come

15    up with is by subtracting this 14,350 from

16    it; is that correct?

17  A.  From this number right here, yes.

18  Q.  From the 45,000?

19  A.  Yes.

20  Q.  And the 14,350 is territory that he's

21    purchased, I guess, as it says, additional

22    territory purchased?

23  A.  That's actually sold.

26

1   Q.   I'm sorry.  I'm looking at the wrong line.

2        Territory sold, 3-29-04.

3   A.   Right.

4   Q.   So you take that away from it to come up

5        with the $30,000 figure.  Equity from

6        territory sold, $7,175?

7   A.   Uh-huh (positive response).

8   Q.   And you've got appreciated equity of

9        $13,255; is that correct?

10  A.   Yes.

11  Q.   Current note, original balance $2,125?

12  A.   Yes.

13  Q.   Total paid in and appreciated equity due to

14       and it's got or from distributor and it's

15       got $24,680; is that right?

16  A.   (Witness nods head).

17  Q.   There's a truck reconciliation below that,

18       and all of that deals with the truck all

19       the way to the bottom of the page; is that

20       correct?

21  A.   No.  This is separate from the truck.

22  Q.   That's separate.  All right.  We've got a

23       truck reconciliation that's just, what,

27

1       $1,642?

2   A.  Yes.

3   Q.  Now, what is this at the bottom?

4   A.  This five-percent transfer fee, that is

5       five percent of this number right here.

6       That's just a figure we charge for doing

7       the repurchase.

8   Q.  Okay.

9   A.  This probably -- and I didn't do this.  But

10      this probably would have been like his last

11      week of his health insurance.

12  Q.  That's the $119?

13  A.  Yes.

14  Q.  Okay.

15  A.  This is a fee Bank of America charges for

16      processing their documents.

17  Q.  And then those charges come out of that

18      bringing it down to 23,126.92; correct?

19  A.  Yes.

20  Q.  What documents -- I know you didn't do this

21      one, but what documents would you have to

22      look at to determine -- well, I guess the

23      purchase price, you would look at what he

28

1          paid for the route?

2    A.   Uh-huh (positive response).

3    Q.   The equity from territory sold.  How do you

4         come up with the equity of $7,175?

5    A.   Well, that was money that was paid to him

6         when he sold part of his route.

7    Q.   Part of the route.  Okay.  Appreciated

8         equity.  How do you come up with that

9         figure?

10   A.   It's this number minus these two numbers.

11   Q.   So it's what he paid for it minus the

12        equity already received and, what, the

13        additional territory purchased?

14   A.   Or sold in that case.

15   Q.   Sold.  All right.  What I'm trying to get

16        at -- and let me just cut straight to it.

17        Where on here do you have the figure of ten

18        times weekly sales?

19   A.   That's what that number is.

20   Q.   That's 24,680?

21   A.   Yes.

22   Q.   And what documents do you have to go to

23        look at to find those figures?

29

1   A.   We can run reports that show what the sales

2         were for the route.

3               (Plaintiff's Exhibit 1 was marked

4               for identification.)

5   Q.   Okay.  I'm going to show you what I want to

6         mark as, I guess, Plaintiff's Exhibit

7         Number 1 to your deposition which is Bates

8         stamp number FBO000856 through FBO00862 --

9         or actually that might be F-B-O instead of

10        zero.  FBO000862.  What are those

11        documents?

12   A.   It's a report showing net sales dollars for

13         a Publix in 2005 and 2006 by the week.

14   Q.   All right.  It's got a Publix number there,

15         1027.  Do you know where that Publix is?

16   A.   Do I know where it is?

17          No.

18   Q.   Is this a report that your office would

19         have run or somebody from your office?

20   A.   Yes.

21   Q.   Now, what is this report called?

22   A.   Just a territory net sales report.

23   Q.   Okay.  It's on the second page -- I'm

30

1    sorry -- yeah, second page.  It's got the

2    2007 amount and -- I'm sorry.  I guess it's

3    on -- 2007 goes up to page 3.  2007 begins

4    on the second page; correct?

5  A.   Yes.

6  Q.   And the next one over, 859 Bates stamp

7    number, has got Wal-Mart brand sales; is

8    that correct?

9  A.   Yes.

10  Q.   Flip on over another couple of pages.  It

11    says -- it looks like Wal-Mart PL sales.

12  A.   Yes.

13  Q.   And what are PL sales?  Private label

14    sales?

15  A.   Private label.  And I'm assuming that's

16    what that stands for on this report.

17  Q.   Now, why would you run this particular type

18    of report typically?

19  A.   Well, we're trying to get the value of the

20    route.

21  Q.   Have you been asked to determine the value

22    of Henry Porterfield's route?

23  A.   No.

31

1    Q.    To determine what the value of his route

2          was today how would you go about computing

3          it?

4    A.    Well, I would run the territory net sales

5          report.

6    Q.    Are the documents that we just looked at

7          that I've marked as Plaintiff's Exhibit

8          Number 1 -- are those part of the territory

9          sales report?  What would be the reason for

10         running these type documents?

11   A.    To get the value of the route.

12   Q.    That's what I'm trying to -- so are there

13         documents in addition to these documents

14         that you would want to look at to get the

15         value of the route?

16   A.    Well, you would want to run them again.  I

17         mean, if there's ...

18   Q.    But let's just take at that particular

19         point -- at any point in time.  Let's say

20         January of 2007.  If we look at these

21         reports which I've marked as Plaintiff's

22         Exhibit Number 1, I've got Wal-Mart and

23         Publix which are both within that area.

32

1    What other reports would you want run for

2    that area, Mr. Porterfield's territory, for

3    January 1, 2007?

4              MR. HISHTA:  I'm going to object

5                   to the extent that it calls

6                   for facts not in evidence,

7                   that I'm not sure it's been

8                   established both accounts are

9                   in the territory.  But having

10                  said that, we're going -- as I

11                  understand your line of

12                  questioning, we're going

13                  through the methodology to

14                  determine --

15             MR. DAVIS:  We are.

16             MR. HISHTA:  -- the value.

17   Q.   Let me just ask you.  Do you know if this

18        particular Wal-Mart is in Mr. Porterfield's

19        territory?

20   A.   No.

21   Q.   Do you know -- and when I say this, the one

22        I'm referring to in Plaintiff's Exhibit 1.

23             And do you know if the Publix referred

33

1      to in Plaintiff's Exhibit 1 is within

2      Mr. Porterfield's territory?

3   A. No, I don't know.

4   Q. The designation Wal-Mart number 5348, is

5      that a Flowers number or a Wal-Mart number?

6   A. I'm not sure on that.  I don't know.

7   Q. I'm just wondering like if y'all have

8      accounts set up for particular Wal-Marts,

9      particular businesses that are separate

10     accounts, or do you label them by their own

11     store numbers?

12  A. Well, we -- if you ask -- this would have

13     been done by the route.  I mean, it

14     wouldn't have been done by this number.

15  Q. If we look at Mr. Porterfield's route, it's

16     2069.

17  A. Yes.

18  Q. Are you aware of that?

19  A. Well, yeah.

20  Q. These reports refer to, then,

21     Mr. Porterfield's route, is that correct,

22     if they say route 2069?

23  A. Yeah.  I'm assuming they do because that's

34

1      what they say at the top.

2  Q.   Then having said all that, in January --

3      let's just pick a date -- January 1, 2007.

4      Is there anything that you would need in

5      addition to the reports run on route number

6      2069 to determine the value of that route?

7  A.   Well, you would need all the sales for the

8      route, not just Publix and Wal-Mart.

9  Q.   All right.  You would need everything that

10     he sold, weekly distribution summary

11     reports; is that correct?

12  A.   Well, no, that wouldn't -- no.

13  Q.   You wouldn't need any of those?

14  A.   No, you wouldn't -- no.  What I'm saying is

15     you would need this report for everything

16     on his route.

17  Q.   On his route.  All right.  Have you run --

18     let me strike that.

19         What do you call this report if you're

20     running one?

21  A.   Territory net sales value report.  I mean,

22     probably different people call it different

23     things, but that's -- if you say that,

35

```
 1        people are going to know what you're
 2        talking about.
 3    Q.  Have you run a territory net sales value
 4        report for Henry Porterfield's route?
 5    A.  No.
 6    Q.  How do you go about running a territory net
 7        sales value report?
 8    A.  Well, we have software that has all the
 9        data in it and you just tell it what you
10        want it to run.
11    Q.  How long does it take it to run a territory
12        net sales value report?
13    A.  A few minutes.
14    Q.  And since you've been there you've never
15        run one on this particular route, route
16        number 2069?
17    A.  No.
18    Q.  Do you know if anybody in your department
19        has run one?
20    A.  Not that I'm aware of.
21    Q.  How is the ten-week period determined?  Is
22        that the last ten weeks, or how is that --
23    A.  No, it's not ten weeks.  It's just ten
```

36

1       times the sales.

2    Q.   Ten times the sales.  All right.  Well, the

3       weekly -- is it weekly average?

4    A.   Yes.

5    Q.   What is the average period?

6    A.   52 weeks.

7              MR. DAVIS:  Let's go off the

8                 record for a second.

9            (Off-the-record discussion followed

10            by a brief recess.)

11           (Plaintiff's Exhibit 2 was marked

12            for identification.)

13    Q.   (Mr. Davis continuing:)  All right.  We

14       took a break.  I want to show you what I've

15       marked as Plaintiff's Exhibit Number 2.

16       That's a territory reconciliation report on

17       territory number 2069; is that correct?

18    A.   Yes.

19    Q.   And when was this particular one run?

20    A.   You mean the complete document?

21    Q.   Yes.

22    A.   It was done this past week.

23    Q.   The $63,430 figure comes from a ten-week

1  average of sales minus private label, fast

2  foods, and bid business on that particular

3  route, 2069?

4  A.  Yes.

5  Q.  If we look down on other credits and

6  charges where it says final weekly

7  statement for 27 ...

8  A.  Uh-huh (positive response).

9  Q.  You see that figure there?

10  A.  Yes.

11  Q.  $13,931.78?

12  A.  Uh-huh (positive response).

13  Q.  What does that figure represent?

14  A.  That's the balance Mr. Porterfield owes

15  Flowers Baking Company of Opelika for

16  running his route for him.

17  Q.  And how did you come up with that figure?

18  Or let me just ask you, does that come

19  from the weekly distribution reports?

20  A.  Yes.

21  Q.  And do you actually have to go to a weekly

22  distribution report to find it or does the

23  computer program pull it from everything

38

1       and put it into this document?

2   A.   No.  We went to the document and got the

3       number.

4   Q.   The five-percent transfer fee is five

5       percent of 63,430; is that correct?

6   A.   Yes, sir.

7   Q.   And did you actually do this territory

8       reconciliation report?

9   A.   I did the report.  I didn't actually come

10      up with the 63,430, but I did the report.

11  Q.   All right.  Who did the 63,430?

12  A.   Well, the number was given to me by Michael

13      Lord.

14  Q.   And where did Mr. Lord get it from?

15  A.   I mean, I don't ...

16  Q.   You don't have access to those type

17      figures?

18  A.   Yes.  But, I mean, I didn't -- he just gave

19      me the number.

20  Q.   Okay.  Did you --

21  A.   And when I said this report was last week,

22      I didn't mean that this number was as of

23      last week.  I don't know when it was as of.

39

1   Q.   The 63,430 came from Michael Lord.  So you

2        had to put that into the repurchase price

3        document, the territory reconciliation.

4        Did you have to put in all the other

5        figures, also, or did a computer program do

6        it?

7   A.   No.  I put them in.  It's basically the

8        same numbers as the other statement.

9   Q.   It is.  The $13,931.78 final weekly

10       settlement figure that you say

11       Mr. Porterfield still owes Flowers, did you

12       obtain that figure yourself?

13  A.   Yes.

14  Q.   And which report or which document did you

15       look at to obtain it?

16  A.   Distributor's statement.

17  Q.   And for what week did you look at?  Was it

18       last week's?

19  A.   27 would have been, I think, a couple of

20       weeks ago.

21  Q.   Is there any reason why Mr. Lord gave you

22       the $63,430 figure?

23  A.   I don't know.

40

1    Q.   Do you typically do territory

2         reconciliation reports?

3    A.   Yes.

4    Q.   When you do them, where do you typically

5         get the repurchase price from?

6    A.   From the territory net sales reports.

7    Q.   Did you look at a territory net sales

8         report for territory number 2069?

9    A.   Did I?

10   Q.   Yes.

11   A.   No, I didn't.

12   Q.   You just relied on Mr. Michael Lord to give

13        you the figure of 63,430?

14   A.   Yes.

15                  (Plaintiff's Exhibit 3 was marked

16                  for identification.)

17   Q.   I'm going to give you what I'm going to

18        mark as Plaintiff's Exhibit Number 3.  And

19        these are documents that were produced and

20        are Bates stamp numbers FBO000863 through

21        FBO000988.

22                  MR. HISHTA:  Let's go off the

23                  record just for a minute.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

41

1              (Off-the-record discussion.)

2    Q.   All right.  Looking at the -- I'm going to

3         refer to them just so that we're clear

4         according to the Bates stamp numbers at the

5         bottom.  And I'm just going to refer to the

6         last three numbers of the Bates stamps so I

7         don't have to repeat it all.

8              Number 863, 64, 65, and 66 appear to be

9         distributor summary report; is that

10        correct?

11   A.   Yes -- yeah.  Yes, sir.

12   Q.   And at the top of each one it's got a year,

13        2001, 2002, 2003, 2004.  And I don't know

14        if 867 is a -- it looks like a different

15        type report or it may be the same type

16        report, just on a different format.

17   A.   867 is just for one week.

18   Q.   Okay.  Let's wait on those for a second.

19        Let's go back to 863.  863 is for a whole

20        year; correct?

21   A.   Let's see.  Yes.

22   Q.   If we look at 863, we've got a beginning

23        balance owed of 34,000 and it looks like

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1       funds paid to distributor, 34,676. What is

2       that?

3  A.   That's a total of the year. If you took

4       his total of his weekly statements, that

5       should total with that.

6  Q.   The next line down, net product charged to

7       distributor, $326,631.02. See that figure?

8  A.   Yes.

9  Q.   Is that all product? It's not just -- it's

10      every product that's delivered to the

11      distributor?

12  A.   Yes.

13  Q.   It doesn't exclude branded sales or

14      anything like that?

15  A.   No.

16  Q.   What is relay adjustment?

17  A.   That is products delivered to our

18      warehouse. That would be if the relay

19      driver was supposed to deliver a hundred

20      units of a certain type bread and he gets

21      there and there's only 95. He would let

22      the driver know, hey, you're five units

23      short. So he gets credit for it.

43

1   Q.   Load adjustment.  What is that?

2   A.   That would be where the distributor

3        discovers, hey, he delivered us a load of

4        bread.  It's supposed to be a hundred units

5        of a certain type.  I've only got 95.  So

6        he gets credit for it.

7   Q.   And in this particular case the load

8        adjustments --

9   A.   It could be the other way.

10  Q.   -- is $364.48.  It's not a -- it looks like

11       it's a plus in this case.

12  A.   In that case he would have discovered he

13       had like 105 instead of a hundred.

14  Q.   So that means that he discovered he had

15       more bread than what the company said he

16       did and let the company know and there was

17       a load adjustment made?

18  A.   Well, he actually does this himself in

19       his --

20  Q.   In his computer?

21  A.   Yes.

22  Q.   Which notifies the company; correct?

23  A.   Yes.

44

1   Q.   Damaged, slash, crippled.  What does that

2       refer to?

3   A.   It's damaged bread he's taking credit for.

4   Q.   The next line down says short code.  And

5       what is short code?

6   A.   That's not one we use very often.  It's $19

7       for the whole year.  I'm assuming that's

8       some type of transaction where he was short

9       some bread.  That's something we really

10      don't use that much.

11   Q.   The next line down says product transfers.

12      What is that?

13   A.   It's where one distributor transfers

14      product to another route.  He can transfer

15      in or out.

16   Q.   Is that typical for distributors to

17      transfer in and out of their routes?

18   A.   Yes.

19   Q.   And why would they do that?

20   A.   I mean, you know, you have to ask the

21      distributor.  I guess they got too much of

22      a product and somebody else needs it.

23   Q.   The next line down says customer price --

45

1      is that allowances?

2   A.  Yes.

3   Q.  Slash, overrides.  What is that?

4   A.  That's -- well, an example of that would be

5       if we had bread in a store that was on

6       sale, so he's not getting the full price

7       for it.  He gets credit for the difference

8       between the regular price and what it's on

9       sale for.

10  Q.  All right.  Stales, $43,427.29?

11  A.  That's bread he takes out of the store and

12      stales it, out of code bread, old bread.

13  Q.  Authorized charges, $289,587.95?

14  A.  That's products sold to larger retail

15      grocery stores that the customer, the

16      grocery store, whoever it might be, doesn't

17      actually pay the distributor.  They pay

18      Flowers.  And we give them credit for it.

19  Q.  And then you've got net accountable.  It

20      looks like a -- is that a credit of

21      $9,168?

22  A.  Yes.

23  Q.  Now, what does that mean when it says net

46

1     accountable?

2  A.  That means at this point the distributor is

3     owed $9,168.

4  Q.  But we're not at the end of the statement

5     yet.

6  A.  Right.

7  Q.  That's just at that point within the

8     statement?

9  A.  Yes.

10  Q.  The next line down says standard discount.

11     It looks like $52,856.46.

12  A.  That's discount on the bread.  They buy it

13     from Flowers of Opelika.  They sell it to a

14     grocery store.  That's their discount they

15     get, the difference between what they buy

16     it from us and what they sell it to the

17     store at.

18  Q.  So that's the amount of profit that they

19     should make if they didn't have any other

20     expenses from buying it from you and

21     selling it to a store?

22  A.  Yes.

23  Q.  That figure is on there twice, total

47

1        distributor discount earning.

2 A.    It's just a total.

3 Q.    Then net distributor balance, a credit of

4        $62,025 at that point in time; correct?

5 A.    Yes.

6 Q.    We come down and we start into our business

7        expenses. Had a territory payment of

8        $11,180. Now, is that a territory payment

9        that was made throughout the year by the

10       distributor?

11 A.    Yes.

12 Q.    Truck purchase, $4,983.68. Is that also an

13       amount that was paid by the distributor

14       throughout the year?

15 A.    Yes.

16 Q.    Truck, slash, bus insurance is the next

17       line down.

18 A.    Business insurance.

19 Q.    Business insurance. Okay. Is that also a

20       figure that was paid by the distributor

21       throughout the year?

22 A.    Yes.

23 Q.    Health/disability insurance was also paid

48

1      by the distributor?

2   A.   Yes.

3   Q.   Warehouse rent, is that also paid by the

4        distributor?

5   A.   Yes.

6   Q.   Administrative fee, $520.  And what is

7        that?

8   A.   That's just a fee that distributors pay

9        Flowers of Opelika for paperwork for

10       running their statements, just a fee

11       Flowers of Opelika charges its

12       distributors.

13  Q.   We've got total business expenses of

14       $27,943.97.  You see that?

15  A.   Yes.

16  Q.   Total business expenses.  It looks like I

17       skipped two.  FICA tax, current work; is

18       that right?

19  A.   Current week.

20  Q.   Current week.  Okay.  $2,759.79.  And

21       miscellaneous expense, 66.12.  I know what

22       the FICA is.  What is a miscellaneous

23       expense?

49

1   A.   It could be anything.  I mean, that's why

2        it says miscellaneous.  Flowers charges

3        distributors -- if they don't pull up their

4        own routes and someone from Flowers of

5        Opelika does it, we charge the

6        distributors.  I mean, that could be -- I

7        mean, it could be several things, smaller

8        charges.

9   Q.   We've got total distributor balance, a

10       credit of $34,027.75; is that correct?

11  A.   Yes.

12  Q.   All right.  Weekly distributor balance,

13       $34,027.75.  And that's a credit.  And then

14       we've got gross earnings of 52,856.46.  And

15       then we've got weekly estimated operating

16       expense, $15,850.66.  Where does that

17       figure come from?

18  A.   That is based on -- the estimated operating

19       expenses are expenses the distributor turns

20       into their CPA.  The CPA compiles them,

21       gives them to Flowers of Opelika.  We use

22       the expenses on their statement to

23       determine --

50

1  Q.  To come up with their estimated net taxable

2      earnings?

3  A.  Exactly.

4  Q.  So if we look for 2001, the gross earnings

5      on his W-2 that Flowers sent to him -- I'll

6      have to let you explain it.  Let me mark

7      Plaintiff's Exhibit Number 4.

8              (Plaintiff's Exhibit 4 was marked

9               for identification.)

10 Q.  Plaintiff's Exhibit Number 4 has a W-2 for

11     2000 and 2001.  You see the 2001 at the

12     bottom of the page there?

13 A.  Yes, sir.

14 Q.  And it shows -- what's the gross taxable --

15     or gross compensation amount?

16 A.  $52,941.67.

17 Q.  All right.  I'm not smart enough.  Tell me

18     how -- why is that figure different than

19     the figure on Bates stamp number 863.

20 A.  Well, you have to take into account Flowers

21     doesn't operate on a normal calendar year.

22     If you notice these dates, 12-31-2000 to

23     12-29-2001.  It's not from January 1st to

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

51

1           December 31st.

2    Q.    That explains it.  All right.

3    A.    Which this is.

4    Q.    So they've got $52,941.67.  That's for the

5          January 1 through December 31st?

6    A.    Yes.

7    Q.    If we look at Bates stamp number 64 -- 864,

8          865, and 866, those are all the same

9          distributor summary reports just like the

10         one we went over in 2001?

11   A.    Yes.

12   Q.    Is there anything -- to me it appears to be

13         pretty standard.  I mean, has anything

14         changed between 2001 and 2004 in the way

15         the process that you did these particular

16         distributor summary reports?

17   A.    Not that I'm aware of.  I mean, I think

18         they're probably -- comparative they're

19         probably exactly the same.

20                 MR. HISHTA:  Just for record

21                    purposes, he didn't prepare

22                    these reports, but he's

23                    explaining the methodology.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

52

1  Q.  All right.  Let's flip over to Bates stamp
2      number 867.  What is this report?
3  A.  This is a weekly distributor's statement.
4  Q.  This is something that each distributor is
5      given every week?
6  A.  Yes, sir.
7  Q.  Let's work through it for a second.  At the
8      top of the page it says -- it's got your --
9      you know, Henry Porterfield's name,
10     distributor number, route, warehouse,
11     company, code, all that kind of stuff at
12     the top, just general information.  It
13     skips down and it says beginning balance
14     owed.  I would assume that's from the
15     previous week?
16 A.  Yes, sir.
17 Q.  Funds paid to distributor is zero.  Funds
18     received from distributor is zero.  Then
19     it's got accountability, total product
20     charged, $5,823.93.  You see that?
21 A.  Yes, sir.
22 Q.  That's product that was charged to Henry
23     Porterfield?

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

53

1    A.    Yes.

2    Q.    Or to Wal-Mart or to Winn-Dixie or somebody

3          that purchased --

4    A.    Well, no.  That's product the distributor

5          bought from Flowers Baking Company of

6          Opelika.

7    Q.    So that doesn't include the Wal-Mart stuff,

8          then, does it?

9                    MR. HISHTA:  Objection to the form

10                       of the question.  Vague and

11                       ambiguous.

12    Q.    Does total product charged, the $5,823.90

13          figure, does that include product --

14          private label product that went to

15          Wal-Mart?

16    A.    Well, I don't know.  I mean, the

17          distributor sells it once he buys it from

18          Flowers.  So I don't know where it went.

19    Q.    The distributor doesn't get paid for it.

20          It comes back straight to Flowers, doesn't

21          it?

22          He doesn't receive a check made out to

23          Henry Porterfield for product that goes to

54

1      Wal-Mart, does he?

2  A.  You're confusing me.

3           MR. HISHTA:  Yeah.  That's --

4  A.  We're talking about two different things

5      here.

6  Q.  All right.  Total product charged.  Tell me

7      what total product charged is.

8  A.  That's product the distributor buys from

9      Flowers Baking Company of Opelika.

10 Q.  Now, product includes bread, buns,

11     everything that you sell -- that Flowers

12     sells, right, that they pick up?

13 A.  Yes, sir.

14 Q.  Now, my question to you is, on total

15     product charged, in 2005 there was not a

16     Wal-Mart within Mr. Porterfield's route

17     that I am aware of; all right?  But

18     assuming there was, would private label

19     bread be included in total product charged

20     on a weekly distributor's report?

21 A.  This number has nothing to do with any

22     customer.  This is just product the

23     distributor bought from us.  That's all it

55

1    is.  I mean, it has nothing to do with any

2    store at that point.

3  Q.  Okay.  Is that just product that he's

4    bought from you just to use for whatever

5    reason he wants to use it for?  He can take

6    it and throw it away if he wants to?

7  A.  Yeah, I guess he could.

8  Q.  Do you have a contract with -- let's take

9    today.  Is there a contract between Flowers

10    and Wal-Mart?

11  A.  Not that I'm aware of.

12  Q.  Does Flowers distribute to Wal-Mart?

13  A.  No.

14  Q.  Has Flowers ever received a check for bread

15    delivered to Wal-Mart made out to Flowers?

16  A.  Yes.

17  Q.  Why did you receive a check made out to

18    Flowers from Wal-Mart?

19  A.  Because the distributor bought the bread

20    from Flowers Baking Company of Opelika.  He

21    put it in the store.  On larger accounts

22    like that the company pays Flowers, and

23    then we give them credit on their

56

1       statement.

2  Q.   The company doesn't pay the distributor.

3       They pay Flowers for it; correct?

4  A.   Yes.

5  Q.   While we're on that subject, the bread

6       that's delivered to Wal-Mart by the

7       distributors, how often do you get paid --

8       does Flowers get paid from Wal-Mart?

9  A.   Weekly.

10  Q.   If the distributor goes out and delivers

11       $10,000 -- let's just take an even

12       number -- $10,000 worth of product to

13       Wal-Mart, does Wal-Mart cut a check for the

14       exact amount that the distributor

15       distributed back to Flowers?

16  A.   Back to ...

17  Q.   To Flowers.

18             MR. HISHTA:  I'm going to object.

19               Again, it's vague and --

20  A.   You said distributed back to Flowers?

21  Q.   I'm sorry.  I'm sorry.  Let's just take it

22       one step at a time.  Let's say that $10,000

23       worth of product is picked up by a

57

1    distributor from Flowers' warehouse.  The

2    distributor looks on his computer and sees

3    that $10,000 worth of product is to go to

4    Wal-Mart; okay?

5          So he takes $10,000 worth of product to

6    Wal-Mart and puts $10,000 worth of product

7    on the shelf at Wal-Mart.  That week, the

8    next week, two weeks, whatever, does

9    Wal-Mart cut Flowers a check which you

10    credit to the distributor for $10,000?

11  A.  Hopefully.

12  Q.  But do they do that?

13  A.  Yeah.

14  Q.  Okay.

15  A.  Yes.

16  Q.  Do you know what the term shrinkage is?

17  A.  Yes.

18  Q.  What is shrinkage?

19  A.  Shrinkage is the term when the

20    distributor -- it's basically an inventory

21    variance.

22  Q.  And like if $10,000 worth of product is

23    delivered to Wal-Mart, does Wal-Mart pay

58

1          $10,000 back to Flowers?

2   A.     Well, first of all, you've got to take into

3          account pay by scan.  Are you --

4   Q.     That's what I'm asking.

5   A.     Well, you didn't mention that.  Okay.

6   Q.     Do they do pay by scan?

7   A.     Oh, yes, Wal-Mart does pay by scan.

8   Q.     That means they only pay you when they sell

9          it; correct?

10  A.     When it's scanned at the register, yeah.

11  Q.     If they don't sell it --

12  A.     I thought you were just talking on general

13         terms.

14  Q.     If they don't sell it, they don't pay you

15         for it?

16  A.     Right.

17  Q.     On the pay by scan, if you have shrinkage

18         in the store, then Flowers doesn't get paid

19         for it, correct, for the shrinkage amount?

20  A.     Right.

21  Q.     Who eats the shrinkage amount?

22  A.     The store -- well, Wal-Mart doesn't pay any

23         of it.  Most stores pay half.  Wal-Mart

59

1       refuses to pay half.  In normal cases the

2       store eats half, Flowers of Opelika eats a

3       fourth and the distributor a fourth.

4  Q.   With Wal-Mart what happens?

5  A.   The distributor gets a fourth and Flowers

6       gets the rest.

7  Q.   And who came up with that calculation?

8  A.   I have no idea.

9  Q.   Have you ever looked at a distributor's

10      contract?

11  A.   I have never read one.  I've seen one.

12      But, you know, I've never sat down and read

13      it.

14  Q.   Do you know of anyplace within the

15      distributor's contract that allows for

16      Flowers to charge a distributor for

17      shrinkage?

18             MR. HISHTA:  Objection to the

19               extent it calls for a legal

20               conclusion.  Second objection,

21               the witness has testified that

22               he hasn't read a distributor

23               agreement.

60

1    Q.    I've got a copy of a distributor agreement

2          if you want to look at one.  I'm just

3          asking if you knew of anyplace within a

4          distributor contract that allows for

5          Flowers to charge a distributor for

6          shrinkage.

7                        MR. HISHTA:  Same objection.

8                        Calls for a legal conclusion.

9    Q.    Well, let me show you what's previously

10         been marked as Defendant's Exhibit 1 to

11         Michael Lord's deposition which is a

12         distributor agreement.  And I'll tell you

13         what, we'll take a five-minute break and

14         I'll let you look through it and I'll ask

15         you that question after the break.

16   A.    You want me to read the whole thing?

17   Q.    Look through it.  I can give you ten

18         minutes.  We'll take ten minutes.

19   A.    What am I looking for?

20   Q.    I want you to tell me where within a

21         distributor's agreement it contains

22         language authorizing Flowers to charge a

23         distributor for shrinkage.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

61

A.   I'm not a lawyer.  I mean, it could be in
     there and I wouldn't even recognize it.

Q.   I'm not asking you to give me a legal
     opinion.  I'm just saying, as a lay person,
     if you see it in there that a lay person
     would understand, please let me know.
     We'll take ten minutes to let you look at
     it.
          I'm not asking you for a legal
     opinion.  I'm just asking you for your
     opinion as a lay person or as an accountant
     for Flowers.
                    (A brief recess was taken.)

Q.   (Mr. Davis continuing:)  Were you able to
     find anything contained within the contract
     that would give Flowers the authority to
     charge distributors for shrinkage?
                    MR. HISHTA:  Objection to the
               extent it calls for a legal
               conclusion and further object
               as this line of questioning
               seemingly has no relevance
               whatsoever to the allegations

62

1           Mr. Porterfield has made in

2           his complaint.

3  Q.  You can answer.

4           MR. HISHTA:  Go ahead.  You can

5               answer the question subject to

6               those objections.

7  A.  No, I didn't see the term shrink anywhere

8      in there.

9  Q.  As the comptroller for Flowers, are all

10     distributors like Henry Porterfield charged

11     for shrinkage?

12           MR. HISHTA:  Objection.  Assumes

13               facts not in evidence.

14               There's no evidence of record

15               that Henry was ever charged

16               for any shrink.

17 Q.  Are distributors charged for shrinkage at

18     Flowers?

19 A.  Yes.

20 Q.  You've worked in both Georgia and Alabama;

21     correct?

22 A.  Yes.

23 Q.  When you were working in Georgia, were

63

1      distributors charged for shrinkage?

2              MR. HISHTA:  Also object to the

3              terminology charged as it

4              relates to this line of

5              questioning.

6    Q.   You can answer.

7    A.   Yes.

8    Q.   And when I say charged, is shrinkage

9         deducted from distributors' weekly

10        accounts?

11   A.   No.

12   Q.   How is it handled?

13   A.   It's done on a period basis.

14   Q.   Done every quarter?

15   A.   Period.

16   Q.   Period.  How long is a period?

17   A.   Four weeks.

18   Q.   So once every four weeks it's adjusted; is

19        that correct?

20   A.   Yes.

21   Q.   And that's across the -- as far as you know

22        every place you've worked it's been that

23        way at Flowers?

64

1   A.   Yes.

2   Q.   All right.  Let's go back to Bates stamp

3         number 867.  We went over total product

4         charged.  And I think I got an answer, but

5         I'm not certain.  Does total product

6         charged include product that is pay by

7         scan?

8                  MR. HISHTA:  Objection.  Vague.

9   Q.   You can answer if you know.

10  A.   Well, I don't know how to answer it.

11  Q.   All right.  Well, then help me out, then.

12        Total product charged is product that is

13        charged to the distributor; correct?

14  A.   Yes.

15  Q.   All right.  Is product that is delivered to

16        Wal-Mart that is paid on pay by scan -- is

17        that a product included in the total

18        product charged --

19  A.   Is the product --

20  Q.   -- figure?

21  A.   Is the product?

22  Q.   Yes.

23  A.   Yes.

65

1    Q.    Relay adjustment.  What is that?

2    A.    That is product delivered to the warehouse

3          where the relay driver leaves an adjustment

4          for the distributor saying, hey, you're

5          short five loaves of bread.

6    Q.    Same thing, load adjustment, product that

7          either is --

8    A.    Short or over.

9    Q.    -- short or over.  Damaged product is

10         product that's just that.  It's damaged.

11         Short code product is what?

12   A.    I can't give you an answer on short code.

13         Like you see here, it's zero.  That's one

14         we really don't ever deal with.

15   Q.    If you look down in the middle, it says pay

16         by scan adjustments, 12-26-2004 through

17         1-1-2005?

18   A.    Yes.

19   Q.    Point of sale data.  It looks like a credit

20         for $1,806.98.  You see that?

21   A.    Yes.

22   Q.    So during this time period there were -- in

23         2005 on this particular route there were

66

1          point of -- I'm sorry -- there were pay by

2          scan customers on that route?

3    A.    Yes.

4    Q.    Revaluation variance.  What is that figure?

5    A.    That's their inventory variance on their

6          pay by scan items.

7    Q.    So does that mean -- or tell me what that

8          means.

9    A.    Well, they do an inventory every week, and

10         if they come up short or over -- if they

11         come up short, they get credit for it.

12   Q.    On a credit of $112.64 -- is that what this

13         particular document says?

14   A.    Yeah.

15   Q.    Does that mean that whoever that customer

16         was that did the pay by scan adjustment,

17         that there was actually more inventory in

18         stock than what they thought they should

19         have?

20   A.    You're saying the customer?  You mean like

21         the store?

22   Q.    The store.

23   A.    The distributor does this.

67

1    Q.    Okay. So on this particular one,

2          revaluation variance, the distributor goes

3          out and does an inventory?

4    A.    Yes.

5    Q.    Once he does the inventory, on this

6          particular 867 document it looks like a

7          $112.64 credit.

8    A.    Yes.

9    Q.    In this particular instance that means that

10          there was more product on the shelf than

11          the distributor thought or less on the

12          shelf than the distributor thought?

13    A.    Less.

14    Q.    Okay. So does that mean that there was

15          $112.64 shrinkage?

16    A.    Yes.

17    Q.    And is the $112.64 revaluation variance --

18          is that just the distributor's portion of

19          it, or is that the total revaluation?

20    A.    That's the total.

21    Q.    All right. Now, did the distributor get

22          charged -- assuming it's not Wal-Mart. On

23          other accounts how much does the

68

```
 1         distributor have to eat?  And when I say
 2         eat, how much is he charged?
 3    A.   25 percent.
 4    Q.   So the distributor should get charged 25
 5         percent of $112.64?
 6    A.   Yes.
 7    Q.   And is that contained anywhere on the
 8         distributor weekly sheet here that we've
 9         got?
10    A.   Well, there's a -- there's not a charge on
11         the sheet, but there is a line item for it.
12    Q.   Where is that at?
13    A.   PBS shrink charges.
14    Q.   PBS shrink charges says zero.
15    A.   Uh-huh (positive response).
16    Q.   All right.  Now, why would there be a zero
17         PBS shrink charge on this particular
18         document, number 867?
19    A.   Because this is a weekly statement and we
20         do it by period.
21    Q.   And so the shrinkage is done by period
22         also?  Pay by scan shrinkage is done by
23         every period or what?
```

69

1            MR. HISHTA:  Objection.  Again,

2                Greg, it's vague.  I don't

3                understand the question.

4  Q.  All right.  Tell me what you mean by it's

5      done by period.

6  A.  We charge them or give them credit by

7      period.

8  Q.  On this particular document number 867,

9      it's not contained on there.  And if we

10     look over to a different period, a

11     different week, it may be on there because

12     it's --

13  A.  Yes.

14  Q.  Is that what you're saying?

15        If we look over at Bates stamp number

16     870 and -- you see PBS shrink charges?

17  A.  Yes.

18  Q.  And is that PBS shrink charge for what

19     period?

20  A.  Well, I didn't do this statement.  I wasn't

21     even working with Flowers Opelika then.

22     So, I mean, I couldn't say.

23  Q.  You can't tell by looking at it?

70

1    A.    Well, I mean, no.  I mean -- I mean, I
2          don't know what makes up that number.
3    Q.    Pay by scan shrink charges on document
4          number 870 says 123.17.  What's your
5          understanding of what the PBS shrink charge
6          is made of currently?
7    A.    That would be charging a distributor for a
8          period worth of shrink.
9    Q.    And if the -- at stores other than Wal-Mart
10         the distributor gets charged how much?
11   A.    Same amount.
12   Q.    25 percent?
13   A.    25 percent.
14   Q.    So he gets charged 25 percent on Wal-Mart
15         and anybody else that does pay by scans?
16   A.    Yes.
17   Q.    And that's still true today?
18   A.    Yes.
19   Q.    Back to number 867.  There's a lot of
20         business expenses, which I think most of
21         them are self-explanatory.  Like the
22         territory payment, that's actually what the
23         distributor is paying for that particular

71

1      territory.  Truck purchase is what he's

2      paying for the truck purchase?

3  A.  Yes.

4  Q.  Tags, tax, license fees.  That's on the

5      truck.  Insurance.  Administrative fee,

6      again, is $10.  Is that a week, every

7      week?

8  A.  Yes.

9  Q.  Warehouse rent every week.  FICA is

10      withheld.  And then a miscellaneous expense

11      of $20?

12  A.  Yes.

13  Q.  Is it always $20 on the miscellaneous

14      expense?

15  A.  Well, I mean, it could be more or could be

16      less.

17  Q.  Is there a minimum that it is?

18  A.  Well, it could be zero.  It's normally

19      going to be -- like I said, if the

20      distributor did his own pull-ups and there

21      wasn't anything else to charge him, then it

22      would be zero.

23  Q.  If the distributor had someone to do the

72

1    pull-ups that Flowers hired, does Flowers

2    charge the distributor a $20 a week pull-up

3    fee -- or did they?

4  A.  Say that again.

5  Q.  Sure.  It's probably a bad question.

6       Let's just take a distributor that has

7    someone else do the pull-ups.  Like, for

8    instance, this morning Marcus Porterfield

9    would go out and do pull-ups every week.

10   Does Flowers pay the person that does the

11   pull-up and then charge the distributor for

12   doing it every week?  Is that how that

13   figure is come up with?

14 A.  Yes.

15 Q.  And I know it was $20.  I think it -- it

16   looks like it went up to -- I want to say

17   it went up to $40 or something at one point

18   in time.  Yeah.  I was looking way over

19   here.  In '06 it starts looking like it's

20   $40 every week.  So now they charge like

21   $40 to do a pull-up.  Is that what that 40

22   would be?  Is that your understanding?

23 A.  Yes.

73

1    Q.    On this when -- when I say this one, number

2          867, it looks like the distributor gets a

3          credit of $1,215.67 at the end of the day.

4    A.    Yes.

5    Q.    Is that correct?  Is that what he gets

6          paid?

7    A.    Yes.

8    Q.    All right.  Flip over to document number

9          878.  And this period or the date is

10         3-20-2005 to 3-26-2005.  You see that at

11         the top of that document?

12   A.    Yes, sir.

13   Q.    On this particular document, 878, under the

14         business expense, it's got relief driver,

15         $334.80.  Do you see that figure?

16   A.    Yes, sir.

17   Q.    And this was, I think, around the time that

18         Mr. Porterfield's contract was terminated.

19         And if you look on the week prior to that,

20         there was no relief driver charged on

21         document number 877.  Do you see that?

22   A.    Yes, sir.

23   Q.    So the relief driver of 334.80, that

74

```
1          according to the contract, if Flowers takes
2          back over the territory, they can hire
3          somebody to run the account.  Are you
4          familiar with that?
5    A.    I know that's what that charge is for,
6          somebody running the route.
7    Q.    Okay.  Do you know who the relief driver
8          was?
9    A.    No.
10   Q.    Do you know why the amount for relief
11         driver is different on all of the
12         documents -- I'm not going to say all of
13         them.  I'm going to say on at least the
14         next eight or ten after this.  The relief
15         driver on 879 is $512.  On 880 it's 331.
16         On 881 it's $416.  You know, I could go on
17         and on.  But do you know why that
18         particular business expense entitled relief
19         driver changes every week?
20   A.    Yes.
21   Q.    Why?
22   A.    It's based on a standard discount which
23         changes every week.
```

75

1   Q.   Explain that for me.

2   A.   Take ten percent of the weekly discount and

3        he's charged that amount per day per relief

4        driver.

5   Q.   Flip over to document number 972 for me,

6        please.

7                 MR. HISHTA:  I'm missing 972.

8   Q.   Well, let's share that one.  What is

9        document number 972?

10  A.   Looks like a distributor's statement run

11       for a full year.

12                MR. HISHTA:  Let's take a break so

13                    we can get a copy of this.

14            (A brief recess was taken.)

15  Q.   (Mr. Davis continuing:)  All right.

16       Document number 972, that's a -- is that a

17       yearly summary?

18  A.   Yes.

19  Q.   And that's for basically the year 2006?

20  A.   Yes.

21  Q.   Except for the last day of the year.  I

22       guess it doesn't have the 12-31-2006 in it;

23       correct?

76

1    A.    Yes, sir.

2    Q.    On the business expenses at the bottom it's

3          got truck rental.  You see that figure?

4    A.    Yes, sir.

5    Q.    $24,698.84?

6    A.    Yes, sir.

7    Q.    How is that figure determined?

8    A.    That is the expense for renting a truck by

9          Flowers Baking Company of Opelika to run

10         this route.

11   Q.    Who was the truck rented from?

12   A.    I couldn't say off the top of my head.

13   Q.    I mean, would it -- do y'all have a

14         specific place y'all rent trucks from?

15   A.    Not that I'm aware of.

16   Q.    How did you come up with or who told you

17         that the figure was $24,698.84 to rent a

18         truck for a year?

19   A.    That would have come from a sales manager,

20         operations manager.

21   Q.    Do you have any documents to back up that

22         the truck rental cost $24,698.84?

23   A.    Yes.  They would have turned those in.

77

1    Q.   It looks like life insurance, 329.68.  Who

2         is the life insurance on?

3    A.   On the distributor.

4    Q.   On Henry Porterfield?

5    A.   Is this on his route, or is this -- I

6         didn't even look.  Is this for one route or

7         is this --

8    Q.   These are documents that your lawyer

9         produced to me.

10                   MR. HISHTA:  It's not -- for

11                        record purposes, it's not

12                        clear that this is route 2069

13                        because 2069 does not appear

14                        on this document.

15   Q.   If I wanted to double-check myself -- and

16        we won't do it here.  But if I took all of

17        the weekly reports and just took total

18        product charged and added those up for the

19        year, they should come up to -- if this is

20        in fact this particular route, it should

21        come up to $600,245.39?

22   A.   Yes, sir.

23   Q.   All of the other charges should match up if

78

1       that is in fact the route?

2   A.  Yes, sir.

3   Q.  Do you know if Henry Porterfield was

4       leasing a truck whenever he had the route?

5   A.  No, sir, I don't know.

6   Q.  On 972 it says the relief driver was paid

7       $37,490.55.

8               MR. HISHTA:  Objection.  It

9                   doesn't say -- it doesn't

10                  indicate what the relief

11                  driver was paid.

12  Q.  Okay.  There was a charge made for relief

13      driver of $37,490.  You see that?

14  A.  Yes, sir.

15  Q.  Who received the benefit of that charge?  I

16      mean, was somebody paid $37,490.55?

17  A.  No.  It was charged to Henry Porterfield's

18      route.

19  Q.  Okay.  And why was it charged to his

20      route?

21  A.  Because Flowers of Opelika was running the

22      route for Henry Porterfield.

23  Q.  So Flowers was running the route.  So

79

1      Flowers charged him $37,490.55 to run the
2      route for him; is that correct?
3  A.  Yes.
4  Q.  And Flowers paid someone themselves to run
5      the route?
6  A.  Well, not if it was a Flowers employee
7      who's getting a salary.
8  Q.  Do you know in 2006 who ran this particular
9      route?
10 A.  No.
11 Q.  And $37,490.55 is computed by taking the
12     total product charged --
13 A.  The discount.
14 Q.  The discount?
15 A.  The discount.
16 Q.  Which is where on here?
17     Okay.  I got you.  Standard discount,
18     $74,775.75?
19 A.  Yes.
20 Q.  And what percentage of that does Flowers
21     use to come up with how they charge for a
22     relief driver?
23 A.  Ten percent.

80

1   Q.   So ten percent of $74,775 should be what?

2   A.   Well, ten percent of that number is $7,478

3        roughly.  But it's done on a weekly basis.

4   Q.   This is a yearly report.  Is this not the

5        yearly standard discount?

6   A.   Yes.

7   Q.   Obviously $37,490.55 is not ten percent of

8        $74,000.

9                  MR. HISHTA:  Objection.  Asked and

10                     answered.  He previously

11                     testified the ten-percent

12                     figure was calculated on a

13                     daily basis.

14  Q.   Okay.  Well, tell me how the $37,490 figure

15       is calculated on a daily basis.

16  A.   That $37,000 wasn't.

17  Q.   Okay.  How was it calculated?

18  A.   It should be a total for the year.

19  Q.   And the total for the year should be ten

20       percent of the standard discount, or no?

21       You tell me.

22  A.   It's ten percent of the discount for a

23       total week based on the number of days

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

81

1      there was a relief driver.

2  Q.  For a total week based on number of days

3      that there was actually a relief driver?

4  A.  Yes, sir.

5  Q.  Tell me how you would compute it.

6  A.  You would take the total standard discount

7      for a week times ten percent, multiply that

8      by the number of days there was a relief

9      driver for that week.

10  Q.  Okay.  Can you explain to me how the relief

11      driver figure on document number 972 is

12      $37,490.55?

13  A.  It should be a total of each week's relief

14      driver expense.

15  Q.  Let's just flip backwards.  I'm just going

16      to pick document number 946.  You see where

17      it says relief driver?

18  A.  Yes, sir.

19  Q.  It says 421.40?

20  A.  Yes, sir.

21  Q.  That's for the week of 7-2 through 7-8-06;

22      is that correct?

23  A.  Yes.

```
 1   Q.   The relief driver charge for that week
 2        should be total discount times ten percent
 3        times number of days; is that right?
 4   A.   Uh-huh (positive response).  Yes, sir.
 5   Q.   So if I go here and I go to total discount,
 6        it's how much?
 7   A.   842.75.
 8   Q.   All right.  842.75 times ten percent equals
 9        $84.27; is that correct?
10   A.   Yes, sir.
11   Q.   Times the number of days.  So five days; is
12        that right?
13   A.   I don't know.
14   Q.   All right.  421.40 divided by --
15             MR. HISHTA:  It's five days.
16   Q.   -- $84.27 is five days; right?
17             MR. HISHTA:  84.27 times five is
18                 421.35.  So for rounding
19                 purposes, yes.
20             MR. DAVIS:  Close enough.
21   Q.   So that's the way that's computed for
22        there?
23   A.   Right.
```

83

1    Q.    So if we take the relief driver figure

2          421.40 and we take that figure each week

3          and add them up, what you're telling me is

4          at the end of the year it should add up for

5          2006 to $37,490.55?

6    A.    Yes.

7    Q.    And the total discount is what's used every

8          week?

9    A.    Yes.

10   Q.    If you look at document number 972, the

11         total discount shows $74,778.  Is that

12         figure correct?

13   A.    I'm sorry.  You lost me.

14   Q.    Sure.  Let's look at document number 972.

15         If we look at the discount for the year

16         2006, 1-1-2006 to 12-30-2006, the standard

17         discount appears to me to be $74,775.75; is

18         that correct?

19   A.    Yes.

20   Q.    And that's for the whole year's standard

21         discount; correct?

22   A.    Yes, sir.

23   Q.    Why -- and I'm sorry if this is a bad

84

1    question.  But explain to me why it's not

2    ten percent of that figure times the number

3    of days, or is it?

4  A.  No, it's not.

5  Q.  Okay.  Well, explain to me -- explain to

6    for me how that figure plays into the

7    calculation.

8  A.  It doesn't.

9  Q.  And why doesn't it?

10  A.  Because it's a yearly figure.

11  Q.  Okay.  So the discount --

12  A.  You can't --

13  Q.  You can't do it because of the numbers of

14    days that the driver has actually worked

15    the route?

16  A.  Yes, sir.

17  Q.  Okay.  That's what I'm trying to get to.

18    I'm trying to get to the bottom of all

19    this.

20    All right.  So if I do it on a weekly

21    and add them up weekly, then my figure

22    should come out to be $37,490.55?

23  A.  Yes, sir.

85

1    Q.    The shrinkage charged to this account

2           according to this for 2006 was $211.47; is

3           that correct?

4    A.    Yes.

5    Q.    That's for the year; is that right?

6    A.    Yes, sir.

7    Q.    Miscellaneous expenses, $1,620.  Do you

8           know what that is?

9    A.    Like I said, miscellaneous could be a lot

10         of different things.  The most usual is

11         pull-up charges.

12    Q.    Do you know why Henry Porterfield's account

13         would be charged for pull-up charges?

14    A.    Not just looking at this document, no.

15    Q.    And the life insurance charge of 329.68, is

16         that on Henry Porterfield's life?

17    A.    Yes.  I mean, it's for -- on the

18         distributor's behalf.  I don't know exactly

19         who it's for.

20    Q.    I mean, does Henry Porterfield have a life

21         insurance policy that y'all pay $329.68 for

22         every year?

23    A.    We pay it on Henry Porterfield's behalf.

86

1    Q.    Do you pay it on -- when you say on his

2          behalf, is it paid for a driver?

3    A.    For a driver?

4    Q.    Somebody that's running -- a relief

5          driver?

6    A.    No.

7    Q.    Who is the life insurance paid to?

8    A.    To the life insurance company.

9    Q.    And who is the insured on that life

10         insurance policy?

11   A.    What I'm saying is it could be -- I don't

12         know if it's just the distributor or his

13         family.  I don't know for sure.  It's on

14         the distributor's behalf.

15   Q.    So it could be anybody.  And when you say

16         the distributor, you're talking about Henry

17         Porterfield?

18   A.    If this is his route, yeah.

19   Q.    I mean, it's not paid on behalf of a relief

20         driver, is it?

21   A.    Not through a statement.

22   Q.    Is a relief driver -- is he covered by life

23         insurance through the company?

87

1   A.   If he's an employee of Flowers Baking

2        Company.

3   Q.   That's not charged to Henry Porterfield,

4        though, is it?

5   A.   No.

6   Q.   And you don't know what kind of truck is

7        being rented for $24,000 a year, do you?

8   A.   What kind of truck?

9   Q.   Yeah.

10  A.   You mean like brand name?  What do you mean

11       by what kind?

12  Q.   Like what kind of delivery truck is it that

13       $2,000 a month basically is being paid by

14       Flowers?

15  A.   I don't ever see the trucks.  I couldn't

16       say what kind of truck it was.

17  Q.   Who has the lease documents on those

18       trucks?

19  A.   I don't know.  I don't handle the lease.  I

20       mean, I just handle this financial end of

21       it, so I don't know.

22  Q.   Flip over to document number 982 for me,

23       please.  If we look down at the item

88

1      entitled truck lease, do you see that

2      item?

3  A.   Yes.

4  Q.   And how much is the weekly truck lease

5      amount?

6  A.   Looks like it's zero.

7           MR. HISHTA:   Zero.

8  Q.   I'm sorry.  Truck rental amount.

9  A.   $333.69.

10 Q.   If you look at number 983, what is the

11     truck rental amount?

12 A.   $333.68.

13 Q.   And if you look at 984, what is the truck

14     rental amount?

15 A.   $333.68.

16 Q.   If you look at 985, what's the truck rental

17     amount?

18 A.   $333.68.

19 Q.   Same thing with 986?

20 A.   333.68.

21 Q.   And that's the weekly truck rental amount;

22     correct?

23 A.   Well, I haven't been checking these.  Yes,

89

1      sir, these are weekly statements.

2   Q.   Flip back to 981 for me.

3         Are you at 981?

4         What's the truck rental amount on 981?

5   A.   $667.38.

6   Q.   Do you know why the truck rental was

7        $667.38 on 2-25-07 through 3-3-07?

8   A.   That's what we were told to charge the

9        route.

10  Q.   And who was it that told you to charge

11       that?

12  A.   Like I said before, we get the information

13       from the sales managers in the warehouse.

14       They tell us how much it's costing to rent

15       a truck.

16  Q.   But the sales office has documents to back

17       up these figures that they give you?

18  A.   Yes.

19             (Plaintiff's Exhibit 5 was marked

20              for identification.)

21  Q.   I'm going to show you what I've marked as

22       Plaintiff's Exhibit Number 5.  Do you know

23       what Plaintiff's Exhibit Number 5 is?

90

1    A.    Yes, sir.

2    Q.    What is that?

3    A.    It's a W-2.

4    Q.    Issued by Flowers Baking Company of

5          Opelika, LLC, to Henry Porterfield?

6    A.    Yes.

7                  (Plaintiff's Exhibit 6 was marked

8                  for identification.)

9    Q.    Let me show you what I've marked as

10         Plaintiff's Exhibit number 6.  Is that also

11         a W-2 for 2003 issued by Flowers Baking

12         Company to Henry Porterfield?

13   A.    Yes.

14                 (Plaintiff's Exhibit 7 was marked

15                 for identification.)

16   Q.    Let me show you what I've marked as

17         Plaintiff's Exhibit number 7.  Is that also

18         a W-2 issued to Mr. Henry Porterfield for

19         2004?

20   A.    Yes, sir.

21                 (Plaintiff's Exhibit 8 was marked

22                 for identification.)

23   Q.    Let me show you what I've marked as

91

1      Plaintiff's Exhibit Number 8.  Is that also

2      a W-2 issued by Flowers to Henry

3      Porterfield for 2005?

4   A.   Yes.

5                (Plaintiff's Exhibit 9 was marked

6                for identification.)

7   Q.   And let me show you Plaintiff's Exhibit

8      Number 9 and ask you if that's also a W-2

9      issued by Flowers to Henry Porterfield for

10     the year 2006.

11  A.   Yes.

12  Q.   And looking at 2006, how much does it say

13     that Mr. Porterfield made in 2006 from

14     Flowers?

15  A.   He didn't make anything from Flowers.  I

16     mean, we don't --

17  Q.   How much does it report that his wages --

18     excuse me.  Let's see what it says --

19     wages, tips, or other compensation were in

20     2006?

21  A.   $74,499.75.

22  Q.   And Mr. Porter didn't get $74,000 and

23     change from Flowers during 2006, did he?

92

1    A.    Well, he wasn't -- what do you mean by get?

2    Q.    Did he receive wages, salaries, or tips

3          from Flowers in the amount of 74,000?

4    A.    No, not wages, salaries, or tips.

5    Q.    What did he receive?

6    A.    He received discount on product he bought

7          from Flowers Baking of Opelika.

8    Q.    And how much was his discount?

9    A.    $74,499.75.

10   Q.    And that discount is a percentage of the,

11         what, net sales, or what is it?  It's a

12         percentage of what?

13   A.    The product he bought from Flowers of

14         Opelika.

15   Q.    And what percentage of it is it?

16   A.    It's different for different --

17   Q.    Different products?

18   A.    -- different products.

19   Q.    And he received a discount or percentage of

20         the discount, I guess; right?

21   A.    Percentage of the -- well, the discount is

22         a percentage.

23   Q.    But as far as dollar figures, he didn't

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

93

1    receive any actual money himself, did he?

2         MR. HISHTA:  Are you asking him

3              did he physically receive

4              money or did money go into a

5              bank account?

6    Q.   Did money go into -- either a check written

7         out that said from Flowers to Henry

8         Porterfield or cash or any type of

9         compensation that went straight to Henry

10        Porterfield?

11   A.   If at the end of the week if we owed --

12        Flowers owed him money, yes.

13   Q.   How many times did Flowers cut Henry

14        Porterfield a check in 2006?

15   A.   I don't know.

16   Q.   If you look at the 2006 summary, would it

17        tell you if Mr. Porterfield received a

18        check?

19   A.   No.  Because he could have received checks

20        one week and the next week he might not

21        have received a check.  You can't go on a

22        yearly figure.

23   Q.   If I look at the 2006 weekly reports, will

94

1       I be able to tell if he received a check?

2  A.   Yes.  You can see what the balance is.

3  Q.   It says distributor balance and it has a

4       figure there.  If there's a balance, then

5       he didn't receive a check; is that right?

6             MR. HISHTA:  If there's a positive

7               balance, is that what you --

8  Q.   A positive balance.

9  A.   If it's a positive balance, no, sir, he

10      didn't receive a check.

11  Q.   Go to Bates stamp number 971 for me.  Are

12      you at that page?

13       You see the weekly distributor balance?

14  A.   Yes, sir.

15  Q.   $16,874.14?

16  A.   Yes, sir.

17  Q.   So as of -- and that's the week of

18      12-24-2006 to 12-30-2006?

19  A.   Yes.

20  Q.   So at the end of 2006 Henry owed --

21      according to your calculations owed Flowers

22      $16,874.14?

23  A.   Yes.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

95

1   Q.   Flip back -- let's go back to document

2        number 878, which is right around the time

3        that Henry's contract was terminated on --

4        which was -- this is for a report of

5        3-20-2005 to 3-26-2005.  You see that?

6   A.   Yes, sir.

7   Q.   And at that time the weekly distributor

8        balance was what?

9   A.   $495.69.

10   Q.   And was that a credit?

11   A.   Yes, sir.

12   Q.   So Henry got cut a check for that week for

13        $495.69; is that right?

14   A.   Yes, sir.

15   Q.   If you look over to the next week, it shows

16        Henry owing you $271.93; correct?

17   A.   Yes, sir.

18   Q.   And that figure is increasing every week

19        until it gets up to where I just stopped at

20        at 12-24-2006 and it's up to 16,874?

21                MR. HISHTA:  It may not increase

22                   every week, but we will

23                   stipulate that it has

96

increased.

Q.    It has increased up to that amount by
12-30-2006.  If you go further, it's even
higher than that now.  So I'm just stopping
at that date.

Do you know any reason why Flowers is
losing money on this particular route when
they're running it themselves?

A.    Mr. Porterfield is not paying us any money.

Q.    Mr. Porterfield should be paying you money
every week?

A.    No, I didn't say that.

Q.    Mr. Porterfield is not paying you any money
on what?

A.    His route number 2069.

Q.    Is anybody paying you any money on that
route number 2069?

MR. HISHTA:  Objection.  It's
vague.  I'm not sure what
either one of you are
referring to.

MR. DAVIS:  I don't either.
That's what I'm trying to get

1                    at.

2    Q.   I mean, who's paying for product charged to

3         route 2069?

4    A.   Nobody.  It's just accumulating.

5    Q.   So since March of 2005 not a single

6         customer on route 2069 has paid any dime to

7         Flowers?

8    A.   Oh --

9              MR. HISHTA:  Objection.  Vague.

10                  But go ahead and answer.

11   A.   Yeah, customers have.

12   Q.   All right.  But Mr. Porterfield hasn't?

13   A.   Not that I'm aware of.

14   Q.   Is there a reason why Mr. Porterfield

15        should be paying you money every week on

16        this account?

17   A.   Well, it's got his name on the document.

18   Q.   Okay.

19             MR. HISHTA:  Well, I'd state for

20                  record purposes that -- and I

21                  believe that we have

22                  previously stipulated to

23                  this.  Michael Lord certainly

98

1                testified to that effect that

2                the -- Mr. Porterfield's

3                territory is being run on his

4                behalf and an accounting has

5                been taking place since the

6                termination of his contract.

7    Q.    Do you have all of the documents related to

8          the accounting of Mr. Porterfield's route?

9    A.    Yes.

10   Q.    Are those documents kept in a separate

11         file?

12   A.    They're kept in a folder.

13   Q.    All of them related to 2069?

14   A.    Yes.

15   Q.    So every charge, everything that deals with

16         this account is kept in one folder?

17                MR. HISHTA:  If you know.

18   A.    I don't know that every charge is kept in

19         that folder.

20   Q.    What charges are kept in the folder?

21   A.    Well, I don't keep up with the folder, so I

22         don't know.

23   Q.    Who does?

115

1              discussing at the bottom of

2              document 920.

3    A.    The less prior week pay by scan inventory

4          is the ending inventory for the week ending

5          12-31-05.

6    Q.    And that's credit?

7    A.    Uh-huh (positive response).

8    Q.    Is that right?

9    A.    Yes.

10   Q.    All right.  And the less current weekly pay

11         by scan delivery tickets, is that also a

12         credit?

13   A.    Yes.

14   Q.    And when you take your total distributor

15         balance of 11,506.17 and you take your two

16         credits away from it, it leaves a weekly

17         distributor balance of $9,226.47; correct?

18   A.    Yes.

19   Q.    And at the end of that week, that is the

20         weekly distributor balance?

21              MR. HISHTA:  Objection.

22   Q.    Is that correct?

23              MR. HISHTA:  Objection to the

120

1    I'm trying to remember the formula that

2    balances it.  Because, like I said, I don't

3    do this every day.  So the point of sale

4    data and the prior week pay by scan

5    inventory for one week equals the next

6    week's point of sale data, revaluation

7    variance, and pay by scan inventory.  The

8    next -- that's what I'm trying to say.

9    This is not saying that Henry Porterfield

10   owes us $9,490 on this week.

11   Q.   On number 921?

12   A.   Yes.

13   Q.   What's it saying?

14   A.   It's saying that he owes us $11,523.

15   Q.   Well, we're back to my question.  Tell me

16        where on that document, on 921, the 942.83

17        credit and the $1,090 credit went to.

18   A.   Well, nobody ever said he was supposed to

19        get credit for that.  He gets credit for

20        when it's scanned.

21   Q.   All right.  Then why is it there as being a

22        credit?

23   A.   I told you, it's just an accounting

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

121

1    function to check to make sure that these

2    numbers are right.

3    Q.    Well, show me how these numbers are right

4         when you use the numbers at the bottom of

5         the page.  Explain that to us.

6    A.    Okay.  That's what I'm -- that's what I'm

7         trying to remember, the formula.  Which

8         ones are we using?

9              This one right here.  Okay.  I'm doing

10        something wrong.  I can't remember the

11        formula exactly.  I'm trying to remember

12        what it is.

13             It's not coming up right.

14                  MR. HISHTA:  Greg, for record

15                      purposes, we would be happy to

16                      supply you an explanation of

17                      the accounting on a

18                      week-to-week basis if he

19                      cannot testify regarding his

20                      recollection of that

21                      accounting formula as he sits

22                      here today.

23   Q.    Sitting here today you don't know how you

122

1  came up with those figures, do you?

2  A.  Not off the top of my head, no.

3  Q.  Let me ask you another question.  Flip over

4      to 922.  You see where it says new

5      distributor balance here?

6  A.  Yes, sir.

7  Q.  It's $1,264.18?

8  A.  Yes, sir.

9  Q.  From your standpoint -- from an accounting

10     standpoint, does this tell you that at the

11     end of the week that this distributor

12     had -- whether or not it's Henry

13     Porterfield or whoever it is -- had

14     $1,264.18 of bread that they didn't

15     deliver?

16         Aren't these figures based on bread?

17 A.  On bread that they didn't deliver?

18         This number is taking the product he

19     bought from Flowers minus his load

20     adjustments --

21 Q.  Shorts, damaged, product transfers,

22     authorized charges.  So this distributor at

23     the end of the day has $1,264 worth of