# FREEDOM COURT REPORTING

<u>TRAVEL TRANSCRIPT</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:05-cv-937-F


HENRY G. PORTERFIELD,

Plaintiff,

VS.

FLOWERS BAKING COMPANY OF OPELIKA, LLC,

Defendant.


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF**

**HENRY G. PORTERFIELD**

May 9th, 2007

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRAVEL TRANSCRIPT PREPARED BY

FREEDOM COURT REPORTING

RENA' MESSICK LANIER, CSR

(334) 300-3832

www.freedomreporting.com
1-877-373-3660

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5    CASE NUMBER: 2:05-cv-937-F

6

7    HENRY G. PORTERFIELD,

8        Plaintiff,

9        VS.

10   FLOWERS BAKING COMPANY OF OPELIKA, LLC,

11       Defendant.

12       S T I P U L A T I O N

13       IT IS STIPULATED AND AGREED by

14   and between the parties through their

15   respective counsel, that the video

16   deposition of HENRY G. PORTERFIELD may be

17   taken before RENA' MESSICK LANIER, Court

18   Reporter and Notary Public for the State

19   of Alabama at Large, at the Tiger Town Inn

20   at 205 North 21st Street, Opelika, Alabama

21   36801, on the 9th day of May, 2007.

22       IT IS FURTHER STIPULATED AND

23   AGREED that the signature to and the

Page 2

1    reading of the deposition by the witness

2    is waived, the deposition to have the same

3    force and effect as if full compliance had

4    been had with all laws and rules of Court

5    relating to the taking of depositions.

6        IT IS FURTHER STIPULATED AND

7    AGREED that it shall not be necessary for

8    any objections to be made by counsel to

9    any questions except as to form or leading

10   questions, and that counsel for the

11   parties may make objections and assign

12   grounds at the time of the trial, or at

13   the time said deposition is offered in

14   evidence, or prior thereto.

15       IT IS FURTHER STIPULATED AND

16   AGREED that the notice of filing of the

17   deposition by the Commissioner is waived.

18

19

20

21

22

23

Page 3

1            I N D E X

2    EXAMINATION BY:              PAGE

3    MR. HISTA                         14

4    EXHIBITS              MARKED

5    DEX 1   Complaint                   31

6    DEX 2   Employment app. for Flowers  86

7    DEX 3   1994 Distributor agreement   95

8    DEX 4   6-month buy back option     101

9    DEX 5   1994 Distributor information 103

10   DEX 6   Distributor adjustment doc.  134

11   DEX 7   2/15/95 breach ltr: Krystal  136

12   DEX 8   Meat City Grocery breach ltr 141

13   DEX 9   Breach ltr re: NSF check     147

14   DEX 10  Breach re: Krystal #2 complt 148

15   DEX 11  4/9/97 memo re: Krystal      150

16   DEX 12  10/9/98 ltr re: monitoring   151

17   DEX 13  Breach ltr re: Gunter AFB    157

18   DEX 14  Gunter termination of plf    159

19   DEX 15  9/10/98 HP ltr re Gunter AFB 164

20   DEX 16  Breach ltr re: late payment  165

21   DEX 17  Amendment, Repurchase Agrmt  168

22   DEX 18  6/23/2000 Repurchase statemt 173

23   DEX 19  2000 Distributor agreement   177

Page 4

1    DEX 20  6-month buy back option     189

2    DEX 21  Breach ltr re: BK/Davis Cafe 214

3    DEX 22  Interdepartmental memo       223

4    DEX 23  Doc. re: Sno-Balls missing   223

5    DEX 24  3/16/01 ltr re: Applebee's   229

6    DEX 25  10/23/01 ltr re: Winn-Dixie  230

7    DEX 26  Repurchase statement 3/1/02  231

8    DEX 27  2002 Distributor agreement   233

9    DEX 28  6-month buy back option     238

10   DEX 29  Distributor checklist        239

11   DEX 30  Adjustment worksheet         241

12   DEX 31  3/18/02 ltr re: Winn-Dixie   243

13   DEX 32  5/29/02 ltr re: not working  244

14   DEX 33  10/8/02 ltr re: two trays    247

15   DEX 34  10/15/02 Stephens note       256

16   DEX 35  3/28/03 ltr re: Krystal      258

17   DEX 36  7/7/03 ltr re: not working   260

18   DEX 37  9/12/03 ltr re left too much 265

19   DEX 38  4/7/04 BK complt - 5 day svc 266

20   DEX 39  6/3/04 memo re: BK service   269

21   DEX 40  7/14/04 ltr re: Winn-Dixie   270

22   DEX 41  7/16/04 ltr re: Krystal buns 271

23   DEX 42  10/22/04 ltr re: attitude    272

Page 5

1 DEX 43  12/6/04 ltr re: Krystal                274
2 DEX 44  2/3/05 ltr re: Burger King             278
3 DEX 45  2/14/05 BK termination note            280
4 DEX 46  Stephens note re Joni Barnes           281
5 DEX 47  Cert. ltr to Porterfield               298
6 DEX 48  3/16/05 memo re: meeting               299
7 DEX 49  3/16/05 ltr barring HP                 308
8 DEX 50  3/17/05 ltr from M. Lord               315
9 DEX 51  HP ltr to Michael Lord                 323
10 DEX 52 Tammy Luster note                      325
11 DEX 53 Termination of distributor             330
12 DEX 54 Montgomery Public School app           334
13 DEX 55 MPS leave of absence form              339
14 DEX 56 MPS termination notice                 343
15 DEX 57 9/27/06 ltr terminating                346
16 DEX 58 Winn-Dixie job application             349
17 DEX 59 1999 1040 tax return                   355
18 DEX 60 W-2 forms                              358
19 DEX 61 2000 1040 tax return                   360
20 DEX 62 2001 1040 tax return                   361
21 DEX 63 2002 1040 tax return                   362
22 DEX 64 2003 1040 tax return                   364
23 DEX 65 Benefit Mgmt Services doc.             364

Page 6

1 DEX 66  Bankruptcy petition                    379
2 DEX 67  Bankruptcy petition                    381
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5  CASE NUMBER:  2:05-cv-937-F
6
7  HENRY G. PORTERFIELD,
8          Plaintiff,
9          VS.
10 FLOWERS BAKING COMPANY OF OPELIKA, LLC,
11         Defendant.
12
13 BEFORE:
14      RENA' M. LANIER, Commissioner
15
16 APPEARANCES:
17      DAN W. TALIAFERRO, Attorney at
18 Law, 6987 Halcyon Park Drive, Montgomery,
19 Alabama  36117, (334) 409-0545, appearing
20 for the Plaintiff.
21      OGLETREE, DEAKINS, NASH, SMOAK &
22 STEWART, by SANDRA B. REISS, 1819 5th
23 Avenue North, Suite 1000, Birmingham,

Page 8

1 Alabama  35203, (205) 328-1900, appearing
2 for the Defendant Flowers Baking Company
3 of Opelika, LLC.
4      OGLETREE, DEAKINS, NASH, SMOAK &
5 STEWART, by KEVIN P. HISTA, Bank of
6 America Plaza, 600 Peachtree Street,
7 Northeast, Suite 2100, Atlanta, Georgia
8 30308, (404) 881-1302, appearing for the
9 Defendant Flowers Baking Company of
10 Opelika, LLC.
11      ALSO PRESENT:  Michael Lord,
12 Corporate Representative for the
13 Defendant; Vic Griswold, Video Specialist
14
15 * * * * * * * * * * * * * * *
16
17      I, RENA' MESSICK LANIER, a Court
18 Reporter of Elmore County, Alabama, acting
19 as Commissioner, certify that on this
20 date, as provided by the Federal Rules of
21 Civil Procedure and the foregoing
22 stipulation of counsel, there came before
23 me at the Tiger Town Inn, 205 North 21st

Page 9

1 Street, Opelika, Alabama 36801, beginning
2 at 8:55 a.m., HENRY G. PORTERFIELD,
3 witness in the above cause, for oral
4 examination, whereupon the following
5 proceedings were had:
6        THE VIDEO SPECIALIST:  This
7 is the deposition of Henry G. Porterfield
8 taken in the matter of Henry G.
9 Porterfield, Plaintiff, versus Flowers
10 Baking Company of Opelika, LLC, Defendant,
11 Case No. 2:05-cv-937-F held in the United
12 States District Court for the Middle
13 District of Alabama, Northern Division.
14        Today is May 9th, 2007.
15 We're at the Tiger Town Inn in Opelika,
16 Alabama. And the local time is 8:56 a.m.
17        If counsel would introduce
18 themselves, we can have the oath, please.
19        MR. HISTA:  Good morning.
20 Kevin Hista representing the Defendant,
21 Flowers Baking Company of Opelika, LLC.
22        MS. REISS:  Sandra Reiss
23 representing the Defendant.

Page 10

1        MR. TALIAFERRO:  Dan
2 Taliaferro representing the Plaintiff,
3 Henry Porterfield.
4        MR. LORD:  Michael Lord.
5        MR. HISTA:  For the Record,
6 Mr. Lord is the company representative.
7        Court reporter, please swear
8 the witness.
9        HENRY G. PORTERFIELD,
10 the witness, after having been duly sworn
11 was examined and testified as follows:
12        THE COURT REPORTER:  Thank
13 you.  Do we have usual stipulations?
14        MR. HISTA:  Well, I'll just
15 kind of lay out the ground rules from the
16 start just to make sure Mr. Taliaferro and
17 I are in agreement.
18        This deposition is being
19 taken pursuant to the Federal Rules of
20 Civic Procedure.  Under those rules,
21 certain objections need to be made today;
22 otherwise, such objections are waived.
23        Also, under such rules other

Page 11

1 objections are preserved until the time of
2 trial.
3        If Mr. Taliaferro feels that
4 I've asked an inappropriate question, he
5 may object.  We can discuss as necessary
6 our respected positions on the Record and
7 then proceed.
8        Mr. Taliaferro, does that
9 meet with your approval?
10        MR. TALIAFERRO:  Well, only
11 in the sense that my understanding is that
12 unless I have an objection that is more
13 than objection to the form of your
14 question then I don't have to make it at
15 this juncture in these proceedings during
16 a deposition.
17        Now, if you want me to object
18 to any --
19        MR. HISTA:  No.
20        MR. TALIAFERRO:  -- objection
21 that I feel is necessary, such as
22 relevance or materiality or hearsay, then
23 I'll make those if you want me to do that.

Page 12

1        MR. HISTA:  No.  I mean,
2 under the Federal Rules the objections
3 that you have just outlined are objections
4 that are preserved until the time of --
5 until the time of trial.
6        MR. TALIAFERRO:  Yeah.  I
7 haven't looked at that rule in a while.  I
8 just know that I say if it's the usual
9 stipulations that means all I'm really
10 having to object to is certain things that
11 are mandatory.
12        For example, if you were
13 going to ask questions about attorney-
14 client privileged matters or something
15 that was far beyond the bounds of decorum
16 and decency, I would of course object.
17        Otherwise, I just anticipate
18 objecting to if I don't like the form of
19 your question.
20        MR. HISTA:  And I think, you
21 know, generally speaking I think that is
22 true.  I mean, the objections that, you
23 know, I anticipate hearing today, you

Page 13

1 know, would be objections to the form; and
2 you will tell me why that question is
3 objectable.
4         And I don't intend to get
5 into any attorney-client privileged
6 conversations. But if I mistakenly or
7 inadvertently intrude on that area, you
8 know, certainly Mr. Taliaferro can make an
9 objection.
10        MR. TALIAFERRO: The only
11 other thing I think needs to be pointed
12 out is Henry is diabetic. He takes an
13 Insulin shot at 7 a.m. and 4 p.m. every
14 day. So I'm going to need to drive him
15 home by about ten after three.
16        Hopefully, you can complete
17 it then. If you can't, you can't. But we
18 would be willing -- of course, that's six
19 hours if we work through lunch. And we
20 would be willing to work through lunch and
21 just grab a sandwich and have it brought
22 in.
23        MR. HISTA: Yeah. That's

Page 14

1 fine with me. And if we need to --
2 certainly need to break at any point, you
3 know, we're certainly willing to do that.
4 You know, if we want to take a short break
5 at lunch and try and move through it, that
6 would be great.
7         MR. TALIAFERRO: Okay.
8         MR. HISTA: I personally
9 would like to be done around that same
10 time frame because I lose an hour going
11 back to Atlanta. And I have a daughter
12 coming in early this evening, and I'd like
13 to get home too as well.
14        MR. TALIAFERRO: Okay.
15        EXAMINATION
16 BY MR. HISTA:
17   Q.   A few other ground rules,
18 Mr. Porterfield. Again, I'm Kevin Hista.
19 I represent the company in the lawsuit
20 that you've brought against Flowers
21 Opelika.
22        The purpose of the deposition
23 here today is to ask you various questions

Page 15

1 about what contentions and facts you
2 maintain support the allegations that
3 you're making in this lawsuit.
4         You're testifying under oath
5 under the penalty of perjury. You
6 understand that?
7   A.   Yes.
8   Q.   And you understand you're
9 supposed to tell me the truth during the
10 course of this deposition?
11   A.   Yes.
12   Q.   If you don't hear a question
13 that I've asked you, please let me know,
14 and I'll certainly repeat it.
15        If you don't understand a
16 question that I've asked, you know, let me
17 know that too, and I'll do my best to
18 rephrase it so you do understand the
19 question and we've got a clear Record.
20        It's important during the
21 course of the day to try and get as clear
22 a Record as we can for the court reporter.
23        You know, we are videotaping

Page 16

1 the deposition as well, but we want to try
2 and avoid talking over each other. And
3 that's just a natural tendency of folks
4 when, you know, you're in a proceeding
5 like this.
6         And I'll do my best to try
7 and not interrupt when you're talking, and
8 if, you know, you can try and do the same
9 for me, that -- that will make it easier
10 for everybody concerned; and certainly
11 easier for the court reporter.
12        If you've answered a question
13 that I've asked, I've assumed that you've
14 heard it, understood it and have answered
15 it to the best of your recollection of the
16 facts.
17   A.   Yes, sir.
18   Q.   So, Mr. Porterfield, you
19 understand the basic ground rules that
20 we're going to be dealing with here today?
21   A.   Yes.
22   Q.   Are you currently taking any
23 medication or is there anything else that

Page 17

1 I should know about other than your, you
2 know, Mr. Taliaferro mentioned that you're
3 a diabetic.
4         Is there anything that would
5 affect you giving me your truthful
6 testimony here today concerning various
7 facts that you contend support the
8 allegations you're making in this lawsuit?
9     A.   No.
10    Q.   Could you please state your
11 full name for the Record?
12    A.   Henry George Porterfield.
13    Q.   Have you ever been known by
14 any other name or nickname?
15    A.   No.
16    Q.   Current age?
17    A.   Fifty-five.
18    Q.   Date of birth?
19    A.   4/21st/1952.
20    Q.   And where were you born?
21    A.   Montgomery, Alabama.
22    Q.   Social security number?
23    A.   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.

Page 18

1     Q.   You ever used any other
2 social security number?
3     A.   No.
4     Q.   Current address?
5     A.   167 West Rosemary Road,
6 Montgomery, Alabama 36109.
7     Q.   Are you currently married?
8     A.   Yes.
9     Q.   What is your spouse's name?
10    A.   Betty Jean Porterfield.
11    Q.   How long have you been
12 married?
13    A.   Thirty-one years.
14    Q.   Is your spouse employed?
15    A.   Yes.
16    Q.   Could you tell me where?
17    A.   American Classic Design.
18    Q.   And where is that located?
19    A.   Montgomery, Alabama.
20    Q.   What does she do for them?
21    A.   She's -- she is a like an
22 inspector.
23    Q.   How long has she worked for

Page 19

1 them?
2     A.   Approximately -- I believe
3 about twenty years.
4     Q.   Have you been previously
5 married at all?
6     A.   No.
7     Q.   Do you have any children?
8     A.   Two.
9     Q.   Tell me their names, please.
10    A.   LaRhonda Denise Porterfield.
11    Q.   And where does she live?
12    A.   She live at 167 West
13 Rosemary Road.
14    Q.   Is that in Montgomery?
15    A.   Yes.
16    Q.   How old is she?
17    A.   She's twenty-nine.
18    Q.   Any other children?
19    A.   Marcus Dewayne Porterfield.
20    Q.   Where does he live?
21    A.   167 West Rosemary Road.
22    Q.   And how old is he?
23    A.   Twenty-five.

Page 20

1     Q.   Where is he employed?
2     A.   All America.
3     Q.   And what does he do for
4 them?
5     A.   It's a Hyundai supplier. I
6 don't know exactly what he does in there.
7     Q.   Okay. Anybody else other
8 than your spouse living with you in your
9 household?
10    A.   Jakia Denise Porterfield,
11 grandbaby.
12    Q.   And whose baby is that?
13    A.   My daughter's.
14    Q.   Okay. Anybody else?
15    A.   No.
16    Q.   Have you discussed the
17 allegations in this lawsuit with Marcus?
18    A.   Yes.
19    Q.   Could you tell me what you
20 recall about the discussions you've had
21 with Marcus concerning the lawsuit or the
22 allegations that you're making in the
23 lawsuit?

Page 21

1    A.  Just discussed to Marcus
2 that I had lawsuit against Flowers about I
3 felt like they wrongly terminated me and
4 not specific get into too many details
5 with him with it.  But I have discussed it
6 with him.
7    Q.  When was the last time you
8 discussed it with him?
9    A.  Last night.
10    Q.  Tell me who initiated that
11 discussion.
12    A.  I did.  He had asked me how
13 did it go yesterday.
14    Q.  What did you tell him?
15    A.  I told him everything went
16 fine.
17    Q.  And where did you have the
18 discussion with Marcus?
19    A.  Where did I have it?
20    Q.  Yeah.  Where did you have
21 it?  Was it over the phone?  In-person?
22    A.  In-person.
23    Q.  Where at?

Page 22

1    A.  Baptist Hospital.
2    Q.  Okay.  And tell me what you
3 discussed with him.
4    A.  He just asked the question
5 how is things going.  I said went fine.
6 That's as far as it went.
7    Q.  That's it?
8    A.  Yes.
9    Q.  Did you discuss the lawsuit
10 or any of the allegations in the lawsuit
11 with your daughter?
12    A.  Yes.
13    Q.  Tell me what you've
14 discussed with her.
15    A.  Basically the same thing I
16 discussed with Marcus.
17    Q.  When was the last time you
18 discussed the lawsuit with your daughter?
19    A.  Last night.
20    Q.  Also in the hospital?
21    A.  No.
22    Q.  Okay.  Where at?
23    A.  Home.

Page 23

1    Q.  Okay.  Basically the same
2 thing you talked about with Marcus?
3    A.  Yes.
4    Q.  Have any other previous
5 discussions concerning the lawsuit or the
6 allegations in the lawsuit with either
7 Marcus or your daughter?
8    A.  Previously.  Down the road,
9 yes, we have.  We have discussed it
10 before.
11    Q.  Okay.
12    A.  I don't know when.  But --
13 but it's been several times we have
14 discussed it.  Just talk about how long
15 it's going to go, what's going on, what
16 you think and different things like that,
17 yeah.
18    Q.  Did you --
19    A.  No details getting into it.
20    Q.  Did you discuss with either
21 one of them why you believe -- you think
22 that your contract was wrongfully
23 terminated?

Page 24

1    A.  Yes.
2    Q.  Okay.  Tell me what you told
3 them.
4    A.  I told them that I felt like
5 I was done wrong on the allegation that
6 Troy State.  That I tried to solve the
7 breach at my best effort.
8        My best effort when I tried
9 to solve the breach is when I got the
10 County Commissioner and a City Councilman
11 to go down and talk to the lady.  She
12 refused to talk.
13        Then we came and talked to
14 Mr. Messer, Grady Messer.  And the same
15 thing.  And Grady said he wouldn't discuss
16 my business with them.
17        But I tried my best effort to
18 get back in the stop.  I talked to the
19 lady at Troy State, and she said I could
20 work them only at a smaller portion.  I
21 couldn't work them one hundred percent.
22        So I felt in my good interest
23 that I had got back in the account.  But

Page 25

1 in the meantime, that -- on March the 16th
2 when I discussed with Mr. Messer, he said
3 false allegations against me and barred me
4 from the warehouse.
5        So that was nine days. I had
6 a ten-day breach. So in nine days I had
7 no way to solve it because he terminated
8 me. And he terminated my son the same
9 day, which he could have ran the route.
10     Q. But you didn't go back and
11 service that account again?
12     A. I couldn't go back and
13 service the account because I was barred
14 from the warehouse. I couldn't go on
15 Flowers' premises.
16     Q. Well, you could have got
17 another distributor to pick up your
18 product, couldn't you?
19     A. No.
20     Q. Why not?
21     A. They didn't -- they wouldn't
22 allow me.
23     Q. Who wouldn't allow you?

Page 26

1     A. I couldn't go around the
2 computer. And -- and --
3     Q. Did you ask any other
4 distributor to help you?
5     A. No, I didn't.
6     Q. Did you ask anybody to help
7 you? Anybody associated with Flowers?
8     A. No, I didn't.
9     Q. All right. Let's talk about
10 any discussions that you've had with your
11 wife concerning the allegations in this
12 lawsuit.
13     A. Basically the same thing I
14 just told you.
15     Q. Okay. Tell me what
16 basically the same thing means.
17     A. Same thing means what I told
18 you about the allegation at Troy State.
19     Q. Okay. Discuss anything
20 other than the allegations with Troy
21 State?
22     A. No.
23     Q. So that's pretty much the,

Page 27

1 you know, sum and substance against
2 Flowers?
3     A. Yes.
4     Q. Have you --
5     A. No.
6     Q. Let me just -- have you
7 discussed the lawsuit with or the
8 allegations in the lawsuit with Marty
9 Senn?
10     A. Yes.
11     Q. Okay. Who is Marty Senn?
12     A. He was an employee at
13 Flowers.
14     Q. Was he an employee? Or
15 distributor?
16     A. Employee.
17     Q. What was his job?
18     A. Run the route in -- in
19 Prattville.
20     Q. So he was a company employee
21 as far as you know? Or was he a
22 distributor?
23     A. We are classed as

Page 28

1 distributors. We're not distributors.
2 We're company employees.
3     Q. Okay. You had a distributor
4 agreement with Flowers, did you not?
5     A. On paper.
6     Q. Okay. Well, we'll get into
7 that in a little bit. But you did in fact
8 have a distributor agreement with Flowers,
9 correct?
10     A. Yes.
11     Q. Okay. Did Mr. Senn have a
12 distributor agreement with Flowers?
13     A. Yes.
14     Q. Okay. Tell me what you
15 discussed with Mr. Senn concerning the
16 allegations in this lawsuit.
17     A. I discussed with Mr. Sims
18 (sic.) that I felt like Grady Messer had
19 did me wrong. And that Grady Messer, I
20 would sit here and I would call him a
21 liar. And Grady Messer would sit down and
22 use little smart things about how he would
23 do peoples.

Page 29

1    Q.  What do you mean by that?
2    A.  Really, he didn't care too
3 much for me no way.  I knew that.  Because
4 I used to get behind the warehouse and
5 Marty and them heard this.
6        Like, we knew the Wal-Mart
7 and the Publix was coming.  And I used to
8 brag about it.  And I used to tell them
9 the route is going to do good when they
10 get here.
11        And then I used to brag about
12 I wasn't going to work the private label
13 bread in the route.
14        And allegations from Grady
15 and Steve Stephens, either you work the
16 private label in the route or you won't
17 get the Wal-Mart.
18        And I told them I didn't have
19 to work the private label in the route.
20 And ever since then things started
21 changing.
22    Q.  Okay.  So you didn't have
23 any issues -- any type of performance

Page 30

1 issues with respect to your contract
2 before that?
3    A.  Yes, I did.
4    Q.  You had a lot of performance
5 issues, didn't you?
6    A.  I had some performance
7 issues.
8    Q.  Quite a few, huh?
9    A.  I wouldn't say that.
10    Q.  You wouldn't?
11    A.  No.
12    Q.  More than ten?
13    A.  Ten allegations they -- they
14 accused me of.
15    Q.  Okay.  How many times would
16 you estimate that you breached the
17 contract with Flowers?
18    A.  I wouldn't know.
19    Q.  You wouldn't know.  Could
20 you give me a best estimate?
21    A.  Can't answer it.
22    Q.  Okay.  You're not contending
23 in this lawsuit that your distributor

Page 31

1 relationship with Flowers was an
2 employment relationship, are you?
3    A.  Repeat your question.
4        MR. TALIAFERRO:  Object to
5 the form that it calls for a legal
6 conclusion.
7    A.  Repeat.
8    Q.  Yes.  Are you contending in
9 the complaint in this lawsuit that your
10 relationship with Flowers was an
11 employment relationship?
12    A.  Yes.
13        (Off-the-Record discussion.)
14        (Whereupon, Defendants' Exhibit No.
15 1 was marked for identification purposes
16 by Mr. Hista.)
17        THE VIDEO SPECIALIST:  We're
18 back on the Record.
19    Q.  (BY MR. HISTA) I'm going to
20 hand the court reporter to mark as
21 Defendant's Exhibit 1.
22    A.  He's going to have to -- my
23 attorney's going to have to check over it.

Page 32

1 Because as diabetes this morning, my eyes
2 is blurry.
3    Q.  Well, at the beginning of
4 the deposition, Mr. Porterfield --
5    A.  I can -- I can function
6 good.
7    Q.  Well, we've got a lot of
8 exhibits to go through today.  I mean, are
9 you telling me you can't read the exhibit,
10 read the exhibits that I'm going to go
11 through?
12        Because if so, then we're
13 going to have to reconvene the deposition
14 at a time that you are able to read the
15 exhibits --
16    A.  Let me see.
17    Q.  -- and answer --
18    A.  I can --
19    Q.  -- my questions.
20    A.  I can read over it the best
21 that I can.
22    Q.  For the Record,
23 Mr. Porterfield, the first two pages are

Page 33

1 simply legal forms that are required for
2 purposes of having the actual complaints
3 served upon Flowers Baking Company of
4 Opelika.
5         The actual complaint that you
6 have filed in this lawsuit starts on page
7 three of the document that I have handed
8 to you.
9         So if you could start
10 reviewing Defendant's Exhibit No. 1 on
11 page three, that's where I'd like to ask
12 you a question or two about.
13    A.    (Witness complying.) First
14 question?
15    Q.    Why don't you, if you could
16 read the complaint to yourself?
17    A.    I just --
18    Q.    You know, have you read all
19 three --
20    A.    I just --
21    Q.    -- four or five pages?
22    A.    Okay. I just read the one
23 number so far. You said page one.

Page 34

1    Q.    Yeah. Just keep -- where
2 are you? What have you read so far,
3 Mr. Porterfield? Up through page two?
4    A.    Page two.
5    Q.    Okay. Do you see anywhere
6 on pages one and two any allegation or
7 contention that your relationship was --
8 with Flowers was an employment
9 relationship?
10        You don't see that contention
11 on pages one and two, do you?
12    A.    No.
13    Q.    Do you see the word
14 "employee" anywhere on pages one and two?
15    A.    No.
16    Q.    You do you see the word
17 "distributor agreement" on pages one and
18 two, do you not?
19    A.    Yes.
20    Q.    Okay. Let's look at page
21 three.
22    A.    (Witness complying.)
23    Q.    Have you finished reading

Page 35

1 page three, Mr. Porterfield?
2    A.    Yes.
3    Q.    Mr. Porterfield, is there
4 any reference on page three to any
5 contention that your relationship with
6 Flowers was an employment relationship?
7        MR. TALIAFERRO: Object to
8 the form. He's not an attorney. But if
9 you can, the best you can answer it.
10    A.    I feel like -- like this.
11    Q.    There's a question pending.
12 My question was --
13    A.    My --
14    Q.    -- do you see anything --
15    A.    My -- my --
16    Q.    -- on page three --
17    A.    My -- my answer is maintain
18 a fresh market like telling you what to
19 do, yeah. They tell you how to maintain
20 everything. They tell you what to do.
21 And this keeping fresh market out of cold.
22 So you did have rules to go by like an
23 employee.

Page 36

1    Q.    That's good industry
2 practice, is it not?
3    A.    It's good industry practice,
4 yeah.
5    Q.    Okay. My question again on
6 page three is: Do you see any -- any
7 reference to the word "employee" --
8    A.    I don't see any reference --
9    Q.    -- on page --
10    A.    -- on there.
11    Q.    Do you see any reference to
12 the word "employment" on page three?
13    A.    No.
14    Q.    Turning your attention to
15 page four --
16    A.    (Witness complying.)
17    Q.    -- Mr. Porterfield, do you
18 see the word "employee" anywhere on page
19 four of your complaint?
20    A.    No.
21    Q.    Mr. Porterfield, do you see
22 the word "employment" anywhere on page
23 four of the complaint?

PORTERFIELD v FLOWERS                CondenseIt!™                DEPO:HENRY PORTERFIELD

Page 37

1     A.  No.
2     Q.  Turn your attention to page
3 five, please.
4     A.  (Witness complying.)
5     Q.  Mr. Porterfield, do you see
6 the word "employee" anywhere on page five
7 of your complaint?
8     A.  No.
9     Q.  Do you see the word
10 "employment" anywhere on page five of your
11 complaint?
12     A.  No.
13     Q.  Okay.  Turning your
14 attention to page six, if you could read
15 that for me, please.
16     A.  (Witness complying.)
17     Q.  Mr. Porterfield, have you
18 read page six of the complaint?
19     A.  Yes.
20     Q.  Do you see the word
21 "employee" anywhere on page six of the
22 complaint?
23     A.  No.

Page 38

1     Q.  Do you see the word
2 "employment" anywhere on page six of the
3 complaint?
4     A.  No.
5     Q.  Turning your attention to
6 page seven, do you agree with me that
7 that's simply the signature page of the
8 complaint?
9     A.  Yes.
10     Q.  Do you agree with me that
11 now that we have reviewed your complaint
12 in its entirety that nowhere in the
13 complaint does the word "employee" appear?
14     A.  The employee don't appear.
15     Q.  Would you agree with me that
16 nowhere in the complaint does the word
17 "employment" appear?
18     A.  No.
19     Q.  Mr. Porterfield, have you
20 discussed the lawsuit or the allegations
21 in the lawsuit with Doug Branch?
22     A.  Yes.
23     Q.  And could you tell me, who

Page 39

1 is Doug Branch?
2     A.  Employee of Flowers.
3     Q.  Does Mr. Branch have a
4 distributor agreement with Flowers?
5     A.  Yes.
6     Q.  How long has he been a
7 distributor with Flowers?
8     A.  About thirteen years, I
9 believe.
10     Q.  Were you formerly related to
11 Mr. Branch?
12     A.  Yes.
13     Q.  How?
14     A.  It's my brother-in-law.
15     Q.  And what do you recall
16 discussing with Mr. Branch concerning the
17 allegations in the lawsuit?
18     A.  I discussed basically the
19 same thing I discussed with the rest of
20 them.  Go back to the same thing I said
21 about Grady Messer.
22     Q.  Discuss the allegations in
23 the lawsuit with Raymond Price?

Page 40

1     A.  Yes.
2     Q.  Who is Raymond Price?
3     A.  He used to be an employee of
4 Flowers.
5     Q.  Was Mr. Price formerly a
6 distributor with Flowers?
7     A.  No.
8     Q.  Did he have a distributor
9 agreement with Flowers?
10     A.  He did.  But he sued
11 Flowers.
12     Q.  Okay.  My question is:  He
13 did have a distributor agreement --
14     A.  Yes.
15     Q.  -- with Flowers?
16      What do you know about
17 Mr. Price's lawsuit against Flowers?
18     A.  Nothing.
19     Q.  Pardon me?
20     A.  Nothing.
21     Q.  You don't know anything
22 about it?
23     A.  Huh-uh.

Page 41

1    Q.  So Mr. Price never discussed
2  the allegations in his lawsuit with you?
3    A.  He just told -- I know -- I
4  don't know the outcome of it.  I just know
5  that he say he was wrongfully done at one
6  of his stops like I believe it was.
7       I ain't going to discuss what
8  it was because I don't regularly remember.
9  One of his -- he was on vacation, and they
10 lost a stop for him.  That's all I can
11 remember.
12   Q.  And did you discuss the
13 allegations that you're making in this
14 lawsuit with Mr. Price?
15   A.  Repeat the question.  How --
16 what you mean?
17   Q.  Have you discussed the
18 allegations that you are making --
19   A.  Yes.
20   Q.  -- in this lawsuit with
21 Mr. Price?
22   A.  Yes.
23   Q.  Tell me what you recall

Page 42

1  about any discussion or discussions that
2  you've had with Mr. Price.
3    A.  I just repeat the same thing
4  I told the rest of them.  That Grady still
5  up to the same old thing.
6    Q.  Okay.  When you say Grady is
7  up to the same old thing, what do you
8  mean?
9    A.  Still telling lies and doing
10 what he do.
11   Q.  All right.  Give me some
12 specifics.
13   A.  About Grady?
14   Q.  Yeah.  Give me some
15 specifics about, you know, what you spoke
16 about with Raymond Price.
17   A.  I discussed that I had lost
18 a Sodexho account and I tried to get it
19 back, and I didn't.  And they terminated
20 the contract.  That's basically all I
21 could discuss with him.
22   Q.  Do you know if Mr. Price was
23 represented by a lawyer in his lawsuit

Page 43

1  against the company?
2    A.  Do I know the lawyer?
3    Q.  Do you know -- number one,
4  do you know if he was represented by
5  counsel?
6    A.  Yes.
7    Q.  And do you know who that
8  counsel was?
9       MR. TALIAFERRO:  Object to
10 the form.  Go ahead and answer it if you
11 can.
12   A.  Greg -- Greg Davis.  The
13 same lawyer I have that recommended him to
14 this one.
15   Q.  Did Mr. Price recommend --
16   A.  Yes.
17   Q.  -- that you see Mr. Davis?
18   A.  Yes.
19   Q.  Have you discussed the
20 allegations in the lawsuit with Charles
21 Morrow?
22   A.  Yes.
23   Q.  Who is Charles Morrow?

Page 44

1    A.  A retired distributor from
2  Flowers Baking Company.
3    Q.  What do you recall about any
4  discussions with Mr. Morrow?
5    A.  I have discussed with
6  Charles Morrow about Grady.  And Charles
7  Morrow replied back that he had heard some
8  things about Grady hisself (sic.) about
9  allegations against me.
10      And that's how me and
11 Charles -- he wouldn't tell me at first
12 because I never discussed with any of
13 them.  And it was like late I believe
14 September or October before I found out,
15 and I talked to Charles Morrow.                44
16   Q.  Did Charles Morrow know
17 anything about your distributor record
18 with Flowers?
19   A.  I wouldn't know.
20   Q.  Do you know if Charles
21 Morrow, you know, has any knowledge about
22 any breach letters or performance issues
23 you had under the distributor agreement?

PORTERFIELD v FLOWERS                ClondenseIt!™                DEPO:HENRY PORTERFIELD

---

Page 45

1    A.  I wouldn't know.
2    Q.  And what specifically do you
3 contend that Charles Morrow will say that
4 will support the allegations that you're
5 making in this lawsuit?
6        MR. TALIAFERRO:  Object to
7 the form.  Go ahead and answer it if you
8 can.
9    A.  I couldn't answer for
10 Charles Morrow.  The only thing I can say
11 is what he told me that he overheard Grady
12 saying something about my distributorship.
13 And we didn't get into really details.
14    Q.  Tell me what Charles Morrow
15 allegedly told you about your
16 distributorship.
17    A.  That they was planning to --
18 when they found out the Wal-Mart and the
19 Publix was coming and I was telling them
20 that I wasn't going to work private label
21 and all the stuff that I wasn't going to
22 do and they said I had to do it.  And then
23 Grady was saying if I didn't do it -- that

---

Page 46

1 I had to do it or either somebody else
2 would get the stop, yeah.
3    Q.  Where did this discussion
4 with Charles Morrow take place?
5    A.  At his house.
6    Q.  Was anybody else present?
7    A.  No.
8    Q.  Did you make any notes of
9 that conversation --
10    A.  No.
11    Q.  -- with Charles Morrow?
12        Have you discussed the
13 allegations in the lawsuit with John
14 Renfroe?
15    A.  No.
16    Q.  Who is John Renfroe for the
17 Record?
18    A.  He's a -- I guess a
19 supervisor with Flowers.
20    Q.  And have you discussed the
21 allegations in the lawsuit with Tom
22 Griffin?
23    A.  Yes, we have.

---

Page 47

1    Q.  Who is Mr. Griffin?
2    A.  One of the distributors.
3    Q.  And what did you discuss
4 with Mr. Griffin concerning the
5 allegations?
6    A.  The same thing I discussed
7 with the rest of them.
8    Q.  And -- which is?
9    A.  About the incident at Troy
10 State.
11    Q.  Do you know Aaron Chapman?
12    A.  Yes.
13    Q.  Who is Mr. Chapman?
14    A.  One of the distributors.
15    Q.  Was he a distributor in the
16 Montgomery warehouse?
17    A.  Yes.
18    Q.  Is he still a distributor
19 there?
20    A.  Yes.
21    Q.  And what do you recall
22 discussing with Mr. Chapman concerning the
23 allegations?

---

Page 48

1    A.  I don't know.
2    Q.  Do you know a Robert
3 McCrory?
4    A.  Yes.
5    Q.  Can you tell me who
6 Mr. McCrory is?
7    A.  A distributor with Flowers.
8    Q.  Is he a current distributor
9 with Flowers?
10    A.  Yes.
11    Q.  And is he in the Montgomery
12 warehouse?
13    A.  Yes.
14    Q.  What do you recall
15 discussing with Mr. McCrory concerning the
16 allegations in the lawsuit?
17    A.  Same thing.
18    Q.  Basically your contentions
19 regarding --
20    A.  Yes.
21    Q.  -- the Troy State Sodexho
22 account?
23    A.  Yes. Uh-huh.

---

Page 49

```
1    Q.  Do you know a Jason Goodman?
2    A.  Yes.
3    Q.  Who is Mr. Goodman?
4    A.  Distributor.
5    Q.  Is he a distributor in the
6 Montgomery warehouse?
7    A.  Yes.
8    Q.  Is he a current distributor?
9    A.  Yes.
10    Q.  What do you recall
11 discussing with Mr. Goodman?
12    A.  Same thing.
13    Q.  For the Record, same thing,
14 your contention regarding the Sodexho
15 account?
16    A.  Yes.
17    Q.  Do you know Cedric Martin?
18    A.  Yes.
19    Q.  Who is Mr. Martin?
20    A.  One of the distributors.
21    Q.  What do you recall --
22    A.  Same.
23    Q.  -- discussing with
```

Page 50

```
1 Mr. Martin?
2    A.  For the Record, same.
3    Q.  Same thing meaning your
4 contention with respect to Sodexho?
5    A.  Yes.
6    Q.  Do you know Jimmy DeRamus?
7    A.  Yes.
8    Q.  Who is Mr. DeRamus?
9    A.  One of the distributors who
10 run the Prattville route.
11    Q.  I'm sorry?
12    A.  Yes.
13    Q.  He's a distributor in the
14 Montgomery warehouse?
15    A.  Yes.
16    Q.  What do you recall
17 discussing with Mr. DeRamus?
18    A.  Same.
19    Q.  Again, your contention
20 regarding the Sodexho account?
21    A.  Yes.
22    Q.  Do you know a Brad Allen?
23    A.  Yes.
```

Page 51

```
1    Q.  Who is Mr. Allen?
2    A.  One of the distributors.
3    Q.  Is he a current distributor
4 for Flowers?
5    A.  Yes.
6    Q.  In the Montgomery warehouse?
7    A.  Yes.
8    Q.  What do you recall
9 discussing with Mr. Allen?
10    A.  I don't know.
11    Q.  Do you know a Don or Donald
12 Lunsford?
13    A.  Yes.
14    Q.  Who is Mr. Lunsford?
15    A.  One of the distributors.
16    Q.  Is he a current distributor
17 with Flowers?
18    A.  Yes.
19    Q.  In the Montgomery warehouse?
20    A.  Yes.
21    Q.  What do you recall
22 discussing with Mr. Lunsford?
23    A.  Same.
```

Page 52

```
1    Q.  Again, your contention
2 regarding Sodexho?
3    A.  Yes.
4    Q.  Who is Mr. Cleve -- Dwayne
5 Cleveland?
6    A.  A distributor.
7    Q.  Is he a current distributor
8 for Flowers?
9    A.  Yes.
10    Q.  Is he in the Montgomery
11 warehouse?
12    A.  Yes.
13    Q.  What do you recall
14 discussing with him?
15    A.  Same.
16    Q.  Again, same being the
17 Sodexho issue?
18    A.  Yes.
19    Q.  Do you know a Lou Baxter?
20    A.  Yes.
21    Q.  Who is Mr. Baxter?
22    A.  Distributor?
23    Q.  Is he a current distributor?
```

**Page 53**

1    A.   Yes.
2    Q.   In the Montgomery warehouse?
3    A.   Yes.
4    Q.   What do you recall
5 discussing with --
6    A.   Same.
7    Q.   The same being the Sodexho
8 issue?
9    A.   Yes.
10    Q.   Have you discussed the
11 lawsuit or the allegations in this lawsuit
12 with any of the customers that you
13 formerly serviced?
14    A.   I don't know.
15    Q.   Do you attend church?
16    A.   Yes.
17    Q.   What church do you attend?
18    A.   New Providence Missionary
19 Baptist Church.
20    Q.   Who is the pastor?
21    A.   Jiles Williams, Jr.
22    Q.   Have you discussed the
23 allegations in the lawsuit with your

**Page 54**

1 pastor?
2    A.   Yes.
3    Q.   What do you recall
4 discussing with him?
5    A.   Same thing.
6    Q.   Again, the issue with the
7 Sodexho account?
8    A.   Yes.
9    Q.   Anything else?
10    A.   No.
11    Q.   Do you recall discussing
12 anything other than the Sodexho account
13 with the distributors that we've
14 previously talked about?
15    A.   Would you repeat that?
16    Q.   Yes.  Do you recall
17 discussing with Marty Senn anything other
18 than your contention with respect to the
19 Sodexho account?
20    A.   I don't think so.  I don't
21 know.  Can't answer that one.
22    Q.   Do you recall discussing
23 with Mr. Branch anything other than your

**Page 55**

1 issue with the Sodexho account?
2    A.   We done had discussion about
3 Grady, yeah, with Branch.  Yeah.
4    Q.   Just how you felt Grady had
5 been --
6    A.   Yes.
7    Q.   You felt some of the things
8 that Grady had done with --
9    A.   Uh-huh.
10    Q.   -- you you didn't feel was
11 right?
12    A.   Yes.
13    Q.   Did you discuss anything
14 other than, you know, how Grady was
15 treating you and the Sodexho issue with
16 Mr. Branch?
17    A.   Yes.
18    Q.   Okay.  What else did you
19 discuss with him?
20    A.   I don't know.
21    Q.   You don't have any specific
22 recollection --
23    A.   No.

**Page 56**

1    Q.   -- of any other issue?
2        What about with Mr. Morrow?
3 Did you discuss anything other than the
4 Sodexho issue with Mr. Morrow?
5    A.   Yes.
6    Q.   What did you discuss with
7 Mr. Morrow?
8    A.   We discussed about Grady and
9 the talk that Grady was doing.  Over --
10 say he overheard Grady saying if I didn't
11 do the route like I should.  That's the
12 only thing, yes.
13    Q.   Okay.  And that's the issue
14 with respect to what you testified about
15 with the Wal-Mart and the private label?
16    A.   Yes.
17    Q.   What about with Mr. Renfroe?
18    A.   No.
19    Q.   Do you recall discussing
20 anything other than Sodexho with him?
21    A.   Nothing with Renfroe.
22    Q.   Okay.  Do you recall
23 discussing anything other than the Sodexho

PORTERFIELD v FLOWERS         CondenseIt!™         DEPO:HENRY PORTERFIELD

---

Page 57

1  issue with Mr. Griffin?
2      A.  No.  Don't recall.
3      Q.  Okay.  Do you recall
4  discussing anything other than this
5  Sodexho issue with Mr. Chapman?
6      A.  I didn't discuss nothing
7  with --
8      Q.  Okay.
9      A.  Not that I know of.
10     Q.  Okay.  What about with
11  Robert McCrory?
12     A.  No.
13     Q.  What about with Mr. Goodman?
14     A.  Not that I know of.
15     Q.  What about Mr. Martin?
16     A.  Who?
17     Q.  Cedric Martin?
18     A.  Not that I know of.
19     Q.  Mr. DeRamus?  Jimmy DeRamus?
20     A.  Not that I know of.
21     Q.  Mr. Allen?
22     A.  Not that I know of.
23     Q.  Mr. Lunsford?

---

Page 58

1      A.  Not that I know of.
2      Q.  Mr. Cleveland?
3      A.  Same.
4      Q.  And Mr. Baxter?
5      A.  Same.
6      Q.  You mentioned previously two
7  councilmen that became involved with your
8  contention regarding Sodexho.
9          Can you tell me their names,
10  please?
11     A.  Councilman Jiles Williams,
12  County Commissioner Jiles Williams, and
13  Councilman James Knuckles.
14     Q.  How did they become involved
15  with your issue that you had with Sodexho?
16     A.  I called them.
17     Q.  Okay.  And how did you know
18  these gentlemen?
19     A.  I know them personally.
20     Q.  And they -- you talked with
21  them, and, you know, they then came and
22  talked with Flowers --
23     A.  Yes.

---

Page 59

1      Q.  -- and the lady at Sodexho?
2      A.  Yes.
3      Q.  We'll talk about that in a
4  little bit.  Other than the folks that
5  we've discussed, have you discussed the
6  lawsuit or the contentions in the lawsuit
7  with anyone else other than your lawyers?
8      A.  Family members.
9      Q.  And who are they?
10     A.  Robert Porterfield, my
11  mother, my sister.  And --
12     Q.  Could you give me your
13  mother's name for the Record?
14     A.  Lily Marie Porterfield.
15     Q.  I'm sorry?
16     A.  Lillie Marie Porterfield.
17     Q.  Sister?
18     A.  Marietta Branch.
19     Q.  Okay.
20     A.  Thomas Porterfield.
21     Q.  Thomas is your brother?
22     A.  Yes.  No.
23     Q.  Anybody else that you can

---

Page 60

1  remember?
2      A.  Well, not discussed.  I
3  hadn't discussed it with nobody.  Probably
4  people probably ask me about other ones
5  telling people that you had one going.
6  Yeah or nay.  But not to just sit up and
7  discuss with nobody about it.
8      Q.  Okay.  What do you recall
9  discussing with your brother, Robert
10  Porterfield?
11     A.  We discussing the allegation
12  with Flowers and basically same thing that
13  I said right there.  Same thing I said on
14  all the rest of them.
15     Q.  Well, let's just try and be
16  more specific.  You recall discussing the
17  Sodexho issue with your brother, Robert?
18     A.  Yes.
19     Q.  Do you recall discussing
20  anything other than the Sodexho issue with
21  your brother, Robert?
22     A.  I didn't get into nothing
23  else other but Sodexho and the way I felt

---

Page 61

1  about the way Grady treated.  That's it.
2      Q.  Anything else?
3      A.  No.
4      Q.  What about with your mother?
5      A.  Same thing.
6      Q.  What about with your sister?
7      A.  Same.
8      Q.  What about with your
9  brother, Thomas?
10     A.  Same.
11     Q.  Other than, you know, your
12  spouse, the children that you've
13  mentioned, your -- your brothers, sister
14  and mother, do you have any other
15  relatives in the Montgomery area?
16     A.  Yes.
17     Q.  Could you tell me who they
18  are, please?
19     A.  I have some cousins.  I like
20  have Ida Belle, Donna Bell, first cousin
21  and her wife -- husband and wife.
22         And I have the Wilsons in
23  Montgomery.  Alice and Woodrow Wilson.

Page 62

1  Uncle and aunt.
2      Q.  How are they related to you?
3      A.  Yes.  Uncle and aunt.  And
4  they have only one son that lives in
5  Montgomery.  His name is Albert Wilson.
6         I got -- I got some kin in
7  Montgomery.  But as far as just
8  associating with them, it's kind of off
9  like.  Like, what you want to know?
10  Everybody's name?
11     Q.  Well, just give me their
12  names for the Record.
13     A.  Okay.  On my wife's side,
14  got Amanda Cooley, which that's her
15  mother.  And the McCalls in Madison Park.
16  The Fullers.  Just giving last names.
17  Fullers.
18         The Lawsons.  They on my
19  side.  The Hamiltons on my side.  The
20  Garretts on my side.  That's about all I
21  can think of right now.
22     Q.  Okay.  With all of the folks
23  that you've mentioned, the more distant

Page 63

1  relatives, have you discussed the lawsuit
2  with any of them?
3      A.  Not that I can recall.
4      Q.  Have you ever communicated
5  with anyone other than your attorneys via
6  e-mail concerning the lawsuit or the
7  allegations that you're making in the
8  lawsuit?
9      A.  No.
10     Q.  Do you have a personal
11  computer?
12     A.  No.
13     Q.  Have you ever had a personal
14  computer?
15     A.  No.
16     Q.  Is there a personal computer
17  in your house?
18     A.  Yes.
19     Q.  And who uses it?
20     A.  My daughter.
21     Q.  Have you ever used it?
22     A.  Don't know how.
23     Q.  Have you ever had your

Page 64

1  deposition taken previously?
2      A.  No.
3      Q.  What, if any, documents did
4  you review for purposes of the deposition
5  here today?
6         MR. TALIAFERRO:  Object to
7  anything that you reviewed with your
8  attorney as being attorney-client
9  privilege.
10         Anything you've reviewed
11  outside of my presence and didn't discuss
12  with me, go ahead if there is anything.
13     A.  I re --
14     Q.  I'll ask the question again.
15     A.  How do you --
16     Q.  I hear your counsel's
17  objection, but I don't believe that
18  identifying documents without telling me
19  anything about the discussions that you've
20  had with Mr. Taliaferro or Mr. Davis -- I
21  don't believe simply identifying the
22  documents is covered by the attorney-
23  client privilege.

Page 65

1    A.   What are you talking about?
2 I don't --
3    Q.   Again, I'm asking if
4 Mr. Taliaferro wants to make an objection.
5    A.   I don't understand it.
6    Q.   What, if any, documents did
7 you review for purposes of your deposition
8 here today?
9        MR. TALIAFERRO:  And, again,
10 I'm going to instruct you not to discuss
11 anything about what we reviewed together.
12       But anything you reviewed
13 outside of my presence without discussing
14 them with me, go ahead and tell him.
15    A.   Yeah.  I didn't review
16 nothing with my attorney.  But there's
17 some papers that I did read over, some of
18 those allegations like what Flowers had
19 against me and stuff like that, yes.
20    Q.   Okay.
21       MR. HISTA:  Just so I
22 understand Mr. Taliaferro's position on
23 the Record, it's your position that he

Page 66

1 cannot identify any documents that he
2 reviewed in your presence?
3    A.   No.
4        MR. TALIAFERRO:  Anything he
5 discussed with me, I don't want him
6 discussing with you.
7        MR. HISTA:  Oh, absolutely.
8 And I'm not intending to ask about any
9 discussions.
10       MR. TALIAFERRO:  Yeah.
11       MR. HISTA:  I'm simply asking
12 him about documents.
13       MR. TALIAFERRO:  Right.
14       MR. TALIAFERRO:  For instance, the
15 distributor agreement.
16       MR. TALIAFERRO:  Right.  I
17 think he has looked at that at some point
18 without me having any input in it.  And
19 he's looked at all the stuff you've, you
20 know, provided, at least some of it.  So
21 certainly --
22    A.   Yes.
23       MR. TALIAFERRO:  -- he can go

Page 67

1 forward with that.
2        MR. HISTA:  Fair enough.
3    Q.   (BY MR. HISTA)  Let me ask
4 it this way.  Outside of Mr. Taliaferro's
5 presence, what, if any, documents did you
6 review for purposes of your deposition
7 here today?
8    A.   I reviewed the documents.  I
9 went back over my distributor agreement.
10    Q.   Uh-huh.
11    A.   I reviewed that.  And I
12 reviewed some of the allegations that they
13 had against me, what they said happened,
14 yes.
15    Q.   Okay.  When you say
16 allegations of what happened, what are you
17 referring to?
18    A.   I'm referring about those
19 breaches that they had in the forms you
20 sent to my lawyer.
21    Q.   Okay.
22    A.   I read over those.
23    Q.   Okay.  Do you have any

Page 68

1 breach letters otherwise in your
2 possession?
3    A.   No.
4    Q.   Okay.  During the course of
5 your distributor relationship with
6 Flowers, did you receive copies of breach
7 letters?
8    A.   Yes.
9    Q.   What have you done with
10 copies of those breach letters?
11    A.   I may have a few.  Some of
12 them I probably don't have.
13    Q.   Okay.  And what happened
14 with the ones that you --
15    A.   Just got lost some kind of
16 way.
17    Q.   When did you talk with your
18 attorneys to prepare for your deposition
19 here today?
20       And, again, I'm not asking
21 anything about a discussion.  I'm just
22 asking when.
23    A.   It was -- they sent me a

Page 69

1  letter to the house about two weeks ago
2  because --
3        MR. TALIAFERRO: All right.
4        Q. (BY MR. HISTA) Don't tell
5  me anything about the letter. Just -- all
6  I'm asking is --
7        MR. TALIAFERRO: Let me just
8  state for the Record we met with him
9  yesterday at our offices.
10       MR. HISTA: Fair enough.
11       Q. (BY MR. HISTA) Had you met
12  with Mr. Taliaferro and Mr. Davis
13  previously?
14       A. I had went to the office
15  one -- one day last week. And all he did
16  was tell me just to tell me that what --
17       MR. TALIAFERRO: No.
18       Q. (BY MR. HISTA) Don't tell
19  me anything. Don't tell -- don't --
20       A. We didn't discuss nothing.
21  He just told me I had to come up here.
22  I'm sorry.
23       Q. All right. Anybody else

Page 70

1  other than the attorneys or attorney staff
2  present during any of these meetings?
3        A. No.
4        Q. Have you ever been convicted
5  of a crime other than a minor traffic
6  violation?
7        A. No.
8        Q. Have you ever pled guilty or
9  no contest to any type of charge?
10       A. No.
11       Q. Have you ever brought or
12  asserted any other claim or legal action?
13       A. Have I ever sued anybody
14  before is what you said?
15       Q. Yes.
16       A. We sued once on behalf of my
17  daughter. I don't know exactly what year.
18  It was a traffic accident.
19       Q. Anything else?
20       A. And they had -- they didn't
21  sue. They -- the insurance company --
22  they sued -- it was an accident between my
23  daughter and a truck hit her.

Page 71

1        Q. Have you been involved in
2  any other type of legal proceeding?
3        A. No. Not that I know of, no.
4        Q. While you were a distributor
5  with Flowers, could you tell me in general
6  terms what were your recordkeeping
7  practices?
8        A. Fair.
9        Q. Well, let's talk -- did you
10  receive weekly financial statements from
11  Flowers?
12       A. Yes.
13       Q. And what did you do with
14  those weekly financials once you received
15  them?
16       A. They at home.
17       Q. Do you still have weekly
18  financials at home?
19       A. Some, yes.
20       Q. Did you provide copies of
21  those weekly financials to your attorneys?
22       A. A few, yes.
23       Q. Did you provide copies of

Page 72

1  all of them?
2        A. No.
3        Q. Could you tell me what year
4  or years you have weekly financials from?
5        A. I got some from 2005. I may
6  can scrounge up some even older.
7        Q. Okay. Do you have any
8  tickets in your records?
9        A. No.
10       Q. Do you understand what I'm
11  referring to with tickets?
12       A. Yes.
13       Q. Do you have any sales
14  tickets at your home?
15       A. No.
16       Q. While you were a distributor
17  with Flowers, did you keep any such sales
18  tickets?
19       A. We didn't have sales
20  tickets. We had it in the computer.
21       Q. Okay. Did you keep any
22  records that you had run off of your
23  hand-held computer?

Page 73

1    A.  No.  Not that I know of.
2    Q.  Did you keep any other
3  documents related to your distributorship
4  during the normal course of operating your
5  distributorship?
6    A.  Not that I know of.
7    Q.  So you just kept weekly
8  financials?
9    A.  Yes.
10    Q.  You didn't keep any
11  documents off of your hand-held?
12    A.  No.
13    Q.  What about business --
14    A.  Ah --
15    Q.  Go ahead.
16    A.  You talking about -- we left
17  those at the warehouse, the documents off
18  the hand-held.  And we throwed them away
19  after it was so long.  I never kept them
20  at my house.
21    Q.  Okay.  What about business
22  expenses?  How did you keep track of
23  those?

Page 74

1    A.  I kept some records.  Some
2  of them I didn't.
3    Q.  Well, tell me what type of
4  records did you keep?
5    A.  The gas, upkeep on the
6  truck.
7    Q.  Anything else?
8    A.  That's basically.
9    Q.  Did you -- while you were a
10  distributor for Flowers, did you ever have
11  anybody assist you running your
12  distributorship?
13    A.  Yes.
14    Q.  Who?
15    A.  My son.
16    Q.  And that's Marcus?
17    A.  Yes.
18    Q.  How did you --
19    A.  He --
20    Q.  I'm sorry.  Go ahead.
21    A.  Every now and then somebody
22  might ride with you.  But that was it.
23    Q.  Did you pay your son?

Page 75

1    A.  No.
2    Q.  He worked free of charge?
3    A.  I just give him a tip or
4  something.  That's all.
5    Q.  Did you give it to him in
6  cash?
7    A.  Yes.
8    Q.  With -- anybody that rode
9  with you, did you pay them?
10    A.  No.
11    Q.  You mentioned that you may
12  have some breach letters at home; is that
13  correct?
14    A.  May.
15    Q.  And you discarded or lost
16  the other breach letters?
17    A.  I wouldn't know.  I probably
18  can't find them or whatever.  I didn't
19  keep them in a safe place.  No.
20    Q.  Since you filed this
21  lawsuit, have you discarded any documents
22  that might be potentially relevant to the
23  allegations that you're making?

Page 76

1    A.  No.
2    Q.  Are you sure about that?
3    A.  What -- repeat the question.
4    Q.  Sure.  Since this lawsuit
5  was filed, have you discarded any weekly
6  financial statements?
7    A.  Yes.
8    Q.  And why did you discard
9  those statements?
10    A.  Got frustrated and didn't
11  pay any attention to them.
12    Q.  But you're telling me that
13  they have been discarded since you filed
14  the lawsuit?
15    A.  Maybe a few.  Misplaced or
16  something.
17    Q.  Have you discarded any other
18  documents since the lawsuit has started?
19    A.  Not that I know of.
20    Q.  Have you ever sought to get
21  a statement from anyone, current
22  distributor or otherwise, to support the
23  contentions that you're making in this

Page 77

1 lawsuit?
2    A.  Not that I know of.
3    Q.  You haven't gone to, for
4 instance, to Charles Morrow and say, you
5 know, would you -- would you sign this for
6 me?  Have you ever done that?
7    A.  No.
8    Q.  Done it with anybody?
9    A.  Not that I know of.
10       MR. HISTA:  Okay.  We can
11 take a break to change the tape.
12       THE VIDEO SPECIALIST:  We're
13 going off the Record.
14       MR. TALIAFERRO:  Yeah.  It's
15 been an hour.  If you don't mind, I'll
16 make a phone call if you give me ten
17 minutes.
18       THE VIDEO SPECIALIST:  We're
19 going off the Record.  This is the end of
20 Tape 1.
21    (Short break.)
22       THE VIDEO SPECIALIST:  We're
23 back on the Record.  This is the beginning

Page 78

1 of Tape 2.
2    Q.  (BY MR. HISTA)
3 Mr. Porterfield, we're back on the Record.
4 Are you ready to proceed?
5    A.  Yes.  There's a question you
6 asked me, did I discuss with -- it was --
7 I can't refrain, but the last question you
8 asked me I wanted to --
9    Q.  Okay.  Why don't we go back
10 to the last several questions that I asked
11 Mr. Porterfield?
12    A.  I was confused on something.
13    Q.  Was it related --
14    A.  I might have have answered
15 it clear as I can, but probably didn't --
16    Q.  Let me ask you a couple of
17 questions and see if we can clarify.
18       Was it related to my line of
19 questioning regarding obtaining any
20 statement or affidavit of --
21    A.  Yes.  That was it.
22    Q.  -- someone?  Okay.  How
23 would you like to clarify your testimony?

Page 79

1    A.  I did ask Doug Branch, Marty
2 Sims (sic.) and Charles Morrow would they
3 give a statement.  I remember that.
4    Q.  And when did you ask them to
5 give a statement?
6    A.  That was sometime in -- it
7 was around September or October of 2005, I
8 believe.
9    Q.  Did they give a statement?
10    A.  Yes.
11    Q.  And do you recall if all
12 three give statements?  Or --
13    A.  All three did give
14 something.
15    Q.  Okay.  Anybody else other
16 than the three that you've just mentioned?
17    A.  No.
18    Q.  Let's talk for a few minutes
19 about your employment history prior to
20 becoming a route salesman for Flowers
21 Baking Company of Opelika.
22       Could you tell me who you
23 were employed with?

Page 80

1    A.  Starting from the beginning?
2    Q.  Yes.
3    A.  Yes.  First job I worked at
4 Coppers in Montgomery.  Sears Roebuck in
5 Montgomery, Montgomery Advertiser,
6 Winn-Dixie, Allstate Beverage, Flowers
7 Baking Company.  And then Montgomery Board
8 of Education.  And then Winn-Dixie for one
9 day.
10    Q.  Okay.  Well, let's go back
11 to the folks that you mentioned prior to
12 you becoming a route salesman for Flowers.
13    A.  Okay.
14    Q.  You mentioned you know,
15 Winn-Dixie.
16    A.  Yes.
17    Q.  What did you do for them?
18    A.  I started off as a stock
19 clerk.  And then when I left, I was
20 pricing manager.
21    Q.  Did you leave voluntarily?
22    A.  Yes.
23    Q.  Why did you leave?

Page 81

1    A.    I leave -- I left to go to
2  be a salesman for Allstate Beverage.
3    Q.    Okay.  And how long were you
4  employed by Winn-Dixie?
5    A.    Approximately about eleven
6  and a half, almost twelve years.
7    Q.    And what prompted you to
8  resign your position?
9    A.    Allstate Beverage.  Felt
10  like I had more broader opportunity at
11  Allstate.  And the salary was a lot bigger
12  increase and everything, pay.
13    Q.    And -- so you went from
14  Winn-Dixie to Allstate?
15    A.    Yes.
16    Q.    How long did you work for
17  Allstate?
18    A.    I worked for Allstate six
19  months.
20    Q.    And why did you leave there?
21    A.    I wasn't cut out to be a
22  salesman seven days a week.  And I didn't
23  go to work on a Sunday, and I was

Page 82

1  terminated.
2    Q.    Okay.  What type of sales
3  work did you do for Allstate Beverage?
4    A.    Beer.
5    Q.    Delivered beer products?
6    A.    Beer.  Beer products.
7    Q.    And did you deliver those
8  products to grocery stores?
9    A.    Yes.
10    Q.    And you said you weren't cut
11  out to be a salesman.  What do you mean?
12    A.    I wasn't cut out to be a
13  beer salesman.  They work too many hours.
14  We was working ten hours a hours almost
15  sometimes.  Had to go out on Saturday
16  morning, Saturday evening, go back Sunday
17  evening.  And I wasn't -- there was no
18  free -- no time to be at home.
19    Q.    Okay.  So you didn't go in
20  to work one day, and your employment was
21  terminated?
22    A.    I went to work that one
23  Wednesday morning.  And like I said,

Page 83

1  supervisor that Sunday he went and pulled
2  it up himself because I had told him I had
3  something else to do that Sunday.  And so
4  they had the right to do it.  And they did
5  it.
6    Q.    So you were fired from
7  Allstate Beverage?
8    A.    Yes.
9    Q.    You may have mentioned this
10  with the list of companies or firms that
11  you previously told me about.  What about
12  Jerry Lawson?  Who is that?
13    A.    That's my cousin.
14    Q.    Okay.  You worked for him?
15    A.    Helped him out a little bit.
16  He got an automotive shop and body and
17  fender shop.  And I was just working
18  around, doing odds and ends and making
19  money in-between that Allstate Beverage
20  and Flowers Baking Company.
21    Q.    Okay.  And coming to work
22  for Flowers.  Okay.  So you voluntarily
23  left his employment to go with Flowers?

Page 84

1    A.    Yes.
2    Q.    With the other companies or
3  firms that you mentioned prior to coming
4  to work with Flowers other than Allstate,
5  were you terminated from any other
6  position?
7    A.    At Sears Roebuck, I don't
8  remember what happened.  I went back to
9  school.  And I went to work for the
10  Advertiser company.  I had a paper route.
11  And then I couldn't work full-time at the
12  job.
13    Q.    With any of the employers
14  that we have discussed so far up until the
15  time of you going to work for Flowers, did
16  you have any type of work place issues
17  with any of them other than Allstate?
18    A.    Okay.  At Sears Roebuck, we
19  had a drive off.  A customer had the car
20  worked on, and they didn't pay for it.
21  And I had recommended them.  So they
22  figured I had let them have the car.  But
23  I didn't.

Page 85

1   Q.   So what happened?
2   A.   They terminated me and I
3   think about two more salespeoples and
4   about -- at Sears Roebuck.
5   Q.   Okay. So you were
6   terminated from both Sears and Allstate?
7   A.   Yes.
8   Q.   Okay. Do you remember
9   anybody else that you've been terminated
10  from?
11  A.   Not that I know of.
12  Q.   Who was the supervisor at
13  Sears that terminated your employment?
14  A.   It's been so long. I don't
15  know.
16  Q.   Do you recall the name of
17  the supervisor that terminated your
18  employment at Allstate?
19  A.   Chuck -- Chuck Grant.
20  Q.   How did you become
21  interested in working for Flowers?
22  A.   Steve Bordeaux hired me.
23  Q.   Did you know Mr. Bordeaux

Page 86

1   prior to going to work for Flowers?
2   A.   Yes.
3   Q.   How did you know him?
4   A.   When I worked at Winn-Dixie.
5   Q.   How did you come to know him
6   while you were working at Winn-Dixie?
7   A.   I was the pricing manager at
8   the Winn-Dixie, and they had to come
9   through me to get different things done.
10  I was overseeing all the prices in the
11  store and the vendors and everything.
12  That's how I come to know him.
13  Q.   Was Mr. Bordeaux responsible
14  for you coming to work for Flowers?
15  A.   Yes.
16  Q.   Did he hire you?
17  A.   Yes.
18  (Whereupon, Defendant's Exhibit No.
19  2 was marked for identification purposes
20  by Mr. Hista.)
21  Q.   (BY MR. HISTA) Let's mark
22  this as 2. Mr. Porterfield, have you had
23  the opportunity to review Defendant's

Page 87

1   Exhibit No. 2?
2   A.   Talking like where I live,
3   the reference I gave, page one.
4   Q.   Could you tell me what this
5   document is?
6   A.   Application for employment.
7   Q.   And is it an application for
8   employment at Flowers Baking Company of
9   Opelika?
10  A.   I don't see Opelika on there
11  yet. Yes. Yes, I see it. Yes.
12  Q.   Okay. And is this your
13  handwriting on this document?
14  A.   Yes.
15  Q.   Is it fair to say you
16  completed this document?
17  A.   Go back to the front. The
18  only thing I see is on the front where I
19  said advertisement. I might have had the
20  Advertiser. But Mr. Bordeaux did stop me
21  and asked me what happened. But other
22  than that, I think that's about right.
23  Q.   Turning to the fourth page

Page 88

1   of this document, is that your signature
2   at the bottom of the page?
3   A.   Yes.
4   Q.   Okay. Before you signed the
5   document, you believe that you read what's
6   outlined in the paragraphs above your
7   signature?
8   A.   Yes.
9   Q.   Okay. So you understood
10  that when you completed this application
11  you were supposed to tell the truth?
12  A.   Because I didn't put job
13  three and job four?
14  Q.   I'm just asking. Did you
15  understand when you completed this
16  application that you were supposed to tell
17  the truth?
18  A.   When I did this application,
19  he said, Mr. Bordeaux, last ten years.
20  Q.   He said you only needed to
21  complete the employment for the last ten
22  years?
23  A.   Yes. Uh-huh.

PORTERFIELD v FLOWERS                CondenseIt!™                DEPO:HENRY PORTERFIELD

Page 89

1    Q.  Is that your testimony?
2         But you understand that you
3  were supposed to tell the truth on the
4  application?  Did you understand that?
5    A.  As far as I am concerned and
6  I felt like I told the truth.
7    Q.  Okay.
8    A.  That's how I felt.
9    Q.  Do you have any type of
10 education past high school?
11   A.  It says colleges,
12 university.  I went to no college and no
13 university.  I went to trade school.  So
14 that's not a college or university.
15 That's why I didn't check it.
16   Q.  Okay.  And turning to page
17 three of the document --
18   A.  (Witness complying.)
19   Q.  -- under employment,
20 experience, the first employer listed is
21 Allstate Beverage.  Do you see that?
22   A.  Yes.
23   Q.  It says reason for leaving

Page 90

1  Mr. Rankin.  Who is Mr. Rankin?
2    A.  Supervisor.
3    Q.  Was he the supervisor that
4  terminated your employment at Allstate?
5    A.  He's one of them, yes.  Him
6  and -- he was the supervisor.  And Chuck
7  was the head man.  That's why I said
8  Chuck's name.
9    Q.  Why did you put Mr. Rankin
10 in as the reason for leaving?
11   A.  Well, he the one that
12 recommended it.  That's why.
13   Q.  He's the one that
14 recommended you be terminated?
15   A.  Uh-huh.
16   Q.  Do you recall how long you
17 were in a route sales salesman position
18 before you became a distributor?
19   A.  I think about a little over
20 five years.
21   Q.  Okay.
22   A.  I believe.
23   Q.  Who were your supervisors

Page 91

1  during that time period?
2    A.  When I first started, it was
3  Fred Jeffcoat.  And another supervisor
4  came and stayed a little while, but I done
5  forgot his name.  He didn't stay no time.
6    Q.  Okay.
7    A.  And then Woody Jaye and
8  Steve Stephens.
9    Q.  The last one is Steve?
10   A.  Stephens.
11   Q.  Any issues getting along
12 with any of your supervisors during that
13 time period?
14   A.  No.
15   Q.  Any performance issues while
16 you were a route salesman?
17   A.  I didn't feel like I had
18 any.
19   Q.  How were you paid?
20   A.  Biweekly.
21   Q.  And was there commission?
22   A.  Yes.
23   Q.  Receive a base rate or a

Page 92

1  guarantee?
2    A.  As an employee, we had a
3  base rate and then -- then a commission.
4  I don't remember exactly what it was.
5    Q.  Okay.  Did you receive
6  company benefits?
7    A.  As an employee, yes.
8    Q.  Okay.  What type of benefits
9  did you receive?
10   A.  We had dental, health
11 insurance.  And I believe they had life
12 insurance.  And they had vacation.  And I
13 don't know about sick days or nothing.
14   Q.  Okay.  When did you -- when
15 did you first hear about Flowers' decision
16 to convert to distributors?
17        Do you remember hearing
18 anything about it?
19   A.  I heard through the
20 warehouse talking and the year might be
21 wrong, but I think when they went over to
22 distributor -- I don't know exactly what
23 year that was.  I might name the wrong

Page 93

1 thing. Somewhere around about '94, '93.
2 Somewhere around there.
3    Q.  Do you recall anything
4 specific about what you heard in the
5 warehouse?
6    A.  Nothing but said they were
7 changing over to distributorships. And
8 you lose your benefits. And that's
9 basically what I heard. They were
10 changing over to distributorships.
11   Q.  Were there a series of
12 meetings to explain what the
13 distributorship relationship or program
14 would entail?
15   A.  It was a series of meetings
16 that we had. I remember one, maybe two.
17   Q.  Okay.
18   A.  I believe.
19   Q.  One or two meetings?
20   A.  Yes, I believe.
21   Q.  And do you recall what was
22 said during those meetings?
23   A.  I can't go -- go with

Page 94

1 specifics, no.
2    Q.  Okay. You don't remember
3 any specifics at all from those meetings?
4    A.  One thing I know. They had
5 everybody pumped up like it was so good.
6 I remember that part.
7        Everything -- they painted a
8 real pretty picture. And about two years
9 into it you found out it wasn't as good
10 because everything changed.
11   Q.  Okay.
12   A.  All the good stuff you got
13 when you started it started -- started
14 dropping it back.
15   Q.  Do you remember any specific
16 statements by any Flowers representatives
17 during these --
18   A.  I don't remember.
19   Q.  You don't remember any
20 statements whatsoever?
21   A.  I don't remember.
22   Q.  Do you remember receiving a
23 copy of a distributor agreement during any

Page 95

1 of the meetings that you've mentioned?
2    A.  At that last meeting we did.
3    Q.  Did you receive a copy
4 before that?
5    A.  I don't remember.
6        (Whereupon, Defendant's Exhibit No.
7 3 was marked for identification purposes
8 by Mr. Hista.)
9    Q.  (BY MR. HISTA) Okay. The
10 court reporter has marked this next
11 exhibit No. 3.
12       If you could, take a few
13 moments and look at that for me, please.
14   A.  (Witness complying.)
15       MR. TALIAFERRO: It's twenty
16 pages long. Would you mind --
17       MR. HISTA: Yeah.
18   Q.  (BY MR. HISTA) I'm going to
19 ask you -- you don't need to read the
20 document in its entirety. I'm just going
21 to ask you about a few specific provisions
22 in it.
23       Why don't we just jump ahead?

Page 96

1 And at the bottom of the page, you will
2 see number -- the FBO then a series of
3 numbers. Do you see that?
4    A.  Uh-huh.
5    Q.  That's commonly what is
6 referred to as a Bates number which
7 lawyers use to just keep track of a
8 document.
9    A.  Copies.
10   Q.  If you could look -- and
11 it's actually -- the pages of this
12 document are also numbered.
13       Can you turn to page 20 of
14 this document?
15   A.  (Witness complying.)
16   Q.  Are you with me on page 20
17 at the bottom of the page? Why don't you
18 go back a couple of pages?
19   A.  (Witness complying.) I see.
20 I got -- I got you.
21   Q.  All right. And do you see
22 the word "distributor" on page 20?
23   A.  Yes.

Page 97

1    Q.  And underneath the word
2  "distributor" is a signature.  Do you see
3  that?
4    A.  Yes.
5    Q.  And is that your signature?
6    A.  Yes, it is.
7    Q.  Do you recognize any of the
8  other signatures on there?
9    A.  Yes.
10    Q.  Could you tell which
11  signatures you recognize?
12    A.  Steve Bordeaux and Calvin
13  Rhodes.  And the other two I can't tell
14  what they said.  Charles something.
15    Q.  Okay.  Can you tell me what
16  this document is?
17    A.  This is the signing of the
18  agreement, or the contract.
19    Q.  Okay.  Is this the first
20  distributor agreement that you signed with
21  Flowers Baking Company of Opelika?
22    A.  Yes.
23    Q.  Okay.  I'd like to just ask

Page 98

1  you some questions about several of the
2  provisions -- several of the provisions in
3  this contract.
4        Let's first turn your
5  attention to Section 2.5.
6    A.  Okay.
7    Q.  Would you agree with me that
8  maintaining an adequate and fresh supply
9  of products in your stores and accounts is
10  good industry practice?
11    A.  Yes.
12    Q.  Would you agree with me that
13  properly rotating the products in your
14  accounts is good industry practice?
15    A.  Yes.
16    Q.  Would you agree with me that
17  promptly removing all stale products from
18  your accounts is good industry practice?
19    A.  Yes.
20    Q.  Would you agree with me that
21  maintaining proper service and delivery to
22  all of the accounts in your territory
23  requesting service is good industry

Page 99

1  practice?
2    A.  Yes.
3    Q.  Turning your attention to
4  5.1, would you agree with me that under
5  Section 5.1 you were agreeing and
6  obligated to use your best efforts to
7  develop and sell the products to the
8  customers in your territory?
9    A.  Yes.
10    Q.  And would you agree with me
11  that under Section 5.1 that you agreed and
12  were obligated to cooperate with the
13  company with respect to company marketing
14  programs?
15    A.  Yes.
16    Q.  Turning your attention to
17  16.3, would you agree with me,
18  Mr. Porterfield, that under Section 16.3
19  that if you did not properly service an
20  account that Flowers had the right to
21  issue you a ten-day breach letter?
22    A.  Yes.
23    Q.  And did you understand that

Page 100

1  under Section 16.3 that if you did not
2  cure a breach during a ten-day period that
3  Flowers had the right to terminate the
4  distributor agreement?
5    A.  You said ten days?
6    Q.  Yes.
7      MR. TALIAFERRO:  I'm going to
8  object to the form.  But ten business
9  days.
10    A.  Ten business days.
11    Q.  The --
12    A.  I agreed to this.  But in my
13  case, that wasn't the answer.
14    Q.  That's all I'm asking is
15  your understanding.  That if there was --
16  if there was a breach and that breach was
17  not cured within ten business days, would
18  you agree with me that Flowers had the
19  right to terminate the distributor
20  agreement?
21    A.  Yes.
22    Q.  And would you agree with me
23  that under Section 16.3 that if there were

Page 101

1 in fact repeated violations of the
2 distributor agreement that Flowers could
3 terminate the contract on that basis?
4      A.  Yes.
5      Q.  Turning your attention to
6 Section 19.4, if you could take a few
7 moments and read that for me, please.
8      A.  (Witness complying.)
9      Q.  Did you understand that
10 under Section 19.4 that the distributor
11 agreement set forth the terms and
12 conditions of your relationship with
13 Flowers Baking Company?
14     A.  Yes.
15     Q.  And did you understand that
16 if a representation was not contained in
17 this agreement that it wasn't binding?
18     A.  I understand.
19     (Whereupon, Defendant's Exhibit No.
20 4 was marked for identification purposes
21 by Mr. Hista.)
22     Q.  (BY MR. HISTA)
23 Mr. Porterfield, the court reporter is

Page 102

1 handing you what has been marked as
2 Exhibit -- Defendant's Exhibit No. 3
3 (sic.).
4      If you could just take a few
5 months and look at that for me, please.
6      MS. REISS:  I think it's
7 four.
8      Q.  (BY MR. HISTA)  No. 4.  I'm
9 sorry.
10     A.  I understand.
11     Q.  Okay.  Mr. Porterfield, on
12 the bottom right-hand side of this
13 document under the word "distributor," is
14 that your signature?
15     A.  Yes.
16     Q.  Did you sign this document?
17     A.  Yes.
18     Q.  Tell me what it is, please.
19     A.  Agreement if I didn't -- six
20 months to one day the effective day that
21 they would buy back the distributorship.
22 I understand that.
23     Q.  So basically you had six

Page 103

1 months and one day.  If you weren't happy
2 with the way things were going, Flowers
3 would buy it back?
4      A.  Yes.
5      Q.  And during that time period,
6 were you satisfied with the way the
7 distributor relationship was going with
8 Flowers?
9      A.  Yes.
10     (Whereupon, Defendant's Exhibit No.
11 5 was marked for identification purposes
12 by Mr. Hista.)
13     Q.  (BY MR. HISTA)  Okay.  No.
14 5.  If you could take a few moments and
15 look at this one for me, please.
16     A.  It's --
17     Q.  Mr. Porterfield, have you
18 had the opportunity to review Exhibit No.
19 5?
20     A.  I -- I -- I know what this
21 is.
22     Q.  Tell me what it is.
23     A.  This is the outline of the

Page 104

1 purchase of the route and the price of the
2 truck and the price of the route, ten
3 times branded sales, and cost of what the
4 route costs.
5      Q.  Is this basically
6 information related to your first
7 distributorship, the 1994 contract?
8      A.  Yes.
9      Q.  And if you go to the middle
10 of the page, it -- you've got your ten
11 times weekly branded sales.  Do you see
12 that?  Thirty-five thousand four hundred
13 and fifty-eight dollars?
14     A.  I see that.
15     Q.  Okay.  And then it says less
16 bid business.  What's bid business?
17     A.  That's like restaurant
18 items.
19     Q.  Any schools?  Did you have
20 any schools?
21     A.  I wouldn't remember.  But
22 the same school, the same thing.
23     Q.  But predominantly restaurant

Page 105

1 business was the big --
2   A.  Yes.
3   Q.  -- business?  So you didn't
4 actually have to pay for that business?
5   A.  No.
6   Q.  You had the rights to
7 service the accounts, but you didn't have
8 to pay for them?
9   A.  Yes.
10   Q.  So you ended up paying a
11 little over forty-eight hundred dollars
12 for your territory in 1994?
13   A.  Yes.
14   Q.  And then you ended up
15 financing it looks like about twenty-eight
16 hundred dollars; is that correct?
17   A.  Yes.
18   Q.  When you became a
19 distributor in 1994, were you using a
20 hand-held computer at that time?
21   A.  No.
22   Q.  Okay.  When did you start
23 using a hand-held?

Page 106

1   A.  I don't remember.
2   Q.  Was it sometime during
3 that --
4   A.  Sometime later.
5   Q.  Sometime under that first
6 contract?  Sometime between 1994 and 2000?
7   A.  Oh, we did, yes.
8   Q.  Sometime in the 1990s?
9   A.  Yes.
10   Q.  Did you receive training on
11 using the hand-held computer?
12   A.  Yes.
13   Q.  What do you remember about
14 that?
15   A.  We had a section such as we
16 sit up here, and they went over how to use
17 it.  That's all.
18   Q.  Tell me in general terms,
19 what did you use the hand-held for?
20   A.  To print tickets, stale
21 tickets, and checkup.
22   Q.  Did you use the hand-held to
23 order product?

Page 107

1   A.  Yes.
2   Q.  Tell me how that worked.
3   A.  You ordered seven days in
4 advance.  And I might can get some of it
5 right because it's about so long.
6      On -- such as you order a
7 week in advance for your stops.  And then
8 you -- you had a route book.  It tells
9 about how much the sales, the stop was
10 doing.  And you try to guess at it because
11 that's all you were doing.  Trying --
12   Q.  Okay.
13   A.  -- to get it close.
14 Projection close to what they was selling.
15   Q.  And were you making that
16 decision as to --
17   A.  Yes, I was.
18   Q.  -- what product you were
19 going to order?
20   A.  Yes.
21   Q.  Okay.  When you say you
22 ordered seven days in advance, were you
23 ordering product for your normal service

Page 108

1 days?
2   A.  Yes.
3   Q.  Is that how it generally
4 worked?
5   A.  Yes.
6   Q.  And what were the normal
7 service days?
8   A.  Normal service days was
9 Monday, Tuesday, Thursday, Friday,
10 Saturday.
11   Q.  And your normal off days
12 were Wednesday and Sunday?
13   A.  Yes.
14   Q.  Did you have to do pull-ups
15 on Wednesday and Sunday?
16   A.  No.
17   Q.  How did that work?  How was
18 the --
19   A.  The company had pull-up
20 peoples to do it.
21   Q.  When you -- when you ordered
22 product, would you agree with me that it
23 was good industry practice to order fresh

Page 109

1  product for your accounts for each of the
2  normal service days?
3      A.  It -- it would have been
4  good product if you ordered it three days.
5      Q.  Well, let's say you order on
6  Monday.  What day are you ordering for
7  that --
8      A.  On Monday?
9      Q.  Uh-huh.
10     A.  I am ordering for Saturday
11 of the same -- of the same week.
12     Q.  Okay.  And then on Tuesday
13 you're ordering for the following Monday?
14     A.  For the following Monday.
15     Q.  Okay.  And then on Thursday,
16 what are you ordering for?
17     A.  Tuesday.
18     Q.  And then on Friday what are
19 you ordering for?
20     A.  Thursday.
21     Q.  And on then Saturday?
22     A.  Friday.
23     Q.  Okay.  So you're ordering a

Page 110

1  week in advance for what you anticipate
2  your customers' needs are on the five
3  normal service days, correct?
4      A.  Yes.
5      Q.  And, you know, is it fair to
6  say that it's good industry practice to
7  provide fresh product to your accounts on
8  those five normal service days?
9      A.  It's -- it's fair industry
10 practice if you had bread in code.  You
11 had a four, five-day code on the bread.
12 You could order Monday and supply Tuesday.
13 Because it still was in code.
14         And you wasn't -- you didn't
15 have stale bread on the market.  For
16 instance, what you order on Saturday, it
17 have an extra day.  It don't come out
18 until Thursday.
19     Q.  But that bread isn't as
20 fresh as the product that went into the --
21 if you had ordered for Tuesday, you would
22 have fresher bread, correct?
23     A.  It would be fresher.

Page 111

1      Q.  Okay.  And is that what the
2  company expected you to do?
3      A.  That's what I did.
4      Q.  So you did order product
5  for -- the freshest product available for
6  the five service days?
7      A.  Sometime.
8      Q.  What do you mean sometimes?
9      A.  Okay.  Some stops you only
10 worked on Monday.  You work them on
11 Monday.  And some you only worked on
12 Monday and Friday.
13         They was serviced with bread
14 Monday.  They still had -- it was still
15 fresh on Tuesday.  It was fresh on
16 Wednesday.  It was fresh on Thursday.
17         You picked -- you picked it
18 up on Thursday.  And what I'm trying to
19 say, the bread two days is still just as
20 fresh as that one day bread you get.
21     Q.  Okay.
22     A.  That's what Flowers said.
23     Q.  How many -- do you remember

Page 112

1  how many authorized charge accounts that
2  you had --
3      A.  No.
4      Q.  -- under the 1994 agreement?
5         Let's go back and look at
6  Exhibit No. -- let's go back and look at
7  Exhibit No. 3.
8      A.  In the distributor?
9      Q.  Yes.  Distributor agreement.
10     A.  Three one?
11     Q.  Let's go to -- at the bottom
12 of the page it is FBO000689.  Towards the
13 back of the document.
14     A.  Okay.
15     Q.  Are you with me with
16 authorized charge accounts?  Do you see
17 that?
18     A.  Yes.
19     Q.  Okay.  Were these accounts
20 that you had at the beginning of your
21 distributor relationship with Flowers as
22 best you can remember?
23     A.  As best I can remember, yes.

Page 113

1    Q.   Did any of these accounts
2 require five-day service?
3    A.   Doesn't none of them require
4 it. But we worked Oaktree and Gunter
5 Commissary and Krystal five days. Three
6 of them.
7    Q.   Did Krystal require five-day
8 service?
9    A.   Company require five day.
10    Q.   I didn't ask you that. I
11 said: Did Krystal require five-day
12 service?
13    A.   I don't know. They required
14 fresh product.
15    Q.   So you don't know if it was
16 Krystal's policy to have a distributor
17 service them five days? Is that what
18 you're telling me?
19    A.   I don't know.
20    Q.   At some point you picked up
21 some Burger King accounts; is that
22 correct?
23    A.   Yes.

Page 114

1    Q.   Do you know if it was Burger
2 King's policy to have a distributor
3 service their units five days a week?
4    A.   Yes.
5    Q.   It was their policy?
6    A.   That's what Flowers said,
7 yes.
8    Q.   Do you have any reason to
9 believe that wasn't true?
10    A.   I -- I had the belief -- I
11 was running the route -- that as long as
12 you had fresh product in there it didn't
13 make a difference.
14    Q.   Burger King wanted service
15 five days a week, correct? Is that
16 correct?
17    A.   That's what Flowers said.
18    Q.   Is it your -- is it your
19 understanding that Burger King --
20    A.   I understand that's what
21 Flowers said.
22    Q.   Okay. Again, my question
23 is: Do you have any reason to believe

Page 115

1 that what Flowers representatives told you
2 was incorrect?
3    A.   I don't know.
4    Q.   Did you service your Burger
5 Kings five days a week?
6    A.   Sometime.
7    Q.   And sometimes you didn't?
8    A.   Yes.
9    Q.   At some point, there were
10 complaints about your service to Burger
11 King, were there not?
12    A.   Yes.
13    Q.   How would you go about
14 servicing your territory when you were a
15 distributor for Flowers?
16        What time did you come into
17 the warehouse generally?
18    A.   4:30, quarter to five, five.
19 Somewhere around there.
20    Q.   Okay. It wasn't any set
21 time to come in, was there?
22    A.   No.
23    Q.   And how did you determine

Page 116

1 the order of visiting your accounts during
2 the course of a day?
3    A.   You determined by what time
4 they open up and about what time the --
5 outline the route you had to take to save
6 you gas on your truck. That's it.
7    Q.   Did you make that decision?
8    A.   Yes, I did.
9    Q.   Flowers didn't tell you the
10 order in which you had to service the
11 accounts?
12    A.   They told me I had to
13 service -- I knew I had to service
14 Winn-Dixie before twelve and certain
15 things like that.
16    Q.   Because that was
17 Winn-Dixie's policy?
18    A.   Yes.
19    Q.   Take me through a typical
20 day of coming into the warehouse. You've
21 ordered your product. There's product in
22 the warehouse. Just tell me what you did.
23    A.   When you first get in, you

Page 117

1 run a load sheet, check your load.
2    Q.  When you say load, are you
3 referring to products?
4    A.  Product.  Check your
5 product.  Then you separate it by stops.
6 Then you load your truck.
7        You load your truck with the
8 last stop you work to the front and work
9 yourself back.
10       Then you go and start working
11 the route.  The first stop should be on
12 the tail end of the truck to bring it off
13 first.  And then just finish the day the
14 same way.
15    Q.  Could you make additions or
16 subtractions to product orders?
17    A.  Yes.
18    Q.  Was that commonly referred
19 to as adds and cuts?
20    A.  Yes.
21    Q.  How does that work?
22    A.  If you get in and you have
23 an overage, you can put in the overage.

Page 118

1 If you have something that was damaged,
2 you can use damaged.  Something that
3 wasn't there, you can cut.
4    Q.  Is that your decision?
5    A.  Your daily decision.
6    Q.  Your daily decision?
7    A.  Yes.
8    Q.  What's a final load report?
9    A.  Final load report is --
10 final load report is what you had on the
11 truck.
12    Q.  That's the inventory
13 starting the day?
14    A.  Yes.
15    Q.  Tell me, how did you work,
16 you know, transactions with your
17 authorized charge accounts?  How did that
18 work?
19        What type of sales
20 transaction would you conduct with an
21 authorized charge account?
22    A.  What are you talking about?
23    Q.  Okay.  Did you have any

Page 119

1 grocery stores?
2    A.  Yes.
3    Q.  Tell me what grocery stores
4 you had.
5    A.  I believe on -- at the end
6 was two Winn -- it was two Winn-Dixies.
7    Q.  When you went to a
8 Winn-Dixie, did you generate a sales
9 ticket?
10    A.  Yes.
11    Q.  And that sales ticket would
12 reflect product that you were putting into
13 the store, correct?
14    A.  Yes.
15    Q.  Did you have any private
16 label with Winn-Dixie?
17    A.  No.
18    Q.  Just branded product?
19    A.  Yes.
20    Q.  And if you took product out
21 of the store, what kind of ticket was
22 there?
23    A.  Credit ticket.

Page 120

1    Q.  A credit ticket is for stale
2 or returns that you're taking out of the
3 store, correct?
4    A.  Yes.
5    Q.  And you're supposed to take
6 the stale or returns out of the store on
7 the date that it's color coded, correct?
8    A.  Yes.
9    Q.  How did you work
10 transactions with the cash accounts?
11    A.  Basically the same.
12    Q.  Did you generate tickets?
13    A.  Yes.
14    Q.  With the cash accounts, you
15 actually received cash, you know, from the
16 accounts paying for the products?
17    A.  Yes.
18    Q.  When you took the product
19 off the dock in the morning, did you
20 understand that that was your product?
21    A.  Yes.
22    Q.  And you owned it?
23    A.  Yes.

Page 121

1    Q.   Your responsibility?
2    A.   Yes.
3    Q.   When you sold product to
4 authorized charge accounts, do you have
5 any understanding about how you were
6 credited for such accounts?
7    A.   Yes.
8    Q.   Tell me, what's your
9 understanding?
10    A.   On authorized charges, they
11 paid the company. And you get a
12 percentage of -- of what your sales was
13 after they subtract the stale from it.
14    Q.   Okay. Well, let's just go
15 through just a simple example. If the
16 wholesale price of a loaf of bread is a
17 dollar, and the discount is twenty
18 percent, how much are you buying that loaf
19 of bread for?
20    A.   Wholesale price -- what --
21 repeat now. You said --
22    Q.   If the wholesale price is a
23 dollar.

Page 122

1    A.   Wholesale, okay.
2    Q.   Okay. And the discount is
3 twenty percent. Would you agree with me
4 that you're charged eighty cents for that
5 loaf of bread?
6    A.   Yes.
7    Q.   And then you would typically
8 sell it to an authorized charge account
9 for a dollar?
10    A.   Yes.
11    Q.   And you would make twenty
12 cents --
13    A.   Yes.
14    Q.   -- off that transaction?
15    What's a credit buy back
16 account?
17    A.   Credit buy back account is
18 if you've got bread like -- okay. If you
19 buy something from the Thrift Store, you
20 can get something from somebody else, you
21 can pay them cash for it and you can
22 credit it back into your account and sell
23 it.

Page 123

1    Q.   Did you use the credit buy
2 back --
3    A.   Yes, I did.
4    Q.   -- for that purpose?
5    A.   Yes.
6    Q.   Did you use it for any other
7 purpose?
8    A.   I used it to generate sales.
9    Q.   Tell me, how did you use it
10 to generate sales?
11    A.   If I had extra bread that I
12 had got from someone, resale some stale, I
13 could use the credit buy back and do it.
14    Q.   How would you -- how would
15 you come to obtain additional product?
16    A.   Sometimes you can get it
17 from someone'else.
18    Q.   And how would you enter that
19 transaction in your hand-held?
20    A.   Credit buy back.
21    Q.   And how would you or how
22 would the other distributor get credit for
23 that product?

Page 124

1    A.   Sometimes you'd pay it.
2    Q.   Why would you put it in the
3 credit buy back account?
4    A.   You put it in the credit buy
5 back account so you can sell it.
6    Q.   What about miscellaneous
7 cash accounts? What was that used for?
8    You've never heard that
9 terminology, "miscellaneous cash
10 accounts"?
11    A.   That -- I guess that was the
12 cash accounts. I guess that's what they
13 call it.
14    Q.   How do you transfer into the
15 hand-held inventory from warehouse stock?
16    A.   You run a transfer from
17 route to route.
18    Q.   So if -- what was your route
19 number?
20    A.   2069.
21    Q.   And who -- who do you recall
22 getting inventory from? What other
23 distributors?

Page 125

1    A.  I don't remember.
2    Q.  Okay.  Do you remember how
3 price allowances worked?
4    A.  Yes.
5    Q.  What's your recollection of
6 how price allowances worked?
7    A.  Price allowance.  The
8 company automatically get the price
9 allowance in the computer.  Such as, if
10 they had white wheat on sale and regular,
11 one nineteen.  They might have it on sale
12 for ninety-nine.  And it's a difference
13 between ninety-nine is the price
14 allowance.  Difference of twenty cents.
15    Q.  That would be a company
16 promotion?
17    A.  It would be a company
18 promotion, yes.
19    Q.  And if it was a company
20 promotion, you understood that this was an
21 authorized price allowance?
22    A.  In some accounts it was.  In
23 some accounts it wasn't.

Page 126

1    Q.  Do you know what an
2 unauthorized price allowance is?
3    A.  No.
4    Q.  You've never heard that
5 terminology?
6    A.  I -- right now I can't
7 recollect.
8    Q.  Could you run -- could you
9 run price allowances in accounts when
10 Flowers was not running a promotion?
11    A.  No.  Not that I know of.
12    Q.  You didn't do that?
13    A.  I don't remember.
14    Q.  Did you ever take any
15 inventory from any other distributor
16 without permission?
17    A.  I told them about it.
18    Q.  What do you remember?
19    A.  I remember getting some
20 bread off -- swapping some bread.
21 Swapping some, I believe it was either one
22 hundred percent or honey wheat.
23         Because I don't know exactly

Page 127

1 what happened, but we did -- we done
2 swapped bread.  And they always knew about
3 it.
4    Q.  Who was the other
5 distributor?
6    A.  One was Steve Head at one
7 time.  He was ordering for some food
8 company.  And he had a whole stack of, I
9 believe it was one hundred percent.  And I
10 swapped mine for his.
11    Q.  Before you took it from him,
12 did you tell him you were going to take
13 it?
14    A.  Yes, I did.  That evening.
15 But he had beat me in I believe and
16 mentioned his bread was gone.
17    Q.  Okay.  I'm not quite sure I
18 understood that.  You picked up your bread
19 early in the morning, correct?
20    A.  Yes.
21    Q.  And was that when you --
22    A.  Steve Head was already gone.
23    Q.  He's already gone?

Page 128

1    A.  Uh-huh.
2    Q.  Okay.  And when did you swap
3 the product out?
4    A.  That morning.
5    Q.  Okay.  So he was gone?
6    A.  Yes.
7    Q.  And was there product there
8 for Steve Head?
9    A.  Yes.
10    Q.  And so you took that product
11 before you asked him -- asked his --
12    A.  Yes.
13    Q.  -- permission?
14    A.  We didn't too much ask each
15 other permission.  A lot of us just, we
16 did that.
17         We took product from each
18 other.  If we -- if they left behind the
19 door, we'll take it and -- and didn't ask
20 him for permission.  Yes, we have done it.
21    Q.  So you'd do it after the
22 fact?
23    A.  And all of us did it.

Page 129

1   Q.  Did Steve Head ever complain
2 about you taking product from him?
3   A.  Not to me.
4   Q.  Did he complain to anybody
5 else?
6   A.  I don't know.
7   Q.  Did you give Steve credit
8 for the product that we've just discussed?
9   A.  I didn't need to.  I
10 swapped --
11   Q.  Why?
12   A.  -- it.
13   Q.  You swapped it.  What did
14 you give him?
15   A.  I swapped -- it was a
16 lateral swap.  Honey wheat I believe for
17 one hundred percent.
18   Q.  How did you know he wanted
19 the product you swapped out?
20   A.  It was -- because the
21 restaurant place he was -- he was getting
22 it at a discount place anyway.
23       And the restaurant was fixing

Page 130

1 sandwiches.  It was something like a food
2 service.  And it didn't make no
3 difference.  They use white wheat, honey
4 wheat or whatever.  That's the only reason
5 I swapped it with him.
6   Q.  That was his decision,
7 wasn't it?
8   A.  It was his decision, but he
9 didn't complain about it.  Not to me.
10   Q.  It was his product?
11   A.  Yes, it was.
12   Q.  Did you take his product
13 without his permission?
14   A.  Yes, I did.
15   Q.  What is warehouse stock?
16   A.  Overstock in the warehouse.
17   Q.  And do you recall, where was
18 warehouse stock kept in the warehouse?
19   A.  Sometime at the end of the
20 floor.
21   Q.  Is warehouse stock Flowers'
22 product still?
23   A.  Warehouse product.

Page 131

1   Q.  Did you ever take any
2 product out of warehouse stock?
3   A.  Yes.
4   Q.  And how did you enter that
5 into your hand-held?
6   A.  Credit buy back.
7   Q.  And when you entered it into
8 the hand-held, was that properly
9 accounting for that product?
10   A.  When I entered it in the
11 computer, yes.
12   Q.  Did you ever fail to provide
13 any customer inventory that was shown on a
14 sales ticket?
15   A.  I don't remember.
16   Q.  You don't remember?
17   A.  I can't -- I can't answer
18 that.
19   Q.  Do you ever recall any
20 customer complaints about not receiving
21 inventory that was shown on the sales
22 ticket?
23   A.  That happens all the time.

Page 132

1   Q.  Do you recall any specifics?
2   A.  I saw a document about
3 Krystal.
4   Q.  You say it happens all the
5 time.  What other distributor did it
6 happen with?
7   A.  Ever -- most of the ones
8 down there.
9   Q.  Do you recall any specifics?
10   A.  No.
11   Q.  Just kind of word of mouth?
12   A.  Just word of mouth.  Things
13 like that that happen.
14   Q.  That's all you've heard?
15   A.  Yeah.
16   Q.  Word of mouth?
17   A.  Word of mouth.
18   Q.  Do you have any personal
19 knowledge about any breach letters that
20 other distributors in the Montgomery
21 warehouse received over, you know, over
22 the years that you worked there?
23   A.  I didn't discuss their

Page 133

1 business.
2     Q.  Ever take out more stale
3 product from a customer than you were
4 giving the customer credit for?
5     A.  Maybe I have.
6     Q.  How did that come about?
7     A.  Probably miscounted.
8     Q.  Happen more than once?
9     A.  Probably did.
10     Q.  Do you recall what accounts
11 it happened with?
12     A.  No.
13     Q.  Ever have any customer
14 complain about more product going out of
15 the store than what they were being given
16 credit for?
17     A.  I don't remember.
18     Q.  Could there have been such
19 complaints you just don't recall today?
20     A.  No.
21     Q.  Pardon me?
22     A.  I don't remember.
23     Q.  You don't remember.

Page 134

1       (Whereupon, Defendant's Exhibit No.
2 6 was marked for identification purposes
3 by Mr. Hista.)
4     Q.  (BY MR. HISTA)
5 Mr. Porterfield, the court reporter has
6 handed you what has been marked as
7 Defendant's Exhibit No. 6.
8       Do you recognize this
9 document?
10     A.  Yes.
11     Q.  Tell me what it is.
12     A.  It's a document of
13 adjustment signed by Henry Porterfield.
14 And Frank Wilder say he didn't sign it.
15 And it might have been one of the other
16 guys I got to sign it.  We just signed
17 each other's documents sometimes.  I
18 remember.
19     Q.  So you signed each other's
20 names?
21     A.  Yes.
22     Q.  Who else did that?
23     A.  Several.

Page 135

1     Q.  Who else specifically?
2     A.  I -- I wouldn't call no
3 name.
4     Q.  Who was the distributor that
5 complained about this?
6     A.  No distributor complained
7 about that.
8     Q.  All right.  Whose -- under
9 your signature, do you know whose
10 signature that is?
11     A.  Frank Wilder.
12     Q.  Who is that?
13     A.  He was something like a
14 route builder.
15     Q.  Route builder?
16     A.  Yes.
17     Q.  What is the transaction that
18 is reflected on this document?
19     A.  Okay.  Short three hoagie
20 buns and five club white, 14.05.  Product
21 I didn't get.
22     Q.  Was there a complaint about
23 this?

Page 136

1     A.  No.
2     Q.  There was not.  Did you ever
3 hear about this before today?
4     A.  I don't recall.
5       (Whereupon, Defendant's Exhibit No.
6 7 was marked for identification purposes
7 by Mr. Hista.)
8     Q.  (BY MR. HISTA)  Turning your
9 attention back to No. 6, Mr. Porterfield,
10 do you recall signing someone else's name
11 to any other documents while you were a
12 distributor with Flowers?
13     A.  I don't remember.
14     Q.  Could you have?
15     A.  Maybe.
16     Q.  Would you agree with me that
17 you forged that gentleman's signature?
18     A.  I don't remember.
19     Q.  Did you -- did you sign that
20 document on behalf of that individual?  Is
21 that -- did you do that?
22     A.  I don't remember.
23     Q.  So under your signature, you

Page 137

1 don't know if you wrote that in?
2    A.  I may have.  Because we done
3 signed them before.  They let us sign them
4 before.
5    Q.  So if -- again, that's a
6 route builder.  What's his name?
7    A.  Frank Wilder.
8    Q.  Do you know if he's still
9 there?
10    A.  No.
11    Q.  All right.  Turning your
12 attention to what has been marked as
13 Defendant's Exhibit 7, take a moment and
14 look at this document for me, please.
15    A.  I already looked at it.
16    Q.  Tell me what it is, please.
17    A.  It's saying that Krystal had
18 forty-eight Krystal buns, yellow ties in
19 the back.  Okay.
20    Q.  Turning to page two of the
21 document, is that your signature?
22    A.  Yes.
23    Q.  And is this document -- it

Page 138

1 indicates that it's from Steve Bordeaux.
2 Would you agree with that?
3    A.  Yes.
4    Q.  And Mr. Bordeaux was the
5 individual that was responsible for you
6 initially coming to work for Flowers as a
7 route salesman?
8    A.  Yes.
9    Q.  You agree with the contents
10 of this document?
11    A.  Yes, I do.  And the reason
12 why I agree with it, I left them on
13 purpose.  Because on that particular day,
14 I could have been short some buns, and I
15 left them to make up the inventory.
16       And those forty-four Krystal
17 buns and those six yellow ties would have
18 been sold that day.  And that was
19 practicing in keeping your customer with
20 product.  That's why I left them.  I made
21 that decision.
22    Q.  Why -- why would
23 Mr. Bordeaux say that those items were out

Page 139

1 of code?
2    A.  Because -- because --
3 because yellow ties was supposed to have
4 been picked up on Tuesday.
5       I made a decision because I
6 was short on the market to leave it.  So
7 it was still in salable -- it was still
8 in -- good enough for a customer to buy.
9    Q.  All right.  So it's supposed
10 to be pulled on Tuesday?
11    A.  Yes.
12    Q.  Is that your testimony?
13    A.  Normally on Tuesday.  These
14 forty-four could have been out there on
15 the rack, and I didn't check out there.
16 They could have been misinventoried.
17    Q.  Let's -- turning your
18 attention back to the second paragraph, or
19 let me ask a few more specific questions
20 so that I understand your testimony.
21       It says on 2/15/95, Flowers
22 personnel found the following out-of-code
23 products under the counter and back room

Page 140

1 of your Krystal.
2       Do you see that?
3    A.  I see where they say this,
4 yeah.
5    Q.  Okay.  And then it says
6 forty-four Krystal buns, code 2/14/95.
7 What does that seen?
8    A.  That's probably the date.
9    Q.  Does that mean that those
10 products should have been picked up on
11 2/14/95?
12    A.  It has 2/14/95.  Good
13 through 2/14/95.
14    Q.  And you didn't pick them up
15 on 2/14/95; is that correct?
16    A.  And Krystal -- we go to
17 Krystal.  If you thought you had enough
18 that can -- if you go to Krystal and you
19 felt like you had enough product that they
20 would sell before lunch, we was -- we
21 was -- we could leave it in there.
22    Q.  Okay.  But it was still
23 there on 2/15/95 according to this

Page 141

1 document; is that correct?
2     A.  I don't know.
3     Q.  Do you have any reason to
4 believe what's stated in this document is
5 not true?
6     A.  It's possible.
7     Q.  And these yellow ties,
8 they're supposed to be picked up on
9 Tuesday as well?
10     A.  Tuesday, yes.
11         THE VIDEO SPECIALIST:  We're
12 going off the Record.  This is end of Tape
13 2.
14     (Short break.)
15         THE VIDEO SPECIALIST:  We're
16 back on the Record.  This is the beginning
17 of Tape 3.
18     (Whereupon, Defendant's Exhibit No.
19 8 was marked for identification purposes
20 by Mr. Hista.)
21     Q.  (BY MR. HISTA)
22 Mr. Porterfield, you have in front of you
23 what has been marked as Defendant's

Page 142

1 Exhibit No. 8.
2         Have you had the opportunity
3 to review this document?
4     A.  I read it before.
5     Q.  You've seen it before?
6     A.  Yes.
7     Q.  You recall seeing it before?
8     A.  Uh-huh.
9     Q.  In the first paragraph, it
10 refers to an account named Meat City
11 Grocery.  Was that one of your accounts?
12     A.  Uh-huh.
13     Q.  And the document goes on to
14 say that you ran a price allowance for
15 seven hundred and eighty-four pound cakes.
16 Is that true?
17     A.  That computer malfunctioned
18 that day, and I had told Woody about it
19 that same day.  And he wrote -- supposed
20 to have wrote a letter to get it cleared
21 out of the computer.  I remember that.
22 Yes.
23     Q.  So this was a mistake?

Page 143

1     A.  Yes, it was.  And I went to
2 him with this.  No, we can go down a
3 little further to Oaktree and them.
4     Q.  Now, what was -- were you
5 authorized to run a price allowance for
6 Meat City Grocery at all?
7     A.  I don't know what happened
8 in that computer that day.  I really
9 don't.
10     Q.  So it's a computer mistake?
11     A.  Yes.  I don't know what
12 happened.
13     Q.  Would you agree with me that
14 seven hundred and eighty-four pound cakes
15 is --
16     A.  Say what now?
17     Q.  Would you agree with me that
18 seven hundred and eighty-four pound cakes
19 is a very large --
20     A.  That would be --
21     Q.  -- number of units?
22     A.  Yes, it is.
23     Q.  And you didn't recognize in

Page 144

1 your hand-held that you were putting that
2 amount of product into the store?
3     A.  I didn't put that in the
4 store.
5     Q.  I know.  But you didn't
6 recognize that transaction in your
7 hand-held?
8     A.  I -- I recognized it when
9 the ticket came out.  That's when I gave
10 it to Woody Jaye to straighten it.
11     Q.  Give it to who?
12     A.  Woody Jaye was the
13 supervisor at the time.
14     Q.  Okay.
15     A.  I remember that.
16     Q.  And the next sentence
17 states:  Had our management not discovered
18 this, it would have cost the company one
19 thousand nine hunudred and fifty-two
20 dollars and sixteen cents?
21     A.  Flowers did that.  Because
22 Woody Jaye was notified the same time it
23 happened.



Page 145

1    And like I said, go back to
2 the Grady Messer. It -- that -- no kind
3 of excuse with him. So that's why it did
4 that, yeah. I agree with that.
5    Q.  So management discovered it
6 before you brought --
7    A.  I discovered it.
8    Q.  Oh, you did?
9    A.  And I brought it to
10 management.
11    Q.  Who did you bring it --
12    A.  Woody Jaye.
13    Q.  So is it your testimony that
14 what is stated in the second sentence of
15 this first paragraph is wrong?
16    A.  Yes, it is.
17    Q.  Okay. Turning to the bottom
18 part of the document, there's a recitation
19 of various out-of-code products.
20    Do you agree or disagree that
21 those out-of-code products were found in
22 your accounts?
23    A.  I wouldn't know.

Page 146

1    Q.  Do you have any reason as we
2 sit here today do believe that what is
3 stated regarding out-of-code product in
4 this document is wrong?
5    A.  Yes. I refused to sign it.
6    Q.  Okay.
7    A.  I didn't agree with it.
8    Q.  Do you have any specific --
9 any specific proof that would indicate
10 that -- other than you refusing to sign it
11 that what is stated in the second half of
12 this letter is inaccurate?
13    A.  I wouldn't know. I never
14 saw the products, and I disagreed with it.
15    Q.  Was it your general practice
16 to refuse to sign breach of contract
17 letters?
18    A.  It was -- you had your
19 option to sign or not to sign if you
20 disagreed with something.
21    Q.  Did you generally refuse to
22 sign?
23    A.  If I disagreed with it.

Page 147

1    Q.  Go back to the second
2 paragraph in this -- in this letter. Tell
3 me how you go about making a price
4 allowance in the hand-held.
5    Do you have to punch a
6 certain key?
7    A.  Yes.
8    Q.  And that's what happened in
9 this particular situation?
10    A.  Evidently.
11    Q.  And it's your testimony that
12 you did it inadvertently?
13    A.  That's my testimony.
14    Q.  And it was a mistake?
15    A.  It was a mistake. It's on
16 here. It's the same thing I said back
17 then.
18    Q.  And it's your testimony that
19 you brought it to Flowers' attention?
20    A.  I brought it to their
21 attention.
22    (Whereupon, Defendant's Exhibit No.
23 9 was marked for identification purposes

Page 148

1 by Mr. Hista.)
2    A.  I remember this. It was
3 paid.
4    Q.  Mr. Porterfield, could you
5 identify Exhibit No. 9 for me?
6    A.  Yes.
7    Q.  Tell me what it is.
8    A.  It's an insufficient fund.
9    Q.  Would you agree with me that
10 you were in breach of the 1994 distributor
11 agreement in this situation?
12    A.  Yes.
13    (Whereupon, Defendant's Exhibit No.
14 10 was marked for identification purposes
15 by Mr. Hista.)
16    Q.  (BY MR. HISTA)
17 Mr. Porterfield, do you recognize
18 Defendant's Exhibit No. 10?
19    A.  Yes.
20    Q.  Was Krystal No. 2 one of
21 your accounts?
22    A.  Yes.
23    Q.  Who is Mr. Barry Sutherland?

Page 149

1    A.  Could have been the
2  management at the time.
3    Q.  And who is the Mr. Baker?
4    A.  Supervisor.
5    Q.  With Krystal?
6    A.  Yes.
7    Q.  Do you recall Mr. Sutherland
8  and Mr. Baker complaining about out-of-
9  code product in your Krystal No. 2?
10   A.  I don't recall.
11   Q.  Do you believe you received
12 a copy of this letter?
13   A.  Yes, I did.
14   Q.  And you didn't sign this
15 letter?
16   A.  No.
17   Q.  As we sit here today, any
18 recollection of why you wouldn't sign this
19 letter?
20   A.  Evidently, I didn't agree
21 with it then.
22   Q.  Okay.  As we sit here today,
23 any reason to believe that there was not

Page 150

1  out-of-code product in your Krystal No. 2
2  situation --
3    A.  I wouldn't know.
4    Q.  -- in this situation?
5    Q.  You don't recall?
6    A.  No.
7    (Whereupon, Defendant's Exhibit No.
8  11 was marked for identification purposes
9  by Mr. Hista.)
10   Q.  (BY MR. HISTA)
11 Mr. Porterfield, have you had the
12 opportunity to review Defendant's Exhibit
13 11?
14   A.  Yes.
15   Q.  Do you remember anything
16 about the situation that is described in
17 this document?
18   A.  Yes.
19   Q.  Who is Nicky Barber?
20   A.  Could have been the district
21 manager at the time then.
22   Q.  It says division manager.
23   A.  Division manager.

Page 151

1    Q.  Do you have any reason to
2  believe that's not true?
3    A.  I wouldn't know.
4    Q.  Is division manager a fairly
5  high level position with Krystal?
6    A.  I don't know.
7    Q.  What do you recall about
8  this situation?
9    A.  It said they had four-inch
10 buns and Giant Bread with yellow ties that
11 should have been picked up this morning.
12 That had to be a Tuesday.
13   Q.  Have you seen this document
14 before today?
15   A.  Maybe.
16   Q.  Would you agree that Krystal
17 is strict on codes?
18   A.  I know they are.
19   (Whereupon, Defendant's Exhibit No.
20 12 was marked for identification purposes
21 by Mr. Hista.)
22   Q.  (BY MR. HISTA)
23 Mr. Porterfield, have you ever seen

Page 152

1  Defendant's Exhibit No. 12 before?
2    A.  Not that I knew of.
3    Q.  Do you recall discussing the
4  contents of this with anyone at Flowers?
5    A.  I don't remember.
6    Q.  What are negative sales?
7    A.  Negative sales could be
8  generated if you, like I said earlier,
9  bought some bread from someone else.  And
10 it will show a negative figure when you
11 get through after you put it in your
12 credit buy back.
13   Q.  Is that an accounting
14 transaction that resulted in your account
15 receiving proper credit for the
16 transaction?
17   A.  I don't understand.
18   Q.  Okay.  This -- the first
19 paragraph here states negative sales in
20 some accounts which means that you are
21 giving stale credits to accounts that were
22 never charged.
23       Do you see that statement?

Page 153

1    A.  Yes.
2    Q.  What does that statement
3 mean to you?
4    A.  I was just using an account
5 that -- that used credit in and -- just
6 probably used a credit buy back in that
7 account.  That's what it was.
8        Okay.  If you want credit
9 back some bread in the account and you can
10 resale it to someone else.  So we can go
11 to any cash account and credit it back.
12 That's why it generate a negative sales.
13    Q.  Why was the company putting
14 you on notice that they believed that your
15 accounting wasn't proper?
16    A.  Because when you show a
17 negative, it did look like it wasn't
18 proper.  I understand that.
19    Q.  Was your accounting proper?
20    A.  Sometimes.
21    Q.  Was it sometimes improper?
22    A.  Possibility.
23    Q.  And when you say that it was

Page 154

1 possibly improper, were you engaging in
2 unauthorized transactions?
3    A.  Possible.
4    Q.  And were you benefitting
5 financially from such unauthorized
6 transactions?
7    A.  Sometime.
8    Q.  Do you recall ever having
9 any issues with an account called Bama
10 Lanes?
11    A.  No.
12    Q.  Did you have an account
13 named Bama Lanes?
14    A.  Yes.  And Flowers lost that
15 account.  And I see they added some stuff
16 to it.
17        It was where they went out
18 and said that I was shorting the man some
19 bread.  But that was a lie.  They lost it
20 because the club bread wasn't right.
21        And the lady used to make her
22 own orders.  I didn't make their orders.
23 The kitchen manager ordered the bread.

Page 155

1    Q.  What does shorting bread
2 mean?
3    A.  It mean they didn't get
4 everything they should have had.
5    Q.  Everything that was shown on
6 the ticket?
7    A.  That's what he thought.
8    Q.  That's what who thought?
9    A.  Joe didn't work -- Joe, he
10 didn't work back there at all.
11    Q.  Did the customer think that
12 they were being shorted bread?
13    A.  Not the kitchen manager.
14    Q.  Did somebody at the customer
15 believe --
16    A.  Joe.
17    Q.  And who is Joe?
18    A.  He was the -- over the
19 bowling lane part.
20    Q.  Why do you believe, or why
21 did he believe that, if you know, that he
22 was being shorted bread?
23    A.  I couldn't -- I don't know

Page 156

1 why he would believe it.  I can't answer
2 for him.
3    Q.  So it's your testimony that
4 you did not short that account?
5    A.  I did not short that
6 account.
7    Q.  Ever?
8    A.  Ever.
9    Q.  Did you ever short any other
10 accounts?
11    A.  Yes.
12    Q.  What accounts did you short?
13    A.  I don't remember.
14    Q.  Was it intentional?
15    A.  Sometime.
16    Q.  And why would you do that?
17    A.  Why would I do it?
18    Q.  Uh-huh.  Did you benefit
19 from shorting accounts?
20    A.  Sometime.
21    Q.  Benefitted financially?
22    A.  Not really.
23    Q.  When you say not really,

Page 157

1 what do you mean?
2     A.   Because the route at that
3 particular time wasn't running enough
4 money to do nothing.  Just did make enough
5 to pay for your gas.
6     Q.   But if you did short
7 someone, that would end up benefitting you
8 to at least some degree financially?
9     A.   Little bit.
10    (Whereupon, Defendant's Exhibit No.
11 13 was marked for identification purposes
12 by Mr. Hista.)
13    Q.   (BY MR. HISTA)
14 Mr. Porterfield, have you had the
15 opportunity to review Defendant's Exhibit
16 13?
17    A.   Yes.
18    Q.   Have you seen this document
19 before?
20    A.   Yes.
21    Q.   Could you tell me what you
22 recall about the circumstances leading to
23 this breach of contract letter?

Page 158

1     A.   I don't remember.
2     Q.   You don't remember anything
3 about it?
4     A.   Not much.  Huh-uh.
5     Q.   Was Gunter Air Force Base
6 one of your accounts?
7     A.   Yes.  Uh-huh.
8     Q.   And do you have any
9 recollection as to why Gunter Air Force
10 Base no longer wanted you to service them?
11    A.   Something about -- I had got
12 a letter about -- talking about products
13 was short in Maxwell Gunter.
14    Q.   Did Gunter Air Force Base
15 believe that they were not properly
16 receiving credit for various products?
17    A.   That's what they stated.
18    Q.   Was it true?
19    A.   I don't know.
20    Q.   Could it have been true?
21    A.   I don't know.
22    Q.   Do you know if an
23 investigation was conducted?

Page 159

1     A.   I know wasn't nothing done
2 about it.
3     Q.   What do you mean nothing was
4 done about it?
5     A.   I never was prosecuted,
6 never was accused, charged or nothing.
7     Q.   What do you understand was
8 the contention that Gunter Air Force Base
9 was making?
10    A.   They was contending that
11 something was going on wrong.  And I
12 disagreed with it.
13    Q.   Okay.  What exactly did they
14 say was going on wrong?
15    A.   Said credit was taken out,
16 what it did or not.
17    Q.   Was the sum and substance of
18 their complaint that you were stealing
19 from them?
20    A.   I don't know.
21    (Whereupon, Defendant's Exhibit No.
22 14 was marked for identification purposes
23 by Mr. Hista.)

Page 160

1     A.   I read this one.  I got it
2 at home.
3     Q.   Okay.  Take a few moments
4 and let's review Defendant's Exhibit No.
5 14, which is a two-page document.
6        Mr. Porterfield, would you
7 agree with me that this account notified
8 you that you would no longer be able to
9 serve them due to an accusation of theft?
10    A.   Yes.
11    Q.   And turning to page two of
12 this document, approximately the middle of
13 the page, there's the word "synopsis."
14 And, thereafter, it states that, you know,
15 an investigation was initiated by DoDIG,
16 Defense Criminal Investigative Service.
17       Do you know anything about
18 that investigation?
19    A.   No.
20    Q.   Have you seen page two of
21 this document before today?
22    A.   Yes.
23    Q.   Do you have any knowledge of

PORTERFIELD v FLOWERS                CondenseIt!™            DEPO:HENRY PORTERFIELD

Page 161

1  interviews being conducted as part of any
2  investigation?
3      A.  One time.
4      Q.  Okay.  Were you interviewed?
5      A.  They asked questions once.
6      Q.  Okay.  Who was present
7  during that interview?
8      A.  I don't remember who he was.
9      Q.  The document goes on to
10  state it was alleged based on interviews
11  conducted that such theft had been going
12  on for the past three years with an
13  estimated loss of thirty thousand dollars.
14         Do you agree or disagree with
15  that statement?
16     A.  I disagree.
17     Q.  And what do you disagree
18  with?
19     A.  The theft went on for three
20  years.  I disagree with the whole -- with
21  the statement.
22     Q.  Did you engage in any
23  accounting transaction with this account

Page 162

1  that could be considered theft?
2      A.  Might have carried some
3  stale out and didn't give them credit for
4  it.  That's it.
5      Q.  Would you agree that's
6  theft?
7      A.  Yes.
8      Q.  The document goes on to
9  state that the investigation ultimately
10  determined that subject, Porterfield, did
11  devise a scheme to convert and steal
12  bakery items from the Commissary by
13  removing items from the Commissary after
14  they had been received into inventory, and
15  then reselling them to cash customers.
16         Do you agree with that?
17     A.  No.
18     Q.  You never did that?
19     A.  I don't -- I don't know.
20     Q.  Could you have done it
21  sometimes?
22     A.  Possible.
23     Q.  The document goes on to

Page 163

1  state that you removed back stocked items
2  from the company warehouse.
3         Did you do that?
4      A.  What company you talking
5  about?
6      Q.  The same account.
7      A.  I don't remember.
8      Q.  Could you have done that,
9  and you just don't remember it here today?
10     A.  I don't remember.
11     Q.  The document goes on to
12  state that you overstated the count of
13  items being delivered.
14         Did you do that?
15     A.  Not that I know of.
16     Q.  Could you have, and you just
17  don't remember it today?
18     A.  Don't remember.
19     Q.  You were -- you were kicked
20  out of that account, correct?
21     A.  Yes, I was.
22     Q.  Was that one of your larger
23  accounts at the time?

Page 164

1      A.  Yes, it was.
2      Q.  Was it your largest account?
3      A.  Yes, it was.
4         (Whereupon, Defendant's Exhibit No.
5  15 was marked for identification purposes
6  by Mr. Hista.)
7      A.  Yeah.
8      Q.  Mr. Porterfield, do you
9  recognize Defendant's Exhibit 15?
10     A.  Yes.
11     Q.  Tell me what it is, please.
12     A.  It's where I sold --
13  transferred the -- let me check it out.
14  Steve Head, I was -- the Commissary.
15  Signed it back to the company.
16     Q.  And you did this because you
17  were no longer allowed to service that
18  account, correct?
19     A.  Yes.  I sold it back to
20  Flowers.  I didn't really sell it because
21  it was a bid stop.  Then they sold it
22  after I sold it back -- after I signed
23  back off, Flowers sold it.

Page 165

1    Q.  Okay.  And, you know, after
2  you sold the rights back to Flowers, did
3  you ever receive any financial proceeds
4  from that account again?
5    A.  No.
6    (Whereupon, Defendant's Exhibit No.
7  16 was marked for identification purposes
8  by Mr. Hista.)
9    A.  I remember this.
10    Q.  Okay.  For the Record,
11  Mr. Porterfield, have you had the
12  opportunity to review Defendant's Exhibit
13  No. 16?
14    A.  Uh-huh.
15    Q.  All right.  Tell me what it
16  is.
17    A.  It's stating that -- a
18  checkup on a Friday.  I didn't send
19  seventy-three dollars and seventy-seven
20  cents to the company.  And they received
21  it the following week.
22    Q.  Okay.  Were you late with
23  the payment?

Page 166

1    A.  Yes.
2    Q.  Would you agree that you
3  were in breach of the agreement for being
4  late with the payment?
5    A.  I --
6    Q.  Yes?
7    A.  No.
8    Q.  Why not?
9    A.  Because all of them did it.
10  Because it was --
11    Q.  My question was:  Did you
12  make proper weekly settlement the week
13  that's noted in this document?
14    A.  On that particular week?
15    Q.  Yes.
16    A.  No, I didn't.
17    Q.  So you were late?
18    A.  Yes.
19    Q.  And being late is in
20  violation of the distributor agreement,
21  correct?
22    A.  That's what it says.  Yes.
23    Q.  Any reason -- yes?

Page 167

1    A.  Yes.
2    Q.  So you were in breach of the
3  distributor agreement?
4    A.  Yes.
5    Q.  And you were issued this
6  breach of contract letter?
7    A.  Yes, sir, I was.
8    MR. TALIAFERRO:  Object to
9  the form of the characterization of it as
10  such.  But go ahead and answer the
11  question.
12    A.  And I refused to sign it
13  because it was such a small amount.  And I
14  knew the next week it would be
15  straightened.  That's -- I agreed -- I
16  refused to sign it.
17    Q.  Do you know if other
18  distributors received letters regarding
19  late payments?
20    A.  Yes.
21    Q.  Do you recall a Chris Baker
22  with Krystal?
23    A.  Yes.

Page 168

1    Q.  And who is Chris Baker?
2    A.  District manager.
3    Q.  Did Chris Baker have any
4  concerns or issues with your service of
5  the Krystal account?
6    A.  That's what Flowers said.  I
7  never discussed anything with him.
8    Q.  What -- what do you
9  remember?
10    A.  I don't know.
11    Q.  You don't remember anything
12  about it?
13    A.  No.
14    Q.  After you lost the military
15  account, did you ever purchase additional
16  distribution rights from Flowers under
17  that first contract?  Do you remember?
18    A.  No.  I think it was on the
19  second contract when I --
20    Q.  Let's take a look this.
21    (Whereupon, Defendant's Exhibit No.
22  17 was marked for identification purposes
23  by Mr. Hista.)

PORTERFIELD v FLOWERS                    CondenseIt!™                    DEPO: HENRY PORTERFIELD

Page 169

1    Q.   (BY MR. HISTA)
2    Mr. Porterfield, the court reporter has
3    handed you what has been marked as
4    Defendant's Exhibit No. 17, which is a
5    composite exhibit comprising of six pages.
6         If you could review this
7    document for me, please.
8    A.   (Witness complying.)
9    Q.   Mr. Porterfield, does this
10   document refresh your recollection
11   concerning whether or not you purchased
12   additional distribution rights from
13   Flowers while you held the 1994
14   distributor agreement?
15   A.   Yes.
16   Q.   Tell me what you remember
17   about this transaction.
18   A.   Well, this transaction after
19   I had lost the Commissary, I had ran the
20   route several years.  Wasn't making an
21   income sufficient.
22        And I made a call to Opelika
23   and talked to the personnel manager at the

Page 170

1    time.  I done forgot who she was.  It was
2    a young black lady.  And she talked to
3    Bordeaux.  And a week later they added
4    some more territory to the route.
5         And when I ran that route,
6    after I lost the Commissary, Flowers was
7    subsidizing other routes.  And my
8    complaint was, why didn't they subsidize
9    mine?  It wasn't running something like
10   from twenty-five to three thousand dollars
11   a week.  And I got no subsidizing.  That's
12   why they did what they did, adding them to
13   redo it.
14   Q.   Okay.  So turning to --
15   let's talk about page two of this
16   document.  It actually -- turn to page one
17   just for a second to get this in a time
18   line.
19        It appears that -- from the
20   bottom of this page that this transaction
21   was entered into September, 1999.
22        Do you think that's right?
23   A.   Uh-huh.

Page 171

1    Q.   Okay.  Now, turn to page
2    two.  Are these various accounts that you
3    received distribution rights to at that
4    time?
5    A.   Yes.
6    Q.   So you started serving
7    Winn-Dixie and the other accounts that are
8    listed on page two of this document?
9    A.   Yes.
10   Q.   Did you also start serving
11   the three accounts that are listed on page
12   three of this document?
13   A.   Yes.
14   Q.   And then turning to page
15   four of the document, was your territory
16   description changed to reflect that you
17   would begin servicing these accounts?
18   A.   Yes.
19   Q.   Was the name of the
20   individual that you spoke with initially
21   Ann Tolbert?
22   A.   I think so.
23   Q.   Is it your understanding

Page 172

1    that Mr. Bordeaux was responsible for you
2    receiving these additional distribution
3    rights?
4    A.   I don't know.
5    Q.   You testified that Mr. --
6    A.   I talked to her.  And then
7    that's who -- I know it got done
8    afterward.
9    Q.   Do you know if she spoke
10   with Mr. Bordeaux?
11   A.   Yes, she did.
12   Q.   Do you know if she spoke to
13   anybody else?
14   A.   I don't know.
15   Q.   Did you speak with
16   Mr. Bordeaux?
17   A.   Can't remember.
18   Q.   Could you have, and you just
19   don't remember?
20   A.   I don't remember.
21   Q.   Did this help your
22   distributorship financially?
23   A.   Yes, it did.

Page 173

1    Q.   Is it fair to say that you
2  made a complaint, and the company
3  responded to the complaint --
4    A.   Yes, they did.
5    Q.   -- that you made?
6        And Mr. Bordeaux was the
7  president of the company at the time?
8    A.   No, he wasn't.
9    Q.   He was vice president of
10 sales?
11   A.   I believe, yes.  I think so.
12   Q.   And he's -- he was one of
13 the senior people in the company?
14   A.   Yes.
15   (Whereupon, Defendant's Exhibit No.
16 18 was marked for identification purposes
17 by Mr. Hista.)
18   Q.   (BY MR. HISTA)
19 Mr. Porterfield, have you had the
20 opportunity to review Exhibit No. 18,
21 which is a composite exhibit of three
22 documents?
23       Have you had the opportunity

Page 174

1  to review this?
2    A.   Yes.
3    Q.   Do you recognize anything
4  about any of these documents?
5    A.   Repurchasing some more
6  territory.
7    Q.   Okay.  And the first
8  document is entitled repurchase statement,
9  is it not?
10   A.   Yes.
11   Q.   And it's dated June 23,
12 2000?
13   A.   Uh-huh.
14   Q.   And is that your signature
15 on the bottom right-hand side?
16   A.   Yes.
17   Q.   And do you recognize the
18 signature to the left?
19   A.   I believe it's Calvin
20 Rhodes.
21   Q.   And who was Mr. Rhodes?
22   A.   The president.
23   Q.   He was the president at the

Page 175

1  time of this repurchase statement?
2    A.   Yes.
3    Q.   And do you recognize the
4  document on page two of this exhibit?
5    A.   Yes.
6    Q.   Could you tell me what it
7  is?
8    A.   It is the signature and the
9  witness when I purchased the territory.
10   Q.   Is this when you're
11 purchasing the territory?  Or when you're
12 selling it back to the company?
13   A.   Wait a minute.  Now, let
14 me -- sell it back and then repurchase it.
15   Q.   Was there a realignment of
16 the territories going on at this point?
17 Or do you know?
18   A.   I can't remember what
19 happened.  But you had to sell it back to
20 them and then repurchase it to get the
21 other territory.  That's what this was.
22   Q.   Okay.  And then turning to
23 page three of four of the document --

Page 176

1    A.   Yes.
2    Q.   Okay.  And now turning to
3  page four, is that your signature on
4  page --
5    A.   Yes.
6    Q.   -- four?
7    A.   Uh-huh.
8    Q.   And Mr. Rhodes' signature to
9  the right-hand side?
10   A.   And Don Adkins.
11   Q.   And who is Don Adkins?
12   A.   The go between, coordinator,
13 whatever.
14   Q.   Okay.  So it's your
15 understanding that you were selling the
16 distribution rights that you held under
17 the '94 contract back to the company?
18       Is that what you understood
19 was going on?
20   A.   Yes.
21   Q.   And did you understand
22 that -- turning your attention to
23 paragraph two of the last document,

Page 177

1 paragraph two, when you signed this
2 document, did you understand that you were
3 releasing any claims related to the 1994
4 agreement?
5      A.  Yes.
6      (Whereupon, Defendant's Exhibit No.
7 19 was marked for identification purposes
8 by Mr. Hista.)
9      MR. TALIAFERRO:  If you don't
10 mind, I'm sure you got a lot of questions,
11 you think it would be all right to break
12 now and let's just grab a sandwich?
13      MR. HISTA:  I think now is as
14 good a time as any.  Let's just grab
15 something relatively quick.
16      MR. TALIAFERRO:  Yeah.
17      MR. HISTA:  Could we do it
18 maybe in half an hour --
19      MR. TALIAFERRO:  Yeah.
20      MR. HISTA:  -- forty-five
21 minutes?  I really think I can get done by
22 three if we can do that.
23      MR. TALIAFERRO:  Yeah.

Page 178

1 That's why I'm saying I want you to.  As
2 quick as you want.  If you want ten
3 minutes, we'll eat crackers, you know.
4      Thirty minutes is fine.
5      MR. HISTA:  Let's just try
6 and maybe get back here a little bit
7 before 12:30.
8      MR. TALIAFERRO:  Right.
9 Okay.
10      THE VIDEO SPECIALIST:  We're
11 going off the Record.  This is the end of
12 Tape 3.
13      (Lunch break.)
14      THE VIDEO SPECIALIST:  We're
15 back on the Record.  This is the beginning
16 of Tape 4.
17      Q.  (BY MR. HISTA)
18 Mr. Porterfield, we're back on on the
19 Record after lunch.  Are you prepared to
20 continue with your deposition this
21 afternoon?
22      A.  Yes.
23      Q.  Before we turn our attention

Page 179

1 to Exhibit No. 19, Mr. Porterfield, I want
2 to ask you just a couple of follow-up
3 questions on the use of the hand-held
4 computer.
5      Can you tell me what step or
6 steps you would have to go through to
7 change the price of the product when you
8 sold it to any of your accounts?
9      A.  Yeah.  You scroll over to
10 the price and key in the new price and
11 change it.  Yes.
12      Q.  Okay.  How many steps would
13 that entail?
14      A.  One.
15      Q.  Okay.  Tell me exactly what
16 you would do.
17      A.  You would just scroll over
18 to the price and change it.
19      Q.  Well, what -- what key would
20 you hit first?
21      A.  The scroll key.
22      Q.  Okay.  And what would pop up
23 first on the hand-held computer?

Page 180

1      A.  You can go to the account or
2 you go to what item you're going to
3 change.
4      Q.  Would any carry over
5 inventory show up?
6      A.  Carry over show up?
7      Q.  Carry over?  Do you
8 recognize that term?
9      A.  It might.
10      Q.  It might.  Okay.  So then
11 you --
12      A.  You have to enter your carry
13 over.
14      Q.  And then what did you scroll
15 over to?
16      A.  Scroll over to the price if
17 you're going to change the price on the
18 product.
19      Q.  And is that the sequence
20 that you would go through to enter a price
21 allowance?
22      A.  Yes.
23      Q.  Okay.  Turning your

Page 181

1 attention to Exhibit No. 19, if you could
2 take just a few moments and look at this.
3        I'm going to ask you again
4 about certain provisions of this document,
5 but I'd like you to review it generally.
6        And then I'm going to ask you
7 if your signature appears on this
8 document.
9      A.  (Witness complying.)
10     Q.  Without reading this
11 document at this point word for word,
12 Mr. Porterfield --
13     A.  Okay.
14     Q.  -- can you tell me what this
15 document is?
16     A.  It's another outline of the
17 distributor agreement between the
18 distributor and Flowers.
19     Q.  Okay.  And looking on page
20 one of the document under the term
21 distributor's agreement -- are you with
22 me?
23     A.  Yes.

Page 182

1      Q.  -- it states that the
2 agreement is made this 3rd day of July,
3 2000.  Do you see that?
4      A.  Yes.
5      Q.  Is this the agreement that
6 replaced your 1994 contract?
7      A.  No.
8      Q.  It's not.  Is this the
9 second distributor agreement that you
10 entered into with Flowers Baking Company?
11     A.  I -- I don't know.  I think
12 we had another one over here.
13     Q.  All right.  Let's turn your
14 attention back to Exhibit No. 18.
15     A.  Okay.
16     Q.  And turn to the second page
17 of Exhibit No. 18.
18     A.  (Witness complying.)  Okay.
19     Q.  What is the date on the
20 first line of that document?
21     A.  The same date that is on
22 this one.
23     Q.  Okay.

Page 183

1      A.  This is when -- okay.  I got
2 you now.
3      Q.  And that --
4      A.  This is when I sold it back
5 to the company.  And this is when I
6 purchased it back.
7      Q.  Is Exhibit No. 19 the new
8 distributor agreement?
9      A.  Distributor agreement.
10     Q.  Which is signed the same day
11 as you signed the other documents?
12     A.  Yes.
13     Q.  And turning to -- if you
14 look on the bottom right again, what's
15 referred to as a Bates number, FBO and
16 then 000414 --
17     A.  414?
18     Q.  Uh-huh.
19     A.  Okay.
20     Q.  Is that your signature
21 beneath the word "distributor"?
22     A.  Yes.
23     Q.  And do you recognize the

Page 184

1 signature immediately below yours?
2      A.  Calvin Rhodes.
3      Q.  And do you recognize any of
4 the other signatures on this document?
5      A.  Steve Bordeaux and Don
6 Adkins.
7      Q.  Okay.  Turn to the next
8 page, which is Exhibit A.
9      A.  (Witness complying.)
10     Q.  Was that your new territory?
11     A.  Yes.
12     Q.  How much did your territory
13 change from the 1994 agreement?
14     A.  Really after losing the
15 Commissary and all that, it wasn't too
16 much changes.  It was almost a lateral
17 change.
18     Q.  Okay.  Did you -- did you
19 read the distributor's agreement that
20 we're looking at before you signed it?
21     A.  Yes.
22     Q.  Did you understand that it
23 was basically the same business

Page 185

1 relationship as under the 1994 contract?
2    A.   Yes.
3    Q.   And turning your attention
4 to 2.5 of this agreement --
5    A.   2.5?
6    Q.   Correct.
7    A.   What page that is?
8    Q.   Page two. I'm sorry.
9    A.   Back.
10   Q.   Back.
11   A.   Okay.
12   A.   Oh, back. I understand.
13 2.5, good industry practice. I see.
14   Q.   Would you agree that what is
15 set forth in 2.5 is good industry
16 practice?
17   A.   Yes.
18   Q.   And that you were obligated
19 under this agreement to comply with good
20 industry practice?
21   A.   Yes.
22   Q.   Turning your attention to
23 the next page -- and turn your attention

Page 186

1 to 5.1, obligations of, and it's whited
2 out, but I believe it's distributor, would
3 you agree with me that under Section 5.1
4 you agreed to and were obligated to use
5 your best efforts to develop and maximize
6 the sale of company products?
7    A.   Yes.
8    Q.   And would you agree that you
9 were to cooperate with the company with
10 any company marketing programs?
11   A.   Yes.
12   Q.   Now, turning your attention
13 to Article 16 of the contract, which is
14 close to the end, turn your attention to
15 16.3.
16   A.   I read it before. Is this
17 the same?
18   Q.   Is it your understanding
19 that Section 16.3 of this agreement is the
20 same as the 1994 agreement?
21   A.   Yes.
22   Q.   And then look at Section
23 19.4.

Page 187

1    A.   (Witness complying.)
2    Q.   Would you agree with me that
3 Section 19.4 states that the agreement and
4 the accompanying exhibits are the entire
5 agreement between you and Flowers?
6    A.   Yes.
7    Q.   And would you agree that
8 under Section 19.4 unless it is set forth
9 in this agreement that neither you nor
10 Flowers should be liable for any
11 representation made to each other?
12       MR. TALIAFERRO: Object to
13 the form. It calls for a legal
14 conclusion. If you can answer it, go
15 ahead.
16   A.   I didn't understand it that
17 way.
18   Q.   Okay. How did you
19 understand that? Why don't you read the
20 second to the last sentence of Section
21 19.4? Just read it for the Record.
22   A.   Set forth agreement no party
23 should be disabled -- table? This word is

Page 188

1 kind of cut off.
2    Q.   Okay. Let me ask you this
3 then. When you signed this agreement, was
4 there any specific discussion that you
5 recall about why you were entering into
6 this new agreement?
7    A.   No.
8    Q.   Okay. You don't -- it was
9 basically you were selling back the old
10 contract?
11   A.   Yes. I wasn't aware of some
12 of this stuff in here.
13   Q.   But, I mean, nothing was
14 changing as far as you were --
15   A.   At first, we was informed
16 nothing was changing.
17   Q.   Okay. So to the extent that
18 anything was said --
19   A.   I don't know.
20   Q.   -- you understood it to be
21 the same deal?
22   A.   Understood it to be the same
23 deal.

Page 189

1    (Whereupon, Defendant's Exhibit No.
2  20 was marked for identification purposes
3  by Mr. Hista.)
4      A.   This is basically the same
5  as we went over earlier.
6      Q.   Okay.  Could you tell me
7  what it is, please?  And we're referring
8  to Defendant's Exhibit 20.
9      A.   Six months and one day that
10 you can sell your distributorship back to
11 the company.
12     Q.   So is that the same deal as
13 with the first contract?
14     A.   It seems like the same deal
15 with the first one.
16     Q.   So you understood that
17 within that six-month period if you wanted
18 to get out you could?
19     A.   Yes.  Uh-huh.
20     Q.   Okay.  During that first
21 six-month period of time under the new
22 contract, was, you know, all going well
23 with you and Flowers?

Page 190

1      I mean, were there any issues
2  at that point?
3      A.   No.
4      Q.   Did you feel like Flowers
5  was breaching the 2000 agreement during
6  that first six months in any way?
7      A.   No.
8      Q.   When the 1994 agreement was
9  in place, which was sometime in '94 up
10 until July of 2000, would you agree with
11 that?
12     A.   Yes.
13     Q.   Okay.  During that period of
14 time, was there any issue concerning
15 product that was being delivered from any
16 freezer or freezers?
17     A.   Yes.
18     Q.   There was?
19     A.   Yes.
20     Q.   During that period of time?
21     A.   You said from '94 to --
22     Q.   2000.
23     A.   From 2000?

Page 191

1      Q.   From 1994 up until 2000.
2      A.   I -- I don't know exactly
3  when the freezer came.  I don't know
4  exactly when they got it there.
5      Q.   I mean, could it have been
6  after 2000?  Do you have any specific --
7      A.   I know it was during 2000,
8  but I don't know what year it got there.
9      Q.   Okay.  Well, you just told
10 me that for the first six months of the
11 2000 contract that you didn't feel like
12 Flowers was breaching the contract in any
13 way?
14     A.   For the first six months, I
15 probably used nothing out of that freezer.
16 And I didn't use the freezer as much as
17 some of them no way.  So I wasn't really
18 concerned about it at the time.
19     Q.   So at least at that time it
20 wasn't an issue?
21     A.   At that time, it wasn't an
22 issue.
23     Q.   Okay.  When you -- back then

Page 192

1  when product came out of the freezer, what
2  was the -- what was the procedure?  How
3  would you take -- how would you get it?
4      A.   The majority of the time
5  when product came out of that freezer and
6  was delivered, it was delivered by a
7  company person.  Stop called in the
8  evening time, if somebody delivered, one
9  of Flowers folks delivered the bread out
10 of the freezer.
11     And sometime out of the
12 freezer you can order footlong, chili
13 pups, or something on your route that you
14 ordered fresh, they would replace it out
15 of the freezer for your fresh product.
16 And you had no other choice but to haul
17 out of the freezer.
18     Q.   Let me --
19     A.   Because the company failed
20 to send you with your order.
21     Q.   Okay.  You just told me that
22 up until around 2000 this wasn't an issue
23 with you, correct?

Page 193

1    A.  I said it.
2    Q.  Okay.  So at that point
3  in --
4    A.  You said 2000 -- you -- it's
5  my recollection you was talking about
6  later did I have any problem out of the
7  freezer.
8    Q.  All right.  Let's go over it
9  again.
10    A.  Okay.
11    Q.  I asked you during the first
12  six months of the 2000 contract was
13  Flowers breaching the contract in any way,
14  and you told me no.
15    A.  I didn't have no problem
16  with the freezer.
17    Q.  Okay.  So you had no problem
18  with the freezer --
19    A.  No.
20    Q.  -- up until that point in
21  time?
22    A.  No.  No.
23    Q.  When did you first start

Page 194

1  having an issue with the freezer?
2    A.  I wouldn't know the year.
3    Q.  Okay.  Just tell me when --
4  when do you --
5    A.  I'd --
6    Q.  I mean, what in your mind --
7    A.  Back --
8    Q.  -- triggered you having an
9  issue?
10    A.  About 2003 and 2004.  Around
11  in that time.  In 2001.
12    Q.  All right.  Well, what
13  changed?
14    A.  The company had started --
15  you didn't get your products like you
16  should.  And you had to use the freezer.
17    Q.  Okay.  Again, when product
18  came out of the freezer, how did it come
19  out?  Did you ask for it?
20    A.  I told them I needed product
21  on my route, and they said we had it in
22  the freezer.  I didn't ask for it.
23    Q.  What time -- what time of

Page 195

1  the day would that typically be at?
2    A.  Sometime you get there in
3  the morning time.  And --
4    Q.  How often did that occur?
5    A.  With Flowers?
6    Q.  Uh-huh.
7    A.  Sometime it could happen
8  two, three -- three times a month.
9    Q.  Okay.
10    A.  Or it could go, sometimes
11  happen two times a week.
12    Q.  Okay.  Tell me exactly what
13  type of product you used that came out of
14  the freezer.
15    A.  Sometime footlongs.
16    Q.  And which account did the
17  footlongs go in?
18    A.  Sonic's.
19    Q.  Okay.
20    A.  Chili pups.
21    Q.  And what --
22    A.  Krystal.
23    Q.  What accounts did the chili

Page 196

1  pups go in?
2    A.  Krystal.
3    Q.  All right.  What other
4  product?
5    A.  Bulk buns.  Burger King.
6    Q.  Okay.
7    A.  Sonic's.
8    Q.  Okay.  What type of product
9  for Sonic?
10    A.  Bulk buns, hot dogs, chili
11  pups, Texas toast.
12    Q.  Anything else for Sonic?
13    A.  I think that's all Sonic
14  used.
15    Q.  Any other --
16    A.  And --
17    Q.  -- accounts that you served
18  product that came out of the freezer?
19    A.  Krystal.
20    Q.  We've talked about Krystal.
21    A.  Burger King, Sonic
22  Chick-Fil-A.
23    Q.  What type of product came

Page 197

1  out of the freezer for Chick-Fil-A?
2      A.  Hamburger buns.  And I just
3  right off can't think of everything that
4  they used at the time.  It's been a while.
5      Q.  Okay.  How often did you
6  deliver product from the freezer to
7  Chick-Fil-A?
8      A.  They had some specialty buns
9  that they used.  And when they didn't send
10 those specialty buns, in the morning time
11 when you get to work, all you had was
12 something to come out of the freezer to
13 supply them.
14         Then you sure enough had to
15 hide it in Chick-Fil-A because Chick-Fil-A
16 was strict about their codes and dates.
17     Q.  Was specialty buns something
18 that you delivered to Chick-Fil-A every
19 day?
20     A.  Yes.
21     Q.  Yes?  And were you
22 responsible for ordering --
23     A.  Right.

Page 198

1      Q.  Were you responsible for
2  ordering the proper amount of specialty
3  buns --
4      A.  I ordered the proper amount
5  of specialty buns.
6      Q.  -- for Chick-Fil-A?
7      A.  Flowers refused to send it.
8  Had a cut on it.
9      Q.  Okay.  Well, tell me when
10 you contend that Flowers refused to send
11 you specialty buns for Chick-Fil-A.
12     A.  If you tell -- there's
13 nothing to do about it.  Because you had
14 to wait until the next shipment come.  It
15 was just like rolling water off the
16 shoulder.
17     Q.  Do you have any records to
18 support what you've just told me?
19     A.  I don't have records.  But I
20 can guarantee you can get talk from
21 anybody at the warehouse to tell you the
22 same thing.
23     Q.  I'm just asking you.

Page 199

1      A.  I have no records.
2      Q.  You don't have any records?
3      A.  No.
4      Q.  Okay.  Do you believe
5  that -- do you have any reason to believe
6  that there is anything wrong with product
7  that came out of the freezer?
8      A.  Yes.
9      Q.  Okay.  Tell me why you
10 believe --
11     A.  Sometime after one day it
12 crumbles up.  I done noticed that to
13 happen before.
14     Q.  Okay.  How often did you
15 notice that?
16     A.  On a couple of occasions.
17     Q.  Okay.  A couple occasions.
18 Any other reason to believe that product
19 is not good?
20     A.  Because it's not dated
21 right.  When you're taking the date off a
22 product, you're cheating the customer
23 then.

Page 200

1      Q.  I'm asking you the product
2  itself.  Is there anything to -- any
3  reason for you to believe that that
4  product is not edible?
5      A.  I just know it's not fresh.
6      Q.  Is there any reason to
7  believe that that product is not edible?
8      A.  Yes, it can be edible.
9      Q.  Okay.  Is there any reason
10 to believe that that product is unsafe in
11 any way?
12     A.  Couldn't answer it.
13     Q.  Do you have any reason to
14 believe that?
15     A.  No.
16     Q.  Have you ever -- ever frozen
17 bread at home?
18     A.  No.
19     Q.  Never have?
20     A.  Not that I know of.  We
21 don't freeze bread.
22     Q.  When you delivered bread to
23 your Chick-Fil-A account, did you tell the

Page 201

1 Chick-Fil-A manager that this product has
2 been in the freezer?
3     A.  I had to go by Flowers'
4 rules, no.
5     Q.  When -- when you went to
6 your Krystal account, did you tell the
7 Krystal manager or managers this product
8 has come out of the freezer?
9     A.  Same answer.  Had to go by
10 Flowers' rule, no.
11     Q.  Okay.  But you didn't?
12     A.  No.
13     Q.  You kept your mouth shut?
14     A.  Had to.
15     Q.  Okay.  Why did you have to?
16     A.  If you did, you got in
17 trouble.
18     Q.  Okay.
19     A.  Flowers specifically told us
20 not to tell them their bread was frozen.
21 And they --
22     Q.  Okay.  Who told you --
23     A.  Supervisors.

Page 202

1     Q.  Who told you that?
2     A.  Steve Stephens for one.
3 Grady for two.
4     Q.  When did Mr. Stephens tell
5 you that?
6     A.  On numerous occasions.  We
7 knew that was the rule before we carried
8 it out of the freezer to them.  They
9 discussed it with us.
10     Q.  I'd like to know what
11 specific conversation you had with Steve
12 Stephens about frozen product.
13     A.  Okay.  Anytime -- one of the
14 supervisors had to get the bread out of
15 the freezer for you.
16         They normally would take the
17 dates off theirself.  And when they take
18 the dates off to make sure that you didn't
19 take it to the stop with the date on it.
20 Sometimes you might have took it off
21 yourself.
22     Q.  Did you do that?
23     A.  Yes, I have did it.

Page 203

1     Q.  Okay.  And you delivered it
2 to your account without saying anything?
3     A.  Yes, I have.
4     Q.  Okay.  Did you tell any of
5 the Outback managers that you were
6 delivering product that had been in the
7 freezer?
8     A.  Outback?
9     Q.  Did you have an Outback
10 Steakhouse?
11     A.  No.
12     Q.  You had a Krystal, Burger
13 King, Sonic?
14     A.  Yes.
15     Q.  What was the other account
16 that you mentioned?  Chick-Fil-A?
17     A.  Chick-Fil-A.
18     Q.  Those are all restaurant
19 accounts, correct?
20     A.  Yes.  And Montgomery
21 Biscuits.
22     Q.  What's Montgomery Biscuits?
23     A.  Baseball stadium.

Page 204

1     Q.  Okay.  What product did you
2 deliver to them?
3     A.  Bulk buns, hot dog buns,
4 footlongs and white bread.
5     Q.  Okay.  And is it your
6 contention that some of that product came
7 out of the freezer?
8     A.  A lot of it.
9     Q.  Okay.  And how often did you
10 order for that particular account?  Did
11 you order every day?
12     A.  No.
13     Q.  Why not?
14     A.  Because they didn't have
15 baseball games every day.
16     Q.  Okay.  So how did you know
17 that they needed product?
18     A.  They would let you know.
19 They would call.
20     Q.  And then did you attempt to
21 get product from other distributors to
22 fill that account?
23     A.  Sometime.

Page 205

1    Q.   Okay.  And would that be
2  product that had not been in the freezer?
3    A.   Yes.
4    Q.   On the times that you
5  delivered product from the freezer, did
6  you exhaust efforts to get product from
7  other sources?
8    A.   That's what you did first
9  anyway is try to get products, yes.
10    Q.   Did you do that every time?
11    A.   Yes.  Most of the time.
12    Q.   Most of the time?
13    A.   Most of the time.
14    Q.   You didn't do it all the
15  time?
16    A.   Sometime they be gone.
17  That's -- the last resort you had was the
18  freezer.
19    Q.   When you delivered product
20  that had been in the freezer to these
21  accounts, did you receive full credit for
22  that transaction?
23    A.   Yes.

Page 206

1    Q.   So when you delivered
2  product to those accounts, you never lost
3  any money in any way?
4    A.   No.
5    Q.   Did you ever lose any
6  customers?
7    A.   Let's back up.
8    Q.   I said:  Did you ever lose
9  any customers?
10    A.   Let's back up to the last
11  one.
12    Q.   Yes.
13    A.   Some cases you did.  Because
14  you take it out of the freezer, and it
15  wouldn't go full dates.
16          If you had -- if you needed a
17  full order on Tuesday for your Burger
18  King -- all right.  Not Burger King.
19  Let's just use footlong for example.
20          You fill up your Tuesday
21  order with footlongs.  They will not last
22  till Friday or Saturday.  You had to pull
23  them out Thursday.  So you lose money

Page 207

1  there.
2    Q.   You got full credit for any
3  stale or --
4    A.   Yes.  But I you still lost
5  commission.
6    Q.   But the product that came
7  out of the freezer generally was used
8  quickly, was it not?
9    A.   That's what I'm talking
10  about.  It was used quickly.  But you had
11  to fill your order.  So you had to go and
12  adjust your order back to make up for your
13  losses.
14    Q.   How often did you take any
15  product that had been in the freezer out
16  of an account?
17    A.   I wouldn't have a number
18  count.
19    Q.   You wouldn't have any proof
20  that that would have been product that was
21  frozen or product that was fresh, would
22  you?
23    A.   You could tell the

Page 208

1  difference.
2    Q.   I mean, do you have any
3  records to prove that?
4    A.   I don't think nobody have
5  records to prove that.
6    Q.   Then your answer is no, you
7  don't have any records?
8    A.   No.
9    Q.   Ever lose any customers due
10  to the delivery of product that had been
11  in the freezer?
12    A.   Not that I know of.
13    Q.   Is your answer no?
14    A.   No.
15    Q.   Did you ever advise
16  management that you considered the
17  delivery of product that was in -- that
18  had been in the freezer, that it was --
19    A.   I --
20    Q.   -- a breach of the contract?
21    A.   I complained to Grady and
22  Steve Stephens about it before.
23    Q.   Okay.  When did you first

Page 209

1 complain about it?
2    A.   I don't remember when.
3    Q.   Okay.  Was it within the
4 last year of your distributorship?
5    A.   It was -- maybe.
6    Q.   So it could have been?
7    A.   Uh-huh.
8    Q.   Would that have been the
9 first time?
10    A.   No.  It could have been -- I
11 have no recollection of when.
12    Q.   How often did you complain?
13    A.   Several.
14    Q.   Several meaning two?  Three?
15    A.   About three, four.
16 Something like that.
17    Q.   Okay.  And what did you tell
18 Mr. Messer and Mr. Stephens?
19    A.   I just mentioned that
20 eventually they were going to catch up
21 with us putting bread in out of the
22 freezer.
23         And when it go in there

Page 210

1 frozen, we have to hide it from the
2 customers.
3    Q.   And what was their response?
4    A.   Mr. Messer's response was we
5 just had to do the best we can.
6    Q.   Mr. Messer said that we're
7 doing the best you could?
8    A.   Mr. Messer would respond --
9 I don't know exactly what he said.  It was
10 something pertaining to that.  He kind of
11 like brushed it off the shoulder.  That's
12 what we had to do to supply the customer.
13    Q.   But, again, just so the
14 Record is straight, when you put that
15 product into the account and the product
16 being product that had been in the
17 freezer, you received full credit for that
18 product?
19    A.   Yes, I did.
20    Q.   Other than the accounts that
21 we have mentioned, did you deliver product
22 that had been in the freezer to any other
23 account?

Page 211

1    A.   Anything but a grocery
2 store.  So it could have been some of the
3 other accounts that used product.
4    Q.   Do you remember any
5 specifics?
6    A.   It -- that's about it.
7    Q.   Okay.  And except for the
8 baseball stadium, are all of the accounts
9 that we have discussed restaurant
10 accounts?
11    A.   Restaurant accounts.
12    Q.   And is it fair to say that
13 you never delivered any product to any
14 grocery store that had been in the
15 freezer?
16    A.   No.
17    Q.   You never did that?
18    A.   Not that I know of.
19    Q.   Okay.  And the grocery
20 stores, that's where all the branded or
21 name brand products went?
22    A.   Yes.
23    Q.   Were any of those -- none of

Page 212

1 these products had been in the freezer?
2    A.   Not -- huh-uh.
3    Q.   Okay.  Are you aware of any
4 Flowers consumer advertising regarding
5 products that go into restaurant accounts?
6    A.   No.
7    Q.   Are you aware of any
8 discussions that Flowers officials may
9 have had with the restaurant accounts that
10 you have mentioned to me regarding product
11 that had been in the freezer?
12    A.   No.
13    Q.   Let's go back to -- let's go
14 back to -- let's just wait for a minute
15 and let's go through and mark a few
16 others.
17         When you go into a restaurant
18 and order product that has a bun or other
19 bread product, would you know if that
20 product has been frozen or not?
21    A.   No.
22    Q.   Are you aware of restaurants
23 other than what you've described as far as

Page 213

1 product coming from Flowers' freezer using
2 products that have been frozen of any
3 sort?
4    A.  No.
5    Q.  You're not aware of that at
6 all?
7    A.  Huh-uh.
8    Q.  You're not aware of, you
9 know, for instance, any product that, you
10 know, Chick-Fil-A might --
11    A.  I don't know their rules.
12    Q.  -- possibly --
13    A.  I don't know nothing about
14 it.
15    Q.  Okay.  Did you have anything
16 to do with any program that Burger King
17 had in the 1990s regarding frozen buns?
18    A.  Know nothing about it.
19    Q.  Did you ever advise Flowers'
20 management in writing that you considered
21 product coming out of the freezer a breach
22 of contract?
23    A.  No.

Page 214

1    Q.  Did you ever refuse product
2 that had been in the freezer?
3    A.  Yes.
4    Q.  You did?
5    A.  Yes.
6    Q.  And what happened?
7    A.  It wasn't quality.
8    Q.  Okay.  Did you ever receive
9 a breach of contract letter under those
10 circumstances?
11    A.  No.
12    Q.  Did you have the right to
13 refuse such product?
14    A.  I did.
15    (Whereupon, Defendant's Exhibit No.
16 21 was marked for identification purposes
17 by Mr. Hista.)
18    Q.  (BY MR. HISTA)
19 Mr. Porterfield, do you recognize what has
20 been marked as Defendant's Exhibit 21?
21    A.  Uh-huh.
22    Q.  Could you tell me what it
23 is, please?

Page 215

1    A.  Where Henry Porterfield
2 staled out twenty trays of Burger King
3 four-inch buns; twent count; ten trays of
4 five-inch, twenty counts under the Davis
5 Cafe.
6    Q.  Was Davis Cafe one of your
7 accounts?
8    A.  Yes.
9    Q.  And what product did Davis
10 Cafe typically order?·
11    A.  Bread and rolls.
12    Q.  How did Burger King product
13 end up in Davis Cafe?
14    A.  That was staled out Davis
15 Cafe.  It wasn't sold to Davis Cafe.
16    Q.  Okay.  How did it get in
17 there?  Do you have any idea?
18    A.  If you had bread left on
19 your truck, you could stale it through a
20 cash account.  Because you couldn't stale
21 it through an authorized account.  That's
22 why.
23    Q.  When you say you staled this

Page 216

1 account with Davis Cafe --
2    A.  Bread -- bread that was left
3 in inventory, to clear out your inventory,
4 you can stale it out in a cash account to
5 clear your inventory, zero inventory out.
6 That's what happened there.
7    Q.  Even though it has the
8 Burger King logo on it?
9    A.  I didn't -- I didn't care
10 what it had on it.
11    Q.  That didn't matter to you?
12    A.  Huh-uh.
13    Q.  So you actually sold --
14    A.  It didn't have Burger King
15 on it.  It was just under the Burger King
16 code.
17    Q.  So you don't believe there
18 was anything wrong with that?
19    A.  I didn't think anything was
20 wrong with it.
21    Q.  And -- but that account --
22 that product was sold --
23    A.  It wasn't sold.

Page 217

1    Q.  -- to -- okay.  Tell me.
2    A.  It was sold to me.
3    Q.  Uh-huh.  And what did you do
4 with it then?
5    A.  I carried it to the Thrift
6 Store and got credit for it.  That's the
7 only way you can get credit for it.  You
8 had to stale it out and carry it to the
9 Thrift Store.
10   Q.  Well, what does Davis Cafe
11 have to do with staling Burger King buns
12 and the Thrift Store?
13   A.  It wasn't nothing wrong with
14 doing it under that account.
15   Q.  Why would you do it under
16 that account?
17   A.  Because I could have did it
18 under miscellaneous.  I could have did it
19 under -- it could have been under any cash
20 account, and it would have been the same
21 thing.  It would have been no different.
22   Q.  Why wouldn't you -- what
23 would be the normal procedure for staling

Page 218

1 product from a Burger King?
2    A.  I would have went to my
3 miscellaneous account and did it.
4    Q.  So that was your normal
5 procedure to --
6    A.  Yes.
7    Q.  -- do it under miscellaneous
8 account?
9    A.  Miscellaneous.
10   Q.  Was that how you typically
11 would stale product from any of your
12 restaurant accounts was miscellaneous?
13   A.  No.
14   Q.  Okay.  Just Burger King?
15   A.  No.
16   Q.  Just --
17   A.  That was -- that was -- that
18 wasn't from Burger King.  That was on the
19 truck and hadn't been sold.  Because
20 evidently it was heavy and had too much.
21        So rather than -- the simple
22 way to do it was just to stale it and put
23 it in the Thrift Store.  So just used that

Page 219

1 account just to be doing it.
2    Q.  They were Burger King buns,
3 correct?
4    A.  I know what kind of buns
5 they were.
6    Q.  I'm just trying to make sure
7 I understand it for the Record.  Are we
8 talking about Burger King buns?
9    A.  I'm talking about Flowers
10 product.
11   Q.  Does this --
12   A.  It was Flowers product.
13   Q.  Was it -- was the product
14 that is outlined in this letter product
15 for Burger King?
16   A.  It was product for -- for --
17 it was product for Sonic's.  More than
18 Burger King used that product.
19   Q.  Why does this letter refer
20 to Burger King buns?
21   A.  Because it was in the Burger
22 King code.
23   Q.  Is it fair to say those buns

Page 220

1 were produced for Burger King units?
2    A.  Those buns were produced
3 for -- Henry Porterfield owned those buns
4 at the time.  He got rid of them any kind
5 of way he wanted to.
6        When I buy it from Flowers,
7 it's mine.  It wasn't Burger King's.  It
8 was on my truck and belongs to me.  And
9 that's what I did.
10   Q.  Okay.  The product did not
11 sell, correct?
12   A.  Product did not sell.
13   Q.  And if product did not sell,
14 you took it back to the Thrift Store,
15 correct?
16   A.  Sold it back to Flowers.
17   Q.  And then Flowers would give
18 you credit for that product?
19   A.  Yes.
20   Q.  And my question is:  Why
21 associate Davis Cafe with that
22 transaction?
23   A.  My answer is it didn't make

Page 221

1 any difference.
2    Q.  Did you use Davis Cafe to
3 stale other product?
4    A.  Sometime.
5    Q.  Okay.  And why would you do
6 that?
7    A.  Because I can use any -- you
8 say I was an independent distributor.  I
9 can use any account I felt like on my
10 route to stale out something.
11    Q.  Well, I just -- all I'm
12 trying to do is understand why would you
13 use Davis Cafe.
14    A.  Because it was my bread and
15 my -- and I was using the hand-held and my
16 route.  So I staled it out like I wanted
17 to.
18    Q.  Regardless of whether it had
19 been --
20    A.  Regardless of who went on
21 it.
22    Q.  Do you recall how you ended
23 up with these particular Burger King buns?

Page 222

1    A.  I answered you two or three
2 times.
3    Q.  If you could tell me once
4 more.
5    A.  I ordered those Burger King
6 buns, and they didn't sell.  And I had too
7 many.  And I had to get rid of them out of
8 my inventory.  So that was my means of
9 getting out of the inventory.
10    Q.  Why did Flowers issue this
11 breach of contract letter to you?
12    A.  Because Flowers vindiction
13 (sic.) was -- I don't care what happened
14 it wasn't pertaining to anything -- did
15 they see -- ask Flowers.
16    Q.  Did they explain to you why
17 they believed this was an improper
18 transaction?
19    A.  No.
20    Q.  Not at all?
21    A.  No.  Just give me the
22 letter.
23    Q.  So you don't believe this

Page 223

1 was an improper transaction?
2    A.  I don't agree with it.  And
3 I didn't sign it.
4    Q.  Okay.
5    (Whereupon, Defendant's Exhibit No.
6 22 was marked for identification purposes
7 by Mr. Hista.)
8    Q.  (BY MR. HISTA)
9 Mr. Porterfield, have you had the
10 opportunity to review Defendant's Exhibit
11 No. 22?
12    A.  Yes.  But I just don't
13 remember this.
14    Q.  Do you have any recollection
15 of what is described in this document?
16    A.  Tom Lunsford knew about it.
17    Q.  Sir?
18    A.  Lunsford knew about it.
19    Q.  Do you remember anything
20 about this?
21    A.  No, I don't.
22    (Whereupon, Defendant's Exhibit No.
23 23 was marked for identification purposes

Page 224

1 by Mr. Hista.)
2    Q.  (BY MR. HISTA)  Do you
3 recall a situation of three cases of snack
4 Sno-Balls being missing from the
5 Montgomery warehouse?
6    A.  Yes.
7    Q.  What do you recall about
8 that?
9    A.  I got them.
10    Q.  How did you come into the
11 possession of them?
12    A.  I got them out of the
13 warehouse.
14    Q.  And where in the warehouse
15 were they?
16    A.  Down -- I don't know.
17    Q.  Were they warehouse stock?
18    A.  I think they were in the
19 other stock.
20    Q.  Pardon me?
21    A.  Another one of the salesman
22 said he didn't want them.  It was their
23 stock.

Page 225

1    Q.  Who was that?
2    A.  I don't know which one it
3 was.  And I told him I would take them.  I
4 remember.
5    Q.  Did you have that discussion
6 with the distributor before you took the
7 product?
8    A.  Yes.
9    Q.  You're positive of that?
10   A.  I don't know which one it
11 was.
12   Q.  Do you recall any discussion
13 with Steve Stephens about that?
14   A.  Yes.
15   Q.  Okay.  What do you recall
16 about that?
17   A.  He questioned me about it.
18 And I gave them back to him and told him I
19 didn't want them.
20   Q.  Why would you give it back
21 to him if you already had permission to
22 take them?
23   A.  Because of the way he came

Page 226

1 at me.
2    Q.  Pardon me?
3    A.  Because of the conversation
4 he gave.  So I told him I didn't want them
5 then.  I gave them back to them.  I
6 remember.
7         I don't know why Steve wrote
8 this like this.  I don't remember this.
9    Q.  You don't remember this?
10   A.  I don't remember them
11 telling me I had two.  I told him it was
12 three.
13   Q.  Okay.  If this document
14 approximately quarter of the way down
15 states Henry at this point confessed that
16 he had two shippers on his bread truck.
17         I asked Henry what he was
18 doing with the shippers.  Henry said that
19 he had no comment but that he would give
20 them back to me if I wanted them.
21         Is that what you told Steve
22 Stephens?
23   A.  That's what I just told you.

Page 227

1 That I gave them back.
2    Q.  The document goes on to say:
3 I also told Henry I wanted the shipper
4 that was in the car's back seat.  And
5 Henry told me that he didn't know what I
6 was talking about.
7         I told Henry I could see what
8 appeared to be a shipper on the back seat
9 of his car covered with a sheet.  Henry
10 held to his claim that he did not know
11 what I was talking about.
12         But later that day I was
13 reviewing security tapes and noticed Henry
14 pushing a shipment of the Sno-Balls across
15 the warehouse floor with his foot.
16         Do you know --
17   A.  Pushing a shipper across?
18   Q.  Yes.  Do you know anything
19 about that?
20   A.  Huh-uh.
21   Q.  Did Mr. Stephens ever
22 discuss that with you?
23   A.  Yes.  I gave the shippers

Page 228

1 back to Mr. Steve Stephens because I had
2 told him that I had got them off, I
3 believe it was Pat -- one of the routes on
4 the other side.
5    Q.  Did you have permission to
6 get the product from that other route?
7    A.  I think I did.
8    Q.  Okay.  Who did you get
9 permission from?
10   A.  Whoever's route that was
11 over there.  Whoever is on that end over
12 there.
13   Q.  But you don't remember that
14 person's name?
15   A.  No.  That was 2001.  No.
16   Q.  Okay.  How would you give
17 that distributor credit for the product
18 that you had taken?
19   A.  We'd run a transfer before
20 the day over.
21   Q.  Did you do that?
22   A.  I didn't need to.  I gave it
23 back to him.

Page 229

1      (Whereupon, Defendant's Exhibit No.
2  24 was marked for identification purposes
3  by Mr. Hista.)
4      A.  I don't know nothing about
5  this.
6      Q.  Okay.  You don't remember
7  anything about this?
8      A.  Huh-uh.  Not at all.
9      Q.  You never recall any
10  discussion about this?
11      A.  I don't remember nothing
12  about that one.
13      Q.  Was it generally Flowers'
14  practice that when a breach of contract
15  letter was issued to provide a copy of to
16  a distributor?
17      MR. TALIAFERRO:  If you know.
18      A.  I don't remember.
19      Q.  Did you receive --
20      A.  I don't remember.
21      Q.  -- copies -- did you receive
22  copies of breach of contract letters?
23      A.  I have.  But I don't

Page 230

1  remember that one.
2      Q.  Okay.
3      (Whereupon, Defendant's Exhibit No.
4  25 was marked for identification purposes
5  by Mr. Hista.)
6      A.  I don't remember this one
7  either.
8      Q.  Okay.  This document
9  indicates on the bottom right that you
10  refused to sign.
11      Does that refresh your memory
12  at all?
13      A.  I don't remember.  I don't
14  remember it.
15      Q.  Okay.  It's possible that
16  you received this and just don't remember
17  today?
18      A.  I don't remember.
19      Q.  That is possible?  That you
20  may have received this, but you just don't
21  remember it today?
22      A.  I don't remember.
23      (Whereupon, Defendant's Exhibit No.

Page 231

1  26 was marked for identification purposes
2  by Mr. Hista.)
3      Q.  (BY MR. HISTA)
4  Mr. Porterfield, have you had the
5  opportunity to review Exhibit No. 26?
6      A.  Yes.
7      Q.  Do you recognize any of
8  these documents?
9      A.  Yes.
10      Q.  Could you tell me what they
11  are, please?
12      A.  Flowers purchased back stops
13  from me.
14      Q.  Was it stops?  Or the entire
15  distributorship?
16      A.  The entire distributorship.
17      Q.  How did that come about?
18      A.  I bought some more territory
19  in another company.
20      Q.  On page one of the document,
21  the bottom right, is that your signature?
22      A.  Yes.
23      Q.  Is that Mr. Rhodes'

Page 232

1  signature to the left-hand side?
2      A.  Yes.
3      Q.  Page two of this document
4  indicates that it's a purchase agreement.
5  Would you agree with me?
6      A.  Yes.
7      Q.  And does this document
8  reflect Flowers buying back your 2000
9  contract?
10      A.  Yes.
11      Q.  And pages three and four are
12  a document entitled release agreement and
13  bill of sale.  Would you agree with that?
14      A.  Yes.
15      Q.  And on the last page of this
16  document, is that your signature under the
17  word "seller"?
18      A.  Yes.
19      Q.  And is that Mr. Rhodes'
20  signature to the right?
21      A.  Yes.
22      Q.  And was this witnessed by
23  Mr. Bordeaux and Mr. Adkins?

Page 233

1    A.   Yes.
2    Q.   Did you voluntarily sell
3 your 2000 contract back to the company?
4    A.   Yes.
5    Q.   Did you understand that by
6 selling that contract back that you were
7 releasing any claims related to the 2000
8 contract?
9    A.   Yes.
10    (Whereupon, Defendant's Exhibit No.
11 27 was marked for identification purposes
12 by Mr. Hista.)
13    Q.   (BY MR. HISTA) We're going
14 to mark this one No. 27.
15    A.   Okay.
16    Q.   Again, I'd just like for you
17 to generally identify it for me. Is this
18 the distributor agreement that replaced
19 your 2000 contract?
20    A.   Yes.
21    Q.   And turning to page two of
22 this document, Section 2.5, good industry
23 practice, would you agree with me that

Page 234

1 that's the, you know, the same --
2    A.   Basically about the same.
3    Q.   -- same thing that's in the
4 first two contracts?
5    And you agree that you had to
6 comply with the good industry practice
7 provision of the distributor agreement?
8    A.   Yes.
9    Q.   And then turning to five
10 point -- 5.1, obligations of
11 distributor --
12    A.   Same.
13    Q.   -- same thing? Same deal?
14 You knew you had to use your best efforts
15 and to cooperate with the company with
16 marketing programs?
17    And then -- is that yes?
18    A.   Yes.
19    Q.   What discussion do you
20 recall about entering into this new
21 agreement with Flowers? I mean, how did
22 it come about?
23    A.   Let me check one more thing

Page 235

1 if it may come back to me. I am looking
2 for stops that was purchased.
3    Q.   It's very close to the end.
4 There's an account listing. It's like the
5 third to last page.
6    A.   I see it now. Yes.
7    Q.   So basically the 2002
8 contract, you got some more accounts?
9    A.   Yes.
10    Q.   Was that your request? Or
11 how did that come about? Do you remember?
12    A.   They asked -- because they
13 had -- had cut a route, I believe. And
14 they was putting -- asked some of the
15 stops would they take some of the extra
16 territory. That's how that come about.
17    Q.   Okay. And then turning your
18 attention to Section 20.4 of this
19 agreement --
20    A.   20.4.
21    Q.   -- did you read this
22 agreement before you signed it?
23    A.   Yes.

Page 236

1    Q.   Did you understand that this
2 agreement, the distributor's agreement
3 that we're looking at, along with the
4 exhibits referenced A, B, C, D and E, were
5 the entire agreement between you and
6 Flowers?
7    A.   Yes.
8    Q.   Okay. Read the last
9 sentence of the Section 20.4 for me.
10 Actually the last two sentences. Just
11 read it out loud for me.
12    A.   Unless set forth in this
13 agreement, no party shall be liable for
14 any representation made by any other.
15 This agreement may be amended or modified
16 only by a written (sic.) signed by all
17 parties.
18    Q.   Okay. What is your
19 understanding of those two sentences? Do
20 you have any understanding of those two
21 sentences?
22    A.   No.
23    Q.   Do you understand that the

PORTERFIELD v FLOWERS                CondenseIt!™                DEPO:HENRY PORTERFIELD

---

Page 237

1 agreement could not be modified unless
2 there was another writing signed between
3 you and Flowers?
4         MR. TALIAFERRO: Object.
5 Object to the form. Calls for a legal
6 conclusion or opinion. I don't even know
7 if he knows what a modification is.
8    A.   I don't know. Can't answer.
9         MR. HISTA: Okay. We can
10 take maybe a five-minute break here and
11 everybody stretch their feet.
12        MR. TALIAFERRO: Sure.
13        THE VIDEO SPECIALIST: We're
14 going off the Record. This is the end of
15 Tape 4.
16    (Short break.)
17        THE VIDEO SPECIALIST: We're
18 back on the Record. This is beginning of
19 Tape 5.
20    Q.   (BY MR. HISTA)
21 Mr. Porterfield, we're back on the Record.
22 It's approximately 1:45 in the afternoon.
23 Are you prepared to proceed?

---

Page 238

1    A.   Yes, I am.
2    (Whereupon, Defendant's Exhibit No.
3 28 was marked for identification purposes
4 by Mr. Hista.)
5    Q.   (BY MR. HISTA)
6 Mr. Porterfield, I've handed you what has
7 been marked as Exhibit No. 28. If you
8 could look at this document for me,
9 please,
10   A.   It's basically the same as
11 the other.
12   Q.   Okay. Is this another basic
13 six-month bale out option?
14   A.   And I understand it.
15   Q.   And you understand it?
16   A.   Yes.
17   Q.   Okay. During that first six
18 months of that 2002 contract, was there
19 anything going on that was an issue
20 between you and Flowers?
21   A.   I understand.
22   Q.   Was there any major issue
23 between you and Flowers during this six-

---

Page 239

1 month period?
2    A.   Wasn't no major issue.
3    (Whereupon, Defendant's Exhibit No.
4 29 was marked for identification purposes
5 by Mr. Hista.)
6    Q.   (BY MR. HISTA)
7 Mr. Porterfield, have you ever seen
8 Exhibit No. 28 (sic.) before?
9    A.   29?
10   Q.   I'm sorry. 29. Have you
11 ever seen Exhibit No. 29 before?
12   A.   You know what? I don't
13 know.
14   Q.   All right. Turn to page two
15 of this document.
16   A.   I might need to find mine.
17 I signed this.
18   Q.   Is that your signature on
19 the bottom right?
20   A.   Yes, it is.
21   Q.   By signing this document,
22 would that indicate that you had seen it
23 before?

---

Page 240

1    A.   I don't know if I signed
2 this or not. I don't know.
3    Q.   Are you saying you don't
4 recognize that as your signature?
5    A.   It don't seem like it. Not
6 on this one, it don't.
7    Q.   What's different about the
8 signature?
9    A.   I never spelled my name --
10 left the -- let me see. I don't know.
11   Q.   Okay. Let's just -- let me
12 just ask you a few questions about the
13 items that are on this document. Look
14 under private label products.
15   A.   I see it.
16   Q.   Do you see that?
17   A.   Uh-huh.
18   Q.   Do you agree or disagree
19 with those points under private label
20 products?
21   A.   I disagree with them.
22   Q.   You disagree. Why do you
23 disagree?

---

Page 241

1    A.  Because I always notified
2 that I wasn't hauling private label.  And
3 that's why I don't too much agree with
4 this one at all.
5    Q.  So you never carried private
6 label?
7    A.  Never carried private label
8 bread.
9    (Whereupon, Defendant's Exhibit No.
10 30 was marked for identification purposes
11 by Mr. Hista.)
12    Q.  (BY MR. HISTA)  Okay.
13 Mr. Porterfield, have you had the
14 opportunity to review Exhibit No. 30?
15    A.  I understand this one.
16    Q.  Tell me what it is.
17    A.  This is when I sold
18 Promenade Winn-Dixie back to the company.
19    Q.  And why did you do that?
20    A.  I sold it back because I was
21 downsizing my territory after I had had
22 surgery on my leg I believe at the time.
23    Q.  Was it your decision to sell

Page 242

1 the Winn-Dixie?
2    A.  It was my decision to sell
3 it back to them.
4    Q.  And you received money when
5 Flowers purchased --
6    A.  Seven thousand one hundred
7 and seventy-five dollars.
8    Q.  Would you agree with me a
9 transaction like this would indicate that
10 you were being treated an as independent
11 contractor?
12    MR. TALIAFERRO:  Object to
13 the form of the question.  It calls for a
14 legal conclusion.
15    A.  I can't answer that.
16    Q.  You can answer subject to
17 your attorney's objection.  Did you
18 understand that you were selling
19 distribution rights back to the company?
20    A.  Yes.
21    Q.  Were you acting as an
22 independent businessman in doing so?
23    MR. TALIAFERRO:  Again,

Page 243

1 object to the form.  Calls for a legal
2 conclusion.
3    If you know, Henry, you can
4 answer it.  If you don't, don't speculate.
5    A.  I thought I was.
6    (Whereupon, Defendant's Exhibit No.
7 31 was marked for identification purposes
8 by Mr. Hista.)
9    Q.  (BY MR. HISTA)
10 Mr. Porterfield, have you had the
11 opportunity to review Defendant's Exhibit
12 No. 31?
13    A.  Yes, I have.
14    Q.  Do you recognize this
15 document?
16    A.  I recognize it.
17    Q.  Tell me, what do you
18 remember about this document?
19    A.  I recognize it now, but I
20 don't remember nothing about it.
21    Q.  Any reason to believe that
22 this was not discussed with you?
23    A.  I wouldn't know.

Page 244

1    Q.  You wouldn't know?
2    A.  Huh-uh.
3    Q.  On the bottom, it appears
4 that Steve Stephens has indicated that you
5 would not sign this document.
6    A.  No.
7    Q.  Any recollection of that?
8    A.  I don't remember.
9    Q.  Okay.  Any reason to believe
10 as we sit here today that what's set forth
11 in this document is not true?
12    A.  I don't know.
13    Q.  You just don't remember?
14    A.  No.
15    Q.  Not at all?
16    A.  Not this one.
17    (Whereupon, Defendant's Exhibit No.
18 32 was marked for identification purposes
19 by Mr. Hista.)
20    Q.  (BY MR. HISTA)
21 Mr. Porterfield, have you had the
22 opportunity to review Defendant's Exhibit
23 No. 32?

Page 245

1    A.   Yes, I have.
2    Q.   Would you identify this for
3 me, please?
4    A.   Stating that that Monday
5 they had four hundred and eight dollars
6 and forty-seven cents worth of stale.
7         Tuesday they had eight
8 hundred and thirty-seven dollars and
9 ninety-seven cents worth of stale.
10        And some product was due out
11 May the 25th. And white ties -- we didn't
12 pick up white ties on Saturday. We didn't
13 pick up nothing on Saturday when I was
14 there.
15        And there's possibility it
16 could have had that much stale because --
17 it's a possibility.
18   Q.   Okay. The second paragraph
19 says that Saturday, May 25, 2002, you
20 didn't work any of your accounts.
21        Do you believe that to be
22 true?
23   A.   I don't know.

Page 246

1    Q.   Any reason to believe as we
2 sit here today that that is not true?
3    A.   I don't know exactly. I
4 don't know.
5    Q.   Okay.
6    A.   No. I really don't.
7    Q.   But you can't give me any
8 reasons to provide any evidence that
9 that's not true? You just don't remember?
10   A.   I just don't remember.
11   Q.   Okay. It goes on to say you
12 didn't even order any products for that
13 day?
14   A.   That's why I say I don't
15 know. I don't know.
16   Q.   Okay. Should you normally
17 order products for Saturday?
18   A.   Normally, yeah.
19   Q.   Normally, it's a regular
20 service day, correct?
21   A.   And this route was pulled up
22 that Saturday. That's probably a Saturday
23 I took off.

Page 247

1    Q.   You took off that Saturday?
2    A.   Yes.
3    Q.   Did you have anybody handle
4 the territory for you?
5    A.   Yes.
6    Q.   Who was that?
7    A.   I don't know who did it.
8 But somebody did it. Worked the bread up.
9 I done forgot who did it.
10   Q.   Okay. Would you agree it's
11 still your ultimate responsibility to
12 insure that your accounts are properly
13 serviced on Saturdays?
14   A.   I know that.
15   Q.   You know that?
16   A.   Yes.
17   Q.   And you would agree with me
18 on that?
19   A.   Yes.
20   (Whereupon, Defendant's Exhibit No.
21 33 was marked for identification purposes
22 by Mr. Hista.)
23   A.   I didn't sign this one

Page 248

1 because it wasn't done wrong on this.
2    Q.   Let's talk about it.
3    A.   Okay. Ask the question.
4    Q.   Do you recognize this
5 document?
6    A.   Yes, I do.
7    Q.   And we're referring to
8 Defendant's Exhibit No. 33, correct?
9    A.   Yes.
10   Q.   The second paragraph states:
11 In checking your advance orders, it shows
12 that you only have two trays of products
13 coming for Friday sales.
14        Do you see that?
15   A.   Yes.
16   Q.   Friday is a normal service
17 day?
18   A.   I did it.
19   Q.   Is Friday a normal service
20 day?
21   A.   If you want to.
22   Q.   Is it good industry
23 practice --

Page 249

1    A.  Yes.
2    Q.  -- to service your accounts
3 on Friday?
4    A.  I felt like it was.
5    Q.  Okay.  Why did you order
6 just two trays of products for Friday?
7    A.  Because I didn't work
8 Friday.
9    Q.  So you --
10    A.  All --
11    Q.  Is it fair to say that you
12 overloaded your market on Thursday?
13    A.  No, I didn't overload it.
14    Q.  How --
15    A.  In that case, I can overload
16 it on Tuesday.  You take off Wednesday.
17 So I took off Friday just like I can take
18 off on Tuesday.
19         You just put enough.  They
20 take two days.  Same thing.  No different.
21 You do the same thing on Saturday.
22    Q.  So you're not just servicing
23 the market at all on those days?

Page 250

1    A.  You don't service them on
2 Wednesday.  You don't service on Sunday.
3 So you can do the same thing on Thursday
4 for Friday.  So --
5    Q.  On the Friday that is
6 referred to in this document, did you
7 service your accounts?
8    A.  The accounts was serviced.
9    Q.  But you didn't --
10    A.  The accounts was serviced
11 that Friday just like they was serviced
12 Monday and Wednesday.  No different.  Pull
13 up.  Put on shelf.  Stacked out.  No
14 problem.
15    Q.  But you only -- only
16 provided or ordered two trays of products?
17    A.  I know what I ordered.  But
18 I serviced my stops.
19    Q.  But you only ordered two
20 trays of product a week in advance,
21 correct?
22    A.  I just told you that.
23    Q.  So to cover the -- cover the

Page 251

1 accounts for that Friday, is it not fair
2 to say you had --
3    A.  Evidently you don't
4 understand what's going on out there.  I
5 ordered enough bread Thursday to take care
6 of Friday just like I ordered on Tuesday
7 to take care of Wednesday when I don't
8 work.  Just like I order on Saturday to
9 take care of Sunday when I don't work.  No
10 different.
11    Q.  Let's just stick to Friday.
12 What's the normal order day for Friday?
13    A.  So you're saying control
14 again.
15    Q.  What is the --
16    A.  No.  You're saying control
17 again.  If I was independent, I felt like
18 I can do it like I wanted.
19         So if you want to control,
20 you control me to come in Friday.  As long
21 as I felt like I was doing the job, I felt
22 like I didn't need to come in Friday.
23    Q.  What is the normal --

Page 252

1    A.  I don't know.
2    Q.  -- order day for Saturday?
3 I mean for Friday?
4    A.  Whatever I wanted to order.
5    Q.  Is there not a set day for
6 ordering --
7    A.  Whatever I wanted to order
8 on my route was a normal order day for
9 Friday.
10    Q.  Did Flowers have --
11    A.  Did Flowers tell me what to
12 do?
13    Q.  If you'd let me finish my
14 question, I think we could get a clear
15 Record.
16    A.  Go ahead.
17    Q.  I think that we've
18 previously established that you ordered
19 your product generally a week in advance;
20 is that correct?
21    A.  That's correct.
22    Q.  And if that is correct, what
23 would typically be the order day for

Page 253

1 Friday?
2     A.  The way I ordered it.
3     Q.  All right.  Let's maybe go
4 through the example again.  When you
5 ordered product on Monday, what day --
6     A.  That was one of those
7 special occasions like Flowers have when
8 bringing bread out of the freezer.
9         It was a special occasion for
10 me.  So I felt like I ordered that to
11 supply what I needed to do.  That's why it
12 was ordered like that.
13     Q.  On Monday when you came to
14 the warehouse, what day was the product
15 that you were ordering on Monday for?
16     A.  Saturday.
17     Q.  On Tuesday when you came to
18 the warehouse, what day was that product
19 to be delivered to your accounts?
20     A.  Monday.
21     Q.  What about on Thursday?
22 When did that --
23     A.  Tuesday.

Page 254

1     Q.  What about on Friday when
2 you came in?
3     A.  Thursday.
4     Q.  And then on Saturday?
5     A.  I needed two trays.  And I
6 ordered two trays for Friday.
7     Q.  Okay.  Was Saturday your
8 normal order day for Friday?
9     A.  I didn't need a normal order
10 for that particular Friday.  So I ordered
11 two trays.
12     Q.  So you knew a week in
13 advance that you were going --
14     A.  That I was only ordering two
15 trays.  I knew a week in advance.
16     Q.  -- that your accounts would
17 need only two trays of product?
18     A.  Yes.  That's all I needed.
19     Q.  How do you estimate that
20 your accounts on a Friday would only need
21 two trays?
22     A.  That was my decision.
23     Q.  How did you come to that

Page 255

1 decision?
2     A.  That's the way I wanted to
3 do it.  I had come to that decision
4 myself.
5     Q.  Turning to part three of
6 this document, it states:  Henry, by not
7 getting products on Friday, you were
8 overloading the market on Thursday and
9 creating more stale on Monday.
10         Do you agree with that?
11     A.  No.
12     Q.  Why not?
13     A.  Because it didn't happen.
14     Q.  It didn't happen?
15     A.  No, it didn't.
16     Q.  Do you have any documents to
17 prove that it didn't happen?
18     A.  No documents to prove it did
19 or didn't happen.  It didn't happen.
20     Q.  So you believe that by
21 overloading your market on a particular
22 day, that that's proper service?
23     A.  I didn't overload the

Page 256

1 market.  I worked that Thursday just like
2 I would have worked it Tuesday for a day I
3 wanted to take off.
4     Q.  And so you took Friday off?
5     A.  I took Friday off.
6     Q.  And you didn't service any
7 of your accounts?
8     A.  They was pulled up.  I
9 didn't run the truck.
10     Q.  Who pulled them up?
11     A.  I did.
12     Q.  But you only delivered two
13 trays of fresh product on that day?
14     A.  I didn't run the truck.
15     Q.  You used your car?
16     A.  I don't know what I used.
17         (Whereupon, Defendant's Exhibit No.
18 34 was marked for identification
19 purposes.)
20     A.  I don't know nothing about
21 this.  I can't answer you on that one.  I
22 don't know nothing about it.
23     Q.  Okay.  You don't know

Page 257

1 anything about what's contained in Exhibit
2 No. 34?
3    A.   No.
4    Q.   Anybody ever address this
5 with you?
6    A.   I don't know nothing about
7 it I told you.
8    A.   No.
9    Q.   Not at all?
10    A.   I don't know nothing about
11 it.
12    Q.   Do you own any weapon or
13 weapons?
14    A.   Say what?
15    Q.   Did you own a gun?
16    A.   No, I don't.
17    Q.   Have you ever owned a gun?
18    A.   No, I hadn't.
19    Q.   So it's your testimony that
20 this simply did not occur?
21    A.   I don't know anything about
22 it I told you.
23    Q.   Don't remember?  Or it

Page 258

1 didn't happen?
2    A.   I don't know anything about
3 it.
4    (Whereupon, Defendant's Exhibit No.
5 35 was marked for identification purposes
6 by Mr. Hista.)
7    Q.   (BY MR. HISTA)
8 Mr. Porterfield, do you recognize
9 Defendant's Exhibit 35?
10    A.   Uh-huh.
11    Q.   Tell me, what is this
12 document?
13    A.   I did it.
14    Q.   It's another example of you
15 ordering only product for a certain
16 account on Friday?
17    A.   Uh-huh.
18    Q.   And you don't believe
19 there's anything wrong by doing that?
20    A.   That wasn't -- this product
21 shouldn't have been ordered on Friday.  It
22 might have been ordered on a Thursday.
23    So no.  I didn't -- I didn't

Page 259

1 work no stop on Friday to cover for no
2 Saturday.  No.  I don't agree with this
3 one.
4    Now, if he said I ordered on
5 a Thursday, it might have been right.  But
6 not on a Friday.  I don't think so.
7    Q.   Again, is this a situation
8 where you only ordered a small amount of
9 product for a Friday?
10    A.   It -- no.  It was a
11 situation probably -- I didn't work
12 Krystal on that Friday.  I worked Krystal
13 that Thursday exactly like I would have
14 worked them that Tuesday and that
15 Saturday.  And I didn't work them on that
16 Friday.
17    Q.   All right.  The second
18 paragraph states:  Today on your order you
19 received only a hundred and forty Krystal
20 buns.  You didn't receive any more
21 products for the rest of your accounts.
22    That would seem to indicate
23 to me that you only ordered buns for your

Page 260

1 Krystal account, would it not?
2    MR. TALIAFERRO:  Object to
3 the form.  Go ahead and answer.
4    A.   Let me see what you say.  It
5 was -- it was -- no.  I know what
6 happened.  Refrain.
7    Ordered for Krystal and then
8 didn't order for no one else.  That was
9 another Friday that I --
10    Q.   It's another Friday you just
11 took off?
12    A.   Just took off.  Worked
13 Krystal.
14    (Whereupon, Defendant's Exhibit No.
15 36 was marked for identification purposes
16 by Mr. Hista.)
17    Q.   (BY MR. HISTA)
18 Mr. Porterfield, do you recognize
19 Defendant's Exhibit 36?
20    A.   Uh-huh.
21    Q.   Is this another example of
22 you deciding not to work on Friday?
23    A.   Yes.  A bunch of us took off

Page 261

1 that 4th of July. Same thing. I remember
2 that too. Same thing.
3    Q. How did the accounts get
4 serviced that day?
5    A. We pulled them up.
6    Q. You delivered only a small
7 amount of fresh product?
8    A. If I ain't mistaken, I
9 believe Krystal and them was closed. And
10 we just straightened the stores up. We
11 decided to take the holiday off.
12    Q. Okay. So you didn't --
13    A. No.
14    Q. -- provide normal service on
15 that day?
16    A. I provided normal service
17 like you would have on a Wednesday or
18 Sunday. Made sure the customer was taken
19 care of. I --
20    Q. And isn't Friday considered
21 a normal service date?
22    A. It was considered a holiday
23 for me.

Page 262

1    Q. So even if your customers
2 wanted full service on that day --
3    A. Your customer got serviced
4 like I told you once before. Just like
5 you would service on Wednesday when no
6 trucks run. Just like you service on
7 Sunday when no trucks run. They got
8 serviced the same way that Friday.
9    Q. That's just pull-up service,
10 correct?
11    A. That's all they needed.
12 That's all they need on Wednesday. That's
13 all they need on Sunday. And that's all
14 they needed that Friday.
15    Q. But is it normal business --
16    A. It was normal for me.
17    Q. And that was normal for you?
18    A. On that particular case,
19 yes.
20    Q. So you decided to take that
21 Friday off, it really didn't matter if
22 your accounts wanted full service that
23 day?

Page 263

1    A. The accounts was serviced
2 full that day.
3    Q. But my question is: Full
4 service means delivery of fresh product in
5 the morning, does it not?
6    A. Full service means the same
7 thing you do on Wednesday and Sunday. It
8 was full service.
9    Q. You've never heard the
10 terminology "full service" before?
11    A. That's the way I think it
12 was full service.
13    Q. Okay. Well, what's the
14 difference between service on Wednesday
15 and Sunday and a Monday?
16    A. Sunday -- Monday you take
17 the truck out and work them. On Wednesday
18 and Sunday you go in the store and make
19 sure that there is no out-of-code and make
20 sure all the bread is worked up on the
21 shelf.
22        And the store was handled
23 just as good that Friday as if it had been

Page 264

1 handled that Thursday, that Monday, that
2 Tuesday, that Wednesday or whatever.
3    Q. When you take your truck
4 out, you're delivering fresh product --
5    A. So you come back to control
6 again.
7    Q. I'm just asking you --
8    A. I told you.
9    Q. -- when you take your truck
10 out --
11    A. But I done told you what I
12 did. I'm through.
13    Q. I understand that. But I
14 just want to make it clear on the Record.
15        When you take your truck out
16 and service your account, are you
17 delivering fresh product?
18    A. That answer is yes.
19    Q. And when you don't take your
20 truck out and are providing only pull-up
21 service, you are not delivering any fresh
22 product that particular day; is that
23 correct?

Page 265

1    A.   That's correct.
2       (Whereupon, Defendant's Exhibit No.
3    37 was marked for identification purposes
4    by Mr. Hista.)
5    Q.   (BY MR. HISTA)
6    Mr. Porterfield, have you ever seen
7    Defendant's Exhibit 37?
8    A.   Yes.
9    Q.   What do you recall about
10   Defendant's Exhibit 37?
11   A.   Nothing but two hundred and
12   fifty buns put in Krystal Restaurant No.
13   2, Atlanta Highway.  And --
14   Q.   Was that because you didn't
15   want to work that account on Friday?
16   A.   I don't know.
17   Q.   Could it have been?
18   A.   I think I did work them that
19   Friday.  But it wasn't nothing -- I felt
20   like it wasn't nothing wrong with putting
21   two-fifty in there until they said nothing
22   something about it.
23   Q.   Did you curse at the Krystal

Page 266

1    manager?
2    A.   Curse?  No, I didn't.  No.
3    Q.   So your testimony is what's
4    reflected in this document is false?
5    A.   That's what I think.
6    Q.   Do you recall anybody
7    discussing that with you?
8    A.   I don't know.
9       (Whereupon, Defendant's Exhibit No.
10   38 was marked for identification purposes
11   by Mr. Hista.)
12   A.   I'm aware of this one.
13   Q.   Okay.  And you are referring
14   to Defendant's Exhibit 38?
15   A.   Uh-huh.
16   Q.   What do you recognize about
17   this document?
18   A.   Burger King wanted to be
19   serviced five days a week.  And I was -- I
20   served them four days.
21   Q.   If Burgr King wants five-day
22   service, would you agree with me that
23   that's good industry practice?

Page 267

1    A.   No.
2    Q.   Why not?
3    A.   Because you can do the same
4    thing in three days.
5    Q.   Even though the customer
6    requests five-day service, you're telling
7    me it's your position that's not good
8    industry practice?
9    A.   No.  You can do the same
10   thing in three days.
11   Q.   So you feel it's appropriate
12   to ignore a customer's request to
13   service --
14   A.   No.
15   Q.   -- five days?  You think you
16   can do that?
17   A.   No.
18   Q.   You can't?
19   A.   No.
20   Q.   I'm not sure I understand
21   your testimony.  Do you believe that
22   three-day service to Burger King is proper
23   service?

Page 268

1    A.   I believe -- in this
2    particular case, in this particular Burger
3    King, selling something like ten trays of
4    buns and not getting out of code, I
5    believe you could have worked them in
6    three days my opinion.
7    Q.   Is it your understanding
8    that Burger King wants their units served
9    five days a week?
10   A.   Yes, sir.  Yes.  That's what
11   they say.  Flowers said.
12   Q.   Is that your understanding
13   of what Burger King policy is?
14   A.   I don't know what Burger
15   King policy is.
16   Q.   Do you have any reason to
17   believe that is not Burger King's policy?
18   A.   No, I don't.
19   Q.   And you believe that you can
20   service Burger King's less than five days
21   if you believe you can get the work done?
22   A.   I believe it.
23   Q.   Did you ever get kicked out

Page 269

1  of any Burger Kings?
2      A.  Yes.
3      Q.  Was it for not providing
4  five-day service?
5      A.  No.
6      Q.  Do you know if Burger king
7  ever complained about you not servicing
8  your Burger King accounts five days a
9  week?
10      A.  Flowers told me.  Burger
11  King never said anything to me.
12      (Whereupon, Defendant's Exhibit No.
13  39 was marked for identification purposes
14  by Mr. Hista.)
15      Q.  (BY MR. HISTA) Turning your
16  attention to Exhibit No. 39, is this
17  another example of where you didn't work
18  your Burger King accounts five days a
19  week?
20      A.  Yes, it is.
21      Q.  You made that decision?
22      A.  Yes.
23      (Whereupon, Defendant's Exhibit No.

Page 270

1  40 was marked for identification purposes
2  by Mr. Hista.)
3      Q.  (BY MR. HISTA)
4  Mr. Porterfield, you've been handed what
5  has been marked as Defendant's Exhibit No.
6  40.  Can you identify this document for
7  me, please?
8      A.  40?
9      Q.  Pardon me?
10      A.  I agree it's Exhibit 40.
11      Q.  Okay.  Do you recognize this
12  document?
13      A.  No.
14      Q.  Do you recognize the
15  contents of this document?
16      A.  I recognize the contents.
17      Q.  Okay.  What do you recall
18  about the contents of this document?
19      A.  I recognize what they got on
20  paper.
21      Q.  Do you recall this
22  occurring?
23      A.  No, I don't.

Page 271

1      Q.  Could it have occurred, and
2  you just don't remember it today?
3      A.  I don't recall that it
4  occurred.
5      Q.  So it's possible that it did
6  occur?
7      A.  I don't know.
8      Q.  No?
9      A.  I don't know.
10      Q.  You don't know?
11      A.  I don't know.
12      Q.  So if Grady Messer testified
13  that this did occur, would you have any
14  specific facts to refute that?
15      A.  I don't know.
16      Q.  Would your response simply
17  be I don't know?
18      A.  I don't remember.  That's my
19  response.
20      (Whereupon, Defendant's Exhibit No.
21  41 was marked for identification purposes
22  by Mr. Hista.)
23      Q.  (BY MR. HISTA)

Page 272

1  Mr. Porterfield, you've been handed what
2  has been marked as Defendant's Exhibit No.
3  41.
4      Have you seen this document
5  before?
6      A.  I don't know nothing about
7  this.  I don't remember.
8      Q.  No recollection of this at
9  all?
10      A.  No.
11      Q.  This is another example of
12  you taking off·on Friday?
13      A.  I don't know.  I didn't --
14  I --
15      (Whereupon, Defendant's Exhibit No.
16  42 was marked for identification purposes
17  by Mr. Hista.)
18      Q.  (BY MR. HISTA) You've been
19  handed what has been marked as Defendant's
20  Exhibit 42.
21      Would you take a moment and
22  look at this document for me, please?
23      A.  (Witness complying.)

PORTERFIELD v FLOWERS                CondenseIt!™                DEPO:HENRY PORTERFIELD

Page 273

1    Q.  Mr. Porterfield, have you
2 seen Exhibit No. 42 previously?
3    A.  Yes. Uh-huh.
4    Q.  Did this meeting take place?
5    A.  Yes.
6    Q.  Is what is reflected in this
7 document an accurate summary of the
8 meeting between yourself, Grady Messer and
9 Steve Stephens?
10    A.  Yes.
11    Q.  So you would agree with the
12 statement some companies expect five days
13 per week, and that is what we must give
14 them?
15        You agree with that
16 statement?
17    A.  I accepted what they said.
18    Q.  Okay.  And the document also
19 states: Henry, you gave Steve and myself
20 your word that you would correct this, and
21 I appreciate the way you handled it.
22        Is that the way you responded
23 to Mr. Messer and Mr. Stephens?

Page 274

1    A.  Probably did.
2    Q.  Any reason to believe
3 that's -- that you didn't respond in that
4 fashion?
5    A.  Yes.
6    Q.  Okay.  You believe that's
7 true?
8    A.  Yes.
9        (Whereupon, Defendant's Exhibit No.
10 43 was marked for identification purposes
11 by Mr. Hista.)
12    Q.  (BY MR. HISTA)
13 Mr. Porterfield, I've handed you what has
14 been marked as Defendant's Exhibit No. 43.
15        Do you recognize this
16 document?
17    A.  Yes, I do.
18    Q.  Okay.  Were you given a copy
19 of this document?
20    A.  Let me read over it again.
21        (Brief pause.)
22    A.  I remember this.  Yes.  I
23 left it outside.

Page 275

1    Q.  You did leave it outside?
2    A.  Uh-huh.
3    Q.  Why did you leave it
4 outside?
5    A.  Because they didn't have a
6 key to the back door.  And I had unloaded
7 the truck.  And I had other stops to work.
8        And once you get it off that
9 truck, it's not an easy task putting it up
10 on that truck.  And there was no bother in
11 leaving it outside.  There wasn't no
12 damage or harm came to it.
13        And I was going to come back
14 and put it back in the store as soon as I
15 went and worked another stop.
16    Q.  Was this the only time that
17 you had left product outside of this
18 account?
19    A.  Maybe another time when the
20 key wasn't there I have did it before,
21 yes.
22    Q.  And it's the Krystal folks
23 that have the key to the back door?

Page 276

1    A.  Yes.  I don't.
2    Q.  Did you explain to the
3 Krystal manager that you had to move on to
4 another account?
5    A.  I didn't get a chance to
6 talk to him before they had did what they
7 had to do.  I did talk to him later about
8 it.
9    Q.  Okay.  Did you leave a note?
10    A.  No, I didn't.
11    Q.  You just left the product
12 there?
13    A.  Uh-huh.
14    Q.  Did you have a --
15    A.  No.
16    Q.  -- contact person of anybody
17 at Krystal?
18    A.  I had went on the inside and
19 told the ones on the inside I couldn't get
20 it in the store.  And I told them that I
21 had left it, and I would be back, yeah.  I
22 had talked to someone in Krystal about it.
23    Q.  What did they say?

FREEDOM COURT REPORTING    (334) 300-3832                Page 273 - Page 276

Page 277

1    A.  They said okay.
2    Q.  Are you sure about that?
3    A.  I said it.
4    Q.  Who were the Krystal
5 managers --
6    A.  I don't remember.
7    Q.  -- that you talked to?  Do
8 you remember?
9    A.  I don't remember none of the
10 managers.  It's been so long.  They change
11 them like sometime.
12    Q.  Were you kicked out of your
13 Krystal accounts because of that
14 particular situation?
15    A.  Yes.  And got back in.
16    Q.  And you did get back in?
17    A.  (Nodding head.)
18    Q.  Who got you back in?
19    A.  Me and Steve Stephens.
20    Q.  Pardon me?
21    A.  Me and Steve Stephens went
22 down and talked to them.
23    Q.  So is it fair to say that

Page 278

1 Steve Stephens helped you get back into
2 the Krystal accounts?
3    A.  We got back in the Krystal
4 account.
5    Q.  And he helped you do that?
6    A.  He went along with me.
7    (Whereupon, Defendant's Exhibit No.
8 44 was marked for identification purposes
9 by Mr. Hista.)
10    Q.  (BY MR. HISTA) Do you
11 recall the name Kim Colquitt?  Do you
12 recall that name at all?
13    A.  No.
14    Q.  No, you do not?
15    A.  Huh-uh.  This one I totally
16 disagree with.  This lady was crazy.
17    Q.  Okay.  Are you referring to
18 Defendant's Exhibit No. 44?
19    A.  Uh-huh.  Mary.  That was her
20 name.
21    Q.  Do you know her last name?
22    A.  No, I don't.  She had had
23 problems with other vendors.  Said that

Page 279

1 woman didn't have good sense.  And I
2 didn't say anything to her.
3    Q.  So you didn't -- this
4 document states that you told her to stack
5 the damn trays right?
6    A.  Now, you think I'm going to
7 tell that lady that?
8    Q.  I don't know.  Did you tell
9 her that?
10    A.  No.  No.
11    Q.  Did she end up saying that
12 she didn't want you working at the store
13 any more?
14    A.  She sure did.
15    Q.  Did you go and talk to her
16 about it?
17    A.  No.
18    Q.  Any reason why you didn't go
19 and talk to her about it?
20    A.  I don't remember if I didn't
21 talk to her.
22    Q.  Do you recall talking to
23 Grady about it?

Page 280

1    A.  Grady and Steve.
2    Q.  Okay.  What do you remember
3 about that conversation or conversations?
4    A.  I disagreed with what she
5 said.
6    Q.  Did they say they would try
7 and help you get back into the account?
8    A.  I didn't want to work it no
9 more.
10    Q.  Okay.
11    (Whereupon, Defendant's Exhibit No.
12 45 was marked for identification purposes
13 by Mr. Hista.)
14    A.  This is what I wrote not to
15 work that Burger King no more.  I remember
16 this.
17    Q.  You're referring to
18 Defendant's Exhibit No. 45?
19    A.  45.  To go along with 44.
20    Q.  This is the store -- this is
21 the document where you indicate that
22 you're no longer going to be working the
23 Burger King where Mary worked?

Page 281

1    A.  Yes.
2    Q.  What happened to that
3 account?
4    A.  Another route worked it.
5    Q.  Who -- who picked up working
6 it?
7    A.  I know him.  Just the name
8 don't ring a bell right now.
9    Q.  Another distributor?
10   A.  Another distributor picked
11 it up.
12   Q.  From the Montgomery
13 warehouse?
14   A.  Yes.
15   Q.  Do you know if that
16 distributor ever had any issues with Mary?
17   A.  I wouldn't know.  That's
18 2005.  I didn't work but a month after.
19   (Whereupon, Defendant's Exhibit No.
20 46 was marked for identification purposes
21 by Mr. Hista.)
22   A.  This is the one Troy State,
23 yeah.  I remember this.

Page 282

1    Q.  Okay.  Let me ask you just a
2 few questions before we review this
3 document.  By March of 2005, did you carry
4 a cell phone with you when you were
5 servicing your territory?
6    A.  Sometimes I had it.
7 Sometimes I didn't.
8    Q.  And why wouldn't you carry
9 it with you?
10   A.  Well, it could have been one
11 of them times when it wasn't working.
12   Q.  Was it your general practice
13 to carry a cell phone?
14   A.  That is my cell phone.  I
15 didn't have to carry it unless I wanted
16 to.
17   Q.  Would you agree that it
18 would be good business practice to carry a
19 cell phone when you're running a bread
20 route?
21   A.  Well, back before cell
22 phones came out, we didn't carry cell
23 phones to run a bread route.

Page 283

1    Q.  Okay.  In March of 2005,
2 weren't cell phone prevalent?
3    A.  Yes, they was.
4    Q.  Did you have a cell phone at
5 that time?
6    A.  Yes, I did.
7    Q.  Did you normally carry it
8 with you when you ran your route?
9    A.  Sometime.
10   Q.  Were you --
11   A.  On that particular day, I
12 did have it.
13   Q.  Okay.  Let's review this
14 document.  Do you recognize the name Joni
15 Barnes?
16   A.  Yes.
17   Q.  Is that the lady that you
18 dealt with at Sodexho?
19   A.  No.
20   Q.  Okay.  How do you recognize
21 the name Joni Barnes?
22   A.  I knew she was the manager.
23   Q.  Who was the individual that

Page 284

1 you dealt with at Sodexho?
2    A.  The kitchen manager.  I
3 don't remember her name.
4    Q.  This document states that
5 Ms. Barnes -- she, seemingly referring to
6 Ms. Barnes, told -- told me that on
7 Thursday, March 3, 2005, Henry worked her
8 in the morning but did not have any
9 hamburger buns.  Is that true?
10   A.  Yes, it is.
11   Q.  And then the next clause
12 states: Henry promised her that he would
13 bring some back later that day.
14        Is that true?
15   A.  That was -- that was true.
16 They needed them for lunch.
17   Q.  Okay.  And Henry never
18 carried any buns back.  Is that true?
19   A.  That's true.
20   Q.  Did you call back to the
21 Sodexho account and tell them that you
22 were not going to make it back that day?
23   A.  That particular day when the

Page 285

1 truck broke down and the truck was
2 steaming so, I got out to work on the
3 truck, and I didn't think about Sodexho.
4    Q.   Okay.  So your testimony is
5 you did not call the Sodexho account
6 back --
7    A.   No, I didn't.
8    Q.   -- on Thursday?
9    A.   No, I didn't.
10    Q.   The document goes on to
11 state:  On Friday, Ms. Barnes called Henry
12 and asked what happened.  Henry told
13 Ms. Barnes his truck broke down, and he
14 couldn't get back to her.
15    A.   Ms. Barnes didn't call
16 Henry.  Henry went back there that next
17 morning and talked to Ms. Barnes --
18    Q.   Okay.
19    A.   -- and explained to her what
20 had happened to my truck.  She didn't call
21 me.
22    Q.   So your testimony is you
23 went back to the account?

Page 286

1    A.   Back to the account, uh-huh.
2    Q.   And you told her that you
3 had had truck problems?
4    A.   Truck had broke down, and I
5 couldn't get back to deliver the buns.
6    Q.   When you -- when your truck
7 broke down, did you call anybody at
8 Flowers and ask for assistance at the
9 Sodexho account?
10    A.   It wouldn't have did any
11 good when the truck broke down.  Because
12 it was a situation where you had about a
13 thirty-minute span from get the buns to
14 get back to them, thirty to forty minutes.
15        And when the truck broke
16 down, it wouldn't have did any good.  They
17 couldn't have made it there on time.
18    Q.   They could have tried?
19    A.   They wouldn't have made it.
20    Q.   But you didn't contact
21 anybody at Flowers?
22    A.   I didn't contact anybody.  I
23 was mostly concerned about my truck.

Page 287

1    Q.   Did you contact any other
2 distributors and ask for their assistance?
3    A.   I was mostly concerned about
4 my truck at the time.
5    Q.   So you were more concerned
6 about your truck than your customer?
7    A.   I was more concerned about
8 my truck at the time.  I had forgot about
9 that -- that at the time when it happened.
10    Q.   It occurred the same day
11 though, correct?
12    A.   Same day, yeah.  So when the
13 truck broke down, my attention went
14 towards working on the truck.  And I
15 just --
16    Q.   Okay.  What was wrong with
17 the truck?
18    A.   It busted a hose.  And it
19 cracked the manifold, and it ran hot.
20    Q.   Did you have it towed?
21    A.   Yes.
22    Q.   Who towed it?
23    A.   F&D Automotives.

Page 288

1    Q.   Do you have any receipts
2 that would indicate that that company
3 towed your truck?
4    A.   I can get it.
5    Q.   Do you have such a receipt?
6    A.   Huh?
7    Q.   Do you have such a receipt
8 in your possession?
9    A.   I might not have it in my
10 possession.
11    Q.   Where is that business
12 located?
13    A.   Montgomery.
14    Q.   What's their address?  Do
15 you have an idea?
16    A.   It's on Holcomb Street.
17    Q.   When was the truck fixed?
18    A.   The truck was fixed the same
19 day.
20    Q.   Could you have utilized your
21 personal vehicle to service the Sodexho
22 account on that date?
23    A.   It wouldn't have did any

Page 289

1 good to service Sodexho at that particular
2 time. Because it had passed the time that
3 they really needed the product.
4          So whatever you did
5 wouldn't -- wouldn't have pleased them no
6 way.
7     Q.   So it's fair to say that you
8 made no attempt in any way, shape or form
9 to either contact the Sodexho account or
10 to get anyone to help with that account?
11    A.   No. No.
12    Q.   Do you recall how much it
13 cost you to have the truck repaired?
14    A.   I don't remember.
15    Q.   Do you know who repaired the
16 truck?
17    A.   F&D.
18    Q.   Do you know -- recall the
19 individual that you dealt with there?
20    A.   Yes.
21    Q.   Who's that?
22    A.   My kinfolk's shop. That's
23 who fixed it.

Page 290

1     Q.   And what is his or her --
2 his name?
3     A.   Fred Porterfield.
4     Q.   How is he kin to you?
5     A.   His uncle and my daddy are
6 first cousins. His daddy and my daddy are
7 first cousins.
8     Q.   This document goes on to
9 reference that there had previously been a
10 service issue with Sodexho.
11          Would you agree with that?
12    A.   Sodexho, the way that we
13 handled that stop, I go in on Monday. And
14 the kitchen manager make her order out and
15 tell me that she made it out for the whole
16 week. That's the way she usually do it.
17          I go back on Thursday to
18 check with her in case she needed anything
19 else. But as far as having a problem, I
20 hadn't had any problem with that lady.
21    Q.   What -- what time did you
22 typically serve this account during the
23 day?

Page 291

1     A.   That was the last stop on
2 the route. About eleven o'clock.
3     Q.   Eleven o'clock?
4     A.   Uh-huh.
5     Q.   Okay. Going back up to the
6 document -- and I believe that you agreed
7 with this previously -- it says that Henry
8 promised her that he would bring some back
9 later that day. Do you see that?
10    A.   I saw that.
11    Q.   Do you agree with that?
12    A.   Uh-huh.
13    Q.   So your testimony is that
14 you would typically service that account
15 at eleven o'clock in the morning?
16    A.   Typically, normally get
17 there about eleven o'clock.
18    Q.   Would later that day mean
19 later that afternoon that you were going
20 to come back?
21    A.   They needed it for lunch,
22 and I didn't make it. Couldn't get back
23 in time. It was a little after eleven

Page 292

1 when I got to there.
2          And when I got to the place
3 to pick the buns up to take back to them,
4 that's when the truck messed up.
5     Q.   Why did you say that you
6 would bring the product back later that
7 day?
8     A.   Because I was intending to
9 do it. I had meant what I said. I was
10 going to do it. I had all intention to do
11 it. And I went and picked up the product
12 to bring to them when the truck messed up.
13 So I had -- I was all intentioned to do
14 it.
15    Q.   Oh, okay. So you drove back
16 to the warehouse to get hamburger buns?
17    A.   I went to one of the outlet
18 stores that they had fresh buns there that
19 someone -- somebody had left there.
20    Q.   Which outlet was that?
21    A.   That was over to the one on
22 I believe Fairground Road.
23    Q.   How far away was that?

Page 293

1    A.   That was about -- about five
2  or six miles --
3    Q.   Do you --
4    A.   -- through traffic.
5    Q.   Do you specifically recall
6  telling her --
7    A.   Downtown.
8    Q.   Do you recall telling the
9  person at Sodexho that you would be back
10 later that day?
11   A.   I told her I'd be back later
12 that day.  I didn't talk to her no way.  I
13 told the kitchen manager I'll be back
14 later that day.
15   Q.   How did you know that they
16 needed the product for that --
17   A.   That was --
18   Q.   -- particular day?
19   A.   That was a special event
20 they was having.  It wasn't the normal
21 order.  It was special, something special
22 they needed.
23       She had already ordered the

Page 294

1  normal order for the week.  And that was
2  something special she needed.  That's why
3  I said I can go get it for her and bring
4  it back.
5    Q.   Could she have used the
6  product on Friday?
7    A.   No.  That was -- I told you
8  it was for lunch on Thursday.
9    Q.   Okay.  Where exactly did you
10 breakdown?
11   A.   I broke down on Upper
12 Wetumpka Road.
13   Q.   Is there a police report of
14 any sort?
15   A.   You don't get a police
16 report when your truck tear up.
17   Q.   Were there any witnesses to
18 the truck breaking down?
19   A.   The one that fixed it.
20   Q.   And that's it?
21   A.   And my son was with me.
22   Q.   Marcus?
23   A.   I showed it to Grady Messer

Page 295

1  the next day.  I showed him -- I showed
2  Grady where the manifold was cracked on
3  the truck.  Ask him.
4    Q.   So it's your testimony that
5  Marcus was riding with you that day?
6    A.   Yes, he was.
7    Q.   Did you tell Marcus to try
8  and make any arrangements to get the
9  trucks that run -- the buns that were on
10 your truck over to the Sodexho account?
11   A.   Didn't I tell you that I
12 didn't think about it once the truck broke
13 down?
14   Q.   Could Marcus have gotten the
15 buns to the Sodexho account?
16   A.   No.  He could walk them to
17 it?
18   Q.   Well, could he have called
19 to get a ride?
20   A.   No.
21   Q.   Why not?
22   A.   I told you time had lapsed.
23   Q.   Well, you just testified

Page 296

1  that you were on your way back to the
2  Sodexho account?
3    A.   I was on the way back.  And
4  who?  He had no one to call.
5    Q.   Couldn't you call another
6  distributor?
7    A.   I told you at the time when
8  the truck broke down I didn't think about
9  the buns no more.  My attention was on the
10 truck.
11   Q.   As soon as the truck broke
12 down, if you had called someone, could
13 someone have come and picked up the buns
14 and delivered them to the Sodexho account?
15   A.   No.
16   Q.   Why not?
17   A.   By the time they got to me
18 and got to Sodexho it still would have
19 been too late.
20   Q.   Why do you say that?
21   A.   Because it was -- the time
22 frame was something like about a ten-
23 minute difference from me getting there.

Page 297

1 And it would have took anybody at least
2 twenty-five minutes to get to me.
3     Q.  Okay.  What time did the
4 truck break down?
5     A.  I think it was about -- I
6 don't -- I don't know exactly.  About
7 something till twelve.
8     Q.  Do you have any records that
9 would support that statement?
10     A.  I don't know where he put
11 time I broke down or not.
12     THE VIDEO SPECIALIST:  Need
13 to change tape.
14     MR. HISTA:  Go ahead.  We can
15 go off the Record.
16     THE VIDEO SPECIALIST:  We're
17 going off the Record.  This is the end of
18 Tape 5.
19     (Short break.)
20     THE VIDEO SPECIALIST:  Back
21 on the Record.  This is the beginning of
22 Tape 6.
23     (Whereupon, Defendant's Exhibit No.

Page 298

1 47 was marked for identification purposes
2 by Mr. Hista.)
3     Q.  (BY MR. HISTA)
4 Mr. Porterfield, you've been handed what
5 has been marked as Defendant's Exhibit 47.
6     A.  Yes.
7     Q.  Do you recognize this
8 document?
9     A.  Yes.
10     Q.  Tell me what it is, please.
11     A.  This document is the letter
12 I received certified mail from Flowers
13 Baking Company.  I -- I -- I remember it,
14 yes.
15     Q.  And this was due to the
16 issue with Sodexho, correct?
17     A.  Sodexho, yes.  I remember
18 this.
19     Q.  And at this point, Sodexho
20 was not allowing you to service them; is
21 that correct?
22     A.  Yes.
23     Q.  Did you understand that you

Page 299

1 had ten business days to try and get back
2 into the Sodexho account?
3     A.  I understood that very
4 clearly.  But I went -- I was barred from
5 the warehouse before ten days.
6     Q.  Okay.
7     (Whereupon, Defendant's Exhibit No.
8 48 was marked for identification purposes
9 by Mr. Hista.)
10     A.  I'm aware of this one too.
11     Q.  Okay.  Let's go over this
12 document.  Defendant's Exhibit No. 48.
13     Does this document reference
14 the meeting that you previously testified
15 concerning Councilman Williams and
16 Councilman Knuckles?
17     A.  Uh-huh.
18     Q.  Is that a meeting with
19 Mr. Messer?
20     A.  Yes.
21     Q.  The document indicates that
22 Councilman Williams said that they been
23 down to see the lady at Troy State about

Page 300

1 getting Henry's problem resolved, but she
2 was real rude and wouldn't talk to them.
3     Were you there when that
4 happened?
5     A.  Yes.
6     Q.  What happened?  What
7 occurred?
8     A.  She came in and she wouldn't
9 talk.  She slammed down what she had and
10 rushed off to the back.
11     Q.  Was that the kitchen
12 manager?  Or was it Ms. Barnes?
13     A.  That was Ms. Barnes, the
14 lady with the attitude.
15     Q.  The document goes on to talk
16 about Mr. Knuckles saying, well, Henry,
17 you've got several more days to work on
18 this.
19     A.  I remember.
20     Q.  Do you remember Mr. Knuckles
21 saying that?
22     A.  Yes, I do.
23     Q.  And then the document says:

Page 301

1 About that time, Henry said he talked to
2 the lady at Troy State this morning, and
3 she said he could come back and work her?
4    A.  She did.
5    Q.  Is that -- who told you
6 that?
7    A.  The lady at Sodexho.
8    Q.  Which lady?
9    A.  Ms. Barnes.
10   Q.  Okay.  So if that's true,
11 why did you go down there with the
12 councilmen?
13   A.  Because she said she knew
14 them and wouldn't mind talking to them.  I
15 had talked to her that Tuesday.
16   Q.  Well, why did you go back
17 down with the councilmen if you were
18 already back in the account?
19   A.  I wasn't back in there one
20 hundred percent.
21   Q.  Pardon me?
22   A.  I wasn't back in there one
23 hundred percent, but I was back in the

Page 302

1 account.
2    Q.  What do you mean you weren't
3 back in there a hundred percent?
4    A.  That means she had two bread
5 companies working her.
6    Q.  Okay.  She was going to
7 compare your service with somebody else?
8    A.  No.  She was just going to
9 buy from both.
10   Q.  Okay.  So you took the
11 councilmen down to try and get back into
12 the account --
13   A.  Yes.
14   Q.  -- full service?
15   A.  Yes.
16   Q.  Is that what you're saying?
17   A.  Yes.
18   Q.  The account -- I mean, the
19 document then goes on to state that Henry
20 stayed behind and talked to me some more.
21      Did you do that?
22   A.  Yes.  I talked to him.
23   Q.  The document states Henry

Page 303

1 said it really wasn't his fault that he
2 lost the account and that the last
3 breaches wasn't his fault either.
4      Is that what you told
5 Mr. Messer?
6    A.  Yes.
7    Q.  The document states after a
8 little more talk he got up and left.  When
9 he was going out the door, he said
10 somebody might die over this.
11      Did you say that?
12   A.  No.
13   Q.  Positive about that?
14   A.  No.
15   Q.  You're not positive?
16   A.  I said I didn't say it.
17   Q.  You didn't say that?
18   A.  No.
19   Q.  You're positive you didn't
20 say that?
21   A.  I didn't say that.
22   Q.  Did you say words to that
23 effect?

Page 304

1    A.  I didn't say that.
2    Q.  Did you say anything to
3 Mr. Messer as you were going out the door?
4    A.  I didn't say that.
5    Q.  Did you say anything to
6 Mr. Messer as you were going out the door?
7    A.  I called him racist.
8    Q.  Okay.  What else did you
9 say?
10   A.  I believe that's about all.
11   Q.  Could you have said
12 something else, and you just don't
13 remember it today?
14   A.  I didn't -- that's what I
15 said to him.  I called him a racist.
16   Q.  Why did you call him racist?
17   A.  Because he is.
18   Q.  And on what basis do you
19 make that contention?
20   A.  The way he treat me.
21   Q.  Pardon me?
22   A.  The way -- I just -- that's
23 my belief.

Page 305

1    Q.   Are there other African-
2  American distributors in the Montgomery
3  warehouse?
4    A.   Ask them.
5    Q.   Pardon me?
6    A.   Ask them.  Talk to them.
7    Q.   Anybody else maintain that
8  they were being discriminated against in
9  any way due to their race?
10    A.   Talk to them.
11    Q.   I said:  Are you aware of
12  that?
13    A.   Yes.
14    Q.   Okay.  Who do you believe
15  will state that they have been
16  discriminated against due to their race?
17    A.   Ask Dwayne Cleveland.  Ask
18  Doug Branch.  I don't know what some of
19  the rest of them will say nothing anyway.
20  But those two probably ain't job scared.
21  They might say so.
22    Q.   Did you have any
23  conversations with them about Grady Messer

Page 306

1  allegedly being a racist?
2    A.   I have with Doug Branch.
3  And not only Grady Messer, John Renfroe.
4    Q.   Who is John Renfroe?
5    A.   The other district manager
6  down there.
7    Q.   When did that discussion
8  take place?
9    A.   Just holding conversation
10  with the guys.  We talks.  I don't know
11  when, but we have talked.
12    Q.   Did Mr. Grady ever make any
13  statement to the effect that you
14  didn't need to be threatening anyone?
15    A.   When I called him racist.
16    Q.   What was his response?
17    A.   He just said why would I
18  call him racist.  I don't -- I don't
19  remember exactly what -- what he said, but
20  I didn't make a threat towards him.
21    Q.   So the only thing that you
22  you said during that conversation was,
23  Mr. Messer, you're a racist?

Page 307

1    A.   I called him racist.
2    Q.   And that's it?
3    A.   I talked about him.  I said
4  why was he doing me like this and why was
5  you treating me so different.  And then I
6  did call him racist, yeah.
7    Q.   Did you raise your voice?
8    A.   I don't remember.
9    Q.   Could you have?
10    A.   I don't remember.
11    Q.   Were you close to him when
12  you were having this conversation?
13    A.   No.
14    Q.   How far away were you?
15    A.   About two -- about three
16  feet, maybe.
17    Q.   The document goes on to
18  state I am not threatening anyone but more
19  than me is going to get hurt over this,
20  and that's a promise.
21        Did you say that?
22    A.   Don't remember.  No.
23    Q.   You don't remember?

Page 308

1    A.   No.  I didn't say that.
2    Q.   You're absolutely sure you
3  didn't say that?
4    A.   I didn't say that.
5    Q.   So if Grady Messer testifies
6  that you said that, he's lying?
7    A.   He's lying.
8    Q.   He's lying about this
9  conversation?
10    A.   He's lying.
11        (Whereupon, Defendant's Exhibit No.
12  49 was marked for identification purposes
13  by Mr. Hista.)
14    Q.   (BY MR. HISTA)
15  Mr. Porterfield, you have been handed what
16  has been marked as Exhibit No. 49.
17        Do you recognize this
18  document?
19    A.   Yes, I do.
20    Q.   Tell me what it is, please.
21    A.   This is a document received
22  from Grady Messer, when the other day he
23  sits here and said he didn't see me but

Page 309

1 one time after that fact.
2        But he met me the same night
3 he said I threatened him and brought me
4 this letter here.  So --
5      Q.  All right.  Who is this
6 letter from?
7      A.  This letter is from -- it's
8 from Michael Lord.
9      Q.  Did you receive a copy of
10 this letter?
11      A.  I received this copy from
12 Grady Messer that evening at Ryder truck.
13      Q.  All right.  So you were
14 barred from the warehouse?
15      A.  Uh-huh.
16      Q.  Okay.  Who did you get to
17 cover picking up your product and handling
18 transactions at the warehouse?
19      A.  That's -- that's why they
20 was at Ryder.  They was renting a truck
21 and told me to get my truck off the
22 premises.
23        That's why I was -- wasn't

Page 310

1 able to supply my stops or either breach
2 the -- solve the breach.  Because they
3 barred me from the warehouse before ten
4 days.
5      Q.  Okay.  Could you get Marcus
6 to help --
7      A.  They fired Marcus the same
8 day.
9      Q.  Okay.  Let me just ask it.
10 Did Marcus help you service your accounts
11 once you were barred from the warehouse?
12      A.  Once I was barred from the
13 warehouse, I couldn't service my account
14 because I couldn't come to the warehouse.
15      Q.  Did Marcus go to the
16 warehouse and pick up product for you?
17      A.  We no longer went to the
18 warehouse.  I went to the warehouse one
19 time afterward.
20      Q.  Once you were barred from
21 the warehouse, did you make arrangements
22 with Marcus such that he would go to the
23 warehouse and pick up the product?

Page 311

1      A.  Marcus wasn't allowed to go
2 to the warehouse neither.
3      Q.  So it's your testimony
4 Marcus never went to the warehouse to pick
5 up products for you?
6      A.  After then?  After March
7 16th?
8      Q.  That's correct.
9      A.  No.
10      Q.  So he never tried to pick up
11 products for you?
12      A.  No.
13      Q.  Well, what was Marcus --
14 Marcus did go on the premises at one
15 point, correct?
16      A.  Marcus -- before then, yes.
17      Q.  When -- I understand that
18 Marcus was filming something on company
19 premises.  When was that?
20      A.  You'll see it at a later
21 date.
22      Q.  A later date.  Okay.  So --
23      A.  It was before then.

Page 312

1      Q.  It was before March 16th?
2 Or after March 16th?
3      A.  It was before March 16th.
4      Q.  So Marcus was already banned
5 from the property too?
6      A.  Marcus was banned the same
7 day that I was fired.
8      Q.  Okay.
9      A.  We was terminated the same
10 day, March the 16th.
11      Q.  Marcus wasn't an employee of
12 Flowers, was he?
13      A.  He was working through some
14 temp service.
15      Q.  Okay.  Once you were barred
16 from the warehouse, did you make, you
17 know, any arrangements with any other
18 distributor to handle picking up your
19 product?
20      A.  I was told by Grady Messer
21 that I couldn't come out there and
22 couldn't nobody else run my route.  That I
23 wasn't allowed on the premises.  And --

Page 313

1    Q.   He didn't tell you nobody
2 else could pick up your product, did he?
3    A.   Why would they rent a truck
4 the same night? They was renting a truck
5 the night that he brought me that
6 paperwork to run that route.
7    Q.   That's not my question. Did
8 Mr. Messer ever tell you that you could
9 not make arrangements with another
10 distributor to have your product picked
11 up?
12    A.   I don't recall.
13    Q.   He didn't say that, did he?
14    A.   I don't recall. No.
15    Q.   And you didn't make
16 arrangements with any other distributor to
17 have your product picked up, did you?
18    A.   No, I didn't.
19    Q.   Didn't make arrangements
20 with anybody to have your product picked
21 up, did you?
22    A.   No, I didn't.
23    Q.   Are you aware of any

Page 314

1 documents that would indicate when Marcus
2 was no longer allowed on company premises?
3    A.   I don't know anything about
4 any documents.
5    Q.   What is your understanding
6 about why --
7    A.   He got --
8    Q.   -- Marcus was no longer --
9    A.   He got a phone call.
10    Q.   Okay. And what was he told?
11    A.   That he wasn't allowed on
12 company property no more.
13    Q.   And why was that?
14    A.   They said he was filming on
15 company property. I just found it out the
16 other day.
17    Q.   Pardon me?
18    A.   I just found out the reason
19 the other day when Grady was testifying.
20    Q.   So you had never heard that
21 before then?
22    A.   No. Never heard it before.
23    Q.   Do you know what Marcus was

Page 315

1 attempting to videotape or take pictures
2 of?
3    A.   Yes, I do.
4    Q.   What?
5    A.   He filmed the freezer and
6 some of the other stuff at the warehouse.
7    Q.   And you heard that for the
8 first time the other day?
9    A.   I heard that the first time
10 the reason why they terminated him.
11    Q.   Did you have a discussion
12 with Marcus about going on company
13 property to tape the freezer or any
14 product coming out of the freezer?
15    A.   Yes, I did.
16    Q.   And when did you have that
17 discussion?
18    A.   The day he did it.
19    Q.   Was it your idea?
20    A.   It was my idea.
21    (Whereupon, Defendant's Exhibit No.
22 50 was marked for identification purposes
23 by Mr. Hista.)

Page 316

1    Q.   (BY MR. HISTA) Did you ask
2 permission from anyone at Flowers so that
3 Marcus could take pictures of anything on
4 company premises?
5    A.   Other people took pictures.
6    Q.   I'm not asking you that.
7 I'm asking you --
8    A.   I didn't think I needed to.
9    Q.   So your answer is no, you
10 didn't ask for permission?
11    A.   I didn't think I needed to.
12    Q.   You didn't ask for
13 permission?
14    A.   I didn't think I needeed to.
15    Q.   Just for the Record, I'd
16 like a clear answer. Is your answer no?
17    A.   Answer is no.
18    Q.   Why did you want Marcus to
19 take pictures on Flowers' premises?
20 Mr. Porterfield?
21    A.   I'm reading. Say what now
22 about Marcus?
23    Q.   Why did you attempt to

Page 317

1 arrange for Marcus to take pictures or a
2 videotape on company premises?
3    A.  Some things on company
4 property I wanted to see.
5    Q.  And why did you want to see
6 it?
7    A.  Because of some wrongdoing
8 the company was doing.
9    Q.  So you were planning at that
10 point to file a lawsuit against Flowers?
11    A.  No.
12    Q.  You weren't?
13    A.  No.  Hadn't decided.
14    Q.  So -- well, why did you need
15 pictures then?
16    A.  I just needed pictures for
17 my proof.
18    Q.  Okay.  Do you have any such
19 pictures?
20    A.  Yes.
21    Q.  You do?  Did you provide
22 those pictures to your attorney?
23    A.  Not yet.

Page 318

1    Q.  Not yet.  Why not?
2    A.  Waiting.
3    Q.  What are you waiting for?
4    A.  Just waiting.
5    Q.  Do you not understand that
6 as part of this litigation that you're
7 supposed to provide relevant evidentiary
8 materials to your attorney?
9        MR. TALIAFERRO:  Are we
10 talking about the tapes?
11        MR. HISTA:  Yes.
12    A.  That's what he's talking
13 about?
14        MR. TALIAFERRO:  He said
15 pictures, but I assume he meant tapes.
16    Q.  (BY MR. HISTA)  Tapes?  Do
17 you have tapes?
18    A.  Yes.
19    Q.  Did you turn them over to
20 your attorney yet?
21    A.  Yes.
22        MR. TALIAFERRO:  I've got
23 them.

Page 319

1        MR. HISTA:  Okay.  They
2 haven't been produced.
3        MR. TALIAFERRO:  I don't
4 think you've requested them, but I don't
5 remember.
6        MR. HISTA:  I've requested
7 everything under the sun.
8    A.  I thought he said pictures.
9        MR. TALIAFERRO:  We'll get
10 them to you though.  Simple enough.
11        MR. HISTA:  I could probably
12 show you for record purposes probably four
13 or five separate requests that would cover
14 that.
15        MR. TALIAFERRO:  His son had
16 them for a good long time.  I don't think
17 he got them to us until what, a month ago,
18 or three weeks ago, whenever it was he got
19 them to us.  But his son kept them for the
20 longest time.  I didn't even know about
21 them until recently.
22        MR. HISTA:  Okay.  Fair
23 enough.  I do want copies of them.

Page 320

1        MR. TALIAFERRO:  Oh, I've got
2 nothing to hide.  I don't know if we want
3 this whole conversation on the Record.
4        I think in light of the
5 deposition I think it's already been
6 admitted about the frozen product.  I
7 think that's what the tapes are mainly of.
8    Q.  (BY MR. HISTA)  Okay.
9 Mr. Porterfield, you have in front of you
10 what has been marked as Defendant's
11 Exhibit No. 50.
12        Do you recognize that
13 document?
14    A.  Yes.  I have a copy of this.
15    Q.  Could you identify it for
16 me, please?
17    A.  It's got several breaches
18 and comments at the bottom and different
19 dates.  And on the back page from Michael
20 Lord.
21    Q.  And at this point, you were
22 still a distributor for Flowers, correct?
23    A.  No.

Page 321

1  Q.  Look at --
2  A.  I had been barred from the
3  warehouse.
4  Q.  At this point, were you
5  still a distributor for Flowers?
6  A.  If you say so, yes.
7  Q.  I'm asking.  Were you a
8  distributor?
9  A.  I was no longer allowed on
10  Flowers' property.  So I felt like I
11  wasn't a distributor.
12  Q.  Okay.  But the distributor
13  relationship had not been terminated at
14  this point, had it?
15  A.  Verbally it had been.
16  Q.  All right.  Let's look at
17  this letter.  Look at the first paragraph.
18  A.  (Witness complying.)
19  Q.  Read the last sentence of
20  the first paragraph into the Record,
21  please.
22  A.  Okay.  However, be advised
23  this is still your responsibility to

Page 322

1  service your distributorship and make
2  it -- make acceptable allegation (sic.)
3  against you to insure your customers are
4  properly served -- arrangements that your
5  customers are properly served.
6  Q.  Would that statement not
7  indicate that you were still a distributor
8  for Flowers as of March 17, 2005?
9  A.  This letter would.  But by
10  me not going -- allowed to go on the
11  warehouse, I don't know how I could
12  operate it myself.  I didn't have anyone
13  else to go out there and do it.
14  Q.  But you didn't attempt to
15  get anybody else to help you, did you?
16  A.  I didn't have anyone to do
17  it.
18  Q.  But you didn't ask any other
19  distributor for help, did you?
20  A.  I don't remember.  No.
21  Q.  Well, you've previously
22  testified no.
23  A.  No.

Page 323

1  Q.  Correct?
2  A.  No, I didn't.
3  MR. HISTA:  Let's go off the
4  Record for a minute.
5  THE VIDEO SPECIALIST:  One
6  moment.  Off the Record.
7  (Off-the-Record discussion.)
8  THE VIDEO SPECIALIST:  We're
9  back on the Record.
10  Q.  (BY MR HISTA)
11  Mr. Porterfield, we're back on the Record.
12  It's approximately 3:17.  Are you prepared
13  to proceed?
14  A.  Yes, sir.
15  (Whereupon, Defendant's Exhibit No.
16  51 was marked for identification purposes
17  by Mr. Hista.)
18  Q.  (BY MR. HISTA)
19  Mr. Porterfield, I have had the court
20  reporter hand you what has been marked as
21  Defendant's Exhibit 51.
22  If you could take a few
23  moments and review this document for me,

Page 324

1  please.
2  A.  Okay.
3  (Brief pause.)
4  A.  Okay.
5  Q.  Mr. Porterfield, could you
6  identify Defendant's Exhibit 51 for me?
7  A.  Yes.
8  Q.  Could you tell me what it
9  is, please?
10  A.  This is the letter I wrote
11  to Mr. Lord.
12  Q.  When did you write this
13  letter?
14  A.  When?
15  Q.  Yes.
16  A.  March 17th.
17  Q.  Did you write it?
18  A.  I got help with it.
19  Q.  Who did you get help from?
20  A.  Kinfolk.
21  Q.  Which kinfolks helped you
22  prepare it?
23  A.  My daughter.

Page 325

```
1     Q.  Anybody else?
2        MR. TALIAFERRO:  Now, don't
3  testify about any help or any
4  conversations whatsoever with your
5  attorneys.
6     (Whereupon, Defendant's Exhibit No.
7  52 was marked for identification purposes
8  by Mr. Hista.)
9     Q.  (BY MR. HISTA)  Let's mark
10 the next document.  We're going to go back
11 to that one.
12    A.  I done read this before.
13    Q.  Okay.  You've seen
14 Defendant's Exhibit 52?
15    A.  Yeah.  I'm aware of
16 everything on here.
17    Q.  Is what is stated in Exhibit
18 No. 52 accurate?
19    A.  Yes.
20    Q.  So it's accurate that you
21 stated that you had been told by your
22 lawyer to run your route?  Is that an
23 accurate statement?
```

Page 326

```
1     A.  I had called and asked him.
2  Told me I need to go run it if the letter
3  said the 23rd.
4     Q.  Okay.  Who was your lawyer
5  at the time?
6     A.  I hadn't acquired none.  I
7  had just asked questions with one.
8     Q.  Who was it?
9     A.  I had talked to -- I got a
10 kinfolk that's a lawyer.  Mr. Fred.
11    Q.  Is that who you are
12 referring to in that conversation?
13    A.  Really, in this conversation
14 here, when I said I had asked my attorney,
15 I was just talking to Tammy and was acting
16 like I had already occurred (sic.) one.
17    Q.  This document again states:
18 Henry stated he was told by his lawyer to
19 run his route.  Do you see that?
20    A.  Let me see.  I told her
21 that.  I didn't have a lawyer.
22    Q.  You didn't have a lawyer?
23    A.  No.  But I told her that,
```

Page 327

```
1  uh-huh.
2     Q.  Did you have a lawyer before
3  your contract with Flowers was terminated?
4     A.  No.
5     Q.  Okay.  Who else other than
6  your daughter helped you prepare
7  Defendant's Exhibit No. 51?
8        MR. TALIAFERRO:  Again, if
9  you received help from an attorney, I'm
10 going to ask you not to answer that if it
11 involves an attorney.  Anybody other than
12 an attorney you can tell.
13       MR. HISTA:  He just testified
14 that he didn't have an attorney.
15       MR. TALIAFERRO:  Yeah.  But
16 he could have gotten advice from one, but
17 that doesn't mean he had retained an
18 attorney, he hired an attorney.  You can
19 certainly ask one for advice if they're
20 not your lawyer.
21       So I'm just telling you, as
22 everyone at this table knows, your
23 conversations are attorney-client
```

Page 328

```
1  privileged just as their client's
2  conversations with them are attorney-
3  client privileged.
4        So any conversation you had
5  with anyone other than a lawyer, of
6  course, you can talk about that.
7     A.  Uh-huh.
8     Q.  Who typed Defendant's
9  Exhibit 51?
10    A.  My daughter typed it.
11    Q.  And on page two of that
12 document, is that your signature?  Or did
13 somebody sign for you?
14    A.  That's my signature.
15    Q.  Turn your attention to page
16 four of this document.  I mean, I'm sorry.
17 Paragraph four of this document.
18    A.  One thing on here, this
19 first time and I received notice of
20 customer complaints --
21    Q.  Read the second sentence of
22 paragraph four into the Record for me,
23 please.
```

Page 329

1    A.  Your letter also points
2  out -- for customers, which I must point
3  out was the first time I received and
4  noticed customer complaints.  It wasn't.
5    Q.  That's not a true statement,
6  is it?
7    A.  That wasn't.
8    Q.  That's a false statement,
9  correct?
10    A.  I was probably just running
11  off.  She typed it in wrong, and I didn't
12  read it like I should.  Yeah.
13    Q.  Did you read this letter
14  before you signed it?
15    A.  I read it.
16    Q.  And you sent the letter with
17  that statement in it, correct?
18    A.  Yes, I did.
19    Q.  Why didn't you tell your
20  daughter to change that sentence?
21    A.  I didn't pay it any
22  attention.
23    Q.  Turning to -- turning your

Page 330

1  attention to the fifth paragraph, you use
2  the terminology "false accusations."
3         What are you referring to?
4    A.  Troy State.
5    Q.  Anything else?
6    A.  That's all I was concerned
7  about.
8    Q.  The last paragraph of this
9  letter addresses the issue of product that
10  had been in the freezer.
11        Is this the first time that
12  you had written a letter to Flowers about
13  any --
14    A.  This is.
15    Q.  -- product being in the
16  freezer?
17    (Whereupon, Defendant's Exhibit No.
18  53 was marked for identification urposes
19  by Mr. Hista.)
20    A.  This is the letter I
21  received from Michael Lord and Steve
22  Stephens at Tenda Chick.
23    Q.  Is -- you're referring to

Page 331

1  Defendant's Exhibit No. 53, correct?
2    A.  Yes.
3    Q.  And is this the letter that
4  terminated your distributor relationship
5  with Flowers?
6    A.  Yes.
7    Q.  And in this letter, you were
8  given the option of selling the
9  distributorship back to the company; is
10  that correct?
11    A.  Yes.
12    Q.  Did you have any discussions
13  with anyone in Flowers' management about
14  that option?
15    A.  Michael Lord and -- and
16  Grady talked to me about it.  But we
17  didn't -- the conversation didn't last
18  over a few minutes.  It didn't last long.
19  I told them I wasn't going to accept it.
20    Q.  Did you -- where did the
21  conversation or conversations take place?
22    A.  Tenda Chick.
23    Q.  What did they offer you to

Page 332

1  repurchase the distributorship?  Do you
2  remember?
3    A.  The price is on here.
4    Q.  But you declined their
5  offer --
6    A.  Yes.
7    Q.  -- to repurchase the
8  distributorship?
9    A.  Yes.
10    Q.  Is it your understanding
11  that the offer would have been based on
12  the value of your distributorship less any
13  accounting that had to be done?
14        Is that typically the way it
15  was done?
16    A.  Yes.
17    Q.  After the conversation that
18  you just referred to at the -- was it a
19  chicken restaurant you said?
20        Where did the conversation --
21    A.  Tenda Chick.
22    Q.  Tenda Chick.  Have you had
23  any discussions with anyone at Flowers

Page 333

1 about the termination of your contract or
2 your distributor relationship with Flowers
3 since then?
4    A.   Yes.
5    Q.   Okay. Who have you talked
6 to?
7    A.   We discussed it earlier.
8 Those names that I -- that you asked me
9 about.
10    Q.   Okay. Anybody in Flowers'
11 management?
12    A.   Not about my
13 distributorship.
14    Q.   About anything else?
15    A.   Not that I know of, huh-uh.
16 No.
17    Q.   Tell me, once your contract
18 with Flowers was terminated, what efforts
19 did you make to obtain other work?
20    A.   I took a job with Montgomery
21 Board of Education.
22    Q.   Did you apply anyplace else
23 before you got the job there?

Page 334

1    A.   No.
2    Q.   And how did you come about
3 applying there? Did you know somebody
4 there?
5    A.   Yes.
6    Q.   Who did you know there?
7    A.   I got kinfolks that work for
8 the Board of Education.
9    Q.   And who works for the Board
10 of Education?
11    A.   Robert Porterfield, Marietta
12 Branch.
13    (Whereupon, Defendant's Exhibit No.
14 54 was marked for identification purposes
15 by Mr. Hista.)
16    Q.   (BY MR. HISTA) Anybody else
17 that's kin that works there?
18    A.   I got a brother named Thomas
19 that works there for the Board.
20    Q.   Mr. Porterfield, could you
21 identify Exhibit No. 54 for me, please?
22    A.   Application for Montgomery
23 Public Schools.

Page 335

1    Q.   And did you complete this
2 application?
3    A.   The best of my knowledge.
4    Q.   Turn your attention to page
5 two of this document. Is that your
6 signature at the bottom of the document?
7    A.   Yes.
8    Q.   And it's dated it appears
9 March 28, 2005. I believe that you
10 completed this application on that date?
11    A.   Yes.
12    Q.   Do you see the paragraph
13 above your signature?
14    A.   Uh-huh.
15    Q.   Did you read that paragraph
16 before you signed it?
17    A.   Yes.
18    Q.   Did you understand it?
19    A.   Yes.
20    Q.   Read the first sentence into
21 the Record.
22    A.   Certify that the answers
23 given herein are true and complete to the

Page 336

1 best of my knowledge.
2    Q.   Okay. Read the first
3 sentence of the second paragraph.
4    A.   I authorize you to
5 investigate, inquire of my personnel
6 (sic.), employment and family history or
7 other relation matters as made by
8 necessary as employer decision.
9    Q.   Okay. Read the -- read the
10 first sentence of the second paragraph.
11    A.   In the event of employment,
12 I understand that false and misleading
13 information given in my application for
14 investigation result in discharge.
15    Q.   Okay. Turning your
16 attention to the top of the page under
17 experience, you list Flowers Baking
18 Company as a company that you had worked
19 for, correct?
20    A.   Yes.
21    Q.   And then it says reason for
22 leaving, need to move on. Do you see
23 that?

| Page 337 | Page 339 |
|---|---|
| 1   A.  Yes. | 1 55 was marked for identification purposes |
| 2   Q.  Did you write that there? | 2 by Mr. Hista.) |
| 3   A.  Yes. | 3       Q.  (BY MR. HISTA) |
| 4   Q.  Would you agree with me that | 4 Mr. Porterfield, you've been handed what |
| 5 that's misleading? | 5 has been marked as Defendant's Exhibit No. |
| 6   A.  No. | 6 55. |
| 7   Q.  Why not? | 7       Have you ever seen this |
| 8   A.  I needed to move on. | 8 document before? |
| 9   Q.  Why did you need to move on? | 9   A.  Yes. |
| 10   A.  Because they were through | 10   Q.  Tell me what's it's about. |
| 11 with me.  So I need to move on.  So I | 11   A.  It's about -- this letter -- |
| 12 moved on to the next thing. | 12 I put on leave of absence on -- on August |
| 13   Q.  Were you thinking about | 13 the 13th until further notice. |
| 14 moving on before your contract with | 14   Q.  Why were you put on leave? |
| 15 Flowers -- | 15   A.  I don't know. |
| 16   A.  No. | 16   Q.  You have no idea? |
| 17   Q.  -- was terminated? | 17   A.  I didn't inquire.  They |
| 18   A.  No. | 18 didn't never tell me. |
| 19   Q.  Not at all? | 19   Q.  Did you inquire? |
| 20   A.  No. | 20   A.  Yeah.  They wouldn't tell |
| 21   Q.  Did you seek an alternate, | 21 me. |
| 22 you know, source of work at any time you | 22   Q.  Did they say why they |
| 23 were a distributor for Flowers? | 23 wouldn't tell you? |

| Page 338 | Page 340 |
|---|---|
| 1   A.  No.  Talking about working | 1   A.  They didn't tell me. |
| 2 somewhere else? | 2   Q.  While you were working |
| 3   Q.  Yes.  While you were a | 3 there, did you have any disciplinary |
| 4 distributor for Flowers? | 4 issues? |
| 5   A.  I worked I think seven days | 5   A.  Not that I know of. |
| 6 for Rheem one time.  But I didn't think | 6   Q.  Did you have any |
| 7 nothing of that. | 7 disagreements with any supervisors? |
| 8   Q.  That was it? | 8   A.  No. |
| 9   A.  Yes. | 9   Q.  Did you have any |
| 10   Q.  What did you do for the | 10 disagreements with anybody that worked |
| 11 public schools? | 11 there? |
| 12   A.  Custodian. | 12   A.  Yes. |
| 13   Q.  How much you make? | 13   Q.  Who? |
| 14   A.  Nothing. | 14   A.  The other custodian Dwayne |
| 15   Q.  All right. | 15 Cleveland.  Dwayne -- Dwayne Carter. |
| 16   A.  About -- about twenty -- | 16   Q.  And what was the nature of |
| 17 about two thousand a month, I believe. | 17 your disagreement? |
| 18 Something around there. | 18   A.  He just didn't get along |
| 19   Q.  Once you became employed | 19 with me.  That's all. |
| 20 with the public schools, did you seek | 20   Q.  Did he complain about you? |
| 21 another job anywhere else? | 21   A.  Yes. |
| 22   A.  No. | 22   Q.  What was the nature of his |
| 23   (Whereupon, Defendant's Exhibit No. | 23 complaint? |

| Page 341 | Page 343 |
|---|---|

**Page 341**

1    A.   Complaining all the time.
2    Q.   Did he complain that you
3  threatened him?
4    A.   (Nodding head.)
5    Q.   Yes?
6    A.   He complained one time that
7  I threatened him.
8    Q.   And do you recall what his
9  specific complaint was?
10    A.   He didn't complain I
11  threatened him.  He complained I cussed
12  him.
13    Q.   Well, you just told me he
14  complained --
15    A.   I had to refrain that.  He
16  complained that I cussed him.
17    Q.   Okay.  What did he --
18    A.   I ain't never threatened
19  him.
20    Q.   What did he claim you said?
21    A.   Ass.
22    Q.   Anything else?
23    A.   That's all I can remember.

**Page 342**

1  And it wasn't -- the way the conversation
2  was, it wasn't directly talking to him.
3    Q.   Did he complain about you
4  physically touching him in any way?
5    A.   Never touched him.
6    Q.   Was there an investigation
7  into his complaint?
8    A.   I don't know.
9    Q.   Were you interviewed
10  regarding his complaint?
11    A.   One time.
12    Q.   Who interviewed you?
13    A.   Ms. Allen.
14    Q.   And who is she?
15    A.   She was the Director of the
16  Professional Development Center.
17    Q.   And what do you recall about
18  that interview?
19    A.   Nothing.
20    Q.   You don't recall anything at
21  all?
22    A.   All she told me, y'all was
23  grown mens.  Go on back to work, whatever.

**Page 343**

1    Q.   Pardon me? .
2    A.   She said y'all was old
3  enough and those kind of words be said.
4  That was all was said in the interview.
5    Q.   Was anybody else present
6  during that conversation?
7    A.   The three of us.
8    Q.   And did you go back to work?
9    A.   No.
10    Q.   Did the other custodian go
11  back to work?
12    A.   I went back to work then,
13  yes.
14    Q.   Oh, you did go back to work?
15    A.   Yeah, then.
16    Q.   Okay.  Resume your normal
17  duties?
18       (Whereupon, Defendant's Exhibit No.
19  56 was marked for identification purposes
20  by Mr. Hista.)
21    Q.   (BY MR. HISTA) Next we've
22  marked Defendant's Exhibit No. 56.  Take a
23  moment and review this document for me,

**Page 344**

1  please.
2    A.   (Witness complying.)
3    Q.   Mr. Porterfield, Defendant's
4  Exhibit No. 56 indicates that your
5  employment at Montgomery Public Schools
6  was terminated; is that correct?
7    A.   Yes.
8    Q.   Was it a voluntary
9  termination?
10    A.   No.
11    Q.   Was it an involuntary
12  termination?  Were you fired?
13    A.   I was terminated.
14    Q.   For what reason?
15    A.   I don't know.
16    Q.   Did you ever ask anyone?
17    A.   Yes.
18    Q.   Who did you ask?
19    A.   Mark Sims I guess is his
20  name.  He wouldn't tell me.
21    Q.   Did you ask anybody else?
22    A.   I wrote him a letter, but he
23  wouldn't tell me.

| Page 345 | Page 347 |
|---|---|
| 1  Q.  Do you have a copy of that<br>2 letter?<br>3  A.  Well, you got a copy of<br>4 everything else.  You probably got that<br>5 too.<br>6  Q.  For the Record, I don't.  Do<br>7 you have any thoughts as to why you were<br>8 terminated?<br>9  A.  Answer now, no.<br>10  Q.  Pardon me?<br>11  A.  No.<br>12  Q.  None at all?  You don't have<br>13 any -- any thoughts at all as to why you<br>14 may have been terminated from Montgomery<br>15 Public Schools?<br>16  A.  No.<br>17  Q.  Did you ask anybody else<br>18 other than that one individual?<br>19  A.  That's the only one you<br>20 needed.  They supposed -- he was the<br>21 personnel director.<br>22  Q.  How were you notified that<br>23 your employment was terminated? | 1  A.  At that time, no.<br>2  Q.  Okay.  What about at this<br>3 time?<br>4  A.  It's coming up to it, I<br>5 guess.  I don't know.<br>6  Q.  You don't know?<br>7  A.  No.<br>8  Q.  You just mentioned that<br>9 you're coming up on to information that<br>10 you may find out why you were terminated?<br>11  A.  I don't know.<br>12  Q.  Are you actively attempting<br>13 to find out why you were terminated?<br>14  A.  I don't know.<br>15  Q.  At this point in time, are<br>16 you undertaking any efforts to find out<br>17 why your employment from the Montgomery --<br>18  A.  No.<br>19  Q.  -- Public Schools was<br>20 terminated?<br>21  A.  No.<br>22  Q.  Have you talked with --<br>23  A.  No. |

| Page 346 | Page 348 |
|---|---|
| 1  A.  You had to go down to his<br>2 office.<br>3  Q.  What do you remember about<br>4 that conversation?  What did he tell you?<br>5  A.  I was put on adminstrative<br>6 leave until further notice.<br>7  (Whereupon, Defendant's Exhibit No.<br>8 57 was marked for identification purposes<br>9 by Mr. Hista.)<br>10  Q.  (BY MR. HISTA) The next<br>11 document has been marked Defendant's 57.<br>12  Do you recognize this<br>13 document?<br>14  A.  Yes, I do.<br>15  Q.  Is it fair to say that this<br>16 document indicates that you were<br>17 terminated from the Montgomery County<br>18 Board of Education -- Montgomery Public<br>19 Schools?<br>20  A.  Yes.<br>21  Q.  And, again, you have no<br>22 information or thoughts about why you were<br>23 terminated? | 1  Q.  -- anyone about your<br>2 termination from the Montgomery Public<br>3 Schools other than with the personnel<br>4 director that you mentioned?<br>5  A.  No.<br>6  Q.  And you never received any<br>7 response to the letter --<br>8  A.  No.<br>9  Q.  -- that you wrote?<br>10  What did you do after you<br>11 were terminated from the Montgomery Public<br>12 Schools?  Did you seek alternate<br>13 employment?<br>14  A.  I worked one day at<br>15 Winn-Dixie.<br>16  Q.  Why did you only work one<br>17 day?<br>18  A.  Because I quit after one<br>19 day.<br>20  Q.  What position were you hired<br>21 in?<br>22  A.  Hired in -- back at helping<br>23 out with stock merchandise. |

## Page 349

1    Q.  Do you recall who hired you?

2    A.  Mr. Brown.  I don't know his

3 first name.  Carter Hill Road Winn-Dixie.

4    Q.  Why did you work only one

5 day?

6    A.  Because I had a problem with

7 my leg.  I couldn't stand on my legs long.

8    Q.  Did you file any type of

9 claim with Winn-Dixie concerning your leg?

10    A.  I didn't get hurt at

11 Winn-Dixie.

12    Q.  Where did you get hurt?

13    A.  At Flowers, I guess.

14    Q.  Have you sought out medical

15 treatment for your leg?

16    A.  Yes.

17    Q.  And do you recall the name

18 of your doctor?

19    A.  I got a Dr. Davis,

20 Dr. Fletcher, Dr. Fallahi, Dr. Jakes.

21    (Whereupon, Defendant's Exhibit No.

22 58 was marked for identification purposes

23 by Mr. Hista.)

## Page 350

1    Q.  (BY MR. HISTA) Did the leg

2 bother you while you were working for the

3 Montgomery Public Schools?

4    A.  Yes.

5    Q.  Was there any anything in

6 particular about the work at Winn-Dixie

7 that aggravated it?

8    A.  I couldn't stay on my legs

9 long.  My leg swoll that day so big that I

10 didn't go back to work.

11    Q.  I've handed you what has

12 been marked as Defendant's Exhibit 68.

13    If you could take a moment

14 and look at this document for me, please.

15    A.  (Witness complying.)

16    Q.  Do you recognize this

17 document, Mr. Porterfield?

18    A.  Yes.

19    Q.  Could you tell me what it

20 is?

21    A.  Application for Winn-Dixie.

22    Q.  Is the information that's

23 contained in this document information

## Page 351

1 that you gave Winn-Dixie?

2    A.  I didn't key it into the

3 computer.  I had to get somebody else to

4 key it in for me.  So I wouldn't -- some

5 of it probably is.  Most of it should be

6 because I was telling them what to do.

7    Q.  Okay.

8    A.  And I never did get a

9 printout.  It goes straight to Winn-Dixie

10 off the computer.

11    Q.  So you met with somebody who

12 typed the information into the computer?

13    A.  Uh-huh.

14    Q.  Look at the top.  It says

15 the date of application is 8/16/2006.  Do

16 you see that?

17    A.  Yes.

18    Q.  Do you believe that date to

19 be accurate?

20    A.  It should be.

21    Q.  And at that time -- on

22 August 16th, 2006, you were still employed

23 with the Montgomery Public Schools, were

## Page 352

1 you not?

2    A.  No, I wasn't working.  I was

3 on administrative leave.

4    Q.  Yeah.  But you were still an

5 employee of the Montgomery --

6    A.  Uh-huh.

7    Q.  -- Public Schools?

8    Why did you make application

9 with Winn-Dixie if you were still an

10 employee --

11    A.  I needed --

12    Q.  -- of --

13    A.  I went to work.

14    Q.  Did you know how long you

15 were going to be on administrative leave

16 with the Montgomery Public Schools?

17    A.  No, I didn't.

18    Q.  Turning to page two of this

19 document, under employment history, it

20 says Montgomery Board of Education.

21    Do you see that?

22    A.  Uh-huh.

23    Q.  It says still employed.  Do

Page 353

1 you see that? It says no. That's not
2 true, is it?
3     A. I felt like I wasn't
4 employed.
5     Q. So --
6     A. I wasn't planning on going
7 back.
8     Q. You weren't planning to go
9 back?
10     A. No.
11     Q. Why not?
12     A. I didn't really want that
13 job. I didn't like it.
14     Q. Why didn't you like it?
15     A. I wasn't able to perform it
16 like I should. And I -- I felt like I
17 didn't like it.
18         And at this particular time
19 when I had took this one at Winn-Dixie --
20     Q. Okay. The next column, it
21 says reason for leaving the Montgomery
22 Board of Education, it says voluntary
23 quit. That's false, isn't it?

Page 354

1     A. Like I told you, I didn't
2 key it in. And I didn't sign it. And I
3 sent it off the computer to them. So --
4     Q. That's not correct, is it?
5     A. It's not signed by me no
6 way. So I'm not going to discuss it no
7 more.
8     Q. Is the reason for leaving
9 the Montgomery Board of Education that
10 appears on this document false?
11     A. I didn't sign it, and I'm
12 not going to comment on it.
13     Q. What's it say?
14     A. Voluntary quit.
15     Q. That's not true, is it?
16     A. I told you I didn't sign it,
17 and I didn't know what they had keyed into
18 the computer.
19     Q. Was your employment with
20 Montgomery Board of Education terminated
21 involuntarily?
22     A. It was terminated.
23     Q. Involuntarily, correct?

Page 355

1     A. Yes.
2     Q. Why did you write to the
3 Montgomery Board of Education concerning
4 the reason for your termination?
5     A. I write to find out the
6 reason why. That's why I wrote to them.
7     Q. And is that the -- is the
8 conversation with the personnel director
9 of the Public Schools and the letter that
10 you wrote the only attempts that you've
11 made to find out why you were terminated?
12     A. Repeat the question.
13     Q. Yeah. Was the letter that
14 you wrote and the discussion that you had
15 with the personnel director of the
16 Montgomery Board of Education the only
17 efforts that you have made to find out why
18 you were terminated?
19     A. That -- yes, it is.
20         (Whereupon, Defendant's Exhibit No.
21 59 was marked for identification purposes
22 by Mr. Hista.)
23     Q. (BY MR. HISTA)

Page 356

1 Mr. Porterfield, do you recognize
2 Defendant's Exhibit No. 59?
3     A. My 1999 1040.
4     Q. Turning to page two of this
5 document, is that your signature? Is one
6 of those signatures yours?
7     A. Uh-huh.
8     Q. And to the right of your
9 signature is the date August 25, '06?
10     A. Uh-huh.
11     Q. Do you see that?
12     A. Uh-huh.
13     Q. Is that the date you
14 completed your 1999 tax return?
15     A. Yes.
16     Q. Had you completed a tax
17 return for the year 1999 before August 25,
18 2006?
19     A. No.
20     Q. Is it fair to say that you
21 knew you had an obligation to file an
22 annual tax return? Did you know that?
23     A. Yes, I do.

Page 357

1    Q.   Is it fair to say that you
2  knowingly did not file a tax return for
3  the year 1999?
4    A.   Yes.
5    Q.   Why didn't you file a tax
6  return?
7    A.   I just didn't file it.
8    Q.   Is the information on this
9  tax return accurate?
10   A.   Should be.
11   Q.   Any reason to believe it's
12 not?
13   A.   Ain't no reason to believe
14 it's not.
15        THE VIDEO SPECIALIST:  I need
16 to change the tape, please.
17        MR. HISTA:  Okay.
18        THE VIDEO SPECIALIST:  We're
19 going off the Record.  This is end of Tape
20 6.
21        (Off-the-Record discussion.)
22        THE VIDEO SPECIALIST:  We're
23 back on the Record.  This is the beginning

Page 359

1    Q.   Is it fair to say that page
2  two of this document indicates earnings
3  from gambling?
4    A.   Yes.
5    Q.   Is this the only year since
6  1999 that you have had any earnings from
7  gambling?
8    A.   I don't know.
9    Q.   You don't know?
10   A.   I think later.  I don't
11 know.
12   Q.   You think there are some
13 later?
14   A.   Yes, I do.
15   Q.   Do you know if you reported
16 those earnings?
17   A.   Might have got misplaced.
18 But if I didn't, they will be taken care
19 of.
20   Q.   Okay.
21   A.   I was looking through
22 some -- nothing.
23        (Whereupon, Defendant's Exhibit No.

Page 358

1  of Tape 7.
2        (Whereupon, Defendant's Exhibit No.
3  60 was marked for identification purposes
4  by Mr. Hista.)
5    Q.   (BY MR. HISTA)
6  Mr. Porterfield, we're back on the Record.
7  It's approximately 3:55.  Hopefully, we
8  don't have too much further to go.
9        Are you prepared to proceed?
10   A.   Yes.
11   Q.   You have in front of you
12 what has been marked as Defendant's
13 Exhibit No. 60.
14        Have you ever seen this
15 document before?
16   A.   Yes.
17   Q.   How did you come into
18 possession of this document?
19   A.   I -- I believe I got it from
20 the Internal Revenue.  I really do.
21   Q.   Okay.  Turn to page two of
22 this document.
23   A.   Okay.

Page 360

1  61 was marked for identification purposes
2  by Mr. Hista.)
3    Q.   (BY MR. HISTA)
4  Mr. Porterfield, do you recognize
5  Defendant's Exhibit No. 61?
6    A.   Yes.
7    Q.   Tell me what it is, please.
8    A.   2000 taxes.
9    Q.   And turning to page two of
10 Defendant's Exhibit 61, does your
11 signature appear at the bottom of that
12 page?
13   A.   Yes.
14   Q.   Is it a first signature on
15 page two?
16   A.   Yes.
17   Q.   To the right of your
18 signature is a date.  Do you see that?
19   A.   Yes.
20   Q.   Would you agree with me that
21 the date is August 25, 2006?
22   A.   Yes.  Same day I did the
23 other one.

Page 361

1    Q.   Is this the first time that
2  you filed a tax return for the year 2000?
3    A.   Yes.
4    Q.   Turning your attention to
5  page three of this document --
6    A.   Yes.
7    Q.   -- would you agree with me
8  that this document reflects your income
9  and expenses from your Flowers
10 distributorship?
11   A.   Yes.
12   Q.   Do you believe that the
13 information that is on page three of this
14 tax return is accurate?
15   A.   I have to talk to my
16 accountant about that.  It looks like it.
17   Q.   Any reason to believe that
18 it's not accurate as we sit here today?
19   A.   I'm looking at this -- yes.
20 It's accurate.
21   (Whereupon, Defendant's Exhibit No.
22 62 was marked for identification purposes
23 by Mr. Hista.)

Page 362

1    Q.   (BY MR. HISTA) We've marked
2  the next one as Defendant's Exhibit No.
3  62.
4    Do you recognize this
5  document?
6    A.   Yes.
7    Q.   Turning to page two, is that
8  your signature -- first signature on that
9  page?
10   A.   Yes.
11   Q.   Do you agree with me that
12 this is the your 2001 Federal tax return?
13   A.   Yes.
14   Q.   And would you agree with me
15 that you didn't file this return until
16 August 25, 2006?
17   A.   Yes.
18   (Whereupon, Defendant's Exhibit No.
19 63 was marked for identification purposes
20 by Mr. Hista.)
21   Q.   (BY MR. HISTA)
22 Mr. Porterfield, you have in front of you
23 what has been marked as Defendant's

Page 363

1  Exhibit No. 63.
2    Do you recognize this
3  document?
4    A.   2002 taxes.
5    Q.   Is it your 2002 Federal tax
6  return?
7    A.   Yes.
8    Q.   For you and your wife?
9    A.   Yes.
10   Q.   And on page two of that
11 document, is that -- the first signature
12 on that page yours?
13   A.   Yes.
14   Q.   And you didn't file your
15 2002 tax return until August 25, 2006,
16 correct?
17   A.   Yes.
18   Q.   Turning to page three of
19 this document, do you believe that page
20 three of this document accurately reflects
21 your income and expenses related to your
22 Flowers distributorship for the year 2002?
23   A.   Yes.

Page 364

1    (Whereupon, Defendant's Exhibit
2  Nos. 64 & 65 were marked for
3  identification purposes by Mr. Hista.)
4    Q.   (BY MR. HISTA)
5  Mr. Porterfield, do you recognize what has
6  been marked as Defendant's Exhibit 64?
7    A.   2003 taxes.
8    Q.   And is this your 2003
9  Federal tax return for yourself and your
10 wife?
11   A.   Yes.
12   Q.   And on page two of that
13 document, is the first signature on that
14 page yours?
15   A.   Yes.
16   Q.   And this tax return is also
17 dated 8/25/2006.  Would you agree with
18 that?
19   A.   Yes.
20   Q.   Turning to page three of
21 this document, would you agree with me
22 that page three reflects the income and
23 expenses from your Flowers distributorship

Page 365

1 for the year 2003?
2    A.  Yes.
3    Q.  Do you believe that it
4 accurately reflects your income and
5 expenses for the distributorship for that
6 year?
7    A.  Yes.
8    Q.  Okay.  We've just reviewed
9 your tax returns for the years 1999 to
10 2003 which you did not file until August
11 25, 2006, correct?
12    A.  Yes.
13    Q.  Is there any particular
14 reason why you didn't file any of those
15 tax returns until 2006?
16    A.  No reason.
17    Q.  You did understand that you
18 were supposed to file tax returns?
19    A.  I know.
20    Q.  What made you decide to
21 finally file tax returns for those years
22 in 2006?
23    A.  I decided to get them all

Page 366

1 straight.  Because I had already talked to
2 my accountant about getting them straight.
3    Q.  Did you think that you could
4 get away with not filing tax returns?
5    A.  I know I can't.
6    Q.  You knew you couldn't?
7    A.  Yes.
8    Q.  But you still didn't file
9 tax returns?
10    A.  I know.
11    Q.  Have you ever had the
12 Internal Revenue Service obtain a tax lien
13 against you?
14    A.  A long time ago.  I don't
15 know when.
16    Q.  Just one?
17    A.  I don't -- well, maybe
18 several.
19    Q.  It could be several.  What
20 about the State of Alabama?
21    A.  Yes.
22    Q.  Do they have any tax liens
23 against you?

Page 367

1    A.  Not no more.  They've been
2 paid.
3    Q.  Are there any current tax
4 liens by the Internal Revenue Service or
5 the State of Alabama against you?
6    A.  Not State of Alabama that I
7 know of.
8    Q.  What about the Interal
9 Revenue Service?  Is there any?
10    A.  Internal Revenue, there's no
11 lien.  Internal Revenue, I -- I went to
12 them and made an agreement to pay them.
13 And I pays them monthly.
14    Q.  So you still have an
15 outstanding debt?
16    A.  I still owe them.  And I'm
17 paying them.
18    Q.  Have you filed tax returns
19 for the year 2004 through 2006?
20    A.  Yes.
21    Q.  You have filed those?
22    A.  Yes.
23    Q.  Have you given copies of

Page 368

1 those to your attorneys?
2    A.  I don't know.
3    Q.  Just for the Record, if you
4 could provide those -- those documents.
5 We've got an outstanding request for them.
6        Have you ever been audited by
7 the IRS?
8    A.  Not audited by them, no.
9    Q.  After you stopped working
10 for Winn-Dixie after one day, did you seek
11 alternate employment?
12    A.  No.
13    Q.  You didn't?
14    A.  Huh-uh.
15    Q.  Have you ever sought
16 alternate employment since that date?
17    A.  No.
18    Q.  Are you receiving income
19 from any source at this point?
20    A.  Yes.
21    Q.  What source are you
22 receiving income from?
23    A.  I was receiving -- receiving

Page 369

1 from disability insurance with Flowers
2 with Huntsville Insurance, whatever the
3 name was.
4     Q.  Are you still receiving
5 payments?
6     A.  They stopped.  They supposed
7 to be stopping next week.
8     Q.  Do you know who those
9 payments are coming from?
10     A.  Let me see.  Benefit
11 Management Service.
12     Q.  Okay.  And what is your
13 understanding of Benefit Management
14 Services?  Who is that group associated
15 with?
16     A.  Flowers Baking Company.
17     Q.  And for what period of time
18 have you received disability benefits
19 under this particular policy?
20     A.  I think since last October
21 or November.  Somewhere around there.
22     Q.  And how did you go about
23 making a claim for those benefits?

Page 370

1     A.  Because I was -- I applied
2 for disability.
3     Q.  Have you applied for
4 disability under any other policy?
5     A.  No.
6     Q.  Are you receiving any income
7 from any other sources?
8     A.  Disability started.
9     Q.  Disability from whom?
10     A.  The Federal Government.
11     Q.  Social security disability?
12     A.  (Nodding head.)
13     Q.  You are receiving full
14 disability payments?
15     A.  Yes.
16     Q.  Are you able to drive a
17 vehicle at this point?
18     A.  Yes, I can drive.  I just
19 hurt sometimes, but I can drive a car.
20     Q.  What is the nature of your
21 disability?
22     A.  I got diabetes.  I got a
23 knee that hurts all the time and got a

Page 371

1 shoulder that almost froze.  High blood
2 pressure and different complaints.
3     Q.  Is there any way that you
4 could run a bread route at this point?
5     A.  I can get somebody to help
6 run it.
7     Q.  Who would you get to help
8 run it?
9     A.  I can find somebody.
10     Q.  How much are you receiving
11 from social security disability at this
12 point?
13     A.  1605 -- 1505.  1506, I
14 think.
15     Q.  For what period?
16     A.  What you mean?
17     Q.  1505 per month?
18     A.  Per month.  Month.  1506 per
19 month.
20     Q.  Are you receiving income
21 from any other source?
22     A.  No.
23     Q.  When did you start receiving

Page 372

1 benefits from social security?
2     A.  March the 28th I got the
3 first check, I believe.
4     Q.  Of the year 2007?
5     A.  Yes.
6     Q.  Until that point, you were
7 receiving benefits under the Flowers
8 policy?
9     A.  Uh-huh.
10     Q.  Do you recall when the
11 benefits under the Flowers policy started?
12     A.  In, I think, October or
13 September.
14     Q.  If you could, turn your
15 attention back to Exhibit No. 1.  It's a
16 copy of your complaint.
17         Mr. Porterfield, did the
18 benefits under the Flowers policy start
19 after you were injured at Winn-Dixie?  Is
20 this how it worked?
21     A.  I wasn't injured at
22 Winn-Dixie.
23     Q.  Okay.  Did you get benefits

Page 373

1 starting at that point in time?
2    A.  No.
3    Q.  It started before that?
4    A.  Later.
5    Q.  Later?
6    A.  Way later.
7    Q.  Okay.  Did it start with
8 just a weekly payment?  Or did they make
9 up payments from previously of any sort?
10    A.  They made up payments from
11 the first time I applied.  And I think
12 that was about a month after I left
13 Winn-Dixie.
14    Q.  Do you have documents
15 reflecting all of the payments that you
16 received --
17    A.  Got some of them.
18    Q.  -- under that policy?
19    Q.  You got some of them?
20    A.  Uh-huh.
21    Q.  Have you turned those over
22 to your attorneys?
23    A.  Have I?

Page 374

1    Q.  Yes.
2    A.  No, I didn't.
3    Q.  Could you do that for me,
4 please?
5    A.  Yes.
6        MR. TALIAFERRO:  Who would be
7 the payor of something like that?  Who is
8 writing, issuing the benefit check?
9        MR. HISTA:  I think it's -- I
10 think it's that document that we just
11 marked.
12        MS. REISS:  Benefit
13 Management.
14        MR. TALIAFERRO:  Services.
15        MR. REISS:  Yeah.  And then,
16 obviously, his social security, we need to
17 know if they've been backdated too.
18        MR. TALIAFERRO:  Okay.
19    Q.  (BY MR. HISTA)
20 Mr. Porterfield, is it fair to say that in
21 this complaint you're seeking damage for
22 alleged emotional distress and mental
23 anguish?

Page 375

1    A.  Yes.
2    Q.  Could you tell me what
3 symptoms of emotional distress or mental
4 anguish support that claim?
5    A.  I started getting aggravated
6 or whatever and worried about what it took
7 from me and that caused my diabetes to get
8 out of line even more and upset.
9    Q.  Have you ever had any doctor
10 render an opinion to that effect?
11    A.  I didn't go to a doctor
12 about that.  But --
13    Q.  Your diabetes doesn't have
14 anything to do with Flowers, does it?
15    A.  No.  Huh-uh.  I got it while
16 I was there, but it didn't have nothing to
17 do with that.
18    Q.  Okay.  Have you ever gone to
19 see any doctor for any symptoms of
20 emotional distress?
21    A.  No.
22    Q.  Have you ever taken any type
23 of medication for any mental distress or

Page 376

1 mental anguish?
2    A.  No.
3    Q.  Have you ever been diagnosed
4 with any type of depression?
5    A.  No.
6    Q.  Have you ever been diagnosed
7 with any type of psychological problem?
8    A.  No.
9    Q.  What current medical
10 problems do you suffer from?
11    A.  I have diabetes, high blood
12 pressure, vision problem.  I got a knee
13 where I had a staph infection in it once,
14 and it hurts.  And shoulder.  That's about
15 it.
16    Q.  All the problems that you've
17 described for me are physical problems,
18 correct?
19    A.  Yes.
20    Q.  None of them are emotional
21 problems?
22    A.  None of those problems are.
23    Q.  Okay.  Have you ever seen

Page 377

1 any counselor about any alleged emotional
2 problems?
3     A.   No.
4     Q.   Ever seen any type of health
5 professional at all about any alleged
6 emotional problems?
7     A.   No.
8     Q.   Ever talked to anybody about
9 any alleged emotional problems?
10    A.   Talked to my family.
11    Q.   Anybody else?
12    A.   That's about it.  I talked
13 to my -- I went to counseling one time
14 with my pastor one time.  A couple --
15 couple of times on it.
16    Q.   And what happened there?
17    A.   Just talked to me.
18    Q.   Did you just stop going?
19    A.   Yes, I did.
20    Q.   Was that your decision?
21    A.   Yes, it was.
22    Q.   Have you made any negative
23 comments about any Flowers officials to

Page 378

1 any third parties?
2     A.   No.
3     Q.   Never made any comments
4 about Grady Messer to any of your kinfolk
5 or anybody other than your attorneys?
6     A.   I talked to Robert -- a few
7 of my brothers or something like that,
8 yeah.
9     Q.   What do you remember telling
10 them?
11    A.   I just told them that I
12 didn't think I was treated fairly.  That's
13 all.  No -- nothing out of line.
14    Q.   I understand that you've
15 been through at least two bankruptcy
16 proceedings; is that correct?
17    A.   Oh, yeah.
18    Q.   Do you recall when those
19 were?
20    A.   I don't know.  I don't know
21 what year they was.
22    Q.   What led you to file for
23 bankruptcy?

Page 379

1     A.   Had overspent.
2     Q.   Did you file for bankruptcy
3 more than once?
4     A.   I think it was twice.  I
5 don't know.  Maybe one, two, three.
6     Q.   Do you have any plans to
7 file for bankruptcy again?
8     A.   No.
9         (Whereupon, Defendant's Exhibit No.
10 66 was marked for identification purposes
11 by Mr. Hista.)
12    Q.   (BY MR. HISTA)
13 Mr. Porterfield, do you recognize
14 Defendant's Exhibit 66?
15    A.   Yes.
16    Q.   Turning to page two of that
17 document, does your signature appear on
18 that page in the left-hand column?
19    A.   Yes, uh-huh.
20    Q.   Turn to the eighth page of
21 this document.
22    A.   (Witness complying.)
23    Q.   Are you on a page that at

Page 380

1 the top states Schedule B, personal
2 property?
3     A.   Yes.
4     Q.   And on the type of property
5 on the left, is the first number No. 20?
6     A.   Yes.
7     Q.   And a description and
8 location of the property listed there was
9 a class action lawsuit.
10        What's that all about?
11    A.   I don't know.
12    Q.   You don't know?
13    A.   Huh-uh.
14    Q.   Would that be something your
15 wife's involved with?
16    A.   I don't know.
17    Q.   You have no idea why that's
18 listed --
19    A.   I don't know.
20    Q.   -- on your petition?
21        Did you list any claims
22 against Flowers in this document?
23    A.   No.

Page 381

1   Q.  Did you have any claims
2  against Flowers at this time?
3   A.  No.
4   (Whereupon, Defendant's Exhibit No.
5  67 was marked for identification purposes
6  by Mr. Hista.)
7   Q.  (BY MR. HISTA)
8  Mr. Porterfield, do you recognize
9  Defendant's Exhibit No. 67?
10   A.  Yes.
11   Q.  Is this another bankruptcy
12  petition that you filed or was filed on
13  your behalf?
14   A.  Where is -- this was the
15  same --
16   Q.  Let's go back to Exhibit No.
17  66.
18   A.  -- same thing.
19   Q.  We'll go back to Exhibit 66.
20   MR. TALIAFERRO:  Can we take
21  just a quick break if you don't mind?
22   MR. HISTA:  Sure.
23   MR. TALIAFERRO:  I got a call

Page 383

1  They went together.
2   Q.  Okay.  So at any point
3  during this bankruptcy proceeding if --
4  assuming it was consolidated, did you --
5  did you have any claim against Flowers?
6   A.  No.
7   Q.  Mr. Porterfield, is it your
8  understanding that Flowers Baking Company
9  of Opelika is continuing to operate your
10  distributorship on your behalf?
11   A.  Yes.
12   Q.  And while Flowers is doing
13  that, is Flowers continuing to make
14  insurance payments on your behalf?
15   A.  Yes.
16   Q.  And does that include
17  insurance payments for any vehicles that
18  you own?
19   A.  Yes.
20   Q.  What vehicles is Flowers
21  currently picking up the insurance for?
22   A.  On 2002 Ford Explorer, a '96
23  Dodge Caravan, a '96 Grand Jeep Cherokee

Page 382

1  I got to take.
2   A.  Okay.
3   THE VIDEO SPECIALIST:  Off
4  the Record.
5   (Short break.)
6   THE VIDEO SPECIALIST:  We're
7  back on the Record.
8   Q.  (BY MR. HISTA)  All right.
9  Let's just lay side by side next to each
10  other --
11   A.  These?
12   Q.  -- Defendant's Exhibit 66
13  and 67 and try and figure out if these are
14  two separate bankruptcies.
15   A.  I can tell you about it --
16   Q.  All right.
17   A.  -- right quick like.
18   Q.  Tell me about it.
19   A.  One of them was Chapter 13
20  and one was Chapter 11.  And they --
21   MR. TALIAFERRO:  Seven.
22   A.  Seven.  Something, you had
23  to file one before you filed the other.

Page 384

1  and a '95 Isuzu truck.
2   Q.  Are all of those personal
3  vehicles?
4   A.  Two of them are.
5   Q.  Okay.  Which two are
6  personal?
7   A.  The -- all but the Isuzu.
8   Q.  Are personal?
9   A.  Yes.
10   Q.  And what do you use the
11  Isuzu for?
12   A.  It's sitting still.
13   Q.  That's -- that's the bread
14  truck?
15   A.  That's the big truck,
16  uh-huh.
17   Q.  Have you driven it recently?
18   A.  No.
19   Q.  Do you have any restrictions
20  driving?
21   A.  Me, myself?
22   Q.  Yes.
23   A.  No.

Page 385

1    Q.   Do you have a regular
2 driver's license still?
3    A.   Yes.
4    Q.   No doctor's restrictions on
5 driving?
6    A.   No.
7    Q.   Yesterday there was some
8 discussion about the Thrift Store
9 procedures.  Do you recall that?
10    A.   Yes.
11    Q.   I believe you testified to
12 this earlier today; but to make sure I
13 understand it, do you understand that you
14 could have sold your stales and returns to
15 places other than Flowers?
16    A.   I -- yeah.  I heard that.
17    Q.   Could you do that?
18    A.   I -- you could have sold it
19 to a stop.  If you had sold it, you had to
20 sold it like fresh bread for regular price
21 for all -- to get your correct money out
22 of it.
23    Q.   Could you sell it to a hog

Page 386

1 farmer?
2    A.   You wouldn't.
3    Q.   You wouldn't?
4    A.   You would lose money.  No.
5    Q.   You didn't have to sell your
6 products back to Flowers, did you?
7    A.   I thought that was standard
8 procedure.
9    Q.   But --
10    A.   In my recollection, I
11 thought it was standard procedure to sell
12 it back to Flowers.
13    Q.   But it was your product,
14 right?
15    A.   At that particular time, it
16 was my product.
17    Q.   And so if you wanted to, you
18 could have taken a loss on that product
19 and not sold it back to --
20    A.   Now, if I wanted to, I could
21 have took a loss on that product.
22    Q.   With your current medical
23 condition, do you anticipate seeking

Page 387

1 employment of any sort in the near future?
2    A.   If it gets better.  But if
3 not, no.
4    Q.   Is your wife continuing to
5 work?
6    A.   Yes.
7    Q.   Are you working on the side
8 at all doing any sort of odd jobs or
9 anything like that?
10    A.   No.
11    Q.   Doing nothing that would --
12 you would receive any income from?
13    A.   No.
14    Q.   What do you do with your
15 day?  What's your standard day like?
16    A.   Go down to the church and
17 help the old folks out:  I drive them
18 different places sometime or whatever.
19    Q.   You like doing that?
20    A.   I don't mind.  It's fun.
21       MR. HISTA:  Dan, I guess just
22 so we have a general understanding, if you
23 could get from him any documents that

Page 388

1 would reflect the disability benefits that
2 we have discussed.
3       MR. TALIAFERRO:  Yeah.  I
4 wrote a note down for social security
5 benefit documents, anything along those
6 lines.
7       MR. HISTA:  Yeah.  And
8 anything that you -- anything he might
9 have on the benefits from the policy
10 that --
11       MR. TALIAFERRO:  Benefit
12 Management Services.  Got that too.
13       MR. HISTA:  Yes.  We could
14 check --
15       MR. TALIAFERRO:  I got tax
16 returns '04 to '06, Benefit Management
17 Services, social security benefits.  And
18 I'm going to write and these tapes that I
19 just got a little while ago.
20       MR. HISTA:  And the tapes.
21    Q.   (BY MR. HISTA) And, you
22 know, if there's any, you know, other
23 documents related to your distributorship,

Page 389

1 at least provide those to Mr. Taliaferro
2 so he can assess them and determine
3 whether or not --
4       A.   Those documents related to
5 my distributorship, they got -- they're
6 current.  Because y'all sent a copy to all
7 of them.  They're current.
8       Q.   Well, why don't you do this
9 for me?  If you could just give them to
10 Mr. Taliaferro, and then he can decide
11 whether or not they're potentially
12 relevant to the claims.
13      A.   I got you.
14      Q.   Okay.  That's his job.
15 We'll let him do that.
16      A.   Okay.
17      Q.   And having said that, I have
18 no further questions.
19          MR. TALIAFERRO:  Thank you.
20          THE VIDEO SPECIALIST:  This
21 concludes the deposition.  The time is
22 4:35 p.m.
23

Page 390

1          REPORTER'S CERTIFICATE
2
3 STATE OF ALABAMA:
4 LEE COUNTY:
5
6       I, Rena' Messick Lanier, Court
7 Reporter and Commissioner for the State of
8 Alabama at Large, do hereby certify that
9 the above and foregoing transcript of the
10 proceedings in the matter of:
11 HENRY G. PORTERFIELD,
12 Plaintiff,
13 VS
14 FLOWERS BAKING COMPANY OF OPELIKA, LLC,
15 Defendant,
16 CASE NUMBER:
17 2:05-cv-937-F
18 was reported by me on the 9th day of May,
19 2007.
20      I further certify that the
21 foregoing three hundred eighty-nine
22 computer-printed pages contain a true and
23 correct transcript of the proceedings held

Page 391

1 in this matter.
2       I further certify that I am
3 neither of kin nor of counsel to the
4 parties to said cause, nor in any manner
5 interested in the results thereof.
6       This the 22nd day of May, 2007.
7
8
9
10
11      Rena' M. Lanier, Court
12      Reporter and Commissioner
13      for the State of Alabama
14      at Large
15
16
17
18
19
20
21
22
23

**-#-**

#2 [1] 3:14

**-'-**

'04 [1] 388:16
'06 [2] 356:9 388:16
'93 [1] 93:1
'94 [3] 93:1 176:17 190:9 190:21
'95 [1] 384:1
'96 [2] 383:22,23

**-0-**

000414 [1] 183:16

**-1-**

1 [6] 3:5 31:15,21 33:10 77:20 372:15
10 [3] 3:14 148:14,18
10/15/02 [1] 4:15
10/22/04 [1] 4:23
10/23/01 [1] 4:6
10/8/02 [1] 4:14
10/9/98 [1] 3:16
1000 [1] 7:23
101 [1] 3:9
103 [1] 3:9
1040 [6] 5:17,19,20,21 5:22 356:3
11 [4] 3:15 150:8,13 382:20
12 [3] 3:16 151:20 152:1
12/6/04 [1] 5:1
12:30 [1] 178:7
13 [4] 3:17 157:11,16 382:19
134 [1] 3:10
136 [1] 3:11
13th [1] 339:13
14 [4] 3:3,18 159:22 160:5
14.05 [1] 135:20
141 [1] 3:12
147 [1] 3:13
148 [1] 3:14
15 [3] 3:19 164:5,9
150 [1] 3:15
1505 [2] 371:13,17
1506 [2] 371:13,18
151 [1] 3:16
157 [1] 3:17
159 [1] 3:18
16 [4] 3:20 165:7,13 186:13
16.3 [6] 99:17,18 100:1 100:23 186:15,19
1605 [1] 371:13
164 [1] 3:19

165 [1] 3:20
167 [3] 18:5 19:12,21
168 [1] 3:21
16th [7] 25:1 311:7 312:1 312:2,3,10 351:22
17 [4] 3:21 168:22 169:4 322:8
173 [1] 3:22
177 [1] 3:23
17th [1] 324:16
18 [5] 3:22 173:16,20 182:14,17
1819 [1] 7:22
189 [1] 4:1
19 [5] 3:23 177:7 179:1 181:1 183:7
19.4 [6] 101:6,10 186:23 187:3,8,21
1990s [2] 106:8 213:17
1994 [16] 3:7,9 104:7 105:12,19 106:6 112:4 148:10 169:13 177:3 182:6 184:13 185:1 186:20 190:8 191:1
1999 [8] 5:17 170:21 356:3,14,17 357:3 359:6 365:9
1:45 [1] 237:22

**-2-**

2 [10] 3:6 78:1 86:19,22 87:1 141:13 148:20 149:9 150:1 265:13
2.5 [6] 98:5 185:4,5,13,15 233:22
2/14/05 [1] 5:3
2/14/95 [5] 140:6,11,12 140:13,15
2/15/95 [3] 3:11 139:21 140:23
2/3/05 [1] 5:2
20 [7] 4:1 96:13,16,22 189:2,8 380:5
20.4 [3] 235:18,20 236:9
2000 [22] 3:23 5:19 106:6 174:12 182:3 190:5,10,22 190:23 191:1,6,7,11 192:22 193:4,12 232:8 233:3,7,19 360:8 361:2
2001 [4] 5:20 194:11 228:15 362:12
2002 [10] 4:8 5:21 235:7 238:18 245:19 363:4,5,15 363:22 383:22
2003 [6] 5:22 194:10 364:7,8 365:1,10
2004 [2] 194:10 367:19
2005 [8] 72:5 79:7 281:18 282:3 283:1 284:7 322:8 335:9
2006 [9] 351:22 356:18 360:21 362:16 363:15 365:11,15,22 367:19

2007 [5] 1:21 9:14 372:4 390:19 391:6
205 [3] 1:20 8:1,23
2069 [1] 124:20
21 [3] 4:2 214:16,20
2100 [1] 8:7
214 [1] 4:2
21st [1] 1:20 8:23
22 [3] 4:3 223:6,11
223 [2] 4:3,4
229 [1] 4:5
22nd [1] 391:6
23 [3] 4:4 174:11 223:23
230 [1] 4:6
231 [1] 4:7
233 [1] 4:8
238 [1] 4:9
239 [1] 4:10
23rd [1] 326:3
24 [2] 4:5 229:2
241 [1] 4:11
243 [1] 4:12
244 [1] 4:13
247 [1] 4:14
25 [9] 4:6 230:4 245:19 356:9,17 360:21 362:16 363:15 365:11
256 [1] 4:15
258 [1] 4:16
25th [1] 245:11
26 [3] 4:7 231:1,5
260 [1] 4:17
265 [1] 4:18
266 [1] 4:19
269 [1] 4:20
27 [3] 4:8 233:11,14
270 [1] 4:21
271 [1] 4:22
272 [1] 4:23
274 [1] 5:1
278 [1] 5:2
28 [5] 4:9 238:3,7 239:8 335:9
280 [1] 5:3
281 [1] 5:4
28th [1] 372:2
29 [5] 4:10 239:4,9,10,11
298 [1] 5:5
299 [1] 5:6
2:05-cv-937-F [4] 1:5 7:5 9:11 390:17

**-3-**

3 [8] 3:7 95:7,11 102:2 112:7 141:17 178:12 284:7
3/1/02 [1] 4:7
3/16/01 [1] 4:5
3/16/05 [2] 5:6,7

3/17/05 [1] 5:8
3/18/02 [1] 4:12
3/28/03 [1] 4:16
30 [3] 4:11 241:10,14
30308 [1] 8:8
308 [1] 5:7
31 [4] 3:5 4:12 243:7,12
315 [1] 5:8
32 [3] 4:13 244:18,23
323 [1] 5:9
325 [1] 5:10
328-1900 [1] 8:1
33 [3] 4:14 247:21 248:8
330 [1] 5:11
334 [2] 5:12 7:19
339 [1] 5:13
34 [3] 4:15 256:18 257:2
343 [1] 5:14
346 [1] 5:15
349 [1] 5:16
35 [3] 4:16 258:5,9
35203 [1] 8:1
355 [1] 5:17
358 [1] 5:18
36 [3] 4:17 260:15,19
360 [1] 5:19
361 [1] 5:20
36109 [1] 18:6
36117 [1] 7:19
362 [1] 5:21
364 [2] 5:22,23
36801 [2] 1:21 9:1
37 [3] 4:18 265:3,7,10
379 [1] 6:1
38 [3] 4:19 266:10,14
381 [1] 6:2
39 [3] 4:20 269:13,16
3:17 [1] 323:12
3:55 [1] 358:7
3rd [1] 182:2

**-4-**

4 [6] 3:8 13:13 101:20 102:8 178:16 237:15
4/21st/1952 [1] 17:19
4/7/04 [1] 4:19
4/9/97 [1] 3:15
40 [5] 4:21 270:1,6,8,10
404 [1] 8:8
409-0545 [1] 7:19
41 [3] 4:22 271:21 272:3
414 [1] 183:17
42 [4] 4:23 272:16,20 273:2
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 [1] 17:23
43 [3] 5:1 274:10,14
44 [4] 5:2 278:8,18 280:19
45 [3] 5:3 280:12,18,19

46 [3] 5:4 281:20
47 [3] 5:5 298:1,5
48 [3] 5:6 299:8,12
49 [3] 5:7 308:12,16
4:30 [1] 115:18
4:35 [1] 389:22
4th [1] 261:1

**-5-**

5 [7] 3:9 4:19 103:11,14 103:19 237:19 297:18
5.1 [6] 99:4,5,11 186:1,3 234:10
5/29/02 [1] 4:13
50 [3] 5:8 315:22 320:11
51 [6] 5:9 323:16,21 324:6 327:7 328:9
52 [4] 5:10 325:7,14,18
53 [3] 5:11 330:18 331:1
54 [3] 5:12 334:14,21
55 [3] 5:13 339:1,6
56 [4] 5:14 343:19,22 344:4
57 [3] 5:15 346:8,11
58 [2] 5:16 349:22
59 [3] 5:17 355:21 356:2
5th [1] 7:22

**-6-**

6 [6] 3:10 134:2,7 136:9 297:22 357:20
6-month [3] 3:8 4:1,9
6/23/2000 [1] 3:22
6/3/04 [1] 4:20
60 [3] 5:18 358:3,13
600 [1] 8:6
61 [4] 5:19 360:1,5,10
62 [3] 5:20 361:22 362:3
63 [3] 5:21 362:19 363:1
64 [3] 5:22 364:2,6
65 [2] 5:23 364:2
66 [6] 6:1 379:10,14 381:17,19 382:12
67 [4] 6:2 381:5,9 382:18
68 [1] 350:12
6987 [1] 7:18

**-7-**

7 [5] 3:11 13:13 136:6 137:13 358:1
7/14/04 [1] 4:21
7/16/04 [1] 4:22
7/7/03 [1] 4:17

**-8-**

8 [3] 3:12 141:19 142:1
8/16/2006 [1] 351:15
8/25/2006 [1] 364:17

Case 2:05-cv-00937-MEF-TFM   Document 47-16   Filed 07/26/2007   Page 102 of 117
PORTERFIELD v FLOWERS          CondenseIt!          86 – attention
DEPO:HENRY PORTERFIELD

**86** [1] 3:6
**881-1302** [1] 8:8
**8:55** [1] 9:2
**8:56** [1] 9:16

**-9-**

**9** [3] 3:13 147:23 148:5
**9/10/98** [1] 3:19
**9/12/03** [1] 4:18
**9/27/06** [1] 5:15
**95** [1] 3:7
**9th** [3] 1:21 9:14 390:18

**-A-**

**a.m** [3] 9:2,16 13:13
**Aaron** [1] 47:11
**able** [5] 32:14 160:8 310:1
353:15 370:16
**above** [4] 9:3 88:6 335:13
390:9
**absence** [2] 5:13 339:12
**absolutely** [2] 66:7
308:2
**accept** [1] 331:19
**acceptable** [1] 322:2
**accepted** [1] 273:17
**accident** [2] 70:18,22
**accompanying** [1]
187:4
**according** [1] 140:23
**account** [93] 24:23 25:11
25:13 42:18 48:22 49:15
50:20 54:7,12,19 55:1
99:20 118:21 122:8,16,17
122:22 124:3,5 142:10
152:14 153:4,7,9,11 154:9
154:12,15 156:4,6 160:7
161:23 163:6,20 164:2,18
165:4 168:5,15 180:1
195:16 200:23 201:6
203:2,15 204:10,22
207:16 210:15,23 215:20
215:21 216:1,4,21 217:14
217:16,20 218:3,8 219:1
221:9 235:4 258:16 260:1
264:16 265:15 275:18
276:4 278:4 280:7 281:3
284:21 285:5,23 286:1,9
288:22 289:9,10 290:22
291:14 295:10,15 296:2
296:14 299:2 301:18
302:1,12,18 303:2 310:13
**accountant** [2] 361:16
366:2
**accounting** [6] 131:9
152:13 153:15,19 161:23
332:13
**accounts** [77] 98:9,14,18
98:22 105:7 109:1 110:7
112:1,16,19 113:1,21
116:1,11 118:17 120:10
120:14,16 121:4,6 124:7
124:10,12 125:22,23
126:9 133:10 142:11

**145:22** 148:21 152:20,21
156:10,12,19 158:6
163:23 171:2,7,11,17
179:8 195:23 196:17
203:19 205:21 206:2
210:20 211:3,8,10,11
212:5,9 215:7 218:12
235:8 245:20 247:12
249:2 250:7,8,10 251:1
253:19 254:16,20 256:7
259:21 261:3 262:22
263:1 269:8,18 277:13
278:2 310:10
**accurate** [9] 273:7
325:18,20,23 351:19
357:9 361:14,18,20
**accurately** [2] 363:20
365:4
**accusation** [1] 160:9
**accusations** [1] 330:2
**accused** [2] 30:14 159:6
**acquired** [1] 326:6
**acting** [3] 8:18 242:21
326:15
**action** [2] 70:12 380:9
**actively** [1] 347:12
**actual** [2] 33:2,5
**added** [2] 154:15 170:3
**adding** [1] 170:12
**additional** [4] 123:15
168:15 169:12 172:2
**additions** [1] 117:15
**address** [3] 18:4 257:4
288:14
**addresses** [1] 330:9
**adds** [1] 117:19
**adequate** [1] 98:8
**adjust** [1] 207:12
**adjustment** [3] 3:10 4:11
134:13
**Adkins** [4] 176:10,11
184:6 232:23
**administrative** [2]
352:3,15
**adminstrative** [1] 346:5
**admitted** [1] 320:6
**advance** [9] 107:4,7,22
110:1 248:11 250:20
252:19 254:13,15
**advertisement** [1] 87:19
**Advertiser** [3] 80:5
84:10 87:20
**advertising** [1] 212:4
**advice** [2] 327:16,19
**advise** [2] 208:15 213:19
**advised** [1] 321:22
**AFB** [3] 3:17,19
**affect** [1] 17:5
**affidavit** [1] 78:20
**African** [1] 305:1
**afternoon** [3] 178:21
237:22 291:19

**afterward** [2] 172:8
310:19
**again** [31] 14:18 25:11
36:5 50:19 52:1,16 54:6
64:14 65:3,9 68:20 114:22
137:5 165:4 181:3 183:14
193:9 194:17 210:13
233:16 242:23 251:14,17
253:4 259:7 264:6 274:20
326:17 327:8 346:21
379:7
**against** [19] 14:20 21:2
25:3 27:1 40:17 43:1 44:9
65:19 67:13 305:8,16
317:10 322:3 366:13,23
367:5 380:22 381:2 383:5
**age** [1] 17:16
**aggravated** [2] 350:7
375:5
**ago** [5] 69:1 319:17,18
366:14 388:19
**agree** [63] 38:6,10,15 98:7
98:12,16,20 99:4,10,17
100:18,22 108:22 122:3
136:16 138:2,9,12 143:13
143:17 145:4,20 146:7
148:9 149:20 151:16
160:7 161:14 162:5,16
166:2 185:14 186:3,8
187:2,7 190:10 223:2
232:5,13 233:23 234:5
240:18 241:3 242:8
247:10,17 255:10 259:2
266:22 270:10 273:11,15
282:17 290:11 291:11
337:4 360:20 361:7
362:11,14 364:17,21
**agreed** [9] 1:13,23 2:7,16
99:11 100:12 167:15
186:4 291:6
**agreeing** [1] 99:5
**agreement** [66] 3:7,23
4:8 10:17 28:4,8,12 34:17
39:4 40:9,13 44:23 66:15
67:9 94:23 97:18,20 100:4
100:20 101:2,11,17
102:19 112:4,9 148:11
165:3,20 167:3 169:14
177:4 181:17,21 182:2,5
182:9 183:8,9 184:13,19
185:4,19 186:19,20 187:3
187:5,9,22 188:3,6 190:5
190:8 232:4,12 233:18
234:7,21 235:19,22 236:2
236:2,5,13,15 237:1
367:12
**Agrmt** [1] 3:21
**ahead** [12] 43:10 45:7
64:12 65:14 73:15 74:20
95:23 167:10 187:15
252:16 260:3 260:3
**ain't** [5] 41:7 261:8
305:20 341:18 357:13
**Air** [4] 158:5,9,14 159:8
**Alabama** [19] 1:2,19,20
7:2,19 8:1,18 9:1,13,16
17:21 18:6,19 366:20
367:5,6 390:3,8 391:13

**Albert** [1] 62:5
**Alice** [1] 61:23
**allegation** [5] 24:5 26:18
34:6 60:11 322:2
**allegations** [34] 15:2
17:8 20:17,22 22:10 23:6
25:3 26:11,20 27:8 28:16
29:14 30:13 38:20 39:17
39:22 41:2,13,18 43:20
44:9 45:4 46:13,21 47:5
47:23 48:16 53:11,23 63:7
65:18 67:12,16 75:23
**alleged** [5] 161:10 374:22
377:1,5,9
**allegedly** [2] 45:15 306:1
**Allen** [5] 50:22 51:1,9
57:21 342:13
**allow** [2] 25:22,23
**allowance** [5] 125:7,9
125:14,21 126:2 142:14
143:5 147:4 180:21
**allowances** [3] 125:3,6
126:9
**allowed** [7] 164:17 311:1
312:23 314:2,11 321:9
322:10
**allowing** [1] 298:20
**Allstate** [16] 80:6 81:2,9
81:11,14,17,18 82:3 83:7
83:19 84:4,17 85:6,18
89:21 90:4
**almost** [4] 81:6 82:14
184:16 371:1
**along** [6] 91:11 236:3
278:6 280:19 340:18
388:5
**alternate** [4] 337:21
348:12 368:11,16
**always** [6] 127:2 241:1
**Amanda** [1] 62:14
**amended** [1] 236:15
**Amendment** [1] 3:21
**America** [3] 8:6 20:2
305:2
**American** [2] 18:17
305:2
**amount** [6] 144:2 167:13
198:2,4 259:8 261:7
**anguish** [3] 374:23 375:4
376:1
**Ann** [1] 171:21
**annual** [1] 356:22
**answer** [31] 30:21 32:17
35:9,17 43:10 45:7,9
54:21 100:13 131:17
156:1 167:10 187:14
200:12 201:9 208:6,13
220:23 237:8 242:15,16
243:4 256:21 260:3
264:18 316:9,16,16,17
327:10 345:9
**answered** [4] 16:12,14
78:14 222:1
**answers** [1] 335:22
**anticipate** [4] 12:17,23

**110:1** 386:23
**anyplace** [1] 333:22
**Anytime** [1] 202:13
**anyway** [3] 129:22 205:9
305:19
**app** [2] 3:6 5:12
**appear** [5] 38:13,14,17
360:11 379:17
**APPEARANCES** [1]
7:16
**appeared** [1] 227:8
**appearing** [3] 7:19 8:1,8
**Applebee's** [1] 4:5
**application** [14] 5:16
87:6,7 88:10,16,18 89:4
334:22 335:2,10 336:13
350:21 351:15 352:8
**applied** [3] 370:1,3
373:11
**apply** [1] 333:22
**applying** [1] 334:3
**appreciate** [1] 273:21
**appropriate** [1] 267:11
**approval** [1] 11:9
**area** [3] 13:7 61:15
**arrange** [1] 317:1
**arrangements** [7] 295:8
310:21 312:17 313:9,16
313:19 322:4
**Article** [1] 186:13
**Ass** [1] 341:21
**asserted** [1] 70:12
**assess** [1] 389:2
**assign** [1] 2:11
**assist** [1] 74:11
**assistance** [2] 286:8
287:2
**associate** [1] 220:21
**associated** [2] 26:7
369:14
**associating** [1] 62:8
**assume** [1] 318:15
**assumed** [1] 16:13
**assuming** [1] 383:4
**Atlanta** [3] 8:7 14:11
265:13
**attempt** [4] 204:20 289:8
316:23 322:14
**attempting** [2] 315:1
347:12
**attempts** [1] 355:10
**attend** [2] 53:15,17
**attention** [34] 36:14 37:2
37:14 38:5 76:11 98:5
99:3,16 101:5 136:9
137:12 139:18 147:19,21
176:22 178:23 181:1
182:14 185:3,22,23
186:12,14 235:18 269:16
287:13 296:9 328:15
329:22 330:1 335:4
336:16 361:4 372:15

Case 2:05-cv-00937-MEF-TFM    Document 47-16    Filed 07/26/2007    Page 103 of 117
PORTERFIELD v FLOWERS                    CondenseIt!                    attitude / change
DEPO:HENRY PORTERFIELD

attitude [2] 4:23 300:14
attorney [18] 7:17 12:13 35:8 64:8,22 65:16 70:1 317:22 318:8,20 326:14 327:9,11,12,14,18,18 328:2
attorney's [2] 31:23 242:17
attorney-client [3] 13:5 64:8 327:23
attorneys [8] 63:5 68:18 70:1 71:21 325:5 368:1 373:22 378:5
audited [2] 368:6,8
August [3] 339:12 351:22 356:9,17 360:21 362:16 363:15 365:10
aunt [2] 62:1,3
authorize [1] 336:4
authorized [10] 112:1 112:16 118:17,21 121:4 121:10 122:8 125:21 143:5 215:21
automatically [1] 125:8
automotive [1] 83:16
Automotives [1] 287:23
available [1] 111:5
Avenue [1] 7:23
avoid [1] 16:2
aware [11] 188:11 212:3 212:7,22 213:5,8 266:12 299:10 305:11 313:23 325:15
away [4] 73:18 292:23 307:14 366:4

-B-

B [3] 7:22 236:4 380:1
baby [1] 20:12
backdated [1] 374:17
Baker [5] 149:3,8 167:21 168:1,3
bakery [1] 162:12
Baking [20] 1:10 7:10 8:2 8:9 9:9,10,21 33:3 44:2 79:21 80:7 83:20 87:8 97:21 101:3 182:10 298:13 336:17 369:16 383:8 390:14
bale [1] 238:13
Bama [2] 154:9,13
Bank [1] 8:5
bankruptcies [1] 382:14
bankruptcy [8] 6:1,2 378:15,23 379:2,7 381:11 383:3
banned [2] 312:4,6
Baptist [2] 22:1 53:19
Barber [1] 150:19
Barnes [12] 5:4 283:15 283:21 284:5,6 285:11,13 285:15,17 300:12,13 301:9

barred [10] 25:3,13 299:4 309:14 310:3,11,12,20 312:15 321:2
barring [1] 5:7
Barry [1] 148:23
base [6] 91:23 92:3 158:5 158:10,14 159:8
baseball [3] 203:23 204:15 211:8
based [2] 161:10 332:11
basic [2] 16:19 238:12
basis [2] 101:3 304:18
Bates [2] 96:6 183:15
Baxter [3] 52:19,21 58:4
beat [1] 127:15
became [4] 58:7 90:18 105:18 338:19
become [2] 58:14 85:20
becoming [2] 79:20 80:12
beer [5] 82:4,5,6,6,13
begin [1] 171:17
beginning [10] 9:1 32:3 77:23 80:1 112:20 141:16 178:15 237:18 297:21 357:23
behalf [5] 70:16 136:20 381:13 383:10,14
behind [3] 29:4 128:18 302:20
belief [1] 114:10 304:23
bell [2] 61:20 281:8
Belle [1] 61:20
belongs [1] 220:8
below [1] 184:1
beneath [1] 183:21
benefit [9] 5:23 156:18 369:10,13 374:8,12 388:5 388:11,16
benefits [13] 92:6,8 93:8 369:18,23 372:1,7,11,18 372:23 388:1,9,17
Benefitted [1] 156:21
benefitting [2] 154:4 157:7
best [18] 15:17 16:6,15 24:7,8,17 30:20 32:20 35:9 99:6 112:22,23 186:5 210:5,7 234:14 335:3 336:1
better [1] 387:2
Betty [1] 18:10
between [13] 1:14 70:22 106:6 125:13 176:12 181:17 187:5 236:5 237:2 238:20,23 263:14 273:8
Beverage [7] 80:6 81:2 81:9 82:3 83:7,19 89:21
beyond [1] 12:15
bid [3] 104:16,16 164:21
big [3] 105:1 350:9 384:15
bigger [1] 81:11

bill [1] 232:13
binding [1] 101:17
Birmingham [1] 7:23
birth [1] 17:18
Biscuits [2] 203:21,22
bit [5] 28:7 59:4 83:15 157:9 178:6
Biweekly [1] 91:20
BK [3] 4:19,20 5:3
BK/Davis [1] 4:2
black [1] 170:2
blood [2] 371:1 376:11
blurry [1] 32:2
Board [12] 80:7 333:21 334:8,9,19 346:18 352:20 353:22 354:9,20 355:3,16
body [1] 83:16
book [1] 107:8
Bordeaux [16] 85:22,23 86:13 87:20 88:19 97:12 138:1,4,23 170:3 172:1 172:10,16 173:6 184:5 232:23
born [1] 17:20
bother [2] 275:10 350:2
bottom [16] 88:2 96:1,17 102:12 112:11 145:17 170:20 174:15 183:14 230:9 231:21 239:19 244:3 320:18 335:6 360:11
bought [2] 152:9 231:18
bounds [1] 12:15
bowling [1] 155:19
Brad [1] 50:22
brag [2] 29:8,11
Branch [13] 38:21 39:1,3 39:11,16 54:23 55:3,16 59:18 79:1 305:18 306:2 334:12
brand [1] 211:21
branded [4] 104:3,11 119:18 211:20
breach [35] 3:11,12,13,14 3:17,20 4:2 24:7,9 25:6 44:22 68:1,6,10 75:12,16 99:21 100:2,16,16 132:19 146:16 148:10 157:23 166:3 167:2,6 208:20 213:21 214:9 222:11 229:14,22 310:1,2
breached [1] 30:16
breaches [5] 67:19 303:3 320:17
breaching [3] 190:5 112:12 193:13
bread [54] 29:13 110:10 110:11,15,19,22 111:13 111:19,20 121:16,19 122:5,18 123:11 126:20 126:20 127:2,16,18 151:10 152:9 153:9 154:19,20,23 155:1,11,22 192:9 200:17,21,22

201:20 202:14 204:4 209:21 212:19 215:11,18 216:2,22 221:14 226:16 241:8 247:8 251:5 253:8 263:20 282:19,23 302:4 371:4 384:13 385:20
break [13] 14:2,4 77:11 77:21 141:14 177:11 178:13 237:10,16 297:4 297:19 381:21 382:5
breakdown [1] 294:10
breaking [1] 294:18
Brief [2] 274:21 324:3
bring [7] 117:12 145:11 284:13 291:8 292:6,12 294:3
bringing [1] 253:8
broader [1] 81:10
broke [12] 285:1,13 286:4 286:7,11,15 287:13 294:11 295:12 296:8,11 297:11
brother [6] 59:21 60:9,17 60:21 61:9 334:18
brother-in-law [1] 39:14
brothers [2] 61:13 378:7
brought [9] 13:21 14:20 70:11 145:6,9 147:19,20 309:3 313:5
Brown [1] 349:2
brushed [1] 210:11
builder [3] 135:14,15 137:6
Bulk [1] 196:5,10 204:3
bun [1] 212:18
bunch [1] 260:23
buns [45] 4:22 135:20 137:18 138:14,17 140:6 151:10 196:5,10 197:2,8 197:10,17 198:3,5,11 204:3,3 213:17 215:3 217:11 219:2,4,8,20,23 220:2,3 221:23 222:6 259:20,23 265:12 268:4 284:9,18 286:5,13 292:3 292:16,18 295:9,15 296:9 296:13
Burger [47] 5:2 113:21 114:1,14,19 115:4,10 196:5 21 203:12 206:17 206:18 213:16 215:2,12 216:8,14,15 217:11 218:1 218:11,18 219:2,8,15,18 219:20,21 220:1,7 221:23 222:5 266:18 267:22 268:2,8,13,14,17,20 269:1 269:6,8,10,18 280:15,23
Burgr [1] 266:21
business [17] 24:16 73:13,21 100:8,10,17 104:16,16 105:1,3,4 133:1 184:23 262:15 282:18 281:11 299:1
businessman [1] 242:22
busted [1] 287:18

buy [19] 3:8 4:1,9 102:21 103:3 122:15,17,19 123:1 123:13,20 124:3,4 131:6 139:8 152:12 153:6 220:6 302:9
buying [2] 121:18 232:8

-C-

C [1] 236:4
Cafe [4] 4:2 215:5,6,10 215:13,15,15 216:1 217:10 220:21 221:2,13,6
cakes [3] 142:15 143:14 143:18
calls [3] 31:5 187:13 237:5 242:13 243:1
Calvin [3] 97:12 174:19 184:2
cannot [1] 66:1
car [5] 84:19,22 227:9 256:15 370:19
car's [1] 227:4
Caravan [1] 383:23
care [8] 29:2 216:9 222:13 251:5,7,9 261:19 359:18
carried [6] 162:2 202:7 217:5 241:5,7 284:18
carry [2] 180:4,6,7,12 217:8 282:3,8,13,15,18 282:22 283:7
Carter [2] 340:15 349:3
case [9] 1:5 7:5 9:11 100:13 249:15 262:18 268:2 290:18 390:16
cases [2] 206:13 224:3
cash [13] 75:6 120:10,14 120:15 122:21 124:7,9,12 153:11 162:15 215:20 216:4 217:19
catch [1] 209:20
caused [1] 375:7
Cedric [2] 49:17 57:17
cell [8] 282:4,13,14,19,21 282:22 283:2,4
Center [1] 342:16
cents [7] 122:4,12 125:14 144:20 165:20 245:6,9
Cert [1] 5:5
certain [6] 10:21 12:10 116:14 147:6 181:4 258:15
certainly [7] 13:8 14:2,3 15:14 16:10 66:21 327:19
CERTIFICATE [1] 390:1
certified [1] 298:12
certify [5] 8:19 335:22 390:8,20 391:2
chance [1] 276:5
change [12] 71:11 179:7 179:11,18 180:3,17 184:13,17 277:10 297:13 329:20 357:16

Case 2:05-cv-00937-MEF-TFM    Document 47-16    Filed 07/26/2007    Page 104 of 117
PORTERFIELD v FLOWERS                    CondenseIt!™                    changed - credit
DEPO: HENRY PORTERFIELD

changed [3] 94:10 171:16 194:13
changes [1] 184:16
changing [5] 29:21 93:7 93:10 188:14,16
Chapman [4] 47:11,13 47:22 57:5
Chapter [2] 382:19,20
characterization [1] 167:9
charge [8] 70:9 75:2 112:1,16 118:17,21 121:4 122:8
charged [3] 122:4 152:22 159:6
charges [1] 121:10
Charles [16] 43:20,23 44:6,6,11,15,16,20 45:3 45:10,14 46:4,11 77:4 79:2 97:14
cheating [1] 199:22
check [5] 3:13 31:23 89:15 117:1,4 139:15 164:13 234:23 290:18 372:3 374:8 388:14
checking [1] 248:11
checklist [1] 4:10
checkup [2] 106:21 165:18
Cherokee [1] 383:23
Chick [4] 330:22 331:22 332:21,22
Chick-Fil-A [13] 196:22 197:1,7,15,15,18,18 198:6 198:11 200:23 201:1 203:16,17 213:10
chicken [1] 332:19
children [3] 19:7,18 61:12
chili [4] 192:12 195:20 195:23 196:10
choice [1] 192:16
Chris [3] 167:21 168:1,3
Chuck [3] 85:19,19 90:6
Chuck's [1] 91:2
church [4] 53:15,17,19 387:16
circumstances [2] 157:22 214:10
City [4] 3:12 24:10 142:10 143:6
Civic [1] 10:20
Civil [1] 8:21
claim [7] 70:12 227:10 341:20 349:9 369:23 375:4 383:5
claims [5] 177:3 233:7 380:21 381:1 389:12
clarify [2] 78:17,23
class [1] 380:9
classed [1] 27:23
Classic [1] 18:17
clause [1] 284:11

clear [8] 15:19,21 78:15 216:3,5 252:14 264:14 316:16
cleared [1] 142:20
clearly [1] 299:4
clerk [1] 80:19
Cleve [1] 52:4
Cleveland [4] 52:5 58:2 305:17 340:15
client [3] 12:14 64:23 328:3
client's [1] 328:1
close [5] 107:13,14 186:14 235:3 307:11
closed [1] 261:9
club [2] 135:20 154:20
code [9] 110:10,11,13 139:1 140:6 149:9 216:16 219:22 268:4
coded [1] 120:7
codes [2] 151:17 197:16
cold [1] 35:21
college [2] 89:12,14
colleges [1] 89:11
color [1] 120:7
Colquitt [1] 278:11
column [2] 353:20 379:18
coming [15] 14:12 29:7 45:19 83:21 84:3 86:14 116:20 138:6 213:1,21 248:13 315:14 347:4,9 369:9
comment [2] 226:19 354:12
comments [3] 320:18 377:23 378:3
Commissary [7] 113:5 162:12,13 164:14 169:19 170:6 184:15
commission [1] 91:21 92:3 207:5
Commissioner [2] 2:17 7:14 8:19 24:10 58:12 390:7 391:12
commonly [2] 96:5 117:18
communicated [1] 63:4
companies [4] 83:10 84:2 273:12 302:5
company [75] 1:10 7:10 8:2,9 9:10,21 10:6 14:19 27:20 28:2 33:3 43:1 44:2 70:21 79:21 80:7 83:20 84:10 87:8 92:6 97:21 99:13,13 101:13 108:19 111:2 113:9 121:11 125:8 125:15,17,19 127:8 144:18 153:13 163:2,4 164:15 165:20 173:2,7,13 175:12 176:17 182:10 183:5 186:6,9,10 189:11 192:7,19 194:14 231:19 233:3 234:15 241:18

242:19 288:2 298:13 311:18 314:2,12,15 315:12 316:4 317:2,3,8 331:9 316:18 369:16 383:8 390:14
compare [1] 302:7
complain [29] 129:1,4 130:9 133:14 209:1,12 340:20 341:2,10 342:3
complained [4] 135:5,6 208:21 269:7 341:6,11,14 341:16
complaining [2] 149:8 341:1
complaint [26] 3:5 31:9 33:5,16 36:19,23 37:7,11 37:18,22 38:3,8,11,13,16 135:22 159:18 170:8 173:2,3 340:23 341:9 342:7,10 372:16 374:21
complaints [7] 33:2 115:10 131:20 133:19 328:20 329:4 371:2
complete [4] 13:16 88:21 335:1,23
completed [6] 87:16 88:10,15 335:10 356:14 356:16
compliance [1] 2:3
complt [2] 3:14 4:19
comply [2] 185:19 234:6
complying [20] 33:13 34:22 36:16 37:4,16 89:18 95:14 96:15,19 101:8 169:8 181:9 182:18 184:9 187:1 272:23 321:18 344:2 350:15 379:22
composite [2] 169:5 173:21
comprising [1] 169:5
computer [21] 26:2 63:11 63:14,16 72:20,23 105:20 106:11 125:9 131:11 142:17,21 143:8,10 179:4 179:23 351:3,10,12 354:3 354:18
computer-printed [1] 390:22
concerned [8] 16:10 89:5 191:18 286:23 287:3 287:5,7 330:6
concerning [15] 17:6 20:21 23:5 26:11 28:15 39:16 47:4,22 48:15 63:6 169:11 190:14 299:15 349:9 355:3
concerns [1] 168:4
concludes [1] 389:21
conclusion [5] 31:6 187:14 237:6 242:14 243:2
condition [1] 386:23
conditions [1] 101:12
conduct [1] 118:20
conducted [3] 158:23

161:1,11
confessed [1] 226:15
confused [1] 78:12
considered [5] 162:1 208:16 213:20 261:20,22
consolidated [1] 383:4
consumer [1] 212:4
contact [5] 276:16 286:20,22 287:1 289:9
contain [1] 390:22
contained [3] 101:16 257:1 350:23
contend [3] 17:7 45:3 198:10
contending [3] 30:22 31:8 159:10
contention [12] 34:7,10 35:5 49:14 50:4,19 52:1 54:18 58:8 159:8 204:6 304:19
contentions [4] 15:1 48:18 59:6 76:23
contents [5] 138:9 152:4 270:15,16,18
contest [1] 70:9
continue [1] 178:20
continuing [3] 383:9,13 387:4
contract [42] 23:22 30:1 30:17 42:20 97:18 98:3 101:3 104:7 106:6 146:16 157:23 167:6 168:17,19 176:17 182:6 185:1 186:13 188:10 189:13,22 191:11,12 193:12,13 208:20 213:22 214:9 222:11 229:14,22 232:9 233:3,6,8,19 235:8 238:18 327:3 333:1,17 337:14
contractor [1] 242:11
contracts [1] 233:3
control [5] 251:13,16,19 251:20 264:5
conversation [20] 46:9 211:21 226:3 280:3 306:9 306:22 307:12 308:9 320:3 326:12,13 328:4 331:17,21 332:17,20 342:1 343:6 346:4 355:8
conversations [7] 13:6 280:3 305:23 325:4 327:23 328:2 331:21
convert [2] 92:16 162:11
convicted [1] 70:4
Cooley [1] 62:14
cooperate [2] 99:12 186:9 234:15
coordinator [1] 176:12
copies [9] 68:6,10 71:20 71:23 96:9 229:21,22 319:23 367:23
Coppers [1] 80:4
copy [12] 94:23 95:3 149:12 229:15 274:18

309:9,11 320:14 345:1,3 372:16 389:6
Corporate [1] 8:12
correct [54] 28:9 75:13,3 105:16 110:3,22 113:22 114:15,16 119:13 120:3,7 127:19 140:15 141:1 163:20 164:18 166:21 185:6 192:23 203:19 219:3 220:11,15 246:20 248:8 250:21 252:20,21 252:22 262:10 264:23 265:1 273:20 287:11 298:16,21 311:8,15 320:22 323:1 329:9,17 331:1,10 336:19 344:6 354:4,23 363:16 365:11 376:18 378:16 385:21 390:23
cost [3] 104:3 144:18 289:13
costs [1] 104:4
Councilman [6] 24:10 58:11,13 299:15,16,22
councilmen [4] 58:7 301:12,17 302:11
counsel [8] 1:15 2:8,10 8:22 9:17 43:5,8 391:3
counsel's [1] 64:16
counseling [1] 377:13
counselor [1] 377:1
count [3] 163:12 207:18 215:3
counter [1] 139:23
counts [1] 215:4
County [5] 8:18 24:10 58:12 346:17 390:4
couple [7] 78:16 96:18 179:2 199:16,17 377:14 377:15
course [8] 12:16 13:18 15:10,21 68:4 73:4 116:2 328:6
court [18] 1:1,17 2:4 7:1 8:17 9:12 10:7,12 15:22 16:11 31:20 95:10 101:23 134:5 169:2 323:19 390:6 391:11
cousin [2] 61:20 83:13
cousins [3] 61:19 290:6 290:7
cover [5] 250:23,23 259:1 309:17 319:13
covered [4] 64:22 227:9
cracked [2] 287:19 295:2
crackers [1] 178:3
crazy [1] 278:16
creating [1] 255:9
credit [31] 119:23 120:1 122:15,17,22 123:1,13,20 123:22 124:3,4 129:7 131:6 133:4,16 152:12,15 153:5,6,8,11 158:16 159:15 162:3 205:21 207:2 210:17 217:6,7

credited [1] 121:6

credits [1] 152:21

crime [1] 70:5

Criminal [1] 160:16

crumbles [1] 199:12

cure [1] 100:2

cured [1] 100:17

current [14] 17:16 18:4 48:8 49:8 51:3,16 52:7,23 76:21 367:3 376:9 386:22 389:6,7

curse [2] 265:23 266:2

cussed [2] 341:11,16

custodian [3] 338:12 340:14 343:10

customer [18] 84:19 131:13,20 133:3,4,13 138:19 139:8 155:11,14 199:22 210:12 261:18 262:3 267:5 287:6 328:20 329:4

customer's [1] 267:12

customers [11] 53:12 99:8 162:15 206:6,9 208:9 210:2 262:1 322:3,5 329:2

customers' [1] 110:2

cut [7] 81:21 82:10,12 118:3 188:1 198:8 235:13

cuts [1] 117:19

---

-D-

D [2] 3:1 236:4

daddy [3] 290:5,6,6

daily [2] 118:5,6

damage [2] 275:12 374:21

damaged [2] 118:1,2

damn [1] 279:5

Dan [2] 7:17 10:1 387:21

date [20] 8:20 17:18 120:7 140:8 182:19,21 199:21 202:19 261:21 288:22 311:21,22 335:10 351:15 351:18 356:9,13 360:18 360:21 368:16

dated [4] 174:11 199:20 335:8 364:17

dates [5] 197:16 202:17 202:18 206:15 320:19

daughter [11] 14:11 22:11,18 23:7 63:20 70:17 70:23 324:23 327:6 328:10 329:20

daughter's [1] 20:13

Davis [16] 43:12,17 64:20 69:12 215:4,6,9,13,14,15 216:1 217:10 220:21 221:2,13 349:19

days [4] 2:5:5,6 81:22 92:13 100:5,9,10,17 107:3 107:22 108:1,7,8,11 109:2 109:4 110:3,8 111:6,19

113:5,17 114:3,15 115:5 249:20,23 266:19,20 267:4,10,15 268:6,9,20 269:8,18 273:12 299:1,5 300:17 310:4 338:5

DEAKINS [2] 7:21 8:4

deal [5] 188:21,23 189:12 189:14 234:13

dealing [1] 16:20

dealt [3] 283:18 284:1 289:19

debt [1] 367:15

decency [1] 12:16

decide [2] 365:20 389:10

decided [4] 261:11 262:20 317:13 365:23

deciding [1] 260:22

decision [18] 92:15 107:16 116:7 118:4,5,6 130:6,8 138:21 139:5 241:23 242:2 254:22 255:1,3 269:21 336:8 377:20

declined [1] 332:4

decorum [1] 12:15

Defendant [9] 1:11 7:11 8:2,9,13 9:10,20,23 390:15

Defendant's [121] 31:21 33:10 86:18,23 95:6 101:19 102:2 103:10 134:1,7 136:5 137:13 141:18,23 147:22 148:13 148:18 150:7,12 151:19 152:1 157:10,15 159:21 160:4 164:4,9 165:6,12 168:21 169:4 173:15 177:6 189:1,8 214:15,20 223:5,10,22 229:1 230:3 230:23 233:10 238:2 239:3 241:9 243:6,11 244:17,22 247:20 248:8 256:17 258:4,9 260:14,19 265:2,7,10 266:9,14 269:12,23 270:5 271:20 272:2,15,19 274:9,14 278:7,18 280:11,18 281:19 297:23 298:5 299:7,12 308:11 315:21 320:10 323:15,21 324:6 325:6,14 327:7 328:8 330:17 331:1 334:13 338:23 339:5 343:18,22 344:3 346:7,11 349:21 350:12 355:20 356:2 358:2,12 359:23 360:5,10 361:21 362:2,18,23 364:1 364:6 379:9,14 381:4,9 382:12

Defendants' [1] 31:14

Defense [1] 160:16

degree [1] 157:8

deliver [5] 82:7 197:6 204:2 210:21 286:5

delivered [18] 82:5 163:13 190:15 192:6,6,8 192:9 197:18 200:22

203:1 205:5,19 206:1 211:13 253:19 256:12 261:6 296:14

delivering [4] 203:6 264:4,17,21

delivery [4] 98:21 208:10,17 263:4

Denise [2] 19:10 20:10

dental [1] 92:10

deposition [2] 1:16 2:1 2:2,13,17 9:7 10:18 11:16 14:22 15:10 16:1 32:4,13 64:1,4 65:7 67:6 68:18 178:20 320:5 389:21

depositions [1] 2:5

depression [1] 376:4

DeRamus [5] 50:6,8,17 57:19,19

described [4] 150:16 212:23 223:15 376:17

description [2] 171:16 380:7

Design [1] 18:17

details [3] 21:4 23:19 45:13

determine [2] 115:23 389:2

determined [2] 116:3 162:10

develop [2] 99:7 186:5

Development [1] 342:16

devise [1] 162:11

Dewayne [1] 19:19

DEX [67] 3:5,6,7,8,9,10 3:11,12,13,14,15,16,17,18 3:19,20,21,22,23 4:1,2,3 4:4,5,6,7,8,9,10,11,12,13 4:14,15,16,17,18,19,20,21 4:22,23 5:1,2,3,4,5,6,7,8 5:9,10,11,12,13,14,15,16 5:17,18,19,20,21,22,23 6:1,2

diabetes [5] 32:1 370:22 375:7,13 376:11

diabetic [2] 13:12 17:3

diagnosed [2] 376:3,6

die [1] 303:10

difference [8] 114:13 125:12,14 130:3 208:1 221:1 263:14 296:23

different [11] 23:16 86:9 217:21 240:7 249:20 250:12 251:10 307:5 320:18 371:2 387:18

directly [1] 342:2

director [5] 342:15 345:21 348:4 355:8,15

disability [11] 369:1,18 370:2,4,8,9,11,14,21 371:11 388:1

disabled [1] 187:23

disagree [10] 145:20 161:14,16,17,20 240:18

240:21,22,23 278:16

disagreed [3] 146:14,20 146:23 159:12 280:4

disagreement [1] 340:17

disagreements [2] 340:7,10

discard [1] 76:8

discarded [5] 75:15,21 76:5,13,17

discharge [1] 336:14

disciplinary [1] 340:3

discount [1] 121:17 122:2 129:22

discovered [3] 144:17 145:5,7

discriminated [2] 305:8 305:16

discuss [23] 11:5 22:9 23:20 24:15 26:19 39:22 41:7,12 42:21 47:3 55:13 55:19 56:3,6 57:6 60:7 64:11 65:10 69:20 78:6 132:23 227:22 354:6

discussed [43] 20:16 21:1,5,8 22:3,14,16,18 23:9,14 25:2 27:7 28:15 28:17 38:20 39:18,19 41:1 41:17 42:17 43:19 44:5 44:12 46:12,20 47:6 53:10 53:22 56:8 59:5,5 60:2,3 63:1 66:5 84:14 129:8 168:7 202:9 211:9 243:22 333:7 388:2

discussing [25] 39:16 47:22 48:15 49:11,23 50:17 51:9,22 52:14 53:5 54:4,11,17,22 56:19,23 57:4 60:9,11,16,19 65:13 66:6 152:3 266:7

discussion [19] 21:11 21:18 31:13 42:1 46:3 55:2 68:21 188:4 225:5 225:12 229:10 234:19 306:7 315:11,17 323:7 355:14 357:21 385:8

discussions [10] 20:20 23:5 26:10 42:1 44:4 64:19 66:9 212:8 331:12 332:23

distant [1] 62:23

distress [4] 374:22 375:3 375:20,23

distribution [6] 168:16 169:12 171:3 172:2 176:16 242:19

distributor [107] 3:7,9 3:10,23 4:8,10 5:11 25:17 26:4 27:15,22 28:3,8,12 30:23 34:17 39:4,7 40:6,8 40:13 44:1,17,23 47:15 47:18 48:7,8 49:4,5,8 50:13 51:3,16 52:6,7,22 52:23 66:15 67:9 68:5 71:4 72:16 74:10 76:22 90:18 92:22 94:23 96:22 97:2,20 100:4,19 101:2

240:21,22,23 278:16

101:10 102:13 103:7 105:19 112:8,9,21 113:16 114:2 115:15 123:22 126:15 127:5 132:5 135:4 135:6 136:12 148:10 166:20 167:3 169:14 181:17,18 182:9 183:8,9 183:21 186:2 221:8 225:6 228:17 229:16 233:18 234:7,11 281:9,10,16 296:6 312:18 313:10,16 320:22 321:5,8,11,12 322:7,19 331:4 333:2 337:23 338:4

distributor's [3] 181:21 184:19 236:2

distributors [11] 28:1,1 47:2,14 49:20 50:9 51:2 51:15 54:13 92:16 124:23 132:20 167:18 204:21 287:2 305:2

distributorship [26] 45:12,16 73:3,5 74:12 93:13 102:21 104:7 172:22 189:10 209:4 231:15,16 322:1 331:9 332:1,8,12 333:13 361:10 363:22 364:23 365:5 383:10 388:23 389:5

distributorships [2] 93:7,10

district [9] 1:1,2 7:1,2 9:12,13 150:20 168:2 306:5

division [1] 1:3 7:3 9:13 150:22,23 151:4

doc [3] 3:10 4:4 5:23

dock [1] 120:19

doctor [4] 349:18 375:9 375:11,19

doctor's [1] 385:4

document [151] 33:7 87:5,13,16 88:1,8,9 17 95:20 96:8,12,14 97:16 102:13,16 112:13 132:2 134:9,12 135:18 136:20 137:14,21,23 138:10 141:1,4 142:3,13 145:18 146:4 150:17 151:13 157:18 160:5,5,21 161:9 162:8,23 163:11 166:13 169:7,10 170:16 171:8,12 171:15 174:8 175:4,23 176:23 177:2 181:4,8,11 181:15,20 182:20 184:4 223:15 226:13 227:2 230:8 231:20 232:3,7,12 232:16 233:22 238:8 239:15,21 240:13 243:15 243:18 244:5,11 248:5 250:6 255:6 258:12 266:4 266:17 270:6,12,15,18 272:4,22 273:7,18 274:16 274:19 279:4 280:21 282:3 283:14 284:4 285:10 290:8 291:6 298:8 298:11 299:12,13,21 300:15,23 302:19,23 303:7 307:17 308:18,21

**320:13** 323:23 325:10 326:17 328:12,16,17 335:5,6 339:8 343:23 346:11,13,16 350:14,17 350:23 352:19 354:10 356:5 358:15,18,22 359:2 361:5,8 362:5 363:3,11 363:19,20 364:13,21 374:10 379:17,21 380:22

**documents** [29] 64:3,18 64:22 65:6 66:1,12 67:5,8 73:3,11,17 75:21 76:18 134:17 136:11 173:22 174:4 183:11 231:8 255:16,18 314:1,4 368:4 373:14 387:23 388:5,23 389:4

**Dodge** [1] 383:23
**DoDIG** [1] 160:15
**doesn't** [1] 113:3 327:17 375:13
**dog** [1] 204:3
**dogs** [1] 196:10
**dollar** [1] 121:17,23 122:9
**dollars** [10] 104:13 105:11,16 144:20 161:13 165:19 170:10 242:7 245:5,8
**Don** [2] 51:11 176:10,11 184:5
**Donald** [1] 51:11
**done** [28] 14:9 24:5 41:5 55:2,8 68:9 77:6,8 86:9 91:4 127:1 128:20 137:2 159:1,4 162:20 163:8 170:1 172:7 177:21 199:12 247:9 248:1 264:11 268:21 325:12 332:13,15
**Donna** [1] 61:20
**door** [6] 128:19 275:6,23 303:9 304:3,6
**Doug** [5] 38:21 39:1 79:1 305:18 306:2
**down** [31] 23:8 24:11 28:21 132:8 143:2 224:16 226:14 277:22 285:1,13 286:4,7,11,16 287:13 294:11,18 295:13 296:8 296:12 297:4,11 299:23 300:9 301:1,17 302:11 306:6 346:1 387:16 388:4
**downsizing** [1] 241:21
**Downtown** [1] 293:7
**Dr** [4] 349:19,20,20,20
**drive** [7] 7:18 13:14 84:19 370:16,18,19 387:17
**driven** [1] 384:17
**driver's** [1] 385:2
**driving** [2] 384:20 385:5
**dropping** [1] 94:14
**drove** [1] 292:15
**due** [6] 160:9 208:9 245:10 298:15 305:9,16

**duly** [1] 10:10
**during** [28] 11:15 15:9 15:20 68:4 70:2 73:4 91:1 91:12 93:22 94:17,23 100:2 103:5 106:2 116:1 161:7 189:20 190:5,13,20 191:7 193:11 238:17,23 290:22 306:22 343:6 383:3
**duties** [1] 343:17
**Dwayne** [5] 52:4 305:17 340:14,15,15

**-E-**
**E** [2] 3:1 236:4
**e-mail** [1] 63:6
**early** [2] 14:12 127:19
**earnings** [3] 359:2,6,16
**easier** [2] 16:9,11
**easy** [1] 275:9
**eat** [1] 178:3
**edible** [3] 200:4,7,8
**education** [12] 80:8 89:10 333:21 334:8,10 346:18 352:20 353:22 354:9,20 355:3,16
**effect** [4] 2:3 303:23 306:13 375:10
**effective** [1] 102:20
**effort** [1] 24:7,8,17
**efforts** [7] 99:6 186:5 205:6 234:14 333:18 347:16 355:17
**eight** [2] 245:5,7
**eighth** [1] 379:20
**eighty** [1] 122:4
**eighty-four** [3] 142:15 143:14,18
**eighty-nine** [1] 390:21
**either** [9] 23:6,20 29:15 46:1 126:21 230:7 289:9 303:3 310:1
**eleven** [6] 81:5 291:2,3 291:15,17,23
**Elmore** [1] 8:18
**emotional** [7] 374:22 375:3,20 376:20 377:1,6 377:9
**employed** [8] 18:14 20:1 79:23 81:4 338:19 351:22 352:23 353:4
**employee** [19] 27:12,14 27:16,20 34:14 35:23 36:7 36:18 37:6,21 38:13,14 39:2 40:3 92:2,7 312:11 352:5,10
**employees** [1] 28:2
**employer** [2] 89:20 336:8
**employers** [1] 84:13
**employment** [31] 3:6 31:2,11 34:8 35:6 36:12 36:22 37:10 38:2,17 79:19

**82:20** 83:23 85:13,18 87:6 87:8 88:21 89:19 90:4 336:6,11 344:5 345:23 347:17 348:13 352:19 354:19 368:11,16 387:1
**end** [15] 77:19 117:12 119:5 130:19 141:12 157:7 178:11 186:14 215:13 228:11 235:3 237:14 279:11 297:17 357:19
**ended** [3] 105:10,14 221:22
**ends** [1] 83:18
**engage** [1] 161:22
**engaging** [1] 154:1
**entail** [2] 93:14 179:13
**enter** [4] 123:18 131:4 180:12,20
**entered** [4] 131:7,10 170:21 182:10
**entering** [2] 188:5 234:20
**entire** [4] 187:4 231:14 231:16 236:5
**entirety** [2] 38:12 95:20
**entitled** [2] 174:8 232:12
**established** [1] 252:18
**estimate** [3] 30:16,20 254:19
**estimated** [1] 161:13
**evening** [6] 14:12 82:16 82:17 127:14 192:8 309:12
**event** [2] 293:19 336:11
**eventually** [1] 209:20
**everybody** [3] 16:10 94:5 237:11
**Everybody's** [1] 62:10
**evidence** [2] 2:14 246:8
**evidentiary** [1] 188:17
**evidently** [1] 147:10 149:20 218:20 251:3
**exactly** [16] 20:6 70:17 92:4,22 126:23 159:13 179:15 191:2,4 195:12 210:9 246:3 259:13 294:9 297:6 306:19
**examination** [3] 3:2 9:4 14:15
**examined** [1] 10:11
**example** [8] 12:12 121:15 206:19 253:4 258:14 260:21 269:17 272:11
**except** [2] 2:9 211:7
**excuse** [1] 145:3
**exhaust** [1] 205:6
**exhibit** [153] 31:14,21 32:9 33:10 86:18 87:1 95:6,11 101:19 102:2,2 103:10,18 112:6,7 134:1 134:7 136:5 137:13 141:18 142:1 147:22 148:5,13,18 150:7,12

**151:19** 152:1 157:10,15 159:21 160:4 164:4,9 165:6,12 168:21 169:4,5 173:15,20,21 175:4 177:6 179:1 181:1 182:14,17 183:7 184:8 189:1,8 214:15,20 223:5,10,22 229:1 230:3,23 231:5 233:10 238:2,7 239:3,8 239:11 241:9,14 243:6,11 244:17,22 247:20 248:8 256:17 257:1 258:4,9 260:14,19 265:2,7,10 266:9,14 269:12,16,23 270:5,10 271:20 272:2,15 272:20 273:2 274:9,14 278:7,18 280:11,18 281:19 297:23 298:5 299:7,12 308:11,16 315:21 320:11 323:15,21 324:6 325:6,14,17 327:7 328:9 330:17 331:1 334:13,21 338:23 339:5 343:18,22 344:4 346:7 349:21 350:12 355:20 356:2 358:2,13 359:20 360:5,10 361:21 362:2,18 363:1 364:1,6 372:15 379:9,14 381:4,9,16,19 382:12
**exhibits** [6] 3:4 32:8,10 32:15 187:4 236:4
**expect** [2] 273:12
**expected** [1] 111:2
**expenses** [5] 73:22 361:9 363:21 364:23 365:5
**experience** [2] 89:20 336:17
**explain** [3] 93:12 222:16 276:2
**explained** [1] 285:19
**Explorer** [1] 383:22
**extent** [1] 188:17
**extra** [3] 110:17 123:11 235:15
**eyes** [1] 32:1

**-F-**
**F&D** [2] 287:23 289:17
**fact** [4] 28:7 101:1 128:22 309:1
**facts** [4] 15:1 16:16 17:7 271:14
**fail** [1] 131:12
**failed** [1] 192:19
**fair** [19] 67:2 69:10 71:8 87:15 110:5,9 173:1 211:12 219:23 249:11 251:1 277:23 289:7 319:22 346:15 356:20 357:1 359:1 374:20
**Fairground** [1] 292:22
**fairly** [2] 151:4 378:12
**Fallahi** [1] 349:20
**false** [7] 25:3 266:4 329:8 330:2 336:12 353:23

**354:10**
**family** [3] 59:8 336:6 377:10
**far** [13] 12:15 22:6 27:21 33:23 34:2 62:7 84:14 89:5 188:14 212:23 290:19 292:23 307:14
**farmer** [1] 386:1
**fashion** [1] 274:4
**fault** [1] 303:1,3
**FBO** [2] 96:2 183:15
**FBO000689** [1] 112:12
**Federal** [7] 8:20 10:19 12:2 362:12 363:5 364:9 370:10
**feels** [1] 11:3
**feet** [2] 237:11 307:16
**felt** [21] 21:3 24:4,22 28:18 55:4,7 60:23 81:9 89:6,8 140:19 221:9 249:4 251:17,21,21 253:10 265:19 321:10 353:3,16
**fender** [1] 83:17
**few** [20] 14:17 30:8 68:11 71:22 76:15 79:18 95:12 95:21 101:6 102:4 103:14 139:19 160:3 181:2 212:15 240:12 282:2 323:22 331:18 378:6
**fifth** [1] 330:1
**fifty** [1] 265:12
**fifty-eight** [1] 104:13,17
**Fifty-five** [1] 17:17
**fifty-two** [1] 144:19
**figure** [2] 152:10 382:10
**figured** [1] 84:22
**file** [17] 317:10 349:8 356:21 357:2,5,7 362:15 363:14 365:10,14,18,21 366:8 378:22 379:2,7 382:23
**filed** [10] 33:6 75:20 76:5 76:13 361:2 367:18,21 381:12,12 382:23
**filing** [2] 2:16 366:4
**fill** [3] 204:22 206:20 207:11
**filmed** [1] 315:5
**filming** [2] 311:18 314:14
**final** [3] 118:8,9,10
**finally** [1] 365:21
**financial** [3] 71:10 76:6 165:3
**financially** [4] 154:5 156:21 157:8 172:22
**financials** [5] 71:14,18 71:21 72:4 73:8
**financing** [1] 105:15
**fine** [4] 14:1 21:16 22:5 178:4
**finish** [2] 117:13 252:13
**finished** [1] 34:23

Case 2:05-cv-00937-MEF-TFM    Document 47-16    Filed 07/26/2007    Page 107 of 117
PORTERFIELD v. FLOWERS                    CondenseIt!                   fired – helping
DEPO:HENRY PORTERFIELD

**fired** [4] 83:6 310:7 312:7 344:12
**firms** [2] 83:10 84:3
**first** [58] 32:23 33:13 44:11 61:20 80:3 89:20 91:2 92:15 97:19 98:4 104:6 106:5 116:23 117:11,13 142:9 145:15 152:18 168:1 7 174:7 179:20,23 182:20 188:15 189:13,15,20 190:6 191:10,14 193:11,23 205:8 208:23 209:9 234:4 238:17 290:6,7 315:8,9 321:17,20 328:19 329:3 330:11 335:20 336:2,10 349:3 360:14 361:1 362:8 363:11 364:13 372:3 373:11 380:5
**five** [27] 33:21 37:3,6,10 90:20 110:2,8 111:6 113:5 113:9,17 114:3,15 115:5 115:18,18 135:20 234:9 266:19 267:15 268:9,20 269:8,18 273:12 293:1 319:13
**five-day** [7] 110:11 113:2,7,11 266:21 267:6 269:4
**five-inch** [1] 215:4
**five-minute** [1] 237:10
**fixed** [4] 288:17,18 289:23 294:19
**fixing** [1] 129:23
**Fletcher** [1] 349:20
**floor** [2] 130:20 227:15
**Flowers** [166] 1:10 3:6 7:10 8:2,9 9:9,21 14:20 21:2 26:7 27:2,13 28:4,8 28:12 30:17 31:1,10 33:3 34:8 35:6 39:2,4,7 40:4,6 40:9,11,15,17 44:2,18 46:19 48:7,9 51:4,17 52:8 58:22 60:12 65:18 68:6 71:5,11 72:17 74:10 79:20 80:6,12 83:20,22,23 84:4 84:15 85:21 86:1,14 87:8 94:16 97:21 99:20 100:3 100:18 101:2,13 103:2,8 111:22 112:21 114:6,17 114:21 115:1,15 116:9 126:10 136:12 138:6 139:21 144:21 152:4 154:14 164:20,23 165:2 168:6,16 169:13 170:6 181:18 182:10 187:5,10 189:23 190:4 191:12 192:9 193:13 195:5 198:7 198:10 201:19 212:4,8 219:9,12 220:6,16,17 222:10,12,15 231:12 232:8 234:2 1 236:6 237:3 238:20,23 242:5 252:10 252:11 253:7 268:11 269:10 286:8,21 298:12 312:12 316:2 317:10 320:22 321:5 322:8 327:3 330:12 331:5 332:23 333:2,18 336:17 337:15
337:23 338:4 349:13 361:9 363:22 364:23 369:1,16 372:7,11,18 375:14 377:23 380:22 381:2 383:5,8,12,13,20 385:15 386:6,12 390:14
**Flowers'** [13] 25:15 92:15 130:21 147:19 201:3,10 213:1,19 229:13 316:19 321:10 331:13 333:10
**folks** [7] 16:3 59:4 62:22 80:11 192:9 275:22 387:17
**follow-up** [1] 179:2
**following** [5] 9:4 109:13 109:14 139:22 165:21
**follows** [1] 10:11
**food** [2] 127:7 130:1
**foot** [1] 227:15
**footlong** [2] 192:12 206:19
**footlongs** [4] 195:15,17 204:4 206:21
**force** [5] 2:3 158:5,9,14 159:8
**Ford** [1] 383:22
**foregoing** [3] 8:21 390:9 390:21
**forged** [1] 136:17
**forgot** [4] 91:5 170:1 247:9 287:8
**form** [17] 2:9 5:13 11:13 12:18 13:1 31:5 35:8 43:10 45:7 100:8 167:9 187:13 237:5 242:13 243:1 260:3 289:8
**formerly** [3] 39:10 40:5 53:13
**forms** [3] 5:18 33:1 67:19
**forth** [6] 101:11 185:15 187:8,22 236:12 244:10
**forty** [2] 259:19 286:14
**forty-eight** [2] 105:11 137:18
**forty-five** [1] 177:20
**forty-four** [3] 138:16 139:14 140:6
**forty-seven** [1] 245:6
**forward** [1] 67:1
**found** [7] 44:14 45:18 94:9 139:22 145:21 314:15,18
**four** [20] 33:21 36:15,19 36:23 88:13 102:7 104:12 110:11 171:15 175:23 176:3,6 209:15 232:11 245:5 266:20 319:12 328:16,17,22
**four-inch** [1] 151:9 215:3
**fourth** [1] 87:23
**frame** [1] 14:10 296:22
**Frank** [1] 134:14 135:11

137:7
**Fred** [3] 91:3 290:3 326:10
**free** [2] 75:2 82:18
**freeze** [1] 200:21
**freezer** [53] 190:16 191:3 191:15,16 192:1,5,10,12 192:15,17 193:7,16,18 194:1,16,18,22 195:14 196:18 197:1,6,12 199:7 201:2,8 202:8,15 203:7 204:7 205:2,5,18,20 206:14 207:7,15 208:11 208:18 209:22 210:17,22 211:15 212:1,11 213:1,21 214:2 253:8 315:5,13,14 330:10,16
**freezers** [1] 190:16
**fresh** [24] 35:18,21 98:8 108:23 110:7,20 111:15 111:15,16,20 113:14 114:12 192:14,15 200:5 207:21 256:13 261:7 263:4 264:4,17,21 292:18 385:20
**fresher** [2] 110:22,23
**freshest** [1] 111:5
**Friday** [53] 108:9 109:18 109:22 111:12 165:18 206:22 248:13,16,19 249:3,6,8,17 250:4,5,11 251:1,6,11,12,20,22 252:3 252:9 253:1 254:1,6,8,10 254:20 255:7 256:4,5 258:16,21 259:1,6,9,12 259:16 260:9,10,22 261:20 262:8,14,21 263:23 265:15,19 272:12 285:11 294:6
**front** [7] 87:17,18 117:8 124:12 320:9 358:11 362:22
**froze** [1] 371:1
**frozen** [9] 200:16 201:20 202:12 207:21 210:11 212:20 213:2,17 320:6
**frustrated** [1] 76:10
**full** [17] 2:3 17:11 205:21 206:15,17 207:2 210:17 262:2,22 263:2,3,6,8,10 263:12 302:14 370:13
**full-time** [1] 84:11
**Fullers** [2] 62:16,17
**fun** [1] 387:20
**function** [1] 32:5
**fund** [1] 148:8
**future** [1] 387:1

-G-

**G** [8] 1:7,16 7:7 9:2,7,8 10:9 390:11
**gambling** [2] 359:3,7
**games** [1] 204:15
**Garretts** [1] 62:20
**gas** [3] 74:5 116:6 157:5

**general** [5] 71:5 106:18 146:15 282:12 387:22
**generally** [9] 12:21 108:3 115:17 146:21 181:5 207:7 229:13 233:17 252:19
**generate** [5] 119:8 120:12 123:8,10 153:12
**generated** [1] 152:8
**gentleman's** [1] 136:17
**gentlemen** [1] 58:18
**George** [1] 17:12
**Georgia** [1] 8;7
**Giant** [1] 151:10
**given** [6] 133:15 274:18 331:8 335:23 336:13 367:23
**giving** [4] 17:5 62:16 133:4 152:21
**goes** [13] 142:13 161:9 162:8,23 163:11 227:2 246:11 285:10 290:8 300:15 302:19 307:17 351:9
**gone** [7] 77:3 127:16,22 127:23 128:5 205:16 375:18
**good** [35] 9:19 24:22 29:9 32:6 36:1,3 94:5,9,12 98:10,14,18,23 108:23 109:4 110:6 139:8 140:12 177:14 185:13,15,19 199:19 233:22 234:6 248:22 263:23 266:23 267:7 279:1 282:18 286:11,16 289:1 319:16
**Goodman** [4] 49:1,3,11 57:13
**Government** [1] 370:10
**grab** [3] 13:21 177:12,14
**Grady** [41] 24:14,15 28:18,19,21 29:14 39:21 42:4,6,13 44:6,8 45:11,23 55:3,4,8,14 56:8,9,10 61:1 145:2 202:3 208:21 271:12 273:8 279:23 280:1 294:23 295:2 305:23 306:3,12 308:5,22 309:12 312:20 314:19 331:16 378:4
**Grand** [1] 383:23
**grandbaby** [1] 20:11
**Grant** [1] 85:19
**great** [1] 14:6
**Greg** [2] 43:12,12
**Griffin** [4] 46:22 47:1,4 57:1
**Griswold** [1] 8:13
**grocery** [9] 3:12 82:8 119:1,3 142:11 143:6 211:1,14,19
**ground** [3] 10:15 14:17 16:19
**grounds** [1] 2:12
**group** [1] 369:14

**grown** [1] 342:23
**guarantee** [2] 92:1 198:20
**guess** [8] 46:18 107:10 124:11,12 244:19 347:5 349:13 387:21
**guilty** [1] 70:8
**gun** [2] 257:15,17
**Gunter** [9] 3:17,18,19 113:4 158:5,9,13,14 159:8
**guys** [3] 134:16 306:10

-H-

**Halcyon** [1] 7:18
**half** [3] 81:6 146:11 177:18
**hamburger** [3] 197:2 284:9 292:16
**Hamiltons** [1] 62:19
**hand** [2] 31:20 323:20
**hand-held** [8] 72:23 73:11,18 105:20,23 106:11,19,22 123:19 124:15 131:5,8 144:1,7 147:4 179:3,23 211:15
**handed** [12] 33:7 134:6 169:3 238:6 270:4 272:1 272:19 274:13 298:4 308:15 339:4 350:11
**handing** [1] 102:1
**handle** [2] 247:3 312:18
**handled** [4] 263:22 264:1 273:21 290:13
**handling** [1] 309:17
**handwriting** [1] 87:13
**happy** [1] 103:1
**harm** [1] 275:12
**haul** [1] 192:16
**hauling** [1] 241:2
**head** [9] 90:7 127:6,22 128:8 129:1 164:14 277:17 341:4 370:12
**health** [2] 92:10 377:4
**hear** [4] 15:12 64:16 92:15 136:3
**heard** [15] 16:14 29:5 44:7 92:19 93:4,9 124:8 126:4 132:14 263:9 314:20,22 315:7,9 385:16
**hearing** [2] 12:23 92:17
**hearsay** [1] 11:22
**heavy** [1] 218:20
**held** [5] 9:11 169:13 176:16 227:10 390:23
**help** [16] 26:4,6 172:21 280:7 289:10 310:6,10 322:15,19 324:18,19 325:3 327:9 371:5,7 387:17
**helped** [5] 83:15 278:1,5 324:21 327:6
**helping** [1] 348:22

**Henry** [38] 1:7,16 7:7 9:2 9:7,8 10:3,9 13:12 17:12 134:13 215:1 220:3 226:15,17,18 227:3,5,7,9 227:13 243:3 255:6 273:19 284:7,12,17 285:11,12,16,16 291:7 300:16 301:1 302:19,23 326:18 390:1:1

**Henry's** [1] 300:1

**hereby** [1] 390:8

**herein** [1] 335:23

**hide** [3] 197:15 210:1 320:2

**high** [4] 89:10 151:5 371:1 376:11

**Highway** [1] 265:13

**Hill** [1] 349:3

**himself** [1] 83:2

**hire** [1] 86:16

**hired** [5] 85:22 327:18 348:20,22 349:1

**hisself** [1] 44:8

**Hista** [172] 3:3 8:5 9:19 9:20 10:5,14 11:19 12:1 12:20 13:23 14:8,16,18 31:16,19 65:21 66:7,11 66:14 67:2,3 69:4,10,11 69:18 77:10 78:2 86:20 86:21 95:8,9,17,18 101:21 101:22 102:8 103:12,13 134:3,4 136:7,8 141:20 141:21 148:1,15,16 150:9 150:10 151:21,22 157:12 157:13 159:23 164:6 165:8 168:23 169:1 173:17,18 177:8,13,17,20 178:5,17 189:3 214:17,18 223:7,8 224:1,2 229:3 230:5 231:2,3 233:12,13 237:9,20 238:4,5 239:5,6 241:11,12 243:8,9 244:19 244:20 247:22 258:6,7 260:16,17 265:4,5 266:11 269:14,15 270:2,3 271:22 271:22 272:17,18 274:11 274:12 278:9,10 280:13 281:21 297:14 298:2,3 299:9 308:1,3,14 315:23 316:1 318:1,1,16 319:1,12 319:11,22 320:8 323:3,10 323:17,18 325:8,9 327:13 330:19 334:15,16 339:2,3 343:20,21 346:9,10 349:23 350:1 355:22,23 357:17 358:4,5 360:2,3 361:23 362:1,20,21 364:3 364:4 374:9,19 379:11,12 381:6,7,22 382:8 387:21 388:7,13,20,21

**history** [1] 79:19 336:6 352:19

**hit** [1] 70:23 179:20

**hoagie** [1] 135:19

**hog** [1] 385:23

**Holcomb** [1] 288:16

**holding** [1] 306:9

**holiday** [2] 261:11,22

**home** [10] 13:15 14:13 22:23 71:16,18 72:14 75:12 82:18 160:2 200:17

**honey** [3] 126:22 129:16 130:3

**Hopefully** [2] 13:16 358:7

**hose** [1] 287:18

**hospital** [2] 22:1,20

**hot** [3] 196:10 204:3 287:19

**hour** [3] 14:10 77:15 177:18

**hours** [4] 13:19 82:13,14 82:14

**house** [4] 46:5 63:17 69:1 73:20

**household** [1] 20:9

**HP** [3] 3:19 5:7,9

**huh** [2] 30:8 288:6

**huh-uh** [13] 40:23 158:4 212:2 213:7 216:12 227:20 229:8 244:2 278:15 333:15 368:14 375:15 380:13

**hundred** [19] 24:21 104:12 105:11,16 126:22 127:9 129:17 142:15 143:14,18 242:6 245:5,8 259:19 265:11 301:20,23 302:3 390:21

**Huntsville** [1] 369:2

**hunudred** [1] 144:19

**hurt** [4] 307:19 349:10,12 370:19

**hurts** [1] 370:23 376:14

**husband** [1] 61:21

**Hyundai** [1] 20:5

---

**-I-**

**Ida** [1] 61:20

**idea** [6] 215:17 288:15 315:19,20 339:16 380:17

**identification** [66] 31:15 86:19 95:7 101:20 103:11 134:2 136:6 141:19 147:23 148:14 150:8 151:20 157:11 159:22 164:5 165:7 168:22 173:16 177:7 189:2 214:16 223:6,23 229:2 230:4 231:1 233:11 238:3 239:4 241:10 243:7 244:18 247:21 256:18 258:5 260:15 265:3 266:10 269:13 270:1 271:21 272:16 274:10 278:8 280:12 281:20 298:1 299:8 308:12 315:22 323:16 325:7 330:18 334:14 339:1 343:19 346:8 349:22 355:21 358:3 360:1 361:22 362:19 364:3

**identify** [8] 66:1 148:5 233:17 245:2 270:6 320:15 324:6 334:21

**identifying** [2] 64:18 64:21

**ignore** [1] 267:12

**immediately** [1] 184:1

**important** [1] 15:20

**improper** [1] 153:21 154:1 222:17 223:1

**in-between** [1] 83:19

**In-person** [2] 21:21,22

**inaccurate** [1] 146:12

**inadvertently** [1] 13:7 147:12

**inappropriate** [1] 11:4

**incident** [1] 47:9

**include** [1] 383:16

**income** [10] 169:21 361:8 363:21 364:22 365:4 368:18,22 370:6 371:20 387:12

**incorrect** [1] 115:2

**increase** [1] 81:12

**independent** [4] 221:8 242:10,22 251:17

**indicate** [8] 146:9 239:22 242:9 259:22 280:21 288:2 314:1 322:7

**indicated** [1] 244:4

**indicates** [7] 138:1 230:9 232:4 299:21 344:4 346:16 359:2

**individual** [4] 136:20 138:5 171:20 283:23 289:19 345:18

**industry** [17] 36:1,3 98:10,14,18,23 108:23 110:6,9 185:13,15,20 233:22 234:6 248:22 266:23 267:8

**infection** [1] 376:13

**information** [10] 3:9 104:6 336:13 346:22 347:9 350:22,23 351:12 357:8 361:13

**informed** [1] 188:15

**initiated** [2] 21:10 160:15

**injured** [2] 372:19,21

**Inn** [1] 1:19 8:23 9:15

**input** [1] 66:18

**inquire** [3] 336:5 339:17 339:19

**inside** [2] 276:18,19

**inspector** [1] 18:22

**instance** [4] 66:14 77:4 110:16 213:9

**instruct** [1] 65:10

**insufficient** [1] 148:8

**Insulin** [1] 13:13

**insurance** [8] 70:21 92:11,12 369:1,2 383:14 383:17,21

**insure** [2] 247:12 322:3

**intend** [1] 13:4

**intending** [2] 66:8 292:8

**intention** [1] 292:10

**intentional** [1] 156:14

**intentioned** [1] 292:13

**Interal** [1] 367:8

**Interdepartmental** [1] 4:3

**interest** [1] 24:22

**interested** [2] 85:21 391:5

**Internal** [5] 358:20 366:12 367:4,10,11

**interrupt** [1] 16:7

**interview** [2] 161:7 342:18 343:4

**interviewed** [1] 161:4 342:9,12

**interviews** [2] 161:1,10

**introduce** [1] 9:17

**intrude** [1] 13:7

**inventory** [15] 118:12 124:15,22 126:15 131:13 131:21 138:15 162:14 180:5 216:3,3,5,5 222:8,9

**investigate** [1] 336:5

**investigation** [5] 158:23 160:15,18 161:2 162:9 336:14 342:6

**Investigative** [1] 160:16

**involuntarily** [1] 354:21,23

**involuntary** [1] 344:11

**involved** [4] 58:7,14 71:1 380:15

**involves** [1] 327:11

**IRS** [1] 368:7

**issue** [27] 52:17 53:8 54:6 55:1,15 56:1,4,13 57:1,5 58:15 60:17,20 99:21 190:14 191:20,22 192:22 194:1,9 222:10 238:19,22 239:2 290:10 298:16 330:9

**issued** [1] 167:5 229:15

**issues** [13] 29:23 30:1,5 30:7 44:22 84:16 91:11 91:15 154:9 168:4 190:1 281:16 340:4

**issuing** [1] 374:8

**Isuzu** [1] 384:1,7,11

**item** [1] 180:2

**items** [7] 104:18 138:23 162:12,13 163:1,13 240:13

**itself** [1] 200:2

---

**-J-**

**Jakes** [1] 349:20

**Jakia** [1] 20:10

**James** [1] 58:13

**Jason** [1] 49:1

**Jaye** [5] 91:7 144:10,12 144:22 145:12

**Jean** [1] 18:10

**Jeep** [1] 383:23

**Jeffcoat** [1] 91:3

**Jerry** [1] 83:12

**Jiles** [5] 53:21 58:11,12

**Jimmy** [2] 50:6 57:19

**job** [13] 5:16 27:17 80:3 84:12 88:12,13 251:21 305:20 333:20,23 338:21 353:13 389:14

**jobs** [1] 387:8

**Joe** [4] 155:9,9,16,17

**John** [4] 46:13,16 306:3,3

**Joni** [3] 5:4 283:14,21

**Jr** [1] 53:21

**July** [3] 182:2 190:10 261:1

**jump** [1] 95:23

**juncture** [1] 11:15

**June** [1] 174:11

---

**-K-**

**keep** [9] 34:1 72:17,21 73:2,10,22 74:4 75:19 96:7

**keeping** [5] 35:21 138:19

**kept** [6] 73:7,19 74:1 130:18 201:13 319:19

**Kevin** [3] 8:6 92:10 14:18

**key** [10] 147:6 179:10,19 179:21 275:6,20,23 351:2 351:4 354:2

**keyed** [1] 354:17

**kicked** [3] 163:19 268:23 277:12

**Kim** [1] 278:11

**kin** [4] 62:6 290:4 334:17 391:3

**kind** [11] 10:15 62:8 68:15 119:21 132:11 145:2 188:1 210:10 219:3 220:4 343:3

**kinfolk** [3] 324:20 326:10 378:4

**kinfolk's** [1] 289:22

**kinfolks** [2] 324:21 334:7

**king** [42] 5:2 113:21 114:14,19 115:11 196:53 196:21 203:13 206:18,18 213:16 215:2,12 216:8,16 216:15 217:11 218:1,14 218:18 219:2,8,15,18,20 219:22 220:1 221:23 222:5 266:18,21 267:22 268:3,8,13,15 269:6,8,21

Case 2:05-cv-00937-MEF-TFM   Document 47-16   Filed 07/26/2007   Page 109 of 117
PORTERFIELD V FLOWERS                CondenseIt!                King's 1-7 medical
DEPO:HENRY PORTERFIELD

PORTERFIELD V FLOWERS

269:18 280:15,23
King's [4] 1:14:2 220:7 268:17,20
Kings [2] 115:5 269:1
kitchen [6] 154:23 155:13 284:2 290:14 293:13 300:11
knee [2] 370:23 376:12
knew [15] 29:3,6 116:13 127:2 167:14 202:7 223:16,18 234:14 254:12 254:15 283:22 301:13 356:21 366:6
knowingly [1] 357:2
knowledge [5] 44:21 132:19 160:23 335:3 336:1
known [1] 17:13
knows [2] 237:7 327:22
Knuckles [4] 58:13 299:16 300:16,20
Krystal [50] 3:11,14,15 4:16,22 5:1 113:5,7,11 132:3 137:17,18 138:16 140:1,6,16,17,18 148:20 149:5,9 150:1 151:5,16 167:22 168:5 195:22 196:2,19,20 201:6,7 203:12 259:12,12,19 260:1,7,13 261:9 265:12 265:23 275:22 276:3,17 276:22 277:4,13 278:2,3
Krystal's [1] 113:16

**-L-**

L [1] 1:12
label [19] 29:12,16,19 45:20 56:15 119:16 240:14,19 241:2,6,7
lady [14] 24:11,19 59:1 154:21 170:2 278:16 279:7 283:17 290:20 299:23 300:14 301:2,7,8
lane [1] 155:19
Lanes [2] 154:10,13
Lanier [5] 1:17 7:14 8:17 390:6 391:11
lapsed [1] 295:22
large [4] 1:19 143:19 390:8 391:14
larger [1] 163:22
largest [1] 164:2
LaRhonda [1] 19:10
last [31] 21:7,9 22:17,19 62:16 69:15 78:7,10 88:19 88:21 91:9 95:2 117:8 176:23 187:20 205:17 206:10,21 209:4 232:15 235:5 236:8,10 278:21 291:1 303:2 321:19 330:8 331:17,18 369:20
late [8] 3:20 44:13 165:22 166:4,17,19 167:19 296:19

lateral [2] 129:16 184:16
Law [1] 7:18
laws [1] 2:4
Lawson [1] 83:12
Lawsons [1] 62:18
lawsuit [48] 14:19 15:3 17:8 20:17,21,23 21:2 22:9,10,18 23:5,6 26:12 27:7,8 28:16 30:23 31:9 33:6 38:20,21 39:17,23 40:17 41:2,14,20 42:23 43:20 45:5 46:13,21 48:16 53:11,11,23 59:6,6 63:1,6 63:8 75:21 76:4,14,18 77:1 317:10 380:9
lawyer [13] 42:23 43:2 43:13 67:20 325:22 326:4 326:10,18,21,22 327:2,20 328:5
lawyers [2] 59:7 96:7
lay [2] 10:15 382:9
leading [2] 2:9 157:22
least [6] 66:20 157:8 191:19 297:1 378:15 389:1
leave [15] 5:13 80:21,23 81:1,20 139:6 140:21 275:1,3 276:9 339:12,14 346:6 352:3,15
leaving [8] 89:23 90:10 275:11 336:22 353:21 354:8
led [1] 378:22
LEE [1] 390:4
left [21] 4:18 73:16 80:19 81:1 83:23 128:18 138:12 138:15,20 174:18 215:18 216:2 240:10 274:23 275:17 276:11,21 292:19 303:8 373:12 380:5
left-hand [1] 232:1 379:18
leg [6] 241:22 349:7,9,15 350:1,9
legal [8] 31:5 33:1 70:12 71:2 187:13 237:5 242:14 243:1
legs [2] 349:7 350:8
less [3] 104:15 268:20 332:12
letter [42] 69:1,5 99:21 42:20 146:12 147:2 149:12,15,19 157:23 158:12 167:6 214:9 219:14,19 222:11,22 229:15 298:11 309:4,6,7 309:10 321:17 322:9 324:10,13 326:2 329:1,13 329:16 330:9,12,20 331:3 331:7 339:11 344:22 345:2 348:7 355:9,13
letters [10] 44:22 68:1,7 68:10 75:12,16 132:19 146:17 167:18 229:22
level [1] 151:5
liable [2] 187:10 236:13

liar [1] 28:21
license [1] 385:2
lie [1] 154:19
lien [2] 366:12 367:11
liens [2] 366:22 367:4
lies [1] 42:9
life [1] 92:11
light [1] 320:4
Lillie [1] 59:16
Lily [1] 59:14
line [5] 78:18 170:18 182:20 375:8 378:13
lines [1] 388:6
list [3] 83:10 336:17 380:21
listed [5] 89:20 171:8,11 380:8,18
listing [1] 235:4
litigation [1] 138:6
live [4] 19:11,12,20 87:2
lives [1] 62:4
living [1] 20:8
LLC [7] 1:10 7:10 8:3,10 9:10,21 390:14
load [8] 117:1,1,2,6,7 118:8,9,10
loaf [3] 121:16,18 122:5
local [1] 9:16
located [2] 18:18 288:12
location [1] 380:8
logo [1] 216:8
longer [8] 158:10 160:8 164:17 280:22 310:17 314:2,8 321:9
longest [1] 319:20
look [21] 34:20 95:13 96:10 102:5 103:15 112:5 112:6 137:14 153:17 168:20 181:2 183:14 186:22 238:8 240:13 272:22 321:1,16,17 350:14 351:14
looked [4] 12:7 66:17,19 243:1
looking [6] 181:19 184:20 235:1 236:3 359:21 361:19
looks [2] 105:15 361:16
Lord [11] 5:8 8:11 10:4 10:4,6 309:8 320:20 324:11 330:21 331:15 311:4,8,23 315:12 316:3,18 316:22 317:1
Lou [1] 52:19
loud [1] 236:11

ltr [25] 3:12,13,16,17,19 3:20 4:2,5,6,12,13,14,16 4:17,18,21,22,23 5:1,2,5 5:7,8,9,15
lunch [9] 13:19,20 14:5 140:20 178:13,19 284:16 291:21 294:8
Lunsford [6] 51:12,14 51:22 57:23 223:16,18
Luster [1] 5:10
lying [4] 308:6,7,8,10

**-M-**

M [3] 5:8 7:14 391:11
Madison [2] 62:15
mail [2] 298:12
maintain [4] 15:2 35:17 35:19 305:7
maintaining [1] 98:8,21
major [2] 238:22 239:2
majority [1] 192:4
malfunctioned [1] 142:17
man [2] 90:7 154:18
management [13] 144:17 145:5,10 149:2 208:16 213:20 331:13 333:11 369:11,13 374:13 388:12,16
manager [20] 80:20 86:7 150:21,22,23 151:4 154:23 155:13 168:2 169:23 201:1,7 266:1 276:3 283:22 284:2 290:14 293:13 300:12 306:5
managers [4] 201:7 203:5 277:5,10
mandatory [1] 12:11
manifold [2] 287:19 295:2
manner [1] 391:4
March [13] 25:1 282:3 283:1 284:7 311:6 312:1 312:2,3,10 322:8 324:16 335:9,372:2
Marcus [35] 19:19 20:17 20:21 21:1,18 22:16 23:2 23:7 74:16 294:22 295:5 295:7,14 310:5,7,10,15 310:22 311:1,4,13,14,16 314:8,23 315:12 316:3,18 316:22 317:1
Marie [2] 59:14,16
Marietta [2] 59:18 334:11
mark [6] 31:20 86:21 212:15 233:14 325:9 344:19
marked [92] 3:4 31:15 86:19 95:7,10 101:20 102:1 103:11 134:2,6 136:6 137:12 141:19,23 147:23 148:14 150:8

151:20 157:11 159:22 164:5 165:7 168:22 169:3 173:16 177:7 189:2 214:16,20 223:6,23 229:2 230:4 231:1 233:11 238:3 238:7 239:4 241:10 243:7 244:18 247:21 256:18 258:5 260:15 265:3 266:10 269:13 270:1,5 271:21 272:2,16,19 274:10,14 278:8 280:12 281:20 298:1,5 299:8 308:12,16 315:22 320:10 323:16,20 325:7 330:18 334:14 339:1,5 343:19,22 355:21 358:3,12 360:1 361:22 362:1,19,23 364:2 364:6 374:11 379:10 381:5
market [9] 35:18,21 110:15 139:6 249:12,22,23 255:8,21 256:1
marketing [3] 99:13 186:10 234:16
married [3] 18:7,12 19:3
Martin [5] 49:17,19 50:1 57:15,17
Marty [5] 27:8,11 29:5 54:17 79:1
Mary [3] 278:19 280:23, 281:16
materiality [1] 11:22
materials [1] 318:8
matter [5] 9:8 216:11 262:21 390:10 391:1
matters [2] 12:14 336:7
maximize [1] 186:5
Maxwell [1] 158:13
may [11] 1:16,21 2:11 9:14 11:5 68:11 72:5 75:11,14 83:9 137:2 212:8 230:20 235:1 236:15 245:11,19 345:14 347:10 390:18 391:6
McCalls [1] 62:15
McCrory [4] 48:3,6,15 57:11
mean [27] 12:1,22 29:1 32:8 41:16 42:8 82:11 111:8 140:9 153:3 155:2 155:3 157:1 159:3 188:13 190:1 191:5 194:6 208:2 234:21 252:3 291:18 302:2,18 327:17 328:16 371:16
meaning [2] 50:3 209:14
means [8] 12:9 26:16,17 152:20 222:8 263:4,6 302:4
meant [2] 292:9 318:15
meantime [1] 25:1
Meat [3] 3:12 142:10 143:6
medical [3] 349:14 376:9 386:22

**medication** [2] 16:23 375:23

**meet** [1] 11:9

**meeting** [6] 5:6 95:2 273:4,8 299:14,18

**meetings** [7] 70:2 93:12 93:15,19,22 94:3 95:1

**members** [1] 59:8

**memo** [4] 3:15 4:3,20 5:6

**memory** [1] 230:11

**mens** [1] 342:23

**mental** [4] 374:22 375:3 375:23 376:1

**mentioned** [18] 17:2 58:6 61:13 62:23 75:11 79:16 80:11,14 83:9 84:3 95:1 127:16 203:16 209:19 210:21 212:10 347:8 348:4

**merchandise** [1] 348:23

**messed** [2] 292:4,12

**Messer** [28] 24:14,14 25:2 28:18,19,21 39:21 145:2 209:18 210:6,8 271:12 273:8,23 294:23 299:19 303:5 304:3,6 305:23 306:3,23 308:5,22 309:12 312:20 313:8 378:4

**Messer's** [1] 210:4

**Messick** [3] 1:17 8:17 390:6

**met** [4] 69:8,11 309:2 351:11

**Mgmt** [1] 5:23

**Michael** [7] 5:9 8:11 10:4 309:8 320:19 330:21 331:15

**middle** [5] 1:2 7:2 9:12 104:9 160:12

**might** [7] 74:22 75:22 78:14 87:19 92:20,23 107:4 125:1 134:15 162:2 180:9,10 202:20 213:10 239:16 258:22 259:5 288:9 303:10 305:21 359:17 388:8

**miles** [1] 293:2

**military** [1] 168:14

**mind** [7] 77:15 95:16 177:10 194:6 301:14 381:21 387:20

**mine** [4] 127:10 170:9 220:7 239:16

**minor** [1] 70:5

**minute** [4] 175:13 212:14 296:23 323:4

**minutes** [8] 77:17 79:18 177:21 178:3,4 286:14 297:2 331:18

**miscellaneous** [7] 124:6,9 217:18 218:3,7,9 218:12

**miscounted** [1] 133:7

**misinventoried** [1] 139:16

**misleading** [2] 336:12 337:5

**misplaced** [2] 76:15 359:17

**missing** [2] 4:4 224:4

**Missionary** [1] 53:18

**mistake** [4] 142:23 143:10 147:14,15

**mistaken** [1] 261:8

**mistakenly** [1] 13:6

**modification** [1] 237:7

**modified** [2] 236:15 237:1

**moment** [5] 137:13 272:21 323:6 343:23 350:13

**moments** [6] 95:13 101:7 103:14 160:3 181:2 323:23

**Monday** [21] 108:9 109:6 109:8,13,14 110:12 111:10,11,12,14 245:4 250:12 253:5,13,15,20 255:9 263:15,16 264:1 293:1

**money** [7] 83:19 157:4 206:3,23 242:4 385:21 386:4

**monitoring** [1] 3:16

**Montgomery** [48] 5:12 7:18 17:21 18:6,19 19:14 47:16 48:11 49:6 50:14 51:6,19 52:10 53:2 61:15 61:23 62:5,7 80:4,5,5,7 132:20 203:20,22 224:5 281:12 288:13 305:2 333:20 334:22 344:5 345:14 346:17,18 347:17 348:2,11 350:3 351:23 352:5,16,20 353:21 354:9 354:20 355:3,16

**month** [10] 195:8 239:1 281:18 319:17 338:17 371:17,18,18,19 373:12

**monthly** [1] 367:13

**months** [10] 81:19 102:5 102:20 103:1 189:9 190:6 191:10,14 193:12 238:18

**morning** [15] 9:19 32:1 82:16,23 120:19 127:19 128:4 151:11 195:3 197:10 263:5 284:8 285:17 291:15 301:2

**Morrow** [18] 43:21,23 44:4,6,7,15,16,21 45:3,10 45:14 46:4,11 56:2,4,7 77:4 79:2

**most** [5] 132:7 205:11,12 205:13 351:5

**mostly** [2] 286:23 287:3

**mother** [4] 59:11 61:4,14 62:15

**mother's** [1] 59:13

**mouth** [5] 132:11,12,16 132:17 201:13

**move** [6] 14:5 276:3 336:22 337:8,9,11

**moved** [1] 337:12

**moving** [1] 337:14

**MPS** [2] 5:13,14

**Ms** [13] 9:22 102:6 284:5 284:6 285:11,13,15,17 300:12,13 301:9 342:13 374:12

**must** [2] 273:13 329:2

## -N-

**N** [2] 1:12 3:1

**name** [30] 17:11,14 18:9 59:13 62:5,10 85:16 90:8 91:5 92:23 135:3 136:10 137:6 171:19 211:21 228:14 240:9 278:11,12 278:20,21 281:7 283:14 283:21 284:3 290:2 344:20 349:3,17 369:3

**named** [3] 142:10 154:13 334:18

**names** [4] 19:9 58:9 62:12,16 134:20 333:8

**NASH** [1] 7:21 8:4

**natural** [1] 16:3

**nature** [3] 340:16,22 370:20

**nay** [1] 60:6

**near** [1] 387:1

**necessary** [4] 2:7 11:5 11:21 336:8

**need** [23] 10:21 13:14 14:1,2 95:19 129:9 228:22 239:16 251:22 254:9,17 254:20 262:12,13 297:12 336:22 337:9,11 357:15 374:16

**needed** [22] 88:20 194:20 204:17 206:16 253:11 254:5,18 262:11,14 284:16 289:3 290:18 291:21 293:16,22 294:2 316:8,11 317:16 337:8 345:20 352:11

**needeed** [1] 316:14

**needs** [2] 13:11 110:2

**negative** [7] 152:6,7,10 152:19 153:12,17 377:22

**neither** [3] 187:9 311:2 391:3

**never** [32] 41:1 44:12 73:19 124:8 126:4 146:13 152:22 159:5,6 162:18 168:7 200:19 206:2 211:13,17 229:9 240:9 241:5,7 263:9 269:11 284:17 311:4,10 314:20 314:22 339:18 341:18 342:5 348:6 351:8 378:3

**new** [7] 53:18 179:10

**next** [17] 95:10 144:16 167:14 184:7 185:23 198:14 284:11 285:16 295:1 325:10 337:12 343:21 346:10 353:20 362:2 369:7 382:9

**nickname** [1] 17:14

**Nicky** [1] 150:19

**night** [5] 21:9 22:19 309:2 313:4,5

**nine** [3] 25:5,6 144:19

**nineteen** [1] 125:11

**ninety-nine** [3] 125:12 125:13

**ninety-seven** [1] 245:9

**nobody** [5] 60:3,7 208:4 312:22 313:1

**none** [7] 113:3 211:23 277:9 326:6 345:12 376:20,22

**nor** [3] 187:9 391:3,4

**normal** [26] 73:4 107:23 108:6,8,11 109:2 110:3,8 217:23 218:4 248:16,19 251:12,23 252:8 254:8,9 261:14,16,21 262:15,16 262:17 293:20 294:1 343:16

**normally** [7] 139:13 202:16 246:16,18,19 283:7 291:16

**North** [3] 1:20 7:23 8:23

**Northeast** [1] 8:7

**Northern** [3] 1:3 7:3 9:13

**Nos** [1] 364:2

**Notary** [1] 1:18

**note** [6] 4:15 5:3,4,10 276:9 388:4

**noted** [1] 166:13

**notes** [1] 46:8

**nothing** [42] 40:18,20 56:21 57:6 60:22 65:16 69:20 92:13 93:6 157:4 159:1,3,6 188:13,16 191:15 198:13 213:13,18 217:13 229:4,11 243:20 245:13 256:20,22 257:6 257:10 265:11,19,20,21 272:6 305:19 320:2 338:7 338:14 342:19 359:22 375:16 378:13 387:11

**notice** [7] 2:16 5:14 153:14 199:15 328:19 339:13 346:6

**noticed** [3] 199:12 227:13 329:4

**notified** [4] 144:22 160:7 241:1 345:22

**November** [1] 369:21

**now** [24] 11:17 38:11 62:21 74:21 121:21 126:6 143:4,16 171:1 175:13 176:2 177:12,13 183:2

**186:12 235:6 243:19 259:4 279:6 281:8 316:21 325:2 345:9 386:20**

**nowhere** [2] 38:12,16

**NSF** [1] 3:13

**number** [14] 1:5 7:5 17:22 18:2 33:23 43:3 96:2,6 124:19 143:21 183:15 207:17 380:5 390:16

**numbered** [1] 96:12

**numbers** [1] 96:3

**numerous** [1] 202:6

## -O-

**O** [1] 1:12

**o'clock** [4] 291:2,3,15 291:17

**Oaktree** [2] 113:4 143:3

**oath** [2] 9:18 15:4

**object** [17] 11:5,17 12:10 12:16 31:4 35:7 43:9 45:6 64:6 100:8 167:8 187:12 237:4,5 242:12 243:1 260:2

**objectable** [1] 13:3

**objecting** [1] 12:18

**objection** [7] 11:12,13 11:20 13:9 64:17 65:4 242:17

**objections** [9] 2:8,11 10:21,22 11:1 12:2,3,22 13:1

**obligated** [4] 99:6,12 185:18 186:4

**obligation** [1] 356:21

**obligations** [2] 186:1 234:10

**obtain** [3] 123:15 333:19 366:12

**obtaining** [1] 78:19

**obviously** [1] 374:16

**occasion** [1] 253:9

**occasions** [4] 199:16,17 202:6 253:7

**occur** [4] 195:4 257:20 271:6,13

**occurred** [5] 271:1,4 287:10 300:7 326:16

**occurring** [1] 270:22

**October** [4] 44:14 79:7 369:20 372:12

**odd** [1] 387:8

**odds** [1] 83:18

**off** [52] 62:8 72:22 73:11 73:17 77:13,19 80:18 84:19 108:11 117:12 120:19 122:14 126:20 141:12 164:23 178:11 188:1 197:3 198:15 199:21 202:17,18,20 210:11 228:2 237:14 246:23 247:1 249:16,17

249:18 256:3,4,5 260:11
260:12,23 261:11 262:21
272:12 275:8 297:15,17
300:10 309:21 323:3,6
329:11 351:10 354:3
357:19 382:3

**Off-the-Record** [3]
31:13 323:7 357:21

**offer** [3] 331:23 332:5,11
**offered** [1] 2:13
**office** [2] 69:14 346:2
**offices** [1] 69:9
**officials** [2] 212:8
377:23
**often** [6] 195:4 197:5
199:14 204:9 207:14
209:12
**OGLETREE** [2] 7:21
8:4
**old** [7] 19:16,22 42:5,7
188:9 343:2 387:17
**older** [1] 72:6

**once** [16] 70:16 71:14
133:8 161:5 222:3 262:4
275:8 295:12 310:11,12
310:20 312:15 333:17
338:19 376:13 379:3
**one** [129] 23:21 24:21
33:22,23 34:6,11,14,17
41:5,9 43:3,14 47:2,14
49:20 50:9 51:2,15 54:21
60:5 62:4 69:15,15 80:8
82:20,22 87:3 90:5,11,13
91:9 93:16,19 94:4 102:20
103:1,15 111:20 112:10
125:11 126:21 127:6,6,9
129:17 134:15 142:11
144:18 148:20 158:6
160:1 161:3 163:22
170:16 173:12 179:14
181:20 182:12,22 189:9
189:15 192:8 199:11
202:2,13 206:11 215:6
224:21 225:2,10 228:3
229:12 230:1,6 231:20
233:14 234:23 240:6
241:4,15 242:6 244:16
247:23 253:6 256:21
259:3 260:8 266:12
278:15 281:22 282:10
292:17,21 294:19 296:4
299:10 301:19,22 309:1
310:18 311:14 323:5
325:11 326:7,16 327:16
327:19 328:18 338:6
341:6 342:11 345:18,19
348:14,16,18 349:4
353:19 356:5 360:23
362:2 366:16 368:10
377:13,14 379:5 382:19
382:20,23
**ones** [4] 60:4 68:14 132:7
276:19
**Opelika** [18] 1:10,20 7:10
8:3,10 9:1,10,15,21 14:21
33:4 79:21 87:9,10 97:21
169:22 383:9 390:14
**open** [1] 116:4

**operate** [2] 322:12 383:9
**operating** [1] 73:4
**opinion** [3] 237:6 268:6
375:10
**opportunity** [14] 81:10
86:23 103:18 142:2
150:12 157:15 165:12
173:20,23 223:10 231:5
241:14 243:11 244:22
**option** [7] 3:8 4:1,9
146:19 238:13 331:8,14
**oral** [1] 9:3
**order** [37] 106:23 107:6
107:19 108:23 109:5
110:12,16 111:4 116:1,10
192:12,20 204:10,11
206:17,21 207:11,12
212:18 215:10 246:12,17
249:5 251:8,12 252:2,4,7
252:8,23 254:8,9 259:18
260:8 290:14 293:21
294:1
**ordered** [29] 107:3,22
108:21 109:4 110:21
116:21 154:23 192:14
198:4 222:5 250:16,17,19
251:5,6 252:18 253:2,5
253:10,12 254:6,10
258:21,22 259:4,8,23
260:7 293:23
**ordering** [4] 107:23
109:6,10,13,16,19,23
127:7 197:22 198:2 252:6
253:15 254:14 258:15
**orders** [4] 117:16 154:22
154:22 248:11
**otherwise** [4] 10:22
12:17 68:1 76:22
**out-of** [1] 149:8
**out-of-code** [6] 139:22
145:19,21 146:3 150:1
263:19
**Outback** [3] 203:5,8,9
**outcome** [1] 41:4
**outlet** [2] 292:17,20
**outline** [3] 103:23 116:5
181:16
**outlined** [3] 12:3 88:6
219:14
**outside** [8] 64:11 65:13
67:4 274:23 275:1,4,11
275:17
**outstanding** [2] 367:15
368:5
**overage** [2] 117:23,23
**overheard** [2] 45:11
56:10
**overload** [2] 249:13,15
255:23
**overloaded** [1] 249:12
**overloading** [2] 255:8
255:21
**overseeing** [1] 86:10
**overspent** [1] 379:1
**overstated** [1] 163:12

**Overstock** [1] 130:16
**owe** [1] 367:16
**own** [4] 154:22 257:12,15
383:18
**owned** [3] 120:22 220:3
257:17

**-P-**

**P** [2] 1:12 8:5
**p.m** [2] 13:13 389:22
**page** [91] 3:2 33:6,11,23
34:3,4,20 35:1,4,16 36:6
36:9,12,15,18,22 37:2,6
37:10,14,18,21 38:2,6,7
87:3,23 88:2 89:16 96:1
96:13,16,17,22 104:10
112:12 137:20 160:11,13
160:20 170:15,16,20
171:1,8,11,14 175:4,23
176:3,4 181:19 182:16
184:8 185:7,8,23 231:20
232:3,15 233:21 235:5
239:14 320:19 328:11,15
335:4 336:16 352:18
356:4 358:21 359:1 360:9
360:12,15 361:5,13 362:7
362:9 363:10,12,18,19
364:12,14,20,22 379:16
379:18,20,23
**pages** [12] 32:23 33:21
34:6,11,14,17 95:16 96:11
96:18 169:5 232:11
390:22
**paid** [4] 91:19 121:11
148:3 367:2
**painted** [1] 94:7
**paper** [2] 28:5 84:10
270:20
**papers** [1] 65:17
**paperwork** [1] 313:6
**paragraph** [20] 139:18
142:9 145:15 147:2
152:19 176:23 177:1
245:18 248:10 259:18
321:17,20 328:17,22
330:1,8 335:12,15 336:3
336:10
**paragraphs** [1] 88:6
**Pardon** [12] 40:19 133:21
224:20 226:2 270:9
277:20 301:21 304:21
305:5 314:17 343:1
345:10
**Park** [2] 7:18 62:15
**part** [6] 94:6 145:18
155:19 161:1 255:5 318:6
**particular** [22] 138:13
147:9 157:3 166:14
204:10 221:23 254:10
255:21 262:18 264:22
268:2,2 277:14 283:11
284:23 289:1 293:18
350:6 353:18 365:13
369:19 386:15
**parties** [5] 1:14 2:11
236:17 378:1 391:4

**party** [2] 187:22 236:13
**passed** [1] 289:2
**past** [2] 89:10 161:12
**pastor** [3] 53:20 54:1
377:14
**Pat** [1] 228:3
**pause** [2] 274:21 324:3
**pay** [12] 74:23 75:9 76:1
81:12 84:20 105:4,8
122:21 124:1 157:5
329:21 367:12
**paying** [3] 105:10 120:16
367:17
**payment** [4] 3:20 165:23
166:4 373:8
**payments** [9] 167:19
369:5,9 370:14 373:9,10
373:15 383:14,17
**payor** [1] 374:7
**pays** [1] 367:13
**Peachtree** [1] 8:6
**penalty** [1] 15:5
**pending** [1] 35:11
**people** [4] 60:4,5 173:13
316:5
**peoples** [2] 28:23 108:20
**per** [4] 273:13 371:17,18
371:18
**percent** [9] 24:21 121:18
122:3 126:22 127:9
129:17 301:20,23 302:3
**percentage** [1] 121:12
**perform** [1] 353:15
**performance** [5] 29:23
30:4,6 44:22 91:15
**period** [11] 91:1,13 100:2
103:5 189:17,21 190:13
190:20 239:1 369:17
371:15
**perjury** [1] 15:5
**permission** [11] 126:16
128:13,15,20 130:13
225:21 228:5,9 316:2,10
316:13
**person** [3] 192:7 276:16
293:9
**person's** [1] 228:14
**personal** [9] 63:10,13,16
132:18 288:21 380:1
384:2,6,8
**personally** [2] 14:8
58:19
**personnel** [7] 139:22
169:23 336:5 345:21
348:3 355:8,15
**pertaining** [2] 210:10
224:14
**petition** [4] 6:1,2 380:20
381:12
**phone** [9] 21:21 77:16
282:4,13,14,19 283:2,4
314:9
**phones** [2] 282:22,23

**physical** [1] 376:17
**physically** [1] 342:4
**pick** [10] 25:17 140:14
245:12,13 292:3 310:16
310:23 311:4,10 313:2
**picked** [15] 111:17,17
113:20 127:18 139:4
140:10 141:8 151:11
281:5,10 292:11 296:13
313:10,17,20
**picking** [2] 309:17
312:18 383:21
**picture** [1] 94:8
**pictures** [11] 315:1 316:3
316:5,19 317:1,15,16,19
317:22 318:15 319:18
**place** [10] 46:4 75:19
84:16 129:21,22 190:9
273:4 292:2 306:8 331:21
**places** [2] 385:15 387:18
**Plaintiff** [4] 1:8,7,8,20
9:9 10:22 390:12
**planning** [4] 45:17 317:9
353:6,8
**plans** [1] 379:6
**Plaza** [1] 8:6
**pleased** [1] 289:5
**pled** [1] 70:8
**plf** [1] 3:18
**point** [26] 14:2 66:17
113:20 115:9 175:16
181:11 190:2 193:2,20
226:15 234:10 298:19
311:15 317:10 320:21
321:4,14 329:2 347:15
368:19 370:17 371:4,12
372:6 373:1 383:2
**pointed** [1] 13:11
**points** [2] 240:19 329:17
**police** [2] 294:13,15
**policy** [11] 113:16 114:2
114:5 116:17 268:13,15
268:17 369:19 370:4
372:8,11,18 373:18 388:9
**pop** [1] 179:22
**Porterfield** [99] 1:7,16
5:5 7:7 9:2,7,9 10:3,9
14:18 16:18 17:12 18:10
19:10,19 20:10 32:4,23
34:3 35:1,3 36:17,21 37:5
37:17 38:19 59:10,14,16
59:20 60:10 78:3,11 86:22
99:18 101:23 102:11
103:17 134:5,13 136:9
141:22 148:4,17 150:11
151:23 157:14 160:6
162:10 164:8 165:11
169:2,9 173:19 178:18
179:1 181:12 214:19
215:11 220:3 223:9 231:4
237:21 238:6 239:7
241:13 243:10 244:21
258:8 260:18 265:6 270:4
272:1 273:1 274:13 290:3
298:4 308:15 316:20
320:9 323:11,19 324:5

portion [1] 24:20

position [8] 65:22,23 81:8 84:6 90:17 151:5 267:7 348:20

positions [1] 11:6

positive [4] 225:9 303:13 303:15,19

possession [5] 68:2 224:11 288:8,10 358:18

possibility [3] 153:22 245:15,17

possible [6] 141:6 154:3 162:22 230:15,19 271:5

possibly [1] 154:1 213:12

potentially [2] 75:22 389:11

pound [3] 142:15 143:14 143:18

practice [21] 36:2,3 98:10,14,18 99:1 108:23 110:6,10 146:15 185:13 185:16,20 229:14 233:23 234:6 248:23 266:23 267:8 282:12,18

practices [1] 71:7

practicing [1] 138:19

Prattville [2] 27:19 50:10

predominantly [1] 104:23

premises [9] 25:15 309:22 311:14,19 312:23 314:2 316:4,19 317:2

prepare [3] 68:18 324:22 327:6

prepared [4] 178:19 237:23 323:12 358:9

presence [4] 64:11 65:13 66:2 67:5

present [5] 8:11 46:6 70:2 161:6 343:5

preserved [2] 11:1 12:4

president [4] 173:7,9 174:22,23

pressure [2] 371:2 376:12

pretty [2] 26:23 94:8

prevalent [1] 283:2

previous [1] 23:4

previously [14] 19:4 23:8 54:14 58:6 64:1 69:13 83:11 252:18 273:2 290:9 291:7 299:14 322:21 373:9

price [35] 39:23 40:2,5 41:1,14,21 42:2,16,22 43:15 104:1,2 121:16,20 121:22 125:3,6,7,8,13,21 126:2,9 142:14 143:15

147:3 179:7,10,10,18 180:16,17,20 332:3 385:20

Price's [1] 40:17

prices [1] 86:10

pricing [2] 80:20 86:7

print [1] 106:20

printout [1] 351:9

private [11] 29:12,16,19 45:20 56:15 119:15 240:14,19 241:2,5,7

privilege [2] 64:9,23

privileged [4] 12:14 13:5 328:1,3

problem [10] 193:6,15 193:17 250:14 290:19,20 300:1 349:6 376:7,12

problems [10] 278:23 286:3 376:10,16,17,21,22 377:2,6,9

procedure [7] 8:21 10:20 192:2 217:23 218:5 386:8 386:11

procedures [1] 385:9

proceed [5] 11:7 78:4 237:23 323:13 358:9

proceeding [5] 16:4 71:2 383:3

proceedings [5] 9:5 11:15 378:16 390:10,23

proceeds [1] 165:3

produced [2] 220:1,2 319:2

product [163] 25:18 106:23 107:18,23 108:22 109:1,4 110:7,20 111:4,5 113:14 114:12 116:21,21 117:4,5,16 119:12,18,20 120:18,20 121:3 123:15 123:23 128:3,7,10,17 129:2,8,19 130:10,12,22 130:23 131:2,9 133:3,14 135:20 138:20 140:19 144:2 146:3 149:9 150:1 179:7 180:18 190:15 192:1,5,15 194:17,20 195:13 196:4,8,18,23 197:6 199:6,18,22 200:1 200:4,7,10 201:1,7 202:12 203:6 204:1,6,17,21 205:2 205:5,6,19 206:2 207:6 207:15,20,21 208:10,17 210:15,15,16,18,21 211:3 211:13 212:10,18,19,20 213:1,9,21 214:1,13 215:9 215:12 216:22 218:1,11 219:10,12,13,14,16,17,18 220:10,12,13,18 221:3 225:7 228:6,17 245:10 250:20 252:19 253:5,14 253:18 254:17 256:13 258:15,20 259:9 261:7 263:4 264:4,17,22 275:17 276:11 289:3 292:6,11 293:16 294:6 309:17 310:16,23 312:19 313:2 313:10,17,20 315:14

320:6 330:9,15 386:13,16 386:18,21

products [35] 82:5,6,8 98:9,13,17 99:7 117:3 120:16 139:23 140:10 145:19,21 146:14 158:12 158:16 186:6 194:15 205:9 211:21 212:1,5 213:2 240:14,20 246:12 246:17 248:12 249:6 250:16 255:7 259:21 311:5,11 386:6

professional [2] 342:16 377:5

program [2] 93:13 213:16

programs [3] 99:14 186:10 234:16

Projection [1] 107:14

Promenade [1] 241:18

promise [1] 307:20

promised [2] 284:12 291:8

promotion [4] 125:16 125:18,20 126:10

prompted [1] 81:7

promptly [1] 98:17

proof [3] 146:9 207:19 317:17

proper [10] 98:21 152:15 153:15,18,19 166:12 198:2,4 255:22 267:22

properly [7] 98:13 99:19 131:8 158:15 247:12 322:4,5

property [9] 312:5 314:12,15 315:13 317:4 321:10 380:2,4,8

prosecuted [1] 159:5

prove [4] 208:3,5 255:17 255:18

provide [11] 71:20,23 110:7 131:12 229:15 246:8 261:14 317:21 318:7 368:4 389:1

provided [4] 8:20 66:20 250:16 261:16

Providence [1] 53:18

providing [2] 264:20 269:3

provision [1] 234:7

provisions [4] 95:21 98:2,2 181:4

psychological [1] 376:7

public [16] 1:18 5:12 334:23 338:11,20 344:5 345:15 346:18 347:19 348:2,11 350:3 351:23 352:7,16 355:9

Publix [3] 29:7 45:19

pull [2] 206:22 250:12

pull-up [3] 108:19 262:9 264:20

pull-ups [1] 108:14

pulled [6] 83:1 139:10 246:21 256:8,10 261:5

pumped [1] 94:5

punch [1] 147:5

pups [4] 192:13 195:20 196:1,11

purchase [3] 104:1 168:15 232:4

purchased [6] 169:11 175:9 183:6 231:12 235:2 242:5

purchasing [1] 175:11

purpose [4] 14:22 123:4 123:7 138:13

purposes [70] 31:15 33:2 64:4 65:7 67:6 86:19 95:7 101:20 103:11 134:2 136:6 141:19 147:23 148:14 150:8 151:20 157:11 159:22 164:5 165:7 168:22 173:16 177:7 189:2 214:16 223:6 223:23 229:2 230:4 231:1 233:11 238:3 239:4 241:10 243:7 244:18 247:21 256:19 258:5 260:15 265:3 266:10 269:13 270:1 271:21 272:16 274:10 278:8 280:12 281:20 298:1 299:8 308:12 315:22 319:12 323:16 325:7 334:14 339:1 341:9 346:8 349:22 355:21 358:3 360:1 361:22 362:19 364:3 379:10 381:5

pursuant [1] 10:19

pushing [2] 227:14,17

put [17] 88:12 90:9 117:23 124:2,4 144:3 152:11 210:14 218:22 249:19 250:13 265:12 275:14 297:10 339:12,14 346:5

putting [7] 119:12 144:1 153:13 209:21 235:14 265:20 275:9

-Q-

quality [1] 214:7

quarter [2] 115:18 226:14

questioned [1] 225:17

questioning [1] 15:13

questions [16] 2:9,10 12:13 14:23 32:19 78:10 78:17 98:1 139:19 161:5 177:10 179:3 240:12 282:2 326:7 389:18

quick [4] 177:15 178:2 381:21 382:17

quickly [2] 207:8,10

quit [3] 348:18 353:23 354:14

quite [2] 30:8 127:17

-R-

race [2] 305:9,16

racist [9] 304:7,15,16 306:1,15,18,23 307:1,6

rack [1] 139:15

raise [1] 307:7

ran [6] 25:9 142:14 169:19 170:5 283:8 287:19

Rankin [3] 90:1,1,9

rate [2] 91:23 92:3

rather [1] 218:21

Raymond [3] 39:23 40:2 42:16

re [27] 3:11,13,14,15,16 3:17,19,20 4:2,4,5,6,12 4:13,14,16,17,18,20,21,22 4:23 5:1,2,4,6 64:13

read [36] 32:9,10,14,20 33:16,18,22 34:2 37:14 37:18 65:17 67:22 88:5 95:19 101:7 142:4 160:1 184:19 186:16 187:19,21 235:21 236:8,11 274:20 321:19 325:12 328:21 329:12,13,15 335:15,20 336:2,9,9

reading [4] 2:1 34:23 181:10 316:21

ready [1] 78:4

real [2] 94:8 300:2

realignment [1] 175:15

really [17] 12:9 29:2 45:13 143:8 156:22,23 164:20 177:21 184:14 191:17 246:6 262:21 289:3 303:1 326:13 353:12 358:20

reason [36] 89:23 90:10 114:8,23 130:4 138:11 141:3 146:1 149:23 151:1 166:23 199:5,18 200:3,6 200:9,13 243:21 244:9 246:1 268:16 274:2 279:18 314:18 315:10 336:21 344:14 353:21 354:8 355:4,6 357:11,13 361:17 365:14,16

reasons [1] 246:8

receipt [2] 288:5,7

receipts [1] 288:1

receive [15] 66:13 71:10 91:23 92:5,9 95:3 106:10 165:3 205:21 214:8 229:19,21 259:20 309:9 387:12

received [23] 71:14 120:15 132:21 149:11 162:14 165:20 167:18 171:3 210:17 230:16,20 242:4 259:19 298:12 308:21 309:11 327:9 328:19 329:3 332:12 348:6 369:18 373:16

receiving [16] 94:22

131:20 152:15 158:16
172:2 368:18,22,23,23
369:4 370:6,13 371:10,20
371:23 372:7
**recently** [2] 319:21
384:17
**recitation** [1] 145:18
**recognize** [42] 97:7,11
134:8 143:23 144:6
148:17 164:9 174:3,17
175:3 180:8 183:23 184:3
214:19 231:7 240:4
243:14,16,19 248:4 258:8
260:18 266:16 270:11,14
270:16,19 274:15 283:14
283:20 298:7 308:17
320:12 346:12 350:16
356:1 360:4 362:4 363:2
364:5 379:13 381:8
**recognized** [1] 144:8
**recollect** [1] 126:7
**recollection** [12] 16:15
55:22 125:5 149:18 158:9
169:10 193:5 209:11
223:14 244:7 272:8
386:10
**recommend** [1] 43:15
**recommended** [4] 43:13
84:21 90:12,14
**reconvene** [1] 32:13
**record** [53] 10:5 11:6
15:19,22 17:11 31:18
32:22 44:17 46:17 49:13
50:2 59:13 62:12 65:23
69:8 77:13,19,23 78:3
141:12,16 165:10 178:11
178:15,19 187:21 210:14
219:7 237:14,18,21
252:15 264:14 297:15,17
297:21 316:15 319:12
320:3 321:20 323:4,6,9
323:11 328:22 335:21
345:6 357:19,23 358:6
368:3 382:4,7
**recordkeeping** [1] 71:6
**records** [12] 72:8,22 74:1
74:4 198:17,19 199:1,2
208:3,5,7 297:8
**redo** [1] 170:13
**refer** [1] 219:19
**reference** [7] 35:4 36:7
36:8,11 87:3 290:9 299:13
**referenced** [1] 236:4
**referred** [5] 96:6 117:18
183:15 250:6 332:18
**referring** [13] 67:17,18
72:11 117:3 189:7 248:7
266:13 278:17 280:17
284:5 326:12 330:3,23
**refers** [1] 142:10
**reflect** [4] 119:12 171:16
232:8 388:1
**reflected** [3] 135:18
266:4 273:6
**reflecting** [1] 373:15
**reflects** [1] 361:8 363:20

**refrain** [3] 78:7 260:6
341:15
**refresh** [1] 169:10 230:11
**refuse** [4] 146:16,21
214:1,13
**refused** [7] 24:12 146:5
167:12,16 198:7,10
230:10
**refusing** [1] 146:10
**refute** [1] 271:14
**regarding** [8] 48:19
49:14 50:20 52:2 58:8
78:19 146:3 167:18 212:4
212:10 213:17 342:10
**Regardless** [3] 221:18
221:20
**regular** [4] 125:10 246:19
385:1,20
**regularly** [1] 41:8
**Reiss** [6] 7:22 9:22,22
102:6 374:12,15
**related** [11] 39:10 62:2
73:3 78:13,18 104:6 177:3
233:7 363:21 388:23
389:4
**relating** [1] 2:5
**relation** [1] 336:7
**relationship** [17] 31:1,2
31:10,11 34:7,9 35:5,6
68:5 93:13 101:12 103:7
112:21 185:1 321:13
331:4 333:2
**relatively** [1] 177:15
**relatives** [2] 61:15 63:1
**release** [1] 232:12
**releasing** [2] 177:3 233:7
**relevance** [1] 11:22
**relevant** [3] 75:22 318:7
389:12
**remember** [120] 41:8,11
60:1 79:3 84:8 85:8 92:4
92:17 93:16 94:2,6,15,18
94:19,21,22 95:5 104:21
106:1,13 111:23 112:22
112:23 125:1,2 126:13,18
126:19 131:15,16 133:17
133:22,23 134:18 136:13
136:18,22 142:21 144:15
148:2 150:15 152:5
156:13 158:1,2 161:8
163:7,9,10,17,18 165:9
168:9,11,17 169:16
172:17,19,20 175:18
209:2 211:4 223:13,19
225:4 226:6,8,9,10 228:13
229:6,11,18,20 230:1,6
230:13,14,16,18,21,22
235:11 243:18,20 244:8
244:13 246:9,10 257:23
261:1 271:2,18 272:7
274:22 277:6,8,9 279:20
280:2,15 281:23 284:3
289:14 298:13,17 300:19
300:20 304:13 306:19
307:8,10,22,23 319:5

322:20 332:2 341:23
346:3 378:9
**removed** [1] 163:1
**removing** [2] 98:17
162:13
**Rena'** [5] 1:17 7:14 8:17
390:6 391:11
**render** [1] 375:10
**Renfroe** [6] 46:14,16
56:17,21 306:3,4
**rent** [1] 313:3
**renting** [2] 309:20 313:4
**repaired** [2] 289:13,15
**repeat** [9] 15:14 31:3,7
41:15 42:3 54:15 76:3
121:21 355:12
**repeated** [1] 101:1
**rephrase** [1] 192:14
**replace** [1] 192:14
**replaced** [2] 182:6
233:18
**replied** [1] 44:7
**report** [5] 118:8,9,10
294:13,16
**reported** [2] 359:15
390:18
**reporter** [14] 1:18 8:18
10:7,12 15:22 16:11 31:20
95:10 101:23 134:5 169:2
323:20 390:7 391:12
**REPORTER'S** [1]
390:1
**represent** [1] 14:19
**representation** [3]
101:16 187:11 236:14
**representative** [2] 8:12
10:6
**representatives** [2]
94:16 115:1
**represented** [2] 42:23
43:4
**representing** [3] 9:20
9:23 10:2
**repurchase** [9] 3:21,22
4:7 174:8 175:1,14,20
332:1,7
**Repurchasing** [1] 174:5
**request** [2] 235:10 267:12
368:5
**requested** [2] 319:4,6
**requesting** [1] 98:23
**requests** [2] 267:6
319:13
**require** [5] 113:2,3,7,9
113:11
**required** [2] 33:1 113:13
**resale** [2] 123:12 153:10
**reselling** [1] 162:15
**resign** [1] 81:8
**resolved** [1] 300:1
**resort** [1] 205:17
**respect** [2] 30:1 50:4

54:18 56:14 99:13
**respected** [1] 11:6
**respective** [1] 1:15
**respond** [2] 210:8 274:3
**responded** [2] 173:3
273:22
**response** [6] 210:3,4
271:16,19 306:16 348:7
**responsibility** [3] 121:1
247:11 321:23
**responsible** [5] 86:13
138:5 172:1 197:22 198:1
**rest** [6] 39:19 42:4 47:7
60:14 259:21 305:19
**restaurant** [13] 104:17
104:23 129:21,23 203:18
211:9,11 212:5,9,17
218:12 265:12 332:19
**restaurants** [1] 212:22
**restrictions** [2] 384:19
385:4
**result** [1] 336:14
**resulted** [1] 152:14
**results** [1] 391:5
**Resume** [1] 343:16
**retained** [1] 327:17
**retired** [1] 44:1
**return** [5] 5:17,19,20,21
5:22 356:14,17,22 357:2
357:6,9 361:2,14 362:12
362:15 363:6,15 364:9,16
**returns** [1] 120:2,6
365:9,15,18,21 366:4,9
367:18 385:14 388:16
**Revenue** [6] 358:20
366:12 367:4,9,10,11
**review** [6] 64:4 65:7,15
67:6 86:23 103:18 142:3
150:12 157:15 160:4
165:12 169:6 173:20
174:1 181:5 223:10 233:5
241:14 243:11 244:22
282:2 283:13 323:23
343:23
**reviewed** [10] 38:11 64:7
64:10 65:11,12 66:2 67:8
67:11,12 365:8
**reviewing** [2] 33:10
227:13
**Rheem** [1] 338:6
**Rhodes** [6] 97:13 174:20
174:21 184:2
**Rhodes'** [3] 176:8 231:23
232:19
**rid** [2] 220:4 222:7
**ride** [2] 74:22 295:19
**riding** [1] 295:5
**right** [55] 26:9 42:11
55:11 60:13 62:21 66:13
66:16 69:3,23 83:4 87:22
96:21 99:20 100:3,19
107:5 126:6 135:8 137:11
139:9 154:20 165:15
170:22 177:11 178:8

182:13 183:14 193:8
194:12 196:3 197:3,23
199:21 206:18 214:12
230:9 231:21 232:20
239:14,19 253:3 259:5,17
279:5 281:8 309:5,13
321:16 338:15 356:8
360:17 382:8,16,17
386:14
**right-hand** [3] 102:12
174:15 176:9
**rights** [8] 105:6 165:2
168:16 169:12 171:3
172:3 176:16 242:19
**ring** [1] 281:8
**road** [2] 18:5 19:13,21
23:8 292:22 294:12 349:3
**Robert** [8] 48:2 57:11
59:10 60:9,17,21 334:11
378:6
**rode** [1] 75:8
**Roebuck** [4] 80:4 84:7
84:18 85:4
**rolling** [1] 198:15
**rolls** [1] 215:11
**room** [1] 139:23
**Rosemary** [3] 18:5 19:13
19:21
**rotating** [1] 98:13
**route** [50] 25:9 27:18 29:9
29:13,16,19 50:10 56:11
79:20 80:12 84:10 90:17
91:16 104:1,2,4 107:8
114:11 116:5 117:11
124:17,17,18 135:14,15
137:6 138:7 157:2 169:20
170:4,5 192:13 194:21
221:10,16 228:6,10
235:13 246:21 252:8
281:4 282:20,23 283:8
291:2 312:22 313:6
325:22 326:19 371:4
**routes** [2] 170:7 228:3
**rude** [1] 300:2
**rule** [2] 12:7 201:10 202:7
**rules** [12] 2:4 8:20 10:15
10:19,20,23 12:2 14:17
16:19 19:22 20:22 201:4 213:19
**run** [2] 27:18 50:10 72:22
117:1 124:16 126:8,9
143:5 228:19 256:9,14
262:6,7 282:23 295:9
312:22 313:6 325:22
326:2,19 371:4,6,8
**running** [2] 74:11 114:11
126:10 157:3 170:9
282:19 329:10
**rushed** [1] 300:10,20
**Ryder** [1] 309:12,20

**-S-**

**S** [1] 1:12
**safe** [1] 75:19
**salable** [1] 139:7
**salary** [1] 81:11

Case 2:05-cv-00937-MEF-TFM    Document 47-16    Filed 07/26/2007    Page 114 of 117
PORTERFIELD v. FLOWERS                CondenseIt!                           sale - specialist
DEPO:HENRY PORTERFIELD

**sale** [4] 125:10,11 186:6 232:13

**sales** [22] 72:13,17,19 82:2 90:17 104:3,11 107:9 118:19 119:8,11 121:12 123:8,10 131:14,21 152:6 152:7,19 153:12 173:10 248:13

**salesman** [10] 79:20 80:12 81:2,22 82:11,13 90:17 91:16 138:7 224:21

**salespeoples** [1] 85:3

**Sandra** [2] 7:22 9:22

**sandwich** [2] 13:21 177:12

**sandwiches** [1] 130:1

**satisfied** [1] 103:6

**Saturday** [22] 82:15,16 108:10 109:10,21 110:16 206:22 245:12,13,19 246:17,22,22 247:1 249:21 251:8 252:2 253:16 254:4,7 259:2,15

**Saturdays** [1] 247:13

**save** [1] 116:5

**saw** [3] 132:2 146:14 291:10

**says** [17] 89:11,23 104:15 139:21 140:5 150:22 166:22 245:19 291:7 300:23 336:21 351:14 352:20,23 353:1,21,22

**scared** [1] 305:20

**Schedule** [1] 380:1

**scheme** [1] 162:11

**school** [5] 5:12 84:9 89:10,13 104:22

**schools** [16] 104:19,20 334:23 338:11,20 344:5 345:15 346:19 347:19 348:3,12 350:3 351:23 352:7,16 355:9

**scroll** [5] 179:9,17,21 180:14,16

**scrounge** [1] 72:6

**Sears** [6] 80:4 84:7,18 85:4,6,13

**seat** [2] 227:4,8

**second** [15] 139:18 145:14 146:11 147:1 168:19 170:17 182:9,16 187:20 245:18 248:10 259:17 328:21 336:3,10

**section** [18] 98:5 99:5,11 99:18 100:1,23 101:6,10 106:15 186:3,19,22 187:3 187:8,20 233:22 235:18 236:9

**security** [9] 17:22 18:2 227:13 370:11 371:11 372:1 374:16 388:4,17

**see** [60] 32:16 34:5,10,13 34:16 35:14 36:6,8,11,18 36:21 37:5,9,20 38:1 43:17 78:17 87:10,11,18

**seeing** [1] 142:7

**seek** [4] 337:21 338:20 348:12 368:10

**seeking** [2] 374:21 386:23

**seem** [2] 240:5 259:22

**seemingly** [1] 284:5

**sell** [19] 99:7 122:8,22 124:5 140:20 164:20 175:14,19 189:10 220:11 220:12,13 222:6 233:2 241:23 242:2 385:23 386:5,11

**seller** [1] 232:17

**selling** [8] 107:14 175:12 176:15 188:9 233:6 242:18 268:3 331:8

**send** [5] 165:18 192:20 197:9 198:7,10

**senior** [1] 173:13

**Senn** [5] 27:9,11 28:11 28:15 54:17

**sense** [1] 11:11 279:1

**sent** [5] 67:20 68:23 329:16 354:3 389:6

**sentence** [10] 144:16 145:14 187:20 236:9 321:19 328:21 329:20 335:20 336:3,10

**sentences** [3] 236:10,19 236:21

**separate** [3] 117:5 319:13 382:14

**September** [4] 44:14 79:7 170:21 372:13

**sequence** [1] 180:19

**series** [3] 93:11,15 96:2

**serve** [2] 160:9 290:22

**served** [6] 33:3 196:17 266:20 268:8 322:4,5

**service** [77] 4:20 25:11 25:13 98:21,23 99:19 105:7 107:23 108:7,8 109:2 110:3,8 111:6 113:2 113:8,12,17 114:3,14 115:4,10 116:10,13,13 130:2 158:10 160:16 164:17 168:4 246:20 248:16,19 249:2 250:1,2 250:7 255:22 256:6 261:14,16,21 262:2,5,6,9 262:22 263:4,6,8,10,12 263:14 264:16,21 266:22 267:6,13,22,23 268:20 269:4 288:21 289:1

**89:1** 96:2,3,19,21 97:2 104:11,14 112:16 140:2,3 152:23 154:15 182:3 185:13 222:15 227:7 235:6 240:10,15,16 248:14 260:4 291:9 299:23 308:23 311:20 317:4,5 326:19,20 335:12 336:22 351:16 352:21 353:1 356:11 360:18 369:10 375:19

**serviced** [12] 53:13 111:13 247:13 250:8,10 250:11,18 261:4 262:3,8 263:1 266:19

**Services** [5] 5:23 369:14 374:14 388:12,17

**servicing** [5] 115:14 171:17 249:22 269:7 282:5

**serving** [2] 171:6,10

**set** [8] 101:11 115:20 185:15 187:8,22 236:12 244:10 252:5

**settlement** [1] 166:12

**seven** [11] 38:6 81:22 107:3,22 142:15 143:14 143:18 242:6 338:5 382:21,22

**seventy-five** [1] 242:7

**seventy-seven** [1] 165:19

**seventy-three** [1] 165:19

**several** [12] 23:13 78:10 98:1,2 134:23 169:20 209:13,14 300:17 320:17 366:18,19

**shall** [2] 2:7 236:13

**shape** [1] 289:8

**sheet** [1] 117:1 227:9

**shelf** [3] 250:13 263:21

**shipment** [2] 198:14 227:14

**shipper** [3] 227:3,8,17

**shippers** [3] 226:16,18 227:23

**shop** [3] 83:16,17 289:22

**short** [15] 14:4 77:21 135:19 138:14 139:6 141:14 156:4,5,9,12 157:6 158:13 237:16 297:19 382:5

**shorted** [2] 155:12,22

**shorting** [3] 154:18 155:1 156:19

**shot** [1] 13:13

**shoulder** [4] 198:16 210:11 371:1 376:14

**show** [5] 152:10 153:16 180:5,6 319:12

**showed** [3] 294:23 295:1 295:1

**shown** [3] 131:13,21 155:5

**shows** [1] 248:11

**shut** [1] 201:13

**sic** [10] 28:18 44:8 79:2 102:3 222:13 236:16 239:8 322:2 326:16 336:6

**sick** [1] 92:13

**side** [12] 62:13,19,19,20 102:12 174:15 176:9 228:4 232:1 382:9,9 387:7

**sign** [24] 77:5 102:16 134:14,16 136:19 137:3 146:5,10,16,19,19,22 149:14,18 167:12,16 223:3 230:10 244:5 247:23 328:13 354:2,11 354:16

**signature** [41] 1:23 38:7 88:1,7 97:2,5 102:14 135:9,10 136:17,23 137:21 174:14,18 175:8 176:3,8 181:7 183:20 184:1 231:21 232:1,1,6,20 239:18 240:4,8 328:14 335:6,13 356:5,9 360:11 360:14,18 362:8,8 363:11 364:13 379:17

**signatures** [4] 97:8,11 184:4 356:6

**signed** [21] 88:4 97:20 134:13,16,19 137:3 164:15,22 177:1 183:10 183:11 184:20 188:3 235:22 236:16 237:2 239:17 240:1 329:14 335:16 354:5

**signing** [3] 97:17 136:10 239:21

**simple** [3] 121:15 218:21 319:10

**simply** [6] 33:1 38:7 64:21 66:11 257:20 271:16

**Sims** [3] 28:17 79:2 344:19

**sister** [4] 59:11,17 61:6 61:13

**sit** [10] 28:20,21 60:6 106:16 146:2 149:17,22 244:10 246:2 361:18

**sits** [1] 308:23

**sitting** [1] 384:12

**situation** [11] 147:9 148:11 150:2,4,16 151:8 224:3 259:7,11 277:14 286:12

**six** [18] 13:18 37:14,18,21 38:2 81:18 102:19,23 138:17 169:5 189:9 190:6 191:10,14 193:12 238:17 238:23 293:2

**six-month** [3] 189:17,21 238:13

**sixteen** [1] 144:20

**slammed** [1] 300:9

**small** [3] 167:13 259:8 261:6

**smaller** [1] 24:20

**smart** [1] 28:22

**SMOAK** [2] 7:21 8:4

**snack** [1] 224:3

**Sno-Balls** [3] 4:4 224:4 227:14

**social** [8] 17:22 18:2 370:11 371:11 372:1 374:16 388:4,17 –

**Sodexho** [45] 42:18 48:21 49:14 50:4 20 52:2 52:17 53:7 54:7,12,19 55:1,15 56:4,20,23 57:5 58:8,15 59:1 60:17,20,23 283:18 284:1,21 285:3,5 286:9 288:21 289:1,9 290:10,12 293:9 295:10 295:15 296:2,14,18 298:16,17,19 299:2 301:7

**sold** [24] 121:3 138:18 164:12,19,21,22,23 165:2 179:8 183:4 215:15 216:13,22,23 217:2 218:19 220:16 241:17,20 385:14,18,19,20 386:19

**solve** [2] 24:6,9 25:7 310:2

**someone** [11] 78:22 123:12,17 136:10 152:9 153:10 157:7 276:22 292:19 296:12,13

**sometime** [24] 79:6 106:2,4,5,6,8 111:7 115:5 130:19 154:7 156:15,20 190:9 192:11 195:2,7,15 199:11 204:23 205:16 221:4 277:11 283:9 387:18

**sometimes** [14] 82:15 111:8 115:7 123:16 124:1 134:17 153:20,21 162:21 195:10 202:20 282:6,7 370:19

**somewhere** [5] 93:1,2 115:19 338:2 369:21 –

**son** [7] 25:8 62:4 74:15 74:23 294:21 319:15,19 –

**Sonic** [5] 196:9,12,13,21 203:13

**Sonic's** [3] 195:18 196:7 219:17

**soon** [5] 275:14 296:11 –

**sorry** [8] 50:11 59:15 69:22 74:20 102:9 185:8 239:10 328:16

**sort** [5] 8:21,23 294:14 373:9 387:1,8

**sought** [3] 76:20 349:14 368:15

**source** [4] 337:22 368:19 368:21 371:21

**sources** [2] 205:7 370:7 –

**span** [1] 286:13

**speak** [1] 172:15

**speaking** [1] 12:21

**special** [6] 253:7,9 293:19,21,21 294:2

**Specialist** [23] 8:13 9:9 31:17 77:12,18,22 141:1 141:15 178:10,14 237:13 237:17 297:12,16,20 323:5,8 357:15,18,22

382:3,6 389:20

**specialty** [6] 197:8,10 197:17 198:2,5,11

**specific** [14] 21:4 55:21 60:16 93:4 94:15 95:21 139:19 146:8,9 188:4 191:6 202:11 271:14 341:9

**specifically** [4] 45:2 135:1 201:19 293:5

**specifics** [7] 42:12,15 94:1,3 132:1,9 211:5

**speculate** [1] 243:4

**spelled** [1] 240:9

**spoke** [4] 42:15 171:20 172:9,12

**spouse** [3] 18:14 20:8 61:12

**spouse's** [1] 18:9

**stack** [2] 127:8 279:4

**Stacked** [1] 250:13

**stadium** [2] 203:23 211:8

**staff** [1] 70:1

**stale** [23] 98:17 106:20 110:15 120:1,6 121:13 123:12 133:2 152:21 162:3 207:3 215:19,20 216:4 217:8 218:11,12 221:3,10 245:6,9,16 255:9

**staled** [4] 215:2,14,23 221:16

**stales** [1] 385:14

**staling** [2] 217:11,23

**stand** [1] 349:7

**standard** [3] 386:7,11 387:15

**staph** [1] 376:13

**start** [9] 10:16 33:9 105:22 117:10 171:10 193:23 371:23 372:18 373:7

**started** [13] 29:20 76:18 80:18 91:2 94:13,13,13 171:6 194:14 370:8 372:11 373:3 375:5

**starting** [3] 80:1 118:13 373:1

**starts** [1] 33:6

**state** [27] 1:18 17:10 24:6 24:19 26:18,21 47:10 48:21 69:8 161:10 162:9 163:1,12 281:22 285:11 299:23 301:2 302:19 305:15 307:18 330:4 366:20 367:5,6 390:3,7 391:13

**statement** [21] 4:7 76:21 78:20 79:3,5,9 152:23 153:2 161:15,21 174:8 175:1 273:12,16 297:9 306:13 322:6 325:23 329:5,8,17

**statements** [6] 71:10 76:6,9 79:12 94:16,20

**statemt** [1] 3:22

**states** [20] 1:1 7:1 9:12 144:17 152:19 160:14 182:1 187:3 226:15 248:10 255:6 259:18 273:19 279:4 284:4,12 302:23 303:7 326:17 380:1

**stating** [2] 165:17 245:4

**stay** [1] 91:5 350:8

**stayed** [2] 91:4 302:20

**Steakhouse** [1] 203:10

**steal** [1] 162:11

**stealing** [1] 159:18

**steaming** [1] 285:2

**step** [1] 179:5

**Stephens** [21] 4:15 5:4 29:15 91:8,10 202:2,4,12 208:22 209:18 225:13 226:22 227:21 228:1 244:4 273:9,23 277:19,21 278:1 330:22

**steps** [2] 179:6,12

**Steve** [28] 29:15 85:22 91:8,9 97:12 127:6,22 128:8 129:1,7 138:1 164:14 184:5 202:2,11 208:22 225:13 226:7,21 228:1 244:4 273:9,19 277:19,21 278:1 280:1 330:21

**STEWART** [2] 7:22 8:5

**stick** [1] 251:11

**still** [30] 42:4,9 47:18 71:17 110:13 111:14,14 111:19 130:22 137:8 139:7,7 140:22 207:4 247:11 296:18 320:22 321:5,23 322:7 351:22 352:4,9,23 366:8 367:14 367:16 369:4 384:12 385:2

**STIPULATED** [4] 1:13 1:22 2:6,15

**stipulation** [1] 8:22

**stipulations** [2] 10:13 12:9

**stock** [10] 80:18 124:15 130:15,18,21 131:2 224:17,19,23 348:23

**stocked** [1] 163:1

**stop** [16] 24:18 41:10 46:2 87:20 107:9 117:8,11 164:21 192:7 202:19 259:1 275:15 290:13 291:1 377:18 385:19

**stopped** [2] 368:9 369:6

**stopping** [1] 369:7

**stops** [11] 41:6 107:7 111:9 117:5 231:12,14 235:2,15 250:18 275:7 310:1

**store** [23] 86:11 119:13 119:21 120:3,6 122:19 133:15 144:2,4 211:2,14 217:6,9,12 218:23 220:14 263:18,22 275:14 276:20

**stores** [7] 82:8 98:9 119:1 119:3 211:20 261:10 292:18

**straight** [4] 210:14 351:9 366:1,2

**straighten** [1] 144:10

**straightened** [2] 167:15 261:10

**Street** [4] 1:20 8:6 9:1 288:16

**stretch** [1] 237:11

**strict** [2] 151:17 197:16

**stuff** [7] 45:21 65:19 66:19 94:12 154:15 188:12 315:6

**subject** [2] 162:10 242:16

**subsidize** [1] 170:8

**subsidizing** [1] 170:7 170:11

**substance** [2] 27:1 159:17

**subtract** [1] 121:13

**subtractions** [1] 117:16

**such** [18] 10:22,23 11:21 72:17 106:15 107:6 121:16 125:9 133:18 154:5 161:11 167:10,13 214:13 288:5,7 310:22 317:18

**sue** [1] 70:21

**sued** [4] 40:10 70:13,16 70:22

**suffer** [1] 376:10

**sufficient** [1] 169:21

**Suite** [1] 7:23 8:7

**sum** [2] 27:1 159:17

**summary** [1] 273:7

**sun** [1] 319:7

**Sunday** [15] 81:23 82:16 83:1,3 108:12,15 250:2 251:9 261:18 262:7,13 263:7,15,16,18

**supervisor** [10] 46:19 83:1 85:12,17 90:2,3,6 91:3 144:13 149:4

**supervisors** [9] 90:23 91:12 201:23 202:14 340:7

**supplier** [1] 30:7

**supply** [6] 98:8 110:12 197:13 210:12 253:11 310:1

**support** [7] 15:2 17:7 45:4 76:22 198:18 297:9 375:4

**supposed** [13] 15:9 88:11 88:16 89:3 120:5 139:3,9 141:8 142:19 318:7 345:20 365:18 369:9

**surgery** [1] 241:22

**Sutherland** [2] 148:23 149:7

**svc** [1] 4:19

**swap** [2] 128:2 129:16

**swapped** [7] 127:2,10 129:10,13,15,19 130:5

**swapping** [2] 126:20,21

**swear** [1] 10:7

**swoll** [1] 350:9

**sworn** [1] 10:10

**symptoms** [2] 375:3,19

**synopsis** [1] 160:13

---

## -T-

**T** [2] 1:12,12

**table** [2] 187:23 327:22

**tail** [1] 117:12

**takes** [1] 13:12

**taking** [6] 2:5 16:22 120:2 129:2 199:21 272:12

**Taliaferro** [69] 7:17 10:1 10:2,16 11:3,8,10,20 12:6 13:8,10 14:7,14 17:2 31:4 35:7 43:9 45:6 64:6,20 65:4,9 66:4,10,13,16,23 69:3,7,12,17 77:14 95:15 100:7 167:8 177:9,16,19 177:23 178:8 187:12 229:17 237:4,12 242:23 242:23 260:2 318:9,14,22 319:3,9,15 320:1 325:2 327:8,15 374:6,14,18 381:20,23 382:21 388:3 388:11,15 389:1,10,19

**Taliaferro's** [2] 65:22 67:4

**talks** [1] 306:10

**Tammy** [2] 5:10 326:15

**tape** [16] 77:11,20 78:1 141:12,17 178:12,16 237:15,19 297:13,18,22 315:13 357:16,19 358:1

**tapes** [8] 227:13 318:10 318:15,16,17 320:7 388:18,20

**task** [1] 275:9

**tax** [29] 5:17,19,20,21,22 356:14,16,22 357:2,5,9 361:2,14 362:12 363:5,15 364:9,16 365:9,15,18,21 366:4,9,12,22 367:3,18 388:15

**taxes** [3] 360:8 363:4 364:7

**tear** [1] 294:16

**telling** [15] 32:9 35:18 42:9 45:19 60:5 64:18 76:12 113:18 226:11 267:6 293:6,8 327:21 351:6 378:9

**tells** [1] 107:8

**temp** [1] 312:14

**ten** [20] 13:15 30:12,13 77:16 82:14 88:19,21 100:5,8,10,17 104:2,10 178:2 215:3 268:3 296:22

299:1,5 310:3

**ten-day** [3] 25:6 99:21 100:2

**Tenda** [4] 330:22 331:22 332:21,22

**tendency** [1] 16:3

**term** [2] 180:8 181:20

**terminate** [3] 100:3,19 101:3

**terminated** [37] 21:3 23:23 25:7,8 42:19 82:11 82:21 84:5 85:2,6,9,13,17 90:4,14 312:9 315:10 321:13 327:3 331:4 333:18 337:17 344:6,13 345:8,14,23 346:17,23 347:10,13,20 348:11 354:20,22 355:11,18

**terminating** [1] 5:15

**termination** [9] 3:18 5:3 5:11,14 333:1 344:9,12 348:2 355:4

**terminology** [4] 124:9 126:5 263:10 330:2

**terms** [3] 71:6 101:11 106:18

**territories** [1] 175:16

**territory** [19] 98:22 99:8 105:12 115:14 170:4 171:15 174:6 175:9,11,21 184:10,12 231:18 235:16 241:21 247:4 282:5

**testified** [9] 10:11 56:14 172:5 271:12 295:23 299:14 322:22 327:13 385:11

**testifies** [1] 308:5

**testify** [1] 325:3

**testifying** [2] 15:4 314:19

**testimony** [18] 17:6 78:23 89:1 139:12,20 145:13 147:11,13,18 156:3 257:19 266:3 267:21 285:4,22 291:13 295:4 311:3

**Texas** [1] 196:11

**Thank** [2] 10:12 389:19 162:1,6

**theft** [5] 160:9 161:11,19

**theirself** [1] 202:17

**themselves** [1] 9:18

**thereafter** [1] 160:14

**thereof** [1] 391:5

**thereto** [1] 2:14

**they've** [2] 367:1 374:17

**thinking** [1] 337:13

**third** [2] 235:5 378:1

**thirteen** [1] 39:8

**thirty** [3] 161:13 178:4 286:14

**Thirty-five** [1] 104:12

**thirty-minute** [1] 286:13

**Thirty-one** [1] 18:13

**thirty-seven** [1] 245:8

**Thomas** [4] 59:20,21 61:9 334:18

**thought** [7] 140:17 155:7 155:8 243:5 319:8 386:7 386:11

**thoughts** [3] 345:7,13 346:22

**thousand** [6] 104:12 144:19 161:13 170:10 242:6 338:17

**threat** [1] 306:20

**threatened** [5] 309:3 341:3,7,11,18

**threatening** [2] 306:14 307:18

**three** [50] 13:15 33:7,11 33:19 34:21 35:1,4,16 36:6,12 79:12,13,16 88:13 89:17 109:4 112:10 113:5 135:19 161:12,19 170:10 171:11,12 173:21 175:23 177:22 195:8,8 209:14,15 222:1 224:3 226:12 232:11 255:5 267:4,10 268:6 307:15 319:18 343:7 361:5,13 363:18,20 364:20,22 379:5 390:21

**three-day** [1] 267:22

**Thrift** [7] 122:19 217:5,9 217:12 218:23 220:14 385:8

**through** [26] 1:14 13:19 13:20 14:5 32:8,11 34:3 86:9 92:19 116:19 121:15 140:13 152:11 179:6 180:20 212:15 215:19,21 253:4 264:12 293:4 312:13 337:10 359:21 367:19 378:15

**throwed** [1] 73:18

**Thursday** [22] 108:9 109:15,20 110:18 111:16 111:18 206:23 249:12 250:3 251:5 253:21 254:3 255:8 256:1 258:22 259:5 259:13 264:1 284:7 285:8 290:17 294:8

**ticket** [9] 119:9,11,21,23 120:1 131:14,22 144:9 155:6

**tickets** [8] 72:8,11,14,18 72:20 106:20,21 120:12

**ties** [7] 137:18 138:17 139:3 141:7 151:10 245:11,12

**Tiger** [1] 1:19 8:23 9:15

**times** [10] 23:13 30:15 104:3,11 195:8,11 205:4 222:2 282:1 1 377:15

**tip** [1] 75:3

**toast** [1] 196:11

**today** [29] 9:14 10:21 12:23 14:23 16:20 17:6 32:8 64:5 65:8 67:7 68:19

**133**:19 136:3 146:2 149:17,22 151:14 160:21 163:9,17 230:17,21 244:10 246:2 259:18 271:2 304:13 361:18 385:12

**together** [2] 65:11 383:1

**Tolbert** [1] 171:21

**Tom** [2] 46:21 223:16

**too** [19] 4:18 14:13 15:17 21:4 29:2 82:13 128:14 184:15 218:20 222:6 241:3 261:2 296:19 299:10 312:5 345:5 358:8 374:17 388:12

**took** [19] 19:20 120:18 127:11 128:10,17 202:20 220:14 225:6 246:23 247:1 249:17 256:4,5 260:11,12,23 297:1 302:10 316:5 333:20 353:19 375:6 386:21

**top** [3] 336:16 351:14 380:1

**totally** [1] 278:15

**touched** [1] 342:5

**touching** [1] 342:4

**towards** [3] 112:12 287:14 306:20

**towed** [1] 287:20,22 288:3

**Town** [3] 1:19 8:23 9:15

**track** [2] 73:22 96:7

**trade** [1] 89:13

**traffic** [3] 70:5,18 293:4

**training** [1] 106:10

**transaction** [16] 118:20 122:14 123:19 135:17 144:6 152:14,16 161:23 169:17,18 170:20 205:22 220:22 222:18 223:1 242:9

**transactions** [5] 118:16 120:10 154:2,6 309:18

**transcript** [2] 390:9,23

**transfer** [3] 124:14,16 228:19

**transferred** [1] 164:13

**trays** [16] 4:14 215:2,3 248:12 249:6 250:16,20 254:5,6,11,15,17,21 256:13 268:3 279:5

**treat** [1] 304:20

**treated** [3] 61:1 242:10 378:12

**treating** [2] 55:15 307:5

**treatment** [1] 349:15

**trial** [3] 2:12 11:2 12:5

**tried** [6] 24:6,8,17 42:18 286:18 311:10

**triggered** [1] 194:8

**trouble** [1] 201:17

**Troy** [10] 24:6,19 26:18 26:20 47:9 48:21 281:22

**299**:22 301:2 330:4

**truck** [63] 70:23 74:6 104:2 116:6 117:6,7,12 118:11 215:19 218:19 220:8 226:16 256:9,14 263:17 264:3,9,15,20 275:7,9,10 285:1,1,3,13 285:20 286:3,4,6,11,15 286:23 287:4,6,8,13,14 287:17 288:3,17,18 289:13,16 292:4,12 294:16,18 295:3,10,12 296:8,10,11 297:4 309:12 309:20,21 313:3,4 384:1 384:14,15

**trucks** [3] 262:6,7 295:9

**true** [23] 12:22 114:9 141:5 142:16 151:2 158:18,20 244:11 245:22 246:2,9 274:7 284:9,14 284:15,18,19 301:10 329:5 335:23 353:2 354:15 390:22

**truth** [5] 15:9 88:11,17 89:3,6

**truthful** [1] 17:5

**try** [14] 14:5 15:21 16:1,6 16:8 60:15 107:10 178:5 205:9 280:6 295:7 299:1 302:11 382:13

**trying** [4] 107:11 111:18 219:6 221:12

**Tuesday** [24] 108:9 109:12,17 110:12,21 111:15 139:4,10,13 141:9 141:10 151:12 206:17,20 245:7 249:16,18 251:6 253:17,23 256:2 259:14 264:2 301:15

**turn** [18] 37:2 96:13 98:4 170:16 171:1 178:23 182:13,16 184:7 185:23 186:14 239:14 318:19 328:15 335:4 358:21 372:14 379:20

**turned** [1] 373:21

**turning** [40] 36:14 37:13 38:5 87:23 89:16 99:3,16 101:5 136:8 137:11,20 139:17 145:17 160:11 170:14 171:14 175:22 176:2,22 180:23 183:13 185:3,22 186:12 233:21 234:9 235:17 255:5 269:15 329:23,23 336:15 352:18 356:4 360:9 361:4 362:7 363:18 364:20 379:16

**twelve** [3] 81:6 116:14 297:7

**twent** [1] 215:3

**twenty** [9] 19:3 95:15 121:17 122:3,11 125:14 215:2,4 338:16

**twenty-eight** [1] 105:15

**twenty-five** [3] 19:23 170:10 297:2

**twenty-nine** [1] 19:17

**twice** [1] 379:4

**two** [78] 4:14 19:8 32:23 33:12 34:3,4,6,11,14,18 58:6 69:1 85:3 93:16,19 94:8 97:13 111:19 119:6 119:6 137:20 160:11,20 170:15 171:2,8 175:4 176:23 177:1 187:8 195:8 195:11 202:3 209:14 222:1 226:11,16 232:3 233:21 234:4 236:10,19 236:20 239:14 248:12 249:6,20 250:16,19 254:5 254:6,11,14,17,21 256:12 265:11 302:4 305:20 307:15 328:11 335:5 338:17 352:18 356:4 358:21 359:2 360:9,15 362:7 363:10 364:12 378:15 379:5,16 382:14 384:4,5

**two-fifty** [1] 265:21

**two-page** [1] 160:5

**type** [18] 29:23 70:9 71:2 74:3 82:2 84:16 89:9 92:8 118:19 195:13 196:8,23 349:8 375:22 376:4,7 377:4 380:4

**typed** [4] 328:8,10 329:11 351:12

**typical** [1] 116:19

**typically** [9] 122:7 195:1 215:10 218:10 252:23 290:22 291:14,16 332:14

**-U-**

**U** [1] 1:12

**ultimate** [1] 247:11

**ultimately** [1] 162:9

**unauthorized** [3] 126:2 154:2,5

**uncle** [3] 62:1,3 290:5

**under** [48] 10:20,23 12:2 15:4,5 44:23 89:19 99:4 99:11,18 100:1,23 101:10 102:13 106:5 112:4 135:8 136:23 139:23 168:16 176:16 181:20 185:1,19 186:3 187:8 189:21 214:9 215:4 216:15 217:14,15 217:18,19,19 218:7 232:16 240:14,19 319:7 336:16 352:19 369:19 370:4 372:7,11,18 373:18

**underneath** [1] 97:1

**understand** [51] 15:6,8 15:15,18 16:19 65:5,22 72:10 88:15 89:2,4 99:23 101:9,15,18 102:10,22 114:20 120:20 139:20 152:17 153:18 159:7 176:21 177:2 184:22 185:12 187:16,19 219:7 221:12 233:5 236:1,23 238:14,15,21 241:15 242:18 251:4 264:13

**267**:20 298:23 311:17 318:5 335:18 336:12 365:17 378:14 385:13,13

**understood** [9] 16:14 88:9 125:20 127:18 176:18 188:20,22 189:16 299:3

**undertaking** [1] 347:16

**United** [3] 1:7 1:9 1:11

**units** [4] 114:3 143:21 220:1 268:8

**university** [3] 89:12,13 89:14

**unless** [5] 11:12 187:8 236:12 237:1 282:15

**unloaded** [2] 275:6

**unsafe** [1] 200:10

**up** [76] 25:17 34:3 42:5,7 60:6 69:21 72:6 83:2 84:14 94:5 105:10,14 106:16 111:18 113:20 116:4 127:18 138:15 139:4 140:10,14 141:8 151:11 157:7 179:22 180:5,6 190:9 191:1 192:22 193:20 199:12 206:7,10,20 207:12 209:20 215:13 221:23 245:12,13 246:21 247:8 250:13 256:8,10 261:5,10 263:20 275:9 279:11 281:5,11 291:5 292:3,4 292:11,12 294:16 296:13 303:8 309:17 310:16,23 311:5,10 312:18 313:2,11 313:17,21 347:4,9 373:9 373:10 383:21

**upkeep** [1] 74:5

**Upper** [1] 294:11

**upset** [1] 375:8

**urposes** [1] 330:18

**used** [25] 18:1 29:4,7,8,11 40:3 63:21 123:8 124:7 153:5,6 154:21 191:15 195:13 196:14 197:4,9 207:7,10 211:3 218:23 219:18 256:15,16 294:5

**uses** [1] 63:19

**using** [6] 105:19,23 106:11 153:4 213:1 221:15

**usual** [2] 10:13 12:8

**usually** [1] 290:16

**utilized** [1] 288:20

**-V-**

**vacation** [4] 41:9 92:12 **value** [1] 332:12

**various** [5] 14:23 17:6 145:19 158:16 171:2

**vehicle** [1] 288:21 370:17

**vehicles** [3] 383:17,20 384:3

**vendors** [2] 86:11 278:23

**Verbally** [1] 321:15
**versus** [1] 9:9
**via** [1] 63:5
**Vic** [1] 8:13
**vice** [1] 173:9
**video** [24] 1:15 8:13 9:6 31:17 77:12,18,22 141:11 141:15 178:10,14 237:13 237:17 297:12,16,20 323:5,8 357:15,18,22 382:3,6 389:20
**videotape** [2] 315:1 317:2
**videotaping** [1] 15:23
**vindiction** [1] 222:12
**violation** [2] 70:6 166:20
**violations** [1] 101:1
**vision** [1] 376:12
**visiting** [1] 116:1
**voice** [1] 307:7
**voluntarily** [3] 80:21 83:22 233:2
**voluntary** [3] 344:8 353:22 354:14
**VS** [3] 1:9 7:9 390:13

-W-

**W** [1] 7:17
**W-2** [1] 5:18
**wait** [3] 175:13 198:14 212:14
**waiting** [3] 318:2,3,4
**waived** [3] 2:2,17 10:22
**Wal-Mart** [4] 29:6,17 45:18 56:15
**walk** [1] 295:16
**wants** [3] 65:4 266:21 268:8
**warehouse** [56] 25:4,14 29:4 47:16 48:12 49:6 50:14 51:6,19 52:11 53:2 73:17 92:20 93:5 115:17 116:20,22 124:15 130:15 130:16,18,18,21,23 131:2 132:21 163:2 198:21 224:5,13,14,17 227:15 253:14,18 281:13 292:16 299:5 305:3 309:14,18 310:3,11,13,14,16,18,18 310:21,23 311:2,4 312:16 315:6 321:3 322:11
**water** [1] 198:15
**weapon** [1] 257:12
**weapons** [1] 257:13
**Wednesday** [15] 82:23 108:12,15 111:16 249:16 250:2,12 251:7 261:17 262:5,12 263:7,14,17 264:2
**week** [27] 69:15 81:22 107:7 109:1 110:1 114:3 114:15 115:5 165:21 166:12,14 167:14 170:3

170:11 195:11 250:20 252:19 254:12,15 266:19 268:9 269:9,19 273:13 290:16 294:1 369:7
**weekly** [10] 71:10,14,17 71:21 72:4 73:7 76:5 104:11 166:12 373:8
**weeks** [3] 69:1 319:18
**West** [3] 18:5 19:12,21
**Wetumpka** [1] 294:12
**whatsoever** [2] 94:20 325:4
**wheat** [5] 125:10 126:22 129:16 130:3,4
**white** [6] 125:10 130:3 135:20 204:4 245:11,12
**whited** [1] 186:1
**Whoever's** [1] 228:10
**whole** [4] 127:8 161:20 290:15 320:3
**wholesale** [4] 121:16,20 121:22 122:1
**wife** [6] 26:11 61:21,21 363:8 364:10 387:4
**wife's** [2] 62:13 380:15
**Wilder** [3] 134:14 135:11 137:7
**Williams** [5] 53:21 58:11,12 299:15,22
**willing** [3] 13:18,20 14:3
**Wilson** [2] 61:23 62:5
**Wilsons** [1] 61:22
**Winn** [1] 119:6
**Winn-Dixie** [32] 4:6,12 4:21 5:16 80:6,8,15 81:4 81:14 86:4,6,8 116:14 119:8,16 171:7 241:18 242:1 348:15 349:3,9,11 350:6,21 351:1,9 352:9 353:19 368:10 372:19,22 373:13
**Winn-Dixie's** [1] 116:17
**Winn-Dixies** [1] 119:6
**within** [3] 100:17 189:17 209:3
**without** [7] 64:18 65:13 66:18 126:16 130:13 181:10 203:2
**witness** [25] 2:1 9:3 10:8 10:10 33:13 34:22 36:16 37:4,16 89:18 95:14 96:15 96:19 101:8 169:8 175:9 181:9 182:18 184:9 187:1 272:23 321:18 342:2 350:15 379:22
**witnessed** [1] 232:22
**witnesses** [1] 294:17
**woman** [1] 279:1
**Woodrow** [1] 61:23
**Woody** [6] 91:7 142:18 144:10,12,22 145:12
**word** [26] 34:13,16 36:7 36:12,18,22 37:6,9,20

38:1,13,16 96:22 97:1 102:13 132:11,12,16,17 160:13 181:11,11 183:21 187:23 232:17 273:20
**words** [2] 303:22 343:3
**worked** [32] 18:23 75:2 80:3 81:18 83:14 84:20 86:4 107:2 108:4 111:10 111:11 113:4 125:3,6 132:22 247:8 256:1,2 259:12,14 260:12 263:20 268:5 275:15 280:23 281:4 284:7 336:18 338:5 340:10 348:14 372:20
**works** [3] 334:9,17,19
**worksheet** [1] 4:11
**worried** [1] 375:6
**worth** [2] 245:6,9
**write** [6] 324:12,17 337:2 355:2,5 388:18
**writing** [3] 213:20 237:2 374:8
**written** [2] 236:16 330:12
**wrong** [17] 24:5 28:19 92:21,23 145:15 146:4 159:11,14 199:6 216:18 216:20 217:13 248:1 258:19 265:20 287:16 329:11
**wrongdoing** [1] 317:7
**wrongfully** [2] 23:22 41:5
**wrongly** [1] 21:3
**wrote** [12] 137:1 142:19 142:20 226:7 280:14 324:10 344:22 348:9 355:6,10,14 388:4

-X-

**X** [1] 3:1

-Y-

**y'all** [3] 342:22 343:2 389:6
**year** [17] 70:17 72:3 92:20 92:23 191:8 194:2 209:4 356:17 357:3 359:5 361:2 363:22 365:1,6 367:19 372:4 378:21
**years** [15] 18:13 19:3 39:8 72:4 81:6 88:19,22 90:20 94:8 132:22 161:12,20 169:20 365:9,21
**yellow** [5] 137:18 138:17 139:3 141:7 151:10
**yesterday** [3] 21:13 69:9 385:7
**yet** [4] 87:11 317:23 318:1 318:20
**young** [1] 170:2
**yourself** [5] 33:16 117:9 202:21 273:8 364:9

-Z-

**zero** [1] 216:5