## DISTRIBUTOR'S AGREEMENT

AGREEMENT made this ___11Th.___ day of **March, 2002**, by and between **Flowers BakingCo. Of Opelika LLC.** (COMPANY), and **Henry Porterfield**(DISTRIBUTOR).

### WITNESSETH:

COMPANY has developed or acquired a license of franchise for the use of formulae, recipes, trademarks and trade names through which it manufactures and/or markets bread, rolls, and other fresh-baked products, as defined herein, throughout a geographic area which constitutes the Territory designated in Exhibit A (Territory), attached hereto and made a part hereof; and

Whereas, COMPANY, through the expenditure of time and effort and through its continuing research and marketing programs, has over the years developed a reputation for excellence in quality, value, and superior service which has created strong consumer recognition, approval, and demand for its products; and

Whereas, COMPANY has determined that the division of a portion of its market area into distribution territories, and the sale of its products to Independent Distributors for distribution and ultimate retail sale in said territories, will result in a superior distribution system; and

Whereas, **Henry Porterfield** is an independent contractor with the resources, expertise and capability to act as a distributor of COMPANY'S products in the Territory; and

Whereas, the parties desire to create a right in DISTRIBUTOR, under which DISTRIBUTOR will be authorized to sell certain defined products within a specified geographic area.

Now, therefore, in consideration of these premises, and of the covenants and conditions contained in this Agreement, and for other good and valuable consideration given and received, the receipt and the sufficiency of which is hereby specifically agreed to and acknowledged, the parties mutually agree as follows:

### I. WARRANTY

1.1     The foregoing preambles shall constitute warranties, representations, agreements and undertakings by the parties.

### II. DEFINITIONS

2.1     **Outlets**: Shall mean all retail stores (except thrift stores) selling to the general public and all restaurant and institutional accounts except those exempt from this Agreement as set forth in Article VII, below.

2.2     **Products**: Shall mean fresh baked goods, as specifically described in Exhibit B, attached hereto and made a part hereof, which are currently produced and/or distributed by COMPANY, provided,



PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989

FBO000031

however, that the Distribution Rights granted herein shall survive only so long as COMPANY has the license or franchise rights for such goods and COMPANY produces and/or sells such goods.

2.3 **Distribution Rights**: Except as expressly limited by this Agreement, Distribution Rights shall mean the right to sell and distribute Products as set forth in Exhibit B to Outlets in the Territory, which right has been purchased by DISTRIBUTOR from COMPANY as evidenced by a Bill of Sale executed by the parties, the form of which is attached hereto as Exhibit C, and made a part hereof.

2.4 **Territory**: Shall mean that geographic area as more specifically described in Exhibit A within which DISTRIBUTOR owns the Distribution Rights.

2.5 **Good Industry Practice**: Shall mean the standards that have developed and are universally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products in all Outlets, properly rotating all Products, promptly removing all stale Products, maintaining proper service and delivery to all Outlets requesting service except those proven consistently to be unprofitable, and maintaining all equipment in a sanitary condition and in good safe working order.

### III. RELATIONSHIP

3.1 **Extent and Duration**:     COMPANY hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, said ownership to continue until:

(a) transferred, assigned or sold by DISTRIBUTOR or anyone acting on behalf of DISTRIBUTOR (this includes a sale by COMPANY for the account of DISTRIBUTOR in the event of a termination of this Agreement upon the terms defined below), or

(b) COMPANY, for legitimate business reasons, ceases to use distributors to distribute its products in the **Montgomery AL** market area. In such event, COMPANY will repurchase the territory and distribution rights from DISTRIBUTOR at the greater of the first original purchase price or ten (10) times the average weekly sales volume of name brand Products in the Territory calculated over the six month period preceding the repurchase, or

(c) either party exercise their rights to terminate pursuant to Section 15.1.

3.2 **Nature of Rights**: The parties agree that the Distribution Rights sold to DISTRIBUTOR pursuant to the Bill of sale can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement other than in accordance with Section 3.1 (b) or (c) requires DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, to sell such Distribution Rights subject to the terms of this Agreement.

### IV. SALE OF PRODUCTS

4.1 Products will be sold to DISTRIBUTOR at such terms and prices as established by COMPANY from time to time. COMPANY will also furnish to DISTRIBUTOR suggested resale prices. Bid prices will be jointly established by COMPANY and DISTRIBUTOR.

FBO000032

## V. BEST EFFORTS/DISTRIBUTOR

5.1  **Obligations of DISTRIBUTOR:**  DISTRIBUTOR agrees and covenants to use his/her best efforts to develop and maximize the sale of COMPANY'S Products to Outlets within his/her Territory and service his/her Territory in accordance with good industry practice as defined above.

DISTRIBUTOR shall cooperate with COMPANY on its marketing program and maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with COMPANY.  DISTRIBUTOR may not carry outside merchandise which is competitive with COMPANY'S products.  DISTRIBUTOR may carry noncompetitive products, as long as this does not interfere with the distribution of COMPANY'S Products.

5.2  **Non-Compliance:**  Failure to comply with Section 5.1 above shall be considered a material breach of this Agreement and shall be governed by the provisions of this Agreement dealing with termination.

## VI. BEST EFFORTS/MANUFACTURING

6.1  **Obligations of Company:**  COMPANY shall use its best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of Products to supply Outlets requesting service in his/her Territory, preserve and develop the quality and marketability of the Products, and cooperate with DISTRIBUTOR in his/her sales efforts.

## VII. ACCOUNTS AND/OR TRADEMARKS EXEMPT FROM DISTRIBUTORSHIP

7.1  **Accounts Exempt From Agreement:**  COMPANY reserves the right to solicit and service drop delivery accounts in DISTRIBUTOR'S Territory, so long as it is done for legitimate business reasons and not for the purpose of undermining DISTRIBUTOR'S business.

7.2  **Thrift Stores:**  COMPANY reserves the right to continue to sell Products through its retail thrift store operation, Company-owned and/or independently owned.

7.3  **Other Trademarks:**  The parties hereto stipulate that the COMPANY produces a variety of products marketed under a variety of trademarks distributed through multiple channels of distribution.  This Agreement applies only to the trademarks set forth on Exhibit B and does not restrict any other distribution of products by the COMPANY marketed under trademarks not listed on Exhibit B.

## VIII. PAYMENT FOR PRODUCTS

8.1  **Settlement of Account:**  On or before Friday of each week, DISTRIBUTOR will provide to COMPANY a full settlement of all Products sold to DISTRIBUTOR in, and a statement of operating expenses for, the preceding week.

8.2  **Maintenance of Records:**  DISTRIBUTOR will maintain current and accurate financial records for the operation of the Distributorship during the term of the Agreement.  DISTRIBUTOR will provide the COMPANY with complete and accurate quarterly and annual financial reports and operating

FBO000033

statements in the form as described in Exhibit E attached hereto and as amended from time to time, within thirty (30) days after each quarter and year end. To insure the adequacy and accuracy of such reports and otherwise insure compliance with the obligations referenced herein, COMPANY, at its expense, shall be entitled to inspect, copy and audit DISTRIBUTOR'S records and books kept in accordance with this Agreement upon request.

**8.2.1** COMPANY, for a period of _one_ ( 1 ) year(s) following the date of this agreement, agrees to reimburse the DISTRIBUTOR the expenses of a certified public accountant, to a maximum of _five hundred_ dollars ($ 500 ) per year, who will assist the DISTRIBUTOR in the maintenance of these records. Upon request, DISTRIBUTOR shall provide COMPANY evidence of payment to the certified public accountant.

**8.3** **Cash Sales**: DISTRIBUTOR is responsible for the collection of all cash sales in his/her Territory.

**8.4** **Non-Cash Sales**: In cases where Products are sold and distributed to Outlets which have been authorized by COMPANY for credit, COMPANY, at the request and for the convenience of DISTRIBUTOR, may establish an account receivable for COMPANY'S Products with the Outlet and will promptly credit DISTRIBUTOR for all such accounts. DISTRIBUTOR is wholly responsible for collection of accounts receivable not authorized by COMPANY.

**8.5** **Chain Accounts**: COMPANY reserves the right to continue carrying the accounts receivable for all chain and other major accounts and to promptly credit DISTRIBUTOR for all such accounts. The accounts covered by this section are listed in Exhibit D, attached hereto and made a part hereof.

**8.6** **Security Interest**: To secure the payment of any indebtedness or liability of DISTRIBUTOR to COMPANY now or hereafter arising, DISTRIBUTOR hereby grants and conveys to COMPANY a security interest in his/her Distribution Rights, all other rights under this Agreement and all Products in DISTRIBUTOR'S possession, and grants to COMPANY the rights of a secured party under the Uniform Commercial Code.

## IX. EQUIPMENT AND MAINTENANCE

**81** DISTRIBUTOR is responsible for obtaining his/her own delivery truck and purchasing adequate insurance thereon, which will include combined single limit coverage of at least $1,000,000.00 DISTRIBUTOR'S insurance purchased pursuant to this section shall be endorsed to name COMPANY as an additional named insured and be primary and not contributory to any other coverage available to the COMPANY under similar policies. The DISTRIBUTOR will provide the COMPANY evidence of insurance and the endorsement described in this section. The DISTRIBUTOR shall provide evidence of the primary and non contributory coverage by providing an additional insured endorsement which specifically states that the insurance is primary and not contributory.

**82** DISTRIBUTOR is responsible for truck sanitation. Consistent with good industry practice, the delivery truck should be kept clean at all times and maintained in such condition as to provide safe, prompt, and regular service to all customers.

83     DISTRIBUTOR is responsible for maintenance of his/her delivery truck.

84     COMPANY will assist DISTRIBUTOR in securing a spare delivery truck, when needed, at a specified location which DISTRIBUTOR may use in case of an emergency. DISTRIBUTOR will be responsible for any charges resulting from any use of such vehicle. On any such vehicle, DISTRIBUTOR is responsible for obtaining automobile liability insurance coverage with limits of at least $1,000,000, with COMPANY named as additional insured. On any vehicle DISTRIBUTOR rents, borrows or leases from COMPANY, DISTRIBUTOR agrees that his/her automobile liability insurance shall be primary and not contributory to any other coverage available to the COMPANY under similar policies.

85     COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) collection of sales data, (ii) preparation of sales tickets, (iii) accumulation of sales histories, (iv) preparation of daily and weekly settlements, (v) preparation of automated "adds" to and "cuts" from DISTRIBUTOR's daily order of the COMPANY's products, and (vi) direct communication to company for the purpose of DISTRIBUTOR's ordering of product and receipt of daily load information.

Further, the COMPANY shall make available, and DISTRIBUTOR shall use, certain proprietary administrative services in order to assist the DISTRIBUTOR in the conduct of his/her business for the following purposes: (i) to provide automated route book information, (ii) to provide automated product movement information, (iii) to provide individual customer sales profiles, and (iv) to provide suggested orders for each customer.

85.1     COMPANY shall charge, and DISTRIBUTOR shall pay, a fair market, reasonable administrative fee for these services, which shall be established from time to time by the COMPANY.

85.2     DISTRIBUTOR agrees to maintain and hold in confidence any and all information obtained from or derived about the COMPANY's proprietary administrative services.

85.3     DISTRIBUTOR acknowledges that he/she cannot and shall not acquire any proprietary rights in the COMPANY's proprietary administrative services and no rights shall accrue to DISTRIBUTOR by virtue of the use of the proprietary administrative services.

85.4     This provision shall remain in effect for as long as the DISTRIBUTOR's Agreement is in effect. However, in the event the DISTRIBUTOR's Agreement is terminated for any reason, so shall DISTRIBUTOR's right to use the proprietary administrative services. The right to use these administrative services shall not be assigned by DISTRIBUTOR without the express written consent of COMPANY.

85.5     Compliance with these provisions is a material part of the performance standards of the DISTRIBUTOR's Agreement and any violation shall be a material breach of the DISTRIBUTOR's Agreement.

85.6     The COMPANY may, in its sole discretion, alter, amend or terminate the proprietary administrative services herein made available by the giving of 14 days notice to the DISTRIBUTOR.

## X.  PRODUCT DELIVERY

10.1    COMPANY shall deliver Products to DISTRIBUTOR at **Montgomery Al.** .  COMPANY reserves the right to change such location provided that any location chosen will be of suitable size with the necessary loading dock heights to allow for use by DISTRIBUTOR. DISTRIBUTOR will be charged a fee for warehouse use.

## XI.  PRODUCT CODE

11.1    Maintaining a fresh market is a fundamental tenet of the baking industry.  Accordingly, out of code product on the market is a material breach of this Agreement.  Repeated violations will be grounds for termination of this Agreement.

11.2    To assist DISTRIBUTOR in maintaining a fresh market, COMPANY will repurchase up to 10% of DISTRIBUTOR'S weekly volume returned as stale product, at a price equal to DISTRIBUTOR'S cost of such product.  In the event that the volume of stale product exceeds 10% of DISTRIBUTOR'S weekly volume, COMPANY will repurchase such stale product at 50% of DISTRIBUTOR'S cost of such product.

11.3    DISTRIBUTOR may not sell any product over code or product not in a saleable condition for distribution to the general public but may otherwise sell such product to purchasers who are not competitors of COMPANY.

## XII. ADVERTISING AND PROMOTIONS

12.1    COMPANY will provide all COMPANY initiated advertising material at no cost to DISTRIBUTOR, including, but not limited to, point of sale material and COMPANY scheduled media advertising.  Subject to COMPANY'S prior approval, which approval will not be unreasonably withheld, DISTRIBUTOR may use other advertising materials.

12.2    DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and chain accounts in his/her Territory.  Such promotions and feature pricing are optional with respect to local accounts.  When DISTRIBUTOR follows promotions or feature pricing, DISTRIBUTOR will receive a reduction in his/her purchase price accounting for such promotion or feature pricing.

## XIII.  SERVICE REQUIREMENTS

13.1    DISTRIBUTOR is responsible for providing service of his/her Territory during periods of sickness, vacation, temporary disability and other similar circumstances.

13.2    In the case of an emergency during which DISTRIBUTOR cannot provide a substitute to service his/her Territory, COMPANY reserves the right to service such Territory and charge DISTRIBUTOR a daily fee plus operating expenses.

## XIV.  TRANSFER OR SALE OF RIGHTS

FBO000036

**14.1**  **Conditions:**  The Distribution Rights are owned by the DISTRIBUTOR and may be assigned, transferred or sold, in whole or in part, by DISTRIBUTOR, or anyone acting on behalf of DISTRIBUTOR, subject in either case to the prior written approval of the assignees', transferees' or purchasers' qualifications by COMPANY, which approval will not be unreasonably withheld. However, any sale, whether made by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR, shall be subject to a first right of refusal on the part of COMPANY at the same terms and conditions offered to DISTRIBUTOR, OR ANYONE ACTING ON BEHALF OF DISTRIBUTOR, by a qualified and/or bona fide purchaser, which right shall expire if not exercised with ten (10) days after the later of: (a) receipt by COMPANY of written notice of intent to sell to a named purchaser on terms and conditions fully set forth in such notice, and (b) and evaluation by COMPANY of the proposed purchaser.

**14.2**  **Settlement of Account:**  No transfer or sale of DISTRIBUTOR'S rights under this Agreement is to be made unless and until DISTRIBUTOR has settled with COMPANY all outstanding accounts; provided, however, that COMPANY may waive this requirement if it is satisfied that under the terms of the sale, the purchaser assumes all such liabilities and is financially capable of such assumption.

**14.3**  **Transfer Fee:**  In the event of a sale by DISTRIBUTOR, or by anyone acting on behalf of DISTRIBUTOR (including a sale by COMPANY for the account of DISTRIBUTOR), of DISTRIBUTOR'S Distribution Rights, DISTRIBUTOR shall pay a transfer fee to COMPANY in an amount equal to five (5%) of such gross sales price, in consideration of the administrative activities undertaken by COMPANY in connection with such sale.

## XV. INDEPENDENT BUSINESS

**15.1**  **Essential Term:**  The status of DISTRIBUTOR pursuant to this Agreement is that of independent contractor and the parties hereby signify their express intention to this effect. DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR'S business, it being understood that the primary interest of COMPANY is the results achieved by DISTRIBUTOR. DISTRIBUTOR'S business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business. Any contrary final determination by any governmental agency or court of competent jurisdiction shall entitle either party to cancel this Agreement. Neither DISTRIBUTOR nor any of his/her employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of COMPANY and neither party has the right or power, express or implied, to do any act or thing that would bind the other, except as herein specifically provided. The parties do not intend to act as joint employers, parent/subsidiary, joint venturers, or any other legal capacity other than separate and distinct businesses acting pursuant to the terms of this Agreement. Furthermore, none of the benefits provided by COMPANY to its employees is available from COMPANY to DISTRIBUTOR or to DISTRIBUTOR'S employees, agents, or servants, except as required by law. DISTRIBUTOR will be solely and entirely responsible for his/her acts and for the acts of his/her employees, agents, and servants during the performance of this Agreement; and

FBO000037

will save and hold COMPANY harmless from any and all damages which may arise therefrom, including attorneys' fees. As a part of this obligation, DISTRIBUTOR agrees to obtain a combined single limit insurance policy against any such liability as to COMPANY with limits of at least $1,000,000.00, naming COMPANY as an additional named insured therein. Such coverage shall be primary and not contributory. DISTRIBUTOR must provide COMPANY with a written certificate of said insurance. Notwithstanding the fact the DISTRIBUTOR is an independent contractor, COMPANY and DISTRIBUTOR agree that, until further written notice from COMPANY to DISTRIBUTOR, COMPANY shall treat DISTRIBUTOR as a "statutory employee" as defined in Section 3121 of the Internal Revenue Code, and shall withhold and/or remit the appropriate amounts on DISTRIBUTOR'S behalf pursuant to the Federal Insurance Contributions Act and/or Section 3306 of the Federal Unemployment Tax Act. Any such written notice shall be effective as of the date specified therein which shall be no sooner than thirty (30) days from the date of delivery thereof.

## XVI. TERMINATION

16.1   **Performance**: Except as set forth in Sections 3.1 (b) and (c) above and Section 15.1, of this Article, COMPANY shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof. In the event DISTRIBUTOR fails to perform his/her obligations under this Agreement, COMPANY may terminate this Agreement as set forth below.

16.2   **Non-Curable Breach**: COMPANY may terminate upon twenty-four (24) hours' written notice and DISTRIBUTOR shall have no right to cure if DISTRIBUTOR'S failure of performance involves criminal activity, threatens public health or safety, or threatens to do substantial harm to COMPANY'S business.

16.3   **Curable Breach**: In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure his/her failure of performance. If DISTRIBUTOR does not cure such failure performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure. Furthermore, the parties agree that repeated violations constitute a chronic failure of performance and threaten substantial harm to COMPANY'S business, and in such event COMPANY shall be entitled to terminate this Agreement and DISTRIBUTOR shall have no further right to cure.

16.4   **Actions Following Termination**: If this Agreement is terminated under either Section 16.2 or 16.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR'S Distribution Rights to an qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement. Such sale shall be for the account of the terminated DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to COMPANY, the amount of any outstanding liens, any other known liabilities of the Distributorship and the reasonable costs incurred in effecting the sale, shall be turned over to

FBO000038

DISTRIBUTOR in exchange for the release of his/her Distribution Rights and interests under this Agreement.

## XVII. DISPUTE RESOLUTION

**17.1**    **Negotiations And Mediation**

**(a)**    DISTRIBUTOR and COMPANY shall attempt in good faith and employ their best efforts to resolve and terminate any controversy, claim or dispute arising out of or relating to this Agreement promptly by negotiations. Such negotiations shall take place between representatives of COMPANY and DISTRIBUTORS who have the authority to settle and resolve the dispute. Such negotiations shall begin upon written notice from one party to the other describing any dispute or claim which has not been resolved in the ordinary course of business and suggesting a location for a meeting between the parties to conduct such negotiation within 10 business days after delivery of such notice. Representatives of DISTRIBUTOR and COMPANY shall meet at a mutually acceptable time and place within 10 days after delivery of such and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. Any such meeting may be attended by one or more representatives of each party. No such meeting shall be attended by an attorney representing either party unless such party shall have first given the other party at least three days' notice that it will be accompanied by an attorney at the next scheduled meeting, and at such meeting the other party may also be accompanied by an attorney.

**(b)**    If the dispute has not been resolved within 30 days of the initial notice, or if the party receiving such notice has failed to meet within 15 days, either party may initiate mediation by a request therefor in writing to the other party. Upon receipt of such notice, DISTRIBUTOR or COMPANY shall be obligated to engage in mediation in accordance with the then-current Mediation Procedure published by the Center for Public Resources, and if the parties fail to agree within 15 days of the date of such request for mediation on the selection of a mediator, then the Center for Public Resources shall appoint a mediator in accordance with its Mediation Procedure and the parties shall continue efforts through mediation to resolve the controversy and dispute between them until mediation is terminated by the occurrence of any of the following events:

(i) A written resolution in settlement of the dispute is reached, or

(ii) The mediator informs the parties in writing that further efforts would not be productive or useful, or

(iii) The parties agree in writing that further efforts would not be productive, or

(iv) Sixty (60) days elapse from the commencement of the mediation without resolution.

FBO000039

Neither COMPANY nor DISTRIBUTOR may withdraw from mediation before such a termination of the process.

(c)    If the dispute has not been resolved in accordance with the foregoing within 90 days of the commencement of the negotiation procedure, either party may initiate litigation upon 10 days written notice to the other party; provided, however, that if any party has failed to voluntarily participate in the requirements of the foregoing Paragraphs, the other party may initiate litigation before expiration of the 90 day period. DISTRIBUTOR and COMPANY specifically agree that in litigation between them arising out of or relating to the Agreement, the prevailing party shall be reimbursed by the other party for legal fees and other expenses incurred by that party in such litigation.

(d)    All negotiations and mediations pursuant to this Paragraph of the Agreement are confidential and shall be treated as compromise and settlement negotiations for purpose of the Federal Rules of Evidence and any similar state rules of evidence.

(e)    All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the procedures specified in this Paragraph. All deadlines specified by this Paragraph may be extended by mutual agreement of the parties.

(f)    Each party shall be required to continue the performance obligation under this Agreement pending final resolution of any dispute arising out of or related to this Agreement.

(g)    The procedures specified by this Paragraph shall be the sole and exclusive procedures for the resolution of disputes between COMPANY and DISTRIBUTOR arising out of or relating to this Agreement.

## XVIII. CONSENT TO INCORPORATION

18.1    If DISTRIBUTOR desires to conduct business in a corporate or other legal capacity, other than as a sole proprietorship, COMPANY will consent to the assignment of this Agreement to such legal entity provided:

(a)

If a corporation, DISTRIBUTOR at all times retains at least 51% of the outstanding stock and meets the other conditions set forth in this Article; the books and records of the corporation reflect that the issuance and transfer of shares of stock are restricted and that all stock certificates shall bear a legend giving notice of such restriction and referring the reader to the terms of this Agreement; DISTRIBUTOR acts as such corporation's principal officer and continues personally to meet and guarantee the obligations imposed hereunder; and DISTRIBUTOR executes any other consents or documents reasonably required by COMPANY in connection with such approval.

(b)

If any other legal business enterprise is established, DISTRIBUTOR shall have all other

FBO000040

individuals involved in the enterprise as an entrepreneur personally execute this Agreement, and DISTRIBUTOR'S interest in the enterprise shall at all times represent at least 51%.

## XIX.  TRADEMARKS AND TRADE NAMES

19.1 **Permission for Use**:  DISTRIBUTOR shall make no use of COMPANY'S trademarks or trade names subject to this Agreement, nor engage in any program or activity which makes use of or contains any reference to COMPANY, its products, trademarks or trade names, other than as specifically provided herein, except with the prior written consent of COMPANY.

19.2 **Return Upon Termination**:  Upon termination of this Agreement, DISTRIBUTOR shall cease use of COMPANY'S trademarks and shall deliver to COMPANY any advertising, promotional or merchandising material.

## XX.  MISCELLANEOUS

20.1 **Notice**:  Any notice required or permitted under this Agreement shall be deemed properly given when personally received, or seventy-two (72) hours after deposit in the U.S. mail, return receipt requested, first class postage prepaid, addressed to the below designated parties at the below-designated addresses or at such other address as either party may designate by written notice duly given in accordance with this Section 19.1:

As to DISTRIBUTOR, <u>Henry Porterfield, 2807 Ravenwood Montgomery AL 36116</u>

As to COMPANY, <u>Flowers Baking Co. Of Opelika LLC.   101 Simmons St. Opelika Al.</u>

20.2 **Survival**:  This agreement shall be binding upon the heirs, personal representatives, successors or assigns of the parties to this Agreement.

20.3 **Incorporation of Bill of Sale**:  This Agreement is subject to and affected by a Bill of Sale simultaneously executed by the parties, such Bill of Sale being fully incorporated in this Agreement by reference.

20.4 **Entire Agreement**:  This Agreement, together with Exhibits A, B, C, D, and E, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter.  Unless set forth in this Agreement, no party shall be liable for any representation made to any other.  This Agreement may be amended or modified only by a writing signed by all parties.

20.5 **Indemnification**:  DISTRIBUTOR agrees to indemnify and hold harmless COMPANY from and against any and all claims, actions, liabilities, expenses, losses or demands, including reasonable attorneys' fees, growing out of or based upon this Agreement or any acts of DISTRIBUTOR arising in the normal course of the conduct of business by DISTRIBUTOR pursuant to this Agreement.  DISTRIBUTOR shall also indemnify COMPANY against all liability and loss in connection with, and shall assume full responsibility for, payment of all federal, state and local taxes and/or contributions imposed or required under unemployment insurance, workers' compensation insurance, and income tax laws, except as

FBO000041

otherwise provided by Paragraph 15.1 herein, with respect to DISTRIBUTOR or DISTRIBUTOR'S employees engaged in performance of this Agreement.

**20.6** <u>**Covenant Not To Compete**</u>:    DISTRIBUTOR agrees that if this Agreement is terminated, DISTRIBUTOR will not, for a period of one (1) year thereafter, sell or attempt to sell any product competitive with the Products as defined in Section 2.2 of this Agreement to any of the customers to whom DISTRIBUTOR made one or more sales during his/her last year as COMPANY'S DISTRIBU-TOR. The geographical territory applicable to this paragraph is the Territory as defined in Section 2.4 of this Agreement. DISTRIBUTOR agrees that his/her promise herein made to refrain from selling or attempting to sell means that he/she will not, directly or indirectly, either as an individual on his/her own account or as a partner, employee, distributor, agent or salesman of or for any person, firm, association or corporation, engage in selling or attempting to sell any of said competitive products to any of the customers hereinabove designated.

**20.7** <u>**Governing Law**</u>: This Agreement and the construction thereof shall be governed by the laws of the State of <u>**Alabama**</u>.

IN WITNESS WHEREOF, COMPANY and DISTRIBUTOR have executed this Agreement on the day and year first above written.

WITNESSES                                        DISTRIBUTOR

By :

ATTEST:

COMPANY

_____         By:___**Calvin Rhodes**_____

Its:___**President**_____

EXHIBIT A

# TERRITORIAL DESCRIPTION

## AREA: ___2069___

### SECTION I:

Territory begins at intersection of Eastern Blvd. And Vaughn Road. Working Promande Shopping Center.(only). Go West on Vaughn Road to Zelda Road. Working both sides of the road. Go Right on Zelda to Ann street.Working both sides of the road. Go Right on Ann Street to Madison Ave. Go left on Madison Ave.to Mt. Meigs Road. Go left on Mt. Meigs road to South Capital Parkway. Working both sides of the road. Go right on South capital Parkway to Madison Ave. Go left on Madison Ave. to North McDonough .Working both sides of th road. Go right on North McDonough to Columbus St. Working both sides of the road. Go left on Columbus St. To North Perry. Go left on North Perry to Madison Ave. Go right on Madison Ave. To Molton Ave.Working left side of road(only) Go left on Molton Ave.to Montgomery St. Go Left on Montgomery St. To Dexter Ave. Working both sides of the road. Go right on Dexter Ave. To North Bainbridge. Go left on North Bainbridge to Madison Ave.(stop)

### SECTION II

Territory begins at Zelda Road and Carter Hill Road. Go NorthWest on Carter Hill Road to Hall Street. Working both sides of the road. Go North on Hall Street. To I-85. Go right on I-85 to Forrest Ave. Go left on Forrest Ave. to Highland Ave. Working both sides of the road. Take Highland Ave. back to Ann Street. (stop)

FBO000043

# EXHIBIT A
## AREA: <u>2069</u>

# TERRITORY MAP

## SEE ATTACHED

FBO000044



**EXHIBIT B**

**EXCLUSIVE RIGHTS**

Distributor shall have the exclusive right to sell and distribute the following products in the territory specifically designated in Exhibit A.

1.   SunBeam

2.   Nature's own

3.   Cobblestone

4.   Blue Bird

5.   Breads International

\*   Distribution rights granted herein shall survive only so long as Flowers has the license or franchise rights for such products.

FBO000047

### EXHIBIT "B"

Except as expressly limited by the Distributor's Agreement, DISTRIBUTOR shall have the exclusive right to sell and distribute the following Products in the Territory specifically described in Exhibit A.

FBO000048

EXHIBIT "C"

**BILL OF SALE**

**Flowers Baking Co. Of Opelika LLC.**   , Seller, subject to the consideration set for the below, hereby conveys, sells, transfers and delivers to **Henry Porterfield**, Buyer, the Distribution Rights specifically described in the Distributor's Agreement executed simultaneously with this Bill of Sale. Both the Distributor's Agreement and all appendices (exhibits) thereto are specifically incorporated into and made a part of this Bill of Sale.

The terms of this sale are as follows:

Purchase price shall be **$ 34,078.00**.

Buyer shall own all Distribution Rights in the Territory in himself/herself and in his/her executors, administrators and assigns, consistent with the terms and conditions contained in the Distributor's Agreement.

Seller has lawful title to the Distribution Rights in the Territory free from all encumbrances. Seller warrants and will defend the rights conveyed herein against the lawful claims and demands of all persons.

IN WITNESS WHEREOF, Seller and Buyer execute this Bill of Sale at **11Th.** day of **March 2002**.

WITNESSES

DISTRIBUTOR

By :

ATTEST:

COMPANY

By:   **Calvin Rhodes**
Its:    **President**

FBO000049

## *ACCOUNT  LISTING*

### *AREA:* _____ *2069* _____

| ACCOUNT  NAME |
| --- |
| BURGER KING $9326 |
| DAVIS CAFE |
| DECKER'S CAFE 1 |
| DECKER'S CAFE 2 |
| E. Z. FOODS #64 |
| JACKSON HOSPITAL |
| KRYSTAL  #6 |
| LION'S PRIDE |
| MADISON MINI MART |
| MASONIC HOME |
| MONTGOMERY ACADEMY |
| QUICK SERVE #30 |
| REGIONS BANK |
| SILVER SPOON |
| SPECTRUM |
| SUNDAY DINNER |
| TROY STATE |
| T. J. BEST |
| WINN DIXIE #463 |
| WINN DIXIE #464 |
| WINN DIXIE #468 |

## _AUTHORIZED  CHARGE  ACCOUNT  LIST*_

_AREA:_ _____ _2069_ _____

| ACCOUNT NAME | ACCOUNT NUMBER |
|---|---|
| | |
| | |
| BURGER KING #9326 | 105–40001532 |
| E. Z . FOODS #64 | 105–40001866 |
| JACKSON HOSPITAL | 105–40001908 |
| KRYSTAL #6 | 105–40001830 |
| MASONIC HOME | 105–40001890 |
| MONTGOMERY ACADEMY | 105–40001914 |
| Regions Bank | 105–40001920 |
| Spectrum | 105–40002052 |
| Sunday Dinner | 105–40002052 |
| Troy State | 105–40001926 |
| Winn–Dixie #463 | 105–40002257 |
| Winn–Dixie #464 | 105–40002263 |
| Winn–Dixie #468 | 105–40002275 |
| | |
| | |
| | |
| | |
| | |

\*   All Accounts listed above as a Distributor's Authorized Charge Account List
     are authorized accounts by Flowers. These Accounts are the responsibility of
     Flowers to collect.

FBO000051

## EXHIBIT "E"

Quarterly and Annual Financial Reports, consisting of:

1.      Compiled Statement of Revenues and Expenses

2.      Compiled Statement of Cash Flow

These statements may be prepared on a cash basis and issued without disclosure as required by generally accepted accounting principles.   Further, these statements must be compiled by a certified public accountant in accordance with the standards established by the American Institute of Certified Public Accountants.

3.      Statement of Revenues, expenses other than transportation expense, and fair rental value of vehicles used in the business.

Company will supply actual format, if necessary.

FBO000052

APR. 6.2002 11:19AM    FLOWERS BAKERY

1. Return copy or recorded original to/acknowledge    to/ to:

Craig Horn
c/o Flowers Baking Co. of Opelika, Inc.
P.O. Box 2548
Opelika, Al. 36803-2548

Pre-paid Acct. #

2. Name and Address of Debtor                    (Last Name First if a Person)

Porterfield, Henry G.
2807 Ravenwood
Montgomery, Al. 36116

Social Security/Tax ID #    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

2A. Name and Address of Debtor    (IF ANY)    (Last Name First if a Person)

Social Security/Tax ID #

☐ Additional debtors on attached UCC-E

3. NAME AND ADDRESS OF SECURED PARTY (Last Name First if a Person)

Sun Trust Bank
25 Park Place, N.E.
P.O. Box 4418  Mail Code 113
Atlanta, Ga. 30303  (P.O. Box 30302)

Social Security/Tax ID #    58-0466330

☐ Additional secured parties on attached UCC-E

4. NAME AND ADDRESS OF    (IF ANY)    (Last Name First if a Person)
ASSIGNEE OF SECURED PARTY

FILED WITH:

5. The Financing Statement Covers the Following Types (or items) of Property:

All distribution rights as described in the Distributor's Agreement
between Flowers Baking Co. of Opelika, Inc. and Henry G. Porterfield

■Dated:  August 23, 2000

5A. Enter Code(s) From
Back of Form That
Best Describes The
Collateral Covered
By This Filing:

Check X if covered: ☐ Products of Collateral are also covered.

6. This statement is filed without the debtor's signature to perfect a security interest in collateral
(check X, if so)
☐ already subject to a security interest in another jurisdiction when it was brought into this state.
☐ already subject to a security interest in another jurisdiction when debtor's location changed to this state.
☐ which is proceeds of the original collateral described above in which a security interest is perfected.
☐ acquired after a change of name, identity or corporate structure of debtor
☐ as to which the filing has lapsed.

7. Complete only when filing with the Judge of Probate:
The initial indebtedness secured by this financing statement is $
Mortgage tax due (15¢ per $100.00 or fraction thereof) $
8. ☐ This Financing statement covers timber to be cut, crops, or fixtures and is to be cross indexed in the real estate mortgage records (Describe real estate and if debtor does not have an interest of record, give name of record owner in Box 5)

Signature(s) of Secured Party(ies)
(Required only if filed without debtor's Signature — see Box 6)

Signature(s) of Debtor(s)

Henry G. Porterfield
Type Name of Individual or Business

(1) FILING OFFICER COPY - ALPHABETICAL    (3) FILING OFFICER COPY - ACKNOWLEDGEMENT
(2) FILING OFFICER COPY - NUMERICAL    (5) FILE COPY - SECURED PARTY

Signature(s) of Secured Party(ies) or Assignee

Signature(s) of Secured Party(ies) or Assignee

Sun Trust Bank
Type Name of Individual or Business

(6) FILE COPY DEBTOR(S)

STANDARD FORM — UNIFORM COMMERCIAL CODE — FORM UC
Approved by The Secretary of State of Alabama

FBO000053