1

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HENRY PORTERFIELD,

     Plaintiff,

  vs.              CIVIL ACTION NO.
                        2:05-CV-937-MEF

FLOWERS BAKING COMPANY OF
OPELIKA, LLC,

     Defendant.

       * * * * * * * * * * * *


     **DEPOSITION OF STEVE BORDEAUX**, taken pursuant to stipulation and agreement before Tracye Sadler, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, at the Tiger Town Inn, 205 21st Street, Opelika, Alabama, on May 8, 2007, commencing at approximately 11:10 a.m.

       * * * * * * * * * * *

haislip, ragan, green, starkie & watson, p.c.
566 south perry street • montgomery, alabama 36104

11

1    Q.    How long were you a supervisor in

2          Montgomery?

3    A.    I believe it was in '85 or '86 they

4          promoted me to sales manager.

5    Q.    Of Montgomery?

6    A.    Yes, sir.

7    Q.    And how long were you sales manager in

8          Montgomery?

9    A.    Until May of '91.

10   Q.    And what happened in May of '91?

11   A.    I was promoted to VP of sales for Opelika

12         bakery -- Flowers Baking Company of

13         Opelika.

14   Q.    And how long did you stay VP of sales in

15         Opelika?

16   A.    Just till approximately two and a half

17         years ago.  I got promoted to plant

18         president.

19   Q.    2004 or --

20   A.    No, sir.  It was 2005, January of 2005.

21   Q.    To president of Flowers Baking Company of

22         Opelika?

23   A.    That is correct.

12

1   Q.   And what's your job duties and

2        responsibilities as president for Flowers

3        Baking Company of Opelika?

4   A.   Responsibility is to reach our sales profit

5        goal, lead, guide, and direct management

6        teams over each department to reach their

7        goals and exceed in the bread-making

8        industry.

9   Q.   You were working in Montgomery when Henry

10       Porterfield was hired; correct?

11  A.   I believe that is correct.

12  Q.   Did you hire Mr. Porterfield?

13  A.   I was thinking about that the other day,

14       and I can't remember if I hired Henry or

15       someone else did.  I'm pretty sure that I

16       perhaps interviewed with him, but I'm

17       not -- not sure if I was the one that

18       actually gave the final okay to hire

19       Mr. Porterfield.

20  Q.   Were you sales manager when Mr. Porterfield

21       was hired or were you supervisor?

22  A.   I'm not exactly sure.  I can't remember

23       if -- exactly what year Mr. Porterfield

13

1    started as a route salesperson at the

2    time. It was quite a few years ago though.

3 Q.  Mr. Porterfield was -- his contract with

4    Flowers Baking Company was terminated in

5    March of 2005, I believe?

6 A.  Yes, sir, I believe so.

7 Q.  Tell me what your involvement was regarding

8    the termination of Mr. Porterfield's

9    contract.

10 A.  My involvement was to give the final say-so

11   whether to go forward or not go forward on

12   the issue of the curable breach.

13 Q.  When you say go forward or not go forward,

14   explain to me what you mean by that.

15 A.  Whether to terminate the contract for the

16   curable breach that was not cured or not

17   to.

18 Q.  And who besides yourself participated in

19   that decision-making process?

20 A.  Michael Lord and myself.

21 Q.  Tell me what you recall about the first

22   time that you heard about the breach that

23   Mr. Porterfield had with his contract.

1  A.   On -- for this particular incident was with

2       the Sodexho Marriott account, which is part

3       of Troy State, that he did not service the

4       account and that she didn't want him

5       servicing anymore, you know, just for his

6       lack of performance.

7  Q.   Who told you about this breach with Sodexho

8       Marriott?

9  A.   Michael Lord and Grady Messer.

10 Q.   Was that by phone or did y'all have a

11      meeting, or how did that --

12 A.   He sent us an e-mail, Grady Messer did, at

13      approximately the same time addressed to

14      myself and to Michael Lord.

15 Q.   And then once you got the e-mail, did you

16      meet with Grady Messer or was everything

17      done over the phone after that?

18 A.   Some of both.  We met with him and also

19      discussed the issue over the phone.

20 Q.   Who besides yourself met with Grady Messer

21      in person?

22 A.   I believe it was just us three.

23 Q.   You, Michael Lord, and Grady Messer?

15

1    A.   Grady Messer.

2    Q.   And where did y'all meet?

3    A.   In Montgomery.  We didn't meet at the

4         warehouse.  I can't remember the exact

5         location.  We did at times meet at the

6         Steak-n-Shake, Hardee's.  I can't remember

7         the exact place that we met.

8    Q.   Tell me what you remember about that

9         meeting with you, Grady Messer, and Michael

10       Lord.

11   A.   We discussed what happened, that this lady

12       was upset that she didn't get service.  And

13       she also brought up the fact that she had

14       had a problem before not getting proper

15       service.  That was mentioned.  And I

16       believe Grady told me that Steve Stevens

17       went to see her at one time before on this

18       other incident that he didn't get -- she

19       didn't get proper service about, you know,

20       the service issues that she's been having,

21       and she didn't want any more service

22       problem issues.  And if not, she was going

23       to change.  And Steve Stevens corrected

16

1          everything with her and let Henry continue

2          to work her at that time.

3    Q.    And was this Grady that was telling you

4          this?

5    A.    Yes, sir.

6    Q.    Did you meet with Grady in person more than

7          once or just once?

8    A.    I'm pretty sure we met more than once,

9          probably also at our bakery.

10   Q.    In Opelika?

11   A.    Yes, sir.

12   Q.    What do you recall about a meeting with

13         Grady Messer at the bakery in Opelika?

14   A.    More or less the same that I just

15         mentioned, that -- the curable breach and

16         it was not cured or was going -- looked

17         like it was not going to be cured within

18         the ten-day span.

19   Q.    Okay.  So you think we met with Grady at

20         least two times before the termination of

21         the contract?

22   A.    Yes, sir.

23   Q.    And --

17

1   A.   And probably talked a couple -- you know,
2        several times over the phone.
3   Q.   Tell me about the phone conversations that
4        you recall.
5   A.   More of the same.  Just rehashed the same
6        thing that we had talked about before.
7   Q.   How long were the phone conversations?
8   A.   I don't recall.  I mean, I'm sure we
9        discussed other issues at the time when we
10       were on the phone.
11  Q.   Was it a call specifically to discuss Henry
12       Porterfield or was it a general --
13  A.   I don't remember, sir.
14  Q.   When was the decision made to terminate the
15       contract?
16  A.   I believe it was the very next day.
17  Q.   Very next day after what?
18  A.   After he got the curable breach --
19  Q.   Letter?
20  A.   -- letter, yes, sir, which was the very
21       next day that he got the curable breach
22       letter.  I believe the breach actually
23       happened on March the 6th and then we gave

18

1        him a ten-day curable breach letter the

2        7th.

3  Q.    And you decided to terminate him then?

4  A.    No, sir.  I can't terminate anybody, but I

5        can give them a letter to cure a breach.

6  Q.    So a letter was given to cure the breach on

7        the 7th?

8  A.    Yes, sir, I believe so.

9  Q.    When was the decision made to terminate

10       Mr. Porterfield's contract?

11  A.    I believe it was the 16th or the 17th.  I'm

12       not exactly sure on the correct date.  It

13       was ten days from the time he got the

14       letter.

15  Q.    And was the decision to terminate his

16       contract based upon failure to secure the

17       Sodexho Marriott contract?

18  A.    Yes, sir.

19  Q.    And that was it?

20  A.    Yes, sir.

21  Q.    Have you ever had other distributors that

22       worked underneath you at any level -- I

23       mean -- any level -- any of the positions

19

1    that you were holding with Flowers -- And I

2    think you just told me about all of them.

3    But have you ever had any route salesmen

4    that had a breach that was not cured and

5    continued to work for Flowers after that?

6  A.  There are some distributors that we gave

7    breach letters to and they did not cure the

8    breach letters and they went ahead and

9    decided to go ahead and sell their route

10    back to Flowers Baking Company of Opelika

11    prior to the ten-day span, you know, for

12    the contract.

13  Q.  Other than that have there been any

14    distributors that have had breach letters

15    sent to them and they didn't cure the

16    breach?

17  A.  Yes, sir.  We've had some people that we've

18    sent registered mail to -- of course, the

19    registered mail would come back to us where

20    they had abandoned their route and just

21    moved away completely and we never heard

22    from them again.  They might have had some

23    problems with the Internal Revenue.  We had

20

1    that happen one time.  We have one that we

2    don't know what happened to him.  He

3    just -- we went over to his house and

4    nobody was there.  His truck was sitting

5    there with a blown engine.

6  Q.  Have you ever had a route salesman that

7      didn't cure a breach that continued to work

8      for Flowers?

9  A.  Not to my knowledge.

10 Q.  Have you ever had distributors or route

11     salesmen that have lost accounts similar to

12     Sodexho Marriott that didn't get a breach

13     letter at all?

14 A.  Not to my knowledge.

15 Q.  Is it standard operating procedure every

16     time that an account is lost that that

17     distributor will get a ten-day breach

18     letter?

19 A.  I don't know if it's always.  I'm sure

20     there's probably some circumstances in

21     there that maybe someone did not get one,

22     but I can't -- I don't know of any to my

23     knowledge.

21

1  Q.  Can you think of a situation where someone

2       wouldn't get a ten-day notice letter once

3       they lost an account?

4  A.  No, sir, I cannot.

5  Q.  Did you have any conversations with Henry

6       Porterfield after the ten-day breach letter

7       was sent out to him?

8  A.  No, sir.

9  Q.  Have you had any conversations with

10      Mr. Porterfield since that time?

11  A.  No, sir.

12  Q.  When's the last time that you spoke to

13      Mr. Porterfield?

14  A.  I don't know.  I can't remember the last

15      time that I actually spoke with him.

16  Q.  Was it around the time that his contract

17      was terminated?  Was it months before?  Was

18      it years before?

19  A.  No, sir.  I don't know.  I mean, I don't

20      know.

21  Q.  You don't have any --

22  A.  The last time I actually spoke with him,

23      no, sir, I do not know.

22

1   Q.  You don't have any memory of speaking with

2       him in the last five years?

3   A.  I'm sure that I have spoken with him in the

4       last five years, but I don't know the exact

5       date or exactly what it was about or

6       anything.

7   Q.  You don't have any memory of it today?

8   A.  I don't have any memory of it at all, sir,

9       not just today other than, you know, me

10      seeing Mr. Porterfield out there a few

11      minutes ago and said hey.

12   Q.  There's been testimony yesterday and today

13      concerning bread that was placed into the

14      freezer at the Montgomery warehouse

15      location, the Opelika warehouse location,

16      and the Phenix City warehouse location.

17      Are you aware that bread is placed into the

18      freezer at those locations?

19   A.  Yes, sir.  I'm aware that the main use of

20      that freezer is for bun usage.  There

21      perhaps might have been some bread in -- as

22      I refer to as loaf breads.  There may have

23      been some in there, but I'm not exactly

1    sure what was in there.  But I know the

2    biggest part of it was mainly buns.

3  Q.  How long is that bread stored in the

4    freezer?

5  A.  We try not to keep it longer than any three

6    months -- two months to three months.  It

7    is subject to get freezer-burned.

8  Q.  What happens to the bread once it's removed

9    from the freezer?

10 A.  If it's been in there longer than three

11    months, then we remove it and throw it in

12    the trash dumpster because it had freezer

13    burn on it.

14 Q.  If it's being sold to a restaurant, what

15    happens to the bread?

16    When I say bread, buns, bread

17    products.

18 A.  What do you mean by what happened to it?  I

19    mean, what --

20 Q.  Are you aware that the dates are removed

21    from the product?

22 A.  Yes, sir.

23 Q.  Are you aware that new dates are placed

24

1   onto the product?

2 A. Yes, sir.  Most of the time dates are put

3   on them, but there is times where dates

4   were not put on it.

5 Q. Were you the person that authorized the

6   dates to be removed from the product?

7 A. As far as being authorized, I can't say

8   that I was actually authorized to do it,

9   but it's just something that we've been

10   doing.  And I was aware of it, so you could

11   say that I authorized it, yes, sir.

12 Q. At least while you've been the president of

13   the company at Flowers Baking Company of

14   Opelika you've authorized it?

15 A. Yes, sir.

16 Q. Before you were the president -- when you

17   were the vice president, who was the

18   president at that time?

19 A. That was Calvin Rhodes.

20 Q. And did Mr. Rhodes know that bread was

21   being taken out of the freezer and new

22   dates placed on it?

23 A. Yes, sir, I'm -- I believe he was aware of

25

```
 1        that, yes, sir.
 2             When you refer to bread, you are
 3        meaning buns in particular?
 4   Q.   Buns, yes.  Yes.
 5             How do you think -- or how do you know
 6        that Mr. Rhodes was aware of it?
 7   A.   Mr. Rhodes was there when we purchased the
 8        freezers from Burger King.
 9   Q.   Was he aware that the dates were removed
10        from the product?
11   A.   Yes, sir.
12   Q.   Was he aware that the new dates were placed
13        onto the product?
14   A.   Yes, sir.
15   Q.   Have you discussed the fact that you use
16        bread from the freezer with Brad Alexander,
17        the regional vice president?
18   A.   Can you ask that question again for me,
19        please?
20   Q.   Sure.  Have you discussed the fact that
21        bread is taken from a freezer at your
22        Montgomery, your Opelika, and your Phenix
23        City locations and sold to restaurants --
```

26

1    and when I say bread, I'm meaning buns.

2    A.    Yes, sir.

3    Q.    Have you discussed that with Brad Alexander

4    who is the regional vice president of

5    Flowers Foods?

6    A.    Yes, sir, he's aware of it.

7    Q.    How do you know Mr. Brad Alexander is aware

8    of it?

9    A.    Because I told him.

10    Q.    Has he been there when it's been done, I

11    mean, when you've actually been removing

12    dates?

13    A.    No, sir, he hasn't been there.

14    Q.    Why did you tell Brad Alexander that you

15    were doing that?

16    A.    Because we had this pending lawsuit and he

17    needed to be aware of it.

18    Q.    When did you tell him?

19    A.    I don't recall the exact date.  No, sir, I

20    do not.

21    Q.    It's been after the lawsuit has been filed?

22    A.    I'm sure he knew about it before, but I

23    can't recall me telling Brad Alexander we

27

1       have a freezer in those locations and we

2       are putting product in there and selling

3       it.

4  Q.  Are you aware of freezers in any other

5       locations other than those three that I've

6       discussed?

7  A.  No, sir, I'm not aware what other

8       facilities have.

9  Q.  What did Mr. Brad Alexander tell you when

10      you told him that you were placing bread

11      into the freezer?

12  A.  Off the top of my head I don't actually

13      recall.  I mean, you know, said just make

14      sure that we do it -- we're doing it

15      properly, let it thaw properly.

16  Q.  He didn't tell you to stop doing it though?

17  A.  No, sir.

18  Q.  Did you tell Mr. Alexander that you were

19      removing the old dates and placing new

20      dates on the product?

21  A.  Yes, sir.

22  Q.  He didn't tell you to stop that either, did

23      he?

28

1   A.   No, sir.

2   Q.   What about Mr. Lord, Gene Lord?  Is he

3        aware that you have product that's being

4        placed into a freezer and then sold to

5        customers in the restaurant business?

6   A.   I'm not really sure what he knows.

7   Q.   Have you ever discussed it with him?

8   A.   No, sir.

9   Q.   Ever received any memos from him?

10  A.   No, sir.

11  Q.   Ever received any e-mails from him?

12  A.   Excuse me.  I have received e-mails from

13       him, yes, sir.

14  Q.   Dealing with the fact that bread is -- or

15       product is being placed into the freezer

16       and then removed at a later date and sold?

17  A.   No, sir, I haven't had any discussion with

18       him or any e-mail correspondence to that

19       regard with Mr. Lord.

20  Q.   Who besides Mr. Brad Alexander have you

21       discussed the fact that bread is being --

22       buns are being placed into the freezer and

23       then removed at a later date and sold?

29

1    A.    No one other than legal counsel.

2    Q.    No one other than legal counsel?

3    A.    And Mr. Messer, which he knows about it

4          because he was there.

5    Q.    Anything that you recall Brad Alexander

6          telling you after you discussed it with

7          him?

8                    MS. REISS:  Object to the form.

9                         Asked and answered.  You can

10                        go ahead and answer.

11   A.    Would you repeat the question.

12   Q.    Anything at all that you recall Brad

13         Alexander telling you about the fact

14         that -- you know, after you told him the

15         fact that you were placing bread into the

16         freezer, removing the dates, and placing

17         new dates on them?

18                   MS. REISS:  Same objection.

19   A.    No, sir, I can't remember anything specific

20         other than what I've already stated.

21   Q.    And you think that was after this lawsuit

22         was filed or you think it could have been

23         before?

---

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

30

1  A.    I'm pretty sure it was before.  I mean, he

2         was aware that we had the freezers and that

3         we purchased them from Burger King and, you

4         know, knew what we were doing with them.

5         There's emergency situations and that's all

6         the freezers were for was emergency

7         situations.  It's not something every day,

8         but that's -- that practice is being done.

9         And that's all they are for is for

10        emergency situations for fast food

11        restaurants mainly.

12 Q.    Let me ask you this:  Regarding your route

13       salesmen such as Henry Porterfield, does

14       Flowers have the right to direct the manner

15       in which Mr. Porterfield does business?

16                    MR. HISTA:  You want to clarify

17                         the time frame, whether you're

18                         talking about when he was an

19                         employee route salesman or

20                         when he was a distributor.  He

21                         was both.

22                    MR. DAVIS:  When he was a

23                         distributor.

31

```
1    A.    Would you repeat the question, please.
2                      MR. DAVIS:  Read it back, please.
3                      (Requested portion of the record
4                      read by the court reporter.)
5                      MR. HISTA:  Also object to the
6                      extent it calls for a legal
7                      conclusion.
8    Q.    You can answer.
9    A.    As far as us having the rights to actually
10          tell Henry what to do, we don't tell him
11          what to do.  The consumers -- or his
12          customers on his route tell him what to
13          do.  All we can do is advise him what he
14          should do and what has been done in the
15          past and is proven good selling practices
16          and give advice to him.
17   Q.    Let's take Henry for example.  If Henry
18          delivers product outside a restaurant
19          instead of inside the restaurant, do you
20          have the right to tell him, Henry, you
21          can't deliver product outside this
22          restaurant, you need to make sure it's
23          delivered inside this restaurant?
```

32

1    A.    Again, like I stated before, I cannot tell

2          Henry that he needs to deliver product

3          inside the restaurant.  That particular

4          customer needs to tell him that he needs to

5          deliver it inside the restaurant.

6    Q.    And if he --

7    A.    And that's a known given practice that we

8          do is deliver it inside the restaurant, not

9          leave it outside the restaurant.

10   Q.    And if the customer tells him to deliver it

11         inside the restaurant and he doesn't

12         deliver it inside the restaurant, then do

13         you have the right to terminate him?

14                   MS. REISS:  Object to the form.

15                   They can't terminate him.

16   Q.    Terminate his contract.

17   A.    We can't terminate him for leaving product

18         outside of a restaurant.

19   Q.    If the company that he's left the product

20         outside of says we're not going to do

21         business with you anymore because he left

22         the product outside, would that be a breach

23         of the contract?

33

1   A.   Say that again, sir.

2   Q.   If the restaurant comes to you and says,

3        Mr. Bordeaux, Henry left product outside my

4        restaurant, I don't want to do business

5        with Henry anymore, do you then have the

6        right to terminate his contract with

7        Flowers?

8   A.   No, sir.  I would give him a breach letter

9        to get with that particular manager or

10       owner to correct his actions in that

11       particular account.

12  Q.   And if -- go ahead.

13  A.   And you've referred to terminating --

14       excuse me.  I --

15  Q.   Go right ahead.

16  A.   I can't terminate him for anything

17       because -- all I can do is terminate his

18       contract.  I cannot terminate him.  I

19       cannot fire Henry Porterfield.

20  Q.   You can terminate his contract?

21  A.   That's correct.

22  Q.   And in the business world if he's unable to

23       get back in and get that business back,

34

1       then you have the right if you've sent him

2       a ten-day breach letter to terminate his

3       contract with Flowers; is that right?

4 A.   That's correct. I mean, if he can't cure

5       the breach, we have the right to terminate

6       the contract.

7 Q.   So on a distributorship agreement there are

8       restaurants, businesses, grocery stores

9       that are within a geographic area that that

10      distributor has a right to distribute

11      product to; correct?

12 A.   That is correct.

13 Q.   And when Henry became a distributor for

14      Flowers, he came in and he was given the

15      option to purchase a particular area; isn't

16      that correct?

17 A.   Purchase the rights to a particular area,

18      yes, sir.

19 Q.   The rights. And he purchased rights to a

20      particular area; correct?

21 A.   Uh-huh (positive response). Yes, sir.

22 Q.   And those rights are that distributor's

23      exclusive rights; is that correct?

35

1   A.   Yes, sir.

2   Q.   No one else can come in and sell Flowers

3        product within that geographic area that he

4        purchased, can they?

5   A.   Another distributor cannot, but we have the

6        right -- as a company we could come in

7        there and build a satellite warehouse or a

8        satellite thrift store to sell product

9        within that particular territory, yes, sir,

10       we do.

11  Q.   But if I purchased a geographic territory

12       and I paid for that geographic territory,

13       John Doe, if he has purchased a geographic

14       territory right next to mine with Flowers,

15       also, he can't come to the warehouse and

16       pick up bread and go deliver to a store or

17       a restaurant or business right smack dab in

18       the middle of my geographic territory, can

19       he?

20  A.   Only under certain situations.  If that

21       particular distributor was thrown out of

22       that account or there was a problem with

23       the account and they didn't want that

36

1    particular distributor to service them,

2    that distributor could get another person

3    to come into his territory and service that

4    account.  Or if he abandoned that account

5    and we didn't know about it and they called

6    in and we sent somebody, whether it be the

7    one next to him or the one two territories

8    over, to go service the account.  We can --

9    it can be done under certain situations

10   when he has abandoned it or -- and didn't

11   tell anybody and they called in for service

12   or he got another distributor to come in

13   and service it.

14   Q.   If an account has never been abandoned, if

15        it's -- let's just say that there is -- a

16        brand new store comes in -- a brand new

17        restaurant comes into an account and it's

18        within a geographic territory owned by

19        Henry Porterfield.  If John Doe has the

20        account right next to it, can he go over to

21        that geographic area and call on that new

22        customer and get that business in that

23        geographic territory owned by Henry

37

1       Porterfield?

2   A.  Yes, sir, he can.

3   Q.  And what would happen?  He would receive --

4   A.  Only if he gave him permission to do so.

5   Q.  If he did not have permission to do so at

6       all, if John Doe had no permission to go

7       into that geographic area and solicit

8       business, does he have the right to go in

9       and solicit business within a geographic

10      area that's not his?

11              MR. HISTA:  Objection to the

12                  extent it calls for a legal

13                  conclusion, but otherwise the

14                  witness can answer.

15  A.  No.  He -- he doesn't have the rights to go

16      in there.

17  Q.  Only Mr. Porterfield would have the rights

18      to go and call on clients within his

19      geographic area?

20  A.  That is correct.

21  Q.  And, likewise, John Doe -- no one can go

22      into John Doe's area and call on his

23      accounts unless he gives them permission to

38

1    do so.  Otherwise those are his accounts

2    within that area, any new account that

3    comes into that area?

4  A.   Yes, sir.  There's been other distributors

5    that have called on certain accounts that

6    might be in John Doe's territory just

7    because that person knew the owner of that

8    store and by doing so we've picked up that

9    account and all of its sister stores or

10    restaurants and this particular guy had two

11    of them in his territory.  So there are

12    certain circumstances regarding that.  It

13    could happen.  But if he called on that

14    one, John Doe over here would be servicing

15    his restaurant that this distributor or

16    Flowers management person called on at the

17    time to possibly pick up those accounts.

18  Q.   And if John Doe had someone come into his

19    territory and start servicing another

20    business -- and using your example -- I'm

21    sorry.  I have to draw with a pen in my

22    hand -- talk with a pen in my hand.

23        If we've got two geographic areas and

39

1      we've got John Doe over here and we've got

2      Jim Doe over here.  If John has two or

3      three accounts that he's calling on within

4      his geographic territory and a third one

5      moves into Jim Doe's territory, can John

6      Doe call on that account in Jim Doe's

7      territory?

8  A.   Yes, sir, if he wants to call on it.

9  Q.   Will John Doe be compensated if he gets

10     business from that account within Jim Doe's

11     territory?

12  A.   No, sir.  We'll tell him thank you for

13     helping your fellow distributor out, Jim,

14     for helping him --

15  Q.   Jim would get paid for that account;

16     correct?

17  A.   Yes, sir.

18         -- for helping Jim get some business

19     and make some more discount.

20  Q.   Otherwise there would be a breach of the

21     exclusivity provisions in the distributor

22     agreement?

23         MS. REISS:  I object to the extent

40

1          it calls for a legal

2          conclusion.  You can answer.

3   A.   Yes, sir, most cases it would be.  On your

4        little map there, not all territories butt

5        up to each other exactly just for reference

6        purposes.

7   Q.   And since we were discussing it, I'll just

8        go ahead and mark it as Plaintiff's 1 to

9        this deposition.

10               (Plaintiff's Exhibit 1 was marked

11                for identification.)

12  A.   Mr. Davis, can I comment on that?

13  Q.   Yes.

14  A.   We have had that happen where a distributor

15       refused to work it because it was a private

16       label account or a fast food account and

17       their discount was not up to where they

18       thought they could be profitable for their

19       route to service that account.

20  Q.   Has Flowers ever been sued by one

21       distributor over a scenario similar to what

22       we've just been discussing?

23  A.   I don't have any knowledge of that.

41

1  Q.  Did Raymond Price work under you in

2      Montgomery?

3  A.  Not directly under me as a distributor, no,

4      sir.  I think I might have been -- I was

5      sales manager there.  Some district

6      managers or supervisors there under him, I

7      believe.

8  Q.  Are you aware that Raymond Price filed a

9      lawsuit against Flowers?

10 A.  Yes, sir, I'm aware of that.

11 Q.  Do you know what the reason that he filed

12     the lawsuit was?

13 A.  Right at this time, unless I go back and

14     research it, no, sir, I can't -- don't

15     recall.

16 Q.  Tell me about distributors -- I'm sorry --

17     about route salesmen.  If you've got a

18     route salesman and he's calling on a

19     particular geographic area, he also has to

20     pick up bread within that geographic area

21     that is out of code; is that correct?

22             MS. REISS:  Wait a minute.  You're

23                 talking about route salesmen

42

1               now?

2           MR. DAVIS:  I'm sorry.  I'm

3             sorry.  Distributors.

4           MS. REISS:  Okay.

5  Q.   If you've got a distributor, he's got to

6       pick up bread within his area that's out of

7       code?

8  A.   Yes, sir, he's supposed to.

9  Q.   What happens when the distributor picks up

10      bread that's out of code?  What's done with

11      it?

12  A.   It's supposed to be throwed away, but we

13      didn't always have people to throw it

14      away.  We didn't give them credit for it

15      because it has happened quite often -- or

16      at times.  Excuse me.

17  Q.   What about the thrift store?  How does the

18      thrift store work within a -- like at the

19      Montgomery warehouse, where does the bread

20      come from for the thrift stores?

21  A.   It comes from the distributor routes.

22  Q.   Is that bread that's been picked up on

23      those routes?

43

1    A.    Yes, sir.

2    Q.    It's been -- walk me through -- give me an

3          example of what happens from, I guess, the

4          time the bread gets there to the time it

5          gets to the thrift store.

6    A.    Well, the distributor comes in at the end

7          of the day and finishes working all of his

8          accounts and sorts the product out.  And

9          the thrift store operator checks him in

10         based on a sheet of paper that lists all of

11         the products to see if it's all there.

12   Q.    Does the distributor -- I guess to begin

13         with he picks up bread from the warehouse

14         and takes it out to customers out in the

15         field; is that correct?

16   A.    That's correct.

17   Q.    Like Winn-Dixie, you know, Publix,

18         different supermarkets.  At the end of five

19         days has that product been picked up if

20         it's still on the shelf at Publix or

21         Winn-Dixie or whatever by that distributor?

22   A.    The product is picked up by the

23         distributors, yes, sir, and it comes back

44

1      to the outlet stores.

2  Q.   Comes back to the outlet stores.  Does

3      Flowers control the distributor as to how,

4      when, where he's to pick up the bread?

5            MS. REISS:  I'm going to object to

6            the extent it calls for a

7            legal conclusion.  You can

8            answer.

9  A.   We don't control him, no, sir.

10  Q.  Do you tell the distributor that he's got

11     to pick up bread that's, you know, four or

12     five days old based on the code?

13  A.  Picking up what the color tie says for it

14     to be picked up on, yes, sir.

15  Q.  Can the distributor pick up bread that is

16     not out of code and bring it back in?

17  A.  He can pick it up if it's in code, out of

18     code, molded, falling apart in the bag, and

19     bring it back.

20  Q.  Bring it back.  Get credit for it when he

21     brings it back?

22  A.  I didn't say that, but we would make a

23     judgment call at that time.

45

1    Q.    When does he get credit for it?

2    A.    Usually that afternoon when he closes out

3          his hand-held computer.

4    Q.    And what products does he get credit for?

5          Does he get credit for molded bread?

6    A.    Gets credit for all the products that's on

7          that sheet.

8    Q.    And do you tell him that he has to pick up

9          molded bread, also, off the shelf?

10   A.    I don't tell him, but usually he won't have

11         to wait very long.  His customers are going

12         to tell him to get it off of there.

13   Q.    You have a procedure, though, set up

14         whereby bread is color-coded.  It's got

15         different twist ties on it; correct?

16   A.    Correct.

17   Q.    He can walk into a business and look at it

18         and go -- by looking at the twist ties and

19         tell which bread to pick back up; correct?

20   A.    Correct.

21   Q.    That's a procedure that Flowers has set up;

22         correct?

23   A.    Right.

46

1    Q.    Once it's picked up, if it's still usable

2          bread, it's brought back into the thrift

3          store; correct?

4    A.    That's correct.

5    Q.    And when it gets to the thrift store, you

6          instruct him on what to do with the bread,

7          is that correct, as far as bringing it to

8          the thrift store?

9    A.    Oh, yes, sir.  He's already brought it to

10          the store, yes, sir.

11    Q.    Brings it to the thrift store.  What he's

12          to do with it once it gets there?

13    A.    Right.

14    Q.    That he's supposed to sort it, fill out the

15          proper paperwork; is that correct?

16    A.    Usually the computer fills out the

17          paperwork for you on what he's actually

18          leaving in the store.

19    Q.    And the stales -- I think is what you refer

20          to them in the industry as, the stales.

21          That's the -- the product that's stale has

22          to be separated?

23    A.    Excuse me for interrupting.

47

1   Q.   Sure.

2   A.   Stales or returns, yes. Those words are

3        used quite often, yes, sir.

4   Q.   The stales or returns have to be separated

5        when he returns them back. He can't bring

6        them in in bulk and put them all in one --

7        they have to be separated out; correct?

8   A.   That's correct.

9   Q.   And how much is he allowed to bring back to

10       the thrift stores?

11  A.   There's no certain or definite number that

12       we concrete stand by. Each route was set

13       up based on anything under eight percent or

14       seven percent, depending on the volume of

15       the route, as a goal that we shoot for as

16       far as a dollar budget allowed for that

17       particular route. So all routes were

18       different. Some might have been $500 worth

19       of stale that we thought was adequate for

20       that route to cover all of his space in the

21       stores and gain new customers and have

22       repeat sales. Normally a bread rack

23       wouldn't sell if it's very low on product.

48

1    So you have to have some product on the

2    shelf, you know, to maintain your shelf

3    space.

4  Q.  Well, is it five percent, seven percent,

5    eight percent, or does it vary according to

6    the routes?

7  A.  It varies for the routes.  Some routes may

8    have a seven-percent goal.  Some routes may

9    have a ten-percent goal.

10 Q.  And when you say a goal, are you talking

11    about a goal of less than that percentage

12    being stale or being returns?

13 A.  Less as far as percentage based on the

14    amount of dollar sales for that week.

15    Normally the set goal does not change given

16    for that route.  It might be $500 for an

17    example and that equates to eight percent

18    for that route.  Another route, route B,

19    might be $800 stale goal, but that's

20    required because -- due to the customers

21    may insist that -- to give you an example,

22    Mr. Davis, you're not going to leave my

23    bread rack this low.  I want my bread rack

49

1       kept full.  Some of those accounts we're

2       aware of that.  Some accounts we give extra

3       stale dollar budgets to to account for some

4       of those customers that are that demanding

5       and want more product on their shelves out.

6   Q.  And Flowers sets the stale budget allowance

7       or the stale budget goals?

8   A.  For our records we do, but for the

9       distributor -- it's ten percent is what we

10      allow.  Anything over ten percent is taboo.

11  Q.  Anything over ten percent would be excess?

12  A.  Excess of their ten-percent goal, yes, sir.

13  Q.  Of their ten-percent goal.

14  A.  And that's explained to them prior to

15      purchasing that distributor route.

16  Q.  And what happens if a distributor brings in

17      12 percent of stale product back to the

18      thrift store?  Do they get credit for all

19      12 percent?

20  A.  Yes, sir.  It's not -- this is not a

21      cut-and-dried situation on the stale for a

22      given route.  Some routes go over their

23      budget every week.  We know why they go

50

1    over it because that store is that

2    demanding and they need the product.   If

3    they continue to go over their stale goal,

4    we would counsel with them and ask them

5    what's the problem, can we help you, do I

6    need to go see store manager A for you to

7    ask him to, you know, let us cut back the

8    product that's on the shelf and in turn

9    would help us have less stale.

10                   (Plaintiff's Exhibit 2 was marked

11                    for identification.)

12   Q.   Let me show you what I've marked as

13        Plaintiff's Exhibit Number 2.

14   A.   Okay.

15   Q.   What's the date on that memo?

16   A.   January 24th of 2005.

17   Q.   And that's from Michael Lord?

18   A.   Yes, sir.

19   Q.   And you got a copy of this memo it shows;

20        is that correct?

21   A.   Yes, sir.

22   Q.   And it's addressed to the distributors?

23   A.   Yes, sir.

51

1   Q.   Distributors being persons like Mr. Henry
2        Porterfield was at that time?
3   A.   Yes, sir.
4   Q.   And does that basically set forth Flowers'
5        policy regarding the thrift stores?
6   A.   It sets forth something that's not being
7        done that was explained to them prior to
8        them being a distributor and they all
9        agreed to do by signing the contract.
10  Q.   It says -- just read the first paragraph
11       there for me.  If you would, read it out
12       loud.
13  A.   You should be delivering your --
14            MS. REISS:  No.  It has come to my
15                attention --
16  Q.   No.  It's come to my attention.
17  A.   It's come to my attention that we have a
18       few routes that are not following procedure
19       when it comes to delivering stales to the
20       thrift store.  Effective immediately the
21       following procedure must take place.
22  Q.   All right.  So Flowers has set forth
23       procedures that distributors must follow

1       regarding thrift stores; correct?

2   A.  That's correct.  If they want to receive

3       credit for their product, yes, sir,

4       that's -- and this was explained to them

5       prior to them being a distributor also.

6   Q.  And the very first one there says you

7       should be delivering your stales to the

8       thrift store on a daily basis.  Going to

9       the thrift store twice per week will not be

10      acceptable.  Is that correct?  Did I read

11      that correct?

12  A.  That's what it states, yes, sir.

13  Q.  So Flowers controls the distributors by

14      telling them how many days a week they must

15      go to the thrift store to deliver product?

16              MS. REISS:  I'm going to object to

17                  the extent it calls for a

18                  legal conclusion.  You can

19                  answer.

20  A.  You made the comment of us controlling

21      them.  No, sir, it does not control them.

22      This is standard procedures that we put

23      forth prior to them becoming distributors

1    and it was all explained to them that that

2    was part of the agreement that they had to

3    do.  And all we were doing is reinforcing

4    the procedures that had already been

5    explained to them.

6  Q.  Well, the procedures are that they have to

7    go to the thrift store on a daily basis;

8    correct?

9  A.  If they have any stale, yes, sir.

10  Q.  And the procedure as set forth in this

11    paragraph numbered number one, going to the

12    thrift store twice per week will not be

13    acceptable; is that correct?

14  A.  That's what it states.

15  Q.  And not be acceptable from Flowers?

16    Flowers won't accept it if you go to the

17    stores only twice a week?

18  A.  That's what it states, but we usually

19    accepted it.  Because it happened where

20    somebody -- you know, several didn't go

21    twice -- you know, every day.  And we had

22    to get with all of those distributors that

23    violated that particular item right there.

54

1    Q.    But you want them to come to the store on a

2          daily basis with their stale product if

3          they have any?

4    A.    Yes, sir.

5    Q.    The second paragraph:  You should be

6          running two copies of your stale report.

7          You need to leave one copy with the store

8          and keep one for yourself.  From the copy

9          that you keep for yourself, be sure that

10         you send a signed copy into the bakery each

11         day.  The office will be checking to be

12         sure that a signed stale sheet is sent in

13         each day.  Does that set forth the

14         procedure that the distributors are to

15         follow with regard to stale reports?

16   A.    Yes, sir.  It says what they're supposed to

17         do.  It hadn't -- it's nothing that hadn't

18         been explained to them before.  It's just

19         refreshing their memory on what they're

20         required to do.

21   Q.    Number four, all stales must be separated.

22         What does that mean?

23   A.    You don't want your four-inch buns mixed in

55

1    with your five-inch buns and your

2    four-and-a-half-inch size bun or two or

3    three cakes mixed in there between them.

4    You know, in a particular stack some of

5    those four-inch and five-inch buns were

6    stacked way over here and below it was some

7    loaf bread, below it were cakes, and then

8    over on another stack you had the same

9    thing.  They should be separated by item

10   and grouped together by those items.

11   Q.  And Flowers requires that they be

12       separated; correct?

13   A.  Yes, sir.

14   Q.  Number five, out of code has been out of

15       hand.  Excess out of code will not be

16       tolerated.  What does that number five

17       mean?

18           Out of code has been out of hand.  Does

19       that mean that there has been too much

20       out-of-code product?

21   A.  Most of the time when somebody says that

22       that's what they mean, yes, sir.

23   Q.  What does it mean when it says excess out

56

1      of code will not be tolerated?

2  A.   It means it will not be tolerated.  There

3      again, it happened and we would counsel

4      with them about having an excessive amount

5      of out of code.  And we would counsel with

6      them.

7  Q.   The last paragraph, if you would, read that

8      for the record for me there.

9  A.   If the above procedures are not followed,

10     we will have no choice but to charge your

11     stale back to you.  If you have any

12     questions, please contact your sales

13     manager or director of sales.

14  Q.  So if the distributors do not follow the

15     procedures that Flowers sets forth in

16     detail in this memo which I've marked as

17     Plaintiff's Exhibit 2, then Flowers charges

18     stales back to that distributor, don't

19     they?

20  A.   No, sir.

21  Q.  Doesn't the memo say we have no choice but

22     to charge your stales back to you?

23  A.   Yes, sir.  The only time that we did that

57

1          was when we had had habitual offenders that

2          we have already talked to about this

3          problem and it continued and continued and

4          continued and continued.  And when -- you

5          know, when your bucket fills up with water,

6          you've got to do something with it.  And

7          we'll have enough and we'll usually go

8          ahead and charge that particular product

9          back to a distributor because it was a

10         chronic failure of them to follow

11         procedure.

12    Q.   You would agree with me that Flowers

13         determines what the distributors have to do

14         with regard to the thrift store.  You've

15         set forth what they've got to do; is that

16         correct?

17    A.   That is correct.  And it also states that

18         in the contract.

19    Q.   It also sets forth how it's to be done by

20         the distributors --

21    A.   Yes, sir.

22    Q.   -- and when it's to be done by the

23         distributors?

58

```
 1   A.   Yes, sir.
 2                  MR. DAVIS:  Why don't we take a
 3                   five-minute break.
 4             (A lunch recess was taken.)
 5   Q.   (Mr. Davis continuing:)  If you would, look
 6        at paragraph 11.1.  And if you would read
 7        paragraph 11.1 into the record for me.
 8   A.   Maintaining a fresh market is a fundamental
 9        tenet of the baking company.
10        Accordingly --
11                  MS. REISS:  Industry.
12   A.   I'm sorry.  Of the baking industry.
13        Accordingly, out-of-code product on the
14        market is a material breach of this
15        agreement.  Repeated violations will be
16        grounds for termination of the agreement.
17   Q.   Maintaining a fresh market is a fundamental
18        tenet of the baking industry.  What does
19        that comment mean to you?
20   A.   That they will maintain a fresh market in
21        the industry, I mean, as far as the
22        accounts that's serviced.
23   Q.   Is that fresh product?
```

59

```
1    A.    That means that fresh product that is of
2          saleable nature.
3    Q.    Okay.  If we look back at paragraph 2.2, it
4          describes products.  If you would, read for
5          me what 2.2 states.
6    A.    Shall maintain fresh baked goods, as
7          specifically described in Exhibit B,
8          attached hereto and made a part hereof
9          which is -- are currently produced and/or
10         distributed by company, provided, however,
11         that the distribution rights granted herein
12         shall survive only so long as company has
13         the license or franchise rights for such
14         goods and company produces and/or sells
15         such goods.
16   Q.    Does Flowers advertise through any media
17         that they sell fresh baked products?
18   A.    I'm not sure.  I'm trying to think over
19         some of our commercials what they might
20         say, but I don't recall ever any
21         advertising stating that it says fresh.
22   Q.    Does the FDA allow Flowers or bakers to use
23         the word fresh in their advertising, if you
```

60

1 know?

2     MS. REISS:  I'm going to object to

3      the extent it calls for a

4      legal conclusion.

5 A. I'm sure -- you know, I don't know exactly

6  what they expect as far as that -- in that

7  regards.  I do not know.

8 Q. What's your definition of fresh?

9 A. Fresh is anything that is of good quality

10  and it's still in good shape as far as it

11  being -- any product for that matter, you

12  know, as far as it being edible or -- you

13  know, it's still good for you.  It wouldn't

14  be harmful, you know, for eating.

15 Q. Okay.  Do you think that freezing bread

16  still makes it be fresh as Flowers would

17  describe fresh or define fresh?

18 A. I think freezing bread does not distort the

19  actual product, whether it be Flowers'

20  product or anybody else's product.  I don't

21  think it distorts the product as far as the

22  quality and the edible goodness of that

23  particular product.

61

1   Q.   Would you agree with me that freezing is a

2        form or a method of preserving a product?

3   A.   It extends the product.

4   Q.   It allows you to take fresh product and

5        preserve its freshness for a while.  Would

6        you agree with that statement?

7   A.   It extends the actual shelf life of that

8        product because it is suspended.  I mean,

9        it's in --

10  Q.   It's suspended.  It's preserved?

11  A.   I don't know if it's preserved.  If it's

12       preserved, it's something that's going to

13       really distort the -- it changes the

14       product itself when you preserve something.

15  Q.   Well --

16  A.   And I'm speaking of that in regards to

17       grandmother making, you know, fig preserves

18       or what have you.

19  Q.   Well, let's take another example.  And I'll

20       use my grandmother.  I remember she had

21       blueberry trees.  And if you went out and

22       picked a bucket of blueberries and brought

23       them in and set them in the sink two or

1    three days they would all be mush.  If you

2    took the same blueberries and washed them

3    and put them in a bag and put them in her

4    deep freeze, it would preserve them or

5    prolong them.  Would you agree with that?

6 A.  I agree with what your grandmother does,

7    yes.  That's a good --

8 Q.  I mean, it preserves it; right?

9 A.  Right.

10 Q.  It keeps it from spoiling?

11 A.  That's true.

12 Q.  Do you think that the American Heritage

13    Dictionary is an authority on the

14    definition of words?

15 A.  I can't really say yea or nay.

16 Q.  Well, let me see if you agree or disagree

17    with this definition of fresh found in the

18    American Heritage Dictionary.  Not

19    preserved as by canning, smoking, or

20    freezing, for example, fresh vegetables.

21    Do you agree or disagree with that

22    definition?

23 A.  Without actually having a dictionary in

63

1           front of me, I'm going to disagree.

2     Q.    All right.  Let me give you another

3           American Heritage Dictionary definition of

4           the word fresh.  Recently made, produced,

5           or harvested, for example, fresh bread.  Do

6           you agree with that definition?

7     A.    No, sir.

8                    MS. REISS:  Just for clarification

9                         of the record, which American

10                        Heritage Dictionary are you

11                        getting these definitions

12                        from?  Which edition?

13                   MR. DAVIS:  I don't know which

14                        edition.

15    Q.    What is it about those definitions that I

16          quoted to you that you disagree with?

17    A.    Well, I don't know if those are exactly how

18          it's written in the dictionary.  All I got

19          to go on is what you're sitting here

20          telling me.

21    Q.    Well, let's say that it's not -- let's just

22          say that that's my definition.  Do you

23          disagree with my definition?

64

1    A.    As I stated awhile ago, I disagree and I

2          disagree with your statement of the

3          definition of that.

4    Q.    And what is it about what I said that you

5          disagree with?

6    A.    Every bit of it.

7    Q.    Okay.  So you disagree that recently made,

8          produced, or harvested -- you disagree with

9          that.  That's not a definition of fresh?

10   A.    That's correct.

11   Q.    You disagree with not preserved as by

12         canning, smoking, or freezing, for example,

13         fresh vegetables.  You disagree with that

14         definition?

15   A.    Yes, I do.

16   Q.    And do you have a basis or a reason why you

17         disagree with it?

18   A.    There's several terms for freshness.  If

19         you -- you can use your terminology of

20         freshness.  You can use my terminology of

21         freshness.  But as far as freezing product,

22         it does not preserve it.  All it does is

23         put it in a suspended state.  It's not

65

1    preserving it to mean it's going to last

2    there forever and ever and ever.  It's a

3    temporary state, the freezing part is, and

4    that's what I'm calling as far as fresh.

5    It's still fresh products in a suspended

6    state for a small length of time.  And we

7    don't keep anything in our freezers more

8    than two to three months.

9  Q.  So you as president of Flowers Baking of

10    Opelika would define fresh to include

11    freezing as long as it's only frozen for a

12    two to three-month period?

13  A.  No, sir, I disagree with that.  That's your

14    assessment.

15  Q.  All right.  Well, tell me what your

16    assessment of -- as president of Flowers

17    Baking Company your definition of the word

18    fresh.

19  A.  My definition of fresh is fresh baked

20    quality of products that's no -- not longer

21    than 14 to 16 days old if it has not been

22    frozen.  If the product has been -- half of

23    that length of that time, the 14th or 16th

66

1   day, if it's frozen, the product is

2   suspended and it is still in good shape

3   three months from the time that you froze

4   that product.  It is still considered fresh

5   product.

6   Q.   So your definition and Flowers' definition

7        is that if it is frozen, it is suspended

8        and for a two to three-month period it's

9        still considered fresh?

10  A.   Yes, sir, it's still considered fresh.

11  Q.   Do you know what the Food and Drug

12       Administration defines fresh as?

13  A.   No, sir, I do not.

14  Q.   Do you know if Flowers Baking Company is

15       subject to the Food and Drug

16       Administration?

17  A.   Yes, we are subject to the Food and Drug

18       Administration.  But with regards to

19       freshness, I do not know that specifically.

20  Q.   Is changing the code on product a breach of

21       the distributor agreement?

22            MS. REISS:  Object to the extent

23                 it calls for a legal

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

67

1                         conclusion.  You can answer.

2    A.   No, sir.

3    Q.   So you can change the date on products and

4         not be in breach of the distributor

5         agreement?

6                    MR. HISTA:  Objection.  Vague.

7    Q.   Is that --

8    A.   Excuse me.  Go ahead.  Ask me again,

9         please, sir.

10   Q.   So you can change the date or the product

11        code on a product and not be in violation

12        of the distributor agreement?

13   A.   Yes.

14                   MS. REISS:  Same objection.

15   Q.   Yes, you can?

16   A.   In certain senses, yes, sir.

17   Q.   When can you?

18                   MS. REISS:  You're talking about

19                      the buns that come out of the

20                      freezer?

21                   MR. DAVIS:  I'm just asking him

22                      when he can change the date

23                      and not be in violation of the

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

68

1          distributor agreement.

2                    MS. REISS:  Well, I think you need

3                         to clarify, then, when -- if

4                         and when that is ever done.

5     A.    When it is done, it is product that's came

6          out of our freezers and the date was

7          changed, yes, sir.

8     Q.    And that's not a violation of the

9          distributor agreement?

10    A.    No, sir.  Mainly because we don't come and

11         ask for those buns.  We don't sit there and

12         say, well, Mr. Davis, I have some steak

13         buns or freezer buns and if you run short

14         and you need them.  They came and asked us

15         for -- they meaning other distributors as

16         well as Mr. Porterfield -- for product out

17         of the freezers because they underordered,

18         didn't order properly.  A busload of

19         baseball players came through where they

20         had a tournament in a certain area and they

21         sold more than was anticipated.  That's

22         when the freezer product was used.

23    Q.    And it's not a violation -- my sole

1   question, though, it's not a violation of

2   the distributor agreement for Flowers to

3   change the date on product?

4   A.   No, sir.  No, sir.

5   Q.   Well, would it be --

6   A.   Not in that regard that I just mentioned

7        it's not.

8   Q.   Would it be a violation for a distributor

9        to change the date on product?

10  A.   It depends on the circumstances, what it

11       was, what context it was being used or why

12       he was doing it.

13  Q.   But you never tell the customers in the

14       field, the restaurants, that you've changed

15       the date, do you?

16                MS. REISS:  Object to the form.

17                     Facts not in evidence.  You

18                     can go ahead and answer.

19  A.   Yes, sir.  We have told them in the past

20       sometimes at the local units, sometimes no,

21       just, you know, to cut down on the

22       intermediate local level harassment that

23       would possibly come as far as them maybe

70

1       being upset because we had, you know,

2       changed the --

3   Q.   Frozen product?

4   A.   Frozen product.

5   Q.   And you changed the date on it?

6   A.   Yes, sir.

7   Q.   And you could see where that would cause

8       certain customers to be irate about that,

9       can't you?

10  A.   Because they wouldn't understand.  But if

11      they got upset, we would explain to them

12      what the procedure was for that particular

13      incident.  It was an emergency situation

14      and only done on emergency situations.  It

15      was done to take care of the customer's

16      needs, whether it be on Mr. Porterfield's

17      route or any other route.  It was only done

18      on extreme emergency cases, and if they

19      asked, we would tell them.  If they asked

20      the distributor and he don't know, all they

21      had to do was pick up the phone and call us

22      and ask us or we would have a manager over

23      there to explain it to them what actually

71

1    happened.  We took these particular buns

2    out of the freezer.  We did that as a

3    precautionary measure because you, the

4    customer, had a certain item on sale and

5    you used -- you gave us the estimated usage

6    increase for your particular unit.  You

7    used more buns than what the estimated unit

8    possible requirement would be.

9    Q.   But you didn't disclose it to the customer?

10             MS. REISS:  Object to the form.

11             Asked and answered.

12   A.   Sometimes we did.  Sometimes we didn't,

13        sir.

14   Q.   Would you pay the same for frozen bread as

15        you would for bread that had never been

16        frozen?

17   A.   Yes, sir, if it's in good quality

18        product -- in good -- if it's in good

19        quality of product, yes, sir, I would.

20   Q.   And you think that consumers should pay the

21        same for frozen bread that's in good

22        quality as opposed to bread that's never

23        been frozen?

72

1        MS. REISS:  I'm going to object to

2        the use of frozen bread.  We

3        have clarified more than once

4        it's buns to specific

5        restaurants on specific

6        occasions.  I don't want there

7        to be -- it to be misconstrued

8        that it's going to a grocery

9        store or anything like that on

10       the record.

11  Q.  Are buns bread?  Are they made from dough,

12     or are they not bread?

13  A.  It's really all bread, but we refer to buns

14     as buns and bread as bread.  I mean, but --

15  Q.  But buns are still bread?

16  A.  But all of it combined is bread.  You know,

17     if you want to clarify -- classify that as

18     breads.

19  Q.  And do you know that when buns are

20     delivered to restaurants, that restaurants

21     are going to turn around and sell them to

22     consumers that come in there and buy hot

23     dogs and buy Chili Pups and whatever they

73

1        may buy at those restaurants.  You know

2        that ultimately the consumer is going to

3        receive that bun; correct?

4    A.  If we took some out of the freezer and a

5        distributor took them to that unit after he

6        had called us telling them that he wanted

7        them and they used them in that particular

8        restaurant for an emergency situation, yes,

9        sir.

10   Q.  Is one reason -- well, strike that.

11           By changing the date on bread are you

12       representing that the bread is good to that

13       new date?

14   A.  By changing the date to a different date?

15   Q.  Yes.

16   A.  Yes, sir.  Still good through the date that

17       we would put on it, yes, sir.

18   Q.  And you put basically two days on it; is

19       that right?

20   A.  Yes, sir, two days after we take something

21       out of the freezer.

22   Q.  And why don't you leave the original dates

23       on it?

74

A.    Mainly as a precautionary measure in case
we ever have a recall situation.  It gives
the time and the date that it was baked and
what producing plant it came from is the
main reason -- main and only reason just
about it.

Q.    Well, if customers get buns -- if a
restaurant gets a bun and it's got a date
that's three months old, would that
cause -- potentially cause a problem with
that customer?

A.    I guess if they got buns that was three
days old -- I mean --

Q.    Three months old.

A.    -- three months old, yes, sir, there would
probably be a problem.  I don't -- it would
probably be molded to -- probably wouldn't
be nothing left in the bag.

Q.    Well, if they got a product and the product
said that it was manufactured three months
earlier but it wasn't molded, do you think
that could cause some concern to that
customer?

75

1  A.    Well, I don't see how a product that's

2        three months old is not going to be molded.

3  Q.    Unless it's been frozen?

4  A.    Unless it's been suspended.

5  Q.    Frozen?

6  A.    Frozen would be suspended, yes, sir.

7  Q.    How else can you suspend something other

8        than freezing it?

9  A.    I don't know if you can.

10 Q.    Whose clients are the restaurants that buy

11       bread from Flowers?

12              MS. REISS:  Object to the form.  I

13                      don't even -- I don't

14                      understand that question.

15 A.    I don't understand your question, whose

16       clients.  I mean ...

17 Q.    Whose -- one second.

18              MS. REISS:  It is after lunch.

19 Q.    Let me ask you this:  As far as Mr. Henry

20       Porterfield did, what particular part of

21       the distributor's agreement did

22       Mr. Porterfield violate?

23              MS. REISS:  Let him look at it.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

76

1    MR. HISTA:  What time frame are

2        you referring to in that

3        question?

4    MR. DAVIS:  That caused him to be

5        terminated -- caused his

6        contract to be terminated,

7        same thing.

8    MS. REISS:  No.

9  A.  Number 16.3, curable breach, where he

10     didn't cure his breach.

11 Q.  What does 16.3 say?

12    MS. REISS:  You want him to read

13        the whole thing?

14    MR. DAVIS:  Yes.

15 A.  In the event of failure of performance by

16     distributor, customer must give distributor

17     ten business days --

18    MS. REISS:  Company.

19 A.  -- company must give distributor ten

20     business days written notice within which

21     distributor may cure his or her failure of

22     performance.  If distributor does not cure

23     such failure of performance within this

```
 1        ten-day period, company may thereafter

 2        terminate this agreement and distributor

 3        shall have no right -- further right to

 4        cure.  Furthermore, the parties agree that

 5        repeated violations constitute a chronic

 6        failure of performance and threaten

 7        substantial harm to company's business and

 8        in such event the company shall be entitled

 9        to termination -- terminate this agreement

10        and distributor shall have no further

11        rights to cure.

12   Q.   Now, what failure of performance was it

13        that Mr. Porterfield breached?

14   A.   He did not provide adequate product service

15        to Sodexho Marriott account.

16   Q.   Where in the contract does it require

17        Mr. Porterfield to provide adequate product

18        service to Sodexho Marriott?

19   A.   Well, to all of his accounts on his route

20        and not specifically Sodexho Marriott.  But

21        that was the one that you had made

22        reference to as far as what the curable

23        breach was.
```

78

1   Q.   Where in the contract does it provide that

2         Mr. Porterfield shall provide adequate

3         product service to his accounts?

4   A.   It would be in 5.1, obligation of

5         distributor.

6   Q.   What does it say in 5.1?

7   A.   Distributor agrees and covenants to use his

8         or her best effort to develop and maximize

9         the sale of company's product to outlets

10        within his or her territory and service his

11        or her territory in accordance with good

12        industry practice as defined above.

13  Q.   So Mr. Porterfield would have to use his

14        best efforts to service the account; is

15        that correct?

16  A.   That is true.

17  Q.   And if he doesn't use his best efforts to

18        service the account, then according to

19        Flowers he would be in breach of it; is

20        that right?

21               MR. HISTA:  That's

22               mischaracterizing his

23               testimony.  He's saying in

79

1          accordance with good industry
2          practice.
3    Q.    Who determines good industry practice?
4    A.    Who does?
5    Q.    Yes.
6    A.    We do.
7    Q.    Flowers does?
8    A.    As far as, you know, whatever the normal
9          good business industry practice would be,
10         whether it be Flowers Baking Company
11         servicing good accounts or Frito-Lay
12         servicing their accounts.  Whatever the
13         industry practice is.
14   Q.    And is there someplace you can go look to
15         see what industry practice is?
16   A.    Not necessarily.  If you're making your
17         customer happy and taking care of all of
18         his customer's needs, whether it be on
19         bread, meat, potato chips or whatever, and
20         providing him with quality service and
21         quality product and he's happy.  But that
22         wasn't the case.
23   Q.    Who makes the determination if the

80

1       distributor is using his best efforts?

2  A.  Everybody that he's affiliated with with

3       Flowers.

4  Q.  So Flowers --

5  A.  And the district manager.  Could be the

6       sales manager.

7  Q.  All right.  Sales manager does.  Who else?

8  A.  That's probably the two that he would come

9       in contact with more often than anyone else

10      on a day-to-day basis.

11  Q.  Okay.  Who else at Flowers?

12  A.  I would just leave it at that as far as any

13      direct, you know, association with that

14      individual.

15  Q.  Did you determine if Mr. Porterfield was

16      using his best efforts?

17  A.  I guess I did since I was the one that had

18      the final say-so as far as terminating the

19      contract, mainly because of all the past

20      performances from Mr. Porterfield.

21  Q.  Well, you've already told us that you

22      didn't consider those in deciding to

23      terminate this contract, that the reason

1    you terminated this contract was because of

2    the Sodexho Marriott; is that correct?

3  A.   Right.  But --

4              MS. REISS:  Object to the form.

5              You're mischaracterizing his

6              testimony.

7  A.   It is not -- the slate is not wiped clean,

8    Mr. Davis.  Everything is -- the past is

9    still part of his distributorship, how he

10    performed, how he did his job, how he

11    handled his customers, how he grew his

12    business, and it wasn't done.

13  Q.   You didn't terminate him on any of those

14    other curable breaches, did you?

15  A.   No, sir, we didn't.  But we had --

16  Q.   Did you have the right to?

17  A.   We had the right to do it.

18  Q.   Did you have the right to --

19  A.   Yes, we did.

20  Q.   -- terminate him even if he cured the

21    breach?

22  A.   On any -- not just one or two, Mr. Davis.

23  Q.   I'm just asking, did you have --

82

1    A.    But the chronic --

2    Q.    Did you have the right --

3              MS. REISS:  Let him finish

4                   answering the question.

5              MR. DAVIS:  That's fine.

6    A.    After a chronic abuse on his part, we could

7          have terminated the contract, yes, sir.

8    Q.    You didn't terminate it, did you?

9    A.    No, sir.

10   Q.    You didn't terminate it any of the times up

11         until -- the only time you terminated it

12         was on March the 17th, 2005?

13             MS. REISS:  Object.  That's

14                  incorrect information or facts

15                  not in evidence.

16   Q.    In March of 2005 you terminated it;

17         correct?

18   A.    Yes, sir.

19   Q.    Did you ever terminate it prior to March

20         2005?

21   A.    No, sir.  In context to -- we terminated

22         prior contracts, yes, sir.

23   Q.    You've terminated prior contracts, but you

```
 1           didn't terminate Mr. Porterfield's
 2           relationship with Flowers, did you?
 3   A.      No, sir.
 4   Q.      Did you decide that Mr. Porterfield was not
 5           servicing his territory in accordance with
 6           good industry practices?
 7   A.      Yes, sir, with the information that was
 8           gathered by Michael Lord and Grady Messer.
 9   Q.      Does good industry practice include
10           providing fresh product?
11   A.      Yes, sir, fresh product that is in saleable
12           condition, in edible condition.
13               Mr. Davis, there's no difference in
14           taking buns out of our freezer that the
15           distributors wanted to take to their
16           accounts than you having a party at your
17           house.  Your wife bought 12 packs of buns,
18           whether it be Flowers, Sara Lee, Pepperidge
19           Farm buns or whatever.  She didn't use them
20           all.  She stuck four packs of them in the
21           freezer.  Three weeks later when you had a
22           group of friends over at your house she got
23           them out of the freezer and used them and
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

84

1      ate them.  And I am sure that you have done

2      that.  Your wife has done that.  I have

3      done that.  Probably everybody that we know

4      of has done that.

5   Q.  I understand that.

6   A.  There's nothing wrong with that product.

7   Q.  There's nothing wrong with freezing

8      product.  I agree with that.  The

9      difference is that there is something wrong

10     with freezing product that you represent to

11     be fresh.

12              MR. HISTA:  Objection.

13              Argumentative.

14  Q.  Do you think that it's fine to distribute

15     product that you represent to be fresh when

16     you have frozen it or suspended it as you

17     would say?

18  A.  Yes, sir, I do.

19  Q.  And that's Flowers' position; right?

20  A.  And it's my position.  I think it's okay.

21     You asked me did I think --

22              MS. REISS:  I'm going to object to

23              the extent that he is not a

85

1              30(b)(6) witness.  He is

2              testifying as Steve Bordeaux;

3              okay?

4         MR. DAVIS:  He's also

5              testifying --

6    Q.   Are you testifying today as the president

7         of Flowers Baking Company of Opelika?

8    A.   Yes, ma'am -- yes, sir.

9    Q.   Is there anybody at Flowers Baking Company

10        of Opelika that -- in any corporate

11        capacity that has more authority than you

12        do at Flowers Baking Company of Opelika?

13   A.   No, sir.

14             MR. DAVIS:  Why don't we take

15                  about a five-minute break.

16        (A brief recess was taken.)

17   Q.   (Mr. Davis continuing:)  Under the

18        distributors's agreement there are two

19        kinds of breaches; correct?

20   A.   Yes, sir.

21   Q.   A noncurable breach and a curable breach;

22        correct?

23   A.   Yes, sir.

86

1    Q.    Mr. Porterfield wasn't terminated for a

2          noncurable breach, was he?

3                    MS. REISS:  Object to the form.

4                    Go ahead and answer.

5    A.    No, sir.  It was a curable breach that

6          he ...

7    Q.    And curable breach is listed under 16.3 and

8          curable breach is the one that gives you

9          ten days to correct the problem; correct?

10   A.    I'd have to review it to see, sir.

11              16.3 is curable.  16.2 is noncurable.

12   Q.    And 16.3 is the one that gives you the

13         ten-day time period; correct?

14   A.    Yes, sir.

15   Q.    Actually 16.3 has two parts to it, doesn't

16         it?

17              Why don't you read --

18   A.    Let me read it right quick.

19              Okay.

20   Q.    The way I read it -- and you tell me if I'm

21         wrong -- is that under 16.3, which covers

22         curable breaches, you can determine that a

23         distributor has a curable breach and give

1    him ten days to cure it.  That's one way

2    under curable breach.  The second way under

3    16.3, in some situations the company can

4    determine that there is no cure at all and

5    terminate the person; is that right?

6  A.  I'm sorry.  Would you repeat that.

7  Q.  Sure.  Let me show you.  Let me --

8  A.  Okay.

9  Q.  If you don't mind, I'll come around there

10    and we'll look at it together.

11        Under curable breach, you've got the

12    ten-day part of curable breach where you

13    give them ten days.  Furthermore, the

14    parties agree that repeated violations

15    constitute a chronic failure of performance

16    and threatens substantial harm to the

17    company's business, and in such event

18    company shall be entitled to terminate this

19    agreement and distributor shall have no

20    further right to cure.  You read that?

21  A.  Yes, sir, I read that.

22  Q.  And in situations where the company

23    determines that there's a chronic failure

88

1        or it threatens substantial harm to the

2        company's business, you don't even have to

3        send a ten-day letter to the distributor.

4        You can just terminate and he have -- the

5        distributor shall have no further right to

6        cure.  Is that the way you read that?

7  A.    Yes, sir.

8  Q.    In Mr. Porterfield's situation under 16.2,

9        he didn't receive a noncurable breach

10       letter, did he?

11  A.    No, sir.

12  Q.    Under 16.3, Mr. Porterfield received a

13       curable breach letter which gave him ten

14       days to correct it.  He didn't receive a

15       letter that gave him no right to cure under

16       16.3, did he?

17  A.    Excuse me.  No, sir.  It also says right

18       here after failure of performance within

19       ten-day period the company may thereafter

20       terminate.  We didn't have to do anything

21       if we didn't want to.  We were subject to

22       do whatever we wanted to after that ten

23       days.

89

1    Q.   It was up to the company to do it?

2    A.   Yes, sir.

3    Q.   Whether or not a distributor is in breach

4         of the contract is determined solely by

5         Flowers, isn't it?

6    A.   More or less, yes, sir.

7    Q.   Flowers is the ultimate decision-maker in

8         deciding whether or not the distributor is

9         in breach; right?

10   A.   Yes, sir.  But to my knowledge, Mr. Davis,

11        we have never ran anybody off in regards to

12        terminating their contract that didn't

13        justifiably warrant doing so.

14   Q.   And that was based on Flowers' opinion that

15        it justifiably warranted doing so?

16   A.   Based on past history, past write-ups, past

17        ten-day letters, et cetera, et cetera, et

18        cetera.

19   Q.   But my point is Flowers decides that;

20        correct?

21   A.   Yes, sir.

22   Q.   Who drafts the contract that the

23        distributor signs?

90

1    A.    In the years past when I was VP I did some

2          of them.  At the present time Michael Lord

3          does some of them along with the director

4          of sales.

5    Q.    Does the distributor get to negotiate on

6          the contract regarding what terms should be

7          in here or what shouldn't be or is the

8          distributor given this copy to sign?

9    A.    He's given that copy to sign as far as the

10         contract.

11   Q.    Let me ask you a question about what I want

12         to mark as Plaintiff's Exhibit Number ...

13               (Brief interruption.)

14               (Plaintiff's Exhibits 3, 4, and 5

15               were marked for identification.)

16   Q.    Let me show you what I've marked as

17         Plaintiff's Exhibit Number 3 to begin

18         with.  Are you familiar with this document?

19   A.    Not this particular one.  I do know it's a

20         distributor's statement.

21   Q.    Who at Flowers is the -- do you have a

22         comptroller or an accountant or someone in

23         a position that actually determines all of

91

1      these figures that are placed on like

2      Plaintiff's Exhibit 3?

3  A.  The numbers speak for themselves as far as

4      where they go and everything.  But, yes,

5      sir, we have a controller at our facility.

6  Q.  Who is the most knowledgeable person at

7      your facility regarding how these figures

8      are computed and determined?

9  A.  I wouldn't know exactly who was the best.

10     Jerry Woodham, our controller, is very

11     good, and then, of course, Michael Lord is

12     also very good as far as determining these

13     numbers or where the numbers arrive from.

14 Q.  Do you actually participate in determining

15     how all these numbers are arrived at?

16 A.  No, sir.

17 Q.  So if I asked you a specific question about

18     how they came up with a relay adjustment,

19     would you be able to tell me or would you

20     have to defer me to someone else to answer

21     that question?

22 A.  Somebody else would have to answer that

23     because I could not explain it to you.

```
 1   Q.   I went ahead and marked Plaintiff's Exhibit
 2        3, 4, and 5.  I think they're all the same
 3        type documents, but I think they're just
 4        for separate years.  If you would, just
 5        confirm that for me.
 6   A.   It's three different ones, yes, sir.
 7   Q.   And you think your comptroller would be the
 8        best person to answer questions about how
 9        those figures were derived?
10   A.   I don't know if he would be the best.
11        Either him or either Michael Lord could
12        explain it to you.
13               MR. DAVIS:  That's all the
14                   questions I've got.
15               MS. REISS:  I've got a few.
16                   EXAMINATION
17   BY MS. REISS:
18   Q.   Mr. Bordeaux, we were talking about the
19        thrift store earlier.  Does Mr. Porterfield
20        have to turn in his product to the thrift
21        store?
22   A.   No, ma'am, he doesn't have to.  But we had
23        told everyone that we would buy their
```

93

1    products back, you know, if it's brought to

2    us daily.  But they don't have to sell it

3    back to us.

4    Q.  So it's his option whether or not to sell

5        his product back on his truck -- that ends

6        up back on his truck to the thrift store?

7    A.  He could go and sell it to some hog feeder

8        if he wanted to, but we wouldn't give him

9        credit.

10   Q.  Or he could just throw it off the back of

11       his truck into a trash can if he wanted to?

12   A.  Ride by the Alabama River and throw it off

13       in the river if he wanted to.

14   Q.  But if he sells it back to the thrift

15       store, he needs to follow a few certain

16       procedures; is that correct?

17   A.  That is correct, which we covered earlier

18       with Mr. Davis.

19   Q.  Has Mr. Porterfield ever mentioned product

20       that has come out of the freezer to you in

21       any manner, under any circumstance?

22   A.  No, ma'am.  Not that I recall, no, ma'am.

23   Q.  Do you know if he has ever mentioned it to

94

1      anyone else?

2 A.   I -- I don't know.  I wouldn't know that.

3 Q.   Have you heard about that he's mentioned it

4      to anyone else?

5 A.   No, ma'am.

6 Q.   Did you ever know he had an issue with

7      product coming out of the freezer before he

8      filed this lawsuit?

9 A.   No, ma'am.

10 Q.   Did he ever have a -- do you know if he

11      ever had a customer who said I can't take

12      your product anymore, Mr. Porterfield,

13      because it came out of the freezer?  Do you

14      know of any such circumstance?

15 A.   No, ma'am, not that I know of.

16 Q.   Have you ever knowingly had bread in a

17      restaurant that you knew was frozen?

18 A.   Yes, ma'am.

19 Q.   What was that -- what restaurant was that?

20 A.   Outback Steakhouse, Wendy's, Chili's.

21 Q.   When you were at Outback Steakhouse --

22 A.   Arby's.

23 Q.   -- did you eat the bread they served you

95

1      that had been frozen?

2  A.   Yes, ma'am.

3  Q.   Did you complain to management that they

4       had given you frozen bread?

5  A.   No, ma'am.

6  Q.   When the waiter served the bread, did he

7       say, hey, customer, this bread has been

8       frozen?

9  A.   No one has ever said that to me, no, ma'am.

10 Q.   Did you feel that you had been tricked

11      because you knew the bread had been

12      frozen?

13 A.   No, ma'am.

14 Q.   Did you get sick afterwards because you ate

15      bread that had been frozen?

16 A.   No, ma'am.

17 Q.   Did you feel the need to call the FDA on

18      Outback Steak?

19 A.   No, ma'am.

20 Q.   Looking at previous -- looking at the

21      distributor agreement.  Looking at the

22      paragraph regarding good industry practice

23      in Mr. Porterfield's contract, does that

1     also include maintaining proper service and
2     delivery to all outlets requesting service?
3  A. Yes, ma'am.
4  Q. And did Mr. Porterfield comply with that
5     part of the contract?
6  A. No, ma'am.
7  Q. Did he comply with that part of the
8     contract with regard to Sodexho?
9  A. No, ma'am.
10 Q. Did Sodexho complain about
11    Mr. Porterfield's service because they had
12    received any sort of frozen product?
13 A. No, ma'am.
14 Q. What was Sodexho's complaint about
15    Mr. Porterfield?
16 A. They weren't serviced at all.
17 Q. What percentage of the product is frozen to
18    your knowledge that is delivered to
19    restaurants?
20 A. Half to one percent, maybe one and a
21    quarter at times.
22 Q. You said earlier that you bought -- the
23    freezer was purchased from Burger King;

97

```
 1          correct?

 2   A.     Yes, ma'am.

 3   Q.     And they had a program where they were

 4          using frozen buns for a time?

 5   A.     Yes, ma'am.

 6   Q.     Do you know if Burger King told their

 7          customers these buns are frozen every time

 8          someone bought a Whopper?

 9   A.     No, ma'am, they did not.

10   Q.     Do you have knowledge if the FDA came down

11          on Burger King for having frozen their

12          buns?

13   A.     No, ma'am.

14               MS. REISS:  That's it.

15                      EXAMINATION

16   BY MR. DAVIS:

17   Q.     Do you know if Burger King even knew that

18          the buns were frozen?

19   A.     That Burger King knew that they were

20          frozen?

21               Yes, sir.

22   Q.     Did you tell Burger King we're delivering

23          you frozen buns?
```

98

1    A.    Yes, sir.

2    Q.    You did?

3    A.    Yes, sir.

4    Q.    Which Burger King did you tell that to?

5    A.    Are you asking me that in regards to what

6          she said earlier as far as Burger King?

7    Q.    Yes.

8    A.    Yes, sir.  And the particular area that we

9          had was in Columbus, Georgia, and they were

10         frozen and that was their program.

11   Q.    They knew they were frozen?

12   A.    Yes, sir.

13   Q.    You told me earlier that sometimes you told

14         customers that they were getting frozen

15         buns and sometimes you didn't.

16              MS. REISS:  Object to the form.

17              That's not his testimony.

18   A.    That's not my testimony.

19   Q.    Do you always tell customers -- when I say

20         customers, I'm talking about your Burger

21         Kings, your Sonics, your Krystals -- that

22         they're getting buns that are frozen or

23         have been frozen?

99

1   A.   No, we didn't tell them every time.  And

2        I'm sure Mr. Porterfield or any other

3        distributor did not tell them either when

4        they were in dire need of buns and got

5        frozen buns out of the freezer.  I didn't

6        tell them.  They didn't tell them.

7   Q.   So is it possible that the customer that

8        received the buns didn't even know they

9        were getting frozen buns?

10  A.   That is correct.  But those frozen buns

11       were good, saleable, in edible condition

12       buns.

13  Q.   So they were being deceived about the fact

14       that they were getting buns that were

15       frozen versus fresh product?

16  A.   No, sir, I'm not saying that.  You can say

17       that.  I'm not saying that, no, sir.  I

18       don't feel like that they were deceived.

19  Q.   You feel like that it was fine to deliver

20       them product that had been suspended,

21       frozen?

22  A.   Yes, sir.  It's a saleable, edible, good

23       tasting, good product.  I could serve you

1    some buns, Mr. Davis -- or anybody for that

2    matter -- and make you a sandwich and you

3    would not know the difference between

4    frozen and fresh.  And I don't see where

5    that is being deceptive or pulling the wool

6    over somebody's eye or anything.

7        The reason we did not say anything to

8    local management, whether it be at -- a

9    store manager or restaurant level person --

10   is that -- just the hassle and stuff that

11   you would have to go through there

12   explaining that to them, and the buns are

13   fine.

14       But as far as any corporation or

15   anything, Burger King or Krystal or whoever

16   it is, knows on certain situations,

17   emergency situations, taking care of our

18   customers' needs, the distributor's

19   customers' needs, that they got some frozen

20   buns on emergency situations.  And that's

21   not being brassy or anything.  I'm telling

22   you just like it was.  I mean, it's

23   emergency situation only.  Probably a half

101

```
1        to one percent of our weekly business is

2        ever frozen.

3    Q.   How much is your weekly business in

4        Opelika?

5                   MS. REISS:  Object to the form.

6                        Vague.  What do you mean by

7                        that?

8    A.   I don't know.  As far as dollar value, I

9        can't --

10                  MR. DAVIS:  He just testified it's

11                       one percent of his weekly --

12                  MS. REISS:  You said how much of

13                       his business is.  I don't know

14                       if you mean --

15                  MR. DAVIS:  Weekly sales.

16                  MS. REISS:  Okay.

17   A.   I don't think we're supposed to disclose

18        dollar amounts of --

19   Q.   Well, yesterday Mr. Grady Messer said that,

20        I think, Montgomery did --

21                  MS. REISS:  It's okay.  It'll be

22                       protected.

23   Q.   It's protected in here.
```

1         He told us what Montgomery's was.

2   What's Opelika's?

3   A.   All right.  As far as estimated, it

4   averages -- because it changes every week.

5   Every week is not the same -- 650,000 to

6   725,000, ballpark range there.  It

7   fluctuates as far as total dollar sales.

8   Q.   A week?

9   A.   A week, yes, sir.

10   Q.   What about in the Phenix City market?

11   A.   Without looking at some computer run

12   report, I couldn't tell you exactly how

13   it's separated.

14   Q.   What about an estimate?

15           MS. REISS:  I don't want you to

16              guess if you don't know.

17   Q.   You don't have to -- I'm not going to hold

18   you to it.  I'm asking for an estimate of

19   what Phenix City is.  Is it in line with

20   Montgomery or is it larger or smaller than

21   Montgomery?

22   A.   It's a little larger due to population.

23   $350,000 worth of sales.  And that's gross

103

1        sales.

2   Q.   So that's about a million-two a week for

3        the three locations, 650, 350 and -- I said

4        200 for Montgomery.  That might be --

5   A.   No, sir.  I might have answered you

6        incorrectly.  When you said Columbus --

7   Q.   Phenix City.

8   A.   -- I was -- that's in one geographical area

9        for us.  Opelika, Columbus, LaGrange is all

10        part of one area.

11   Q.   So 650 covers Opelika, Phenix City --

12   A.   Opelika, Phenix City, yes, sir, and

13        LaGrange, Georgia.

14           350 to 400,000 for all of that general

15        area.

16   Q.   Well, what's the 650 to 725 a week?

17   A.   That was the grand total of all of them.

18   Q.   Of all of them?

19   A.   Yes, sir.

20   Q.   So about a half a percent to as high as one

21        and a quarter percent of that gross weekly

22        sales actually gets frozen?

23   A.   I wouldn't say actually gets frozen, no,

104

1      sir.

2   Q.  Well, I thought you told me that --

3   A.  It all depends on --

4   Q.  -- as low as a half-percent and sometimes

5      as high in certain situations as one and a

6      quarter percent would actually get frozen.

7   A.  No.  I didn't say it gets frozen.  I said

8      that that was probably -- based on a

9      different week -- I mean, you could go some

10     weeks and not have any.  You could go some

11     weeks and it might be 1.2 percent.  We

12     don't really track it.  That was just an

13     estimated guess on my part based on the

14     number of buns that we will use based on a

15     particular account getting "X" number of

16     trays per week.  It's just, you know, a

17     nonscientific way for me to kind of look at

18     what we were doing as far as freezing a

19     product.  There's nothing scientific about

20     it.

21   Q.  One other thing I wanted to ask you.  You

22     said on the Sodexho Marriott account that

23     Mr. Porterfield didn't service it at all.

1    You're talking about on that particular

2    day -- I think it was March 6th --

3  A.  That was in question, yes, sir.

4  Q.  That was in question.  Because he had a --

5    reportedly had a broke-down truck that

6    day?

7  A.  That's what I heard, yes, sir.  I

8    didn't ...

9              MR. DAVIS:  That's all I've got.

10             MS. REISS:  That's all we have.

11

12             (Deposition concluded at

13             approximately 2:35 p.m.)

14

15             * * * * * * * * *

16         FURTHER DEPONENT SAITH NOT

17             * * * * * * * * *

18         REPORTER'S CERTIFICATE

19  STATE OF ALABAMA:

20  MONTGOMERY COUNTY:

21         I, Tracye Sadler, Certified Shorthand

22  Reporter and Commissioner for the State of Alabama

23  at Large, do hereby certify that I reported the

106

1   deposition of:

2                   **STEVE BORDEAUX**

3   who was duly sworn by me to speak the truth, the

4   whole truth and nothing but the truth, in the

5   matter of:

6                   HENRY PORTERFIELD,

7                   Plaintiff,

8                   vs.

9                   FLOWERS BAKING COMPANY OF

10                  OPELIKA, LLC,

11                  Defendant.

12                  IN THE UNITED STATES DISTRICT COURT

13                  FOR THE MIDDLE DISTRICT OF ALABAMA

14                  NORTHERN DIVISION

15                  Case Number 2:05-CV-937-MEF

16  on May 8, 2007.

17                  The foregoing 105 computer-printed pages

18  contain a true and correct transcript of the

19  examination of said witness by counsel for the

20  parties set out herein.  The reading and signing of

21  same is hereby not waived.

22                  I further certify that I am neither of

23  kin nor of counsel to the parties to said cause nor

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

107

1    in any manner interested in the results thereof.

2              This 17th day of May 2007.

3

4

5    _____
     Tracye Sadler, Certified
6    Shorthand Reporter and
     Commissioner for the State
7    of Alabama at Large

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

108

```
            *  *  *  *  *  *  *  *  *  *  *  *  *

                WITNESS SIGNATURE PAGE

            *  *  *  *  *  *  *  *  *  *  *  *  *
```

In Re:  Henry Porterfield vs. Flowers Baking Company


     I, **STEVE BORDEAUX**, hereby certify that I
have read the foregoing transcript of my deposition
given on May 8, 2007, and it is a true and correct
transcript of the testimony given by me at the time
and place stated with the corrections, if any, and
the reasons therefor noted on a separate sheet of
paper and attached hereto.



                    _____
                    **STEVE BORDEAUX**

     SWORN TO AND SUBSCRIBED before me this _____
day of _____, 2007.

                    _____
                    NOTARY PUBLIC

                    MY COMMISSION EXPIRES:

                    _____