COPY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HENRY PORTERFIELD,

     Plaintiff,

  vs.              CIVIL ACTION NO.
                    2:05-CV-937-MEF

FLOWERS BAKING COMPANY OF
OPELIKA, LLC,

     Defendant.


       * * * * * * * * * * * *


    **DEPOSITION OF JERRY WOODHAM**, taken

pursuant to stipulation and agreement before Tracye

Sadler, Certified Shorthand Reporter and

Commissioner for the State of Alabama at Large, at

the Tiger Town Inn, 205 21st Street, Opelika,

Alabama, on July 16, 2007, commencing at

approximately 1:00 p.m.


       * * * * * * * * * * * *

haislip, ragan, green, starkie & watson, p.c.
566 south perry street • montgomery, alabama 36104

12

1   A.   Yes.

2   Q.   How long did you stay assistant controller

3       in Villa Rica?

4   A.   A year.

5   Q.   So in October of '03 what happened?

6   A.   I left Flowers of Villa Rica and went to

7       Flowers Baking of Bailey Street -- well,

8       it's actually Bailey Street Bakery and

9       Flowers Baking of Tucker.

10   Q.   Is Bailey Street in Tucker, Georgia --

11   A.   No.

12   Q.   -- or is that a separate --

13   A.   It's a separate company in Atlanta.

14   Q.   It's separate from Flowers Baking of

15       Tucker?

16   A.   Yes.

17   Q.   So what position did you assume at those

18       two locations?

19   A.   Controller.

20   Q.   So you were controller over two locations?

21   A.   Yes.

22   Q.   Now, is Flowers Baking of Bailey Street --

23       is that actually a place where they

13

```
 1        manufacture the buns, or is that a
 2        distributorship type place?
 3   A.   They only manufacture at Bailey Street.
 4   Q.   And Flowers Baking of Tucker --
 5   A.   Same thing.
 6   Q.   They only manufacture?
 7   A.   Yes.
 8   Q.   And then out of those two locations,
 9        Flowers ships buns and rolls and bread and
10        whatever to other places that distribute
11        the bread?
12   A.   Yes.
13   Q.   Is that correct?
14   A.   Uh-huh (positive response).
15   Q.   So out of Flowers Baking of Bailey, you
16        wouldn't have route distributors like Henry
17        Porterfield pulling up to this location to
18        pick up bread.  It would be
19        tractor-trailers pulling up to pick it up
20        to take it to a warehouse?
21   A.   Yes.
22   Q.   Same with Flowers Baking of Tucker?
23   A.   Yes.
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

14

1    Q.    How long did you stay as comptroller or

2          controller for these two locations?

3    A.    Approximately two years.

4    Q.    So sometime around October '05?

5    A.    No.  It was first of '06 when I left.

6    Q.    And what happened the first of '06?

7    A.    Terminated my employment at Flowers Baking

8          of Tucker and Bailey Street Bakery and came

9          back to Flowers Baking of Opelika.

10   Q.    And why did you come back to Flowers Baking

11         of Opelika?

12   A.    They had an opening and I wanted to get

13         back to this area.

14   Q.    Did you ask to be moved to Flowers Baking

15         of Opelika?

16   A.    Well, no.  I was told that there was an

17         opening at the company.  And I was asked if

18         I was interested and I said yes.

19   Q.    Were you terminated from Flowers Baking of

20         Bailey Street?

21   A.    Well, my employment was terminated, just

22         like they were at all of them when I left.

23   Q.    I guess what I'm asking is, did they tell

15

1    you to leave or did you just say --

2  A.    No.  They didn't tell me to leave, no.

3  Q.    Did they say --

4  A.    Whenever you leave one bakery and go to

5        another one, your employment is terminated

6        there and you start over at the other one,

7        at the new bakery.

8  Q.    All right.  But you made the decision to

9        terminate your employment at both of those

10       locations?

11 A.    Yes.  Yes.

12 Q.    Someone else didn't make that decision for

13       you?

14 A.    Right.

15 Q.    All right.  Came back to Flowers Baking of

16       Opelika in the first part of '06?

17 A.    Yes.

18 Q.    And you came back as controller; is that

19       right?

20 A.    Yes.

21 Q.    I may say different things.  Is it

22       controller or comptroller, or what actually

23       is the position?

16

1    A.    Controller.

2    Q.    All right.  As a controller for Flowers

3          Baking of Opelika, what are your job duties

4          and responsibilities?

5    A.    Well, basically anything on the financial

6          side, making -- balancing accounts, making

7          sure our accounts have the right balances

8          in them.  I'm responsible for fixed assets,

9          anything financial.  I mean, I could

10         list ...

11   Q.    Is the controller -- are you the head guy

12         in the controller department of Flowers

13         Baking of Opelika?

14   A.    Yes.

15   Q.    How many people in that department report

16         to you?

17   A.    Five.

18   Q.    And what are their positions?

19   A.    It's office manager, receptionist, computer

20         operator, A/R clerk, and A/P clerk.

21   Q.    Who's the office manager?

22   A.    Judy Manley.

23   Q.    And what does Judy Manley do as office

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

17

1       manager?

2   A.  She basically runs the office.  She pretty

3       much deals with the other four ladies.  She

4       assists me in the accounting function.

5   Q.  Is she an accountant or have an accounting

6       background?

7   A.  She doesn't have an accounting degree.

8   Q.  But she's been doing it, on-the-job type

9       work?

10  A.  Yes.

11  Q.  Who is the accounts receivable clerk?

12  A.  Wanda Payne.

13  Q.  And the accounts payable clerk?

14  A.  Teresa Jernigan.

15  Q.  And I guess their positions are just what

16      they are, one does accounts receivable, one

17      does accounts payable?

18  A.  Yes.

19  Q.  And is that accounts receivable for Flowers

20      Baking of Opelika only?

21  A.  Yes.

22  Q.  All of the work that you do is for Flowers

23      Baking of Opelika?

18

1   A.   Yes.

2   Q.   And who do you report to at Flowers Baking

3        of Opelika?

4   A.   The plant president of Flowers Opelika.

5   Q.   Have you ever testified in any kind of

6        legal proceeding before?

7   A.   No.

8   Q.   Have you ever been sued by anybody?

9   A.   No.

10   Q.   Ever sued anyone?

11   A.   No.

12   Q.   You've been put up as, I guess, the person

13        most knowledgeable about all of the

14        accounts dealing with Henry Porterfield,

15        number one, and, I guess, the person most

16        knowledgeable about how you compute what

17        the value of a route is.  Are you the

18        person most knowledgeable about those two

19        areas at Flowers Baking of Opelika?

20   A.   I couldn't say if I'm the most

21        knowledgeable.  I deal with it.

22   Q.   That's what you do on a daily basis?

23   A.   Yes.

19

1    Q.    You or your staff --

2    A.    Yes.

3    Q.    -- that all reports to you?

4    A.    Yes.

5    Q.    In 2005 you weren't working at Flowers of

6          Opelika, were you?

7    A.    No.

8    Q.    Who was the comptroller who was working in

9          March of 2005 in Opelika?

10   A.    I believe it was Craig Horn.

11   Q.    Does Craig Horn still work for Flowers

12         Baking?

13   A.    He works for Flowers Baking Company of New

14         Orleans.

15   Q.    And what does he do there?

16   A.    Controller.

17   Q.    So in 2005 you had nothing to do with how

18         the computations were made involving Henry

19         Porterfield's route and the amount of money

20         that was offered to him?

21   A.    No, sir.

22   Q.    As a comptroller how do you go about

23         computing the value of a route?

20

1   A.   It's ten times the weekly average and the

2         branded sales.

3   Q.   All right.  And tell me what branded sales

4         are.

5   A.   It's -- take away your private -- well,

6         just examples would be Sunbeam bread,

7         Nature's Own bread.  It's not private

8         label.  It's not fast food or bid business.

9   Q.   Anything else?

10   A.   That's it.

11   Q.   Private label.  Private label would be

12        Wal-Mart, their private label bread;

13        correct?

14   A.   Yes.

15   Q.   Who else has private label?

16   A.   Well, usually any grocery store has their

17        own private label brand.

18   Q.   Like Winn-Dixie?

19   A.   Yeah.

20   Q.   Publix?

21   A.   Yeah.  I mean, I don't get into the product

22        that much, but I'm pretty sure they do.

23   Q.   When you say no fast food, what do you

21

1      consider fast food?

2   A.  Burger King, Hardee's, Wendy's.

3   Q.  And no bid business.  What do you consider

4      bid business?

5   A.  Any business we have to bid on like

6      schools.

7   Q.  Once you take out private label, once you

8      take out fast food, once you take out bid

9      business, you come up with a -- I guess

10     a -- is it a weekly average?

11  A.  Uh-huh (positive response).

12  Q.  And whatever that weekly average is

13     multiplied by ten?

14  A.  Right.

15  Q.  And who is it that determines or came up

16     with the valuation for a route?

17  A.  What do you mean?  This method?

18  Q.  Yes.

19  A.  I don't know.  I mean, that's what they

20     were doing when I started and I don't know.

21  Q.  Is that part of the contract between the

22     distributor and Flowers?

23  A.  I don't know.  I don't deal with the

22

1       contracts.

2   Q.   Is that just what you were taught how to do

3       it?

4   A.   Yes.

5   Q.   Did you have to go somewhere and look at it

6       to see how it was done?  Did you have to

7       look at any books or any kind of documents

8       to see that's typically how it was done?

9   A.   Well, I might have looked at one that was

10      done before.

11  Q.   And would Mr. Horn, I guess, have trained

12      you on how it was done --

13  A.   Yes.

14  Q.   -- whenever you were at Flowers of Opelika

15      initially?

16  A.   Yes.

17  Q.   And is that the way they do it at all

18      Flowers that you've worked at?

19  A.   The method for determining a route?

20  Q.   Yes.

21  A.   Yes.

22  Q.   Prior to coming here today what documents

23      have you looked at?

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1  A.  What documents have I looked at?

2       I mean, I looked at -- you talking

3     about any specific documents or --

4  Q.  In preparation for this deposition.

5  A.  I've seen a repurchase statement that was

6     done.

7  Q.  Okay.  Anything else?

8  A.  No.

9  Q.  Was that a repurchase statement on the

10    route that Henry Porterfield owns?

11  A.  Yes.

12  Q.  And when was that repurchase statement

13    prepared?

14  A.  I don't know.

15  Q.  Did it have the actual figures in it?

16  A.  It had some figures, yes.

17  Q.  Do you remember what figures were in that

18    repurchase statement?

19  A.  I mean, not exact numbers, not off the top

20    of my head.

21  Q.  Do you remember roundabout what they were?

22  A.  Yeah, I could say close.

23  Q.  Well, close what was it?

24

1    You don't have to -- it's not a guess.

2    I mean, it's not --

3   A.   I believe the route value was -- I want to

4        say 23, 24,000.

5   Q.   I'm going to show you what has already

6        previously been marked as Plaintiff's

7        Exhibit Number 3 to Michael Lord's

8        deposition, which this consists of a

9        letter, a three-page purchase agreement and

10       general release, and a territory

11       reconciliation.  Have you ever seen that

12       document before?

13            MR. HISHTA:  For record purposes,

14                 you're talking about the first

15                 page?

16  Q.   The first page of that document.

17  A.   No.

18  Q.   Have you ever seen the purchase agreement

19       and general release?

20  A.   No.

21  Q.   Have you ever seen the last page of that

22       document?

23  A.   Yes.  Now, I don't know if it was the exact

1    same numbers, but, yes, I've seen one.

2  Q.  This is a territory reconciliation on Henry

3      Porterfield's territory; is that correct?

4  A.  Uh-huh (positive response).

5  Q.  And it says Henry Porterfield, 2069, here

6      at the top.  It's got his distribution

7      number on it also; correct?

8  A.  Uh-huh (positive response).

9  Q.  Looking at this document, it shows the

10     original purchase price.  It looks like

11     $45,110.  I apologize.  I'm trying to read

12     it sideways.  And then you've got

13     distributor's adjusted purchase price.  It

14     looks like 30,000.  And the way that's come

15     up with is by subtracting this 14,350 from

16     it; is that correct?

17 A.  From this number right here, yes.

18 Q.  From the 45,000?

19 A.  Yes.

20 Q.  And the 14,350 is territory that he's

21     purchased, I guess, as it says, additional

22     territory purchased?

23 A.  That's actually sold.

26

1   Q.   I'm sorry.  I'm looking at the wrong line.

2        Territory sold, 3-29-04.

3   A.   Right.

4   Q.   So you take that away from it to come up

5        with the $30,000 figure.  Equity from

6        territory sold, $7,175?

7   A.   Uh-huh (positive response).

8   Q.   And you've got appreciated equity of

9        $13,255; is that correct?

10   A.   Yes.

11   Q.   Current note, original balance $2,125?

12   A.   Yes.

13   Q.   Total paid in and appreciated equity due to

14        and it's got or from distributor and it's

15        got $24,680; is that right?

16   A.   (Witness nods head).

17   Q.   There's a truck reconciliation below that,

18        and all of that deals with the truck all

19        the way to the bottom of the page; is that

20        correct?

21   A.   No.  This is separate from the truck.

22   Q.   That's separate.  All right.  We've got a

23        truck reconciliation that's just, what,

27

1           $1,642?

2    A.    Yes.

3    Q.    Now, what is this at the bottom?

4    A.    This five-percent transfer fee, that is

5          five percent of this number right here.

6          That's just a figure we charge for doing

7          the repurchase.

8    Q.    Okay.

9    A.    This probably -- and I didn't do this.  But

10         this probably would have been like his last

11         week of his health insurance.

12   Q.    That's the $119?

13   A.    Yes.

14   Q.    Okay.

15   A.    This is a fee Bank of America charges for

16         processing their documents.

17   Q.    And then those charges come out of that

18         bringing it down to 23,126.92; correct?

19   A.    Yes.

20   Q.    What documents -- I know you didn't do this

21         one, but what documents would you have to

22         look at to determine -- well, I guess the

23         purchase price, you would look at what he

28

1          paid for the route?

2     A.   Uh-huh (positive response).

3     Q.   The equity from territory sold.  How do you

4          come up with the equity of $7,175?

5     A.   Well, that was money that was paid to him

6          when he sold part of his route.

7     Q.   Part of the route.  Okay.  Appreciated

8          equity.  How do you come up with that

9          figure?

10    A.   It's this number minus these two numbers.

11    Q.   So it's what he paid for it minus the

12         equity already received and, what, the

13         additional territory purchased?

14    A.   Or sold in that case.

15    Q.   Sold.  All right.  What I'm trying to get

16         at -- and let me just cut straight to it.

17         Where on here do you have the figure of ten

18         times weekly sales?

19    A.   That's what that number is.

20    Q.   That's 24,680?

21    A.   Yes.

22    Q.   And what documents do you have to go to

23         look at to find those figures?

29

1    A.    We can run reports that show what the sales

2          were for the route.

3                    (Plaintiff's Exhibit 1 was marked

4                    for identification.)

5    Q.    Okay.  I'm going to show you what I want to

6          mark as, I guess, Plaintiff's Exhibit

7          Number 1 to your deposition which is Bates

8          stamp number FBO000856 through FBO00862 --

9          or actually that might be F-B-O instead of

10         zero.  FBO000862.  What are those

11         documents?

12   A.    It's a report showing net sales dollars for

13         a Publix in 2005 and 2006 by the week.

14   Q.    All right.  It's got a Publix number there,

15         1027.  Do you know where that Publix is?

16   A.    Do I know where it is?

17              No.

18   Q.    Is this a report that your office would

19         have run or somebody from your office?

20   A.    Yes.

21   Q.    Now, what is this report called?

22   A.    Just a territory net sales report.

23   Q.    Okay.  It's on the second page -- I'm

30

1      sorry -- yeah, second page.  It's got the

2      2007 amount and -- I'm sorry.  I guess it's

3      on -- 2007 goes up to page 3.  2007 begins

4      on the second page; correct?

5   A.  Yes.

6   Q.  And the next one over, 859 Bates stamp

7      number, has got Wal-Mart brand sales; is

8      that correct?

9   A.  Yes.

10  Q.  Flip on over another couple of pages.  It

11     says -- it looks like Wal-Mart PL sales.

12  A.  Yes.

13  Q.  And what are PL sales?  Private label

14     sales?

15  A.  Private label.  And I'm assuming that's

16     what that stands for on this report.

17  Q.  Now, why would you run this particular type

18     of report typically?

19  A.  Well, we're trying to get the value of the

20     route.

21  Q.  Have you been asked to determine the value

22     of Henry Porterfield's route?

23  A.  No.

31

```
 1    Q.   To determine what the value of his route

 2         was today how would you go about computing

 3         it?

 4    A.   Well, I would run the territory net sales

 5         report.

 6    Q.   Are the documents that we just looked at

 7         that I've marked as Plaintiff's Exhibit

 8         Number 1 -- are those part of the territory

 9         sales report?  What would be the reason for

10         running these type documents?

11    A.   To get the value of the route.

12    Q.   That's what I'm trying to -- so are there

13         documents in addition to these documents

14         that you would want to look at to get the

15         value of the route?

16    A.   Well, you would want to run them again.  I

17         mean, if there's ...

18    Q.   But let's just take at that particular

19         point -- at any point in time.  Let's say

20         January of 2007.  If we look at these

21         reports which I've marked as Plaintiff's

22         Exhibit Number 1, I've got Wal-Mart and

23         Publix which are both within that area.
```

32

1     What other reports would you want run for

2     that area, Mr. Porterfield's territory, for

3     January 1, 2007?

4                    MR. HISHTA:  I'm going to object

5                       to the extent that it calls

6                       for facts not in evidence,

7                       that I'm not sure it's been

8                       established both accounts are

9                       in the territory.  But having

10                      said that, we're going -- as I

11                      understand your line of

12                      questioning, we're going

13                      through the methodology to

14                      determine --

15                    MR. DAVIS:  We are.

16                    MR. HISHTA:  -- the value.

17    Q.   Let me just ask you.  Do you know if this

18         particular Wal-Mart is in Mr. Porterfield's

19         territory?

20    A.   No.

21    Q.   Do you know -- and when I say this, the one

22         I'm referring to in Plaintiff's Exhibit 1.

23              And do you know if the Publix referred

33

1    to in Plaintiff's Exhibit 1 is within

2    Mr. Porterfield's territory?

3 A. No, I don't know.

4 Q. The designation Wal-Mart number 5348, is

5    that a Flowers number or a Wal-Mart number?

6 A. I'm not sure on that.  I don't know.

7 Q. I'm just wondering like if y'all have

8    accounts set up for particular Wal-Marts,

9    particular businesses that are separate

10    accounts, or do you label them by their own

11    store numbers?

12 A. Well, we -- if you ask -- this would have

13    been done by the route.  I mean, it

14    wouldn't have been done by this number.

15 Q. If we look at Mr. Porterfield's route, it's

16    2069.

17 A. Yes.

18 Q. Are you aware of that?

19 A. Well, yeah.

20 Q. These reports refer to, then,

21    Mr. Porterfield's route, is that correct,

22    if they say route 2069?

23 A. Yeah.  I'm assuming they do because that's

34

1   what they say at the top.

2   Q.   Then having said all that, in January --

3        let's just pick a date -- January 1, 2007.

4        Is there anything that you would need in

5        addition to the reports run on route number

6        2069 to determine the value of that route?

7   A.   Well, you would need all the sales for the

8        route, not just Publix and Wal-Mart.

9   Q.   All right.  You would need everything that

10       he sold, weekly distribution summary

11       reports; is that correct?

12  A.   Well, no, that wouldn't -- no.

13  Q.   You wouldn't need any of those?

14  A.   No, you wouldn't -- no.  What I'm saying is

15       you would need this report for everything

16       on his route.

17  Q.   On his route.  All right.  Have you run --

18       let me strike that.

19            What do you call this report if you're

20       running one?

21  A.   Territory net sales value report.  I mean,

22       probably different people call it different

23       things, but that's -- if you say that,

35

```
 1          people are going to know what you're

 2          talking about.

 3    Q.    Have you run a territory net sales value

 4          report for Henry Porterfield's route?

 5    A.    No.

 6    Q.    How do you go about running a territory net

 7          sales value report?

 8    A.    Well, we have software that has all the

 9          data in it and you just tell it what you

10          want it to run.

11    Q.    How long does it take it to run a territory

12          net sales value report?

13    A.    A few minutes.

14    Q.    And since you've been there you've never

15          run one on this particular route, route

16          number 2069?

17    A.    No.

18    Q.    Do you know if anybody in your department

19          has run one?

20    A.    Not that I'm aware of.

21    Q.    How is the ten-week period determined?  Is

22          that the last ten weeks, or how is that --

23    A.    No, it's not ten weeks.  It's just ten
```

36

1    times the sales.

2    Q.    Ten times the sales.  All right.  Well, the

3          weekly -- is it weekly average?

4    A.    Yes.

5    Q.    What is the average period?

6    A.    52 weeks.

7                    MR. DAVIS:  Let's go off the

8                record for a second.

9                (Off-the-record discussion followed

10               by a brief recess.)

11               (Plaintiff's Exhibit 2 was marked

12               for identification.)

13   Q.    (Mr. Davis continuing:)  All right.  We

14         took a break.  I want to show you what I've

15         marked as Plaintiff's Exhibit Number 2.

16         That's a territory reconciliation report on

17         territory number 2069; is that correct?

18   A.    Yes.

19   Q.    And when was this particular one run?

20   A.    You mean the complete document?

21   Q.    Yes.

22   A.    It was done this past week.

23   Q.    The $63,430 figure comes from a ten-week

1   average of sales minus private label, fast

2   foods, and bid business on that particular

3   route, 2069?

4   A.   Yes.

5   Q.   If we look down on other credits and

6   charges where it says final weekly

7   statement for 27 ...

8   A.   Uh-huh (positive response).

9   Q.   You see that figure there?

10  A.   Yes.

11  Q.   $13,931.78?

12  A.   Uh-huh (positive response).

13  Q.   What does that figure represent?

14  A.   That's the balance Mr. Porterfield owes

15  Flowers Baking Company of Opelika for

16  running his route for him.

17  Q.   And how did you come up with that figure?

18       Or let me just ask you, does that come

19  from the weekly distribution reports?

20  A.   Yes.

21  Q.   And do you actually have to go to a weekly

22  distribution report to find it or does the

23  computer program pull it from everything

38

1       and put it into this document?

2  A.   No.  We went to the document and got the

3      number.

4  Q.   The five-percent transfer fee is five

5      percent of 63,430; is that correct?

6  A.   Yes, sir.

7  Q.   And did you actually do this territory

8      reconciliation report?

9  A.   I did the report.  I didn't actually come

10     up with the 63,430, but I did the report.

11  Q.  All right.  Who did the 63,430?

12  A.  Well, the number was given to me by Michael

13     Lord.

14  Q.  And where did Mr. Lord get it from?

15  A.  I mean, I don't ...

16  Q.  You don't have access to those type

17     figures?

18  A.  Yes.  But, I mean, I didn't -- he just gave

19     me the number.

20  Q.  Okay.  Did you --

21  A.  And when I said this report was last week,

22     I didn't mean that this number was as of

23     last week.  I don't know when it was as of.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

39

1   Q.   The 63,430 came from Michael Lord.  So you

2        had to put that into the repurchase price

3        document, the territory reconciliation.

4        Did you have to put in all the other

5        figures, also, or did a computer program do

6        it?

7   A.   No.  I put them in.  It's basically the

8        same numbers as the other statement.

9   Q.   It is.  The $13,931.78 final weekly

10       settlement figure that you say

11       Mr. Porterfield still owes Flowers, did you

12       obtain that figure yourself?

13  A.   Yes.

14  Q.   And which report or which document did you

15       look at to obtain it?

16  A.   Distributor's statement.

17  Q.   And for what week did you look at?  Was it

18       last week's?

19  A.   27 would have been, I think, a couple of

20       weeks ago.

21  Q.   Is there any reason why Mr. Lord gave you

22       the $63,430 figure?

23  A.   I don't know.

40

1    Q.   Do you typically do territory

2         reconciliation reports?

3    A.   Yes.

4    Q.   When you do them, where do you typically

5         get the repurchase price from?

6    A.   From the territory net sales reports.

7    Q.   Did you look at a territory net sales

8         report for territory number 2069?

9    A.   Did I?

10   Q.   Yes.

11   A.   No, I didn't.

12   Q.   You just relied on Mr. Michael Lord to give

13        you the figure of 63,430?

14   A.   Yes.

15                  (Plaintiff's Exhibit 3 was marked

16                  for identification.)

17   Q.   I'm going to give you what I'm going to

18        mark as Plaintiff's Exhibit Number 3.  And

19        these are documents that were produced and

20        are Bates stamp numbers FBO000863 through

21        FBO000988.

22                  MR. HISHTA:  Let's go off the

23                  record just for a minute.

41

1              (Off-the-record discussion.)

2   Q.   All right.  Looking at the -- I'm going to

3        refer to them just so that we're clear

4        according to the Bates stamp numbers at the

5        bottom.  And I'm just going to refer to the

6        last three numbers of the Bates stamps so I

7        don't have to repeat it all.

8             Number 863, 64, 65, and 66 appear to be

9        distributor summary report; is that

10       correct?

11  A.   Yes -- yeah.  Yes, sir.

12  Q.   And at the top of each one it's got a year,

13       2001, 2002, 2003, 2004.  And I don't know

14       if 867 is a -- it looks like a different

15       type report or it may be the same type

16       report, just on a different format.

17  A.   867 is just for one week.

18  Q.   Okay.  Let's wait on those for a second.

19       Let's go back to 863.  863 is for a whole

20       year; correct?

21  A.   Let's see.  Yes.

22  Q.   If we look at 863, we've got a beginning

23       balance owed of 34,000 and it looks like

42

1      funds paid to distributor, 34,676.  What is

2      that?

3   A.  That's a total of the year.  If you took

4      his total of his weekly statements, that

5      should total with that.

6   Q.  The next line down, net product charged to

7      distributor, $326,631.02.  See that figure?

8   A.  Yes.

9   Q.  Is that all product?  It's not just -- it's

10     every product that's delivered to the

11     distributor?

12  A.  Yes.

13  Q.  It doesn't exclude branded sales or

14     anything like that?

15  A.  No.

16  Q.  What is relay adjustment?

17  A.  That is products delivered to our

18     warehouse.  That would be if the relay

19     driver was supposed to deliver a hundred

20     units of a certain type bread and he gets

21     there and there's only 95.  He would let

22     the driver know, hey, you're five units

23     short.  So he gets credit for it.

43

1    Q.    Load adjustment.  What is that?

2    A.    That would be where the distributor

3          discovers, hey, he delivered us a load of

4          bread.  It's supposed to be a hundred units

5          of a certain type.  I've only got 95.  So

6          he gets credit for it.

7    Q.    And in this particular case the load

8          adjustments --

9    A.    It could be the other way.

10   Q.    -- is $364.48.  It's not a -- it looks like

11         it's a plus in this case.

12   A.    In that case he would have discovered he

13         had like 105 instead of a hundred.

14   Q.    So that means that he discovered he had

15         more bread than what the company said he

16         did and let the company know and there was

17         a load adjustment made?

18   A.    Well, he actually does this himself in

19         his --

20   Q.    In his computer?

21   A.    Yes.

22   Q.    Which notifies the company; correct?

23   A.    Yes.

44

1   Q.   Damaged, slash, crippled.  What does that

2        refer to?

3   A.   It's damaged bread he's taking credit for.

4   Q.   The next line down says short code.  And

5        what is short code?

6   A.   That's not one we use very often.  It's $19

7        for the whole year.  I'm assuming that's

8        some type of transaction where he was short

9        some bread.  That's something we really

10       don't use that much.

11  Q.   The next line down says product transfers.

12       What is that?

13  A.   It's where one distributor transfers

14       product to another route.  He can transfer

15       in or out.

16  Q.   Is that typical for distributors to

17       transfer in and out of their routes?

18  A.   Yes.

19  Q.   And why would they do that?

20  A.   I mean, you know, you have to ask the

21       distributor.  I guess they got too much of

22       a product and somebody else needs it.

23  Q.   The next line down says customer price --

45

1          is that allowances?

2     A.   Yes.

3     Q.   Slash, overrides.  What is that?

4     A.   That's -- well, an example of that would be

5          if we had bread in a store that was on

6          sale, so he's not getting the full price

7          for it.  He gets credit for the difference

8          between the regular price and what it's on

9          sale for.

10    Q.   All right.  Stales, $43,427.29?

11    A.   That's bread he takes out of the store and

12         stales it, out of code bread, old bread.

13    Q.   Authorized charges, $289,587.95?

14    A.   That's products sold to larger retail

15         grocery stores that the customer, the

16         grocery store, whoever it might be, doesn't

17         actually pay the distributor.  They pay

18         Flowers.  And we give them credit for it.

19    Q.   And then you've got net accountable.  It

20         looks like a -- is that a credit of

21         $9,168?

22    A.   Yes.

23    Q.   Now, what does that mean when it says net

46

1     accountable?

2  A.  That means at this point the distributor is

3     owed $9,168.

4  Q.  But we're not at the end of the statement

5     yet.

6  A.  Right.

7  Q.  That's just at that point within the

8     statement?

9  A.  Yes.

10  Q.  The next line down says standard discount.

11     It looks like $52,856.46.

12  A.  That's discount on the bread.  They buy it

13     from Flowers of Opelika.  They sell it to a

14     grocery store.  That's their discount they

15     get, the difference between what they buy

16     it from us and what they sell it to the

17     store at.

18  Q.  So that's the amount of profit that they

19     should make if they didn't have any other

20     expenses from buying it from you and

21     selling it to a store?

22  A.  Yes.

23  Q.  That figure is on there twice, total

47

1          distributor discount earning.
2     A.   It's just a total.
3     Q.   Then net distributor balance, a credit of
4          $62,025 at that point in time; correct?
5     A.   Yes.
6     Q.   We come down and we start into our business
7          expenses.  Had a territory payment of
8          $11,180.  Now, is that a territory payment
9          that was made throughout the year by the
10         distributor?
11    A.   Yes.
12    Q.   Truck purchase, $4,983.68.  Is that also an
13         amount that was paid by the distributor
14         throughout the year?
15    A.   Yes.
16    Q.   Truck, slash, bus insurance is the next
17         line down.
18    A.   Business insurance.
19    Q.   Business insurance.  Okay.  Is that also a
20         figure that was paid by the distributor
21         throughout the year?
22    A.   Yes.
23    Q.   Health/disability insurance was also paid

1          by the distributor?

2    A.    Yes.

3    Q.    Warehouse rent, is that also paid by the

4          distributor?

5    A.    Yes.

6    Q.    Administrative fee, $520.  And what is

7          that?

8    A.    That's just a fee that distributors pay

9          Flowers of Opelika for paperwork for

10         running their statements, just a fee

11         Flowers of Opelika charges its

12         distributors.

13   Q.    We've got total business expenses of

14         $27,943.97.  You see that?

15   A.    Yes.

16   Q.    Total business expenses.  It looks like I

17         skipped two.  FICA tax, current work; is

18         that right?

19   A.    Current week.

20   Q.    Current week.  Okay.  $2,759.79.  And

21         miscellaneous expense, 66.12.  I know what

22         the FICA is.  What is a miscellaneous

23         expense?

49

1   A.   It could be anything.  I mean, that's why

2        it says miscellaneous.  Flowers charges

3        distributors -- if they don't pull up their

4        own routes and someone from Flowers of

5        Opelika does it, we charge the

6        distributors.  I mean, that could be -- I

7        mean, it could be several things, smaller

8        charges.

9   Q.   We've got total distributor balance, a

10       credit of $34,027.75; is that correct?

11  A.   Yes.

12  Q.   All right.  Weekly distributor balance,

13       $34,027.75.  And that's a credit.  And then

14       we've got gross earnings of 52,856.46.  And

15       then we've got weekly estimated operating

16       expense, $15,850.66.  Where does that

17       figure come from?

18  A.   That is based on -- the estimated operating

19       expenses are expenses the distributor turns

20       into their CPA.  The CPA compiles them,

21       gives them to Flowers of Opelika.  We use

22       the expenses on their statement to

23       determine --

50

1    Q.    To come up with their estimated net taxable

2          earnings?

3    A.    Exactly.

4    Q.    So if we look for 2001, the gross earnings

5          on his W-2 that Flowers sent to him -- I'll

6          have to let you explain it.  Let me mark

7          Plaintiff's Exhibit Number 4.

8                    (Plaintiff's Exhibit 4 was marked

9                    for identification.)

10   Q.    Plaintiff's Exhibit Number 4 has a W-2 for

11         2000 and 2001.  You see the 2001 at the

12         bottom of the page there?

13   A.    Yes, sir.

14   Q.    And it shows -- what's the gross taxable --

15         or gross compensation amount?

16   A.    $52,941.67.

17   Q.    All right.  I'm not smart enough.  Tell me

18         how -- why is that figure different than

19         the figure on Bates stamp number 863.

20   A.    Well, you have to take into account Flowers

21         doesn't operate on a normal calendar year.

22         If you notice these dates, 12-31-2000 to

23         12-29-2001.  It's not from January 1st to

51

1   December 31st.

2   Q.   That explains it.  All right.

3   A.   Which this is.

4   Q.   So they've got $52,941.67.  That's for the

5        January 1 through December 31st?

6   A.   Yes.

7   Q.   If we look at Bates stamp number 64 -- 864,

8        865, and 866, those are all the same

9        distributor summary reports just like the

10       one we went over in 2001?

11  A.   Yes.

12  Q.   Is there anything -- to me it appears to be

13       pretty standard.  I mean, has anything

14       changed between 2001 and 2004 in the way

15       the process that you did these particular

16       distributor summary reports?

17  A.   Not that I'm aware of.  I mean, I think

18       they're probably -- comparative they're

19       probably exactly the same.

20              MR. HISHTA:  Just for record

21                 purposes, he didn't prepare

22                 these reports, but he's

23                 explaining the methodology.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

52

1    Q.    All right.  Let's flip over to Bates stamp

2          number 867.  What is this report?

3    A.    This is a weekly distributor's statement.

4    Q.    This is something that each distributor is

5          given every week?

6    A.    Yes, sir.

7    Q.    Let's work through it for a second.  At the

8          top of the page it says -- it's got your --

9          you know, Henry Porterfield's name,

10         distributor number, route, warehouse,

11         company, code, all that kind of stuff at

12         the top, just general information.  It

13         skips down and it says beginning balance

14         owed.  I would assume that's from the

15         previous week?

16   A.    Yes, sir.

17   Q.    Funds paid to distributor is zero.  Funds

18         received from distributor is zero.  Then

19         it's got accountability, total product

20         charged, $5,823.93.  You see that?

21   A.    Yes, sir.

22   Q.    That's product that was charged to Henry

23         Porterfield?

53

1   A.   Yes.

2   Q.   Or to Wal-Mart or to Winn-Dixie or somebody

3        that purchased --

4   A.   Well, no.  That's product the distributor

5        bought from Flowers Baking Company of

6        Opelika.

7   Q.   So that doesn't include the Wal-Mart stuff,

8        then, does it?

9                MR. HISHTA:  Objection to the form

10                    of the question.  Vague and

11                    ambiguous.

12  Q.   Does total product charged, the $5,823.90

13       figure, does that include product --

14       private label product that went to

15       Wal-Mart?

16  A.   Well, I don't know.  I mean, the

17       distributor sells it once he buys it from

18       Flowers.  So I don't know where it went.

19  Q.   The distributor doesn't get paid for it.

20       It comes back straight to Flowers, doesn't

21       it?

22            He doesn't receive a check made out to

23       Henry Porterfield for product that goes to

54

1          Wal-Mart, does he?

2     A.   You're confusing me.

3               MR. HISHTA:  Yeah.  That's --

4     A.   We're talking about two different things

5          here.

6     Q.   All right.  Total product charged.  Tell me

7          what total product charged is.

8     A.   That's product the distributor buys from

9          Flowers Baking Company of Opelika.

10    Q.   Now, product includes bread, buns,

11         everything that you sell -- that Flowers

12         sells, right, that they pick up?

13    A.   Yes, sir.

14    Q.   Now, my question to you is, on total

15         product charged, in 2005 there was not a

16         Wal-Mart within Mr. Porterfield's route

17         that I am aware of; all right?  But

18         assuming there was, would private label

19         bread be included in total product charged

20         on a weekly distributor's report?

21    A.   This number has nothing to do with any

22         customer.  This is just product the

23         distributor bought from us.  That's all it

55

1          is.  I mean, it has nothing to do with any

2          store at that point.

3    Q.    Okay.  Is that just product that he's

4          bought from you just to use for whatever

5          reason he wants to use it for?  He can take

6          it and throw it away if he wants to?

7    A.    Yeah, I guess he could.

8    Q.    Do you have a contract with -- let's take

9          today.  Is there a contract between Flowers

10         and Wal-Mart?

11   A.    Not that I'm aware of.

12   Q.    Does Flowers distribute to Wal-Mart?

13   A.    No.

14   Q.    Has Flowers ever received a check for bread

15         delivered to Wal-Mart made out to Flowers?

16   A.    Yes.

17   Q.    Why did you receive a check made out to

18         Flowers from Wal-Mart?

19   A.    Because the distributor bought the bread

20         from Flowers Baking Company of Opelika.  He

21         put it in the store.  On larger accounts

22         like that the company pays Flowers, and

23         then we give them credit on their

56

1       statement.

2    Q.   The company doesn't pay the distributor.

3        They pay Flowers for it; correct?

4    A.   Yes.

5    Q.   While we're on that subject, the bread

6        that's delivered to Wal-Mart by the

7        distributors, how often do you get paid --

8        does Flowers get paid from Wal-Mart?

9    A.   Weekly.

10   Q.   If the distributor goes out and delivers

11       $10,000 -- let's just take an even

12       number -- $10,000 worth of product to

13       Wal-Mart, does Wal-Mart cut a check for the

14       exact amount that the distributor

15       distributed back to Flowers?

16   A.   Back to ...

17   Q.   To Flowers.

18              MR. HISHTA:  I'm going to object.

19                  Again, it's vague and --

20   A.   You said distributed back to Flowers?

21   Q.   I'm sorry.  I'm sorry.  Let's just take it

22       one step at a time.  Let's say that $10,000

23       worth of product is picked up by a

57

1        distributor from Flowers' warehouse.  The

2        distributor looks on his computer and sees

3        that $10,000 worth of product is to go to

4        Wal-Mart; okay?

5              So he takes $10,000 worth of product to

6        Wal-Mart and puts $10,000 worth of product

7        on the shelf at Wal-Mart.  That week, the

8        next week, two weeks, whatever, does

9        Wal-Mart cut Flowers a check which you

10        credit to the distributor for $10,000?

11   A.   Hopefully.

12   Q.   But do they do that?

13   A.   Yeah.

14   Q.   Okay.

15   A.   Yes.

16   Q.   Do you know what the term shrinkage is?

17   A.   Yes.

18   Q.   What is shrinkage?

19   A.   Shrinkage is the term when the

20        distributor -- it's basically an inventory

21        variance.

22   Q.   And like if $10,000 worth of product is

23        delivered to Wal-Mart, does Wal-Mart pay

58

1      $10,000 back to Flowers?

2  A.  Well, first of all, you've got to take into

3      account pay by scan.  Are you --

4  Q.  That's what I'm asking.

5  A.  Well, you didn't mention that.  Okay.

6  Q.  Do they do pay by scan?

7  A.  Oh, yes, Wal-Mart does pay by scan.

8  Q.  That means they only pay you when they sell

9      it; correct?

10  A.  When it's scanned at the register, yeah.

11  Q.  If they don't sell it --

12  A.  I thought you were just talking on general

13      terms.

14  Q.  If they don't sell it, they don't pay you

15      for it?

16  A.  Right.

17  Q.  On the pay by scan, if you have shrinkage

18      in the store, then Flowers doesn't get paid

19      for it, correct, for the shrinkage amount?

20  A.  Right.

21  Q.  Who eats the shrinkage amount?

22  A.  The store -- well, Wal-Mart doesn't pay any

23      of it.  Most stores pay half.  Wal-Mart

1       refuses to pay half.  In normal cases the

2       store eats half, Flowers of Opelika eats a

3       fourth and the distributor a fourth.

4   Q.  With Wal-Mart what happens?

5   A.  The distributor gets a fourth and Flowers

6       gets the rest.

7   Q.  And who came up with that calculation?

8   A.  I have no idea.

9   Q.  Have you ever looked at a distributor's

10      contract?

11  A.  I have never read one.  I've seen one.

12      But, you know, I've never sat down and read

13      it.

14  Q.  Do you know of anyplace within the

15      distributor's contract that allows for

16      Flowers to charge a distributor for

17      shrinkage?

18              MR. HISHTA:  Objection to the

19                  extent it calls for a legal

20                  conclusion.  Second objection,

21                  the witness has testified that

22                  he hasn't read a distributor

23                  agreement.

60

1   Q.    I've got a copy of a distributor agreement

2         if you want to look at one.  I'm just

3         asking if you knew of anyplace within a

4         distributor contract that allows for

5         Flowers to charge a distributor for

6         shrinkage.

7                       MR. HISHTA:  Same objection.

8                       Calls for a legal conclusion.

9   Q.    Well, let me show you what's previously

10        been marked as Defendant's Exhibit 1 to

11        Michael Lord's deposition which is a

12        distributor agreement.  And I'll tell you

13        what, we'll take a five-minute break and

14        I'll let you look through it and I'll ask

15        you that question after the break.

16  A.    You want me to read the whole thing?

17  Q.    Look through it.  I can give you ten

18        minutes.  We'll take ten minutes.

19  A.    What am I looking for?

20  Q.    I want you to tell me where within a

21        distributor's agreement it contains

22        language authorizing Flowers to charge a

23        distributor for shrinkage.

61

```
 1   A.   I'm not a lawyer.  I mean, it could be in
 2        there and I wouldn't even recognize it.
 3   Q.   I'm not asking you to give me a legal
 4        opinion.  I'm just saying, as a lay person,
 5        if you see it in there that a lay person
 6        would understand, please let me know.
 7        We'll take ten minutes to let you look at
 8        it.
 9             I'm not asking you for a legal
10        opinion.  I'm just asking you for your
11        opinion as a lay person or as an accountant
12        for Flowers.
13                 (A brief recess was taken.)
14   Q.   (Mr. Davis continuing:)  Were you able to
15        find anything contained within the contract
16        that would give Flowers the authority to
17        charge distributors for shrinkage?
18                 MR. HISHTA:  Objection to the
19                 extent it calls for a legal
20                 conclusion and further object
21                 as this line of questioning
22                 seemingly has no relevance
23                 whatsoever to the allegations
```

22222

1                    Mr. Porterfield has made in
2                    his complaint.
3    Q.   You can answer.
4              MR. HISHTA:  Go ahead.  You can
5                    answer the question subject to
6                    those objections.
7    A.   No, I didn't see the term shrink anywhere
8         in there.
9    Q.   As the comptroller for Flowers, are all
10        distributors like Henry Porterfield charged
11        for shrinkage?
12             MR. HISHTA:  Objection.  Assumes
13                   facts not in evidence.
14                   There's no evidence of record
15                   that Henry was ever charged
16                   for any shrink.
17   Q.   Are distributors charged for shrinkage at
18        Flowers?
19   A.   Yes.
20   Q.   You've worked in both Georgia and Alabama;
21        correct?
22   A.   Yes.
23   Q.   When you were working in Georgia, were

1       distributors charged for shrinkage?

2            MR. HISHTA:  Also object to the

3               terminology charged as it

4               relates to this line of

5               questioning.

6  Q.   You can answer.

7  A.   Yes.

8  Q.   And when I say charged, is shrinkage

9       deducted from distributors' weekly

10      accounts?

11  A.   No.

12  Q.   How is it handled?

13  A.   It's done on a period basis.

14  Q.   Done every quarter?

15  A.   Period.

16  Q.   Period.  How long is a period?

17  A.   Four weeks.

18  Q.   So once every four weeks it's adjusted; is

19      that correct?

20  A.   Yes.

21  Q.   And that's across the -- as far as you know

22      every place you've worked it's been that

23      way at Flowers?

64

1  A.  Yes.

2  Q.  All right.  Let's go back to Bates stamp

3      number 867.  We went over total product

4      charged.  And I think I got an answer, but

5      I'm not certain.  Does total product

6      charged include product that is pay by

7      scan?

8               MR. HISHTA:  Objection.  Vague.

9  Q.  You can answer if you know.

10  A.  Well, I don't know how to answer it.

11  Q.  All right.  Well, then help me out, then.

12      Total product charged is product that is

13      charged to the distributor; correct?

14  A.  Yes.

15  Q.  All right.  Is product that is delivered to

16      Wal-Mart that is paid on pay by scan -- is

17      that a product included in the total

18      product charged --

19  A.  Is the product --

20  Q.  -- figure?

21  A.  Is the product?

22  Q.  Yes.

23  A.  Yes.

65

1   Q.   Relay adjustment.  What is that?

2   A.   That is product delivered to the warehouse

3        where the relay driver leaves an adjustment

4        for the distributor saying, hey, you're

5        short five loaves of bread.

6   Q.   Same thing, load adjustment, product that

7        either is --

8   A.   Short or over.

9   Q.   -- short or over.  Damaged product is

10       product that's just that.  It's damaged.

11       Short code product is what?

12  A.   I can't give you an answer on short code.

13       Like you see here, it's zero.  That's one

14       we really don't ever deal with.

15  Q.   If you look down in the middle, it says pay

16       by scan adjustments, 12-26-2004 through

17       1-1-2005?

18  A.   Yes.

19  Q.   Point of sale data.  It looks like a credit

20       for $1,806.98.  You see that?

21  A.   Yes.

22  Q.   So during this time period there were -- in

23       2005 on this particular route there were

66

1        point of -- I'm sorry -- there were pay by

2        scan customers on that route?

3  A.   Yes.

4  Q.   Revaluation variance.  What is that figure?

5  A.   That's their inventory variance on their

6        pay by scan items.

7  Q.   So does that mean -- or tell me what that

8        means.

9  A.   Well, they do an inventory every week, and

10       if they come up short or over -- if they

11       come up short, they get credit for it.

12  Q.   On a credit of $112.64 -- is that what this

13       particular document says?

14  A.   Yeah.

15  Q.   Does that mean that whoever that customer

16       was that did the pay by scan adjustment,

17       that there was actually more inventory in

18       stock than what they thought they should

19       have?

20  A.   You're saying the customer?  You mean like

21       the store?

22  Q.   The store.

23  A.   The distributor does this.

67

1    Q.    Okay.  So on this particular one,

2          revaluation variance, the distributor goes

3          out and does an inventory?

4    A.    Yes.

5    Q.    Once he does the inventory, on this

6          particular 867 document it looks like a

7          $112.64 credit.

8    A.    Yes.

9    Q.    In this particular instance that means that

10         there was more product on the shelf than

11         the distributor thought or less on the

12         shelf than the distributor thought?

13   A.    Less.

14   Q.    Okay.  So does that mean that there was

15         $112.64 shrinkage?

16   A.    Yes.

17   Q.    And is the $112.64 revaluation variance --

18         is that just the distributor's portion of

19         it, or is that the total revaluation?

20   A.    That's the total.

21   Q.    All right.  Now, did the distributor get

22         charged -- assuming it's not Wal-Mart.  On

23         other accounts how much does the

68

```
 1         distributor have to eat?  And when I say

 2         eat, how much is he charged?

 3    A.   25 percent.

 4    Q.   So the distributor should get charged 25

 5         percent of $112.64?

 6    A.   Yes.

 7    Q.   And is that contained anywhere on the

 8         distributor weekly sheet here that we've

 9         got?

10    A.   Well, there's a -- there's not a charge on

11         the sheet, but there is a line item for it.

12    Q.   Where is that at?

13    A.   PBS shrink charges.

14    Q.   PBS shrink charges says zero.

15    A.   Uh-huh (positive response).

16    Q.   All right.  Now, why would there be a zero

17         PBS shrink charge on this particular

18         document, number 867?

19    A.   Because this is a weekly statement and we

20         do it by period.

21    Q.   And so the shrinkage is done by period

22         also?  Pay by scan shrinkage is done by

23         every period or what?
```

69

```
 1              MR. HISHTA:  Objection.  Again,
 2                   Greg, it's vague.  I don't
 3                   understand the question.
 4    Q.   All right.  Tell me what you mean by it's
 5         done by period.
 6    A.   We charge them or give them credit by
 7         period.
 8    Q.   On this particular document number 867,
 9         it's not contained on there.  And if we
10         look over to a different period, a
11         different week, it may be on there because
12         it's --
13    A.   Yes.
14    Q.   Is that what you're saying?
15              If we look over at Bates stamp number
16         870 and -- you see PBS shrink charges?
17    A.   Yes.
18    Q.   And is that PBS shrink charge for what
19         period?
20    A.   Well, I didn't do this statement.  I wasn't
21         even working with Flowers Opelika then.
22         So, I mean, I couldn't say.
23    Q.   You can't tell by looking at it?
```

70

1    A.    Well, I mean, no.  I mean -- I mean, I

2          don't know what makes up that number.

3    Q.    Pay by scan shrink charges on document

4          number 870 says 123.17.  What's your

5          understanding of what the PBS shrink charge

6          is made of currently?

7    A.    That would be charging a distributor for a

8          period worth of shrink.

9    Q.    And if the -- at stores other than Wal-Mart

10         the distributor gets charged how much?

11   A.    Same amount.

12   Q.    25 percent?

13   A.    25 percent.

14   Q.    So he gets charged 25 percent on Wal-Mart

15         and anybody else that does pay by scans?

16   A.    Yes.

17   Q.    And that's still true today?

18   A.    Yes.

19   Q.    Back to number 867.  There's a lot of

20         business expenses, which I think most of

21         them are self-explanatory.  Like the

22         territory payment, that's actually what the

23         distributor is paying for that particular

71

1    territory.  Truck purchase is what he's

2    paying for the truck purchase?

3    A.  Yes.

4    Q.  Tags, tax, license fees.  That's on the

5    truck.  Insurance.  Administrative fee,

6    again, is $10.  Is that a week, every

7    week?

8    A.  Yes.

9    Q.  Warehouse rent every week.  FICA is

10    withheld.  And then a miscellaneous expense

11    of $20?

12    A.  Yes.

13    Q.  Is it always $20 on the miscellaneous

14    expense?

15    A.  Well, I mean, it could be more or could be

16    less.

17    Q.  Is there a minimum that it is?

18    A.  Well, it could be zero.  It's normally

19    going to be -- like I said, if the

20    distributor did his own pull-ups and there

21    wasn't anything else to charge him, then it

22    would be zero.

23    Q.  If the distributor had someone to do the

72

1        pull-ups that Flowers hired, does Flowers

2        charge the distributor a $20 a week pull-up

3        fee -- or did they?

4  A.   Say that again.

5  Q.   Sure.  It's probably a bad question.

6           Let's just take a distributor that has

7        someone else do the pull-ups.  Like, for

8        instance, this morning Marcus Porterfield

9        would go out and do pull-ups every week.

10       Does Flowers pay the person that does the

11       pull-up and then charge the distributor for

12       doing it every week?  Is that how that

13       figure is come up with?

14  A.   Yes.

15  Q.   And I know it was $20.  I think it -- it

16       looks like it went up to -- I want to say

17       it went up to $40 or something at one point

18       in time.  Yeah.  I was looking way over

19       here.  In '06 it starts looking like it's

20       $40 every week.  So now they charge like

21       $40 to do a pull-up.  Is that what that 40

22       would be?  Is that your understanding?

23  A.   Yes.

73

1    Q.    On this when -- when I say this one, number

2          867, it looks like the distributor gets a

3          credit of $1,215.67 at the end of the day.

4    A.    Yes.

5    Q.    Is that correct?  Is that what he gets

6          paid?

7    A.    Yes.

8    Q.    All right.  Flip over to document number

9          878.  And this period or the date is

10         3-20-2005 to 3-26-2005.  You see that at

11         the top of that document?

12   A.    Yes, sir.

13   Q.    On this particular document, 878, under the

14         business expense, it's got relief driver,

15         $334.80.  Do you see that figure?

16   A.    Yes, sir.

17   Q.    And this was, I think, around the time that

18         Mr. Porterfield's contract was terminated.

19         And if you look on the week prior to that,

20         there was no relief driver charged on

21         document number 877.  Do you see that?

22   A.    Yes, sir.

23   Q.    So the relief driver of 334.80, that

74

1       according to the contract, if Flowers takes

2       back over the territory, they can hire

3       somebody to run the account.  Are you

4       familiar with that?

5  A.   I know that's what that charge is for,

6       somebody running the route.

7  Q.   Okay.  Do you know who the relief driver

8       was?

9  A.   No.

10  Q.   Do you know why the amount for relief

11       driver is different on all of the

12       documents -- I'm not going to say all of

13       them.  I'm going to say on at least the

14       next eight or ten after this.  The relief

15       driver on 879 is $512.  On 880 it's 331.

16       On 881 it's $416.  You know, I could go on

17       and on.  But do you know why that

18       particular business expense entitled relief

19       driver changes every week?

20  A.   Yes.

21  Q.   Why?

22  A.   It's based on a standard discount which

23       changes every week.

75

1    Q.   Explain that for me.

2    A.   Take ten percent of the weekly discount and

3         he's charged that amount per day per relief

4         driver.

5    Q.   Flip over to document number 972 for me,

6         please.

7                   MR. HISHTA:  I'm missing 972.

8    Q.   Well, let's share that one.  What is

9         document number 972?

10   A.   Looks like a distributor's statement run

11        for a full year.

12                  MR. HISHTA:  Let's take a break so

13                  we can get a copy of this.

14             (A brief recess was taken.)

15   Q.   (Mr. Davis continuing:)  All right.

16        Document number 972, that's a -- is that a

17        yearly summary?

18   A.   Yes.

19   Q.   And that's for basically the year 2006?

20   A.   Yes.

21   Q.   Except for the last day of the year.  I

22        guess it doesn't have the 12-31-2006 in it;

23        correct?

76

1    A.    Yes, sir.

2    Q.    On the business expenses at the bottom it's

3          got truck rental.  You see that figure?

4    A.    Yes, sir.

5    Q.    $24,698.84?

6    A.    Yes, sir.

7    Q.    How is that figure determined?

8    A.    That is the expense for renting a truck by

9          Flowers Baking Company of Opelika to run

10         this route.

11    Q.    Who was the truck rented from?

12    A.    I couldn't say off the top of my head.

13    Q.    I mean, would it -- do y'all have a

14         specific place y'all rent trucks from?

15    A.    Not that I'm aware of.

16    Q.    How did you come up with or who told you

17         that the figure was $24,698.84 to rent a

18         truck for a year?

19    A.    That would have come from a sales manager,

20         operations manager.

21    Q.    Do you have any documents to back up that

22         the truck rental cost $24,698.84?

23    A.    Yes.  They would have turned those in.

77

1    Q.   It looks like life insurance, 329.68.  Who

2         is the life insurance on?

3    A.   On the distributor.

4    Q.   On Henry Porterfield?

5    A.   Is this on his route, or is this -- I

6         didn't even look.  Is this for one route or

7         is this --

8    Q.   These are documents that your lawyer

9         produced to me.

10              MR. HISHTA:  It's not -- for

11                 record purposes, it's not

12                 clear that this is route 2069

13                 because 2069 does not appear

14                 on this document.

15    Q.   If I wanted to double-check myself -- and

16         we won't do it here.  But if I took all of

17         the weekly reports and just took total

18         product charged and added those up for the

19         year, they should come up to -- if this is

20         in fact this particular route, it should

21         come up to $600,245.39?

22    A.   Yes, sir.

23    Q.   All of the other charges should match up if

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1      that is in fact the route?

2  A.   Yes, sir.

3  Q.   Do you know if Henry Porterfield was

4      leasing a truck whenever he had the route?

5  A.   No, sir, I don't know.

6  Q.   On 972 it says the relief driver was paid

7      $37,490.55.

8              MR. HISHTA:  Objection.  It

9                doesn't say -- it doesn't

10              indicate what the relief

11              driver was paid.

12  Q.   Okay.  There was a charge made for relief

13      driver of $37,490.  You see that?

14  A.   Yes, sir.

15  Q.   Who received the benefit of that charge?  I

16      mean, was somebody paid $37,490.55?

17  A.   No.  It was charged to Henry Porterfield's

18      route.

19  Q.   Okay.  And why was it charged to his

20      route?

21  A.   Because Flowers of Opelika was running the

22      route for Henry Porterfield.

23  Q.   So Flowers was running the route.  So

79

1       Flowers charged him $37,490.55 to run the

2       route for him; is that correct?

3  A.   Yes.

4  Q.   And Flowers paid someone themselves to run

5       the route?

6  A.   Well, not if it was a Flowers employee

7       who's getting a salary.

8  Q.   Do you know in 2006 who ran this particular

9       route?

10  A.   No.

11  Q.   And $37,490.55 is computed by taking the

12       total product charged --

13  A.   The discount.

14  Q.   The discount?

15  A.   The discount.

16  Q.   Which is where on here?

17       Okay.  I got you.  Standard discount,

18       $74,775.75?

19  A.   Yes.

20  Q.   And what percentage of that does Flowers

21       use to come up with how they charge for a

22       relief driver?

23  A.   Ten percent.

80

1   Q.   So ten percent of $74,775 should be what?

2   A.   Well, ten percent of that number is $7,478

3       roughly.  But it's done on a weekly basis.

4   Q.   This is a yearly report.  Is this not the

5       yearly standard discount?

6   A.   Yes.

7   Q.   Obviously $37,490.55 is not ten percent of

8       $74,000.

9              MR. HISHTA:  Objection.  Asked and

10                  answered.  He previously

11                  testified the ten-percent

12                  figure was calculated on a

13                  daily basis.

14   Q.   Okay.  Well, tell me how the $37,490 figure

15       is calculated on a daily basis.

16   A.   That $37,000 wasn't.

17   Q.   Okay.  How was it calculated?

18   A.   It should be a total for the year.

19   Q.   And the total for the year should be ten

20       percent of the standard discount, or no?

21       You tell me.

22   A.   It's ten percent of the discount for a

23       total week based on the number of days

```
 1            there was a relief driver.
 2    Q.    For a total week based on number of days
 3            that there was actually a relief driver?
 4    A.    Yes, sir.
 5    Q.    Tell me how you would compute it.
 6    A.    You would take the total standard discount
 7            for a week times ten percent, multiply that
 8            by the number of days there was a relief
 9            driver for that week.
10    Q.    Okay.  Can you explain to me how the relief
11            driver figure on document number 972 is
12            $37,490.55?
13    A.    It should be a total of each week's relief
14            driver expense.
15    Q.    Let's just flip backwards.  I'm just going
16            to pick document number 946.  You see where
17            it says relief driver?
18    A.    Yes, sir.
19    Q.    It says 421.40?
20    A.    Yes, sir.
21    Q.    That's for the week of 7-2 through 7-8-06;
22            is that correct?
23    A.    Yes.
```

82

1    Q.    The relief driver charge for that week

2           should be total discount times ten percent

3           times number of days; is that right?

4    A.    Uh-huh (positive response).  Yes, sir.

5    Q.    So if I go here and I go to total discount,

6           it's how much?

7    A.    842.75.

8    Q.    All right.  842.75 times ten percent equals

9           $84.27; is that correct?

10    A.    Yes, sir.

11    Q.    Times the number of days.  So five days; is

12           that right?

13    A.    I don't know.

14    Q.    All right.  421.40 divided by --

15                  MR. HISHTA:  It's five days.

16    Q.    -- $84.27 is five days; right?

17                  MR. HISHTA:  84.27 times five is

18                     421.35.  So for rounding

19                     purposes, yes.

20                  MR. DAVIS:  Close enough.

21    Q.    So that's the way that's computed for

22           there?

23    A.    Right.

83

1    Q.    So if we take the relief driver figure

2          421.40 and we take that figure each week

3          and add them up, what you're telling me is

4          at the end of the year it should add up for

5          2006 to $37,490.55?

6    A.    Yes.

7    Q.    And the total discount is what's used every

8          week?

9    A.    Yes.

10   Q.    If you look at document number 972, the

11         total discount shows $74,778.  Is that

12         figure correct?

13   A.    I'm sorry.  You lost me.

14   Q.    Sure.  Let's look at document number 972.

15         If we look at the discount for the year

16         2006, 1-1-2006 to 12-30-2006, the standard

17         discount appears to me to be $74,775.75; is

18         that correct?

19   A.    Yes.

20   Q.    And that's for the whole year's standard

21         discount; correct?

22   A.    Yes, sir.

23   Q.    Why -- and I'm sorry if this is a bad

84

```
 1        question.  But explain to me why it's not

 2        ten percent of that figure times the number

 3        of days, or is it?

 4   A.   No, it's not.

 5   Q.   Okay.  Well, explain to me -- explain to

 6        for me how that figure plays into the

 7        calculation.

 8   A.   It doesn't.

 9   Q.   And why doesn't it?

10   A.   Because it's a yearly figure.

11   Q.   Okay.  So the discount --

12   A.   You can't --

13   Q.   You can't do it because of the numbers of

14        days that the driver has actually worked

15        the route?

16   A.   Yes, sir.

17   Q.   Okay.  That's what I'm trying to get to.

18        I'm trying to get to the bottom of all

19        this.

20             All right.  So if I do it on a weekly

21        and add them up weekly, then my figure

22        should come out to be $37,490.55?

23   A.   Yes, sir.
```

85

1    Q.    The shrinkage charged to this account

2          according to this for 2006 was $211.47; is

3          that correct?

4    A.    Yes.

5    Q.    That's for the year; is that right?

6    A.    Yes, sir.

7    Q.    Miscellaneous expenses, $1,620.  Do you

8          know what that is

9    A.    Like I said, miscellaneous could be a lot

10         of different things.  The most usual is

11         pull-up charges.

12   Q.    Do you know why Henry Porterfield's account

13         would be charged for pull-up charges?

14   A.    Not just looking at this document, no.

15   Q.    And the life insurance charge of 329.68, is

16         that on Henry Porterfield's life?

17   A.    Yes.  I mean, it's for -- on the

18         distributor's behalf.  I don't know exactly

19         who it's for.

20   Q.    I mean, does Henry Porterfield have a life

21         insurance policy that y'all pay $329.68 for

22         every year?

23   A.    We pay it on Henry Porterfield's behalf.

86

1   Q.   Do you pay it on -- when you say on his

2         behalf, is it paid for a driver?

3   A.   For a driver?

4   Q.   Somebody that's running -- a relief

5         driver?

6   A.   No.

7   Q.   Who is the life insurance paid to?

8   A.   To the life insurance company.

9   Q.   And who is the insured on that life

10        insurance policy?

11  A.   What I'm saying is it could be -- I don't

12       know if it's just the distributor or his

13       family.  I don't know for sure.  It's on

14       the distributor's behalf.

15  Q.   So it could be anybody.  And when you say

16       the distributor, you're talking about Henry

17       Porterfield?

18  A.   If this is his route, yeah.

19  Q.   I mean, it's not paid on behalf of a relief

20       driver, is it?

21  A.   Not through a statement.

22  Q.   Is a relief driver -- is he covered by life

23       insurance through the company?

87

1  A.  If he's an employee of Flowers Baking

2      Company.

3  Q.  That's not charged to Henry Porterfield,

4      though, is it?

5  A.  No.

6  Q.  And you don't know what kind of truck is

7      being rented for $24,000 a year, do you?

8  A.  What kind of truck?

9  Q.  Yeah.

10 A.  You mean like brand name?  What do you mean

11     by what kind?

12 Q.  Like what kind of delivery truck is it that

13     $2,000 a month basically is being paid by

14     Flowers?

15 A.  I don't ever see the trucks.  I couldn't

16     say what kind of truck it was.

17 Q.  Who has the lease documents on those

18     trucks?

19 A.  I don't know.  I don't handle the lease.  I

20     mean, I just handle this financial end of

21     it, so I don't know.

22 Q.  Flip over to document number 982 for me,

23     please.  If we look down at the item

88

1  entitled truck lease, do you see that

2  item?

3  A.  Yes.

4  Q.  And how much is the weekly truck lease

5  amount?

6  A.  Looks like it's zero.

7          MR. HISHTA:  Zero.

8  Q.  I'm sorry.  Truck rental amount.

9  A.  $333.69.

10 Q.  If you look at number 983, what is the

11 truck rental amount?

12 A.  $333.68.

13 Q.  And if you look at 984, what is the truck

14 rental amount?

15 A.  $333.68.

16 Q.  If you look at 985, what's the truck rental

17 amount?

18 A.  $333.68.

19 Q.  Same thing with 986?

20 A.  333.68.

21 Q.  And that's the weekly truck rental amount;

22 correct?

23 A.  Well, I haven't been checking these.  Yes,

89

1    sir, these are weekly statements.

2    Q.    Flip back to 981 for me.

3          Are you at 981?

4          What's the truck rental amount on 981?

5    A.    $667.38.

6    Q.    Do you know why the truck rental was

7          $667.38 on 2-25-07 through 3-3-07?

8    A.    That's what we were told to charge the

9          route.

10   Q.    And who was it that told you to charge

11         that?

12   A.    Like I said before, we get the information

13         from the sales managers in the warehouse.

14         They tell us how much it's costing to rent

15         a truck.

16   Q.    But the sales office has documents to back

17         up these figures that they give you?

18   A.    Yes.

19              (Plaintiff's Exhibit 5 was marked

20              for identification.)

21   Q.    I'm going to show you what I've marked as

22         Plaintiff's Exhibit Number 5.  Do you know

23         what Plaintiff's Exhibit Number 5 is?

90

1    A.    Yes, sir.

2    Q.    What is that?

3    A.    It's a W-2.

4    Q.    Issued by Flowers Baking Company of

5          Opelika, LLC, to Henry Porterfield?

6    A.    Yes.

7                    (Plaintiff's Exhibit 6 was marked

8                    for identification.)

9    Q.    Let me show you what I've marked as

10         Plaintiff's Exhibit number 6.  Is that also

11         a W-2 for 2003 issued by Flowers Baking

12         Company to Henry Porterfield?

13   A.    Yes.

14                   (Plaintiff's Exhibit 7 was marked

15                   for identification.)

16   Q.    Let me show you what I've marked as

17         Plaintiff's Exhibit number 7.  Is that also

18         a W-2 issued to Mr. Henry Porterfield for

19         2004?

20   A.    Yes, sir.

21                   (Plaintiff's Exhibit 8 was marked

22                   for identification.)

23   Q.    Let me show you what I've marked as

91

1       Plaintiff's Exhibit Number 8.  Is that also

2       a W-2 issued by Flowers to Henry

3       Porterfield for 2005?

4    A.    Yes.

5                (Plaintiff's Exhibit 9 was marked

6                 for identification.)

7    Q.    And let me show you Plaintiff's Exhibit

8       Number 9 and ask you if that's also a W-2

9       issued by Flowers to Henry Porterfield for

10      the year 2006.

11   A.    Yes.

12   Q.    And looking at 2006, how much does it say

13      that Mr. Porterfield made in 2006 from

14      Flowers?

15   A.    He didn't make anything from Flowers.  I

16      mean, we don't --

17   Q.    How much does it report that his wages --

18      excuse me.  Let's see what it says --

19      wages, tips, or other compensation were in

20      2006?

21   A.    $74,499.75.

22   Q.    And Mr. Porter didn't get $74,000 and

23      change from Flowers during 2006, did he?

92

1    A.    Well, he wasn't -- what do you mean by get?

2    Q.    Did he receive wages, salaries, or tips

3          from Flowers in the amount of 74,000?

4    A.    No, not wages, salaries, or tips.

5    Q.    What did he receive?

6    A.    He received discount on product he bought

7          from Flowers Baking of Opelika.

8    Q.    And how much was his discount?

9    A.    $74,499.75.

10   Q.    And that discount is a percentage of the,

11         what, net sales, or what is it?  It's a

12         percentage of what?

13   A.    The product he bought from Flowers of

14         Opelika.

15   Q.    And what percentage of it is it?

16   A.    It's different for different --

17   Q.    Different products?

18   A.    -- different products.

19   Q.    And he received a discount or percentage of

20         the discount, I guess; right?

21   A.    Percentage of the -- well, the discount is

22         a percentage.

23   Q.    But as far as dollar figures, he didn't

93

1      receive any actual money himself, did he?

2                 MR. HISHTA:  Are you asking him

3                     did he physically receive

4                     money or did money go into a

5                     bank account?

6   Q.   Did money go into -- either a check written

7        out that said from Flowers to Henry

8        Porterfield or cash or any type of

9        compensation that went straight to Henry

10       Porterfield?

11  A.   If at the end of the week if we owed --

12       Flowers owed him money, yes.

13  Q.   How many times did Flowers cut Henry

14       Porterfield a check in 2006?

15  A.   I don't know.

16  Q.   If you look at the 2006 summary, would it

17       tell you if Mr. Porterfield received a

18       check?

19  A.   No.  Because he could have received checks

20       one week and the next week he might not

21       have received a check.  You can't go on a

22       yearly figure.

23  Q.   If I look at the 2006 weekly reports, will

94

1          I be able to tell if he received a check?

2     A.   Yes.  You can see what the balance is.

3     Q.   It says distributor balance and it has a

4          figure there.  If there's a balance, then

5          he didn't receive a check; is that right?

6                    MR. HISHTA:  If there's a positive

7                    balance, is that what you --

8     Q.   A positive balance.

9     A.   If it's a positive balance, no, sir, he

10         didn't receive a check.

11    Q.   Go to Bates stamp number 971 for me.  Are

12         you at that page?

13              You see the weekly distributor balance?

14    A.   Yes, sir.

15    Q.   $16,874.14?

16    A.   Yes, sir.

17    Q.   So as of -- and that's the week of

18         12-24-2006 to 12-30-2006?

19    A.   Yes.

20    Q.   So at the end of 2006 Henry owed --

21         according to your calculations owed Flowers

22         $16,874.14?

23    A.   Yes.

95

1    Q.   Flip back -- let's go back to document

2         number 878, which is right around the time

3         that Henry's contract was terminated on --

4         which was -- this is for a report of

5         3-20-2005 to 3-26-2005.  You see that?

6    A.   Yes, sir.

7    Q.   And at that time the weekly distributor

8         balance was what?

9    A.   $495.69.

10   Q.   And was that a credit?

11   A.   Yes, sir.

12   Q.   So Henry got cut a check for that week for

13        $495.69; is that right?

14   A.   Yes, sir.

15   Q.   If you look over to the next week, it shows

16        Henry owing you $271.93; correct?

17   A.   Yes, sir.

18   Q.   And that figure is increasing every week

19        until it gets up to where I just stopped at

20        at 12-24-2006 and it's up to 16,874?

21                   MR. HISHTA:  It may not increase

22                   every week, but we will

23                   stipulate that it has

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1           increased.

2   Q.   It has increased up to that amount by

3        12-30-2006.  If you go further, it's even

4        higher than that now.  So I'm just stopping

5        at that date.

6           Do you know any reason why Flowers is

7        losing money on this particular route when

8        they're running it themselves?

9   A.   Mr. Porterfield is not paying us any money.

10  Q.   Mr. Porterfield should be paying you money

11       every week?

12  A.   No, I didn't say that.

13  Q.   Mr. Porterfield is not paying you any money

14       on what?

15  A.   His route number 2069.

16  Q.   Is anybody paying you any money on that

17       route number 2069?

18            MR. HISHTA:  Objection.  It's

19               vague.  I'm not sure what

20               either one of you are

21               referring to.

22            MR. DAVIS:  I don't either.

23               That's what I'm trying to get

97

1                              at.

2     Q.    I mean, who's paying for product charged to

3           route 2069?

4     A.    Nobody.  It's just accumulating.

5     Q.    So since March of 2005 not a single

6           customer on route 2069 has paid any dime to

7           Flowers?

8     A.    Oh --

9                 MR. HISHTA:  Objection.  Vague.

10                       But go ahead and answer.

11    A.    Yeah, customers have.

12    Q.    All right.  But Mr. Porterfield hasn't?

13    A.    Not that I'm aware of.

14    Q.    Is there a reason why Mr. Porterfield

15          should be paying you money every week on

16          this account?

17    A.    Well, it's got his name on the document.

18    Q.    Okay.

19                 MR. HISHTA:  Well, I'd state for

20                       record purposes that -- and I

21                       believe that we have

22                       previously stipulated to

23                       this.  Michael Lord certainly

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

98

1              testified to that effect that

2              the -- Mr. Porterfield's

3              territory is being run on his

4              behalf and an accounting has

5              been taking place since the

6              termination of his contract.

7    Q.   Do you have all of the documents related to

8         the accounting of Mr. Porterfield's route?

9    A.   Yes.

10   Q.   Are those documents kept in a separate

11        file?

12   A.   They're kept in a folder.

13   Q.   All of them related to 2069?

14   A.   Yes.

15   Q.   So every charge, everything that deals with

16        this account is kept in one folder?

17              MR. HISHTA:  If you know.

18   A.   I don't know that every charge is kept in

19        that folder.

20   Q.   What charges are kept in the folder?

21   A.   Well, I don't keep up with the folder, so I

22        don't know.

23   Q.   Who does?

115

1          discussing at the bottom of

2          document 920.

3  A.    The less prior week pay by scan inventory

4        is the ending inventory for the week ending

5        12-31-05.

6  Q.    And that's credit?

7  A.    Uh-huh (positive response).

8  Q.    Is that right?

9  A.    Yes.

10 Q.    All right.  And the less current weekly pay

11       by scan delivery tickets, is that also a

12       credit?

13 A.    Yes.

14 Q.    And when you take your total distributor

15       balance of 11,506.17 and you take your two

16       credits away from it, it leaves a weekly

17       distributor balance of $9,226.47; correct?

18 A.    Yes.

19 Q.    And at the end of that week, that is the

20       weekly distributor balance?

21            MR. HISHTA:  Objection.

22 Q.    Is that correct?

23            MR. HISHTA:  Objection to the

120

1       I'm trying to remember the formula that

2       balances it.  Because, like I said, I don't

3       do this every day.  So the point of sale

4       data and the prior week pay by scan

5       inventory for one week equals the next

6       week's point of sale data, revaluation

7       variance, and pay by scan inventory.  The

8       next -- that's what I'm trying to say.

9       This is not saying that Henry Porterfield

10      owes us $9,490 on this week.

11   Q.  On number 921?

12   A.  Yes.

13   Q.  What's it saying?

14   A.  It's saying that he owes us $11,523.

15   Q.  Well, we're back to my question.  Tell me

16      where on that document, on 921, the 942.83

17      credit and the $1,090 credit went to.

18   A.  Well, nobody ever said he was supposed to

19      get credit for that.  He gets credit for

20      when it's scanned.

21   Q.  All right.  Then why is it there as being a

22      credit?

23   A.  I told you, it's just an accounting

121

```
 1           function to check to make sure that these
 2           numbers are right.
 3      Q.   Well, show me how these numbers are right
 4           when you use the numbers at the bottom of
 5           the page.  Explain that to us.
 6      A.   Okay.  That's what I'm -- that's what I'm
 7           trying to remember, the formula.  Which
 8           ones are we using?
 9                This one right here.  Okay.  I'm doing
10           something wrong.  I can't remember the
11           formula exactly.  I'm trying to remember
12           what it is.
13                It's not coming up right.
14                     MR. HISHTA:  Greg, for record
15                          purposes, we would be happy to
16                          supply you an explanation of
17                          the accounting on a
18                          week-to-week basis if he
19                          cannot testify regarding his
20                          recollection of that
21                          accounting formula as he sits
22                          here today.
23      Q.   Sitting here today you don't know how you
```

122

1           came up with those figures, do you?

2   A.     Not off the top of my head, no.

3   Q.     Let me ask you another question.  Flip over

4          to 922.  You see where it says new

5          distributor balance here?

6   A.     Yes, sir.

7   Q.     It's $1,264.18?

8   A.     Yes, sir.

9   Q.     From your standpoint -- from an accounting

10         standpoint, does this tell you that at the

11         end of the week that this distributor

12         had -- whether or not it's Henry

13         Porterfield or whoever it is -- had

14         $1,264.18 of bread that they didn't

15         deliver?

16             Aren't these figures based on bread?

17  A.     On bread that they didn't deliver?

18             This number is taking the product he

19         bought from Flowers minus his load

20         adjustments --

21  Q.     Shorts, damaged, product transfers,

22         authorized charges.  So this distributor at

23         the end of the day has $1,264 worth of