UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HENRY G. PORTERFIELD | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.  2:05cv937-F |
| | ) | |
| | ) | |
| FLOWERS BAKING CO. OF | ) | |
| OPELIKA, LLC. | ) | |
| | ) | |
|     Defendant. | ) | |

## DEFENDANT, FLOWERS BAKING CO. OF OPELIKA, LLC's, REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

On July 2, 2007, Flowers Baking Co. of Opelika, LLC  filed its Motion for Summary Judgment, its Brief in Support thereof, (the "Summary Judgment Brief") and Evidentiary Submission (collectively referred to as the "Summary Judgment Motion").  On July 26, 2007, Plaintiff filed his Opposition to Flowers Baking Co. of Opelika, LLC's ("Flowers") Motion for Summary Judgment as well as an Evidentiary Submission (collectively referred to as the "Opposition Brief").  In his Opposition Brief, Plaintiff relies on inadmissible evidence[1], unsupported factual allegations and confusing arguments in an attempt to engineer factual dispute.  As demonstrated herein, as well as in Flowers' previous submissions in support of summary judgment,

---

[1]See Defendant's Motions to Strike the Affidavits of Henry Porterfield and Charles Morrow (filed simultaneously herewith).

1

Plaintiff's efforts to create factual disputes are not worthy of credence, and as a result, Flowers is entitled to summary judgment on all of Plaintiff's claims.

## I.  ADDITIONAL UNDISPUTED MATERIAL FACTS[2]

### A.  Testimony of Plaintiff's Son, Marcus Porterfield, and Plaintiff's Brother, Robert Porterfield

92.     Marcus Porterfield (hereafter "Marcus") is the son of Plaintiff, Henry Porterfield. (Deposition of Marcus Porterfield [hereafter "Marcus Dep."] p.  8, lines 14-18, Tab I.)

93.     Marcus Porterfield worked at Flowers' Montgomery warehouse as a pullup man through the temporary service, WorkStaff, from 2000 to 2005. (Marcus Dep. p 16, line 1 to p. 17, line 11; p. 24, lines 13 to 20, Tab I.) In this position, Marcus would work on Wednesdays, Saturdays and Sundays and take bread from the back of his assigned stores and place it on the shelves. (Marcus Dep., p. 25, line 21 to p. 26, line 13, Tab I.)  In performing this job, Marcus did not need to stop at the Montgomery warehouse to pick up or leave any product. (Marcus Dep., p. 27, lines 3-23, Tab I.) He believes that he was treated fairly by Flowers' employees. (Marcus Dep., p. 36, lines 17-19, Tab  I.)

94.     Marcus was terminated from his employment with WorkStaff.  (Marcus Dep., p. 17, lines 4-11, Tab I.)  Marcus was told by personnel from WorkStaff that he was not allowed to return to Flowers' premises, sometime after he videotaped on Flowers' premises. (Marcus Dep., p. 19, line 11 to p. 21, line 17; p. 35, line 15 to p. 36, line 1, Tab I. )

---

[2]After Defendant's Brief in Support of Summary Judgment was submitted on July 2, 2007, Plaintiff took the depositions of Jerry Woodham, Brad Alexander, and an additional deposition of Michael Lord on July 16 and 17, 2007.  Defendant took the depositions of Marcus Porterfield and Robert Porterfield on July 16, 2007. As such, the relevant deposition testimony of these additional witnesses will be added to the facts.

95.    Henry Porterfield asked his son to videotape the freezer on Flowers' premises. (Marcus Dep., p. 20, line 22 to p. 21, line 3, Tab I. )

96.    During the time he worked as a pullup man, Marcus also helped his father with his distributor route. (Marcus Dep., p. 36, line 20 to 37, line 7, Tab I.)   Marcus did not report the income his father paid him for assisting on the route. (Marcus Dep., p. 38, lines 8-10, Tab I. ) Marcus does not recall his father ever complaining about delivering product from the freezer. (Marcus Dep., p. 43, lines 9-22, Tab I. )

97.    Marcus was assisting his father with his route on the day that Plaintiff was to bring extra buns back to the Troy State Sodexho account. (Marcus Dep. p. 44, line 17 to p. 45, line 5, Tab I.) Marcus does not recall that his father's truck broke down that day.  (Marcus Dep., p. 45, lines 17-19, Tab I. ) Marcus does not remember any trouble with the truck that day. (Marcus Dep., p. 47, lines 9-12, Tab I. )

98.    Robert Porterfield (hereafter "Robert"), Plaintiff's brother, also worked his route for him for one week while Plaintiff was on vacation. (Deposition of Robert Porterfield [hereafter "Robert Dep."], p. 18, lines 1-20, Tab J.)

99.    Robert received "a lot of help and support" from Flowers in assisting him with running his brother's route. (Robert Dep., p. 18, lines 11-16, p. 32, lines 7-11, Tab J.)

100.  Robert Porterfield, who is a retired teacher with the Montgomery County School System, put in a good word for his brother, Henry, for a position with the Montgomery School Board after Plaintiff's contract was terminated with Flowers. (Robert Dep., p.19, lines 8-21, p. 26, lines 15-23, Tab J.)

101.    Robert disagrees with Plaintiff's explanation on his application with the Montgomery School Board that he left Flowers because it "was time to leave" and instead would have stated that his contract was terminated. (Robert Dep., p. 28, lines 1-11, Tab J.)

**B.  Testimony of Regional Vice-President Brad Alexander Regarding Practices in the Bread Industry**

102.    Brad Alexander currently serves as the Vice-President for Region 4 which includes Flowers Baking Co. of Opelika, LLC.  (Deposition of Brad Alexander [hereafter "Alexander Dep."] p. 12, lines 11-18,  Tab K.) Alexander has been in the bread business, specifically with Flowers Foods or one of its subsidiaries, since 1981, working as a Route Salesman, in production, shipping, administration, marketing, as a Sales Manager, Director of Sales, Regional Brand Manager, Director of Marketing, Vice-President of Marketing, Plant President, Senior Vice-President of Sales and Marketing and his current position, Vice-President for Region 4. (Alexander Dep., p. 6, line 7, to p. 12, line 18, Tab K.)

103.    As Regional Vice-President, Alexander is responsible for improving the financial picture of the region, although the subsidiaries are highly independent and decentralized. (Alexander Dep., p. 14, lines  1-5, p. 16, lines 4-16, Tab K.)

104.    Based on Alexander's broad and long experience in the bread industry, he is aware that freezing product is a common practice. (Alexander Dep., p. 23, lines 15-19, Tab K.) In fact, Flowers' customers actually put Flowers' product into their own freezers. (Alexander Dep., p. 25, lines 2-9, Tab K.)  The practice utilized by Flowers is for limited unique items used in restaurants that are not made in high volume in order to have surplus for a customer. (Alexander Dep., p. 26, lines 7-16, Tab K.)

105.    This practice is not kept a secret from Flowers' customers, as Alexander has talked with Krystal and Sonic about the practice. (Alexander Dep., p. 28, line 14 to p. 29, line 14, Tab K.)

**C. Michael Lord's Testimony Regarding Flowers' Accounting Practices**

106.    Jerry Woodham, Controller for Flowers, provided an explanation of each notation for costs or credits on Plaintiff's weekly summary sheets for his route. (Woodham Dep., p. 15, lines 15-20, p. 41, line 22 to page 50, line 3; Tab L.)

107.    Michael Lord offered to give a second deposition to better explain the weekly summary accounting pages for Plaintiff's route and the pay-by-scan system which is part of the accounting program used on Plaintiff's weekly summary sheets. (Lord II Dep., p. 92, line 18 to p. 93, line 23, Tab M.)

108.    Certain Flowers' customers use a pay-by-scan program wherein Flowers is not paid for product until the product is purchased by a retail customer and is scanned at the register. (Woodham Dep., p. 58, lines 2-10, Tab L.) One such pay-by-scan customer is Walmart, which was built and added to Plaintiff's route after his contract was terminated. (See Plaintiff's Exh. 1 wherein Walmart is not listed as a route stop on his 2002 contract).

109.    Distributors do not need to wait until a pay-by-scan customer pays Flowers for the product to receive credit for such product sales. Distributors receive a full temporary credit for deliveries to pay-by-scan accounts. As stated by Lord,

> "He [the distributor] is not going to receive credit for that until the following week. So we give him a temporary credit right there to try to make him whole for that week so he doesn't have to blunt the full – full inventory. Because most distributors can't go out there and carry all that themselves. So we look at it like we're going to do this to help you out so you don't have to carry the whole inventory."

5

(Lord II Dep., p. 99, lines 3-23, p. 100, line 12 to p. 101, line 13, p. 134, line 21 to p. 135, line 1; Tab M.)

110.    A review of Lord's deposition testimony demonstrates that he answered all of Plaintiff's counsel's questions regarding the accounting and any apparent discrepancies in the numbers on the weekly summary sheets were explained or could be explained with further investigation. (Lord II Dep., p. 89 to p. 135, Tab M.) In fact, Plaintiff's counsel, Greg Davis, noted his understanding of the accounting system more than once throughout Lord's testimony.

> MR. DAVIS: I understand how it's working now.
> Q: Yesterday we could not get an explanation to determine how this all worked. I think that you've helped, Mr. Lord, figure this out. But still I'm just wondering about these figures, why they don't match up.
> A; What you've got to keep in mind right here is that this is a temporary credit. It is temporary trying to make the distributor whole from the inventory that he would have to carry. We don't want him to have to carry all of that. So that is just temporary.
>     Now, it if it's off one way or the other , when its all said and done it's going to work out. Pay by scan is a continuing rolling over. It rolls from week to week to week to week to week. It continues to roll the whole time. It's never going to come out to be – because you're a week behind. Does that make sense?
> A: It does make sense (Greg Davis)

(Lord II Dep., p. 111, line 14 to p. 112, line 13 Tab M.)

111.    Plaintiff did not receive any income for the year 2006, as the expenses of running his route, namely renting two trucks and paying a driver, outweighed the income to the route. (Woodham Dep., p. 94, lines 3-23, Tab L.) Specifically, the route needed two trucks after the WalMart opened. (Lord II Dep., p. 132, lines 6-14, Tab M.) Another large expense on Plaintiff's route is the weekly cost of a relief driver to run his route. (Woodham Dep., p. 73, line 13 to p. 75, line 6, Tab L.)

112.  Distributors are charged from 25 percent to 50 percent of the shrinkage at their stores, and this was discussed with the distributors. (Lord II Dep., p. 112, lines 14 to p. 114, line 9, Tab M.) While shrinkage costs are normally calculated every fourth week, Plaintiff's route has only been charged for shrinkage two times over the last two years. (Lord II Dep., p. 118, line 6 to p. 120, line 13, Tab M.)

113.  Any income from cash accounts on Plaintiff's route were utilized to pay for the gas for the route or other expenses. (Lord II Dep., p. 131, lines 15-21, Tab M.)

### D. A Review of Plaintiff's Alleged Facts that Are Either Disputed by Plaintiff's Own Testimony or Unsupported by the Record

In response to paragraph 9 of Plaintiff's alleged facts, he gives no citation for his assertion that in 2004, Publix or Walmart announced they would be opening stores in his territory.

In response to paragraph 12 of Plaintiff's alleged facts, Plaintiff's own son, Marcus, who accompanied his father on his route the day of the Sodexho incident, **denies the truck broke down that day**. (Marcus Dep., p. 45, lines 17-19, p. 47, lines 9-12, Tab I.) Moreover, it is undisputed that Plaintiff testified at his deposition that he forgot about the delivery to Sodexho after his truck allegedly "broke down" and never called anyone for help, including any other distributor, Flowers' personnel or his customer, Sodexho. (Pl. Dep., p. 286, lines 6-23, p. 289, lines 7-11, p. 295, line 1 to p. 296, line 10 , Tab B.) As such, Plaintiff's statement that no one else was available to make the delivery is not based on personal knowledge or fact.  *See, Defendant's Motion to Strike the Affidavit of Henry Porterfield* filed contemporaneously herewith.

Likewise in response to Plaintiff's paragraph 14 of alleged facts, Plaintiff's own deposition testimony contradicts his allegation that he "did everything that he could, and used his best efforts

7

as called for in his Distributor Agreement to try to regain the Sodexho Marriott account." As stated, Plaintiff testified he **made no effort** to contact anyone the day his truck "allegedly broke down" (which his son states did not happen) and he also stated he made no effort to have his deliveries handled once he was barred from Flowers' premises although he states he could have someone handle his route today even though he is on Social Security disability. (Pl. Dep., p. 312, line 15 to p. 313, line 22, p. 322, line 14 to p. 323, line 2, p. 371, lines 3-9, Tab B.) *See, Defendant's Motion to Strike the Affidavit of Henry Porterfield filed contemporaneously herewith.*

In response to paragraph 18 of Plaintiff's alleged facts, the citation to Grady Messer's deposition does not support the fact that Plaintiff was told he was partially back into the Sodexho account. In fact, Exhibits 4 and 6 in support of Plaintiff's Response, the Affidavits of James Knuckles and Jiles Williams, Jr., respectively, demonstrate that when these men accompanied Plaintiff to Sodexho, they understood that Plaintiff was not even partially back into servicing these accounts. As stated by Jiles Williams, Jr. in his Affidavit:

> I met with Henry and James Knuckles and we drove to Troy State of Montgomery to the cafeteria to meet with the person in charge of the cafeteria. Henry told me that Sodexho Marriot had the account at Troy State. Henry began introducing us to the person in charge. She refused to speak with any of us and she left the room. **She was not budging on her decision to stop Flowers from servicing their account** and to change to one of Flowers' competitors.

(Pl. Exhibit 6, ¶ 6, emphasis added). In fact, Plaintiff states at the end of paragraph 18 of his brief, that "both Williams and Knuckles traveled with Henry to the Flowers warehouse to tell Grady Messer of their **unsuccessful attempt to retrieve the account**." (emphasis added). The statement does not read that they were unsuccessful in retrieving the "entire" account, but indicates that

Plaintiff did not possess **any** of the Sodexho account.  This statement clearly indicates Plaintiff was not partially back into the Sodexho account.

In response to paragraph 20 of Plaintiff's allegations, it is against company policy to allow videotaping on the premises and thus, Marcus Porterfield was fired for this activity which his father asked him to perform. (Messer Dep., p. 71, line 10 to p. 73, line 7, Tab E; Marcus Dep., p. 20, line 22 to p. 21, line 3, Tab I. )

In response to paragraph 35 of Plaintiff's allegations, a review of the citation to Messer's deposition does not support Plaintiff's contention that "Flowers regularly delivers to its distributors product, that, by their own testimony, is two to three months old. . ."  In fact, Plaintiff does not dispute that Flowers only delivers limited restaurant product from its freezer that constitutes approximately 1 percent of its sales to these customers. (Bordeaux Dep., p. 104, lines 7-20, Tab G.)

In response to paragraph 57 of Plaintiff's allegations, he does not provide any citation or support for his assertion that Plaintiff's weekly summary sheets do not balance.  In fact, when stating that Lord could not explain weekly summary  balance sheets related to Plaintiff's route, a review of pages 92-104 of Lord's second deposition demonstrates he answered all questions and provided a possible explanation for a slight imbalance from one week to the next and noted he could explain any differentials if he had additional time to research the same. (Lord II Dep., p. 92 to p. 104, Tab M.)  Moreover, a review of pages 111-112 of Lord's deposition demonstrates Plaintiff's counsel's affirmative understanding of the accounting practices on the weekly summary sheets.

In response to paragraph 60 of Plaintiff's allegations, he fails to cite to the portion of Messer's deposition testimony which explains why Plaintiff's route has two drivers.  Messer stated:

Q: How many have ever had two people on the truck?
A: When a new account opens, it's very possible that for the first few weeks we put two people on there till it gets – you know, we know what's happening.
Q: How long were two people on this particular route?
A: Quite a while.
Q: What's quite a while?
A: Quite a while.  Maybe – Don't know –a year.
Q: Any reason why two people were on there for a year?
A: To – the route was a big route.  To get it down to where they can handle it.

(Messer Dep., p. 117, line 2 to p. 121, line 11, Tab E.)  In essence, Plaintiff's accounting assertions boil down to whether the expenses Plaintiff has been charged by Flowers to run his territory are "reasonable" under Section 16.4 of the Distributor Agreement and resolution of the differentials noted above.  Such an accounting could readily be conducted by Flowers following the resolution of the core issues in this lawsuit.

## II.  ARGUMENT

### A.  Plaintiff's Opposition Does Not Address Certain Claims, Thus Flowers is Entitled To Summary Judgment Regarding these Claims or Arguments

Plaintiff's Opposition Brief does not oppose Defendant's Summary Judgment Motion with respect to the following arguments and claims: (1) Section IV.A.5 Plaintiff Cannot Recover Mental or Emotional Distress Damages or other non-contractual losses on a claim for Breach-of-Contract; (2) Section IV. B. Plaintiff's Misrepresentation/Fraud Claim Is Not Actionable; (3) Section  IV. C. Plaintiff Negligence Claim Is Not Actionable; (4) Plaintiff Does not Address Wantonness with Respect to alleged "out-of-code" product" claim.  In his Response in Opposition to Summary Judgment, Plaintiff has failed to respond to these claims, and thus, Flowers is entitled to summary judgment on these claims. *See* Fed. R. Civ. P. 56(e); *Clark v. Jefferson County Health Dept.*, 2005

U.S. App. LEXIS 10276, *20 (11th Cir. 2005) (holding plaintiff waived argument that district court

erred in granting motion for summary judgment by failing to oppose summary judgment in district

court).

**B.  Plaintiff Cannot Present a Dispute of Material Fact Regarding his Claim for Breach of Contract**

**1.  The Material  Facts Which Led to The Termination of Plaintiff's Contract Are Not in Dispute**

The core facts which led to the termination of Plaintiff's contract are not in dispute, and thus,

should be disposed of on summary judgment.  The parties are in agreement that Plaintiff's contract

was terminated due to his failure to cure his breach with Sodexho at Troy State.  This is consistent

with the terms of Plaintiff's last agreement with Flowers, the 2002 contract which states in Section

16.3 <u>Curable Breach</u>

> In any event of failure of performance by DISTRIBUTOR, COMPANY must give DISTRIBUTOR ten (10) business days written notice within which DISTRIBUTOR may cure his/her failure of performance.  If DISTRIBUTOR does not cure such failure performance within this ten (10) day period, COMPANY may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure. Furthermore, the parties agree that repeated violations constitute a chronic failure of performance and threaten substantial harm to COMPANY's business, and in such event COMPANY shall be entitled to terminate this Agreement and DISTRIBUTOR shall have no further right to cure.

(Df. Tab B, Exh. 27)

The parties also do not disagree that Plaintiff did not cure his breach with Sodexho, a large

client of Flowers.  (Messer Dep., p. 36, lines 11-18, Tab E.) (Plaintiff's Response Brief, at ¶ 18:

11

"After their failed attempt to speak to the Sodexho Marriott Account Manager, both Williams and Knuckles traveled with Plaintiff to the Flowers' warehouse to tell Grady Messer of their unsuccessful attempt to retrieve the account.") ; (Pl. Exhibits 4 and 6, Affidavits of Knuckles and Williams) Nor does Plaintiff dispute that in keeping with Section 16.3 that he had repeated violations of performance leading up to the Sodexho non-delivery, including a previous complaint from the Troy State Sodexho location. (Def's Initial Brief, ¶¶ 20, 21, 29, 30, 39, 40, 43, 44, 45, 46, 48, 49; Stephens Decl. ¶ 5, Tab D.).  Nor do the parties dispute that Steve Stephens, the Operations Manager for the Montgomery warehouse, attempted to assist Plaintiff in getting back into the Sodexho account. (Stephens Decl.¶ ¶ 2, 6, 7; Tab D.)

Moreover, Plaintiff's attempt to allege that he was only required to use "best efforts" to cure a breach as referred to in his contract, is misleading at best.  This paragraph, read in its entirety refers to developing and maximizing the sale of Flowers' product and working with Flowers' marketing program, not the basic job duty of making a delivery.  Paragraph 5.1 <u>Obligations of DISTRIBUTOR</u> reads:

> DISTRIBUTOR agrees and covenants to use his/her best efforts to develop and maximize the sale of COMPANY'S Products to Outlets within his/her Territory and service his/her Territory in accordance with good industry practice as defined above. DISTRIBUTOR shall cooperate with COMPANY on its marketing program and maintain a clean and neat personal appearance consistent with the professional image customers and public associate with COMPANY. . .

(Pl. Dep., Exh. 27, Tab B) However, even if the term "best efforts" were to apply to a breach, Plaintiff's own testimony belies the use of best efforts.  As stated above, and extensively in Defendant's Initial Brief, Plaintiff stated that once his truck allegedly broke down he "didn't think about the buns no more.  My attention was on the truck."  (Pl. Dep., p. 296, lines 8-10, Tab B.)

Plaintiff also stated in response to a question regarding whether his son, who accompanied him that day could have made arrangements for the delivery "Didn't I tell you that I didn't think about it once the truck broke down?" (Pl. Dep. p. 295, lines 11-13, Tab B.)  Of course, Marcus Porterfield has now testified that he has no recollection of the truck breaking down, which casts further doubt on Plaintiff's "best efforts." (Marcus Dep., p. 45, lines 17-19, p. 47, lines 9-12, Tab I.)

Moreover, there is no dispute that Plaintiff did not contact anyone, including another distributor, Flowers or Sodexho regarding his alleged problem on the day he did not make the delivery. (Pl. Dep., p. 286, lines 6-23, p. 289, lines 7-11, p. 295, line 1 to p. 296, line 10, Tab B.) There is no dispute of fact that this was not  an "effort" much less a "best effort."

Moreover, Plaintiff repeatedly states he was not allowed back into the account either in whole or partially.  Both of his witnesses to the meeting with the representative from Sodexho submitted affidavits indicating that he was not back in the account at all. As stated by Councilman Knuckles, "When we left the cafeteria, it became clear to us that she was not budging on her decision to stop Flowers from servicing their account." (Pl. Ex. 4, Affidavit of  James Knuckles, ¶ 6) Plaintiff's minister stated, "She was not budging on her decision to stop Flowers from servicing their account and to change to one of Flowers' competitors." (Pl. Ex. 6, Affidavit of Jiles Williams, Jr., ¶ 6) As such, Plaintiff's own first-hand witnesses do not state that Plaintiff was somehow partially in the account, but clearly maintain that Plaintiff was out of the Sodexho account, and the client was not going to change her mind.

Further, there is no dispute that Plaintiff made absolutely no arrangements for someone to run his route after he was barred from the premises, although he states that would not be a problem,

now, two years after the fact, when he can no longer run a route at all due to his receipt of Social Security. (Pl. Dep., p. 371, lines 3-9, Tab B.) As such, his argument regarding the fact that Marcus was banned from the premises for videotaping is simply a red herring on this issue given the fact that Plaintiff is confident he could find someone to run his route two years removed from the business. While Plaintiff attempts to blame Flowers for his failure to cure his breach, it was not Flowers who did not make the delivery. It was not Flowers whose truck "allegedly" broke down. It was not Flowers who did not contact anyone for alternative arrangements. It was not Flowers who had a previous bad experience with this client; and it was not Flowers who did not make alternative arrangements for the deliveries.

For these reasons, there is simply no evidence, much less credible circumstances to show that Plaintiff's allegations, especially that it was somehow Flowers' fault that he lost the account and breached his contract. A plaintiff's testimony "can and should be rejected without trial [at summary judgment] if, in circumstances, no reasonable person would believe it." *S.R. Sheshardri v. Kasraian* 130 F.3d 798, 802 (7th Cir. 1997). Given the fact that Plaintiff's own son will not back his story regarding his truck, no reasonable jury could believe plaintiff's testimony. *Hutchinson v. Fifth Third Bank of Northwestern Ohio, N.A.*, 234 F.3d 1268 (6th Cir. 2000) (holding no reasonable jury could believe the defendant's legitimate explanations for its actions were pretextual); *Scott v. Genuine Parts Co.,* 2002 U.S. Dist. LEXIS 24284, *13 (S.D. Ind. 2002) ("Given all this, no reasonable jury could believe Plaintiff's self-serving, unsupported contentions."); *Combes v. AIG Consultants*, 1996 U.S. Dist. LEXIS 15279, *12 (N.D. Ill. 1996) ("no reasonable jury could believe an employee would forget such clear and direct evidence of a supervisor's animus, only to remember

it verbatim months later...."); *LK Productions, Inc. v. American Fed'n of Television & Radio Artists*, 475 F. Supp. 251, 265 (S.D. Tex. 1979) ("This court is fully aware of the fact that in deciding a motion for summary judgment, it cannot make decisions concerning disputed facts; however, the undersigned believes that no reasonable jury could ever believe [the plaintiff's story].").

While Plaintiff attempts to inject the concept of substantial performance, it is not a proper argument, nor has it been demonstrated. Plaintiff does not dispute that he incurred a breach under his 2002 contract, not a partial breach of or a "substantial portion of a breach" but a clear breach. While his previous, numerous breaches and poor efforts as a distributor were not included in the decision to terminate his contract, these events cannot stand isolated from Plaintiff's record as a distributor and demonstrate a history of substandard, and at times, hostile performance towards his customers. (Def's Initial Brief, ¶¶ 20, 21, 29, 30, 39, 40, 43, 44, 45, 46, 48, 49) The issue might be different had Plaintiff made the small effort to call Sodexho or **anyone** when his truck allegedly broke down, but it is undisputed that he did not make any effort to let Sodexho know of his alleged predicament, a situation Plaintiff's own son denies occurred. (Marcus Dep., p. 45, lines 17-19, p. 47, lines 9-12, Tab I.)

As stated in *Bay City Construction Co. v. Hays, 624 So. 2d 1031, 1034 (Ala. 1993)* "[S]ubstantial performance of a contract does not contemplate exact performance of every detail, but performance of all important parts." Here, the important parts are, at the least, calling the client to explain the delay the day it occurs, especially when, as here, the client had already made one complaint against Plaintiff. The facts are undisputed that Plaintiff did not even call the client that entire day to explain the failure to deliver.

15

Finally, Plaintiff's argument regarding the hearsay cited to in Morrow's affidavit is misplaced. First, the alleged comment made by Messer is hearsay and not admissible for purposes of summary judgment. *See Defendant's Motion to Strike the Affidavit of Charles Morrow.* However, more importantly, it is undisputed that Steve Bordeaux, the President of Flowers, located in Opelika, made the decision to terminate Plaintiff's contract, not Messer. (Bordeaux Dep., p. 13, lines 7-20, Tab G.) As such, Messer's alleged utterance a year before the fact[3], is not only inadmissible, but irrelevant to the issues before this Court.

### 2. Plaintiff Cannot Show That Product Stored in a Freezer is Not Fresh Under Bread Industry Standards and Cannot Show Any Damages Regarding his Allegation that He Delivered Product From a Freezer

Plaintiff's assertions regarding product from the freezer are unsupported. In the bread industry, frozen product due to freezing, on occasion, is not considered stale or "unfresh" product. Alexander who has worked in all facets of the bread industry including route sales, production, marketing, plant operations and branding testified that freezing product is a common industry practice, and Flowers' customers such as Krystal and Sonic, are well aware of the need to freeze limited restaurant product, on occasion. (Alexander Dep., p. 23, lines 15-19, p. 26, lines 7-16, Tab K.) In fact, Flowers' customers actually put Flowers' product into their own freezers. (Alexander Dep., p. 25, lines 2-9, Tab K.) While Plaintiff and his counsel may not like it, the practice  is

---

[3]Interestingly, according to Plaintiff, Messer made this comment a year before Plaintiff's contract was terminated; however, if this were true, Messer never took advantage of the many opportunities to terminate Plaintiff's contract when breaches occurred during that year.

common in the industry, and customers, whether wholesale or retail, commonly freeze bread to preserve the same.[4]

Additionally, Plaintiff does not dispute that this practice pertains to a small amount of low volume restaurant product totaling one-half to one and one-quarter percent of Flowers' restaurant bun business. (Bordeaux Dep., p. 104, lines 7-20, Tab G; Bordeaux Decl. ¶ 9, Tab A.)

Regardless of Plaintiff's assertion regarding his opinion regarding the definition of "fresh" bread, in order to present a claim for breach of contract, Plaintiff must show "resulting damages." *State Farm Fire and Casualty v. Williams et. al.*, 926 So.2d 1008, 1013 (Ala. 2005). *See also*, *Sullivan v. Eastern Health Systems Inc.*, 953 So.2d 355, 259 (Ala. 2006). It is undisputed that Plaintiff cannot show any damages as a result of his delivery of limited restaurant product from Flowers' freezer. (Pl. Dep., p. 205, lines 19-23, p. 208, lines 9-14, p. 210, lines 13-19, Tab B; *See also Defendant's Initial Brief, Undisputed Facts # 81 -83*)

Plaintiff also seeks to recover damages **if** he is ever sued by a customer in the future for providing product from the freezer which would have been less than 1 percent of his deliveries to restaurant customers only. This argument is contrary to the law in the State of Alabama and is so hypothetical in nature as to border on the non-sensical. In *Ricwil, Inc. v. S. L. Pappas and Company Inc.,* 599 So.2d 1126 (Ala. 1992), the Alabama Supreme Court held that while damages for breach

---

[4]There is absolutely no testimony or citation thereto that supports Plaintiff's assertion that bread is transported to a different city and stored unfrozen for two to three days, then frozen and stored for three months in a warehouse freezer. . . " (Pl. Brief, p. 25)

of contract do not have to be assessed with "mathematical certainty", [t]he uncertainty which prevents a recovery is uncertainty as **to the fact of the damage** and not as to its amount. . . " 599 So.2d at 1132. (emphasis added). That is exactly the scenario that Plaintiff has presented: He is seeking damages **if** he is sued for bread that he delivered to a restaurant over two years ago. The request for damages is based on a hypothetical very unlikely to happen, and probably beyond the statute of limitations. *See also*, *Lindy Manufacturing Company v. Twentieth Century Marketing, Inc.,* 706 So.2d 1169, 1176 (Ala. 1997) ("The rule has long been established that the party claiming damages has the burden of establishing **the existence of** and amount of those damages by competent evidence."); *Money et. al. v. Standeffer et. al.* , 678 So.2d 1061, 1067, (Ala. 1996) ("It is true that damages may be awarded only where they are reasonably certain. Damages may not be based upon speculation.") As such, Plaintiff cannot proceed with his claim for breach of contract.

### 3. Plaintiff's Arguments Regarding Estoppel are Misapplied, the Undisputed Material Facts Demonstrate that Plaintiff Willingly Delivered and Profited from Delivering Product from the Freezer

It is undisputed that Plaintiff was aware of and knowingly delivered limited, restaurant items from the freezer from the time it was purchased from Burger King in the late 1990s, until the time his contract was terminated. (Lord Dep., p. 57, line 4 to p. 5, line 22, Tab H; Pl. Dep., 191, lines 2-22, p. 192, line 21 to p. 193, line 22, p. 195, lines 4-11, Tab B.) Plaintiff received full credit for these products and cannot recall a time when this product was returned by a customer. (Pl. Dep., p. 205, lines 19-23, p. 207, line 14 to p. 208, line 8, p. 210, lines 13-19, Tab B.)

Moreover, Plaintiff has absolutely no proof that if he had refused to deliver product from the freezer his contract would have been terminated as he never did so, and as such, this contention is

18

a pure hypothetical. *See Defendant's Motion to Strike Henry Porterfield Affidavit* filed contemporaneously herein.[5] **It is also undisputed that Plaintiff bought a new contract with Defendant in 2002 knowing that limited product was delivered from the freezer; if Plaintiff had been so opposed to the practice one would have to think he would not have continued to contract with Flowers.** (Pl. Dep., p. 238, line 5 to p. 239, line 2; Exs. 27 and 28 to Pl. Dep., Tab B.)

A review of Plaintiff's history with Defendant and his customers also demonstrates that Plaintiff has little to no fear of reprisal and can be vocal when he chooses. It simply stretches the imagination to assert that Plaintiff was somehow "deceived" about the product from the freezer when he ordered his son to videotape the freezer. (Pl. Brief, p. 30; Marcus Dep., p. 20, line 22 to p. 21, line 3, Tab I.) Further, to actually assert that Plaintiff "was induced to commit fraud" when his customers were aware of the practice and when Plaintiff was actually found to have stolen thousands of dollars from customers on his route, is absurd. (Pl. Dep., p. 153, line 19 to p. 154, line 7, p. 155, lines 1-4, p. 156, line 9 to p. 157, line 9, p. 157, line 10 to p. 164, line 3, Exs. 13 and 14 to Pl. Dep., Tab B.)

Further, Plaintiff's distinction of the estoppel cases cited in Defendant's brief is an attempt to mix apples with oranges. For example, Plaintiff argues that the case *Southern Energy Homes v. Ard,* 772 So.2d 1131 (Ala. 2000) supports his proposition that Plaintiff should not be estopped from bringing his claim. *Ard* dealt with the avenue of redress, arbitration versus litigation, not with

---

[5]There is absolutely no citation to any evidence that Plaintiff refused to deliver product from the freezer.

whether the actual claims were estopped. In fact, the Alabama Supreme Court stated in their opinion, "The Ard's agreements, disputes and claims against the retailer who sold them this manufactured home are not material to the issues dispositive of this appeal." 772 So.2d at 1132. Here, Flowers is not attempting to deny Plaintiff his right to file his claim with a trial court; however, on summary judgment, Defendant maintains that the claim should be estopped based on the undisputed facts. Plaintiff's interpretation of the holding of *Ard* whether the party must litigate or arbitrate, simply does not apply to the matter before this Court, which is based on the facts asserted in the matter. However, the *Ard* Court did rule on the principle of estoppel, stating:

> The Ards are contractually bound to the arbitration provisions for two reasons: First, the affidavit of Don McNutt establishes, without contradiction, that the Ards have accepted the benefits of the warranty containing the arbitration provisions. This acceptance constitutes the Ard's acceptance of the arbitration provisions themselves.

772 So.2d at 1134. Similarly, in the present case, Plaintiff consistently enjoyed the benefits of having non-typical product available for his customers in an emergency situation. He cannot now complain that this industry practice somehow violated his contract, especially when he was not damaged by the practice.

In attempting to distinguish *Salisbury v. Semple*, 565 So.2d 234 (Ala. 1990), Plaintiff asserts that "he has been deprived of the benefit of his bargain. . . " however, on this issue of product from the freezer, it is undisputed that Plaintiff received all he was due for the product. Again, attempting to distinguish these cases on irrelevant grounds does not eliminate the doctrine of estoppel cited therein.

### C.  Plaintiff Cannot Show a Dispute of Fact to Present a Claim of Conversion

Is it important at the outset to dispose of an assertion by Plaintiff somehow related to his conversion claim that his contract was terminated because of some grand scheme to take over his territory by Grady Messer. First, any alleged comment repeated by witness Morrow regarding an alleged comment by Messer is hearsay. *See Defendant's Motion to Strike the Affidavit of Charles Morrow*. Second, it is undisputed Messer did not make the decision to terminate Plaintiff's contract. Bordeaux made this decision. (Bordeaux Dep., p. 13, lines 7-20, Tab G.) As such, even if Messer made such a statement, there is no evidence to suggest that Bordeaux had such motives in terminating Plaintiff's contract for his failure to cure his breach.[6]

Moreover, it is also undisputed that Flowers is paying a hefty amount in truck rental and delivery person costs to simply run the route each week. (Woodham Dep., p. 73, line 13, to p. 75 line 4, p. 94, lines 3-23, Tab L; Lord II Dep., p. 132, lines 6-14, Tab M) These amounts add up in addition to the other normal expenses of the route. Further, Plaintiff's unsupported allegations that Flowers is engaged in misfeasance regarding the accounting of the route is simply not based in fact. Flowers' Vice-President of Sales, Michael Lord, answered all of Plaintiff's questions regarding the accounting of the gains and expenses of the route, and offered to answer any admittably small discrepancies upon further investigation. (Lord II Dep., pp. 92-137, Tab M.) Any discrepancies in the accounting sheets are simply accounting variances which can be explained and Plaintiff presents not one example of "misfeasance".

---

[6]Moreover, given the timing of Messer's alleged comment according to Morrow, he had many occasions before March 2005, to terminate Plaintiff's contract given his breach with all Krystal accounts in December 2004, or the breach with Burger King in February 2005. (Messer Decl. ¶ 10, 11, Exs. 9 and 10 to Messer Decl., Tab C.)

To establish a claim for conversion, the plaintiff must show "a **wrongful** taking, an **illegal** assumption of ownership, an **illegal** use or misuse of another's property, or a **wrongful** detention or interference with another's property." *Birmingham-Jefferson County Transit Auth. V. Arvan*, 669 So.2d 825, 828 (Ala. 1995) (emphasis added). Here, Plaintiff cannot show any illegal acts or a taking in conflict with his 2002 contract with Defendant. As plainly stated in the 2002 Distributorship Agreement, 16.4 <u>Actions Following Termination</u>:

> If this Agreement is terminated under either Section 16.2 or 16.3, COMPANY, within the limits of its ability to do so, will operate the business for the account of DISTRIBUTOR, deducting its reasonable expenses in connection with the operation thereof, and sell DISTRIBUTOR's Distribution Rights to a Qualified Purchaser at the best price which can reasonably be obtained after proper notice and advertisement.

(Pl. Dep., Ex. 27, Tab B.) The undisputed facts are: (1) Plaintiff did not cure his breach with Sodexho, a customer from which he had already received a complaint; (2) his Distributorship Agreement was terminated in accordance with Section 16.3 noted above; (3) Flowers offered to buy Plaintiff's distributorship but he refused to sell it (Pl. Dep., p. 331, line 23 to p. 332, line 9, Tab B.) and; (4) Defendant has run the distributorship shouldering the costs of a driver and truck rental in addition to the other expenses for the past two years while maintaining the other benefits Plaintiff receives from retaining the route such as insurance coverage for personal vehicles. (Pl. Dep., p. 282, line 7 to p. 384, line 16, Tab B.) Defendant has not sold Plaintiff's territory to anyone else pending the outcome of this litigation.

The fact that Defendant actually tried to buy the territory from Plaintiff and he refused further demonstrates that Defendant's operation of Plaintiff's territory is not a wrongful or illegal

taking, but the only and best alternative when Plaintiff refuses to sell the territory and Defendant did not believe it advisable to sell the territory during litigation.

### D.  Plaintiff Cannot Prove Wantonness

Plaintiff rehashes his allegations to assert this claim, this time with more exaggeration.  To reiterate, there is not one shred of evidence to suggest that Messer made the decision to terminate Plaintiff's contract, and his alleged comment heard by a witness who is in  current litigation against Flowers is complete hearsay.  *See Defendant's Motion to Strike Affidavit of Charles Morrow* filed contemporaneously herein.   As such, the facts necessary to establish clear and convincing evidence of a malicious plot or other bad motive is simply not demonstrated by the Plaintiff. Additionally, Flowers attempted to help Plaintiff back into the Sodexho account, as Steve Stephens actually contacted Sodexho, as he had done on previous occasions, to assist Plaintiff. (Stephens Decl.¶ 2, 6, 7; Ex. 1 to Stephens Decl., Tab D.)

More importantly, a review of Plaintiff's Complaint shows he alleges "wantonness" to the facts he alleges constitute a breach of contract.  Plaintiff does not allege a separate tort in alleging wantonness, but simply repeats the factual allegations alleged for his breach of contract.   Plaintiff cannot convert his claim for breach of contract into a wantonness claim in an attempt to receive punitive damages.  Plaintiff's tactic is further amplified by the cases he chooses to rely upon.  Two cases, *Carter v. Treadway Trucking, Inc. et. al.*, 611 So.2d 1034 (Ala. 1992) and *Scott v. Villegas*, 723 So.2d 642 (Ala. 1998) arise out of car accidents wherein other tort actions were alleged.  The

other case relied upon by Plaintiff was *S.B. et. al. v. Saint James School et. al.* 2006 Ala. LEXIS 336 (December 8, 2006) wherein students sued under a number of tort claims surrounding an investigation which led to their expulsion.  The facts of these cases and the claims arising therefrom are not even remotely similar to an action arising from a breach of contract.  As such, Plaintiff cannot allege Defendant wantonly or recklessly breached his contract in an attempt to convert the breach of contract claim into a tort.

### E.  Plaintiff is Not Entitled to Punitive Damages

Plaintiff maintains that he is due punitive damages for his claims of conversion, wantonness and fraud, even though on page 47 of his brief, he concedes his fraud claim is "untenable for reasons (sic) lack of reasonable reliance."  However, Plaintiff cannot prove he is entitled to punitive damages on the former two claims, conversion and wantonness, as discussed above and he cannot provide the elements of either claim, nor can he demonstrate a duty in tort separate from the duty in contract.

Plaintiff maintains that Flowers has a duty to Plaintiff separate and apart from the contract. However, all of the claims pled in Plaintiff's Complaint with regard to conversion and wantonness arise from the contract.  The Complaint reads in paragraph 22:

> Plaintiff was wantonly denied his rights under the Distributor Agreement, was wantonly denied the ability to deliver product to his exclusive territory, was wantonly taxed and/or charged with unnecessary costs and expenses associated with Defendant prohibiting Plaintiff from servicing his exclusive customers, was wantonly provided with "out-of-code" product, and was wantonly forced to market and sell "out of code" or expired product.

As stated in Defendant's initial brief, (pp. 31-32) all of these allegations are contained in the four corners of the Distributor Agreement Plaintiff signed with Flowers in 2002, including when and how the contract could be terminated (16.3), and Plaintiff's rights and obligations thereunder.

24

Sections 2.1-2.5, 3.1, 3.2, 5.1 and 11.1).  Further, Plaintiff cannot identify any separate agreements or conversations with Flowers related to the contract which provide for additional responsibilities, promises or duties guaranteed by Flowers. (Pl. Dep., p. 233, lines 13-20, p. 235, lines 7-9; Ex. 27 to Pl. Dep., Tab B.)  Moreover, Plaintiff's claims related to wantonness regarding "out-of-code" product are barred by the two-year statute of limitations.  Ala. Code § 6-2-38(1) (1975).

Similarly, Plaintiff's conversion claim centers the language upon Section 16.4 of the Distributorship Agreement and Flowers does not owe Plaintiff a duty beyond the terms of the contract.

Additionally, there are no facts to support a claim for punitive damages.  While Plaintiff attempts to pin a malevolent motive for the termination of his contract to an alleged statement by Messer, this statement was allegedly overheard by Morrow, another former independent distributor in litigation with Flowers and is clear hearsay given the fact that both Plaintiff and Morrow were not employees of Flowers and Messer was not the decisionmaker.   A review of Plaintiff's record as an independent distributor demonstrates his increasingly poor performance and there is no dispute that he  could not cure his breach with Sodexho despite the help of the Operations Manager at Flowers.


## III.   CONCLUSION

Based on the rationale set forth herein, as well as the arguments and evidence submitted in Flowers' Summary Judgment Brief, all of Plaintiff's claims fail as a matter of law and Flowers is entitled to summary judgment.

Respectfully Submitted,


/s/Sandra B. Reiss
Sandra B. Reiss (ASB-3650-S80S)
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
e-mail:  Sandra.Reiss@odnss.com
Ph.  (205) 328-1900
Fax:  (205) 328-6000

And

Kevin  P. Hishta, Esq.  (Georgia Bar 357410)
Admitted *Pro Hac Vice*
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART**
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 2100
Atlanta, GA   30308
e-mail:  Kevin.hishta@ogletreedeakins.com
Pnh. (404) 881-1302
Fax (404) 870-1732

*Attorneys for Defendant,*
*Flowers Baking Co. of Opelika, LLC*

26

## <u>CERTIFICATE OF SERVICE</u>

      I do hereby certify that I electronically filed the foregoing Reply in Support of Defendant's Motion for Summary Judgment with the Middle District Court's ECF system on this 8th day of August, 2007, which will forward the same via electronic notice to counsel for Plaintiff, as follows:

        The Law Offices of
        Greg L. Davis
        6987 Halcyon Park Drive
        Montgomery, AL   36117

        Dan W. Taliaferro
        Attorney at Law
        6987 Halcyon Park Drive
        Montgomery, AL  36117

                                <u>/s/Sandra B. Reiss</u>
                                Sandra B. Reiss