**DEFENDANT'S SUPPLEMENTAL EVIDENTIARY SUBMISSION
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

TAB   L

Deposition of Jerry Woodham

# DEPOSITION OF JERRY WOODHAM

## July 16, 2007

## Pages 1 through 142

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Deposition of Jerry Woodham                                                July 16, 2007

---

**Page 1**

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
 3        FOR THE MIDDLE DISTRICT OF ALABAMA
 4                 NORTHERN DIVISION
 5
 6    HENRY PORTERFIELD,
 7        Plaintiff,
 8    vs.          CIVIL ACTION NO.
                   2:05-CV-937-MEF
 9
      FLOWERS BAKING COMPANY OF
10    OPELIKA, LLC,
11        Defendant.
12
          * * * * * * * * * * * * *
13
14
15        DEPOSITION OF JERRY WOODHAM, taken

16    pursuant to stipulation and agreement before Tracye

17    Sadler, Certified Shorthand Reporter and

18    Commissioner for the State of Alabama at Large, at

19    the Tiger Town Inn, 205 21st Street, Opelika,

20    Alabama, on July 16, 2007, commencing at

21    approximately 1:00 p.m.
22
23        * * * * * * * * * * * * *
```

---

**Page 2**

```
 1              APPEARANCES
 2
 3    ON BEHALF OF THE PLAINTIFF:
 4    Mr. Greg L. Davis
      LAW OFFICES OF GREG L. DAVIS
 5    Attorneys at Law
      6987 Halcyon Park Drive
 6    Montgomery, Alabama  36117

      ON BEHALF OF THE DEFENDANT:
 8
      Mr. Kevin P. Hishta
 9    Ms. Sandra B. Reiss
      OGLETREE, DEAKINS, NASH, SMOAK & STEWART
10    Attorneys at Law
      One Federal Place, Suite 1000
11    1819 Fifth Avenue North
      Birmingham, Alabama  35203
12
13    ALSO PRESENT:
14    Mr. Henry Porterfield
      Mr. Michael Lord
15
16
17        * * * * * * * * * * * * *
18
19        EXAMINATION INDEX
20
         BY MR. DAVIS . . . . . . . . . . 5
21
22
23        (Index continued on next page)
```

---

**Page 3**

```
 1              PLAINTIFF'S EXHIBITS
 2
 3    1  Composite Exhibit of Route 2069 Net     29
         Sales Dollars
 4
      2  3-11-02 Final Repurchase Statement      36
 5
      3  Composite of Distributor Summary Reports  41
 6
      4  2000 and 2001 W-2                        50
 7
      5  2002 W-2                                 90
 8
      6  2003 W-2                                 90
 9
      7  2004 W-2                                 90
10
      8  2005 W-2                                 91
11
      9  2006 W-2                                 91
12
13        * * * * * * * * * * *
14
15              STIPULATIONS
16
17        It is hereby stipulated and agreed by and

18    between counsel representing the parties that the

19    deposition of JERRY WOODHAM is taken pursuant to

20    the Federal Rules of Civil Procedure and that said

21    deposition may be taken before Tracye Sadler,

22    Certified Shorthand Reporter and Commissioner for

23    the State of Alabama at Large, without the
```

---

**Page 4**

```
 1    questions other than objections as to the form of

 2    the question need not be made at this time but may

 3    be reserved for a ruling at such time as the said

 4    deposition may be offered in evidence or used for

 5    any other purpose by either party provided for by

 6    the Statute.

 7        It is further stipulated and agreed by and

 8    between counsel representing the parties in this

 9    case that the filing of said deposition is hereby

10    waived and may be introduced at the trial of this

11    case or used in any other manner by either party

12    hereto provided for by the Statute regardless of

13    the waiving of the filing of the same.

14        It is further stipulated and agreed by and

15    between the parties hereto and the witness that the

16    signature of the witness to this deposition is

17    hereby not waived.

18
19        * * * * * * * * * * * * *
20
21        THE COURT REPORTER:  Usual

22        stipulations?

23        MR. HISHTA:  That's fine.
```

Page 5

1            JERRY WOODHAM
2      The witness, after having first been duly sworn
3 to speak the truth, the whole truth, and nothing
4 but the truth, testified as follows:
5            EXAMINATION
6 BY MR. DAVIS:
7    Q. Please state your name for the record.
8    A. Jerry Woodham.
9    Q. Mr. Woodham, what's your current address?
10    A. 3709 Flintwood Lane. That's Opelika.
11    Q. Who do you live there with you?
12    A. My wife and two children.
13    Q. Your children are minors? Neither one them
14      are over 19?
15    A. Right. They're under 19, yes.
16    Q. What's your wife's name?
17    A. June.
18    Q. Does she work outside of the home?
19    A. No.
20    Q. I made sure I said outside of the home.
21      I'm sure she works.
22           What's your educational background?
23    A. I have a degree from Auburn University and

Page 6

1      also have what's called an accounting
2      equivalency from UAB in Birmingham.
3    Q. When did you get your degree from Auburn?
4    A. 1987.
5    Q. And what was that degree in?
6    A. Operations management.
7    Q. And when did you get your accounting degree
8      from UAB?
9    A. 1989.
10    Q. When did you graduate from high school?
11    A. 1982.
12    Q. Where did you go to high school?
13    A. Eufaula High School.
14    Q. Once you got out of high school, what did
15      you do? Did you begin work somewhere
16      before you went to Auburn?
17    A. For the summer, yes.
18    Q. Where did you work then?
19    A. Oh, gosh. That was a long time ago. I
20      worked for American Buildings Company for
21      the summer before I started Auburn in the
22      fall.
23    Q. And then you started in the fall of '82?

Page 7

1    A. Yes.
2    Q. Once you got out of Auburn in '87, did you
3      go straight to UAB or did you go to work
4      somewhere?
5    A. I worked for about a year.
6    Q. Who did you work for then?
7    A. I worked for Westpoint Pepperell in
8      Abbeville, Alabama.
9    Q. And what did you do for Westpoint
10      Pepperell?
11    A. I was a production supervisor.
12    Q. Were you working when you went to UAB or
13      were you a full-time student?
14    A. I had a part-time job.
15    Q. Who did you work for part-time, or was it
16      various part-time jobs?
17    A. It was various.
18    Q. Once you got out of UAB, what was the first
19      job that you had?
20    A. Hughes Aircraft Company in Eufaula.
21    Q. And what did you do for Hughes Aircraft?
22    A. I was a cost analyst, accounting.
23    Q. How long did you stay with Hughes?

Page 8

1    A. About three years.
2    Q. And why did you leave Hughes?
3    A. I took a job in Birmingham with Butler
4      Manufacturing Company.
5    Q. More money?
6    A. Well, it was more money. I wanted to get
7      to Birmingham.
8    Q. Did you have relatives in Birmingham or did
9      your wife have relatives in Birmingham or
10      you just like Birmingham?
11    A. I do have relatives, but I just wanted to
12      get to Birmingham.
13    Q. What does Butler Manufacturing do?
14    A. They manufacture metal buildings.
15    Q. And what did you do for them?
16    A. I was a cost accountant.
17    Q. How long did you stay with Butler?
18    A. Eight years.
19    Q. I think I've seen Butler buildings before.
20      Is that like metal buildings that people
21      either build like a shopping center or some
22      people -- mini warehouses, the whole --
23    A. Yeah, industrial -- pretty much anything.

Deposition of Jerry Woodham                                                      July 16, 2007

---

Page 9

1    Q.   The whole range?
2    A.   Anything other than residential pretty
3         much.
4    Q.   Were you a cost analyst for Butler the
5         entire eight years?
6    A.   Yes.
7    Q.   When did you leave Butler?
8    A.   In December of '92.
9              No. I'm sorry. That's when I
10        started. I'm sorry. I'm backwards. I
11        started in December of '92. I left in
12        February of '01.
13   Q.   And why did you leave Butler?
14   A.   To start work with Flowers.
15   Q.   And what position were you hired at with
16        Flowers?
17   A.   Controller trainee.
18   Q.   And at which location were you hired at by
19        Flowers?
20   A.   Flowers Baking of Opelika.
21   Q.   Was it more money at Flowers than at
22        Butler?
23   A.   Yes, it was more money.

---

Page 10

1    Q.   Did you have to move to Opelika then?
2    A.   Yes.
3    Q.   All right. And what is a controller
4         trainee?
5    A.   Basically training to be a controller.
6    Q.   How long were you a controller trainee?
7    A.   Let's see. From February of '01 till
8         October of '02.
9    Q.   Who was the person that was training you at
10        Flowers?
11   A.   Craig Horn.
12   Q.   Craig Horn?
13   A.   Uh-huh (positive response).
14   Q.   And was he the controller?
15   A.   Yes.
16   Q.   Did he leave in October of '02?
17   A.   No.
18   Q.   Is he still there?
19   A.   No, he's not there now.
20   Q.   Did he assume another position with the
21        company?
22   A.   Not at that time.
23   Q.   I guess what I'm getting at, were there two

---

Page 11

1         controllers once you became controller
2         or --
3    A.   No. I left Flowers of Opelika and went to
4         Flowers of Villa Rica.
5    Q.   When did you leave Flowers of Opelika?
6    A.   October of '89.
7              I'm sorry.
8    Q.   You started in '01?
9    A.   '02.
10   Q.   So October '02 you left Flowers of
11        Opelika --
12   A.   And went to Flowers Baking of Villa Rica.
13   Q.   And that's Villa Rica, Georgia; right?
14   A.   Yes.
15   Q.   And what did you do at Flowers Baking of
16        Villa Rica?
17   A.   I was an assistant controller.
18   Q.   Doing the same thing as you did as a
19        controller trainee basically?
20   A.   Basically, yeah.
21   Q.   Who did you report to in Villa Rica?
22   A.   Mike Matthews.
23   Q.   And was he the controller for Villa Rica?

---

Page 12

1    A.   Yes.
2    Q.   How long did you stay assistant controller
3         in Villa Rica?
4    A.   A year.
5    Q.   So in October of '03 what happened?
6    A.   I left Flowers of Villa Rica and went to
7         Flowers Baking of Bailey Street -- well,
8         it's actually Bailey Street Bakery and
9         Flowers Baking of Tucker.
10   Q.   Is Bailey Street in Tucker, Georgia --
11   A.   No.
12   Q.   -- or is that a separate --
13   A.   It's a separate company in Atlanta.
14   Q.   It's separate from Flowers Baking of
15        Tucker?
16   A.   Yes.
17   Q.   So what position did you assume at those
18        two locations?
19   A.   Controller.
20   Q.   So you were controller over two locations?
21   A.   Yes.
22   Q.   Now, is Flowers Baking of Bailey Street --
23        is that actually a place where they

---

Deposition of Jerry Woodham                                                July 16, 2007

Page 13

1　　　manufacture the buns, or is that a
2　　　distributorship type place?
3　A.　They only manufacture at Bailey Street.
4　Q.　And Flowers Baking of Tucker --
5　A.　Same thing.
6　Q.　They only manufacture?
7　A.　Yes.
8　Q.　And then out of those two locations,
9　　　Flowers ships buns and rolls and bread and
10　　　whatever to other places that distribute
11　　　the bread?
12　A.　Yes.
13　Q.　Is that correct?
14　A.　Uh-huh (positive response).
15　Q.　So out of Flowers Baking of Bailey, you
16　　　wouldn't have route distributors like Henry
17　　　Porterfield pulling up to this location to
18　　　pick up bread. It would be
19　　　tractor-trailers pulling up to pick it up
20　　　to take it to a warehouse?
21　A.　Yes.
22　Q.　Same with Flowers Baking of Tucker?
23　A.　Yes.

Page 14

1　Q.　How long did you stay as comptroller or
2　　　controller for these two locations?
3　A.　Approximately two years.
4　Q.　So sometime around October '05?
5　A.　No. It was first of '06 when I left.
6　Q.　And what happened the first of '06?
7　A.　Terminated my employment at Flowers Baking
8　　　of Tucker and Bailey Street Bakery and came
9　　　back to Flowers Baking of Opelika.
10　Q.　And why did you come back to Flowers Baking
11　　　of Opelika?
12　A.　They had an opening and I wanted to get
13　　　back to this area.
14　Q.　Did you ask to be moved to Flowers Baking
15　　　of Opelika?
16　A.　Well, no. I was told that there was an
17　　　opening at the company. And I was asked if
18　　　I was interested and I said yes.
19　Q.　Were you terminated from Flowers Baking of
20　　　Bailey Street?
21　A.　Well, my employment was terminated, just
22　　　like they were at all of them when I left.
23　Q.　I guess what I'm asking is, did they tell

Page 15

1　　　you to leave or did you just say --
2　A.　No. They didn't tell me to leave, no.
3　Q.　Did they say --
4　A.　Whenever you leave one bakery and go to
5　　　another one, your employment is terminated
6　　　there and you start over at the other one,
7　　　at the new bakery.
8　Q.　All right. But you made the decision to
9　　　terminate your employment at both of those
10　　　locations?
11　A.　Yes. Yes.
12　Q.　Someone else didn't make that decision for
13　　　you?
14　A.　Right.
15　Q.　All right. Came back to Flowers Baking of
16　　　Opelika in the first part of '06?
17　A.　Yes.
18　Q.　And you came back as controller; is that
19　　　right?
20　A.　Yes.
21　Q.　I may say different things. Is it
22　　　controller or comptroller, or what actually
23　　　is the position?

Page 16

1　A.　Controller.
2　Q.　All right. As a controller for Flowers
3　　　Baking of Opelika, what are your job duties
4　　　and responsibilities?
5　A.　Well, basically anything on the financial
6　　　side, making -- balancing accounts, making
7　　　sure our accounts have the right balances
8　　　in them. I'm responsible for fixed assets,
9　　　anything financial. I mean, I could
10　　　list ...
11　Q.　Is the controller -- are you the head guy
12　　　in the controller department of Flowers
13　　　Baking of Opelika?
14　A.　Yes.
15　Q.　How many people in that department report
16　　　to you?
17　A.　Five.
18　Q.　And what are their positions?
19　A.　It's office manager, receptionist, computer
20　　　operator, A/R clerk, and A/P clerk.
21　Q.　Who's the office manager?
22　A.　Judy Manley.
23　Q.　And what does Judy Manley do as office

Deposition of Jerry Woodham                                July 16, 2007

Page 17

1    manager?
2    A.  She basically runs the office.  She pretty
3        much deals with the other four ladies.  She
4        assists me in the accounting function.
5    Q.  Is she an accountant or have an accounting
6        background?
7    A.  She doesn't have an accounting degree.
8    Q.  But she's been doing it, on-the-job type
9        work?
10   A.  Yes.
11   Q.  Who is the accounts receivable clerk?
12   A.  Wanda Payne.
13   Q.  And the accounts payable clerk?
14   A.  Teresa Jernigan.
15   Q.  And I guess their positions are just what
16       they are, one does accounts receivable, one
17       does accounts payable?
18   A.  Yes.
19   Q.  And is that accounts receivable for Flowers
20       Baking of Opelika only?
21   A.  Yes.
22   Q.  All of the work that you do is for Flowers
23       Baking of Opelika?

Page 18

1    A.  Yes.
2    Q.  And who do you report to at Flowers Baking
3        of Opelika?
4    A.  The plant president of Flowers Opelika.
5    Q.  Have you ever testified in any kind of
6        legal proceeding before?
7    A.  No.
8    Q.  Have you ever been sued by anybody?
9    A.  No.
10   Q.  Ever sued anyone?
11   A.  No.
12   Q.  You've been put up as, I guess, the person
13       most knowledgeable about all of the
14       accounts dealing with Henry Porterfield,
15       number one, and, I guess, the person most
16       knowledgeable about how you compute what
17       the value of a route is.  Are you the
18       person most knowledgeable about those two
19       areas at Flowers Baking of Opelika?
20   A.  I couldn't say if I'm the most
21       knowledgeable.  I deal with it.
22   Q.  That's what you do on a daily basis?
23   A.  Yes.

Page 19

1    Q.  You or your staff --
2    A.  Yes.
3    Q.  -- that all reports to you?
4    A.  Yes.
5    Q.  In 2005 you weren't working at Flowers of
6        Opelika, were you?
7    A.  No.
8    Q.  Who was the comptroller who was working in
9        March of 2005 in Opelika?
10   A.  I believe it was Craig Horn.
11   Q.  Does Craig Horn still work for Flowers
12       Baking?
13   A.  He works for Flowers Baking Company of New
14       Orleans.
15   Q.  And what does he do there?
16   A.  Controller.
17   Q.  So in 2005 you had nothing to do with how
18       the computations were made involving Henry
19       Porterfield's route and the amount of money
20       that was offered to him?
21   A.  No, sir.
22   Q.  As a comptroller how do you go about
23       computing the value of a route?

Page 20

1    A.  It's ten times the weekly average and the
2        branded sales.
3    Q.  All right.  And tell me what branded sales
4        are.
5    A.  It's -- take away your private -- well,
6        just examples would be Sunbeam bread,
7        Nature's Own bread.  It's not private
8        label.  It's not fast food or bid business.
9    Q.  Anything else?
10   A.  That's it.
11   Q.  Private label.  Private label would be
12       Wal-Mart, their private label bread;
13       correct?
14   A.  Yes.
15   Q.  Who else has private label?
16   A.  Well, usually any grocery store has their
17       own private label brand.
18   Q.  Like Winn-Dixie?
19   A.  Yeah.
20   Q.  Publix?
21   A.  Yeah.  I mean, I don't get into the product
22       that much, but I'm pretty sure they do.
23   Q.  When you say no fast food, what do you

Deposition of Jerry Woodham                                                    July 16, 2007

Page 21

1    consider fast food?
2    A.  Burger King, Hardee's, Wendy's.
3    Q.  And no bid business.  What do you consider
4        bid business?
5    A.  Any business we have to bid on like
6        schools.
7    Q.  Once you take out private label, once you
8        take out fast food, once you take out bid
9        business, you come up with a -- I guess
10       a -- is it a weekly average?
11   A.  Uh-huh (positive response).
12   Q.  And whatever that weekly average is
13       multiplied by ten?
14   A.  Right.
15   Q.  And who is it that determines or came up
16       with the valuation for a route?
17   A.  What do you mean?  This method?
18   Q.  Yes.
19   A.  I don't know.  I mean, that's what they
20       were doing when I started and I don't know.
21   Q.  Is that part of the contract between the
22       distributor and Flowers?
23   A.  I don't know.  I don't deal with the

Page 22

1    contracts.
2    Q.  Is that just what you were taught how to do
3        it?
4    A.  Yes.
5    Q.  Did you have to go somewhere and look at it
6        to see how it was done?  Did you have to
7        look at any books or any kind of documents
8        to see that's typically how it was done?
9    A.  Well, I might have looked at one that was
10       done before.
11   Q.  And would Mr. Horn, I guess, have trained
12       you on how it was done --
13   A.  Yes.
14   Q.  -- whenever you were at Flowers of Opelika
15       initially?
16   A.  Yes.
17   Q.  And is that the way they do it at all
18       Flowers that you've worked at?
19   A.  The method for determining a route?
20   Q.  Yes.
21   A.  Yes.
22   Q.  Prior to coming here today what documents
23       have you looked at?

Page 23

1    A.  What documents have I looked at?
2        I mean, I looked at -- you talking
3        about any specific documents or --
4    Q.  In preparation for this deposition.
5    A.  I've seen a repurchase statement that was
6        done.
7    Q.  Okay.  Anything else?
8    A.  No.
9    Q.  Was that a repurchase statement on the
10       route that Henry Porterfield owns?
11   A.  Yes.
12   Q.  And when was that repurchase statement
13       prepared?
14   A.  I don't know.
15   Q.  Did it have the actual figures in it?
16   A.  It had some figures, yes.
17   Q.  Do you remember what figures were in that
18       repurchase statement?
19   A.  I mean, not exact numbers, not off the top
20       of my head.
21   Q.  Do you remember roundabout what they were?
22   A.  Yeah, I could say close.
23   Q.  Well, close what was it?

Page 24

1        You don't have to -- it's not a guess.
2        I mean, it's not --
3    A.  I believe the route value was -- I want to
4        say 23, 24,000.
5    Q.  I'm going to show you what has already
6        previously been marked as Plaintiff's
7        Exhibit Number 3 to Michael Lord's
8        deposition, which this consists of a
9        letter, a three-page purchase agreement and
10       general release, and a territory
11       reconciliation.  Have you ever seen that
12       document before?
13       MR. HISHTA:  For record purposes,
14           you're talking about the first
15           page?
16   Q.  The first page of that document.
17   A.  No.
18   Q.  Have you ever seen the purchase agreement
19       and general release?
20   A.  No.
21   Q.  Have you ever seen the last page of that
22       document?
23   A.  Yes.  Now, I don't know if it was the exact

Deposition of Jerry Woodham                                              July 16, 2007

Page 25

1      same numbers, but, yes, I've seen one.
2    Q.   This is a territory reconciliation on Henry
3      Porterfield's territory; is that correct?
4    A.   Uh-huh (positive response).
5    Q.   And it says Henry Porterfield, 2069, here
6      at the top.  It's got his distribution
7      number on it also; correct?
8    A.   Uh-huh (positive response).
9    Q.   Looking at this document, it shows the
10      original purchase price.  It looks like
11      $45,110.  I apologize.  I'm trying to read
12      it sideways.  And then you've got
13      distributor's adjusted purchase price.  It
14      looks like 30,000.  And the way that's come
15      up with is by subtracting this 14,350 from
16      it; is that correct?
17    A.   From this number right here, yes.
18    Q.   From the 45,000?
19    A.   Yes.
20    Q.   And the 14,350 is territory that he's
21      purchased, I guess, as it says, additional
22      territory purchased?
23    A.   That's actually sold.

Page 26

1    Q.   I'm sorry.  I'm looking at the wrong line.
2      Territory sold, 3-29-04.
3    A.   Right.
4    Q.   So you take that away from it to come up
5      with the $30,000 figure.  Equity from
6      territory sold, $7,175?
7    A.   Uh-huh (positive response).
8    Q.   And you've got appreciated equity of
9      $13,255; is that correct?
10    A.   Yes.
11    Q.   Current note, original balance $2,125?
12    A.   Yes.
13    Q.   Total paid in and appreciated equity due to
14      and it's got or from distributor and it's
15      got $24,680; is that right?
16    A.   (Witness nods head).
17    Q.   There's a truck reconciliation below that,
18      and all of that deals with the truck all
19      the way to the bottom of the page; is that
20      correct?
21    A.   No.  This is separate from the truck.
22    Q.   That's separate.  All right.  We've got a
23      truck reconciliation that's just, what,

Page 27

1      $1,642?
2    A.   Yes.
3    Q.   Now, what is this at the bottom?
4    A.   This five-percent transfer fee, that is
5      five percent of this number right here.
6      That's just a figure we charge for doing
7      the repurchase.
8    Q.   Okay.
9    A.   This probably -- and I didn't do this.  But
10      this probably would have been like his last
11      week of his health insurance.
12    Q.   That's the $119?
13    A.   Yes.
14    Q.   Okay.
15    A.   This is a fee Bank of America charges for
16      processing their documents.
17    Q.   And then those charges come out of that
18      bringing it down to 23,126.92, correct?
19    A.   Yes.
20    Q.   What documents -- I know you didn't do this
21      one, but what documents would you have to
22      look at to determine -- well, I guess the
23      purchase price, you would look at what he

Page 28

1      paid for the route?
2    A.   Uh-huh (positive response).
3    Q.   The equity from territory sold.  How do you
4      come up with the equity of $7,175?
5    A.   Well, that was money that was paid to him
6      when he sold part of his route.
7    Q.   Part of the route.  Okay.  Appreciated
8      equity.  How do you come up with that
9      figure?
10    A.   It's this number minus these two numbers.
11    Q.   So it's what he paid for it minus the
12      equity already received and, what, the
13      additional territory purchased?
14    A.   Or sold in that case.
15    Q.   Sold.  All right.  What I'm trying to get
16      at -- and let me just cut straight to it.
17      Where on here do you have the figure of ten
18      times weekly sales?
19    A.   That's what that number is.
20    Q.   That's 24,680?
21    A.   Yes.
22    Q.   And what documents do you have to go to
23      look at to find those figures?

Deposition of Jerry Woodham                                      July 16, 2007

Page 29

1   A.  We can run reports that show what the sales
2       were for the route.
3           (Plaintiff's Exhibit 1 was marked
4           for identification.)
5   Q.  Okay. I'm going to show you what I want to
6       mark as, I guess, Plaintiff's Exhibit
7       Number 1 to your deposition which is Bates
8       stamp number FBO000856 through FBO00862 --
9       or actually that might be F-B-O instead of
10      zero. FBO000862. What are those
11      documents?
12  A.  It's a report showing net sales dollars for
13      a Publix in 2005 and 2006 by the week.
14  Q.  All right. It's got a Publix number there,
15      1027. Do you know where that Publix is?
16  A.  Do I know where it is?
17          No.
18  Q.  Is this a report that your office would
19      have run or somebody from your office?
20  A.  Yes.
21  Q.  Now, what is this report called?
22  A.  Just a territory net sales report.
23  Q.  Okay. It's on the second page -- I'm

Page 30

1       sorry -- yeah, second page. It's got the
2       2007 amount and -- I'm sorry. I guess it's
3       on -- 2007 goes up to page 3. 2007 begins
4       on the second page; correct?
5   A.  Yes.
6   Q.  And the next one over, 859 Bates stamp
7       number, has got Wal-Mart brand sales; is
8       that correct?
9   A.  Yes.
10  Q.  Flip on over another couple of pages. It
11      says -- it looks like Wal-Mart PL sales.
12  A.  Yes.
13  Q.  And what are PL sales? Private label
14      sales?
15  A.  Private label. And I'm assuming that's
16      what that stands for on this report.
17  Q.  Now, why would you run this particular type
18      of report typically?
19  A.  Well, we're trying to get the value of the
20      route.
21  Q.  Have you been asked to determine the value
22      of Henry Porterfield's route?
23  A.  No.

Page 31

1   Q.  To determine what the value of his route
2       was today how would you go about computing
3       it?
4   A.  Well, I would run the territory net sales
5       report.
6   Q.  Are the documents that we just looked at
7       that I've marked as Plaintiff's Exhibit
8       Number 1 -- are those part of the territory
9       sales report? What would be the reason for
10      running these type documents?
11  A.  To get the value of the route.
12  Q.  That's what I'm trying to -- so are there
13      documents in addition to these documents
14      that you would want to look at to get the
15      value of the route?
16  A.  Well, you would want to run them again. I
17      mean, if there's ...
18  Q.  But let's just take at that particular
19      point -- at any point in time. Let's say
20      January of 2007. If we look at these
21      reports which I've marked as Plaintiff's
22      Exhibit Number 1, I've got Wal-Mart and
23      Publix which are both within that area.

Page 32

1       What other reports would you want run for
2       that area, Mr. Porterfield's territory, for
3       January 1, 2007?
4           MR. HISHTA: I'm going to object
5           to the extent that it calls
6           for facts not in evidence,
7           that I'm not sure it's been
8           established both accounts are
9           in the territory. But having
10          said that, we're going -- as I
11          understand your line of
12          questioning, we're going
13          through the methodology to
14          determine --
15          MR. DAVIS: We are.
16          MR. HISHTA: -- the value.
17  Q.  Let me just ask you. Do you know if this
18      particular Wal-Mart is in Mr. Porterfield's
19      territory?
20  A.  No.
21  Q.  Do you know -- and when I say this, the one
22      I'm referring to in Plaintiff's Exhibit 1.
23          And do you know if the Publix referred

Deposition of Jerry Woodham                                           July 16, 2007

---

Page 33

1   to in Plaintiff's Exhibit 1 is within
2   Mr. Porterfield's territory?
3   A.  No, I don't know.
4   Q.  The designation Wal-Mart number 5348, is
5       that a Flowers number or a Wal-Mart number?
6   A.  I'm not sure on that.  I don't know.
7   Q.  I'm just wondering like if y'all have
8       accounts set up for particular Wal-Marts,
9       particular businesses that are separate
10      accounts, or do you label them by their own
11      store numbers?
12  A.  Well, we -- if you ask -- this would have
13      been done by the route.  I mean, it
14      wouldn't have been done by this number.
15  Q.  If we look at Mr. Porterfield's route, it's
16      2069.
17  A.  Yes.
18  Q.  Are you aware of that?
19  A.  Well, yeah.
20  Q.  These reports refer to, then,
21      Mr. Porterfield's route, is that correct,
22      if they say route 2069?
23  A.  Yeah.  I'm assuming they do because that's

---

Page 34

1   what they say at the top.
2   Q.  Then having said all that, in January --
3       let's just pick a date -- January 1, 2007.
4       Is there anything that you would need in
5       addition to the reports run on route number
6       2069 to determine the value of that route?
7   A.  Well, you would need all the sales for the
8       route, not just Publix and Wal-Mart.
9   Q.  All right.  You would need everything that
10      he sold, weekly distribution summary
11      reports; is that correct?
12  A.  Well, no, that wouldn't -- no.
13  Q.  You wouldn't need any of those?
14  A.  No, you wouldn't -- no.  What I'm saying is
15      you would need this report for everything
16      on his route.
17  Q.  On his route.  All right.  Have you run --
18      let me strike that.
19      What do you call this report if you're
20      running one?
21  A.  Territory net sales value report.  I mean,
22      probably different people call it different
23      things, but that's -- if you say that,

---

Page 35

1   people are going to know what you're
2   talking about.
3   Q.  Have you run a territory net sales value
4       report for Henry Porterfield's route?
5   A.  No.
6   Q.  How do you go about running a territory net
7       sales value report?
8   A.  Well, we have software that has all the
9       data in it and you just tell it what you
10      want it to run.
11  Q.  How long does it take it to run a territory
12      net sales value report?
13  A.  A few minutes.
14  Q.  And since you've been there you've never
15      run one on this particular route, route
16      number 2069?
17  A.  No.
18  Q.  Do you know if anybody in your department
19      has run one?
20  A.  Not that I'm aware of.
21  Q.  How is the ten-week period determined?  Is
22      that the last ten weeks, or how is that --
23  A.  No, it's not ten weeks.  It's just ten

---

Page 36

1   times the sales.
2   Q.  Ten times the sales.  All right.  Well, the
3       weekly -- is it weekly average?
4   A.  Yes.
5   Q.  What is the average period?
6   A.  52 weeks.
7          MR. DAVIS:  Let's go off the
8          record for a second.
9          (Off-the-record discussion followed
10         by a brief recess.)
11         (Plaintiff's Exhibit 2 was marked
12         for identification.)
13  Q.  (Mr. Davis continuing:)  All right.  We
14      took a break.  I want to show you what I've
15      marked as Plaintiff's Exhibit Number 2.
16      That's a territory reconciliation report on
17      territory number 2069; is that correct?
18  A.  Yes.
19  Q.  And when was this particular one run?
20  A.  You mean the complete document?
21  Q.  Yes.
22  A.  It was done this past week.
23  Q.  The $63,430 figure comes from a ten-week

---

Deposition of Jerry Woodham                                              July 16, 2007

Page 37

1      average of sales minus private label, fast
2      foods, and bid business on that particular
3      route, 2069?
4   A.  Yes.
5   Q.  If we look down on other credits and
6      charges where it says final weekly
7      statement for 27 ...
8   A.  Uh-huh (positive response).
9   Q.  You see that figure there?
10  A.  Yes.
11  Q.  $13,931.78?
12  A.  Uh-huh (positive response).
13  Q.  What does that figure represent?
14  A.  That's the balance Mr. Porterfield owes
15     Flowers Baking Company of Opelika for
16     running his route for him.
17  Q.  And how did you come up with that figure?
18     Or let me just ask you, does that come
19     from the weekly distribution reports?
20  A.  Yes.
21  Q.  And do you actually have to go to a weekly
22     distribution report to find it or does the
23     computer program pull it from everything

Page 38

1      and put it into this document?
2   A.  No.  We went to the document and got the
3      number.
4   Q.  The five-percent transfer fee is five
5      percent of 63,430; is that correct?
6   A.  Yes, sir.
7   Q.  And did you actually do this territory
8      reconciliation report?
9   A.  I did the report.  I didn't actually come
10     up with the 63,430, but I did the report.
11  Q.  All right.  Who did the 63,430?
12  A.  Well, the number was given to me by Michael
13     Lord.
14  Q.  And where did Mr. Lord get it from?
15  A.  I mean, I don't ...
16  Q.  You don't have access to those type
17     figures?
18  A.  Yes.  But, I mean, I didn't -- he just gave
19     me the number.
20  Q.  Okay.  Did you --
21  A.  And when I said this report was last week,
22     I didn't mean that this number was as of
23     last week.  I don't know when it was as of.

Page 39

1   Q.  The 63,430 came from Michael Lord.  So you
2      had to put that into the repurchase price
3      document, the territory reconciliation.
4      Did you have to put in all the other
5      figures, also, or did a computer program do
6      it?
7   A.  No.  I put them in.  It's basically the
8      same numbers as the other statement.
9   Q.  It is.  The $13,931.78 final weekly
10     settlement figure that you say
11     Mr. Porterfield still owes Flowers, did you
12     obtain that figure yourself?
13  A.  Yes.
14  Q.  And which report or which document did you
15     look at to obtain it?
16  A.  Distributor's statement.
17  Q.  And for what week did you look at?  Was it
18     last week's?
19  A.  27 would have been, I think, a couple of
20     weeks ago.
21  Q.  Is there any reason why Mr. Lord gave you
22     the $63,430 figure?
23  A.  I don't know.

Page 40

1   Q.  Do you typically do territory
2      reconciliation reports?
3   A.  Yes.
4   Q.  When you do them, where do you typically
5      get the repurchase price from?
6   A.  From the territory net sales reports.
7   Q.  Did you look at a territory net sales
8      report for territory number 2069?
9   A.  Did I?
10  Q.  Yes.
11  A.  No, I didn't.
12  Q.  You just relied on Mr. Michael Lord to give
13     you the figure of 63,430?
14  A.  Yes.
15         (Plaintiff's Exhibit 3 was marked
16         for identification.)
17  Q.  I'm going to give you what I'm going to
18     mark as Plaintiff's Exhibit Number 3.  And
19     these are documents that were produced and
20     are Bates stamp numbers FBO000863 through
21     FBO000988.
22         MR. HISHTA:  Let's go off the
23         record just for a minute.

Page 41

1       (Off-the-record discussion.)
2   Q.  All right.  Looking at the -- I'm going to
3       refer to them just so that we're clear
4       according to the Bates stamp numbers at the
5       bottom.  And I'm just going to refer to the
6       last three numbers of the Bates stamps so I
7       don't have to repeat it all.
8       Number 863, 64, 65, and 66 appear to be
9       distributor summary report; is that
10      correct?
11  A.  Yes -- yeah.  Yes, sir.
12  Q.  And at the top of each one it's got a year,
13      2001, 2002, 2003, 2004.  And I don't know
14      if 867 is a -- it looks like a different
15      type report or it may be the same type
16      report, just on a different format.
17  A.  867 is just for one week.
18  Q.  Okay.  Let's wait on those for a second.
19      Let's go back to 863.  863 is for a whole
20      year; correct?
21  A.  Let's see.  Yes.
22  Q.  If we look at 863, we've got a beginning
23      balance owed of 34,000 and it looks like

Page 42

1       funds paid to distributor, 34,676.  What is
2       that?
3   A.  That's a total of the year.  If you took
4       his total of his weekly statements, that
5       should total with that.
6   Q.  The next line down, net product charged to
7       distributor, $326,631.02.  See that figure?
8   A.  Yes.
9   Q.  Is that all product?  It's not just -- it's
10      every product that's delivered to the
11      distributor?
12  A.  Yes.
13  Q.  It doesn't exclude branded sales or
14      anything like that?
15  A.  No.
16  Q.  What is relay adjustment?
17  A.  That is products delivered to our
18      warehouse.  That would be if the relay
19      driver was supposed to deliver a hundred
20      units of a certain type bread and he gets
21      there and there's only 95.  He would let
22      the driver know, hey, you're five units
23      short.  So he gets credit for it.

Page 43

1   Q.  Load adjustment.  What is that?
2   A.  That would be where the distributor
3       discovers, hey, he delivered us a load of
4       bread.  It's supposed to be a hundred units
5       of a certain type.  I've only got 95.  So
6       he gets credit for it.
7   Q.  And in this particular case the load
8       adjustments --
9   A.  It could be the other way.
10  Q.  -- is $364.48.  It's not a -- it looks like
11      it's a plus in this case.
12  A.  In that case he would have discovered he
13      had like 105 instead of a hundred.
14  Q.  So that means that he discovered he had
15      more bread than what the company said he
16      did and let the company know and there was
17      a load adjustment made?
18  A.  Well, he actually does this himself in
19      his --
20  Q.  In his computer?
21  A.  Yes.
22  Q.  Which notifies the company; correct?
23  A.  Yes.

Page 44

1   Q.  Damaged, slash, crippled.  What does that
2       refer to?
3   A.  It's damaged bread he's taking credit for.
4   Q.  The next line down says short code.  And
5       what is short code?
6   A.  That's not one we use very often.  It's $19
7       for the whole year.  I'm assuming that's
8       some type of transaction where he was short
9       some bread.  That's something we really
10      don't use that much.
11  Q.  The next line down says product transfers.
12      What is that?
13  A.  It's where one distributor transfers
14      product to another route.  He can transfer
15      in or out.
16  Q.  Is that typical for distributors to
17      transfer in and out of their routes?
18  A.  Yes.
19  Q.  And why would they do that?
20  A.  I mean, you know, you have to ask the
21      distributor.  I guess they got too much of
22      a product and somebody else needs it.
23  Q.  The next line down says customer price --

Page 45

1    is that allowances?
2    A.  Yes.
3    Q.  Slash, overrides.  What is that?
4    A.  That's -- well, an example of that would be
5        if we had bread in a store that was on
6        sale, so he's not getting the full price
7        for it.  He gets credit for the difference
8        between the regular price and what it's on
9        sale for.
10   Q.  All right.  Stales, $43,427.29?
11   A.  That's bread he takes out of the store and
12       stales it, out of code bread, old bread.
13   Q.  Authorized charges, $289,587.95?
14   A.  That's products sold to larger retail
15       grocery stores that the customer, the
16       grocery store, whoever it might be, doesn't
17       actually pay the distributor.  They pay
18       Flowers.  And then we give them credit for it.
19   Q.  And then you've got net accountable.  It
20       looks like a -- is that a credit of
21       $9,168?
22   A.  Yes.
23   Q.  Now, what does that mean when it says net

Page 46

1        accountable?
2    A.  That means at this point the distributor is
3        owed $9,168.
4    Q.  But we're not at the end of the statement
5        yet.
6    A.  Right.
7    Q.  That's just at that point within the
8        statement?
9    A.  Yes.
10   Q.  The next line down says standard discount.
11       It looks like $52,856.46.
12   A.  That's discount on the bread.  They buy it
13       from Flowers of Opelika.  They sell it to a
14       grocery store.  That's their discount they
15       get, the difference between what they buy
16       it from us and what they sell it to the
17       store at.
18   Q.  So that's the amount of profit that they
19       should make if they didn't have any other
20       expenses from buying it from you and
21       selling it to a store?
22   A.  Yes.
23   Q.  That figure is on there twice, total

Page 47

1        distributor discount earning.
2    A.  It's just a total.
3    Q.  Then net distributor balance, a credit of
4        $62,025 at that point in time; correct?
5    A.  Yes.
6    Q.  We come down and we start into our business
7        expenses.  Had a territory payment of
8        $11,180.  Now, is that a territory payment
9        that was made throughout the year by the
10       distributor?
11   A.  Yes.
12   Q.  Truck purchase, $4,983.68.  Is that also an
13       amount that was paid by the distributor
14       throughout the year?
15   A.  Yes.
16   Q.  Truck, slash, bus insurance is the next
17       line down.
18   A.  Business insurance.
19   Q.  Business insurance.  Okay.  Is that also a
20       figure that was paid by the distributor
21       throughout the year?
22   A.  Yes.
23   Q.  Health/disability insurance was also paid

Page 48

1        by the distributor?
2    A.  Yes.
3    Q.  Warehouse rent, is that also paid by the
4        distributor?
5    A.  Yes.
6    Q.  Administrative fee, $520.  And what is
7        that?
8    A.  That's just a fee that distributors pay
9        Flowers of Opelika for paperwork for
10       running their statements, just a fee
11       Flowers of Opelika charges its
12       distributors.
13   Q.  We've got total business expenses of
14       $27,943.97.  You see that?
15   A.  Yes.
16   Q.  Total business expenses.  It looks like I
17       skipped two.  FICA tax, current work; is
18       that right?
19   A.  Current week.
20   Q.  Current week.  Okay.  $2,759.79.  And
21       miscellaneous expense, 66.12.  I know what
22       the FICA is.  What is a miscellaneous
23       expense?

Deposition of Jerry Woodham                                                     July 16, 2007

Page 49

1    A.  It could be anything.  I mean, that's why
2        it says miscellaneous.  Flowers charges
3        distributors -- if they don't pull up their
4        own routes and someone from Flowers of
5        Opelika does it, we charge the
6        distributors.  I mean, that could be -- I
7        mean, it could be several things, smaller
8        charges.
9    Q.  We've got total distributor balance, a
10       credit of $34,027.75; is that correct?
11   A.  Yes.
12   Q.  All right.  Weekly distributor balance,
13       $34,027.75.  And that's a credit.  And then
14       we've got gross earnings of 52,856.46.  And
15       then we've got weekly estimated operating
16       expense, $15,850.66.  Where does that
17       figure come from?
18   A.  That is based on -- the estimated operating
19       expenses are expenses the distributor turns
20       into their CPA.  The CPA compiles them,
21       gives them to Flowers of Opelika.  We use
22       the expenses on their statement to
23       determine --

Page 50

1    Q.  To come up with their estimated net taxable
2        earnings?
3    A.  Exactly.
4    Q.  So if we look for 2001, the gross earnings
5        on his W-2 that Flowers sent to him -- I'll
6        have to let you explain it.  Let me mark
7        Plaintiff's Exhibit Number 4.
8            (Plaintiff's Exhibit 4 was marked
9             for identification.)
10   Q.  Plaintiff's Exhibit Number 4 has a W-2 for
11       2000 and 2001.  You see the 2001 at the
12       bottom of the page there?
13   A.  Yes, sir.
14   Q.  And it shows -- what's the gross taxable --
15       or gross compensation amount?
16   A.  $52,941.67.
17   Q.  All right.  I'm not smart enough.  Tell me
18       how -- why is that figure different than
19       the figure on Bates stamp number 863.
20   A.  Well, you have to take into account Flowers
21       doesn't operate on a normal calendar year.
22       If you notice these dates, 12-31-2000 to
23       12-29-2001.  It's not from January 1st to

Page 51

1        December 31st.
2    Q.  That explains it.  All right.
3    A.  Which this is.
4    Q.  So they've got $52,941.67.  That's for the
5        January 1 through December 31st?
6    A.  Yes.
7    Q.  If we look at Bates stamp number 64 -- 864,
8        865, and 866, those are all the same
9        distributor summary reports just like the
10       one we went over in 2001?
11   A.  Yes.
12   Q.  Is there anything -- to me it appears to be
13       pretty standard.  I mean, has anything
14       changed between 2001 and 2004 in the way
15       the process that you did these particular
16       distributor summary reports?
17   A.  Not that I'm aware of.  I mean, I think
18       they're probably -- comparative they're
19       probably exactly the same.
20           MR. HISHTA:  Just for record
21           purposes, he didn't prepare
22           these reports, but he's
23           explaining the methodology.

Page 52

1    Q.  All right.  Let's flip over to Bates stamp
2        number 867.  What is this report?
3    A.  This is a weekly distributor's statement.
4    Q.  This is something that each distributor is
5        given every week?
6    A.  Yes, sir.
7    Q.  Let's work through it for a second.  At the
8        top of the page it says -- it's got your --
9        you know, Henry Porterfield's name,
10       distributor number, route, warehouse,
11       company, code, all that kind of stuff at
12       the top, just general information.  It
13       skips down and it says beginning balance
14       owed.  I would assume that's from the
15       previous week?
16   A.  Yes, sir.
17   Q.  Funds paid to distributor is zero.  Funds
18       received from distributor is zero.  Then
19       it's got accountability, total product
20       charged, $5,823.93.  You see that?
21   A.  Yes, sir.
22   Q.  That's product that was charged to Henry
23       Porterfield?

Deposition of Jerry Woodham                                                                    July 16, 2007

Page 53

1   A.  Yes.
2   Q.  Or to Wal-Mart or to Winn-Dixie or somebody
3       that purchased --
4   A.  Well, no.  That's product the distributor
5       bought from Flowers Baking Company of
6       Opelika.
7   Q.  So that doesn't include the Wal-Mart stuff,
8       then, does it?
9           MR. HISHTA:  Objection to the form
10          of the question.  Vague and
11          ambiguous.
12  Q.  Does total product charged, the $5,823.90
13      figure, does that include product --
14      private label product that went to
15      Wal-Mart?
16  A.  Well, I don't know.  I mean, the
17      distributor sells it once he buys it from
18      Flowers.  So I don't know where it went.
19  Q.  The distributor doesn't get paid for it.
20      It comes back straight to Flowers, doesn't
21      it?
22      He doesn't receive a check made out to
23      Henry Porterfield for product that goes to

Page 54

1       Wal-Mart, does he?
2   A.  You're confusing me.
3           MR. HISHTA:  Yeah.  That's --
4   A.  We're talking about two different things
5       here.
6   Q.  All right.  Total product charged.  Tell me
7       what total product charged is.
8   A.  That's product the distributor buys from
9       Flowers Baking Company of Opelika.
10  Q.  Now, product includes bread, buns,
11      everything that you sell -- that Flowers
12      sells, right, that they pick up?
13  A.  Yes, sir.
14  Q.  Now, my question to you is, on total
15      product charged, in 2005 there was not a
16      Wal-Mart within Mr. Porterfield's route
17      that I am aware of; all right?  But
18      assuming there was, would private label
19      bread be included in total product charged
20      on a weekly distributor's report?
21  A.  This number has nothing to do with any
22      customer.  This is just product the
23      distributor bought from us.  That's all it

Page 55

1       is.  I mean, it has nothing to do with any
2       store at that point.
3   Q.  Okay.  Is that just product that he's
4       bought from you just to use for whatever
5       reason he wants to use it for?  He can take
6       it and throw it away if he wants to?
7   A.  Yeah, I guess he could.
8   Q.  Do you have a contract with -- let's take
9       today.  Is there a contract between Flowers
10      and Wal-Mart?
11  A.  Not that I'm aware of.
12  Q.  Does Flowers distribute to Wal-Mart?
13  A.  No.
14  Q.  Has Flowers ever received a check for bread
15      delivered to Wal-Mart made out to Flowers?
16  A.  Yes.
17  Q.  Why did you receive a check made out to
18      Flowers from Wal-Mart?
19  A.  Because the distributor bought the bread
20      from Flowers Baking Company of Opelika.  He
21      put it in the store.  On larger accounts
22      like that the company pays Flowers, and
23      then we give them credit on their

Page 56

1       statement.
2   Q.  The company doesn't pay the distributor.
3       They pay Flowers for it; correct?
4   A.  Yes.
5   Q.  While we're on that subject, the bread
6       that's delivered to Wal-Mart by the
7       distributors, how often do you get paid --
8       does Flowers get paid from Wal-Mart?
9   A.  Weekly.
10  Q.  If the distributor goes out and delivers
11      $10,000 -- let's just take an even
12      number -- $10,000 worth of product to
13      Wal-Mart, does Wal-Mart cut a check for the
14      exact amount that the distributor
15      distributed back to Flowers?
16  A.  Back to ...
17  Q.  To Flowers.
18          MR. HISHTA:  I'm going to object.
19          Again, it's vague and --
20  A.  You said distributed back to Flowers?
21  Q.  I'm sorry.  I'm sorry.  Let's just take it
22      one step at a time.  Let's say that $10,000
23      worth of product is picked up by a

Deposition of Jerry Woodham                                                    July 16, 2007

---

Page 57

1    distributor from Flowers' warehouse. The
2    distributor looks on his computer and sees
3    that $10,000 worth of product is to go to
4    Wal-Mart; okay?
5        So he takes $10,000 worth of product to
6    Wal-Mart and puts $10,000 worth of product
7    on the shelf at Wal-Mart. That week, the
8    next week, two weeks, whatever, does
9    Wal-Mart cut Flowers a check which you
10   credit to the distributor for $10,000?
11   A.  Hopefully.
12   Q.  But do they do that?
13   A.  Yeah.
14   Q.  Okay.
15   A.  Yes.
16   Q.  Do you know what the term shrinkage is?
17   A.  Yes.
18   Q.  What is shrinkage?
19   A.  Shrinkage is the term when the
20   distributor -- it's basically an inventory
21   variance.
22   Q.  And like if $10,000 worth of product is
23   delivered to Wal-Mart, does Wal-Mart pay

---

Page 59

1    refuses to pay half. In normal cases the
2    store eats half, Flowers of Opelika eats a
3    fourth and the distributor a fourth.
4    Q.  With Wal-Mart what happens?
5    A.  The distributor gets a fourth and Flowers
6    gets the rest.
7    Q.  And who came up with that calculation?
8    A.  I have no idea.
9    Q.  Have you ever looked at a distributor's
10   contract?
11   A.  I have never read one. I've seen one.
12   But, you know, I've never sat down and read
13   it.
14   Q.  Do you know of anyplace within the
15   distributor's contract that allows for
16   Flowers to charge a distributor for
17   shrinkage?
18       MR. HISHTA:  Objection to the
19       extent it calls for a legal
20       conclusion. Second objection,
21       the witness has testified that
22       he hasn't read a distributor
23       agreement.

---

Page 58

1        $10,000 back to Flowers?
2    A.  Well, first of all, you've got to take into
3    account pay by scan. Are you --
4    Q.  That's what I'm asking.
5    A.  Well, you didn't mention that. Okay.
6    Q.  Do they do pay by scan?
7    A.  Oh, yes, Wal-Mart does pay by scan.
8    Q.  That means they only pay you when they sell
9    it; correct?
10   A.  When it's scanned at the register, yeah.
11   Q.  If they don't sell it --
12   A.  I thought you were just talking on general
13   terms.
14   Q.  If they don't sell it, they don't pay you
15   for it?
16   A.  Right.
17   Q.  On the pay by scan, if you have shrinkage
18   in the store, then Flowers doesn't get paid
19   for it, correct, for the shrinkage amount?
20   A.  Right.
21   Q.  Who eats the shrinkage amount?
22   A.  The store -- well, Wal-Mart doesn't pay any
23   of it. Most stores pay half. Wal-Mart

---

Page 60

1    Q.  I've got a copy of a distributor agreement
2    if you want to look at one. I'm just
3    asking if you knew of anyplace within a
4    distributor contract that allows for
5    Flowers to charge a distributor for
6    shrinkage.
7        MR. HISHTA:  Same objection.
8        Calls for a legal conclusion.
9    Q.  Well, let me show you what's previously
10   been marked as Defendant's Exhibit 1 to
11   Michael Lord's deposition which is a
12   distributor agreement. And I'll tell you
13   what, we'll take a five-minute break and
14   I'll let you look through it and I'll ask
15   you that question after the break.
16   A.  You want me to read the whole thing?
17   Q.  Look through it. I can give you ten
18   minutes. We'll take ten minutes.
19   A.  What am I looking for?
20   Q.  I want you to tell me where within a
21   distributor's agreement it contains
22   language authorizing Flowers to charge a
23   distributor for shrinkage.

---

Deposition of Jerry Woodham                                July 16, 2007

Page 61

1    A.  I'm not a lawyer.  I mean, it could be in
2        there and I wouldn't even recognize it.
3    Q.  I'm not asking you to give me a legal
4        opinion.  I'm just saying, as a lay person,
5        if you see it in there that a lay person
6        would understand, please let me know.
7        We'll take ten minutes to let you look at
8        it.
9            I'm not asking you for a legal
10       opinion.  I'm just asking you for your
11       opinion as a lay person or as an accountant
12       for Flowers.
13           (A brief recess was taken.)
14   Q.  (Mr. Davis continuing:)  Were you able to
15       find anything contained within the contract
16       that would give Flowers the authority to
17       charge distributors for shrinkage?
18           MR. HISHTA:  Objection to the
19           extent it calls for a legal
20           conclusion and further object
21           as this line of questioning
22           seemingly has no relevance
23           whatsoever to the allegations

Page 62

1            Mr. Porterfield has made in
2            his complaint.
3    Q.  You can answer.
4            MR. HISHTA:  Go ahead.  You can
5            answer the question subject to
6            those objections.
7    A.  No, I didn't see the term shrink anywhere
8        in there.
9    Q.  As the comptroller for Flowers, are all
10       distributors like Henry Porterfield charged
11       for shrinkage?
12           MR. HISHTA:  Objection.  Assumes
13           facts not in evidence.
14           There's no evidence of record
15           that Henry was ever charged
16           for any shrink.
17   Q.  Are distributors charged for shrinkage at
18       Flowers?
19   A.  Yes.
20   Q.  You've worked in both Georgia and Alabama;
21       correct?
22   A.  Yes.
23   Q.  When you were working in Georgia, were

Page 63

1        distributors charged for shrinkage?
2            MR. HISHTA:  Also object to the
3            terminology charged as it
4            relates to this line of
5            questioning.
6    Q.  You can answer.
7    A.  Yes.
8    Q.  And when I say charged, is shrinkage
9        deducted from distributors' weekly
10       accounts?
11   A.  No.
12   Q.  How is it handled?
13   A.  It's done on a period basis.
14   Q.  Done every quarter?
15   A.  Period.
16   Q.  Period.  How long is a period?
17   A.  Four weeks.
18   Q.  So once every four weeks it's adjusted; is
19       that correct?
20   A.  Yes.
21   Q.  And that's across the -- as far as you know
22       every place you've worked it's been that
23       way at Flowers?

Page 64

1    A.  Yes.
2    Q.  All right.  Let's go back to Bates stamp
3        number 867.  We went over total product
4        charged.  And I think I got an answer, but
5        I'm not certain.  Does total product
6        charged include product that is pay by
7        scan?
8            MR. HISHTA:  Objection.  Vague.
9    Q.  You can answer if you know.
10   A.  Well, I don't know how to answer it.
11   Q.  All right.  Well, then help me out, then.
12       Total product charged is product that is
13       charged to the distributor; correct?
14   A.  Yes.
15   Q.  All right.  Is product that is delivered to
16       Wal-Mart that is paid on pay by scan -- is
17       that a product included in the total
18       product charged --
19   A.  Is the product --
20   Q.  -- figure?
21   A.  Is the product?
22   Q.  Yes.
23   A.  Yes.

Deposition of Jerry Woodham                                                July 16, 2007

Page 65

1   Q.  Relay adjustment.  What is that?
2   A.  That is product delivered to the warehouse
3       where the relay driver leaves an adjustment
4       for the distributor saying, hey, you're
5       short five loaves of bread.
6   Q.  Same thing, load adjustment, product that
7       either is --
8   A.  Short or over.
9   Q.  -- short or over.  Damaged product is
10      product that's just that.  It's damaged.
11      Short code product is what?
12  A.  I can't give you an answer on short code.
13      Like you see here, it's zero.  That's one
14      we really don't ever deal with.
15  Q.  If you look down in the middle, it says pay
16      by scan adjustments, 12-26-2004 through
17      1-1-2005?
18  A.  Yes.
19  Q.  Point of sale data.  It looks like a credit
20      for $1,806.98.  You see that?
21  A.  Yes.
22  Q.  So during this time period there were -- in
23      2005 on this particular route there were

Page 66

1       point of -- I'm sorry -- there were pay by
2       scan customers on that route?
3   A.  Yes.
4   Q.  Revaluation variance.  What is that figure?
5   A.  That's their inventory variance on their
6       pay by scan items.
7   Q.  So does that mean -- or tell me what that
8       means.
9   A.  Well, they do an inventory every week, and
10      if they come up short or over -- if they
11      come up short, they get credit for it.
12  Q.  On a credit of $112.64 -- is that what this
13      particular document says?
14  A.  Yeah.
15  Q.  Does that mean that whoever that customer
16      was that did the pay by scan adjustment,
17      that there was actually more inventory in
18      stock than what they thought they should
19      have?
20  A.  You're saying the customer?  You mean like
21      the store?
22  Q.  The store.
23  A.  The distributor does this.

Page 67

1   Q.  Okay.  So on this particular one,
2       revaluation variance, the distributor goes
3       out and does an inventory?
4   A.  Yes.
5   Q.  Once he does the inventory, on this
6       particular 867 document it looks like a
7       $112.64 credit.
8   A.  Yes.
9   Q.  In this particular instance that means that
10      there was more product on the shelf than
11      the distributor thought or less on the
12      shelf than the distributor thought?
13  A.  Less.
14  Q.  Okay.  So does that mean that there was
15      $112.64 shrinkage?
16  A.  Yes.
17  Q.  And is the $112.64 revaluation variance --
18      is that just the distributor's portion of
19      it, or is that the total revaluation?
20  A.  That's the total.
21  Q.  All right.  Now, did the distributor get
22      charged -- assuming it's not Wal-Mart.  On
23      other accounts how much does the

Page 68

1       distributor have to eat?  And when I say
2       eat, how much is he charged?
3   A.  25 percent.
4   Q.  So the distributor should get charged 25
5       percent of $112.64?
6   A.  Yes.
7   Q.  And is that contained anywhere on the
8       distributor weekly sheet here that we've
9       got?
10  A.  Well, there's a -- there's not a charge on
11      the sheet, but there is a line item for it.
12  Q.  Where is that at?
13  A.  PBS shrink charges.
14  Q.  PBS shrink charges says zero.
15  A.  Uh-huh (positive response).
16  Q.  All right.  Now, why would there be a zero
17      PBS shrink charge on this particular
18      document, number 867?
19  A.  Because this is a weekly statement and we
20      do it by period.
21  Q.  And so the shrinkage is done by period
22      also?  Pay by scan shrinkage is done by
23      every period or what?

Deposition of Jerry Woodham                                        July 16, 2007

Page 69

1      MR. HISHTA: Objection. Again,
2          Greg, it's vague. I don't
3          understand the question.
4   Q.  All right. Tell me what you mean by it's
5       done by period.
6   A.  We charge them or give them credit by
7       period.
8   Q.  On this particular document number 867,
9       it's not contained on there. And if we
10      look over to a different period, a
11      different week, it may be on there because
12      it's --
13  A.  Yes.
14  Q.  Is that what you're saying?
15          If we look over at Bates stamp number
16      870 and -- you see PBS shrink charges?
17  A.  Yes.
18  Q.  And is that PBS shrink charge for what
19      period?
20  A.  Well, I didn't do this statement. I wasn't
21      even working with Flowers Opelika then.
22      So, I mean, I couldn't say.
23  Q.  You can't tell by looking at it?

Page 70

1   A.  Well, I mean, no. I mean -- I mean, I
2       don't know what makes up that number.
3   Q.  Pay by scan shrink charges on document
4       number 870 says 123.17. What's your
5       understanding of what the PBS shrink charge
6       is made of currently?
7   A.  That would be charging a distributor for a
8       period worth of shrink.
9   Q.  And if the -- at stores other than Wal-Mart
10      the distributor gets charged how much?
11  A.  Same amount.
12  Q.  25 percent?
13  A.  25 percent.
14  Q.  So he gets charged 25 percent on Wal-Mart
15      and anybody else that does pay by scans?
16  A.  Yes.
17  Q.  And that's still true today?
18  A.  Yes.
19  Q.  Back to number 867. There's a lot of
20      business expenses, which I think most of
21      them are self-explanatory. Like the
22      territory payment, that's actually what the
23      distributor is paying for that particular

Page 71

1       territory. Truck purchase is what he's
2       paying for the truck purchase?
3   A.  Yes.
4   Q.  Tags, tax, license fees. That's on the
5       truck. Insurance. Administrative fee,
6       again, is $10. Is that a week, every
7       week?
8   A.  Yes.
9   Q.  Warehouse rent every week. FICA is
10      withheld. And then a miscellaneous expense
11      of $20?
12  A.  Yes.
13  Q.  Is it always $20 on the miscellaneous
14      expense?
15  A.  Well, I mean, it could be more or could be
16      less.
17  Q.  Is there a minimum that it is?
18  A.  Well, it could be zero. It's normally
19      going to be -- like I said, if the
20      distributor did his own pull-ups and there
21      wasn't anything else to charge him, then it
22      would be zero.
23  Q.  If the distributor had someone to do the

Page 72

1       pull-ups that Flowers hired, does Flowers
2       charge the distributor a $20 a week pull-up
3       fee -- or did they?
4   A.  Say that again.
5   Q.  Sure. It's probably a bad question.
6           Let's just take a distributor that has
7       someone else do the pull-ups. Like, for
8       instance, this morning Marcus Porterfield
9       would go out and do pull-ups every week.
10      Does Flowers pay the person that does the
11      pull-up then charge the distributor for
12      doing it every week? Is that how that
13      figure is come up with?
14  A.  Yes.
15  Q.  And I know it was $20. I think it -- it
16      looks like it went up to -- I want to say
17      it went up to $40 or something at one point
18      in time. Yeah. I was looking way over
19      here. In '06 it starts looking like it's
20      $40 every week. So now they charge like
21      $40 to do a pull-up. Is that what that 40
22      would be? Is that your understanding?
23  A.  Yes.

Deposition of Jerry Woodham                                                    July 16, 2007

Page 73

1    Q.  On this when -- when I say this one, number
2        867, it looks like the distributor gets a
3        credit of $1,215.67 at the end of the day.
4    A.  Yes.
5    Q.  Is that correct?  Is that what he gets
6        paid?
7    A.  Yes.
8    Q.  All right.  Flip over to document number
9        878.  And this period or the date is
10       3-20-2005 to 3-26-2005.  You see that at
11       the top of that document?
12   A.  Yes, sir.
13   Q.  On this particular document, 878, under the
14       business expense, it's got relief driver,
15       $334.80.  Do you see that figure?
16   A.  Yes, sir.
17   Q.  And this was, I think, around the time that
18       Mr. Porterfield's contract was terminated.
19       And if you look on the week prior to that,
20       there was no relief driver charged on
21       document number 877.  Do you see that?
22   A.  Yes, sir.
23   Q.  So the relief driver of 334.80, that

Page 74

1        according to the contract, if Flowers takes
2        back over the territory, they can hire
3        somebody to run the account.  Are you
4        familiar with that?
5    A.  I know that's what that charge is for,
6        somebody running the route.
7    Q.  Okay.  Do you know who the relief driver
8        was?
9    A.  No.
10   Q.  Do you know why the amount for relief
11       driver is different on all of the
12       documents -- I'm not going to say all of
13       them.  I'm going to say on at least the
14       next eight or ten after this.  The relief
15       driver on 879 is $512.  On 880 it's 331.
16       On 881 it's $416.  You know, I could go on
17       and on.  But do you know why that
18       particular business expense entitled relief
19       driver changes every week?
20   A.  Yes.
21   Q.  Why?
22   A.  It's based on a standard discount which
23       changes every week.

Page 75

1    Q.  Explain that for me.
2    A.  Take ten percent of the weekly discount and
3        he's charged that amount per day per relief
4        driver.
5    Q.  Flip over to document number 972 for me,
6        please.
7            MR. HISHTA:  I'm missing 972.
8    Q.  Well, let's share that one.  What is
9        document number 972?
10   A.  Looks like a distributor's statement run
11       for a full year.
12           MR. HISHTA:  Let's take a break so
13           we can get a copy of this.
14           (A brief recess was taken.)
15   Q.  (Mr. Davis continuing:)  All right.
16       Document number 972, that's a -- is that a
17       yearly summary?
18   A.  Yes.
19   Q.  And that's for basically the year 2006?
20   A.  Yes.
21   Q.  Except for the last day of the year.  I
22       guess it doesn't have the 12-31-2006 in it;
23       correct?

Page 76

1    A.  Yes, sir.
2    Q.  On the business expenses at the bottom it's
3        got truck rental.  You see that figure?
4    A.  Yes, sir.
5    Q.  $24,698.84?
6    A.  Yes, sir.
7    Q.  How is that figure determined?
8    A.  That is the expense for renting a truck by
9        Flowers Baking Company of Opelika to run
10       this route.
11   Q.  Who was the truck rented from?
12   A.  I couldn't say off the top of my head.
13   Q.  I mean, would it -- do y'all have a
14       specific place y'all rent trucks from?
15   A.  Not that I'm aware of.
16   Q.  How did you come up with or who told you
17       that the figure was $24,698.84 to rent a
18       truck for a year?
19   A.  That would have come from a sales manager,
20       operations manager.
21   Q.  Do you have any documents to back up that
22       the truck rental cost $24,698.84?
23   A.  Yes.  They would have turned those in.

Deposition of Jerry Woodham                                        July 16, 2007

Page 77

1   Q.  It looks like life insurance, 329.68.  Who
2       is the life insurance on?
3   A.  On the distributor.
4   Q.  On Henry Porterfield?
5   A.  Is this on his route, or is this -- I
6       didn't even look.  Is this for one route or
7       is this --
8   Q.  These are documents that your lawyer
9       produced to me.
10          MR. HISHTA:  It's not -- for
11              record purposes, it's not
12              clear that this is route 2069
13              because 2069 does not appear
14              on this document.
15  Q.  If I wanted to double-check myself -- and
16      we won't do it here.  But if I took all of
17      the weekly reports and just took total
18      product charged and added those up for the
19      year, they should come up to -- if this is
20      in fact this particular route, it should
21      come up to $600,245.39?
22  A.  Yes, sir.
23  Q.  All of the other charges should match up if

Page 78

1       that is in fact the route?
2   A.  Yes, sir.
3   Q.  Do you know if Henry Porterfield was
4       leasing a truck whenever he had the route?
5   A.  No, sir, I don't know.
6   Q.  On 972 it says the relief driver was paid
7       $37,490.55.
8          MR. HISHTA:  Objection.  It
9              doesn't say -- it doesn't
10             indicate what the relief
11             driver was paid.
12  Q.  Okay.  There was a charge made for relief
13      driver of $37,490.  You see that?
14  A.  Yes, sir.
15  Q.  Who received the benefit of that charge?  I
16      mean, was somebody paid $37,490.55?
17  A.  No.  It was charged to Henry Porterfield's
18      route.
19  Q.  Okay.  And why was it charged to his
20      route?
21  A.  Because Flowers of Opelika was running the
22      route for Henry Porterfield.
23  Q.  So Flowers was running the route.  So

Page 79

1       Flowers charged him $37,490.55 to run the
2       route for him; is that correct?
3   A.  Yes.
4   Q.  And Flowers paid someone themselves to run
5       the route?
6   A.  Well, not if it was a Flowers employee
7       who's getting a salary.
8   Q.  Do you know in 2006 who ran this particular
9       route?
10  A.  No.
11  Q.  And $37,490.55 is computed by taking the
12      total product charged --
13  A.  The discount.
14  Q.  The discount?
15  A.  The discount.
16  Q.  Which is where on here?
17      Okay.  I got you.  Standard discount,
18      $74,775.75?
19  A.  Yes.
20  Q.  And what percentage of that does Flowers
21      use to come up with how they charge for a
22      relief driver?
23  A.  Ten percent.

Page 80

1   Q.  So ten percent of $74,775 should be what?
2   A.  Well, ten percent of that number is $7,478
3       roughly.  But it's done on a weekly basis.
4   Q.  This is a yearly report.  Is this not the
5       yearly standard discount?
6   A.  Yes.
7   Q.  Obviously $37,490.55 is not ten percent of
8       $74,000.
9          MR. HISHTA:  Objection.  Asked and
10             answered.  He previously
11             testified the ten-percent
12             figure was calculated on a
13             daily basis.
14  Q.  Okay.  Well, tell me how the $37,490 figure
15      is calculated on a daily basis.
16  A.  That $37,000 wasn't.
17  Q.  Okay.  How was it calculated?
18  A.  It should be a total for the year.
19  Q.  And the total for the year should be ten
20      percent of the standard discount, or no?
21      You tell me.
22  A.  It's ten percent of the discount for a
23      total week based on the number of days

Deposition of Jerry Woodham                                           July 16, 2007

**Page 81**

1    there was a relief driver.
2    Q.  For a total week based on number of days
3        that there was actually a relief driver?
4    A.  Yes, sir.
5    Q.  Tell me how you would compute it.
6    A.  You would take the total standard discount
7        for a week times ten percent, multiply that
8        by the number of days there was a relief
9        driver for that week.
10   Q.  Okay.  Can you explain to me how the relief
11       driver figure on document number 972 is
12       $37,490.55?
13   A.  It should be a total of each week's relief
14       driver expense.
15   Q.  Let's just flip backwards.  I'm just going
16       to pick document number 946.  You see where
17       it says relief driver?
18   A.  Yes, sir.
19   Q.  It says 421.40?
20   A.  Yes, sir.
21   Q.  That's for the week of 7-2 through 7-8-06;
22       is that correct?
23   A.  Yes.

**Page 82**

1    Q.  The relief driver charge for that week
2        should be total discount times ten percent
3        times number of days; is that right?
4    A.  Uh-huh (positive response).  Yes, sir.
5    Q.  So if I go here and I go to total discount,
6        it's how much?
7    A.  842.75.
8    Q.  All right.  842.75 times ten percent equals
9        $84.27; is that correct?
10   A.  Yes, sir.
11   Q.  Times the number of days.  So five days; is
12       that right?
13   A.  I don't know.
14   Q.  All right.  421.40 divided by --
15           MR. HISHTA:  It's five days.
16   Q.  -- $84.27 is five days; right?
17           MR. HISHTA:  84.27 times five is
18           421.35.  So for rounding
19           purposes, yes.
20           MR. DAVIS:  Close enough.
21   Q.  So that's the way that's computed for
22       there?
23   A.  Right.

**Page 83**

1    Q.  So if we take the relief driver figure
2        421.40 and we take that figure each week
3        and add them up, what you're telling me is
4        at the end of the year it should add up for
5        2006 to $37,490.55?
6    A.  Yes.
7    Q.  And the total discount is what's used every
8        week?
9    A.  Yes.
10   Q.  If you look at document number 972, the
11       total discount shows $74,778.  Is that
12       figure correct?
13   A.  I'm sorry.  You lost me.
14   Q.  Sure.  Let's look at document number 972.
15       If we look at the discount for the year
16       2006, 1-1-2006 to 12-30-2006, the standard
17       discount appears to me to be $74,775.75; is
18       that correct?
19   A.  Yes.
20   Q.  And that's for the whole year's standard
21       discount; correct?
22   A.  Yes, sir.
23   Q.  Why -- and I'm sorry if this is a bad

**Page 84**

1        question.  But explain to me why it's not
2        ten percent of that figure times the number
3        of days, or is it?
4    A.  No, it's not.
5    Q.  Okay.  Well, explain to me -- explain to
6        for me how that figure plays into the
7        calculation.
8    A.  It doesn't.
9    Q.  And why doesn't it?
10   A.  Because it's a yearly figure.
11   Q.  Okay.  So the discount --
12   A.  You can't --
13   Q.  You can't do it because of the numbers of
14       days that the driver has actually worked
15       the route?
16   A.  Yes, sir.
17   Q.  Okay.  That's what I'm trying to get to.
18       I'm trying to get to the bottom of all
19       this.
20           All right.  So if I do it on a weekly
21       and add them up weekly, then my figure
22       should come out to be $37,490.55?
23   A.  Yes, sir.

Deposition of Jerry Woodham                                     July 16, 2007

Page 85

1  Q.  The shrinkage charged to this account
2      according to this for 2006 was $211.47; is
3      that correct?
4  A.  Yes.
5  Q.  That's for the year; is that right?
6  A.  Yes, sir.
7  Q.  Miscellaneous expenses, $1,620.  Do you
8      know what that is?
9  A.  Like I said, miscellaneous could be a lot
10     of different things.  The most usual is
11     pull-up charges.
12 Q.  Do you know why Henry Porterfield's account
13     would be charged for pull-up charges?
14 A.  Not just looking at this document, no.
15 Q.  And the life insurance charge of 329.68, is
16     that on Henry Porterfield's life?
17 A.  Yes.  I mean, it's for -- on the
18     distributor's behalf.  I don't know exactly
19     who it's for.
20 Q.  I mean, does Henry Porterfield have a life
21     insurance policy that y'all pay $329.68 for
22     every year?
23 A.  We pay it on Henry Porterfield's behalf.

Page 86

1  Q.  Do you pay it on -- when you say on his
2      behalf, is it paid for a driver?
3  A.  For a driver?
4  Q.  Somebody that's running -- a relief
5      driver?
6  A.  No.
7  Q.  Who is the life insurance paid to?
8  A.  To the life insurance company.
9  Q.  And who is the insured on that life
10     insurance policy?
11 A.  What I'm saying is it could be -- I don't
12     know if it's just the distributor or his
13     family.  I don't know for sure.  It's on
14     the distributor's behalf.
15 Q.  So it could be anybody.  And when you say
16     the distributor, you're talking about Henry
17     Porterfield?
18 A.  If this is his route, yeah.
19 Q.  I mean, it's not paid on behalf of a relief
20     driver, is it?
21 A.  Not through a statement.
22 Q.  Is a relief driver -- is he covered by life
23     insurance through the company?

Page 87

1  A.  If he's an employee of Flowers Baking
2      Company.
3  Q.  That's not charged to Henry Porterfield,
4      though, is it?
5  A.  No.
6  Q.  And you don't know what kind of truck is
7      being rented for $24,000 a year, do you?
8  A.  What kind of truck?
9  Q.  Yeah.
10 A.  You mean like brand name?  What do you mean
11     by what kind?
12 Q.  Like what kind of delivery truck is it that
13     $2,000 a month basically is being paid by
14     Flowers?
15 A.  I don't ever see the trucks.  I couldn't
16     say what kind of truck it was.
17 Q.  Who has the lease documents on those
18     trucks?
19 A.  I don't know.  I don't handle the lease.  I
20     mean, I just handle this financial end of
21     it, so I don't know.
22 Q.  Flip over to document number 982 for me,
23     please.  If we look down at the item

Page 88

1      entitled truck lease, do you see that
2      item?
3  A.  Yes.
4  Q.  And how much is the weekly truck lease
5      amount?
6  A.  Looks like it's zero.
7          MR. HISHTA:  Zero.
8  Q.  I'm sorry.  Truck rental amount.
9  A.  $333.69.
10 Q.  If you look at number 983, what is the
11     truck rental amount?
12 A.  $333.68.
13 Q.  And if you look at 984, what is the truck
14     rental amount?
15 A.  $333.68.
16 Q.  If you look at 985, what's the truck rental
17     amount?
18 A.  $333.68.
19 Q.  Same thing with 986?
20 A.  333.68.
21 Q.  And that's the weekly truck rental amount;
22     correct?
23 A.  Well, I haven't been checking these.  Yes,

Deposition of Jerry Woodham                                            July 16, 2007

**Page 89**

1      sir, these are weekly statements.
2    Q.   Flip back to 981 for me.
3      Are you at 981?
4      What's the truck rental amount on 981?
5    A.   $667.38.
6    Q.   Do you know why the truck rental was
7      $667.38 on 2-25-07 through 3-3-07?
8    A.   That's what we were told to charge the
9      route.
10   Q.   And who was it that told you to charge
11      that?
12   A.   Like I said before, we get the information
13      from the sales managers in the warehouse.
14      They tell us how much it's costing to rent
15      a truck.
16   Q.   But the sales office has documents to back
17      up these figures that they give you?
18   A.   Yes.
19      (Plaintiff's Exhibit 5 was marked
20      for identification.)
21   Q.   I'm going to show you what I've marked as
22      Plaintiff's Exhibit Number 5. Do you know
23      what Plaintiff's Exhibit Number 5 is?

**Page 90**

1    A.   Yes, sir.
2    Q.   What is that?
3    A.   It's a W-2.
4    Q.   Issued by Flowers Baking Company of
5      Opelika, LLC, to Henry Porterfield?
6    A.   Yes.
7      (Plaintiff's Exhibit 6 was marked
8      for identification.)
9    Q.   Let me show you what I've marked as
10      Plaintiff's Exhibit number 6. Is that also
11      a W-2 for 2003 issued by Flowers Baking
12      Company to Henry Porterfield?
13   A.   Yes.
14      (Plaintiff's Exhibit 7 was marked
15      for identification.)
16   Q.   Let me show you what I've marked as
17      Plaintiff's Exhibit number 7. Is that also
18      a W-2 issued to Mr. Henry Porterfield for
19      2004?
20   A.   Yes, sir.
21      (Plaintiff's Exhibit 8 was marked
22      for identification.)
23   Q.   Let me show you what I've marked as

**Page 91**

1      Plaintiff's Exhibit Number 8. Is that also
2      a W-2 issued by Flowers to Henry
3      Porterfield for 2005?
4    A.   Yes.
5      (Plaintiff's Exhibit 9 was marked
6      for identification.)
7    Q.   And let me show you Plaintiff's Exhibit
8      Number 9 and ask you if that's also a W-2
9      issued by Flowers to Henry Porterfield for
10      the year 2006.
11   A.   Yes.
12   Q.   And looking at 2006, how much does it say
13      that Mr. Porterfield made in 2006 from
14      Flowers?
15   A.   He didn't make anything from Flowers. I
16      mean, we don't --
17   Q.   How much does it report that his wages--
18      excuse me. Let's see what it says --
19      wages, tips, or other compensation were in
20      2006?
21   A.   $74,499.75.
22   Q.   And Mr. Porter didn't get $74,000 and
23      change from Flowers during 2006, did he?

**Page 92**

1    A.   Well, he wasn't -- what do you mean by get?
2    Q.   Did he receive wages, salaries, or tips
3      from Flowers in the amount of 74,000?
4    A.   No, not wages, salaries, or tips.
5    Q.   What did he receive?
6    A.   He received discount on product he bought
7      from Flowers Baking of Opelika.
8    Q.   And how much was his discount?
9    A.   $74,499.75.
10   Q.   And that discount is a percentage of the,
11      what, net sales, or what is it? It's a
12      percentage of what?
13   A.   The product he bought from Flowers of
14      Opelika.
15   Q.   And what percentage of it is it?
16   A.   It's different for different --
17   Q.   Different products?
18   A.   -- different products.
19   Q.   And he received a discount or percentage of
20      the discount, I guess; right?
21   A.   Percentage of the -- well, the discount is
22      a percentage.
23   Q.   But as far as dollar figures, he didn't

Deposition of Jerry Woodham                                                July 16, 2007

Page 93

1  receive any actual money himself, did he?
2       MR. HISHTA:  Are you asking him
3            did he physically receive
4            money or did money go into a
5            bank account?
6  Q.  Did money go into -- either a check written
7       out that said from Flowers to Henry
8       Porterfield or cash or any type of
9       compensation that went straight to Henry
10      Porterfield?
11 A.  If at the end of the week if we owed --
12      Flowers owed him money, yes.
13 Q.  How many times did Flowers cut Henry
14      Porterfield a check in 2006?
15 A.  I don't know.
16 Q.  If you look at the 2006 summary, would it
17      tell you if Mr. Porterfield received a
18      check?
19 A.  No.  Because he could have received checks
20      one week and the next week he might not
21      have received a check.  You can't go on a
22      yearly figure.
23 Q.  If I look at the 2006 weekly reports, will

Page 94

1  I be able to tell if he received a check?
2  A.  Yes.  You can see what the balance is.
3  Q.  It says distributor balance and it has a
4       figure there.  If there's a balance, then
5       he didn't receive a check; is that right?
6       MR. HISHTA:  If there's a positive
7            balance, is that what you --
8  Q.  A positive balance.
9  A.  If it's a positive balance, no, sir, he
10      didn't receive a check.
11 Q.  Go to Bates stamp number 971 for me.  Are
12      you at that page?
13      You see the weekly distributor balance?
14 A.  Yes, sir.
15 Q.  $16,874.14?
16 A.  Yes, sir.
17 Q.  So as of -- and that's the week of
18      12-24-2006 to 12-30-2006?
19 A.  Yes.
20 Q.  So at the end of 2006 Henry owed --
21      according to your calculations owed Flowers
22      $16,874.14?
23 A.  Yes.

Page 95

1  Q.  Flip back -- let's go back to document
2       number 878, which is right around the time
3       that Henry's contract was terminated on --
4       which was -- this is for a report of
5       3-20-2005 to 3-26-2005.  You see that?
6  A.  Yes, sir.
7  Q.  And at that time the weekly distributor
8       balance was what?
9  A.  $495.69.
10 Q.  And was that a credit?
11 A.  Yes, sir.
12 Q.  So Henry got cut a check for that week for
13      $495.69; is that right?
14 A.  Yes, sir.
15 Q.  If you look over to the next week, it shows
16      Henry owing you $271.93; correct?
17 A.  Yes, sir.
18 Q.  And that figure is increasing every week
19      until it gets up to where I just stopped at
20      at 12-24-2006 and it's up to 16,874?
21      MR. HISHTA:  It may not increase
22           every week, but we will
23           stipulate that it has

Page 96

1  increased.
2  Q.  It has increased up to that amount by
3       12-30-2006.  If you go further, it's even
4       higher than that now.  So I'm just stopping
5       at that date.
6       Do you know any reason why Flowers is
7  losing money on this particular route when
8  they're running it themselves?
9  A.  Mr. Porterfield is not paying us any money.
10 Q.  Mr. Porterfield should be paying you money
11      every week?
12 A.  No, I didn't say that.
13 Q.  Mr. Porterfield is not paying you any money
14      on what?
15 A.  His route number 2069.
16 Q.  Is anybody paying you any money on that
17      route number 2069?
18      MR. HISHTA:  Objection.  It's
19           vague.  I'm not sure what
20           either one of you are
21           referring to.
22      MR. DAVIS:  I don't either.
23           That's what I'm trying to get

Page 97

1          at.
2     Q.  I mean, who's paying for product charged to
3          route 2069?
4     A.  Nobody.  It's just accumulating.
5     Q.  So since March of 2005 not a single
6          customer on route 2069 has paid any dime to
7          Flowers?
8     A.  Oh --
9          MR. HISHTA:  Objection.  Vague.
10              But go ahead and answer.
11    A.  Yeah, customers have.
12    Q.  All right.  But Mr. Porterfield hasn't?
13    A.  Not that I'm aware of.
14    Q.  Is there a reason why Mr. Porterfield
15         should be paying you money every week on
16         this account?
17    A.  Well, it's got his name on the document.
18    Q.  Okay.
19         MR. HISHTA:  Well, I'd state for
20              record purposes that -- and I
21              believe that we have
22              previously stipulated to
23              this.  Michael Lord certainly

Page 98

1              testified to that effect that
2              the -- Mr. Porterfield's
3              territory is being run on his
4              behalf and an accounting has
5              been taking place since the
6              termination of his contract.
7     Q.  Do you have all of the documents related to
8          the accounting of Mr. Porterfield's route?
9     A.  Yes.
10    Q.  Are those documents kept in a separate
11         file?
12    A.  They're kept in a folder.
13    Q.  All of them related to 2069?
14    A.  Yes.
15    Q.  So every charge, everything that deals with
16         this account is kept in one folder?
17         MR. HISHTA:  If you know.
18    A.  I don't know that every charge is kept in
19         that folder.
20    Q.  What charges are kept in the folder?
21    A.  Well, I don't keep up with the folder, so I
22         don't know.
23    Q.  Who does?

Page 99

1     A.  Distributor coordinator.
2     Q.  Who is that?
3     A.  Don Adkins.
4     Q.  And why does Mr. Don Adkins keep that file?
5     A.  That's part of his job.
6     Q.  And he's got the file on everything that's
7          been charged to Henry Porterfield's
8          account?
9     A.  I don't know.
10    Q.  He's the person who's supposed to have
11         every document that's charged to Henry
12         Porterfield's account as the distributor
13         coordinator?
14         MR. HISHTA:  Okay.  Assumes facts
15              not in evidence.
16    Q.  Is that your understanding?
17    A.  No.
18    Q.  What's your understanding of who's supposed
19         to maintain that file?
20    A.  He keeps up with the paperwork for the file
21         for a route.
22    Q.  Which involves what?
23    A.  I believe -- I don't know what all is in

Page 100

1          there.
2     Q.  Is there any part that you keep up with?
3     A.  The distributor's statements.
4     Q.  And you get your information for the
5          distributor's statements from Don Adkins
6          for a lot of the information on there?
7     A.  Some of it.
8     Q.  The part that you don't get from Don
9          Adkins, where do you get it from?
10    A.  The sales manager.
11    Q.  Anybody else?
12    A.  Not that I can think of.
13    Q.  Look back at document number 972 for me.
14         At the very top of it it says beginning
15         balance owed.  You see that?
16    A.  Yes, sir.
17    Q.  It's got $1,026,415.34?
18    A.  Yes, sir.
19    Q.  What does that figure represent?
20    A.  That would be a total of -- should be a
21         total of all the weekly distributor
22         statements.
23    Q.  For the year 2006?

Deposition of Jerry Woodham                                              July 16, 2007

---

Page 101

1    A.  Yes.
2    Q.  It's got funds paid to distributor, zero.
3        You see that?
4    A.  Yes, sir.
5    Q.  It's got funds received from distributor,
6        $1,810.54?
7    A.  Yes, sir.
8    Q.  Where did that $1,810.54 come from?
9    A.  I can't say just from looking at this
10       report where it came from.
11   Q.  Did Mr. Porterfield write you a check in
12       2006 for $1,810.54?
13   A.  I don't know.
14   Q.  So $1,026,000 worth of product went out the
15       door at Flowers during 2006 on this
16       particular route?
17           MR. HISHTA:  Objection.  Vague.
18               And that's not what he
19               previously testified to.
20   Q.  Tell me how the $1,026,415.34 is
21       comprised.
22   A.  It's a total of all the weekly distributor
23       statements.

---

Page 102

1    Q.  Of the beginning balance owed?
2    A.  Yes.
3    Q.  And the beginning balance owed is derived
4        from what?
5    A.  From the previous week.
6    Q.  Okay.
7            MR. HISHTA:  Are we going to be a
8                while?  Because if we are,
9                I need to reschedule a
10               conference call if we could
11               take a break.
12           MR. DAVIS:  Yeah.  We can go ahead
13               and take a break for just a
14               minute.
15           (A brief recess was taken.)
16   Q.  (Mr. Davis continuing:)  Let's go to 918.
17       918 is for route 2069 for the dates
18       12-25-2005 to 12-31-2005.  You see that?
19   A.  Yes, sir.
20   Q.  All right.  At the very bottom of the page,
21       if I look at total distributor balance,
22       it's got 10,709.85.  You see that?
23   A.  Yes, sir.

---

Page 103

1    Q.  And then if we look at pay by scan credits
2        less prior week pay by scan inventory, it
3        looks like a credit of 728.27?
4    A.  Yes, sir.
5    Q.  And then also you've got a less current
6        week pay by scan delivery tickets,
7        12-25-2005 to 12-31-2005.  It looks like
8        another credit of $1,008.77; is that
9        correct?
10   A.  Yes.
11   Q.  That leaving a weekly distributor balance
12       of $8,972.81; right?
13   A.  Yes, sir.
14   Q.  That's the end of 2005.  That's the balance
15       owed on that account; right?
16   A.  Yes.
17   Q.  Now, flip over two pages to 920.  Beginning
18       balance owed.  You see that?
19   A.  Yes, sir.
20   Q.  $10,723.19.  You'll have to walk me through
21       that and explain that one to me and tell me
22       how it went from 8,972.81 to 10,723.19.
23   A.  I don't know.

---

Page 104

1    Q.  From an accounting standpoint how did it do
2        it?
3    A.  I don't know.
4    Q.  Why don't you know?  I mean, is there
5        something you need to look at to determine
6        why it did that?
7    A.  I could try.  I mean, I ...
8    Q.  Look back at 918.
9            MR. HISHTA:  Are we missing 919?
10           MR. DAVIS:  19 is right here.
11               That's the end of the year.
12               That's a full one.
13           MR. HISHTA:  It's not in the
14               exhibit that is --
15           MR. DAVIS:  Let's put it -- let's
16               make sure that the exhibit
17               before we leave has every
18               single document from 919 -- or
19               whatever it begins at to the
20               end.
21           MR. HISHTA:  Do you have an extra
22               919?
23           MR. DAVIS:  I thought -- I don't

---

26 (Pages 101 to 104)

Page 105

1  know why it's not copied in
2  there, but --
3  MR. HISHTA: It appears the year
4  ending documents in the
5  exhibit that you're using for
6  the court reporter for some
7  reason does not have those
8  documents.
9  Q. Look at 919 and tell me is there anything
10  that's added at 919 -- document number 919,
11  which is the end of the year report total,
12  that would change it from 12-31 to 1-1.
13  A. I mean, I don't see anything.
14  Q. Well, let's go back to 918. Let me ask a
15  question about 918 one more time.
16  All right. You're the controller of
17  Flowers; right?
18  A. Yes, sir.
19  Q. All right. You understand these documents
20  as good as anybody; right?
21  A. Yes, sir.
22  Q. And these are your documents that y'all
23  produced; right?

Page 106

1  A. Yes.
2  Q. Your company produced.
3  Am I correct that by looking at this
4  little area down in the box, it's got total
5  distributor balance, $10,709.85. And then
6  it's got the credits. You see the two
7  credits?
8  A. Yes, sir.
9  Q. That leaves an ending balance according to
10  this document of $8,972.81. You see that?
11  A. Yes, sir.
12  Q. Now, assuming that nothing happened between
13  12-31 and 1-1, should the weekly
14  distributor balance roll over to the next
15  week?
16  A. Yes, sir.
17  Q. Is that the proper way for it to do?
18  A. Uh-huh (positive response).
19  Q. Because when you get credits, it reduces
20  the balance, gives you a new balance
21  because you've got credits; correct?
22  A. Yes.
23  Q. All right. Now, let's go to document

Page 107

1  number 920. And we've established that you
2  don't know why it went from $8,972.81 to
3  the new balance of $10,723.19; correct?
4  A. Yes, sir.
5  Q. Now, during this weekly period -- let's
6  just say that that figure is correct or for
7  whatever reason -- we don't know why it's
8  $10,723.19, but let's just use that
9  figure.
10  During that week, if we look at it, we
11  got a credit of 318 and then we got a
12  positive or a debit or whatever you want to
13  say of $1,101.05. You see that?
14  A. Yes.
15  Q. That brings your total distributor balance
16  up to $11,506.17; correct?
17  A. Yes, sir.
18  Q. You also have two credits, pay by scans;
19  all right?
20  A. Yes.
21  Q. It knocks it back down to $9,226.47;
22  correct?
23  A. Yes.

Page 108

1  Q. That's at the end of that week; correct?
2  A. Yes, sir.
3  Q. Flip over to 921. Can you tell me why the
4  beginning balance owed the very next day is
5  $11,506.17?
6  A. This carried from week one.
7  Q. Right. Where are the credits that were in
8  week one of 740.82 and 1538.88? Why isn't
9  the balance of -- my question is, why isn't
10  the balance $9,226.47 carried over to the
11  next page at the top?
12  You've already told me that I'm
13  supposed to -- that's supposed to be the
14  actual amount that's carried forward.
15  A. Well, if I said this one carried forward,
16  pay by scan, it's supposed to be the total
17  distributor -- that's what he owes -- when
18  you have pay by scan, the total distributor
19  balance is what they owe or Flowers owes
20  them.
21  MR. HISHTA: For the record
22  purposes, the number he was
23  just referring to as total

Deposition of Jerry Woodham                                                        July 16, 2007

Page 109

1        distributor balance was
2        $11,506.17 on document
3        FBO000920.
4    Q.   On the pay by scans, then, who got credit
5        for the pay by scans?
6    A.   The distributor did.
7    Q.   All right.  Well, then flip back to 920
8        because I'm confused.
9            MR. HISHTA:  That's the document
10               that we were just -- he was
11               testifying about when he was
12               referring to 11,506.17.
13   Q.   Let's look at 920.
14           MR. HISHTA:  I believe what Greg
15               is trying to walk through is
16               this arithmetic calculation
17               where this number ends up
18               being this number.
19   Q.   Tell me why that happens.
20   A.   Well, that's -- that's the balance a
21       distributor owes right there.
22   Q.   All right.  Let's look at it.  The
23       distributor balance, we figured that out.

Page 110

1        It's $11,506.17; correct?
2    A.   Uh-huh (positive response).
3    Q.   The way that's calculated is taking the
4        prior weekly balance and then any credits
5        or any debits, whatever is added to that
6        figure, to come up with that; correct?
7    A.   Yes.
8    Q.   You do that over here, add these up in the
9        far right-hand column, and it comes down to
10       that.  You also get two credits, 740.82 and
11       1538.88; correct?
12   A.   Yes.
13   Q.   Making the new balance $9,226.47; is that
14       correct?
15           MR. HISHTA:  Objection to the
16               terminology new balance such
17               that it connotes legally
18               that that is the balance that
19               Mr. Porterfield owes Flowers
20               after that calculation.
21   Q.   Okay.  Tell me what the $9,226.47 is.
22   A.   It's the difference between the 11,506 and
23       the two numbers below it.  It's just an

Page 111

1        accounting function.
2    Q.   I see it's an accounting function.  And
3        assuming your figures are correct,
4        Mr. Porterfield owes you $11,506.17.  But
5        he's not given any credit, then, if you're
6        carrying that figure forward for the two
7        pay by scan credits of 740.82 and 1538.88,
8        is he?
9    A.   Well, he gets his credit up here.
10   Q.   All right.  Up there you've got a credit
11       for point of sale data of $1,085.60; okay?
12   A.   Yes, sir.
13   Q.   All right.  I don't know how those figures
14       equal the 740 figure and the 1538 figure.
15   A.   They're not supposed to.  This pay by scan
16       is a week behind.  You have to take that
17       into account.
18   Q.   Well, let's start over again.  Am I correct
19       that at the beginning of the week he owed
20       10,723.19?
21   A.   Yes, sir.
22   Q.   Throughout the week you've got charges,
23       total product charged, relay adjustments,

Page 112

1        all these adjustments here in this column.
2        New distributor balance, $688.66 (sic).
3        $1,066.69 (sic) on the discount earnings.
4        Add those two together.  You get a credit
5        of $318.07; correct?
6    A.   Yes, sir.
7    Q.   And that includes the pay by scan, doesn't
8        it?
9    A.   Yes, sir.
10   Q.   Now, the next thing down is you go to
11       business expenses.  You add up all the
12       business expenses, and Mr. Porterfield owes
13       $1,101.05; correct?
14   A.   Yes, sir.
15   Q.   Now, you add up all these figures in the
16       right column and you get $11,506.17;
17       correct?
18   A.   Yes, sir.
19   Q.   Now, did Mr. Porterfield receive a credit
20       for pay by scan inventory 12-31 of $740.82?
21   A.   Well, when you -- when you say credit, I
22       mean, this is just a balance -- he
23       didn't -- I don't know how to explain this

Deposition of Jerry Woodham

July 16, 2007

Page 113

1   to you.
2        He got his credit up here when the
3   items are scanned.
4   Q.  Show it to me.
5   A.  Right here.
6   Q.  Pay by scan, yeah.  Point of sale data,
7       $1,085.
8   A.  Yes, sir.
9   Q.  All right.  That's a credit; right?
10  A.  Yes, sir.
11  Q.  You add that credit with all the other
12      credits here and you come up to 688.62,
13      don't you?
14  A.  Yes, sir.
15  Q.  Now, 688.62 plus the discount of that
16      equals a credit of 318; right?
17  A.  Yes, sir.
18  Q.  All right.  But down here it's got prior
19      week's pay by scan $740.  Where is that
20      figure in your accountability up on the
21      top?
22  A.  Where is ...
23        It would be in the product he bought

Page 114

1   from us.  Let's see.  This is prior week
2   pay by scan inventory where he got credit
3   for the point of sale data.
4   Q.  You got point of sale data, $1,085.60?
5   A.  Uh-huh (positive response).
6   Q.  All right.  Where is the $1,538.88 credit
7       at?
8        MR. HISHTA:  Do you understand his
9              question?
10       THE WITNESS:  No.  I mean--
11  Q.  What I'm trying to figure out is, where do
12      these two figures -- you've got them listed
13      here as credits which brings weekly
14      distributor balance to $9,226.47.
15  A.  Uh-huh (positive response).
16  Q.  Is that accurate?
17       MR. HISHTA:  Can you -- maybe to
18              make this simpler, can you
19              just explain what these two
20              figures are vis-a-vis pay by
21              scan?
22        I'm pointing to the two
23        figures that we have been

Page 115

1   discussing at the bottom of
2       document 920.
3   A.  The less prior week pay by scan inventory
4       is the ending inventory for the week ending
5       12-31-05.
6   Q.  And that's credit?
7   A.  Uh-huh (positive response).
8   Q.  Is that right?
9   A.  Yes.
10  Q.  All right.  And the less current weekly pay
11      by scan delivery tickets, is that also a
12      credit?
13  A.  Yes.
14  Q.  And when you take your total distributor
15      balance of 11,506.17 and you take your two
16      credits away from it, it leaves a weekly
17      distributor balance of $9,226.47; correct?
18  A.  Yes.
19  Q.  And at the end of that week, that is the
20      weekly distributor balance?
21       MR. HISHTA:  Objection.
22  Q.  Is that correct?
23       MR. HISHTA:  Objection to the

Page 116

1   extent it is vague as to what
2       balance you are referring to.
3   Q.  I'm referring to your document that says
4       weekly distributor balance.  Is the weekly
5       distributor balance for route 2069 at the
6       end of this week, which is 1-1-2006 to
7       1-7-2006 -- is the weekly distributor
8       balance $9,226.47?
9   A.  Yes.
10  Q.  Okay.  When you go from 920 to 921, it goes
11      back to $11,506.17 for the beginning
12      balance owed instead of $9,226.47; is that
13      correct?
14  A.  Yes.
15  Q.  If you go down to the bottom of 921, it's
16      the same thing.  You add up all those in
17      the right column and you come up with a
18      distributor balance of $11,523.75.  You've
19      got two credits, pay by scan credits.  One
20      is 942.83, one is $1,090, leaving you with
21      a weekly distributor balance of $9,490.92.
22      You see that?
23  A.  Uh-huh (positive response).

Deposition of Jerry Woodham                                                    July 16, 2007

Page 117

1    Q.  Is that the weekly balance at the end of
2        that week?
3    A.  That's the weekly distributor balance, yes.
4    Q.  Is there anyplace contained within these
5        documents that gives Mr. Porterfield credit
6        for the pay by scan inventory credits that
7        are listed at the bottom of these documents
8        in the little box?
9    A.  When you say give him credit --
10   Q.  Right.  Accounting is plus and minuses;
11       right?  You've got pluses coming in and
12       minuses going out.  In your accounting
13       statement you've got credits and debits.
14       Some are -- you know, the credits have
15       little negative signs behind them; correct?
16   A.  Yes.
17   Q.  Is that the way you designate it?
18       When you add up the positives with the
19       negatives, you come up with a balance.
20       Here each week you do that to come up with
21       a weekly distributor balance; correct?
22   A.  Yes.
23   Q.  And the figure at the bottom you've already

Page 118

1        told us, already testified to, the figure
2        at the bottom that says weekly distributor
3        balance is the balance for that account at
4        the end of that week.
5    A.  Well, I didn't say that's what he was owed
6        or not owed.
7    Q.  I'm not saying that's what he's owed.  I'm
8        saying that's what the balance is on that
9        account.
10            MR. HISHTA:  He's testified that
11                that figure at the bottom of
12                the page is, as stated in the
13                document, weekly distributor
14                balance.
15   Q.  That's what Mr. Porterfield owes to Flowers
16       at the end of the day according to your
17       document?
18   A.  The bottom number?
19   Q.  The bottom number.
20   A.  No.  It's actually the total distributor
21       balance.
22   Q.  All right.
23   A.  That's why it's carried forward.

Page 119

1    Q.  Why is it actually the total distributor
2        balance?
3    A.  These numbers are put on there, like I
4        said, just as an accounting function just
5        to be able to balance the balance week to
6        week.
7    Q.  I want to know sitting here today where
8        those figures came from and where they're
9        listed in your document.
10   A.  Okay.  If you take --
11   Q.  Let's take 920.  That's the one we've
12       been -- let's take that one.
13   A.  I'm going to need a calculator.
14   Q.  All right.
15   A.  Okay.  Let me see if I can remember this
16       correctly.  Take -- I don't do this every
17       day, so ...
18            MR. HISHTA:  Write on this piece
19                of paper.
20   A.  Okay.
21            MR. HISHTA:  You want to take him
22                through.
23   A.  Okay.  All I was going to -- if you take --

Page 120

1        I'm trying to remember the formula that
2        balances it.  Because, like I said, I don't
3        do this every day.  So the point of sale
4        data and the prior week pay by scan
5        inventory for one week equals the next
6        week's point of sale data, revaluation
7        variance, and pay by scan inventory.  The
8        next -- that's what I'm trying to say.
9        This is not saying that Henry Porterfield
10       owes us $9,490 on this week.
11   Q.  On number 921?
12   A.  Yes.
13   Q.  What's it saying?
14   A.  It's saying that he owes us $11,523.
15   Q.  Well, we're back to my question.  Tell me
16       where on that document, on 921, the 942.83
17       credit and the $1,090 credit went to.
18   A.  Well, nobody ever said he was supposed to
19       get credit for that.  He gets credit for
20       when it's scanned.
21   Q.  All right.  Then why is it there as being a
22       credit?
23   A.  I told you, it's just an accounting

Deposition of Jerry Woodham

July 16, 2007

**Page 121**

1  function to check to make sure that these
2  numbers are right.
3  Q.  Well, show me how these numbers are right
4  when you use the numbers at the bottom of
5  the page. Explain that to us
6  A.  Okay. That's what I'm -- that's what I'm
7  trying to remember, the formula. Which
8  ones are we using?
9      This one right here. Okay. I'm doing
10  something wrong. I can't remember the
11  formula exactly. I'm trying to remember
12  what it is.
13      It's not coming up right.
14      MR. HISHTA: Greg, for record
15      purposes, we would be happy to
16      supply you an explanation of
17      the accounting on a
18      week-to-week basis if he
19      cannot testify regarding his
20      recollection of that
21      accounting formula as he sits
22      here today.
23  Q.  Sitting here today you don't know how you

**Page 122**

1  came up with those figures, do you?
2  A.  Not off the top of my head, no.
3  Q.  Let me ask you another question. Flip over
4  to 922. You see where it says new
5  distributor balance here?
6  A.  Yes, sir.
7  Q.  It's $1,264.18?
8  A.  Yes, sir.
9  Q.  From your standpoint -- from an accounting
10  standpoint, does this tell you that at the
11  end of the week that this distributor
12  had -- whether or not it's Henry
13  Porterfield or whoever it is -- had
14  $1,264.18 of bread that they didn't
15  deliver?
16      Aren't these figures based on bread?
17  A.  On bread that they didn't deliver?
18      This number is taking the product he
19  bought from Flowers minus his load
20  adjustments --
21  Q.  Shorts, damaged, product transfers,
22  authorized charges. So this distributor at
23  the end of the day has $1,264 worth of

**Page 123**

1  bread still in his inventory?
2  A.  I don't know.
3  Q.  That's undelivered merchandise?
4      MR. HISHTA: Objection. The
5      witness just testified that he
6      did not know what that figure
7      was.
8  A.  It's not undelivered bread.
9  Q.  All right. If total product charged,
10  $9,227.70 -- that means that $9,227.70
11  worth of bread left Flowers' warehouse
12  through Henry Porterfield's truck;
13  correct?
14      I mean, there's no direct-shipped on
15  this. It's all through a distributor;
16  right?
17  A.  Left the warehouse in his truck?
18  Q.  Left the warehouse, yes.
19  A.  No. This is what was delivered to the
20  warehouse.
21  Q.  Delivered to the warehouse and charged to
22  him; correct?
23  A.  Yes.

**Page 124**

1  Q.  So you've got $9,227.70 worth of product
2  sitting out there at the bay; correct?
3  A.  (Witness nods head.)
4  Q.  Now, once it's sitting at the bay, it's
5  delivered to all the stores; right?
6  A.  Yes.
7  Q.  According to the tickets.
8      You've got all these adjustments for
9  damaged and different adjustments that are
10  made. Then you've got authorized charges
11  which are charges that come back and a
12  check is made straight to Flowers from
13  Winn-Dixie or Publix or Wal-Mart or whoever
14  it might be that pays direct.
15      MR. HISHTA: Objection. That
16      wasn't his testimony
17      concerning what authorized
18      charges were.
19  Q.  What's authorized charges? That's a
20  credit?
21  A.  It's a credit to the distributor.
22  Q.  It's a credit to the distributor for --
23      from a check that came in from somewhere

Deposition of Jerry Woodham                                                July 16, 2007

---

Page 125

1   where he delivered bread?
2            MR. HISHTA: Objection. That's
3            not what his testimony was,
4            Greg.
5   Q.   All right. Well, what is your testimony?
6   A.   It's product that was delivered to a
7        customer on an A/R basis where the customer
8        pays Flowers and not the distributor.
9   Q.   And that's for -- now, let me ask you
10       this: The authorized charges that are
11       listed here, are those authorized charges
12       for the week of 1-15-2006 through
13       1-21-2006?
14            MR. HISHTA: Is your question is
15            that for product delivered
16            during that --
17   Q.   Delivered during that time period.
18   A.   Yes.
19   Q.   So you got -- of $9,000 total product
20       charged, Flowers through authorized charge
21       accounts got a check back in made out to
22       Flowers for $5,052.04 and credited that to
23       the distributor's account?

---

Page 126

1            MR. HISHTA: That's not his
2            testimony. He's testified
3            that that is the credit the
4            distributor received for
5            product delivered to
6            authorized charge accounts
7            that week before any check has
8            come in from any account. He
9            testified it was an A/R.
10   Q.   All right. It's an accounts receivable.
11       All right. Got you.
12            So you got $9,227 worth of product
13       delivered to the warehouse for the
14       distributor. Authorized charges of
15       $5,052.04 that have not been paid for yet.
16       They're just authorized. That the --
17       whoever the authorized charge account is
18       with is going to write -- ultimately write
19       a check to Flowers for $5,052.04 total at
20       some point in time, whether it's this week,
21       next week, or the week after. But you're
22       getting credit for it at that time because
23       it's an authorized charged.

---

Page 127

1            MR. HISHTA: The distributor is
2            given credit.
3   Q.   The distributor is. You're also getting
4        credit for point of sale data and the
5        variance bringing you down with a balance
6        of $1,264.18?
7   A.   Yes.
8   Q.   All right. Now, that's a debit that the
9        credit -- I mean, that the distributor owes
10       to Flowers; correct?
11   A.   Yes.
12   Q.   Now, either that distributor has
13       distributed $1,264.18 worth of product to
14       somebody and hasn't received payment on it
15       yet, hasn't paid Flowers, or that
16       distributor has $1,264.18 worth of bread
17       still sitting in their truck?
18            MR. HISHTA: Objection to form.
19            Vague. Ambiguous.
20   Q.   Well, is that true or not?
21   A.   Well, one thing, the point of sale data is
22       for the previous week.
23   Q.   Okay.

---

Page 128

1   A.   So you've got to take that into account.
2   Q.   Well, what would make a distributor have a
3        negative balance of $1,264.18 in this
4        particular situation? Was bread not sold,
5        the distributor still has it, or was bread
6        sold and maybe somebody hasn't paid him for
7        it?
8   A.   Make this -- this positive number, make it
9        negative?
10   Q.   I'm just wondering why that's a debit
11       towards the distributor that week, $1,264.
12       It has to be one of two or three different
13       things. It has to be the distributor is
14       still holding on to the bread, hasn't
15       delivered it, $1,264.18 worth of bread. Or
16       he's delivered it and nobody has paid him
17       for it, paid the distributor, and he hasn't
18       turned the check over to you --
19            MR. HISHTA: Or he's been paid for
20            it and he doesn't have to
21            report it to Flowers because
22            it's a cash account.
23   Q.   Or it's a cash account and he's got it in

---

Page 129

1    his pocket.
2    A.  Right.
3    Q.  It's got to be some scenario like that;
4        correct?
5    A.  Yes.
6    Q.  But in any event, it's got to be one of the
7        three.  That's the only three I can think
8        of.  The distributor got paid the money,
9        hadn't given it to Flowers, the distributor
10       got a check or hadn't got a check yet or
11       money from whoever he delivered it to, or
12       he's still got $1,264 worth of bread
13       somewhere.  Is that accurate?
14           MR. HISHTA:  Again, I'll object to
15               the extent that the question
16               is vague.  Having said that,
17               you can answer his question.
18           MR. DAVIS:  How is it vague?
19           MR. HISHTA:  Because there may be
20               more than three possibilities
21               as to how that balance is
22               calculated.
23    Q.  Can you come up with any other reasons why

Page 130

1        that balance would be other than those
2        three?
3    A.  Come up with a reason why --
4    Q.  At the end of the day the distributor
5        should have delivered all of the product,
6        would you agree with that, at the end of
7        the week -- either that or he's still got
8        it in his truck?
9    A.  Well, it's -- on the pay by scan stores
10       it's going to be still in the store and not
11       scanned.
12    Q.  So it could be part of that, couldn't it?
13    A.  I'd have to think about this.
14    Q.  Okay.  But we've come up with at least
15       three.  There may be more.  Would you agree
16       with that?
17    A.  Yes.
18    Q.  Okay.  Who was running this account?
19           MR. HISHTA:  Running this account
20               or this territory?
21    Q.  This territory.
22    A.  When you say who, do you mean an individual
23       or --

Page 131

1    Q.  Was Flowers running it themselves?
2           MR. HISHTA:  Objection.  Asked and
3               answered.  I think he's
4               already testified that Flowers
5               has been running the territory
6               on Mr. Porterfield's behalf.
7    Q.  Well, do you know why the balance -- the
8        weekly new distributor balance since
9        Flowers started running the account for
10       Mr. Porterfield has gone up since
11       Mr. Porterfield ran it?
12    A.  Well, without going through and adding up
13       the numbers, I know hitting every week now
14       there's a relief driver charge and a truck
15       rental charge.
16    Q.  I'm not talking about that, though, because
17       that's after the new distributor balance.
18       I'm talking about prior to it up here.  Do
19       you know why -- and this is before you get
20       to all these charges.  Do you know why this
21       figure is so much higher now than when
22       Mr. Porterfield ran the account now that
23       Flowers is running the account?

Page 132

1    A.  Not off the top of my head.  I don't know
2        without looking.
3    Q.  Like if you flip over to document number
4        949, you've got a distributor balance
5        before you get to all the business expenses
6        of $3,323.71.
7    A.  Okay.
8    Q.  Do you know why that figure is so high in
9        August of '06 when Flowers was running that
10       route?
11    A.  Well, I mean, who says it's high?  What do
12       you -- I don't understand what you mean by
13       high.
14    Q.  Okay.
15           MR. HISHTA:  He's asking you if
16               you know why that figure has
17               increased from the week
18               reflected on document number
19               922.  It's, you know, $1,264
20               and change.  And then the
21               number reflected on document
22               949 is approximately $3300.
23    A.  Well, I can see right here the load is --

Deposition of Jerry Woodham                                              July 16, 2007

Page 133

1    his total product charge is doubled from
2    one week to the next.
3    Q.  So during that week in July the product
4    load doubled from what to what?
5    A.  Well, this week it's $9,227 and in week 30
6    it's $18,048.
7    Q.  All right.  What was it in 29?
8    A.  29?
9    Q.  Yeah.  I thought you were going from 29 to
10    30.
11    A.  I thought we were going from 3 to 30.
12        MR. HISHTA:  Yeah, you were.
13    Q.  I'm sorry.  All right.
14        So you're saying that it's okay to have
15    a balance owed when you deliver a lot of
16    product?
17        MR. HISHTA:  Objection.  Vague.
18    Q.  I don't know why you've got such a large
19    balance here every week once Flowers took
20    over the account versus when
21    Mr. Porterfield had the account.
22    A.  I don't know.
23    Q.  Do you know if Flowers ever used two

Page 134

1    trucks -- leased two trucks to deliver
2    Mr. Porterfield's route during one week?
3    A.  I don't know.
4        MR. DAVIS:  Why don't you give me
5        five minutes.
6        (A brief recess was taken.)
7        MR. HISHTA:  Before we start I
8        would like to say something on
9        the record.
10        As part of the deposition
11    here today we've gotten into
12    some fairly significant detail
13    on how the pay by scan
14    accounting works for Flowers
15    Baking Company of Opelika.
16    Mr. Woodham has had some
17    experience dealing with this
18    accounting methodology but has
19    only been dealing with it for
20    a somewhat limited period of
21    time.  And we would -- you
22    know, should counsel for
23    Mr. Porterfield desire

Page 135

1    clarification concerning some
2    of the responses that have
3    been made here today, we will
4    make Mr. Lord available to
5    answer those questions.
6        MR. DAVIS:  I guess my question
7        is, is Mr. Lord the person
8        most knowledgeable about the
9        pay by scan?
10        MR. HISHTA:  At Flowers Baking
11        Company of Opelika, yes.
12        MR. DAVIS:  Is that Mr. Michael
13        Lord?
14        MR. HISHTA:  Yes.
15        MR. DAVIS:  And just for the
16        record -- and I don't think
17        there's any dispute about
18        this -- I did ask today for
19        the person most knowledgeable
20        about all of these documents
21        that -- you know, weekly
22        summary documents today.  And
23        I thought y'all put him up for

Page 136

1    that.  But is there another
2    person in the accounting
3    department that is more
4    knowledgeable than this
5    witness?
6        MR. HISHTA:  As far as how the pay
7        by scan methodology works,
8        Michael Lord will be able to
9        testify concerning the
10        derivation of the figures on
11        those documents.  If for some
12        reason Mr. Lord cannot, you
13        know, answer a question, we
14        would certainly make available
15        someone that we believe could
16        answer the questions.  I
17        believe that Mr. Lord is
18        fully -- has full knowledge of
19        how the pay by scan
20        methodology works.
21        MR. DAVIS:  Okay.
22        MR. HISHTA:  And I guess I would
23        just also like to say for

34 (Pages 133 to 136)

Deposition of Jerry Woodham

July 16, 2007

Page 137

1  record purposes the issue with
2  pay by scan revolves around an
3  advance that is given to the
4  distributor on a week-to-week
5  basis that starts with the
6  inventory week one in a pay by
7  scan store.
8  MR. DAVIS: Anything else?
9  MR. HISHTA: No.
10  MR. DAVIS: All Right. That's all
11  I've got.
12  MR. HISHTA: Mr. Woodham will
13  read. And I have no further
14  questions.
15  MR. DAVIS: Just so I'm clear,
16  you're not going to put him
17  back up to testify about this
18  anymore? It's only going to
19  be him?
20  MR. HISHTA: About pay by scan?
21  MR. DAVIS: Pay by scan, about how
22  these figures were calculated?
23  MR. HISHTA: Yeah. The pay by

Page 138

1  scan figures, yes.
2  MR. DAVIS: Okay. All right.
3  (Off-the-record discussion)
4  MR. HISHTA: As far as your
5  comment, Greg, about not
6  putting Mr. Woodham back up as
7  a witness, I take that, that
8  that does not inhibit his
9  ability to read his deposition
10  and where he has -- subject,
11  of course, to your ability to
12  redepose him, you know, if you
13  feel any changes for some
14  reasons --
15  MR. DAVIS: Well, all he's going
16  to do on read and sign is just
17  make any grammatical changes
18  to the --
19  MR. HISHTA: Or if there was
20  something that he recalled,
21  you know, after the deposition
22  that some testimony is
23  absolutely wrong for some

Page 139

1  reason.
2  MR. DAVIS: Well, that would --
3  MR. HISHTA: But you would -- he
4  would have to give a reason
5  for the explanation.
6  MR. DAVIS: Under the Rules I
7  think he --
8  MR. HISHTA: And you would be
9  subject --
10  MR. DAVIS: He would be subject to
11  being redeposed.
12  MR. HISHTA: -- to be deposed
13  again, yes.
14  MR. DAVIS: That's fine.
15  (Deposition concluded at
16  approximately 4:30 a.m.)
17  * * * * * * * * *
18  FURTHER DEPONENT SAITH NOT
19  * * * * * * * * *
20  REPORTER'S CERTIFICATE
21  STATE OF ALABAMA:
22  MONTGOMERY COUNTY:
23  I, Tracye Sadler, Certified Shorthand

Page 140

1  Reporter and Commissioner for the State of Alabama
2  at Large, do hereby certify that I reported the
3  deposition of:
4  JERRY WOODHAM
5  who was duly sworn by me to speak the truth, the
6  whole truth and nothing but the truth, in the
7  matter of:
8  HENRY PORTERFIELD,
9  Plaintiff,
10  vs.
11  FLOWERS BAKING COMPANY OF
12  OPELIKA, LLC,
13  Defendant.
14  IN THE UNITED STATES DISTRICT COURT
15  FOR THE MIDDLE DISTRICT OF ALABAMA
16  NORTHERN DIVISION
17  Case Number 2:05-CV-937-MEF
18  on July 16, 2007.
19  The foregoing 139 computer-printed pages
20  contain a true and correct transcript of the
21  examination of said witness by counsel for the
22  parties set out herein. The reading and signing of
23  same is hereby not waived.

Deposition of Jerry Woodham

July 16, 2007

---

Page 141

1    I further certify that I am neither of
2 kin nor of counsel to the parties to said cause nor
3 in any manner interested in the results thereof.
4    This 24th day of July 2007.
5
6
7    _____
     Tracye Sadler, Certified
8    Shorthand Reporter and
     Commissioner for the State
9    of Alabama at Large
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

July 25, 2007

Mr. Jerry Woodham
c/o Mr. Sandra B. Reiss
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203

In re: Henry Porterfield vs. Flowers Baking Company

Dear Mr. Woodham:

Enclosed is a copy of the transcript of your
deposition taken on July 16, 2007. Please read the
transcript and make any corrections on the correction
sheet provided specifying the page and line number of
each correction.

You will find the original signature page attached to
the front of the transcript. Even if there are no
corrections, please sign the original signature page
and have your signature notarized.
Please return the signature page, correction sheet
and transcript within thirty days. The list of
corrections will be attached to the original
deposition and all parties will be notified of any
changes.
Thank you for your prompt attention to this matter.
Sincerely,

Tracye Sadler Blackwell
Certified Shorthand Reporter

cc: Mr. Greg L. Davis, Ms. Sandra B. Reiss

---

Page 142

1    * * * * * * * * * * * * * *
2    WITNESS SIGNATURE PAGE
3    * * * * * * * * * * * * * *
4
5 In Re: Henry Porterfield vs. Flowers Baking Company
6
7    I, JERRY WOODHAM, hereby certify that I have
8 read the foregoing transcript of my deposition
9 given on July 16, 2007, and it is a true and
10 correct transcript of the testimony given by me at
11 the time and place stated with the corrections, if
12 any, and the reasons therefor noted on a separate
13 sheet of paper and attached hereto.
14
15
16    _____
      JERRY WOODHAM
17    SWORN TO AND SUBSCRIBED before me this _____
18 day of _____, 2007.
19    _____
      NOTARY PUBLIC
20
      MY COMMISSION EXPIRES:
21
22    _____
23

---

Deposition of Jerry Woodham

July 16, 2007

Page 1

---

**A**

Abbeville 7:8
ability 138:9,11
able 61:14 94:1 119:5
 136:8
about 7:5 8:1 18:13,16
 18:18 19:22 23:3
 24:14 31:2 35:2,6
 54:4 86:16 105:15
 109:11 130:13
 131:16,18 135:8,17
 135:20 137:17,20,21
 138:5
absolutely 138:23
access 38:16
according 41:4 74:1
 85:2 94:21 106:9
 118:16 124:7
account 50:20 58:3
 74:3 85:1,12 93:5
 97:16 98:16 99:8,12
 103:15 111:17 118:3
 118:9 125:23 126:8
 126:17 128:1,22,23
 130:18,19 131:9,22
 131:23 133:20,21
accountability 52:19
 113:20
accountable 45:19 46:1
accountant 8:16 17:5
 61:11
accounting 6:1,7 7:22
 17:4,5,7 98:4,8 104:1
 111:1,2 117:10,12
 119:4 120:23 121:17
 121:21 122:9 134:14
 134:18 136:2
accounts 16:6,7 17:11
 17:13,16,17,19 18:14
 32:8 33:8,10 55:21
 63:10 67:23 125:21
 126:6,10
accumulating 97:4
accurate 114:16 129:13
across 63:21
ACTION 1:8
actual 23:15 93:1
 108:14
actually 12:8,23 15:22
 25:23 29:9 37:21
 38:7,9 43:18 45:17
 66:17 70:22 81:3
 84:14 118:20 119:1
add 83:3,4 84:21 110:8
 112:4,11,15 113:11
 116:16 117:18
added 77:18 105:10
 110:5
adding 131:12
addition 31:13 34:5

additional 25:21 28:13
address 5:9
adjusted 25:13 63:18
adjustment 42:16 43:1
 43:17 65:1,3,6 66:16
adjustments 43:8
 65:16 111:23 112:1
 122:20 124:8,9
Adkins 99:3,4 100:5,9
Administrative 48:6
 71:5
advance 137:3
after 5:2 60:15 74:14
 110:20 126:21
 131:17 138:21
again 31:16 56:19 69:1
 71:6 72:4 111:18
 129:14 139:13
ago 6:19 39:20
agree 130:6,15
agreed 3:16 4:7,14
agreement 1:15 24:9
 24:18 59:23 60:1,12
 60:21
ahead 62:4 97:10
 102:12
Aircraft 7:20,21
Alabama 1:3,17,19 2:6
 2:11 3:22 7:8 62:20
 139:21 140:1,15
 141:9 143:5
allegations 61:23
allowances 45:1
allows 59:15 60:4
already 24:5 28:12
 108:12 117:23 118:1
 131:4
always 71:13
ambiguous 53:11
 127:19
America 27:15
American 6:20
amount 19:19 30:2
 46:18 47:13 50:15
 56:14 58:19,21 70:11
 74:10 75:3 88:5,8,11
 88:14,17,21 89:4
 92:3 96:2 108:14
analyst 7:22 9:4
another 10:20 15:5
 30:10 44:14 103:8
 122:3 136:1
answer 62:3,5 63:6
 64:4,9,10 65:12
 97:10 129:17 135:5
 136:13,16
answered 80:10 131:3
anybody 18:8 35:18
 70:15 86:15 96:16
 100:11 105:20

anymore 137:18
anyone 18:10
anyplace 59:14 60:3
 117:4
anything 8:23 9:2 16:5
 16:9 20:9 23:7 34:4
 42:14 49:1 51:12,13
 61:15 71:21 91:15
 105:9,13 137:8
anywhere 62:7 68:7
apologize 25:11
appear 41:8 77:13
APPEARANCES 2:1
appears 51:12 83:17
 105:3
appreciated 26:8,13
 28:7
approximately 1:20
 14:3 132:22 139:16
area 14:13 31:23 32:2
 106:4
areas 18:19
arithmetic 109:16
around 14:4 73:17 95:2
 137:2
asked 14:17 30:21 80:9
 131:2
asking 14:23 58:4 60:3
 61:3,9,10 93:2
 132:15
assets 16:8
assistant 11:17 12:2
assists 17:4
assume 10:20 12:17
 52:14
Assumes 62:12 99:14
assuming 30:15 33:23
 44:7 54:18 67:22
 106:12 111:3
Atlanta 12:13
attached 142:13 143:11
 143:15
attention 143:17
Attorneys 2:5,10
Auburn 5:23 6:3,16,21
 7:2
August 132:9
authority 61:16
authorized 45:13
 122:22 124:10,17,19
 125:10,11,20 126:6
 126:14,16,17,23
authorizing 60:22
available 135:4 136:14
Avenue 2:11 143:5
average 20:1 21:10,12
 36:3,5 37:1
aware 33:18 35:20
 51:17 54:17 55:11
 76:15 97:13

away 20:5 26:4 55:6
 115:16
a.m 139:16
A/P 16:20
A/R 16:20 125:7 126:9

---

**B**

B 2:9 143:3,22
back 14:9,10,13 15:15
 15:18 41:19 53:20
 56:15,16,20 58:1
 64:2 70:19 74:2
 76:21 89:2,16 95:1,1
 100:13 104:8 105:14
 107:21 109:7 116:11
 120:15 124:11
 125:21 137:17 138:6
background 5:22 17:6
backwards 9:10 81:15
bad 72:5 83:23
Bailey 12:7,8,10,22
 13:3,15 14:8,20
bakery 12:8 14:8 15:4
 15:7
Baking 1:9 9:20 11:12
 11:15 12:7,9,14,22
 13:4,15,22 14:7,9,10
 14:14,19 15:15 16:3
 16:13 17:20,23 18:2
 18:19 19:12,13 37:15
 53:5 54:9 55:20 76:9
 87:1 90:4,11 92:7
 134:15 135:10
 140:11 142:5 143:6
balance 26:11 37:14
 41:23 47:3 49:9,12
 52:13 94:2,3,4,7,8,9
 94:13 95:8 100:15
 102:1,3,21 103:11,14
 103:18 106:5,9,14,20
 106:20 107:3,15
 108:4,9,10,19 109:1
 109:20,23 110:4,13
 110:16,18 112:2,22
 114:14 115:15,17,20
 116:2,4,5,8,12,18,21
 117:1,3,19,21 118:3
 118:3,8,14,21 119:2
 119:5,5 122:5 127:5
 128:3 129:21 130:1
 131:7,8,17 132:4
 133:15,19
balances 16:7 120:2
balancing 16:6
bank 27:15 93:5
based 49:18 74:22
 80:23 81:2 122:16
basically 10:5 11:19,20
 16:5 17:2 39:7 57:20
 75:19 87:13

basis 18:22 63:13 80:3
 80:13,15 121:18
 125:7 137:5
Bates 29:7 30:6 40:20
 41:4,6 50:19 51:7
 52:1 64:2 69:15
 94:11
bay 124:2,4
became 11:1
before 1:15 3:20 6:16
 6:21 8:19 18:6 22:10
 24:12 89:12 104:17
 126:7 131:19 132:5
 134:7 142:17
begin 6:15
beginning 41:22 52:13
 100:14 102:1,3
 103:17 108:4 111:19
 116:11
begins 30:3 104:19
behalf 2:3,7 85:18,23
 86:2,14,19 98:4
 131:6
behind 111:16 117:15
being 87:7,13 98:3
 109:18 120:21
 139:11
believe 19:10 24:3
 97:21 99:23 109:14
 136:15,17
below 26:17 110:23
benefit 78:15
between 3:17 4:8,15
 21:21 45:8 46:15
 51:14 55:9 106:12
 110:22
bid 20:8 21:3,4,5,8 37:2
 50:12 76:2 84:18
 102:20 115:1 116:15
 117:7,23 118:2,11,18
 118:19 121:4
Birmingham 2:11 6:2
 8:3,7,8,9,10,12 143:5
Blackwell 143:20
books 22:7
both 15:9 31:23 32:8
 62:20
bottom 26:19 27:3 41:5
 50:12 76:2 84:18
 102:20 115:1 116:15
 117:7,23 118:2,11,18
 118:19 121:4
bought 53:5 54:23 55:4
 55:19 92:6,13 113:23
 122:19
box 106:4 117:8
brand 20:17 30:7 87:10
branded 20:2,3 42:13
bread 13:7,11,18 20:6
 20:7,12 42:20 43:4
 43:15 44:3,9 45:5,11
 45:12,12 46:12 54:10
 54:19 55:14,19 56:5
 65:5 122:14,16,17

Deposition of Jerry Woodham                                          July 16, 2007

Page 2

123:1,8,11 125:1
127:16 128:4,5,14,15
129:12
**break** 36:14 60:13,15
75:12 102:11,13
**brief** 36:10 61:13 75:14
102:15 134:6
**bringing** 27:18 127:5
**brings** 107:15 114:13
**build** 8:21
**buildings** 6:20 8:14,19
8:20
**buns** 13:1,9 54:10
**Burger** 21:2
**bus** 47:16
**business** 20:8 21:3,4,5
21:9 37:2 47:6,18,19
48:13,16 70:20 73:14
74:18 76:2 112:11,12
132:5
**businesses** 33:9
**Butler** 8:3,13,17,19 9:4
9:7,13,22
**buy** 46:12,15
**buying** 46:20
**buys** 53:17 54:8

_____ C _____
**calculated** 80:12,15,17
110:3 129:22 137:22
109:16 110:20
**calculation** 59:7 84:7
109:16 110:20
**calculations** 94:21
**calculator** 119:13
**calendar** 50:21
**call** 34:19,22 102:10
**called** 6:1 29:21
**calls** 32:5 59:19 60:8
61:19
**came** 14:8 15:15,18
21:15 39:1 59:7
101:10 119:8 122:1
124:23
**carried** 108:6,10,14,15
118:23
**carrying** 111:6
**case** 4:9,11 28:14 43:7
43:11,12 140:17
**cases** 59:1
**cash** 93:18 128:22,23
**cause** 141:2
**cc** 143:22
**center** 8:21
**certain** 42:20 43:5 64:5
**certainly** 97:23 136:14
**CERTIFICATE**
139:20
**Certified** 1:16 3:21
139:23 141:7 143:20
**certify** 140:2 141:1

142:7
**change** 91:23 105:12
132:20
**changed** 51:14
**changes** 74:19,23
138:13,17 143:16
**charge** 27:6 49:5 59:16
60:5,22 61:17 68:10
68:17 69:6,18 70:5
71:21 72:2,11,20
74:5 78:12,15 79:21
82:1 85:15 89:8,10
98:15,18 125:20
126:6,17 131:14,15
133:1
**charged** 42:6 52:20,22
53:12 54:6,7,15,19
62:10,15,17 63:1,3,8
64:4,6,12,13,18
67:22 68:2,4 70:10
70:14 73:20 75:3
77:18 78:17,19 79:1
79:12 85:1,13 87:3
97:2 99:7,11 111:23
123:9,21 125:20
126:23
**charges** 27:15,17 37:6
45:13 48:11 49:2,8
68:13,14 69:16 70:3
77:23 85:11,13 98:20
111:22 122:22
124:10,11,18,19
125:10,11 126:14
131:20
**charging** 70:7
**check** 53:22 55:14,17
56:13 57:9 93:6,14
93:18,21 94:1,5,10
95:12 101:11 121:1
124:12,23 125:21
126:7,19 128:18
129:10,10
**checking** 88:23
**checks** 93:19
**children** 5:12,13
**Civil** 1:8 3:19
**clarification** 135:1
**clear** 41:3 77:12 137:15
**clerk** 16:20,20 17:11,13
**close** 23:22,23 82:20
**code** 44:4,5 45:12
52:11 65:11,12
**column** 110:9 112:1,16
116:17
**come** 14:10 21:9 25:14
26:4 27:17 28:4,8
37:17,18 38:9 47:6
49:17 50:1 66:10,11
72:13 76:16,19 77:19
77:21 79:21 84:22

101:8 110:6 113:12
116:17 117:19,20
124:11 126:8 129:23
130:3,14
**comes** 36:23 53:20
110:9
**coming** 22:22 117:11
121:13
**commencing** 1:19
**comment** 138:5
**COMMISSION**
142:20
**Commissioner** 1:17
3:21 140:1 141:8
**company** 1:9 6:20 7:20
8:4 10:21 12:13
14:17 19:13 37:15
43:15,16,22 52:11
53:5 54:9 55:20,22
56:2 76:9 86:8,23
87:2 90:4,12 106:2
134:15 135:11
140:11 142:5 143:6
**comparative** 51:18
**compensation** 50:15
91:19 93:9
**compiles** 49:20
**complaint** 62:2
**complete** 36:20
**Composite** 3:3,5
**comprised** 101:21
**comptroller** 14:1 15:22
19:8,22 62:9
**computations** 19:18
**compute** 18:16 81:5
**computed** 79:11 82:21
**computer** 16:19 37:23
39:5 43:20 57:2
**computer-printed**
140:19
**computing** 19:23 31:2
**concerning** 124:17
135:1 136:9
**concluded** 139:15
**conclusion** 59:20 60:8
61:20
**conference** 102:10
**confused** 109:8
**confusing** 54:2
**connotates** 110:17
**consider** 21:1,3
**consists** 24:8
**contain** 140:20
**contained** 61:15 68:7
69:9 117:4
**contains** 60:21
**continued** 2:23
**continuing** 31:3 61:14
75:15 102:16
**contract** 21:21 55:8,9

59:10,15 60:4 61:15
73:18 74:1 95:3 98:6
**contracts** 22:1
**controller** 9:17 10:3,5
10:6,14 11:1,17,19
11:23 12:2,19,20
14:2 15:18,22 16:1,2
16:11,12 19:16
105:16
**controllers** 11:1
**coordinator** 99:1,13
**copied** 105:1
**copy** 60:1 75:13 143:8
**correct** 13:13 20:13
25:3,7,16 26:9,20
27:18 30:4,8 33:21
34:11 36:17 38:5
41:10,20 43:22 47:4
49:10 56:3 58:9,19
62:21 63:19 64:13
73:5 75:23 79:2
81:22 82:9 83:12,18
83:21 85:3 88:22
95:16 103:9 106:3,21
107:3,6,16,22 108:1
110:1,6,11,14 111:3
111:18 112:5,13,17
115:17,22 116:13
117:15,21 123:13,22
124:2 127:10 129:4
140:20 142:10
**correction** 143:9,10,14
**corrections** 142:11
143:9,12,15
**correctly** 119:16
**cost** 7:22 8:16 9:4
76:22
**costing** 89:14
**counsel** 3:17 4:8
134:22 140:21 141:2
**COUNTY** 139:22
**couple** 30:10 39:19
**course** 138:11
**court** 1:2 4:21 105:6
140:14
**covered** 86:22
**CPA** 49:20,20
**Craig** 10:11,12 19:10
19:11
**credit** 42:23 43:6 44:3
45:7,18,20 47:3
49:10,13 55:23 57:10
65:19 66:11,12 67:7
69:6 73:3 95:10
103:3,8 107:11 109:4
111:5,9,10 112:4,19
112:21 113:2,9,11,16
114:2,6 115:6,12
117:5,9 120:17,17,19
120:19,22 124:20,21

124:22 126:3,22
127:2,4,9
**credited** 125:22
**credits** 37:5 103:1
106:6,7,19,21 107:18
108:7 110:4,10 111:7
113:12 114:13
115:16 116:19,19
117:6,13,14
**crippled** 44:1
**current** 5:9 26:11
48:17,19,20 103:5
115:10
**currently** 70:6
**customer** 44:23 45:15
54:22 66:15,20 97:6
125:7,7
**customers** 66:2 97:11
**cut** 28:16 56:13 57:9
93:13 95:12
**c/o** 143:3

_____ D _____
**daily** 18:22 80:13,15
**damaged** 44:1,3 65:9
65:10 122:21 124:9
**data** 35:9 65:19 111:11
113:6 114:3,4 120:4
120:6 127:4,21
**date** 34:3 73:9 96:5
**dates** 50:22 102:17
**Davis** 2:4,4,20 5:6
32:15 36:7,13 61:14
75:15 82:20 96:22
102:12,16 104:10,15
104:23 129:18 134:4
135:6,12,15 136:21
137:8,10,15,21 138:2
138:15 139:2,6,10,14
143:22
**day** 73:3 75:3,21 108:4
118:16 119:17 120:3
122:23 130:4 141:4
142:18
**days** 80:23 81:2,8 82:3
82:11,11,15,16 84:3
84:14 143:14
**DEAKINS** 2:9 143:4
**deal** 18:21 21:23 65:14
**dealing** 18:14 134:17
134:19
**deals** 17:3 26:18 98:15
**Dear** 143:7
**debit** 107:12 127:8
128:10
**debits** 110:5 117:13
**December** 9:8,11 51:1
51:5
**decision** 15:8;12
**deducted** 63:9

Deposition of Jerry Woodham

July 16, 2007

Page 3

**Defendant** 1:11 2:7 140:13
**Defendant's** 60:10
**degree** 5:23 6:3,5,7 17:7
**deliver** 42:19 122:15 122:17 133:15 134:1
**delivered** 42:10,17 43:3 55:15 56:6 57:23 64:15 65:2 123:19,21 124:5 125:1,6,15,17 126:5 126:13 128:15,16 129:11 130:5
**delivers** 56:10
**delivery** 87:12 103:6 115:11
**department** 16:12,15 35:18 136:3
**DEPONENT** 139:18
**deposed** 139:12
**deposition** 1:14 3:18,20 4:4,9,16 23:4 24:8 29:7 60:11 134:10 138:9,21 139:15 140:3 142:8 143:9,15
**derivation** 136:10
**derived** 102:3
**designate** 117:17
**designation** 33:4
**desire** 134:23
**detail** 134:12
**determine** 27:22 30:21 31:1 32:14 34:6 49:23 104:5
**determined** 35:21 76:7
**determines** 21:15
**determining** 22:19
**difference** 45:7 46:15 110:22
**different** 15:21 34:22 34:22 41:14,16 50:18 54:4 69:10,11 74:11 85:10 92:16,16,17,18 124:9 128:12
**dime** 97:6
**direct** 124:14
**direct-shipped** 123:14
**discount** 46:10,12,14 47:1 74:22 75:2 79:13,14,15,17 80:5 80:20,22 81:6 82:2,5 83:7,11,15,17,21 84:11 92:6,8,10,19 92:20,21 112:3 113:15
**discovered** 43:12,14
**discovers** 43:3
**discussing** 115:1
**discussion** 36:9 41:1

138:3
**dispute** 135:17
**distribute** 13:10 55:12
**distributed** 56:15,20 127:13
**distribution** 25:6 34:10 37:19,22
**distributor** 3:5 21:22 26:14 41:9 42:1,7,11 43:2 44:13,21 45:17 46:2 47:1,3,10,13,20 48:1,4 49:9,12,19 51:9,16 52:4,10,17 52:18 53:4,17,19 54:8,23 55:19 56:2 56:10,14 57:1,2,10 57:20 59:3,5,16,22 60:1,4,5,12,23 64:13 65:4 66:23 67:2,11 67:12,21 68:1,4,8 70:7,10,23 71:20,23 72:2,6,11 73:2 77:3 86:12,16 94:3,13 95:7 99:1,12 100:21 101:2,5,22 102:21 103:11 106:5,14 107:15 108:17,18 109:1,6,21,23 112:2 114:14 115:14,17,20 116:4,5,7,18,21 117:3,21 118:2,13,20 119:1 122:5,11,22 123:15 124:21,22 125:8 126:4,14 127:1 127:3,9,12,16 128:2 128:5,11,13,17 129:8 129:9 130:4 131:8,17 132:4 137:4
**distributors** 13:16 44:16 48:8,12 49:3,6 56:7 61:17 62:10,17 63:1,9
**distributorship** 13:2
**distributor's** 25:13 39:16 52:3 54:20 59:9,15 60:21 67:18 75:10 85:18 86:14 100:3,5 125:23
**DISTRICT** 1:2,3 140:14,15
**divided** 82:14
**DIVISION** 1:4 140:16
**document** 24:12,16,22 25:9 36:20 38:1,2 39:3,14 66:13 67:6 68:18 69:8 70:3 73:8 73:11,13,21 75:5,9 75:16 77:14 81:11,16 83:10,14 85:14 87:22 95:1 97:17 99:11

100:13 104:18 105:10 106:10,23 109:2,9 115:2 116:3 118:13,17 119:9 120:16 132:3,18,21
**documents** 22:7,22 23:1,3 27:16,20,21 28:22 29:11 31:6,10 31:13,13 40:19 74:12 76:21 77:8 87:17 89:16 98:7,10 105:4 105:8,19,22 117:5,7 135:20,22 136:11
**doing** 11:18 17:8 21:20 27:6 72:12 121:9
**dollar** 92:23
**dollars** 3:3 29:12
**Don** 99:3,4 100:5,8
**done** 22:6,8,10,12 23:6 33:13,14 36:22 63:13 63:14 68:21,22 69:5 80:3
**door** 101:15
**doubled** 133:1,4
**double-check** 77:15
**down** 27:18 37:5 42:6 44:4,11,23 46:10 47:6,17 52:13 59:12 65:15 87:23 106:4 107:21 110:9 112:10 113:18 116:15 127:5
**Drive** 2:5
**driver** 42:19,22 65:3 73:14,20,23 74:7,11 74:15,19 75:4 78:6 78:11,13 79:22 81:1 81:3,9,11,14,17 82:1 83:1 84:14 86:2,3,5 86:20,22 131:14
**due** 26:13
**duly** 5:2 140:5
**during** 65:22 91:23 101:15 107:5,10 125:16,17 133:3 134:2
**duties** 16:3

**E**

**each** 41:12 52:4 81:13 83:2 117:20 143:10
**earning** 47:1
**earnings** 49:14 50:2,4 112:3
**eat** 68:1,2
**eats** 58:21 59:2,2
**educational** 5:22
**effect** 98:1
**eight** 8:18 9:5 74:14
**either** 4:5,11 8:21 65:7 93:6 96:20,22 127:12

130:7
**employee** 79:6 87:1
**employment** 14:7,21 15:5,9
**Enclosed** 143:8
**end** 46:4 73:3 83:4 87:20 93:11 94:20 103:14 104:11,20 105:11 108:1 115:19 116:6 117:1 118:4,16 122:11,23 130:4,6
**ending** 105:4 106:9 115:4,4
**ends** 109:17
**enough** 50:17 82:20
**entire** 9:5
**entitled** 74:18 88:1
**equal** 111:14
**equals** 82:8 113:16 120:5
**equity** 26:5,8,13 28:3,4 28:8,12
**equivalency** 6:2
**established** 32:8 107:1
**estimated** 49:15,18 50:1
**Eufaula** 6:13 7:20
**even** 56:11 61:2 69:21 77:6 96:3 143:12
**event** 129:6
**ever** 18:5,8,10 24:11,18 24:21 55:14 59:9 62:15 65:14 87:15 120:18 133:23
**every** 42:10 52:5 63:14 63:18,22 66:9 68:23 71:6,9 72:9,12,20 74:19,23 83:7 85:22 95:18,22 96:11 97:15 98:15,18 99:11 104:17 119:16 120:3 131:13 133:19
**everything** 34:9,15 37:23 54:11 98:15 99:6
**evidence** 4:4 32:6 62:13,14 99:15
**exact** 23:19 24:23 56:14
**exactly** 50:3 51:19 85:18 121:11
**examination** 2:19 5:5 140:21
**example** 45:4
**examples** 20:6
**Except** 75:21
**exclude** 42:13
**excuse** 91:18
**exhibit** 3:3 24:7 29:3,6 31:7,22 32:22 33:1

36:11,15 40:15,18 50:7,8,10 60:10 89:19,22,23 90:7,10 90:14,17,21 91:1,5,7 104:14,16 105:5
**EXHIBITS** 3:1
**expense** 48:21,23 49:16 71:10,14 73:14 74:18 76:8 81:14
**expenses** 46:20 47:7 48:13,16 49:19,19,22 70:20 76:2 85:7 112:11,12 132:5
**experience** 134:17
**EXPIRES** 142:20
**explain** 50:6 75:1 81:10 84:1,5,5 103:21 112:23 114:19 121:5
**explaining** 51:23
**explains** 51:2
**explanation** 121:16 139:5
**extent** 32:5 59:19 61:19 116:1 129:15
**extra** 104:21

**F**

**fact** 77:20 78:1
**facts** 32:6 62:13 99:14
**fairly** 134:12
**fall** 6:22,23
**familiar** 74:4
**family** 86:13
**far** 63:21 92:23 110:9 136:6 138:4
**fast** 20:8,23 21:1,8 37:1
**FBO000856** 29:8
**FBO000862** 29:10
**FBO000863** 40:20
**FBO000920** 109:3
**FBO000988** 40:21
**FBO000862** 29:8
**February** 9:12 10:7
**Federal** 2:10 3:19 143:4
**fee** 27:4,15 38:4 48:6,8 48:10 71:5 72:3
**feel** 138:13
**fees** 71:4
**few** 35:13
**FICA** 48:17,22 71:9
**Fifth** 2:11 143:5
**figure** 26:5 27:6 28:9 28:17 36:23 37:9,13 37:17 39:10,12,22 40:13 42:7 46:23 47:20 49:17 50:18,19 53:13 64:20 66:4 72:13 73:15 76:3,7 76:17 80:12,14 81:11

July 16, 2007

83:1,2,12 84:2,6,10
84:21 93:22 94:4
95:18 100:19 107:6,9
110:6 111:6,14,14
113:20 114:11
117:23 118:1,11
123:6 131:21 132:8
132:16
**figured** 109:23
**figures** 23:15,16,17
28:23 38:17 39:5
89:17 92:23 111:3,13
112:15 114:12,20,23
119:8 122:1,16
136:10 137:22 138:1
**file** 98:11 99:4,6,19,20
**filing** 4:9,13
**final** 3:4 37:6 39:9
**financial** 16:5,9 87:20
**find** 28:23 37:22 61:15
143:11
**fine** 4:23 139:14
**first** 5:2 7:18 14:5,6
15:16 24:14,16 58:2
**five** 16:17 27:5 38:4
42:22 65:5 82:11,15
82:16,17 134:5
**five-minute** 60:13
**five-percent** 27:4 38:4
**fixed** 16:8
**Flintwood** 5:10
**flip** 30:10 52:1 73:8
75:5 81:15 87:22
89:2 95:1 103:17
108:3 109:7 122:3
132:3
**Flowers** 1:9 9:14,16,19
9:20,21 10:10 11:3,4
11:5,10,12,15 12:6,7
12:9,14,22 13:4,9,15
13:22 14:7,9,10,14
14:19 15:15 16:2,12
17:19,22 18:2,4,19
19:5,11,13 21:22
22:14,18 33:5 37:15
39:11 45:18 46:13
48:9,11 49:2,4,21
50:5,20 53:5,18,20
54:9,11 55:9,12,14
55:15,18,20,22 56:3
56:8,15,17,20 57:1,9
58:1,18 59:2,5,16
60:5,22 61:12,16
62:9,18 63:23 69:21
72:1,1,10 74:1 76:9
78:21,23 79:1,4,6,20
87:1,14 90:4,11 91:2
91:9,14,15,23 92:3,7
92:13 93:7,12,13
94:21 96:6 97:7

101:15 105:17
108:19 110:19
118:15 122:19
123:11 124:12 125:8
125:20,22 126:19
127:10,15 128:21
129:9 131:1,4,9,23
132:9 133:19,23
134:14 135:10
140:11 142:5 143:6
**folder** 98:12,16,19,20
98:21
**followed** 36:9
**follows** 5:4
**food** 20:8,23 21:1,8
**foods** 37:2
**foregoing** 140:19 142:8
**form** 4:1 53:9 127:18
**format** 41:16
**formula** 120:1 121:7
121:11,21
**forward** 108:14,15
111:6 118:23
**four** 17:3 63:17,18
**fourth** 59:3,3,5
**from** 5:23 6:2,3,8,10
10:7 12:14 14:19
25:15,17,18 26:4,5
26:14,21 28:3 29:19
36:23 37:19,23 38:14
39:1 40:5,6 46:13,16
46:20,20 49:4,17
50:23 52:14,18 53:5
53:17 54:8,23 55:4
55:18,20 56:8 57:1
63:9 76:11,14,19
89:13 91:13,15,23
92:3,7,13 93:7 100:5
100:8,9 101:5,8,9,10
102:4,5 103:22 104:1
104:18 105:12 107:2
108:6 114:1 115:16
116:10 119:8 122:9,9
122:19 124:12,23,23
126:8 129:11 132:17
133:1,4,9,11
**front** 143:12
**full** 45:6 75:11 104:12
136:18
**fully** 136:18
**full-time** 7:13
**function** 17:4 111:1,2
119:4 121:1
**funds** 42:1 52:17,17
101:2,5
**further** 4:7,14 61:20
96:3 137:13 139:18
141:1
**F-B-O** 29:9

___G___
**gave** 38:18 39:21
**general** 24:10,19 52:12
58:12
**Georgia** 11:13 12:10
62:20,23
**gets** 42:20,23 43:6 45:7
59:5,6 70:10,14 73:2
73:5 95:19 111:9
120:19
**getting** 10:23 45:6 79:7
126:22 127:3
**give** 40:12,17 45:18
55:23 60:17 61:3,16
65:12 69:6 89:17
117:9 134:4 139:4
**given** 38:12 52:5 111:5
127:2 129:9 137:3
142:9,10
**gives** 49:21 106:20
117:5
**go** 6:12 7:3,3 15:4
19:22 22:5 28:22
31:2 35:6 36:7 37:21
40:22 41:19 57:3
62:4 64:2 72:9 74:16
82:5,5 93:4,6,21
94:11 95:1 96:3
97:10 102:12,16
105:14 106:23
112:10 116:10,15
**goes** 30:3 53:23 56:10
67:2 116:10
**going** 24:5 29:5 32:4,10
32:12 35:1 40:17,17
41:2,5 56:18 71:19
74:12,13 81:15 89:21
102:7 117:12 119:13
119:23 126:18
130:10 131:12 133:9
133:11 137:16,18
138:15
**gone** 131:10
**good** 105:20
**gosh** 6:19
**gotten** 134:11
**graduate** 6:10
**grammatical** 138:17
**Greg** 2:4,4 69:2 109:14
121:14 125:4 138:5
143:22
**grocery** 20:16 45:15,16
46:14
**gross** 49:14 50:4,14,15
**guess** 10:23 14:23
17:15 18:12,15 21:9
22:11 24:1 25:21
27:22 29:6 30:2
44:21 55:7 75:22
92:20 135:6 136:22

**guy** 16:11

___H___
**Halcyon** 2:5
**half** 58:23 59:1,2
**handle** 87:19,20
**handled** 63:12
**happened** 12:5 14:6
106:12
**happens** 59:4 109:19
**happy** 121:15
**Hardee's** 21:2
**having** 5:2 32:9 34:2
129:16
**head** 16:11 23:20 26:16
76:12 122:2 124:3
132:1
**health** 27:11
**Health/disability** 47:23
**help** 64:11
**Henry** 1:6 2:14 13:16
18:14 19:18 23:10
25:2,5 30:22 35:4
52:9,22 53:23 62:10
62:15 77:4 78:3,17
78:22 85:12,16,20,23
86:16 87:3 90:5,12
90:18 91:2,9 93:7,9
93:13 94:20 95:12,16
99:7,11 120:9 122:12
123:12 140:8 142:5
143:6
**Henry's** 95:3
**hereto** 4:12,15 142:13
**hey** 42:22 43:3 65:4
**high** 6:10,12,13,14
132:8,11,13
**higher** 96:4 131:21
**him** 19:20 28:5 37:16
50:5 71:21 79:1,2
93:2,12 117:9 119:21
123:22 128:6,16
135:23 137:16,19
138:12
**himself** 43:18 93:1
**hire** 74:2
**hired** 9:15,18 72:1
**Hishta** 2:8 4:23 24:13
32:4,16 40:22 51:20
53:9 54:3 56:18
59:18 60:7 61:18
62:4,12 63:2 64:8
69:1 75:7,12 77:10
78:8 80:9 82:15,17
88:7 93:2 94:6 95:21
96:18 97:9,19 98:17
99:14 101:17 102:7
104:9,13,21 105:3
108:21 109:9,14
110:15 114:8,17

115:21,23 118:10
119:18,21 121:14
123:4 124:15 125:2
125:14 126:1 127:1
127:18 128:19
129:14,19 130:19
131:2 132:15 133:12
133:17 134:7 135:10
135:14 136:6,22
137:9,12,20,23 138:4
138:19 139:3,8,12
**hitting** 131:13
**holding** 128:14
**home** 5:18,20
**Hopefully** 57:11
**Horn** 10:11,12 19:10
19:11 22:11
**Hughes** 7:20,21,23 8:2
**hundred** 42:19 43:4,13

___I___
**idea** 59:8
**identification** 29:4
36:12 40:16 50:9
89:20 90:8,15,22
91:6
**include** 53:7,13 64:6
**included** 54:19 64:17
**includes** 54:10 112:7
**increase** 95:21
**increased** 96:1,2
132:17
**increasing** 95:18
**Index** 2:19,23
**indicate** 78:10
**individual** 130:22
**industrial** 8:23
**information** 52:12
89:12 100:4,6
**inhibit** 138:8
**initially** 22:15
**Inn** 1:18
**instance** 67:9 72:8
**instead** 29:9 43:13
116:12
**insurance** 27:11 47:16
47:18,19,23 71:5
77:1,2 85:15,21 86:7
86:8,10,23
**insured** 86:9
**interested** 14:18 141:3
**introduced** 4:10
**inventory** 57:20 66:5,9
66:17 67:3,5 103:2
112:20 114:2 115:3,4
117:6 120:5,7 123:1
137:6
**involves** 99:22
**involving** 19:18
**issue** 137:1

Deposition of Jerry Woodham

July 16, 2007

Page 5

**issued** 90:4,11,18 91:2
91:9
**item** 68:11 87:23 88:2
**items** 66:6 113:3

---

**J**

**January** 31:20 32:3
34:2,3 50:23 51:5
**Jernigan** 17:14
**Jerry** 1:14 3:18 5:1,8
140:4 142:7,16 143:3
**job** 7:14,19 8:3 16:3
99:5
**jobs** 7:16
**Judy** 16:22,23
**July** 1:19 133:3 140:18
141:4 142:9 143:1,9
**June** 5:17
**just** 8:10,11 14:21 15:1
17:15 20:6 22:2
26:23 27:6 28:16
29:22 31:6,18 32:17
33:7 34:3,8 35:9,23
37:18 38:18 40:12,23
41:3,5,16,17 42:9
46:7 47:2 48:8,10
51:9,20 52:12 54:22
55:3,4 56:11,21
58:12 60:2 61:4,10
65:10 67:18 72:6
77:17 81:15,15 85:14
86:12 87:20 95:19
96:4 97:4 101:9
102:13 107:6,8
108:23 109:10
110:23 112:22
114:19 119:4,4
120:23 123:5 126:16
128:10 135:15
136:23 137:15
138:16

---

**K**

**keep** 98:21 99:4 100:2
**keeps** 99:20
**kept** 98:10,12,16,18,20
**Kevin** 2:8
**kin** 141:2
**kind** 18:5 22:7 52:11
87:6,8,11,12,16
**King** 21:2
**knew** 60:3
**knocks** 107:21
**know** 21:19,20,23
23:14 24:23 27:20
29:15,16 32:17,21,23
33:3,6 35:1,18 38:23
39:23 41:13 42:22
43:16 44:20 48:21
52:9 53:16,18 57:16

59:12,14 61:6 63:21
64:9,10 70:2 72:15
74:5,7,10,16,17 78:3
78:5 79:8 82:13 85:8
85:12,18 86:12,13
87:6,19,21 89:6,22
93:15 96:6 98:17,18
98:22 99:9,23 101:13
103:23 104:3,4 105:1
107:2,7 111:13
112:23 117:14 119:7
121:23 123:2,6 131:7
131:13,19,20 132:1,8
132:16,19 133:18,22
133:23 134:3,22
135:21 136:13
138:12,21
**knowledge** 136:18
**knowledgeable** 18:13
18:16,18,21 135:8,19
136:4

---

**L**

**L** 2:4,4 143:22
**label** 20:8,11,11,12,15
20:17 21:7 30:13,15
33:10 37:1 53:14
54:18
**ladies** 17:3
**Lane** 5:10
**language** 60:22
**large** 1:17 3:22 133:18
140:2 141:9
**larger** 45:14 55:21
**last** 24:21 27:10 35:22
38:21,23 39:18 41:6
75:21
**Law** 2:4,5,10
**lawyer** 61:1 77:8
**lay** 61:4,5,11
**lease** 87:17,19 88:1,4
**leased** 134:1
**leasing** 78:4
**least** 74:13 130:14
**leave** 8:2 9:7,13 10:16
11:5 15:1,2,4 104:17
**leaves** 65:3 106:9
115:16
**leaving** 103:11 116:20
**left** 9:11 11:3,10 12:6
14:5,22 123:11,17,18
**legal** 18:6 59:19 60:8
61:3,9,19
**legally** 110:17
**less** 67:11,13 71:16
103:2,5 115:3,10
**let** 28:16 32:17 34:18
37:18 42:21 43:16
50:6,6 60:9,14 61:6,7
90:9,16,23 91:7

105:14 119:15 122:3
125:9
**letter** 24:9
**let's** 10:7 31:18,19 34:3
36:7 40:22 41:18,19
41:21 52:1,7 55:8
56:11,21,22 64:2
72:6 75:8,12 81:15
83:14 91:18 95:1
102:16 104:15,15
105:14 106:23 107:5
107:8 109:13,22
111:18 114:1 119:11
119:12
**license** 71:4
**life** 77:1,2 85:15,16,20
86:7,8,9,22
**like** 8:10,20,21 13:16
14:22 20:18 21:5
25:10,14 27:10 30:11
33:7 41:14,23 42:14
43:10,13 45:20 46:11
48:16 51:9 55:22
57:22 62:10 65:13,19
66:20 67:6 70:21
71:19 72:7,16,19,20
73:2 75:10 77:1 85:9
87:10,12 88:6 89:12
103:3,7 119:3 120:2
129:3 132:3 134:8
136:23
**limited** 134:20
**line** 26:1 32:11 42:6
44:4,11,23 46:10
47:17 61:21 63:4
68:11 143:10
**list** 16:10 143:14
**listed** 114:12 117:7
119:9 125:11
**little** 106:4 117:8,15
**live** 5:11
**LLC** 1:10 90:5 140:12
**load** 43:1,3,7,17 65:6
122:19 132:23 133:4
**loaves** 65:5
**location** 9:18 13:17
**locations** 12:18,20 13:8
14:2 15:10
**long** 6:19 7:23 8:17
10:6 12:2 14:1 35:11
63:16
**look** 22:5,7 27:22,23
28:23 31:14,20 33:15
37:5 39:15,17 40:7
41:22 50:4 51:7 60:2
60:14,17 61:7 65:15
69:10,15 73:19 77:6
83:10,14,15 87:23
88:10,13,16 93:16,23
95:15 100:13 102:21

103:1 104:5,8 105:9
107:10 109:13,22
**looked** 22:9,23 23:1,2
31:6 59:9
**looking** 25:9 26:1 41:2
60:19 69:23 72:18,19
85:14 91:12 101:9
106:3 132:2
**looks** 25:10,14 30:11
41:14,23 43:10 45:20
46:11 48:16 57:2
65:19 67:6 72:16
73:2 75:10 77:1 88:6
103:3,7
**Lord** 2:14 38:13,14
39:1,21 40:12 97:23
135:4,7,13 136:8,12
136:17
**Lord's** 24:7 60:11
**losing** 96:7
**lost** 83:13
**lot** 70:19 85:9 100:6
133:15

---

**M**

**made** 4:2 5:20 15:8
19:18 43:17 47:9
53:22 55:15,17 62:1
70:6 78:12 91:13
124:10,12 125:21
135:3
**maintain** 99:19
**make** 15:12 46:19
91:15 104:16 114:18
121:1 128:2,8,8
135:4 136:14 138:17
143:9
**makes** 70:2
**making** 16:6,6 110:13
**management** 6:6
**manager** 16:19,21 17:1
76:19,20 100:10
**managers** 89:13
**Manley** 16:22,23
**manner** 4:11 141:3
**manufacture** 8:14 13:1
13:3,6
**Manufacturing** 8:4,13
**many** 16:15 93:13
**March** 19:9 97:5
**Marcus** 72:8
**mark** 29:6 40:18 50:6
**marked** 24:6 29:3 31:7
31:21 36:11,15 40:15
50:8 60:10 89:19,21
90:7,9,14,16,21,23
91:5
**match** 77:23
**matter** 140:7 143:17
**Matthews** 11:22

**may** 3:20 4:2,4,10
15:21 41:15 69:11
95:21 129:19 130:15
**maybe** 114:17 128:6
**mean** 16:9 20:21 21:17
21:19 23:2,19 24:2
31:17 33:13 34:21
36:20 38:15,18,22
44:20 45:23 49:1,6,7
51:13,17 53:16 55:1
61:1 66:7,15,20
67:14 69:4,22 70:1,1
70:1 71:15 76:13
78:16 85:17,20 86:19
87:10,10,20 91:16
92:1 97:2 104:4,7
105:13 112:22
114:10 123:14 127:9
130:22 132:11,12
**means** 43:14 46:2 58:8
66:8 67:9 123:10
**mention** 58:5
**merchandise** 123:3
**metal** 8:14,20
**method** 21:17 22:19
**methodology** 32:13
51:23 134:18 136:7
136:20
**Michael** 2:14 24:7
38:12 39:1 40:12
60:11 97:23 135:12
136:8
**middle** 1:3 65:15
140:15
**might** 22:9 29:9 45:16
93:20 124:14
**Mike** 11:22
**mini** 8:22
**minimum** 71:17
**minors** 5:13
**minus** 28:10,11 37:1
122:19
**minuses** 117:10,12
**minute** 40:23 102:14
**minutes** 35:13 60:18,18
61:7 134:5
**miscellaneous** 48:21,22
49:2 71:10,13 85:7,9
**missing** 75:7 104:9
**money** 8:5,6 9:21,23
19:19 28:5 93:1,4,4,6
93:12 96:7,9,10,13
96:16 97:15 129:8,11
**Montgomery** 2:6
139:22
**month** 87:13
**more** 8:5,6 9:21,23
43:15 66:17 67:10
71:15 105:15 129:20
130:15 136:3

Deposition of Jerry Woodham

July 16, 2007

Page 6

**morning** 72:8
**most** 18:13,15,18,20
  58:23 70:20 85:10
  135:8,19
**move** 10:1
**moved** 14:14
**much** 8:23 9:3 17:3
  20:22 44:10,21 67:23
  68:2 70:10 82:6 88:4
  89:14 91:12,17 92:8
  131:21
**multiplied** 21:13
**multiply** 81:7
**myself** 77:15

**N**

**name** 5:7,16 52:9 87:10
  97:17
**NASH** 2:9 143:4
**Nature's** 20:7
**need** 4:2 34:4,7,9,13,15
  102:9 104:5 119:13
**needs** 44:22
**negative** 117:15 128:3
  128:9
**negatives** 117:19
**neither** 5:13 141:1
**net** 3:3 29:12,22 31:4
  34:21 35:3,6,12 40:6
  40:7 42:6 45:19,23
  47:3 50:1 92:11
**never** 35:14 59:11,12
**new** 15:7 19:13 106:20
  107:3 110:13,16
  112:2 122:4 131:8,17
**next** 2:23 30:6 42:6
  44:4,11,23 46:10
  47:16 57:8 74:14
  93:20 95:15 106:14
  108:4,11 112:10
  120:5,8 126:21 133:2
**nobody** 97:4 120:18
  128:16
**nods** 26:16 124:3
**normal** 50:21 59:1
**normally** 71:18
**North** 2:11 143:5
**NORTHERN** 1:4
  140:16
**notarized** 143:13
**NOTARY** 142:19
**note** 26:11
**noted** 142:12
**nothing** 5:3 19:17
  54:21 55:1 106:12
  140:6
**notice** 50:22
**notified** 143:15
**notifies** 43:22
**number** 18:15 24:7

25:7,17 27:5 28:10
28:19 29:7,8,14 30:7
31:8,22 33:4,5,5,14
34:5 35:16 36:15,17
38:3,12,19,22 40:8
40:18 41:8 50:7,10
50:19 51:7 52:2,10
54:21 56:12 64:3
68:18 69:8,15 70:2,4
70:19 73:1,8,21 75:5
75:9,16 80:2,23 81:2
81:8,11,16 82:3,11
83:10,14 84:2 87:22
88:10 89:22,23 90:10
90:17 91:1,8 94:11
95:2 96:15,17 100:13
105:10 107:1 108:22
109:17,18 118:18,19
120:11 122:18 128:8
132:3,18,21 140:17
143:10
**numbers** 23:19 25:1
28:10 33:11 39:8
40:20 41:4,6 84:13
110:23 119:3 121:2,3
121:4 131:13

**O**

**object** 32:4 56:18 61:20
63:2 129:14
**objection** 53:9 59:18
59:20 60:7 61:18
62:12 64:8 69:1 78:8
80:9 96:18 97:9
101:17 110:15
115:21,23 123:4
124:15 125:2 127:18
131:2 133:17
**objections** 4:1 62:6
**obtain** 39:12,15
**Obviously** 80:7
**October** 10:8,16 11:6
11:10 12:5 14:4
**off** 23:19 36:7 40:22
76:12 122:2 132:1
**offered** 4:4 19:20
**office** 16:19,21,23 17:2
29:18,19 89:16
**OFFICES** 2:4
**Off-the-record** 36:9
41:1 138:3
**often** 44:6 56:7
**OGLETREE** 2:9 143:4
**Oh** 6:19 58:7 97:8
**okay** 23:7 27:8,14 28:7
29:5,23 38:20 41:18
47:19 48:20 55:3
57:4,14 58:5 67:1,14
74:7 78:12,19 79:17
80:14,17 81:10 84:5

84:11,17 97:18 99:14
102:6 110:21 111:11
116:10 119:10,15,20
119:23 121:6,9
127:23 130:14,18
132:7,14 133:14
136:21 138:2
**old** 45:12
**once** 6:14 7:2,18 11:1
21:7,7,8 53:17 63:18
67:5 124:4 133:19
**one** 2:10 5:13 15:4,5,6
17:16,16 18:15 22:9
25:1 27:21 30:6
32:21 34:20 35:15,19
36:19 41:12,17 44:6
44:13 51:10 56:22
59:11,11 60:2 65:13
67:1 72:17 73:1 75:8
77:6 93:20 96:20
98:16 103:21 104:12
105:15 108:6,8,15
116:19,20 119:11,12
120:5 121:9 127:21
128:12 129:6 133:2
134:2 137:6 143:4
**ones** 121:8
**only** 13:3,6 17:20 42:21
43:5 58:8 129:7
134:19 137:18
**on-the-job** 17:8
**Opelika** 1:10,18 5:10
9:20 10:1 11:3,5,11
14:9,11,15 15:16
16:3,13 17:20,23
18:3,4,19 19:6,9
22:14 37:15 46:13
48:9,11 49:5,21 53:6
54:9 55:20 59:2
69:21 76:9 78:21
90:5 92:7,14 134:15
135:11 140:12
**opening** 14:12,17
**operate** 50:21
**operating** 49:15,18
**operations** 6:6 76:20
**operator** 16:20
**opinion** 61:4,10,11
**original** 25:10 26:11
143:11,12,15
**Orleans** 19:14
**other** 4:1,5,11 9:2
13:10 15:6 17:3 32:1
37:5 39:4,8 43:9
46:19 67:23 70:9
77:23 91:19 113:11
129:23 130:1
**out** 6:14 7:2,18 13:8,15
21:7,8,8 27:17 44:15
44:17 45:11,12 53:22

55:15,17 56:10 64:11
67:3 72:9 84:22 93:7
101:14 109:23
114:11 117:12 124:2
125:21 140:22
**outside** 5:18,20
**over** 5:14 12:20 15:6
30:6,10 51:10 52:1
64:3 65:8,9 66:10
69:10,15 72:18 73:8
74:2 75:5 87:22
95:15 103:17 106:14
108:3,10 110:8
111:18 122:3 128:18
132:3 133:20
**overrides** 45:3
**owe** 108:19
**owed** 41:23 46:3 52:14
93:11,12 94:20,21
100:15 102:1,3
103:15,18 108:4
111:19 116:12 118:5
118:6,7 133:15
**owes** 37:14 39:11
108:17,19 109:21
110:19 111:4 112:12
118:15 120:10,14
127:9
**owing** 95:16
**own** 20:7,17 33:10 49:4
71:20
**owns** 23:10

**P**

**P** 2:8
**page** 2:23 24:15,16,21
26:19 29:23 30:1,3,4
50:12 52:8 94:12
102:20 108:11
118:12 121:5 142:2
143:10,11,12,14
**pages** 30:10 103:17
140:19
**paid** 26:13 28:1,5,11
42:1 47:13,20,23
48:3 52:17 53:19
56:7,8 58:18 64:16
73:6 78:6,11,16 79:4
86:2,7,19 87:13 97:6
101:2 126:15 127:15
128:6,16,17,19 129:8
**paper** 119:19 142:13
**paperwork** 48:9 99:20
**Park** 2:5
**part** 15:16 21:21 28:6,7
31:8 99:5 100:2,8
130:12 134:10
**particular** 30:17 31:18
32:18 33:8,9 35:15
36:19 37:2 43:7

51:15 65:23 66:13
67:1,6,9 68:17 69:8
70:23 73:13 74:18
77:20 79:8 96:7
101:16 128:4
**parties** 3:17 4:8,15
140:22 141:2 143:15
**party** 4:5,11
**part-time** 7:14,15,16
**past** 36:22
**pay** 45:17,17 48:8 56:2
56:3 57:23 58:3,6,7,8
58:14,17,22,23 59:1
64:6,16 65:15 66:1,6
66:16 68:22 70:3,15
72:10 85:21,23 86:1
103:1,2,6 107:18
108:16,18 109:4,5
111:7,15 112:7,20
113:6,19 114:2,20
115:3,10 116:19
117:6 120:4,7 130:9
134:13 135:9 136:6
136:19 137:2,6,20,21
137:23
**payable** 17:13,17
**paying** 70:23 71:2 96:9
96:10,13,16 97:2,15
**payment** 47:7,8 70:22
127:14
**Payne** 17:12
**pays** 55:22 124:14
125:8
**PBS** 68:13,14,17 69:16
69:18 70:5
**people** 8:20,22 16:15
34:22 35:1
**Pepperell** 7:7,10
**per** 75:3,3
**percent** 27:5 38:5 68:3
68:5 70:12,13,14
75:2 79:23 80:1,2,7
80:20,22 81:7 82:2,8
84:2
**percentage** 79:20 92:10
92:12,15,19,21,22
**period** 35:21 36:5
63:13,15,16,16 65:22
68:20,21,23 69:5,7
69:10,19 70:8 73:9
107:5 125:17 134:20
**person** 10:9 18:12,15
18:18 61:4,5,11
72:10 99:10 135:7,19
136:2
**physically** 93:3
**pick** 13:18,19 34:3
54:12 81:16
**picked** 56:23
**piece** 119:18

Deposition of Jerry Woodham                                                                July 16, 2007

**PL** 30:11,13
**place** 2:10 12:23 13:2
  63:22 76:14 98:5
  142:11 143:4
**places** 13:10
**Plaintiff** 1:7 2:3 140:9
**Plaintiff's** 3:1 24:6
  29:3,6 31:7,21 32:22
  33:1 36:11,15 40:15
  40:18 50:7,8,10
  89:19,22,23 90:7,10
  90:14,17,21 91:1,5,7
**plant** 18:4
**plays** 84:6
**please** 5:7 61:6 75:6
  87:23 143:9,12,14
**plus** 43:11 113:15
  117:10
**pluses** 117:11
**pocket** 129:1
**point** 31:19,19 46:2,7
  47:4 55:2 65:19 66:1
  72:17 111:11 113:6
  114:3,4 120:3,6
  126:20 127:4,21
**pointing** 114:22
**policy** 85:21 86:10
**Porter** 91:22
**Porterfield** 1:6 2:14
  13:17 18:14 23:10
  25:5 37:14 39:11
  52:23 53:23 62:1,10
  72:8 77:4 78:3,22
  85:20 86:17 87:3
  90:5,12,18 91:3,9,13
  93:8,10,14,17 96:9
  96:10,13 97:12,14
  101:11 110:19 111:4
  112:12,19 117:5
  118:15 120:9 122:13
  131:10,11,22 133:21
  134:23 140:8 142:5
  143:6
**Porterfield's** 19:19
  25:3 30:22 32:2,18
  33:2,15,21 35:4 52:9
  54:16 73:18 78:17
  85:12,16,23 98:2,8
  99:7,12 123:12 131:6
  134:2
**portion** 67:18
**position** 9:15 10:20
  12:17 15:23
**positions** 16:18 17:15
**positive** 10:13 13:14
  21:11 25:4,8 26:7
  28:2 37:8,12 68:15
  82:4 94:6,8,9 106:18
  107:12 110:2 114:5
  114:15 115:7 116:23

128:8
**positives** 117:18
**possibilities** 129:20
**preparation** 23:4
**prepare** 51:21
**prepared** 23:13
**PRESENT** 2:13
**president** 18:4
**pretty** 8:23 9:2 17:2
  20:22 51:13
**previous** 52:15 102:5
  127:22
**previously** 24:6 60:9
  80:10 97:22 101:19
**price** 25:10,13 27:23
  39:2 40:5 44:23 45:6
  45:8
**prior** 22:22 73:19
  103:2 110:4 113:18
  114:1 115:3 120:4
  131:18
**private** 20:5,7,11,11,12
  20:15,17 21:7 30:13
  30:15 37:1 53:14
  54:18
**probably** 27:9,10 34:22
  51:18,19 72:5
**Procedure** 3:19
**proceeding** 18:6
**process** 51:15
**processing** 27:16
**produced** 40:19 77:9
  105:23 106:2
**product** 20:21 42:6,9
  42:10 44:11,14,22
  52:19,22 53:4,12,13
  53:14,23 54:6,7,8,10
  54:15,19,22 55:3
  56:12,23 57:3,5,6,22
  64:3,5,6,12,12,15,17
  64:18,19,21 65:2,6,9
  65:10,11 67:10 77:18
  79:12 92:6,13 97:2
  101:14 111:23
  113:23 122:18,21
  123:9 124:1 125:6,15
  125:19 126:5,12
  127:13 130:5 133:1,3
  133:16
**production** 7:11
**products** 42:17 45:14
  92:17,18
**profit** 46:18
**program** 37:23 39:5
**prompt** 143:17
**proper** 106:17
**provided** 4:5,12 143:10
**PUBLIC** 142:19
**Publix** 20:20 29:13,14
  29:15 31:23 32:23

34:8 124:13
**pull** 37:23 49:3
**pulling** 13:17,19
**pull-up** 72:2,11,21
  85:11,13
**pull-ups** 71:20 72:1,7,9
**purchase** 24:9,18 25:10
  25:13 27:23 47:12
  71:1,2
**purchased** 25:21,22
  28:13 53:3
**purpose** 4:5
**purposes** 24:13 51:21
  77:11 82:19 97:20
  108:22 121:15 137:1
**pursuant** 1:15 3:18
**put** 18:12 38:1 39:2,4,7
  55:21 104:15 119:3
  135:23 137:16
**puts** 57:6
**putting** 138:6
**p.m** 1:20

---

**Q**

**quarter** 63:14
**question** 4:2 53:10
  54:14 60:15 62:5
  69:3 72:5 84:1
  105:15 108:9 114:9
  120:15 122:3 125:14
  129:15,17 135:6
  136:13
**questioning** 32:12
  61:21 63:5
**questions** 4:1 135:5
  136:16 137:14

---

**R**

**ran** 79:8 131:11,22
**range** 9:1
**re** 142:5 143:6
**read** 25:11 59:11,12,22
  60:16 137:13 138:9
  138:16 142:8 143:9
**reading** 140:22
**really** 44:9 65:14
**reason** 31:9 39:21 55:5
  96:6 97:14 105:7
  107:7 130:3 136:12
  139:1,4
**reasons** 129:23 138:14
  142:12
**recalled** 138:20
**receivable** 17:11,16,19
  126:10
**receive** 53:22 55:17
  92:2,5 93:1,3 94:5,10
  112:19
**received** 28:12 52:18
  55:14 78:15 92:6,19

93:17,19,21 94:1
  101:5 126:4 127:14
**receptionist** 16:19
**recess** 36:10 61:13
  75:14 102:15 134:6
**recognize** 61:2
**recollection** 121:20
**reconciliation** 24:11
  25:2 26:17,23 36:16
  38:8 39:3 40:2
**record** 5:7 24:13 36:8
  40:23 51:20 62:14
  77:11 97:20 108:21
  121:14 134:9 135:16
  137:1
**redepose** 138:12
**redeposed** 139:11
**reduces** 106:19
**refer** 33:20 41:3,5 44:2
**referred** 32:23
**referring** 32:22 96:21
  108:23 109:12 116:2
  116:3
**reflected** 132:18,21
**refuses** 59:1
**regarding** 121:19
**regardless** 4:12
**register** 58:10
**regular** 45:8
**Reiss** 2:9 143:3,22
**related** 98:7,13
**relates** 63:4
**relatives** 8:8,9,11
**relay** 42:16,18 65:1,3
  111:23
**release** 24:10,19
**relevance** 61:22
**relied** 40:12
**relief** 73:14,20,23 74:7
  74:10,14,18 75:3
  78:6,10,12 79:22
  81:1,3,8,10,13,17
  82:1 83:1 86:4,19,22
  131:14
**remember** 23:17,21
  119:15 120:1 121:7
  121:10,11
**rent** 48:3 71:9 76:14,17
  89:14
**rental** 76:3,22 88:8,11
  88:14,16,21 89:4,6
  131:15
**rented** 76:11 87:7
**renting** 76:8
**repeat** 41:7
**report** 11:21 16:15
  18:2 29:12,18,21,22
  30:16,18 31:5,9
  34:15,19,21 35:4,7
  35:12 36:16 37:22

38:8,9,10,21 39:14
  40:8 41:9,15,16 52:2
  54:20 80:4 91:17
  95:4 101:10 105:11
  128:21
**reported** 140:2
**reporter** 1:16 3:21 4:21
  105:6 140:1 141:8
  143:20
**REPORTER'S** 139:20
**reports** 3:5 19:3 29:1
  31:21 32:1 33:20
  34:5,11 37:19 40:2,6
  51:9,16,22 77:17
  93:23
**represent** 37:13 100:19
**representing** 3:17 4:8
**repurchase** 3:4 23:5,9
  23:12,18 27:7 39:2
  40:5
**reschedule** 102:9
**reserved** 4:3
**residential** 9:2
**response** 10:13 13:14
  21:11 25:4,8 26:7
  28:2 37:8,12 68:15
  82:4 106:18 110:2
  114:5,15 115:7
  116:23
**responses** 135:2
**responsibilities** 16:4
**responsible** 16:8
**rest** 59:6
**results** 141:3
**retail** 45:14
**return** 143:14
**revaluation** 66:4 67:2
  67:17,19 120:6
**revolves** 137:2
**Rica** 11:4,12,13,16,21
  11:23 12:3,6
**right** 5:15 10:3 11:13
  15:8,14,15,19 16:2,7
  20:3 21:14 25:17
  26:3,15,22 27:5
  28:15 29:14 34:9,17
  36:2,13 38:11 41:2
  45:10 46:6 48:18
  49:12 50:17 51:2
  52:1 54:6,12,17
  58:16,20 64:2,11,15
  67:21 68:16 69:4
  73:8 75:15 82:3,8,12
  82:14,16,23 84:20
  85:5 92:20 94:5 95:2
  95:13 97:12 102:20
  103:12,15 104:10
  105:16,17,19,20,23
  106:23 107:19 108:7
  109:7,21,22 111:10

Deposition of Jerry Woodham

July 16, 2007

Page 8

111:13 112:16 113:5
113:9,16,18 114:6
115:8,10 116:17
117:10,11 118:22
119:14 120:21 121:2
121:3,9,13 123:9,16
124:5 125:5 126:10
126:11 127:8 129:2
132:23 133:7,13
137:10 138:2
**right-hand** 110:9
**roll** 106:14
**rolls** 13:9
**roughly** 80:3
**roundabout** 23:21
**rounding** 82:18
**route** 3:3 13:16 18:17
19:19,23 21:16 22:19
23:10 24:3 28:1,6,7
29:2 30:20,22 31:1
31:11,15 33:13,15,21
33:22 34:5,6,8,16,17
35:4,15,15 37:3,16
44:14 52:10 54:16
65:23 66:2 74:6
76:10 77:5,6,12,20
78:1,4,18,20,22,23
79:2,5,9 84:15 86:18
89:9 96:7,15,17 97:3
97:6 98:8 99:21
101:16 102:17 116:5
132:10 134:2
**routes** 44:17 49:4
**Rules** 3:19 139:6
**ruling** 4:3
**run** 29:1,19 30:17 31:4
31:16 32:1 34:5,17
35:3,10,11,15,19
36:19 74:3 75:10
76:9 79:1,4 98:3
**running** 31:10 34:20
35:6 37:16 48:10
74:6 78:21,23 86:4
96:8 130:18,19 131:1
131:5,9,23 132:9
**runs** 17:2

_____
                S
_____

**Sadler** 1:16 3:20
139:23 141:7 143:20
**SAITH** 139:18
**salaries** 92:2,4
**salary** 79:7
**sale** 45:6,9 65:19
111:11 113:6 114:3,4
120:3,6 127:4,21
**sales** 3:3 20:2,3 28:18
29:1,1,22,22 30:7,11
30:13,14 31:4,9 34:7
34:21 35:3,7,12 36:1

36:2 37:1 40:6,7
42:13 76:19 89:13,16
92:11 100:10
**same** 4:13 11:18 13:5
13:22 25:1 39:8
41:15 51:8,19 60:7
65:6 70:11 88:19
116:16 140:23
**Sandra** 2:9 143:3,22
**sat** 59:12
**saying** 34:14 61:4 65:4
66:20 69:14 86:11
118:7,8 120:9,13,14
133:14
**says** 25:5,21 30:11 37:6
44:4,11,23 45:23
46:10 49:2 52:8,13
65:15 66:13 68:14
70:4 78:6 81:17,19
91:18 94:3 100:14
116:3 118:2 122:4
132:11
**scan** 58:3,6,7,17 64:7
64:16 65:16 66:2,6
66:16 68:22 70:3
103:1,2,6 108:16,18
111:7,15 112:7,20
113:6,19 114:2,21
115:3,11 116:19
117:6 120:4,7 130:9
134:13 135:9 136:7
136:19 137:2,7,20,21
138:1
**scanned** 58:10 113:3
120:20 130:11
**scans** 70:15 107:18
109:4,5
**scenario** 129:3
**school** 6:10,12,13,14
**schools** 21:6
**second** 29:23 30:1,4
36:8 41:18 52:7
59:20
**see** 10:7 22:6,8 37:9
41:21 42:7 48:14
50:11 52:20 61:5
62:7 65:13,20 69:16
73:10,15,21 76:3
78:13 81:16 87:15
88:1 91:18 94:2,13
95:5 100:15 101:3
102:18,22 103:18
105:13 106:6,10
107:13 111:2 114:1
116:22 119:15 122:4
132:23
**seemingly** 61:22
**seen** 8:19 23:5 24:11,18
24:21 25:1 59:11
**sees** 57:2

**self-explanatory** 70:21
**sell** 46:13,16 54:11 58:8
58:11,14
**selling** 46:21
**sells** 53:17 54:12
**sent** 50:5
**separate** 12:12,13,14
26:21,22 33:9 98:10
142:12
**set** 33:8 140:22
**settlement** 39:10
**several** 49:7
**share** 75:8
**sheet** 68:8,11 142:13
143:10,14
**shelf** 57:7 67:10,12
**ships** 13:9
**shopping** 8:21
**short** 42:23 44:4,5,8
65:5,8,9,11,12 66:10
66:11
**Shorthand** 1:16 3:21
139:23 141:8 143:20
**Shorts** 122:21
**show** 24:5 29:1,5 36:14
60:9 89:21 90:9,16
90:23 91:7 113:4
121:3
**showing** 29:12
**shows** 25:9 50:14 83:11
95:15
**shrink** 62:7,16 68:13
68:14,17 69:16,18
70:3,5,8
**shrinkage** 57:16,18,19
58:17,19,21 59:17
60:6,23 61:17 62:11
62:17 63:1,8 67:15
68:21,22 85:1
**sic** 112:2,3
**side** 16:6
**sideways** 25:12
**sign** 138:16 143:12
**signature** 4:16 142:2
143:11,12,13,14
**significant** 134:12
**signing** 140:22
**signs** 117:15
**simpler** 114:18
**since** 35:14 97:5 98:5
131:8,10
**Sincerely** 143:18
**single** 97:5 104:18
**sir** 19:21 38:6 41:11
50:13 52:6,16,21
54:13 73:12,16,22
76:1,4,6 77:22 78:2,5
78:14 81:4,18,20
82:4;10 83:22 84:16
84:23 85:6 89:1 90:1

90:20 94:9,14,16
95:6,11,14,17 100:16
100:18 101:4,7
102:19,23 103:4,13
103:19 105:18,21
106:8,11,16 107:4,17
108:2 111:12,21
112:6,9,14,18 113:8
113:10,14,17 122:6,8
**sits** 121:21
**sitting** 119:7 121:23
124:2,4 127:17
**situation** 128:4
**skipped** 48:17
**skips** 52:13
**slash** 44:1 45:3 47:16
**smaller** 49:7
**smart** 50:17
**SMOAK** 2:9 143:4
**software** 35:8
**sold** 25:23 26:2,6 28:3
28:6,14,15 34:10
45:14 128:4,6
**some** 8:21 23:16 44:8,9
100:7 105:6 117:14
126:20 129:3 134:12
134:16 135:1 136:11
138:13,22,23
**somebody** 29:19 44:22
53:2 74:3,6 78:16
86:4 127:14 128:6
**someone** 15:12 49:4
71:23 72:7 79:4
136:15
**something** 44:9 52:4
72:17 104:5 121:10
134:8 138:20
**sometime** 14:4
**somewhat** 134:20
**somewhere** 6:15 7:4
22:5 124:23 129:13
**sorry** 9:9,10 11:7 26:1
30:1,2 56:21,21 66:1
83:13,23 88:8 133:13
**speak** 5:3 140:5
**specific** 23:3 76:14
**specifying** 143:10
**staff** 19:1
**stales** 45:10,12
**stamp** 29:8 30:6 40:20
41:4 50:19 51:7 52:1
64:2 69:15 94:11
**stamps** 41:6
**standard** 46:10 51:13
74:22 79:17 80:5,20
81:6 83:16,20
**standpoint** 104:1 122:9
122:10
**stands** 30:16
**start** 9:14 15:6 47:6

**111:18 134:7**
**started** 6:21,23 9:10,11
11:8 21:20 131:9
**starts** 72:19 137:5
**state** 1:17 3:22 5:7
97:19 139:21 140:1
141:8
**stated** 118:12 142:11
**statement** 3:4 23:5,9,12
23:18 37:7 39:8,16
46:4,8 49:22 52:3
56:1 68:19 69:20
75:10 86:21 117:13
**statements** 42:4 48:10
89:1 100:3,5,22
101:23
**STATES** 1:2 140:14
**Statute** 4:6,12
**stay** 7:23 8:17 12:2
14:1
**step** 56:22
**STEWART** 2:9 143:4
**still** 10:18 19:11 39:11
70:17 123:1 127:17
128:5,14 129:12
130:7,10
**stipulate** 95:23
**stipulated** 3:16 4:7,14
97:22
**stipulation** 1:15
**stipulations** 3:15 4:22
**stock** 66:18
**stopped** 95:19
**stopping** 96:4
**store** 20:16 33:11 45:5
45:11,16 46:14,17,21
55:2,21 58:18,22
59:2 66:21,22 130:10
137:7
**stores** 45:15 58:23 70:9
124:5 130:9
**straight** 7:3 28:16
53:20 93:9 124:12
**Street** 1:18 12:7,8,10
12:22 13:3 14:8,20
**strike** 34:18
**student** 7:13
**stuff** 52:11 53:7
**subject** 56:5 62:5
138:10 139:9,10
**SUBSCRIBED** 142:17
**subtracting** 25:15
**sued** 18:8,10
**Suite** 2:10 143:4
**summary** 3:5 34:10
41:9 51:9,16 75:17
93:16 135:22
**summer** 6:17,21
**Sunbeam** 20:6
**supervisor** 7:11

Deposition of Jerry Woodham

July 16, 2007

supply 121:16
supposed 42:19 43:4
  99:10,18 108:13,13
  108:16 111:15
  120:18
sure 5:20,21 16:7 20:22
  32:7 33:6 72:5 83:14
  86:13 96:19 104:16
  121:1
sworn 5:2 140:5 142:17

---

**T**

Tags 71:4
take 13:20 20:5 21:7,8
  21:8 26:4 31:18
  35:11 50:20 55:5,8
  56:11,21 58:2 60:13
  60:18 61:7 72:6 75:2
  75:12 81:6 83:1,2
  102:11,13 111:16
  115:14,15 119:10,11
  119:12,16,21,23
  128:1 138:7
taken 1:4 3:18,20
  61:13 75:14 102:15
  134:6 143:9
takes 45:11 57:5 74:1
taking 44:3 79:11 98:5
  110:3 122:18
talking 23:2 24:14 35:2
  54:4 58:12 86:16
  131:16,18
taught 22:2
tax 48:17 71:4
taxable 50:1,14
tell 14:23 15:2 20:3
  35:9 50:17 54:6
  60:12,20 66:7 69:4
  69:23 80:14,21 81:5
  89:14 93:17 94:1
  101:20 103:21 105:9
  108:3 109:19 110:21
  120:15 122:10
telling 83:3
ten 20:1 21:13 28:17
  35:22,23,23 36:2
  60:17,18 61:7 74:14
  75:2 79:23 80:1,2,7
  80:19,22 81:7 82:2,8
  84:2
ten-percent 80:11
ten-week 35:21 36:23
Teresa 17:14
term 57:16,19 62:7
terminate 15:9
terminated 14:7,19,21
  15:5 73:18 95:3
termination 98:6
terminology 63:3
  110:16

---

terms 58:13
territory 24:10 25:2,3
  25:20,22 26:2,6 28:3
  28:13 29:22 31:4,8
  32:2,9,19 33:2 34:21
  35:3,6,11 36:16,17
  38:7 39:3 40:1,6,7,8
  47:7,8 70:22 71:1
  74:2 98:3 130:20,21
  131:5
testified 5:4 18:5 59:21
  80:11 98:1 101:19
  118:1,10 123:5 126:2
  126:9 131:4
testify 121:19 136:9
  137:17
testifying 109:11
testimony 124:16 125:3
  125:5 126:2 138:22
  142:10
Thank 143:17
their 16:18 17:15 20:12
  20:16 27:16 33:10
  44:17 46:14 48:10
  49:3,20,22 50:1
  55:23 66:5,5 127:17
themselves 79:4 96:8
  131:1
therefor 142:12
thereof 141:3
thing 11:18 13:5 60:16
  65:6 88:19 112:10
  116:16 127:21
things 15:21 34:23 49:7
  54:4 85:10 128:13
think 8:19 39:19 51:17
  64:4 70:20 72:15
  73:17 100:12 129:7
  130:13 131:3 135:16
  139:7
thirty 143:14
though 87:4 131:16
thought 58:12 66:18
  67:11,12 104:23
  133:9,11 135:23
three 8:1 41:6 128:12
  129:7,7,20 130:2,15
three-page 24:9
through 29:8 32:13
  40:20 51:5 52:7
  60:14,17 65:16 81:21
  86:21,23 89:7 103:20
  109:15 119:22
  123:12,15 125:12,20
  131:12
throughout 47:9,14,21
  111:22
throw 55:6
tickets 103:6 115:11
  124:7

---

Tiger 1:18
till 10:7
time 4:2,3 6:19 10:22
  31:19 47:4 56:22
  65:22 72:18 73:17
  95:2,7 105:15 125:17
  126:20,22 134:21
  142:11
times 20:1 28:18 36:1,2
  81:7 82:2,3,8,11,17
  84:2 93:13
tips 91:19 92:2,4
today 22:22 31:2 55:9
  70:17 119:7 121:22
  121:23 134:11 135:3
  135:18,22
together 112:4
told 14:16 76:16 89:8
  89:10 108:12 118:1
  120:23
top 23:19 25:6 34:1
  41:12 52:8,12 73:11
  76:12 100:14 108:11
  113:21 122:2 132:1
total 26:13 42:3,4,5
  46:23 47:2 48:13,16
  49:9 52:19 53:12
  54:6,7,14,19 64:3,5
  64:12,17 67:19,20
  77:17 79:12 80:18,19
  80:23 81:2,6,13 82:2
  82:5 83:7,11 100:20
  100:21 101:22
  102:21 105:11 106:4
  107:15 108:16,18,23
  111:23 115:14
  118:20 119:1 123:9
  125:19 126:19 133:1
towards 128:11
Town 1:18
tractor-trailers 13:19
Tracye 1:15 3:20
  139:23 141:7 143:20
trained 22:11
trainee 9:17 10:4,6
  11:19
training 10:5,9
transaction 44:8
transcript 140:20
  142:8,10 143:8,9,12
  143:14
transfer 27:4 38:4
  44:14,17
transfers 44:11,13
  122:21
trial 4:10
truck 26:17,18,21,23
  47:12,16 71:1,2,5
  76:3,8,11,18,22 78:4
  87:6,8,12,16 88:1,4,8

---

88:11,13,16,21 89:4
  89:6,15 123:12,17
  127:17 130:8 131:14
trucks 76:14 87:15,18
  134:1,1
true 70:17 127:20
  140:20 142:9
truth 5:3,3,4 140:5,6,6
try 104:7
trying 25:11 28:15
  30:19 31:12 84:17,18
  96:23 109:15 114:11
  120:1,8 121:7,11
Tucker 12:9,10,15 13:4
  13:22 14:8
turned 76:23 128:18
turns 49:19
twice 46:23
two 5:12 10:23 12:18
  12:20 13:8 14:2,3
  18:18 28:10 48:17
  54:4 57:8 103:17
  106:6 107:18 110:10
  110:23 111:6 112:4
  114:12,19,22 115:15
  116:19 128:12
  133:23 134:1
type 13:2 17:8 30:17
  31:10 38:16 41:15,15
  42:20 43:5 44:8 93:8
typical 44:16
typically 22:8 30:18
  40:1,4

---

**U**

UAB 6:2,8 7:3,12,18
Uh-huh 10:13 13:14
  21:11 25:4,8 26:7
  28:2 37:8,12 68:15
  82:4 106:18 110:2
  114:5,15 115:7
  116:23
ultimately 126:18
undelivered 123:3,8
under 5:15 73:13 139:6
understand 32:11 61:6
  69:3 105:19 114:8
  132:12
understanding 70:5
  72:22 99:16,18
UNITED 1:2 140:14
units 42:20,22 43:4
University 5:23
until 95:19
use 44:6,10 49:21 55:4
  55:5 79:21 107:8
  121:4
used 4:4,11 83:7
  133:23
using 105:5 121:8

---

usual 4:21 85:10
usually 20:16

---

**V**

vague 53:10 56:19 64:8
  69:2 96:19 97:9
  101:17 116:1 127:19
  129:16,18 133:17
valuation 21:16
value 18:17 19:23 24:3
  30:19,21 31:1,11,15
  32:16 34:6,21 35:3,7
  35:12
variance 57:21 66:4,5
  67:2,17 120:7 127:5
various 7:16,17
versus 133:20
very 44:6 100:14
  102:20 108:4
Villa 11:4,12,13,16,21
  11:23 12:3,6
vis-a-vis 114:20
vs 1:8 140:10 142:5
  143:6

---

**W**

wages 91:17,19 92:2,4
wait 41:18
waived 4:10,17 140:23
waiving 4:13
walk 103:20 109:15
Wal-Mart 20:12 30:7
  30:11 31:22 32:18
  33:4,5 34:8 53:2,7,15
  54:1,16 55:10,12,15
  55:18 56:6,8,13,13
  57:4,6,7,9,23,23 58:7
  58:22,23 59:4 64:16
  67:22 70:9,14 124:13
Wal-Marts 33:8
Wanda 17:12
want 24:3 29:5 31:14
  31:16 32:1 35:10
  36:14 60:2,16,20
  72:16 107:12 119:7
  119:21
wanted 8:6,11 14:12
  77:15
wants 55:5,6
warehouse 13:20 42:18
  48:3 52:10 57:1 65:2
  71:9 89:13 123:11,17
  123:18,20,21 126:13
warehouses 8:22
wasn't 69:20 71:21
  80:16 92:1 124:16
way 22:17 25:14 26:19
  43:9 51:14 63:23
  72:18 82:21 106:17
  110:3 117:17

Deposition of Jerry Woodham                                     July 16, 2007

Page 10

| | | | | |
|---|---|---|---|---|
| week 27:11 29:13 36:22 38:21,23 39:17 41:17 48:19,20 52:5 52:15 57:7,8 66:9 69:11 71:6,7,9 72:2,9 72:12,20 73:19 74:19 74:23 80:23 81:2,7,9 81:21 82:1 83:2,8 93:11,20,20 94:17 95:12,15,18,22 96:11 97:15 102:5 103:2,6 106:15 107:10 108:1 108:6,8 111:16,19,22 114:1 115:3,4,19 116:6 117:2,20 118:4 119:5,6 120:4,5,10 122:11 125:12 126:7 126:20,21,21 127:22 128:11 130:7 131:13 132:17 133:2,3,5,5 133:19 134:2 137:6 | 130:9 131:7,12 132:11,23 133:5 138:15 139:2<br>Wendy's 21:2<br>went 6:16 7:12 11:3,12 12:6 38:2 51:10 53:14,18 64:3 72:16 72:17 93:9 101:14 103:22 107:2 120:17<br>were 7:12,13 9:4,15,18 10:6,23 12:20 14:19 14:22 19:6,18 21:20 22:2,14 23:17,21 29:2 40:19 58:12 61:14 62:23,23 65:22 65:23 66:1 89:8 91:19 108:7 109:10 124:18 133:9,11,12 137:22<br>weren't 19:5<br>Westpoint 7:7,9<br>we'll 60:13,18 61:7 | 122:23 123:11 124:1 126:12 127:13,16 128:15 129:12<br>wouldn't 13:16 33:14 34:12,13,14 61:2<br>write 101:11 119:18 126:18,18<br>written 93:6<br>wrong 26:1 121:10 138:23<br>W-2 3:6,7,8,9,10,11 50:5,10 90:3,11,18 91:2,8<br><br>―――――― Y ――――――<br>yeah 8:23 11:20 20:19 20:21 23:22 30:1 33:19,23 41:11 54:3 55:7 57:13 58:10 66:14 72:18 86:18 87:9 97:11 102:12 113:6 133:9,12 137:23 | $1,642 27:1<br>$1,806.98 65:20<br>$1,810.54 101:6,8,12<br>$10 71:6<br>$10,000 56:11,12,22 57:3,5,6,10,22 58:1<br>$10,709.85 106:5<br>$10,723.19 103:20 107:3,8<br>$11,180 47:8<br>$11,506.17 107:16 108:5 109:2 110:1 111:4 112:16 116:11<br>$11,523 120:14<br>$11,523.75 116:18<br>$112.64 66:12 67:7,15 67:17 68:5<br>$119 27:12<br>$13,255 26:9<br>$13,931.78 37:11 39:9<br>$15,850.66 49:16<br>$1538.88 111:7 | $5,823.90 53:12<br>$5,823.93 52:20<br>$512 74:15<br>$52,856.46 46:11<br>$52,941.67 50:16 51:4<br>$520 48:6<br>$600,245.39 77:21<br>$62,025 47:4<br>$63,430 36:23 39:22<br>$667.38 89:5,7<br>$688.66 112:2<br>$7,175 26:6 28:4<br>$7,478 80:2<br>$74,000 80:8 91:22<br>$74,499.75 91:21 92:9<br>$74,775 80:1<br>$74,775.75 79:18 83:17<br>$74,778 83:11<br>$740 113:19<br>$740.82 112:20<br>$8,972.81 103:12 106:10 107:22 |
| weekly 20:1 21:10,12 28:18 34:10 36:3,3 37:6,19,21 39:9 42:4 49:12,15 52:3 54:20 56:9 63:9 68:8,19 75:2 77:17 80:3 84:20,21 88:4,21 89:1 93:23 94:13 95:7 100:21 101:22 103:11 106:13 107:5 110:4 114:13 115:10 115:16,20 116:4,4,7 116:21 117:1,3,21 118:2,13 131:8 135:21 | we're 30:19 32:10,12 41:3 46:4 54:4 56:5 120:15<br>we've 26:22 41:22 48:13 49:9,14,15 68:8 107:1 119:11 130:14 134:11<br>whatsoever 61:23<br>while 56:5 102:8<br>whole 5:3 8:22 9:1 41:19 44:7 60:16 83:20 140:6<br>wife 5:12 8:9<br>wife's 5:16 | year 7:5 12:4 41:12,20 42:3 44:7 47:9,14,21 50:21 75:11,19,21 76:18 77:19 80:18,19 83:4,15 85:5,22 87:7 91:10 100:23 104:11 105:3,11<br>yearly 75:17 80:4,5 84:10 93:22<br>years 8:1,18 9:5 14:3<br>year's 83:20 | $16,874.14 94:15,22<br>$18,048 133:6<br>$19 44:6<br>$2,000 87:13<br>$2,125 26:11<br>$2,759.79 48:20<br>$20 71:11,13 72:2,15<br>$211.47 85:2<br>$24,000 87:7<br>$24,680 26:15<br>$24,698.84 76:5,17,22 | $84.27 82:9,16<br>$9,000 125:19<br>$9,168 45:21 46:3<br>$9,226.47 107:21 108:10 110:13,21 114:14 115:17 116:8 116:12<br>$9,227 126:12 133:5<br>$9,227.70 123:10,10 124:1<br>$9,490 120:10<br>$9,490.92 116:21 |
| weeks 35:22,23 36:6 39:20 57:8 63:17,18<br>week's 39:18 81:13 113:19 120:6<br>week-to-week 121:18 137:4 | Winn-Dixie 20:18 53:2 124:13<br>withheld 71:10<br>witness 4:15,16 5:2 26:16 59:21 114:10 123:5 124:3 136:5 138:7 140:21 142:2 | y'all 33:7 76:13,14 85:21 105:22 135:23<br><br>―――――― Z ――――――<br>zero 29:10 52:17,18 65:13 68:14,16 71:18 71:22 88:6,7 101:2 | $27,943.97 48:14<br>$271.93 95:16<br>$289,587.95 45:13<br>$3,323.71 132:6<br>$30,000 26:5<br>$318.07 112:5<br>$326,631.02 42:7<br>$329.68 85:21 | ―――――― 0 ――――――<br>01 9:12 10:7 11:8<br>02 10:8,16 11:9,10<br>03 12:5<br>05 14:4<br>06 14:5,6 15:16 72:19 132:9 |
| well 8:6 12:7 14:16,21 16:5 20:5,16 22:9 23:23 27:22 28:5 30:19 31:4,16 33:12 33:19 34:7,12 35:8 36:2 38:12 43:18 45:4 50:20 53:4,16 58:2,5,22 60:9 64:10 64:11 66:9 68:10 69:20 70:1 71:15,18 75:8 79:6 80:2,14 84:5 88:23 92:1,21 97:17,19 98:21 105:14 108:15 109:7 109:20 111:9,18 112:21 118:5 120:15 120:18 121:3 125:5 127:20,21 128:2 | wondering 33:7 128:10<br>Woodham 1:14 3:18 5:1,8,9 134:16 137:12 138:6 140:4 142:7,16 143:3,7<br>work 5:18 6:15,18 7:3 7:6,15 9:14 17:9,22 19:11 48:17 52:7<br>worked 6:20 7:5,7 22:18 62:20 63:22 84:14<br>working 7:12 19:5,8 62:23 69:21<br>works 5:21 19:13 134:14 136:7,20<br>worth 56:12,23 57:3,5 57:6,22 70:8 101:14 | ―――――― $ ――――――<br>$1,008.77 103:8<br>$1,026,000 101:14<br>$1,026,415.34 100:17 101:20<br>$1,066.69 112:3<br>$1,085 113:7<br>$1,085.60 111:11 114:4<br>$1,090 116:20 120:17<br>$1,101.05 107:13 112:13<br>$1,215.67 73:3<br>$1,264 122:23 128:11 129:12 132:19<br>$1,264.18 122:7,14 127:6,13,16 128:3,15<br>$1,538.88 114:6<br>$1,620 85:7 | $3300 132:22<br>$333.68 88:12,15,18<br>$333.69 88:9<br>$334.80 73:15<br>$34,027.75 49:10,13<br>$364.48 43:10<br>$37,000 80:16<br>$37,490 78:13 80:14<br>$37,490.55 78:7,16 79:1,11 80:7 81:12 83:5 84:22<br>$4,983.68 47:12<br>$40 72:17,20,21<br>$416 74:16<br>$43,427.29 45:10<br>$45,110 25:11<br>$495.69 95:9,13<br>$5,052.04 125:22 126:15,19 | ―――――― 1 ――――――<br>1 3:3 29:3,7 31:8,22 32:3,22 33:1 34:3 51:5 60:10<br>1st 50:23<br>1-1 105:12 106:13<br>1-1-2005 65:17<br>1-1-2006 83:16 116:6<br>1-15-2006 125:12<br>1-21-2006 125:13<br>1-7-2006 116:7<br>1:00 1:20<br>10,709.85 102:22<br>10,723.19 103:22 111:20<br>1000 2:10 143:4<br>1027 29:15 |

Deposition of Jerry Woodham

July 16, 2007

**105** 43:13
**11,506** 110:22
**11,506.17** 109:12
  115:15
**12-24-2006** 94:18
  95:20
**12-25-2005** 102:18
  103:7
**12-26-2004** 65:16
**12-29-2001** 50:23
**12-30-2006** 83:16
  94:18 96:3
**12-31** 105:12 106:13
  112:20
**12-31-05** 115:5
**12-31-2000** 50:22
**12-31-2005** 102:18
  103:7
**12-31-2006** 75:22
**123.17** 70:4
**139** 140:19
**14,350** 25:15,20
**1538** 111:14
**1538.88** 108:8 110:11
**16** 1:19 140:18 142:9
  143:9
**16,874** 95:20
**1819** 2:11 143:5
**19** 5:14,15 104:10
**1982** 6:11
**1987** 6:4
**1989** 6:9

— **2** —
**2** 3:4 36:11,15
**2-25-07** 89:7
**2:05-CV-937-MEF** 1:8
  140:17
**2000** 3:6 50:11
**2001** 3:6 41:13 50:4,11
  50:11 51:10,14
**2002** 3:7 41:13
**2003** 3:8 41:13 90:11
**2004** 3:9 41:13 51:14
  90:19
**2005** 3:10 19:5,9,17
  29:13 54:15 65:23
  91:3 97:5 103:14
**2006** 3:11 29:13 75:19
  79:8 83:5,16 85:2
  91:10,12,13,20,23
  93:14,16,23 94:20
  100:23 101:12,15
**2007** 1:19 30:2,3,3
  31:20 32:3 34:3
  140:18 141:4 142:9
  142:18 143:1,9
**205** 1:18
**2069** 3:3 25:5 33:16,22
  34:6 35:16 36:17

37:3 40:8 77:12,13
  96:15,17 97:3,6
  98:13 102:17 116:5
**21st** 1:18
**23** 24:4
**23,126.92** 27:18
**24th** 141:4
**24,000** 24:4
**24,680** 28:20
**25** 68:3,4 70:12,13,14
  143:1
**27** 37:7 39:19
**29** 3:3 133:7,8,9

— **3** —
**3** 3:5 24:7 30:3 40:15
  40:18 133:11
**3-11-02** 3:4
**3-20-2005** 73:10 95:5
**3-26-2005** 73:10 95:5
**3-29-04** 26:2
**3-3-07** 89:7
**30** 133:5,10,11
**30,000** 25:14
**31st** 51:1,5
**318** 107:11 113:16
**329.68** 77:1 85:15
**331** 74:15
**333.68** 88:20
**334.80** 73:23
**34,000** 41:23
**34,676** 42:1
**35203** 2:11 143:5
**36** 3:4
**36117** 2:6
**3709** 5:10

— **4** —
**4** 3:6 50:7,8,10
**4:30** 139:16
**40** 72:21
**41** 3:5
**421.35** 82:18
**421.40** 81:19 82:14
  83:2
**45,000** 25:18

— **5** —
**5** 2:20 3:7 89:19,22,23
**50** 3:6
**52** 36:6
**52,856.46** 49:14
**5348** 33:4

— **6** —
**6** 3:8 90:7,10
**63,430** 38:5,10,11 39:1
  40:13
**64** 41:8 51:7
**65** 41:8

**66** 41:8
**66.12** 48:21
**688.62** 113:12,15
**6987** 2:5

— **7** —
**7** 3:9 90:14,17
**7-2** 81:21
**7-8-06** 81:21
**728.27** 103:3
**74,000** 92:3
**740** 111:14
**740.82** 108:8 110:10
  111:7

— **8** —
**8** 3:10 90:21 91:1
**8,972.81** 103:22
**82** 6:23
**84.27** 82:17
**842.75** 82:7,8
**859** 30:6
**863** 41:8,19,19,22
  50:19
**864** 51:7
**865** 51:8
**866** 51:8
**867** 41:14,17 52:2 64:3
  67:6 68:18 69:8
  70:19 73:2
**87** 7:2
**870** 69:16 70:4
**877** 73:21
**878** 73:9,13 95:2
**879** 74:15
**880** 74:15
**881** 74:16
**89** 11:6

— **9** —
**9** 3:11 91:5,8
**90** 3:7,8,9
**91** 3:10,11
**918** 102:16,17 104:8
  105:14,15
**919** 104:9,18,22 105:9
  105:10,10
**92** 9:8,11
**920** 103:17 107:1 109:7
  109:13 115:2 116:10
  119:11
**921** 108:3 116:10,15
  120:11,16
**922** 122:4 132:19
**942.83** 116:20 120:16
**946** 81:16
**949** 132:4,22
**95** 42:21 43:5
**971** 94:11
**972** 75:5,7,9,16 78:6

81:11 83:10,14
  100:13
**981** 89:2,3,4
**982** 87:22
**983** 88:10
**984** 88:13
**985** 88:16
**986** 88:19