# DEPOSITION OF MICHAEL LORD

## May 8, 2007

## Pages 1 through 88

### PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Plaintiff's Exhibit 10

# DEPOSITION OF MICHAEL LORD

# VOLUME II

July 17, 2007

Pages 89 through 138

## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Page 29

1  talked about it then because we decided to
2  bar him from the premises any -- from
3  Flowers' property. And then we talked about
4  it the day that we did his termination
5  letter also.
6  Q. Tell me, on March 16th were you in
7  Montgomery or were you in Opelika?
8  A. I was in Opelika.
9  Q. How did you learn about the March 16th
10  event?
11  A. Grady sent an e-mail to Steve and myself --
12  Steve Bordeaux and myself.
13  Q. That was the e-mail that we discussed or
14  looked at yesterday. I think it was marked
15  as an exhibit. It's marked as Plaintiff's
16  Exhibit 2 to Grady Messer's deposition?
17  A. That's it.
18  Q. And --
19  A. And he also called me and told me what
20  happened too.
21  Q. This says it was sent by Grady Messer, I
22  guess, 3-16 at 2:43 p.m. Is that --
23  A. Yes, sir.

Page 30

1  Q. I assume you received it sometime after
2  2:43 p.m.?
3  A. Yes, sir.
4  Q. Do you remember when you received it?
5  A. No, sir, I don't.
6  Q. Once you received it, what did you do?
7  A. I read it and talked with Steve about it.
8  And Steve had read it, also, because it was
9  sent to him as well.
10  Q. And is that when you made the decision to
11  bar him from the property?
12  A. Yes, sir.
13  Q. From company property?
14  A. Yes, sir.
15  Q. And what did you do to bar him from company
16  property?
17  A. We issued him a letter stating that he was
18  not allowed to come on company property.
19  And I can't -- we also talked to Henry. I
20  don't remember if it was myself or Grady
21  that talked to Henry. And he said that he
22  wanted it in writing, so we put it in
23  writing.

Page 31

1  Q. Then on March 23rd you spoke again with
2  Mr. Bordeaux; is that right?
3  A. That's correct.
4  Q. And that's when you terminated the
5  contract?
6  A. That is correct.
7  Q. Tell me about any conversations you and
8  Mr. Bordeaux had concerning terminating his
9  contract.
10  A. His ten days were up and it was -- we had
11  to -- he couldn't cure the breach, so we
12  had to terminate his contract.
13  Q. Anything you remember Mr. Bordeaux saying
14  about it or is that basically the whole
15  conversation?
16  A. That it was time to terminate his contract.
17  Q. And you were terminating it because he
18  didn't cure the breach with Sodexho
19  Marriott at Troy State?
20  A. Exactly.
21  Q. Did you have -- I'm sorry. You did have a
22  conversation with Henry, I guess, on the
23  23rd when you met with him and his brother;

Page 32

1  right?
2  A. It was more of a conversation with his
3  brother than Henry, but we did.
4  Q. Was that Robert?
5  A. I don't remember his name. I just remember
6  him introducing me as his brother.
7  Q. Tell me what you remember about that
8  conversation.
9  A. That's been two years ago. I know it was
10  about a ten-minute meeting. It wasn't very
11  long.
12  Q. Were y'all eating lunch?
13  A. No, sir.
14  Q. Was it just in the parking lot at Tenda
15  Chick?
16  A. No, sir. We -- myself and Grady got there
17  first and we just -- we waited for Henry to
18  get there. We didn't know who he would be
19  with. I was sure he would have someone
20  with him. And I gave him the letter. I
21  went over it with him. And his brother
22  made a few comments. And I basically just
23  told him that I would discuss it with Henry

Deposition of Michael Lord                                                                                           July 17, 2007

---

**Page 89**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

HENRY PORTERFIELD,
    Plaintiff,
vs.    CIVIL ACTION NO.
    2:05-CV-937-MEF
FLOWERS BAKING COMPANY OF
OPELIKA, LLC,
    Defendant.

\* \* \* \* \* \* \* \* \* \* \* \*

VOLUME II

\* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF MICHAEL LORD, taken pursuant to stipulation and agreement before Tracye Sadler, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, at the Tiger Town Inn, 205 21st Street, Opelika, Alabama, on July 17, 2007, commencing at approximately 9:10 a.m.

---

**Page 90**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
Mr. Greg L. Davis
LAW OFFICES OF GREG L. DAVIS
Attorneys at Law
6987 Halcyon Park Drive
Montgomery, Alabama 36117

ON BEHALF OF THE DEFENDANT:
Mr. Kevin P. Hishta
Ms. Sandra B. Reiss
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
Attorneys at Law
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203

ALSO PRESENT:
Mr. Henry Porterfield
Mr. Brad Alexander

\* \* \* \* \* \* \* \* \* \*

EXAMINATION INDEX

BY MR. DAVIS ............ 5
BY MR. HISHTA ........... 45

(No exhibits marked to this deposition.)

---

**Page 91**

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of MICHAEL LORD is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Tracye Sadler, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the Statute.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.

It is further stipulated and agreed by and

---

**Page 92**

between the parties hereto and the witness that the signature of the witness to this deposition is hereby not waived.

\* \* \* \* \* \* \* \* \* \* \*

THE COURT REPORTER: Usual stipulations?
MR. HISHTA: Yes. And he'll read.
MR. DAVIS: That's fine.

MICHAEL LORD
The witness, after having first been duly sworn to speak the truth, the whole truth, and nothing but the truth, testified as follows:
EXAMINATION
BY MR. DAVIS:
Q. Mr. Lord, I'm not going to get into any particulars from last time, but I just want to go over some stuff that we covered yesterday in the deposition. And your counsel has informed me yesterday that you were the person most knowledgeable about

Deposition of Michael Lord                                                                        July 17, 2007

## Page 93

1  pay by scan inventory.
2      I'm just going to pick up -- we're
3  looking at Plaintiff's Exhibit Number 3.
4  I'm just going to pull out a page here.
5  I've got FBO000908.
6  A. Okay.
7      MR. HISHTA: Do you have a copy
8      or --
9      MR. DAVIS: That's fine. I don't
10     need one. I'll look at it
11     upside down.
12 Q. Yesterday we were having difficulty, I
13  guess, deciphering these weekly summary
14  pages.
15 A. Okay.
16 Q. If you would, explain for us the pay by
17  scan figures that are on this particular
18  document 908 --
19 A. All right.
20 Q. -- and as it relates to -- let's take the
21  next one, 909.
22 A. Okay. I'm trying to think where to start
23  here. What exactly -- what figure on here

## Page 94

1  do you not ...
2  Q. All right.
3  A. Because I couldn't see exactly what y'all
4     were looking at.
5  Q. Let's do this. Let me just start at the
6     top of the page.
7  A. Okay.
8  Q. This is what I did yesterday.
9  A. Okay. That will be good. That will be
10    good.
11 Q. At the top of the page you've got the
12    figures here, $8,344.82.
13 A. Okay.
14 Q. And that figure is for what?
15 A. That is the balance forward from his
16    previous week.
17 Q. Okay. As we work down the page -- actually
18    there's two columns as we work down the
19    page.
20 A. Okay.
21 Q. You've got -- what's this, accountability?
22 A. Right.
23 Q. I'm reading upside down.

## Page 95

1  A. Accountability.
2  Q. You've got various figures, pluses and
3     minuses, in the accountability which brings
4     you down to the bottom here of 151.85 for
5     the accountability column.
6  A. Correct.
7  Q. And that's a negative figure.
8  A. No.
9  Q. I mean, it's a --
10 A. Right there --
11 Q. It's not a -- from an accounting standpoint
12    it's a negative figure. It's an amount
13    that's owed; right?
14 A. Right now on this particular -- the new
15    distributor balance here is $151.85.
16    That's what --
17 Q. That's what he owes --
18 A. -- Mr. Porterfield would owe us right now.
19 Q. Okay. That's under the accountability?
20 A. Correct.
21 Q. The next column over is discount --
22 A. Earnings.
23 Q. -- earnings. As you work down that figure,

## Page 96

1  you've got 785.16. And that's what Flowers
2  would owe Mr. Porterfield?
3  A. That is the discount he made on the
4     product --
5  Q. On the product.
6  A. -- from that week.
7  Q. From that week.
8  A. Based on what he was charged for his
9     product and less any load shortage, less
10    any transfers -- or additional transfers,
11    if he had transferred more than he
12    transferred out, and less his sales.
13    That's what his discount was.
14 Q. What his discount was?
15 A. Right.
16 Q. And then you go across that item line
17    there, which is new distributor --
18 A. New distributor balance.
19 Q. -- balance. You take the -- add these two
20    figures together and that comes up with a
21    633.31.
22 A. Right there that shows that we owe him
23    $633.31.

2 (Pages 93 to 96)

Page 97

1  Q. Right. Then beneath that you've got your
2     expenses, business expenses, that are
3     charged to that particular account, that
4     particular account being 2069.
5  A. 69.
6  Q. They're pretty self-explanatory, and we
7     went over those yesterday. There's no
8     problem with that?
9  A. Right.
10 Q. Those business expenses total -- what's
11    that?
12 A. 957.30.
13 Q. Now, when you take the figures on the right
14    side of the page starting with 8,344.82,
15    you bring all these down and it comes out
16    to what figure here?
17 A. $8,668.81. That is what -- oh, go ahead.
18 Q. Tell me what that figure is.
19 A. Okay. This figure right here is what
20    Mr. Porterfield owes us right now without
21    any advance on his pay by scan inventory
22    and pay by scan invoices that he charged in
23    the current week. That right there is what

Page 98

1     he would owe us.
2  Q. That's the figure he would owe you?
3  A. Correct.
4  Q. But during that week there were pay by
5     scan -- what's the next line down?
6  A. This is pay by scan credits. It tells what
7     his inventory is.
8  Q. Let's take pay by scan credits.
9  A. Okay. Well, actually it's describing what
10    the next two are.
11 Q. All right.
12 A. Prior week pay by scan inventory is the
13    next line there.
14 Q. And what is that?
15 A. This is the inventory that was counted on
16    the Saturday before this statement. It
17    tells you which date it was. It was 10-15
18    of 2005. That is the inventory that was
19    counted by -- I'm going to -- I know
20    Mr. Porterfield wasn't running the route
21    then. But it was counted by the person
22    that was pulling the route that day. That
23    is the inventory that they went through

Page 99

1     item by item and counted what was on the
2     shelf and what was in the back room.
3  Q. That is inventory that he has not been paid
4     for yet?
5  A. That is correct. That is correct. That's
6     why we're giving him a temporary credit for
7     it right here, so he doesn't have to blunt
8     the full -- what's the word I'm looking --
9     so he doesn't have to pay for all of it.
10    We're giving him a temporary credit based
11    on what he said was in that store the
12    previous week.
13    Even though it has not gone through the
14    register yet, we're giving him a temporary
15    credit for that. That's not his money yet.
16    It's just a temporary credit to try to make
17    him whole. Because most distributors can't
18    go in -- because pay by scan works a week
19    behind on the point of sale data and your
20    inventory. It's all a week behind. So if
21    we didn't give him credit for this right
22    here, he would owe us this $8,000 up here.
23    So it is just a temporary credit.

Page 100

1  Q. And the next line down is what?
2  A. That is the -- it says less current week
3     pay by scan delivery tickets. And it gives
4     the actual dates that the tickets were made
5     from, from October 16th, '05, through
6     October 22nd of '05. That is what the
7     tickets that he generated through his
8     hand-held for that particular week, which
9     is the current week that he was in -- that
10    is where he received credit for that
11    product.
12    Now, that product has not gone through
13    the -- he has not received pay by scan
14    credit for it yet here. Okay. He won't
15    receive credit for anything here until the
16    following week because it works a week
17    behind.
18    So, again, this is just a temporary
19    advance to try to make the distributor
20    whole to keep him from having to pay for
21    all the inventory that was in his store
22    that week that he put in. Because he
23    didn't -- he's not going to receive any pay

Deposition of Michael Lord

July 17, 2007

Page 101

1  by scan credit for it until the following
2  week. And the same thing with his
3  inventory that he had on Saturday. He's
4  not going to receive credit for that until
5  the following week. So we give him a
6  temporary credit right there to try to make
7  him whole for that week so he doesn't have
8  to blunt the full -- full inventory.
9  Because most distributors can't go out
10 there and carry all that themselves. So we
11 look at it like we're going to do this to
12 help you out so you don't have to carry the
13 whole inventory.
14 Q. All right. Now, flipping over to the next
15    page.
16 A. Yes, sir.
17 Q. So instead of carrying the $6,355 forward,
18    you carry the $8,668.81 forward?
19 A. Right. That is money that -- this is
20    really not his. This is a temporary
21    credit. It's a temporary credit. It's not
22    money -- he's going to actually receive
23    this in the following week. Okay. And let

Page 102

1     me --
2  Q. Let's just take this though. We're
3     supposed to carry this 866.81 --
4  A. 81.
5  Q. 81 -- I'm sorry -- $8,668.81 forward to the
6     next one.
7  A. Correct.
8  Q. But if we look to the next one, which is
9     909 --
10 A. Right.
11 Q. -- it's $8,723.23.
12 A. Right.
13 Q. And why is that figure more than the
14    distributor balance?
15 A. That's -- I really could not say at this
16    time. I really couldn't.
17 Q. And this is just one I picked at random out
18    of here. I didn't have this --
19 A. Can I use this?
20 Q. Sure. I'm just trying to figure it out.
21 A. Okay. There are several reasons why that
22    could be -- well, let me back up a minute.
23    There's only one reason that I can

Page 103

1  think of right now why it would be. If a
2  distributor puts unauthorized product into
3  a pay by scan account -- and the easiest
4  way I know to say it is -- let's -- we have
5  a lot of restaurant products that we sell
6  that are bulk package; okay?
7     If a distributor were to sell
8  Winn-Dixie in this case -- because this is
9  Winn-Dixie right now. If they were to sell
10 them product that was not authorized to
11 sell in Winn-Dixie, for instance, bulk
12 buns, that line number is not set up to
13 flow through the system, and it would kick
14 it out. And they wouldn't receive credit
15 for it. It would automatically flip
16 through there. So his balance forward
17 would change by whatever the amount of that
18 product was.
19    If it was -- where are we at here?
20 We're going from 42 to 43. So in this case
21 it is -- it's $54.42 difference right
22 there. I don't know this without really
23 digging into it deeper, but it could be

Page 104

1  that there was $54.42 worth of unauthorized
2  products that was charged into that store
3  that week.
4  Q. Well, sitting here today is there anything
5     in the documents that would tell you what
6     it is?
7  A. No. There's nothing in the documents.
8  Q. There's no line item that would tell us
9     anything?
10 A. There's no line item that I'm aware of that
11    would tell you.
12 Q. And this particular time was 10-16-2005 to
13    10-22-05 and 10-22-05 to 10-29-05?
14 A. Correct.
15 Q. And Flowers was running this route for
16    Mr. Porterfield at that time; correct?
17 A. That's correct.
18 Q. If we look at the inventory -- pay by scan
19    inventory line item here, the $571.11, that
20    means that this person that was working for
21    Flowers running this account went out to
22    the stores and determined that there was
23    $571.11 worth of inventory still in the

4 (Pages 101 to 104)