# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **HENRY G. PORTERFIELD** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:05-CV-937-MEF** |
| | ) | |
| **FLOWERS BAKING CO. OF** | ) | |
| **OPELIKA, L.L.C.,** | ) | **(WO)** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Henry Porterfield ("Porterfield") originally brought this action on August 23, 2005 against Defendant Flowers Baking Company of Opelika, L.L.C. ("Flowers"), in the Circuit Court of Montgomery County, Alabama. Porterfield seeks unspecified punitive and compensatory damages for claims associated with the termination of his exclusive Distribution Agreement with Flowers as an independent bread deliveryman. On October 3, 2005, Flowers filed a notice of removal of the case to this court based on diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332. (Doc. #1).

The claims brought by Porterfield which are pending before the court[1] include breach of

---

[1] In his Brief in Opposition to Def.'s Motion for Summary Judgment, Porterfield conceded his fraudulent representation claim (Count Two) as well as his claims for certain damages. Defendant argues that Porterfield has abandoned his negligence claim (Count Three) as well. (Reply (Doc. #50) at 10). Because Porterfield mentions "affirmative negligent conduct" in his opposition brief, (Br. in Opp. (Doc. #46) at 39), this Court will include the negligence claim in its summary judgment analysis, *infra* Part I.B. Porterfield also conceded that damages for mental anguish and emotional distress were unrecoverable under his breach of contract claim, although he retained the right to seek such damages for his tort claims of conversion and wantonness.

contract (Count One), negligence (Count Three), wantonness (Count Four) and conversion

(Count Five).  This cause is before this Court on Defendant's Motion for Summary Judgment

(Doc. #35) as well as Defendant's Motions to Strike the Affidavits (or portions thereof) of Henry

Porterfield (Doc. #52) and Charles Morrow (Doc. #53).  This Court has carefully considered all

submissions in support of and in opposition to the motions and the relevant case law. For the

reasons set forth below, the Court finds that Defendant's Motion for Summary Judgment is due to

be DENIED in part and GRANTED in part, and the Motions to Strike the Affidavits are due to

be DENIED in part and DENIED as moot in part.

## JURISDICTION

Subject matter jurisdiction over plaintiff's claims is proper under 28 U.S.C. § 1332

(diversity).  Porterfield is a citizen of Alabama, whereas Defendant LLC Flowers' sole

member—Flowers Foods Bakeries Group, LLC—is a Georgia citizen for diversity jurisdictional

purposes.  *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings, L.L.C.,* 374 F.3d 1020,

1022 (11th Cir. 2004).

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An

issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for

the nonmoving party.   An issue is 'material' if it might affect the outcome of the case under the

governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.

1996) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (*quoting Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir. 1995) (internal quotation marks and citations omitted)).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort*

*Lauderdale,* 333 F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### FACTS AND PROCEDURAL HISTORY

This Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:

Flowers Baking Company of Opelika ("Flowers") is a subsidiary of one of the leading producers and marketers of packaged bakery foods in the United States.  Plaintiff Henry Porterfield ("Porterfield") began working as an employee of Flowers in 1988, running a distribution route delivering bread in the Montgomery, Alabama area.  Around 1994 or 1995, Flowers fundamentally changed its distribution operations by selling each of its distribution routes as "exclusive territories" to independent contractors, as opposed to retaining the distributors as employees.  At this time, Porterfield entered into the first of three consecutive Distribution Agreements with Flowers and purchased an exclusive territory covering accounts in the Ann Street/Zelda Road area of Montgomery.[2]

In 2004, it was discovered that Publix Grocery Stores and Wal-Mart each would soon be

---

[2]The third Distribution Agreement ("Agreement" or "2003 Agreement"), purchased on March 11, 2002, is the only one at issue in this case, as the Plaintiff concedes that all claims under the first two Agreements were waived and released upon selling those rights back to Flowers.

opening stores within Porterfield's territory. Their future arrival promised to significantly increase Porterfield's income and, consequently, to allow him to discontinue his delivery of "private label" bread, which reaped a much lower commission and was often unprofitable.

On or about March 3, 2005, Porterfield was en route to his Troy State Sodexho Marriott account ("TSUM account") when his delivery truck broke down. Porterfield did not attempt to contact Flowers or fellow distributors. Because Porterfield failed to deliver the product to TSUM on time, the TSUM manager angrily terminated the relationship, and decided to buy from one of Flowers' competitors. Flowers consequently sent Porterfield a letter on March 7, 2005, informing him that his loss of the TSUM account constituted a "breach" under their Distributorship Agreement ("Agreement"), and that he had ten (10) days to "cure" his failure to perform under the contract. Although Porterfield disagreed that his truck breaking down was a "breach," he began working to recover the TSUM account.

On March 16, 2005, Porterfield approached the TSUM Manager, accompanied by a Montgomery County Commissioner and a Montgomery City Councilman, in an attempt to recover the account. After this visit and other conversations, Porterfield was able to convince the manager to allow him to partially recover the account, accepting some deliveries from Porterfield and some deliveries from a competitor.

That same day, Porterfield and the two public officials also visited Grady Messer, the Flowers sales manager for his area, and they all had a conversation about Porterfield's alleged breach of the TSUM account. After the officials departed, Messer and Porterfield continued the conversation alone. Based on this latter conversation, Porterfield was barred from the premises for having allegedly threatened Messer. Porterfield denies having threatened Messer on that day

or any other, but does state that he called Messer a racist.

Now unable to pick up his bread, Porterfield attempted to recruit his son, Marcus Porterfield ("Marcus"), to run his routes for him, but Marcus was also barred from the Flowers premises.  Marcus had previously worked for Flowers as a "pull-up" man, which involved on-site stocking of shelves at the client's facilities, was familiar with Porterfield's routes, and had been complimented at one time as the "best pull-up man" the sales manager had ever had.  Flowers had barred Marcus from the premises for videotaping Flowers' freezer at his dad's request. Porterfield was attempting to document his concern about Flowers delivering frozen bread and changing the date on the packages, which he felt was contrary to language in his Agreement regarding "freshly baked product."

On March 23, 2005, after the 10-day "cure" period had expired, Flowers informed Porterfield in writing that it was terminating his distribution route for failure to recover the TSUM account.  Flowers continues to refrain from reselling Porterfield's account, and has been operating the distribution route on his behalf pending the present litigation.

Porterfield's remaining claims under the 2003 Agreement are as follows: (1) breach of contract; (2) negligence; (3) wantonness; and (4) conversion.[3]  The Court will discuss them in turn below.

## DISCUSSION

### I. Motion for Summary Judgment

### A. Breach of Contract Claim (Count One)

Porterfield argues that Flowers breached the terms of their Agreement by: (1) forcing him

---

[3]See *supra* notes 1-2.

to deliver frozen product as opposed to "fresh baked product" as defined in the Distribution

Agreement; and (2) wrongfully terminating his contract. Porterfield gives several potential

reasons for his wrongful termination: that Flowers sought to convert his route when its potential

value increased, that Porterfield was complaining too much about the lack of "fresh" versus

frozen product available for distribution, and that Flowers desired to obtain greater profits by

running the route in-house. Flowers denies any breach and argues that it properly terminated

Porterfield under the Agreement's terms as follows:

First, Flowers argues that its clients recognize that freezing the product simply suspends

its shelf life, that bread product frozen for 2-3 months or less is still "fresh" by industry

standards, and that, indeed, this is Flowers' way of diligently servicing its customers'

unexpected needs. Flowers insists that its practice of altering the expiration dates on previously

frozen bread product is simply to avoid confusion; although Flowers does not typically forewarn

its customers of this practice, many of them are aware of it. Frozen bread product only accounts

for approximately 1 percent of its total production, is only used in cases of emergencies where

demand unexpectedly rises, and only pertains to buns delivered to its restaurant clients, not

grocery stores.

Second, Flowers argues that it barred Porterfield from the premises because he threatened

area sales manager Grady Messer ("Messer"), and that it ultimately terminated Porterfield's

contract under Section 16.3 of the Agreement because of his inability to cure the alleged TSUM

breach within ten (10) days. The evidence is unclear whether the alleged TSUM breach was the

sole cause of Porterfield's termination or the culmination of a history of significant performance

problems. (Pl.'s Br. in Opp. (Doc #46) at 18-19.)

To prevail on a claim for breach of contract, the "plaintiff must establish: (1) the existence of a valid contract binding on the parties; (2) his own performance under the contract; (3) the defendant's non-performance under the contract; and (4) resulting damages." *State Farm Fire and Cas. Co. v. Larry Williams, et. al.*, 926 So. 2d 1008, 1013 (Ala. 2005). Flowers argues that the undisputed facts show that (1) Porterfield breached the contract by failing to perform; (2) Flowers didn't breach the contract, but rather exercised reasonable diligence in freezing product for emergency situations; (3) that any damages regarding "out-of-code" product are totally speculative; and (4) Plaintiff's use of frozen product during his 1994 and 2000 Distributorship Agreements, and subsequent purchase of the 2003 Agreement with full knowledge of Flowers' use of frozen product, estops him from bringing a breach of contract claim.

The validity of the Distribution Agreement is undisputed. The Court finds material issues of genuine dispute as to the other three prongs. Because Porterfield alleges two different theories with respect to Flowers' breach, freezing product and wrongful termination, the Court will address them in turn.

### i. Breach by serving frozen, "out of date" product

First, Porterfield alleges that Flowers breached the contract by providing frozen product, instead of "freshly baked product" as defined by the Agreement. Specifically, Porterfield claims that Flowers was obligated under the § 6.1 to "use its best efforts to manufacture and deliver to [Porterfield] sufficient quantities of Products," whereas "Products" are defined in § 2.2 as "fresh baked goods." (Agreement at §§ 2.2, 6.1.) By forcing Porterfield to occasionally distribute frozen goods to its restaurant customers, Porterfield argues that Flowers violated this obligation, and thus materially breached the terms of the Agreement. Flowers argues that summary

judgment is due on this issue because: (1) their provision of frozen product is in fact the exercise of "reasonable diligence" to meet customer needs; (2) Porterfield's claim of breach is estopped because he has continued to distribute frozen bread on occasion since the mid-1990's and because he purchased the new distribution route in 2002 knowing full well that frozen product would occasionally be provided; and (3) Porterfield's claims are barred because his damages are speculative. The Court need not decide arguments (1) and (2) because it finds that Porterfield's claim of breach, to the extent that it is based on Flowers' provision of frozen product, is barred because his alleged damages are speculative. To the extent, therefore, that Porterfield seeks damages from Flowers for providing him with allegedly "out-of-date" product, Flowers' Motion for Summary Judgment is due to be GRANTED, for the following reasons.

Flowers argues that Porterfield's claimed damages due to frozen product were speculative, since he had testified that "his only potential loss on delivery of product out of the freezer would be if he had to pick up the unused product from the customer," and he had not produced evidence that he had any product returned from a customer. (Def's Br. in Support of Motion for Summary Judgment (Doc. #36) at 27; Def's Reply (Doc. #50) at 17-18. Flowers also rejects Porterfield's second argument for damages, that he seeks to recover for the contingency that he might one day be sued by a former restaurant customer for having provided them with frozen product, as "contrary to the law in the State of Alabama and . . . so hypothetical in nature as to border on the non-sensical." (Def.'s Reply at 17 (citing *Ricwil, Inc. v. S.L. Pappas and Company, Inc.*, 599 So. 2d 1126 (Ala. 1992))).

By Porterfield's own admission, he received full credit for delivering frozen product as well as "fresh" product, and he has produced no evidence that, upon delivering such product to

those accounts, he ever lost customers or money in any way. (Porterfield Depo. 205:19-208:14).

Porterfield admits that he has refused frozen product in the past, without receiving a breach of

contract letter. (Porterfield Depo. 214: 1-11). In short, Porterfield has provided no evidence that

he has suffered any actual damages as a result of being provided frozen bread by Flowers - all

evidence of damages provided so far have been as a result of the termination of his contract.

　　　　To the extent that Porterfield seeks contract damages based on potential future liability

for having distributed frozen product under duress, such damages are speculative. Flowers is

correct in that "'[t]he uncertainty which prevents a recovery is uncertainty as to the fact of the

damages and not as to its amount.'" (Def.'s Reply at 17 (quoting *Ricwil* at 1132)). If Porterfield

were solely seeking damages to protect against the possibility of future liability for having

provided frozen product, his breach of contract claim would fail. Such concerns are better

resolved at a time when an actual suit is brought against Porterfield, through the principles of

joinder and third party practice. See generally FED. R. CIV. P. 14, 19. To the extent that

Porterfield seeks compensation for actual losses incurred during his distributorship due to being

"forced" to provide frozen bread, he has provided no evidence thereof, nor even alleged that they

exist. Because Porterfield has failed to show any damages beyond mere speculation, therefore,

summary judgment on Porterfield's breach of contract claim, to the extent that it alleges a

violation via  provision of "out-of-date" frozen product,  is due to be GRANTED.

　　　　Defendants wish to strike ¶ 6 of Porterfield's affidavit, where he states that if he did not

deliver frozen goods as instructed he would be terminated, on grounds that it is "speculative, a

bald conclusion and based on a hypothetical." (Motion to Strike (Doc. #52) at 3.) Because, as

discussed above,  the Court finds summary judgment is due to be granted on the frozen goods

issue on grounds which do not require consideration of this statement, this part of Defendant's Motion to Strike is DENIED as moot.

### ii. Breach by wrongfully terminating the contract

To the extent Flowers breached the Agreement by wrongfully terminating the contract, (as opposed to the frozen product breach claim), Porterfield has sufficiently alleged, for purposes of summary judgment, genuine disputes of material fact as to each parties' performance as well as to the nature and extent of the financial damages suffered through loss of his exclusive distribution rights to the territory. In other words, Porterfield has produced sufficient evidence such that, given all facts and inferences in his favor, a reasonable jury could find for him. The Court will discuss each prong in turn below.

### 1. Porterfield's performance

With respect to Porterfield's performance, material issues of genuine dispute remain as to (1) whether Porterfield originally breached the Agreement; and (2) whether Porterfield ultimately cured his breach within the ten-day period. Section 5.1 of the Agreement requires Porterfield to use his "best efforts to develop and maximize the sale of COMPANY's Products in accordance with" baking industry standards. (Doc. #17-4). Similarly, § 6.1 requires Flowers to use "its best efforts to manufacture and deliver to [Porterfield] sufficient quantities of Products to supply Outlets . . . ." *Id.*

Whether Porterfield abided by the Agreement by using his "best efforts" hinges upon several genuine disputes of material fact. First, there is the question of whether Porterfield's

failure to call Flowers or a fellow distributor when his truck broke down[4] constituted the type of

material breach due to "failure of performance" that warranted a 10-day breach letter. "Good

industry practice," held in § 5.1 to be the standard of Porterfield's performance, is defined as the

following:

> Good Industry Practice . . . [s]hall mean the standards that have developed and are
> universally accepted and followed in the baking industry, including, but not limited
> to, maintaining an adequate and fresh supply of Products in all Outlets, properly
> rotating all Products, promptly removing all stale Products, maintaining proper
> service and delivery to all Outlets requesting service except those proven consistently
> to be unprofitable, and maintaining all equipment in a sanitary condition and in good
> safe working order.

(Doc. #17-4 at 3.)

If Porterfield exercised the diligence "universally accepted and followed" in the baking industry

to maintain his truck "in good safe working order" and to "maintain[] proper service and

delivery" to the TSUM Account (assuming that it was profitable), then he arguably exercised his

"best efforts" under the Contract, and therefore did not fail to perform under the Agreement.  On

the other hand, reasonable minds might conclude, as Flowers did, that Porterfield's failure to

make *any* effort to use his cell phone and contact someone for help once his truck broke down

could *not* constitute "best" efforts.  Evaluation of Porterfield's actions that day is precisely the

role for which the jury was designed.

Second, even if Porterfield's breach were undisputed, there is a genuine question of

---

[4]There seems to be some question as to whether Porterfield's truck actually broke down
in the first place.  Flowers points to son Marcus Porterfield's deposition in which he, although
unclear as to when he was dropped off by his father, could not recall the truck breaking down.
Although this issue may or may not become a material issue at trial, it is unnecessary at the
summary judgment stage, where the Court properly infers the facts in Porterfield's favor, and
where there are several other genuinely disputed material facts to preclude summary judgment.
For purposes of this analysis, therefore, the Court properly assumes that Porterfield had a faulty
memory or was dropped off before the truck, in fact, broke down.

material fact as to whether Porterfield effectively "cured" his breach with respect to the TSUM account.  Porterfield's 10-day breach letter required him to either "(a) [o]btain[] permission to resume servicing [the account] or (b) mak[e] satisfactory alternative arrangements for providing service to [the account]." (Def.'s Exh. 3 (Doc. #15-6).)  After several unsuccessful attempts to recover the TSUM account, Porterfield claims that the TSUM manager eventually allowed Porterfield to resume his deliveries, although she stated she would begin receiving deliveries from another company at the same time. (Porterfield Affid. (Doc. #48-7) at ¶ 11; Doc. #37-4 at 96; Doc. #37-7 at 15.)  Whether this partial resumption of service to the account constitutes a cure of the breach is a genuinely disputed issue of material fact precluding summary judgment.

A third material and disputed fact is whether Porterfield threatened Messer or not.  In the absence of a threat, Flowers arguably failed to give Porterfield any meaningful chance to cure his breach when they prevented him and his son Marcus from accessing the warehouse.  Flowers has produced testimony that Porterfield threatened Messer, whereas Porterfield testifies that he has never threatened Messer in his life, although he did call him a "racist." (Porterfield Affid. (Doc. #48-7) at  ¶¶ 13-14.)  If the other inferences in Porterfield's favor establish that he did not breach his contract when his truck broke down, or that he effectively cured the breach, then Flowers' remaining defense is that he threatened an employee.  If no such threat occurred, then a jury could find that Porterfield never committed any breach of the Agreement, satisfying this prong of his breach of contract claim.

With respect to Porterfield's performance, Flowers moves to strike two paragraphs, ¶¶ 9 and 1, in Porterfield's affidavit as contradictory, or "sham" testimony.  As discussed below, the court finds that these motions are due to be DENIED as moot and DENIED, respectively.

First, Flowers moves to strike ¶ 9 of Porterfield's affidavit on grounds, *inter alia,* that it is a contradictory, or "sham" affidavit. In ¶ 9, Porterfield discusses how any attempt to contact others to pick up the bread would have been futile, given the timeframe involved. Flowers argues this completely contradicts his deposition testimony, where he repeatedly states that he forgot all about his route once the truck broke down. In response, Porterfield points to other portions of his deposition, left unquoted by Flowers, in which he discusses how the timeframe would have made such efforts futile.

The "sham affidavit" concept arises when there is a clear inconsistency between factual assertions in an affidavit submitted in conjunction with a motion for summary judgment and prior deposition testimony. The Eleventh Circuit has developed a standard by which to determine when certain testimony's contradictory nature renders it inappropriate for consideration as creating a genuine issue of material fact. In this circuit, "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v, U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir. 1984). Before disregarding an affidavit, therefore, a court must find some inherent inconsistency between the affidavit and deposition. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987). It is the inherent inconsistency which renders the subsequent affidavit a "sham." *See Van T. Junkins*, 736 F.2d at 657.

The "sham" issue here is a subtle one. Reconciling Porterfield's testimony in the most favorable light for purposes of summary judgment, Porterfield never testifies that he knew *at the time his truck had broken down* that attempts to call others would be futile; therefore, his claims

that such attempts were futile does not directly contradict his testimony that he never considered calling. He simply states that he forgot all about his route, and additionally states in both affidavit and deposition testimony that, had he tried, it wouldn't have made any difference.

Interpreting his testimony in this manner, however, presents a secondary problem of relevance. Porterfield's actions when the truck broke down is crucial to the issue of his performance under the contract. Porterfield's testimony that, in retrospect, any call for help would ultimately have been futile, however, is irrelevant to whether Porterfield nevertheless should have tried in the first place. In other words, if Porterfield's affidavit testimony had suggested that he *did* consider it at the time, but made a reasoned judgment call that it would have been futile, then he arguably used his best efforts, but the testimony would flatly contradict his prior deposition testimony and should be struck under *Van T. Junkins*. If on the other hand, the affidavit testimony can be interpreted to suggest that he didn't consider calling, but claims now that it would be futile, then it wouldn't be struck under *Van T. Junkins*, but is immaterial and irrelevant to whether he truly used his "best efforts" when his truck broke down. Porterfield's performance under the contract, in terms of breach and cure, is still disputed no matter how this testimony is interpreted. A reasonable jury may or may not find that failure to call, either out of measured decision or complete oversight, is a breach; the issue is disputed either way. The Court therefore chooses not to consider this testimony in its summary judgment analysis, and DENIES this part of the Motion to Strike as moot.

Second, Flowers moves to strike ¶ 1 of the Porterfield affidavit as contradictory, where he states that the TSUM manager told him he "could resume [his] deliveries and she also said she would begin receiving deliveries from another bread company at the same time . . . ." (Porterfield

Aff. ¶ 1.)  Flowers argues that this flatly contradicts deposition testimony where he admitted that "I discussed that I had lost the Sodexho account and I tried to get it back, and I didn't." (Motion to Strike (Doc. #52), at 5 (*quoting* Porterfield Dep. 42:14-21).)  In response, Porterfield argues that the referenced comment recounted a conversation between him and an employee at a certain point in time, whereas the affidavit explains the actual events that took place.  That Porterfield did not explain the details to the employee doesn't contradict his later, more detailed explanation. Porterfield also points to excerpts in the previous deposition that repeat his claim that he partially recovered the TSUM account.  The Court agrees.  The two testimonies do not compel a finding of "inherent contradiction" as much as a mere discrepancy of detail.  For purposes of summary judgment, the Court finds that the Defendant's Motion to Strike ¶ 1 is due to be DENIED.

### *2. Flowers' nonperformance*

Porterfield alleges that Flowers breached, or failed to perform, by terminating his contract in violation of the terms of his Agreement.  There seems to be no dispute involved with respect to the procedures Flowers used to terminate Porterfield; instead, Porterfield claims that he fully performed under the Agreement and therefore gave Flowers no contractually justifiable reason to terminate him.  The question of Flowers' performance under the Agreement, therefore, hinges upon Porterfield's performance, and is thus subject to all of the disputed facts discussed *supra* in Part I.A.ii.1.

Flowers moves to strike ¶¶ 12 and 16 of Porterfield's affidavit as inadmissible speculation and assumption of another's motives.  The court finds these motions are due to be DENIED as moot in part and DENIED in part, as discussed below.

First, Defendants wish to strike ¶ 12, where Porterfield predicts an increase in profits and

deliveries on his route and states that Flowers was aware of the two store arrivals, as "inadmissible speculation." *Id.* at 5-6. Flowers' knowledge of the route's potential profit is irrelevant for purposes of summary judgment, because the dispositive issue is *whether* Flowers breached the contract, not *why*. Because an examination of Flowers' intentions is neither necessary nor helpful to its summary judgment analysis, the Court chooses not to consider this testimony and DENIES the motion to strike this paragraph as moot.

Second, Defendants wish to strike ¶ 16 of the affidavit, arguing that Porterfield's claims that his son Marcus was banned from the warehouse and "thus prevented from running my route," and that "it was clear to [Porterfield] that Flowers was going to mak[e] it impossible for [him] to run [his] route" were contradictory. Specifically, they contradict Porterfield's deposition, where he admits that son Marcus was banned for videotaping the freezer upon his instruction. (Porterfield Depo. at 314:23-316:17.) Flowers also argues that Porterfield's latter statement should be struck because it speculates as to Flowers' motives. *Id.* at 6 (*citing Wadsworth v. Nalco Chemical Co.*, 523 F. Supp. 977, 1000 (N.D. Ala. 1981), *aff'd*, 679 F.2d 251 (11th Cir. 1982)). Again, to the extent that these statements may be viewed as speculation regarding Flowers' intentions, they are irrelevant to the Court's summary judgment analysis of Porterfield's breach of contract claim, and thus the motion to strike is DENIED as moot. Otherwise, the testimony merely states facts based on personal knowledge: Flowers prevented Marcus from running Porterfield's route. This statement is admissible, and the motion to strike is DENIED.

Flowers also moves to strike ¶¶ 3 and 4 from the affidavit of Charles Morrow, a fellow independent distributor at Flowers. In his affidavit, Morrow testifies that Flowers treated

Porterfield unequally in terms of flexibility with curing breaches, that Messer personally disliked Porterfield, that Messer was angry at Porterfield's complaints about frozen product, and that Messer stated, because of the new store arrivals, that he "was going to find a way to get Henry terminated and get his route back." (Morrow Aff. ¶¶ 3-4.)  For the reasons discussed below, both motions are due to be DENIED as moot.

First, Flowers moves to strike portions of ¶ 3, in which Morrow states that, "as far as [he] know[s]," Flowers "usually works very hard with you to 'cure' the breach and help you resume your deliveries." (*Id.* at ¶ 3.)  Morrow testifies, however, that Porterfield was treated differently, and that "Flowers worked to make sure [Porterfield] would not cure his breach, then they terminated him." (*Id.*)  Morrow had "never heard of another independent contractor being treated like that." (*Id.*)  Flowers moves to strike ¶ 3 as facially speculative, given away by Morrow's words "as far as I know."  (Mot. to Strike Morrow Aff. (Doc. #53) at 2.)  Flowers argues that Morrow gave no "basis for personal knowledge" of its allegation that Flowers didn't help cure Porterfield's breach, an allegation belied by the undisputed fact that Stephens attempted to help Porterfield regain the TSUM account. (*Id.*)  Instead, Flowers contends, Morrow's testimony constitutes bald assumptions of another's motives based on no facts, and most likely hearsay, since it seems to be based on what Morrow has or has not "heard." (*Id.* at 2-3.)  Porterfield responds that Morrow's statements in ¶ 3 are statements of fact "supported by independent facts herein," and that Stephens's alleged attempt to help him regain the account completely ignores his own allegations that Flowers removed him and Marcus from the warehouse in an attempt to remove him from the account. (Pl.'s Response to Def.'s Mot. to Strike at 17.)

Second, Flowers moves to strike ¶ 4 of the Morrow affidavit, in which Morrow states

that, "[f]rom the way Grady Messer acted around . . . Porterfield, [he] knew Messer did not like

him." (Morrow Aff.  at ¶ 4.)  Testifying that this problem began "more than a year ago, around

the time we heard that Publix and Walmart were going to be adding new locations," Morrow

"heard Grady Messer state that he was going to find a way to get Henry terminated and get his

route back." *Id.*  Morrow testifies to knowing that "Grady was angry about Henry complaining

over Flowers making us deliver out of date product . . . .  He said to stop complaining or he

would regret it or words like that." (*Id.*)  Flowers moves to strike ¶ 4 on grounds that Morrow's

assumptions about how Messer would "act" around Plaintiff is not based on any given facts and

is subjective, speculative, and inadmissible. (Def. Mot. To Strike (Doc. #53) at 3.)  Flowers

further argues that any mention of what Messer might have said is hearsay; no party admission

exception applies because Morrow was not an employee but an independent distributor, and that

Messer, by Plaintiff's own admission, was not the decisionmaker regarding Porterfield's contract

termination. (*Id.* (*citing* Def.'s Statement of Material Facts at 26, 59.))  Porterfield responds that

Messer and Morrow are both employee-agents of Flowers,[5] that Messer was heavily involved in

Porterfield's termination process, and thus the hearsay should be admissible under FED. R. EVID.

801(d)(2)(D), *see Rowell v. Bellsouth,* 433 F.3d 794, 800 (11th Cir. 2005), or alternatively

admissible at trial to show intent and motive on the part of Messer and Flowers.

     As discussed above, there are several genuine disputes of material fact with respect to the

---

[5]Porterfield alleges Morrow is in fact an employee, not independent contractor, based on a
pending class action suit between Morrow, et. al., and Flowers, in which Morrow alleges that he
is a de facto employee of Flowers. *See Morrow v. Flowers Foods, Inc.,* No. 3:07cv617.  This
issue, presently pending before another court, is unnecessary for resolution of the motion for
summary judgment, and will neither be considered nor decided upon at this stage of the
proceedings.

performance of both parties under the contract, such that summary judgment on his "wrongful termination" breach of contract claim is due to be denied. The Court's identification of those disputes does not rely on Morrow's affidavit. The claims upon which the Court grants summary judgment similarly rely on grounds that do not depend on any evidence contained in Morrow's affidavit. Because resolution of Flowers' summary judgment motion is achieved without reaching the issue of the admissibility of Morrow's affidavit at this time, the Motion to Strike Morrow's affidavit is DENIED as moot.

### 3. Resulting damages

Unlike his speculative damages claim for having to distribute frozen food, Porterfield's economic and other losses due to termination of his contract are quite real and concrete. The damages that Flowers continuously claims, the "deni[al of] profits, income . . . work . . . [and the] right to receive the product . . ." all arise from the termination of his contract. (Pl.'s Br. in Opposition (Doc. #46) at 30.) The extent of these damages, albeit disputed, are well documented. Indeed, Flowers has been keeping an account of such damages through the operation of Porterfield's route on his behalf. *See* Pl.'s Exh 3 (Docs. # 47-4, 47-5.) That Flowers' accounting may not reflect the true value of the distributorship is a question of contract liability or damages to be argued at trial. The Court holds that Porterfield has sufficiently alleged damages based on termination of his contract to survive summary judgment, and that the extent of such damages, subject to Porterfield's questionable accounting argument, is a disputed issue of material fact to be resolved at a later stage in the proceedings.

Flowers moves to strike ¶ 19 of the affidavit, where Porterfield claims that:

Flowers is intentionally running his route in such a manner, and with such

> questionable and improper accounting practices, so as to ensure my route loses
> money, or at a minimum, to make it appear as though it is losing money through
> the use of false and improper accounting practices.

(Porterfield Aff. ¶ 19.)   Flowers moves to strike this statement as speculatively relying on

assumed motives without any personal basis of knowledge.  This statement refers to Porterfield's

"questionable accounting" theory, which is relevant to his breach of contract claim in terms of

liability and damages.  Like ¶ 16, this statement partially recites facts and partially assumes

motives.

Porterfield has produced accounting statements of his routes to show that it appears his

route is losing money, a prospect he finds questionable in light of the new stores' arrival.

Flowers has not denied that it was aware of the new stores' imminent arrival, although it has

questioned the admissibility of Porterfield's claim that they knew. (Def.'s Motion to Strike at 5-

6.)  To the extent that ¶ 19 is offered to show that a genuine dispute exists as to Flowers'

accounting methods, it is a proper inference derived from the facts in evidence, and the Motion to

Strike is DENIED.  To the extent that ¶ 19 assumes that the allegedly "questionable accounting"

is intentional, the Court reiterates that Flowers' intentions are irrelevant for purposes of summary

judgment for breach of contract, and DENIES the Motion to Strike as moot.

### *iii. Estoppel*

Flowers finally argues that Porterfield should be estopped from suing for breach of

contract because he has been accepting frozen product since the mid-1990's, having bought and

sold two distributorships, and having purchased the third one in 2002 with full knowledge that

Flowers occasionally provides its customers with frozen product.  This argument applies only to

Porterfield's "frozen product" theory of breach, which the Court has already found to contain

speculative damages, and not to the "wrongful termination" theory of breach. *See supra* Part

I.A.i.  Accordingly, it is moot with respect to the former theory, and irrelevant with respect to the

latter.

In sum, the Court finds that summary judgment on Porterfield's contract claim is due to

be GRANTED to the extent that it relies on Flowers' use of frozen product, and DENIED to the

extent that it alleges wrongful termination of his contract.

### iv. After-Acquired Evidence

Finally, Flowers claims that all of Porterfield's damages are barred by the doctrine of

after-acquired evidence.  The after-acquired evidence doctrine holds that if an employer

discovers, in the course of litigation, past conduct by the employee that would have alone

warranted termination had the employer known of it at the time of discharge, then the court may

dismiss claims for reinstatement or front pay, and instead calculate backpay "from the date of the

unlawful discharge to the date the new information was discovered."  *Def. Br.* at 45 (*quoting*

*McKennon v. Nashville Banner Publishing Company,* 513 U.S. 352 (1995)). Defendant claims

that this doctrine has been extended by the Middle District of Alabama to "cases arising in

contract and/or tort." *Id.* (*citing Quillen v. American Tobacco Company*, 874 F. Supp. 1285

(M.D. Ala. 1995)).  Steve Bordeaux, President of Flowers Baking Co., claims in his declaration

that, due to Porterfield's admission of having shorted some of the customer accounts in the past,

Flowers would have terminated the agreement had they known. Therefore, Flowers argues, the

after-acquired evidence doctrine should apply to halt all of Porterfield's damages in contract and

tort. The Court disagrees, and finds the doctrine irrelevant for purposes of summary judgment.

First, the after-acquired evidence doctrine, as applied to an ADEA suit in *McKennon,* has

been historically applied to federal causes of action in the employment context; this Court has

neither found nor been provided with any cases that have definitively extended the doctrine to

issues of state law contract and tort issues.[6]  As Porterfield correctly argues, the *Quillen* court did

not apply the after-acquired evidence doctrine to state law issues of contract and tort.  Instead, the

*Quillen* court  applied it to the plaintiff's Title VII claims in granting summary judgment, and

separately examined the pendent state law claims without applying the doctrine. *Quillen*, 874 F.

Supp. at 1295-96, 1297-99.  Second, assuming the doctrine was extended to the state law issue

surrounding employment, Porterfield is an independent contractor and not an employee;

therefore, Flowers would have to show that the doctrine should be extended further to

independent contractors.  Third and most importantly, the after-acquired evidence doctrine

operates as a partial bar to damages, halting reinstatement and front pay but still allowing

backpay.  As a partial limitation on the calculation of damages and not a defense to liability, any

application of the after-acquired evidence doctrine would be inappropriate at the summary

judgment stage, even if such application were otherwise proper under state law.

## B. Tort Claims:  Negligence (Count Three), Wantonness (Count Four) and Conversion (Count Five)

In addition to his breach of contract claim, Porterfield also alleges various tort claims,

including negligence, fraud, wantonness, and conversion. Having conceded fraud (as well as

---

[6]In *Southern Medical Health Sys. v. Vaughn*, 669 So. 2d 98, 101-02 (Ala. 1995) (Houston, J., concurring specially), Justice Houston alone advocates the extension of *McKennon* to breach of employment cases in Alabama.  The Alabama Court of Civil Appeals has also applied the after-acquired evidence doctrine in the context of a suit against an employer for retaliatory discharge based on the plaintiff's workmen's compensation filing. *Beaulieu of Am. V. Kilgore*, 680 So. 2d 288, 294-95 (Ala. 1996).  Neither of these references amount to a majority extension of *McKennon* and progeny to state law contract and tort claims.

certain damages), the Court is free to examine only the negligence, wantonness and conversion claims.  For the reasons concerning speculative damages discussed in Part A.i., the tort claims regarding "out-of-code" product fail as a matter of law and summary judgment is due to be GRANTED.  Although Porterfield alleges mental anguish and other distress in his tort claims in the Complaint, he has provided no evidence, physical or otherwise, to support any allegation of mental distress due to serving frozen product to his customers. *Compare B & M Homes v. Hogan, 376 So. 2d 667, 672-73* (Ala. 1979); *Rawlings v. Dovenmuehle Mortg., Inc.,* 64 F. Supp. 2d 1156, 1167-68 & n.8 (M.D. Ala. 1999).  The questions of Flowers' tort claims with respect to wrongful termination and "questionable accounting," on the other hand, warrant more analysis.

### i. Tort Claims due to Flowers' "Questionable Accounting"

Flowers asserts that all of Porterfield's tort claims are barred because they are not based on any facts independent from the promises contained in the Agreement, and that  "a mere failure to perform a contract obligation is not a tort when the wrong . . . alleged is within the confines of a contract, and there is no independent legal duty outside the confines of the contract." (Def.'s Br. in Support of Mot. for Summary Judgment at 38 (*citing Cahaba Seafood, Inc. v. Central Bank,* 567 So. 2d 1304 (Ala. 1990)*; Armstrong Bus. Servs. Inc. v. AmSouth Bank,* 817 So. 2d 665 (Ala. 2001)).)  In response, Porterfield argues that while there is no tort liability "for nonfeasance for failing to do what one has promised to do in the absence of a duty to act apart from the promise made," an actor may be subjected to tort liability "for physical harm to persons and tangible things" if the actor engages in "misfeasance, or negligent affirmative conduct in the performance of a promise." (Pl.'s Br. In Opposition (Doc. #46) at 38.)

Porterfield relies on *Morgan v. South Central Bell Telephone Co*. for this "broad

exception" for affirmative misfeasance versus nonfeasance. 466 So. 2d 107 (Ala. 1985).   In

*Morgan*, two periodontists had a contractual relationship with South Central Bell ("SCB") to

place advertisements in the Yellow Pages, the only permanent form of advertising allowed by the

State Board of Dental Examiners at the time. *Id.* at 110.  After SCB repeatedly failed to place

their names in the directory, despite several revisions and corrections to the directory and

repeated requests by the periodontists, the plaintiffs finally sued for fraud, negligence and breach

of contract.  The trial court held that the action for negligence was not supported by the facts. *Id.*

at 114.  The Alabama Supreme Court reversed, holding that the trial court "improperly

characterized defendants' negligence in their performance of contracts entered into with the

plaintiffs as nonfeasance rather than misfeasance." *Id.*  Citing the "broad exception" the Alabama

Supreme Court stated the "general rule of tort law" that:

> one who acts is under a duty to exercise reasonable care to avoid physical harm to
> persons and to property of others and this general duty or obligation would extend to
> parties in bargaining transactions such as sales and service transactions as well as to
> those who are not parties to bargaining transactions. Entering into a bargaining
> transaction, pursuant to which one party promises to do something, does not alter the
> fact that there was a preexisting obligation to act with reasonable care to avoid harm.

*Id.* (*citing* Prosser, *Selected Topics in the Law of Torts*, 655, at 655-667 (1984).  The *Morgan*

court held that, although the parties had a contractual relationship, the circumstances of that

contract,  "where plaintiffs were clearly dependent on the Yellow Pages as their only form of

advertisement, defendants were aware of [plaintiffs'] dependency, and though undertaking to

perform the contract, did so in such a negligent and slipshod manner that plaintiff Morgan's

name was omitted from the Yellow Pages four times in succession," clearly warranted tort

liability. *Id.*

Applying *Morgan*, Porterfield argues that "Flowers went beyond the contract when it began using questionable and fraudulent accounting practices in running Plaintiff's route." (Pl.'s Br. in Opposition at 39.)  According to Porterfield's complaint, such "questionable accounting" took the form of "unnecessary costs and expenses" which Flowers "intentionally" imposed in order to "show a loss on his route [and] suppress its fair value." *Id.* at 40.  This Court finds the *Morgan* case to be distinguishable.

The Alabama Supreme Court has recognized that "the line of distinction between actions in tort and [actions in] contract is thin and often nebulous in many instances." *Ex Parte Certain Underwriters at Lloyd's of London,* 815 So. 2d 558, 563 (Ala. 2001).  The *Lloyd's* court outlined the general rule as follows:

> [I]f there is [a] failure or refusal to perform a promise the action is in contract; if there is a negligent performance of a contractual duty or the negligent breach of a duty implied by law, *such duty being not expressed in the contract,* but arising by implication of law from the relation of the parties created by the contract, the action may be either in contract or [in] tort. In the latter instance, whether the action declared is in tort or [in] contract must be determined from the gist or gravamen of the complaint. Basically the line of division between [an action in contract and an action in] tort in such instances is [the line between] nonfeasance and misfeasance. If there is a defective performance there is a breach of contract and [there may also be] a tort.

*Id.* (internal citations and quotations omitted) (emphasis added).

Several cases have articulated this rule with the following oft-quoted analogy:

> For instance, if the declaration allege the hiring of a horse to ride to a certain place, and that the defendant rode him so immoderately that he died, this would be [tort]; for the contract of hiring imposed upon him the [independent] duty to ride in reason, or not unreasonably fast; but if the declaration alleged the hiring, *and that he promised to ride with reasonable speed,* but not regarding his promise he rode the horse immoderately, whereby he died, the action may be considered [contract].

*Wilkinson v. Moseley,* 18 Ala. 288 (1850); *see e.g., Garig v. East End Mem. Hosp.*, 182 So. 2d 852

(Ala. 1966).

This analogy seems instructive in our case. Section 16.4 of the Agreement, entitled "Actions Following Termination," provides in relevant part that upon termination via breach of the Agreement, Flowers, "within the limits of its ability to do so, will operate the business for the account of [Porterfield], deducting its *reasonable* expenses in connection with the operation thereof" until the distributorship is sold to another contractor. (Agreement (Doc. #17-4) at 9 (emphasis added).)  As with the *Wilkinson* analogy, if the contract had provided solely that Flowers would, upon termination, "operate the business for the account of Porterfield," then an independent duty, fiduciary or otherwise, might give rise to an action in tort as well as contract. In this case, however, the provision specifies that Flowers is to "deduct its *reasonable* expenses in connection with the operation thereof." *Id.* (emphasis added)  The "gist or gravamen," *Lloyd's* at 563, of Porterfield's complaint with respect to questionable accounting is that Porterfield was "wantonly taxed and/or charged with unnecessary costs and expenses associated with Defendant prohibiting Plaintiff from servicing his exclusive customers . . . ." (Complaint at ¶ 22.)  Put simply, the expenses that Flowers is deducting under § 16.4 of the Agreement are not "reasonable" but instead are designed to suppress the value of the distribution route.  Like the horseman's promise to "ride with reasonable speed," this is a duty set forth in the Agreement, and therefore only a contract action should lie.

The *Morgan* case is not at odds with this precedent, but may be easily distinguished.  In *Morgan*, the plaintiffs and defendants had a simple agreement to list plaintiffs' names in the directory.  The opinion mentions no additional promises to, for example, reasonably cure mistakes or to promptly correct errors and omissions. *See Morgan*, 466 So. 2d at 110.  Here, the

Agreement at issue promises not just to take over the account and deduct expenses, but to deduct "reasonable expenses." Any claim that Flowers breached its duty to refrain from imposing unnecessary or unreasonable expenses, therefore, alleges a violation of a *contractual* duty. Accordingly, summary judgment with respect to Porterfield's negligence, conversion, and wantonness claims, to the extent they are grounded in Flowers' alleged engagement in "questionable accounting," is due to be GRANTED. This does not, however, necessarily preclude Porterfield from providing evidence of "questionable accounting" to the extent such evidence may be relevant in the context of damages for his breach of contract claim.

### ii. Tort Claims with respect to Wrongful Termination

Besides questionable accounting and provision of "out of date" product, Porterfield also asserts wrongful termination as a ground for his negligence, conversion and wantonness claims. Specifically, Defendant "negligently failed to abide by the terms of its agreement with [Porterfield] by . . . usurping [Porterfield's] duties and obligations under the contract . . . ." (Complaint at ¶ 19.) Plaintiff was also "wantonly denied his rights under the Distributor's Agreement, [and] was wantonly denied the ability to deliver product to his exclusive territory." (Complaint at ¶ 22.) Finally, Defendant "converted to its own use the exclusive territory, as set forth and described in [the Agreement] . . . and prohibited Plaintiff from servicing said customers." (Complaint at ¶ 26.) These duties also fall within the rights and obligations set out in the Agreement, and summary judgment for the tort claims are due to be GRANTED. A particularly instructive case is *Elizabeth Homes, L.L.C. v. Cato*, 2007 Ala. LEXIS 66 (Ala. April 13, 2007).

In *Elizabeth Homes,* the defendant home builders ("Elizabeth Homes") appealed the trial

court's denial of a motion to compel arbitration of claims asserted against them by the home buyers ("Catos"), seeking damages for both contract and tort claims. *Elizabeth* at *2. Defendants argued that the Catos were attempting to "circumvent the contract and its arbitration provision by couching their complaint in terms of tort and implied contract" while being "careful to avoid any mention of the [Purchase] Agreement in their complaint." *Id.* at *17 (internal citations omitted). The Catos responded that they had "simply elected to 'forgo' claims under the contract to 'avoid arbitration.'" *Id.* The Alabama Supreme Court reversed the trial court and remanded to compel arbitration, finding that the defendants had met their burden in supporting their motion to compel, namely that the claims arose under the arbitration provision. *Id.* at *27-*28.

The court analyzed the nature of the Cato's cause of action by looking "to allegations in the body of the complaint, not the caption or label the party applies." *Id.* at *18 (citations and quotations omitted). The court stated that the "substance of the plaintiff's allegations control, not the effort given by the plaintiff to style the claims throughout litigation." *Id.* (*citing Bailey v. Faulkner,* 940 So. 2d 247, 253 (Ala. 2006).

The court held that each claim, even assuming a duty exists, arose from obligations described in the agreement: "While the standard of care to which Elizabeth Homes was required to adhere may have arisen by operation of law . . . , Elizabeth Homes' duty to actually build the house and set the elevation clearly arises under the purchase agreement, which provides the specifications and standards for constructing the house." *Id.* at *23-24. Therefore, any obligation to refrain from acting "negligently or wantonly" in performing such contractual obligations, even if imposed by a source outside the contract, were duties that arose under the contract, and an independent tort action could not be supported. *Id.* at *24. All of the claims appeared to revolve

around "alleged deficiencies in the construction of the house," and "[b]ecause the duty to

construct the house, and the specifications describing that duty, were all imposed by the purchase

agreement," the court refused to conclude that the Catos' claims fell outside of the purchase

agreement or its arbitration provision. *Id.* at *27.

Here, all of Porterfield's claims similarly revolve around rights, obligations, and duties

specified under the Distribution Agreement.  Moreover, Porterfield does not attempt to couch his

claims exclusively in terms of tort; each of the allegations in his Complaint expressly references

either Flowers' negligent or wanton failure to respect the rights and obligations set forth in the

Agreement, or Flowers' conversion of his territory "as set forth and described in [the Agreement]

. . . ." (Complaint at ¶¶ 19, 22, 26.)  To the extent that Porterfield's tort claims are grounded in

his wrongful termination, Flowers owed no other duties with respect to termination of the

contract other than those contractual duties arising from the Agreement.  Section 16.1

("Performance") provides that Flowers shall not terminate the contract, "provided [Porterfield]

faithfully carries out the terms [t]hereof." (Agreement (Doc. #17-4) at 9.)  In the event of a

breach, the Agreement sets out two categories—curable and non-curable—and describes the

consequences of each. Agreement (Doc. #17-4) at 9, §§ 16.2, 16.3.[7]  Upon termination of the

contract under § 16.2 or § 16.3, § 16.4 sets out the appropriate post-termination actions to be

taken regarding the account.  Any claim by Porterfield that Flowers negligently or wantonly and

wrongfully terminated his contract is necessarily a claim that the provisions of the contract

specifying the termination procedures were violated.  Summary judgment for Flowers with

---

[7]Unfortunately, the Agreement fails to sufficiently define what constitutes an effective "cure," a disputed issue of material fact that will have to be determined at trial.

respect to Porterfield's tort claims for wrongful termination is therefore due to be GRANTED.

As far as Porterfield's tort claims with respect to conversion, they are simply another way of stating his claim as a tort. Essentially, Porterfield claims that Flowers converted his territory to its own use, depriving him of the ability to service the territory and of the consequent profits from such service. In his conversion claim, Porterfield also mentions the "lost revenues and profits" and "unnecessary and burdensome expenses and costs" as a "proximate result of Defendant's wantonness." (Complaint at ¶ 28.) In other words, Porterfield has taken his wrongful termination claim and his "questionable accounting" claim and amalgamated them into the conversion claim. For the reasons discussed above, any rights, duties and obligations of the parties relevant to Porterfield's termination or to the "reasonable" financial administration of the account on Porterfield's behalf arise from the contractual duties set forth in the Agreement. Summary judgment for Flowers with respect to Porterfield's conversion claim is therefore also due to be GRANTED.

## CONCLUSION

For all of the reasons set forth above, it is hereby ORDERED that:

(1) Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part as follows:

> (a) Defendant's Motion for Summary Judgment for Breach of Contract (Count One) with respect to serving frozen, "out of date" product is GRANTED on grounds of speculative damages, and judgment is entered in favor of Flowers and against Porterfield on that claim.

(b) Defendant's Motion for Summary Judgment for Breach of Contract (Count One) with respect to wrongful termination is DENIED.

(c) Defendant's Motion for Summary Judgment as to Count Two (misrepresentation) is GRANTED, as conceded by Plaintiff.

(d) Defendant's Motion for Summary Judgment as to Counts Three (negligence), Four (wantonness) and Five (conversion) is GRANTED, although arguments with respect to allegedly questionable accounting are relevant for purposes of the breach of contract claim.

(2) Defendant's Motion to Strike Portions of Porterfield's affidavit are DENIED as moot in part and DENIED in part as follows:

(a) ¶¶ 6, 9, and 12 of Porterfield's Affidavit are DENIED as moot.

(b) Defendant's Motion to Strike ¶¶ 1 and 16 of Porterfield's Affidavit is DENIED. To the extent that ¶ 16 speculates as to Flowers' motives, it is DENIED as moot.

(c) Defendant's Motion to Strike ¶ 19 of Porterfield's Affidavit is DENIED in part, and DENIED in part as moot.

(3) Defendant's Motion to Strike ¶¶ 3 and 4 of Morrow's Affidavit is DENIED as moot.

DONE this the 12th day of December, 2007.

_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE